Case No. 23-2030

———————————————————————————————————————————

# UNITED STATES COURT OF APPEALS

# FOR THE FIRST CIRCUIT

—————————

LISA MENNINGER,

*Plaintiff-Appellee*,

v.

PPD DEVELOPMENT, L.P.,

*Defendant-Appellant,*

—————————

On Appeal from a Judgement of the
United States District Court for the District of Massachusetts
Docket No. 1:19-cv-11441-LTS
—————————

## JOINT APPENDIX

## Volume I (JA1 - JA2181)

Douglas Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4600
Douglas.Hallward-
Driemeier@ropesgray.com

John Bueker
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000
John.Bueker@ropesgray.com

Dated: April 8, 2024

*Attorneys for the Defendant-Appellant*

# TABLE OF CONTENTS

**Contents**                                                                  **Page(s)**

## VOLUME I

District Court Docket ...................................................................................JA1

Complaint and Demand for Jury Trial, dated
    July 28, 2019 [Dkt. 1] ........................................................................JA25

Affidavit of Chris Fikry, dated March 24, 2021 [Dkt. 51] ..........................JA55

Order on PPD's Motion for Summary Judgment and
    Menninger's Motion to Strike, dated
    March 22, 2022 [Dkt. 81] ..................................................................JA63

PPD Trial Brief, dated March 10, 2023 [Dkt. 114] ....................................JA84

Menninger Trial Brief, dated March 10, 2023 [Dkt. 118] ..........................JA139

Charge to the Jury, dated March 30, 2023 [Dkt. 145] ................................JA167

Response to Court Order, dated March 30, 2023 [Dkt. 147]......................JA202

Jury Verdict, dated March 31, 2023 [Dkt. 149]..........................................JA204

Trial Transcript Day 1, dated March 31, 2023 [Dkt. 151]..........................JA209

Trial Transcript Day 2, dated March 31, 2023 [Dkt. 152]..........................JA299

Trial Transcript Day 3, dated March 31, 2023 [Dkt. 153]..........................JA404

Trial Transcript Day 4, dated March 31, 2023 [Dkt. 154]..........................JA558

Trial Transcript Day 5, dated March 31, 2023 [Dkt. 155]..........................JA716

Trial Transcript Day 6, dated March 31, 2023 [Dkt. 156]..........................JA872

Trial Transcript Day 7, dated March 31, 2023 [Dkt. 157]..........................JA1130

i

Trial Transcript Day 8, dated March 31, 2023 [Dkt. 158]...........................JA1394

Trial Transcript Day 9, dated March 31, 2023 [Dkt. 159]..........................JA1553

Trial Transcript Day 10, dated March 31, 2023 [Dkt. 160]........................JA1731

Defendant's Combined Memorandum of Law in support
    of Renewed Motion for Judgement,
    dated June 9, 2023 [Dkt. 181]............................................................JA1869

Plaintiff's Opposition to Defendant's Post-Trial Motion,
    dated July 7, 2023 [Dkt 186] ............................................................JA1914

Defendant's Reply in Support of Renewed Motion,
    dated July 28, 2023 [Dkt. 189] .........................................................JA1972

Trial Exhibit 14 ......................................................................................JA2000

Trial Exhibit 17 ......................................................................................JA2001

Trial Exhibit 18 ......................................................................................JA2002

Trial Exhibit 19 ......................................................................................JA2114

Trial Exhibit 20 ......................................................................................JA2120

Trial Exhibit 21 ......................................................................................JA2130

## VOLUME II

Trial Exhibit 23 ......................................................................................JA2182

Trial Exhibit 24 ......................................................................................JA2256

## VOLUME III

Trial Exhibit 25 ......................................................................................JA2297

Trial Exhibit 26 ......................................................................................JA2357

Trial Exhibit 27 ....................................................................................... JA2395

Trial Exhibit 33 ....................................................................................... JA2577

Trial Exhibit 35 ....................................................................................... JA2579

Trial Exhibit 41 ....................................................................................... JA2581

Trial Exhibit 47 ....................................................................................... JA2582

Trial Exhibit 48 ....................................................................................... JA2586

Trial Exhibit 49 ....................................................................................... JA2589

Trial Exhibit 50 ....................................................................................... JA2590

Trial Exhibit 57 ....................................................................................... JA2594

Trial Exhibit 58 ....................................................................................... JA2606

Trial Exhibit 59 ....................................................................................... JA2615

Trial Exhibit 60 ....................................................................................... JA2625

Trial Exhibit 62 ....................................................................................... JA2628

Trial Exhibit 67 ....................................................................................... JA2632

**VOLUME IV**

Trial Exhibit 68 ....................................................................................... JA2638

Trial Exhibit 69 ....................................................................................... JA2642

Trial Exhibit 70 ....................................................................................... JA2647

Trial Exhibit 73 ....................................................................................... JA2656

Trial Exhibit 74 ....................................................................................... JA2662

Trial Exhibit 75 ........................................................................................ JA2664

Trial Exhibit 76 ........................................................................................ JA2665

Trial Exhibit 80 ........................................................................................ JA2666

Trial Exhibit 87 ........................................................................................ JA2667

Trial Exhibit 90 ........................................................................................ JA2686

Trial Exhibit 106 ...................................................................................... JA2688

Trial Exhibit 109 ...................................................................................... JA2705

Trial Exhibit 115 ...................................................................................... JA2709

Trial Exhibit 118 ...................................................................................... JA2720

Trial Exhibit 119 ...................................................................................... JA2725

Trial Exhibit 121 ...................................................................................... JA2730

Trial Exhibit 124 ...................................................................................... JA2732

Trial Exhibit 125 ...................................................................................... JA2736

Trial Exhibit 126 ...................................................................................... JA2738

Trial Exhibit 132 ...................................................................................... JA2743

Trial Exhibit 136 ...................................................................................... JA2756

Trial Exhibit 139 ...................................................................................... JA2769

Trial Exhibit 141 ...................................................................................... JA2774

Trial Exhibit 142 ...................................................................................... JA2777

Trial Exhibit 144 ...................................................................................... JA2779

Trial Exhibit 146 ........................................................................... JA2784

Trial Exhibit 148 ........................................................................... JA2785

Trial Exhibit 154 ........................................................................... JA2787

Trial Exhibit 157 ........................................................................... JA2788

Trial Exhibit 167 ........................................................................... JA2792

Trial Exhibit 172 ........................................................................... JA2797

Trial Exhibit 174 ........................................................................... JA2804

Trial Exhibit 176 ........................................................................... JA2809

Trial Exhibit 180 ........................................................................... JA2815

Trial Exhibit 182 ........................................................................... JA2819

Trial Exhibit 186 ........................................................................... JA2825

Trial Exhibit 192 ........................................................................... JA2829

Trial Exhibit 194 ........................................................................... JA2833

Trial Exhibit 197 ........................................................................... JA2838

Trial Exhibit 200 ........................................................................... JA2845

Trial Exhibit 201 ........................................................................... JA2848

Trial Exhibit 213 ........................................................................... JA2853

Trial Exhibit 229 ........................................................................... JA2856

Trial Exhibit 231 ........................................................................... JA2859

Trial Exhibit 233 ........................................................................... JA2861

Trial Exhibit 242 ........................................................................... JA2862

Trial Exhibit 244 ........................................................................... JA2866

Trial Exhibit 245 ........................................................................... JA2868

Trial Exhibit 261 ........................................................................... JA2871

Trial Exhibit 265 ........................................................................... JA2879

Trial Exhibit 271 ........................................................................... JA2880

Trial Exhibit 277 ........................................................................... JA2883

Trial Exhibit 290 ........................................................................... JA2887

Trial Exhibit 291 ........................................................................... JA2889

Trial Exhibit 300 ........................................................................... JA2894

Trial Exhibit 301 ........................................................................... JA2899

Trial Exhibit 320 ........................................................................... JA2903

Trial Exhibit 332 ........................................................................... JA2907

Trial Exhibit 333 ........................................................................... JA2911

Trial Exhibit 338 ........................................................................... JA2912

Trial Exhibit 350 ........................................................................... JA2918

Trial Exhibit 366 ........................................................................... JA2923

Trial Exhibit 373 ........................................................................... JA2925

Trial Exhibit 378 ........................................................................... JA2926

Trial Exhibit 392 ........................................................................... JA2929

Trial Exhibit 394 ........................................................................... JA2933

Trial Exhibit 405 ........................................................................... JA2940

Trial Exhibit 433 ........................................................................... JA2943

Trial Exhibit 450 ........................................................................... JA2946

Trial Exhibit 454 ........................................................................... JA2959

Trial Exhibit 455 ........................................................................... JA2960

Trial Exhibit 456 ........................................................................... JA2961

Trial Exhibit 460 ........................................................................... JA2969

Notice of Appeal, dated November 29, 2023 [Dkt. 195]............................ JA2972

CERTIFICATE OF SERVICE

### *1:19cv11441, Menninger V. Ppd Development, L.P.*

US District Court Docket

United States District Court, Massachusetts

(Boston)

**This case was retrieved on 03/11/2024**

## Header

**Case Number:** 1:19cv11441
**Date Filed:** 06/28/2019
**Assigned To:** District Judge Leo T. Sorokin
**Nature of Suit:** Americans with Disabilities - Employment (445)
**Cause:** Americans with Disabilities Act
**Lead Docket:** None
**Other Docket:** USCA - First Circuit, 23-02030
**Jurisdiction:** Federal Question

**Class Code:** Open
**Statute:** 42:1218(2)
**Jury Demand:** Plaintiff
**Demand Amount:** $1,500,000
**NOS Description:** Americans with Disabilities - Employment

## Participants

| ## Litigants | ## Attorneys |
| --- | --- |

Lisa Menninger
**Plaintiff**

Patrick J. Hannon
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Hartley Michon Robb Hannon LLP
101 Federal Street Suite 1810
Boston, MA  02110
USA
617-723-8000 Email:Phannon@hmrhlaw.Com

Hampton M. Watson
ATTORNEY TO BE NOTICED
[Terminated: 08/31/2023]
Hartley Michon Robb LLP
155 Seaport Boulevard
Boston, MA  02210
USA
617-447-2822 Email:Hwatson@sanfordheisler.Com

Lucia A. Passanisi
ATTORNEY TO BE NOTICED
[Terminated: 09/18/2019]
Todd & Weld LLP
One Federal Street 27th Floor
Boston, MA  02110
USA
617-624-4773 Email:Lpassanisi@toddweld.Com

PPD Development, L.P.
**Defendant**

Rachel Reingold Mandel
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Ogletree Deakins Nash Smoak & Stewart, P.C.
One Boston Place Suite 3500

**JA1**

1:19cv11441, Menninger V. Ppd Development, L.P.

| Litigants | Attorneys |
|---|---|
| | Boston, MA  02108<br>USA<br>617-994-5700 Email:Rachel.Mandel@ogletreedeakins.Com<br><br>Alexandra E. Shaw<br>ATTORNEY TO BE NOTICED<br>[Terminated: 06/04/2021]<br>Ogletree Deakins Nash Smoak & Stewart, P.C.<br>One Boston Place Suite 3500<br>Boston, MA  02108<br>USA<br>617-994-5735 Email:Alexandra.Shaw@ogletree.Com<br><br>Andrea M. Sullivan<br>ATTORNEY TO BE NOTICED<br>Ogletree Deakins Nash Smoak & Stewart, P.C.<br>One Boston Place Suite 3500<br>Boston, MA  02108<br>USA<br>617-994-5700 Fax: 617-994-5701<br>Email:Andrea.Sullivan@ogletree.Com<br><br>Catherine Brackett<br>ATTORNEY TO BE NOTICED<br>Ogletree, Deakins, Nash, Smoak & Stewart, P.C.<br>400 S Hope Street Suite 1200 Suite 1200<br>Los Angeles, CA  90071<br>USA<br>213-438-1280 Fax: 213-239-9045<br>Email:Catherine.Brackett@ogletree.Com<br><br>Douglas Hallward-Driemeier<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP - DC<br>2099 Pennsylvania Avenue, Nw<br>Washington, DC  20006<br>USA<br>202-508-4776 Email:Douglas.Hallward-<br>Driemeier@ropesgray.Com<br><br>Jack Sholkoff<br>ATTORNEY TO BE NOTICED<br>Ogletree, Deakins, Nash, Smoak & Stewart, P.C.<br>400 South Hope Street Suite 1200<br>Los Angeles, CA  90071<br>USA<br>213-239-9800 Fax: 213-239-9045<br>Email:Jack.Sholkoff@ogletreedeakins.Com<br><br>John P. Bueker<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray - MA<br>Prudential Tower 800 Boylston Street<br>Boston, MA  02199-3600<br>USA<br>617-951-7000 Fax: 617-951-7050<br>Email:John.Bueker@ropesgray.Com |

1:19cv11441, Menninger V. Ppd Development, L.P.

## Litigants

## Attorneys

Patrick M. Curran , Jr.
ATTORNEY TO BE NOTICED
Ogletree Deakins Nash Smoak & Stewart, P.C.
One Boston Place Suite 3500
Boston, MA  02108
USA
617-994-5728 Fax: 617-994-5701
Email:Patrick.Curran@ogletreedeakins.Com

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 06/28/2019 | COMPLAINT  against PPD Development, L.P. Filing fee: $ 400, receipt number 0101-7758011 (Fee Status: Filing Fee paid), filed by Lisa Menninger. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Civil Cover Sheet, # 5 Category Form)(Hannon, Patrick) (Entered: 06/28/2019) | |
| 2 | 07/01/2019 | ELECTRONIC NOTICE of Case Assignment. District Judge Leo T. Sorokin assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Marianne B. Bowler. (Finn, Mary) (Entered: 07/01/2019) | |
| 3 | 07/01/2019 | Summons Issued as to All Defendants. Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service. (Coppola, Katelyn) (Entered: 07/01/2019) | |
| 4 | 07/03/2019 | Set Deadlines: Service completed by 9/30/2019. (Montes, Mariliz) (Entered: 07/03/2019) | |
| 5 | 07/11/2019 | NOTICE of Appearance by Lucia A. Passanisi on behalf of Lisa Menninger (Passanisi, Lucia) (Entered: 07/11/2019) | |
| 6 | 08/16/2019 | NOTICE of Appearance by Alexandra E. Shaw on behalf of PPD Development, L.P. (Shaw, Alexandra) (Entered: 08/16/2019) | |
| 7 | 08/16/2019 | NOTICE of Appearance by Rachel Reingold Mandel on behalf of PPD Development, L.P. (Mandel, Rachel) (Entered: 08/16/2019) | |
| 8 | 08/16/2019 | ANSWER to 1 Complaint,  by PPD Development, L.P..(Shaw, Alexandra) (Entered: 08/16/2019) | |
| 9 | 08/16/2019 | CORPORATE DISCLOSURE STATEMENT by PPD Development, L.P.. (Shaw, Alexandra) (Entered: 08/16/2019) | |
| 10 | 08/20/2019 | NOTICE of Scheduling Conference: A Scheduling Conference has been set for 9/17/2019 11:15 AM in Courtroom 13 before District Judge Leo T. Sorokin. (Attachments: # 1 scheduling order sample, # 2 standing order re summary judgment)(Simeone, Maria) (Entered: 08/20/2019) | |
| 11 | 09/06/2019 | JOINT STATEMENT of counsel Pursuant to Local Rule 16.1(d). (Shaw, Alexandra) (Entered: 09/06/2019) | |
| 12 | 09/09/2019 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered. In light of the joint statement, the Court hereby CANCELS the Rule 16 Conference currently scheduled on 9/17/2019 and ADOPTS the proposed schedule, Doc. 11, as an Order of the Court. The Court will convene a status conference on May 7, 2020 at 2:15 PM. (Montes, Mariliz) (Entered: 09/09/2019) | |
| 13 | 09/09/2019 | District Judge Leo T. Sorokin: ORDER entered. SCHEDULING ORDER: Initial disclosures to be completed by 10/16/2019; amended pleadings due by 11/1/2019; fact discovery to be | |

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | completed by 4/30/2020; trial experts for the party with the burden of proof must be designated and disclosed by 6/1/2020; rebuttal experts must be designated and disclosed by 7/1/2020; all trial experts must be deposed by 8/1/2020; dispositive motions to be filed by 9/30/2020. A Status Conference is set for 5/7/2020 at 02:15 PM in Courtroom 13 before District Judge Leo T. Sorokin. (Montes, Mariliz) (Entered: 09/09/2019) | |
| 14 | 09/17/2019 | NOTICE of Withdrawal of Appearance by Lucia A. Passanisi (Passanisi, Lucia) (Entered: 09/17/2019) | |
| 15 | 12/19/2019 | Joint MOTION for Protective Order by PPD Development, L.P.. (Attachments: # 1 Exhibit A - Confidentiality Stipulation and Proposed Order)(Shaw, Alexandra) (Entered: 12/19/2019) | |
| 16 | 12/20/2019 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 15 Joint Motion for Entry of Protective Order. (Montes, Mariliz) (Montes, Mariliz) (Entered: 12/20/2019) | |
| 17 | 12/20/2019 | District Judge Leo T. Sorokin: ENDORSED ORDER entered. CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER.(Montes, Mariliz) (Entered: 12/20/2019) | |
| 18 | 01/28/2020 | NOTICE of Appearance by Hampton M. Watson on behalf of Lisa Menninger (Watson, Hampton) (Entered: 01/28/2020) | |
| 19 | 04/23/2020 | ELECTRONIC NOTICE OF RESCHEDULING. The status conference set for 5/7/20 will be held on 5/6/2020 at 02:45 PM in Courtroom 13 before District Judge Leo T. Sorokin. A link will be provided to appear via video/telephone prior to the hearing.(Simeone, Maria) (Entered: 04/23/2020) | |
| 20 | 04/30/2020 | Joint MOTION for Extension of Time to Complete Discovery and Extend Subsequent Deadlines Established by the Scheduling Order by PPD Development, L.P..(Shaw, Alexandra) (Entered: 04/30/2020) | |
| 21 | 05/01/2020 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 20 Joint Motion to Extend the Scheduling Order Deadlines. . Depending upon the evolution of the present health guidance, counsel should be prepared for remote depositions by video conference. Fact discovery to be completed by 8/31/2020; dispositive motions due by 1/1/2021; plaintiff's expert disclosures to be served by 8/31/2020; rebuttal expert disclosures to be served by 9/30/2020; all trial experts to be deposed by 11/2/2020. The Status Conference currently scheduled for 5/6/2020 s reset to 9/2/2020 at 3:00 PM. (Montes, Mariliz) NEF Regenerated. Modified on 5/1/2020 (Montes, Mariliz). (Entered: 05/01/2020) | |
| 22 | 05/01/2020 | ELECTRONIC NOTICE of Hearing. A Status Conference is reset for 9/2/2020 at 03:00 pm in Courtroom 13 before District Judge Leo T. Sorokin. (Montes, Mariliz) (Entered: 05/01/2020) | |
| 23 | 08/12/2020 | Joint MOTION for Extension of Time to Extend Scheduling Order Deadlines by Lisa Menninger.(Watson, Hampton) (Entered: 08/12/2020) | |
| 24 | 08/12/2020 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 23 Motion for Extension of the deadlines by 45 days. The 9/2/20 Status Conference has been reset to 10/20/2020 02:45 PM in Courtroom 13 before District Judge Leo T. Sorokin. (Simeone, Maria) (Entered: 08/12/2020) | |
| 25 | 08/12/2020 | Set Deadlines: Discovery to be completed by 10/15/2020. Dispositive Motions due by 2/17/2021 (Simeone, Maria) (Entered: 08/12/2020) | |
| 26 | 10/09/2020 | ELECTRONIC NOTICE OF RESCHEDULINGThe status conference set for 10/20/20 at 2:45 will be held at 2:30PM. This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the | |

**JA4**

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | technology, please notify the session's courtroom deputy as soon as possible.Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. Status Conference set for 10/20/2020 02:30 PM in Courtroom 13 before District Judge Leo T. Sorokin. (Simeone, Maria) (Entered: 10/09/2020) | |
| 27 | 10/20/2020 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin. Status Conference held on 10/20/2020. Counsel state the status of the case. 1 deposition remains outstanding regarding discovery. Counsel anticipate having liability and damage experts, rebuttal experts and filing summary judgment. Counsel discuss possible Motions to compel regarding the Privilege logs and medical records. Motions to compel due by 11/17/20. Counsel should file a joint status report or request if they would like to attend the courts mediation program or have a status conference. ( Motions due by 11/17/2020) (Court Reporter: Rachel Lopez at raeufp@gmail.com.) (Simeone, Maria) (Entered: 10/23/2020) | |
| 28 | 11/17/2020 | MOTION to Compel  by Lisa Menninger.(Hannon, Patrick) (Entered: 11/17/2020) | |
| 29 | 11/17/2020 | MEMORANDUM in Support re 28 MOTION to Compel  (redacted) filed by Lisa Menninger. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13 (redacted), # 14 Exhibit 14, # 15 Exhibit 15 (redacted), # 16 Exhibit 16 (redacted), # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19 (redacted), # 20 Exhibit 20 (redacted), # 21 Exhibit 21)(Hannon, Patrick) (Main Document 29 replaced on 11/18/2020) (Montes, Mariliz). Modified on 11/18/2020 to replace memorandum with corrected redacted version provided by counsel (Montes, Mariliz). (Additional attachment(s) added on 12/10/2020: # 22 memorandum in support of motion (redacted version)) (Montes, Mariliz). (Additional attachment(s) added on 12/10/2020: # 23 Exhibit 13 (unredacted version), # 24 Exhibit 15 (unredacted version), # 25 Exhibit 16 (unredacted version), # 26 Exhibit 19 (unredacted version), # 27 Exhibit 20 (unredacted version)) (Montes, Mariliz). (Entered: 11/17/2020) | |
| 30 | 11/17/2020 | MOTION to Seal  (Unopposed) by Lisa Menninger.(Hannon, Patrick) (Entered: 11/17/2020) | |
| 31 | 11/18/2020 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 30 Plaintiff's Unopposed Motion to Seal. Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Montes, Mariliz) (Entered: 11/18/2020) | |
| 32 | 11/18/2020 | Notice of correction to docket made by Court staff. Correction: Docket 29 corrected by replacing memorandum (only) with corrected version provided by counsel. (Montes, Mariliz) (Entered: 11/18/2020) | |
| 33 | 11/20/2020 | Assented to MOTION for Extension of Time to December 15, 2020 to File Response/Reply as to 28 MOTION to Compel  by PPD Development, L.P..(Shaw, Alexandra) (Entered: 11/20/2020) | |

**JA5**

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 34 | 11/20/2020 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 33 Assented-To Motion to Extend Deadline for Defendant's Response to Plaintiff's 28 Motion to Compel. 28 MOTION to Compel: Responses due by 12/15/2020 (Montes, Mariliz) (Entered: 11/20/2020) | |
| 35 | 12/15/2020 | Opposition re 28 MOTION to Compel  filed by PPD Development, L.P.. (Attachments: # 1 Exhibit A - 360 Feedback, # 2 Exhibit B - 1.11.18 Email, # 3 Exhibit C - 1.30.18 Request for Accommodation, # 4 Exhibit D - February 2018 Request for Accommodation, # 5 Exhibit E - Affidavit of Lisa Carter Noecker)(Shaw, Alexandra) (Entered: 12/15/2020) | |
| 36 | 12/17/2020 | MOTION for Extension of Time To Extend Deadlines by PPD Development, L.P..(Shaw, Alexandra) (Entered: 12/17/2020) | |
| 37 | 12/18/2020 | District Judge Leo T. Sorokin. ELECTRONIC ORDER entered. Allowed. Defendant's expert disclosures by January 8, 2021. Trial experts deposed by February 26, 2021. Dispositive motions by March 24, 2021.  36 Motion for Extension of Time.(Simeone, Maria) (Entered: 12/18/2020) | |
| 38 | 12/18/2020 | Reset Deadlines: Dispositive Motions due by 3/24/2021 (Simeone, Maria) (Entered: 12/18/2020) | |
| 39 | 01/04/2021 | MOTION for Leave to File  Reply Brief in Support of Motion to Compel (Unopposed) by Lisa Menninger. (Attachments: # 1 Exhibit (Proposed Reply Brief))(Hannon, Patrick) (Entered: 01/04/2021) | |
| 40 | 01/05/2021 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 39 Plaintiff's Unopposed Motion for Leave to File a Reply Brief in Support of 28 Motion to Compel ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Montes, Mariliz) (Entered: 01/05/2021) | |
| 41 | 01/05/2021 | REPLY to Response to 28 MOTION to Compel  filed by Lisa Menninger. (Hannon, Patrick) (Entered: 01/05/2021) | |
| 42 | 02/17/2021 | JOINT STATEMENT of counsel Regarding Defendant's Production of Documents to Plaintiff as it Relates to Plaintiff's Motion to Compel (ECF Doc. Nos. 28-29). (Attachments: # 1 Exhibit A - Privilege Log)(Shaw, Alexandra) (Entered: 02/17/2021) | |
| 43 | 03/24/2021 | MOTION for Summary Judgment  by PPD Development, L.P..(Shaw, Alexandra) (Entered: 03/24/2021) | |
| 44 | 03/24/2021 | MEMORANDUM in Support re 43 MOTION for Summary Judgment   filed by PPD Development, L.P.. (Shaw, Alexandra) (Entered: 03/24/2021) | |
| 45 | 03/24/2021 | Statement of Material Facts L.R. 56.1 re 43 MOTION for Summary Judgment   filed by PPD Development, L.P.. (Shaw, Alexandra) (Entered: 03/24/2021) | |
| 46 | 03/24/2021 | AFFIDAVIT of Deborah Ballweg in Support re 43 MOTION for Summary Judgment   filed by PPD Development, L.P.. (Attachments: # 1 Exhibit Tabs 1-9)(Shaw, Alexandra) (Additional attachment(s) added on 3/29/2021: # 2 Tabs 1-9 (unredacted version)) (Montes, Mariliz). (Entered: 03/24/2021) | |
| 47 | 03/24/2021 | AFFIDAVIT of Alexandra Shaw in Support re 43 MOTION for Summary Judgment   filed by PPD Development, L.P.. (Attachments: # 1 Exhibit Tabs 1-5)(Shaw, Alexandra) (Additional attachment(s) added on 3/29/2021: # 2 Tabs 1-5 unsealed version) (Montes, Mariliz) (Entered: 03/24/2021) | |
| 48 | 03/24/2021 | AFFIDAVIT of Hacene Mekerri in Support re 43 MOTION for Summary Judgment   filed by PPD Development, L.P.. | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | (Attachments: # 1 Exhibit Tabs 1-12)(Shaw, Alexandra) (Additional attachment(s) added on 3/29/2021: # 2 Tabs 1-12 unredacted version) (Montes, Mariliz). (Entered: 03/24/2021) | |
| 49 | 03/24/2021 | AFFIDAVIT of Brent McKinnon in Support re 43 MOTION for Summary Judgment  filed by PPD Development, L.P.. (Attachments: # 1 Exhibit Tab 1)(Shaw, Alexandra) (Entered: 03/24/2021) | |
| 50 | 03/24/2021 | AFFIDAVIT of Chad St. John in Support re 43 MOTION for Summary Judgment  filed by PPD Development, L.P.. (Attachments: # 1 Exhibit Tabs 1-17)(Shaw, Alexandra) (Additional attachment(s) added on 3/29/2021: # 2 Tabs 1-17 (unredacted version) (Montes, Mariliz). (Entered: 03/24/2021) | |
| 51 | 03/24/2021 | AFFIDAVIT of Chris Fikry in Support re 43 MOTION for Summary Judgment  filed by PPD Development, L.P.. (Attachments: # 1 Exhibit Tab 1)(Shaw, Alexandra) (Additional attachment(s) added on 3/29/2021: # 2 Tab 1 (unredacted version)) (Montes, Mariliz). (Entered: 03/24/2021) | |
| 52 | 03/24/2021 | MOTION to Seal Unredacted Versions of Affidavits Filed in Support of Defendant's Motion for Summary Judgment by PPD Development, L.P..(Shaw, Alexandra) (Entered: 03/24/2021) | |
| 53 | 03/25/2021 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 52 Motion to Seal. Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Montes, Mariliz) (Entered: 03/25/2021) | |
| 54 | 03/29/2021 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered. Plaintiff Lisa Menninger has moved to compel (Doc. No. 28) various documents in the possession of Defendant PPD Development. PPD has asserted the work product doctrine and the attorney-client privilege in response. Doc. No. 35. The parties have worked together to narrow the issue. Doc. No. 42. The Court hereby ORDERS PPD to produce for in camera review those documents which remain the subject of dispute within three business days. PPD's filing should organize each document by group, or "Conversation," in line with the approach utilized by the parties in briefing.(Montes, Mariliz) (Entered: 03/29/2021) | |
| 56 | 04/07/2021 | MOTION for Extension of Time to May 5, 2021 to File Response/Reply as to 43 MOTION for Summary Judgment  by Lisa Menninger.(Watson, Hampton) (Entered: 04/07/2021) | |
| 57 | 04/09/2021 | District Judge Leo T. Sorokin. ELECTRONIC ORDER entered granting 56 Motion for Extension of Time to File Response/Reply re 43 MOTION for Summary Judgment  Responses due by 5/5/2021 (Simeone, Maria) (Entered: 04/09/2021) | |
| 58 | 04/14/2021 | District Judge Leo T. Sorokin: ORDER entered.[ 28 Menninger's Motion to Compel is ALLOWED IN PART and DENIED IN PART as detailed herein. PPD shall comply with this Order within three business days. (Montes, Mariliz) (Entered: 04/14/2021) | |
| 59 | 04/21/2021 | Joint MOTION for Clarification re 58 Order on Motion to Compel by PPD Development, L.P.. (Attachments: # 1 Exhibit A - Conversation 1)(Shaw, Alexandra) (Entered: 04/21/2021) | |
| 60 | 04/22/2021 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 59 Joint MOTION for Clarification re 58 Order on Motion to Compel.  The parties have sought clarification regarding the Court's April 14, 2021 Order (Doc. No. 58) which inadvertently omitted consideration of Defendant's assertion of attorney-client privilege as to the communications to and from Attorney Noecker | |

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | embedded within Conversation 1. Doc. No. 59. After reviewing these communications, the Court finds that they are privileged and endorses the proposed redactions reflected in docket entry number 59-1. (Pacho, Arnold) (Entered: 04/22/2021) | |
| 61 | 05/05/2021 | MOTION for Extension of Time to May 6, 2021 to File Response/Reply as to 43 MOTION for Summary Judgment by Lisa Menninger.(Hannon, Patrick) (Entered: 05/05/2021) | |
| 62 | 05/06/2021 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 61 Motion for Extension of Time May 6, 2021 to File Response re 43 MOTION for Summary Judgment. (Pacho, Arnold) (Entered: 05/06/2021) | |
| 63 | 05/06/2021 | MOTION to Seal by Lisa Menninger.(Watson, Hampton) (Entered: 05/06/2021) | |
| 64 | 05/06/2021 | MOTION to Strike by Lisa Menninger.(Watson, Hampton) (Entered: 05/06/2021) | |
| 65 | 05/06/2021 | MEMORANDUM in Opposition re 43 MOTION for Summary Judgment filed by Lisa Menninger. (Watson, Hampton) (Entered: 05/06/2021) | |
| 66 | 05/06/2021 | Statement of Material Facts L.R. 56.1 re 43 MOTION for Summary Judgment filed by Lisa Menninger. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7, # 8 Exhibit Exhibit 8, # 9 Exhibit Exhibit 9, # 10 Exhibit Exhibit 10, # 11 Exhibit Exhibit 11, # 12 Exhibit Exhibit 12, # 13 Exhibit Exhibit 13, # 14 Exhibit Exhibit 14, # 15 Exhibit Exhibit 15, # 16 Exhibit Exhibit 16, # 17 Exhibit Exhibit 17, # 18 Exhibit Exhibit 18, # 19 Exhibit Exhibit 19, # 20 Exhibit Exhibit 20, # 21 Exhibit Exhibit 21, # 22 Exhibit Exhibit 22, # 23 Exhibit Exhibit 23, # 24 Exhibit Exhibit 24, # 25 Exhibit Exhibit 25, # 26 Exhibit Exhibit 26, # 27 Exhibit Exhibit 27, # 28 Exhibit Exhibit 28, # 29 Exhibit Exhibit 29, # 30 Exhibit Exhibit 30, # 31 Exhibit Exhibit 31, # 32 Exhibit Exhibit 32, # 33 Exhibit Exhibit 33, # 34 Exhibit Exhibit 34, # 35 Exhibit Exhibit 35, # 36 Exhibit Exhibit 36, # 37 Exhibit Exhibit 37, # 38 Exhibit Exhibit 38, # 39 Exhibit Exhibit 39, # 40 Exhibit Exhibit 40, # 41 Exhibit Exhibit 41, # 42 Exhibit Exhibit 42, # 43 Exhibit Exhibit 43, # 44 Exhibit Exhibit 44, # 45 Exhibit Exhibit 45, # 46 Exhibit Exhibit 46, # 47 Exhibit Exhibit 47, # 48 Exhibit Exhibit 48, # 49 Exhibit Exhibit 49, # 50 Exhibit Exhibit 50, # 51 Exhibit Exhibit 51, # 52 Exhibit Exhibit 52, # 53 Exhibit Exhibit 53, # 54 Exhibit Exhibit 54, # 55 Exhibit Exhibit 55, # 56 Exhibit Exhibit 56, # 57 Exhibit Exhibit 57, # 58 Exhibit Exhibit 58, # 59 Exhibit Exhibit 59, # 60 Exhibit Exhibit 60, # 61 Exhibit Exhibit 61, # 62 Exhibit Exhibit 62, # 63 Exhibit Exhibit 63, # 64 Exhibit Exhibit 64, # 65 Exhibit Exhibit 65, # 66 Exhibit Exhibit 66, # 67 Exhibit Exhibit 67, # 68 Exhibit Exhibit 68, # 69 Exhibit Exhibit 69, # 70 Exhibit Exhibit 70, # 71 Exhibit Exhibit 71, # 72 Exhibit Exhibit 72, # 73 Exhibit Exhibit 73, # 74 Exhibit Exhibit 74, # 75 Exhibit Exhibit 75, # 76 Exhibit Exhibit 76, # 77 Exhibit Exhibit 77, # 78 Exhibit Exhibit 78, # 79 Exhibit Exhibit 79, # 80 Exhibit Exhibit 80, # 81 Exhibit Exhibit 81, # 82 Exhibit Exhibit 82, # 83 Exhibit Exhibit 83, # 84 Exhibit Exhibit 84, # 85 Exhibit Exhibit 85, # 86 Exhibit Exhibit 86, # 87 Exhibit Exhibit 87, # 88 Exhibit Exhibit 88, # 89 Exhibit Exhibit 89, # 90 Exhibit Exhibit 90, # 91 Exhibit Exhibit 91, # 92 Exhibit Exhibit 92, # 93 Exhibit Exhibit 93, # 94 Exhibit Exhibit 94, # 95 Exhibit Exhibit 95, # 96 Exhibit Exhibit 96, # 97 Exhibit Exhibit 97, # 98 Exhibit Exhibit 98, # 99 Exhibit Exhibit 99, # 100 Exhibit Exhibit 100, # 101 Exhibit Exhibit 101, # 102 Exhibit Exhibit 102, # 103 Exhibit Exhibit 103, # 104 Exhibit Exhibit 104, # 105 Exhibit Exhibit 105, # 106 Exhibit Exhibit 106, # 107 Exhibit Exhibit 107, # 108 Exhibit Exhibit 108, # 109 Exhibit Exhibit 109, # 110 Exhibit Exhibit 110, # | |

**JA8**

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 111 Exhibit Exhibit 111, # 112 Exhibit Exhibit 112, # 113 Exhibit Exhibit 113, # 114 Exhibit Exhibit 114, # 115 Exhibit Exhibit 115, # 116 Exhibit Exhibit 116, # 117 Exhibit Exhibit 117, # 118 Exhibit Exhibit 118, # 119 Exhibit Exhibit 119, # 120 Exhibit Exhibit 120, # 121 Exhibit Exhibit 121, # 122 Exhibit Exhibit 122, # 123 Exhibit Exhibit 123, # 124 Exhibit Exhibit 124, # 125 Exhibit Exhibit 125, # 126 Exhibit Exhibit 126, # 127 Exhibit Exhibit 127, # 128 Exhibit Exhibit 128, # 129 Exhibit Exhibit 129, # 130 Exhibit Exhibit 130, # 131 Exhibit Exhibit 131, # 132 Exhibit Exhibit 132, # 133 Exhibit Exhibit 133, # 134 Exhibit Exhibit 134, # 135 Exhibit Exhibit 135, # 136 Exhibit Exhibit 136, # 137 Exhibit Exhibit 137, # 138 Exhibit Exhibit 138, # 139 Exhibit Exhibit 139, # 140 Exhibit Exhibit 140, # 141 Exhibit Exhibit 141, # 142 Exhibit Exhibit 142, # 143 Exhibit Exhibit 143, # 144 Exhibit Exhibit 144, # 145 Exhibit Exhibit 145, # 146 Exhibit Exhibit 146, # 147 Exhibit Exhibit 147, # 148 Exhibit Exhibit 148, # 149 Exhibit Exhibit 149, # 150 Exhibit Exhibit 150, # 151 Exhibit Exhibit 151, # 152 Exhibit Exhibit 152, # 153 Exhibit Exhibit 153, # 154 Exhibit Exhibit 154, # 155 Exhibit Exhibit 155, # 156 Table of Contents - Exhibits, # 157 Hannon Decl.)(Watson, Hampton) (Additional attachment(s) added on 5/7/2021: # 158 Response to Statement of Material Facts and Plaintiff's Statement of Additional Material Facts) (Pacho, Arnold). (Attachment 11 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 19 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 28 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 31 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 34 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 41 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 47 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 52 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 53 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 56 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 57 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 70 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 71 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 72 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 73 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 74 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 75 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 76 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 77 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 78 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 79 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 80 replaced on 5/7/2021) (Pacho, Arnold). (Attachment 58 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 60 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 62 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 66 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 67 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 68 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 83 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 84 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 85 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 86 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 87 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 90 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 91 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 94 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 98 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 99 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 100 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 111 replaced on 5/10/2021) (Pacho, Arnold). | |

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | (Attachment 113 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 114 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 115 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 116 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 117 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 118 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 119 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 120 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 121 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 122 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 123 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 124 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 127 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 128 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 129 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 130 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 131 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 132 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 133 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 135 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 136 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 138 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 143 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 146 replaced on 5/10/2021) (Pacho, Arnold). (Attachment 148 replaced on 5/10/2021) (Pacho, Arnold). (Entered: 05/06/2021) | |
| 67 | 05/07/2021 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 63 Motion to Seal. Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order) - in the caption of the document. (Pacho, Arnold) (Entered: 05/07/2021) | |
| 68 | 05/19/2021 | MOTION for Extension of Time to June 16, 2021 to File Response/Reply as to 64 MOTION to Strike , 65 Memorandum in Opposition to Motion, 66 Statement of Material Facts L.R. 56.1,,,,,,,,,,,,,,,,,,,,,,,,,,,,, [UNOPPOSED] by PPD Development, L.P..(Shaw, Alexandra) (Entered: 05/19/2021) | |
| 69 | 05/20/2021 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 68 Motion for Extension of Time to File Response re 64 MOTION to Strike, 65 Memorandum in Opposition to Motion, 66 Statement of Material Facts L.R. 56.1. Responses due by 6/16/2021. (Pacho, Arnold) Modified docket text on 5/25/2021 to include reference to dkt # 65 and 66. Notice to counsel regenerated (Pacho, Arnold). (Entered: 05/20/2021) | |
| 70 | 06/04/2021 | NOTICE of Withdrawal of Appearance by Alexandra E. Shaw (Shaw, Alexandra) (Entered: 06/04/2021) | |
| 71 | 06/16/2021 | REPLY to Response to 43 MOTION for Summary Judgment   filed by PPD Development, L.P.. (Mandel, Rachel) (Entered: 06/16/2021) | |
| 72 | 06/16/2021 | AFFIDAVIT in Support re 43 MOTION for Summary Judgment and Defendant's Responses to Plaintiff's Statement of Additional Facts. (Attachments: # 1 Tabs 1-4)(Mandel, Rachel) (Entered: 06/16/2021) | |
| 73 | 06/16/2021 | Response by PPD Development, L.P. to 66 Statement of Material Facts L.R. 56.1,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, . (Mandel, Rachel) (Entered: 06/16/2021) | |
| 74 | 06/16/2021 | Opposition re 64 MOTION to Strike   filed by PPD Development, | |

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | L.P.. (Mandel, Rachel) (Entered: 06/16/2021) | |
| 75 | 02/10/2022 | ELECTRONIC NOTICE Setting Hearing on Motion 43 MOTION for Summary Judgment.   Motion Hearing set for 2/24/2022 11:00 AM in Courtroom 13 (In person only) before District Judge Leo T. Sorokin. (Dore, Samantha) (Entered: 02/10/2022) | |
| 76 | 02/10/2022 | MOTION to Continue Hearing on Motion for Summary Judgment to March 7,8,9(until 3pm) March 10 between 12pm - 3pm  by PPD Development, L.P..(Mandel, Rachel) (Entered: 02/10/2022) | |
| 77 | 02/11/2022 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 76 MOTION to Continue Hearing.  ALLOWED. (Dore, Samantha) (Entered: 02/11/2022) | |
| 78 | 02/11/2022 | ELECTRONIC NOTICE Resetting Hearing on Motion 43 MOTION for Summary Judgment  : Motion Hearing set for 3/8/2022 10:00 AM in Courtroom 13 (In person only) before District Judge Leo T. Sorokin. (Dore, Samantha) (Entered: 02/11/2022) | |
| 79 | 03/08/2022 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin:  Motion Hearing held on 3/8/2022 re 43 MOTION for Summary Judgment  filed by PPD Development, L.P. Court heard argument on the motion. Court took the matter under advisement.  (Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Patrick Hannon and Hampton Watson for the plaintiff and Rachel Reingold Mandel) (Belmont, Kellyann) (Entered: 03/08/2022) | |
| 80 | 03/09/2022 | NOTICE of Appearance by Andrea M. Sullivan on behalf of PPD Development, L.P. (Sullivan, Andrea) (Entered: 03/09/2022) | |
| 81 | 03/22/2022 | District Judge Leo T. Sorokin: ORDER entered. ORDER ON PPD'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 43 ) AND MENNINGER'S MOTION TO STRIKE (DOC. NO. 64 ) PPD's Motion for Summary Judgment (Doc. No. 43) is DENIED IN PART and ALLOWED IN PART. Menninger,s Motion to Strike (Doc. No. 64) is DENIED. (Dore, Samantha) (Entered: 03/22/2022) | |
| 82 | 03/22/2022 | Set Deadlines: Status Report due by 4/5/2022. (Dore, Samantha) (Entered: 03/22/2022) | |
| 83 | 04/05/2022 | STATUS REPORT of the Parties by PPD Development, L.P.. (Mandel, Rachel) (Entered: 04/05/2022) | |
| 84 | 04/06/2022 | ELECTRONIC NOTICE of Hearing. Status Conference set for 4/12/2022 03:30 PM in by video before District Judge Leo T. Sorokin. This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.(Belmont, Kellyann) (Entered: 04/06/2022) | |
| 85 | 04/08/2022 | ELECTRONIC NOTICE OF RESCHEDULING: Status Conference set for 4/12/2022 11:30 AM in Courtroom 13 (Remote only) before District Judge Leo T. Sorokin.  Note: Change is to time only! This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must | |

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.(Belmont, Kellyann) (Entered: 04/08/2022) | |
| 86 | 04/12/2022 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin: Status Conference held on 4/12/2022. Court hears from parties regarding their positions on mediation. The parties anticipate the trial lasting two weeks going full days. The Court will set set trial date. Order to issue. Court informs the parties of the availability of the Magistrate Judge to conduct trial. Court hears from counsel regarding witness outside of the country and the logistics of testimony. If the parties consent the witness may appear by video. (Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Hampton Watson for the plaintiff and Rachel Reingold Mandel for defendant) (Belmont, Kellyann) (Entered: 04/12/2022) | |
| 87 | 04/13/2022 | ELECTRONIC NOTICE of Hearing. Jury Trial set to begin 1/9/2023 09:00 AM in Courtroom 13 (In person only) before District Judge Leo T. Sorokin. (Belmont, Kellyann) (Entered: 04/13/2022) | |
| 88 | 05/02/2022 | STATUS REPORT  (Joint) by Lisa Menninger. (Hannon, Patrick) (Entered: 05/02/2022) | |
| 89 | 05/12/2022 | ELECTRONIC NOTICE of Hearing. Status Conference set for 5/17/2022 11:00 AM in Courtroom 13 (Remote only) before District Judge Leo T. Sorokin. This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.(Belmont, Kellyann) (Entered: 05/12/2022) | |
| 90 | 05/13/2022 | MOTION to Continue Status Conference to May 23, 2022  by PPD Development, L.P..(Mandel, Rachel) (Entered: 05/13/2022) | |
| 91 | 05/16/2022 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re 90 Motion to Continue.  ALLOWED. Status Conference reset for 5/23/2022 03:00 PM in Courtroom 13 (Remote only) before District Judge Leo T. Sorokin. This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. (Belmont, Kellyann) (Entered: 05/16/2022) | |
| 92 | 05/23/2022 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin:  Status Conference held on 5/23/2022. Counsel inform the Court that the state court case scheduled for trial in January 2023 is likely to go forward. Counsel discuss new trial | |

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | date. The Court will schedule the trial for March 2023. Order to issue. If the parties have any issues with the new trial date they may file something within two weeks of the order setting the date. (Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Patrick Hannon and Hampton Watson for the plaintiff and Rachel Reingold Mandel for defendant) (Belmont, Kellyann) (Entered: 05/23/2022) | |
| 93 | 06/06/2022 | District Judge Leo T. Sorokin: ORDER entered. In light of a conflict with an older state court case, the trial date is reset to March 20, 2023. The final pretrial conference will be held on March 16, 2023 at 3:00 PM. All other deadlines relevant to trial will adjust accordingly. By June 13, 2022 the parties shall notify the Court whether the new trial date works or if there are witness conflicts that cannot be resolved. (Belmont, Kellyann) (Entered: 06/06/2022) | |
| 94 | 07/11/2022 | District Judge Leo T. Sorokin: ORDER entered. ORDER SETTING CASE FOR TRIAL (Belmont, Kellyann) (Entered: 07/11/2022) | |
| 95 | 02/02/2023 | NOTICE of Appearance by Patrick M. Curran, Jr on behalf of PPD Development, L.P. (Curran, Patrick) (Entered: 02/02/2023) | |
| 96 | 02/17/2023 | CORPORATE DISCLOSURE STATEMENT by PPD Development, L.P. identifying Corporate Parent Thermo Fisher Scientific, Inc. for PPD Development, L.P... (Curran, Patrick) (Entered: 02/17/2023) | |
| 97 | 03/09/2023 | Joint MOTION for Extension of Time to March 13, 2023 to File Joint Pretrial Memorandum by Lisa Menninger.(Watson, Hampton) (Entered: 03/09/2023) | |
| 98 | 03/10/2023 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered. re 97 Joint MOTION for Extension of Time to March 13, 2023 to File Joint Pretrial Memorandum. ALLOWED. (Dore, Samantha) (Entered: 03/10/2023) | |
| 99 | 03/10/2023 | MOTION in Limine to Exclude Evidence of Potential Disability Accommodations that Plaintiff did not Request During Her Employment by PPD Development, L.P..(Curran, Patrick) (Entered: 03/10/2023) | |
| 100 | 03/10/2023 | MEMORANDUM in Support re 99 MOTION in Limine to Exclude Evidence of Potential Disability Accommodations that Plaintiff did not Request During Her Employment  filed by PPD Development, L.P.. (Curran, Patrick) (Entered: 03/10/2023) | |
| 101 | 03/10/2023 | MOTION in Limine to Exclude Evidence of the Compensation Paid to Any Employee of Defendant other than Plaintiff by PPD Development, L.P..(Curran, Patrick) (Entered: 03/10/2023) | |
| 102 | 03/10/2023 | MEMORANDUM in Support re 101 MOTION in Limine to Exclude Evidence of the Compensation Paid to Any Employee of Defendant other than Plaintiff  filed by PPD Development, L.P.. (Curran, Patrick) (Entered: 03/10/2023) | |
| 103 | 03/10/2023 | MOTION in Limine to Exclude Documents Produced by Plaintiff for the First Time, on February 24, 2023 by PPD Development, L.P..(Curran, Patrick) (Entered: 03/10/2023) | |
| 104 | 03/10/2023 | MEMORANDUM in Support re 103 MOTION in Limine to Exclude Documents Produced by Plaintiff for the First Time, on February 24, 2023  filed by PPD Development, L.P.. (Attachments: # 1 Exhibit A-E)(Curran, Patrick) (Entered: 03/10/2023) | |
| 105 | 03/10/2023 | MOTION in Limine to Bar Argument or Statements to the Jury that it May Draw Inferences Adverse to Defendant Based on Absence of Hacene Mekerri by PPD Development, L.P..(Curran, Patrick) (Entered: 03/10/2023) | |
| 106 | 03/10/2023 | MEMORANDUM in Support re 105 MOTION in Limine to Bar | |

**JA13**

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Argument or Statements to the Jury that it May Draw Inferences Adverse to Defendant Based on Absence of Hacene Mekerri filed by PPD Development, L.P.. (Attachments: # 1 Affidavit of Rachel Reingold Mandel)(Curran, Patrick) (Entered:03/10/2023) | |
| 107 | 03/10/2023 | MOTION in Limine to Exclude Evidence of Stray Remarks by Any Person Who was not a Decision-Maker with Respect to Defendant's Challenged Employment Decisions by PPD Development, L.P..(Curran, Patrick) (Entered: 03/10/2023) | |
| 108 | 03/10/2023 | MEMORANDUM in Support re 107 MOTION in Limine to Exclude Evidence of Stray Remarks by Any Person Who was not a Decision-Maker with Respect to Defendant's Challenged Employment Decisions filed by PPD Development, L.P.. (Attachments: # 1 Exhibit A-D)(Curran, Patrick) (Entered: 03/10/2023) | |
| 109 | 03/10/2023 | MOTION in Limine Exclude Evidence Supporting Claims that the Court Dismissed on Defendants Motion for Summary Judgment by PPD Development, L.P..(Curran, Patrick) (Entered: 03/10/2023) | |
| 110 | 03/10/2023 | MEMORANDUM in Support re 109 MOTION in Limine Exclude Evidence Supporting Claims that the Court Dismissed on Defendants Motion for Summary Judgment filed by PPD Development, L.P.. (Curran, Patrick) (Entered: 03/10/2023) | |
| 111 | 03/10/2023 | MOTION in Limine to Exclude Testimony Concerning an Alleged Relationship between Plaintiff's Supervisor and Another Employee by PPD Development, L.P..(Curran, Patrick) (Entered: 03/10/2023) | |
| 112 | 03/10/2023 | MEMORANDUM in Support re 111 MOTION in Limine to Exclude Testimony Concerning an Alleged Relationship between Plaintiff's Supervisor and Another Employee filed by PPD Development, L.P.. (Curran, Patrick) (Entered: 03/10/2023) | |
| 113 | 03/10/2023 | MOTION in Limine to Preclude Defendant's Use of "Voluntary Self-Identification of Disability" Form by Lisa Menninger.(Watson, Hampton) (Entered: 03/10/2023) | |
| 114 | 03/10/2023 | TRIAL BRIEF by PPD Development, L.P.. (Attachments: # 1 Exhibit A - B)(Curran, Patrick) (Entered: 03/10/2023) | |
| 115 | 03/10/2023 | MEMORANDUM in Support re 113 MOTION in Limine to Preclude Defendant's Use of "Voluntary Self-Identification of Disability" Form filed by Lisa Menninger. (Attachments: # 1 Exhibit 1)(Watson, Hampton) (Entered: 03/10/2023) | |
| 116 | 03/10/2023 | MOTION in Limine Pursuant to Fed. R. Civ. P. 37(c)(1) to Preclude Defendant's Medical Expert from Testifying on Matters Not Disclosed in Original Expert Report by Lisa Menninger.(Watson, Hampton) (Entered: 03/10/2023) | |
| 117 | 03/10/2023 | MEMORANDUM in Support re 116 MOTION in Limine Pursuant to Fed. R. Civ. P. 37(c)(1) to Preclude Defendant's Medical Expert from Testifying on Matters Not Disclosed in Original Expert Report filed by Lisa Menninger. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Watson, Hampton) (Entered: 03/10/2023) | |
| 118 | 03/10/2023 | TRIAL BRIEF by Lisa Menninger. (Attachments: # 1 Exhibit A (Witness List), # 2 Exhibit B (Proposed Voir Dire Questions), # 3 Exhibit C (Proposed Jury Instructions), # 4 Exhibit D (Proposed Verdict Form))(Hannon, Patrick) (Entered: 03/10/2023) | |
| 119 | 03/13/2023 | PRETRIAL MEMORANDUM by Lisa Menninger. (Attachments: # 1 Exhibit A (Uncontested Exhibits), # 2 Exhibit B (Contested Exhibits))(Hannon, Patrick) (Entered: 03/13/2023) | |
| 120 | 03/14/2023 | Opposition re 116 MOTION in Limine Pursuant to Fed. R. Civ. P. 37(c)(1) to Preclude Defendant's Medical Expert from Testifying on Matters Not Disclosed in Original Expert Report filed by PPD Development, L.P.. (Mandel, Rachel) (Entered: 03/14/2023) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 121 | 03/14/2023 | Opposition re 113 MOTION in Limine to Preclude Defendant's Use of "Voluntary Self-Identification of Disability" Form  filed by PPD Development, L.P.. (Curran, Patrick) (Entered: 03/14/2023) | |
| 122 | 03/14/2023 | Opposition re 99 MOTION in Limine to Exclude Evidence of Potential Disability Accommodations that Plaintiff did not Request During Her Employment  filed by Lisa Menninger. (Attachments: # 1 Exhibit A)(Hannon, Patrick) (Entered: 03/14/2023) | |
| 123 | 03/14/2023 | Opposition re 109 MOTION in Limine Exclude Evidence Supporting Claims that the Court Dismissed on Defendants Motion for Summary Judgment  filed by Lisa Menninger. (Hannon, Patrick) (Entered: 03/14/2023) | |
| 124 | 03/14/2023 | Opposition re 111 MOTION in Limine to Exclude Testimony Concerning an Alleged Relationship between Plaintiff's Supervisor and Another Employee  filed by Lisa Menninger. (Hannon, Patrick) (Entered: 03/14/2023) | |
| 125 | 03/14/2023 | Opposition re 103 MOTION in Limine to Exclude Documents Produced by Plaintiff for the First Time, on February 24, 2023  filed by Lisa Menninger. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Watson, Hampton) (Entered: 03/14/2023) | |
| 126 | 03/14/2023 | MOTION to Seal  Confidential Portions of Opposition to Defendant's Motion In Limine to Exclude Evidence of Purported "Stray Remarks" by Lisa Menninger.(Hannon, Patrick) (Entered: 03/14/2023) | |
| 127 | 03/14/2023 | Opposition re 107 MOTION in Limine to Exclude Evidence of Stray Remarks by Any Person Who was not a Decision-Maker with Respect to Defendant's Challenged Employment Decisions (Partially Redacted) filed by Lisa Menninger. (Attachments: # 1 Exhibit A, # 2 Exhibit B (redacted), # 3 Exhibit C (redacted), # 4 Exhibit D)(Hannon, Patrick) (Additional attachment(s) added on 3/15/2023: # 5 Opposition (unredacted), # 6 Exhibit B (unredacted), # 7 Exhibit C (unredacted)) (Dore, Samantha). (Entered: 03/14/2023) | |
| 128 | 03/14/2023 | Opposition re 101 MOTION in Limine to Exclude Evidence of the Compensation Paid to Any Employee of Defendant other than Plaintiff  filed by Lisa Menninger. (Attachments: # 1 Exhibit 1)(Watson, Hampton) (Entered: 03/14/2023) | |
| 129 | 03/15/2023 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 126 MOTION to Seal Confidential Portions of Opposition to Defendant's Motion In Limine to Exclude Evidence of Purported "Stray Remarks". ALLOWED. Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Dore, Samantha) (Entered: 03/15/2023) | |
| 130 | 03/15/2023 | ELECTRONIC NOTICE OF RESCHEDULING: Final Pretrial Conference reset for 3/16/2023 02:00 PM in Courtroom 13 (In person only) before District Judge Leo T. Sorokin. (Belmont, Kellyann) (Entered: 03/15/2023) | |
| 131 | 03/16/2023 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin: Final Pretrial Conference held on 3/16/2023.The Court goes over empanelment process and trial logistics. The Court plans to sit until 4:30pm on 3/20/23 and then 8:30am-1:00pm thereafter. The Court plans to select 10-12 jurors with no alternates. Court hears argument on the motions in limine. Court issues the following rulings: # 99 MOTION in Limine to Exclude Evidence of Potential Disability Accommodations that Plaintiff did not Request During Her Employment by PPD Development, L.P. | |

**JA15**

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Taken under advisement.  # 101 MOTION in Limine to Exclude Evidence of the Compensation Paid to Any Employee of Defendant other than Plaintiff by PPD Development, L.P.  Taken under advisement  # 103 MOTION in Limine to Exclude Documents Produced by Plaintiff for the First Time, on February 24, 2023 by PPD Development, L.P.  Taken under advisement.  # 105 MOTION in Limine to Bar Argument or Statements to the Jury that it May Draw Inferences Adverse to Defendant Based on Absence of Hacene Mekerri by PPD Development, L.P.  Allowed as unopposed.  # 107 MOTION in Limine to Exclude Evidence of Stray Remarks by Any Person Who was not a Decision-Maker with Respect to Defendant's Challenged Employment Decisions by PPD Development, L.P  Denied  # 109 MOTION in Limine Exclude Evidence Supporting Claims that the Court Dismissed on Defendants Motion for Summary Judgment by PPD Development, L.P.. Taken under advisement.  # 111 MOTION in Limine to Exclude Testimony Concerning an Alleged Relationship between Plaintiff's Supervisor and Another Employee by PPD Development, L.P.. Allowed without prejudice  # 113 MOTION in Limine to Preclude Defendant's Use of "Voluntary Self-Identification of Disability" Form by Lisa Menninger. Taken under advisement.  # 116 MOTION in Limine Pursuant to Fed. R. Civ. P. 37(c)(1) to Preclude Defendant's Medical Expert from Testifying on Matters Not Disclosed in Original Expert Report by Lisa Menninger.  Taken under advisement.  Parties inform the Court they plan to file a joint amended exhibit list. Court hears parties on witnesses testifying through depositions. Portion of certain deposition is objected to. Parties to file objected to portion and reasons for objections by end of day 3/17/23. Court in recess. Court back on record to discuss witness availability issues. Court will address this issue if it becomes necessary.  (Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Patrick J. Hannon and Hampton M. Watson for the plaintiff and Rachel Reingold Mandel and Patrick M. Curran, Jr. for the defendant) (Belmont, Kellyann) (Entered: 03/17/2023) | |
| 132 | 03/17/2023 | District Judge Leo T. Sorokin: ORDER ON MOTIONS IN LIMINE. (Belmont, Kellyann) (Entered: 03/17/2023) | |
| 133 | 03/20/2023 | Supplemental Proposed Jury Instructions by Lisa Menninger. (Watson, Hampton) (Entered: 03/20/2023) | |
| 134 | 03/20/2023 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin: Jury Trial Day 1 held on 3/20/2023.  Hearing held outside the presence of the jury. Court goes over logistics and jury instructions. The Court will sit until 4:00pm today 3/20 and possibly on 3/27. Panel of 46 jurors join the courtroom. Court gives opening remarks. Panel of jurors sworn. Court conducts individual voir dire. Court takes break. Court back on record. Panel of jurors returns to courtroom. Jury of 12 selected and sworn. Court gives preliminary instructions. Court takes lunch break. Jury rejoins courtroom. Parties give opening statements. Plaintiff calls Dr. Lisa Menninger. Witness sworn. Direct by plaintiff. Exhibits admitted: 3, 378, 57, 58, 392. Jury excused for the day. Hearing held outside the presence of the jury regarding contested exhibit issue. Trial to resume 3/21/23 at 8:30am  (Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Patrick Hannon and Hampton Watson for the plaintiff and Rachel Reingold Mandel and Patrick M. Curran, Jr. for defendant) (Belmont, Kellyann) (Entered: 03/20/2023) | |
| 135 | 03/21/2023 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin:  Jury Trial Day 2 held on 3/21/2023. Hearing held outside of the presence of the jury regarding contested exhibit. | |

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Court hears argument. With the agreement of the parties Juror #11 is discharged. Jury of 11 joins the courtroom. Court reminds the Dr. Menninger that she remains under oath. Testimony of Dr. Menninger continues. Exhibits admitted into evidence: 377, 373, 375, 366, 18, 47, 201, 350, 180, 182, 21, 332, 333, 176, 141, 41, 49, 50, 301, 320, 300, 174, 261. Trial to resume 3/22/23 at 8:30am. (Court Reporter: Robert Paschal at rwp.reporter@gmail.com.)(Attorneys present: Patrick Hannon for the plaintiff and Rachel Reingold Mandel and Patrick Curran, Jr. for defendant) (Belmont, Kellyann) (Entered: 03/21/2023) | |
| 136 | 03/22/2023 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin: Jury Trial Day 3 held on 3/22/2023. Hearing held outside of the presence of the jury regarding scheduling. Court goes over the expected length of testimony of remaining witnesses. Jury of 11 joins the courtroom. Testimony of Dr. Menninger resumes. Exhibits admitted into evidence: 14, 33, 59, 54, 20, 398, 80, 407, 220, 62, 433, 421, 440. Trial to resume 3/23/23 at 8:45am. (Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Patrick Hannon and Hampton Watson for the plaintiff and Rachel Reingold Mandel and Patrick Curran, Jr. for defendant) (Belmont, Kellyann) (Entered: 03/22/2023) | |
| 137 | 03/23/2023 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin:  Jury Trial Day 4 held on 3/23/2023. Hearing held outside of the presence of the jury regarding scheduling. Court discusses charge conference and verdict form with counsel. Jury of 11 joins the courtroom. Testimony of Dr. Menninger continues with cross by defendants. Court reminds Dr. Menninger that she remains under oath. Re-direct. Re-cross. Witness steps down. Plaintiff calls Deborah Ballweg. Witness sworn. Direct by plaintiff. Exhibits admitted into evidence. : 23, 27, 17, 419, 60, 223, 213, 193, 172, 277, 192, 186, 167, 65, 87, 271, 69, 142, 148, 265, 118, 119, 67, 73, 76, 70, 115, 74. The Court will sit full days Monday 3/27/23 and Tuesday 3/28/23. Hearing held outside the presence of the jury regarding objection during Ms. Ballweg's testimony and scheduling. Trial to resume 3/24/23 at 8:45am. (Court Reporter: Robert Paschal at rwp.reporter@gmail.com.)(Attorneys present: Patrick Hannon for the plaintiff and Rachel Reingold Mandel and Patrick M. Curran, Jr. for the defendant) (Belmont, Kellyann) (Entered: 03/23/2023) | |
| 138 | 03/24/2023 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin:  Jury Trial Day 5 held on 3/24/2023. Jury of 11 joins the courtroom. Testimony of Deborah Ballweg continues. Court reminds Ms. Ballweg she remains under oath. Cross by defendant. Testimony of Deborah Ballweg paused for out of state witness to testify. Plaintiff calls Tonya Hart. Witness sworn. Direct by plaintiff. Cross by defendant. Witness steps down. Testimony of Deborah Ballweg continues. Re-direct. Exhibits admitted into evidence: 242, 401, 280, 278, 263, 129, 450, 447, 448, 449, 238, 446, 90, 229. Trial to resume 3/27/23 at 8:45am. (Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Patrick Hannon and Hampton Watson for the plaintiff and Rachel Reingold Mandel and Patrick Curran, Jr. for defendant) (Belmont, Kellyann) (Entered: 03/24/2023) | |
| 139 | 03/27/2023 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin: Jury Trial Day 6 held on 3/27/2023. Hearing held outside the presence of the jury. Court goes over trial schedule. Court hears argument on contested exhibit 39 (BO). Court takes matter under advisement. Plaintiff does not object to exhibits previously marked as contested exhibits 40 (BP), 46 (BQ), 47 | |

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|----------------|--------|
|  |  | (BR), 48 (BS). Those exhibits are admitted. Jury of 11 joins the courtroom. Court goes over trial schedule with jury. Testimony of Deborah Ballweg continues. Re-cross. Witness steps down. Plaintiff calls Dr. Marianna Kessimian. Witness sworn. Direct by plaintiff. Cross by defendant. Re-direct. Witness steps down. Plaintiff calls Dr. Paul Summergrad. Witness sworn. Direct by plaintiff. Cross by defendant. Re-direct. Re-cross. Witness steps down. Exhibits admitted into evidence: 257, 244, 313, 154, 136, 19, 451, 452, 453, 28, 48, 25. Trial to resume 3/28/2023 at 8:45 am.  (Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Patrick Hannon and Hampton Watson for the plaintiff and Rachel Reingold Mandel and Patrick Curran Jr. for the defendant ) (Belmont, Kellyann) (Entered: 03/27/2023) |  |
| 140 | 03/27/2023 | Supplemental Proposed Jury Instructions by Lisa Menninger. (Watson, Hampton) (Entered: 03/27/2023) |  |
| 141 | 03/28/2023 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin:  Jury Trial Day 7 held on 3/28/2023. Jury of 11 joins the courtroom. Plaintiff calls Chad St. John. Witness sworn. Direct by plaintiff. Hearing held outside the presence of jury regarding contested exhibit BI. Jury rejoins courtroom. Cross by defendant. Witness steps down. Plaintiff calls Christopher Fikry. Witness flight was delayed and he will be called later today. Plaintiff calls Hacene Mekerri (by deposition transcript). Portions of deposition transcript read into the record. Hearing held outside presence of jury regarding live juror question of why Hacene Mekerri is not present to tesify. Court takes afternoon break. Hearing held outside of the presence of the jury regarding lineup of witnesses for afternoon. Jury of 11 rejoins the courtroom. Remaining deposition of Hacene Mekerri read into the record. Plaintiff calls Dr. Christopher Fikry. Witness sworn. Direct by plaintiff. Cross by defendant. Re-direct. Plaintiff calls Mason Menninger (by deposition transcript). Portions of deposition transcript read into the record. Exhibits admitted into evidence: 200, 194, 202, 338, 68, 125, 121, 124, 197, 146, 144, 139, 71, 132, 75, 245. Trial to resume on 3/29/2023 at 8:45am.  (Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Patrick Hannon and Hampton Watson for the plaintiff and Rachel Reingold Mandel and Patrick Curran, Jr. for defendant) (Belmont, Kellyann) (Entered: 03/28/2023) |  |
| 142 | 03/29/2023 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin: Jury Trial held on 3/29/2023.  Jury Trial Day 8. Hearing held outside the presence of the jury regarding scheduling and timing of charge conference. Charge conference will be held tomorrow at close of evidence depending on timing and the Court's afternoon schedule. Closings will occur on Friday. Jury of 11 joins the courtroom. The remaining portions of deposition transcript of Mason Menninger read into the record. Plaintiff calls Brent McKinnon. Witness sworn. Direct by plaintiff. Cross by defendant. Re-direct. Witness steps down. Plaintiff calls Christopher Clendening. Witness sworn. Direct by plaintiff. Juror #32 submits written question. Cross by defendant. Court takes morning break and Juror #35 submits written question. Hearing held outside the presence of the jury regarding question. Jury of 11 joins courtroom. Continued testimony of Chris Clendening. Re-direct. Plaintiff offers exhibit AD. Defendant objects. Court reserves and will hear argument outside presence of jury. Re-cross. Witness steps down. Jury is released for day. Court hears argument on exhibit AD outside the presence of the jury. Court takes it under advisement. Court goes over scheduling. Exhibits |  |

**JA18**

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | admitted into evidence: 427, 35, 171, 291, 287, 290. Trial to resume 3/30/2023 at 8:45am. (Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Patrick Hannon and Hampton Watson for the plaintiff and Rachel Reingold Mandel and Patrick Curran Jr. for the defendant) (Belmont, Kellyann) (Entered: 03/29/2023) | |
| 143 | 03/29/2023 | Written questions from jurors received on 3/29/2023. (Attachments: # 1 Juror question #2)(Belmont, Kellyann) (Entered: 03/30/2023) | |
| 144 | 03/30/2023 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin: Jury Trial Day 9 held on 3/30/2023. Hearing held outside the presence of the jury. Jury of 11 joins courtroom. Plaintiff calls Bruce Jonas. Witness sworn. Direct by plaintiff. Cross by defendant. Re-direct. Witness steps down. Plaintiff moves to admit all joint exhibits into evidence. All Joint exhibits admitted. Plaintiff rests. Defendant makes oral motion for directed verdict. Motion denied. Defendant calls Dr. Martin Kelly. Witness sworn. Direct by defendant. Cross by plaintiff. Witness steps down. Defendant rests. Additional Exhibits admitted into evidence: 454, 455, 456. Jury excused for the day. Charge conference held. Trial to resume 3/31/2023.  (Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Patrick Hannon and Hampton Watson for the plaintiff and Rachel Reingold Mandel and Patrick Curran for the defendant) (Belmont, Kellyann) (Entered: 03/30/2023) | |
| 145 | 03/30/2023 | District Judge Leo T. Sorokin: ORDER entered. Final Jury Instructions and Verdict Form. (Attachments: # 1 Appendix)(Sorokin, Leo) (Entered: 03/30/2023) | |
| 146 | 03/30/2023 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered. Defendant's request to admit Exhibit BO into evidence is ALLOWED. (Belmont, Kellyann) (Entered: 03/30/2023) | |
| 147 | 03/30/2023 | RESPONSE TO COURT ORDER by Lisa Menninger re 145 Order . (Hannon, Patrick) (Entered: 03/30/2023) | |
| 148 | 03/31/2023 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin:  Jury Trial Day 10 completed on 3/31/2023. Hearing outside the presence of the jury. Jury of 11 joins the courtroom. Parties give closing arguments. Court gives instructions to the jury. Jury begins deliberations. Jury reaches verdict at 3:15pm. The jury is discharged. Plaintiff will file motion for attorney's fees by April 11, 2023. Defendant will respond by April 25, 2023.  (Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Patrick Hannon and Hampton Watson for the plaintiff and Rachel Reingold Mandel and Patrick ) (Belmont, Kellyann) (Entered: 03/31/2023) | |
| 149 | 03/31/2023 | JURY VERDICT in favor of Plaintiff against Defendant. (Belmont, Kellyann) (Entered: 03/31/2023) | |
| 150 | 03/31/2023 | Exhibit List. (Belmont, Kellyann) (Entered: 03/31/2023) | |
| 151 | 03/31/2023 | Transcript of Jury Trial Day 1 held on March 20, 2023, before Judge Leo T. Sorokin. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com. Redaction Request due 4/21/2023. Redacted Transcript Deadline set for 5/1/2023. Release of Transcript Restriction set for 6/29/2023. (McDonagh, Christina) (Entered: 04/03/2023) | |
| 152 | 03/31/2023 | Transcript of Jury Trial Day 2 held on March 21, 2023, before Judge Leo T. Sorokin. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and | |

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Contact Information: Rachel Lopez at raeufp@gmail.com. Redaction Request due 4/21/2023. Redacted Transcript Deadline set for 5/1/2023. Release of Transcript Restriction set for 6/29/2023. (McDonagh, Christina) (Entered: 04/03/2023) | |
| 153 | 03/31/2023 | Transcript of Jury Trial Day 3 held on March 22, 2023, before Judge Leo T. Sorokin. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com. Redaction Request due 4/21/2023. Redacted Transcript Deadline set for 5/1/2023. Release of Transcript Restriction set for 6/29/2023. (McDonagh, Christina) (Entered: 04/03/2023) | |
| 154 | 03/31/2023 | Transcript of Jury Trial Day 4 held on March 23, 2023, before Judge Leo T. Sorokin. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com. Redaction Request due 4/21/2023. Redacted Transcript Deadline set for 5/1/2023. Release of Transcript Restriction set for 6/29/2023. (McDonagh, Christina) (Entered: 04/03/2023) | |
| 155 | 03/31/2023 | Transcript of Jury Trial Day 5 held on March 24, 2023, before Judge Leo T. Sorokin. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com. Redaction Request due 4/21/2023. Redacted Transcript Deadline set for 5/1/2023. Release of Transcript Restriction set for 6/29/2023. (McDonagh, Christina) (Entered: 04/03/2023) | |
| 156 | 03/31/2023 | Transcript of Jury Trial Day 6 held on March 27, 2023, before Judge Leo T. Sorokin. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com. Redaction Request due 4/21/2023. Redacted Transcript Deadline set for 5/1/2023. Release of Transcript Restriction set for 6/29/2023. (McDonagh, Christina) (Entered: 04/03/2023) | |
| 157 | 03/31/2023 | Transcript of Jury Trial Day 7 held on March 28, 2023, before Judge Leo T. Sorokin. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com. Redaction Request due 4/21/2023. Redacted Transcript Deadline set for 5/1/2023. Release of Transcript Restriction set for 6/29/2023. (McDonagh, Christina) (Entered: 04/03/2023) | |
| 158 | 03/31/2023 | Transcript of Jury Trial Day 8 held on March 29, 2023, before Judge Leo T. Sorokin. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com. Redaction Request due 4/21/2023. Redacted Transcript Deadline set for 5/1/2023. Release of Transcript Restriction set for 6/29/2023. (McDonagh, Christina) (Entered: 04/03/2023) | |
| 159 | 03/31/2023 | Transcript of Jury Trial Day 9 held on March 30, 2023, before Judge Leo T. Sorokin. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com. Redaction Request due 4/21/2023. Redacted Transcript Deadline set for 5/1/2023. Release of Transcript Restriction set for 6/29/2023. (McDonagh, Christina) (Entered: 04/03/2023) | |

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 160 | 03/31/2023 | Transcript of Jury Trial Day 10 held on March 31, 2023, before Judge Leo T. Sorokin. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com. Redaction Request due 4/21/2023. Redacted Transcript Deadline set for 5/1/2023. Release of Transcript Restriction set for 6/29/2023. (McDonagh, Christina) (Entered: 04/03/2023) | |
| 161 | 03/31/2023 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 04/03/2023) | |
| 162 | 04/11/2023 | Assented to MOTION to Modify Briefing Schedule on Plaintiff's Application for Fees and Costs  by Lisa Menninger.(Hannon, Patrick) (Entered: 04/11/2023) | |
| 163 | 04/12/2023 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 162 Assented to MOTION to Modify Briefing Schedule on Plaintiff's Application for Fees and Costs. ALLOWED. (Dore, Samantha) (Entered: 04/12/2023) | |
| 164 | 04/13/2023 | MOTION for Attorney Fees  and Costs by Lisa Menninger.(Hannon, Patrick) (Entered: 04/13/2023) | |
| 165 | 04/13/2023 | AFFIDAVIT in Support re 164 MOTION for Attorney Fees  and Costs . (Attachments: # 1 Exhibit, A (summary of fees), # 2 Exhibit, B (billing records), # 3 Exhibit, C (Datamine Discovery Costs), # 4 Exhibit, D (Depo Tr. Costs), # 5 Exhibit, E (Expert Costs), # 6 Exhibit, F (Travel Costs), # 7 Exhibit, G (Other Costs))(Hannon, Patrick) (Attachment 5 replaced on 4/14/2023) (Dore, Samantha). (Entered: 04/13/2023) | |
| 166 | 04/19/2023 | MOTION for Extension of Time to 5/8/2023 to Extend Deadline To Oppose Plaintiffs Motion For Fees And Costs  by PPD Development, L.P..(Mandel, Rachel) Modified on 4/20/2023: Updated docketing event. (Dore, Samantha). (Entered: 04/19/2023) | |
| 167 | 04/20/2023 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 166 MOTION for Extension of Time to 5/8/2023 to Extend Deadline To Oppose Plaintiffs Motion For Fees And Costs. ALLOWED. (Dore, Samantha) (Entered: 04/20/2023) | |
| 168 | 05/08/2023 | Opposition re 164 MOTION for Attorney Fees  and Costs  filed by PPD Development, L.P.. (Mandel, Rachel) (Entered: 05/08/2023) | |
| 169 | 05/12/2023 | District Judge Leo T. Sorokin: ORDER entered. ORDER ON PLAINTIFF'S APPLICATION FOR AWARD OF ATTORNEY'S FEES AND COSTS (DOC. NO. 164 ) (Belmont, Kellyann) (Entered: 05/12/2023) | |
| 170 | 05/12/2023 | District Judge Leo T. Sorokin: ORDER entered. FINAL JUDGMENT (Belmont, Kellyann) (Entered: 05/12/2023) | |
| 171 | 05/17/2023 | Assented to MOTION for Leave to File Excess Pages in Connection with Post-Trial Motions by PPD Development, L.P..(Mandel, Rachel) (Entered: 05/17/2023) | |
| 172 | 05/18/2023 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re 171 Assented to MOTION for Leave to File Excess Pages in Connection with Post-Trial Motions by PPD Development, L.P. ALLOWED. (Belmont, Kellyann) (Entered: 05/18/2023) | |
| 173 | 06/02/2023 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Jack S. Sholkoff and Catherine L. Brackett Filing fee: $ 250, receipt number BMADC-9885907 by PPD Development, L.P.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Mandel, Rachel) (Entered: 06/02/2023) | |

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 174 | 06/02/2023 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 173 Motion for Leave to Appear Pro Hac Vice Added Jack S. Sholkoff and Catherine L. Brackett. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (Dore, Samantha) (Entered: 06/02/2023) | |
| 175 | 06/05/2023 | NOTICE of Appearance by John P. Bueker on behalf of PPD Development, L.P. (Bueker, John) (Entered: 06/05/2023) | |
| 176 | 06/05/2023 | NOTICE of Appearance by Douglas Hallward-Driemeier on behalf of PPD Development, L.P. (Hallward-Driemeier, Douglas) (Entered: 06/05/2023) | |
| 177 | 06/06/2023 | NOTICE of Appearance by Jack Sholkoff on behalf of PPD Development, L.P. (Sholkoff, Jack) (Entered: 06/06/2023) | |
| 178 | 06/06/2023 | NOTICE of Appearance by Catherine Brackett on behalf of PPD Development, L.P. (Brackett, Catherine) (Entered: 06/06/2023) | |
| 179 | 06/09/2023 | MOTION for New Trial or in the Alternative, Remittitur by PPD Development, L.P..(Mandel, Rachel) (Entered: 06/09/2023) | |
| 180 | 06/09/2023 | MOTION for Judgment as a Matter of Law by PPD Development, L.P..(Mandel, Rachel) (Entered: 06/09/2023) | |
| 181 | 06/09/2023 | MEMORANDUM in Support re 179 MOTION for New Trial or in the Alternative, Remittitur, 180 MOTION for Judgment as a Matter of Law filed by PPD Development, L.P.. (Mandel, Rachel) (Entered: 06/09/2023) | |
| 182 | 06/13/2023 | Transcript of Final Pretrial Conference held on March 16, 2023, before Judge Leo T. Sorokin. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com. Redaction Request due 7/5/2023. Redacted Transcript Deadline set for 7/14/2023. Release of Transcript Restriction set for 9/11/2023. (McDonagh, Christina) (Entered: 06/14/2023) | |
| 183 | 06/13/2023 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 06/14/2023) | |
| 184 | 06/22/2023 | Assented to MOTION for Extension of Time to July 7, 2023 to File Response/Reply to Defendant's Post-Trial Motions (ECF Docs. 179 and 180) by Lisa Menninger.(Watson, Hampton) (Entered: 06/22/2023) | |
| 185 | 06/23/2023 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re 184 Assented to MOTION for Extension of Time to July 7, 2023 to File Response/Reply to Defendant's Post-Trial Motions (ECF Docs. 179 and 180) by Lisa Menninger. ALLOWED. Responses due by 7/7/2023 (Belmont, Kellyann) (Entered: 06/23/2023) | |
| 186 | 07/07/2023 | Opposition re 179 MOTION for New Trial or in the Alternative, Remittitur, 180 MOTION for Judgment as a Matter of Law filed by Lisa Menninger. (Attachments: # 1 Exhibit A)(Hannon, Patrick) (Entered: 07/07/2023) | |
| 187 | 07/11/2023 | Assented to MOTION for Leave to File Reply (of up to 20 pages) in Further Support of Defendant's Renewed Motion for Judgment | |

**JA22**

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | as a Matter of Law and Motion for a New Trial or in the Alternative, Remittitur by PPD Development, L.P..(Mandel, Rachel) (Entered: 07/11/2023) | |
| 188 | 07/12/2023 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 187 Assented to MOTION for Leave to File Reply (of up to 20 pages) in Further Support of Defendant's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial or in the Alternative, Remittitur. ALLOWED. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Dore, Samantha) (Entered: 07/12/2023) | |
| 189 | 07/28/2023 | REPLY to Response to 179 MOTION for New Trial or in the Alternative, Remittitur, 180 MOTION for Judgment as a Matter of Law   filed by PPD Development, L.P.. (Mandel, Rachel) (Entered: 07/28/2023) | |
| 190 | 08/31/2023 | NOTICE of Withdrawal of Appearance by Hampton M. Watson (Watson, Hampton) (Entered: 08/31/2023) | |
| 191 | 09/29/2023 | Assented to MOTION to Stay Execution of the Judgment by PPD Development, L.P.. (Attachments: # 1 Affidavit)(Mandel, Rachel) (Entered: 09/29/2023) | |
| 192 | 10/02/2023 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re 191 Assented to MOTION to Stay Execution of the Judgment by PPD Development, L.P. ALLOWED. (Belmont, Kellyann) (Entered: 10/02/2023) | |
| 193 | 11/01/2023 | District Judge Leo T. Sorokin: ORDER entered. ORDER ON DEFENDANT'S POST-TRIAL MOTIONS (DOC. NOS. 179 , 180 ) (Dore, Samantha) (Entered: 11/01/2023) | |
| 194 | 11/01/2023 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered. The parties shall file a joint status report regarding whether any further action by this Court is required with respect to the stay previously imposed, Doc. No. 192, no later than: 7 days after the expiration of the appeal period (if no appeal is filed); or 7 days after the conclusion of any appeal (if an appeal is filed). (Dore, Samantha) (Entered: 11/01/2023) | |
| 195 | 11/29/2023 | NOTICE OF APPEAL as to 81 Order on Motion for Summary Judgment,, Order on Motion to Strike, 170 Judgment, 193 Order on Motion for New Trial, Order on Motion for Judgment as a Matter of Law by PPD Development, L.P. Filing fee: $ 505, receipt number AMADC-10152708 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals.  Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 12/19/2023. (Hallward-Driemeier, Douglas) (Entered: 11/29/2023) | |
| 196 | 11/30/2023 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 195 Notice of Appeal. (Paine, Matthew) (Entered: 11/30/2023) | |
| 197 | 12/01/2023 | USCA Case Number 23-2030 for 195 Notice of Appeal, filed by PPD Development, L.P.. (Paine, Matthew) (Entered: 12/01/2023) | |
| 198 | 12/11/2023 | TRANSCRIPT ORDER FORM  by PPD Development, L.P. for proceedings held on March 8, 2022 Judge Judge Leo T. Sorokin.. | |

1:19cv11441, Menninger V. Ppd Development, L.P.

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | (Hallward-Driemeier, Douglas) (Entered: 12/11/2023) | |
| 199 | 02/12/2024 | Transcript of Motion Hearing held on March 8, 2022, before Judge Leo T. Sorokin. COA Case No. 23-2030. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com Redaction Request due 3/4/2024. Redacted Transcript Deadline set for 3/14/2024. Release of Transcript Restriction set for 5/13/2024. (Dore, Samantha) (Entered: 02/12/2024) | |
| 200 | 02/12/2024 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (Dore, Samantha) (Entered: 02/12/2024) | |

## Judgments

| Date | In Favor Of | Against | Amount | Interest | Court Cost | Status | Status Date |
|---|---|---|---|---|---|---|---|
| 05/12/2023 | Lisa Menninger | PPD Development, L.P. | $ 0.00 | 0.00% | $ 0.00 | No Payment | 05/12/2023 |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

　　　　Plaintiff,

v.                                                        C.A. NO:

PPD DEVELOPMENT, L.P.,

　　　　Defendant.

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Dr. Lisa Menninger ("Dr. Menninger") brings this action against her former employer, PPD Development, L.P. ("PPD"), to recover damages caused by PPD's knowing and intentional violations of state and federal anti-discrimination laws. As alleged below, in January 2018 Dr. Menninger made the difficult decision to disclose her mental health disability to PPD. But rather than engage in a good faith dialogue with Dr. Menninger regarding her disability, or how it could be accommodated, PPD jumped to the conclusion that Dr. Menninger was unable to perform her responsibilities, and set about a campaign to force her out of the company. These efforts took an immense toll on Dr. Menninger's health and ultimately resulted in the destruction of her once flourishing career.

This case exemplifies both the insidiousness of disability discrimination and the importance of the interactive process required under state and federal. Had PPD given credence to the information provided by Dr. Menninger and her physician, instead of their own uninformed preconceptions about her disability, they would have known that she remained fully capable of performing the essential functions of her job. Had PPD engaged in a good faith dialogue with Dr. Menninger regarding how her disability impacted her work, they could have

**JA25**

discovered that many of their assumptions concerning her disability were completely wrong.
That her disability did not prevent her from going to work dinners or doing the many other tasks
that PPD appears to have mistakenly assumed she was unable to perform. Had PPD done any of
this, the nightmare that Dr. Menninger has endured for the past year and a half may well have
been avoided.

### Parties

1.    At all times relevant hereto, Dr. Menninger resided at 8 Waterford Circle,
Dighton, Massachusetts.

2.    PPD is a limited partnership organized under the laws of Delaware with a
principal place of business located at 929 North Front Street, Wilmington, North Carolina.

### Jurisdiction

3.    This Court has jurisdiction over Dr. Menninger's claim under the Americans with
Disabilities Act ("ADA") pursuant to 28 U.S.C. § 1331 because it is a claim arising under the
laws of the United States.

4.    This Court has supplemental jurisdiction over the remaining claim asserted herein
pursuant to 28 U.S.C. § 1367 because these claims are so closely related to the ADA claim that
they form part of the same case or controversy under Article III of the United States Constitution.

5.    Dr. Menninger timely filed a Charge of Discrimination ("Charge") with the
Massachusetts Commission Against Discrimination ("MCAD") and Equal Employment
Opportunity Commission ("EEOC") on July 27, 2018.

6.    Dr. Menninger withdrew her Charge from the MCAD and EEOC after 90 days to
pursue her claims in court, and thereafter received a Right to Sue letter from the EEOC to pursue
her ADA claim in court.

**JA26**

## Facts

7.    For as long as she can remember, Dr. Menninger has suffered from anxiety and panic attacks, typically triggered by social interactions and public speaking. As these and other symptoms have persisted throughout her life, she has been diagnosed with Panic Disorder with Agoraphobia, Social Anxiety Disorder, and Generalized Anxiety Disorder.

8.    Despite this disability, Dr. Menninger succeeded in establishing a successful career as a Medical Doctor and Board Certified Clinical Pathologist.

9.    In July of 2015, Dr. Menninger accepted an employment offer from PPD to serve as the Executive Director of its Global Central Labs ("GCL").

10.    PPD is a leading global contract research organization providing comprehensive, integrated drug development, laboratory and lifecycle management services.

11.    As Executive Director of GCL, Dr. Menninger was responsible for oversight of PPD laboratories located in Highland Heights, KY, US; Zaventem, Belgium; Shanghai, China and Singapore.

12.    Dr. Menninger's disability made certain aspects of her job more difficult for her to perform. In particular, Dr. Menninger experienced anxiety and panic attacks on the few occasions that she was required to make presentations in front of large groups. Fortunately, these types of presentations were very infrequent, and Dr. Menninger was able to successfully complete these tasks with the aid of medication.

13.    Despite the challenges posed by her disability, Dr. Menninger performed her job extremely well. This is reflected in the annual performance reviews that she received in December 2016 and December 2017, copies of which are attached as Exhibit A and B.

3

**JA27**

14.     In late December 2017, Dr. Menninger was scheduled to have a performance review with her direct supervisor, Hacene Mekerri ("Mekerri").  The performance review never occurred.  Mr. Mekerri instead discussed feedback from a "360" review involving Dr. Menninger's subordinates.

15.     The feedback was overall positive.  Among other things, Mr. Mekerri complimented Dr. Menninger on her management style and professionalism.

16.     As part of this same meeting, Mr. Mekerri informed Dr. Menninger that he was considering making changes to her role in order to make it more "visible."  He did not specify what he had in mind, but suggested that it would include increased client visits, social interactions and presentations.  Mr. Mekerri indicated that he would discuss these possible changes with Dr. Menninger in more detail when they met to discuss her annual review, which he had apparently not yet had an opportunity to complete.

17.     Dr. Menninger had not previously disclosed her disability to Mr. Mekerri or anyone else at PPD.  However, as the changes that Mr. Mekerri was considering to her role seemed likely to include activities that would be made more difficult by her disability, Dr. Menninger thought it was important to be open and honest with him regarding the challenges that she faced.

18.     Accordingly, on January 11, 2018, Dr. Menninger sent Mr. Mekerri an email informing him of her disability.  A copy of that email is attached as Exhibit C.

19.     While Dr. Menninger's email was intended to help facilitate further discussion with Mr. Mekerri, it had quite the opposite effect.

4

**JA28**

20.     Dr. Mekerri became cold and distant.  And instead of having the follow up conversation that had been promised, he told Dr. Menninger that she needed to deal directly with Human Resources.

21.     On January 15, 2018, Dr. Menninger received an email from Chad St. John, a representative of PPD's Human Resources Department.  Mr. St. John asserted that Dr. Menninger had "eluded to a need for an accommodation to be able to perform the essential functions of [her] job" and instructed Dr. Menninger to have her doctor complete and return certain forms.

22.     Dr. Menninger fully complied with Mr. St. John's request and had her physician submit the requested forms on January 31, 2018.

23.     Dr. Menninger hoped that this would finally facilitate her long-awaited discussion with Mr. Mekerri regarding the changes he was considering making to her role.  But it didn't.

24.     Instead, Dr. Menninger received another request from Mr. St. John on February 2, 2018.  This time, he instructed Dr. Menninger to have her physician provide a written statement addressing each of the "specific expectations that [Mr. Mekerri] shared with [her] for 2018 that [she] believe[d] that [she] cannot or limitedly perform."

25.     Dr. Menninger promptly reminded Mr. St. John that her concern related to the changes that Mr. Mekerri was considering making to Dr. Menninger's role.  She further noted that Mr. Mekerri still had not specified what those changes would be or had any further discussions with her regarding the issue.

26.     Mr. St. John responded by instructing Mr. Mekerri to provide "documented clarification …regarding the role expectations as the business continue to grow." He further observed that "[i]t will be important to understand all of the specific duties within your current

5

**JA29**

role that are consistent with the areas of concern identified by your physician (public speaking & social interaction)."

27.    On February 6, 2018, Mr. Mekerri responded via email by attaching a copy of Dr. Menninger's job description and identifying five broad categories of activities, which consisted of the following:

    a.    SLT Presentations, Town Hall, COO/EVP meeting;

    b.    Client Bid Defense, Issue resolution calls, HH/Client site meetings, phone;

    c.    Technical Sales presentation internal and external (i.e. internal Sales meeting), HH/Client site meetings, phone;

    d.    For customer visits, Lunch/dinner and social interactions may occur (expected 60-80% of the time) in order to build business relationships;

    e.    Travels: Up to 30%.

28.    No further explanation was provided.

29.    As instructed by Mr. St. John, Dr. Menninger provided these categories to her physician and asked her to respond.  She did so on February 14, 2018—first providing a brief information summary to assist PPD in understanding Dr. Menninger's disability, and then proposed possible accommodations relating to each of the five categories referenced above.

30.    Importantly, Dr. Menninger's physician never suggested that the accommodations she was recommending were the only accommodations available.  Indeed, for example, she noted with respect to category 4 that it would be beneficial to "brainstorm other potential avenues."

31.    No such brainstorming ever took place.  On February 26, 2018, Dr. Menninger received an email from Mr. St. John informing her that Mr. Mekerri had agreed to the suggested accommodations concerning categories 1 and 5, but that no accommodation would be provided

6

**JA30**

for categories 2, 3, and 4 because they are "critical for your level and for the growth of the business."

32. Dr. Menninger found this response distressing on multiple levels. For one, she did not understand how they could reach such a conclusion without at least having a conversation with her. Again, Dr. Menninger had been trying to have this conversation with Mr. Mekerri since the start of January.

33. Further, Dr. Menninger was also concerned about what this meant for her future. It still was not clear what specific changes Mr. Mekerri had in mind for her role. Accordingly, she was left in a state of constant anxiety wondering just how and when her job was going to change—if at all.

34. Dr. Menninger hoped to address these concerns with Mr. Mekerri and Mr. St John during a meeting scheduled for February 28, 2018, but they had a very different plan. When the meeting began they presented Dr. Menninger with two "options"—she could either accept a temporary role as a "consultant," or she could leave PPD and receive an "exit package."

35. Dr. Menninger was not interested in either. She told them that she wanted to keep her job, and that she was confident they could work through the issues concerning her disability if they simply talked about the specific changes that Mr. Mekerri was considering making. Dr. Menninger noted that she had been doing her job successfully for the past two years, and that she was clearly capable of performing the essential functions of her job with or without accommodation.

36. But they persisted. Mr. Mekerri and Mr. St. John refused to engage in any discussion regarding Dr. Menninger's role or any of the categories that they claimed could not be accommodated. They insisted that these were all requirements set forth in her job description,

and told her that they could continue the discussion the following day after Dr. Menninger had considered their "options."

37.    The next morning, Dr. Menninger wrote Mr. Mekerri and Mr. St. John an email reiterating her desire to have a genuine dialogue concerning her disability and their changing expectations for her role. Specifically, Dr. Menninger wrote that "[i]f you can be more specific regarding the tasks that you believe [cannot be accommodated], I think we could have a more productive dialogue regarding which specific tasks implicate my disability and what reasonable accommodations may be available with respect to those specific tasks."

38.    Dr. Menninger further reiterated her desire to keep her job and made clear that she had no desire to discuss the other "options" they had proposed.

39.    Shortly thereafter, Dr. Menninger received this response from Mr. St. John: "I am cancelling this meeting since we will be considering the items conveyed in your email that you sent a little while ago and will get back to you soon."

40.    Soon was eleven days later. Dr. Menninger received an email that purported to come from Mr. St. John, but it was clearly written by someone else. It was in no way responsive to her prior email. While Dr. Menninger had asked Mr. St. John and Mr. Mekerri to "be more specific regarding the tasks that you believe [cannot be accommodated]," the email did nothing of the sort. Instead, it accused Dr. Menninger of trying to "rewrite [her] job description," and insisted that the burden was solely on Dr. Menninger and her physician to propose new accommodations for PPD to consider.

41.    Dr. Menninger's response politely pointed out that they had still not answered her question. For the third time, Dr. Menninger asked that they "identify the specific tasks" that they believe cannot be accommodated, so that they could "have a productive dialogue regarding

8

**JA32**

which specific tasks implicate [Dr. Menninger's] disability and what reasonable accommodations may be available with respect to those specific tasks."

42.     Again they refused.  On April 3, 2018 Dr. Menninger received another message from Mr. St. John's email address.  As with the prior message sent from his email address, it mischaracterized her request for accommodation, misstated the essential functions of her job and twisted the words of Dr. Menninger's physician in an effort to make her look unreasonable. They continued to refuse to engage in any kind of interactive dialogue.

43.     Meanwhile, Mr. Mekerri was attacking Dr. Menninger from another angle.

44.     On January 12, 2018, the day after he learned of Dr. Menninger's disability, Mr. Mekerri submitted Dr. Menninger's annual review.  Unlike Dr. Menninger's prior review, in which Mr. Mekerri had rated her as "Highly Effective" (4 on a scale of 1 to 5) in every category, he gave Dr. Menninger an overall rating of just "Fully Effective" (3), and failed to rate her as "Highly Effective" in a single category.

45.     Notably, Mr. Mekerri never spoke to Dr. Menninger about why his perception of her performance fell so drastically.  Indeed, he never even discussed the annual review with her, which was contrary to PPD policy.

46.     Mr. Mekerri also took adverse action against Dr. Menninger with respect to her compensation.  Following disclosure of her disability, Dr. Menninger was awarded a merit increase of just 1.9% while similarly situated non-disabled laboratory professionals received increases of 2.6% or more.  Upon information and belief, Dr. Menninger's bonus was also below that awarded to similarly situated peers who do not suffer from a disability.

47.     Mr. Mekerri also progressively cut Dr. Menninger out from important decision-making that affected her business unit.  In particular, he did not keep Dr. Menninger apprised of

potential hires and did not allow her to participate in the decision making process. This was generally contrary to how he had treated Dr. Menninger prior to the disclosure of her disability.

48.    Perhaps most significant, however, was Mr. Mekerri's increasingly unreasonable scrutiny of Dr. Menninger's job performance. In particular, Mr. Mekerri began to blame Dr. Menninger for errors within the organization that were not her fault, and he falsely suggested that Dr. Menninger was failing to provide appropriate "leadership" and "communication."

49.    Mr. Mekerri had not treated Dr. Menninger in this manner before he learned of her disability.

50.    Dr. Menninger complained of Mr. Mekerri's harassment and retaliation on April 17, 2018 via an email to Mr. St. John. She received no response and, upon information and belief, no action was taken by PPD in response to this complaint.

51.    Mr. Mekerri's misconduct continued, and Dr. Menninger complained again to Mr. St. John via email on April 27, 2018.

52.    Finally, on April 30, 2018, Dr. Menninger received a response from Mr. St. John. Again, he refused to respond to Dr. Menninger's repeated requests to engage in an interactive dialogue with respect to her request for accommodation.

53.    With respect to Mr. Mekerri's harassment and retaliation, Mr. St. John flatly denied—without any evidence or analysis—that such misconduct had taken place. Nonetheless, he assured Dr. Menninger that PPD would conduct a proper investigation and that she would be contacted by another member of the Human Resources Department.

54.    On May 2, 2018, Dr. Menninger was contacted by Deborah Ballweg, from PPD's Human Resources Department. Ms. Ballweg informed Dr. Menninger that she would be conducting an investigation into her allegations of discrimination and retaliation.

10

**JA34**

55.     Dr. Menninger cooperated fully in the investigation and provided ample evidence to demonstrate that Mr. Mekerri had engaged in both discrimination and retaliation in connection with Dr. Menninger's disability.

56.     Despite this evidence, Dr. Menninger was informed by Deborah Ballweg, on May 22, 2018, that PPD had concluded that no discrimination or retaliation had taken place.

57.     PPD's refusal to recognize the existence of the discrimination and retaliation to which Dr. Menninger was being subjected, along with its continued refusal to engage in an interactive dialogue concerning her disability, greatly exacerbated the anxiety, stress and other symptoms that she had been suffering from since disclosing her disability.  Rather than help alleviate Dr. Menninger's burden, PPD made it progressively worse, and its refusal to recognize that misconduct was the last straw.

58.     As a result of the emotional distress that she was suffering, Dr. Menninger's physician instructed her to take an immediate medical leave effective June 3, 2018.  Dr. Menninger was subsequently required to take part in an intensive partial hospitalization treatment program to deal with the anxiety, depression and other emotional distress caused by this situation.

59.     The significant decline in Dr. Menninger's health, which was caused by PPD's unlawful conduct, ultimately resulted in Dr. Menninger losing her job.

## COUNT I

### (Americans with Disabilities Act)

60.     Dr. Menninger realleges and incorporates paragraphs 1 through 59 above, as if fully set forth herein.

11

**JA35**

61.     Dr. Menninger timely met the administrative prerequisites to suit under the Americans with Disabilities Act ("ADA").

62.     At all times relevant hereto, Dr. Menninger had a "disability" as defined by the ADA, 42 U.S.C. § 12102(2), as amended.

63.     At all times relevant hereto, Dr. Menninger was a "qualified individual with a disability" within the meaning of the ADA, 42 U.S.C. § 12111(8).

64.     Through conduct alleged above, PPD has discriminated and retaliated against Dr. Menninger in violation of the ADA, 42 U.S.C. § 12112.

65.     As a direct and proximate result thereof, Dr. Menninger has suffered and continues to suffer damages, including but not limited to loss of compensation and benefits, and emotional distress damages.

## COUNT II

### (M.G.L. c. 151B)

66.     Dr. Menninger realleges and incorporates paragraphs 1 through 65 above, as if fully set forth herein.

67.     Dr. Menninger timely met the administrative prerequisites to suit under M.G.L. c. 151B.

68.     At all times relevant hereto, Dr. Menninger had a "handicap" as defined by G.L. c. 151B § 1(17).

69.     At all times relevant hereto Dr. Menninger was a "qualified handicapped person" within the meaning of G.L. c. 151B § 1(16).

70.     Through conduct alleged above, PPD has discriminated and retaliated against Dr. Menninger in violation of G.L. c. 151B.

12

**JA36**

71.     As a direct and proximate result thereof, Dr. Menninger has suffered and continues to suffer damages, including but not limited to loss of compensation and benefits, and emotional distress damages.

**WHEREFORE**, Dr. Menninger respectfully requests that this Court:

1.     Enter judgment in dr. Menninger's favor and against PPD on all Counts;

2.     Award Dr. Menninger compensatory damages, including, but not limited to, back pay, front pay, and lost benefits, all with interest at the statutory rate;

3.     Award Dr. Menninger emotional distress damages, with interest at the statutory rate;

4.     Award Dr. Menninger punitive damages;

5.     Award Dr. Menninger her attorneys' fees and costs; and

6.     Order such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Lisa Menninger hereby demands a trial by jury on all Counts that are so triable.

Respectfully submitted,
**Plaintiff Lisa Menninger**,
By her attorneys,

Patrick J. Hannon, BBO# 664958
Hartley Michon Robb, LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
P: (617) 723-8000
F: (617) 447-2800
phannon@hartleymichonrobb.com

**DATED**: June 28, 2019

**JA37**

## 2015 Performance Review for Lisa Menninger



## Employee Information

|  |  |
|---|---|
| First Name: | Lisa |
| Last Name: | Menninger |
| Manager: | David Johnston |
| Department: | OPS |
| Location: | US - Highland Heights |
| Position: | ED Labs |
| Last Year's Performance Rating:: | Not Applicable |

## Review Information

|  |  |
|---|---|
| Originator: | PPD Performance Management (v4admin) |
| Review Period: | 01/01/2015 - 12/31/2015 |
| Due Date: | 12/31/2015 |

## Performance Review

Performance against Business Goals and Behavior Goals are reviewed and documented twice per year. Employee's draft comments are viewable by their manager during the review period.

During the Mid-year Check-in employees and managers provide comments on overall Business Goals and Behavior Goals progress to date. Also, at the Year-end Review employees provide details and examples against each Business Goal and Behavior Goal by briefly stating the Situation/Task, Action and Result.

## Business Goals

PPD_MENNINGER000067

JA38

**Category: Superior Performance**

**Goal :** 1. Collaborate with financial leadership and lab ADs to achieve 80% completion on cost-per-test project
2. Use project outcome data to update the GCL rate card for 2016

**Measurement :** 1. Weekly meetings with financial leadership to advise on project inputs
2. Adjustments to 2016 rate card based on cost-per-test project data

**Start :** 09/07/2015   **Due :** 12/31/2015   **Status :** On Target   **Weight :** 25.0%

**Tasks/Milestones :**

**Rating by David Johnston:**

**Manager Rating: 3: Fully Effective**

**David Johnston's Year-end Comments:**
Lisa has made good progress on this task but needs additional support from other departments and staff.

**Rating by Lisa Menninger:**

**Employee Rating: Please Rate**

**Lisa Menninger's Year-end Comments:**
This is a high-priority goal for PPD GCLs to ensure that the lab is setting rates appropriately based on all direct and indirect assay costs. This project was on track in the EU upon my arrival, but stalled in the US due to lack of prioritization and personnel resources. To drive this project forward, I worked with the lab and financial leadership to:
- Hire an admin temp to assist the bench techs in capturing the direct costs of targeted assays
- Advise on inputs for the cost-per-test project
- Review formulas used in the bidding process
- Identify areas in the lab where efficiencies could be improved and/or rates needed to be adjusted
- Update the 2016 rate card based on cost-per-test project outputs

---

**Category: Superior Performance**

**Goal :** Drive the completion of the Cobas Validation Project by December 31, 2015

**Measurement :** Cobas validations are completed and approved by December 31, 2015

**Start :** 09/07/2015   **Due :** 12/31/2015   **Status :** On Target   **Weight :** 25.0%

**Tasks/Milestones :**

**Rating by David Johnston:**

**Manager Rating: 4: Highly Effective**

**David Johnston's Year-end Comments:**
Lisa has gotten this project back on track despite several resource gaps and structural challenges.

**Rating by Lisa Menninger:**

**Employee Rating: Please Rate**

**Lisa Menninger's Year-end Comments:**
This project experienced significant delays in 2014-2015 due to lack of organization and leadership.
- Met with validation team during first week of September to review status of all validations
- Provided technical guidance and feedback for all global Cobas validation plans and summaries
- Determined ownership for all pending validations and set deadlines for deliverables
- Drove the Cobas group 1 validations (largest group) to completion by November 30, 2015
- Set December 14, 2015 target date for Group 2 completion and December 31, 2015 deadline for remaining groups 3 and 4
- Worked with leadership to bring in additional validation specialists to meet Cobas project and sponsor-required validation deadlines

PPD_MENNINGER000068

## Category: Continuous Improvement

**Goal :** Identify and address GCL CAP/CLIA and State of NY compliance and quality gaps

**Measurement : 1.** Submit all necessary documentation and applications to update CAP/CLIA and State of NY certifications 2. Delegate molecular and flow cytometry technical oversight to Ph.D. level scientists from Biomarker lab

**Start :** 09/01/2015    **Due :** 12/31/2015    **Status :** On Target   **Weight :** 25.0%

### Tasks/Milestones :

**Rating by David Johnston:**

**Manager Rating: 4: Highly Effective**

**David Johnston's Year-end Comments:**
Lisa identified all compliance gaps, proposed a plan to address them, and made arrangements to achieve the plans, including engagement of QPs from the biomarker lab.

**Rating by Lisa Menninger:**

**Employee Rating: Please Rate**

**Lisa Menninger's Year-end Comments:**
- Reviewed current CAP/CLIA and State of NY certification categories
- Addressed current compliance gaps in testing categories listed on certificates
- Advised and worked on plan to remediate with QA
- Identified NY CQ qualified molecular and flow cytometry technical consultants from Biomarker lab
- Submitted applications and received CAP directorship certification for EU and US laboratories
- Submitted application for State of KY Medical License
- Added anatomic pathology to CAP US and EU test menus (CAP AP inspections scheduled for both labs)
- Provided ISO 15189 expertise to QA leadership based on previous consultation and work with international ISO 15189 experts

## Category: People and Culture

**Goal :** Build and restructure the Technical and Scientific Affairs team by adding key talent and updating the organization chart to reflect Lab Director oversight

**Measurement : 1.** Requisitions submitted, applications reviewed and interviews conducted 2. Official change in organization chart

**Start :** 09/07/2015    **Due :** 12/31/2015    **Status :** On Target   **Weight :** 25.0%

### Tasks/Milestones :

**Rating by David Johnston:**

**Manager Rating: 4: Highly Effective**

**David Johnston's Year-end Comments:**
This is a work in progress but Lisa has made tremendous project in mapping out a plan to build a durable, effective scientific affairs department. There is a lead candidate with an offer pending and a plan to bolster resources and processes.

**Rating by Lisa Menninger:**

**Employee Rating: Please Rate**

**Lisa Menninger's Year-end Comments:**
- Submitted requisitions and received approval for Associate Research Scientists with expertise in the validation process
- Led Technical Director recruitment efforts with HR, internal and external recruiters
- Updated the SciTech Team organizational chart to reflect Lab Director leadership and technical oversight
- Created Global Validation Manager position for SciTech team
- Added Scientific Writer position to address technical writing gaps in documents intended for internal and external clients

# Behavior Goals

Employees and managers work together to select a recommended 2-3 behaviors needed for achieving Business Goals and develop a goal for each that is specific, measurable, achievable, relevant and timebased.

**Decision Making**

Identifies the root causes of a problem, prioritizes them, and then identifies solutions to key root causes; Makes clear, consistent, transparent decisions based on logic; Distinguishes relevant from irrelevant information when making decisions; Generates and proposes alternate decisions, and when those alternatives should be used; Able to overcome the dilemma of short-term gains versus longer-term gains; Asks for guidance when compete data and information are not available

**Behavior Goal**

To support my goal of leading the SciTech and Lab teams, I will work with the teams to identify gaps in the validation, quality control and proficiency testing processes.

**Rating by David Johnston:**

**Manager Rating: 5: Exceptional**

**Weight: 50%**

**David Johnston's Year-end Comments:**
Lisa has shown strong leadership and has exerted clear decision making on several business critical items-- during a time of leadership change within central labs.

**Rating by Lisa Menninger:**

**Employee Rating: Please Rate**

**Lisa Menninger's Year-end Comments:**
- Assigned validation responsibilities to team members based on skill sets
- Set clearly defined expectations and timelines for validation deliverables
- Raised the bar for lab quality and compliance
  - Held individuals accountable for repeated mistakes due to lack of attention to detail
  - Enforced documentation compliance (GDP)
  - Spent time on each lab bench to discuss and identify process improvement projects
  - Educated lab team on 5S and ISO 15189 initiatives
  - Assigned Westgard Basic Method Validation and Quality Control continuing education courses for all technical staff
  - Incorporated lab metrics into the Quality Management System

**Organizational Awareness**
Understands the organization's mission and values; Understands the organization's capabilities, capacities, and constraints in terms of resources; Demonstrates an understanding of the formal and informal structure of the organization; Keeps updated on formal and informal reporting relationships in immediate surroundings; Participates in cross-functional activities and interdepartmental initiatives; Aligns actions and decisions with the mission, vision, and goals of the department and the organization; Reviews external information and news to learn about political and social issues that might affect the organization; Uses discretion when handling sensitive matters or content; Learns about the corporate culture and adapts personal style to reflect his or her understanding

**Behavior Goal**
I will work with HR and recruiting to bring in key talent and strengthen the technical expertise of the SciTech and Lab teams.

**Rating by David Johnston:**

**Manager Rating: 4: Highly Effective**

**Weight: 50%**

**David Johnston's Year-end Comments:**
Lisa has demonstrated enterprise wide thinking in addressing the key business and scientific priorities for the business in a way that leverages resources within PPD. She is a valuable member of the management team and has clear potential to continue to contribute at higher levels within the organization.

**Rating by Lisa Menninger:**

**Employee Rating: Please Rate**

**Lisa Menninger's Year-end Comments:**
- Created a global validation manager position for the SciTech team with input from HR and compensation
- Submitted a requisition for a hematology and urinalysis supervisor position to address quality and lab tech competency gaps
- Worked with Biomarker team to bring in temporary validation support for Central Labs
- Formalized plan to bring in Ph.D. level technical consultants from Biomarker Lab to address regulatory compliance gaps in Central Lab

# Mid-year Check-in

The purpose of the Mid-year Check-in is to provide an opportunity for managers and employees to discuss and document progress against goals, update Career Development Plans and to update Employee Profiles. However, comments summarizing performance against Business goals and PPD behavior goals are required.

If employee performance is not meeting the expectations of the role, documenting performance concerns is required. If employee performance exceeds expectations it is recommended that be documented, as well.

## Mid-year Check-in for Business Goals

**Section Comments:**
**David Johnston's Mid-year Comments:**
*No comments*

**Lisa Menninger's Mid-year Comments:** *No comments*

## Mid-year Check-in for Behavior Goals

**Section Comments:**
**David Johnston's Mid-year Comments:**
*No comments*

**Lisa Menninger's Mid-year Comments:** *No comments*

# Employee Confirmations

## Mid-year Check-in Employee Confirmations

Employee completes this section as the final step in the Mid-year Check-in.

☐ Employee confirms the following:

- Employee Profile is up to date as of submission of this form.
- LMS requirements are current as of submission of this form.
- Mid-year Check-in discussion took place.

## Year-end Review Employee Confirmations

Employee completes this section during the Year-end Self-assessment.

☑ Employee confirms the following:

- Employee Profile is up to date as of submission of this form.
- LMS requirements are current as of submission of this form.

# Manager Confirmations

## Mid-year Check-in Manager Confirmations

As part of the Mid-year Check-in process, progress against Developmental Objectives is discussed and documented in the Career Development Plan.

☐ Manager confirms that Career Development Plan has been discussed and updated.
Mid-year Check-in follow-up needed with Employee? Select one
If yes, date?

## Year-end Review Manager Confirmations

As part of the Year-end Review process, progress against Developmental Objectives is discussed and documented in the Career Development Plan.

☑ Manager confirms that Career Development Plan has been discussed and updated.
Year-end follow-up needed with Employee? Yes
If yes, date? 02/28/2015

**JA43**

# Overall Performance

Overall Business Goals rating weighted at 60% and overall Behavior Goals rating weighted at 40%.

**4.0 - Highly**
**Overall Rating: Effective**

| | Rating | Weights |
|---|---|---|
| **Business Goals (60%)** | | |
| 1. Collaborate with financial leadership and lab ADs to achieve 80% completion on cost-per-test project 2. Use project outcome data to update the GCL rate card for 2016 | 3: Fully Effective | 25.0% |
| Drive the completion of the Cobas Validation Project by December 31, 2015 | 4: Highly Effective | 25.0% |
| Identify and address GCL CAP/CLIA and State of NY compliance and quality gaps | 4: Highly Effective | 25.0% |
| Build and restructure the Technical and Scientific Affairs team by adding key talent and updating the organization chart to reflect Lab Director oversight | 4: Highly Effective | 25.0% |
| **Behavior Goals (40%)** | | |
| Decision Making | 5: Exceptional | 50% |
| Organizational Awareness | 4: Highly Effective | 50% |

---

**Too New to Rate and Long Term Leave of Absence**

Managers may select the appropriate box below to indicate that the employee has not worked sufficient time during the year to evaluate performance. If performance ratings have not been entered due to employee Long Term Leave of Absence, contact your HR representative to have the form routed to completion.

☐ Too New to Rate

☐ Long Term Leave of Absence

---

# Signature Section

Use this section to sign the document.

Employee signature does not imply agreement or disagreement, only the acknowledgement that the discussion occurred.

| Employee: | *Lisa Menninger* | *12/28/2015* |
|---|---|---|
| | Lisa Menninger | |
| Manager: | *David Johnston* | *12/30/2015* |
| | David Johnston | |
| 2nd Level Manager: | *Bill Sharbaugh* | *01/02/2016* |
| | Bill Sharbaugh | |

**Section Comments:**
**Comments by Bill Sharbaugh:**
Lisa is great aditional to the Central Lab leadership team, and is assisting with scientific and technical capability expansion.

## 2016 Performance Review for Lisa Menninger



## Employee Information

First Name: Lisa
Last Name: Menninger
Manager: Hacene Mekerri
Department: OPS
Location: US - Highland Heights
Position: ED Labs
Last Year's Performance Rating: 4 - Highly Effective

## Review Information

Originator: Corporate HRIS (adminNA11)
Review Period: 01/01/2016 - 12/31/2016
Due Date: 12/31/2016

## Performance Review

Performance against Business Goals and Behavior Goals are reviewed and documented twice per year. Employee's draft comments are viewable by their manager during the review period.

During the Mid-year Check-in employees and managers provide comments on overall Business Goals and Behavior Goals progress to date. Also, at the Year-end Review employees provide details and examples against each Business Goal and Behavior Goal by briefly stating the Situation/Task, Action and Result.

## Business Goals

JA45

## Category: Superior Performance

**Goal :** Collaborate with lab, data management and finance to establish and standardize global lab metrics for test volumes, supply costs and revenue generated per test/test category.

**Measurement :** Metrics created, organized and reviewed for accuracy for presentation at SLT meetings. Documented meetings with data management and finance to begin process of working toward standardization.

**Start :** 01/01/2016  **Due :** 12/31/2016  **Status :** On Target  **Weight :** 25.0%

**Tasks/Milestones :**

**Rating by Hacene Mekerri:**

**Manager Rating: 4: Highly Effective**

**Hacene Mekerri's Year-end Comments:**
Excellent collaboration with the GCL teams to put in place Laboratory dashboards.
Lab Dashboards will be used for discussions with Sales to increase our Testing revenue (Molecular, AP).
Lisa will help to have Metrics process automated, accessible in Spotfire.

**Rating by Lisa Menninger:**

**Employee Rating: 4: Highly Effective**

**Lisa Menninger's Year-end Comments:**
Metrics consolidated and submitted to QA for presentation at Quality Council and SLT meetings. Joint project between lab and finance to standardize revenue, lab cost codes and test volume categories near completion and on track for go-live 02Jan2017. This alignment will allow for better visibility and analysis of test category volumes compared to supply costs and revenue.

## Category: Superior Performance

**Goal :** Evaluate, select, submit FAR and purchase global replacement instrumentation for urinalysis and hematology. Work with SciTech team create validation plan upon instrument delivery to lab. Begin/complete validations depending on timing of instrument arrival.

**Measurement :** FAR approved, instruments delivered, validation plans created and validations started with possible completion depending on when instruments are delivered.

**Start :** 01/01/2016  **Due :** 12/31/2016  **Status :** On Target  **Weight :** 25.0%

**Tasks/Milestones :**

**Rating by Hacene Mekerri:**

**Manager Rating: 4: Highly Effective**

**Hacene Makerri's Year-end Comments:**
Major investments to upgrade instruments and provide state-of-the-art services to customer. Lisa has been leading the effort successfully, Validation completed on time and communication to client is being completed as planned.

**Rating by Lisa Menninger:**

**Employee Rating: 4: Highly Effective**

**Lisa Menninger's Year-end Comments:**
FAR approved, all instrumentation delivered and installed in US, EU, SG and SH labs. Urinalysis and hematology validation plans complete. US and EU urinalysis and hematology lab validation experiments complete globally, APAC experiments in progress. On track to complete all validation experiments Q4 2016. Anticipated go-live Q2 2017 once IT component completed and MTM updated.

**JA46**

**Category: Continuous Improvement**

Goal : Collaborate with QA to identify and address GCL CAP/CLIA/NY compliance and quality gaps. Complete application for KY medical license and receive license.

Measurement : NY CQ holders (Frank and K) in place for molecular virology and flow cytometry. Lab director KY medical license obtained (Lisa Menninger) NY renewal application submitted with updated testing categories. Process initiated to transition send-out testing away from non-NY certified third-party labs to NY certified labs (ARUP contract in place and lab audited)

Start : 01/01/2016   Due : 12/31/2016   Status : On Target   Weight : 25.0%

**Tasks/Milestones :**

**Rating by Hacene Mekerri:**

Manager Rating: 4: Highly Effective

**Hacene Mekerri's Year-end Comments:**
Strong progress in our 3PL strategy, minimize number of 3PLs (Cost and Margin effective), in source testing, partner with certified Labs (NYS).
ARUP Laboratory qualification completed in Q4 2016.

**Rating by Lisa Menninger:**

Employee Rating: 4: Highly Effective

**Lisa Menninger's Year-end Comments:**
Kentucky medical license obtained. CQ certification obtained for Frank, certification for K pending completion of recommendation letter by Pat Bennet. Test menu audit underway between SciTech and QA to ensure accuracy of MTM with identification of all lab developed tests before updating NY test menu, as this will trigger an onsite inspection by State of NY.
ARUP vendor management process complete. Send-out testing transitioned from CCF (non-NY certified) to ARUP (NY certified) as our primary 3PL partner.

**Category: People and Culture**

Goal : Collaborate with AP Task Force and leadership teams to clarify and redefine AP strategy and project plan, identify gaps and propose solutions to meet client expectations.

Measurement : AP project plan created to reflect clarified strategy Task Force created to identify and address AP gaps New AP workflows developed and implemented to meet client expectations

Start : 01/01/2016   Due : 12/31/2016   Status : On Target   Weight : 25.0%

**Tasks/Milestones :**

**Rating by Hacene Mekerri:**

Manager Rating: 4: Highly Effective

**Hacene Mekerri's Year-end Comments:**
Successful AP implementation, CAP accreditations in EU and US. 37 trials awarded, sample processed in a 5S environment.
AP Task force has been a great initiative for cross departmental collaboration (Engagement Survey).
Once completed, this objective will allow us to provide full service to client, Lisa is exploring collaboration with partner (i.e.:Phenopath Laboratory visit planned for January 2017).

**Rating by Lisa Menninger:**

Employee Rating: 3: Fully Effective

**Lisa Menninger's Year-end Comments:**
AP project plan updated and task force created with representation by GCL cross-functional departments. 97 total gaps identified with 75% brought to closure as of 15Nov2016. AP workflows created and implemented by lab. Ongoing training by AP lab staff continues for cross-functional departments to increase their understanding and confidence in handling AP studies.

# Behavior Goals

Employees and managers work together to select a recommended 2-3 behaviors needed for achieving Business Goals and develop a goal for each that is specific, measurable, achievable, relevant and timebased.

PPD_MENNINGER000076

**Organizational Awareness**

Understands the organization's mission and values; Understands the organization's capabilities, capacities, and constraints in terms of resources; Demonstrates an understanding of the formal and informal structure of the organization; Keeps updated on formal and informal reporting relationships in immediate surroundings; Participates in cross-functional activities and interdepartmental initiatives; Aligns actions and decisions with the mission, vision, and goals of the department and the organization; Reviews external information and news to learn about political and social issues that might affect the organization; Uses discretion when handling sensitive matters or content; Learns about the corporate culture and adapts personal style to reflect his or her understanding

**Behavior Goal**

I will work with HR and recruiting to bring in key talent and strengthen the technical expertise of the SciTech and Lab teams.

**Rating by Hacene Mekerri:**

Manager Rating: 4: Highly Effective

Weight: 50%

Hacene Mekerri's Year-end Comments:
*No comments*

**Rating by Lisa Menninger:**

Employee Rating: 4: Highly Effective

**Lisa Menninger's Year-end Comments:**
SciTech Director hired. Lab supervisors hired for chemistry/microbiology and hematology/UA lab sections. US Lab Senior Director interviewed and offer made (Currently working through non-compete issue with goal of hire Q1 2017). Reqs submitted, approved and interviews underway for five candidates to build up expertise in SciTech department.
In discussions with EU Ph.D. candidate for EU CAP Director position and technical director oversight of APAC labs.
Recruitment of molecular and flow directors ongoing.

**Decision Making**

Identifies the root causes of a problem, prioritizes them, and then identifies solutions to key root causes; Makes clear, consistent, transparent decisions based on logic; Distinguishes relevant from irrelevant information when making decisions; Generates and proposes alternate decisions, and when those alternatives should be used; Able to overcome the dilemma of short-term gains versus longer-term gains; Asks for guidance when complete data and information are not available

**Behavior Goal**

To support my goal of leading the SciTech and Lab teams, I will work with the teams to identify quality and compliance gaps in their respective departments. I will prioritize projects, assign action items and hold teams responsible for on-time deliverables.

**Rating by Hacene Mekerri:**

Manager Rating: 4: Highly Effective

Weight: 50%

Hacene Mekerri's Year-end Comments:
Successful Scientific affairs Procedures implemented early this year.
ARUP Laboratory qualification completed in Q4 2016.
Lisa will continue to work on reducing 3PLs and referral costs.

**Rating by Lisa Menninger:**

Employee Rating: 4: Highly Effective

**Lisa Menninger's Year-end Comments:**
All global labs and SciTech team completed internal CAP inspections to assess readiness for their actual inspection. AP CAP inspections this year in the EU and US had outstanding outcomes, as did the SH lab for their routine 2-year CAP inspection.
A robust validation tracker and validation plan and summary templates have been created by the SciTech team. There has been significant improvement in meeting validation deadlines since Q1 2016. I expect continuing improvement as open validation scientist positions are filled. In the interim, the SciTech team is working overtime to ensure that client deadlines are met. Continuous improvements are underway to streamline communication between lab and SciTech department for validations, 3PL result data entry and bidding process.
There has been significant progress made by the labs in completing overdue quality CAPAs/Events. The target date for completion of any remaining overdue items is the end of Q4 2016. There was a tremendous team effort between SciTech and the global lab teams in completing a two-year backlog of overdue ANFs. Going forward, this process has been simplified to ensure faster turnaround with on-time completion.

# Mid-year Check-in

PPD_MENNINGER000077

The purpose of the Mid-year Check-in is to provide an opportunity for managers and employees to discuss and document progress against goals, update Career Development Plans and to update Employee Profiles. However, comments summarizing performance against Business goals and PPD behavior goals are required.

If employee performance is not meeting the expectations of the role, documenting performance concerns is required. If employee performance exceeds expectations it is recommended that be documented, as well.

## Mid-year Check-in for Business Goals

**Section Comments:**

**Hacene Mekerri's Mid-year Comments:**
No comments

**Lisa Menninger's Mid-year Comments:**
On-target for all goals with the exception of transitioning 3PL work from non-NY-certified labs. Additionally, K has not received his NY CQ certificate for flow cytometry technical oversight. Will continue to work with SciTech Director, QA and Biomarker lab on addressing NY compliance gaps.

## Mid-year Check-in for Behavior Goals

**Section Comments:**

**Hacene Mekerri's Mid-year Comments:**
No comments

**Lisa Menninger's Mid-year Comments:**
SciTech Director hired. Lab supervisors hired for chemistry, microbiology and hematology/UA lab sections. Technical Director interviewed and offer made. Reqs submitted to build up expertise in SciTech department.

Will begin exploring consultant options for a hematopathologist, as well as recruit for a flow cytometry section director qualified to oversee flow oncology testing.

Internal CAP Inspections performed to assess CAP readiness in US and EU labs. Validation gaps identified and corrective action plan developed based on CLSI guidelines. Continue to coach SciTech director on setting priorities and meeting validation deadlines.

# Employee Confirmations

## Mid-year Check-in Employee Confirmations

Employee completes this section as the final step in the Mid-year Check-in.

☐ Employee confirms the following:

- Employee Profile is up to date as of submission of this form.
- LMS requirements are current as of submission of this form.
- Mid-year Check-in discussion took place.

PPD_MENNINGER000078

**JA49**

### Year-end Review Employee Confirmations

Employee completes this section during the Year-end Self-assessment.

☑ Employee confirms the following:

- Employee Profile is up to date as of submission of this form.
- LMS requirements are current as of submission of this form.

# Manager Confirmations

## Mid-year Check-in Manager Confirmations

As part of the Mid-year Check-in process, progress against Developmental Objectives is discussed and documented in the Career Development Plan.

☐ Manager confirms that Career Development Plan has been discussed and updated.
**Mid-year Check-in follow-up needed with Employee?** Select one
**If yes, date?**

## Year-end Review Manager Confirmations

As part of the Year-end Review process, progress against Developmental Objectives is discussed and documented in the Career Development Plan.

☐ Manager confirms that Career Development Plan has been discussed and updated.
**Year-end follow-up needed with Employee?** Select one
**If yes, date?**

# Overall Performance

Overall Business Goals rating weighted at 60% and overall Behavior Goals rating weighted at 40%.

**4.0 - 4: Highly**
**Overall Rating: Effective**

| | Rating | Weights |
|---|---|---|
| **Business Goals (60%)** | | |
| Collaborate with lab, data management and finance to establish and standardize global lab metrics for test volumes, supply costs and revenue generated per test/test category. | 4: Highly Effective | 25.0% |
| Evaluate, select, submit FAR and purchase global replacement instrumentation for urinalysis and hematology. Work with SciTech team create validation plan upon instrument delivery to lab. Begin/complete validations depending on timing of instrument arrival. | 4: Highly Effective | 25.0% |
| Collaborate with QA to identify and address GCL CAP/CLIA/NY compliance and quality gaps. Complete application for KY medical license and receive license. | 4: Highly Effective | 25.0% |

PPD_MENNINGER000079

**JA50**

| Collaborate with AP Task Force and leadership teams to clarify and redefine AP strategy and project plan, identify gaps and propose solutions to meet client expectations. | 4: Highly Effective | 25.0% |
| Behavior Goals (40%) | | |
| Organizational Awareness | 4: Highly Effective | 50% |
| Decision Making | 4: Highly Effective | 50% |

### Too New to Rate and Long Term Leave of Absence

Managers may select the appropriate box below to indicate that the employee has not worked sufficient time during the year to evaluate performance. If performance ratings have not been entered due to employee Long Term Leave of Absence, contact your HR representative to have the form routed to completion.

☐ Too New to Rate

☐ Long Term Leave of Absence

## Optional Overall Comments

## Signature Section

Use this section to sign the document.

Employee signature does not imply agreement or disagreement, only the acknowledgement that the discussion occurred.

| Employee: | *Lisa Menninger* | 01/04/2017 |
| | Lisa Menninger | |
| Manager: | *Hacene Mekerri* | 01/07/2017 |
| | Hacene Mekerri | |
| 2nd Level Manager: | *David Johnston* | 01/16/2017 |
| | David Johnston by Sydney Bens | |

**JA51**

**From:** Lisa Menninger
**Sent:** Thursday, January 11, 2018 6:49 PM
**To:** Hacene Mekerri <Hacene.Mekerri@ppdi.com>
**Subject:** Confidential
**Sensitivity:** Confidential

Hi Hacene,

It was great catching back up with you this week after the holidays. As you mentioned that you'd like to discuss some ideas you have regarding how to make my role more visible, I think it's important that I make you aware of a medical condition that I've been suffering from. This is very difficult for me to discuss, as it's not something I openly share with others.

I have a generalized anxiety disorder that includes social anxiety disorder and panic attacks. It's something that I've been dealing with my entire life. I'd rather not get into all of the details, but I am particularly affected by social interactions, which often cause panic attacks. I've received treatment in the past and continue to take medication as needed when my panic attacks become severe.

As you've seen, my medical condition has not prevented me from accomplishing the essential functions of my job. However, some of the new tasks you've suggested will be difficult in light of my disability, as they would include increased client visits/social interactions and presentations (internal and external).

I am, of course, open to discussing whatever ideas you have for my role. But my condition presents some very significant challenges for me, and I thought it would be most productive for me to openly and honestly share those with you. I would have done so sooner, but this is something that I really have a hard time talking about. I hope you understand.

I'm confident that we can work through this together, and I really hope to have your support in doing so.

Lisa


**Lisa A. Menninger, M.D., DABP, FCAP, FASCP**
Executive Director Lab, Global Central Labs, PPD
OPERATIONS

**PPD**

Phone +1 859 462 2747
Lisa.Menninger@ppdi.com
www.ppdi.com

**JS 44   (Rev. 06/17)**

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Menninger, Lisa | PPO Development, LLP |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Bristol**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Patrick Hannon, Hartley Michon Robb LLP, 155 Seaport Blvd, Boston, MA, 617-737-8000

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ❏ 2  U.S. Government Defendant
- ❏ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- ❏ 110 Insurance
- ❏ 120 Marine
- ❏ 130 Miller Act
- ❏ 140 Negotiable Instrument
- ❏ 150 Recovery of Overpayment & Enforcement of Judgment
- ❏ 151 Medicare Act
- ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ❏ 153 Recovery of Overpayment of Veteran's Benefits
- ❏ 160 Stockholders' Suits
- ❏ 190 Other Contract
- ❏ 195 Contract Product Liability
- ❏ 196 Franchise

### REAL PROPERTY
- ❏ 210 Land Condemnation
- ❏ 220 Foreclosure
- ❏ 230 Rent Lease & Ejectment
- ❏ 240 Torts to Land
- ❏ 245 Tort Product Liability
- ❏ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ❏ 310 Airplane
- ❏ 315 Airplane Product Liability
- ❏ 320 Assault, Libel & Slander
- ❏ 330 Federal Employers' Liability
- ❏ 340 Marine
- ❏ 345 Marine Product Liability
- ❏ 350 Motor Vehicle
- ❏ 355 Motor Vehicle Product Liability
- ❏ 360 Other Personal Injury
- ❏ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ❏ 365 Personal Injury - Product Liability
- ❏ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ❏ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ❏ 370 Other Fraud
- ❏ 371 Truth in Lending
- ❏ 380 Other Personal Property Damage
- ❏ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ❏ 440 Other Civil Rights
- ❏ 441 Voting
- ❏ 442 Employment
- ❏ 443 Housing/ Accommodations
- ☒ 445 Amer. w/Disabilities - Employment
- ❏ 446 Amer. w/Disabilities - Other
- ❏ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ❏ 463 Alien Detainee
- ❏ 510 Motions to Vacate Sentence
- ❏ 530 General
- ❏ 535 Death Penalty
**Other:**
- ❏ 540 Mandamus & Other
- ❏ 550 Civil Rights
- ❏ 555 Prison Condition
- ❏ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ❏ 625 Drug Related Seizure of Property 21 USC 881
- ❏ 690 Other

### LABOR
- ❏ 710 Fair Labor Standards Act
- ❏ 720 Labor/Management Relations
- ❏ 740 Railway Labor Act
- ❏ 751 Family and Medical Leave Act
- ❏ 790 Other Labor Litigation
- ❏ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ❏ 462 Naturalization Application
- ❏ 465 Other Immigration Actions

### BANKRUPTCY
- ❏ 422 Appeal 28 USC 158
- ❏ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ❏ 820 Copyrights
- ❏ 830 Patent
- ❏ 835 Patent - Abbreviated New Drug Application
- ❏ 840 Trademark

### SOCIAL SECURITY
- ❏ 861 HIA (1395ff)
- ❏ 862 Black Lung (923)
- ❏ 863 DIWC/DIWW (405(g))
- ❏ 864 SSID Title XVI
- ❏ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ❏ 870 Taxes (U.S. Plaintiff or Defendant)
- ❏ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ❏ 375 False Claims Act
- ❏ 376 Qui Tam (31 USC 3729(a))
- ❏ 400 State Reapportionment
- ❏ 410 Antitrust
- ❏ 430 Banks and Banking
- ❏ 450 Commerce
- ❏ 460 Deportation
- ❏ 470 Racketeer Influenced and Corrupt Organizations
- ❏ 480 Consumer Credit
- ❏ 490 Cable/Sat TV
- ❏ 850 Securities/Commodities/ Exchange
- ❏ 890 Other Statutory Actions
- ❏ 891 Agricultural Acts
- ❏ 893 Environmental Matters
- ❏ 895 Freedom of Information Act
- ❏ 896 Arbitration
- ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ❏ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ❏ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from Another District *(specify)*
- ❏ 6 Multidistrict Litigation - Transfer
- ❏ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):* 42 U.S.C. § 12100

Brief description of cause: Employment discrimination

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ $1.5 MM

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE 6/28/19

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**JA53**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) _Lisa Menninger v. PPD Development, L.P._

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐ I. 160, 400, 410, 441, 535, 830*, 835*, 850, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

☒ II. 110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

☐ III. 120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.

*Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES ☐   NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES ☐   NO ☒

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES ☐   NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES ☐   NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES ☒   NO ☐

A. If yes, in which division do all of the non-governmental parties reside?

Eastern Division ☒   Central Division ☐   Western Division ☐

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division ☐   Central Division ☐   Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES ☐   NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME ___Patrick Hannon___
ADDRESS ___155 Seaport Blvd, Boston, MA___
TELEPHONE NO. ___617-447-2819___

(CategoryForm1-2019.wpd )

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

        Dr. Menninger,

v.

        Civil Action No.  1:19-CV-11441-LTS

PPD DEVELOPMENT, L.P.,

        Defendant.

## AFFIDAVIT OF CHRIS FIKRY

I, Chris Fikry, hereby depose and state as follows:

1.  I make this affidavit upon personal knowledge and I can testify competently to the matters discussed below.

2.  I work at PPD Development, L.P. ("PPD" or the "Company") as the Executive Vice President of Laboratories. In my role, I manage and oversee the Company's global laboratory business, which includes the Global Central Labs (four laboratories in China, Singapore, Belgium, and the United States). I am based in the Company's corporate headquarters in Wilmington, North Carolina, but I traveled to the laboratory in Highland Heights, Kentucky every quarter, at the very least (pre-pandemic).

3.  I was hired by PPD in June 2017. Around this time, the Global Central Labs' Executive Director, Dr. Lisa Menninger – who was hired by the Company in August 2015 – moved with her family to Massachusetts and began working remotely.

4.  I had never before encountered this type of remote work arrangement, especially for an Executive Director with such significant responsibilities over laboratory operations. I

1

Case: 23-2030    Document: 00118129985    Page: 63    Date Filed: 04/08/2024    Entry ID: 6634402

Case: 23-2030    Document: 00118129985    Page: 64    Date Filed: 04/08/2024    Entry ID: 6634402

was somewhat concerned, and inquired with Human Resources and Hacene Mekerri (then Vice President of Global Central Labs, and Dr. Menninger's supervisor) about how this arrangement was going to work. I was assured that Dr. Menninger was committed to maintaining a physical presence in the Highland Heights laboratory, and that she would travel as frequently as necessary to ensure that the Central Labs continued to operate without disruption.

5. I am aware that some concerns relating to Dr. Menninger's remote work arrangement began to arise in late 2017, specifically relating to a perceived lack of leadership over the Global Central Labs. At this point, I had not yet personally observed those issues firsthand, but they arose in the context of the Company's annual executive talent review, which occurred in December 2017. I met with other members of executive leadership, and we worked with Human Resources to evaluate senior leadership, applying retrospective and prospective standards (i.e., evaluating how the employee had performed in 2017 and expectations for his or her progress in 2018). Mr. Mekerri rated Dr. Menninger as "Limited Progress," which was defined as, "Solid business performance today but with risk of falling behind due to lack of leadership capability." *See* December 20, 2017 Email (PPD_MENNINGER 002999-003000), attached as Tab 1.

6. This was concerning to me, and I recalled my initial hesitance regarding Dr. Menninger's remote work arrangement when I began working at the Company. It seemed that my expectations with respect to that arrangement – i.e., that it is less than ideal for an Executive Director and would inevitably lead to operations issues – were unfortunately coming to fruition.

2

7. In early 2018, a representative of a very important client called me to discuss certain quality issues relating to a particular study. The client was concerned that there was a lack of oversight of the staff conducting the study, and expressed dissatisfaction with respect to technical problems around the development of assays and various other operational issues. In addition, the client was frustrated by what it perceived as a slow response time from PPD generally, and a lack of urgency to address the recently raised issues.

8. This feedback was very concerning to me. Of course, I do not expect any one person – Dr. Menninger included – to be able to ensure that there are no issues or errors within the laboratory. However, at the end of the day, the Company was failing to meet the client's expectations as a result of technical issues which ultimately fell under the responsibility of the Executive Director of the Global Central Labs.

9. I immediately brought these issues to Mr. Mekerri's attention. I expected him, as Dr. Menninger's direct supervisor, to confer with her and let her know that this type of client feedback was very troubling (especially from a very significant client). I told him that he should do what he could to ensure that Dr. Menninger recognized the gravity of the situation and do what was necessary – within reason – to fix the problems that were contributing to the client's dissatisfaction.

10. I am aware that, at some point during the first quarter of 2018, Dr. Menninger disclosed a disability and requested workplace accommodations. I was not involved in these discussions, and I am only aware that they occurred as a result of this litigation. However, I do recall that Dr. Menninger had communicated some hesitancy with respect to certain aspects of her job duties, and it is my understanding that she was working on

3

**JA57**

Case: 23-2030      Document: 00118129985      Page: 66      Date Filed: 04/08/2024      Entry ID: 6634402

those issues with Mr. Mekerri and Human Resources (I now understand that those were workplace accommodation discussions).

11.   I recall that in or around June 2018, Dr. Menninger went out on leave. At that time, I expected that she would return. We made temporary arrangements by allocating her duties among other employees and hiring outside consultants. At some point (I do not recall exactly when), the Company needed to find a more permanent solution, at which time it separated Dr. Menninger's employment.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS $\underline{22}$ DAY OF $\underline{\text{March}}$, 2021.

Chris Fikry

4

**JA58**

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2021 the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Alexandra E. Shaw
Alexandra E. Shaw

TAB 1



**JA61**

PPD_MENNINGER 002999



CONFIDENTIAL

**JA62**

PPD_MENNINGER 003000

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LISA MENNINGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil No. 19-11441-LTS |
| | ) |
| PPD DEVELOPMENT, L.P., | ) |
| | ) |
| Defendant. | ) |
| | ) |

ORDER ON PPD'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 43) AND
MENNINGER'S MOTION TO STRIKE (DOC. NO. 64)

March 22, 2022

SOROKIN, J.

On June 28, 2019, Lisa Menninger filed suit against PPD Development, L.P. ("PPD")

alleging disability discrimination and retaliation in violation of state and federal law.[1]  Pending

now is PPD's Motion for Summary Judgment, in which it challenges Menninger's ability to

succeed at trial on all four claims she brings against it.  Doc. No. 43.  The Court has carefully

reviewed the parties' submissions and arguments and applied the familiar summary judgment

standard, drawing all reasonable inferences and resolving disputes of genuine material fact in

favor of Menninger as the non-moving party.  For the reasons that follow, the Court DENIES IN

PART and ALLOWS IN PART PPD's Motion for Summary Judgment (Doc. No. 43) and

DENIES Menninger's Motion to Strike (Doc. No. 64).

---

[1] The operative complaint includes four claims: (1) disability discrimination in violation of the
Americans with Disabilities Act ("ADA"); (2) retaliation in violation of the ADA; (3) disability
discrimination in violation of Chapter 151B of the Massachusetts General Laws; and (4)
retaliation in violation of Chapter 151B.  Doc. No. 1.

I.     BACKGROUND[2]

On August 31, 2015, PPD hired Dr. Lisa Menninger as the Executive Director of its

Global Central Labs based in Kentucky.  Pl.'s Resp. to Def.'s Statement of Facts ("Pl.'s Resp. to

Def.'s SOF"), Doc. No. 66-158 ¶ 3.  The job description provided to Menninger upon her hire

specified that the "essential functions"[3] of her role included:

- Provides operational leadership to laboratory services. Integrates operational processes, business development, research & development and quality assurance functions for optimal performance within the labs;
- Supports [b]usiness [d]evelopment in obtaining new customers and maintaining relationships. Directs the development of new programs for revenue enhancement/cost expense reduction, including post-evaluation of new implementations for effectiveness;
- Performs financial review, establishes operating budget, and develops forecasts maximizing operating profit. Provides business updates to senior leadership;
- Sets operational standards/goals and directs the implementation of laboratory goals and policies. Oversees resource allocation including space, capital equipment, scientific instrumentation and staff;
- Performs administrative responsibilities including HR functions, personnel development, facilities management, writing SOPs and PDs;
- Oversees the quality assurance and quality control aspects of the lab to ensure compliance with regulatory standards.

See Doc. No. 46-2 at 7.

Hacene Mekerri, Menninger's supervisor and then Vice President of Central Lab

Services, gave Menninger a "Highly Effective" rating for 2016.  Pl.'s Resp. to Def.'s SOF, Doc.

No. 66-158 ¶ 11.  In late 2016, Menninger asked Mekerri whether she could work remotely from

the east coast due to family circumstances.  Id. ¶ 14.  PPD approved this request, and Menninger

eventually moved to Massachusetts in June 2017.  Id. ¶¶ 15, 17.  At some point in November

---

[2] Unless specifically noted, these facts are undisputed.  "Where material disputes remain, they are highlighted in the court's legal analysis and viewed in the light most favorable to the nonmoving party."  Davis v. Murphy, No. 13-CV-11900-IT, 2018 WL 1524532, at *1 (D. Mass. Mar. 28, 2018).
[3] PPD's mere characterization of these functions as "essential" in its job description is relevant, but not dispositive, of whether these functions were in fact essential.  The Court engages in that analysis later in this Order.

2017, Menninger mentioned to Mekerri that she was "overwhelmed," and Mekerri asked her to send him a list describing what she did on a day-to-day basis.  Id. ¶ 20.  Then, in the same month, as a part of feedback-sourcing process, another colleague told Mekerri that he had concerns about Menninger because she had been "indecisive on numerous important matters . . . and, since her decision to relocate, she has been lackadaisical toward her time on-site[.]"  Id. ¶ 22.  One subordinate communicated similar concerns, but others had positive feedback as well. Id. ¶ 23.

After gathering feedback from other members of executive leadership, Mekerri met with Menninger on December 20, 2017 to discuss performance feedback, and Mekerri suggested that her role will become more visible involving increased client visits, social interactions, and presentations.  Id. ¶ 26.  Mekerri explained that 2017 was less successful for PPD than 2016 in terms of sales numbers and revenue, so PPD was bolstering efforts to encourage "more visibility and productivity among its senior leadership to increase sales and support business development."  Id. ¶ 19.[4]  Mekerri rated Menninger's 2017 performance as "Fully Effective" which is one rating lower than her 2016 rating, although the date on which the review was completed is somewhat disputed.[5]  Id. ¶ 28.

The very prospect of making Menninger more visible with increased client visits and social interactions caused great distress for Menninger resulting in "increased anxiety with somatic symptoms, including diarrhea, heart racing, sweatiness, and increased respiratory rate." Doc. No. 66-22.  PPD did not know of this distress then.  The distress and the prospect of change

---

[4] PPD also asserts that during this December 20, 2017 meeting Mekerri agreed to take on the hiring and recruiting responsibilities.  Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 26. Menninger disputes ever discussing this matter during this meeting.  Id.
[5] But see infra note 18.

prompted Menninger on January 11, 2018 to disclose, for the first time to anyone at PPD, that

she suffers from "generalized anxiety disorder that includes social anxiety disorder and panic

attacks" via email to Mekerri in response to Mekerri's prior suggestions that her role would

become more visible.  Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 29.  Mekerri then connected

Menninger with Chad St. John, Associate Director of Human Resources ("HR"), who emailed

her PPD's accommodation request forms.  Id. ¶¶ 30-31. On January 31, 2018, Menninger

submitted an accommodation form along with a form from her psychiatrist, Dr. Kessimian, who

noted that changes to Menninger's role would increase her anxiety and make it "substantially

more difficult, if not impossible, for [Plaintiff] to perform her job," so such interactions if

required should be "planned in consultation with her medical provider[.]"  Id. ¶ 33.  Further

communication resulted in Menninger requesting and Mekerri providing additional detail on the

new or enlarged responsibilities of her role.  On February 6, 2018, Mekerri emailed Menninger

his expectations for her role that fell within five categories:

> (1) [S]enior leadership team presentations, Town Hall meetings, and meetings with the
> Chief Operating Officer and Executive Vice President (bi-weekly, monthly, and/or
> quarterly) [up to an audience of 500 people], (2) client bid defenses, issue resolution
> calls, meetings at Highland Heights and/or client meetings in-person (at client site) or via
> phone (once a month at minimum per client) [up to an audience of 50 people], (3)
> technical sales presentations (internal and external) (monthly, quarterly, and as-needed)
> [up to an audience of 100 people], (4) meals and social interactions while at client visits
> (expected 60-80% of the time to build business relationships), and (5) travel (up to 30%).

Id. ¶ 36; Doc. No. 66-26.

Although Menninger performed some of these responsibilities frequently, such as "issue

resolution calls," others she engaged in infrequently.  Doc. No. 66-155 ¶ 28.  For example, she

rarely engaged in "client bid defenses," had never been asked to give a formal presentation to

clients, and was asked only a few times to be available to answer questions at these bid defenses.

Id.  Additionally, she recalls attending approximately six dinners and zero lunches during her time at PPD.  Doc. No. 73 ¶ 42.

On February 14, 2018, Menninger's psychiatrist sent St. John her specific accommodation requests in response to Mekerri's email.  Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 39; Doc. No. 66-32.  These requests more or less mapped onto the categories Mekerri specified in his email:

- For internal team presentations and meetings, Menninger will be "responsible for all slides/handouts/ presentation material with necessary information but will require a reader to present to the group, or can pre-record the audio / video and it can be played at the meeting available for questions via email after the meeting."
- For client bid defenses, issue resolution calls, and meetings at Highland Heights, Menninger will be "available via email/ text/ remote video conferencing for a representative of the client, 1-2 person audience maximum. If it is a site meeting, surrogate or reader with all necessary information / real time access to [Menninger] will be available."
- For client site meetings, Menninger "would like a surrogate to attend, but will be responsible for all problem solving/ ideas for resolution if emailed/ communicated to [her] a few days before anticipated visit."
- For internal and external technical sales presentations, Menninger requested to be "excused from sales presentations but again will provide any necessary data information for the reader/ surrogate to have at their disposal."
- For meals and social interactions while at client visits, Menninger requested a "surrogate, as this is not her strength/ skill set and her disability will flare with significant impairment. She is able to build business relationship in a more 'behind the scenes' fashion and would like [to] brainstorm other potential avenues where she can add value as she does understand this is an important part of the business."
- For travel, Menninger requested to travel to the Belgium laboratory versus its laboratories in the United States.

Id.

On February 26, 2018, St. John emailed Menninger that PPD would provide accommodations for two of the five categories by reducing travel expectations from 30% to 15% and by allowing Menninger to have a reader present for internal company meetings.  Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 42.  That said, PPD could not grant the proposed accommodations for categories 2, 3, and 4 because they involved, according to PPD, functions

central to Menninger's role and PPD's needs.  Id.  On February 28, 2018, St. John discussed the

possibility of an exit package or transitioning to a consultant role during a meeting with

Menninger and Mekerri.[6]  Id. ¶ 43.  Menninger stated she was not interested in those options and

asked for "additional detail regarding [categories] 2, 3, and 4" for which PPD had rejected the

proposed accommodations, because she thought that there were "many tasks that could fall

within those items that would not implicate [her] disability."  Doc. No. 66-46 at 6.  PPD

responded by referring Menninger to her job description and stating that "it is not reasonable for

PPD to . . . do away with core requirements such as that you attend business development

meetings, dinners, bid defenses, etc. [because] [t]hese are not 'behind the scenes' functions[.]"

Doc. No. 66-55.  PPD asked Menninger to let it "know if there are other accommodations that

would allow [her] to perform the essential functions of [her] job."  Id.  On March 24, 2018,

Menninger emailed St. John reiterating that categories 2-4 were broad in her opinion but

nonetheless explaining that despite her disability, she was "capable of performing all of [her]

responsibilities with or without accommodation."  Doc. No. 66-59 at 3.  That said, she suggested

they could "table this discussion until a particular task arises" because there seemed to be no

upcoming events or activities that would implicate her disability.  Id.

On April 17, 2018, Menninger told St. John that she felt like Mekerri was "starting to

target [her] because of [her] disability."  Doc. No. 60-93 at 5.  Upon receipt of the email, St. John

informed his supervisor Deborah Ballweg of the email, and they agreed that Ballweg would

investigate Menninger's complaint.  Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 51.  As a part

---

[6] This fact is disputed in that Menninger argues the meeting began with St. John presenting her
with the two options of taking an exit package or transitioning to a consulting role, but PPD
argues that these options were "not suggested" but rather mentioned as a possibility.  Pl.'s Resp.
to Def.'s SOF, Doc. No. 66-158 ¶ 43.

of the investigation, Ballweg interviewed Menninger, St. John, Mekerri, and three other

employees.  Id. ¶¶ 53-54.  Ultimately on May 22, 2018, Ballweg concluded that Mekerri was not

targeting Menninger because of her disability and communicated her findings to Menninger.  Id.

¶ 56.

      On June 2, 2018, Menninger informed PPD that her doctor advised her to take medical

leave immediately.  Id. ¶ 57.  Menninger remained on leave for the next eight months, six of

which were paid.  Id. ¶ 59.  Eventually on February 1, 2019, PPD terminated Menninger's

employment.  Id.  The Court sets out further facts as necessary in discussing the individual

issues.

### II.    LEGAL STANDARD

      Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Once a party "has properly supported its motion for summary judgment, the

burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his

pleading, but must set forth specific facts showing there is a genuine issue for trial.'"  Barbour v.

Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256 (1986)).  The Court is "obliged to [] view the record in the light most

favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving

party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the

Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation."

Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds

Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  A court may enter summary judgment "against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

III.    PPD'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 43)

    A.  Discrimination

Menninger's Complaint (Doc. No. 1) fairly read presents two theories of disability discrimination under the ADA: (1) failure to reasonably accommodate and (2) disparate treatment.  The Court assesses each theory of liability in turn.

    1.  *Failure to Reasonably Accommodate*

To withstand summary judgment, Menninger must establish a genuine dispute of material fact as to the three elements of an ADA disability discrimination claim for a failure to reasonably accommodate:[7] (1) "she is disabled within the ADA's definition;" (2) she "could perform the job's essential functions either with or without a reasonable accommodation;" and that (3) "the employer knew of her disability, yet failed to reasonably accommodate it." Audette v. Town of Plymouth, 858 F.3d 13, 20 (1st Cir. 2017) (quoting Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 454 (1st Cir. 2016)).

Here, the first element is not at issue because all parties agree or assume for the purposes of summary judgment that Menninger is disabled under the ADA.  Doc. No. 44 at 9 n.9.  The second element, however, is at issue and imposes a burden on Menninger to show: (1) "'that she possesses the requisite skill, experience, education and other job-related requirements for the position'; and (2) 'that she is able to perform the essential functions of the position with or

---

[7] The First Circuit has noted that "Massachusetts's handicap discrimination statute . . . is nearly identical to the ADA" and so "we analyze the statute in exactly the same manner as the ADA." Audette, 858 F.3d at 20 (internal quotation marks omitted).  Moreover, no party has argued that the Court should analyze the discrimination claim separately under federal and state law.

without reasonable accommodation.'" <u>Echevarria v. AstraZeneca Pharm. LP</u>, 856 F.3d 119, 126 (1st Cir. 2017) (quoting <u>Mulloy v. Acushnet Co.</u>, 460 F.3d 141, 147 (1st Cir. 2006)).  PPD does not dispute the first requirement that Menninger is qualified for the position.[8]  <u>See</u> Doc. No. 44 at 9.  Accordingly, we narrow our inquiry further to assess whether Menninger is able to perform the essential functions of her position with or without a reasonable accommodation. As to this second requirement, the plaintiff "bears the burden of showing the existence of a reasonable accommodation" by demonstrating that (1) it would enable her "to perform the essential functions of the job" and (2) that it is "facially reasonable."  <u>Echevarria</u>, 856 F.3d at 127 (quoting <u>Reed v. LePage Bakeries, Inc.</u>, 244 F.3d 254, 258-60 (1st Cir. 2001)).  Once a plaintiff has made this showing, "the defendant[] then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances."  <u>Eustace v. Springfield Pub. Sch.</u>, 463 F. Supp. 3d 87, 103 (D. Mass. 2020) (quoting <u>U.S. Airways, Inc. v. Barnett</u>, 535 U.S. 391, 401-02 (2002)).

"An essential function is a 'fundamental job duty of the position at issue.  The term does not include marginal tasks, but may encompass individual or idiosyncratic characteristics' [sic] of the job.'"  <u>Jones v. Nationwide Life Ins. Co.</u>, 696 F.3d 78, 88 (1st Cir. 2012) (quoting <u>Kvorjak v. Maine</u>, 259 F.3d 48, 55 (1st Cir. 2001)).  Courts consider factors such as "the employer's judgment, written job descriptions, the work experience of past incumbents of the job, and the

---

[8] PPD states that it "does not question or doubt Plaintiff's qualifications, credentials, or experience, nor does it argue that Plaintiff's job performance was unacceptably poor," but argues instead that Menninger's requests for accommodation compel the conclusion that she was not able to do the essential functions of her job.  Doc. No. 44 at 9.  Although PPD later contests in its Reply that Menninger "is not a qualified individual under state or federal law," Doc. No. 71 at 5, its argument stems from a belief that she cannot do the essential functions of her job with or without accommodation.  Accordingly, the Court does not engage in an analysis of the first requirement of whether Menninger is a qualified individual given that PPD's contention essentially turns on the second requirement.

current work experience of incumbents in similar jobs," and give a "significance degree of deference to an employer's business judgment about the necessities of a job." Id. (internal quotation marks omitted). Furthermore, courts consider "evidence of the amount of time spent performing the particular function." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 25 (1st Cir. 2002).

On the record before the Court, PPD has established that an essential function of Menninger's role included at least some of the meetings, public speaking, or client engagements described in categories 2, 3 and 4 of Mekerri's February 6, 2018 email. According PPD's judgment as to the needs of its business for 2018 onwards significant deference and considering the job description, the Court reaches this conclusion. That said, a genuine issue of material fact remains regarding the extent of those activities qualifying as essential. Although the categories of functions in Mekerri's email arguably fell within the general description of Menninger's job,[9] that description did not spell out the allegedly essential functions with the level of detail and frequency that Mekerri did. See, e.g., Doc. No. 46-2.

Moreover, the record does establish that Menninger performed some of those tasks prior to December 2017 involving in-person, group, or social activities. Clearly, she could perform at a minimum a limited amount of such activities.[10] This is not the case where the record

---

[9] For example, the job description states Menninger will "support[] business development in obtaining new customers," "interact[] frequently with internal personnel and outside representatives," "participate[] and may present at meetings with internal and external representatives," and "present capabilities and solutions to clients." Doc. No. 46-2 at 7-8.
[10] PPD separately asserts that Menninger is "estopped from showing that she could perform her job duties" because of her receipt of Social Security Disability Insurance ("SSDI") benefits. Doc. No. 44 at 17. Menninger, however, applied for SSDI benefits in January 2019 when "she had already been on leave for several months." Doc. No. 65 at 14. Thus, her receipt of SSDI benefits months after she took leave from PPD does not prevent her from arguing before this Court that she could perform her job duties during the underlying events at issue.

establishes that Menninger could not perform this function at all without an accommodation, whether reasonable or not.  Whether the full <u>extent</u> of the functions described in Mekerri's email all qualify as essential (<u>i.e.</u>, not only the nature of the functions but also the amount or frequency) presents a question of fact on this record, especially in light of her prior performance of only a limited quantity of these functions and the newly required expansion of these functions.  <u>See, e.g.</u>, Doc. No. 73 ¶¶ 36, 41-42.  For this reason, the Court DENIES PPD's Motion for Summary Judgment (Doc. No. 43) on this ground.[11]

---

[11] Two further points bear mention. First, Menninger asserts that she was "capable of performing all of [her] responsibilities . . . <u>without</u> accommodation."  Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 46 (emphasis added).  Whether Menninger could in fact do so is a jury question which necessarily turns on whether the full scope of the activities listed in Mekerri's February 6, 2018 email is essential.  The Court simply notes that Menninger's assertion was in tension with her doctor's statement that "any changes to her role that increase the need for public speaking and/or social interactions . . . would make it substantially more difficult, if not impossible, for [Menninger] to perform her job."  Doc. No. 66-22 at 4.  That said, the Court does not reach the question of whether Menninger could perform the essential functions without accommodation at this stage since it has denied summary judgment on the essential functions issue.  Second, Menninger asserts she could perform the essential functions of her job <u>with</u> a reasonable accommodation.  To the extent that a jury determines that the functions described in Mekerri's February 6, 2018 email as described are in fact essential, the burden falls on Menninger to demonstrate a reasonable accommodation existed.  <u>See</u> <u>Echevarria</u>, 856 F.3d at 127; <u>Freadman v. Metro. Prop. & Cas. Ins. Co.</u>, 484 F.3d 91, 102 (1st Cir. 2007) (internal quotation marks omitted) ("[T]he plaintiff has the burden of showing that she sufficiently requested the accommodation in question.").  In particular, the plaintiff needed to have "sufficiently requested the accommodation in question" because "the ADA's reasonable accommodation requirement usually does not apply unless 'triggered by a request' from the employee."  <u>Reed</u>, 244 F.3d at 260-61 (quoting Henry Perrett, Jr., 1 <u>Americans With Disabilities Act Handbook</u>, § 4.17, at 121 (3d ed. 1997)).  Importantly, the employee's request must be "sufficiently direct and specific to give the employer notice of the needed accommodation."  <u>Tobin v. Liberty Mut. Ins. Co.</u>, 553 F.3d 121, 129 (1st Cir. 2009) (internal quotation marks omitted) (quoting <u>Reed</u>, 244 F.3d at 261).  This means that although the jury will ultimately decide whether the accommodations proposed by Menninger's doctor were reasonable, any accommodations not requested at the time of the underlying events cannot be considered at summary judgment or trial as possible reasonable accommodations.  Although there are limited situations where different rules may apply such that an employer may be required to provide an accommodation on its own accord, this is not that case.  <u>See</u> <u>Enica v. Principi</u>, 544 F.3d 328, 339-40 (1st Cir. 2008).  Those limited situations include when an "employee's disability may prevent the employee from requesting an accommodation, or . . . [when] the employee's need for an accommodation will be obvious."

2.   *Interactive Process*

Under the third element that "the employer knew of her disability, yet failed to

reasonably accommodate it," <u>Audette</u>, 858 F.3d at 20 (quoting <u>Lang</u>, 813 F.3d at 454), "an

employee's request for accommodation sometimes creates a duty on the part of the employer to

engage in an interactive process."  <u>E.E.O.C. v. Kohl's Dep't Stores, Inc.</u>, 774 F.3d 127, 132 (1st

Cir. 2014) (internal quotation marks omitted).[12]  For example, "[i]f the accommodation proposed

by the employee appears unduly onerous, the employer has an obligation to work with the

employee to determine whether another accommodation is possible."  <u>Barbuto v. Advantage</u>

<u>Sales & Mktg., LLC</u>, 477 Mass. 456, 463 (2017) (quoting <u>Godfrey v. Globe Newspaper Co.</u>, 457

Mass. 113, 120 (2010)).  "[I]t is imperative that both the employer and the employee have a duty

to engage in good faith, and that empty gestures on the part of the employer will not satisfy the

good faith standard."  <u>E.E.O.C.</u>, 774 F.3d at 132.

On this ground, the Court ALLOWS PPD's Motion for Summary Judgment (Doc. No.

43).  After Menninger initiated the process by requesting accommodations, PPD asked for

additional information upon which Menninger's doctor submitted proposed accommodations.

<u>See, e.g.</u>, Doc. No. 66-64 at 3, 5.  PPD allowed two of her requested accommodations.  Pl.'s

Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 42.  Mere rejection of the other proposed

accommodations, however, does not necessarily mean that PPD did not engage in an interactive

process.  In contrast to situations where an employer "completely disregarded" an employee's

---

<u>Reed</u>, 244 F.3d at 261 n.7.  Here, to the contrary, Menninger's disability was neither obvious nor
did it prevent her from requesting an accommodation—as evident from the requests she did
make.

[12] Under Massachusetts law, the "refusal of an employer to participate in [the interactive] process
once initiated . . . is a violation of" state discrimination laws in and of itself.  <u>Ocean Spray</u>
<u>Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination</u>, 441 Mass. 632, 644 (2004).

requests for help, "extended no response at all to [employee's] requests, and failed to give any explanations for its failure to do so," PPD engaged, responded, and gave explanations for why it could not grant the other accommodations. See Ocean Spray, 441 Mass. at 647. No reasonable jury could conclude that PPD failed to engage in the interactive process. In fact, after PPD asked Menninger to consult her health care provider and propose other accommodations, Menninger herself suggested that they table the discussion until later when a particular task arises which would require an accommodation. Doc. No. 66-64 at 3-4. PPD responded that it remained "committed to an open dialogue" and would continue to review requests for accommodations as she raises them. Id. This series of events is far from a failure to engage in the interactive process. Thus, the Court ALLOWS PPD's Motion for Summary Judgment (Doc. No. 43) on this ground.

### 3. *Disparate Treatment*

Under the disparate treatment theory of liability, Menninger must establish the first two elements of the ADA disability discrimination claim described previously: "(1) that she is disabled under the ADA; (2) that she is 'qualified to perform the essential functions of [her] job with or without reasonable accommodation[.]'"[13] Echevarria, 856 F.3d at 126 (quoting Jones, 696 F.3d at 87). In addition, Menninger must show "(3) that she 'was discharged or otherwise adversely affected in whole or in part because of [her] disability.'" Id.

An adverse action typically involves "discrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" Morales-Vallellanes v. Potter, 605 F.3d 27,

---

[13] The Court's conclusion on these two elements under the failure to accommodate theory of liability controls here as well.

35 (1st Cir. 2010) (quoting <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998)).  For an employment action to be adverse, it "must materially change the conditions of plaintiffs' employ," <u>id.</u>, which means that it must "be more disruptive than a mere inconvenience or an alteration of job responsibilities."  <u>Marrero v. Goya of Puerto Rico, Inc.</u>, 304 F.3d 7, 23 (1st Cir. 2002).[14]  "[R]eassignment with significantly different responsibilities may be actionable."  <u>Burns v. Johnson</u>, 829 F.3d 1, 10 (1st Cir. 2016) (internal quotation marks omitted).  Importantly, this analysis often "depends on a constellation of surrounding circumstances," and a contextual analysis is therefore necessary.  <u>Burlington N. v. White</u>, 548 U.S. 53, 69 (2006) (describing that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.").

On this factual record, a reasonable jury could find that Menninger experienced an adverse employment action.  Menninger alleges two adverse actions related to the disparate treatment claim: (1) Mekerri's February 6, 2018 email containing five categories of expectations and (2) PPD's plan to force her to quit or create a pretextual basis for termination.  Doc. No. 65 at 16-17.  As to the first alleged adverse action, a reasonable jury could find that Mekerri's February 6, 2018 email that emphasized public speaking and client interactions involved "more difficult" job responsibilities.  <u>See</u> <u>Rodriguez-Vives v. Puerto Rico Firefighters Corps</u>, 743 F.3d 278, 286 (1st Cir. 2014).  Although client-facing responsibilities can be and usually are

---

[14] The standard applied by the Supreme Judicial Court of Massachusetts for claims brought under Mass. Gen. Laws ch. 151B is substantially similar to the federal standard.  <u>See, e.g.</u>, <u>Yee v. Massachusetts State Police</u>, 481 Mass. 290, 296-96 (2019) (internal quotation marks omitted) ("We have said that an action taken by an employer is an adverse employment action where it is substantial enough to have materially disadvantaged an employee.").  Neither party has argued, nor does the Court believe, that the adverse action analysis is meaningfully different under the federal and state discrimination claims.  Accordingly, the Court analyzes both disability discrimination claims under the same standard.

beneficial to advancing one's career, the applicable legal standard requires consideration of whether the addition of these responsibilities is materially adverse for a reasonable person in Menninger's particular circumstances.  See Burlington N., 548 U.S. at 68-69; Yee, 481 Mass. at 296 ("The disadvantage must be objectively apparent to a reasonable person in the employee's position; 'subjective feelings of disappointment and disillusionment' will not suffice.").  Mekerri was aware of Menninger's disability and that changes to her role would make it "substantially more difficult, if not impossible," for her to do her job when he sent this email.  Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶¶ 29, 33.  Drawing all reasonable inferences in Menninger's favor, a reasonable jury could find that expectations of increased public speaking and client interactions sent to someone with anxiety and panic disorders constituted a materially adverse employment action.  There is at least a question of material fact.[15]

As to the second alleged adverse action that PPD "implement[ed] . . . a deliberate plan to remove" Menninger from her position, Doc. No. 65 at 17, Menninger has not shown that it materially changed the terms and conditions of her employment.  No reasonable jury could find that predominantly internal communications allegedly showing that PPD was trying to force Menninger out affected the terms and conditions of her employment.  Neither could they find that her termination nearly eight months after she took a medical leave, and where she showed "no sign of intending to return to work," Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 59, was discharge under the pretext of performance issues.  Menninger does not dispute that PPD left her position open for those eight months and that it needed to identify a long-term solution after that

---

[15] Of course, a reasonable jury could evaluate the facts differently including concluding that the increase in client-facing and public speaking responsibilities was not adverse or that since the increase was discussed initially prior to knowledge of the disability, it had no connection to the disability.

period to fill her role.  Id.  Accordingly, the Court DENIES IN PART and ALLOWS IN PART PPD's Motion for Summary Judgment (Doc. No. 43) on the disparate treatment theory of liability.[16]

### B.  Retaliation

To prove retaliation, Menninger must show the basic elements that 1) she engaged in protected conduct; 2) she suffered an adverse employment action; and 3) the adverse employment action was causally linked to the protected conduct.  Cherkaoui v. City of Quincy, 877 F.3d 14, 28 (1st Cir. 2017).  Put another way, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse."  Id. at 52.  PPD assumes the first element is established here, Doc. No. 44 at 18, directing its summary judgment arguments at the remaining two elements—adverse employment action and causation.  The standard for proving the second element of adverse employment is largely the same as the disparate treatment claim described above with one material difference: "conduct need not relate to the terms and conditions of employment to give rise to a retaliation claim."  Billings v. Town of Grafton, 515 F.3d 39, 54 (1st Cir. 2008) (citing Burlington N., 548 U.S. at 70).[17]

Menninger alleges four theories of materially adverse employment actions: (1) her 2017 performance rating was lowered immediately after she made PPD aware of her disability; (2) PPD tried to coerce her to quit; (3) PPD excluded her from hiring and recruiting decisions, a core

---

[16] The question of whether some or all of the internal communications suggesting efforts to push Menninger out of PPD are admissible at trial on other issues presents a separate question not now before the Court.

[17] PPD has not shown, nor is the Court aware, any caselaw suggesting that the standards for adverse action are meaningfully different for a retaliation claim under Title VII and the ADA. Instead, PPD argues only that "[e]ven if there are two different standards for Plaintiff's discrimination and retaliation claims, she is unable to meet either."  Doc. No. 71 at 9.

component of her role; and (4) PPD conducted a sham investigation into her HR complaint.  See,
e.g., Doc. No. 65 at 19-20.

The Court turns to Menninger's first alleged adverse action that her 2017 performance
rating was immediately lowered after she informed PPD of her disability.  Even assuming,
without deciding, that lowering her performance rating is a materially adverse employment
action, it suffers from a causation issue.  The record shows that HR merely "advanced . . . [the]
performance review in the Company's internal electronic system to move the review towards
finalization" on January 12, 2018 on behalf of Mekerri since he was traveling then and he "had
already completed Dr. Menninger's 2017 review when [HR] advanced it."  Doc. No. 46 ¶ 18.
Menninger does not sufficiently dispute this chronology of events.[18]  Thus, even if adverse,
Menninger is unable to demonstrate that there was a causal connection between her protected
conduct and this allegedly adverse action.  Accordingly, PPD's Motion for Summary Judgment
(Doc. No. 43) is ALLOWED on this ground.

Second, Menninger asserts that PPD's efforts to coerce her to quit after receiving her
requests for accommodations was an adverse action.  Menninger describes that during a February
28, 2018 meeting, PPD presented her with "two options at the start" of either "tak[ing] an exit
package or a temporary role as a consultant" and that Mekerri and St. John urged her to consider
those options.  Doc. No. 66-137 at 168:16-21; 172:1-8.  PPD disputes this fact, arguing that
"these options were not suggested, [but instead] merely brought up in passing for Plaintiff's

---

[18] In fact, Menninger begins "chronologically with January 15, 2018" in her Opposition, days
after her 2017 performance review was moved forward in the internal system on January 12,
2018, to argue that there is sufficient evidence "St. John pressured Mekerri to lower [her]
performance rating for the year 2017 immediately after Mekerri informed him of" Menninger's
disability.  Doc. No. 65 at 19.  Even drawing all reasonable inferences in Menninger's favor, no
reasonable jury could conclude that Mekerri reduced her 2017 rating after she disclosed her
disability.

consideration." Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 43. Viewing this disputed fact in

Menninger's favor as the Court must in considering this motion, a reasonable jury could

conclude that presenting Menninger with two options, neither of which included remaining in her

position, at the beginning of a meeting intended to discuss her disability and proposed

accommodations, constituted an adverse employment action. Cf. Fox v. Town of Framingham,

No. 14-CV-10337-LTS, 2016 WL 4771057, at *5 (D. Mass. Sept. 13, 2016) (describing that the

plaintiff was "repeatedly asked whether [he] intended to resign").[19] Especially considering the

temporal proximity to Menninger's disclosure of her disability and requests for accommodations,

a reasonable jury could find the causation needed for this action to constitute an adverse action.[20]

Third, Menninger argues that PPD excluded her from hiring and recruiting decisions

within her unit so she would not realize that it was trying to replace her. PPD points to a

causation issue because Mekerri agreed to take lead on hiring and recruiting efforts on December

20, 2017, prior to Menninger's disclosure. Doc. No. 48 ¶¶ 12, 18. Menninger disputes

discussing altering her hiring and recruiting responsibilities during this December 2017 meeting

or ever asking to be excluded from these responsibilities. Doc. No. 66-155 ¶ 31. For purposes

of summary judgment, the Court views this disputed fact in Menninger's favor and concludes

that a reasonable jury could find that excluding Menninger from hiring and recruiting

responsibilities after her disclosure constituted a materially adverse action. See, e.g., Doc. No.

66-66 at 2-4 (noting in an April 2018 email that Menninger was not involved in some interviews

---

[19] Even if unlike Fox the facts here do not suggest PPD repeatedly presented these options to
Menninger, PPD has not shown why one instance cannot be sufficient to find an adverse action,
especially when the exit options were presented at the very meeting intended to discuss possible
accommodations.

[20] Notably, the fate of this adverse action is different under the retaliation claim in contrast to the
discrimination claim because the adverse action here need not change the terms and conditions of
employment. See Billings, 515 F.3d at 54.

since PPD was "headed down a performance gap accountability route with Lisa"); Doc. No. 66-155 ¶ 33 (explaining that PPD hired an employee without giving Menninger an "opportunity to participate in the hiring process for this candidate," and the reporting arrangement seemed to skip Menninger's "level in the chain of command"). A reasonable jury could find that such exclusion from hiring and recruiting efforts, especially when Menninger was responsible for the quality control, and thereby talent, in her labs, Doc. No. 46-2, was materially adverse because it "could well dissuade a reasonable [employee] from making or supporting a charge of discrimination." Burlington N., 548 U.S. at 57.[21]

Fourth, Menninger contends that PPD conducted a sham investigation into her discrimination and retaliation complaint made to HR. Doc. No. 65 at 20. Sham investigations can form the basis of retaliation claims. See Gyulakian v. Lexus of Watertown, Inc., 475 Mass. 290, 302-3 (2016) (finding sham investigation where investigator did not interview key employees, was biased against complainant from the beginning, and prematurely concluded the investigation). Specifically, Menninger describes that Ballweg, who conducted the investigation, was "directly involved" in her accommodation process and was working to get her terminated in the background. Pl.'s Resp. to Def.'s SOF, Doc. No. 66-158 ¶ 56. Although a close case, a reasonable jury could find from the record that Ballweg's investigation was a sham because of bias stemming from both her proximity to Menninger's accommodation process and efforts to

---

[21] PPD points to Ballweg's investigation notes to show that Menninger "did recall a conversation with Mr. Mekerri about recruiting and hiring 'at the end of December.'" Doc. No. 73 ¶ 50. Menninger's sworn affidavit, however, states that "[w]hile working for PPD, [she] never asked to be excluded from the tasks of hiring and recruiting" and did not discuss altering her hiring and recruiting responsibilities during the December 2017 meeting with Mekerri. Doc. No. 66-155 ¶ 31. Menninger's statements during Ballweg's investigation were not made under the penalty of perjury. Accordingly, at least for summary judgment, the Court concludes there is no causation issue for this adverse action, drawing the reasonable inference in Menninger's favor.

push her out.  See, e.g., Doc. Nos. 66-41, 66-44, 66-71, 66-74, 66-81, 66-84, 66-87 (showing

multiple email communications where Ballweg was updated about Menninger's accommodation

process and efforts to "delicately work [Menninger] out," provided feedback on some emails

between HR and Menninger, and apprised others on the status of Menninger's exit).

PPD attempts to distinguish between Menninger's disability and her work performance

issues, but it cannot reasonably dispute that Menninger's complaint was intimately tied to her

belief that she was being targeted for her disability.  See, e.g., Doc. No. 66-93 (describing

Menninger's email in which she stated that Mekerri was "looking for any excuse possible to

criticize [her] 'leadership.' He never treated [her] like this before [she] told him about [her]

disability.").  Given that all these matters unfolded simultaneously in a relatively short period,

untangling them is a jury question rather than summary judgment matter on this record.

Accordingly, PPD's Motion for Summary Judgment (Doc. No. 43) is ALLOWED IN PART and

DENIED IN PART as described herein on the retaliation claim.

C.  Pretext

Finally, PPD challenges that even if Menninger can show prima facie cases of

discrimination or retaliation, she cannot show that PPD's proffered reasons were pretextual.

Plainly, the record shows several internal communications among senior leadership and HR

showing efforts to push Menninger out, among other evidence, that a reasonable jury could find

were pretext for discrimination based on her disability.  Accordingly, PPD's Motion for

Summary Judgment (Doc. No. 43) is DENIED on this ground.

IV.  MENNINGER'S MOTION TO STRIKE (DOC. NO. 64)

Menninger moves to strike certain statements PPD employees made in their affidavits

based on the following objections: (1) lack of personal knowledge, (2) legal conclusions, (3)

conclusory characterizations of the record, and (4) the sham affidavit rule. Doc. No. 64. The Motion to Strike (Doc. No. 64) is DENIED in all respects. Insofar as statements in the affidavits could be considered legal conclusions, the Court construes them instead as statements of fact.

V.    <u>CONCLUSION</u>

In sum, PPD's Motion for Summary Judgment (Doc. No. 43) is DENIED IN PART and ALLOWED IN PART. Menninger's Motion to Strike (Doc. No. 64) is DENIED. The parties shall file a joint status report within fourteen days stating their joint or separate positions as to (1) the anticipated duration of trial, (2) whether they request an opportunity to mediate this case prior to trial, and (3) whether they request the Court establish a trial date in the course of an initial pretrial conference with counsel. After receiving the report, the Court will establish a firm trial date either on the papers or at a pretrial conference.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

                Plaintiff,

v.

PPD DEVELOPMENT, L.P.,

                Defendant.

Civil Action No.  1:19-CV-11441-LTS

## DEFENDANT PPD DEVELOPMENT, L.P.'S TRIAL BRIEF

Pursuant to D. Mass. Local Rule 16.5(f) and the Court's Order Setting Case For Trial (ECF Doc. No. 94), Defendant PPD Development, L.P. respectfully submits this Trial Brief.

### A.    Motions in Limine

1. Motion In Limine To Exclude Evidence of Potential Disability Accommodations That Plaintiff Did Not Request During Her Employment (ECF Doc. No. 99)

2. Motion In Limine To Exclude Evidence of the Compensation Paid To Any Employee Of Defendant Other Than Plaintiff (ECF Doc. No. 101)

3. Motion In Limine To Exclude Documents Produced By Plaintiff, For The First Time, On February 24, 2023 (ECF Doc. No. 103)

4. Motion In Limine To Bar Argument Or Statements To The Jury That It May Draw Inferences Adverse To Defendant Based On The Absence Of Hacene Mekerri (ECF Doc. No. 105)

5. Motion In Limine To Exclude Evidence Of Stray Remarks By Any Person Who Was Not A Decision-Maker With Respect To Defendant's Challenged Employment Decisions (ECF Doc. No. 107)

6. Motion In Limine To Exclude Evidence Supporting Claims That The Court Dismissed on Defendant's Motion For Summary Judgment (ECF Doc. No. 109)

7. Motion in Limine To Exclude Testimony Concerning The Existence Of An Alleged Relationship Between Plaintiff's Supervisor And Another Employee (ECF Doc. No. 111)

**B.      Proposed Statement for Venire**

The plaintiff in this case, Lisa Menninger, is a former employee of the defendant, PPD Development, L.P. PPD hired Dr. Menninger in August 2015 to work as the Executive Director of its Global Central Labs, based in Kentucky. In January 2018, Dr. Menninger informed PPD that she suffered from generalized anxiety disorder that includes social anxiety disorder and panic attacks, and she requested that PPD accommodate that condition by excusing her from performing certain aspects of her job as Executive Director. She alleges that thereafter, PPD failed to provide her with reasonable accommodations of her medical condition, discriminated against her on the basis of it, and retaliated against her for requesting accommodations for the condition. She also alleges that, as a result, she suffered lost wages and emotional distress, and she seeks to recover for that harm. PPD denies Dr. Menniger's allegations.

**C.      List of Potential Witnesses**

1. Deborah Ballweg (fact witness), of Hollandale, Wisconsin

2. Christopher Fikry (fact witness), of Wilmington, North Carolina

3. Christopher Clendening (fact witness), of Cleeves, Ohio

4. Brent McKinnon (fact witness), of Pittsburg, Texas

5. Chad St. John (fact witness), of Liberty Township, Ohio

6. Hacene Mekerri (fact witness, by deposition), of Singapore

7. Tonya Hart (fact witness), of Bend, Oregon

8. Mason Menninger (fact witness, by deposition), of Bend, Oregon

9. Dr. Marianna Kessimian (fact witness), of Providence, Rhode Island

10. Dr. Martin Kelly (expert witness), of Westport Point, Massachusetts

11. William B. Scally (expert witness), of Newburyport, Massachusetts

Defendant reserves the right to call additional rebuttal witnesses depending on the

evidence presented in Plaintiff's case-in-chief.

### D.    Defendant's Proposed Voir Dire Questions

1. If you have ever served on a jury, was there anything about that experience that you found difficult or negative in any way?

2. Do you, or does someone close to you, suffer from or have any experience with generalized anxiety disorder, social anxiety disorder, panic attacks, depression, or other mental health issues? Would those issues make it difficult or emotional for you to sit on a jury in a case involving those issues?

3. Have you ever made a request for a disability accommodation in the workplace?
   - If so, were you satisfied with how your employer handled the request?

4. Have you ever made a request for medical leave to an employer?
   - If so, were you satisfied with how your employer handled the request?

5. Have you or any member of your immediate family ever been employed with the defendant, PPD Development LP?

6. Have you or any member of your immediate family ever been employed by Thermo Fisher Scientific?

7. Have you or any member of your immediate family ever been involved in a lawsuit or other dispute with PPD Development LP, or with Thermo Fisher Scientific?

8. Have you, or has anyone close to you, ever felt discriminated or retaliated against in the workplace?
   - If so, did you or they do anything to attempt to resolve the issue? And if so, were you or they satisfied with the result?

9. Have you, or has someone close to you, ever felt that you or they were treated unfairly at work?
   - If so, did you or they do anything to attempt to resolve the issue? And if so, were you or they satisfied with the result?

10. Have you ever felt that a supervisor or co-worker treated you or a member of your immediate family differently because of your or their medical condition?

- If so, did you or they do anything to attempt to resolve the issue? And if so, were you or they satisfied with the result?

11. Have you, or has someone close to you, ever made a complaint to an employer about a co-worker or supervisor?

- If so, were you or they satisfied with how the employer handled the complaint?

12. Have you ever filed a charge of discrimination with the Massachusetts Commission against Discrimination (MCAD), Equal Employment Opportunity Commission (EEOC), or any other federal or state agency concerning discrimination or retaliation?

- If so, what was the nature of your complaint, and what was the result?

13. Are you aware of any discrimination or retaliation complaints submitted by other people at any place where you have worked? If so,

- what was the nature of the complaint?
- were you satisfied with how your employer handled the complaint?

14. Do you believe that just because we are here in court about to start a trial in this case, there must be something to the claims that Plaintiff is making?

15. Given the nature of the case as the Court has described it, do you feel that it would be difficult for you to be fair and impartial in this case?

Defendant reserves the right to request follow-up questions as the answers given by the

potential jurors may require.

### E.    Defendant's Proposed Jury Instructions

Defendant has attached its proposed jury instructions at <u>Exhibit A</u>.

### F.    Defendant's Proposed Verdict Form

Defendant has attached its proposed verdict forms at <u>Exhibit B</u>.

Respectfully submitted

PPD DEVELOPMENT, L.P.

By its attorneys,

*/s/ Patrick M. Curran, Jr.*
Rachel Reingold Mandel (BBO #660495)
Patrick M. Curran, Jr. (BBO #659322)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
Facsimile:  (617) 994-5701
rachel.mandel@ogletree.com
patrick.curran@ogletree.com

Dated: March 10, 2023

**JA88**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 10, 2023 the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

<u>*/s/ Patrick M. Curran, Jr.*   </u>
Patrick M. Curran, Jr.

23370737.1

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

               Plaintiff,

v.

               Civil Action No.  1:19-CV-11441-LTS

PPD DEVELOPMENT, L.P.,

               Defendant.

---

## DEFENDANT PPD DEVELOPMENT, L.P.'S
## PROPOSED JURY INSTRUCTIONS

       Pursuant to Federal Rule of Civil Procedure 51, Defendant PPD Development, L.P. respectfully requests that as part of its charge to the jury empaneled in this action, this Court issue the attached proposed instructions. Defendant respectfully reserves the right to seek leave to supplement or amend these instructions as necessary during and at the conclusion of trial.

               PPD DEVELOPMENT, L.P.

               By its attorneys,

               */s/ Patrick M. Curran, Jr.*
               Rachel Reingold Mandel (BBO #660495)
               Patrick M. Curran, Jr. (BBO #659322)
               OGLETREE, DEAKINS, NASH, SMOAK &
               STEWART, P.C.
               One Boston Place, Suite 3500
               Boston, MA 02108
               Telephone: (617) 994-5700
               Facsimile:  (617) 994-5701
               rachel.mandel@ogletree.com
               patrick.curran@ogletree.com

Dated: March 10, 2023

## PRELIMINARY STATEMENT

Because the Proposed Jury Instructions and Issues are being submitted to the Court before all of the evidence has been submitted at trial, Defendant reserves the right to amend, withdraw, or add to them as may be necessary due to the matters that develop during the course of trial. Defendant requests the Court to advise the undersigned counsel prior to jury submission whether the Proposed Jury Instructions will be refused or modified by the Court, either in whole or in part.

## <u>DEFENDANT'S PROPOSED INSTRUCTION NO. 1</u>

### Prejudice, Sympathy, and Speculation

Your function as the jury is to determine the facts of this case. You are the sole and exclusive judges of the facts. You alone determine what evidence to accept, how important any evidence is that you do accept, and what conclusions to draw from all the evidence. You must apply the law as I give it to you to the facts as you determine them to be, in order to decide whether or not Ms. Menninger has proven her case.

You should determine the facts based solely on a fair consideration of the evidence presented at trial. You are to be completely fair and impartial, and you are not to be swayed by prejudice or by sympathy, by personal likes or dislikes, toward either side. Once you let prejudice or sympathy, or fear or bias, interfere with your thinking, there is a risk that you will not arrive at a true and just verdict.

Furthermore, in many cases there is an element of sympathy which surrounds a trial. People involved in the case may be deserving of sympathy, but not in a courtroom and not by a jury, because sympathy is grounded in emotion, and a jury must consider only facts. Neither the courtroom nor the jury room is a place for sympathy. You must decide this case on the basis of the facts as you find them. You must disregard sympathy and emotion, and you must focus on the facts alone.

In addition, you are not to engage in any guesswork about any unanswered questions that remain in your mind, or to speculate about what the "real" facts might or might not have been. Indeed, to the extent that any of the witnesses have offered speculation or surmise about what the facts might or might not have been, you should disregard such testimony—it is not evidence at all but merely the same type of guesswork that you, as jurors, must avoid.

-3-

**JA93**

In short, you must focus on the facts and the facts alone and consider them in a calm, dispassionate, and analytical manner.

Finally, you must not speculate or guess as to my feelings, either positive or negative, about either the evidence in this case or the parties. My rulings in this case on evidence and other matters at this trial have been intended to be in compliance with court rules and procedures, and should not play any role in your decision making process. Quite simply, it is your, and only your, role as a jury to decide this case.

<u>Authority</u>

*See* Joseph D. Lipschitz, et al., Massachusetts Super. Ct. Civil Practice Jury Instructions (3rd ed. 2014) (2018 Supp.) ("Mass. Jury Instructions"), §§ 1.2.2(a)-(b) & 1.2.6; Leonard B. Sand, et al., 4 Modern Fed. Jury Instr.-Civil, ¶ 71.01 (Instr. 71-3, 71-5, 71-10); *see also Commonwealth v. Smith*, 387 Mass. 900, 909-10 (1983); *Commonwealth v. Fitzgerald*, 376 Mass. 402, 424 (1978).

Accepted:_____

Refused:_____

Modified:_____

**<u>DEFENDANT'S PROPOSED INSTRUCTION NO. 2</u>**

**All Persons Equal Before the Law – Organizations**

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations. The defendant is a type of corporate entity known as a "limited partnership." A limited partnership is entitled to the same fair trial as a private individual. All persons, including limited partnerships, stand equal before the law, and are to be treated as equals.

<u>Authority</u>

*See* Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. § 103:12 (6th ed. 2006) (2023 Supp.); *see also* 4 Modern Fed. Jury Instr.-Civil, ¶72.01 (Instr. 72-1).

Accepted:_____

Refused:_____

Modified:_____

## DEFENDANT'S PROPOSED INSTRUCTION NO. 3

### Evidence

Unless you are otherwise instructed, the evidence in the case consists of the sworn testimony of the witnesses regardless of who called the witness, all exhibits received in evidence regardless of who may have produced them, all facts and events that may have been admitted or stipulated to, and any judicially noticed facts.

Statements, questions, and arguments by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statement, closing arguments, and at other times is intended to help you understand the evidence, but it is not evidence. However, when the lawyers on both sides stipulate or agree on the existence of a fact, unless you are otherwise instructed, you must accept the stipulation and regard that fact as proved.

Any evidence to which I have sustained an objection, and any evidence that I have ordered stricken, must be entirely disregarded by you in rendering your verdict.

To constitute evidence which may be considered by you, exhibits must be received in evidence. Exhibits marked for identification but not admitted are not evidence, nor are materials brought forth only to refresh a witness's recollection.

It is for you alone to decide the weight, if any, to be given to the testimony you have heard and the exhibits you have seen.

### Authority

*See* Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. § 103:30 (6th ed. 2006) (2023 Supp.); Leonard B. Sand, et al., 4 Modern Fed. Jury Instr.-Civil, ¶ 74.01 (Instr. 74-1); *see also* Mass. Jury Instructions, § 1.2.3.

Accepted:_____

Refused:_____

Modified:_____

## DEFENDANT'S PROPOSED INSTRUCTION NO. 4

### Direct and Circumstantial Evidence

Generally speaking, there are two types of evidence presented during a trial—direct evidence and circumstantial evidence. "Direct" evidence is the testimony of a person who asserts or claims to have actual knowledge of a fact, such as an eyewitness. "Indirect or circumstantial" evidence is proof of a chain of facts and circumstances indicating the existence or nonexistence of a fact.

The law generally makes no distinction between the weight or value to be given to either direct or circumstantial evidence. A greater degree of certainty is no required of circumstantial evidence, and one type of evidence is not necessarily "better" than another. You are required to find the facts in accordance with the preponderance of all the evidence in the case, both direct and circumstantial.

<u>Authority</u>

*See* Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. § 104:05 (6th ed. 2006) (2023 Supp.); Mass. Jury Instructions, § 1.2.4.; *see Commonwealth v. Corriveau*, 396 Mass. 319, 339 (1985).

Accepted:_____

Refused:_____

Modified:_____

## <u>Defendant's Proposed Instruction No. 5</u>

### Inferences

An inference is not a suspicion or a guess. Rather, an inference is a deduction or conclusion that reason and common sense lead you to draw from facts established by the evidence in the case. There are times when different inferences may be drawn from facts, whether proved by direct or circumstantial evidence. The plaintiff asks you to draw one set of inferences, while the defense asks you to draw another. It is for you, and you alone, to decide what inferences you will draw, if any.

So, while you are considering the evidence presented to you, you are permitted, but not required, to draw from the facts which you find to be proven such reasonable inferences as would be justified in light of your experience.

<u>Authority</u>

*See* Leonard B. Sand, et al., 4 Modern Fed. Jury Instr.-Civil, ¶ 75.01 (Instr. 75-1); Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. § 104:20 (6th ed. 2006) (2023 Supp.); *see also* Mass. Jury Instructions, § 1.2.4.

Accepted:_____

Refused:_____

Modified:_____

## Defendant's Proposed Instruction No. 6

### Credibility of Witnesses

You have had the opportunity to observe all of the witnesses. It is now your job to decide how believable each witness was in his or her testimony. You are the sole judges of the credibility of each witness and of the importance of his or her testimony.

It must be clear to you by now that you are being called on to resolve various factual issues raised by the parties in the face of very different pictures painted by both sides. (If applicable: It must also be obvious to you that both sides cannot be true and this is where you play your role as jurors.) In making these judgments, you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence that may help you decide the truth and the importance of each witness's testimony.

How do you determine where the truth lies? You watched each witness testify. Everything a witness said or did on the witness stand counts in your determination. How did the witness impress you? Did he or she appear to be frank, forthright, and candid, or evasive and edgy as if hiding something? How did the witness appear; what was his or her demeanor—that is, his or her carriage, behavior, bearing, manner, and appearance while testifying? Often it is not what a person says but how he or she says it that moves us.

You should use all the tests for truthfulness that you would use in determining matters of importance to you in your everyday life. You should consider any bias or hostility the witness may have shown for or against any party as well as any interest the witness has in the outcome of the case. You should consider the opportunity the witness had to see, hear, and know the things about which he or she testified, the accuracy of the witness's memory, the witness's candor or lack of candor, the witness's intelligence, the reasonableness and probability of the witness's testimony

-9-

and its consistency or lack of consistency and its corroboration or lack of corroboration with other credible testimony.

In other words, what you must try to do in deciding credibility is to size a witness up in light of his or her demeanor, the explanations given, and all of the other evidence in the case. Always remember that you should use your common sense, your good judgment, and your own life experience.

<div align="center">Authority</div>

*See* Leonard B. Sand, et al., 4 Modern Fed. Jury Instr.-Civil, ¶ 76.01 (Instr. 76-1); *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 628 (1944); *see also* Mass. Jury Instructions, § 1.2.5.

Accepted:_____

Refused:_____

Modified:_____

## <u>DEFENDANT'S PROPOSED INSTRUCTION NO. 7</u>

### Burden of Proof

In a civil action like this one, the party seeking damages from the other – here, the plaintiff, Dr. Lisa Menninger—has the burden of proving every essential element of each one of her claims by a preponderance of the evidence. If Plaintiff should fail to establish any essential element of one of her claims by a preponderance of the evidence, you should find for Defendant as to that claim.

"Establish by a preponderance of the evidence" means evidence, which as a whole, shows that the fact sought to be proved is more probable than not. In other words, a preponderance of the evidence means such evidence as, when considered and compared with the evidence opposed to it, has more convincing force, and produces in your minds belief that what is sought to be proved is more likely true than not true. This standard does not require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case.

In determining whether any fact in issue has been proved by a preponderance of the evidence, unless otherwise instructed you may consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

The mere existence of an inference against the Defendant does not relieve the Plaintiff of the burden of establishing her case by a preponderance of the evidence. If the Plaintiff is to obtain a verdict, you must still believe from the credible evidence that she has sustained the burden cast upon her. If she has failed, then your verdict must be for the Defendant. If you should find that all of the evidence is evenly balanced, then the Plaintiff has failed to sustain the burden of proof and your verdict should be for the Defendant.

-11-

If and only if you determine, after carefully weighing all the evidence, that the facts favor

the Plaintiff by the standard I have articulated, then she has met the burden of proof.

<u>Authority</u>

*See* Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. § 104:01 (6th ed. 2006) (2023 Supp.); Leonard B. Sand, et al., 4 Modern Fed. Jury Instr.-Civil, ¶ 75.01 (Instr. 75-2); *see also* Mass. Jury Instructions, § 1.2.7

Accepted:_____

Refused:_____

Modified:_____

.

## DEFENDANT'S PROPOSED INSTRUCTION NO. 8

### Expert Witnesses

The rules of evidence ordinarily do not permit witnesses to testify as to opinions or conclusions. There is an exception to this rule for "expert witnesses." An expert witness is a person who by education and experience has become expert in some art, science, profession, or calling. Expert witnesses give state their opinions as to matters in which they profess to be expert, and may also state their reasons for their opinions.

You should consider each expert opinion received in evidence in this case, and give it such weight as you think it deserves. If you should decide the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude the reasons given in support of the opinion are not sound, or if you feel the expert's is outweighed by other evidence, you may disregard the opinion entirely.

### Authority

*See* Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. § 104:40 (6th ed. 2006) (2023 Supp.).

Accepted:_____

Refused:_____

Modified:_____

## DEFENDANT'S PROPOSED INSTRUCTION NO. 9

### Uncalled Witness Not Equally Available

You have heard evidence about a witness, Mason Menninger, who was not called to testify. Counsel for Defendant has argued that this witness could have given material testimony in this case, and that the Plaintiff was in the best position to produce this witness.

If you find that this witness could have been called as a witness by the Plaintiff, and that Plaintiff was in the best position to produce this witness, and that this witness would have given important new testimony, then you are permitted, but not required, to infer that the testimony of this witness would have been unfavorable to the Plaintiff.

In deciding whether to draw this inference, you should consider whether this witness's testimony would merely have repeated other testimony and evidence already before you. You may also consider whether the Plaintiff had a reason for not calling this witness that was explained to your satisfaction.

Any inference you decide to draw should be based on all of the facts and circumstances in this case.

### Authority

*See* Leonard B. Sand, et al., 4 Modern Fed. Jury Instr.-Civil, ¶ 75.01 (Instr. 75-3); *see also Jones v. Otis Elevator*, 86 F.2d 655, 658-60 (11th Cir. 1988); *United States v. Ouimette*, 798 F.2d 47, 49-50 (2d Cir. 1986).

Accepted:_____

Refused:_____

Modified:_____

## DEFENDANT'S PROPOSED INSTRUCTION NO. 10

### Disability Discrimination – Disparate Treatment

Plaintiff accuses Defendant of disability discrimination. Specifically, she claims that Defendant took adverse employment action against her because of disability discrimination. To succeed on this claim, Plaintiff must prove by a preponderance of the evidence all of the following:

<u>First</u>, Plaintiff had a physical or mental impairment that substantially limited Plaintiff's ability to work. A person is "substantially limited" in her ability to work if she is restricted in the ability work.

<u>Second</u>, Plaintiff was a qualified individual with a disability—which means that she possessed the necessary skill, experience, education, and other job-related requirements for the position of Executive Director for Defendant's Global Central Labs, and could have performed the essential functions of the Executive Director position at the time that Defendant took adverse employment action against her, if Defendant had made reasonable accommodations for Plaintiff's disability.

<u>Third</u>, Defendant knew that Plaintiff had an alleged anxiety disorder at the time that it took such alleged adverse employment action against her.

<u>Fourth</u>, that were it not for Plaintiff's disability, Defendant would not have taken adverse employment action against her.

Plaintiff need not show that disability discrimination was the only or predominant factor that motivated Defendant. In fact, you may decide that other factors were involved as well in Defendant's decision-making process. In that event, in order for you to find for Plaintiff, you must find that she has proven that, although there were other factors, she would not have suffered an adverse employment action without the disability discrimination.

-15-

**JA105**

Authority

    *See* Pattern Jury Instructions for Cases of Employment Discrimination (Disparate Treatment) For the District Courts of the United States Court of Appeals for the First Circuit (Feb. 2002) ("First Circuit Instructions"), 1.1 (updated Aug. 24, 2011) & § 3.1 (updated March 1, 2011); *Echevarria v. AstraZeneca Pharmaceutical LP*, 856 F.3d 119, 126 (1st Cir. 2017); *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 87 (1st Cir. 2012); *see also* Mass. Jury Instructions, § 5.2.5

Accepted: _____

Refused: _____

Modified: _____

## DEFENDANT'S PROPOSED INSTRUCTION NO. 11

### Essential Functions

The essential functions of a job are those activities that must necessarily be performed by an employee to accomplish the principal goals of the job. In determining the essential functions of the plaintiff's job, you may consider the plaintiff's job description as well as the nature of the employer's particular business. You may also consider (1) the employer's judgment as to which functions of the job are essential, (2) the amount of time spent on the job performing the function in question, (3) the consequences of not requiring the person to perform the function, (4) the work experience of people who have held the job, (5) the current work experience of people in similar jobs, (6) whether the reason the position exists is to perform the function, (7) whether there are a limited number of employees available among whom the performance of the function can be distributed, and (8) whether the function is highly specialized and the individual in the position was hired for his or her expertise or ability to perform the function. No one factor is necessarily controlling. You should consider all of the evidence in deciding whether a job function is essential.

### Authority

*See* Mass. Jury Instructions, § 5.2.5(c); First Circuit Instructions, § 3.1 (updated March 1, 2011); *see also Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 88 (1st Cir. 2012); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 25 (1st Cir. 2002); *Godfrey v. Globe Newspaper Co.*, 457 Mass. 113, 120-21 (2010); *Carleton v. Commonwealth*, 447 Mass. 791, 808 (2006).

Accepted:_____

Refused:_____

Modified:_____

-17-

**DEFENDANT'S PROPOSED INSTRUCTION NO. 12**

**Adverse Employment Action**

An "adverse employment action" is one that, standing alone, actually causes damage, tangible or intangible, to an employee. A trivial harm is insufficient. The fact that an employee is unhappy with something that his or her employer did or failed to do is not enough to make that act or omission an adverse employment action. Likewise, subjective feelings of disappointment or disillusionment concerning an employment action do not constitute an adverse action. Rather, an employer takes materially adverse action against an employee only if it (1) takes something of consequence away from the employee, for example, by discharging or demoting the employee, reducing his or her salary, or taking away significant responsibilities; or (2) fails to give the employee something that is a customary benefit of the employment relationship, for example, by failing to follow a customary practice of considering the employee for promotion after a particular period of service. For an employment action to be adverse, it must materially change the conditions of the Plaintiff's employment, which means that it must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Whether action is materially adverse should be judged from the perspective of a reasonable person in Plaintiff's position, considering all of the circumstances.

Authority

*See* First Circuit Instructions, § 3.1 (updated March 1, 2011); Mass. Jury Instructions, § 5.2 at 5-39; *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010); *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 23 (1st Cir. 2002); *MacCormack v. Boston Edison Co.*, 423 Mass. 652, 662-63 (1996).

Accepted:_____

Refused:_____

Modified:_____

-18-

**DEFENDANT'S PROPOSED INSTRUCTION NO. 13**

**Disability Discrimination – Failure to Provide Reasonable Accommodation**

Federal law and Massachusetts law both require employers to provide reasonable accommodation to employees who are disabled, unless the accommodation would impose an undue hardship on the employer or pose a direct threat to the employee or others.

To succeed on her claim that Defendant engaged in disability discrimination by failing to provide her with a reasonable accommodation, Plaintiff need not show that Defendant had discriminatory intent, but she must instead prove by a preponderance of the evidence all of the following:

First, Plaintiff had a physical or mental impairment that substantially limited Plaintiff's ability to work. As I instructed you earlier, a person is "substantially limited" in her ability to work if she is restricted in the ability work.

Second, Plaintiff was a qualified individual with a disability. To meet this requirement, as I instructed you earlier, Plaintiff must prove that she possessed the necessary skill, experience, education, and other job-related requirements for the position of Executive Director for Defendant's Global Central Labs, and could have performed the essential functions of the Executive Director position at the time that Defendant took adverse action against her, if Defendant had made reasonable accommodations for Plaintiff's disability.

Third, Plaintiff made a request for an accommodation, which Defendant failed or refused to provide. And

Fourth, The accommodation that Plaintiff requested and that Defendant failed or refused to provide was "reasonable," in that it not only was feasible for Defendant to provide under the circumstances, but also (i) did not involve excusing Plaintiff from performing an essential function

of her job, and (ii) would have enabled Plaintiff to perform the essential functions of her job as

Executive Director of the Defendant's Global Central Labs.

<div align="center">Authority</div>

*See* First Circuit Instructions, § 3.2 (updated Sept. 18, 2009); Mass. Jury Instructions, § 5.2.5; *Audette v. Town of Plymouth*, 858 F.3d 13, 20 (1st Cir. 2017); *Echevarria*, 856 F.3d at 126-27; *Godfrey*, 457 Mass. at 120.

Accepted:_____

Refused:_____

Modified:_____

## DEFENDANT'S PROPOSED INSTRUCTION NO. 14

### What is a "reasonable" accommodation?

I have instructed you that in order to succeed on her claim against Defendant for failure to reasonably accommodate her disability, Plaintiff must prove by a preponderance of the evidence that that one or more of the accommodations that she requested from Defendant was "reasonable." A "reasonable" accommodation is a modification or adjustment to the work environment or to the manner in which a job is performed that (a) would enable the plaintiff to perform the essential functions of her job, and (b) is feasible for the employer to provide under the circumstances.

Depending on the circumstances, a reasonable accommodation might include, among other things, (1) modifying or adjusting a job application process to enable a qualified applicant with a disability to be considered for the position, (2) making existing facilities used by employees readily accessible to and usable by persons with disabilities, (3) job restructuring, (4) a part-time or modified work schedule, (5) reassignment to a vacant position, (6) acquisition or modification of equipment or devices, or (7) the adjustment or modification of examinations, training materials, or policies.

An accommodation is not "reasonable" if it requires changing, eliminating, or excusing an inability to perform any essential function of the job, if it requires shifting any of the essential functions of the job to other employees, if it requires creating a new position for the disabled employee, or if it places an undue burden on the employer.

In determining whether Dr. Menninger requested, and whether Defendant failed to provide, an accommodation that was reasonable, you may consider only those accommodations that Dr. Menninger actually requested at the time of the underlying events. In other words, you may not consider any potentially reasonable accommodations that Defendant did not provide but that Dr. Menninger did not request from Defendant at the time of the underlying events.

Authority

*See* First Circuit Instructions, § 3.2 (updated Sept. 18, 2009); Mass. Jury Instructions, § 5.2.5(d); *see also Echevarria*, 856 F.3d at 127; *Freadman v. Metropolitan Prop. & Cas. Ins. Co.*, 484 F.3d 91, 102 (1st Cir. 2007); *Mulloy v. Acushnet Co.*, 460 F.3d 141, 148 (1st Cir. 2006); *Darian v. University of Mass. Boston*, 980 F. Supp. 77, 88 (D. Mass. 1997); *Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 648 (2004); *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 467 (2002).

Accepted:_____

Refused:_____

Modified:_____

## DEFENDANT'S PROPOSED INSTRUCTION NO. 15

### Undue Burden

If Plaintiff meets her burden of proving all of the necessary elements of her claim against Defendant for failure to provide her with a reasonable accommodation of her disability, you must nevertheless find for the Defendant on that claim if you determine that the Defendant has established, by a preponderance of the evidence, that providing the accommodation would have imposed an undue burden on the Defendant.

An accommodation imposes an "undue burden" if it would create significant difficulty or expense for the Defendant, considering the nature and cost of the accommodation, the overall financial resources of the Defendant, the effect of the accommodation on expenses and resources, and the impact of the accommodation on the operations of the Defendant. This last consideration—the impact of the accommodation on the Defendant's operations—includes the accommodation's impact on the ability of other employees to perform their duties, and the impact that the accommodation has on the Defendant's ability to conduct its business.

### Authority

*See* First Circuit Instructions, § 3.2 (updated Sept. 18, 2009); Mass. Jury Instructions, § 5.2.5(e); *see also Reed v. LePage Bakeries*, 244 F.3d 254, 258-60 (1st Cir. 2001); *Carleton v. Commonwealth*, 447 Mass. 791, 807 (2006).

Accepted:_____

Refused:_____

Modified:_____

## DEFENDANT'S PROPOSED INSTRUCTION NO. 16

### Retaliation

Plaintiff accuses Defendant of violating federal and state law by retaliating against her for engaging in protected activities—namely, for requesting accommodations of her claimed disability. Requesting an accommodation for a disability is a "protected activity."

To succeed on her claim, Plaintiff must prove by a preponderance of the evidence –

First, that Defendant, through its supervisor-level employees, took adverse action against her. In this context, an "adverse action" is one that would be materially adverse to a reasonable employee. An action is "materially adverse" if it could well dissuade a reasonable employee from making or supporting a charge of discrimination.

Second, that when the Defendant's supervisor-level employees took the adverse action against Plaintiff, they were aware that Plaintiff had requested accommodations of her claimed disability.

Third, that were it not for Plaintiff's request for accommodations of her claimed disability, Defendant would not have taken adverse action against her.

Plaintiff need not show that retaliation was the only or predominant factor that motivated Defendant. In fact, you may decide that other factors were involved as well in Defendant's decision-making process. In that event, in order for you to find for Plaintiff, you must find that she has proven that, although there were other factors, she would not have suffered an adverse employment action without the retaliation.

### Authority

*See* First Circuit Instructions, §§ 1.1 (updated Aug. 24, 2011) & 5.1 (updated Apr. 10, 2012); Mass. Jury Instructions, § 5.2.9; *see Burlington N. v. White*, 548 U.S. 53, 57 (2006); *Cherkaoui v. City of Quincy*, 877 F.3d 14, 28-29 (1st Cir. 2017); *Billings v. Town of Grafton*, 515 F.3d 39, 52 (1st Cir. 2008); *Bulwer v. Mt. Auburn Hosp.*, 473 Mass. 672, 680 (2016); *Mole v. University of Mass.*, 442 Mass. 582, 591-02, 594 (2004).

Accepted:

Refused:

Modified:

## DEFENDANT'S PROPOSED INSTRUCTION NO. 17

### Pretext and Business Judgment

If you determine that any employment decision that Defendant made constituted an adverse employment action against Plaintiff, you must also consider any legitimate, non-discriminatory reason or explanation stated by the Defendant for that decision. If you determine that Defendant has stated such a reason, then you must decide in favor of Defendant unless the Plaintiff has proven, by a preponderance of the evidence, that the Defendant's stated reason was not the true reason. The ultimate burden of persuasion that Defendant intentionally discriminated against Plaintiff remains at all times with the Plaintiff. Defendant has only the burden of stating a legitimate, non-discriminatory reason for its actions—it does not have the burden of persuading you of its stated reason by the preponderance of the evidence. Rather, Plaintiff has the burden of persuading you that Defendant's stated reason for its actions was not the true reason.

If you determine that the Defendant's stated reason for its decision was not the true reason, then you may, but need not, infer that the Defendant's true reason for the decision was discrimination or retaliation, and that the Defendant's stated reason was a "pretext" for discrimination or retaliation. Remember, however, that not all pretexts are designed or intended to conceal discrimination or retaliation, and that it is Plaintiff's burden to satisfy you, by a preponderance of the evidence, that the adverse action would not have been taken except for the Defendant's consideration of the Plaintiff's disability or her request for accommodations.

When considering pretext, your focus must be on the Defendant's state of mind, not on whether the Defendant's reasoning was, in your view, right or wrong. In addition, when determining whether the Defendant's stated reason for its actions was not its true reason, you may not question the Defendant's business judgment. Pretext is not established just because you disagree with the business judgment of the Defendant, unless you also find that the Defendant's

stated reason was a pretext for discrimination. Even if you were to decide that Defendant's actions

were foolish, or unfair or unprofessionally handled, that would not be enough to establish that its

actions were discriminatory or retaliatory.

<u>Authority</u>

*See* Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. §§ 171:75 & 171:77 (6th ed. 2006) (2023 Supp.); Leonard B. Sand, et al., 4 Modern Fed. Jury Instr.-Civil, ¶ 88A.04 (Instr. 88A-22); Mass. Jury Instructions, § 5.2.3(a); *see Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991); *Bulwer v. Mt. Auburn Hosp.*, 473 Mass. 672, 681, 683-87 (2016). *Goldman v. First National Bank*, 985 F.2d 1113, 1117 (1st Cir.1993); *Herbert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1111 (1st Cir. 1989); *Connell v. Bank of Boston*, 924 F.2d 1169, 1173 (1st Cir. 1991).

Accepted:_____

Refused:_____

Modified:_____

-27-

## DEFENDANT'S PROPOSED INSTRUCTION NO. 18

### Damages

If you find that Defendant discriminated against Plaintiff based on her disability, or retaliated against her for engaging in protected activities, then you must determine whether it has caused Plaintiff damages and, if so, you must determine the amount of those damages.

You should not conclude from the fact that I am instructing you on damages that I have any opinion as to whether Plaintiff has proved liability. Instructions as to the measure of damages are given for your guidance only in the event you should find in favor of the Plaintiff from a preponderance of the evidence in the case in accordance with the other instructions that I have given you.

Plaintiff must prove her damages by a preponderance of the evidence. Your award must be based on evidence and not on speculation or guesswork. The damages that you award must be fair compensation-no more and no less.

Any award you make should be fair in light of the evidence presented at the trial. In determining the amount of any damages that you decide to award, you should be guided by dispassionate common sense. You must use sound judgment in fixing an award of damages, drawing reasonable inferences from the facts in evidence. You may not award damages based on sympathy, speculation, or guess work. On the other hand, the law does not require that Plaintiff prove the amount of her losses with mathematical precision, but only with as much definiteness and accuracy as circumstances permit.

The categories of damages that you may consider awarding to Plaintiff, if you find that Defendant is liable to Plaintiff, are as follows: (1) back pay; (2) front pay; (3) emotional distress; and (4) punitive damage. I will now instruct you as to each of these categories.

<u>Authority</u>

See Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. §§ 106:02 & 172:70 (6th ed. 2006) (2023 Supp.); First Circuit Instructions, § 9.1; Mass. Jury Instructions, § 5.3.1.

Accepted:_____

Refused:_____

Modified:_____

## DEFENDANT'S PROPOSED INSTRUCTION NO. 19

### Back Pay

If you determine that Defendant discriminated against Plaintiff based on a disability, or retaliated against her for requesting accommodation of a disability, then Plaintiff may be entitled to recover "back pay," which is the amount of the lost salary, bonuses, the value of employment benefits, and health insurance benefits that Plaintiff would have received, but for the Defendant's discriminatory or retaliatory conduct, from the date of the adverse employment decision until today.

The Plaintiff has a duty under the law to make every reasonable effort to minimize or reduce her damages for loss of compensation by seeking employment. This duty is referred to as the duty to mitigate damages. Defendant has the burden of proving, by a preponderance of the evidence, that Plaintiff failed to make reasonable efforts to minimize or reduce her damages for loss of compensation, and thus has failed to mitigate her damages.

If you determine that Plaintiff is entitled to recover back pay damages, you must reduce those damages by (1) the amount of money that Plaintiff has earned from the date of the adverse employment decision until today, and (2) the amount of money that Plaintiff could have earned by reasonable effort during the period from the date of the adverse employment decision until today.

### Authority

*See* Mass. Jury Instructions, § 5.3.2; Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. §§ 172:71, 172:75 (6th ed. 2006) (2023 Supp.).

Accepted:_____

Refused:_____

Modified:_____

-30-

**JA120**

**DEFENDANT'S PROPOSED INSTRUCTION NO. 20**

**Front Pay**

If you determine that Defendant discriminated against Plaintiff based on a disability, or retaliated against her for requesting accommodation of a disability, then you must also calculate separately, as future damages, a monetary amount equal to the present value of the wages and benefits that Plaintiff reasonably would have earned in the future, in her employment with Defendant, if Plaintiff had not been discriminated against or retaliated against, minus the amount of wages and benefits that Plaintiff may reasonably be expected to earn in the future via other similar employment.

You cannot speculate in awarding front pay; rather, the determination of the amount of the award—if any—must be proven with reasonable certainty. You should make reasonable estimates based on the evidence concerning the amount of future earnings, including salary, bonuses, and the value of benefits that the Plaintiff would have received but for the Defendant's unlawful discrimination or retaliation. You must also make reasonable estimates, based on the evidence, of the amount of time that Plaintiff would have remained employed by Defendant if she had not been discriminated against or retaliated against, and of the amount of wages and benefits that Plaintiff may reasonably be expected to earn in the future via other similar employment.

You must also reduce any award to its present value by considering the interest that Plaintiff could earn on the amount of the award if Plaintiff had made a relatively risk-free investment. The reason you must make this reduction is because an award of an amount representing future loss of earnings is more valuable to Plaintiff if plaintiff receives it today than if Plaintiff received it in the future, when Plaintiff would otherwise have earned it. It is more valuable because Plaintiff can earn interest on it for the period of time between the date of the award and the date Plaintiff would have earned the money. Thus you should adjust the amount of

any award for future loss of earnings by the amount of interest that Plaintiff can earn on that amount

in the future.

<u>Authority</u>

      *See* Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. §§ 172:72 (6th ed. 2006) (2023 Supp.); Mass. Jury Instructions, § 5.3.3; *Giles v. General Elec. Co.*, 245 F.3d 474, 489 (5th Cir. 2001); *Scarfo v. Cabletron Sys., Inc.*, 54 F.3d 931, 958 (1st Cir. 1995); *Conway v. Electro Switch Corp.*, 402 Mass. 385, 390 (1988).

Accepted:_____

Refused:_____

Modified:_____

## DEFENDANT'S PROPOSED INSTRUCTION NO. 21

### Emotional Distress

If you find that the Plaintiff has been discriminated against, you may also award her reasonable damages for her emotional distress. Emotional distress includes mental pain, discomfort, indignity, depression, fear, anxiety, or humiliation suffered as a result of the discrimination. Although uncertainty in the amount of damages, including emotional distress damages, does not bar recovery, and although mathematical precision is not required, you must not speculate, conjecture, or guess in awarding damages. Accordingly, you should not award damages for speculative injuries, but only for those that the Plaintiff actually suffered as a result of the Defendant's conduct, or which the Plaintiff is reasonably likely to suffer as a result of the Defendant's conduct in the near future.

In addition, the Plaintiff must show a causal connection between the Defendant's unlawful act and the Plaintiff's emotional distress. Accordingly, you must consider whether and to what extent the Plaintiff's emotional distress has been due to a condition that existed prior to the alleged discrimination or retaliation, or arose from events other than the actions of Defendant. To the extent that Plaintiff's emotional distress has been due to such conditions or events, Plaintiff cannot recover for it from Defendant.

When considering emotional distress awards, evidence in the form of some physical manifestation of the emotional distress, or evidence in the form of expert testimony, although beneficial, is not necessary to awarding damages. That said, an award of emotional distress damages must rest on substantial evidence, and its factual basis must be made clear on the record.

-33-

<u>Authority</u>

*See* Mass. Jury Instructions, § 5.3.4; Leonard B. Sand, et al., 4 Modern Fed. Jury Instr.-Civil, ¶ 88A.05 (Instr. 88A-29).

Accepted:_____

Refused:_____

Modified:_____

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 22

### Punitive Damages

If you find that the Defendant has intentionally discriminated or retaliated against the Plaintiff, you may consider whether punitive damages are warranted. Punitive damages are different from compensatory damages. Unlike compensatory damages, which compensate the plaintiff for the harm that he or she has suffered, the purpose of punitive damages is to punish the defendant for conduct that is outrageous because of the defendant's evil motive or reckless indifference to the rights of others.

To find that punitive damages should be awarded, you must find that more than intentional discrimination occurred. Punitive damages may be awarded only where the plaintiff has proven by a preponderance of the evidence that (1) the individual who engaged in the discriminatory act or practice was acting in a managerial capacity, (2) he or she engaged in the discriminatory act or practice while acting in the scope of his or her employment, and (3) his or her the Defendant's conduct was not only intentional, but also was outrageous or egregious, or that he or she acted with malice or with reckless indifference to the rights of the disabled.

If Plaintiff has proved these facts, then you may award punitive damages, unless Defendant proves by a preponderance of the evidence that the conduct or action by the managerial employee was contrary to its good-faith efforts to prevent discrimination in the workplace.

In determining whether an employee of Defendant was a supervisor or manager for Defendant, you should consider the type of authority that he or she had over Plaintiff and the type of authority for employment decisions Defendant authorized him or her to make.

In determining whether Defendant made good-faith efforts to prevent discrimination in the workplace, you may consider whether it adopted antidiscrimination policies, whether it educated

its employees on the federal antidiscrimination laws, how it responded to Plaintiff's complaint of discrimination, and how it responded to other complaints of discrimination.

It is entirely within your discretion as jurors to determine whether to award punitive damages if the elements I just described have been proved. However, keep in mind that you are not required to award punitive damages. Punitive damages are appropriate only for especially shocking and offensive misconduct. If you decide to award punitive damages, you must use sound reason in setting the amount. The amount of the award must not reflect bias, prejudice, or sympathy toward any party, but the amount can be as large as you believe necessary to fulfill the purpose of punitive damages.

In determining the amount of a punitive damages award, if any, you should consider (1) the egregious or outrageous character or nature of the Defendant's conduct, (2) the Defendant's wealth, in order to determine what amount of money is needed to punish the Defendant's conduct and to deter any future acts of discrimination; (3) the actual harm suffered by the Plaintiff, (4) the magnitude of any potential harm to other victims if similar future behavior is not deterred, (5) whether there was a conscious or purposeful effort to demean or diminish disabled people (or the Plaintiff because she is disabled), (6) whether the Defendant was aware that the discriminatory conduct would likely cause serious harm, or recklessly disregarded the likelihood that serious harm would arise, (7) the Defendant's conduct after learning that the initial conduct would likely cause harm, and (8) the duration of the wrongful conduct and any concealment of that conduct by the Defendant.

<u>Authority</u>

*See* Mass. Jury Instructions, § 5.3.5; Leonard B. Sand, et al., 4 Modern Fed. Jury Instr.-Civil, ¶ 88A.05 (Instr. 88A-30). *Tobin v. Liberty Mut. Ins. Co*, 553 F.3d 121 (1st Circ. 2009); *Iacobucci v. Boulter*, 193 F. 3d 14, 26 (1st Cir. 1999).

Accepted: _____

Refused: _____

Modified: _____

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 23

### Duty to Deliberate

The verdict must represent the considered judgment of each of you. In order to return a verdict, it is necessary that each juror agree. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement, if you can do so without disregard of individual judgment. You must each decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence, solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times that you are not partisans. You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

### Authority

*See* Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. § 106:01 (6th ed. 2006) (2023 Supp.).

Accepted:_____

Refused:_____

Modified:_____

-38-

## DEFENDANT'S PROPOSED INSTRUCTION NO. 24

### Selection of Foreperson – Verdict Forms

Upon retiring to the jury room, you will select one of you to act as your foreperson. You shall then discuss the case with the other jurors to reach agreement if you can do so. The foreperson will preside over your deliberations, and will be your spokesperson here in court.

Verdict forms have been prepared for your convenience. *[Read forms of verdict]*.

You will take these forms to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form that sets forth the verdict upon which you unanimously agree. You will then return with your verdict to the courtroom.

### Authority

*See* Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. § 106:04 (6th ed. 2006) (2023 Supp.).

Accepted:_____

Refused:_____

Modified:_____

## DEFENDANT'S PROPOSED INSTRUCTION NO. 25

### Communication with the Court

If it becomes necessary during your deliberations to communicate with me, you may send a note by a bailiff, signed by your foreperson or by one or more members of the jury. No member of the jury should ever attempt to communicate with me by any means other than a signed writing. I will never communicate with any member of the jury on any subject touching the merits of the case otherwise than in writing, or orally here in open court.

From the oath about to be taken by the bailiffs you will note that they too, as well as all other persons, are forbidden to communicate in any way or manner with any member of the jury on any subject touching the merits of the case.

Bear in mind also that you are never to reveal to any person—not even to me—how the jury stands, numerically or otherwise, on the questions before you, until after you have reached a unanimous verdict.

### Authority

*See* Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. § 106:08 (6th ed. 2006) (2023 Supp.).

Accepted:_____

Refused:_____

Modified:_____

-40-

JA130

## DEFENDANT'S PROPOSED INSTRUCTION NO. 26

**Reaching Agreement**

Each of you must decide the case for yourself, but you should do so only after considering all the evidence, discussing it fully with the other jurors, and listening to their views. Do not be afraid to change your opinion if you think you are wrong. But do not come to a decision simply because other jurors think it is right.

The case has taken time and effort to prepare and try. There is no reason to think it could be better tried or that another jury is better qualified to decide it. It is important therefore that you reach a verdict if you can do so conscientiously. If it looks at some point as if you may have difficulty in reaching a unanimous verdict, and if the greater number of you are agreed on a verdict, the jurors in both the majority and the minority should reexamine their positions to see whether they have given careful consideration and sufficient weight to the evidence that has favorably impressed the jurors who disagree with them. You should not hesitate to reconsider your views from time to time and to change them if you are persuaded that this is appropriate.

It is important that you attempt to return a verdict but, of course, only if each of you can do so after having made his or her own conscientious determination. Do not surrender an honest conviction as to the weight and effect of evidence simply to reach a verdict.

Authority

*See* Draft Civil Jury Instructions of Hon. D. Brock Hornby, United States District Court for the District of Maine, page 7; *see also* Kevin F. O'Malley, et al., 3 Federal Jury Prac. & Instr. § 106:10 (6th ed. 2006) (2023 Supp.).

Accepted:_____

Refused:_____

Modified:_____

-41-

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

          Plaintiff,

v.

                                   Civil Action No.  1:19-CV-11441-LTS

PPD DEVELOPMENT, L.P.,

          Defendant.

## DEFENDANT'S REQUEST FOR SPECIAL VERDICT FORMS

Defendant PPD Development, L.P. respectfully requests that the Court give the attached special verdict forms to the jury. Defendant reserves the right to submit revised special verdict forms based on the Court's rulings on motions *in limine* and other pretrial matters, based on the evidence adduced at trial, or to conform to the Court's rulings of law.

        PPD DEVELOPMENT, L.P.

        By its attorneys,

        */s/ Patrick M. Curran, Jr.*
        Rachel Reingold Mandel (BBO #660495)
        Patrick M. Curran, Jr. (BBO #659322)
        OGLETREE, DEAKINS, NASH, SMOAK &
        STEWART, P.C.
        One Boston Place, Suite 3500
        Boston, MA 02108
        Telephone: (617) 994-5700
        Facsimile:  (617) 994-5701
        rachel.mandel@ogletree.com
        patrick.curran@ogletree.com

Dated: March 10, 2023

**Verdict Form A – Disability Discrimination (Reasonable Accommodation)**

We answer the questions submitted to us as follows:

1. Did Lisa Menninger prove, by a preponderance of the evidence, that she had a "disability" – that is, a physical or mental impairment that substantially limited her ability to work?

   ____ Yes                          ____ No

   If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions on this form, and proceed to the next verdict form.

2. Did Lisa Menninger prove, by a preponderance of the evidence, that she was a "qualified individual with a disability," as defined in the Court's Instructions?

   ____ Yes                          ____ No

   If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions on this form, and proceed to the next verdict form.

3. Did Lisa Menninger prove, by a preponderance of the evidence, that the accommodations of her disability that she requested of PPD Development, L.P. ("PPD"), and that PPD did not provide to her, were "reasonable accommodations," as that term is defined in the Court's instructions?

   ____ Yes                          ____ No

   If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions on this form, and proceed to the next verdict form.

4. Did PPD prove, by a preponderance of the evidence, that the accommodations that Lisa Menninger requested and that PPD did not provide to her would have created an undue hardship to the operation of PPD's business?

   ____ Yes                          ____ No

   Please proceed to the next verdict form.

## **Verdict Form B – Disability Discrimination (Disparate Treatment)**

We answer the questions submitted to us as follows:

1. Did Lisa Menninger prove, by a preponderance of the evidence, that she had a "disability" – that is, a physical or mental impairment that substantially limited her ability to work?

       ___ Yes                             ___ No

   If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions on this form, and proceed to the next verdict form.

2. Did Lisa Menninger prove, by a preponderance of the evidence, that she was a "qualified individual with a disability," as defined in the Court's Instructions?

       ___ Yes                             ___ No

   If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions on this form, and proceed to the next verdict form.

3. Did Lisa Menninger prove, by a preponderance of the evidence, that PPD Development, L.P. ("PPD") took an adverse employment action against her after it learned that she had a physical or mental impairment that substantially limited her ability to work?

       ___ Yes                             ___ No

   If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions on this form, and proceed to the next verdict form.

4. Did Lisa Menninger prove, by a preponderance of the evidence, that if she had not been disabled, PPD would not have taken adverse employment action against her?

       ___ Yes                             ___ No

   Please proceed to the next verdict form.

## **Verdict Form C – Retaliation**

We answer the questions submitted to us as follows:

1. Did Lisa Menninger prove, by a preponderance of the evidence, that PPD Development, L.P. ("PPD"), through its supervisor-level employees, took "adverse action" (as that term is defined in the Court's Instructions) against her?

    ___ Yes                   ___ No

    If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions on this form, and proceed to the next verdict form.

2. Did Lisa Menninger prove, by a preponderance of the evidence, that when PPD's supervisor-level employees took adverse action against her, they were aware that she had requested accommodations of her claimed disability?

    ___ Yes                   ___ No

    If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions on this form, and proceed to the next verdict form.

3. Did Lisa Menninger prove, by a preponderance of the evidence, that if she had not requested accommodations of her claimed disability, PPD would not have taken adverse action against her?

    ___ Yes                   ___ No

    Please proceed to the next verdict form.

## Verdict Form D – Compensatory Damages

We answer the questions submitted to us as follows:

1.  If your last answer on Verdict Forms A, B, <u>or</u> C was "yes," then answer questions 2 through 6, below. If your last answer on Verdict Forms A, B, <u>and</u> C was "no," then stop here and answer no further questions.

2.  <u>Economic damages: back pay</u>. Enter below the amount of "back pay" (as that term is defined in the Court's Instructions), if any, that Lisa Menninger proved by a preponderance of the evidence that she lost because of PPD's disability discrimination or retaliation.

    $_____

3.  <u>Economic damages: front pay</u>. Enter below the amount of "front pay" (as that term is defined in the Court's Instructions), if any, that Lisa Menninger proved by a preponderance of the evidence that she will lose because of PPD's disability discrimination or retaliation.

    $_____

4.  <u>Non-economic damages: emotional distress</u>. Enter below the amount of damages for "emotional distress" (as that term is defined in the Court's Instructions), if any that Lisa Menninger proved by a preponderance of the evidence that she suffered or is reasonably likely to suffer in the near future because of PPD's disability discrimination or retaliation.

    $_____

5.  Enter next to "TOTAL," below, the sum of the dollar amounts listed in your responses to Questions 2, 3, and 4.

    TOTAL: $_____

6.  What percentage of that Total amount is attributable to each the following claims:

    A._____% Disability Discrimination – Disparate Treatment

    B._____% Disability Discrimination – Failure to Accommodate

    C._____% Retaliation

Please proceed to the next verdict form.

## <u>Verdict Form E – Punitive Damages</u>

We answer the questions submitted to us as follows:

1.   If your last answer on Verdict Forms A, B, <u>or</u> C was "yes," then answer questions 2 through 6, below. If your last answer on Verdict Forms A, B, <u>and</u> C was "no," then stop here and answer no further questions.

2.   Did Lisa Menninger prove by a preponderance of the evidence that the employee(s) who engaged in the discriminatory or retaliatory act(s) was or were acting in a managerial capacity?

        ___ Yes                ___ No

If your answer to question 2 is yes, then answer question 3. If you answered no, stop here and answer no further questions.

3.   Did Lisa Menninger prove by a preponderance of the evidence that the employee(s) who engaged in the discriminatory or retaliatory act(s) did so while acting in the scope of their employment?

        ___ Yes                ___ No

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here and answer no further questions.

4.   Did Lisa Menninger prove by a preponderance of the evidence that the employee(s) who engaged in the discriminatory or retaliatory act(s) did so with malice or with reckless indifference to the rights of the disabled?

        ___ Yes                ___ No

If your answer to question 4 is yes, then answer question 5. If you answered no, stop here and answer no further questions.

5.   What amount of punitive damages, if any, do you award to Lisa Menninger?

    $_____

6.   What percentage of the amount listed in response to Question No. 5 is attributable to each of the following claims?

        A._____% Disability Discrimination – Disparate Treatment

        B._____% Disability Discrimination – Failure to Accommodate

        C._____% Retaliation

THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LISA MENNINGER, <br><br> Plaintiff, <br><br> v. <br><br> PPD DEVELOPMENT, L.P., <br><br> Defendant. | Civil Action No: 1:19-CV-11441-LTS |

### **PLAINTIFF'S TRIAL BRIEF**

Plaintiff hereby submits her Trial Brief in accordance with the Court's Order Setting
Case for Trial.

### A. **Motions *in Limine***

Plaintiff has filed the following motions:

(1) Motion *in Limine* to Preclude Defendant's Use of "Voluntary Self-
Identification of Disability" Form (Doc. No. 113).

(2) Motion *in Limine* Pursuant to Fed. R. Civ. P. 37(c)(1) to Preclude Defendant's
Medical Expert from Testifying on Matters Not Disclosed in Original Expert
Report (Doc. 116).

### B. **Proposed Statement of the Case**

The plaintiff, Dr. Lisa Menninger, claims that she was subjected to unlawful discrimination and
retaliation by her former employer, Defendant PPD Development, L.P. Plaintiff claims that these
actions stem from her disclosure to PPD that she suffered from disabilities—specifically, Social
Anxiety Disorder and Panic Disorder—and from her request that Defendant provide her with
reasonable accommodations for those alleged disabilities. Plaintiff further alleges that

Defendant's actions severely exacerbated her pre-existing medical conditions, caused her to develop major depression, and ultimately rendered her unable to work. Defendant denies these claims.

### C.  List of Potential Witnesses

Attached as Exhibit A.

### D.  Proposed Voir Dire Questions

Attached as Exhibit B.

### E.  Proposed Jury Instructions

Attached as Exhibit C.

### F.  Proposed Verdict Form

Attached as Exhibit D.

Respectfully submitted,

*/s/ Patrick J. Hannon*
Patrick J. Hannon (BBO #664958)
Hampton M. Watson (BBO #705983)
Hartley Michon Robb, LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
phannon@hmrhlaw.com
hwatson@hmrhlaw.com
P: (617) 723-8000
F: (617) 447-2800
Attorneys for Plaintiff Lisa Menninger

Date: March 10, 2023

## CERTIFICATE OF SERVICE

I, Patrick J. Hannon, certify that on March 10, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Defendant by electronically serving its counsel of record.

/s/ *Patrick J. Hannon*
Patrick J. Hannon

THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

     Plaintiff,

     v.

PPD DEVELOPMENT, L.P.,

     Defendant.

Civil Action No: 1:19-CV-11441-LTS

## **PLAINTIFF'S LIST OF POTENTIAL WITNESSES**

1. Lisa Menninger (fact witness), Bend, Oregon.

2. Hacene Mekerri (fact witness), Singapore.

3. Deborah Ballweg (fact witness), Hollandale, Wisconsin.

4. Christopher Fikry (fact witness), Wilmington, North Carolina.

5. Christopher Clendening (fact witness), Cleeves, Ohio.

6. Brent McKinnon (fact witness), Pittsburg, Texas.

7. Chad St. John (fact witness), Liberty Township, Ohio.

8. Tonya Hart (fact witness), Bend, Oregon.

9. Dr. Marianna Kessimian (fact witness), Providence, Rhode Island.

10. Dr. Alicia Burbano (fact witness), Albuquerque, New Mexico.

11. Dr. Paul Summergrad (expert witness), Newton, Massachusetts.

12. Bruce R. Jonas (expert witness), Nesconset, New York.

Respectfully submitted,


*/s/ Patrick J. Hannon*

Patrick J. Hannon (BBO #664958)
Hampton M. Watson (BBO #705983)
Hartley Michon Robb, LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
phannon@hmrhlaw.com
hwatson@hmrhlaw.com
P: (617) 723-8000
F: (617) 447-2800
Attorneys for Plaintiff Lisa Menninger


Date: 3/10/2023March 10, 2023

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

LISA MENNINGER,

     Plaintiff,

v.

PPD DEVELOPMENT, L.P.,

     Defendant.

Civil Action No: 1:19-cv-11441-LTS

---

## **PLAINTIFF'S PROPOSED QUESTIONS FOR *VOIR DIRE* EXAMINATION**

Plaintiff Lisa Menninger respectfully submits the following proposed questions to be asked of potential jurors in *voir dire* examination:

1. Have you or any of your close family members ever owned or worked for a company that does business with PPD, PPD, Inc., or Thermo Fisher?

2. Have you, your close family members, or your company, ever had any relationship with any employee of PPD, PPD, Inc., or Thermo Fisher?

3. Are any of you or your close family members employed in the fields of psychology, psychiatry, social work or other licensed therapy providers, pathology, or pharmaceuticals?

4. Have any of you ever worked in a laboratory for your primary job?

5. Have you or any close family members ever been fired from a job for reasons that you believe were unfair or discriminatory?

6. Have you or any close friend or close family member ever been accused of discriminating or retaliating against someone in the workplace?

7. Have you ever been involved in any kind of investigation at work (either as management, a witness, or an employee)?

8. Have you or your close family members ever requested an accommodation for disability at your workplace or from a landlord?

9. Have any of you ever worked in a supervisory position where you received or considered an employee's request for accommodation of their disability?

10. Are any of you suspicious of people who file lawsuits?

11. Do any of you have any negative feelings or bias with respect to people that suffer from depression or other mental illnesses?

12. Do any of you believe that people with depression simply need to try harder to overcome their symptoms?

13. Would anyone have a problem awarding significant compensatory damages to the Plaintiff even if the Plaintiff proved to you that that was the amount of her loss?

14. Do any of you feel that the law should not allow injured people to recover damages for intangible things like mental anguish and emotional distress?

15. Do any of you feel that too much money is awarded for claims of emotional distress?

16. Would any of you have a problem with awarding someone substantial damages for emotional suffering?

17. Would any of you have difficulty awarding punitive damages?

<div style="margin-left: 40%;">

Respectfully submitted,
Plaintiff Lisa Menninger,
By her attorneys,

*/s/ Hampton M. Watson*
Patrick J. Hannon (BBO #664958)
Hampton M. Watson (BBO #705983)
Hartley Michon Robb Hannon LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
phannon@hmrhlaw.com
hwatson@hmrhlaw.com
P: (617) 723-8000
Attorneys for Plaintiff

</div>

Date: March 10, 2023

## CERTIFICATE OF SERVICE

I, Hampton M. Watson, certify that on March 10, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Defendant by electronically serving its counsel of record.

/s/ *Hampton M. Watson*
Hampton M. Watson

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

     Plaintiff,

     v.

PPD DEVELOPMENT, L.P.,

     Defendants.

Civil Action No: 1:19-CV-11441-LTS

## **PLAINTIFF'S PROPOSED JURY INSTRUCTIONS**

LISA MENNINGER

By her attorneys,

*/s/ Patrick J. Hannon*

Patrick J. Hannon (BBO #664958)
Hampton M. Watson (BBO #705983)
Hartley Michon Robb Hannon LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
phannon@hmrhlaw.com
hwatson@hmrhlaw.com
(617) 723-8000
Attorneys for Plaintiff

# DISCRIMINATION

**INSTRUCTION NO. 1.**

To succeed on her claim for disability discrimination, Dr. Menninger must prove by a preponderance of the evidence that:

> First, she suffered from a "disability" within the meaning of federal and state anti-discrimination laws;

> Second, she possessed the requisite skill, experience, education, and other job-related requirements for her position, and was able to perform the position's essential functions either with or without reasonable accommodation;

> Third, that PPD either (i) failed to reasonably accommodate her disability or (ii) engaged in actions that adversely affected Dr. Menninger, in whole or in part, because of her disability.[1]

**INSTRUCTION NO. 2.**

For purposes of her discrimination claim, Dr. Menninger suffered from a "disability" if any of the following are true: (1) she suffered from a "physical or mental impairment" that "substantially limited" one or more of her "major life activities," (2) she had a record of such an impairment, or (3) she was regarded by PPD as having such an impairment.[2]

**INSTRUCTION NO. 3.**

A "physical or mental impairment" is:

> (i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

> (ii) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.[3]

**INSTRUCTION NO. 4.**

The term "major life activity" includes, but is not limited to:

---

[1] Echevarria v. AstraZeneca Pharm. LP, 856 F.3d 119, 126 (1st Cir. 2017).

[2] 29 C.F.R. § 1630.2(g).

[3] 29 C.F.R. § 1630.2(h).

(i)  Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working; and

(ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system.[4]

## INSTRUCTION NO. 5.

The requirement that a disability "substantially limit" a major life activity is not intended to be a demanding standard, and the phrase should be construed broadly in favor of expansive coverage. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Further, the determination of whether an impairment substantially limits a major life activity must be made without regard to the ameliorative effects of mitigating measures. An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.[5]

## INSTRUCTION NO. 6.

The non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regime, may be considered when determining whether an individual's impairment substantially limits a major life activity.[6]

## INSTRUCTION NO. 7.

In determining whether an individual has a disability, the focus is on how a major life activity is substantially limited, and not on what outcome an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write or learn compared to most people in the general population.[7]

## INSTRUCTION NO. 8.

The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the

---

[4] 29 C.F.R. § 1630.2(i).

[5] 29 C.F.R. §§ 1630.2(j)(1).

[6] 29 C.F.R. § 1630.2(j)(4)(ii).

[7] 29 C.F.R. § 1630.2(j)(4)(iii).

3

marginal, that is, non-essential functions of the position.[8] "Essential functions" are those that must necessarily be performed by the individual in order to accomplish the principal objectives of the job.[9]

**INSTRUCTION NO. 9.**

A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.[10]

**INSTRUCTION NO. 10.**

In determining whether a particular function is essential, the evidence you may consider includes the following:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.[11]

---

[8] 29 C.F.R. § 1630.2(n)(1).

[9] Cargill v. Harvard Univ., 60 Mass. App. Ct. 585, 594 (2004).

[10] 29 C.F.R. § 1630.2(n)(2).

[11] 29 C.F.R. § 1630.2(n)(3).

**INSTRUCTION NO. 11.**

It is PPD's burden to prove which of Dr. Menninger's job functions, if any, were "essential."[12]

**INSTRUCTION NO. 12.**

Absent "undue hardship," the law requires employers such as PPD to make "reasonable accommodations" to the known physical or mental limitations of an otherwise "qualified individual" with a disability who is an applicant or employee. A "qualified individual" is an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.[13]

**INSTRUCTION NO. 13.**

A "reasonable accommodation" is any adjustment or modification to a job (or the way a job is done), employment practice, or work environment that makes it possible for a person with a disability to perform the essential functions of the position involved and to enjoy equal terms, conditions and benefits of employment.[14] A reasonable accommodation may include:

(i)     Making existing facilities used by employees readily accessible to and equally usable by individuals with disabilities;

(ii)    Modifying work schedules;

(iii)   Modifying when and how an essential job function is performed;

(iv)    Reassigning marginal or non-essential job functions;

(v)     Job restructuring;

(vi)    Part-time or modified work schedules;

(vii)   Reassignment to a vacant position;

(viii)  Acquisition or modifications of equipment or devices;

(ix)    Appropriate adjustment or modifications of examinations, training materials, or policies;

(x)     The provision of qualified readers or interpreters;

---

[12] Ward v. Massachusetts Health Rsch. Inst., Inc., 209 F.3d 29, 35 (1st Cir. 2000) (employer always bears the burden to prove a function was essential due to its superior access to information).

[13] 29 C.F.R. § 1630.2(o).

[14] Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination, 441 Mass. 632, 648 (2004).

(xi)    and other similar accommodations for individuals with disabilities.[15]

## INSTRUCTION NO. 14.

A "qualified individual" is entitled to a reasonable accommodation even if they are able to perform the essential functions of their job without it.[16] The law requires an accommodation in such circumstances in order to alleviate the added stress, difficulties and other disadvantages that a disabled employee may suffer in performing their work.[17]

## INSTRUCTION NO. 15.

If you find that Dr. Menninger was entitled to a reasonable accommodation and PPD failed to provide it, it is PPD's burden to show that such accommodation would have imposed an "undue hardship."[18]

## INSTRUCTION NO. 16.

An accommodation imposes "undue hardship" on an employer if it causes significant difficulty or expense. In determining whether an accommodation would impose an undue hardship, factors to be considered include:

(i) The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;

(ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;

(iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;

---

[15] 29 C.F.R. § 1630.2(o); MCAD Guidelines: Employment Discrimination on the Basis of Handicap, https://www.mass.gov/doc/mcad-guidelines-on-disability-discrimination-in-employment/download; cf. Dahill v. Police Dep't of Bos., 434 Mass. 233, 239, 748 N.E.2d 956, 961 (2001) ("The guidelines [on employment discrimination on the basis of handicap] represent the MCAD's interpretation of G.L. c. 151B, and are entitled to substantial deference, even though they do not carry the force of law.")

[16] Bell v. O'Reilly Auto Enterprises, LLC, 972 F.3d 21, 24 (1st Cir. 2020) ("An employee who can, with some difficulty, perform the essential functions of his job without accommodation remains eligible to request and receive a reasonable accommodation.").

[17] Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination, 441 Mass. 632, 648 (2004).

[18] Enica v. Principi, 544 F.3d 328, 339 (1st Cir. 2008).

6

(iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and

(v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.[19]

## INSTRUCTION NO. 17.

To find that PPD engaged in actions that adversely affected Dr. Menninger, in whole or in part, because of her disability, you must find that such actions materially changed the conditions of her employment. For example, assignment of more difficult job responsibilities could meet this standard. Likewise, an employee may meet this standard by showing that her employer intentionally assigned new job duties to target her known disability, such as by selecting tasks that would be more difficult due to the disability.[20]

## INSTRUCTION NO. 18.

This analysis requires consideration of all the surrounding circumstances, as well as the context in which events took place. For example, a schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-aged children.[21]

---

[19] 29 C.F.R. § 1630.2(p).

[20] See Summary Judgment Order.

[21] See Summary Judgment Order.

## **RETALIATION**

**INSTRUCTION NO. 19.**

A claim for retaliation is separate and distinct from a claim for retaliation. Accordingly, Dr. Menninger does not need to succeed on her discrimination claim in order to prove retaliation.[22]

**INSTRUCTION NO. 20.**

In order to recover for retaliation, Dr. Menninger must prove by a preponderance of the evidence that (1) she engaged in conduct that is protected under the anti-discrimination laws, (2) she suffered a materially adverse action, and (3) the materially adverse action is causally linked to the protected conduct.[23]

**INSTRUCTION NO. 21.**

An employee's request for accommodation constitutes protected conduct as a matter of law.[24] This is true even if the employee does not meet the statutory definition of "disability" or is otherwise not entitled to any accommodation, so long as the employee makes their request in good faith.

**INSTRUCTION NO. 22.**

With respect to showing an "adverse action," Dr. Menninger's burden under her retaliation claim is different than under her claim for discrimination. To be actionable as retaliation, an adverse action does not need to "relate to the terms and conditions of employment." Instead, Dr. Menninger need only prove that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from engaging in protected activity.[25]

---

[22] Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 405 (2016) (noting that a claim for retaliation is a separate and distinct from a claim of discrimination and may succeed even if the discrimination claim fails, provided "the claimant can prove that [she] reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination" (internal quotations omitted)); Poon v. Mass. Inst. of Tech., 74 Mass. App. Ct. 185, 200 (2009).

[23] See Summary Judgment Order; Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

[24] Incutto v. Newton Pub. Sch., No. CV 16-12385-LTS, 2019 WL 1490132, at *4 (D. Mass. Apr. 4, 2019) (Sorokin, J.); Gauthier v. Sunhealth Specialty Servs., Inc., 555 F. Supp. 2d 227, 244 (D. Mass. 2008).

[25] See Summary Judgment Order; Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

8

**INSTRUCTION NO. 23.**

Material adversity is judged from the standpoint of a reasonable person in the employee's position—meaning a person suffering from the same disabilities as Dr. Menninger, if you find that she suffered from any.[26]

**INSTRUCTION NO. 24.**

Actions such as suggesting that an employee should resign, excluding them from activities normally within the scope of their responsibilities, and conducting a "sham investigation" into complaints of workplace misconduct all could—under appropriate circumstances—constitute materially adverse actions.[27]

**INSTRUCTION NO. 25.**

In determining whether PPD subjected Dr. Menninger to a materially adverse action, you should consider the evidence cumulatively. That is, you should consider whether PPD's cumulative actions in response to her protected request for accommodation might well have dissuaded a reasonable person with her disabilities from requesting an accommodation.[28]

**INSTRUCTION NO. 26.**

You are permitted to infer a causal link from the timing and sequence of events. This inference may be drawn if adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity, or where adverse actions follow close on the heels of protected activity. In other words, close proximity in time between Dr. Menninger's protected activity and the adverse actions by PPD would permit an inference of the causal link necessary for a finding of retaliation.[29]

**INSTRUCTION NO. 27.**

You may also infer a causal link from evidence that a pattern of discriminatory or retaliatory conduct began soon after the protected activity and only culminated later in actual adverse action.[30]

---

[26] Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69 (2006).

[27] See Summary Judgment Order.

[28] Fox v. Town of Framingham, No. 14-CV-10337-LTS, 2016 WL 4771057, at *7–8 (D. Mass. Sept. 13, 2016) (Sorokin, J.).

[29] Psy-Ed Corp. v. Klein, 459 Mass. 697, 711 (2011) ("rapid succession" of events supported inference of causal connection between protected conduct and adverse action); Pardo v. Gen. Hosp. Corp., 446 Mass. 1, 19-20 (2006); Mole v. Univ. of Mass., 442 Mass. 582, 592 (2004); Poon v. Mass. Inst. of Tech., 74 Mass. App. Ct. 185, 200 (2009) (substantial interim between alleged retaliation and protected conduct can break causal connection).

[30] Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 407 (2016); Mole v. Univ. of Massachusetts, 442 Mass. 582, 596 (2004) ("a series of retaliatory measures

# DAMAGES

**INSTRUCTION NO. 28.**

If Dr. Menninger has proven to you that PPD unlawfully discriminated or retaliated against her, or both, then you must decide the amount of damages, if any, that will fairly compensate Dr. Menninger. The purpose of an award of compensatory damages is to make the plaintiff whole for all the losses that she has suffered because of the defendant's unlawful discrimination or retaliation. Except where I instruct you otherwise, the plaintiff bears the burden of proof on damages. [31]

**INSTRUCTION NO. 29.**

A person is entitled to recover damages for any aggravation of a pre-existing condition or disability resulting from an injury. This is true even if the person's condition or disability made him more susceptible to the possibility of ill-effects than a normally healthy person would have been, and even if a normally healthy person would not have suffered any substantial injury.

It is settled that, where an injury arising from a cause which entails liability on the defendant combines with a pre-existing condition to bring about greater harm to the plaintiff than would have resulted from the injury alone, the defendant may be liable for all the consequences. If the injury causes or contributes to cause the development of a pre-existing disease, the person liable for the injury is liable also for the resulting aggravation. The wrongdoer may be held responsible for the harmful results of the combined effects of his wrongful act and the preexisting condition.

A defendant cannot be heard to complain that the injury would have been less or even non-existent in a stronger or healthier person. For example if a defendant negligently ran into a truck containing eggs, breaking the eggs in the truck, he is liable for all of the broken eggs. He cannot complain that had the truck contained bowling balls that there would have been no damages. The same holds for injuries for a person. The defendant takes the plaintiff as she finds her and is liable for any worsening, aggravation or acceleration of any previously existing condition or for any new injury caused by the defendant's discrimination or retaliation.[32]

**INSTRUCTION NO. 30.**

Uncertainty in the amount of damages does not bar recovery and mathematical precision is not required. However, you must not speculate, conjecture, or guess in awarding damages. The award is acceptable as long as it is based on just and reasonable inferences from the evidence.

---

starting shortly after the protected activity can justify the inference that a particular action in that series, although occurring a considerable time later, is still motivated by retaliation").

[31] Mass CPJI § 5.3.1 Damages – Generally.

[32] Frevermuth v. Lufty, 376 Mass. 612 (1978); Wallace v. Ludwig, 292 Mass. 251 (1935); Walker v. Nickerson, 291 Mass. 522, 197 N.E. 451 (1936).

**INSTRUCTION NO. 31.**

If you find that PPD unlawfully discriminated against Dr. Menninger, unlawfully retaliated against Dr. Menninger, or both, then you may award damages in the following four areas:

    1. back pay,

    2. front pay,

    3. emotional distress, and

    4. punitive damages.

I will explain each to you.[33]

**INSTRUCTION NO. 32.**

First, the plaintiff is entitled to back pay, which is the amount of the Dr. Menninger's lost earnings from the date of the adverse employment action until today. This includes all lost salary, bonuses, equity or stock-related compensation, and the value of employment benefits that would have accumulated but for PPD's discriminatory or retaliatory conduct.[34]

In this case, you may award back pay if you find that PPD's discriminatory or retaliatory conduct caused Dr. Menninger to be unable to work.[35]

---

[33] G.L. c. 151B, § 9; Stonehill Coll. v. MCAD, 441 Mass. 549 (2004) (comparing judicial proceeding for damages to MCAD proceeding); Conway v. Electro Switch Corp., 402 Mass. 385, 388 (1988).

[34] Beaupre v. Cliff Smith & Assocs., 50 Mass. App. Ct. 480, 496 n.25 (2000).

[35] Johnson v. Spencer Press of Maine, Inc., 364 F.3d 368, 384 (1st Cir. 2004) ("several courts have held that an employee who is unable to work due to a disability is not precluded from receiving back pay when the employer "caused" the disability. . . . We now extend that holding to Title VII; an employee who cannot mitigate damages because of the unlawful actions of the employer can still receive back pay. . . . This rule is merely a logical corollary of the principle that the victims of discrimination should be restored, "so far as possible ... to a position where they would have been were it not for the unlawful discrimination." Albemarle, 422 U.S. at 421, 95 S.Ct. 2362. If the employer's unlawful conduct caused the employee's inability to mitigate damages, then the employer should be liable for the resulting consequences."); Blockel v. J.C. Penney Co., 337 F.3d 17, 27 (1st Cir. 2003) (applying Massachusetts law) ("The Massachusetts discrimination statute provides for actual damages, and the statute is to be construed liberally. Mass. Gen. Laws ch. 151B, § 9. Compensatory damages may include those that make 'the aggrieved party whole, ... including those which are the natural and probable consequences ... of the illegal conduct.' Conway v. Electro Switch Corp., 402 Mass. 385, 523 N.E.2d 255, 257 (1988) (internal quotations omitted). When an employee's total disability is caused by an employer's failure to reasonably accommodate her, the loss of employment can be an element of special damages that the jury may consider in fashioning a remedy for the failure to accommodate. See, e.g., Langon v. Dep't of

11

**INSTRUCTION NO 33.**

Second, Dr. Menninger is entitled to front pay, which is the amount of damages resulting from the loss of future earnings and benefits that is attributable to PPD's misconduct. You cannot speculate in awarding front pay; rather, the determination of the amount of the award must be proven with reasonable certainty. You should make reasonable estimates based on the evidence concerning the amount of future earnings, including salary, bonuses, equity or stock-related compensation, and the value of benefits that Dr. Menninger would have received but for PPD's unlawful discrimination or retaliation.

In determining front pay, you should consider and weigh the following factors:

     1. the amount of earnings, including salary and benefits, that Dr. Menninger probably would have received between now and her projected retirement date or date of future employment;

     2. Dr. Menninger's probable date of retirement or date of future employment;

     3. the amount of earnings that Dr. Menninger probably will receive from another employer until her retirement;

     4. the availability of other employment opportunities; and

     5. the possibility of inflation and wage increases in the future.[36]

If you award damages to Dr. Menninger for losses she will suffer in the future, keep in mind that a plaintiff cannot be awarded damages that overcompensate the losses that she suffered because of the defendant's conduct.

In order to avoid overpaying Dr. Menninger, you must consider that the amount of money you give her today for future losses can be put in the bank, where it can earn interest. So, in making an award for future damages, you must determine the amount of money that, if invested today at a

---

Health & Human Servs., 959 F.2d 1053, 1061–62 (D.C.Cir.1992). In this case, the jury could have found that Blockel's total disability resulted from J.C. Penney's violation of its statutory duties. Given such a finding, Blockel was entitled to the pay she would have received but for J.C. Penney's mistreatment."); Lathem v. Dep't of Child. & Youth Servs., 172 F.3d 786, 794 (11th Cir. 1999) ("The district court, after reviewing all the evidence, specifically found that DCYS's conduct caused Lathem's disability and that this disability precluded her from obtaining other employment. Accordingly, we hold that a Title VII claimant is entitled to an award of back pay where the defendant's discriminatory conduct caused the disability.")

[36] Selmark Assocs. v. Ehrlich, 467 Mass. 525, 545 n.36 (2014); Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 102–03 (2009); Conway v. Electro Switch Corp., 402 Mass. 385, 388–89 (1988); Ventresco v. Liberty Mut. Ins. Co., 55 Mass. App. Ct. 201, 210 (2002); Handrahan v. Red Roof Inns, Inc., 48 Mass. App. Ct. 901, 902 (1999).

reasonable rate of interest, would in the future provide Dr. Menninger with the amount of money that you calculated she will lose in the future as a result of PPD's conduct.[37]

## INSTRUCTION NO. 34.

Normally, the plaintiff has a duty to limit or "mitigate" her damages by seeking other comparable employment. A comparable job is one that offers similar compensation, long-term benefits, opportunities for promotion, job responsibilities, working conditions, and status.

However, if you find that Dr. Menninger was unable to mitigate her damages because PPD's discriminatory and/or retaliatory conduct caused her to be unable to perform comparable work, then so long as you find that to be the case, Dr. Menninger does not have a mitigation duty and you should not reduce her recovery.[38]

If, and only if, you find that at some point in time Dr. Menninger was or will be able to perform "comparable work," then it is still PPD's burden to prove to you that Dr. Menninger failed in her duty to mitigate damages by seeking other comparable employment. PPD meets this burden only if it has proved to you that:

    1. one or more discoverable opportunities for comparable employment were available in a location at least as convenient as the place of former employment;

    2. Dr. Menninger unreasonably made no attempt to apply for any such job; and

    3. it was reasonably likely that Dr. Menninger would have obtained one of those comparable jobs.[39]

The duty of mitigation does not require a plaintiff to go into another line of work, accept a demotion, or take a demeaning position.[40]

If PPD has proven the three elements of mitigation that I have just read to you, then you should reduce any back pay award to Dr. Menninger by the amount that PPD has proven that she could have earned in wages and benefits at the comparable job.

---

[37] Conway v. Electro Switch Corp., 402 Mass. 385, 388–89 & n.3 (1988).

[38] Johnson v. Spencer Press of Maine, Inc., 364 F.3d 368, 384 (1st Cir. 2004); Blockel v. J.C. Penney Co., 337 F.3d 17, 27 (1st Cir. 2003); Durham Life Ins. Co. v. Evans, 166 F.3d 139, 157 (3d Cir. 1999) ("Significantly, the court found that her decline was caused by Durham's actions against her, which ultimately led her to take disability leave from Paul Revere. Because Durham's conduct affirmatively impaired her ability to mitigate her damages, it would be inequitable to reduce her back pay award in this case.").

[39] Sheriff of Suffolk County v. Jail Officers & Employees, 465 Mass. 584, 592 (2013); Black v. Sch. Comm. of Malden, 369 Mass. 657, 662–63 (1976); Buckley Nursing Home, Inc. v. MCAD, 20 Mass. App. Ct. 172, 185 (1985).

[40] Sherriff of Suffolk Cty. v. Jail Officers and Employees of Suffolk Cty., 465 Mass. 584, 593 (2013).

13

## INSTRUCTION NO. 35.

If you award back pay and/or front pay damages to Dr. Menninger, then you may consider whether to reduce her recovery by the amount of money she received from so-called "collateral sources" such as short- or long-term disability insurance, unemployment insurance, and Social Security Disability benefits.

Generally, under a principle called the "collateral source rule," a wrongdoer's liability to an injured person is not to be reduced by the amount of compensation received by the injured person pursuant from collateral sources such as insurance, unemployment, or Social Security benefits.[41] Applying the collateral source rule means that the plaintiff may receive a double-recovery. However, the collateral source rule reasons that the wrongdoer has an obligation to make good for all of the damage that it causes, and reducing the plaintiff's recovery would allow the wrongdoer to escape full responsibility for its actions, thus, any "windfall" should go to the plaintiff.

Generally, the collateral source rule should apply, meaning the plaintiff's recovery is not reduced, unless you find that there are countervailing circumstances that would make it unjust to apply the collateral source rule.[42]

Based upon those considerations, you must decide whether or not to make a deduction from Dr. Menninger's back-pay and/or front pay award for amounts she received from collateral sources.

---

[41] Buckley Nursing Home, Inc. v. Massachusetts Comm'n Against Discrimination, 20 Mass. App. Ct. 172, 183–184 (1985); accord Sch. Comm. of Norton v. Massachusetts Comm'n Against Discrimination, 63 Mass. App. Ct. 839, 849, 830 N.E.2d 1090, 1100 (2005)

[42] Schillace v. Enos Home Oxygen Therapy, Inc., No. 12-NEM-01742, 2017 WL 1787485 (M.C.A.D. Full Commission Apr. 21, 2017). See Ayanna v. Dechert LLP, 840 F. Supp. 2d 453, 456 (D. Mass. 2012) ("the MCAD's interpretation of its governing statute is entitled to substantial deference but does not carry the force of law.") (citing Global NAPs, Inc. v. Awiszus, 457 Mass. 489, 496–497, 930 N.E.2d 1262 (2010); Bynes v. Sch. Comm. of Bos., 411 Mass. 264, 269, 581 N.E.2d 1019 (1991); Leach v. Comm'r of Ma. Rehabilitation Comm'n, 63 Mass.App.Ct. 563, 827 N.E.2d 745 (2005).)

**INSTRUCTION NO. 36.**

Third, if you find that Dr. Menninger has been discriminated against, retaliated against, or both, you may also award her reasonable damages for her physical and emotional distress. Physical and emotional distress includes pain, discomfort, indignity, depression, fear, anxiety, or humiliation suffered as a result of the discrimination, the retaliation, or both. Although uncertainty in the amount of damages does not bar recovery and mathematical precision is not required, you must not speculate, conjecture, or guess in awarding damages.[43]

To recover for her physical and emotional distress Dr. Menninger may, but is not required to present evidence of physical injury or physical manifestation of her distress. Nor is she required to show that she sought psychiatric consultation.[44]

Some factors that you should consider include, but are not limited to:

      1. the nature and character of the alleged harm;

      2. the severity of the harm;

      3. the length of time Dr. Menninger has suffered and reasonably expects to suffer; and

      4. whether Dr. Menninger has attempted to mitigate the harm (for example, by counseling or by taking medication).[45]

In addition, Dr. Menninger must show a sufficient causal connection between the PPD's unlawful acts and her emotional distress.[46]

You may award Dr. Menninger damages for her emotional distress even if you do not award back pay or front pay.[47]

---

[43] Stonehill Coll. v. MCAD, 441 Mass. 549, 575–76 (2004); Buckley Nursing Home, Inc. v. MCAD, 20 Mass. App. Ct. 172, 182 (1985).

[44] Stonehill Coll. v. MCAD, 441 Mass. 549, 576 (2004).

[45] Stonehill Coll. v. MCAD, 441 Mass. 549, 576 (2004) (declaring these factors in context of MCAD award); Massasoit Indus. Corp. v. MCAD, 91 Mass. App. Ct. 208, 214–15 (2017); Smith v. Bell Atl., 63 Mass. App. Ct. 702, 710 (2005) (applying those factors to jury award, citing Stonehill as "instructive"); see also Restatement (Second) of Torts §§ 905, cmt. i, 912, 917 (1979).

[46] Stonehill Coll. v. MCAD, 441 Mass. 549, 576 (2004).

[47] See, e.g., Mcfail v. Sylvania Lighting Services, No. 04-BEM-01224, 2011 WL 7650244, at *4 (M.C.A.D. Full Commission Mar. 19, 2011); see also Borne v. Haverhill Golf & Country Club, Inc., 58 Mass. App. Ct. 306, 319 (2003) ("The injury which underlay the compensatory damages was emotional distress, a form of injury held in several cases to be recoverable for violation of antidiscrimination laws.") (public accommodations case).

**INSTRUCTION NO. 37.**

Lastly, if you find that PPD has intentionally discriminated or retaliated against Dr. Menninger, or both, you may consider whether punitive damages are warranted. Punitive damages are different from compensatory damages. Unlike compensatory damages, which compensate the victim for the harm she has suffered, the purpose of punitive damages is to punish the defendant for conduct that is outrageous because of the defendant's evil motive or reckless indifference to the rights of others.[48] You may award punitive damages even absent compensatory damages.[49]

To find that punitive damages should be awarded, you must find that more than intentional discrimination or retaliation occurred. Punitive damages may be awarded only where the defendant's conduct is outrageous or egregious.[50]

In determining the amount of a punitive damage award, if any, you should consider:

    1. the egregious or outrageous character or nature of PPD's conduct;

    2. PPD's wealth, in order to determine what amount of money is needed to punish PPD's conduct and to deter any future acts of discrimination or retaliation;

    3. the actual harm suffered by Dr. Menninger;

    4. the magnitude of any potential harm to other victims if similar future behavior is not deterred;

    5. whether there was a conscious or purposeful effort to demean or diminish the class of which Dr. Menninger is a part (or if there was a conscious or purposeful effort to demean or diminish Dr. Menninger because she was a member of that class);

    6. whether PPD was aware that the discriminatory or retaliatory conduct would likely cause serious harm, or recklessly disregarded the likelihood that serious harm would arise;

    7. PPD's conduct after learning that the initial conduct would likely cause harm; and

    8. the duration of the wrongful conduct and any concealment of that conduct by PPD.[51]

If you do award punitive damages, you should fix the amount by using calm discretion and sound reason.

---

[48] Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 106–11 (2009); see also Tryon v. Massachusetts Bay Transportation Auth., 98 Mass. App. Ct. 673, 685–88 (2020).

[49] Bain v. City of Springfield, 424 Mass. 758, 767 (1997);

[50] Haddad, 455 Mass. at 110.

[51] Haddad, 455 Mass. at 110–11; Charles v. Leo, 96 Mass. App. Ct. 326, 347 (2019).

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

     Plaintiff,

     v.

PPD DEVELOPMENT, L.P.,

     Defendant.

Civil Action No: 1:19-CV-11441-LTS

## PLAINTIFF'S PROPOSED VERDICT FORM

### Part A

1.  Has Plaintiff Lisa Menninger proved to you by a preponderance of the evidence that

Defendant PPD Development, L.P. unlawfully discriminated against her?

YES _____     NO _____

*Proceed to Question 2.*

2.  Has Plaintiff Lisa Menninger proved to you by a preponderance of the evidence that

Defendant PPD Development, L.P. unlawfully retaliated her?

YES _____     NO _____

*If you answered Yes to Question 1, Question 2, or both, proceed to Part B. If you answered No to both Questions, proceed to Part D.*

**Part B**

3.  What amount do you award Plaintiff Lisa Menninger in past compensatory damages for the time period up to today's date?

$_____ (amount expressed in numbers)

_____ (amount expressed in words)

4.  What amount do you award Plaintiff Lisa Menninger in future compensatory damages for the time period after today's date?

$_____ (amount expressed in numbers)

_____ (amount expressed in words)

*Proceed to Part C.*

**Part C**

5.  Do you find that punitive damages are appropriate?

YES _____        NO _____

*If your answer to Question 5 is Yes, proceed to Question 6. If your answer is No, proceed to Part D.*

6.  What amount of punitive damages do you award Plaintiff Lisa Menninger?

$_____ (amount expressed in numbers)

_____ (amount expressed in words)

*Proceed to Part D.*

2

## Part D

*Please have the foreperson sign and date this verdict form, and then inform the Court security officer that you have reached a verdict.*


I hereby certify the foregoing answers are the unanimous answers of the jury.


_____

Jury Foreperson


_____

Dated:_____

3

Respectfully submitted,
Plaintiff Lisa Menninger,
By her attorneys,


/s/ *Hampton M. Watson*
Patrick J. Hannon (BBO #664958)
Hampton M. Watson (BBO #705983)
Hartley Michon Robb Hannon LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
phannon@hmrhlaw.com
hwatson@hmrhlaw.com
P: (617) 723-8000
Attorneys for Plaintiff

Date: March 10, 2023


## CERTIFICATE OF SERVICE

I, Hampton M. Watson, certify that on March 10, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Defendant by electronically serving its counsel of record.

/s/ *Hampton M. Watson*
Hampton M. Watson

4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA MENNINGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 19-11441-LTS |
| | ) |
| PPD DEVELOPMENT, L.P., | ) |
| | ) |
| Defendant. | ) |

CHARGE TO THE JURY

March 31, 2023

SOROKIN, J.

Members of the jury:

Now that you have heard the closing arguments, I will instruct you on the law. You will then begin your deliberations. My instructions will be in three parts: first, I will instruct you on the general rules that define and control the duties of a jury in a civil case as well as how to evaluate the evidence that has been presented; second, I will explain the rules of law that you must apply to answer the questions presented to you on the jury slip; and, finally, I have some brief guidelines that will govern the conduct of your deliberations.

As you deliberate, you will have these instructions in written form. But even though you will have them in the jury room with you, you should nevertheless listen very carefully to all of the instructions as I give them to you now.

I.    GENERAL RULES

In defining the duties of the jury, let me first explain the general rules.

JA167

It is your duty to find the facts from all of the evidence in the case.  I will describe the law to you, and you must apply the law to the facts as you find them.  You must follow the law as I describe it, whether or not you personally agree with the wisdom of the law.  This instruction is a fundamental part of our system of government by law, rather than by the individual views of the judge and jury.  It is your duty as jurors to decide the case fairly and impartially, regardless of any personal likes or dislikes, opinions, prejudices, bias, or sympathy for one party or another.  You must make your decision based solely on the evidence before you, and according to the law.

In following my instructions, you must follow all of them.  They are all equally important.  The lawyers are allowed to comment both on the evidence and on the rules of law in their opening and closing statements.  But if what they have said about the evidence differs from your memory, let your collective memory control.  If what they have said about the law seems to differ in any way from my instructions, you must be guided only by my instructions. You must not read into these instructions, or into anything that I may have said or done during the course of the trial, any suggestion from me as to the verdict you should return.  Whatever opinion I might have as to what your verdict should be is utterly irrelevant.  The verdict is yours, and yours alone, to render as the finders of the facts.  While I intend to be as helpful as I can in providing you with the knowledge of the <u>law</u> that you will require to render an intelligent and informed verdict, the law commits this case to your sole determination as the judges of the <u>facts</u>.

"Plaintiff," you will recall, is the name we give to the person or entity who brings a lawsuit.  In this case, the Plaintiff is Dr. Lisa Menninger.  We refer to the party sued as the "Defendant."  In this case, the Defendant is PPD Development, L.P. (to which I will refer as "PPD").

In a civil case such as this, a plaintiff bears the burden of proving her case by a preponderance of the evidence.  As I explained earlier in my preliminary instructions, this is a much lower standard of proof than that of "proof beyond a reasonable doubt," the very high standard that we apply in a criminal trial. Proof by a preponderance of the evidence does not require Dr. Menninger to prove her case to any degree of mathematical certainty.  Rather, she must produce evidence which, when considered in the light of all of the facts and evidence in the case, leads you to believe that her claims are more likely true than not.  If you find that Dr. Menninger meets this burden, your verdict must be for her.  Should she fail to meet this burden, your verdict must be for PPD.

In determining whether any fact at issue in the case has been proven by a preponderance of the evidence, you may consider the testimony of all witnesses, regardless of who may have called them, and you may consider all exhibits received in evidence, regardless of who may have produced them.

## II.    EVALUATING EVIDENCE

Before I turn to the applicable principles of law, let me first briefly review for you what is and is not evidence in a civil case.

Evidence is presented at a trial in one of three ways:

First, through the sworn testimony of witnesses, on both direct and cross-examination;

Second, evidence is presented through physical objects, such as documents, photographs, and videotapes that are identified by a witness and admitted as exhibits during the trial; and,

Third, evidence is presented by stipulation—that is, by agreement between the parties that certain facts are true and need not be independently proven as such at trial.

Certain things are <u>not</u> evidence and should have no influence on your verdict:

1. Arguments and statements by lawyers—as I have cautioned several times—are not evidence. What the lawyers have said over the course of the trial you may find helpful, even persuasive, but the facts are to be determined from your own evaluation of the testimony of the witnesses and exhibits, and from any reasonable inferences that you choose to draw from the facts as you find them.

2. Questions to the witnesses are not evidence and may only be considered in the sense that they give context or meaning to a witness's answer.

3. Objections to questions are not evidence. Attorneys have a duty to their clients to object when they believe that a question is improper under the rules of evidence. You should not be influenced by the fact that an objection was made. If I sustained the objection, you should ignore the lawyer's question, and any assertion of fact it might have contained. If I overruled the objection, you should treat the witness's answer like any other.

4. Testimony that I excluded, struck, or which I instructed you to disregard is not evidence. If you heard an answer to the question before my ruling sustaining an objection, you are to disregard it—that answer is not evidence. You should also ignore editorial comments made by the attorneys during their presentations, particularly those intended to characterize the testimony of witnesses. Whether or not a witness's testimony was believable on any particular point is a determination that only you can make.

5. Notes, if you have kept them are not evidence. They are a personal memory aid to be used to refresh your recollection of the evidence during the deliberations.

6. Finally, anything you may have seen or heard outside the courtroom during the course of the trial is not evidence.

<u>Direct and Circumstantial Evidence</u>

There are two kinds of evidence: direct and circumstantial.  Direct evidence is direct proof of a fact, such as testimony of a witness that the witness saw or did something. Circumstantial evidence is indirect evidence -- that is, proof of a fact or facts from which you could draw a reasonable inference that another fact exists, even though it has not been proven directly.

You all have experience in your everyday life drawing inferences based upon circumstantial evidence.  For instance, imagine it was sunny when you arrived here this morning, but just now someone walked into the courtroom wearing a wet raincoat and carrying a dripping umbrella.  Without any words being spoken, and without looking outside for yourself, you might draw the reasonable inference that it is now raining outside.  In other words, the facts of the wet raincoat and the dripping umbrella would be circumstantial evidence that it is raining.

You are entitled to consider both direct and circumstantial evidence.  Neither type of evidence is considered superior or inferior to the other.  The law permits you to give equal weight to both; it is for you to decide how much weight to give to any piece of evidence.

<u>Witness Credibility</u>

Most evidence received at trial is offered through the testimony of witnesses.  As the jury, you are the sole judges of the credibility of these witnesses.  If there are inconsistencies in the testimony, it is your function to resolve any conflicts and to decide where the truth lies. You are not required to believe the testimony of any witness simply because that witness was under oath.  You may choose to believe everything that a witness said, only part of it, or none of it.  If you do not believe a witness's testimony that something happened, that of course is not evidence that it did not happen.  It simply means that you must put aside that testimony and look elsewhere for credible evidence before deciding where the truth lies.

Often it may not be what a witness says, but how he or she says it that might give you a clue whether or not to accept his version of an event as believable.   You may consider:

- a witness's character;

- his or her appearance and demeanor on the witness stand;

- his or her frankness or lack of frankness in testifying;

- whether the witness was contradicted by anything that he or she said before the trial;

- whether his or her testimony is reasonable or unreasonable, probable or improbable in light of all the other evidence in the case;

- how good an opportunity the witness had to observe the facts about which he or she testifies; and

- whether his or her memory seems accurate.

You may also consider the witness's motive for testifying, whether he or she displays any bias in doing so, and whether he or she has any interest in the outcome of the case.   Simply because a witness has an interest in the outcome of the case does not mean that the witness is not trying to tell you the truth.   But a witness's interest in the case is a factor that you may consider along with everything else.   You may also consider the fact that a witness may be perfectly sincere in his or her account of an event and simply be mistaken as to the truth.

In deciding whether or not to believe a witness, keep in mind that people sometimes forget things, get confused, or remember an event differently.   Memory is not always reliable, and when someone recounts a story twice, it will seldom be identical in every detail, unless it is a memorized lie or the witness is possessed of extraordinary perception and recall.   It is for you to decide whether any contradictions in a witness's testimony are innocent lapses of memory or intentional falsehoods.   That may depend on whether important facts or small details are at issue, and how important the facts might have appeared to the witness at the time they were perceived.

The weight of the evidence does not necessarily depend on the number of witnesses testifying for one side or the other.  The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters in issue at this trial.  Nor does the law require any party to produce as exhibits all papers and things mentioned by the witnesses in the case.  You must determine the credibility of each witness who testified, and then reach a verdict based on all of the believable evidence in the case.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations. The defendant is a type of corporate entity known as a "limited partnership." A limited partnership is entitled to the same fair trial as a private individual. All persons, including limited partnerships, stand equal before the law, and are to be treated as equals.

<u>Expert Witnesses</u>

I would like to address briefly the testimony of experts.  The rules of evidence ordinarily do not permit witnesses to express opinions or conclusions.  Normally, witnesses testify as to the facts and the jury draws conclusions from that testimony.  An exception to this rule is testimony from those we call "experts"—witnesses who, because of special training, education, skills, or knowledge, have become expert in some art, science, profession, or calling.  Such persons may state their opinions as to relevant and material matters in which they profess to be experts, and they may state their reasons for their opinions.

In this case you heard expert opinions.  You should consider each of the expert opinions received in evidence in this case, and give it as much weight as you think it deserves.  An expert's opinion is subject to the same rules concerning reliability as the testimony of any other

witness.  Just because a person is testifying as an expert does not mean you, the jury, have to accept that person's opinion.  A person may be learned in some profession, but if you should decide the opinion of this expert witness is not based upon sufficient education and experience or if you conclude that the reasons given in support of his or her opinion are not sound, or if you feel that the expert's testimony is outweighed by other evidence, or if you find that the expert witness is not believable or credible, you may give the opinion only so much weight, if any, as you think it deserves.  Expert testimony must have a sound factual basis.  An expert's opinion amounting to speculation unsupported by subordinate facts must be disregarded.  It is your responsibility, as jurors, to determine what the facts are.  The fact that the Court has permitted an expert to testify should not be seen by you, the jury, as any indication of the weight that you should accord the expert testimony.

III.    <u>ELEMENTS OF THE CLAIMS</u>

Now I want to turn to the principles of law that govern the specific claims and defenses made in this case.  Dr. Menninger has presented three legal claims for your decision. First, she alleges she faced disability discrimination because PPD, her employer, failed to provide her with a reasonable accommodation. Second, she alleges she faced disability discrimination because she experienced disparate treatment based on an adverse employment action PPD took against her. And third, she alleges PPD retaliated against her for requesting an accommodation for a disability. I will now explain the elements of each of these claims in turn.


<u>CLAIM ONE: Disability Discrimination – Failure to Provide Reasonable Accommodation</u>

Federal law and Massachusetts law both require employers, upon request, to provide reasonable accommodation to employees who are disabled, unless the accommodation would

impose an undue hardship on the employer. To succeed on her claim that Defendant engaged in disability discrimination by failing to provide her with a reasonable accommodation, Plaintiff need not show that Defendant had discriminatory intent, but she must instead prove by a preponderance of the evidence all of the following:

First, Dr. Menninger had a "disability" within the meaning of anti-discrimination laws.

Second, Dr. Menninger was a "qualified individual" for the job, meaning that she both (1) possessed the necessary skill, experience, education, and other job-related requirements for the position of Executive Director for Defendant's Global Central Labs, and (2) could have performed the essential functions of the Executive Director position with or without reasonable accommodation.

Third, that Dr. Menninger made a request for an accommodation that was sufficiently direct and specific so as to put the employer on notice of the need for that accommodation.

And fourth, the accommodation that Dr. Menninger requested was "reasonable," and PPD failed or refused to provide the requested accommodation.

If Dr. Menninger proves all four of these elements by a preponderance of the evidence, then PPD bears the burden of proving by a preponderance of the evidence that the accommodation Dr. Menninger proposed would have been an undue hardship on PPD.

### *Element One: Disability*

First, Dr. Menninger must prove that she had a "disability" within the meaning of anti-discrimination laws. Dr. Menninger suffered from a "disability" if any of the following are true: (1) she suffered from a "physical or mental impairment" that "substantially limited" one or more of her "major life activities," (2) she had a record of such an impairment, or (3) she was regarded by PPD as having a physical or mental impairment.

A "physical or mental impairment" is:

(i)     Any physiological disorder or condition, cosmetic disfigurement, or anatomical

        loss affecting one or more body systems, such as neurological, musculoskeletal,

        special sense organs, respiratory (including speech organs), cardiovascular,

        reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic,

        skin, and endocrine; or

(ii)    Any mental or psychological disorder, such as an intellectual disability (formerly

        termed "mental retardation"), organic brain syndrome, emotional or mental

        illness, and specific learning disabilities.

The term "major life activity" includes, but is not limited to:

(i)     Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping,

        walking, standing, sitting, reaching, lifting, bending, speaking, breathing,

        learning, reading, concentrating, thinking, communicating, interacting with

        others, and working; and

(ii)    The operation of a major bodily function, including functions of the immune

        system, special sense organs and skin; normal cell growth; and digestive,

        genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory,

        cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive

        functions. The operation of a major bodily function includes the operation of an

        individual organ within a body system.

The requirement that a disability "substantially limit" a major life activity is not intended

to be a demanding standard, and the phrase should be construed broadly in favor of expansive

coverage. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Further, the determination of whether an impairment substantially limits a major life activity must be made without regard to the ameliorative effects of mitigating measures. An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

The non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regime, may be considered when determining whether an individual's impairment substantially limits a major life activity.

In determining whether an individual has a disability, the focus is on how a major life activity is substantially limited, and not on what outcome an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write or learn compared to most people in the general population.

An individual meets the standard for "regarded as having" a physical or mental impairment if the individual establishes that she has been subjected to unlawful discrimination because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity.

### *Element Two: "Qualified Individual"*

Second, Dr. Menninger must prove that she was a "qualified individual" for the job under the law. As stated above, in order to be a "qualified individual" Dr. Menninger must prove by a

preponderance of the evidence that she both (1) possessed the necessary skill, experience, education, and other job-related requirements for the position of Executive Director for Defendant's Global Central Labs, and (2) could have performed the "essential functions" of the Executive Director position at the time that PPD took the alleged adverse employment action against her with or without "reasonable accommodation." While Dr. Menninger bears the burden to prove by a preponderance of the evidence these two requirements to be considered a "qualified individual," PPD bears the burden to prove by a preponderance of the evidence what the "essential functions" of Dr. Menninger's position were.

If an employer has a concern about whether an employee with a known disability can perform her job, the law permits the employer to make inquiries about the employee's ability to perform job-related functions. Permissible inquiries include asking for a medical certification from the employee that the employee is able to perform essential job functions with or without accommodation. Additionally, if the employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform the essential functions of her job, then the employer may require the employee to submit to an independent medical examination. The law imposes no limits on what information an employee can provide to an employer regarding her disability, medical conditions, or ability to perform job-related functions.

The term "essential functions" means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal, that is, non-essential functions of the position. In determining the essential functions of the plaintiff's job, you may consider the plaintiff's job description as well as the nature of the employer's particular business. You may also consider (1) the employer's judgment

as to which functions of the job are essential, (2) the amount of time spent on the job performing the function in question, (3) the consequences of not requiring the person to perform the function, (4) the work experience of people who have held the job, (5) the current work experience of people in similar jobs, (6) whether the reason the position exists is to perform the function, (7) whether there are a limited number of employees available among whom the performance of the function can be distributed, and (8) whether the function is highly specialized and the individual in the position was hired for his or her expertise or ability to perform the function. No one factor is necessarily controlling. You should consider all of the evidence in deciding what functions, if any, PPD has established by preponderance of evidence were "essential functions" of Dr. Menninger's job as Executive Director for PPD's Global Central Labs.

A "reasonable accommodation" is a modification or adjustment to the work environment or to the manner in which a job is performed. A reasonable accommodation enables a plaintiff to perform the essential functions of her job. Or, a reasonable accommodation is something that alleviates the added stress, difficulties and other disadvantages that arise from a disability even when the employee can perform the essential functions of the job without the reasonable accommodation. In all cases a reasonable accommodation must be feasible for the employer to provide under the circumstances, at least on the face of things.

Please refer to the section on element four below for further explanation of what qualifies as a "reasonable accommodation."

### Element Three: Sufficiently Direct & Specific Request

Third, as to each accommodation she seeks to prove was reasonable but denied to her, Dr. Menninger must prove that she made a request for that accommodation that was sufficiently

direct and specific so as to put the employer on notice of the need for that accommodation. Any accommodations not sufficiently requested at the time of the underlying events cannot be considered as possible reasonable accommodations for purposes of this claim. In other words, when you move on to the fourth element below, you may only consider those accommodations that you believe were requested in a sufficiently direct and specific way so as to put the employer on notice of the need for that accommodation, and you may not consider any potentially reasonable accommodations that Dr. Menninger did not sufficiently request from PPD at the time of the underlying events.

<p style="text-align:center"><em><u>Element Four: Requested Accommodation Was "Reasonable"</u></em></p>

Fourth, Dr. Menninger must prove that the accommodation that she requested was "reasonable." In evaluating this, please refer back to my definition of a reasonable accommodation under element two and the factors described below. Dr. Menninger must also prove that PPD failed or refused to provide the requested accommodation.

Depending on the circumstances, a reasonable accommodation might include, among other things, (1) modifying or adjusting a job application process to enable a qualified applicant with a disability to be considered for the position, (2) making existing facilities used by employees readily accessible to and usable by persons with disabilities, (3) job restructuring, (4) a part-time or modified work schedule, (5) reassignment to a vacant position, (6) acquisition or modification of equipment or devices, (7) the adjustment or modification of examinations, training materials, or policies, (8) modifying when and how an essential job function is performed, (9) altering, reassigning, or eliminating non-essential job functions, or (10) the provision of qualified readers or interpreters. Whether something is a reasonable accommodation

is a determination you make based upon your consideration of all of the surrounding circumstances.

An accommodation is not "reasonable" if it requires eliminating or excusing an inability to perform any essential function of the job, if it requires shifting any of the essential functions of the job to other employees, if it requires creating a new position for the disabled employee, or if it creates an undue hardship for the employer.

Finally, as to any requested accommodations that you find to be "reasonable," you must determine whether PPD failed to provide that accommodation to Dr. Menninger.

### *Undue Hardship*

If you find that Dr. Menninger has proven by a preponderance of the evidence all four elements of this claim, you must consider whether the reasonable accommodation(s) that you found PPD failed to provide imposed an undue hardship on PPD. On this question, PPD bears the burden to prove that all of the accommodations that you found were both reasonable and not provided by PPD imposed an undue hardship.

An accommodation imposes an "undue hardship" if it would create significant difficulty or expense for PPD, considering the nature and cost of the accommodation, the overall financial resources of PPD, the effect of the accommodation on expenses and resources, and the impact of the accommodation on the operations of PPD. This last consideration—the impact of the accommodation on PPD's operations—includes the accommodation's impact on the ability of other employees to perform their duties, and the impact that the accommodation has on PPD's ability to conduct its business.

If you find that there was at least one reasonable accommodation that satisfied all of the elements above but that did not impose an undue hardship on PPD, then that reasonable

accommodation can support liability on this claim even if other reasonable accommodations would impose an undue hardship. In other words, for PPD to win this claim based on undue hardship, they must show that all, not just one, of the reasonable accommodations sufficiently requested by and denied to Dr. Menninger would have imposed an undue hardship.

*Summary of Claim One*

Below is a list of the questions relevant to Dr. Menninger's claim for discrimination based on failure to provide reasonable accommodation.

1. Did Dr. Menninger prove by a preponderance of the evidence that she had a "disability" within the meaning of anti-discrimination laws?

2. Did Dr. Menninger prove by a preponderance of the evidence that she possessed the necessary skill, experience, education, and other job-related requirements for the position of Executive Director for Defendant's Global Central Labs?

3. Did Dr. Menninger prove by a preponderance of the evidence that she could have performed the essential functions of the Executive Director position with or without reasonable accommodation?

   PPD bears the burden to prove by a preponderance of the evidence which functions of the Executive Director position were "essential."

4. Did Dr. Menninger prove by a preponderance of the evidence that she made a request for an accommodation that was sufficiently direct and specific so as to put PPD on notice of the need for that accommodation?

5. Did Dr. Menninger prove by a preponderance of the evidence that one or more of the accommodations you found that she sufficiently requested was "reasonable"?

6. Did Dr. Menninger prove by a preponderance of the evidence that PPD failed to provide at least one accommodation that you found to be both reasonable and sufficiently requested?

If your answer to one or more of Questions 1-6 above is "no," then you must answer "no" to Question 1 on the Verdict Form. If your answer to all of Questions 1-6 above is "yes," then you must answer "yes" to Question 1 on the Verdict Form **unless** you find that for all of the accommodation(s) you found to be reasonable, sufficiently requested, and denied to Dr. Menninger by PPD, that PPD proved by a preponderance of the evidence that **all** of these accommodations would have imposed an "undue hardship" on PPD, in which case you must answer "no" to Question 1.

CLAIM TWO: Disability Discrimination Claim – Disparate Treatment/Adverse Action

Dr. Menninger also accuses PPD of discriminating against her based on her disability by taking an adverse employment action against her. To succeed on this claim, Dr. Menninger must prove by a preponderance of the evidence all of the following:

First, Dr. Menninger had a "disability" within the meaning of anti-discrimination laws.

Second, Dr. Menninger was a "qualified individual" for the job, meaning that she both (1) possessed the necessary skill, experience, education, and other job-related requirements for the position of Executive Director for Defendant's Global Central Labs, and (2) could have

performed the "essential functions" of the Executive Director position at the time that PPD took the alleged adverse employment action against her with or without reasonable accommodation.

Third, that PPD had knowledge of Dr. Menninger's alleged anxiety disorder at the time it took the alleged adverse employment action against her.

And fourth, that PPD took an adverse employment action against Dr. Menninger, and that PPD did so in whole or in part because of her disability.

### Element One: Disability

First, Dr. Menninger must prove that she had a "disability" within the meaning of anti-discrimination laws. Please refer to and apply here the definition of disability provided above under element one of claim one (the discrimination based on failure to provide reasonable accommodation claim).

### Element Two: "Qualified Individual"

Please refer to the definition of "qualified individual" provided under claim one, element two above. The same definition applies here.

### Element Three: Knowledge

Third, Dr. Menninger must prove by a preponderance of evidence that PPD had knowledge of Dr. Menninger's alleged anxiety disorder at the time it took the alleged adverse employment action against her.

### Element Four: Adverse Employment Action & Causation

Fourth, Dr. Menninger must prove by a preponderance of the evidence that PPD took an adverse employment action against Dr. Menninger, and that PPD did so in whole or in part because of her disability. Dr. Menninger alleges that PPD's creation of new goals and

expectations for her role as Executive Director was an adverse employment action taken because of her disability.

To determine whether Dr. Menninger has proven this element, you must first decide whether PPD took an adverse employment action against her. A trivial harm is insufficient. The fact that an employee is unhappy with something that his or her employer did or failed to do is not enough to make that act or omission an adverse employment action. Likewise, subjective feelings of disappointment or disillusionment concerning an employment action do not constitute an adverse action. Rather, an employer takes materially adverse action against an employee typically when it (1) takes something of consequence away from the employee, for example, by discharging or demoting the employee, reducing his or her salary, or taking away significant responsibilities; or (2) fails to give the employee something that is a customary benefit of the employment relationship, for example, by failing to follow a customary practice of considering the employee for promotion after a particular period of service.

For an employment action to be adverse, it must have materially changed the conditions of Dr. Menninger's employment, which means that it must be more disruptive than a mere inconvenience or an alteration of job responsibilities. However, assignment of more difficult job responsibilities, disadvantageous assignments, unwarranted negative job evaluations, or toleration of harassment by other employees could qualify as adverse actions. Likewise, an employee may meet this standard by showing that her employer intentionally assigned new job duties to target her known disability, such as by selecting tasks that would be more difficult due to the disability.

Whether an action is materially adverse should be judged from the perspective of a reasonable person in Dr. Menninger's position, considering all of the circumstances and the

context in which the events took place. For example, a schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young parent with school aged children.

If you find that PPD took an adverse employment action against Dr. Menninger, you must next determine whether Dr. Menninger's disability was a cause of the adverse action. The definition of "cause" here differs under federal and state law. You will have to determine separately whether she has met her burden under federal and state law.

For this claim, under federal law, you must decide whether Dr. Menninger's disability was a but-for cause for the adverse action you found. To prove that her disability was a but-for cause, Dr. Menninger does not have to prove that disability was the only reason for the adverse action. It is enough if Dr. Menninger proves by a preponderance of the evidence that if not for her disability, the alleged adverse actions would not have occurred.

Under Massachusetts law you must decide whether Dr. Menninger's disability was a "determinative cause" of the adverse action. Dr. Menninger's disability was a "determinative" cause if it contributed significantly to the adverse action(s), that is, that it was a material and important reason for the adverse action. To prove that disability was a "determinative cause," Dr. Menninger need not prove that disability was the only reason for the adverse action.

Under both federal and state law, you are permitted to consider the timing and sequence of events when assessing causation. For example, if adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's disability or protected activity, where adverse actions follow closely on the heels of protected activity, or where there is evidence of a pattern of discriminatory or retaliatory conduct that began soon after the protected activity and only culminated later in actual

adverse action, you may consider the timing and sequence of those events in your analysis of whether Dr. Menninger has proven causation under either the federal or the Massachusetts causation standard.

Under both federal and state law, you may consider any legitimate non-discriminatory reason or explanation stated by PPD for any employment decision that you determine was an adverse action. You may assess whether the reason(s) stated were a "pretext" for discrimination or retaliation, that is whether it was the true reason for the decision. Not all pretexts are necessarily designed or intended to conceal discrimination or retaliation, though that may be the purpose of a pretext. Regarding pretext, your focus is PPD's state of mind, not on whether PPD's reason was, in your view, a good, foolish or unprofessional business decision. Remember that Dr. Menninger bears the burden to prove by a preponderance of the evidence that disability discrimination or retaliation was under federal law the but-for cause of the adverse action and under Massachusetts law the determinative cause of the adverse action. Neither law requires her to prove that the disability discrimination or retaliation was the only cause, though she must prove it was the but-for cause (under federal law) or determinative cause (under Massachusetts law).

*Summary of Claim Two*

Below is a list of the questions relevant to Dr. Menninger's claim for discrimination based on adverse employment action.

1. Did Dr. Menninger prove by a preponderance of the evidence that she had a "disability" within the meaning of anti-discrimination laws?

2. Did Dr. Menninger prove by a preponderance of the evidence that she possessed the necessary skill, experience, education, and other job-related requirements for the position of Executive Director for Defendant's Global Central Labs?

3. Did Dr. Menninger prove by a preponderance of the evidence that she could have performed the essential functions of the Executive Director position with or without reasonable accommodation?

> PPD bears the burden to prove by a preponderance of the evidence which functions of the Executive Director position were "essential."

4. Did Dr. Menninger prove by a preponderance of the evidence that PPD had knowledge of Dr. Menninger's alleged anxiety disorder at the time it took the alleged adverse employment action against her?

5. Did Dr. Menninger prove by a preponderance of the evidence that PPD took an adverse employment action against Dr. Menninger?

6. Causation:

   a. <u>Federal Law</u>: Did Dr. Menninger prove by a preponderance of the evidence that her disability was a but-for cause of the adverse employment action?

   b. <u>Massachusetts Law</u>: Did Dr. Menninger prove by a preponderance of the evidence that her disability was a determinative cause of the adverse employment action?

If your answer(s) to any one or more of Questions 1-5 and 6(a) was "no," then you must answer "no" to Question 2A on the Verdict Form. If your answers to Questions 1-5 and 6(a) were all "yes," then you must answer "yes" to Question 2A on the Verdict Form.

If your answer(s) to any one or more of Questions 1-5 and 6(b) was "no," then you must answer "no" to Question 2B on the Verdict Form. If your answers to Questions 1-5 and 6(b) were all "yes," then you must answer "yes" to Question 2B on the Verdict Form.

CLAIM THREE: Retaliation

Dr. Menninger's third claim is that PPD retaliated against her for requesting an accommodation for a disability. A claim for retaliation is separate and distinct from a claim for discrimination. Accordingly, Dr. Menninger does not need to succeed on her discrimination claim in order to prove retaliation.

In order to recover for retaliation, Dr. Menninger must prove all of the following by a preponderance of the evidence:

First, that she engaged in conduct that is protected under the anti-discrimination laws,

Second, that she suffered a materially adverse action, and

Third, that there was a causal connection between the materially adverse action and Dr. Menninger's protected conduct.

*Element One: Protected Conduct*

Dr. Menninger must first prove that she engaged in conduct that is protected under the law. An employee's request for accommodation constitutes protected conduct as a matter of law. This is true even if the employee does not meet the statutory definition of "disability" or is otherwise not entitled to any accommodation, so long as the employee makes their request in good faith.

*Element Two: Materially Adverse Action*

Second, Dr. Menninger must prove that she suffered a materially adverse action. For the purposes of this retaliation claim, Dr. Menninger alleges three adverse actions: (1) PPD tried to coerce her to quit, (2) PPD excluded her from hiring and recruiting decisions, which she alleges was a core component of her role, and (3) PPD conducted a sham investigation into her HR complaint. You consider these three alleged adverse actions separately and collectively.

With respect to showing an "adverse action," Dr. Menninger's burden under her retaliation claim is different than under her claim for discrimination. To be actionable as retaliation, an adverse action does not need to "relate to the terms and conditions of employment." Instead, Dr. Menninger need only prove that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from engaging in protected activity. Material adversity is judged from the standpoint of a reasonable person in the employee's position—meaning a person with all of the same conditions as Dr. Menninger and in light of all of the relevant circumstances.

In determining whether PPD subjected Dr. Menninger to a materially adverse action, you should consider all the relevant evidence. That is, you should consider whether PPD's cumulative actions in response to her protected request for accommodation might well have dissuaded a reasonable person with her disabilities from requesting an accommodation.

Dr. Menninger satisfies this element if she proves by a preponderance of the evidence that one or more of the three alleged adverse actions occurred and were adverse. You must decide as to each whether Dr. Menninger has proven the action occurred, and if so, whether it was adverse. You must also decide whether the actions collectively were adverse even if you find that individually they were not.

### *Element Three: Causation*

Third, if you find that Dr. Menninger engaged in protected conduct and suffered a materially adverse action, you must determine whether Dr. Menninger proved that protected conduct caused one or more of the action(s) that you found to be materially adverse. Please refer to the explanation of "causation" provided above under claim two, element four, including the explanation of the differing legal standards for causation under federal and Massachusetts law. The same definition applies here. Except that, instead of considering whether her <u>disability</u> was a but-for and/or determinative cause as you did under claim two above, here you must consider whether Dr. Menninger has proved by a preponderance of the evidence that her alleged <u>protected conduct</u> was the but-for and/or determinative cause of any materially adverse action(s) you found under this retaliation claim (claim three).

### *Summary of Claim Three*

Below is a list of the questions relevant to Dr. Menninger's claim for retaliation.

1. Did Dr. Menninger prove by a preponderance of the evidence that she engaged in conduct that is protected under the anti-discrimination laws?

2. Did Dr. Menninger prove by a preponderance of the evidence that she suffered a materially adverse action?

3. Causation:

   a. <u>Federal Law</u>: Did Dr. Menninger prove by a preponderance of the evidence that her protected conduct was a but-for cause of at least one materially adverse action?

   b. <u>Massachusetts Law</u>: Did Dr. Menninger prove by a preponderance of the evidence

      that her protected conduct was a determinative cause of at least one adverse

      action?

If your answer(s) to any one or more of Questions 1-2 and 3(a) was "no," then you must answer

"no" to Question 3A on the Verdict Form. If your answers to Questions 1-2 and 3(a) were all

"yes," then you must answer "yes" to Question 3A on the Verdict Form.

If your answer(s) to any one or more of Questions 1-2 and 3(b) was "no," then you must answer

"no" to Question 3B on the Verdict Form. If your answers to Questions 1-2 and 3(b) were all

"yes," then you must answer "yes" to Question 3B on the Verdict Form.


<u>Damages</u>

      If you find that PPD discriminated against Dr. Menninger based on her disability, or

retaliated against her for engaging in protected activities, then you must determine whether it has

caused Dr. Menninger damages and, if so, you must determine the amount of those damages. In

addition to proving her claims, except where I instruct you otherwise, Dr. Menninger bears the

burden to prove her damages by a preponderance of the evidence. Uncertainty in the amount of

damages does not bar recovery and mathematical precision is not required. However, you must

not speculate, conjecture, or guess in awarding damages. The award is acceptable as long as it is

based on just and reasonable inferences from the evidence. You will reach the damages issue

only if you find that PPD is liable to Dr. Menninger for discrimination or retaliation (or both).

      The fact that I am instructing you on damages does not mean that I am attempting in any

way to suggest to you what your verdict should be. Any suggestions from any of the lawyers in

this case during opening or closing statements as to the value of this case or the amount of damages you should award is not evidence and is not binding upon you in any way.  If you award damages, you should do so in accordance with my instructions and based upon your determination of an appropriate damage award.

The categories of damages that you may consider awarding to Dr. Menninger, if you find that PPD is liable to Dr. Menninger, are as follows: (1) back pay; (2) front pay; (3) emotional distress; and (4) punitive damages. I will now instruct you as to each of these categories.

*Back Pay*

If you determine that PPD discriminated against Dr. Menninger based on a disability, or retaliated against her for requesting accommodation of a disability, then Dr. Menninger may be entitled to recover "back pay," which is the amount of the lost salary, bonuses, equity, the value of employment benefits, and health insurance benefits that Dr. Menninger would have received, but for PPD's discriminatory or retaliatory conduct, from the date of the adverse employment decision or failure to provide a reasonable accommodation until today.

The plaintiff has a duty to limit or "mitigate" her damages by seeking other comparable employment. A comparable job is one that offers similar compensation, long-term benefits, opportunities for promotion, job responsibilities, working conditions, and status. However, if you find that Dr. Menninger was unable to mitigate her damages because PPD's discriminatory and/or retaliatory conduct caused her to be unable to perform comparable work, then so long as you find that to be the case, Dr. Menninger does not have a mitigation duty and you should not reduce her recovery for that period of time.

If, and only if, you find that at some point in time Dr. Menninger was able to perform "comparable work," then it is still PPD's burden to prove to you that Dr. Menninger failed in her

duty to mitigate damages by seeking other comparable employment. PPD meets this burden only if it has proved to you that:

1.  One or more discoverable opportunities for comparable employment were available in a location at least as convenient as the place of former employment;

2.  Dr. Menninger unreasonably made no attempt to apply for any such job; and

3.  It was reasonably likely that Dr. Menninger would have obtained one of those comparable jobs.

The duty of mitigation does not require a plaintiff to go into another line of work, accept a demotion, or take a demeaning position. If PPD has proven the three elements of mitigation that I have just read to you, then you should reduce any back pay award to Dr. Menninger by the amount that PPD has proven that she could have earned in wages and benefits at the comparable job.

Please write the amount of back pay, if any, that you award to Dr. Menninger on Question 4A of the Verdict Form.

*Front Pay*

If you determine that PPD discriminated against Dr. Menninger based on a disability, or retaliated against her for requesting accommodation of a disability, then you must also calculate separately, as future damages, a monetary amount equal to the present value of the wages and benefits that Dr. Menninger reasonably would have earned in the future, in her employment with PPD, but-for PPD's discrimination and/or retaliation against Dr. Menninger, minus the amount of wages and benefits that Dr. Menninger may reasonably be expected to earn in the future via other comparable employment.

You cannot speculate in awarding front pay; rather, the determination of the amount of the award—if any—must be proven with reasonable certainty. In determining front pay, you should consider and weigh the following factors:

1. The availability of other comparable employment opportunities;

2. Dr. Menninger's probable date of retirement or date of future employment;

3. The amount of earnings, including salary and benefits, that Dr. Menninger probably would have received between now and her projected retirement date or date of future comparable employment; and

4. The possibility of inflation and wage increases in the future.

If you award damages to Dr. Menninger for losses she will suffer in the future, keep in mind that a plaintiff cannot be awarded damages that overcompensate the losses that she suffered because of the defendant's conduct. In order to avoid overpaying Dr. Menninger, you must consider that the amount of money you give her today for future losses can be put in the bank, where it can earn interest. So, in making an award for future damages, you must determine the amount of money that, if invested today at a reasonable rate of interest, would in the future provide Dr. Menninger with the amount of money that you calculated she will lose in the future as a result of PPD's conduct.

Please write the amount of front pay, if any, that you award to Dr. Menninger on Question 4B of the Verdict Form.

*Collateral Sources*

You have heard testimony that Dr. Menninger received compensation from sources such as short- or long-term disability insurance, Social Security Disability benefits, and unemployment insurance. These are considered "collateral source" payments under a principle

called the "collateral source rule." Ordinarily, under that rule, you do not deduct these collateral source payments from the amount of front or back pay that you decide to award to the plaintiff, unless you find that there are countervailing circumstances that would make it unjust to apply the collateral source rule. The mere fact that the plaintiff may receive a double-recovery is not alone enough to justify deducting the collateral source payments from the front or back pay award.

## *Emotional Distress Damages*

Third, if you find that Dr. Menninger has been discriminated against, retaliated against, or both, you may also award her reasonable damages for her physical and emotional distress. Physical and emotional distress includes pain, discomfort, indignity, depression, fear, anxiety, or humiliation suffered as a result of the discrimination, the retaliation, or both. Although uncertainty in the amount of damages does not bar recovery and mathematical precision is not required, you must not speculate, conjecture, or guess in awarding damages.

To recover for her physical and emotional distress Dr. Menninger may, but is not required to present evidence of physical injury or physical manifestation of her distress. Nor is she required to show that she sought psychiatric consultation. That said, an award of emotional distress damages must rest on substantial evidence, and its factual basis must be made clear on the record. Some factors that you should consider include, but are not limited to:

1. The nature and character of the alleged harm;

2. The severity of the harm;

3. The length of time Dr. Menninger has suffered and reasonably expects to suffer; and

4. Whether Dr. Menninger has attempted to mitigate the harm (for example, by counseling or by taking medication).

In addition, Dr. Menninger must show a sufficient causal connection between PPD's unlawful acts and her emotional distress. Dr. Menninger is not entitled to compensation for any emotional distress or related symptoms which preexisted PPD's actions. She is entitled to compensation for the full emotional distress you find PPD caused her, even if it is greater than what a reasonable person in her position would suffer, including exacerbation of preexisting symptoms. In other words, she is entitled to full compensation for the increase in her anxiety, depression, or other distress that is caused by PPD's unlawful actions even if you determine that an average person in her situation would not have experienced the same level of emotional distress. However, she is not entitled to compensation for emotional distress that arises from causes other than PPD's actions. You may award Dr. Menninger damages for her emotional distress even if you do not award back pay or front pay.

For emotional distress damages you award, if any, you will need to determine which portion arose up to and including today and which portion, if any, she is likely to suffer in the future. Please write the amount of emotional distress damages, if any, that you award to Dr. Menninger for emotional distress she suffered up to today because of PPD's discrimination and/or retaliation on Question 4C of the Verdict Form.

Please write the amount of emotional distress damages, if any, that you award to Dr. Menninger for emotional distress she is reasonably likely to suffer in the future because of PPD's discrimination and/or retaliation on Question 4D of the Verdict Form.

### *Punitive Damages*

Lastly, if you find that PPD has intentionally discriminated or retaliated against Dr. Menninger, or both, you may consider whether punitive damages are warranted. Punitive

**JA197**

damages are different from compensatory damages. Unlike compensatory damages, which compensate the victim for the harm she has suffered, the purpose of punitive damages is to punish the defendant for conduct that is outrageous because of the defendant's evil motive or reckless indifference to the rights of others.

To find that punitive damages should be awarded, you must find that more than intentional discrimination or retaliation occurred. Punitive damages may be awarded only where the defendant's conduct is outrageous or egregious.

Punitive damages may be awarded only where Dr. Menninger has proven by a preponderance of the evidence that (1) the individual who engaged in the discriminatory act or practice was acting in a managerial capacity, (2) he or she engaged in the discriminatory act or practice while acting in the scope of his or her employment, and (3) his or her conduct was not only intentional, but also was outrageous or egregious, or that he or she acted with malice or with reckless indifference to the rights of the disabled.

If Dr. Menninger has proved these facts, then you may award punitive damages, unless PPD proves by a preponderance of the evidence that the conduct or action by the managerial employee was contrary to its good-faith efforts to prevent discrimination in the workplace. In determining whether an employee of PPD was a supervisor or manager for PPD, you should consider the type of authority that he or she had over Dr. Menninger and the type of authority for employment decisions PPD authorized him or her to make.

In determining the amount of a punitive damage award, if any, you should also consider:

1. The egregious or outrageous character or nature of PPD's conduct;

2. PPD's wealth, in order to determine what amount of money is needed to punish PPD's conduct and to deter any future acts of discrimination or retaliation;

3. The actual harm suffered by Dr. Menninger;

4. The magnitude of any potential harm to other victims if similar future behavior is not deterred;

5. Whether there was a conscious or purposeful effort to demean or diminish the class of which Dr. Menninger is a part (or if there was a conscious or purposeful effort to demean or diminish Dr. Menninger because she was a member of that class);

6. Whether PPD was aware that the discriminatory or retaliatory conduct would likely cause serious harm, or recklessly disregarded the likelihood that serious harm would arise;

7. PPD's conduct after learning that the initial conduct would likely cause harm; and

8. The duration of the wrongful conduct and any concealment of that conduct by PPD.

If you do award punitive damages, you should fix the amount by using calm discretion and sound reason. Keep in mind that you are not required to award punitive damages. The amount of the award must not reflect bias, prejudice, or sympathy toward any party, but the amount can be as large as you believe necessary to fulfill the purpose of punitive damages.

If you find that punitive damages are warranted against PPD, please answer "yes" to Question 4E on the Verdict Form and write the amount of punitive damages you award to Dr. Menninger in Question 4F. If you find that punitive damages are not warranted against PPD, please answer "no" to Question 4E on the Verdict Form and skip Question 4F.

IV. <u>DELIBERATIONS</u>

It is now time for you to start your deliberations. Let me say a few words about those deliberations.

JA199

Each of you brings to your jury service your life experiences and knowledge. This serves only as background for your common sense and judgment. In rendering your verdict you must consider only, and decide the case solely upon, the evidence you heard in court in light of my instructions.

Each of you must decide the case for yourself, but you should do so only after considering all of the evidence and listening to the views of your fellow jurors. Do not be afraid to change your opinion if you think that you are wrong after hearing the opinions of your fellow jurors. But do not come to a decision simply because other jurors insist that it is right, and do not surrender an honest belief about the weight and effect of the evidence simply in order to reach a verdict.

This case has taken a great deal of time and effort to prepare and try. There is no reason to think that it could have been better tried, or that another jury would be better qualified than you are to decide it. It is important therefore that you reach a verdict if you can do so conscientiously. Your verdict must be unanimous as to each of the special questions I am going to ask you to answer. Your answers will be recorded on the verdict slip by your foreperson. The fact that one of you is foreperson does not give that person special status in your deliberations. You are all equal.

Your first order of business will be to select a foreperson. The foreperson will have the same voice and the same vote as the other deliberating jurors. The foreperson will act as the moderator of the discussion and will serve as the jury's spokesperson. The foreperson's most important obligation is to ensure that any juror who wishes to be heard on any material issue has a full and fair opportunity to be heard by his or her fellow jurors. When the jury has reached a

verdict, the foreperson will fill in the appropriate answers, sign and date the verdict slip, and inform the court officer that the jury is ready to return to the courtroom.

Whenever you need a recess for any purpose, your foreperson may declare a recess. Do not discuss the case during a recess. All your discussions of the case should occur only when you are all together and your foreperson has indicated that deliberations may proceed. If it becomes necessary during your deliberations to communicate with me, you may do so by sending a note through the court officer. The note must be signed by your foreperson. No member of the jury should ever attempt to communicate with me, except by such a signed writing. However, in doing so do not tell me how you stand, either numerically or otherwise, on any issue before you, until after you have reached a verdict. On matters touching simply on the arrangements for your meals, schedule, and convenience, you are free to communicate with the court officer orally rather than in writing. You are not to communicate with anyone but me about the case, however, and then only in writing.

When you have reached your verdict, your foreperson should fill in, date, and sign the verdict slip to state the verdict upon which you all agree. You will then return with your verdict to the courtroom. Your verdict must be unanimous. That is, you must be unanimous as to the answer to each of the questions you answer on the verdict form.

You may now go to the jury room and commence your deliberations.

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

                Plaintiff,

v.                                                    Civil Action No.  1:19-CV-11441-LTS

PPD DEVELOPMENT, L.P.,

                Defendant.

## <u>PLAINTIFF'S RESPONSE TO FINAL JURY INSTRUCTIONS</u>

Plaintiff respectfully requests the following revisions to page 24 of the Final Jury

Instructions.

In the first paragraph, revise the second and third sentences to read:

> For the purposes of this retaliation claim, Dr. Menninger alleges that the adverse
> action was comprised of one or more of the following: (1) PPD tried to coerce her
> to quit; (2) PPD tried to manufacture grounds for her termination, (3) PPD refused
> to clarify the anticipated changes to her role, (4) PPD established unrealistic
> expectations and goals for her role; (5) PPD diminished her involvement in hiring
> and recruiting decisions, which she alleges was a core component of her role, and
> (6) PPD conducted a sham investigation into her complaints of mistreatment. You
> must determine whether Plaintiff has proven that any of these acts occurred and, if
> so, whether they amounted to an adverse action, either individually or
> collectively.

Delete the final paragraph.

LISA MENNINGER,
By her attorneys,

/s/ Patrick J. Hannon
Patrick J. Hannon (BBO# 664958)
Hampton M. Watson (BBO# 705983)
Hartley Michon Robb Hannon LLP
155 Seaport Blvd., 2nd Floor
Boston, MA 02210
P: (617) 723-8000
F: (617) 447-2800
phannon@hmrhlaw.com
hwatson@hmrhlaw.com

Dated: March 30, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2023 the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Patrick J. Hannon
Patrick J. Hannon

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA MENNINGER,   )
                 )
     Plaintiff,  )
                 )
v.               )          Civil No. 19-11441-LTS
                 )
PPD DEVELOPMENT, L.P.,   )
                 )
     Defendant.  )

SPECIAL VERDICT QUESTIONS FOR THE JURY

**Question 1: Discrimination—Failure to Provide Reasonable Accommodation Claim**

Question 1. Did Dr. Menninger prove by a preponderance of the evidence that PPD

unlawfully discriminated against her by failing to provide her with a reasonable

accommodation?

YES: ✓_____     NO: _____

*Please proceed to Question 2A.*

**Question 2: Discrimination—Disparate Treatment/Adverse Employment Action Claim**

Question 2A. Did Dr. Menninger prove by a preponderance of the evidence that PPD

unlawfully discriminated against her by taking an adverse employment action against her

under federal law (applying the federal "but-for" causation standard)?

YES: ✓_____     NO: _____

*Please proceed to Question 2B.*

Question 2B. Did Dr. Menninger prove by a preponderance of the evidence that PPD

unlawfully discriminated against her by taking an adverse employment action against her

under Massachusetts law (applying the Massachusetts "determinative cause" causation

standard)?

YES: ___✓___          NO: _____

*Please proceed to Question 3A.*


**Question 3: Retaliation Claim**

Question 3A. Did Dr. Menninger prove by a preponderance of the evidence that PPD

unlawfully retaliated against her under federal law (applying the federal "but-for" causation

standard)?

YES: ___✓___          NO: _____

*Please proceed to Question 3B.*


Question 3B. Did Dr. Menninger prove by a preponderance of the evidence that PPD

unlawfully retaliated against her under Massachusetts law (applying the Massachusetts

"determinative cause" causation standard)?

YES: ___✓___          NO: _____

*Please proceed to Question 4.*


2


**JA205**

**Question 4: Damages**

*If your answer was "yes" to any of Questions 1-3B above, please proceed to Question 4A.*

*If your answer was "no" to all of Questions 1-3B above, please skip Questions 4A-4E and proceed to Certification.*

Question 4A. Enter below the amount of "back pay," if any, that Dr. Menninger proved by a preponderance of the evidence that she lost because of PPD's disability discrimination and/or retaliation.

$ 1,565,000.00 (amount expressed in numbers);

One million five hundred sixtyfive thousand (amount expressed in words)

*Please proceed to Question 4B.*

Question 4B. Enter below the amount of "front pay," if any, that Dr. Menninger proved by a preponderance of the evidence that she will lose because of PPD's disability discrimination and/or retaliation.

$ 5,465,000.00 (amount expressed in numbers);

Five million four hundred sixty five thousand (amount expressed in words)

*Please proceed to Question 4C.*

3

<u>Question 4C.</u> Enter below the amount of damages for "emotional distress," if any, that Dr.

Menninger proved by a preponderance of the evidence that she suffered up to today because

of PPD's disability discrimination and/or retaliation.

$ 5,000,000,00 (amount expressed in numbers);

_____Five million_____ (amount expressed in words)

*Please proceed to Question 4D.*


<u>Question 4D.</u> Enter below the amount of damages for "emotional distress," if any, that Dr.

Menninger proved by a preponderance of the evidence that she is reasonably likely to suffer

in the future because of PPD's disability discrimination and/or retaliation.

$ 2,00,000, 00 (amount expressed in numbers);

_____Two million_____ (amount expressed in words)

*Please proceed to Question 4E.*


<u>Question 4E.</u> Do you find that "punitive damages" are warranted against PPD?

YES: __✓___          NO: _____

*If you answered "yes" to Question 4E, please proceed to Question 4F.*

*If you answered "no" to Question 4E, please skip Question 4F and proceed to*

*Certification.*

4

**JA207**

Question 4F. Enter below the amount of "punitive damages" that you award to Dr.

Menninger.

$ _10, 000, 000_ (amount expressed in numbers);

_Ten million_ (amount expressed in words)

*Proceed to Certification.*


**Certification**

I hereby certify the foregoing answers are the unanimous answers of the jury.

_[signature]_

Jury Foreperson


3-31-2023

Dated:

5



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

LISA MENNINGER,

     Plaintiff,                      Civil Action No.
                                        1:19-cv-11441-LTS

     v.

PPD DEVELOPMENT, L.P.,

     Defendant.

_____

BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

JURY TRIAL
Day 1

Monday, March 20, 2023
9:02 a.m.

John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts

Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

```
 1                        A P P E A R A N C E S

 2

 3      On behalf of the Plaintiff:

 4          HARTLEY MICHON ROBB HANNON, LLP
            BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
 5          155 Seaport Boulevard
            2nd Floor
 6          Boston, Massachusetts  02210
            (617) 723-8000
 7          phannon@hmrhlaw.com
            hwatson@hmrhlaw.com

 8

 9      On behalf of the Defendant:

10          OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
            BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11          One Boston Place
            Suite 3500
12          Boston, Massachusetts  02108
            (617) 994-5700
13          rachel.mandel@ogletreedeakins.com
            patrick.curran@ogletreedeakins.com
14

15

16

17

18

19

20

21

22

23

24

25
```

**TABLE OF CONTENTS**

**TRIAL WITNESSES**

On behalf of the Government:                          Page

LISA A. MENNINGER

    By Mr. Hannon                                    163

**EXHIBITS**

                                             Admitted

Number 3                                             171

**MISCELLANEOUS**

                                                Page

Preliminary Instructions by the Court                122

Opening Statement by the Plaintiff                   139

Opening Statement by the Defendant                   149

```
 1                          P R O C E E D I N G S
 2                  (In open court.)
 3                  THE DEPUTY CLERK:  The United States District Court
 4       for the District of Massachusetts is now in session, the
 5       Honorable Leo T. Sorokin presiding.
 6                  THE COURT:  Please be seated.
 7                  THE DEPUTY CLERK:  Today is Monday, March 20, 2023,
 8       and we're on the record in civil case number 19-11441, Lisa
 9       Menninger vs. PPD Development, LP.
10                  And would counsel please identify themselves for
11       the record.
12                  MR. HANNON:  Good morning, Your Honor, Patrick
13       Hannon, along with Hampton Watson, on behalf of Dr.
14       Menninger, who is here with us as well.
15                  THE COURT:  Good morning.
16                  Good morning, Dr. Menninger.
17                  MS. MANDEL:  Good morning, Your Honor.  Rachel
18       Mandel and Patrick Curran on behalf of Defendant PPD, and
19       with us is Deborah Ballweg of PPD.
20                  THE COURT:  Good morning.
21                  Good morning, Ms. Ballweg.
22                  All right.  Anything to discuss?
23                  MR. HANNON:  Nothing -- well, before I say
24       "Nothing," so just to note for the Court, at Thursday's
25       pretrial, we had noted there might be some objections to some
```

```
 1    coming up, and we'll reconvene.  So that we're here before
 2    they come in.
 3              All right.  Stand in recess.  Thank you.
 4              (Court in recess at 9:12 a.m.
 5              and reconvened at 9:41 a.m.)
 6              THE COURT:  Whenever you're ready, Jim.
 7              MR. MCALEAR:  Thank you, Your Honor.
 8              (The venire enters the courtroom.)
 9              THE COURT:  Good morning, ladies and gentlemen.  My
10    name is Leo Sorokin.  I'm one of the judges here at the
11    federal court.  And in a few moments, we're going to be
12    picking from among you a group of people to serve as jurors
13    in the case that we have slated for trial here today.  And
14    along the way, I'll tell you about how we're going to pick
15    the jurors, and I'll tell you about the case and the schedule
16    and all of those things that you're wondering about.  But
17    before we get to that, I want to talk to you briefly about
18    jury service.  And I know that it's something that some
19    people dread and -- but it is one of the most fundamental
20    parts of our system of justice in the United States.  And I
21    know that each of you probably has a job or school to attend
22    or family responsibilities to deal with, or any number of
23    other ways that you were planning to spend today before you
24    were called to the federal courthouse for jury service.  And
25    I'm probably not overstating it to say that I doubt very many
```

1    of you this morning, when you were having breakfast, were

2    thinking, wow, can't wait to go to the federal court for jury

3    service.  Just what I really wanted to do this Monday

4    morning.  And so I understand that.  You have your own lives

5    and your own things that you want to do in your life, and

6    your own things that you need to do, and your obligations,

7    and the like.  But you, nonetheless, came today.  And just by

8    coming here today, you have already begun to do something,

9    not for yourself, but for your country.  And I know that

10   sounds like an overstatement, but it's not.  It's the truth.

11   And so on behalf of the Court, I thank you for coming.

12          Each of you is a citizen of the United States, and

13   as a citizen, we have both rights and responsibilities.  One

14   of the rights we have is the right to a jury trial.  Our

15   constitution guarantees that every person in the United

16   States has the right to a trial by an impartial jury of his

17   or her peers, to resolve disputes that arise with other

18   people or companies.  And that right means that, in every

19   civil case, and the case that we have here today is a civil

20   case, the question of whether the person bringing the lawsuit

21   has proven his or her claims against the defendant is

22   determined by a fair and impartial cross-section of citizens

23   drawn from the community, people like yourselves, each of

24   whom brings his or her own individual perspective and life

25   experience to your jury service.

1    But with that right to a jury trial, a right which
2    we all have, comes a related responsibility.  We have all the
3    responsibility to serve on a jury.  And by serving on juries,
4    we give life to the guarantee in the constitution, to the
5    right -- to the constitutional right to an impartial jury of
6    citizens drawn from all walks of life.  And without citizens
7    like yourselves, willing to honor their responsibility to
8    serve on a jury, courts like this court would be unable to
9    ensure that the Constitution's promise of a jury trial is
10   fulfilled for every citizen.  That is why jury service
11   applies to every citizen, and that is why it is so important,
12   and that's why you're here today.
13       So first, I'd like to ask each of you to promise to
14   do something, not really for me, but for your country, and
15   for every person in it, including the parties to this case.
16   And what I'm asking you to promise is simply to try to be
17   willing to serve as a fair and impartial juror in this case,
18   if that's something that you're able to do.
19       Is that something that you can each promise?
20       (Affirmative responses.)
21   THE COURT:  Okay.  Thank you.
22       So let me tell you first who is here, who works for
23   the Court, and then we'll go through the jury selection
24   process.
25       Ms. Belmont is what's called my courtroom deputy

```
 1              MS. MANDEL:  I think somewhere between 6 and 12,
 2      just for efficiency purposes.
 3              THE COURT:  Like eight, you would be fine with
 4      eight, or ten.
 5              In state court, are you mostly getting six person
 6      or 12, or somewhere in between?  In civil cases.
 7              MR. HANNON:  I'm told they're still doing six, and
 8      I'm told that the primary motivating factor is cost, because
 9      they're saving a fortune on lunches.
10              THE COURT:  They give lunch every day?
11              MR. HANNON:  Or whatever the cost is.
12              THE COURT:  Just like the juror fee and --
13              MS. MANDEL:  And throughout COVID, things have
14      gotten really complicated, so mostly six, I think, yeah.
15              THE COURT:  If this were COVID, I would have
16      done -- during the COVID, well, if we had them, when we had
17      them, sort of in the emergent, I would have done six, or
18      maybe seven in this case, because it's two weeks.  But I
19      think there's a value of a little bigger than six, it's just
20      a group dynamics, you get a bigger group, it's a little
21      better decision process.  I can't prove that, but --
22              (The jury enters the courtroom.)
23              **PRELIMINARY INSTRUCTIONS BY THE COURT**
24              THE COURT:  All right.  You can move down one.
25      Exactly right.  Basically, you got it, if you sit in that
```

1    seat in the second row, and you sit in that seat in the first
2    row, everyone follows from that.
3            All right.  So just a reminder, I'm going to give
4    you some preliminary instructions now, and then we'll break
5    for lunch for an hour.  I'll tell you about that at the end
6    and have some suggestions for you.  And then we'll come back
7    and we'll hear testimony until 4 o'clock, and then we'll stop
8    at 4:00, and I'll go over, again, the schedule.
9            So these instructions that I'm about to give you
10   will give you a basic framework for considering the evidence
11   as you hear it during the trial.  So the first thing that's
12   going to happen in the trial, after lunch, are the opening
13   statements.  The plaintiff will go first because the
14   plaintiff has the burden of proof, and then the defendant
15   will go.  And opening statements are not evidence.  They're
16   purpose is simply to help you understand what the parties
17   expect the evidence to be.
18           After we're done with opening statements, the
19   plaintiff will start calling witnesses and putting on
20   evidence.  And the plaintiff will present its case, and when
21   she's done presenting her case, at some point you'll hear her
22   lawyer say "the plaintiff rests."  And that means that
23   they're done presenting their case.
24           And then the defendant will be able to present any
25   witnesses -- or additional evidence or witnesses that they

1    wish to present, and when they're done, they'll say the

2    defendant rests.  Typically that's the end of the evidence.

3    And when we're done with that, then we'll have closing

4    arguments.  And you'll hear from the two lawyers about

5    closing arguments, and then I'll give you final instructions

6    on the law and a verdict form.  The final instructions on the

7    law will be much more detailed than what I'm going to give

8    you now, and they'll explain all of the things that you need

9    to determine in order to figure out if the plaintiff proves

10   her claims or not.  And the verdict form will be the

11   questions that you answer.  And the questions are typically

12   yes, no, or an amount of money, but they'll pair with the

13   instructions.  So that's what's to come.  All right.

14          So in terms of your job, it's the duty -- it's your

15   job, and yours alone, to decide from the evidence what the

16   facts are.  It is my job to decide what the law is and to

17   explain the law to you.

18          You will hear the evidence, decide what the facts

19   are, and then apply the law I give you to those facts.  You

20   must follow the law as I explain it, whether you agree with

21   it or not.

22          You will decide this case on the evidence before

23   you and the law as I give it to you.

24          Sometimes jurors are curious about whether I

25   believe certain witnesses or about how I think the case

1    should be decided.  My opinion, if I have one, and I

2    certainly do not have one now, is not relevant at all.  It is

3    your role, not mine, to decide those issues.  You should not

4    interpret anything I may say or anything I may do during the

5    trial as indicating what I think about a witness or what I

6    think your verdict should be.

7         The plaintiff -- this is a civil case, as I told

8    you.  I'm not going to explain the brief summary of the case

9    again, because you heard that this morning.  And the lawyers

10   will give you their explanation of the case in -- a little

11   later today when you hear their opening statements.

12        But the plaintiff, Dr. Menninger in this case, has

13   the burden of proving her claims to you by a preponderance of

14   the evidence.  This is a less rigorous standard than proof

15   beyond a reasonable doubt, a standard you've probably heard

16   of and which applies in criminal cases.  Here, Dr. Menninger

17   has the burden of convincing you, in light of all the

18   evidence, that her claims are more likely true than not.

19        If you find that Dr. Menninger meets this burden,

20   you must return a verdict in her favor.  If Dr. Menninger

21   fails to meet this burden, then your verdict must be for the

22   defendant.

23        I expect the evidence in this case will include

24   witness testimony, documents and other things received as

25   exhibits, and any facts which the parties have agreed are

1    true.

2           As to exhibits, things that come into evidence, you

3    will have those in the jury room during your deliberations.

4    What you won't have is a transcript of the testimony.

5           There are legal rules that control what you may

6    consider as evidence.  When a lawyer asks a question or

7    offers something as evidence, and the lawyer on the other

8    side thinks it is not permitted by the rule of -- rules of

9    evidence, that lawyer may object.  This simply means that the

10   lawyer is asking me to decide whether the rules of evidence

11   allow you to consider the challenged information.

12          It may be necessary for me to discuss the issue

13   with the lawyers privately, either by having a conference

14   over there, what we call the sidebar -- where you saw me with

15   the lawyers a couple times during jury selection -- while

16   you're in the courtroom, or by calling a recess.  I will do

17   my best to keep those conferences to a minimum or zero.

18          The purpose of those conferences is usually so that

19   I can make a decision on the rules of evidence.  We're not

20   keeping things from you to frustrate you, and we do our best

21   to try to have those discussions before 9:00 a.m., when

22   you're hearing evidence, and today after 4:00, or most other

23   days after 1 o'clock when you're done, so that we -- your

24   time that you give us, you're here listening to evidence,

25   rather than sitting there, watching us talk to each other.

1    So I can't promise you that it will never happen, but we're

2    doing our best to try to minimize that.

3    There are certain things that are not evidence.

4    Statements and arguments by lawyers are not evidence.

5    Questions by lawyers, standing alone, are not evidence.  The

6    question and the answer, taken together, are the evidence.

7    Objections are not evidence.  If I sustain an

8    objection -- in other words, if I agree with the lawyer

9    objecting -- you must ignore the question or exhibit and must

10   not try to guess what the answer might have been or what the

11   exhibit might have contained.

12   Anything that I strike or tell you to disregard is

13   not evidence and must not be considered.

14   Anything you hear about this case outside of the

15   four walls of this courtroom is not evidence.  You must

16   decide this case based only on what you see and you hear in

17   the courtroom.

18   In deciding what the facts are, you may have to

19   decide what testimony you believe and what testimony you do

20   not believe.  You may believe all, some, or none of what any

21   witness says.  It is entirely up to you.

22   I will give you suggestions at the end of the trial

23   for how to go about assessing witness credibility.

24   Two ensure fairness, all of you must obey the

25   following rules during the trial.  First, do not make up your

1    mind about what the verdict should be until after you have

2    gone to the jury room to decide the case, and you and your

3    fellow jurors have discussed the evidence.  Keep an open mind

4    until then.

5         Second, do not talk among yourselves about this

6    case or about anyone involved with it until the end of the

7    case, when you go to the jury room to decide on your verdict.

8         You should feel free to get to know one another and

9    to talk about other matters, like the weather or your

10   families.  Anything but this case.

11        Third, do not talk with anyone else about this case

12   or about anyone who has anything to do with it until the

13   trial has ended.  Anyone else includes members of your family

14   and your friends.  You may tell them that you are a juror,

15   but do not tell them anything about this case until after you

16   have been discharged by me at the end of the trial.

17        Fourth, do not discuss this case in any way, in any

18   electronic forum, or form.  You may not talk about the case

19   in an e-mail, a text message, Twitter, Facebook, any other

20   social media site, or in any other online forum.

21        Fifth, do not let anyone talk to you about the case

22   or about anyone who has anything to do with it.  If someone

23   should try to talk to you, please report it to me

24   immediately.

25        Sixth, during the trial, do not speak to any of the

1  parties, the lawyers, or witnesses involved in this case.  It

2  is important not only that you do justice in this case, but

3  that you give the appearance of doing justice.  And if

4  someone saw you talking to someone involved in this case,

5  even if you were just being polite, it might arouse suspicion

6  or call into question your impartiality, so don't do it.  If

7  one of the lawyers or the parties or witnesses does not speak

8  to you when you pass in the hall or ride in the elevator,

9  they are not being rude.  They are not permitted to talk to

10 you for the same reason I'm instructing you not to talk to

11 them.

12        Seventh, don't read any news stories or articles

13 about the case or anyone involved with it or any radio or TV

14 reports or anything like that.

15        Eighth, no independent research.  That means no

16 googling the people, the parties, the claims, the

17 information, the evidence, nothing.  Don't do any other kind

18 of internet research.  Don't conduct any independent research

19 of any kind about the parties, the claims, or the law.

20 Everything that you need will be provided for you right here

21 in the courtroom.

22        Finally, during the course of the trial, if you

23 have any kind of a problem, let me know right away, so that I

24 can take care of it.  If a lawyer steps between you and the

25 witness, so you can't see the witness, raise your hand, and

1     we'll have the lawyer move.

2              If you cannot hear a witness, raise your hand, and

3     we'll have that witness repeat his or her answer.

4              If you need a glass of water or a short break for

5     any reason, let us know, and we'll take care of that.

6              If you need to communicate to me when we're not in

7     court, just give a note to Ms. Belmont or the court security

8     officer to give to me.

9              The rules are important, so please follow them.

10             You'll be allowed to take notes during the trial.

11    It may come as a shock to you that there was a point in time

12    in our country's history where jurors were not allowed to

13    take notes, but it's pretty conventional now that jurors can

14    take notes.  So you have notebooks that you can use to do

15    that.  A couple of cautions about notes.  You are not

16    required to take notes and you can choose not to do so.  If

17    you take notes, don't allow your note-taking to distract you

18    from listening to the witnesses and listening carefully.

19    It's important that you observe and listen to each of the

20    witnesses.

21             Take your notebooks to the jury room at each

22    recess.  You cannot take them home or anywhere else outside

23    the courtroom.

24             Ms. Belmont will collect them at the end of each

25    day.  No one will look at them.  They'll be returned to you

1    the next morning, and when the case is over, we'll destroy

2    your notes without reading them.

3            During the trial, you will be permitted to ask

4    questions of the witnesses, if you wish, that are not posed

5    by the lawyers.  If, during the examination of a witness, you

6    have a question that you would like that witness to answer,

7    write that question down on a piece of paper and raise your

8    hand.  Ms. Belmont will grab the question, the piece of paper

9    from you.  I'll take a look at it.  I will review it, to be

10   sure that it's something that the -- that I think the witness

11   might be able to answer within the rules of evidence, and

12   then I'll provide it, either way, to the lawyers.  And

13   either -- just so you understand, they might ask the question

14   right away, it may be a topic they're coming to, and they

15   might think that reaching that question would be better in

16   the presentation of evidence a little later, so they might

17   get to it later, if they do that.  If it's a question that

18   for some reason I think can't be answered, after I confer

19   with the lawyers, then I'll explain to you why it can't be

20   answered, just so you know.

21           You should not draw any inference from the fact

22   that a question you wrote down was not posed during an

23   examination or -- and draw no inference from which lawyer

24   posed the question.  That doesn't make any difference and you

25   shouldn't draw a conclusion one way or the other from that.

```
 1              As I told you before, no transcript from Ms. Lopez,
 2     because it takes too long to prepare one.  So listen
 3     carefully to the witnesses.
 4              That's all I have for preliminary instructions from
 5     you.
 6              So what we're going to do now is we'll take a break
 7     for lunch and ask you to return -- it's five of 1:00, so I
 8     ask you to return at five of 2:00, so we can start.  We'll
 9     start at five of 2:00 and we'll go until 4 o'clock.  We'll
10     have opening statements and witness testimony.
11              So a couple of suggestions to you in terms of
12     lunch.  One, you can do --
13              Did you already talk to them about this?
14              THE DEPUTY CLERK:  No.
15              THE COURT:  Okay.  You can go downstairs, we have a
16     cafeteria in the second floor.  You're welcome to go
17     downstairs to the cafeteria.  You can eat in the cafeteria,
18     you can bring your lunch -- the jury room is yours.  You can
19     bring your lunch up and eat it in the jury room if you wish.
20     You can go out.  There are a variety of restaurants and fast
21     food of all sorts in the neighborhood.  You can go avail
22     yourself of that.  I make no specific recommendations, but
23     there are plenty there.  I just ask you to come back to be
24     ready to go at five of 2:00, because we can't do anything
25     unless we have everybody.  So one person missing, we all
```

```
 1    wait.

 2              So I think that's it.  All right.  All rise for the

 3    jury.

 4              Ms. Belmont reminds me about your phone.  So you

 5    probably checked your phone when you came in today at the

 6    front desk.  So I allow jurors to have their phones, not in

 7    the courtroom.  So you can bring them in --

 8              Will they be able to do it now, for the afternoon?

 9              THE DEPUTY CLERK:  They should be able to.

10              THE COURT:  So if you want, you can go downstairs

11    now and collect your phone from where you checked it in, and

12    you can have it with you.  And then when you come into the

13    courtroom, just leave it in the jury room.  And it will be

14    fine in the jury room.  You can't have it in the courtroom.

15    And you'll have it there when you leave.

16              And each day you can do that, you can bring it in.

17    You should be all set with security.  If they have any

18    issues, you tell them that I you're in a jury trial before me

19    and that I allowed it.  And if they have any questions, they

20    should call me or Ms. Belmont.  And then so you should be all

21    set to bring it in each day.  And then just leave it in the

22    jury room.

23              And at the end, just so you know -- I'll explain

24    this again later -- but during deliberations, you won't be

25    able to have it in the jury room when you deliberate.  And
```

```
 1    we'll have an envelope for each of you.  You'll drop it in
 2    the envelope.  We'll put all the envelopes in a box, and
 3    we'll have a court employee sitting outside of the jury room
 4    with the box.  You won't have to worry about it; no one will
 5    look at it.  But they'll be right there.
 6              All right.  So we'll take the recess.  You know,
 7    we'll just start at 2 o'clock.  That will be fine.  See you
 8    at 2 o'clock.  Thank you.
 9              (The jury exits the courtroom.)
10              THE COURT:  Anything before we break?
11              MR. HANNON:  No, Your Honor.
12              MS. MANDEL:  No.
13              THE COURT:  All right.  See you at 2 o'clock for
14    opening statements.  Thank you.
15              (Court in recess at 1:00 p.m.
16              and reconvened at 2:02 p.m.)
17              THE COURT:  So if we have all the jurors, just
18    bring them in.
19              THE DEPUTY CLERK:  Okay.
20              (Jury present.)
21              THE COURT:  All right.  Ladies and gentlemen, we're
22    ready to begin.  We'll start with the opening statement from
23    the plaintiff's lawyer.
24              Mr. Hannon.
25              MR. HANNON:  Thank you, Your Honor.
```

| | **OPENING STATEMENT BY THE PLAINTIFF** |
|---|---|
| 1 | |
| 2 | MR. HANNON:  Good afternoon. |
| 3 | This is a case about fear.  Ever since Lisa |

1           **OPENING STATEMENT BY THE PLAINTIFF**

2           MR. HANNON:  Good afternoon.

3               This is a case about fear.  Ever since Lisa

4      Menninger was a little girl, she suffered from fear, a very

5      specific type of fear, which she came to later know in life

6      is called social anxiety disorder.

7               When she was little, it manifested in ways in terms

8      of how she would react with other kids.  When she was in

9      school, it manifested in ways in terms of how she learned.

10     As she got older, it manifested in different ways, and she

11     came to eventually learn that she had social anxiety

12     disorder.

13              But notwithstanding the fact that she suffered from

14     this fear, she did well.  She went to medical school.  She

15     became a pathologist.  She got high-ranking roles at various

16     organizations, which ultimately brought her to PPD, a

17     laboratory company where she was the -- essentially the sort

18     of medical director for its four Global labs.  And you're

19     going to hear that she did that job very well.

20              But her success wasn't without difficulty.  You're

21     going to hear that, in the course of her educational studies,

22     in the course of her professional studies, that on occasion,

23     she would run into activities that happened to implicate her

24     disability, particularly public speaking and social

25     interactions.  That's the sort of core of her particular

1    phobia.

2         And you'll hear that she was able to do these

3    things, that she was able to give presentations.  She was

4    able to do public speaking.  But it was really, really hard;

5    that in the run-up to do it, she would be having all sorts of

6    physical symptoms in terms of stomach issues and all sorts of

7    fright and all these various sort of physical manifestations.

8         And then when she actually did it, she was able to

9    do it, in part, because later in life she went and saw a

10   psychiatrist and she got a prescription.  And between the

11   prescription and in between simply sort of simply going

12   through these things, she was able to do these things.  In

13   fact, you're going to hear she was able to do these things

14   remarkably well, so much so that people didn't even realize

15   that she had social anxiety disorder or that doing these

16   activities caused these kinds of problems for her.

17        Part of that success, as I mentioned, came at PPD.

18   But in December of 2017, something changed.  At the end of

19   December, Dr. Menninger, she was supposed to have an

20   end-of-the-year performance review with her supervisor named

21   Hacene Mekerri.  This is sort of a very critical meeting that

22   you're going to hear a lot about over the next two weeks.

23   You might hear it referred to as the 360 meeting.

24        I'm going to use that term because, while

25   Dr. Menninger thought she was going there to get her

1  end-of-the-year performance review, she didn't get that.

2  What happened instead was Mr. Mekerri started with some

3  feedback from a 360 review, meaning where he had solicited

4  feedback from some of her colleagues, some of the people that

5  reported up to her.

6      Now, you're going to hear that that -- that that

7  review was generally positive; that there was some

8  constructive criticism provided to Dr. Menninger, but there

9  was also lots of very positive things said as well.  And

10  Dr. Menninger's takeaway from that conversation wasn't that

11  there was anything wrong with her performance; quite the

12  opposite.  You're going to hear that during that

13  conversation, during that 360 review in the end of

14  December 2017, Mr. Mekerri said that he was so impressed with

15  Dr. Menninger, he wanted her to do more.  And the more that

16  he wanted her to do were exactly the types of activities that

17  she had so much trouble doing because of her social anxiety

18  disorder; that he wanted her to start doing presentations in

19  front of clients; that he wanted her to become more -- more

20  visible, get more involved in the sales and presentations and

21  all of that.

22      Mr. Mekerri did that because he didn't know,

23  because he thought that Dr. Menninger had done, on those few

24  occasions that she had done it, she had done it really well.

25  This was a sign of Dr. Menninger's good performance, not any

1    kind of poor performance.

2            But Dr. Menninger knew at that point -- she knew

3    the difficulties that she had encountered throughout her life

4    doing these activities.  She knew how draining it was on her

5    when she had to go through these things, when she had to

6    medicate, when she knew about how taxing it was in the

7    lead-up.  So she was confronted with a difficult choice:

8    Does she stay silent and suffer, or does she raise her hand

9    and tell them about her disability?

10           You're going to a hear that she chose the latter,

11   and you're going to hear that she did that, despite a great

12   deal of fear; fear that if she did that, that if she told

13   them about her limitations, if she told them how difficult

14   this was for her, that they were going to reject her; that

15   they were going to see her as somehow broken or somehow less

16   than she was; that they were no longer going to see her as

17   the brilliant medical director they used to see her as, and

18   they'd see her as something else.

19           She raised her hand.  She said, "I have a

20   disability," and she asked for an accommodation.  She asked

21   that if they were going to change her role, that they just

22   take into account the fact that these things are really hard

23   for her; try to limit the social presentations, try to limit

24   these new things they were talking about as much as possible;

25   that if they had to do it, that try to come up with a plan,

1    try to work with her, try to work with her doctors so it

2    wouldn't be so taxing, so it wouldn't be so difficult.

3         And you're going to hear Dr. Menninger did all the

4    right things in making this request.  They asked her for a

5    doctor's note.  She went out and got a doctor.  She hadn't

6    even being seeing a doctor at that time.  She was -- she was

7    in control.  But she needed a note, so she went and saw a

8    doctor.  She got the note.  They asked for additional

9    information concerning some suggested accommodations the

10   doctor might provide.  She gave them those, too.  You're

11   going to hear Dr. Menninger did all the right things.

12        Now, part of this accommodation process involved

13   trying to figure out what these new tasks were; what were

14   these additional things that Mr. Mekerri had sort of alluded

15   to in the December 2017 360 meeting.  And you're going to

16   hear that, although in December he had said that they were

17   going to talk about it and come up with something, that

18   didn't quite happen.  And so as Dr. Menninger is submitting

19   her doctor's notes and trying to convey to PPD that she has

20   this disability, she still doesn't quite know what these new

21   tasks are.  And you're going to hear that that results in

22   Mr. Mekerri providing Dr. Menninger a list of five items, and

23   we're going to refer to those five items as buckets.

24        And throughout the course of this trial, you're

25   going to see these buckets and this email, and there's going

1    to be lots of testimony and discussion about them.  I won't

2    get into all of them now, but just, forewarned, we'll be

3    talking about those five buckets.

4         So Dr. Menninger gets the five buckets.  You'll

5    hear she takes it to her wonderful doctor.  You'll hear her

6    wonderful doctor very thoughtfully proposes some ideas of

7    things that PPD can do that maybe allows Dr. Menninger to

8    contribute to these new things without implicating her

9    disability.

10        And you're going to hear, several days later, that

11   Dr. Menninger got back a response from PPD's HR, and you're

12   going to see that what they said in their initial response

13   was, "Okay.  We'll accommodate bucket 1.  We'll somewhat

14   accommodate bucket 5.  We're not going to accommodate buckets

15   2 through 4, but we're happy to talk."

16        It wasn't the answer that Dr. Menninger was

17   necessarily hoping for, but they offered to talk.  And on

18   February 28th of 2018, Dr. Menninger, she went to

19   Highland Heights, which is where the central lab was located,

20   the sort of corporate part of it at least, and she was going

21   to have a meeting.  She was going to have a meeting with her

22   boss, Hacene Mekerri, and the primary HR contact, someone

23   named Chad St. John.  So a meeting with Mekerri and St. John.

24   And this meeting took place on February 28, 2018.  This is

25   going to be another sort of important meeting you're going to

1   hear an awful lot about today.

2            And you're going to hear that Dr. Menninger went

3   into that meeting expecting to talk about her request for

4   accommodation, to talk about how they can work together, how

5   they can find a way to make sure that she's not overburdened,

6   that they can do whatever they can to lessen the stress and

7   the pain and the discomfort that she feels.

8            It was a very different meeting.  From the outset,

9   the conversation wasn't about how she could do her job; the

10  conversation was about getting her out of the company.  Right

11  away, they approached Dr. Menninger with options.  The

12  options were she could take a package, an exit.  She could do

13  some short-term consulting.  The option they didn't provide

14  was she could keep on doing her job.

15           As the meeting progressed, Dr. Menninger pleaded,

16  she begged them, "I can do this job.  I have a disability.  I

17  can do this job.  I've been doing this job."

18           And you're going to hear time and again her pleas

19  and her cries fell on deaf ears.  Over and over again they

20  insisted to her, "No, no, no.  Your doctor says you can't do

21  this job.  This isn't good for you."

22           And she said over and over again, "I can do it.  If

23  we can just talk about those other buckets, if we can just

24  talk about what you actually mean by buckets 2 and 3 and 4,

25  we can figure something out.  There's lots of things that

Case: 23-2030 Document: 114 Filed: 03/31/2304 Page: 244 of 203 Case 1:19-cv-10441-PBS Document: 254 Filed 03/31/2304 Page 244 of 203 Entry ID: 6634402

141

1  fall in those buckets I can still do."

2         The meeting ended with an agreement to meet next

3  day.  And the very next morning, Dr. Menninger, she sent

4  Mr. Hacene and Mr. St. John an email.  And she repeated

5  exactly what she said in the meeting.  She said, "I like my

6  job.  I don't want a package.  I don't want an exit.  I just

7  want to do my job and I can do it.  All we need to do is talk

8  about what's in buckets 2, 3, and 4."

9         And they canceled the meeting.  And they told

10  Dr. Menninger that they were going to look into it and they'd

11  circle back with her, and for two weeks she waited.  And when

12  she came back -- when they came back and they gave her a

13  response, you're going to see they didn't answer what was in

14  buckets 2, 3, and 4.  You're going to see this was the start

15  of various communications from PPD which just don't match up

16  with the questions that are being asked.  You're going to see

17  these are very suspicious communications that don't seem

18  actually part of a conversation that she's in, that seemed to

19  constantly avoid the question that she's asking, constantly

20  take the words of her doctors, spin them, and suggest that

21  she can't do her job, over and over again.

22         And there was more.  After this February 28, 2018,

23  meeting, you're going to hear that all of a sudden, PPD went

24  on a hiring spree.  That for all this time, Dr. Menninger, in

25  her role as the medical director of the lab, had been urging,

1  trying to get them to hire additional, qualified people,

2  people with PhDs, people with specialties, people that can

3  help cover all of these different benches within the

4  organization.

5         And she'd had trouble doing that, getting PPD to

6  make that investment.  But when she disclosed her disability,

7  all of a sudden, they were willing to invest.  And they made

8  these hires without consulting her.  They started cutting her

9  out of the decision-making.  It started looking like, to

10  Dr. Menninger, like they were trying to replace her, like

11  they were preparing for her to leave.

12         And meanwhile, she saw how they were going to do

13  it.  In the weeks that followed, her boss, Hacene Mekerri,

14  his tone completely changed.  Prior to disclosing her

15  disability, he thought Dr. Menninger walked on water.  You're

16  going to hear Mr. Mekerri's words, you're going to hear his

17  description of Dr. Menninger.  You're going to hear he

18  thought she was brilliant, but after she disclosed her

19  disability, his treatment of her changed dramatically.

20         He began to blame her for issues within the lab,

21  issues within labs that happened all the time, issues that at

22  her level, way, way above what actually transpired in the

23  lab.  She clearly had no responsibility for in terms of being

24  able to stop.  And you're going to hear about the way he

25  provided this criticism, that previously -- he'd been

1    supportive of her, previously he'd been -- he sort of

2    exhibited to her that he trusted her opinion, and all of a

3    sudden, she was accusatory.  All of a sudden, he was

4    suggesting to her that her performance wasn't good enough.

5    You're going to hear it was a drastic, drastic change.

6            And with all Dr. Menninger saw happening around her

7    after the February 8th meeting, after being cut out of the

8    decisions, after the change in tone from her supervisor, she

9    had a feeling of what was going on, that they were trying to

10   make things hard on her, that they were trying to make her

11   quit, or they were trying to build a record, a written

12   record, that would justify terminating her.

13           And you're going to hear that she's seeing emails

14   during this time, emails that are copying HR.  Emails that

15   follow a familiar pattern to Dr. Menninger because it's the

16   same pattern you're going to hear that HR had counseled her

17   to follow when she had a problem employee in her

18   organization.  Dr. Menninger had gone from being brilliant to

19   being a problem employee, and it happened drastically.

20           You're going to hear that these developments had a

21   very, very significant impact on Dr. Menninger's health.

22   Again, I mentioned earlier that, prior to disclosing her

23   disability, Dr. Menninger, she wasn't even treating with a

24   therapist.  She -- she had a prescription from a therapist

25   she had seen a while back, but it wasn't -- it wasn't a

1    situation where she needed constant care then.

2           Over the course of the events that I've described,

3    things changed dramatically.  She began having lots of panic

4    attacks and you'll hear about lots of other sort of physical

5    symptoms she was suffering as well, that the sort of pressure

6    they were trying to exude on her, it did exactly what they

7    wanted.  It made her life extremely difficult.

8           And you're going to hear Dr. Menninger had one last

9    hope.  As she saw all around her all what was happening, as

10   she saw what the scheme was, what they were trying to do, she

11   complained to HR.  And she said it out loud, "I'm being

12   targeted."

13          And you're going to hear that PPD said, "We take

14   these allegations very seriously, and we're going to have an

15   independent investigation done and make sure this isn't

16   happening in our company."

17          And you're going to hear that that independent

18   investigator was Deborah Ballweg.  And you're going to hear

19   that, after a couple of weeks, Ms. Ballweg came back to

20   Dr. Menninger and said, "Nope, nothing there.  I looked.  No

21   one's trying to push you out.  This is just normal routine

22   business stuff.  It's all in your head."

23          And you're going to hear that was sort of the

24   last -- the last straw for Dr. Menninger.  You're going to --

25   you're going to hear that at that point, she had

1    suffered -- she developed a major depressive disorder, you're

2    going to hear that it was difficult for her to kind of

3    function, and you're going to hear that she started thinking

4    about killing herself.

5         It was so bad that, at the end of May, her doctor

6    told her, "No more.  You're not going back to work."  And she

7    took a medical leave on June 2, 2018, in order to enroll in a

8    partial hospitalization program, and you're going to hear

9    that she's not been able to return to work ever since.

10        The evidence will also show that Dr. Menninger has

11   tried desperately to get better.  You're going to hear that

12   she has sought treatments consistently.  She has taken many,

13   many medications, of all different dosages.  And you're going

14   to hear why she tries to get better:  because she has a

15   14-year-old child who she worries about, who she worries

16   about how her own illness impacts her child.

17        It might be very easy hearing this story to think

18   maybe it's all in her head, right?  Maybe -- maybe she

19   imagined it all.  Maybe -- maybe she misperceived things.

20   But you're going to see that she saw things exactly right.

21        You're not going to have to take my word for it or

22   Dr. Menninger's word for it.  You're going to take PPD's word

23   for it.  You're going to see in their own internal

24   communications, ones they never thought were going to see the

25   light of day, that they acknowledged after she disclosed her

1    disability, they didn't want her anymore.

2         You're going to see them talking about how what

3    they wanted to do was they want to gently work her out.  They

4    want to get her to take a package.  You're going to see them

5    communicating internally, asking questions like, "When is she

6    exiting?"  And you're going to see the evidence that this was

7    not a company trying to make this work for Dr. Menninger.

8    This was a company trying to drive her out.

9         Everything she perceived, everything she felt, it

10   really happened.  And you're going to hear the architect, or

11   one of the architects of that entire scheme, was Deborah

12   Ballweg, the alleged independent investigator.

13        Now, over the next couple of weeks, you'll hear a

14   lot of evidence from a lot of different witnesses.  I don't

15   have time to go over all of it, but I just wanted to make two

16   additional points before I leave you for now in terms of the

17   sort of general conduct of the trial.

18        First is, as you hear a lot of evidence and you

19   hear a lot of argument, I'd suggest that one of the things as

20   jurors you have to do is try to connect the dots.  You'll

21   hear evidence of something that happens on one day, and maybe

22   evidence that something happens three weeks later, and so

23   forth, and trying to figure out how do these different events

24   connect.

25        And in a few moments, I'm expecting you're going to

1    hear from PPD's counsel, and that they're going to provide

2    you various additional dots, and they're going to suggest you

3    that they connect to tell a different story.

4         You won't know until the end of the trial how to

5    connect those dots.  And you're going to hear a lot of

6    evidence over the two weeks, but I just ask you to keep in

7    mind that when you hear the evidence, one of the fundamental

8    questions is:  Does the story make sense?  Do those dots

9    actually connect in the way that they're suggesting that they

10   do?  And I ask that as you listen to the evidence and listen

11   to the various events that unfolded here, you keep that

12   question in mind.

13        The last thing I want to say is related to the

14   first thing that I said.  When I started my opening, I told

15   you this is a case about fear.  It's not just about

16   Dr. Menninger's fear.  It's also about the fear that people

17   sometimes have with respect to disabilities.  It's about the

18   fear that people sometimes have when you see somebody with a

19   physical defect or you see somebody or hear somebody about

20   having some kind of a mental health problem or something like

21   that.

22        Disabilities can be scary.  But I submit to you

23   that in your role as fact-finders, that you guys have all

24   agreed that you can put aside that fear yourselves and focus

25   on the evidence and on the law.  And if you do that and if

1    you put aside your fear and focus on the evidence and the

2    law, then I'm going to come back to you at the end of the

3    case and I'm going to ask you to find in favor of

4    Dr. Menninger.

5            Thank you.

6            THE COURT:  Thank you, Mr. Hannon.

7            Ladies and gentlemen of the jury, I remind you that

8    opening statements are just that.  They're statements, but

9    they're not evidence.

10           Ms. Mandel.

11           **OPENING STATEMENT BY THE DEFENDANT**

12           MS. MANDEL:  Good afternoon, members of the jury.

13   My name is Rachel Mandel, and my partner Patrick Curran and I

14   represent PPD in this lawsuit.

15           We believe the evidence will tell a very different

16   story from what you've just heard.  PPD serves customers,

17   usually pharmaceutical companies, to help them develop new

18   medicines.  PPD's work includes running labs around the world

19   to test for customers' clinical trials.  In order to do that,

20   PPD operates what are called Global Central Labs, which is a

21   set of labs in four countries around the world.

22           The main PPD central lab location and the only one

23   in the United States is in Highland Heights, Kentucky.  That

24   lab runs test on medical samples, like you might give at the

25   doctor's office or with a laboratory company, entrusted to

1    PPD by its customers and then returns the results so that its

2    customers can use that data to help it make medicines.

3         PPD needs to make sure that the lab has certain

4    types of accreditations or stamps of approval that its

5    customers require.  In August of 2015, PPD hired the

6    plaintiff in this lawsuit, Dr. Lisa Menninger, to work as its

7    executive director of labs.  This is a leadership role that

8    involves overseeing the technical work of the lab and talking

9    to customers about what's happening on a day-to-day basis.

10        PPD was happy to have found Dr. Menninger, who was

11   highly regarded and appeared qualified for the leadership

12   role based on her comparable experience at her most recent

13   job.  Dr. Menninger is a medical pathologist, a doctor; and

14   with her credentials, PPD could make sure that it had the

15   right oversight in the Highland Heights lab and others for

16   its necessary accreditation.

17        PPD paid for Dr. Menninger to relocate to the

18   Highland Heights area -- she actually lived just over the

19   border in Ohio -- for this position.

20        Dr. Menninger worked in the PPD laboratory building

21   in Highland Heights on a daily basis.  She had an office in

22   the administrative area and spent time in the administrative

23   area with other leaders of the company as well as on the lab

24   floor with the people doing the testing on the samples.

25        In addition to her technical oversight, as an

1    executive working with customers and other leaders, the

2    essential functions of her job, which you will see in her job

3    description from the time she was hired included "excellent

4    communication and interpersonal skills, participation in

5    business development activities, frequent interaction with

6    other people, including PPD employees and outside

7    representatives, participation and presentation at regular

8    meetings, responding to customer issues, responding to

9    audits, presenting budgets to senior management, and

10   excellent marketing and negotiation skills."

11          Dr. Menninger's job description also described

12   frequent travel, both in the United States and

13   internationally, and the requirements included spending

14   70 percent of her time onsite at the lab in Highland Heights

15   with availability by phone and computer the rest of the time.

16          When Dr. Menninger had worked for PPD for about a

17   year and a half in late 2016, she was told by her manager,

18   Hacene Mekerri -- I apologize, she told her manager Hacene

19   Mekerri that her daughter needed to change schools because

20   she was being bullied.  Dr. Menninger asked Mr. Mekerri if

21   she could relocate to Massachusetts along with her husband

22   and daughter so that her daughter could attend a private

23   school in Rhode Island.

24          Even though Dr. Menninger's job was in

25   Highland Heights Kentucky, Mr. Mekerri was incredibly

1    supportive of Dr. Menninger and wanted to help her in any way

2    he could, so he said, yes to that fact, yes to that request,

3    despite the fact that she held a leadership position that

4    required regular attendance in Highland Heights.

5         Both other leaders and human resources personnel at

6    PPD questioned whether this was really a good idea.  But

7    Mr. Mekerri decided to accommodate Dr. Menninger's request so

8    that she could move to Massachusetts for her daughter's needs

9    and largely work remotely.

10         Mr. Mekerri did say that Dr. Menninger would need

11    to travel back to Highland Heights on a regular basis in

12    addition to her other travel so that she could meet all of

13    her job requirements.  PPD even committed to paying for this

14    travel, despite the fact that the move was for personal

15    reasons.

16         Dr. Menninger remained at Highland Heights for

17    several months, and then with Mr. Mekerri's blessing, she and

18    her company and her family relocated to Dighton,

19    Massachusetts, in June 2017.  Despite the arrangement between

20    Mr. Mekerri and Dr. Menninger after she moved, Dr. Menninger

21    traveled to Highland Heights during the remainder of 2017

22    only twice.  This was not in line with Dr. Menninger's

23    commitment, and it posed a problem under the accreditation

24    rules.

25         In November 2017, after living in Massachusetts for

1    several months, Dr. Menninger reported to Mr. Mekerri that

2    she was feeling overwhelmed by her job duties.  Now that she

3    was living far away and was no longer around every day for

4    face-to-face conversations, Dr. Menninger was less involved

5    in customer meetings, business development, and her

6    leadership needs.  Many of Dr. Menninger's co-workers

7    expressed concern about her effectiveness and her ability to

8    lead while working remotely.

9        In late 2017, Mr. Mekerri talked to Dr. Menninger

10   about this.  As you heard, there was a 360 meeting where

11   Dr. Menninger received some of this feedback, and Mr. Mekerri

12   encouraged Dr. Menninger to become more involved with

13   colleagues and customers, including through social

14   interactions and presentations.

15       Mr. Mekerri explained that these parts of

16   Dr. Menninger's job were always part of her responsibilities,

17   and they were especially important now that the lab was in

18   growth mode.  Mr. Mekerri also agreed that he would take the

19   lead on hiring and recruiting to lessen the load on

20   Dr. Menninger and allow her to focus on priority areas.

21       Two-and-a-half years into the job, in January 2018,

22   after Mr. Mekerri had told Dr. Menninger that she would need

23   to be more focused on intrapersonal interactions, both with

24   physical presence in Highland Heights and with customers,

25   Dr. Menninger told Mr. Mekerri for the first time by email

1   that she had mental health challenges that would make it hard

2   for her to do some of the things that Mr. Mekerri had told

3   her were required.

4           Mr. Mekerri was traveling at the time, but he

5   immediately responded and said, "Let's set up a time to

6   talk."  When they talked, Mr. Mekerri was actually still

7   traveling, so he said, "Let's talk again soon," but he

8   suggested that he would connect Dr. Menninger with human

9   resources so that she could obtain more support and

10  assistance with -- with what she had just revealed about a

11  disability.

12          Mr. Mekerri connected Dr. Menninger with Chad

13  St. John, a human resources director, who quickly sent

14  Dr. Menninger information about available paperwork that she

15  could fill out for disability accommodations and other

16  services that she could avail herself of.

17          After those initial communications, Dr. Menninger

18  had her first evaluation with a psychiatrist named

19  Dr. Marianna Kessimian.  And you'll hear from Dr. Kessimian

20  during this trial.  After that one evaluation, Dr. Kessimian

21  diagnosed Dr. Menninger with agoraphobia, social anxiety

22  disorder, and generalized anxiety disorder.

23          A few days later, Dr. Menninger sent a disability

24  accommodation request form to Mr. St. John in human resources

25  saying that her psychiatrist recommended that she avoid or

1    minimize any social interaction or public speaking.

2          Dr. Menninger's psychiatrist, Dr. Kessimian,

3    submitted a form, as well, explaining that Dr. Menninger's

4    condition was chronic and any need for her to increase social

5    interaction or public speaking would increase her anxiety and

6    worsen her symptoms.  And it would make it difficult, if not

7    impossible, for her to do her job.  Those were

8    Dr. Kessimian's exact words.

9          Dr. Kessimian's note also said that if

10    Dr. Menninger would need to have any social interaction or do

11    any public speaking, it needed to be planned together with

12    her doctor.

13          Mr. St. John reviewed these forms that were

14    submitted, and he was concerned that they were vague with

15    regard to what Dr. Menninger actually could and could not do

16    that was required of her job.  He was also concerned because

17    many of the things mentioned in these forms are standard

18    parts of an executive director leader role and were

19    increasing because of the lab's growth.  Mr. St. John quickly

20    reached out to Dr. Menninger to ask for additional

21    information, including which specific tasks she could or

22    could not do.

23          Dr. Menninger essentially repeated back what was on

24    the forms and said that she could not provide more detail.

25          Mr. St. John wanted to help Dr. Menninger, and so

1    he asked Mr. Mekerri to provide additional information about

2    what the executive director role entailed.  Mr. Mekerri then

3    prepared a detailed list with the five buckets that you heard

4    Mr. Hannon speak about, listing out what the job tasks were,

5    how many people Dr. Menninger might have to be speaking to

6    when performing the job tasks described in those buckets, and

7    how often they may occur.

8             In response to this, Dr. Kessimian, who is

9    Dr. Menninger's psychiatrist, explained that Dr. Menninger

10   had endured these types of work events and presentations in

11   the past, but only with intense discomfort and the use of a

12   sedative medication, which came along with serious side

13   effects, including impaired attention and concentration.

14            She also said that, in the weeks leading up to

15   social interactions and speaking engagements, Dr. Menninger

16   experienced insomnia, panic attacks, gastrointestinal

17   problems, and weight loss.

18            In Dr. Kessimian's words, Dr. Menninger could not

19   tolerate public speaking and socializing and that it was as

20   if her vocal cords and brain became paralyzed, while her

21   blood pressure, heart rate, and breathing all increased.  As

22   a result, she recommended that any job requirements that

23   called for speaking publicly or even interacting with other

24   people would require Dr. Menninger to have a surrogate or a

25   reader speak on her behalf.

1          She also said that Dr. Menninger should have a

2   surrogate in place for all customer visits and business

3   development events -- critical parts of her job -- and she

4   recommended that Dr. Menninger adjust her travel to be mostly

5   to the Brussels, Belgium, lab location, instead of the

6   Highland Heights, where her main office was.

7          PPD was surprised by the extreme nature of these

8   requests, especially considering that Dr. Menninger held an

9   executive level position that required regular face-to-face

10  interaction with colleagues and customers.

11         However, Mr. St. John and Mr. Mekerri determined

12  that PPD would work with Dr. Menninger to have someone else

13  present on her behalf at senior leadership meetings, town

14  hall meetings, and they would cut her travel expectation by

15  half.

16         Mr. St. John and Mr. Mekerri then met with

17  Dr. Menninger to talk about this.  Mr. St. John explained

18  that the other items requested by Dr. Kessimian were

19  challenging because they meant Dr. Menninger could no longer

20  performance major parts of her job.

21         Because it was not clear how Dr. Menninger could

22  remain an executive director without performing these

23  critical job tasks, Mr. St. John asked Dr. Menninger if she

24  would like to consider moving into a consultant role or

25  looking at an exit package.

1          Dr. Menninger's response confused Mr. St. John and

2    Mr. Mekerri even more.  She said she could continue to do her

3    job without any accommodations, which was surprising, given

4    the serious problems her doctor had said would occur if she

5    did perform these tasks, including that she could not even

6    tolerate these activities.

7          Over the next couple of weeks into March 2018,

8    Mr. St. John explained again why PPD could not accommodate

9    some of these requested things, including eliminating social

10    interaction.  He suggested again that Dr. Menninger work with

11    her doctor to recommend a different accommodation that would

12    allow her to still perform her job.

13          Unfortunately, Dr. Menninger was still not

14    satisfied and would not accept that PPD could not

15    significantly change her executive level job to eliminate

16    most interpersonal interaction.

17          In the meantime and unrelated to discussions about

18    Dr. Menninger's requested accommodations, some quality issues

19    arose in the lab that Mr. Mekerri and others needed to

20    address.  Some of the same concerns that Mr. Mekerri had

21    spoken about with Dr. Menninger in 2017 before Dr. Menninger

22    had told Mr. Mekerri or anyone at the company that she had a

23    disability.

24          These -- there were discussions about how to

25    improve things in the lab and specifically about

1    Dr. Menninger's lab leadership.  These discussions were

2    simply about improving the functioning of the lab and

3    customer service, and Dr. Menninger was not disciplined in

4    any way.

5          When Dr. Menninger understood that PPD would not

6    fundamentally change her leadership job to remove all

7    interpersonal interaction, in April 2018 she complained to

8    Mr. St. John that she felt that Mr. Mekerri was treating her

9    differently because she told him she had a disability.

10         Mr. St. John took Dr. Menninger's complaint very

11   seriously and immediately referred it to his boss within

12   human resources, Deborah Ballweg.  Ms. Ballweg immediately

13   did a thorough investigation into Dr. Menninger's complaint,

14   beginning first by speaking with Dr. Menninger to understand

15   what her concerns were.

16         Ms. Ballweg spoke with many witnesses as part of

17   her investigation, as you'll hear during this trial, and she

18   ultimately found that Mr. Mekerri had not treated

19   Dr. Menninger unfairly and she reported this back to

20   Dr. Menninger carefully and thoughtfully.

21         Much to PPD's surprise, though, Dr. Menninger

22   almost immediately went out on medical leave starting June 3,

23   2018.  PPD fully accommodated that leave and let her know

24   that they remained open to having her back to work, welcoming

25   her to let them know what accommodations they might be able

1    to offer to -- that would allow her to do her executive level

2    role.

3         Dr. Menninger continued to resist returning; and,

4    ultimately, she remained out on medical level for almost

5    eight months, during which time she and her family relocated

6    to New Mexico.

7         After that lengthy leave, Dr. Menninger did not

8    return to work at PPD; rather, she began to receive long-term

9    disability benefits and ultimately government Social Security

10   benefits.  Dr. Menninger has not returned to work in any

11   capacity for the last five years.  She now lives in Oregon

12   with her husband and daughter near her other family, and she

13   has no plans to apply for new employment.

14        Dr. Menninger is claiming that PPD discriminated

15   and retaliated against her after she disclosed her disability

16   for the first time in January 2018.  She's also claiming that

17   Mr. Mekerri became more critical of her and required her to

18   do more interpersonal communication only after he learned of

19   her disability, even though she told her doctor very clearly

20   that he put in place those requirements earlier in 2017.

21        She is even claiming that PPD tried to push her out

22   of her job in spring 2018, but the evidence will show clearly

23   that Mr. Mekerri began working with Dr. Menninger to increase

24   her presence in the lab and focus on customer communication

25   in 2017 and that those were reasonable requirements given

1    that her job really required her to be in Highland Heights,

2    Kentucky, carrying out those tasks.

3          Certainly, neither Mr. Mekerri nor anyone else at

4    PPD wanted Dr. Menninger to leave the company.  In fact, PPD

5    hoped that she would return from her medical leave, and they

6    did not put in place a permanent replacement for the

7    executive director role for some time.

8          Dr. Menninger is also claiming that PPD did not do

9    enough with its investigation into her complaints in

10   April 2018, which she claimed was retaliation.  The evidence

11   will show, though, that Ms. Ballweg did a complete and

12   unbiased investigation, looking into each concern raised by

13   Dr. Menninger and finding that there was just no indication

14   she had been treated unfairly.

15         Dr. Menninger is also claiming that she is now

16   fully disabled and has been unable to work in any capacity

17   for the last five years, and that, in fact, PPD bears full

18   responsibility for the fact that she did not work during this

19   time.  The evidence will show that Dr. Menninger has not

20   actually been unable to work in any capacity during that

21   time, and that even if she was, it was not due to anything

22   that PPD did during that short time window between January

23   and June 2018.

24         She also claims again that she will not work again

25   in any capacity and that she is fully disabled for the rest

1   of her working life and that PPD bears full responsibility

2   for this fact.  The evidence will show, though, that

3   Dr. Menninger is able to work, but that, even if she is not,

4   it was not caused by anything that PPD did during that short

5   time period.

6           The evidence will show that PPD, through

7   Mr. St. John, Mr. Mekerri, Ms. Ballweg, and others, only

8   supported Dr. Menninger and did everything they could do to

9   help her remain in her job and succeed.  This started when

10  PPD accommodated Dr. Menninger by allowing her to move almost

11  a thousand miles away from her home lab to -- so her daughter

12  could attend a different school, and PPD was similarly

13  accommodating after Dr. Menninger revealed her own

14  disability.

15          When Dr. Menninger and her doctor told PPD that she

16  could not do significant portions of her job, including most

17  communication with company leaders and critical customers,

18  PPD still tried to work with her to understand how they could

19  help her continue in her role as executive director.

20          You will see and hear from Deborah Ballweg, Chad

21  St. John, several other PPD witnesses who will describe this

22  story in detail.  You will also hear the testimony of Hacene

23  Mekerri.

24          The evidence will show that PPD never stopped

25  supporting Dr. Menninger and they stood with their arms wide

```
 1    open for her return, even when she was out of work for eight

 2    months.  Surely this is not evidence of discrimination or

 3    retaliation and, therefore, we will ask you, the jury, to

 4    return a ruling in PPD's favor.  Thank you for your time.  We

 5    appreciate you being here for this trial.

 6              THE COURT:  Thank you, Ms. Mandel.

 7              I remind you, ladies and gentlemen, opening

 8    statements can be helpful, but they are not evidence.

 9              Mr. Hannon call your first witness.

10              MR. HANNON:  Yes, Your Honor.  The plaintiff calls

11    Lisa Menninger to the stand.

12              THE DEPUTY CLERK:  Ms. Menninger, Dr. Menninger, if

13    you can please stand and raise your right hand.

14              (Witness duly sworn.)

15              THE DEPUTY CLERK:  Can you please state your full

16    name, and spell your last name for the record.

17              THE WITNESS:  Lisa Anne Menninger,

18    M-e-n-n-i-n-g-e-r.

19              THE DEPUTY CLERK:  Thank you.

20              THE COURT:  Have a seat.

21              Go ahead, Mr. Hannon.

22              MR. HANNON:  Thank you.

23

24

25
```

|    |                                                                            |
|----|----------------------------------------------------------------------------|
| 1  | **LISA A. MENNINGER**                                                       |
| 2  | having been duly sworn, testified as follows:                              |
| 3  | **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**                            |
| 4  | BY MR. HANNON:                                                              |
| 5  | **Q.**  Ms. Menninger, could you start by telling the jury how            |
| 6  | old you are?                                                                |
| 7  | **A.**  I am 54 years old.                                                  |
| 8  | **Q.**  And where do you currently live?                                    |
| 9  | **A.**  I live in Portland, Oregon.                                         |
| 10 | **Q.**  For how long have you lived there?                                  |
| 11 | **A.**  Approximately two years in Portland and one year in Bend.          |
| 12 | **Q.**  And why did you move there?                                         |
| 13 | **A.**  I moved there because my mom and my sister and my                  |
| 14 | brother-in-law lived there, and I needed additional support.              |
| 15 | I was struggling at the time.                                              |
| 16 | **Q.**  Do you live with anyone?                                            |
| 17 | **A.**  I live with my husband, Mason; and my child, Maya.                 |
| 18 | **Q.**  And how old is Maya?                                                |
| 19 | **A.**  Maya is 14.                                                         |
| 20 | **Q.**  Are you currently employed?                                         |
| 21 | **A.**  No.                                                                 |
| 22 | **Q.**  When was the last time you worked?                                  |
| 23 | **A.**  My last employment was with PPD, and that was -- that             |
| 24 | employment was terminated by PPD in February 2019.                        |
| 25 | **Q.**  Can you just briefly describe for the jury what your role         |

1   was at PPD?

2   **A.**  I was the executive director for laboratory operations

3   for our Global Central laboratories, which were located in

4   Singapore, Shanghai, Highland Heights, and Belgium.

5   **Q.**  And was there any particular qualification you needed for

6   that role?

7   **A.**  You needed to be a medical doctor.  You needed to have

8   regulatory certifications.  In my case, I was a board

9   certified clinical pathologist.  So the different regulatory

10  agencies have different requirements and -- yeah, it's

11  doctoral level, plus additional requirements.

12  **Q.**  Okay.  We'll get into some of that in a moment.  But

13  first, could you just generally describe for the jury your

14  educational background, please.

15  **A.**  I graduated from college, from Aurora University, with a

16  BA in biology.  Then I went to grad school for a year in

17  New Mexico.

18          And it was about that time that -- actually my mom,

19  she said, "You know, one time you had considered medical

20  school.  Why did that change?"  And we had a discussion about

21  it, and I decided to move back to live with my mom to finish

22  my requirements to apply to medical school.

23  **Q.**  Let me pause you there.  When was that?

24  **A.**  Oh, gosh.  I believe that was around 2007.

25  **Q.**  Okay.  And did you go to medical school?

1    **A.**   I'm sorry.  1997.  I'm really bad with dates.

2    **Q.**   No worries.

3    **A.**   1997.

4    **Q.**   And did you go to medical school?

5    **A.**   Yes.

6    **Q.**   And where did you go to medical school?

7    **A.**   Saba University School of Medicine.

8    **Q.**   Okay.  And after you completed medical school, did you do

9    any -- any postgraduate medical training?

10   **A.**   Yes.  Then, after you graduated from medical school, you

11   pick a specialty and apply to residency programs.  So I

12   completed my first year of residency at the University of

13   Missouri, Kansas City in anatomic and clinical pathology.

14   Then I decided that I want to just specialize in strictly

15   clinical pathology, so I transferred to a program that had a

16   clinical pathology only option, and that was at Virginia

17   Commonwealth University in Richmond, Virginia.

18   **Q.**   And what did you do after that?

19   **A.**   I was recruited back to Kansas City and asked to work as

20   a staff pathologist for St. Luke's Health System in

21   Kansas City, where I had previously done some of my pathology

22   electives.

23   **Q.**   And did you accept that position?

24   **A.**   Yes.

25   **Q.**   And just generally, what were your duties and

1  responsibilities there?

2  **A.**  I was a staff pathologist for the core hospital.

3  There -- there were four of us, four pathologists, and then

4  we -- we had other hospitals as part of the health system, so

5  we divided those up between us and covered those laboratories

6  as their laboratory medical director.  I also served as the

7  laboratory director for the St. Luke's cancer institute,

8  which was located in the main hospital.

9  **Q.**  At some point, did you leave St. Luke's?

10  **A.**  Yes.

11  **Q.**  And when was that?

12  **A.**  2010.

13  **Q.**  And where did you go?

14  **A.**  I went to Clinical Reference Laboratory.

15  **Q.**  Where was that?

16  **A.**  That was in Lenexa, Kansas.

17  **Q.**  And what was your role there?

18  **A.**  I was laboratory director for the general and the

19  clinical trials laboratories.

20  **Q.**  At -- at some point, you joined PPD; is that right?

21  **A.**  Yes.

22  **Q.**  Could you explain for the jury how you came to join PPD?

23  **A.**  I had been working at Clinical Reference Laboratory for

24  over five years and was happy.  I wasn't really looking for

25  another job, but I reported directly to the CEO, so I knew

1    there was -- there was really nowhere else to go up.

2              I was contacted by a recruiter and wasn't really

3    taking it seriously at the time because that -- a lot of

4    doctors are frequently contacted by recruiters.  But I

5    listened to what she described as the role, and the benefit

6    package, the compensation and the opportunities for career

7    advancement were much more significant than what I had at

8    CRL.  So I made the decision to apply, and I was interviewed

9    and ultimately hired for that position.

10   **Q.**   And when did you join PPD?

11   **A.**   I joined PPD in August of 2015, the very end of August.

12   **Q.**   And did I hear correctly that one of your

13   responsibilities at PPD concerned oversight of its Global

14   Central Labs?

15   **A.**   That's correct.

16   **Q.**   Now, were you the only person that had oversight of the

17   Global Central Labs?

18   **A.**   I was the only medical doctor who had oversight of the

19   laboratory operations of those four Global laboratories.

20   **Q.**   Were there other functional areas that other people had

21   responsibility over?

22   **A.**   Yes.

23   **Q.**   And could you describe for the jury what those were?

24   **A.**   There was the project management department.  They were

25   responsible for managing the client's studies while they

1    perform them.

2         At the time, I was hired, there was a group called

3    "technical operations."  They were responsible for setting up

4    all the requirements of the study in the computer system so

5    that they knew what supplies had to be sent out to different

6    sites and just -- to make sure -- set up all the logistics

7    that would be required for the study.

8         There was the data management department.  They

9    were responsible for all the data being transmitted back to

10   the client.  I know I'm blanking.

11        Then we had -- we had individuals in place,

12   globally, who were like site heads for the Belgium lab and

13   the labs in Asia.  Asia was unique in that their local

14   regulatory requirements required that they had a local

15   medical doctor serve as the medical director on their

16   certificates.

17        However, those doctors did not work for PPD and

18   they were not involved in the oversight of those

19   laboratories.  It was just like -- to fulfill -- to fulfill

20   the local regulatory requirement.

21        The reason for that was that we treated our four

22   laboratories like they were one so -- so that if you sent

23   your specimen to Belgium and then sent that same specimen to

24   our lab in Shanghai, that the results would be comparable.

25   **Q.**  Understood.

1          And I should have asked this earlier, but can you

2     explain for the jury what -- what PPD actually did back at

3     the time you worked for them?

4     **A.**  They are -- they were a clinical research organization.

5     They had different sections.  The -- part of the company that

6     I worked for was the laboratories, and then the laboratories

7     were also further broken down into types of laboratories.  So

8     there were strictly research laboratories, an analytical

9     laboratory, a laboratory that did, like, vaccine research.

10         And the laboratories that I covered were the ones

11     that actually did patient testing.  So we -- we did testing

12     on the samples of the participants enrolled in the clinical

13     trials.

14    **Q.**  Okay.  And I think you mentioned earlier that you needed

15     to be a medical doctor to fulfill your role; is that right?

16    **A.**  Yes.  The laboratories that I covered were, essentially,

17     equivalent to the type of laboratories you would see in a

18     hospital.  So there were some situations where you could be a

19     PhD clinical chemist and cover that particular section of the

20     lab, but you couldn't cover hematology, for example.  Or

21     there were some situations where you could be a PhD doctoral

22     level scientist and cover molecular, but you could not cover

23     the other sections in the laboratory.

24         So as a clinical pathologist, I was able to cover

25     the majority of the sections in the laboratory in addition to

1    providing medical significance of the results.

2    **Q.**  Understood.

3         And in addition to being a medical doctor, did you

4    also have to have various certifications?

5    **A.**  Yes.  There were a lot.  I -- I was board certified in

6    pathology.  I also needed to hold a medical license in the

7    state that I practiced.  So I had previously practiced in

8    Kansas and Missouri, so I had state licensures there.  I had

9    to obtain a license in Kentucky when I took the job at PPD.

10        Also laboratories need to be certified by CLIA.

11   That's a government standard, or a CLIA deemed laboratory or

12   organization.

13        So most clinical laboratories are accredited by the

14   College of American Pathologist.  There are a few states that

15   if -- if you're going to perform testing on samples that come

16   from those states, you also have to hold certification for

17   those states.

18   **Q.**  Okay.  I'm going to show you a document here on the

19   screen in front of you.  And just for the record, this is

20   Exhibit 3.  And I'm showing you here the fourth page of

21   Exhibit 3.

22        And do you recognize this?

23   **A.**  Yes.

24   **Q.**  And what is this?

25   **A.**  This is my CV that I submitted before I worked at PPD.

```
 1              MR. HANNON:  Ms. Belmont, I believe this is in

 2    evidence.

 3    BY MR. HANNON:

 4    Q.  I'm sorry, you said this is --

 5              THE COURT:  Exhibit 3 is an agreed-to exhibit?

 6              MR. HANNON:  Yes, correct.

 7              THE COURT:  All right.  So it's admitted, if it

 8    isn't already.

 9              (Exhibit No. 3 admitted into evidence.)

10    BY MR. HANNON:

11    Q.  So you said this was a CV from what --

12              THE COURT:  I'm sorry.

13              In the back row, you have your own monitors, if you

14    want, between the seats.  You can pop them up out of those

15    armrests.  Then you won't have to squint.  We can pull them

16    out for you if you need help.

17              (Pause in proceedings.)

18              THE COURT:  Go ahead.

19              MR. HANNON:  Thank you.

20    BY MR. HANNON:

21    Q.  So I'm sorry; from what point in time was this, was this

22    CV?

23    A.  This was -- this was the CV that I had updated.  I'm

24    trying to see -- oh, once I -- once I was working at Clinical

25    Reference Laboratory.
```

1    **Q.**   Okay.  So this was -- this was just prior to joining PPD?

2    **A.**   Yes.

3    **Q.**   Okay.  And if we turn to the second page there at the

4    top, you see the section captioned "Professional License and

5    Certification"?

6    **A.**   Yes.

7    **Q.**   And does that accurately describe the professional

8    licenses and certifications you held at the time?

9    **A.**   Yes.

10   **Q.**   I want to direct your attention to the -- about

11   two-thirds of the way down that list, there's one that says

12   "Clinical Laboratory Improvement Amendments" and then

13   "(CLIA)."

14          Do you see that?

15   **A.**   Yes.

16   **Q.**   Can you explain for the jury what that is?

17   **A.**   That is a requirement by the US government for clinical

18   laboratories.  It is regulatory standards that laboratories

19   must follow to ensure that you're providing high quality

20   results in testing and that you have qualified individuals in

21   your laboratory to perform the testing.

22          CLIA will give deemed status to certain

23   professional organizations, such as the College of American

24   Pathologists.  But usually, in addition to having College of

25   American Pathologists certification, you still need to have a

 1    CLIA certification and meet that requirement.

 2    **Q.**  And then below that section, there's a section for

 3    professional associations.  Do you see that?

 4    **A.**  Yes.

 5    **Q.**  And does that accurately reflect the association, the

 6    professional associations you were involved with at the time?

 7    **A.**  Yes.  Based on those dates.

 8    **Q.**  Okay.  So when you -- when you actually joined PPD, can

 9    you explain for the jury what your day-to-day

10    responsibilities were like?

11    **A.**  PPD solely focused on clinical trials, so my job heavily

12    consisted of planning, reviewing, and approving validations

13    of new testing that we brought in our laboratory, and that

14    was based on requiring -- or requests from our clients, what

15    kind of testing they wanted.

16          There was a lot of esoteric testing, so we were

17    constantly validating, and I was constantly reviewing

18    technical documents that only I was authorized to approve.

19    **Q.**  And when you say "validate," what do you mean by that?

20    **A.**  A validation is testing that you perform if you're going

21    to bring a new test into the laboratory.  So to give an

22    example, if you wanted to do blood sugar testing, and it

23    wasn't set up in your laboratory yet, you would have to run

24    samples using the kit that you planned to use to show that

25    the tests performed according to specifications that were

1    acceptable before reporting out patient results.

2    **Q.**  Besides these validations that you described, what else

3    did you do?

4    **A.**  I also frequently would consult with clients and project

5    managers by phone, by email.  Any time they had questions

6    about the results, the testing, you know, could -- asking if

7    we could do certain types of testing, asking for medical

8    clarification about particular results, a lot of times they

9    would give me more information related to clinical history

10   that would help me, you know, give them more -- help them

11   with their consultation.

12          I also was responsible for the labs' staff to make

13   sure that we had qualified lab staff based on the CAP and

14   CLIA requirements in our laboratories.  There are -- the

15   requirements are that the med techs doing the actual testing

16   at the bench, they also need to go through certain levels of

17   education and certifications to perform that testing.

18          Then I was also responsible for things like quality

19   control.  At my level, I reviewed the monthly metrics.

20   Quality control started with -- like, the med tech at the

21   bench was the first line to make sure, okay, the -- the

22   testing -- the reagents are running as they should, the

23   instruments are running as they should, and the person

24   performing the testing is performing it as they should.

25          And then those quality metrics went up the line

1    based on levels, so then the next line would be the

2    supervisor would review and then the associate director or

3    director or manager.  And then I was provided with monthly

4    metrics to review our quality control to make sure that there

5    weren't any issues or -- and follow up on any issues.  We had

6    a quality control program for each individual lab.

7            In addition, though, since we had four Global

8    laboratories that we treated as, like, one, we sent specimens

9    to the four different laboratories, and we all made sure that

10   we were getting comparable results within -- within the

11   limits of acceptability.

12           I also oversaw quality management functions for the

13   laboratory.  So in the beginning of each year, we would set

14   metrics, determine metrics that we wanted to follow, and

15   evaluate those during the year to see if we needed to make

16   any changes to any of our processes in the laboratory.  I was

17   responsible for reviewing and improving all standard

18   operating procedures, so we had procedures for every assay.

19   I mean, we had procedures, which we called it SOPs, for

20   everything.  So usually those would be initially written and

21   drafted by like a lead technician or a supervisor.  Sometimes

22   those got passed around between the Global supervisors,

23   because, like I said, we acted as one lab.  we wanted to make

24   sure that we were globally all following the same procedure.

25           And then ultimately, finally, it would come through

1   the system for me to review and approve, and I could reject

2   or I can approve -- sometimes I rejected it because there

3   were certain parts of it that were not acceptable, and I

4   would suggest changes and edits.

5   **Q.**  Did you ever directly supervise the technicians in the

6   labs that were doing the work?

7   **A.**  No, like I said, the laboratory has different sections

8   and the different sections have a supervisor.  So the

9   supervisor was responsible for managing and supervising the

10  actual med techs at the bench.  And we even further had the

11  med techs divided into different levels so you had like an

12  entry-level med tech, a mid-level, and a lead med tech, and

13  they had different levels of responsibility based on their

14  experience.

15  **Q.**  I'm going to ask you to look at another document here.

16  This is Joint Exhibit 378.  Let me see if I can enlarge that

17  a bit.

18          Do you recognize this document?

19  **A.**  Yes.

20  **Q.**  And what is it?

21  **A.**  This was when I was on site in Highland Heights for the

22  State of New York CAP inspection.  And the office that I was

23  working in at the -- at the time I was working late, after

24  hours, trying to catch up on a lot of tasks that I had to do

25  before leaving for the day.

```
 1              And so Hacene stopped in the office, and I had my
 2    Outlook calendar and tasks lists opened.  And he said, "How
 3    are you doing?"  You know, it was dark, it was late.  And I
 4    said -- I pointed to the Outlook task list, and I said, "I'm
 5    overwhelmed."
 6              And -- and he was kind of surprised like, "Well,
 7    what do you do?  Like, what things are you working on?"  And
 8    I was not surprised that Hacene was not familiar with what a
 9    clinical pathologist does.  That was not his background.  His
10    background was in data management.
11              So he really didn't understand or know what I did
12    from a technical or medical standpoint, all the day-to-day,
13    like, validations and consults and answering emails and, you
14    know, the things I described previously.
15    Q.  Let me stop you there for a moment.  I don't know if this
16    has been said yet.  Can you tell the jury who the person is
17    you just described to us as Hacene?
18    A.  Hacene was my manager.
19    Q.  Okay.  And the last name is Mekerri?
20    A.  Yes.
21    Q.  Okay.  So you -- you have that interaction with
22    Mr. Mekerri you just described.  And how, if at all, does
23    that relate to the email we're looking at here?
24    A.  He was curious about what -- what I did as part of my
25    day-to-day job.
```

1    And he's -- so he -- he asked can I, like, make a

2  little table to show him what I actually did, because,

3  apparently, he didn't know.  So I did that, and I sent it to

4  him.  And then I never heard anything more.  He didn't reply,

5  and we never -- he never came up again.

6  **Q.**  So this email is November 28, 2017; is that right?

7  **A.**  Yes.

8  **Q.**  Okay.  And just looking at the first page of the

9  attachment, we can walk through these.  So the first item you

10  have listed here is "emails."  What -- what kinds of emails

11  are you referring to there?

12  **A.**  All different kinds -- emails from my direct reports

13  related to odd questions; emails from project managers with

14  questions from clients; emails about setting up different

15  meetings for the week, meeting invites.  You know, just -- it

16  could be about anything and everything.

17  **Q.**  Next item, "meetings."  What types of meetings were you

18  referring to this there?

19  **A.**  I was involved in Global supervisor meetings with my

20  team.  Also, we had senior leadership meetings that were

21  every two weeks.  If there was a specific request from a

22  client and we wanted to discuss whether it was something we

23  could set up in our lab, we would pull in the appropriate

24  members of different departments and have a meeting about

25  that.

1      So it really depended on -- yeah.  There were

2  just -- there were all kinds of meetings.  We had quarterly

3  quality management meetings.  We had one-on-one meetings with

4  our direct reports.  Yeah, just any time there was anything

5  that needed to be discussed related to what was going on in

6  the central lab.  Some of them were regular standing

7  meetings.  Some of them were specific to, like, a project

8  that we were working on or some other related issue.

9  **Q.**  Okay.  Turning to the next line.  So that reference, in

10  part, the -- the validation plans you referenced earlier?

11  **A.**  Yes.

12  **Q.**  And besides validation plans, what else -- what else is

13  included in that third line there?

14  **A.**  We did stability studies to make sure that the specimens

15  were stored appropriately during transit.  Like if they

16  needed to be at a refrigerated or frozen temperature, so we

17  would do those studies in-house that to show that, yes, the

18  studies were still valid at this temperature.  I would sign

19  off on all of those.

20      I am kind of blanking right now about the test

21  maps.  I suspect those were, like -- yeah:  I'm sorry.  It

22  was so long ago.  I'm not sure exactly what I was referring

23  to there.

24  **Q.**  Pass.  We'll come back to that.

25  **A.**  Okay.

1  **Q.** "Technical memos"?

2  **A.** Technical memos were if there was a change to an assay or

3  an instrument, we would write technical memos to update our

4  clients. I would -- used to write those or have one of my

5  direct reports draft and then clean it up and finalize it.

6  **Q.** Going to the next line, it references "analytical

7  investigations." Can you tell us what that refers to?

8  **A.** If we had any indication based on our quality control

9  samples that a particular assay or instrument wasn't

10  performing according to our specification, we would do an

11  investigation to resolve what was going on before we would

12  actually resume patient testing.

13  **Q.** And then the reference to "CAP/Alt PT"? Do you know what

14  that is?

15  **A.** Yep. That's a requirement that you run in your

16  laboratory proficiency testing as another level to ensure

17  that your instruments and assays are performing according to

18  standards.

19      Most clinical laboratories participate in College

20  of American Pathologists proficiency testing program. So

21  every quarter, they'll send out unknown samples, and you have

22  to run them and then report the results that you get back.

23  And then later they send you a report showing whether or not

24  you passed.

25  **Q.** Okay. And the next item, "linearity," what's that refer

1   to?

2   **A.**   Linearity is basically to show that your -- for certain

3   assays, that it's -- it's linear.  Like if you increase the

4   quantity of the substrate, you see that on your -- you get

5   the straight line.  So it's kind of like, you know, two,

6   four, six, eight.  You want to make sure that you get as

7   straight a line as possible to show that the assay is linear

8   for tests that have that kind of curve.

9   **Q.**   The next item, "GLASS," what's that?

10   **A.**   That was the quality control program that we created

11   ourselves to make sure that our four Global laboratories

12   performed results that were comparable.

13   **Q.**   Moving to the next item, "shipping condition, test cases,

14   and validation docs."  What is that?

15   **A.**   That was -- they would test the containers that the

16   specimens were shipped in to make sure that they remained at

17   the temperature, the required temperature that they needed to

18   be in so that if the specimen was supposed to be frozen at a

19   certain degree, that those containers did, in fact, keep the

20   specimen frozen at that particular temperature.  And I had to

21   review and sign off on those.

22   **Q.**   Next item, "SOP review and approval," what's that?

23   **A.**   That was what I was referring to earlier, procedures for

24   everything we did in the laboratory.  And those would be

25   written usually by, like, a lead tech, a supervisor, and then

1    they would go through a chain, a hierarchy, until they would

2    finally get to me.  And I would review and determine whether

3    or not they were acceptable.  And if I approved them, then

4    they went on and the staff were trained on them.  And if I

5    rejected them, I put in comments and suggested edits and

6    explained why they needed to be changed.

7    **Q.**  Next line, "Safety minutes review/lab KPIs."  What's

8    that?

9    **A.**  It's required that you review safety metrics monthly to

10   make sure that, you know, the eye wash station's working,

11   there's no electrical hazards, things like that.

12           So we had a safety officer and safety team, and

13   they would provide safety minutes for me to review to make

14   sure that there were no safety concerns for the laboratory.

15           And lab KPIs is key performance indicators.  Those

16   were that quality metrics that we set up at the beginning of

17   the year and that I received quarterly to review, to look for

18   any concerning trends or shifts indicating, like, a reagent

19   problem or any kind of issue with the testing and in any one

20   of our laboratories.

21   **Q.**  Okay.  I'm just going to take a break from this document

22   for a little bit.  We can come back to some of those other

23   duties in a little bit.

24           But I'm going to ask you this question now:  As of

25   November 2017, what if any duties had you been asked to

1   perform relative to business development?

2   **A.**  I was asked to -- sometimes they would -- well, they

3   would consult with me if a client wanted a particular assay

4   set up in our laboratory, and we would evaluate if it made

5   sense strategically, if we had enough volume, or did it make

6   more sense to send it out to a reference laboratory?

7          So most of the time, it was, can we get this type

8   of testing?  Do we have the right compliance, the right

9   certifications in our lab to perform this type of testing?

10   If not, we would have to send it out to another laboratory

11   that had that certification.

12   **Q.**  And was there any group within PPD that specifically had

13   the responsibility for business development?

14   **A.**  Yes.  It was a large group, and my -- I had a peer who

15   was also an executive director who oversaw that group.  So

16   lots of times, you know, we would informally chat about

17   strategy and -- yeah.

18   **Q.**  Now, at some point in time, did you -- did you come to

19   learn that business development might become a larger part of

20   your responsibilities at PPD?

21   **A.**  Yes, the end of December 2017.

22   **Q.**  And from whom did you learn that?

23   **A.**  Hacene Mekerri, my manager.

24   **Q.**  And what was the context in which that issue came up?

25   **A.**  He -- he said that he would like to make some changes to

1    my role in 2018 to make me more visible in front of clients,

2    and he specifically mentioned formal presentations, like

3    formal PowerPoint presentations to pharmaceutical clients.

4    **Q.**   And what was your reaction?

5    **A.**   I became extremely anxious.

6    **Q.**   Why?

7    **A.**   Because I have social anxiety and social anxiety

8    disorder, and I knew that giving formal presentations like

9    that would cause severe panic attacks.

10         Also, I knew that I needed to medicate to give

11   those presentations.  And, you know, there's -- there's

12   anticipatory panic when you know those things are coming up,

13   so that's stressful; and there's, like, recovery after you go

14   through those presentations.

15         Basically, it allowed me to give what Hacene

16   considered excellent presentations of the few slides I had

17   done, but the medication masked the external symptoms.

18   Inside I was panicking.  The medication hid that from the

19   audience.

20   **Q.**   Well, we'll get back to that in a moment, but when --

21   when did you first begin to suffer from social anxiety

22   disorder?

23   **A.**   I've had it my entire life.

24   **Q.**   And while you were growing up, did anyone else in your

25   family exhibit any signs of any kind of medical health issue?

1  **A.**  Yes.  My dad had mental health issues.  I did not know

2  exactly at the time what he was diagnosed with, and then --

3  but on my mom's side, my mom and my grandmother had anxiety.

4  **Q.**  And while you were growing up, how -- how did your social

5  anxiety disorder impact you?

6  **A.**  Well, as a child, in school, I was terrified to ever be

7  called on by the teacher, terrified to ever raise my hand.  I

8  was afraid if I would be asked to read out loud in class.

9  Usually, on the playground, I would just go find a spot and

10  hang out by myself.  Yeah.  I was teased.

11  It was hard.  Back then, in the '70s, you know, I

12  don't even know if social anxiety disorder was an official

13  condition.  It was just considered that I was extremely shy.

14  And I had teachers who would refer to my condition on report

15  cards, but I don't think anybody really knew what it was or

16  what to call it.

17  **Q.**  And as you grew older and pursued your educational

18  studies, did your social anxiety disorder continue to impact

19  you?

20  **A.**  Yes.

21  **Q.**  And in what kinds of contexts?

22  **A.**  Definitely with public speaking.  I always felt awkward

23  in social situations.  I did not get panic attacks in social

24  situations.  But I felt uncomfortable.  And when I got home,

25  I was exhausted.  I was relieved to just, like, be by myself

1    with my cat.

2              But, yes, if I had to give a presentation like I

3    did throughout medical school and residency, I needed to

4    take -- I was taking Valium, which was prescribed to me by

5    different doctors at the time, in order to deal with the

6    shaky voice and the panic attacks, essentially.

7    **Q.**  And -- and you mentioned a panic attack.  Can you

8    describe for the jury what a panic attack feels like to you?

9    **A.**  Some are worse than others, but in general, my breathing

10   becomes very rapid.  My heart rate becomes very rapid.  I

11   start sweating.  I get shaky.  My voice gets shaky.

12   Sometimes I'm unable to talk if it's really bad, and I

13   just -- I'll have tears come down my face.  And it's very

14   scary.

15             I get GI distress, which is embarrassing because

16   then I feel like I have to go to the bathroom; and, you know,

17   I'm, like, embarrassed by that.  And the more the symptoms

18   escalate, it just makes me panic more and more.  So it's just

19   this awful spiral of, like, the symptoms just keep

20   escalating, and you can't stop it.

21             And it's like feeling trapped, and sometimes you

22   feel like you have like an out-of-body experience, and you

23   are just, like, not even aware of what's going on around you.

24   So that's what it was like without medication, or what --

25   what it is like.

1    **Q.**  And talking about your time at PPD, you indicated that

2    there were times at PPD you would engage in activities that

3    you had to medicate for; is that right?

4    **A.**  Yes.

5    **Q.**  Okay.  And did I hear you right, those were -- those were

6    essentially presentations and things of that sort?

7    **A.**  Yes.  Very rare.  We would usually have, like, two town

8    hall meetings a year.  They were supposed to be quarterly;

9    but, usually, they only happened a couple of times, so I was

10   asked to present a few slides at two of those.

11          And I was asked to present a few slides at a couple

12   of the senior leadership team meetings.  And then on -- on

13   occasion, when our chief operating officer was coming to

14   visit, I was also asked to present a few slides, but didn't

15   actually present that time because we ran out of time, and

16   they needed to get -- start the lab tour.

17   **Q.**  Besides those activities you just described, up until

18   December of 2017, were there any other responsibilities that

19   you had at PPD that caused you panic attacks?

20   **A.**  No.

21   **Q.**  As of December 2017, had you told anyone at PPD about

22   your social anxiety disorder?

23   **A.**  No.

24   **Q.**  Why not?

25   **A.**  There's a stigma with mental illness, and I was afraid

1   that people would view me as defective and that that might

2   hurt my career opportunities, my job.  I think that's why

3   most people, or a lot of people, with these disorders do not

4   communicate it.

5   **Q.**  And you mentioned fear of losing your job.  Was your job

6   important to you?

7   **A.**  Oh, absolutely.  We made the decision when our child was

8   born that Mason would be a stay-at-home dad, and I would be

9   the sole financial provider for our family.

10          So for the prior over ten years, since 2006, Mason

11  was not working.  He was a stay-at-home dad.  He did get

12  involved in kind of -- I hate to say, like, geeky, technical

13  projects that I didn't understand and were way over my head.

14  But, you know, he did -- he had his own little projects that

15  he worked on; but he also stayed at home and, you know, would

16  take Maya to school and things like that.

17          And we made that decision because my income was

18  much higher than what he was able to make as a software

19  developer.

20  **Q.**  So December of 2017, when you're -- when you have the

21  discussion with Mr. Mekerri you described a few minutes ago,

22  had you, as of that time, typically received annual

23  performance reviews?

24  **A.**  Yes.  Yes.  At PPD?

25  **Q.**  Yes, at PPD.

1    **A.**  Yes.

2    **Q.**  All right.  And generally speaking, what do you recall

3    about the substance of those reviews?

4    **A.**  The first review I got at the end of 2015, I had been

5    reporting to David Johnston temporarily because my initial

6    boss left, and it was a great review.  He was really

7    impressed by how fast I was able to get a global validation

8    project completed that had been stalled for many, many, many

9    months.

10           So he was very impressed.  We got along great.  A

11   lot of times, he would reach out to me and say, "Hey, do you

12   want to join me?  I'm watching this Webex," and I think that

13   caused a little friction with my -- my initial boss at the

14   time.  But David Johnston had a lot of trust in me and gave

15   me a really good review.

16   **Q.**  So I'm going to show you here Joint Exhibit 57.  And can

17   you tell the jury what this is?

18   **A.**  This is my performance review from 2015 from David

19   Johnston.

20   **Q.**  Okay.  And I'll turn to the second page here, and I'll

21   try to enlarge the top of it a little bit here.  Do you see

22   the top section, the second page, it has a goal there.  Do

23   you see that?

24   **A.**  Yes.

25   **Q.**  And can you tell the jury how -- what, just generally

```
 1   speaking, the practice was in terms of establishing goals at
 2   PPD?
 3   A.  Generally, you would establish goals at the beginning of
 4   the year, but since I was coming in -- you know, I was hired
 5   at the end of August, I quickly developed these goals upon
 6   being hired.  And then these are goals that are used to
 7   measure your performance midyear and at the end of the year.
 8   Q.  Okay.  And so there -- looks -- strike that.
 9           So it looks like part of the system is the employee
10   provides a rating, and then the manager provides a rating?
11   Is that what we're looking at?
12   A.  Yes.  So the employee has the ability to pull this up in
13   the performance management system where they can look at the
14   goals that they've set for themselves and provide
15   documentation as to how they met that goal or -- or if it was
16   a midyear review, are they on target in meeting that goal,
17   where they're at -- basically, supportive comments to
18   describe how you're -- how you're going on reaching that
19   goal.
20   Q.  Okay.  And so if you look at the first goal here, do you
21   see that Mr. Johnston, he rated you fully effective?
22   A.  Yes.
23   Q.  And was -- was part of your responsibilities at PPD to
24   provide these reviews for people that you managed?
25   A.  Yes.
```

1    **Q.**  And did you have an understanding in terms of what a --

2    what a three fully effective rating sort of meant?

3    **A.**  Yes.  That was -- that was the bulk, I think, of what

4    most people received at PPD.  That meant you're a good

5    employee, you're doing -- doing a good job, and, you know, no

6    issues, really.

7    **Q.**  And let me scroll down to the second goal here.  It looks

8    like Mr. Johnston rated you as highly effective?

9    **A.**  Yes.

10   **Q.**  Do you see that?

11   **A.**  This --

12   **Q.**  And based upon your experience at PPD, what's your

13   understanding of the significance of that?

14   **A.**  Yeah.  Like I said, this is -- he was really impressed

15   that I was able to get this global validation project

16   completed in the short time that I was there.  Yeah.  So I

17   went, you know, above and beyond to get that done, pushed a

18   lot of people to work really hard and did not take no as an

19   answer.

20            And, you know, I said -- set deadlines and said

21   we're going to meet these deadlines.  And I took very large

22   validations home with me every weekend so I could make sure

23   that we would get this project done.

24   **Q.**  And if you look at the next page here, you see another

25   goal here, and it looks like that's another highly effective

1    rating from Mr. Johnston.  Do you see that?

2    **A.**  Yes.

3    **Q.**  Do you recall what that -- what that goal was?

4    **A.**  Yes.  When I started at PPD, we needed to identify if

5    there were any regulatory and -- compliance gaps.  Coming

6    from a large independent laboratory and a hospital

7    laboratory, I was able to identify those right away.  And I

8    brought that to Chad's attention, to several people's

9    attention, saying that we should not be reporting out results

10   from an area that I am not qualified to oversee, from a

11   regulatory standpoint.

12         So I said that we need to -- at this point, we were

13   kind of borrowing people from one of the Richmond labs who

14   qualified to oversee molecular, and then they -- he reached

15   out to get the New York certification.  And that was the same

16   with flow cytometry.  Eventually, the person from molecular,

17   I think, was abruptly let go, so we were just instantly not

18   in compliance again.

19         And the person from flow was more -- he worked in

20   the Richmond laboratory primarily where they did measure

21   research-based-type testing and wasn't as familiar, I guess,

22   as clinical flow cytometry is done in, like, hospital labs

23   and clinical laboratories.

24         So we had a compliance gap there as well, and I

25   identified that and said that, you know, we need to find

```
 1   people either within PPD that can qualify or hire someone
 2   externally at -- either as a consultant or a permanent hire.
 3   Q.  Okay.  And then, just to look at the -- well, the bottom
 4   of that page, that was another highly effective rating; is
 5   that right?
 6   A.  Yes.
 7   Q.  Okay.  And then -- turning to the next page, page 4 here,
 8   you see there's a rating there for decision-making.  Do you
 9   see that?
10   A.  Yes.
11   Q.  All right.
12   A.  Yes.
13   Q.  And can you tell us what Mr. Johnston rated you on that?
14   A.  A rating of five, exceptional, which is the highest
15   rating.
16   Q.  Okay.  Now, this was Mr. Johnston.  Did you ever receive
17   a rating from -- I'm sorry -- a performance review from
18   Mr. Mekerri?
19   A.  Yes.
20   Q.  And was that the following year?
21   A.  Yes.
22   Q.  Okay.  I'm now going to show you Joint Exhibit 58.  Let
23   me get back to the first page.  Sorry.
24        And can you tell us what this is?
25   A.  This is my 2016 performance review by Hacene Mekerri.
```

1    **Q.**  Okay.  And if you -- do you recall generally what the --

2    what the overall message was of this rating to you?

3    **A.**  I was rated as highly effective.  He had positive things

4    to say.  I can't remember what the focus was, without looking

5    at my goals, of 2016, but --

6    **Q.**  Okay.  Let's -- let's -- the second page here, can you

7    see a goal here listed as "Collaborate with lab data

8    management and finance so establish and standardize global

9    lab metrics for test volumes, supply costs, and

10   revenue-generated per tests/test category."

11         Do you see that?

12   **A.**  Yes.

13   **Q.**  And how did Mr. Mekerri rate you for that?

14   **A.**  Highly effective.

15   **Q.**  And you see that there are some notes then beneath the

16   rating.  What was your understanding as to why the reason why

17   there's a space for notes there?

18   **A.**  Everyone at PPD is trained thoroughly on how to complete

19   their -- complete their performance reviews, work through the

20   performance management system.  And there's tutorials that

21   you have to go through and watch and -- that are required.

22        And so as part of that, it's -- as part of that

23   training, it's -- you need to document to support your

24   rating.  So you can't just put in a number; you have to

25   support it with evidence.  And the employee has to do that

1  for themselves, and then their manager does it after, and

2  then you have a formal performance review where you go

3  through it together.

4  **Q.**  Okay.  Looking at the second goal there, it says,

5  "Category:  Superior performance."  Do you see that one?

6  **A.**  Yes.

7  **Q.**  And what was your rating there?

8  **A.**  Highly effective.

9  **Q.**  And then the next page, do you see "Category:  Continuous

10  Improvement"?

11  **A.**  Yes.

12  **Q.**  And what was Mr. Mekerri's rating of you for that?

13  **A.**  Highly effective.

14  **Q.**  And then the -- scrolling down, the next category,

15  "People and Culture," do you see that?

16  **A.**  Yes.

17  **Q.**  What was Mr. Mekerri's rating of you there?

18  **A.**  Highly effective, even though I rated myself as lower

19  than that.

20  **Q.**  Going to the next page, you see there's a category,

21  "Organizational Awareness"?

22  **A.**  Yes.

23  **Q.**  How did Mr. Mekerri rate you for that?

24  **A.**  Highly effective.

25  **Q.**  Do you see the next category, Decision-Making?

```
 1    A.  Yes.

 2    Q.  How did he rate you for that?

 3    A.  Highly effective.

 4    Q.  All right.  Going back to the -- actually, strike that.

 5            In -- at some point in 2017, had you and your

 6    family moved?

 7    A.  Yes.

 8    Q.  And why was it that you had relocated?

 9    A.  Hacene and I had a conversation in his office, and I

10    brought up the idea.  I said, "Look" -- well, at this time,

11    he already knew about all the issues that were going on with

12    my child at school with the bullying and that it was -- I

13    mean, he saw me in tears at one point and was, like, "You can

14    go and talk to the head of the school, whatever you need to

15    do."  So I -- I kept him informed about that.  We were really

16    close colleagues.

17            And so I brought up the idea of trying to find a

18    different school for Maya because I was really concerned

19    about, as a child, the amount of depression that they were

20    exhibiting.  I was worried about the impact that would have

21    on them later in life.

22            So I asked Hacene would there be a possibility that

23    I could go remote so that I could move my child into a school

24    where they wouldn't be bullied, that they felt safe?  And at

25    the time, he -- he had one direct report who he brought up,
```

1    and it was, like, "Oh, yeah.  Like Michelle Dockhorn, she's

2    remote, so I don't have any problem with it; but I want to

3    run it by David Johnston," who he was reporting to at the

4    time.

5         And then we also agreed that it would be positive

6    because it would allow me to more equally travel to the four

7    different laboratories that I was responsible for.  I was

8    hired to oversee four laboratories and had only been to China

9    and Singapore once and to the Brussels lab, I think, a few

10   times at that point.  So I was really happy about the idea

11   that I could more equally cover the four Global laboratories

12   that I oversaw.

13        And, yeah, we knew it wasn't going to be anything

14   immediate.  We decided that -- he said we should talk to

15   Chad, and we all worked together for a few months to try to

16   come up with, like, an organizational structure so -- that

17   showed how we would bring in some additional scientific

18   expertise.  We decided that we would bring in someone who

19   could be the CAP director and the New York stakeholder

20   director for Highland Heights.

21        I would remain as the CAP director for the Belgium

22   lab.  Like I said, in Asia, their requirements were that they

23   had local doctors on their certificates.  And the individuals

24   that we hired would report to me, and these were primarily

25   PhD-level candidates that could cover the areas where I had

1   identified that we had compliance gaps.

2          So -- yeah.  I forgot the rest of your question.

3   **Q.**  No worries.

4   **A.**  Sorry.

5   **Q.**  I'll ask another one.

6          So at some point, was a decision made that you

7   would be permitted to work remotely?

8   **A.**  Yes.

9   **Q.**  Okay.  And do you recall who was involved in making that

10  decision?

11  **A.**  I know Hacene got permission from David Johnston, and he

12  also -- I had a call with Jerry Williams, and we also

13  presented -- once Chad and Hacene and I came up with our

14  proposed org chart, that was one of the few presentations I

15  gave at the senior leadership team meeting to show them the

16  new structure that we proposed and that we were going to be

17  recruiting for these individuals to cover these areas.  And

18  that's why it was one of my primary goals in 2017.

19  **Q.**  So now I'm going to show you Joint Exhibit 392.  And

20  looking at the top, do you see this as an email from Chad

21  St. John?

22  **A.**  Yes.

23  **Q.**  Can you tell the jury who Mr. St. John is?

24  **A.**  He was the director of human resources of the

25  Highland Heights lab; and then I think later that expanded to

```
 1    cover more of the laboratories, but basically the lab
 2    director -- I mean, the lab director -- the human resources
 3    director for the Global Central Labs.
 4    Q.  And if I can direct your attention here to the second
 5    paragraph of the email, you see it begins, "Lisa has also
 6    shared"?
 7    A.  Yes.
 8    Q.  And then if you look at the second sentence, it reads,
 9    "No concerns regarding her physical move have been expressed
10    or detected at this time."
11            Do you see that?
12    A.  Yes.
13    Q.  Was that accurate?
14    A.  Yes.
15    Q.  And subsequent to -- subsequent to this email, were you,
16    during your employment at PPD, ever advised that there were
17    any concerns concerning your -- your remote work status?
18    A.  No.
19            THE COURT:  I'm going to stop you there,
20    Mr. Hannon.
21            So, ladies and gentlemen of the jury, it's
22    four o'clock.  We're going to stop for the day.  Don't
23    discuss the case among yourselves.  Don't discuss with anyone
24    else.  Don't do any independent research.
25            I know that the Seaport is probably not where you
```

```
1    ordinarily come for work, so tomorrow morning, like today, is

2    sort of a different commute for you.  So do your best to try

3    to organize yourself, figure it out and get here so you're in

4    the jury room, ready to go at nine o'clock, because we hope

5    to start right on time, but we can't start without everybody

6    who is already here.

7              So thank you very much for your attention.  Have a

8    nice evening.

9              All rise for the jury.

10             JUROR:  So tomorrow, we are -- we are --

11             THE COURT:  9:00 to 1:00 tomorrow.  One o'clock --

12   done tomorrow.  Exactly.

13             (Jury not present.)

14             THE COURT:  Okay.  Anything for any of you before

15   we stand in recess?

16             MR. HANNON:  Nothing here, Your Honor.

17             MS. MANDEL:  Just -- just one real quickly.

18             I'm not sure, in terms of that exhibit issue, if

19   we're going to need have it resolved before tomorrow, the one

20   contested exhibit that I mentioned regarding Ms. Ballweg.

21             MR. HANNON:  Sure.

22             MS. MANDEL:  Timing -- I don't know if that's a

23   today issue, if you want to hold it till tomorrow.

24             MR. HANNON:  We can tackle it in the morning,

25   maybe.
```

```
 1              THE COURT:  I'm happy to see you at 8:30.  If
 2   there's something you want me to read tonight, you can tell
 3   me what it is and give it to me.
 4              MS. MANDEL:  Can we just --
 5              MR. HANNON:  Go for it.
 6              THE COURT:  You can sit down there or back at the
 7   table, whichever you prefer.  You don't have to remain
 8   standing.
 9              Okay.  So this is Exhibit D- 530.  I'll read this.
10   And I take it there's evidentiary disputes about it?
11              MR. HANNON:  Correct.  I believe my only objection
12   was to hearsay.
13              Is that right?  This was --
14              THE COURT:  You plan -- Ms. Mandel, you plan to
15   offer this?
16              MS. MANDEL:  We do.
17              THE COURT:  And your objection, essentially, is
18   hearsay?
19              MR. HANNON:  Yes.  Is that the -- is that the --
20              THE COURT:  Dated May 2, 2018, complaint of
21   discriminatory behavior and disability discussion with Lisa
22   Menninger -- am I saying your name, correct?  I'm not sure
23   I'm --
24              DR. MENNINGER:  It is Menninger.
25              THE COURT:  Menninger.  I'm sorry.
```

```
 1              DR. MENNINGER:  No.

 2              MR. HANNON:  I just learned it two days ago, so no

 3    worries.

 4              THE COURT:  By Ballweg?

 5              MR. HANNON:  Yes.  Just hearsay is all, Your Honor.

 6              THE COURT:  Okay.  I'll read it.  We'll talk about

 7    it tomorrow at 8:30 as well as anything else.

 8              Have a good day.  We'll see you tomorrow.  Thanks.

 9              THE DEPUTY CLERK:  Court's in recess.

10              (Court in recess at 4:04 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**C E R T I F I C A T I O N**

    I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/ Rachel M. Lopez             March 20, 2023

/s/ Robert W. Paschal

_____        _____

Rachel M. Lopez, CRR            Date

Robert W. Paschal, CRR, RMR

Official Court Reporters



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

LISA MENNINGER,

     Plaintiff,                      Civil Action No.
                                    1:19-cv-11441-LTS

     v.

PPD DEVELOPMENT, L.P.,

     Defendant.

_____


   BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


JURY TRIAL
Day 2


Tuesday, March 21, 2023
8:35 a.m.


John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts


Robert W. Paschal, CRR, RMR
Official Court Reporter
rwp.reporter@gmail.com

1                    **A P P E A R A N C E S**

2

3    On behalf of the Plaintiff:

4        HARTLEY MICHON ROBB HANNON, LLP
         BY:  PATRICK J. HANNON AND HAMPTON M. WATSON

5        155 Seaport Boulevard
         2nd Floor

6        Boston, Massachusetts  02210
         (617) 723-8000

7        phannon@hmrhlaw.com
         hwatson@hmrhlaw.com

8

9    On behalf of the Defendant:

10       OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
         BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.

11       One Boston Place
         Suite 3500

12       Boston, Massachusetts  02108
         (617) 994-5700

13       rachel.mandel@ogletreedeakins.com
         patrick.curran@ogletreedeakins.com

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **TABLE OF CONTENTS** |
| 2 | |
| 3 | **TRIAL WITNESSES** |
| 4 | |
| 5 | On behalf of the Plaintiff: Page |
| 6 | LISA A. MENNINGER |
| 7 | By Mr. Hannon 32 |
| 8 | |
| 9 | |
| 10 | **EXHIBITS** |
| 11 | |
| 12 | None |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1                    **P R O C E E D I N G S**

2              (In open court.)

3              THE DEPUTY CLERK:  Today is Tuesday March 21, 2023,

4    and we are on the record in Civil Case Number 19-11441, Lisa

5    Menninger versus PPD Development L.P.

6              And would counsel please identify themselves for

7    the record.

8              MR. HANNON:  Good morning, Your Honor.  Patrick

9    Hannon for the plaintiff.

10             THE COURT:  Good morning.

11             MS. MANDEL:  Good morning, Rachel Mandel and

12   Patrick Curran for the defendant.

13             THE COURT:  Good morning.

14             MS. MANDEL:  Good morning.

15             THE COURT:  Okay.  I read that document.  Just tell

16   me briefly, Ms. Mandel, what you're offering it for.

17             MS. MANDEL:  Your Honor, one of the issues in this

18   case is whether the company did a sufficient investigation

19   into Dr. Menninger's complaint that she was being

20   discriminated against, and Deborah Ballweg conducted that

21   investigation, and these are her notes from the

22   investigation.

23             They will not be offered for the truth of the

24   statements that are cited by other people, but, rather,

25   Ms. Ballweg's state of mind in conducting and concluding

1    on where you're coming from.

2             So no one should draw any conclusions from that.  I

3    really appreciate that you were all here on time and ready to

4    go, and so we -- we continue.  All right?

5             And I just ask that, as we go forward each day, you

6    do your best to be here on time; and if, for some reason,

7    something comes up, there's an accident on the highway, the

8    train or the subway, the T stopped, let me know Ms. Belmont

9    know or let jury know where you are and how long it's taking.

10   And then that helps us a lot if we know that.  All right?

11            So I remind you, Dr. Menninger, that you remain

12   under oath.

13            And, Mr. Hannon, you can continue.

14            MR. HANNON:  Thank you, Your Honor.

15                          **LISA A. MENNINGER**

16      having been previously duly sworn, testified as follows:

17      **CONTINUED DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

18   BY MR. HANNON:

19   **Q.**  Ms. Menninger, during your testimony yesterday, we

20   touched upon a meeting in late December 2017 with

21   Mr. Mekerri.  Do you recall that meeting?

22   **A.**  Yes.

23   **Q.**  Okay.  And am I right that's the meeting where

24   Mr. Mekerri had mentioned to you this -- this desire to have

25   you become more visible and do those sorts of things?

1    **A.**   Yes.

2    **Q.**   Okay.  Going into that meeting, what was your

3    understanding as to what the purpose of the meeting was?

4    **A.**   The purpose was -- I was scheduled to have my

5    end-of-the-year performance review.

6    **Q.**   And during the course of that meeting, did he actually

7    provide your performance review?

8    **A.**   No.

9    **Q.**   But was there any -- any discussion at that meeting other

10   than the talk of these new tasks he wanted you to consider?

11   **A.**   Yes.

12   **Q.**   And what was the other subject?

13   **A.**   He provided some 360 feedback that was overall positive,

14   and then we also discussed, because of the challenges we were

15   having recruiting individuals to fill certain roles, of

16   having one of my direct reports act in the interim in that

17   role, and he asked me to reach out to HR to discuss that

18   further.

19   **Q.**   Okay.

20   **A.**   But he was supportive of that plan.

21   **Q.**   So just backing up a little bit, you said 360.  What --

22   can you explain to the jury what you mean by 360?

23   **A.**   At that time, it was an optional additional activity that

24   you could do as part of the performance review process where

25   you would seek feedback from people who work closely with the

1   individual.  So it was treated as, like, a supplement to our

2   formal performance review process.

3   **Q.**  And I'm going to have you look at a document here in just

4   a moment.  So I'm going to show you Joint Exhibit 377 and

5   I'll stall for a moment while the TV screens come out.

6          So I'm going to show you here the second -- excuse

7   me.  Didn't mean to do that.  One second here.  Pressed the

8   wrong button.  I'm sorry.

9          Okay.  So we're back now looking at Joint

10  Exhibit 377, and I want to direct your attention to, not the

11  email at the top, but -- actually, strike that.  I do want to

12  look at the email at the top.

13         Can you tell us who Brent McKinnon is?

14  **A.**  At the time he was executive director for quality

15  assurance for the Global Central Labs.

16  **Q.**  And how did his position relate to yours, if at all?

17  **A.**  We were considered peers as part of the senior leadership

18  team for the Global Central Labs.  He was not someone I

19  interacted with frequently.  Usually it was just when he

20  would hold quarterly quality management meetings and -- as

21  part of our biweekly senior leadership team meetings.

22  **Q.**  Okay.  And to your knowledge, did Mr. McKinnon, did he

23  also report up to Mr. Mekerri?

24  **A.**  No, he didn't -- did not.

25  **Q.**  Okay.  So I want to direct your attention to the section

 1    below.  You see there there's a bullet that says "Lisa

 2    Menninger."

 3              Do you see that?

 4    **A.**  Yes.

 5    **Q.**  Okay.  And I'm just going to try to enlarge that a little

 6    bit without messing this up.  All right.  That's as far as

 7    I'm going to go.

 8              And you see there in the first line, he indicates

 9    that his feedback regarding you was mixed?

10    **A.**  Yes.

11    **Q.**  Okay.  If I can look -- direct your attention here to the

12    statements about -- I'll cull this out here.  One second.

13              And you see there there's a sentence, in the second

14    line that reads, "She has been dismissive of repetitively

15    raised concerns regarding the lack of bench level

16    supervision."

17              Do you see that?

18    **A.**  Yes.

19    **Q.**  Okay.  Was -- was that accurate feedback as of

20    December 2017, from your perspective?

21    **A.**  Not at all.

22    **Q.**  And can you explain to the jury why -- why that was

23    wrong?

24    **A.**  Hacene and Chad and I had been working very hard

25    throughout all of December -- or all of 2017 to recruit

1    individuals and to actually bring in more scientific

2    expertise to provide bench supervision.  So, you know,

3    that -- that was one of my goals, and that's why I had

4    concern when one of those positions was put on hold.

5    **Q.**   Okay.  Well, we'll talk about that in a few moments.

6    But, then turning your attention to the rest of that

7    sentence, he continues on, "Since her decision to relocate,

8    she has been lackadaisical toward her time on-site in US

9    lab."

10           Do you see that?

11   **A.**   Yes.

12   **Q.**   Was that accurate feedback as of December 2017?

13   **A.**   Not at all.

14   **Q.**   And can you explain to the jury why not?

15   **A.**   The fourth quarter of 2017, I was traveling every month

16   extensively.  I -- I went to the Highland Heights lab in the

17   US twice for two inspections, and then I also traveled to

18   Belgium for two of my regularly scheduled visits there.  So I

19   was traveling extensively.

20   **Q.**   And part of that travel had included the US lab in

21   Highland Heights; is that right?

22   **A.**   Yes.

23   **Q.**   And can you tell the jury what the purpose of that visit

24   had been?

25   **A.**   There were two visits.  One visit was for a CAP 15189

1   inspection.  That's based on the ISO standards of quality for

2   medical laboratories.  It's not a required certification, but

3   a lot of laboratories were striving to attain it because it

4   signified that your lab was, like, going above and beyond the

5   quality standards that were required by our regulatory

6   agencies.  So I was on site for that inspection in September,

7   I believe.

8   **Q.**  And with respect to your travel that you had done

9   subsequent to relocating, had Mr. Mekerri been aware of all

10  of that as of December 2017?

11  **A.**  I don't quite follow your question.

12  **Q.**  No worries.  I can ask a better one.  You mentioned

13  before that you had done significant traveling after -- in

14  the fourth quarter of 2017; is that right?

15  **A.**  Yes.

16  **Q.**  Was Mr. Mekerri aware of all that traveling you had done?

17  **A.**  Yes.

18  **Q.**  Okay.  So when you met with Mr. Mekerri in December of

19  2017 to discuss the 360 feedback, did he express to you any

20  of these concerns that we saw from Mr. McKinnon concerning

21  being dismissive about supervision or being lackadaisical

22  toward your time on site?

23  **A.**  No.

24  **Q.**  Did -- did Mr. Mekerri share with you any -- any

25  criticisms or constructive feedback as part of this 360

1  review process?

2  **A.**  Yes.

3  **Q.**  And what do you recall about that?

4  **A.**  I recall that it was generally overall positive.  He

5  complimented me on -- well, it sounded like he was reading

6  from the 360 papers, but he complimented me on my

7  professionalism and said that I was supportive.  As far as

8  constructive feedback, he mentioned that someone had

9  mentioned indecisive or decision-making, and I remember being

10  really surprised by that.

11  **Q.**  And why did that surprise you?

12  **A.**  Because as part of my role, I have to make multiple

13  decisions every single day.  There are decisions that have to

14  be made by a pathologist or someone who is qualified at the

15  regulatory level that I served under.

16  **Q.**  Now, with respect to the types of decisions that you had

17  to make in your role, did it sometimes require some time for

18  you to make those decisions?

19  **A.**  Yes.  I always wanted to make sure that my decisions were

20  compliant and I wanted to make sure that -- sometimes it

21  took, you know, research.  I had to do a literature review to

22  make sure that I had the latest information depending on, you

23  know, what the question was.  So I tried to be as timely as I

24  could, but I wanted to be accurate and compliant as well.

25  **Q.**  I'm going to show you agreed Exhibit 373.  And you see

1  here this is an email from Poluru Reddy?

2  **A.**  Yes.

3  **Q.**  How is my pronunciation?

4  **A.**  Poluru, or you can just say Dr. Reddy.

5  **Q.**  Okay.  And who is Dr. Reddy?

6  **A.**  Dr. Reddy is one of the candidates I hired in 2017 to act

7  as our director of our molecular laboratory.  This had

8  previously been a compliance gap because you need an

9  individual who was at the doctoral level to serve in this

10  role, and they need to have specific certification in

11  molecular.

12  **Q.**  And I think I heard you say earlier this morning that

13  part of this 360 meeting we've been discussing in

14  December 2017 concerned an organizational change; is that

15  right?

16  **A.**  Yes.

17  **Q.**  And did that change involve Dr. Reddy?

18  **A.**  Yes.

19  **Q.**  And what -- what was that change?

20  **A.**  We talked about having Dr. Reddy serve as the interim CAP

21  inspector for the US laboratory because of all the challenges

22  we were having in recruiting for that position.  He worked at

23  that location, was on site daily, and had significant

24  experience performing CAP inspections himself.  He also had a

25  significant amount of clinical chemistry experience, and I

 1   believe, also, was trained in that area, in toxicology.

 2   **Q.**  And had you proposed that Dr. Reddy fulfill that role?

 3   **A.**  Yes, on an interim basis.

 4   **Q.**  And why was it just interim?

 5   **A.**  There were still certain areas of the laboratory that he

 6   couldn't cover and we were still recruiting for.

 7   **Q.**  I'm going to show you now Joint Exhibit 375.  And the top

 8   of the page indicates this is an email from Lorraine

 9   McNamara.  Can you see that?

10   **A.**  Yes.

11   **Q.**  Can you tell the jury who Lorraine McNamara is?

12   **A.**  Lorraine was the director of the Belgium laboratory and

13   she reported directly to me.

14   **Q.**  And can you --

15   **A.**  At this time, she also was acting as a director for the

16   US lab supervisors, because that role had been vacated in the

17   spring of 2017.

18   **Q.**  I'd like to start with the first bullet of Ms. McNamara

19   feedback here.

20           And you see in the first sentence, she ends, "I

21   have to say, with Lisa, I believe she has brought a level of

22   quality to the lab that we have never had before."

23           Do you see that?

24   **A.**  Yes.

25   **Q.**  And then in the next sentence, she concludes that, "We as

1    a global lab are the most compliant we have ever been."

2         Do you see that?

3    **A.**  Yes.

4    **Q.**  Okay.  In the context of a lab environment, can you

5    explain to the jury what it means to be compliant?

6    **A.**  There are thousands of regulatory standards that we need

7    to follow for CAP, CLIA, and any states, like New York.  So

8    to be compliant is to ensure that you are following those

9    regulations and -- yeah.

10   **Q.**  Okay.  And with respect to being compliant, were there

11   also periodic inspections of the labs in order to test its

12   compliance?

13   **A.**  Yes.  So the College of American Pathologists performed

14   inspections every two years.  State of New York was a little

15   bit inconsistent.  I think it was because of staffing issues

16   and resources.  So that, I think, was supposed to be every

17   two years, but it a lot of times ended up being, like, every

18   three or four.

19   **Q.**  And when you say that the State of New York was

20   inconsistent, do you mean that their inspectors were

21   inconsistent in terms of how frequently they would come out?

22   **A.**  Yes.

23   **Q.**  Okay.  And as a general matter, when you served as

24   executive director at PPD, how did it fair in these

25   inspections?

1   **A.**   We did very well.  I was very pleased in 2017 because we

2   had multiple global inspections, and we did very well, and we

3   were complimented by the inspectors about the high quality of

4   all of our labs that were inspected.

5   **Q.**   So -- so after receiving the 360 feedback from

6   Mr. Mekerri, did you have any impression that he was dis- --

7   that he was dissatisfied with your job performance in any

8   way?

9   **A.**   No.

10  **Q.**   But was there anything about that conversation that did

11  concern you?

12  **A.**   Yes.

13  **Q.**   And what was that?

14  **A.**   This is when he brought up making -- wanting to make some

15  changes to my role going forward in 2018 to make it more

16  visible, in particular, in front of clients, large

17  pharmaceutical clients.  And he mentioned giving formal

18  PowerPoint presentations and I had concerns about that.

19  **Q.**   And I think you shared with us yesterday that those

20  concerns related to your health; is that right?

21  **A.**   Yes, my conditions.

22  **Q.**   Okay.  So did you at some point -- actually, strike that.

23           During the -- during the call -- I'm sorry.  During

24  the 360 meeting with Mr. Mekerri, did you say anything then

25  in response to his suggestion about changing your role?

**A.**   Yes.  I told them -- I told him that those types of presentations make me anxious and he tried to reassure me and be very encouraging.  He's like, "I've seen your CV.  It's super impressive.  I've seen you present slides.  You do an excellent job" and yeah, just trying to reassure me and encourage me that there's no reason to be anxious.

**Q.**   Did you at some point make the decision to tell Mr. Mekerri about your health condition?

**A.**   Yes.

**Q.**   And why was it you decided to do so?

**A.**   Because of that discussion, I -- I feared that I might have to give frequent presentations and be highly visible in front of clients, which is not something I had done up until that point.

**Q.**   And what, if any, concern did you have as to how that would impact you if you had to do so?

**A.**   I knew it would trigger panic attacks.

**Q.**   I'm going to show you Joint Exhibit 366.  So there's two emails on this page.  I want to direct you to the email at the bottom.  And so is this an email from you to Mr. Mekerri on January 11, 2018?

**A.**   Yes.

**Q.**   Okay.  Just looking at the first sentence of your note, you say, "It was great catching back up with you this week after the holidays."  Do you see that?

1   **A.**   Yes.

2   **Q.**   Okay.  Had there been any mention in that -- in that

3   meeting of these potential changes to your role?

4   **A.**   I don't recall.

5   **Q.**   Okay.  But can you tell the jury why it was that you sent

6   this email to Mr. Mekerri?

7   **A.**   It was based on him suggesting that he wanted to make

8   changes to my role to make it more visible and give formal

9   presentations in front of clients, both internal and

10   external; and they wanted to put scientific expertise out in

11   front of clients.  That was not something that I had been

12   doing as part of my job up until that point.

13   **Q.**   Okay.  Looking at the -- that's not helpful.

14          Looking at the last sentence of the first

15   paragraph, you write, "This is very difficult for me to

16   discuss, as it's not something I openly share with others."

17          Do you see that?

18   **A.**   Yes.

19   **Q.**   What did you mean by that?

20   **A.**   There is a stigma in our society for people who have

21   mental illness, and I did not want to be viewed as defective.

22   I did not want to risk career advancement opportunities or

23   lose my job because of it.

24   **Q.**   Looking at the second paragraph, the one that begins, "I

25   have a generalized anxiety disorder," if I can turn your

1    attention to the last sentence, you write, "I've received

2    treatment in the past and continue to take medication as

3    needed when my panic attacks become severe."

4              Do you see that?

5    **A.**   Yes.

6    **Q.**   Was that an accurate statement?

7    **A.**   Yes.

8    **Q.**   And how long had it been since you had last actually been

9    involved in therapy, or some other kind of formal treatment?

10   **A.**   I had a doctor in Kansas City who prescribed Valium and

11   he knew that I was accepting this job in Highland Heights;

12   and so he gave me enough refills, because he knew that I

13   didn't need to take it frequently.  And so I had a

14   prescription with refills to take as needed, but like I said,

15   it was rare that I ever had to present and take Valium.

16   **Q.**   And what -- when was it you had moved from

17   Highland Heights to Massachusetts?

18   **A.**   It was in August of 2015.

19   **Q.**   Okay.  And in the time period between August -- I'm

20   sorry.  Did you say August of 2015?

21   **A.**   Yes.

22   **Q.**   Okay.  When was it that you had moved to Massachusetts?

23   **A.**   It was the end of June 2017.

24   **Q.**   Okay.  In between June of 2017 and the date of this email

25   on January 11, 2018, had you needed to seek any medical

1    treatment related to your health condition?

2    **A.** No.

3    **Q.** Looking at the next paragraph, you begin, "As you've

4    seen, my medical condition has not prevented me from

5    accomplishing the essential functions of my job."

6         Do you see that?

7    **A.** Yes.

8    **Q.** And was that an accurate statement as of January 2018?

9    **A.** Yes.

10   **Q.** Looking at the -- the next paragraph, you begin, "I am,

11   of course, open to discussing whatever ideas you have for my

12   role."

13        Do you see that?

14   **A.** Yes.

15   **Q.** As of January 2018, what, if any, expectation did you

16   have as to a discussion with Mr. Mekerri concerning his idea

17   for changing your role?

18   **A.** He had mentioned that we would have a discussion more

19   after the holiday -- after the holidays.  This was -- yeah,

20   right -- right before Christmas.

21   **Q.** Okay.  And did that -- had that conversation taken place

22   as of January 11th?

23   **A.** No, it had not.

24   **Q.** So at some point, did you -- well, strike that.

25        Besides your email we just looked at to Mr. Mekerri

**JA317**

 1    concerning your health condition, did you subsequently

 2    provide PPD any additional information concerning your health

 3    condition?

 4    **A.**   Yes.  Chad St. John, who is our HR director, gave me some

 5    forms for me to fill out and for my doctor to fill out, and

 6    so I submitted my forms back to HR.

 7    **Q.**   Okay.  So you said part of those forms had to be

 8    completed by a doctor; is that right?

 9    **A.**   Yes.

10    **Q.**   And did you have to do anything in order to get a doctor

11    to fill out those forms?

12    **A.**   I had to find a doctor that had an opening, because it

13    was very hard to find someone who had an opening after we

14    moved.  And so I made an appointment with a doctor once I

15    found an opening.

16    **Q.**   Thank you.  And who was that doctor?

17    **A.**   That was Dr. Kessimian.

18    **Q.**   Okay.  And do you recall how you found Dr. Kessimian?

19    **A.**   First, I looked at my insurance policy and called all the

20    doctors that were covered and none of them had openings.

21    And -- and I believe I found Dr. Kessimian through an

22    Internet search of psychiatrists in that area.

23    **Q.**   And was she actually located in Massachusetts?

24    **A.**   No.  She was located in Providence, Rhode Island, which

25    is where Maya went to school.

1    **Q.**  Okay.  And I'm not sure we covered this yesterday.

2    Where -- where was your actual home located in Massachusetts?

3    **A.**  It was located in Dighton, Massachusetts, which is about,

4    I think, a 30-minute drive to Providence.

5    **Q.**  I'm going to show you Joint Exhibit Number 18.  And we're

6    looking at the first page of Joint Exhibit 18.

7            Do you recognize what this is?

8    **A.**  Yes.

9    **Q.**  And what is it?

10   **A.**  I believe this was my first appointment, so notes from my

11   doctor from my first appointment.

12   **Q.**  Okay.  And in the first -- actually, strike that.

13           So the top of the page reflects January 22, 2018.

14   Is that consistent with your recollection in terms of when

15   this first appointment with Dr. K took place?

16   **A.**  Yes.  That was the earliest I could get an appointment.

17   **Q.**  Okay.  That's all right.  I think I just referred to

18   Dr. Kessimian as Dr. K.  If I do that, will you know who I'm

19   referring to?

20   **A.**  Yes.

21   **Q.**  Okay.  In the first line of the notes here, you'll see it

22   begins "presenting complaint."

23           Do you see that?

24   **A.**  Yes.

25   **Q.**  Okay.  And it references an end-of-the-year review.  Do

1    you see that?

2    **A.** Yes.

3    **Q.** Do you know what that's referring to?

4    **A.** Yes. I -- I told Dr. K that I was supposed to have an

5    end-of-the-year review and that my supervisor at the time had

6    suggested changes to my role that I knew would cause panic

7    attacks and implicate my disability.

8    **Q.** And looking at the substance here of Dr. K's note -- let

9    me highlight -- the beginning with the highlighted section

10    there, she writes "She is able to fulfill her job

11    responsibilities within these limitations, but recently she

12    was given this feedback and her worries began to spiral."

13          Do you see that?

14    **A.** Yes.

15    **Q.** Okay. And was that accurate?

16    **A.** Yes.

17    **Q.** And in terms of the feedback that's being referenced

18    there, do you see a few lines above, she notes that at the

19    end-of-the-year review, you were encouraged to be more

20    visible and do more public speaking. Do you see that?

21    **A.** Yes.

22    **Q.** Okay. And is that what you were referring to earlier in

23    terms of what Mr. Mekerri had expressed to you?

24    **A.** Yes.

25    **Q.** Just one more line here. Further below, she writes, "She

1    is able to fulfill her job" -- I'm sorry.  I already covered

2    that one.  We don't need to do again.

3            Let me show you page 2 here.  So here's the second

4    page of Dr. K's notes from this visit.  And you see there, in

5    the section for "Safety," Dr. K writes, "Denies current or

6    past suicidal ideation."

7            Do you see that?

8    **A.**  Yes.

9    **Q.**  Okay.  Was that true as of January 22, 2018?

10   **A.**  Yes.

11   **Q.**  Is it still true today?

12   **A.**  No.

13   **Q.**  Turn to page 3.  I've highlighted there the paragraph

14   beginning "Psychiatric ROS."

15           Do you see that?

16   **A.**  Yes.

17   **Q.**  And it references "denies depression"?  Do you see that?

18   **A.**  Yes.

19   **Q.**  Were you depressed as of January 22, 2018?

20   **A.**  No.

21   **Q.**  Has that changed since then?

22   **A.**  Yes.

23   **Q.**  So you mentioned that one of the reasons for your visit

24   to Dr. K was to get some forms completed; is that right?

25   **A.**  Yes.

1    **Q.**   Okay.  And to your knowledge, did Dr. K prepare those

2    forms?

3    **A.**   Yes.

4    **Q.**   I'm showing you here Joint Exhibit 47.  And can you tell

5    the jury what this is?

6    **A.**   This is an email from my doctor to Chad St. John.

7    **Q.**   Okay.  And do you see Dr. K in her note to Mr. St. John

8    writes, "Per our conversation, the forms are attached"?

9    **A.**   Yes.

10   **Q.**   Okay.  Let's look at the first form that's attached here.

11   Do you see it's captioned "request for accommodation" and

12   then in parentheses "to be completed by a healthcare

13   provider"?

14   **A.**   Yes.

15   **Q.**   Okay.  Where did this form come from?

16   **A.**   From PPD, specifically from Chad.

17   **Q.**   Okay.  And looking at the information contained in this

18   form from Dr. K, you'll see here Question 5,

19   "request information concerning conditions or limitations

20   interfering with your ability to perform the essential

21   functions of your job."

22          Do you see that?

23   **A.**   Yes.

24   **Q.**   Okay.  And in the second sentence, Dr. K writes, "This

25   disability significantly interferes with Lisa's ability to

 1   perform major life activities, such as thinking,

 2   concentrating, communicating and working."

 3          Do you see that?

 4   **A.**  Yes.

 5   **Q.**  Okay.  And it goes on to say "Lisa is most effective in

 6   social situations and when she is required to speak in front

 7   of others."

 8          Do you see that?

 9   **A.**  Yes.

10   **Q.**  And then it goes on to note that you reported that you

11   had historically fulfilled the essential functions of your

12   job without accommodation; is that right?

13   **A.**  Yes.

14   **Q.**  Okay.  But that you frequently suffered from anxiety and

15   other somatic symptoms triggered by social interactions and

16   public speaking incident to your job.  Do you see that?

17   **A.**  Yes.

18   **Q.**  Okay.  Was all that true?

19   **A.**  Absolutely.

20   **Q.**  Okay.  And then it goes on, "Lisa's supervisor recently

21   identified potential changes to her role involving more

22   public speaking and social interactions."

23          Do you see that?

24   **A.**  Yes.

25   **Q.**  Does that -- does that accurately reflect what you had

1    told Dr. Kessimian in January of 2018?

2    **A.**  Yes.

3    **Q.**  And was it true?

4    **A.**  Yes.

5    **Q.**  Looking here at the third page, you see here Question

6    Number 7.  I've highlighted the start.  It asks, "If the

7    employee cannot perform the essential job functions of his or

8    her job, or access a benefit of employment, what

9    accommodations would you recommend which could allow the

10    employee to better perform his or her job functions?"

11          Do you see that question?

12    **A.**  Yes.

13    **Q.**  Okay.  And you see Dr. K recommended that any social

14    interaction or public speaking incident to your role be

15    minimized to the extent possible.  Do you see that?

16    **A.**  Yes.

17    **Q.**  Okay.  As of January 2018, were you looking to

18    fundamentally change your job at PPD?

19    **A.**  Not at all.  I was extremely happy.  I was hoping I

20    could, you know, stay with the company until retirement.

21    **Q.**  Were you looking to be excused from doing the things that

22    you did at PPD on a day-to-day basis?

23    **A.**  No.

24    **Q.**  And now looking at the next paragraph, you see here Dr. K

25    writes, "To the extent that social interactions and/or public

 1   speaking is deemed necessary for Lisa's job, I recommend that

 2   a plan be developed for these activities in consultation with

 3   me or another qualified healthcare provider."

 4          Do you see that?

 5   **A.**  Yes.

 6   **Q.**  Okay.  As of January 2018, was it -- was it in any way

 7   helpful to -- to know or have a sort of plan in terms of when

 8   these activities were going to be coming up?

 9   **A.**  Can you repeat the question?

10   **Q.**  Sure.  No worries.

11          Was having such a plan something that you thought

12   would be helpful for you in dealing with the impact of your

13   health condition?

14   **A.**  Yes, because with my condition, I have a lot of

15   anticipatory anxiety when I don't know what the plan is going

16   to be.  And in this case, I didn't know what Hacene had in

17   mind as far as changes to my role.

18   **Q.**  And would have having -- would have having additional

19   information been helpful for you in terms of managing your

20   anxiety?

21   **A.**  Yes.

22   **Q.**  I'm now going to show you Joint Exhibit 201.  And

23   starting here at the top, is this an email from Mr. St. John

24   to you?

25   **A.**  Yes.

1    **Q.**  Okay.  I actually want to start with the message below

2    that -- actually a couple messages below.  So you'll see, at

3    the bottom of the first page here of the exhibit, there's an

4    email from Mr. St. John to you.  Do you see that?

5    **A.**  Yes.

6    **Q.**  Okay.  So I'm just going to turn the page here so we can

7    see that, the bottom of that email here.  So here's the

8    second page.  And do you see Mr. St. John asked, "What are

9    the specific expectations that Hacene shared with you for

10   2018 that you believe that you cannot or limitedly perform?"

11   Do you see that?

12   **A.**  Yes.

13   **Q.**  Okay.  And as of that point in time, the date of this

14   email, were you able to answer that question?

15   **A.**  No.  I told Chad that he had not given me any specific

16   expectations.  He had just talked in general terms, and Chad

17   seemed very surprised by that.

18   **Q.**  But just to back up half a step, so between the 360

19   meeting in December of 2017 and this email exchange with

20   Mr. St. John, had Mr. Mekerri provided you any additional

21   detail concerning these ideas for potentially changing your

22   role?

23   **A.**  No.

24   **Q.**  Now, I'll flip back to the first page of the exhibit

25   here.  And do you see here your response to Mr. St. John's

1     email which you sent on February 4, 2018?

2     **A.**   Yes.

3     **Q.**   Okay.  And just looking at the first paragraph here of

4     what you wrote, I'm not going to take the time to read it

5     into the record, but is all that information accurate?

6     **A.**   Yes.

7     **Q.**   So your email is February 4, 2018.  Subsequent to this

8     email, do you recall receiving any information from

9     Mr. Mekerri concerning the changes he was considering making

10    to your role?

11    **A.**   No.

12    **Q.**   Okay.  Did he provide any response in terms of any sort

13    of inquiry made in that respect?

14    **A.**   I don't believe so.  I don't know of all the emails that

15    existed.

16    **Q.**   Sure.  Let me ask you a more specific question.  Do you

17    recall Mr. Mekerri sharing with you a list of buckets of

18    expected future responsibilities?

19    **A.**   Yes.

20    **Q.**   Okay.  And do you recall when that was provided?

21    **A.**   I don't recall the exact date, but it was sometime in

22    February 2018, I believe.

23    **Q.**   So I'm going to show you Joint Exhibit 350.  And do you

24    recognize this email?

25    **A.**   Yes.

1    **Q.**  Okay.  And can you tell the jury what it is?

2    **A.**  These are the -- the buckets, the five buckets that he

3    created.  And this -- this was, I believe, in response to

4    Chad's request that he provide more specifics for my doctor

5    to suggest some accommodations.

6    **Q.**  Okay.  Now, these buckets, did -- were these sort of a

7    summary of what your role was as of February 2018 at PPD?

8    **A.**  No.

9    **Q.**  Okay.  Were any of these buckets reflective of things

10   that you had sometimes done while at PPD?

11   **A.**  Yes.  There are some things in here that were regular

12   parts of my day or week that I did regularly without issue.

13   There were some things that I did rarely, like present a

14   couple of slides, I think, during two town halls.

15            I had never been on a client site meeting, but I

16   had been available by phone to answer any technical questions

17   a few times.  A lot of times, they would ask for a lab

18   representative who had expertise in the area of testing that

19   the client was interested in to be present by Webex just to

20   answer any of their technical questions that the sales team

21   couldn't answer.

22   **Q.**  Looking at the last sentence of Mr. Mekerri's email, he

23   writes -- or actually the last sentence of the first

24   paragraph, you see there, it begins, "As you already know"?

25   **A.**  Yes.

1   **Q.**   Okay.  He writes, "The percentage/scope of interactions,

2   internal or external, is increasing in 2018 due to the needs

3   of the business and our aggressive commercial goals."

4        Do you see that?

5   **A.**   Yes.

6   **Q.**   Okay.  So looking at the first bucket, there are --

7   there's a -- there's a black bullet and then two white

8   bullets.  Do you see those?

9   **A.**   Yes.

10   **Q.**   And you see the second bullet there concerns frequency?

11   **A.**   Yes.

12   **Q.**   Okay.  And in terms of frequency of that item, he writes

13   biweekly, monthly, and/or quarterly.  Do you see that?

14   **A.**   Yes.

15   **Q.**   Okay.  What -- what had been the frequency of your

16   participation in SLT presentations, town hall, and COO/EVP

17   meetings as of February 2018?

18   **A.**   I presented, I think, two to three slides on two or three

19   occasions at an SLT meeting, which I presented two times

20   at -- at two of our town halls just a couple of slides.  I --

21   I prepared some slides for a COO visit, but we ran out of

22   time for me to present my slides, so I didn't actually

23   present at that meeting.

24   **Q.**   Okay.  And then looking at the -- at the second bullet,

25   it says "client bid offense, issue resolution calls,

1    HH/client site meetings, phone."  Do you see that?

2    **A.**  Yes.

3    **Q.**  Okay.  Does -- does that all describe one activity, or is

4    that a whole bunch of activities lumped together?

5    **A.**  That's a whole bunch of activities lumped together.

6    **Q.**  Okay.  So let's just sort of separate them out a little

7    bit, for the jury's sake, so they can understand what we're

8    talking about.

9              Client bid defense.  Do you know what that is?

10   **A.**  That's typically when the sales team would go on when

11   they were trying to get studies awarded to PPD.

12   **Q.**  Okay.

13   **A.**  And they would give presentations about the company and

14   our Global Central laboratories and capabilities and things

15   like that.

16   **Q.**  And as of February 6, 2018, had you ever been involved in

17   client bid defense before?

18   **A.**  Not in person.  I was on the phone, I think, one or two

19   times to answer any technical questions.  I don't believe --

20   I know on one occasion there were no technical questions that

21   came up for me; and possibly on one, I answered one -- one or

22   two questions.

23   **Q.**  Did that activity cause you any panic attacks?

24   **A.**  No.

25   **Q.**  Was that kind of activity in terms of -- that you just

1    described, was that the type of activity that implicated your

2    health condition?

3    **A.**  No, not when I was just in my office by Webex answering

4    questions.

5    **Q.**  The next item is issue resolution calls.  Can you tell us

6    what that activity is?

7    **A.**  That was any time a client had an issue with something

8    going on with the Global Central laboratories.  It could have

9    been any of the four laboratories, and we would set up calls

10    with them to discuss the issue, and that was a frequent part

11    of my job.

12    **Q.**  And did that cause you panic attacks?

13    **A.**  No.

14    **Q.**  Next item, HH/client site meetings.  Do you see that?

15    **A.**  Yes.

16    **Q.**  Okay.  Do you know what that refers to?

17    **A.**  It's a little bit confusing.  Most of our site meetings

18    at Highland Heights were just routine audits from clients

19    that our QA department coordinated and usually a lab

20    supervisor would be present.

21    **Q.**  Had you participated in those client site meetings prior

22    to February 6, 2018?

23    **A.**  No, I hadn't.  I was told I did not need to be there.

24    **Q.**  Was that the type of activity that, under some

25    circumstances, might have caused you panic attacks?

```
 1   A.  No, I don't think so.

 2   Q.  Okay.

 3   A.  I mean, yeah, I wouldn't have been giving presentations.

 4   It was just, like, auditors coming in, auditing certain

 5   portions of our lab.

 6   Q.  Mr. Mekerri identified that item here in this -- in this

 7   bucket list.  Did you know whether or not you would be

 8   required to provide presentations as part of that activity

 9   going forward?

10   A.  No.

11   Q.  Were you concerned that you might be?

12   A.  Yes.  Like I said, there were -- it was confusing because

13   there's different types of client site meetings.  It could be

14   just a group of auditors or it could be, like, maybe a new

15   client that we're trying to establish business with, but I

16   had not been involved in those previously.

17   Q.  And then lastly, it identifies "phone."  As of

18   February 2018, were you frequently using the phone?

19   A.  Yes.

20   Q.  Okay.

21   A.  Phone and email.

22   Q.  And was speaking to people on the phone, incident to your

23   job responsibilities, was that something that caused you

24   panic attacks?

25   A.  No.
```

1    **Q.**  Okay.  So can you explain for the jury what -- what, if

2    anything, about this bullet caused you concern about

3    Mr. Mekerri's stated goal of making you more visible?

4    **A.**  Just if it involved, like, going to give a formal

5    PowerPoint presentation, speaking, yeah, to large groups of

6    people in a formal presentation.  But it doesn't look like

7    that -- anything in that bucket included that.

8    **Q.**  But then you see in the bullet below, he writes,

9    "Attendees/audience:  up to 50 attendees."  Do you see that?

10    **A.**  Yes.

11    **Q.**  Okay.  Turning to the next -- the next bullet there,

12    "technical sales presentation, internal and external," do you

13    see that?

14    **A.**  Yes.

15    **Q.**  Okay.  And do you have an understanding as to what that

16    bullet refers to?

17    **A.**  I know what the internal ones are, but I never

18    participated in an external technical sales presentation.

19    **Q.**  Tell us about your involvement in internal technical

20    sales presentations as of February 2018.

21    **A.**  I participated in one and, basically, it was just to

22    update the sales team what new assays we might be bringing up

23    in the laboratory.  It was to give them, you know, just an

24    update on, like, our -- anything new and innovative that we

25    were doing.

1    **Q.**  Okay.  And had that been something that you'd had

2    difficulty doing due to your health situation?

3    **A.**  Yes.  I did have to take medication for that.

4    **Q.**  Okay.  And then with respect to the external technical

5    sales presentations, did I hear you right that you'd never

6    been involved with that previously?

7    **A.**  Correct.

8    **Q.**  Okay.  And then the reference to HH/client site meetings

9    in this bullet, do you have an understanding as to what that

10   means?

11   **A.**  Not really.

12   **Q.**  How about the reference to "phone"?  Do you know what

13   that means?

14   **A.**  Not really.  I mean, it was repeated from the bullet

15   above, so I wasn't sure exactly.

16   **Q.**  Okay.  Turning to the next item on the -- on the list,

17   the fourth -- the fourth bucket, so to speak, it says, "For

18   customer visits, lunch/dinner and social interactions may

19   occur," and then in parentheses, "(expected 60 to 80 percent

20   of the time) in order to build business relationships."

21           Do you see that?

22   **A.**  Yes.

23   **Q.**  What's your understanding as to what that refers to?

24   **A.**  My understanding that would be going out to lunch and

25   dinner with clients, which I had -- I don't think I had ever

1    actually done that with actual clients.

2    **Q.**  Did that give you any concern?

3    **A.**  I'm uncomfortable in social situations like that because

4    it's not professional and to my job, and it's challenging

5    with my condition of having social anxiety disorder.  I did

6    not get panic attacks, but I was very uncomfortable and very

7    fatigued afterwards.

8    **Q.**  Okay.  And the last bullet there, you see there ti says

9    "travels up to 30 percent."

10             Do you see that?

11   **A.**  Yes.

12   **Q.**  Okay.  You mentioned earlier that you had -- you traveled

13   extensively in the fourth quarter of 2017.  Do you recall

14   that testimony?

15   **A.**  Yes.

16   **Q.**  Was travel, in general, was that in any way difficult for

17   you because of your disability?

18   **A.**  No.

19   **Q.**  So you received this, this list of buckets from

20   Mr. Mekerri.  Actually, before we do that, let me -- let me

21   point you to the attachment here.  You see at the top of the

22   page, it refers to an attachment.  Do you see that there?

23   **A.**  Yes.

24   **Q.**  Okay.  And let me turn your attention here to the second

25   page of the exhibit.  And does that appear to be a copy of

 1   your job description as of that date?

 2   **A.**   Yes.

 3   **Q.**   Okay.  And prior to the February 2018 email we just

 4   looked at for Mr. Mekerri, had you been familiar with your

 5   job description?

 6   **A.**   Yes.

 7   **Q.**   Okay.  Did this job description accurately describe what

 8   you actually did for PPD?

 9   **A.**   No.  I would say it was very broad, so partly, but it was

10   written so broadly that it could cover multiple different

11   departments for individuals at the ED level.

12   **Q.**   Okay.  And at any time, did you have any discussion with

13   representatives from PPD concerning the broadness of this

14   description?

15   **A.**   Yes.

16   **Q.**   And who did you have that discussion with?

17   **A.**   I had discussions with Chad St. John, possibly also Kathy

18   Dick --

19   **Q.**   Okay.

20   **A.**   -- who worked in the QA department.

21   **Q.**   With respect to your discussion with Mr. St. John,

22   what -- what, if anything, did he share with you about the

23   sort of general nature of this job description?

24   **A.**   He said that there had been an effort, I think, a few

25   years back -- I'm not sure how long ago -- at the corporate

1    level to standardize the job descriptions based on the level,

2    based on the employee's level.

3    **Q.**  And when you say the "employee's level," what do you mean

4    by that?

5    **A.**  So, for example, this is executive director, labs, and so

6    anybody who was at the executive director level working in

7    the labs, regardless of what particular business unit, they

8    have the same job description, was my understanding from

9    Chad.

10    **Q.**  Okay.  So going back to the first page of the exhibit,

11    you could get this email from Mr. Mekerri.  What did you do

12    with it?

13    **A.**  I gave it to my doctor.

14    **Q.**  Why?

15    **A.**  So that she could suggest some potential accommodations.

16    Yeah.  And return it to Chad.

17    **Q.**  Was that something that Chad had asked you to do?

18    **A.**  Yes.

19    **Q.**  I'm going to show you now Joint Exhibit 180.  And can you

20    tell the jury what this is?

21    **A.**  My doctor provided some education about my disorder just

22    to help them understand what it's like for someone who has

23    social anxiety disorder and panic disorder and so she was

24    just trying to be helpful and educate them.  Then she tried

25    to suggest some potential accommodations based on the buckets

1    that were provided.

2    **Q.**   Okay.  As of the date that Dr. Kessimian provided this to

3    PPD, were -- were any of the things that Dr. Kessimian

4    proposed, were any of these things that you believe that you

5    needed in order to continue doing your job?

6    **A.**   No.

7    **Q.**   Did you think that they would be helpful in terms of

8    making it easier to do your job given the fact that you --

9    you had your health condition?

10   **A.**   Yes.

11   **Q.**   Did you ever express to anyone at PPD that you would be

12   unable to perform your job if they didn't do all of the

13   things that Dr. Kessimian proposed?

14   **A.**   No.

15   **Q.**   Now, at some point in time, you received a response from

16   PPD to Dr. Kessimian's proposal; is that right?

17   **A.**   Yes.

18   **Q.**   I'm going to show you Joint Exhibit 182.  And do you see

19   here this is an email from Mr. St. John to you copying

20   Mr. Mekerri on February 26, 2018?  Do you see that?

21   **A.**   Yes.

22   **Q.**   Okay.  And can you tell the jury where you were when you

23   received this?

24   **A.**   I was in the airport.  I was on my way to the

25   Highland Heights lab.

1    **Q.**  And why were you headed to Highland Heights?

2    **A.**  We were having a town hall.  A lot of senior leadership

3    members were coming in.  It was also a visit for me to, I

4    thought, discuss my performance review with Hacene and also

5    to discuss potential accommodations that might be available

6    based on my condition.

7    **Q.**  And you see here in the first paragraph, Mr. St. John

8    writes, "Hacene has confirmed that he is okay to accommodate

9    points 1 and 5" -- I think it was something I said "points 2,

10   3, 4 below" --

11   　　　　THE COURT:  Don't feel bad.  It's a school group.

12   And they had ten minutes to watch court for ten minutes or

13   so, and that's the ten minutes they had.

14   　　　　MR. HANNON:  Understood.

15   BY MR. HANNON:

16   **Q.**  Let me ask the question again since I distracted myself.

17   **A.**  Okay.

18   **Q.**  Mr. St. John writes, "Hacene has confirmed that he okay

19   to accommodate points 1 and 5.  Points 2, 3, 4, below are

20   critical for your level and for growth of the business.

21   Hacene is happy to discuss this further of course to make

22   sure this is understood."

23   　　　　Do you see that?

24   **A.**  Yes.

25   **Q.**  What, if any, expectation did you have concerning having

1    a further discussion after you received this email?

2    **A.**   I thought we were going to have a further discussion once

3    I was on site.

4    **Q.**   And was there a particular day that that further

5    discussion was scheduled for?

6    **A.**   Once I got there, it was scheduled two days later on

7    February 28th.

8    **Q.**   What time of day did the meeting take place?

9    **A.**   I believe it was early afternoon.

10   **Q.**   And do you recall where it was?

11   **A.**   It was in Hacene's office.

12   **Q.**   And who was present?

13   **A.**   Myself, Hacene, and Chad.

14   **Q.**   Tell us how the meeting started.

15   **A.**   I sat down and I opened up my laptop to have the email

16   that Chad had sent me that I received in the airport, and I

17   thought we were going to discuss that.  Chad immediately

18   started the meeting off by proposing two options to me.

19   Suggesting a potential exit package or a temporary consulting

20   role that would last for maybe, like, a month or a couple

21   months.  And he said it would be until they could find

22   somebody who could replace me who had my qualifications.

23            And I was in shock.  I became very emotional.  I

24   replay this meeting over and over, because I'm still in shock

25   by it.  I couldn't believe that they wanted to get rid of me.

1  **Q.**  Let me just stop you there.  Did Mr. St. John indicate to

2  you why it was that they were proposing these two options

3  that you referenced?

4  **A.**  He kept insisting that the recommended accommodations

5  that my doctor provided were restrictions, and I kept, over

6  and over, correcting him, telling him they're not

7  restrictions.  These are just -- you know, we were

8  brainstorming, trying to come up with creative

9  accommodations, given my condition.  And he wouldn't believe

10  me.  He said, no, they're restrictions.  So it was very

11  upsetting to me.

12  **Q.**  Was there any discussion at this meeting as to whether or

13  not you were able to actually continue doing your job?

14  **A.**  Yes.  It was -- well, it was Hacene and Chad's belief

15  that I couldn't because they thought these were all

16  restrictions.  And I -- I, basically, pleaded with them and

17  said, no, this is not accurate.  This is not factual.  There

18  are a lot of things on this list that I do as part of my job

19  routinely without issue.  And I never said that I could not

20  do other things.  I just -- for some tasks such as formal

21  PowerPoint presentations, I had to take Valium.

22  **Q.**  Did you ask Mr. Mekerri and Mr. St. John any -- to

23  provide you any information during the course of this

24  meeting?

25  **A.**  Yes.  I was -- I was crying.  I was scared and I was

1    panicking, and I was pleading with them to -- could -- can we

2    just talk about the tasks, the specific tasks that fell under

3    those buckets that they said they could not accommodate?  And

4    I explained that there were things listed in those buckets

5    that I did every day weekly without any issue, and could we

6    just break out specific tasks in those buckets that they

7    believed I couldn't perform.

8            And they said they could not.  They would not go

9    into further detail.

10   **Q.**  Just to be clear, Dr. Menninger, did they say they could

11   not, or did they say they would not?

12   **A.**  I believe they said they would not.  They said at our

13   level, we don't -- I can't remember the exact wording, but

14   "We won't go into additional detail."

15   **Q.**  You mentioned before that you were scared in this

16   conversation.  Can you explain to the jury why you were

17   scared?

18   **A.**  I -- I'm -- I was the sole financial provider for our

19   family and I had a young child.  And I didn't know how we

20   were going to survive.  I -- my job and my pay from my job

21   paid for everything, our house, my child's school, food.  If

22   that was abruptly just cut off and I was let go, we had no

23   way to survive.

24           And as a mom, I was devastated.  I felt like, "I

25   can't do this to my child."  I was really scared.  I thought

1  we were going to be homeless on the streets and I didn't know

2  what to do.

3  **Q.**  Did you take notes during the course of this meeting?

4  **A.**  No, I did not.  I was in panic and shock.

5  **Q.**  Did you write notes --

6  **A.**  And --

7  **Q.**  I'm sorry.  Go on.  Were you done?

8  **A.**  I was just pleading with Hacene and Chad to have a

9  conversation with me about the specific tasks.  I felt like I

10  was begging for my life, for the survival of my family.  I

11  don't believe I was capable, in that state, taking notes

12  during that meeting.

13  **Q.**  Did you subsequently write down notes from the meeting?

14  **A.**  Yes.  Right after the meeting, I went back to my office,

15  and I wrote down everything I could remember.

16  **Q.**  Okay.  I'm going to show you Joint Exhibit 21.

17          I apologize for the legibility.  It will get better

18  when I zoom in on particular things, but just to orient the

19  jury, do you know what this -- what this exhibit is?

20  **A.**  These are my handwritten notes from a one-on-one call I

21  had with Hacene on January 8th.

22  **Q.**  Okay.  And is this a -- is this a sort of compilation of

23  handwritten notes from various conversations that you had

24  beginning January 8th and continuing thereafter?

25  **A.**  With Hacene?

1   **Q.**  Yes.

2   **A.**  Yes.

3   **Q.**  Okay.  I'm going to turn you to the 21st page of this

4   exhibit and just -- ease of reference here, you see in the

5   bottom right-hand corner this has a number that ends 1162.

6   Do you see that?

7   **A.**  Yes.

8   **Q.**  Okay.  So that's where we are.  And I direct your

9   attention to the top of that page.  The top left corner, can

10  you -- can you read for the jury what that says?

11  **A.**  "My notes right after 2/28 meeting with Chad and Hacene."

12  **Q.**  Okay.  And just in some of the -- some of the handwriting

13  here is a little bit challenging at times.  Can you -- can

14  you read the first paragraph there of what you wrote,

15  beginning --

16  **A.**  I -- I was frantic when I was writing this.  I kept --

17  "consulting/exit package as options (no details) medical

18  leave?  Kept stating that categories are part of the job

19  description.  I stated that I could perform all the

20  responsibilities in the categories, just formal PowerPoint

21  presentations would trigger panic attacks.  Dinners,

22  et cetera, would not."

23            I used a lot of shorthand.  Do you want me to

24  continue?

25  **Q.**  Please.  And the next paragraph.

1  **A.** "They stated that they did not want me to do something

2  that was against what my doctor stated that I could do. And

3  I said that she did not state that I could not do these

4  things, that we wanted to find creative ways to accommodate.

5  And they stated that they did not want me to be medicated

6  for -- and for something to happen."

7  **Q.** And turning to the next paragraph.

8  **A.** "They wanted to speak face to face again before I left,

9  stated that we were just having a discussion and that nothing

10  had been decided. I asked if they would list the specific

11  tasks that are expected within the categories, as an example,

12  PowerPoint presentations, as lumping everything together

13  isn't factual in terms of what I'm able to do without

14  triggering panic attacks.

15  "Hacene stated that he would not want me to affect

16  my health or go against my doctor by having to medicate to

17  get through presentations. They brought up other activities,

18  like large client calls, groups, unplanned and unexpected,

19  all of which I stated would not cause panic attacks if it

20  didn't involve a formal presentation and that I current do

21  and can do without any issue.

22  "Then Hacene said the business is bigger than all

23  of us. I like you as a person. It's not personal." I was

24  crying through this.

25  "I stated that I do not want to leave PPD."

1    **Q.**  I'll turn to the next page.

2    **A.**  "I also stated that there are things I do that other

3    executive directors don't do and vice versa, even though we

4    all have the same job description.

5            "Hacene asked me to consider the options that Chad

6    presented.  They stated they're not trying to force me out

7    and they stated that they did not want to hurt my

8    reputation."

9            Which kind of caught me off guard, because I -- I

10   didn't know what that meant.

11   **Q.**  So you mentioned -- or you just read a moment ago here on

12   this page that "Hacene asked me to consider the options that

13   Chad presented."

14           What was your understanding as to the options they

15   were referring to?

16   **A.**  The exit package and the consulting arrangement.

17   **Q.**  Was staying --

18   **A.**  And the --

19   **Q.**  Was staying in your role an option presented by them

20   during this meeting?

21   **A.**  No.

22   **Q.**  And was there a -- was there a meeting scheduled to -- to

23   have a follow-up conversation?

24   **A.**  We were supposed to have a follow-up conversation the

25   next day.

1    **Q.**  I'm going to show you Joint Exhibit 332.

2              Can you tell the jury what this is, please?

3    **A.**  This is an email that I sent the next day, the morning

4    before we were scheduled to have a follow-up meeting.

5    **Q.**  And can you tell the jury why you sent it?

6    **A.**  I was -- I was terrified.  I was -- I sent it because I

7    was afraid they were trying to force me out of my job.  And

8    I -- I basically pleaded with them, can we just have a

9    conversation about the specific tasks that may or may not

10   implicate my disability and any, like, accommodations or

11   creative solutions that we might be able to come up with to

12   perform those?

13             And I -- I reiterated that I could perform all my

14   job functions with or without accommodation.  It's just more

15   challenging to perform certain tasks.  But even those tasks,

16   I do -- even though I had rarely done them in the past, I did

17   them very well.

18   **Q.**  Tell the jury how they responded.

19   **A.**  Chad sent an email canceling the meeting and I think he

20   said he was going to consider what I wrote.

21   **Q.**  I'm going to show you Joint Exhibit 333.  Was that

22   Mr. St. John's response?

23   **A.**  Yes.

24   **Q.**  Do you recall what the -- what the next email

25   communication was that you received from Mr. St. John?

1    **A.**  I think it was a couple weeks later.

2    **Q.**  I'm going to show you Joint Exhibit No. 176.

3           THE COURT:  If it's not obvious by now, ladies and

4    gentlemen, the numbers of the exhibits have no evidentiary

5    significance, and you shouldn't draw any conclusions from the

6    facts that something's number 1 or 100, there's a blank

7    potentially in the exhibit numbers or it's a bigger number or

8    lower number.  They're numbered mostly for the convenience

9    and various ways that come up in the course of the case that

10   doesn't have any significance.  So don't draw any

11   significance as to why they're in sequence or not in

12   sequence, because there really is no significance.

13          Go ahead, Mr. Hannon.

14          MR. HANNON:  Thank you, Your Honor.

15   BY MR. HANNON:

16   **Q.**  So, Dr. Menninger, was this the response you see -- you

17   received to your March 1st email we just looked at?

18   **A.**  Yes.

19   **Q.**  Okay.  And between March 1st and March 12th, the date of

20   this email, had you received any other response?

21   **A.**  No.

22   **Q.**  You had mentioned before that a lot of your anxiety or at

23   least some of your anxiety is anticipatory.  Did I hear that

24   right?

25   **A.**  That's correct.

1   **Q.** How, if at all, did Mr. St. John's delay in responding

2   impact you?

3   **A.** I started to have severe and frequent panic attacks. I

4   was scared. I was terrified for my family and for our

5   survival. I didn't know what was going on. And -- yeah.

6   Anticipating what they might come back with, I just -- you

7   know, I was just waiting and scared and very symptomatic.

8   **Q.** And in terms of what you were waiting for, did I hear you

9   right that part of what you were waiting for was the

10   additional information you had asked for regarding buckets 2,

11   3, and 4?

12   **A.** Yes.

13   **Q.** And when you received Mr. St. John's response on

14   March 12, 2018, did he give you that information?

15   **A.** No.

16   **Q.** Let's look at Mr. St. John's email a little bit closer

17   here. So in the second -- in the second paragraph, he

18   begins, "I thought it would be helpful to attach a copy of

19   your job description above for your reference."

20         Do you see that?

21   **A.** Yes.

22   **Q.** Okay. Was that in any way responsive to the information

23   you had asked Mr. St. John to provide?

24   **A.** Not at all.

25   **Q.** Why not?

1   **A.**   Because I had asked about breaking out the specific tasks

2   in those buckets that we were discussing during the meeting.

3   That was not part of my job description.  Those were not on

4   my job description.

5   **Q.**   And then you see Mr. St. John concludes, "Please take

6   another look at the job description, discuss it with your

7   healthcare provider, and let us know if there are other

8   accommodations that would allow you to perform the essential

9   functions of your job as outlined above."

10          Do you see that?

11  **A.**   Yes.

12  **Q.**   Was that in any way helpful to you?

13  **A.**   I was extremely distressed because they implied that I

14  couldn't perform the essential functions of my job, when I

15  never said -- I never said that.  I -- in fact, I said the

16  opposite and always have been able to perform the essential

17  functions of my job.

18          Yeah, this email, it just made me -- it made me

19  feel worse.  It made me feel like they were trying to force

20  me out.

21  **Q.**   Did you respond back to Mr. St. John?

22  **A.**   Yes.

23  **Q.**   I'm going to show you Joint Exhibit 141.  And just -- let

24  me scroll to the second page here.  And so on the bottom of

25  the second page here, is this the email from Mr. St. John we

1    were just looking at?

2    **A.**  Yes.

3    **Q.**  Okay.  And then if we scroll back, does this reflect your

4    response?

5    **A.**  Yes.

6    **Q.**  Okay.  And looking at the section here I've just

7    highlighted in the second paragraph, you write, "As I've

8    stated previously, I am capable of performing all of my

9    responsibilities with or without accommodation.  There are,

10   however, certain types of tasks (e.g., formal group

11   presentations) that are challenging due to my disability and

12   I'd ask that you consider possible reasonable accommodations

13   with respect to those tasks."

14           Do you see that?

15   **A.**  Yes.

16   **Q.**  The comment "as I've stated previously," what were the

17   previous occasions you were referring to?

18   **A.**  During the meeting and also the previous email I sent

19   after the meeting.

20   **Q.**  As of this date, had you ever communicated to anyone at

21   PPD that you were incapable of performing your

22   responsibilities at PPD?

23   **A.**  No.

24   **Q.**  Turning to the next paragraph, which I'll highlight here,

25   and then looking at the second sentence there, you write, "In

1     my last email to you on March 1st, I noted that those

2     categories are very broad and asked that you and/or Hacene

3     identify the specific tasks that might fall within those

4     categories.  As I explained in my March 1st email, that

5     information is necessary in order to have a productive

6     dialogue regarding which specific tasks implicate my

7     disability and what reasonable accommodations may be

8     available with respect to those tasks."

9            Do you see that?

10    **A.**  Yes.

11    **Q.**  As of March 24, 2018, had that information been provided

12    by PPD?

13    **A.**  No.

14    **Q.**  Turning to the next paragraph, it begins, "In any event,

15    based on my one-to-one with Hacene this past week, it does

16    not appear that there are any activities or events in the

17    near future that would implicate my disability.  Given this,

18    and how extremely busy we all are, it might make sense to

19    table this discussion until a particular task arises.

20    Dealing with these issues in context, I think, might make

21    this whole issue seem less daunting and help us all engage in

22    a more meaningful dialogue."

23           Do you see that?

24    **A.**  Yes.

25    **Q.**  Why did you write that?

 1   **A.**  I thought that they wouldn't continue to keep targeting

 2   me.  I thought that my job wouldn't be at risk, but I just

 3   wanted the targeting to stop.

 4   **Q.**  We'll talk about the targeting in a moment; but, first,

 5   if I could direct you back to the bottom of the first page,

 6   where you mentioned "it does not appear that there are any

 7   activities or events in the near future that would implicate

 8   my disability."

 9        Do you see that?

10   **A.**  Yes.

11   **Q.**  Was that accurate as of March 24, 2018?

12   **A.**  Yes.

13   **Q.**  So between December of 2017, when Mr. Mekerri raises this

14   suggestion of -- of new responsibilities, and March of --

15   March 24, 2018, had that actually happened?

16   **A.**  No.  When I was on site, he asked me if I could prepare

17   some slides for him to present, which I did.  He -- he didn't

18   end up presenting them.  My supervisors volunteered to

19   present them.  But -- yeah.  That was it.

20   **Q.**  You mentioned feeling targeted, and I want to back up to

21   that.  Do you -- do you have a sense of when it was that

22   you -- you first began to feel like you were being targeted

23   by PPD?

24   **A.**  It was right after that meeting on March 28th.

25   **Q.**  Did you say March or February 28th?

**A.**   February 28th.  Sorry.

**Q.**   And was there anything that happened shortly after that meeting that contributed to your belief that you were being targeted?

**A.**   Yes.  Well, first, Chad, when he brought up, like, a potential consulting or a temporary consulting role, he mentioned, "Of course, we wouldn't do that until we had somebody that could replace you."

Then a couple days later, I received a text message from my direct report, Dr. Reddy, and he said in -- they made offers to two doctoral candidates, two pathologists, essentially.

And I -- I was shocked.  I thought they are moving extremely fast, trying to get me out and replace me.  I mean, the fact that they immediately made an offer to two pathologists, and it took all of 2017 for us to try to recruit candidates for positions that we had open, made me feel very threatened.

**Q.**   I'm going to show you Joint Exhibit 41.  Do you recognize this?

**A.**   Yes.

**Q.**   Tell the jury what it is.

**A.**   This is the text message that I received from Dr. Reddy when I was in the airport going home.

**Q.**   And her text messages, it references a consensus meeting.

1    Do you see that?

2    **A.**  Yes.

3    **Q.**  Tell the jury what a consensus meeting is in this

4    context.

5    **A.**  A consensus meeting is usually a group of senior leaders

6    in the lab that discuss a potential candidate who we are

7    looking to hire at a high level.  And everybody interviews

8    that candidate, and then they provide rankings and feedback

9    about whether they feel that's a good candidate to hire.

10   **Q.**  And prior to disclosing your health condition to PPD,

11   were you -- were you typically involved in consensus meetings

12   for individuals like -- like the candidates referenced here?

13   **A.**  Yes, absolutely.  I mean, especially if it was somebody

14   who was supposed to report directly to me.  I did not get

15   involved in meetings at the lower level, at the bench tech

16   level.  The supervisors and -- usually the supervisors got

17   involved in those.

18          But at this level, I mean, this was one of the

19   positions -- or these were positions that I was trying to

20   recruit for all of 2017 and I was just completely shut out.

21   I didn't find out -- no one told me anything.  I find out

22   through a text from my direct report, and I was just shocked

23   by how fast they were moving.

24          MR. HANNON:  Your Honor, I'm about to go to another

25   section, if you want to take our morning break now.

```
 1              THE COURT:  Sure.  All right.

 2              Ladies and gentlemen, we'll take the morning break

 3      now.

 4              All rise for the jury.

 5              (Jury not present.)

 6              THE COURT:  We stand in recess.  We'll resume at

 7      11:20.

 8              How much longer do you think you'll have on direct?

 9              MR. HANNON:  Probably about another hour, would be

10      my best guess.

11              THE COURT:  So probably finish a little before

12      one o'clock?

13              MR. HANNON:  Yeah.

14              THE COURT:  Okay.  I take it you'll be more than

15      whatever time is left?

16              MS. MANDEL:  On cross?  Yes.

17              THE COURT:  Okay.

18              (Court in recess at 11:06 a.m.

19              and reconvened at 11:21 a.m.)

20              THE COURT:  You can go get the jury.

21              (Pause in proceedings.)

22              (Jury present.)

23              THE COURT:  Go ahead, Mr. Hannon.

24              MR. HANNON:  Thank you, Your Honor.

25
```

1    BY MR. HANNON:

2    **Q.**  Dr. Menninger, what was your relationship like with

3    Mr. Mekerri after that February 28, 2018, meeting?

4    **A.**  He was tough and accusatory, very cold, disrespectful,

5    did not trust me or appear to have trust in me.  It was scary

6    to me because it was completely opposite from our previous

7    relationship.

8    **Q.**  And could you describe for the jury what your

9    relationship with Mr. Mekerri had been like before you

10   disclosed your disability?

11   **A.**  Yes.  When Mr. Mekerri was hired, we were both somewhat

12   new, like within the same year being hired.  And so we

13   treated each other more like colleagues and he was very warm

14   and compassionate.  When we'd talk about our families, he'd

15   ask about Maya, my child.

16          He would have me, like, proofread emails that he

17   was going to send to others in the company, make sure his

18   grammar was correct or that it made sense.  He'd ask for my

19   medical advice, you know, just very warm and friendly.  And I

20   really -- I really liked him as a boss.  I -- it was nice to

21   have someone that I felt like I could collaborate with as we

22   worked toward our goals.  And that changed drastically after

23   that February 28th meeting.

24   **Q.**  I'm going to show you Joint Exhibit Number 49.  And you

25   see here this is an email from Mr. Mekerri to Mr. St. John on

1    March 29, 2018; is that right?

2    **A.**  Yes.

3    **Q.**  Okay.  And the subject is "1:1 Lisa."  Do you see that?

4    **A.**  Yes.

5    **Q.**  And before getting into the opening paragraph, I want to

6    look at the second paragraph here.  Do you see the sentence

7    that begins, "Prior to that 1:1, the latest conversation was

8    on site the week of February 26th."

9           Do you see that?

10   **A.**  Yes.

11   **Q.**  And then he concludes that paragraph writing, "No other

12   conversation took place from February 28th to March 26th."

13          Do you see that?

14   **A.**  Yes.

15   **Q.**  Is that consistent with your recollection that there was

16   a period of time where you and Mr. Mekerri didn't talk?

17   **A.**  Yes.

18   **Q.**  And now, looking at the first paragraph, he references

19   the content of his one-on-one with you.  Do you see that?

20   Let me help you out.

21   **A.**  Yes.

22   **Q.**  Not a trick question.  He purports to tell Mr. St. John

23   what he had spoken with you during the one-to-one.  Do you

24   see that?

25   **A.**  Yes.

1  **Q.** Okay. And so the first thing he items is structure

2  changes. Do you see that?

3  **A.** Yes.

4  **Q.** Do you know what that refers to?

5  **A.** I believe that was when he was making me aware of

6  bringing on Noreen -- and I'm sorry, I can't pronounce her

7  last name -- but she was essentially hired to replace the

8  associate director who had left back in the spring of the

9  previous year. I was completely left out of that decision,

10 so this was to replace one of my previous direct reports.

11 **Q.** Okay. And the person who replaced your previous direct

12 report, her name was Noreen?

13 **A.** Yes.

14 **Q.** And when she was hired, did -- did she continue to report

15 to you?

16 **A.** No. They made -- the reporting structure was that she

17 reported directly to Hacene, with a dotted line to me.

18 **Q.** And then there's a reference here to a pathologist. Do

19 you have an understanding as to who that refers to?

20 **A.** I believe that was Brent Mann, someone who I had

21 previously screened by phone and determined did not have the

22 necessary qualifications, expertise to invite on site for an

23 interview.

24 **Q.** And had you been involved in Mr. Mann's -- Director

25 Mann's interview?

1    **A.**  No.  I was not invited or asked, which was contrary to

2    what I -- what I discussed with Hacene regarding hires,

3    especially hires of people who were going to be part of my

4    business unit and report directly to me.  Of course, I would

5    be involved in making that decision.

6              The other reason is because these are very

7    technical positions, and we were trying to fulfill specific

8    compliance gaps.  This was not Hacene's area of expertise.

9    He came from a background of data management.  So I was very

10   concerned, as were all the supervisors and the director in

11   the Belgium lab.  Honestly, they were furious.

12   **Q.**  Okay.  Well, let's just focus on what you observed for

13   the time being.  So going back to the exhibit, it references

14   laboratory client issues.  Do you see that?

15   **A.**  Yes.

16   **Q.**  Okay.  And prior to 2018 -- actually, strike that.  Let's

17   start here.  There's a reference here to a Brussels data

18   entry QA issue.  Do you see that?

19   **A.**  Yes.

20   **Q.**  Do you have an understanding as to what that refers to?

21   **A.**  Yes.

22   **Q.**  And could you please describe that for the jury.

23   **A.**  That was an employee who intentionally did not follow the

24   SOP, the standard operating procedure; and as a result, it

25   caused errors in the results to a particular client.  And

1    that individual was terminated because of it, because of the

2    intentional nature of it.

3    **Q.**   Now, had -- had the Global Labs at PPD, had it

4    encountered issues with respect to testing problems prior to

5    2018?

6    **A.**   Yes.

7    **Q.**   And was there any kind of formal system in place for

8    identifying and resolving those issues?

9    **A.**   Yes.  We had a formal quality management program, which

10   consisted of a CAPA process where you perform a formal

11   investigation, root cause analysis, put in corrective action,

12   preventive action; and those were coordinated by our

13   QA department.

14          And then they would work with someone, like if it

15   were a laboratory issue, someone at, usually, like, the

16   supervisor level or maybe a lead med tech to perform the

17   investigation, write up the documentation in the CAPA.  And

18   then that eventually had to be signed off by somebody at the

19   director level.

20          If the director level wasn't filled for some

21   reason, then it would go up to the next level.  So on some

22   occasions, I would sign off because my direct report had left

23   the company at that point for that -- for -- yeah.

24          In this case, actually, this was in Brussels, in

25   Belgium.  So we did have a lab director on site, and I

```
 1    believe she signed off on the -- the CAPA report.
 2    Q.  Let me just pause you there for a moment, if I may.
 3    CAPA, is that an acronym for something?
 4    A.  Yes, it stands for corrective action, preventive action.
 5    Q.  Okay.  And is that -- is that something you or PPD
 6    invented?
 7    A.  No.
 8    Q.  Where does that come from?
 9    A.  That comes from the quality management world.  It's used
10    in all different kinds of industries.
11    Q.  And prior to joining PPD, had you had experience in that?
12    A.  Yes.  I had had a lot of experience in it, especially
13    related to medical laboratories.
14    Q.  Okay.  And with respect to this, this process that you've
15    described, was that a process that would just include people
16    within your organization, or was that sort of cross
17    functional?
18    A.  This one was specific to the lab.  It was an error made
19    by a lab tech, but it was in one of our Global Labs, so our
20    site head was also involved.  Lorraine, my direct report in
21    Belgium, myself, and the supervisor for this particular
22    section worked very closely together every day trying to
23    resolve the issue, address the client's concerns, and we went
24    above and beyond reviewing data to make sure that there were
25    no other impacts, other than what had happened here.
```

1    **Q.**  Okay.  And then the other matter referenced here in this

2    parenthetical in the exhibit we're looking at, it says "BMS

3    sponsor, wrong conversion factor."

4          Do you see that?

5    **A.**  Yes.

6    **Q.**  Do you have an understanding as to what that refers to?

7    **A.**  Yes.  That was an updated assay that was put into the

8    lab.  I should say an updated version of an existing assay.

9    And when it was set up in the system by our IT department,

10   they did not perform the end-to-end testing that normally

11   would be performed, and as a result, the wrong conversion

12   factor from the previous version of that assay, I think, was

13   used instead of the one that should have been.

14         It only affected that one particular assay.  And I

15   personally spoke to that client, made sure that everything

16   was corrected, and we resolved the issue.  But this was --

17   this was an example of an error from our IT department.

18   **Q.**  And you mentioned before the CAPA process for identifying

19   investigating and so forth.  Was that also followed for that

20   issue, as well?

21   **A.**  Yes.

22   **Q.**  Okay.  And had issues of -- of the type that you've just

23   described, had those occurred prior to 2018?

24   **A.**  Yes.

25   **Q.**  And was there anything different about the way that

1   Mr. Mekerri approached the problems that happened in 2018

2   versus how he approached the problems in 2017?

3   **A.**   Yes.  He did not typically get involved in, like, when a

4   quality issue was submitted, unless it was something that was

5   critical, impactful.  But it was rare that he would get

6   involved.  It was usually -- if it was a major issue, it was

7   something that was handled within the senior leader of that

8   particular department.

9        In 2018, I felt like he was scrutinizing every

10  issue and going out of his way to document.  This was not

11  something that he typically ever did before.

12  **Q.**   And just going back to the exhibit that we're looking at

13  here, he references a one-to-one with you on March 26th.  Do

14  you recall anything about his -- about his tone or his --

15  his -- his demeanor in that meeting?

16  **A.**   Very cold, just harsh, accusatory.  I -- yeah.  It

17  honestly just frightened me because I felt like he's trying

18  to make a case to force me out of the company now based on

19  performance since I didn't accept their options from that

20  February 28th meeting.

21  **Q.**   And was that the only one-to-one where Mr. Mekerri gave

22  you that impression?

23  **A.**   No.  It was every one-to-one that we had following that

24  meeting until I went on leave, and it seemed like his tone

25  became more harsh as the meetings went on.  I don't mean

**JA364**

1    within the same meeting, but as the months progressed.

2    **Q.**  And how did that impact you?

3    **A.**  I was terrified.  I thought I was being forced out of the

4    company.  And to me, it felt clear they were going out of

5    their way to document, to scrutinize everything that I did

6    without even performing an investigation, in my cases, as to

7    what the cause of these issues were.

8            And it was also new for him to document.  Hacene

9    rarely documented or responded to emails or would get

10   involved in things like this; and now, all of a sudden --

11   yeah.  And, in fact, most of our one-on-ones before this were

12   canceled by him.

13   **Q.**  I'll show you another document here.  This is going to be

14   Joint Exhibit Number 50, and it's a multipage document.  I'd

15   like to start on the -- on the third page here towards the

16   bottom.

17           Do you see here there's an email from Mr. Mekerri

18   to you on April 11, 2018?  Do you see that?

19   **A.**  Yes.

20   **Q.**  Okay.  And Mr. Mekerri, he begins his note, "As discussed

21   yesterday, I would like to adapt your goals for 2018 as I am

22   concerned with the recent lab issues" and then in parens, he

23   put "Gedeon Richter, BMS, and NGSP."

24           Do you see that?

25   **A.**  Yes.

1    **Q.**  Okay.  And just so -- so first, just for clarity, BMS,

2    that was the IT issue you mentioned a bit ago; is that right?

3    **A.**  Yes.  It was from lack of performing end-to-end testing.

4    There was also a component where the lab tech was confused

5    because the wrong conversion factor was in there.

6    **Q.**  Okay.  Gedeon Richter, what was that?

7    **A.**  That was the issue that happened in the Belgium lab where

8    the med tech intentionally did not follow the SOP for manual

9    entry of results.

10          And there were a few instruments that had not yet

11   been interfaced to the computer system, meaning that the

12   results would go directly from the instrument to our

13   reporting system, and it requires someone to manually enter.

14   That was something we always had concern about because

15   there's always risk of transcription errors, but it was not a

16   priority.

17          But in this case, you know, we had a good updated

18   procedure in place, but this particular tech intentionally

19   did not follow it, which is what led to the error.

20   **Q.**  And they were terminated; is that right?

21   **A.**  Yes.

22   **Q.**  There's a reference to NGSP.  Can you tell us what that

23   is?

24   **A.**  That's a program that certifies testing of hemoglobin

25   A1C.  So it's like a proficiency testing program.  And it's

1     specific to that one assay.  So they send you unknown

2     samples.  You run them on your analyzer, and then you report

3     the results back.

4              This was another area that was not interfaced yet.

5     It was not a priority for our IT team to interface

6     proficiency testing samples because they weren't client

7     samples.  So there was a mislabeling issue by one of the

8     techs, which caused us not to pass.  It was insignificant in

9     that -- I mean, I actually personally knew the person who

10    runs the NGSP program.  She sent us a new batch of samples.

11    We tested them, they were fine, and our certification wasn't

12    impacted at all.

13    **Q.**  Was that an error that you could have prevented?

14    **A.**  That was not something I could have personally prevented,

15    no.  That was something that happens at the bench level.

16    **Q.**  And just so the jury understands, how many levels are

17    there between the bench level and you in the PPD

18    organization?

19    **A.**  I believe it starts as low as the lab assistant, and that

20    might have two different levels, and then there's three

21    different levels of med techs.  And these are all based on

22    experience.

23             And then they report to a supervisor for their

24    particular laboratory section.  And then the supervisor

25    reports to an associate director or, in some cases, like in

1    Belgium, the director, because Lorraine was promoted.  And

2    then they would -- the directors will report to me.

3    **Q.**  Okay.  And while you were at PPD, did you ever do

4    actually any supervision of the actual lab techs doing the

5    work?

6    **A.**  Not supervision, no.

7    **Q.**  Okay.

8    **A.**  I would do some walk-throughs when I was on site at the

9    various laboratories.  But I wasn't responsible for

10   supervising the med techs.  There would be no possible way to

11   do that, especially when you're overseeing four global

12   laboratories.  I mean, if you cloned me, that would still be

13   impossible.

14   **Q.**  Okay.  In this email we're looking at here, Mr. Mekerri's

15   note to you on April 11, 2018, he begins, "As discussed

16   yesterday."

17           Do you see that?

18   **A.**  Yes.

19   **Q.**  No worries.  Do -- do you recall that discussion at all?

20   **A.**  Yes.

21   **Q.**  Okay.  And what, if anything, do you recall about it?

22   **A.**  I was terrified.

23   **Q.**  Okay.  Do you recall what about the conversation that

24   made you terrified?

25   **A.**  His expectations were unrealistic, impossible for anybody

1    to meet.  I mean, if you expect someone to never make an

2    error when you're the sole medical director of four medical

3    laboratories around the globe, there's no possible way that I

4    can have my eye on -- and it wasn't my job to be the

5    supervisor of, you know, people performing the testing on the

6    bench.

7             So the fact that he expected there to be no errors

8    and for me to prevent that from happening was an impossible

9    goal to meet.  And I don't believe he had that same goal for

10   all the other departments that would have issues and submit

11   it as part of our quality management process.

12   **Q.**  Well, you say that you thought he had the expectation

13   that you were going to prevent these issues from occurring in

14   the future.  Did he -- did he tell you that?

15   **A.**  I'm sorry; can you repeat the question?

16   **Q.**  Sure.  You indicated that he wanted you to prevent the

17   lab from having -- having issues in the future; is that

18   right?

19   **A.**  Yes.

20   **Q.**  Okay.  And is that -- is that what he told you in the

21   one-to-one?

22   **A.**  Yes.

23   **Q.**  Based upon your experience in labs, is that -- is that

24   possible?

25   **A.**  That is completely impossible.  There's no way.  There is

1   not one pathologist I am familiar with -- I mean that's why

2   you create quality metrics so that you can event quality

3   events and track them and make changes to your systems to

4   make process improvements and things like that.

5          And the other thing about quality events is they're

6   not supposed -- reporting quality events are not supposed to

7   be treated as punitive.  And that's based on a global

8   standard for quality management of medical laboratories,

9   because then that risks people being afraid to report them if

10  they think they're going to be punished for it.  And that

11  defeats the whole purpose of having a strong quality

12  management program.

13  **Q.**  I'm going to show you Exhibit 50 again here.  And I want

14  you to take a look here at the second sentence of what

15  Mr. Mekerri wrote, where he writes, "I need your full

16  attention and dedication to resolve them and be more

17  proactive to prevent any further issues."

18          Do you see that?

19  **A.**  Yes.

20  **Q.**  What did you understand that to mean?

21  **A.**  He was blaming me for all -- all the issues that were

22  coming up and implying that they were my fault.

23  **Q.**  As of April 11, 2018, were you being proactive to prevent

24  lab issues from occurring?

25  **A.**  Oh, absolutely.  That's ongoing, every day, all the time.

1   **Q.**   And --

2   **A.**   I mean, that's -- that's why you run quality control

3   samples for all your assays through the instruments.  That's

4   why you perform proficiency testing.  It's why you do all of

5   the other quality processes.  That's being proactive to

6   prevent issues.

7   **Q.**   And you see here Mr. Mekerri in his email, he has -- I'll

8   flip to the next page -- so he has two numbered paragraphs.

9   Do you see those there?

10  **A.**   Yes.

11  **Q.**   Okay.  And what was your reaction to reading those two

12  items?

13  **A.**   Again, terrified about the expectation of eliminating lab

14  issues -- that's not possible -- and eliminating all client

15  complaints.  I mean, yeah, these are unrealistic,

16  unachievable goals.  We already had process improvements in

17  place, and I believe later I describe, I gave examples of

18  what some of those were.

19          Yeah, these were things we were already doing.  We

20  were already upgrading our SOPs when needed and, you know, I

21  said that's evidenced by the different revision numbers.

22  Every time you update an SOP, it gets an updated revision

23  number.  And all of those come to me for final approval.  So

24  I was constantly reviewing those and approving or sending

25  them back, rejecting for further edits.

1          And yeah, people management goals, at the beginning

2     of every single year, we all set up goals.  We work with the

3     lab supervisors to set up goals for their specific areas and

4     we create metrics, so we can met- -- we can measure areas

5     where we might think we need to improve from a quality

6     standpoint or just raise the bar.

7          And so we set those up with the supervisors in the

8     beginning of the year, and then those quarterly metric

9     reports come to me for review and sign-off so I can look for

10    any systemic trends or areas of concern.

11    **Q.**  Okay.  So did you respond to Mr. Mekerri's email?

12    **A.**  Yes.

13    **Q.**  And so let's back up here in this exhibit, turn to the

14    first page of the exhibit, and so this is the first page of

15    the exhibit.  And is this your email response to Mr. Mekerri?

16    **A.**  Yes.

17    **Q.**  Okay.  And so with respect to the second paragraph here,

18    you -- you address the issues that he had -- he had raised in

19    his email; is that right?

20    **A.**  Yes.

21    **Q.**  Okay.  Was all that accurate?

22    **A.**  Yes.

23    **Q.**  Okay.  And with respect to the second paragraph here, the

24    ones -- the one that begins, "While errors such as these," do

25    you see that?

1 **A.** Yes.

2 **Q.** Why did you write that?

3 **A.** Because he implied that I was not proactively trying to

4 minimize and prevent errors. And I wanted him to know what

5 we actually were doing that was proactively in place.

6 **Q.** And did you -- did you provide him any information on

7 that front in terms of what you -- what you were doing?

8 **A.** I -- I provided the information in the email. I gave

9 examples of projects that we were working on and things that

10 we do to proactively prevent error.

11 **Q.** And were you looking for any sort of guidance from

12 Mr. Mekerri in terms of what he wanted to do differently?

13 **A.** Yes. I was looking for some clarification after I

14 described, you know, this is what we already do every day and

15 what in addition was he looking for from me to do above and

16 beyond what we already had in place.

17 **Q.** Okay. So I'm not going to go through all of these,

18 but -- but what begins there with paragraph 1(a) and what

19 continues through on the third page here, 2(c), is that all

20 you describing for him in sort of detail exactly what's

21 already being doing in these respects?

22 **A.** Yes.

23 **Q.** Okay. And then, looking at your conclusion here, you ask

24 him for any suggestions as to how you can improve your

25 performance, do you see that?

1    **A.**   Yes.

2    **Q.**   And you note that you'll do your best to achieve whatever

3    goals he thinks are appropriate for 2018; is that right?

4    **A.**   Yes.

5    **Q.**   Is that how you really felt at the time?

6    **A.**   Absolutely.

7    **Q.**   Do you recall how Mr. Mekerri responded?

8    **A.**   He was very disappointed in me for sending -- for writing

9    that and sending that email to him.

10   **Q.**   Is that what he told you?

11   **A.**   I think in his email he mentions that he was disappointed

12   and -- yeah.

13   **Q.**   I'm going to show you Joint Exhibit 301.  And does this

14   appear to be an email back from Mr. Mekerri a little over a

15   week after the email we just looked at from you?

16   **A.**   Yes.

17   **Q.**   Do you see there he begins, "I am very surprised and

18   somehow disappointed by your response."

19         Do you see that?

20   **A.**   Yes.

21   **Q.**   How did you react to that?

22   **A.**   I just felt like it was a continuation of the harsh tone

23   that he had been using and a continuation of trying to force

24   me out of the company.

25   **Q.**   And do you see here, he writes, "You have changed the

1　discussion to one regarding current performance."  Do you see

2　that?

3　**A.**　Yes.

4　**Q.**　Did you believe that was true?

5　**A.**　No.

6　**Q.**　Why not?

7　**A.**　I had continuously tried to have discussions with him

8　about specific SMART goals that I could set up for 2018, and

9　the reason I responded with what I said was because he had a

10　belief that I was not doing those things.  So I wanted to

11　provide examples of the things that I currently was doing

12　that he had a belief that I wasn't.

13　**Q.**　You mentioned SMART goals.  Is SMART -- is that an

14　acronym for something?

15　**A.**　Yes.

16　**Q.**　How many of those that you can get right?

17　**A.**　I'm going to try.  So it's -- the goals should be

18　specific; they should be measure -- measurable; attainable;

19　they should be relevant; and they should be timely.

20　**Q.**　And the use of SMART goals, was that something you did or

21　was that something PPD did?

22　**A.**　That was something that we were instructed to do as part

23　of our HR training on setting goals, is to make SMART goals.

24　**Q.**　And prior to disclosing your disability, had Mr. Mekerri

25　worked with you in establishing goals that were compliant

1  with this SMART system?

2  **A.**  He definitely had worked with me to establish my goals

3  for the year, because he had to approve those.

4  I don't recall if the SMART goal system was in

5  place when I was hired.  I think that was something that was

6  implemented possibly in 2017.  I know they made some updates

7  to their performance management system, and there were

8  several trainings on that from HR in the form of Webex, in

9  the form of calls with Chad.  And so we were all required to

10  be trained on, you know, how to set goals, how to set SMART

11  goals, among other things.

12  **Q.**  Understood.  So looking at the section here, you'll see

13  Mr. Mekerri, he has a section that begins, "If it is helpful,

14  however, I will give you a couple of examples of issues that

15  I have noted (and raised to you) before."

16  Do you see that?

17  **A.**  Yes.

18  **Q.**  All right.  Let's dig into those a little bit.  So the

19  first one he has here, that's Gedeon Richter.  Do you see

20  that?

21  **A.**  Yes.

22  **Q.**  Okay.  And you'll see here he begins referencing an

23  executive summary that he had asked for from you.  Do you see

24  that?

25  **A.**  Yes.

1  **Q.**  And you'll see here that he says that you did not take

2  the lead on that.  Do you see that?

3  **A.**  I -- yes.

4  **Q.**  Okay.  Was that true?

5  **A.**  No.  I did that summary by myself, last minute, when

6  asked on a Friday night.  So I spent the whole weekend doing

7  it.  And then, of course, I ran it by others who were

8  involved in this investigation to get their input; and most

9  all of the input was very positive, because I'm extremely

10  meticulous and wanted to produce a clear, concise,

11  professional report.

12  **Q.**  Now, had you been the one who distributed that report

13  after it was done?

14  **A.**  I shared it with Hacene.  He only had criticisms of

15  certain parts that he asked that I change.  And then I asked,

16  "Okay.  Should I send this to Chris Fikry?" his boss.

17          And he said, "No, I -- I would prefer that Els

18  sends it" -- Els was the site head in Belgium -- because she

19  had been interacting more with him.  And I was a little upset

20  about that, because I worked very hard on that report.  And I

21  was very involved in this investigation, working very, very

22  closely with the team.  Yeah.

23  **Q.**  Let me show you Joint Exhibit 320.  And can you tell the

24  jury what this is?

25  **A.**  This is an email from Hacene to me about the executive

1    summary.

2    **Q.**  Okay.  This was the one that he -- he said you had not

3    taken the lead on?

4    **A.**  Yeah, this is the one where he said to let Els send it on

5    my behalf.

6    **Q.**  How did that make you feel that Mr. Mekerri subsequently

7    alleged that you had not taken the lead on that project?

8    **A.**  I was upset because I worked very hard on it, and I kind

9    of felt like I was being tested, you know, being thrown a

10   very complex report put together on a Friday night, which I

11   did with no complaint, and I did a very good job and got a

12   lot of positive feedback from the directors and QA.  And what

13   I got from Hacene was criticism on certain points and, oh, by

14   the way, have Els -- have it come from Els.  So, yeah, it was

15   upsetting.

16   **Q.**  Okay.  I'm going to direct you back to the email we were

17   looking at a moment ago.  So this is Joint Exhibit 301.  I'll

18   put that back up on the screen for you.

19           You'll see here he has -- he has a statement

20   concerning an issue involving GSK.  Do you see that?

21   **A.**  Yes.

22   **Q.**  Okay.  In the third sentence, he writes, "Apparently, you

23   claim you were not informed that some samples were discarded

24   by mistake, which impacted the client."  Do you see that?

25   **A.**  Yes.

1   **Q.**   Okay.  Did you believe that was -- that was a fair

2   comment from Mr. Mekerri?

3   **A.**   This issue had just been raised and I was not contacted

4   yet by QA who responded right after saying, you know, we're

5   pulling things together.  At this point, an investigation had

6   not even started.

7          And the other thing was my direct report,

8   Dr. Reddy, was hired to be the, from a regulatory standpoint,

9   director of molecular diagnostics, because that's not an area

10  that I'm qualified to standard under our regulatory

11  standards.

12         I was surprised, felt kind of attacked by Hacene

13  directing this to me and not even including our director of

14  molecular diagnostics, who, from a regulatory standpoint,

15  would be the one that would address this with his team.  And,

16  yeah, I did ask to loop him in, and -- and they did a great

17  job.

18  **Q.**   In terms of the -- the time for this to come to your

19  attention, was there -- was there a standard process, so to

20  speak, based upon CAPA in terms of how that -- how that

21  information flowed?

22  **A.**   Yeah.  As part of the quality-management system -- and I

23  apologize.  This is five years ago for me.  But there's a

24  formal way that you document an event or an issue, and then

25  there's a series of steps that you follow and a series -- a

1   specifically level of individuals that get involved for those

2   areas and put in their documentation.  And it keeps going

3   down through that CAPA process until ultimately it's reviewed

4   by someone at the director level.

5          For critical issues, that's when the senior leaders

6   usually also get involved and will jump on calls with

7   clients, discuss what happened, keep an open dialogue with

8   them about what we're doing to resolve the issue, and then

9   offer to present them with the CAPA report when it's

10  complete.

11  **Q.**  And Mr. Mekerri, he continues on, "At one point, I

12  learned there was a client meeting last week where the PPD

13  lab representative was a supervisor with very limited

14  experience with PPD."

15         Do you see that?

16  **A.**  Yes.

17  **Q.**  Was that true?

18  **A.**  He was our molecular supervisor who had a significant

19  amount of experience in molecular, which is why he was hired,

20  and was close to the issue that happened and so was able to

21  explain the details of what was going on.  He was not -- he

22  had not worked for a long time with PPD, but he definitely

23  knew his stuff when it came to molecular.  Yeah.  So, yeah,

24  that was not inappropriate to have him on the call.

25  **Q.**  And then you see that Mr. Mekerri continues after that,

```
 1   he writes, "This is your job -- to handle these situations --
 2   to lead the laboratory operation by integrating operational
 3   processes, business development, research, and development
 4   and quality assurance."
 5           Do you see that?
 6   A.  Yes.
 7   Q.  Prior to your -- your disclosure of your disability,
 8   had -- had Mr. Mekerri expressed that view that, whenever
 9   there were any kind of lab problems, that you had to swoop in
10   and handle them yourself?
11   A.  No.
12           MS. MANDEL:  Objection.
13           THE COURT:  Overruled.
14   BY MR. HANNON:
15   Q.  Did you think that was a realistic expectation?
16   A.  No.
17   Q.  Did you respond to this email from Mr. Mekerri?
18   A.  I believe so.  I'm sorry; I don't recall.
19   Q.  No worries.
20           I'm going to show you exhibit Number -- joint
21   Exhibit Number 300.  Tell the jury what this is.
22   A.  This is -- this is, in fact, a follow-up email from me to
23   Hacene after I received that previous email from him.
24   Q.  Okay.  And in the third and fourth sentence of that first
25   paragraph, you write, "As such, I was not trying to change
```

 1    the conversation.  I just wanted to make sure we were on the

 2    same page as to what the issues are and what I am doing to

 3    address them.  I thought that would be the most productive

 4    way of discussing goals and ensuring that I'm addressing

 5    whatever concerns you have."

 6              Do you see that?

 7    **A.**  Yes.

 8    **Q.**  Was that true?

 9    **A.**  Yes.

10    **Q.**  Okay.  And then in your note, you go on to -- to address

11    the examples he provided regarding Gedeon Richter and GSK.

12    Do you see that?

13    **A.**  Yes.

14    **Q.**  Okay.  And you can just take a moment and just review --

15    you don't need to read it out loud, but if you can just

16    review the information there that you wrote regarding Gedeon

17    Richter and let us know if that is all accurate.

18    **A.**  Yes, that's accurate.

19    **Q.**  And particularly that last sentence, "This is the same

20    type of teamwork that I have employed throughout my tenure as

21    executive director."

22              Was that true?

23    **A.**  Yes.

24    **Q.**  Prior to disclosing your disability, had Mr. Mekerri ever

25    criticized you for utilizing that type of teamwork?

1   **A.**   No.

2   **Q.**   Directing your attention to the next paragraph, again,

3   I'm not going to read it out loud -- you can just read that

4   to yourself -- but my question is if that's accurate.

5   **A.**   That's accurate.

6   **Q.**   I just have one more for you, the paragraph that follows.

7   If you can read that to yourself and let me know if that's

8   accurate as well.

9   **A.**   Yes, that's accurate.

10   **Q.**   Subsequent to the -- to the back-and-forth we've seen in

11   these emails, did Mr. Mekerri provide you any sort of

12   substantive response to what you've written here?

13   **A.**   Can you repeat that or rephrase it?  I'm not quite sure I

14   understood.

15   **Q.**   Let me ask you a question in English this time.  In terms

16   of the dialogue surrounding the changes he wanted for your

17   goals, did he ever provide you further clarification in terms

18   of what he wanted you to do or how he expected you to achieve

19   that?

20   **A.**   No.

21   **Q.**   And can you describe for the jury what, if any, position

22   Mr. Mekerri took regarding that conversation?

23   **A.**   He said that was my responsibility, which is what I had

24   tried to do by creating SMART goals.

25   **Q.**   Did Mr. Mekerri ever tell you that he -- that his

1    expectation wasn't that you were going to eliminate all lab

2    issues?

3    **A.**  I don't recall.

4    **Q.**  Was it -- was it your understanding up until the time

5    that you -- that you stopped working at PPD that it was

6    Mr. Mekerri's expectation that, to succeed in your role, you

7    were going to have to eliminate all lab issues?

8    **A.**  Yes.

9    **Q.**  How did -- how did this dialogue with Mr. Mekerri

10   concerning his expectations impact your health?

11   **A.**  My health deteriorated rapidly.  I wasn't able to sleep.

12   I was having multiple panic attacks a day.  I was taking an

13   antidepressant because I was afraid for my family's survival.

14   I was afraid I was going to lose my job.  I was also taking

15   benzodiazepines prescribed by my doctor.  She prescribed

16   them, a microdose, to try to keep me stable throughout the

17   day.

18           I -- I stopped leaving the house.  I was afraid to

19   leave the house.  So I worked with my doctor to gradually try

20   to just like go to the mailbox and take small steps.

21           I had multiple panic attacks every day.  I would

22   wake up in the middle of the night having panic attacks and

23   just have to breathe through them, and as far as those, you

24   know, it was sweating, shaking, rapid heart rate, rapid

25   breathing.

1          I also had significant GI distress, which, for me

2     especially, is embarrassing as someone who has social anxiety

3     disorder.  I was losing weight.  My doctor was becoming

4     concerned about that.

5          And I -- I felt suicidal.  I didn't want to live

6     anymore.  I felt like I let my family down and I just felt

7     like a failure.  I felt like the world would be better off

8     without me, and I just could not endure that kind of trauma

9     repeatedly.  I just could not -- I couldn't -- I couldn't

10    endure it anymore.

11         And my doctor was concerned for my safety and so

12    she recommended that I take an immediate leave and enter a

13    partial hospitalization program.  So that's what I did, but I

14    mostly just felt really like I let my family down because I

15    was their sole provider, and I didn't know how we were going

16    to survive.

17         And I had worked so hard at PPD, putting in extra

18    hours, just -- you know, I really liked my job.  And I just

19    felt like I was just thrown out and how are we going to

20    survive?  How am I going to -- how am I going to get food for

21    my child to eat?  How are we going to pay the mortgage?

22    She's going to have to leave the school that she finally felt

23    safe at and wasn't bullied and made some friends, and I had

24    to explain that I could no longer pay for that.

25         I'm -- I'm -- I'm still really struggling and I

```
 1    just don't want to risk ever going through this kind of
 2    trauma again.  But I don't -- I don't want to hurt my family
 3    and I feel stuck because I feel trapped that I have to carry
 4    this pain and the trauma, but I don't want to hurt my family.
 5            And I spoke to my therapist and he said it's really
 6    hard when you're still in the middle of the trauma; and I've
 7    been in the middle of the trauma for over five years, just
 8    constantly not knowing what's going to happen to us.  And,
 9    you know, hearing about people getting shot and stabbed and
10    raped on the streets and -- like, I shouldn't have brought a
11    child in this world if I couldn't protect them.
12            And if it were just me, I would probably just take
13    my life because, like, the pain is, like, too much for me.
14    And I just don't want to hurt my family.
15    Q.  Doctor, had you ever felt that way prior to disclosing
16    your disability?
17    A.  No.
18    Q.  You mentioned the partial hospitalization.  Do you recall
19    when that was?
20    A.  Yeah.  That was in July of 2018, after I went on medical
21    leave.
22    Q.  And do you recall when you had gone on the medical leave?
23    A.  I believe it was June 3rd, 2018.
24    Q.  Was there a reason between the gap in time between the
25    medical leave and when you did the hospitalization, the
```

1   partial hospitalization program?

2   **A.**  It was based on when they had an opening for the

3   particular program that my doctor recommended that I enter.

4   **Q.**  Okay.  I -- sorry.  I need to back up a little bit just

5   to cover a couple of additional things here that I don't want

6   to leave out.

7          So before you -- before you took your leave from

8   PPD, do you recall communicating to anyone at PPD's human

9   resources your concerns about the way you were being treated

10  by Mr. Mekerri?

11  **A.**  Yes.  I contacted our director of HR, Chad St. John.

12  **Q.**  Okay.  And I want to show you Joint Exhibit Number 21.

13  These are handwritten notes again.  I'm just going to show

14  you the page for reference here.  It has the number, on the

15  bottom right-hand corner, Menninger1178.  Do you see that?

16  **A.**  Yes.

17  **Q.**  Okay.  And there's no date on that, but directing your

18  attention here to the section that begins, "I kept trying to

19  steer the discussion back."

20         Do you see that?

21  **A.**  Yes.

22  **Q.**  Do you have a recollection of -- of what these notes

23  reflect?  Meaning --

24  **A.**  Yes.

25  **Q.**  -- what the conversation with a particular person, a

```
1   particular place?
2   A.  I believe it was with Chad, and it was around, you
3   know -- I just kept asking can -- can we talk about the
4   specific tasks that you would like me to perform going
5   forward with the change that Hacene wanted to make to my
6   role?
7           And they just wouldn't tell me.  They -- they just
8   kept referring me to my performance -- or my job description
9   and twisting my doctor's words and --
10  Q.  I'll direct your attention to a little bit ahead in this
11  note here, so the page with the number 1180 on it, and I want
12  to direct your attention to the section here.  Can you read
13  what that says?
14  A.  "I felt targeted by Hacene after disclosing my
15  disability."
16  Q.  And did you recall indicating to Mr. St. John during the
17  course of this meeting how that -- how that targeting was
18  impacting you?
19  A.  Yeah -- yes.  I stated I'm not doing well as a result of
20  what's transpired since I disclosed my -- my disability.
21  Q.  And if you look at the bottom here, can you tell us what
22  that says?
23  A.  I -- I restated that I can perform all of the essential
24  functions of my job with or without accommodation.
25  Q.  Was -- and did you believe that to be true?
```

1    **A.**   Yes.

2    **Q.**   And I'm flipping ahead a little bit here.  So this is the

3    page 1182, in the bottom right-hand corner.  And -- I'm

4    sorry.  One more page -- two more pages ahead.

5            So this is page 1184 of Exhibit 21.  And I want to

6    direct your attention to what you wrote at the top of the

7    page here.  Can you tell us what that says?

8    **A.**   Yes.  I -- I also mentioned that I was concerned about

9    confidentiality and asked if anyone other than Chad, Hacene,

10   and Deb knew about my disability.  And Chad said that he had

11   not disclosed to others and that that would be a violation.

12   **Q.**   When you asked that question, did you -- did you have any

13   suspicion that other people had been told?

14   **A.**   I did have that suspicion.

15   **Q.**   Why?

16   **A.**   I felt like I was being treated differently by other

17   colleagues and it made me wonder if they -- like, who knew

18   what, what was happening.

19   **Q.**   But Mr. St. John assured that that hadn't been disclosed,

20   right?

21   **A.**   Yes.  And he -- he was adamant.  He said that would be a

22   violation.

23   **Q.**   I'm going to direct your attention to Joint Exhibit 174.

24   Do you see here at the top, this is an email from Chad

25   St. John to Chris Clendening on February 14, 2018?  Do you

1    see that?

2    **A.**   Yes.

3    **Q.**   So this was before the February 28th meeting you

4    described earlier, right?

5    **A.**   Yes.

6    **Q.**   Was this also before the discussion with -- you had with

7    St. -- that you had with Mr. St. John where he assured you

8    that it hadn't been disclosed to others?

9    **A.**   Yes.

10   **Q.**   Okay.  Who was Mr. St. John emailing here?

11   **A.**   One of my peers.  Chris Clendening was ED overseeing

12   project management and another department that originally was

13   called "tech ops," and they changed the name.  I don't

14   remember what it is, but it is basically where they set up

15   all of the initial parameters for a clinical trial study that

16   we're going to perform.

17   **Q.**   Is Mr. Clendening, is he a medical doctor, to your

18   knowledge?

19   **A.**   No.

20   **Q.**   Okay.  And if we look at the attachment here, from the

21   third page, do you recognize this?

22   **A.**   Yes.

23   **Q.**   What is it?

24   **A.**   This is the education that my doctor provided to Chad.

25   **Q.**   And did that include the accommodations that she was

1  proposing?

2  **A.**  Yes.

3  **Q.**  Besides the meeting notes that we just looked at, do you

4  recall sharing with Mr. St. John in writing that you had

5  concerns that Mr. Mekerri was targeting you?

6  **A.**  Yes.

7  **Q.**  Okay.  And we're going to look at that.  That's going to

8  be Joint Exhibit Number 261.  And so there's two emails on

9  the page.  I want to look at the one on the bottom half.  And

10  is this an email from you to Mr. St. John on April 17, 2018?

11  **A.**  Yes.

12  **Q.**  Okay.  And you reference -- sorry.  You begin, "Your note

13  below does not provide any clarification."

14          Do you see that?

15  **A.**  Yes.

16  **Q.**  Do you know what clarification you're referring to there?

17  **A.**  Clarification about the specific tasks that Hacene wanted

18  to -- the changes he wanted to make to my role.

19  **Q.**  And in your middle paragraph here, you mention

20  Mr. Mekerri targeting you; is that right?

21  **A.**  Yes.

22  **Q.**  Okay.  And if we can look at the last sentence, you

23  write, "I don't want to assume the worst, but it looks like

24  he's trying to build a case against me -- like you previously

25  coached us to do when dealing with a 'problem' employee."

1      Do you see that?

2  **A.**  Yes.

3  **Q.**  What does that refer to?

4  **A.**  Chad -- Chad would coach us as leaders -- for example,

5  one of my direct reports had issues, and so he coached me on

6  documenting and following our process of going on a

7  performance improvement plan, which was a plan that you

8  developed with the employee to try to resolve the issues.

9      And, yeah, so Chad used to coach us on, you know,

10  you've got to document and document, document, document.

11  **Q.**  And was the advice to document, document, document, was

12  that for high-performing employees?

13  **A.**  No.  That was for problem employees.  I mean, you also --

14  he also emphasized that you need to document as part of our

15  performance review process on those forms; but in this

16  context, it was if someone is a problem employee, you need to

17  document what -- what you're observing, what's happening.

18  You need to have evidence.

19  **Q.**  Evidence for what?

20  **A.**  Evidence for putting them on a performance improvement

21  plan and, ultimately, terminating their employment if -- if

22  they don't improve.

23  **Q.**  I want to direct your attention to the top of that -- on

24  that exhibit.  You see Mr. St. John forwards your email to

25  Deborah Ballweg.  Do you see that?

1   **A.**   Yes.

2   **Q.**   Okay.  And that's Ms. Ballweg sitting in the chair to

3   your left?

4   **A.**   Yes.

5   **Q.**   Okay.  Were you at some point contacted by Ms. Ballweg in

6   connection with this email?

7   **A.**   Yes.

8   **Q.**   Okay.  And what do you recall about -- about that?

9   **A.**   I recall that, after I disclosed to Chad my complaints

10  about Hacene targeting me and excluding me from hiring

11  individuals who would report to me, and some other matters,

12  after disclosing my disability, he denied it, but he said he

13  would have someone else from HR perform an investigation that

14  would be fair and impartial.

15  **Q.**   And was it your understanding that Ms. Ballweg was the

16  person who was going to conduct that fair and impartial

17  investigation for PPD?

18  **A.**   That's what I eventually learned.

19  **Q.**   Okay.  And who did you learn that from?

20  **A.**   I don't recall who told me, but I think Deb and I had a

21  call so that I could, I guess, communicate what had been

22  transpiring since I disclosed my disability.

23  **Q.**   Okay.  And when you -- when you spoke with Ms. Ballweg,

24  did -- did you tell her about everything that you had been

25  experiencing?

 1    **A.**  It probably didn't include everything, but I tried to

 2    tell her the core things that were going on.

 3    **Q.**  And by the core things, what are you referring to?

 4    **A.**  I -- I was being shut out of the hiring and

 5    decision-making process for employees that would eventually

 6    report to me.  I was being blamed for issues before there was

 7    even any investigation performed and called out in front of

 8    my peers and had HR copied on those emails, even though that

 9    was never usually done, because HR was not involved in our

10    operations issues.

11          There were a couple of occasions where Hacene

12    mentioned a sales meeting and said, "Oh, I'll forward the

13    invite.  You don't go to that one?"

14          I said, "No.  I didn't even know it existed."

15          And he said, "Okay.  I'll forward it to you."  So

16    on two different occasions, he said that, and so I

17    communicated to Deb that I never received that.

18          I'm trying to remember, and I'm blanking right now

19    of -- I know there were more issues that I communicated.

20    It's hard to remember everything without my notes and I'm

21    pretty -- yeah.

22    **Q.**  No worries.

23          Did you communicate anything about your belief that

24    Mr. Mekerri was targeting you?

25    **A.**  Yes.  Yes.  Since that -- oh, the meeting.  I

1    communicated about the February 28th meeting where I thought

2    we were going to talk about potential creative ways we may

3    accommodate certain tasks that they had in mind for changing

4    my role.  And I communicated that, at the start of that

5    meeting, right at the start, Chad presented me with an exit

6    package option or a temporary consulting role.

7            But, of course, they didn't want me to leave right

8    away because they wanted to make sure they had somebody in

9    place who had the regulatory requirements that I had, which I

10   found insulting.  So I mentioned that.

11           I'm having a hard time.  I'm blanking.

12   **Q.**  No worries.  Let me ask the question this way.  When you

13   met with Ms. Ballweg to describe for her the treatment that

14   you'd received ever since disclosing your disability, did you

15   intentionally withhold any information from her?

16   **A.**  No.

17   **Q.**  Okay.  And did she ask you to provide any -- any

18   documentation surrounding the concerns that you had?

19   **A.**  Yes.

20   **Q.**  Okay.  And did you provide that to her?

21   **A.**  Yes.

22   **Q.**  Okay.  How many times did you speak with Ms. Ballweg?

23   **A.**  I believe it was three times.

24   **Q.**  Okay.  And in terms of the first two, am I right those

25   were essentially her asking you questions and getting

1   information?

2   **A.**  Yes.  I believe the first one was.  I think the second

3   one was kind of, like, a status of where we -- where they

4   were at with the investigation.  And then the third one was

5   the conclusion of the investigation.

6   **Q.**  Okay.  Do you recall when that -- when that third

7   discussion took place?

8   **A.**  I think that was late May.

9   **Q.**  Do you know where you were?

10   **A.**  I'm sorry; can you repeat that?

11   **Q.**  Do you know where you were when this conversation took

12   place?

13   **A.**  I was working in my home office.

14   **Q.**  And was this -- was this a planned call?

15   **A.**  I believe so.

16   **Q.**  Okay.  And -- and what do you remember about what

17   happened during that call?

18   **A.**  Deb communicated that she found no evidence of

19   discrimination or retaliation and I -- I just felt hopeless.

20   I felt like this was my last chance of trying to save my job,

21   protect my family, and that they were succeeding in trying to

22   force me out.

23   **Q.**  Why didn't you just quit?

24   **A.**  I couldn't quit.  I had to provide for my family and I

25   loved my job.  I felt like the purpose of what we were doing

1   was important and we were helping patients.  And it was in a

2   different way from how I was able to do that in a hospital

3   environment, but we were helping people.  I -- it gave me

4   purpose.  And so I liked -- I liked my job.

5          But, also, I was the sole provider for my family,

6   and that was an intentional decision that we made when our

7   child was born so that my husband could be a stay-at-home

8   dad.  He -- he's an engineer and software developer and so he

9   does a lot of stuff on computers anyway.  And so a lot of the

10  stuff he wanted to do, he was able to do from home.

11         And he really likes -- he loves children, so --

12  he's a great dad.  And he wanted me to pursue my career

13  because I had been working so hard up to this point to become

14  a clinical pathologist.

15  **Q.**  Did you take pride in your job?

16  **A.**  I did.  I worked really hard.  Very hard.  I always would

17  put in extra hours and work on weekends.  And, you know, I'm

18  not the type of person who is just going to, like, coast.

19  That's not my personality.  I -- I want to do the best job I

20  can.

21         And I had -- I kind of have a reputation for having

22  expectations of raising the bar on quality and compliance,

23  like, we're not cutting corners.  And people knew that about

24  me, because I felt like this is extremely important.  This

25  specimen is somebody's life and we need to treat it like it's

1    a person.

2    **Q.**  Since you left PPD, have you returned to work?

3    **A.**  No.

4    **Q.**  Why not?

5    **A.**  I'm -- I'm still -- I'm still struggling.  I'm -- my

6    health is getting worse.  I was diagnosed with PTSD.  I have

7    some okay days, but I have a lot of nightmares.  I have a lot

8    of fear.  I have a lot of lack of trust.  I can't imagine

9    putting myself in a situation where I would risk this

10   happening to me again.

11          I don't think my body has any more room for trauma

12   or pain, and I'm trying the best I can.  I've -- I've tried I

13   can't even tell you how many different medications.  I tried

14   medications together that ended up giving me a

15   life-threatening condition, and I then had to stop

16   immediately.

17          I've tried exercise.  I've -- I go to therapy every

18   week.  I've tried probably every benzodiazepine out there.

19   My doctors work closely with me to -- to try to help me get

20   better and -- and I'm still trying, but I'm in the middle of

21   the trauma.

22          And my therapist said -- he actually went and did

23   some research on people who have been, like, in sustained

24   trauma for long periods of time and said that it's really

25   hard to focus on healing when you're just trying to get

1   through the trauma.  So it's been a lot about just focus on

2   the present, just focus on getting through this day.  And so

3   I will set little, mini goals for myself for the next day and

4   just, like, okay, I made it through another day.  And maybe

5   I'm getting one step closer to this nightmare being over.

6          But I don't know if I'm going to be able to

7   experience happiness again.  I don't know what the statistics

8   are on that.  I -- I just want my family to be okay and

9   happy.  I just -- this is so unfair to my child.  And I

10   really just want -- I want them to have a happy life.

11          And I also want -- I've been trying to set the

12   example that it's not okay to be discriminated against or

13   retaliated against, no matter how big or powerful the company

14   or person may be.  It's not right.  And I'm trying to be

15   strong enough to set that example and she has been such an

16   inspiration to help me continue to fight.

17          But it has been hard.  It has been -- I mean,

18   there's days when I'm just curled up in the fetal position in

19   bed and I cannot get out of bed because of fear.  It's hard

20   to trust anyone.  I don't know who I can trust.  I feel like

21   everyone's out to hurt me, whether it's intentional or not.

22   And so I just don't want to even put myself in the position

23   where that might happen.

24   **Q.**  Let me pause you there.  You mentioned nightmares.

25   **A.**  Yes.

1   **Q.** How, if at all, has your experience with PPD resulted in

2   literal nightmares, if at all?

3   **A.** I have recurring frequent nightmares most every single

4   night, and the majority of them involve people I work with at

5   PPD. And it always -- it's always a situation where I feel

6   trapped or I'm trying to hide or get away. And at one point,

7   I -- I had a nightmare where I felt, in my nightmare, my

8   former boss was friends with Putin and I was being threatened

9   that if I don't drop this case, he's going to have Putin

10   poison me. It's just bizarre things like that.

11       And then sometimes I'm just -- like now, I'm, like,

12   if I had a nightmare, at least I know I got some sleep,

13   because it's really hard to function when you can't sleep,

14   too.

15   **Q.** What medications are you currently on?

16   **A.** I'm currently taking fluoxetine, which the common name is

17   Prozac; clonazepam, which is -- is a benzodiazepine sedative,

18   I take that twice a day.

19       Lately, I've been having to take a lot of

20   Pedialyte, because I've been having a lot of GI distress, and

21   I've lost a lot of weight.

22   **Q.** How much do you weigh today?

23   **A.** I don't have a scale. I think I'm probably close to

24   90 pounds.

25   **Q.** And how much did you weigh at the time that you disclosed

```
 1    your disability to PPD?

 2    A.  I was probably around 120.

 3    Q.  Do you believe that you're capable of working now given

 4    your condition?

 5    A.  I need to get through the trauma and focus on healing.

 6    Right now, I am too traumatized to trust that this -- that I

 7    won't get hurt like this again.  And I'm not sleeping and I'm

 8    not able to go out of the house by myself.  Mason drives me

 9    everywhere.  I will only go -- usually to doctors

10    appointments and occasionally we'll take Maya someplace, like

11    a conference that they're interested in.

12            But I will not go myself and I'm uncomfortable.  I

13    usually try to find a corner where I can just sit and, like,

14    work on a puzzle on my phone or something.  Otherwise, I

15    don't leave the house.

16            THE COURT:  I think we'll -- are you done -- I

17    don't want -- are you done with your answer?  I don't want

18    to --

19            THE WITNESS:  Yes.

20            THE COURT:  Okay.  Do you have more, or are you

21    done?

22            MR. HANNON:  Very, very briefly, but obviously --

23    it's one o'clock, so --

24            THE COURT:  Fine.

25            All right.  So, ladies and gentlemen, it's
```

```
 1    one o'clock.  We're going to break for the day.  Don't
 2    discuss the case among yourselves.  Don't discuss with anyone
 3    else.  Don't do any independent research.
 4            I'll see you tomorrow morning we'll resume at
 5    9 a.m. tomorrow again, 9:00 to 1:00.  Thank you for your
 6    attention.  Have a good day.
 7            All rise for the jury.
 8            (Jury not present.)
 9            THE COURT:  You can all be seated.
10            Anything to discuss before we break?
11            MS. MANDEL:  Not from our side, Your Honor.
12            THE COURT:  See you tomorrow at 8:30.
13            Just think about where we are in terms of
14    schedule -- I'm not ready to update the jury, obviously, on
15    the schedule, but I just remind you all to think about that,
16    see where we are, hopefully stay on track.
17            All right.  Have a good afternoon.  Thank you very
18    much.  See you tomorrow.
19            (Court in recess at 1:02 p.m.)
20
21
22
23
24
25
```

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4              I, Robert W. Paschal, Certified Realtime Reporter,

5     in and for the United States District Court for the District

6     of Massachusetts, do hereby certify that pursuant to Section

7     753, Title 28, United States Code, the foregoing pages

8     are a true and correct transcript of the stenographically

9     reported proceedings held in the above-entitled matter and

10    that the transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13                         Dated this 21st day of March, 2023.

14

15

16

17                    /s/ ROBERT W. PASCHAL

18

19

20    _____

21    Robert W. Paschal, CRR, RMR
      Official Court Reporter

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

LISA MENNINGER,

     Plaintiff,                                    Civil Action No.
                               1:19-cv-11441-LTS

   v.

PPD DEVELOPMENT, L.P.,

     Defendant.

_____


   BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


JURY TRIAL
Day 3


Wednesday, March 22, 2023
8:30 a.m.


John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts


Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiff:

    HARTLEY MICHON ROBB HANNON, LLP
    BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
    155 Seaport Boulevard
    2nd Floor
    Boston, Massachusetts  02210
    (617) 723-8000
    phannon@hmrhlaw.com
    hwatson@hmrhlaw.com


On behalf of the Defendant:

    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
    BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
    One Boston Place
    Suite 3500
    Boston, Massachusetts  02108
    (617) 994-5700
    rachel.mandel@ogletreedeakins.com
    patrick.curran@ogletreedeakins.com

1                    **TABLE OF CONTENTS**

2

3                     **TRIAL WITNESSES**

4

5    On behalf of the Government:                    <u>Page</u>

6     LISA A. MENNINGER

7          By Mr. Hannon                              13

8          By Ms. Mandel                              31

9

10

11                      **EXHIBIT**

12

13                        None

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2              (In open court.)

 3              THE DEPUTY CLERK:  The United States District Court

 4     for the District of Massachusetts is now in session, the

 5     Honorable Leo T. Sorokin presiding.

 6              THE COURT:  Please be seated.

 7              THE DEPUTY CLERK:  Today is Wednesday, March 22,

 8     2023, and we're on the record in civil case number 19-11441,

 9     Lisa Menninger versus PPD development, LP.

10              And would counsel please identify themselves for

11     the record.

12              MR. HANNON:  Good morning.  Patrick Hannon and

13     Hampton Watson for the plaintiff.

14              MS. MANDEL:  Good morning, Your Honor, Rachel

15     Mandel and Patrick Curran for defendant, PPD.

16              THE COURT:  Good morning.  Okay.  Anything to

17     discuss?

18              MR. HANNON:  Possibly.  I meant to ask opposing

19     counsel a question this morning, but I'll just raise it now,

20     and I apologize for not having raised it separately

21     beforehand.

22              During the deposition of Dr. Menninger, an issue

23     came out concerning a prior arrest for driving under the

24     influence, which I don't think has any relevance and is not

25     in any way possibly admissible, but I just figured we should
```

1    having been previously duly sworn, testified as follows:

2    **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF, Cont.**

3    BY MR. HANNON:

4    **Q.**  Dr. Menninger, while you were employed at PPD, how were

5    you compensated?

6    **A.**  I had an annual salary and annual bonus, and I had stock

7    options, stock.  And sometimes we would have additional spot

8    bonuses, depending on how the company was doing.

9    **Q.**  And did you have other benefits, like health insurance

10    and things like that?

11    **A.**  Yes.  For my entire family.

12    **Q.**  Okay.  And what was for your entire family?  The health

13    insurance?

14    **A.**  Yes.

15       MR. HANNON:  I'd like to direct your attention to

16    Joint Exhibit Number 14.  And I'd like to show this to the

17    jury.

18    BY MR. HANNON:

19    **Q.**  And Dr. Menninger, can you tell the jury what this is?

20    **A.**  This is the compensation statement for 2018.

21    **Q.**  Okay.  And looking at the top right-hand corner here,

22    does this show what your base salary was going to be,

23    effective April 1, 2018?

24    **A.**  Yes.

25    **Q.**  And to the best of your recollection, is that number

1    there, the $270,581.78, is that accurate?

2    **A.**  Yes.

3    **Q.**  Okay.  And this shows that you're -- am I right that this

4    shows that your salary the prior year had been lower?

5    **A.**  Yes.

6    **Q.**  And was it -- was it typical during your employment at

7    PPD to get annual raises?

8    **A.**  Yes.

9    **Q.**  And then I think you mentioned a moment ago that part of

10   your compensation included an annual bonus; is that right?

11   **A.**  Yes.

12   **Q.**  Okay.  Did you receive a bonus every year that you worked

13   at PPD?

14   **A.**  Yes.

15   **Q.**  And does this document accurately reflect the bonus that

16   you received for your work in 2017?

17   **A.**  Yes.

18   **Q.**  And then you also mentioned spot bonuses.  Under what

19   circumstances during your employment at PPD did you earn spot

20   bonuses?

21   **A.**  There were, I believe, occasional times in 2016 where the

22   company gave certain executives additional bonuses, I think

23   based on how the company was performing.

24          I was also given an additional salary increase at

25   the end of 2015, after I started.

1    **Q.**  Okay.  I'm now going to direct your attention to Joint

2    Exhibit 33.  And does this document reflect the stock options

3    that you held at the time of your termination?

4    **A.**  Yes.

5    **Q.**  Okay.  And were you able to keep those options after you

6    were terminated?

7    **A.**  No, I was not.

8    **Q.**  Okay.  Now, the document here -- look in the far right

9    here.  It shows a cost to exercise.  Was it your

10   understanding that's what it would have cost you at the time

11   of your separation in order to exercise your stock options?

12   **A.**  Yes.

13   **Q.**  And did you?

14   **A.**  No.  I -- we couldn't afford to.

15   **Q.**  Okay.  During the course of your employment, were any

16   representations made to you by PPD concerning the -- the

17   value of your stock options?

18   **A.**  Yes.  It was recorded.

19   **Q.**  And did they -- did they make any representations to you

20   in terms of under what circumstances those options would

21   become valuable?

22   **A.**  Yes.  If the company underwent a restructuring, or if

23   they went from private to public, then those stock options

24   would be available to be cashed out for us, which happened

25   under one circumstance while I was working there.

1    **Q.**   So there had been a prior restructuring at some point

2    during your term at PPD; is that right?

3    **A.**   That's correct.

4    **Q.**   Okay.  And -- but with respect to the options that you

5    held at the time of your termination, do you know if,

6    subsequent to your termination, PPD went public?

7    **A.**   Yes, they did.

8    **Q.**   Okay.  And have you seen any press releases issued by PPD

9    concerning any acquisition of the company?

10   **A.**   Yes, I have.

11   **Q.**   Okay.  And based upon those -- that press release, how

12   was PPD acquired?

13   **A.**   They were acquired by Thermo Fisher Scientific.

14   **Q.**   When?

15   **A.**   I believe it was the end of 2020.

16   **Q.**   Okay.  And did that press release indicate how much PPD

17   was acquired for?

18   **A.**   Yes.

19   **Q.**   How much?

20   **A.**   For 17.4 billion.

21   **Q.**   I'm now going to show you Joint Exhibit 59.  So is this

22   your performance review for 2017?

23   **A.**   Yes.

24   **Q.**   Okay.  Now, you recall testifying previously that you had

25   expected to be talking about your performance review at the

1    end of 2017, in that 360 meeting; is that right?

2    **A.**   Yes.

3    **Q.**   Okay.  Were you actually provided your performance review

4    at that time?

5    **A.**   No.

6    **Q.**   Okay.  Did Mr. Mekerri ever actually provide you your

7    performance review?

8    **A.**   Not for 2017.

9    **Q.**   At some point in time, did you see this performance

10   review?

11   **A.**   Yes.

12   **Q.**   And when did you see it?

13   **A.**   I saw it late January 2018, once Chad told me that it was

14   available in the system for me to view.

15   **Q.**   And was that after you had disclosed your disability to

16   PPD?

17   **A.**   Yes.

18   **Q.**   I'm going to direct your attention to the -- just to the

19   second to the last page of the exhibit.  And do you see here,

20   under, "Overall performance," it reflects an overall rating

21   of "fully effective"?

22   **A.**   Yes.

23   **Q.**   Okay.  And is it your understand that was your rating for

24   the 2017 calendar year?

25   **A.**   Yes.

1    **Q.**  Now, there was some areas in which Mr. Mekerri had rated

2    you lower than fully effective; is that right?

3    **A.**  Yes.

4    **Q.**  So I'm showing you here the second page of the document,

5    and if you could see, there's a "Goal" here.  Could you tell

6    the jury what that refers to?

7    **A.**  Yes.  That was my goal to recruit and hire global

8    scientific technical directors at the Ph.D. or MD level.  And

9    this was to address compliance gaps that we had in certain

10   areas.

11   **Q.**  And looking here, to the right side here, this was your

12   rating for the year, for that particular goal; is that right?

13   **A.**  Yes.

14   **Q.**  And the comment that you wrote there, is that -- is that

15   all accurate?

16   **A.**  Yes.

17   **Q.**  Okay.  And you mentioned here -- and I'll highlight it --

18   that there had been a time where one of the positions that

19   you were supposed to recruit for had been put on hold; is

20   that right?

21   **A.**  Yes.

22   **Q.**  Okay.  And who had put it on hold?

23   **A.**  I'm not sure.  Someone higher than my level.

24   **Q.**  Okay.

25   **A.**  I was never told specifically who.

1  **Q.** Had Mr. Mekerri informed you that that role had been put

2  on hold?

3  **A.** No.  I believe it was one of the recruiters.

4  **Q.** Was Mr. Mekerri aware, to your knowledge, that that

5  position had been put on hold?

6  **A.** Yes.

7  **Q.** Was that something that you and he had spoken about?

8  **A.** Yes.  I believe it came up during -- yes.  I asked him

9  about it, what the status was.  We, at that time, had an

10  excellent candidate, who I thought would be -- who we all

11  thought would be perfect for the role.  And so I continuously

12  asked about the status of that candidate.

13  **Q.** One of the things you also cite here in your note, you

14  see there's a highlighted section, you note that "Feedback

15  from the recruitment team is that we are not competitive for

16  qualified candidates, based on salary and location."

17          Do you see that?

18  **A.** Yes.

19  **Q.** And what do you mean by that?

20  **A.** There were other locations around the country that MD,

21  Ph.D. level scientists preferred to work.  And also, in those

22  locations, they paid higher salary.

23  **Q.** Directing your attention to the third page of the

24  document.  You see here the goal at the top of the page, the

25  category being, "Enhanced commercial and operational

 1  excellence."  Do you see that?

 2  **A.**  Yes.

 3  **Q.**  Okay.  And if I can direct your attention to the note

 4  there from Mr. Mekerri.  Do you see that he

 5  writes, "Validations complete.  Work with"?

 6  **A.**  Yes.

 7  **Q.**  Okay.  What was your reaction when you saw that?

 8  **A.**  He had not performed my performance review.  It looked

 9  like he stopped mid sentence.

10  **Q.**  Okay.  And if you look here at the goal below, do you see

11  he has -- he has no comments there?

12  **A.**  Yes.

13  **Q.**  And if we turn to the next page, the goal there, again,

14  he has no comments?

15  **A.**  Yes.

16  **Q.**  And then turning to the next page, do you see he has a --

17  he has an area in which he rated you, "Sometimes effective."

18          Do you see that?

19  **A.**  Yes.

20  **Q.**  And he provided no comments?

21  **A.**  Correct.

22  **Q.**  Did you ever ask Mr. Mekerri to give you the feedback

23  concerning his ratings for you in 2017?

24  **A.**  Yes.

25  **Q.**  And what did he say?

1  **A.**  He said he would schedule a meeting for us to discuss.

2  **Q.**  And did he?

3  **A.**  He did schedule a meeting.

4  **Q.**  And did you discuss?

5  **A.**  No.  He canceled it and said -- well, he said that he

6  would rather reschedule it for when I was on site, face to

7  face.

8  **Q.**  And when did you expect that would be?

9  **A.**  When I was on site, the same time I had the meeting --

10  let's see, when I was on site February 27th, I think, through

11  March 2nd.

12  **Q.**  And did the conversation happen while you were on site?

13  **A.**  No.

14  **Q.**  Prior to relocating to Massachusetts, you worked in the

15  same complex as the Highland Heights lab; is that right?

16  **A.**  Yes.

17  **Q.**  Was your work space physically located where the actual

18  testing was done?

19  **A.**  No.

20  **Q.**  Okay.  And are you familiar with an area of the lab known

21  as "The Pit"?

22  **A.**  Yes.  A little bit.  That was a term that was before my

23  time.

24  **Q.**  Okay.

25  **A.**  We did not refer to it as "The Pit" after I started.

1   **Q.**  Okay.  And what was your understanding as to what "The

2   Pit" referred to?

3   **A.**  The downstairs area, a certain -- yeah.

4          We were doing a lot of remodeling at the time and

5   so names were changing depending on the lab area.

6   **Q.**  Okay.  But in terms of the area where the actual testing

7   was done, did you on occasion visit that area?

8   **A.**  Yes.

9   **Q.**  Every day?

10   **A.**  No.

11   **Q.**  Why not?

12   **A.**  There -- there was no way I would have time.  I -- I had

13   many other responsibilities that I had to complete, and a lot

14   of technical documents to review, e-mails to respond to,

15   phone calls, meetings, things like that.

16   **Q.**  Do you have any estimate of how often you would visit the

17   actual area where the testing was conducted when you worked

18   in Highland Heights?

19   **A.**  I would try to go visit, you know, make face-to-face

20   contact with the lab staff at the bench on a weekly basis,

21   but that was not always possible depending on my schedule.

22   **Q.**  And when you visited that area, were you doing so in

23   order to supervise the work that was being done?

24   **A.**  No, that would be the supervisor's responsibility.

25   **Q.**  Okay.  When you relocated to Massachusetts, was there any

```
 1    kind of discussion concerning an expected frequency of how

 2    often you would travel back to Highland Heights?

 3    A.  No.

 4    Q.  Was it your understanding that that was left to your

 5    discretion?

 6    A.  Yes.  There was a -- a conversation about dividing my

 7    time more equally amongst the four labs that I oversaw.

 8    Q.  Was that a conversation you had with Mr. Mekerri?

 9    A.  Yes.

10    Q.  Up until the time that you -- you left PPD -- well,

11    strike that.

12            Up until the time that you took your medical leave

13    from PPD, had anyone at PPD ever suggested to you that your

14    remote working status was a problem?

15    A.  No.

16    Q.  Had anyone ever suggested to you that your remote status

17    was causing issues with respect to your performance?

18    A.  No.

19    Q.  Had anyone suggested to you that your remote status was

20    causing any issues with respect to the lab?

21    A.  No.

22    Q.  I'm going to show you Joint Exhibit Number 180.

23            Actually, I'm not going to show you Exhibit 180.  I

24    lied.  Apologies.

25            Do you recall your testimony previously about the
```

1    proposed accommodations from Dr. Kissimian with respect to

2    those buckets Mr. Mekerri had identified?

3    **A.**   Yes.

4    **Q.**   And you reviewed the accommodations proposed by

5    Dr. Kissimian?

6    **A.**   Yes.

7    **Q.**   From your perspective and your experience performing your

8    role and working at PPD, did you believe that those

9    accommodations were reasonable?

10   **A.**   Yes, for the changes that Hacene was proposing broadly to

11   my role.

12   **Q.**   And based upon your observations and your experience,

13   were those all things that PPD could have done to help you do

14   your job?

15   **A.**   Yes.

16   **Q.**   Are you aware of any reason why PPD could not have

17   provided those accommodations to you?

18   **A.**   No.

19   **Q.**   Last -- last section here.  You talked yesterday about

20   the -- what you did after you took your medical leave from

21   PPD, and I just wanted to try to fill in a couple of blanks

22   for the jury, if we could.

23          So after you took your medical leave, you did

24   the -- the partial hospitalization program at Butler

25   Hospital; is that right?

**A.**  Yes.

**Q.**  Do you recall when you completed that?

**A.**  It was some time in July 2018.

**Q.**  And after you completed that, can you describe for the jury what your health status was like then?

**A.**  I was -- I pretty much went back to my baseline of how I was doing before I entered, because I was not doing well.

**Q.**  Had the program at Butler Hospital helped for at least some period of time?

**A.**  Eventually.  At first I was pretty scared to go, because of the group therapy nature of some of it.  But, yes, it felt like a safe space that I could escape, you know, the pain of what was going on in my life with PPD.

**Q.**  And after leaving the program at Butler Hospital, did you continue your treatment with Dr. Kissimian?

**A.**  Yes.

**Q.**  And at some point in time did you move?

**A.**  Yes.

**Q.**  Why did you move?

**A.**  I had my office in -- I had an office in our basement of our home, and it started to trigger severe panic, so I just flat out refused to go back down in the basement.  My husband brought my computer up to the bedroom.  Because of the association I was making, it was very difficult for me.

Also, we can no longer afford to keep our child in

1    private school, and we were living in a more rural area of

2    Massachusetts, and we were concerned -- considering the

3    history with Maya and the challenges that they had in school

4    about sending -- sending them to public school.

5    **Q.**   Okay.  Where did you move to?

6    **A.**   We moved to Albuquerque, New Mexico.

7    **Q.**   And was there anything about Albuquerque in particular

8    that was -- you thought might be beneficial?

9    **A.**   Yeah.  I -- well, the cost of living was much cheaper and

10   we were really stressed about finances.  Also, I had spent a

11   year there as a grad student, and there's a lot of open

12   space.  There were a lot of places where I felt like I could

13   escape to on my own and be just surrounded by nature.  I

14   could go on a trail and just escape from the trauma of what

15   was going on.  That's all I recall.

16   **Q.**   That's fine.

17          And while you were in New Mexico, did you continue

18   your medical treatment?

19   **A.**   Yes.

20   **Q.**   And did you get a new doctor out there?

21   **A.**   Yes.

22   **Q.**   And who was that?

23   **A.**   Dr. Burbano.

24   **Q.**   And with Dr. Burbano, did you continue therapy sessions?

25   **A.**   Yes, I continued appointments.

1  **Q.**  Okay.  And you continued medications?

2  **A.**  Yes.

3  **Q.**  Particularly when you were treating with Dr. Burbano, was

4  there some sort of frequent efforts to sort of adjust your

5  medications?

6  **A.**  Yes.  She was concerned about the tolerance I could build

7  up with Prozac, and so added an additional medication in the

8  same class to try to prevent that from happening.

9  **Q.**  And the work you did with Dr. Burbano, in terms of the

10  medication and the sessions and being out in more of a

11  natural environment, did all of that solve your health

12  issues?

13  **A.**  No.  I had good days and I had bad days.  But, you know,

14  so sometimes I would be out on a trail by myself and, you

15  know, it just felt like an escape.  But then I'd come home

16  and I'd have days where I couldn't get out of bed.  So it

17  depended.

18  **Q.**  And what, if any, side effects did you suffer from the

19  medications you were receiving?

20  **A.**  When we added the additional medication to Prozac, I

21  believe it was a -- a newer medication.  I think it was

22  called VIIBRYD, I ended up getting what's called serotonin

23  syndrome, which can be life threatening, and that was pretty

24  scary.

25  **Q.**  Besides that situation, have you also incurred other side

1  effects from the various medications you've been on?

2  **A.**  Yes.  Depending on the medication.

3  **Q.**  Okay.  And what kinds of side effects have you had?

4  **A.**  If I was on a benzodiazepine or a sedative, I could be

5  off balance, so I have balance issues.  Depending on the dose

6  that you're taking, you shouldn't drive or operate heavy

7  machinery or anything.  It made me feel extremely tired.

8  Sometimes I had to take -- lay down and take naps in the

9  middle of the day.  Some of the medications caused insomnia,

10  so I had trouble falling asleep and sometimes that would take

11  hours.  Then when I would fall asleep, I'd frequently have

12  nightmares, wake up in the middle of the night, and have

13  trouble falling asleep again.  So it was just extremely

14  difficult to have a regular sleeping schedule.

15  **Q.**  And do any of those symptoms that you've described, do

16  they persist to this day?

17  **A.**  Yes.

18  **Q.**  Which ones?

19  **A.**  Definitely the sleeping disturbance and the nightmares.

20  Feeling off balance.  I'm still -- with the clonazepam, when

21  I take it during the daytime, I take it twice a day, I, you

22  know, sometimes will have to like stop myself and try to

23  catch my balance.  It makes me tired, hard to concentrate.

24  It's also difficult with benzodiazepines, because that's

25  another medication you can build up a tolerance to.  So it's

1    effective at a certain dose for a while, but then eventually

2    you have to start increasing the dose to have the same

3    effect.  And you can only do that so much and then it stops

4    working or becomes dangerous.  So there's careful management,

5    experimentation with the doctors on that.

6    **Q.**   Do you still live in New Mexico?

7    **A.**   No.  I currently live in Oregon.

8    **Q.**   And when did you move to Oregon?

9    **A.**   I moved to Oregon in the spring of 2020.

10   **Q.**   Why?

11   **A.**   My mom and my sister and brother-in-law all had moved to

12   Bend, and at that time, I felt like I needed closer family

13   support.  And the pandemic was starting and we just felt like

14   it would be better to be closer to family and it would be

15   helpful for us to have that support and not be so isolated.

16   **Q.**   And are you still receiving medical treatment in Oregon?

17   **A.**   Yes.

18   **Q.**   By who?

19   **A.**   I'm forgetting last names.  I see a therapist weekly,

20   Andrew, and I can't pronounce his last name.  And then I also

21   see a nurse practitioner remotely from Texas, who specializes

22   in mental health.  And she does my medication management.

23   **Q.**   You mentioned that, in connection with your medical leave

24   from PPD, that you had had some suicidal ideations; is that

25   right?

1  **A.**  Yes.

2  **Q.**  Have those recurred at all since your departure from PPD?

3  **A.**  Yes.

4  **Q.**  Any sense of how frequent?

5  **A.**  A lot.

6  **Q.**  When was the last one?  Go ahead.

7  **A.**  It happened a couple days before I came here.

8  **Q.**  And what were you thinking about?

9  **A.**  I just didn't think I could do this.  I wanted to kill

10  myself.

11  **Q.**  And did you actually think about anything you would do in

12  connection with taking your own life?

13  **A.**  I -- yeah.  I've always, in the back of my mind, had a

14  plan.

15  **Q.**  And what did that plan involve?

16  **A.**  It involved overdosing on medication.

17  **Q.**  Have you thought at all about what your suicide note

18  would say?

19  **A.**  I had a night recently, I think in February, where I was

20  struggling to go to sleep, and my brain just decided, okay,

21  let's -- what would a draft suicide note look like to my

22  child.  And that was very difficult, because I didn't want to

23  hurt -- I didn't want to hurt Maya, but I couldn't stop my

24  brain from, you know, playing that out.

25          MR. HANNON:  That's all I have, Your Honor.

1 THE COURT: All right. Thank you.

2 Cross-examination, Ms. Mandel.

3 So the way it works, ladies and gentlemen,

4 Mr. Hannon called the witness, he examines. And then there

5 will be cross-examination by the other side. And then

6 there's an optional second round, so then Mr. Hannon will get

7 the chance, if he wishes -- it's not required, but he can,

8 and it usually often happens, and the lawyer asks a second

9 set of questions, but it's not -- it's limited to what was

10 discussed on cross-examination. So it gets narrower. And

11 then Ms. Mandel will have a chance for recross. And that,

12 too, is limited. So if Mr. Hannon asked no questions -- had

13 no redirect, then there would be no recross. And if he had

14 one question, then Ms. Mandel can ask follow-up, but only on

15 the topics that he asked about, that were implicated by that

16 one question. So it gets narrowed.

17 Go ahead.

18 **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

19 BY MS. MANDEL:

20 **Q.** Good morning, Dr. Menninger.

21 **A.** Good morning.

22 **Q.** As you might recall, I'm Rachel Mandel. I'm going to ask

23 you some questions.

24 You may recall that you testified on Monday that

25 before you worked at PPD, you were a laboratory director at a

1   company called Clinical Reference Laboratory; is that right?

2   **A.**  Yes.

3   **Q.**  And let's pull up your resume.  Let's look at Exhibit 54.

4   This is the resume that you submitted to PPD when you applied

5   for employment there; is that right, Dr. Menninger?

6   **A.**  Yes.  This -- that's correct.

7   **Q.**  And the most recent professional experience that you had

8   listed was the job that you held at Clinical Reference Lab;

9   is that right?

10  **A.**  Yes.

11  **Q.**  And you began working there in 2010, right?

12  **A.**  Yes.

13  **Q.**  Right?  And then you moved over to PPD in 2015?

14  **A.**  Yes.

15  **Q.**  So fair to say it was five years at Clinical Reference

16  Lab?

17  **A.**  Yes.

18  **Q.**  And that company was in Kansas; is that right?

19  **A.**  Yes.

20  **Q.**  And then looking down a little bit farther on your

21  resume, it looks like before that you had been working as a

22  clinical pathologist at a hospital system in Kansas?

23  **A.**  Yes.

24  **Q.**  In your hospital position at St. Luke's Health System,

25  that's the one from 2006 to 2010, you were on the medical

1    staff of seven hospitals; is that right?

2    **A.** Yes.

3    **Q.** And that was all part of one hospital system, but within

4    that St. Luke's system; is that right?

5    **A.** Yes.

6    **Q.** So did you -- did you go to all seven hospitals on a

7    regular basis?

8    **A.** No.

9    **Q.** Where did you do your work for that hospital system

10    position?

11    **A.** We had -- we had four pathologists, so we divided the

12    different hospitals up. And so there was the core main

13    hospital, Saint Luke's Hospital, in Kansas City, Missouri.

14    And then we kind of divided them up based on, like, where we

15    lived. So I covered Saint Luke's South. I also covered

16    Wright Memorial Hospital, which was more rural. And then

17    Saint Luke's Cancer Institute, which was within Saint Luke's

18    Hospital.

19    **Q.** Can you explain for us what type of work did you do at

20    Saint Luke's?

21    **A.** At the main hospital, I primarily covered the hematology

22    section. And then we would back each other up. So if

23    somebody was on vacation, we might cover the blood bank or

24    chemistry, things like that.

25           I'm sorry, I just blanked and lost -- can you

1    repeat the rest of your --

2    **Q.**  And I know, this was a long time ago.  For those of us

3    who aren't pathologists, can you explain what you did

4    day-to-day working in the hospital system?

5    **A.**  Yes.  So okay, day-to-day, that was primarily what I was

6    doing in Saint Luke's Hospital.  Then I had one day that I

7    went to Saint Luke's South that I was the medical laboratory

8    director of, and I would visit with the director and

9    supervisors there, go over any technical documents that we

10   needed to have reviewed and signed off by the medical

11   director, any SOPs, things like that.  So I would do that

12   once a week.

13          And then I went to Wright Memorial Hospital, which

14   was more rural, once a month.  And similar activities to what

15   I just described.

16   **Q.**  Did any of this work involve meeting with patients?

17   **A.**  No.

18   **Q.**  Did you actually review and report on the pathology

19   results that came back into the labs?

20   **A.**  Yes.  In --

21   **Q.**  And did you -- I'm sorry, go ahead.

22   **A.**  It depended on the test.

23   **Q.**  Sure.  Who did you report those results to?

24   **A.**  To other doctors in the health system.

25   **Q.**  And it's safe to say that those doctors would report the

 1     results to the patients?

 2     **A.**   Um --

 3     **Q.**   As far as you know?

 4     **A.**   Yes.  Or they would chart them in their notes, you

 5     know -- I didn't observe that, so I'm not sure exactly, but

 6     usually they get charted in the notes and, yeah, those

 7     doctors will act on the results as part of their treatment.

 8     **Q.**   Understood.  And at some point, you left the hospital

 9     system and you went to -- I think you called it CRL for

10     short?

11     **A.**   Yes.

12     **Q.**   And that was sort of a change in direction as a doctor,

13     to go into industry; is that right?

14     **A.**   Yes.  We had been providing some consulting work to them

15     prior and so we -- we already had a little bit of a

16     connection with them.

17     **Q.**   With CRL?

18     **A.**   Yes.

19     **Q.**   Was that -- going from a hospital system into the CRL

20     job, was that a more dependable schedule for you?

21     **A.**   It was.  I had just had a baby, and in the hospital

22     environment, I was on call 24 hours a day, seven days a week.

23     So that was challenging, having a baby.

24              I was told that CRL was looking for a permanent lab

25     director, and I thought that would be a better fit for my

1    family.

2    **Q.**  And that position was also in Kansas; is that right?

3    **A.**  Yes.

4    **Q.**  So you didn't have to relocate for that job?

5    **A.**  No.

6    **Q.**  And I believe you testified earlier this week that you

7    reported straight to the CEO of CRL?

8    **A.**  Yes.

9    **Q.**  Do you remember like approximately how big a company CRL

10    was at that time?

11    **A.**  Maybe -- I used to know this.  I want to -- I want to say

12    maybe like 10,000.  We had a -- we had a laboratory in the

13    UK, as well.  I can't remember specifically.

14    **Q.**  And you were the only medical director there; is that

15    right?  I'm sorry, I used the wrong term.  Laboratory

16    director.

17    **A.**  We hired somewhere else to cover the laboratory in the

18    UK.

19    **Q.**  So you were the only laboratory director in the United

20    States, then?

21    **A.**  We also had a Ph.D. director who was getting close to

22    retirement, but he was still working on staff and had

23    transferred a lot of his responsibilities to me as he was

24    kind of like winding down his career.

25    **Q.**  And looking at the responsibilities that you had at CRL,

1    the first one listed here, that first bullet point says you

2    provided directorship for the general and clinical trials

3    laboratories; is that right?

4    **A.**  Yes.

5    **Q.**  So were those multiple laboratories that you were

6    directing?

7    **A.**  Yes.  Those were two different laboratories at that time.

8    **Q.**  And the second bullet is, "Ensures an effective quality

9    management program."  So does that mean that you were

10    overseeing quality?

11    **A.**  I was not over seeing the quality assurance department,

12    but I was over seeing lab quality and ensuring that we were

13    meeting our regulatory standards.

14    **Q.**  So a sort of bigger picture overseeing?

15    **A.**  Yeah.

16            MS. MANDEL:  Thanks, Miranda.

17    BY MS. MANDEL:

18    **Q.**  And then the next bullet point down says, "Interacts with

19    international, national, and state regulatory agencies for

20    laboratory related matters"?

21    **A.**  Yes.

22    **Q.**  And you were the main contact for those agencies because

23    you were the regulatory head, right?

24    **A.**  No.  Those were usually coordinated by the quality

25    assurance department, but I held the licensure because it

1    needed to be held by a medical director or a Ph.D. -- a

2    qualified Ph.D. director.

3    **Q.**  And you -- the next bullet down, you provide a

4    consultation with clients regarding the ordering of

5    appropriate tests?

6    **A.**  Yes.

7    **Q.**  And that was in drafting with CRL's clients, right?

8    **A.**  I'm sorry, can you repeat that?

9    **Q.**  That was interacting with CRL's clients?

10   **A.**  Usually not directly with the clients.  Usually it was

11   with other employees who worked in CRL.  If it was the

12   clinical trials laboratory, it was usually the project

13   managers that I was interacting with.  And if it was the

14   general laboratory, they did a lot of life insurance testing,

15   so I was working -- I was getting questions from, basically,

16   the sales team from the life insurance portion of the

17   company.

18   **Q.**  Understood.  Let's jump down to the last bullet point,

19   under the CRL entry on your resume.  It says, "Responsible

20   for oversight of laboratory data communication and

21   appropriate patient result reporting."

22   **A.**  Yes.

23   **Q.**  And who were you doing those communications and reporting

24   with?

25   **A.**  That refers to making sure that the results that are

1  coming off the instrument are appropriate -- appropriately
2  reported to our laboratory computer system and then
3  appropriately transferred to the clients.
4  **Q.**  To make sure the clients get the right information at the
5  end of the day?
6  **A.**  Yes.  And of course, that was a multidisciplinary group
7  of people who made sure that all happened correctly,
8  including the IT department.  And we had people who oversaw
9  data management, things like that.
10  **Q.**  Understood.  Let's jump to -- let's jump to Exhibit 20.
11      Dr. Menninger, do you recall at the time that you
12  were living in Kansas, you had a doctor named Michael
13  Everson?
14  **A.**  Yes.
15  **Q.**  And I apologize with everybody that we're going to have
16  to contend with Dr. Everson's handwriting.  And I'm going to
17  rely on you, Dr. Menninger, because you may be able to
18  interpret it a little better than the rest of us.
19      Let's actually look at --
20      MS. MANDEL:  We're going to look at, Miranda,
21  page 1139.
22  BY MS. MANDEL:
23  **Q.**  Dr. Everson is a psychiatrist in Kansas; is that right?
24  **A.**  Yes.
25  **Q.**  And you treated with him for some time while you were

1    living in Kansas, right?

2    **A.**  Yes.

3    **Q.**  Let's look --

4          MS. MANDEL:  Miranda, let's go back -- yup.  There

5    we go.

6    BY MS. MANDEL:

7    **Q.**  This looks like a note from Dr. Everson, from the dates

8    7/30, July 30th, 2015.  Do you see that, Dr. Menninger?

9    **A.**  Yes.

10   **Q.**  And I know you testified earlier this week that you had

11   some ongoing prescriptions for Valium that you kind of kept

12   with you over time.  Is it safe to say that Dr. Everson is

13   the person who was prescribing it for you?

14   **A.**  Yes.

15   **Q.**  And it indicates here, under encounter details, it says

16   "Valium, five milligrams."  That's what you were talking

17   about, right?

18   **A.**  Yes.

19   **Q.**  Okay.  And looking down at the -- you see where it

20   says, "History of present difficulties"?

21   **A.**  Yes.

22   **Q.**  And Dr. Everson noted -- fortunately, here we don't have

23   to worry about the handwriting -- that you had anxiety at the

24   time, right?  You had it since childhood?

25   **A.**  Correct.

1   **Q.**  And that you were using Valium.  And "PRN" means as

2   needed, right?

3   **A.**  Yes.

4   **Q.**  Okay.  And Dr. Everson noted you were in a lot of stress

5   at work.  So at that time it was during your CRL job, right?

6   **A.**  Yes.

7   **Q.**  Okay.  And that you were going to move to a new job.

8   That was referring to you taking the position at PPD in

9   Kentucky, right?

10  **A.**  Yes.

11  **Q.**  And then Dr. Everson also noted you had been off Celexa

12  for a year or more.  Celexa is an antianxiety and

13  anti-depression medication?

14  **A.**  Yes.  And I was taking it for anxiety.

15  **Q.**  And you also noted that you didn't use the Valium much,

16  but you used it for presentations, right?

17  **A.**  Yes.  But I didn't actually have to give any

18  presentations at CRL.

19  **Q.**  But you did have work stress at CRL that Dr. Everson was

20  noting here, right?

21  **A.**  I had stress -- I had stress about taking on a new

22  position, and so I think it's a little bit misworded.  But I

23  was letting him know that I was going to be taking a new

24  position, and I had some anxiety around that.

25          MS. MANDEL:  Thanks, Miranda.  We can close out of

1    that one.

2    BY MS. MANDEL:

3    **Q.**  I know you testified earlier this week that PPD recruited

4    you in 2015; is that right?

5    **A.**  Yes.

6    **Q.**  Did PPD fly you out to Kentucky to interview with folks

7    there?

8    **A.**  Yes.

9    **Q.**  Do you remember how many people you interviewed with when

10   you were hired at PPD?

11   **A.**  I don't remember the precise number.

12   **Q.**  More than five?  Fewer than five?

13   **A.**  Probably more than five.

14   **Q.**  Once you took the position as executive director at PPD,

15   did PPD pay for you to move from Kansas to closer to Highland

16   Heights?

17   **A.**  Yes.

18   **Q.**  And you didn't live exactly in Highland Heights, right?

19   **A.**  No.  I lived in Cincinnati, which is right across the

20   border.

21   **Q.**  So it's like a short drive from Highland Heights?

22   **A.**  Yes.

23   **Q.**  And you relocated in the summer of 2015 with your family,

24   right?

25   **A.**  It was in August.

| | |
|---|---|
| 1 | **Q.** When you started at PPD in Highland Heights, you were |
| 2 | going into the lab building five days a week, right? |
| 3 | **A.** Yes. |
| 4 | **Q.** And I know there were other lab locations that you have |
| 5 | talked about this week. We've heard about Brussels and |
| 6 | Shanghai; is that right? |
| 7 | **A.** Yes. |
| 8 | **Q.** But you were primarily working on a day-to-day basis in |
| 9 | Highland Heights? |
| 10 | **A.** Yes. But I was hired to oversee all four global |
| 11 | laboratories. |
| 12 | **Q.** Understood. If you can, Dr. Menninger, let's paint a |
| 13 | picture of what this building was like in Highland Heights. |
| 14 | It's one building that has a lab and an administrative area; |
| 15 | is that right? |
| 16 | **A.** Yes. There was a laboratory. There were two different |
| 17 | floors that we had different lab sections on. And then there |
| 18 | was an administrative area where offices and cubicles and |
| 19 | things like that were set up. |
| 20 | **Q.** And in your executive role, you had an office; is that |
| 21 | right? |
| 22 | **A.** Yes. |
| 23 | **Q.** And was it in sort of a row, or an area with other |
| 24 | offices? |
| 25 | **A.** Yes. It was set up as, like, a perimeter of private |

1    offices, kind of in a square, and then cubicles in the

2    middle.

3    **Q.**   Those external offices that were in a square, those were

4    other executives who were also working in the administrative

5    building?

6    **A.**   Not everyone was an executive, but primar- -- I guess

7    somewhat.

8    **Q.**   And Mr. Mekerri's office, when he began at PPD, was also

9    located in that area; is that right?

10   **A.**   Yes.

11   **Q.**   And I know you testified, he traveled some, and you

12   traveled some.  But when you were both in Highland Heights,

13   fair to say you did see each other on a regular basis?

14   **A.**   We did.  He traveled extensively, so I didn't see him

15   very much or know when he was going to be there, but when he

16   was there, yes, I interacted with him.

17   **Q.**   And thinking back to what the world was like before

18   COVID, did people tend to leave their doors open in that

19   administrative area, or was it kind of more of a closed-door

20   setting?

21   **A.**   No, we left our doors open.  Unless -- unless we were

22   having a private conversation with someone.

23   **Q.**   Understood.  Understood.  And you testified earlier this

24   morning that you visited the lab space, I think you called it

25   "The Pit," whenever you could, right?

1    **A.**  I did not call it "The Pit."  I referred to the

2    individual lab sections.  And when I started, there was a lot

3    of construction going on.  We were building out new spaces,

4    upgrading areas.  So "The Pit" was more of an old term that I

5    did not use.

6    **Q.**  Understood.  And as part of that sort of upgrading and

7    building out, I understand there are areas that are another

8    sort of lab term, they are benches; is that right?

9    **A.**  Yes.

10   **Q.**  Are the benches specific to a customer, a certain type of

11   testing?  Like how are those benches divided up?

12   **A.**  Well, first the lab is divided up into lab sections,

13   based on the type of testing that's being performed.  And

14   then the benches are referring to the specific tests that are

15   performed in that section.  So every -- all the sections have

16   primarily lab benches.

17   **Q.**  And I think earlier this week, you used an example of a

18   blood sugar test, right?

19   **A.**  I believe so.

20   **Q.**  Would that be an example of something that would be

21   performed on a specific bench?

22   **A.**  That was performed in the chemistry section, on an

23   analyzer.  So a large instrument.  It wasn't really a

24   bench-type test.

25   **Q.**  Okay.  And I'm going to expose my own scientific

1    ignorance on that one.

2    So in each bench would have lab techs that were

3    actually working with the samples, right?

4    **A.**  Correct.

5    **Q.**  And then overseeing their actual work with samples would

6    be a supervisor?

7    **A.**  Well, there were -- there were more levels, actually, in

8    between that.  There were different levels of med techs, and

9    then there was a lead med tech, and then there was a

10   supervisor.  And the supervisor oversaw different sections of

11   the laboratory.

12   **Q.**  So multiple benches would kind of lead up to one

13   supervisor.

14   **A.**  Yes.  If it -- yes.  Sometimes.  Like chemistry, primary,

15   was large, automated instruments.  It wasn't really benches.

16   But other laboratories -- or other sections of the

17   laboratories were primarily more benches than manual-type

18   testing.

19   **Q.**  And who did those supervisors report to?

20   **A.**  They reported to either -- when I started, they reported

21   to an associate director.  I was told there was another level

22   below that, as a manager, but that wasn't a position that was

23   filled.

24   In the Brussels lab, they also reported to an

25   associate director, who was later promoted to director.

1    **Q.**  Were the associate directors that you saw during the time

2    that you worked at PPD, were they medical doctors like you

3    are?

4    **A.**  No.

5    **Q.**  So if the associate director or below them, the

6    supervisors had questions about the medical details of tests,

7    who did those questions go to?

8    **A.**  It depended on the question.  You know, if it was

9    something related to the testing and the instrumentation,

10   that was something that they were trained on and had their

11   own certifications that they had to maintain.

12           If it was something related to, like, medical

13   doctor level, then, yes, it would come to myself or it would

14   go to another doctor who was specialized in an area that I

15   could not cover.

16   **Q.**  And I understand that one of the things was a little more

17   medical, was something called reference ranges; is that

18   right?

19   **A.**  Yes.

20   **Q.**  And reference ranges are, like, the normal range for a

21   test result; is that right?

22   **A.**  Correct.

23   **Q.**  So like on the blood sugar example, and I'm going to use

24   wrong numbers, but let's say that it's like okay for your

25   blood sugar to be between zero and ten.  That's the reference

1    range.  And it's above that or below that, it's a problem.

2    And I know my numbers don't -- is that right?

3    **A.**   Correct.

4    **Q.**   Okay.  And reference ranges was an area where the lab

5    needed to consult with you, because you were the doctor,

6    right?

7    **A.**   Yes.  I had to approve all the reference ranges.

8    **Q.**   And it was important to the customers that those correct

9    reference ranges be used, because that's how they sort of

10   figured out if what they were doing in medicine development

11   was working, right?

12   **A.**   Yes.  But reference ranges are established by each

13   laboratory, based on the instrumentation reagents, et cetera,

14   that they're using.  And also you have to take into

15   consideration the population that you're testing.  For

16   example, pediatric reference ranges would not necessarily be

17   the same as adults.

18   **Q.**   Understood.  And I think we're probably quite sure that

19   someone who's not a doctor wouldn't be able to talk

20   accurately about that.

21            Let's look at the job description for the executive

22   director of labs role?

23            MS. MANDEL:  Miranda, can you bring up 398, please.

24            And I apologize, Dr. Menninger, just a little bit

25   of a delay to bring up the exhibit.  I'm a little less tech

```
 1   savvy in that regard.
 2          THE COURT:  I'm sorry, what exhibit number did you
 3   say, Ms. Mandel?
 4          MS. MANDEL:  398.
 5          THE COURT:  3-9-8?
 6          MS. MANDEL:  Yes.
 7          THE COURT:  Thank you.
 8          MS. MANDEL:  A little tech delay.  Sorry.  There we
 9   go.  Thanks, Miranda.
10   BY MS. MANDEL:
11   Q.  Dr. Menninger, you probably recall we looked at your job
12   description earlier this week.  This was the job description
13   that you had during the entirety of the time you worked at
14   PPD; is that right?
15   A.  I believe so.  We had to update them yearly, and -- or
16   sign off and make sure there were no changes.  But, yes, this
17   looks accurate.
18   Q.  And sure, that was one of the things, as the executive
19   director of labs, that you worked with the company on, right?
20   A.  Yeah, I -- I didn't so much work on it, other than I just
21   had to review and sign off that I had reviewed it.
22   Q.  Sure.  Understood.
23          MS. MANDEL:  And Miranda, can we just make it a
24   little bit bigger.  I know my eyes -- I don't know if it's my
25   eyes are hard to read it.  Thank you.
```

  1    BY MS. MANDEL:

  2    **Q.**  Dr. Menninger, at the top it says, "ED of labs."  That

  3    refers to the executive director of labs, right?

  4    **A.**  Yes.

  5    **Q.**  And during the time that you worked at PPD, you were the

  6    only executive director of labs, right?

  7    **A.**  No, that's not correct.  I think they used the same job

  8    description to describe anyone who was an executive director

  9    level for the Global Central Laboratories, even if it was a

 10    different, like -- if you were executive director of the

 11    Global Central Labs, but you oversaw project management, I

 12    was told that the job description was the same as this.

 13    **Q.**  So for the folks who worked at this executive level, this

 14    was the job description?

 15    **A.**  Yes.

 16    **Q.**  Am I understanding that correctly?

 17    **A.**  That's what I was told.

 18    **Q.**  Okay.  And let's look at the specific job tasks that are

 19    on here.  We're going to test our eyes a little bit.

 20            If we look down at the, "Supporting business

 21    development," it's the second bullet point next to "Essential

 22    function."

 23            Do you see that document here?

 24    **A.**  Yes.

 25    **Q.**  And it says, "Support business development in obtaining

1   new customers and maintaining relationships."

2          Do you see that?

3   **A.**   Yes.   Uh-huh.

4   **Q.**   And this is something that you worked on, isn't it?

5   **A.**   I worked with the executive director of business

6   development on this particular bullet.

7   **Q.**   Okay.   And that involved answering customer questions, if

8   they had questions about the lab capabilities or things like

9   reference ranges, right?

10  **A.**   That usually went to a different department, if it was

11  something related to reference ranges.

12  **Q.**   Well, what about things what the lab could do, you know,

13  just like the types of testing you could run?

14  **A.**   Yes.

15  **Q.**   That's something that you could answer?

16  **A.**   We would have frequent conversations about the type of

17  testing that we could perform, based on the regulatory

18  certifications that we held.

19  **Q.**   And that was something that you would answer questions on

20  behalf of PPD to new customers about, right?

21  **A.**   I would.   It wouldn't usually go directly to me first.

22  It would usually go to our scientific affairs department.

23  And if there was something that they could not answer, then

24  they would reach out to me.   Usually by e-mail.

25  **Q.**   Understood.

1          So they sort of screened for the questions that

2     required your level of input; is that right?

3     **A.**   Yes.

4     **Q.**   Okay.  And you also made yourself regularly available to

5     answer questions about the lab studies that were being done

6     for customers; is that right?

7     **A.**   The testing portion.

8     **Q.**   Sure.  The part that actually went to the medical tests,

9     right?

10    **A.**   Yes.

11    **Q.**   And if we look at the next bullet point, it

12    says, "Perform financial reviews, establish operating budget,

13    and develop forecasts maximizing operating profit, provide

14    business updates to senior leadership."

15         And you did that on a regular basis, right?

16    **A.**   Yes.

17    **Q.**   And if we look at the next -- the next bullet down, it

18    says, "sets operational standards, goals and directs

19    implementation of laboratory goals and policies, oversees

20    resource allocation."

21         And that's something that you did in connection

22    with the operations folks, right?

23    **A.**   Yes.

24    **Q.**   Performs -- next bullet down is "Performs administrative

25    responsibilities, including HR functions, personnel

1    development, facilities management, writing SOPs and PDs."

2             And I know you talked earlier this week about the

3    writing up of the standard operating procedures, right?

4    **A.** Yes.

5    **Q.** And you also worked on overseeing -- I know you've talked

6    about some of the folks working in the lab and your reports.

7    And you helped carry out the sort of human resources

8    functions and personnel development for those people, right?

9    **A.** Yes. And it also involved -- they had to submit a

10    requisition any time they wanted to hire someone that

11    needed -- I needed to review it and make sure it was

12    justified and approved. And then I specifically was involved

13    in the higher level employees that we recruited and hired.

14    **Q.** And you met regularly with the company's senior

15    leadership team, right?

16    **A.** Yes. We had bi-weekly meetings.

17    **Q.** And those were in-person, Dr. Menninger?

18    **A.** It was a combination of in-person and people calling in.

19    Because we're a global laboratory, so we had people calling

20    in from the different global locations.

21    **Q.** Sure. And this sort of like mothership of the lab

22    locations in the US, it was Highland Heights, because that

23    was the only US location, right?

24    **A.** Highland Heights was the only US location, yes. But we

25    treated all four laboratories as equal. I would say Highland

1    Heights had the highest volume of testing.

2    **Q.**  Looking at the bullet point that we were just -- that we

3    were just reviewing, the one that says, "Perform

4    administrative responsibilities, including HR functions"?

5    **A.**  Yes.

6    **Q.**  You did regular trainings for the lab staff, right?

7    **A.**  That came in different formats.  Sometimes we brought

8    people in.  Sometimes we had to get sponsors that would come

9    in and train on a new product, or assay, or instrument that

10   they had.  So we had different individuals who would do

11   training.  Sometimes it would be one of my direct reports who

12   would train on a specific area, and sometimes it would be

13   things like continuing education, where they would watch a

14   webinar, or like a presentation presented by the College of

15   American Pathologists, things like that.

16   **Q.**  So a mix of things that you needed to do to keep the lab

17   up to date with whatever they needed to be aware of?

18   **A.**  Yes.

19   **Q.**  And one of your responsibilities, if we go to the last

20   bullet, under essential functions, is to oversee quality

21   assurance and quality control aspects of the lab, to ensure

22   compliance with regulatory standards.

23        Do you see that?

24   **A.**  Yes.

25   **Q.**  And I know that you talked a lot this week about the

 1    regulatory roles, things like, I think, CAPA and CLIA; is

 2    that right?

 3    **A.**   Yes.

 4    **Q.**   And those regulatory requirements came with certain

 5    quality assurance obligations, right?

 6    **A.**   Yes.

 7    **Q.**   And that fell within what you did, right?

 8    **A.**   Yes.  Some of it.  The portion that related to the lab,

 9    but quality assurance also covers any ancillary departments

10    that support the lab.

11    **Q.**   Sure.  And if we look down lower, lower down on the page,

12    the last kind of box, it says, "Liaison."  Do you see that,

13    Dr. Menninger?

14    **A.**   Oh, yes.

15    **Q.**   And there it says that the requirement was "to interact

16    frequently with internal personnel and outside

17    representatives at various levels."

18              Do you see that?

19    **A.**   Yes.

20    **Q.**   "Participates and may present at meetings with internal

21    and external representatives"?

22    **A.**   Yes.

23    **Q.**   And that's all the kind of stuff that you've just been

24    describing, right?  The training and the --

25    **A.**   No, this is -- this is different.

1    **Q.**  Okay.  So how is this different?  What types of things

2    did this involve?

3    **A.**  This would not be considered, like, an essential function

4    to my job.

5    **Q.**  Right.  And this is listed.  I see.  It's listed in a

6    different box called "liaison," right?

7    **A.**  Right.  I -- it's written very broadly.  But, yeah, so I

8    would interact with our internal company personnel, and

9    occasionally outside representatives or clients.  I never

10    presented at any meetings, other than one time I presented a

11    few slides at our internal sales meeting.  And on two other

12    occasions, I presented like two to three slides for a town

13    hall presentation.

14    **Q.**  And town halls, Dr. Menninger, that's a bigger meeting

15    within the company, right?

16    **A.**  It's a meeting within all the GCL labs, just to give them

17    high-level updates on what we're doing and the different

18    areas.

19    **Q.**  And when you say GCL, I know that's Global Central

20    Laboratories, but I just want to make sure that we're -- the

21    jury understands.

22          So that's Global Central Labs?

23    **A.**  Yes.

24    **Q.**  And that would be the Brussels, Shanghai, Singapore, and

25    the Highland Heights locations; is that right?

1   **A.**  Yes.

2   **Q.**  And let's pop out of that box, and I want to focus your

3   attention, Dr. Menninger, a little farther --

4         MS. MANDEL:  I'm sorry, Miranda, not out of the

5   exhibit.  Just -- thank you.

6   BY MS. MANDEL:

7   **Q.**  Under the "summarized purpose" of the position, at the

8   top of the page.  At the end of that statement, it says, "Up

9   to 30 percent travel."

10         Is that right?

11   **A.**  Yes.

12   **Q.**  And you did travel from Highland Heights, or from your

13   home in Cincinnati, to the other lab locations on occasion;

14   is that right?

15   **A.**  Yes.

16   **Q.**  And, in fact, you needed to visit the Belgium lab, I

17   think it was three times a year; is that right?

18   **A.**  Yes.

19   **Q.**  And that was some type of regulatory requirement?

20   **A.**  Yes.  -- well, not the three times necessarily, but we

21   had to have a procedure that defined the frequency.

22   **Q.**  Understood.  So that there was assurance that there would

23   be an executive director of labs on site with some

24   regularity?

25   **A.**  Uh-huh.

 1          MS. MANDEL:  Okay.  And let's go -- Miranda, can we

 2    switch to the next page of the job description, please.

 3    BY MS. MANDEL:

 4    **Q.**  And this is the second page of your job description from

 5    when you were the executive director of labs; is that right,

 6    Dr. Menninger?

 7    **A.**  Yes.

 8    **Q.**  And I know that you've testified about this earlier this

 9    week, but I just wanted to make sure that we're clear.  If

10    you look under education and experience, this position

11    required someone with a Ph.D. or an MD -- that's what you

12    have, right?

13    **A.**  Correct.

14    **Q.**  And the other option is a DRPH.  What's that?

15    **A.**  I think that's a doctor of pharmacy, but I don't think

16    that would qualify, based on the regulatory standards that

17    I'm familiar with.

18    **Q.**  And during the time that you were at PPD, it was really

19    the MD level that --

20    **A.**  MD or Ph.D. level in a specific section.

21    **Q.**  Okay.  And the -- underneath that, it talks about

22    previous experience that's necessary; is that right?

23    **A.**  Yes.

24    **Q.**  And that was, in your case, based on the time that you

25    had spent at CRL, right?  That was about five years.  And

1    before that, you had worked in clinical laboratories at the

2    Saint Luke's system, right?

3    **A.**  Yes.

4    **Q.**  Okay.  And then let's -- let's look at the next page of

5    the job description, as well.  Under, "Working conditions and

6    environment."

7                Do you see that at the top of the page,

8    Dr. Menninger?

9    **A.**  Yes.

10   **Q.**  And it says that the work is performed in an office or

11   laboratory and/or clinic environment.  Do you see that?

12   **A.**  Yes.

13   **Q.**  And then frequently drives to site locations, travels

14   within the United States, occasionally internation travel?

15   **A.**  Yes.

16   **Q.**  And that's what you were doing at this time when you were

17   hired, right, you were driving to Highland Heights.  At times

18   you were flying to Brussels as needed; is that right?

19   **A.**  Yes.

20   **Q.**  And I believe in 2016, you did fly to Shanghai to visit

21   that lab; is that right?

22   **A.**  Yes.  And Singapore.

23   **Q.**  And to Singapore.  Okay.

24               And my understanding is that Shanghai and

25   Brussels -- there were sort of different requirements in the

**JA454**

1   different countries for what the lab director really had to

2   do to be on site; is that right?

3   **A.**   In Asia they had local regulations that required the

4   doctors who were on their laboratory directorship be local.

5   So there were different doctors listed on their certificates,

6   but for the purpose of performing testing, I would oversee

7   that.

8   **Q.**   Okay.  Understood.

9        Looking down under the -- the "physical

10   requirements" of your job, skipping the first two which

11   really had to do more with the really truly physical

12   requirements.  If we look at the one, it's about I think

13   seven down, it says, "Ability to communicate complex

14   information and ideas."

15        Do you see that?

16   **A.**   I'm having a hard time finding it.

17   **Q.**   That's why I'm trying to -- I think it's the seventh

18   bullet point down.

19   **A.**   Okay.  Yes.

20   **Q.**   Do you see that?

21   **A.**   Yes.

22   **Q.**   And then under that is "frequently interacts with others,

23   relates sensitive information to diverse groups, internally

24   and externally."

25        Do you see that?

1    **A.**  Yes.

2    **Q.**  And that sensitive information might be things like

3    results of testing or those reference ranges that we talked

4    about; is that right?

5    **A.**  Correct.

6    **Q.**  Okay.  And then if we look down at the -- at the last two

7    bullets, the second to last one says, "Performing a wide

8    range of complex tasks as dictated by variable demands and

9    changing conditions."

10             Do you see that?

11   **A.**  Yes.

12   **Q.**  "And the ability to perform under stress."

13             Do you see that?

14   **A.**  Yes.

15   **Q.**  And the last bullet point there is "Regular and

16   consistent attendance."

17   **A.**  Yes.

18   **Q.**  Okay.  And let's look at the last page.  It's actually an

19   addendum to the job description.  And this is -- if you look

20   down at the last revision date, it says this was added in

21   2013, right?

22   **A.**  Yes.

23   **Q.**  And this was -- you started working at the company in

24   2015.  So this was before that time?

25   **A.**  Yes.

1 **Q.** And there are some specific requirements under -- it

2 says, "Under additional specific job responsibilities, serve

3 as the laboratory director for New York State accreditation."

4 **A.** Correct.

5 **Q.** And I know we've heard this week a couple of mentions of

6 New York State, and it's a little confusing, of course,

7 because you were working in Kentucky, but can you explain why

8 New York State had any relevance here?

9 **A.** If you perform testing on any samples that come from the

10 State of New York, you have to have New York State

11 accreditation.

12 **Q.** And so that was a specific requirement that PPD was

13 making sure that they had in place so that they could get

14 samples flown in from New York, right?

15 **A.** Yes.

16 **Q.** Okay.  And did you have the -- the credentials that were

17 necessary for PPD to be able to get that New York State

18 accreditation?

19 **A.** I had some.  There are multiple different areas and I

20 covered a lot of them, but there were some that we did not

21 have coverage.  And those were the positions where I

22 identified compliance gaps and we were trying to hire to

23 address that.

24 **Q.** Sure.  And I know you talked earlier this week about the

25 need to hire out to make sure that PPD was in compliance

| 1 | there. |
|---|---|

2  **A.**  Yes.

3  **Q.**  The -- the second bullet point there says, "Spend

4  70 percent of time on site and be available 30 percent of the

5  time by telephone or computer, as needed."

6       Do you see that?

7  **A.**  Yes.

8  **Q.**  Okay.  And on site, when you were hired, was in Highland

9  Heights at the lab location?

10  **A.**  Yes.

11  **Q.**  Okay.  Thank you.

12       Dr. Menninger, you testified a few moments ago that

13  you did need to visit the Belgium lab location with some

14  regularity, right?

15  **A.**  Yes.

16  **Q.**  And who set the travel schedule for how often you went to

17  Belgium?

18  **A.**  I worked with my direct report, who is the lab director

19  in Belgium, and we kind of set that schedule based on, like,

20  if there was an inspection coming up or, you know -- we tried

21  to space it out throughout the year, but sometimes because of

22  other obligations, you know, there were a couple visits

23  crammed together really fast and -- yeah, but we -- I set it

24  with my direct report.

25  **Q.**  Your direct report that was in Belgium?

1  **A.**  Yes.

2  **Q.**  Okay.  And when you went to Belgium, you worked on site

3  with that direct report?

4  **A.**  Yes.

5  **Q.**  And there was a lab building sort of like the one in

6  Highland Heights, but located in Brussels?

7  **A.**  Yes.

8  **Q.**  On one trip you took to Belgium, you ran a 10K race; is

9  that right?

10  **A.**  On the weekend, there were, I believe, three employees

11  who were planning to run it from the Brussels lab, and they

12  asked me if I would like to join.  So with some hesitancy, I

13  agreed.

14  **Q.**  Well, I think you're being humble, because you are a

15  runner, right?

16  **A.**  I'm not a runner anymore.

17  **Q.**  But you were at that time?

18  **A.**  Just a little.

19  **Q.**  Well, a little?

20  **A.**  I'm not a very good runner.

21  **Q.**  And when you visited the Belgium lab, I know you

22  mentioned there were inspections?

23  **A.**  Yes.

24  **Q.**  And dealing with inspections and audits, that was part of

25  your role as lab director?

1    **A.**  Not the routine client audits, but definitely the

2    inspections.

3    **Q.**  That was like a regulatory inspection, right?

4    **A.**  Right.

5    **Q.**  And that's when the regulatory agency would send someone

6    to look at what was actually physically being done in the

7    lab?

8    **A.**  Yes, that's correct.  That was usually done by the

9    College of American Pathologists.

10    **Q.**  And in Belgium, was that also done --

11    **A.**  Yeah.  Yes.  They did international inspections.

12    **Q.**  And that required a lab director to be on site when they

13    were doing the inspection?

14    **A.**  Yes.  Usually.  I have been in inspections where there

15    have been exceptions to that, but usually, yes, the lab

16    director is on site.

17    **Q.**  How long does one of these inspections last?

18    **A.**  Usually they last just one day, sometimes two.  It

19    depends on how big the lab is and how many inspectors there

20    are.

21    **Q.**  And can you describe for the jury what would happen

22    during one of these inspections?

23    **A.**  Well, CAP has a number of regulatory --

24    **Q.**  CAP?

25    **A.**  Yes.  CAP is short for College of American Pathologists.

1    They have a number of -- thousands of regulatory standards,

2    and they're divided up into sections.  So usually what would

3    happen is they would bring a team out, and there would be an

4    inspector that would inspect that particular -- one

5    particular section.  And so they would usually meet with the

6    supervisor of that section, and they would go through the

7    standards and make sure that we were compliant.

8    **Q.**  And if -- safe to say that if PPD didn't have all the

9    things in place that were needed, you might lose that

10   accreditation from CAP?

11   **A.**  No.  It is rare -- I mean, like I said, there are

12   thousands, over 2,000 standards, so it's rare for any

13   laboratory to have a CAP inspection and nothing be found.

14   So, no, that's not the -- that's not how it usually works.

15   There's a process where you respond.  There's a summation

16   conference at the end of the inspection, where they report

17   their findings, and there's different levels of the findings.

18   And then you address them accordingly within usually a month.

19   **Q.**  And then everything would be okay, and the lab could

20   continue to function?

21   **A.**  Right.  And then they update your certification for

22   another two years.

23   **Q.**  Okay.  Dr. Menninger, you spoke earlier this week about

24   moving from the Highland Heights area -- I know you were

25   living in Cincinnati, moving to the East Coast.  Do you

1    recall that?

2    **A.**   Yes.

3    **Q.**   And at some point in 2016, you told Mr. Mekerri, who was

4    your manager, that your daughter was having difficulty in

5    school; is that right?

6    **A.**   On multiple occasions we had those conversations.

7    **Q.**   And multiple times from the time Mr. Mekerri started as

8    your manager until the spring of 2016; is that right?

9    **A.**   I believe it was fall of 2016.

10   **Q.**   I'm sorry, fall of 2016.  Okay.  And so safe to say that

11   you were pretty honest with Mr. Mekerri about the challenges

12   that your daughter was having at that time?

13   **A.**   Yes.  We had -- we had a really great relationship and

14   it -- you know, we would talk to each other about our

15   families and personal things.  And he -- he was very

16   compassionate and understanding and, yeah, seemed to really

17   care about my family and my child.

18   **Q.**   In 2016, how old was your daughter at that time?

19   **A.**   I think around 8 or 9.  Eight maybe.

20   **Q.**   So that would be elementary school at that time, right?

21   **A.**   Yes.

22   **Q.**   And I know this must be hard to talk about.  Around that

23   time, you told Mr. Mekerri that she was being bullied in

24   school; is that right?

25   **A.**   Yes.

1   **Q.**   Can you describe a little bit more about what was
2   happening with your daughter in school at that time that
3   caused you to be concerned?
4   **A.**   It started -- I want to say it continued to escalate to
5   much more concerning episodes, but there was tripping,
6   targeting during PE, like intentionally trying to throw the
7   ball to hit her.  And there were some kids who would describe
8   violent acts that they would do to characters that she really
9   loved and watched on television that was very distressing to
10  her.

11          And so we initially tried to address it with the
12  teacher, and then also the physical education teachers, but
13  things kept escalating.  And Maya became extremely depressed
14  and we became very concerned.  So eventually, we went to
15  speak to the head of the school.  We were very concerned
16  about the impact that this was going to have on them growing
17  up, you know, building self-esteem and -- it was just painful
18  to watch as a mom.  You want to protect your child.  So,
19  yeah.
20  **Q.**   And I'm sorry to have to ask you about that.  I know that
21  was difficult.

22          I think you testified earlier this week that
23  Mr. Mekerri had been accommodating for you to go and have
24  meetings with the school, as you've just described; is that
25  right?

1   **A.**   Yeah.   I mean my husband and I went once to meet with --

2   usually we would do it on, like, off hours, but at PPD, I

3   mean, I was working nights, weekends.   Since we were a global

4   lab and we were on different time zones, it was kind of like

5   you always had your phone and your laptop with you.   So yes,

6   I would say, okay, we were -- take an hour for me to go to

7   the school and speak with the head.

8   **Q.**   And at some point in 2016, you talked to Mr. Mekerri

9   about the idea of possibly moving so that your daughter could

10  go to a different school; is that right?

11  **A.**   Yes.

12  **Q.**   And around that time, you and your husband started to

13  look at what school would be best for Maya; is that right?

14  **A.**   Yes.

15  **Q.**   Can you explain where you looked for schools that would

16  work for your daughter?

17  **A.**   We looked all over the -- the entire country.

18  **Q.**   And what type of school were you looking for in

19  particular?

20  **A.**   I was just looking for a place -- Maya is a very creative

21  child and I was just looking for a place that had a school

22  with diversity, a lot of opportunities to participate in

23  creative activities, and schools that look like, you know --

24  Maya and I would look at websites together and I would see

25  what Maya's reaction was.   And based on some of the clubs

1    they had and the activities.  And so that's how we -- that's

2    how we looked for schools, basically.

3    **Q.**  And anything in the US was sort of on the possibility

4    list, right?

5    **A.**  Yes.

6    **Q.**  And you ultimately found out about a school in Rhode

7    Island called The Wheeler School; is that right?

8    **A.**  Yes.

9    **Q.**  And how did you and your family learn about The Wheeler

10   School?

11   **A.**  It was doing an internet search.

12   **Q.**  An internet search?

13   **A.**  Uh-huh.

14   **Q.**  And you described a few moments ago that you kind of

15   gauged your daughter's reaction as you looked at schools

16   online.  What jumped out to you or your family about The

17   Wheeler School?

18   **A.**  Maya was extremely excited after looking at their website

19   and what they had to offer.  And you know, it was really nice

20   for us to see her smile and be excited about a place.  So,

21   yeah, it was one of the schools at the top of our list that

22   we considered.

23   **Q.**  And that's -- that's a private school in Rhode Island; is

24   that right?

25   **A.**  Yes.

1 **Q.** And the school that your daughter had been at in

2 Cincinnati, was that a public school or a private school?

3 **A.** It was also a private school.

4 **Q.** And at some point in this time period in 2016,

5 Dr. Menninger, you told Mr. Mekerri that you found a school

6 that you thought your daughter should go to; is that right?

7 **A.** I'm not sure if it was in 2016 or 2017 when we found that

8 school, but I mentioned that we found a school that we were

9 going to take Maya to visit.

10 **Q.** And did you let Mr. Mekerri know that it was in Rhode

11 Island?

12 **A.** I believe so, yes.

13 **Q.** And after you visited the school, you and your family

14 decided that that's where your daughter would go; is that

15 right?

16 **A.** We had to apply and wait to see if Maya would be

17 accepted.  And then I let Hacene know that she was accepted

18 and he was very happy for me.  And so I confirmed that that

19 was where we were going to relocate.

20 **Q.** And you didn't move to Rhode Island; is that right?

21 **A.** No.  It was a little bit too expensive for us around The

22 Wheeler School, so we found a house a little further out.

23 And like I said, my husband was a stay-at-home dad, so he

24 would drive Maya to school and pick them up.

25 **Q.** And so you moved -- well, you started to make

1  arrangements to move to Dighton, Mass.; is that right?

2  **A.**  Yes.

3  **Q.**  And you told Mr. Mekerri that this was your plan.  And

4  how did he respond to you?

5  **A.**  I think he was excited for me.  He even had to write --

6  he wrote a letter for me for, you know, the house that we

7  were purchasing, because I had to show evidence that I was

8  still employed.  And, yeah, he actually was like if there's

9  any furniture that you need to set up your office, just let

10  me know.  And I said, no, it's fine.  I don't need that.  We

11  can handle that ourselves.  So just very supportive.

12  **Q.**  And at this time, thinking back to that administrative

13  area in the Highland Heights location, where you said there

14  were offices around the periphery, were you aware of any

15  other folks working in those offices, executives or others,

16  who moved to different locations and worked from there for

17  personal reasons?

18  **A.**  I'm not sure I'm understanding what you're asking.

19  **Q.**  Understood.  I'll try to ask that question better.

20      You described a little earlier this morning,

21  Dr. Menninger, that the kind of administrative area in the

22  Highland Heights building, where you sat with other

23  executives and other folks who oversee different parts of the

24  lab business; is that right?

25  **A.**  Yes.

1    **Q.**  At the time that you were making arrangements to move to

2    the East Coast, were you aware of anyone else who was kind of

3    working in that area, who was making the move to live

4    somewhere else for personal reasons?

5    **A.**  No one at that time, but there were other executive

6    directors at my level who were already working remote.

7    **Q.**  As of 2016?

8    **A.**  Yes.

9    **Q.**  And who was working remotely as of 2016, to your

10   knowledge?

11   **A.**  Michelle Dockhorn.  She was our executive director of lab

12   partnerships.  They kind of managed our large, high profile

13   clients, and she lived in Kansas, City.

14         And then Caroline Mackie, who was the executive

15   director for business development.  And she lived in

16   Charlotte, North Carolina.

17         At that time, Michelle Dockhorn was reporting to

18   Hacene, as well, and so when I said, you know, I want to

19   throw out this option about what's going on with Maya, he

20   actually brought up, well, yeah, Michelle's remote.  So he

21   didn't have a problem with it at all.  He just wanted to run

22   it by the person that he was reporting to at the time, who

23   was David Johnston, who also was fine with it.

24   **Q.**  So Mr. Mekerri generally was supportive of his employees

25   working from where they needed to work from, as long as they

1  could get their job done; is that right?

2  **A.**  I can't speak to his opinion about other employees.  I

3  wouldn't --

4  **Q.**  At least from what you experienced, though?

5  **A.**  I suppose.  I don't know.

6  **Q.**  Did Mr. Mekerri tell you that he was receiving push back

7  from other people about the idea of you relocating to

8  Massachusetts?

9  **A.**  No.

10  **Q.**  And I know that you mentioned that Mr. Mekerri offered to

11  get you whatever furniture you would need for your home

12  office in Dighton; is that right?

13  **A.**  Yes.

14  **Q.**  And you set up a home office in your basement there?

15  **A.**  Yes.  We actually had a -- a built-out, finished area

16  specifically for that purpose.

17  **Q.**  And PPD did provide you with things like computer

18  monitors, a docking station, so that you could set up your

19  home office and be able to continue your work seamlessly,

20  right?

21  **A.**  Yeah.  They -- they shipped two monitors and a docking

22  station.  It might have been the same docking station that I

23  was using in Highland Heights, but I already had my laptop

24  and I already had my cell phone.

25  **Q.**  And once you moved to Dighton, BPD paid for your travel

 1  back to Highland Heights whenever you needed to be there,

 2  right?

 3  **A.**  Yes.

 4  **Q.**  Even though you moved for personal reasons, PPD still did

 5  that.

 6  **A.**  They did that for anyone who had to travel for business

 7  purposes.

 8  **Q.**  And just to be clear on the dates, Dr. Menninger, you

 9  actually moved to Dighton, it was June 2017; is that right?

10  **A.**  Yes.

11  **Q.**  And that was your daughter finished out the school year

12  in Cincinnati, and then you relocated?

13  **A.**  Yes.

14  **Q.**  So for the rest of 2017, from June to December of 2017,

15  fair to say you only made the trip back to Highland Heights

16  twice; is that right?

17  **A.**  In July, we were waiting for all of our stuff to arrive,

18  and then in August, I took some PTO, because I had to take --

19  I had to take my 10-year recertification board exam.  So I

20  took some PTO because I knew I needed some time to study for

21  that.

22          After that, I was extensively traveling, every

23  month.  I went to Highland Heights in September, and I turned

24  around and I went to Belgium, and then I turned around and I

25  went back to Highland Heights, and then I turned around and

1    went back to Belgium in December.  So there was frequent

2    travel that last quarter -- quarter of 2017.

3    **Q.**  So again, looking at the period after you moved in

4    June 2017, through December, it was two trips to Highland

5    Heights and two trips to Belgium.  Do I have that right?

6    **A.**  Yes.

7    **Q.**  And I know we looked a few moments ago at that

8    requirement in the ED of labs description to be on site

9    70 percent of the time; is that right?

10   **A.**  Yes.  That was for the position that was to be

11   permanently located on site in Highland Heights, the position

12   we were recruiting for.

13   **Q.**  And at that time, there wasn't someone else filling that

14   position, right?

15   **A.**  There wasn't because that position was put on hold.  But

16   before that, early in the spring, we found an excellent

17   candidate that everyone loved, super-qualified, and the

18   thought was that -- well, I think we actually did make an

19   offer.  And I don't know all the details of why it wasn't

20   accepted, but I think it had something to do with salary.

21   And then so, unfortunately, that candidate, who we all

22   thought was going to take that position, then right after

23   that, they put the position on hold, so I couldn't recruit

24   for it.

25   **Q.**  And Dr. Menninger, in 2018, the first half of 2018,

1  before you went on medical leave, you made one trip to

2  Highland Heights; is that right?

3  **A.**  Yes.

4  **Q.**  And in that first half of 2018, any international trips

5  to the other labs?

6  **A.**  No.

7  **Q.**  Let's look back at an exhibit that we looked at earlier

8  this week.

9         MS. MANDEL:  Miranda, can we bring up 378, please.

10  BY MS. MANDEL:

11  **Q.**  Dr. Menninger, you may recall looking at this exhibit

12  earlier in the week.  I think you -- you explained that this

13  is a list of responsibilities that you were doing that you

14  created for Mr. Mekerri in November of 2017; is that right?

15  **A.**  Yes.

16  **Q.**  And this was -- your cover e-mail is what you see in

17  front of you.  This is the cover e-mail where you attached a

18  list of your responsibilities that you were handling; is that

19  right?

20  **A.**  Yes.

21  **Q.**  And I just want to look at a few parts of this where we

22  didn't really focus on on Monday.  And I -- I just want to

23  clarify, you put this list together on your own, right?

24  **A.**  Yes.

25  **Q.**  Okay.  Let's look at the first page of the chart of work

1    tasks.  And you may recall, we looked at this the other day.

2    You first talked about your number of e-mails you were

3    handling; is that right?

4    **A.**  Yes.

5    **Q.**  And then looking down at the next item was meetings.  And

6    I know you've talked this morning a fair amount about the

7    meetings that you were having.  And you said this was about

8    four hours a day, on average?

9    **A.**  Yes.  You know, it was -- it depends on the week.

10    **Q.**  Sure.  I mean, there was some variability, I'm assuming?

11    **A.**  Yeah.

12    **Q.**  And then if we go down, there's a pretty big square that

13    says, "SciTech projects"?

14    **A.**  Yes.

15    **Q.**  And one of the things listed under there is -- well, it

16    says "SciTech projects and questions requiring lab director

17    input and approval."

18          And you give some examples of what those are,

19    right?

20    **A.**  Yes.

21    **Q.**  And you were the lab director giving that input, right?

22    **A.**  Yes.

23    **Q.**  And if we look over at how much time that was taking,

24    that's about one to two hours a day that you were spending

25    that time doing the input on?

**A.**  Yes.

**Q.**  And then if we look down at the next -- the next box,

where it says, "Internal/external technical consultations"?

**A.**  Yes.

**Q.**  And I think this is some of what you talked about this

morning, right?  Those technical consults?

**A.**  Yes.  This was -- yes.

**Q.**  And this was something you were doing daily, as well?

**A.**  Frequently.  Maybe not every day.

**Q.**  Sure.  And can you just explain, so internal versus

external, can you explain what the difference was?  You know,

what counted as an internal consultation and what was an

external one?

**A.**  Usually the internal consultations were with like a

project manager.  And the external were with clients or

another group that was kind of between the client and the

laboratory.

**Q.**  And I want to pause, actually, on client, Dr. Menninger,

because I think, you know, the jury might not understand

exactly what that means as part of the PPD lab business.

When you say "client," those are the folks who are

engaging PPD to help them with their work, right?

**A.**  Yes.  It is primarily pharmaceutical companies.

**Q.**  So to break this down, to be a little bit more granular,

if a pharmaceutical company is developing a new medicine,

1    they would need to run lab tests to see how patients are

2    responding to the medicine; is that right?

3    **A.**   Our laboratory primarily focused on safety testing.  So

4    we weren't necessarily doing all of their research based

5    testing.  That would go to other laboratories.  This was

6    primarily to make sure that, you know, the -- what they were

7    developing was not harming the patient in some way.

8    **Q.**   So the tests --

9    **A.**   It was testing that you would typically run in a hospital

10   laboratory.

11   **Q.**   But PPD worked directly with the customers to do the

12   testing and report the results back to the customers, without

13   the hospital --

14   **A.**   Yes.

15   **Q.**   Understood.  So PPD wasn't doing any of its own work or

16   testing.  Right?  It was on all on behalf of customers?

17   **A.**   Unless there was a new assay that we wanted to bring in.

18   So, for example, if it was a test that we previously sent out

19   to another lab to perform because we didn't have a high

20   volume, and then all of a sudden we got a study with a very

21   high volume, we would develop that test in our lab, instead

22   of sending it out.

23   **Q.**   And just for the benefits of the jury, an assay is -- can

24   you explain what an assay is?

25   **A.**   It's a laboratory test.

1    **Q.**  And I know that you testified earlier this morning about

2    there being some build out construction going on in the

3    Highland Heights.  I think it was towards the earlier part of

4    your employment; is that right?

5    **A.**  Yes.  It was going on at the start of my employment, but

6    it was also going on throughout.  It was going -- we had a

7    significant build out of a state of the art molecular

8    laboratory in 2017.

9    **Q.**  And that was to add new capabilities for new types of

10   testing that PPD could do in Highland Heights, right?

11   **A.**  Yes.  And that was why I was specifically recruiting for

12   a director for the molecular lab.

13   **Q.**  Because molecular is like its own thing that needs a

14   expert, right?

15   **A.**  It requires additional qualifications, yes.

16   **Q.**  So looking back at what you were explaining what you

17   spent your time on on a daily basis, when you said

18   internal/external technical consultation, the external

19   computation, you used the term clients, those were folks who

20   were hiring PPD to run the testing, the safety testing for

21   medicines, right?

22   **A.**  Yes.  For the most part.

23   **Q.**  Okay.  Thank you.

24            And then let's also look at the next page of

25   this -- this list you made.  We didn't look at this on

1    Monday, but let's look at the next page.

2             So here you listed out, Dr. Menninger, other daily,

3    weekly, monthly activities.  Do you see that?

4    **A.**  Yes.

5    **Q.**  And there are a lot of things on the list, but if we look

6    down to sort of just below the halfway point, one of the

7    things listed is direct reports.  And 1:1 is like a one on

8    one, right?

9    **A.**  Yes.

10   **Q.**  And that would be a one on one meeting with your direct

11   reports?

12   **A.**  Yes.

13   **Q.**  And you would do performance reviews of your reports,

14   right?

15   **A.**  Yes.

16   **Q.**  And coaching, as well, right?

17   **A.**  Yes.

18   **Q.**  And what types of coaching did you do for your reports,

19   Dr. Menninger?

20   **A.**  For example, if I had a particular employee that I was

21   getting complaints about, I would coach them on whatever the

22   particular issue was.  I had a complaint that one of my

23   direct reports did not have a great communication style and

24   so I did some coaching on that.  But it was basically

25   coaching on areas where they might be able to improve or it

1    could be coaching on, you know, say they had a goal to

2    advance in their career, and what steps might they take to

3    pursue that.

4    **Q.**  And you would -- you would do that coaching as part of

5    those one on one meetings that you had?

6    **A.**  Yes.  But also sometimes in addition, if it was -- if I

7    felt like it needed to be done immediately.

8    **Q.**  You would take the employee aside and talk to them about

9    those issues?

10   **A.**  Yes.

11   **Q.**  Let's switch gears and bring up -- let's?

12              MS. MANDEL:  Your Honor, is this -- would you like

13   to break?

14              THE COURT:  I think keep going.  I think we'll go a

15   little bit longer.  We'll take the break more like 11:15 or

16   so.

17              MS. MANDEL:  Perfect.  Thank you.

18              Let's switch to Exhibit 80.  This is Joint

19   Exhibit 80.

20   BY MS. MANDEL:

21   **Q.**  Dr. Menninger, this is a series of e-mails, and you see

22   Chad St. John's name, and Mr. Mekerri, who we've heard about,

23   as well.  And Brent McKinnon is one of the folks on here.  I

24   believe you testified earlier this week, but let's just

25   remind the jury, who's Brent McKinnon?

1    **A.**   He was the executive director for quality assurance.

2    **Q.**   So based on your understanding, Mr. McKinnon was

3    responsible for making sure that the quality level was where

4    it needed to be for customers and for all of those

5    accreditation standards; is that right?

6    **A.**   He coordinated the quality assurance activities.  I

7    wouldn't say he was directly responsible for them.

8    **Q.**   Understood.  Let's look -- if we look in the -- zoom into

9    the middle of the page, there's an e-mail that Brent McKinnon

10   sent to Mr. Mekerri.  And it looks like he copied Mr. St.

11   John in HR; is that right?

12   **A.**   Yes.

13   **Q.**   And Mr. McKinnon sent this e-mail on October 11, 2017.

14   So and just for context, Dr. Menninger, this is after you had

15   moved to Massachusetts, right?

16   **A.**   Yes.

17   **Q.**   Okay.  And Mr. McKinnon said, "Good afternoon, Hacene,"

18   and that's Hacene McCarry, "hope your EU trip is going well"

19   the EU is the European Union, right?

20   **A.**   Yes.

21   **Q.**   Okay.  "I wanted to follow-up with our discussion

22   regarding on site time for the US lab director."

23            And at this point, you were the US lab director; is

24   that right?

25   **A.**   Yes.  But I think he was referring to -- he knew we were

1   hiring for this position and it looks like he was asking for

2   any updates.

3   **Q.**   Okay.  And then he says -- and we'll look at the below

4   e-mail, it says, "Below Kathy has highlighted this concern

5   for Lisa."

6          And fair to say that that's referring to you,

7   Dr. Menninger?

8   **A.**   Yes.

9   **Q.**   "Following research specific to NYS."

10          That's that New York state standard that you

11   described earlier?

12   **A.**   Yes.

13   **Q.**   "And therefore, I wanted to let you know I know we are

14   active on the recruiting front, but this can turn out to be a

15   significant issue with the NYSDOH."

16          Is that New York State Department of health?

17   **A.**   Yes.

18   **Q.**   "Inspection which is about a month away."

19          Is that right?

20   **A.**   Yes.

21   **Q.**   And I know you talked about inspections, but when those

22   regulatory inspections happened, that was when whatever lab

23   it was needed to be able to show everything was in compliance

24   and sort of dotting the Is and crossing the Ts, right?

25   **A.**   Yes.

 1    **Q.**  And so it sounds like Mr. McKinnon here was expressing

 2    concern about whether that would be possible, given this

 3    upcoming inspection by New York; is that right?

 4    **A.**  I think this was a concern that Kathy, his direct report,

 5    had.

 6    **Q.**  And let's look at that.  So underneath Mr. McKinnon's

 7    e-mail, is another e-mail.  This is October 11th that same

 8    day, in 2017.  And this is an e-mail from Kathy Dick.  And

 9    you said Kathy Dick was Mr. McKinnon's report on the quality

10    side?

11    **A.**  Yes.

12    **Q.**  It's an e-mail from Kathy Dick and it actually went to

13    you and to Lorraine McNamara.

14              Who is Lorraine McNamara?

15    **A.**  She was the lab director of the Belgium lab and she was

16    the acting interim director, who was overseeing the US lab

17    supervisors, while -- because our associate director had left

18    that position in the spring.

19    **Q.**  And this was what you were describing earlier, like that

20    kind of open position that was covered on an interim basis?

21    **A.**  This was -- this was one of them.

22    **Q.**  And then there was also a copy of the e-mail went to

23    Mr. McKinnon, right?

24    **A.**  Yes.

25    **Q.**  And let's look up -- so this is an e-mail where Kathy

1    Dick said to you and to Lorraine, the middle paragraph is, "I
2    do have a concern as we approach New York state inspection,
3    the standard as written has the expectation that a full time
4    lab director, serving as the primary CQ holder."
5           What is CQ, Dr. Menninger?
6    **A.**  I do not remember what that stands for, but basically
7    it's referring to you have a primary director for the New
8    York certification, and then you have CQ holders for
9    different sections, because it's -- usually -- usually you
10   don't have one person who is an expert in all of the
11   sections.
12   **Q.**  Understood.  And New York had a ton of requirements,
13   right?
14   **A.**  They had a lot of different areas where they had CQ
15   holders.
16   **Q.**  And then this paragraph goes on.  It says, "The standard
17   does provide a statement that time on site should be defined
18   in the lab director job description, which is written as
19   70 percent of the time being on site."
20          Do you see that?
21   **A.**  Yes.
22   **Q.**  And then it says that the JD, the job description, and
23   the standard are attached.  And we looked at those today and
24   saw that 70 percent, right?
25   **A.**  Correct.

1   **Q.** "And this was required as an outcome of our previous New

2   York state inspection."

3          Do you see that?

4   **A.** Yes. I do.

5   **Q.** And the next paragraph says, "While we can certainly show

6   evidence of lab director support through IM. "

7          That's instant message; is that right?

8   **A.** Yes. But the document changed.

9          MS. MANDEL: Yeah. We're just going to blow up

10  that bottom paragraph.

11         Thanks, Miranda.

12  BY MS. MANDEL:

13  **Q.** "Through IM, email, phone, et cetera, we are currently

14  out of compliance with the standard and the job description."

15         Do you see that?

16  **A.** Yes. But that's not accurate. It wasn't a New York

17  standard. I think this was a concern Kathy Dick had, based

18  on an inspection that happened with her, prior to me joining

19  PPD.

20  **Q.** And the next sentence, Ms. Dick does talk about in the

21  past New York state to push back on the way this was being

22  covered, right?

23  **A.** Right.

24  **Q.** And the last sentence, Ms. Dick said the New York profile

25  still had you listed as being on site Monday through Friday,

1    8:00 to 5:00, right?

2    **A.**  Right.

3    **Q.**  And at this time, you weren't on site, because you were

4    working from Massachusetts the majority of the time, right?

5    **A.**  Yes.  This was a concern for me, as well, because this is

6    the position that was put on hold, and I had a candidate that

7    met all of these requirements that we wanted to hire, and

8    then, all of the sudden, they put the position on hold.  So I

9    couldn't hire to fill that position.

10        Regardless, we had an excellent State of New York

11    inspection.

12    **Q.**  And before we get there, back to that e-mail from

13    Mr. McKinnon, and this was just a little bit later on

14    October 11, 2017, you see Mr. McKinnon was forwarding on this

15    concern to both Mr. Mekerri and Mr. St. John to make them

16    aware of the concern, right?

17    **A.**  Yes.  It's a little bit small, hard to read.

18    **Q.**  Yup.  And we can make that middle section bigger again.

19        MS. MANDEL:  Thanks Miranda.

20    BY MS. MANDEL:

21    **Q.**  And this is where Mr. McKinnon e-mails both Mr. Mekerri

22    and Mr. St. John.  And again, this is October 11, 2017.  And

23    it says Kathy -- and that's Kathy Dick, right?  Highlighted

24    this concern to Lisa -- and Lisa is referring to you, right?

25    **A.**  Yes.

1    **Q.**  Okay.  Thank you.

2         Now, I want to look back at Joint Exhibit 377,

3    which is one that we looked at earlier this week.  And now we

4    have this additional context from Mr. McKinnon, before he

5    provided this 360 feedback to Mr. Mekerri.  Is that right?

6    **A.**  Yes.

7    **Q.**  So -- and we looked at this earlier this week, but

8    this -- Mr. McKinnon sent this e-mail a few weeks later.

9    This is November 29, 2017.

10   **A.**  Yes.

11   **Q.**  And it begins, the e-mail he says, "Hi, Hacene" -- that's

12   Mr. Mekerri.  "Thanks for the opportunity to provide my

13   input.  See below."

14        Do you see that?

15   **A.**  Yes.

16   **Q.**  And there are a number of people listed below, and I know

17   we talked about this a little bit earlier this week, but 360

18   input, that is when different folks in the company could

19   provide their input about having worked with various people;

20   is that right?

21   **A.**  Yes.

22   **Q.**  And so you didn't report to Mr. McKinnon and he didn't

23   report to you, right?

24   **A.**  Correct.

25   **Q.**  But you did report to Mr. Mekerri; is that right?

1    **A.**  Yes.

2    **Q.**  And as you've described, your role in quality did have

3    some kind of overlap at times with Mr. McKinnon's role,

4    right?

5    **A.**  Yes.  At a high level.

6    **Q.**  And so fair to say that Mr. Mekerri was reaching out to

7    people who did interact with you and others to get that

8    input, right?

9    **A.**  Yes.  But I rarely interacted with Brent McKinnon.  I

10    interacted more with his direct reports.

11    **Q.**  Understood.  Let's blow up the section about the 360

12    feedback that Mr. McKinnon gave regarding you, Dr. Menninger.

13    And this is what we looked at the other day, as well.

14            So this is -- again, this is just a few weeks that

15    Mr. McKinnon had forwarded that e-mail from Kathy Dick,

16    right?

17    **A.**  I believe so.  I don't remember the date on the last

18    e-mail.

19    **Q.**  And Mr. McKinnon said, "My feedback with Lisa" -- and

20    that's your, right -- "is mixed, as you and I have

21    discussed."

22            Right?

23    **A.**  Yes.  That's what it says.

24    **Q.**  And then it says, "While I feel that Lisa is technically

25    strong, and a nice person, she has not demonstrated the

1    leadership strength that I would expect.  Lisa has been very

2    indecisive on numerous, important matters."

3              And then he lists out what those things are.  Do

4    you see that?  "Lab training, competency, documentation, and

5    supervisor responsibilities."

6    **A.**  I do see that.

7    **Q.**  "That had resulted in lingering compliance concerns

8    raised by internal auditors, SLT peers" -- wait, SLT, is that

9    senior leadership team?

10   **A.**  Yes.

11   **Q.**  "And customers.  She has been dismissive of repetitively

12   raised concerns regarding the lack of bench level

13   supervision, and since her decision to relocate, she has been

14   lackadaisical toward her time on site in the US lab; this

15   style has led to an environment where lack of accountability

16   is prevalent and overall disrespect for leadership decisions

17   persist."

18             Do you see that?

19   **A.**  Yes.

20   **Q.**  And at this point, Dr. Menninger, this is November of

21   2017, right?

22   **A.**  Yes.

23   **Q.**  And I think based on your testimony from earlier this

24   week, we have established that that was about -- about two

25   months before you told PPD or Mr. Mekerri that you had a

1  disability; is that right?

2  **A.**  I -- I told them I had a disability on December -- around

3  January 11, 2018.

4  **Q.**  So this is a couple months before that?

5  **A.**  Approximately.

6          MS. MANDEL:  Yeah, thanks, Miranda.  We can close

7  out of that.

8  BY MS. MANDEL:

9  **Q.**  And you testified earlier this week, Dr. Menninger, that

10  Mr. Mekerri told you in December of 2017 that he wanted to

11  increase certain parts of your role.  Right?  Social

12  interactions, different types of visibility?

13  **A.**  He said that he was considering some changes to my role

14  in 2018, and that we would discuss those further after the

15  holidays.

16  **Q.**  So this is before the holidays, in December of 2017,

17  Mr. Mekerri told you that he was thinking about these

18  changes.

19  **A.**  Not changes, just -- well, yeah, additional things that

20  he had in mind for my role.  And he gave an example of

21  presentations to clients.

22  **Q.**  And Mr. Mekerri described at that time, I think you

23  testified, additional visibility.  Is that right?

24  **A.**  I believe so.

25  **Q.**  And when Mr. Mekerri told you this in December of 2017,

1    what did you understand additional visibility to mean?

2    **A.**   Well, he -- he gave me an example of formal PowerPoint

3    presentations in front of pharmaceutical clients.

4    **Q.**   And was this discussion that you had with Mr. Mekerri in

5    December 2017, was that an in-person conversation?

6    **A.**   No.  That was by phone.

7    **Q.**   Because you were not in Highland Heights.  You were in

8    Dighton at that time; is that right?

9    **A.**   Correct.

10   **Q.**   Okay.  And I know that you -- you testified earlier this

11   week that at various points you prepared slides, PowerPoint

12   slides, for different purposes?

13   **A.**   Rarely, yes.

14   **Q.**   So at this point, you had some experience doing slides on

15   behalf of the lab business, and Mr. Mekerri was talking about

16   kind of growing that part of what you were doing?

17   **A.**   I had done a few slides internally, but never for

18   clients.

19   **Q.**   And I know you just testified a few moments ago, then it

20   was -- it was after the holidays, on January 11th, that you

21   told Mr. Mekerri that you wanted to let him know about a

22   disability that you had?

23   **A.**   Yes.  And it was because of what he brought up in that

24   December meeting.

25   **Q.**   So in December, Mr. Mekerri told you about wanting to

     1    kind of increase your visibility in certain ways, and because

     2    of that, you wanted to let him know that you had a

     3    disability?

     4    **A.**   I wanted to let him know, because he gave me the

     5    impression that he wanted me to give large and formal

     6    presentations in front of pharmaceutical clients, and I knew

     7    what impact that would have on me and actually mentioned at

     8    the time that that would make me anxious, and he responded

     9    with, you know, oh, but your CV is so impressive.  I've seen

    10    you present.  You do such an excellent job.  And, yeah, that

    11    was the extent of it, but I was anxious because of that

    12    potential change in my role.

    13              THE COURT:  Sure.  Break here.

    14              Ladies and gentlemen.  Take the morning break.

    15              All rise for the jury.

    16              (The jury exits the courtroom.)

    17              THE COURT:  I'll find out what that is when they

    18    come back.

    19              That was not 23 minutes.

    20              MR. HANNON:  I owe you minutes, Your Honor.

    21              THE COURT:  You're in phase two or ten, no matter

    22    what.  I would have given you that amount of time, because it

    23    was only said you said 23 minutes because you were so

    24    confident.  That makes me worry about Friday.  So just so

    25    we're clear, you have to make next Friday, unless

 1    something -- unless there's a snowstorm or something like

 2    that.  I leave it to all of you to figure out your timing

 3    with that in terms of -- did I tell them -- did they raise a

 4    thing about Monday?

 5              THE DEPUTY CLERK:  Uh-uh.

 6              THE COURT:  Okay.  I'll tell them at the end of the

 7    day, about the schedule, and we're on track.

 8              So we'll resume at 11:30.  Thanks.

 9              (Court in recess at 11:16 a.m.

10              and reconvened at 11:30 a.m.)

11              THE COURT:  You can go get the jury.

12              (The jury enters the courtroom.)

13              THE COURT:  You can proceed, Ms. Mandel.

14    BY MS. MANDEL:

15    **Q.**  Dr. Menninger, you started to see a new psychiatrist in

16    the -- towards the end of January 2018; is that right?

17    **A.**  Yes.

18    **Q.**  And that was Dr. Marianna Kissimian?

19    **A.**  That's correct.

20    **Q.**  She is located in Providence or she was located in

21    Providence?

22    **A.**  Yes.

23    **Q.**  And going back to sort of prepandemic times, you saw her

24    in person, in an office?

25    **A.**  Yes.  Most of the time.

1  **Q.**  Most of the time.

2       And when you first went to see Dr. Kissimian, in --

3  I believe it was January 22, 2018, is that right?

4  **A.**  I lost the --

5  **Q.**  Yeah, we'll look at that exhibit in a minute, but it was

6  around January 22, 2018?

7  **A.**  I believe so.  I don't have the date memorized.

8  **Q.**  Understood.  We're going to look at those notes.

9       And you reported to Dr. Kissimian that you were

10  concerned about how you would respond with anxiety about

11  things that PPD was asking you to get more involved in; is

12  that right?

13  **A.**  I told her about the changes to my role that Hacene

14  brought up and my -- my concerns with how that would affect

15  my condition.

16  **Q.**  And that's what prompted you to go see Dr. Kissimian at

17  that point?

18  **A.**  Yes.  I also had some documentation that I needed to get

19  filled out for HR.

20  **Q.**  That was accommodation paperwork for HR?

21  **A.**  Yes.

22  **Q.**  Dr. Menninger, even though Mr. Mekerri told you about

23  these changes that he was planning or, you know, kind of

24  adjustments that he wanted to make to your role in December

25  of 2017, he never actually implemented any of those changes,

```
 1   correct?

 2   A.   That's correct.

 3   Q.   Dr. Menninger, I also want to be clear, no one at PPD

 4   ever said anything negative about any of your disabilities.

 5   Isn't that right?

 6   A.   That's correct.  But it was confidential.

 7   Q.   Yes.  I understand that.  But you didn't hear anyone say

 8   anything that was negative, expressed negative views about

 9   your anxiety or anything like that, right?

10   A.   No, there was no one else who knew, other than HR and

11   Hacene.

12   Q.   And I also want to clarify, PPD never put you on any sort

13   of performance improvement plan; is that right?

14   A.   That's correct.

15   Q.   And you never, throughout your employment, received any

16   kind of written discipline or anything like that, right?

17   A.   That's correct.

18   Q.   You mentioned a couple moments ago that you went through

19   some accommodation paperwork after you told PPD about your

20   anxiety; is that right?

21   A.   Yes.  I've followed up with Chad to find out if there

22   were any forms or a particular process that I needed to

23   follow.

24   Q.   And "Chad" is Chad St. John in HR?

25   A.   Yes.
```

1    **Q.**  And I know we saw his name earlier today, but he was the

2    HR director that the folks in Highland Heights worked with on

3    a daily basis for any HR needs; is that right?

4    **A.**  Yes.

5    **Q.**  Within a few days of you telling Mr. Mekerri about your

6    anxiety on January 11th, Mr. St. John reached out to you to

7    discuss accommodation paperwork, correct?

8    **A.**  That's correct.

9    **Q.**  And I know that was a long time ago, so let's pull up

10   that communication.

11          MS. MANDEL:  Miranda, I apologize, we're going to

12   start with Joint Exhibit 407.

13   BY MS. MANDEL:

14   **Q.**  So this is an e-mail, Dr. Menninger, that's dated

15   January 15, 2018, from Chad St. John to you.  Do you see

16   that?

17   **A.**  Yes.

18   **Q.**  And again, it was January 11th that you told Mr. Mekerri

19   that you had anxiety?

20   **A.**  Yes.

21   **Q.**  Let's just go through this e-mail.  So starting at the

22   top, Mr. St. John said, "I spoke with Hacene," that's Hacene

23   Mekerri?

24   **A.**  Yes.

25   **Q.**  He said, "I fully appreciate the sensitivity in the

1   information that you have disclosed" -- and actually, he

2   refers back to that January 11th date.  Do you see that?

3   **A.**  Yes.

4   **Q.**  You -- you inform Mr. Mekerri of your limitation.  And

5   then below that -- and then he actually also said that

6   eluded -- and maybe that was meant to say alluded to a need

7   for an accommodation to be able to perform the essential

8   functions of your job.  Do you see that?

9   **A.**  Yes.

10  **Q.**  And beneath that, Mr. St. John explained that PPD

11  complies with the Americans with Disabilities Act and wants

12  to support you so that you can continue to perform your job

13  duties; is that right?

14  **A.**  Yes.

15  **Q.**  And then Mr. St. John explained the process is

16  interactive and he looked forward to having this conversation

17  with you.

18          MS. MANDEL:  Let's just go up a little bit,

19  Miranda.  Sorry about that.

20  BY MS. MANDEL:

21  **Q.**  And then he explains further, "PPD has a formal process

22  that will allow us to identify or substantiate your

23  disability limitations and effective accommodations.  And

24  then he explained that, to start the process, there are two

25  forms that would be needed, and one is a request for

1   accommodation form that would be completed by you, and the

2   other is a physician statement."

3        Is that right?

4   **A.** Correct.

5   **Q.** And then Mr. St. John explained that the second form was

6   to be completed by your doctor, "Please take your job

7   description" -- which he attached, "to your medical provider,

8   and review how your medical condition might affect your job

9   functions."

10       Do you see that?

11  **A.** Yes.

12  **Q.** And he explained that the form would include information

13  for your doctor regarding what major life activities are

14  limited, and he explained this accommodation process; is that

15  right?

16  **A.** Yes.

17  **Q.** And then going down further, Mr. St. John explained how

18  long you had to return the form, that you had 15 days to get

19  it back, although he also explained that, you know, you might

20  get -- you could get more time.

21       And let's look at the paragraph that begins, "I

22  have also included EAP information."

23       Do you see that, Dr. Menninger?

24  **A.** Yes.

25  **Q.** Do you recall what EAP is?

1    **A.**  I believe it was -- stood for employee assistance

2    program.

3    **Q.**  And then Mr. St. John said, "I can certainly share FMLA

4    and STD."  Is that Family Medical Leave Act and short-term

5    disability information?

6    **A.**  Yes, I see that.

7    **Q.**  "If you need to pursue those avenues."  And then he says,

8    "please let me know if you have any questions."

9              And then let's look at what those attachments are.

10             MS. MANDEL:  So if we look at the next couple of --

11   Miranda, that's look at pages 24 to 27.

12             So these are in the attachments.

13             And I think, Miranda, the Bates number 24.  Thank

14   you.

15   BY MS. MANDEL:

16   **Q.**  So this is that physician's statement for accommodation,

17   and it was a blank -- a blank version of that form.  Is that

18   right, Dr. Menninger?

19   **A.**  Yes.

20             MS. MANDEL:  And then, Maria, can we -- let's just

21   scroll down and look at the other -- the following couple of

22   pages.

23   BY MS. MANDEL:

24   **Q.**  And this request for accommodation form continues to be

25   completed by your doctor; is that right?

1    **A.**   Correct.

2    **Q.**   And this is what you described taking to Dr. Kissimian

3    when you first went to see her on January 22nd, is that

4    right?

5    **A.**   That's correct.

6              MS. MANDEL:   Okay.   And Miranda, can we go to Bates

7    number 28, please.

8    BY MS. MANDEL:

9    **Q.**   So this is that EAP paperwork.   This is information about

10   what you said was the employee assistance program; is that

11   right, Dr. Menninger?

12   **A.**   It looks like it.   I actually never opened it up.

13   **Q.**   You didn't open this attachment?

14   **A.**   No.

15   **Q.**   Do you see it says, "What can my EAP and work life

16   services benefit do for me"?

17              This is kind of in the middle of the page.

18   **A.**   Yes.

19   **Q.**   And it says, "You may be struggling with stress at work,

20   seeking financial or legal advice, or coping with the death

21   of a loved one."

22              Do you see that?

23   **A.**   Yes.

24   **Q.**   And then it lists out things that this EAP program can

25   help with, and it includes depression, anxiety, stress, down

1    below it includes living with chronic health conditions, it

2    includes child care.  Do you see that?

3    **A.**  Yes.

4    **Q.**  And since you didn't open this, Dr. Menninger, is it fair

5    to say that you didn't pursue any of these services?

6    **A.**  No.  I felt my condition was more serious than what the

7    EAP could address.

8    **Q.**  Although in fairness, you didn't know, because you didn't

9    open the document; is that right?

10   **A.**  No.  But I knew about the EAP program.

11   **Q.**  You were aware of it.  And then after Mr. St. John sent

12   you all of this information, that's when you went to see

13   Dr. Kissimian, and that was a week later, on January 22nd?

14   **A.**  Yes.

15   **Q.**  And you took the paperwork from Mr. St. John to

16   Dr. Kissimian?

17   **A.**  I either handed to her, or I'm emailed it.  I don't

18   remember which.

19   **Q.**  And after you gave that paperwork to Dr. Kissimian, both

20   Dr. Kissimian and you filled out your different portions of

21   the paperwork; is that right?

22   **A.**  Yes.

23           MS. MANDEL:  Let's look at Joint Exhibit 47,

24   please, Miranda.

25   BY MS. MANDEL:

```
 1    Q.  So this first -- the first page here is an e-mail from

 2    Dr. Kissimian to Chad St. John.  And this was sent on

 3    January 31, 2018; is that right?

 4    A.  Yes.

 5    Q.  And Dr. Kissimian said, "Chad, per our conversation, the

 6    forms are attached."  So at this point, it seems like Mr. St.

 7    John and Dr. Kissimian had already talked?

 8    A.  Yes.

 9    Q.  And there are the attachments.  This was the physician

10    form that Dr. Kissimian sent back.  Let's look at that.

11            MS. MANDEL:  Can we go to the next page, please.

12    Thanks, Miranda.

13    BY MS. MANDEL:

14    Q.  So this is the same form that we saw in blank, this is

15    the one that Dr. Kissimian filled out and sent back to

16    Mr. St. John; is that right?

17    A.  Yes.

18    Q.  And it's a little hard to tell exactly what Dr. Kissimian

19    wrote in, but you can see, under number 3, it says, "What is

20    the impairment?"

21            Do you see that?

22    A.  Yes.

23    Q.  And Dr. Kissimian listed panic disorder with agoraphobia,

24    social anxiety, generalized anxiety disorder.

25            Do you see that?
```

Case: 23-2030 Case: 19-cv-10441 Document: 159 Document: 159 Filed 03/31/23 Date 03/31/23 Page 106 of 162 Entry ID: 6634402

106

 1   **A.**   Yes.

 2   **Q.**   Dr. Menninger, can you explain in laymen's terms what

 3   agoraphobia is?

 4   **A.**   It's a fear of places or situations that might trigger a

 5   panic attack.

 6   **Q.**   And it's specific to situations being around other

 7   people, right?

 8   **A.**   No, I'm -- not necessarily.  I'm not a psychiatrist, so I

 9   don't know the precise definition, but I don't think it is

10   specific to being around other people.  I think it's just

11   anything that you would anticipate could cause a panic

12   attack, like place or situation.

13   **Q.**   Okay.  And these were -- these were conditions that, as

14   you understood, you had been dealing with up until this

15   point, but you had not told PPD about; is that right?

16   **A.**   Yes.  I had never actually been diagnosed with panic

17   disorder with agoraphobia before this.  But I knew I had

18   panic attacks and I was diagnosed with social anxiety

19   disorder and generalized anxiety disorder.

20   **Q.**   And in the next question, it says, "Is the impairment

21   permanent, long term, or temporary?"

22           And then it says, "If it is not permanent, what is

23   the expected duration of impairment?"

24           And then Dr. Kissimian responded "Impairment is

25   long term with a chronic course."

1          Do you see that, Dr. Menninger?

2   **A.**  Yes.

3   **Q.**  And that's when Dr. Kissimian was explaining that this

4   wasn't going to go away.  Is that right?

5   **A.**  That's correct.

6   **Q.**  And if we look down in the next, number five, this is

7   where Dr. Kissimian explained how the diagnoses that she

8   listed above would affect your work situation in particular,

9   right?  Do you see that, number 5?

10  **A.**  Yes.  I don't --

11          THE COURT:  Yes, you see number 5, or yes to the

12  other question?

13          THE WITNESS:  Yes, I see number 5.

14          MS. MANDEL:  You see number 5.  Okay.

15          THE WITNESS:  It's very small now.

16          MS. MANDEL:  Yeah, I think Miranda was just going

17  to blow that back up.  I think she was highlighting that so

18  that you would be able to see a little bit more clearly.

19  BY MS. MANDEL:

20  **Q.**  Can you see that now, Dr. Menninger?

21  **A.**  Yes.

22  **Q.**  Okay.  And this specifically, this question is about --

23  it says, "What condition or limitation is or are interfering

24  with the employee's ability to perform the essential

25  functions of his or her job?" And it says, "Based on the

1    attached job profile."

2          Do you see that?

3    **A.**  Yes.

4    **Q.**  So keeping your job profile in mind, Dr. Kissimian wrote

5    down below, "Lisa suffers from panic disorder with

6    agoraphobia, social anxiety disorder, and generalized anxiety

7    disorder."

8          Do you see that, that's the first sentence?

9    **A.**  Yes.

10   **Q.**  "This disability significantly interferes with Lisa's

11   ability to perform major life activities, such as thinking,

12   concentrating, communicating, and working.  Lisa is most

13   affected in social situations when she is required to speak

14   in front of others.  Despite these limitations, Lisa reports

15   that she has historically fulfilled the essential functions

16   of her job without accommodation.  However, she frequently

17   suffers from anxiety and other somatic symptoms triggered by

18   social interactions and public speaking incident to her job."

19          Do you see that?

20   **A.**  Yes.

21   **Q.**  And let me ask you -- and I understand that you're not a

22   psychiatrist, Dr. Menninger, but when you read this, do you

23   understand what somatic symptoms are?

24   **A.**  Yes.

25   **Q.**  That's kind of like a physical reaction; is that right?

1   **A.** Yes.

2   **Q.** And then it goes on to say, "Further, Lisa's supervisor

3   recently identified potential changes to her role involving

4   more public speaking and social interactions. This has

5   caused Lisa to experience increased anxiety with somatic

6   symptoms, including diarrhea, heart racing, sweatiness,

7   increased respiratory rate."

8          Do you see that, as well?

9   **A.** Yes.

10   **Q.** And you would agree that this is what Dr. Kissimian wrote

11   in response to any questions about how this would impact

12   work; is that right?

13   **A.** Yes.

14   **Q.** Now, let's look at number 6, which kind of straddles two

15   pages. In this question, Dr. Kissimian was responding to

16   what, if any, of your job functions you would have trouble

17   performing, based on your job description; is that right? Do

18   you see that, the question, number 6, based on conditions,

19   limitations?

20   **A.** Yes. I just need a second to read it.

21   **Q.** Of course. Of course.

22          Have you seen that question now, number 6?

23   **A.** Yes.

24   **Q.** Okay. And then Dr. Kissimian wrote, "Lisa's disability

25   makes it extremely difficult for her to engage in public

1    speaking and social interactions.  While Lisa has been able

2    to tolerate these types of activities to the extent that

3    they've been necessary for her job, they often cause her to

4    suffer from anxiety and other somatic symptoms.  Any changes

5    of her role that increase the need for public speaking and/or

6    social interaction will increase her anxiety and worsen her

7    somatic symptoms which will make it substantially more

8    difficult, if not impossible for Lisa to perform her job."

9            Do you see that?

10   **A.**  Yes.

11   **Q.**  Okay.  And then let's look down at how Dr. Kissimian

12   fills out the rest of the form.

13           So the next -- the next one is a question about

14   what accommodation Dr. Kissimian would recommend that would

15   allow you to perform your job.  Do you see that?  It says if

16   the employee cannot perform the essential job functions --

17           THE COURT:  I think it would be helpful if you blew

18   it up, just because it's hard to read.  It's pretty small.

19           MS. MANDEL:  Thank you.

20   BY MS. MANDEL:

21   **Q.**  Do you see where it says, "If the employee cannot perform

22   the essential functions"?

23   **A.**  Yes.

24   **Q.**  Number 7.  Okay.  And then it says, "What accommodations

25   would you recommend which could allow the employee to better

**JA505**

1   perform his or her job functions?  Please specify."

2         Do you see that?

3   **A.**  Yes.

4   **Q.**  And Dr. Kissimian wrote, "Given Lisa's disability, I

5   recommend that any social interaction or public speaking

6   incident to her role be minimized to the extent possible.

7   Additionally, I recommend that her role not be changed to

8   require any increased speaking or social interactions."

9         Then she additionally said, "To the extent that

10  social interactions and/or public speaking is deemed

11  necessary for Lisa's job, I recommend that a plan be

12  developed for these activities in consultation with me or

13  another qualified healthcare provider."

14        Do you see that?

15  **A.**  Yes.

16  **Q.**  And at this point in January of 2018, Dr. Kissimian was

17  the only psychiatrist that you were seeing; is that right?

18  **A.**  Yes.

19  **Q.**  Okay.  And then again, in the next -- the next section,

20  number 8, the question says, "How would you recommend an

21  accommodation improve the employee's job performance?"

22        And Dr. Kissimian wrote, "Given Lisa's disability,

23  I recommend that any social interaction or public speaking

24  incident to her role be minimized to the extent possible."

25        And then it says again, "Additionally, I recommend

1    that her role not be changed to require any increased public

2    speaking or social interaction."

3           And then repeating again, that, to the extent they

4    were necessary, a recommendation that a plan be developed in

5    consultation with her; is that right?

6    **A.**   Yes.

7    **Q.**   And then number 9, "What restrictions, if any, do you

8    place on the employee's ability to perform the functions of

9    the job?"

10          Do you see that?

11   **A.**   Yes.

12   **Q.**   And Dr. Kissimian wrote, "Social interactions and public

13   speaking should be minimized as much as possible.  To the

14   extent Lisa is required to engage in social interactions

15   and/or public speaking, these activities should be planned in

16   consultation with her medical provider, in hopes of minimized

17   Lisa's anxiety and somatic symptoms."

18          Do you see that?

19   **A.**   Yes.

20   **Q.**   And then down below, Dr. Kissimian signed -- I think

21   that's probably her name, that chicken scratch; is that

22   right?

23   **A.**   I believe that's her signature.

24   **Q.**   And then she signed it on January 31st of 2018; is that

25   right?

1  **A.**  Yes.

2  **Q.**  Okay.  And then you also submitted the employee form at

3  the same time, or around the same time; is that right,

4  Dr. Menninger?

5  **A.**  Yes.

6          MS. MANDEL:  Miranda, can we bring up joint

7  Exhibit 220, please.

8  BY MS. MANDEL:

9  **Q.**  Dr. Menninger, this is a handwritten form that you filled

10  out; is that right?

11  **A.**  Yes.

12  **Q.**  And at the bottom of the page, we see it has -- that's

13  your signature?

14  **A.**  Yes.

15  **Q.**  Thankfully, much easier to read.

16          And that's January 30th, right, so the day before?

17  **A.**  Yes.

18  **Q.**  And you filled out that you were authorizing disclosure

19  of your health information from Dr. Kissimian; is that right?

20  **A.**  Yes.

21          MS. MANDEL:  Okay.  And let's -- let's go down to

22  Bates number 1382, please, Miranda.

23  BY MS. MANDEL:

24  **Q.**  And I understand there's a lot of typewritten language on

25  the page, but where there are answers that are typed in, did

```
 1   you type those yourself, Dr. Menninger?

 2   A.  I assume so.  It was a long time ago.  I can't really

 3   remember.  But, yes, I think I filled it out on the computer.

 4   Q.  Okay.  And you -- you indicated here, on the third line

 5   down, that your work location was remote --

 6             MS. MANDEL:  Oh, actually, Miranda, let's go back

 7   to -- thank you.

 8   BY MS. MANDEL:

 9   Q.  You said your work location was remote; is that right?

10   A.  Yes.

11   Q.  And that's because you were -- you had relocated to

12   Dighton at that point and you were working out of your home

13   office most of the time?

14   A.  Yes.

15   Q.  Okay.  And then down below, the question says, "Describe

16   the nature of your impairment, and its expected duration"?

17   A.  Yes.

18   Q.  And you wrote in, "I've been diagnosed with panic

19   disorder with agoraphobia, social anxiety disorder, and

20   generalized anxiety disorder."

21   A.  Yes.

22   Q.  And you said you're not aware of a cure for these

23   conditions but you're seeking treatment to minimize and

24   alleviate symptoms?

25   A.  Yes.
```

1  **Q.**  And that was the treatment with Dr. Kissimian that you

2  were talking about?

3  **A.**  Yes.

4  **Q.**  Okay.  And then the next question is what specific

5  accommodation are you requesting.

6  **A.**  Yes.

7  **Q.**  And you typed in, "My psychiatrist has recommended that

8  any social interaction and/or public speaking incident to my

9  job be minimized or avoided as much as possible"?

10  **A.**  Correct.

11  **Q.**  And that was consistent with what Dr. Kissimian wrote on

12  her form; is that right?

13  **A.**  Yes.

14  **Q.**  "Further, she has recommended that my role not be changed

15  in a manner that would require increased social interactions

16  and/or public speaking."

17          That's also consistent with what Dr. Kissimian had

18  written?

19  **A.**  Yes.

20  **Q.**  "To the extent that these activities are deemed

21  necessary, my psychiatrist has recommended that a plan be

22  developed with her assistance for these activities in the

23  hopes of minimizing my anxiety or other symptoms."

24          Do you see that?

25  **A.**  Yes.

```
 1   Q.  And again, you're referring to Dr. Kissimian as the
 2   doctor who would have input on that?
 3   A.  Yes.
 4   Q.  Okay.  And then the last question on that page
 5   is, "Describe how the impairment is interfering with your
 6   ability to perform your essential job functions."
 7        Do you see that?
 8   A.  Yes.
 9   Q.  Okay.  And it references a job description, as well?
10   A.  Yes.
11   Q.  And you wrote in, "I believe that I am able to perform
12   the essential functions of my job without accommodation, as I
13   have been doing so for years.  However, social interactions
14   and public speaking often trigger anxiety, panic attacks, and
15   other symptoms of my condition.  These make it difficult for
16   me to perform my job and interfere with my personal life, as
17   well."
18   A.  That's correct.
19   Q.  Okay.  And so you signed this form and you sent it to
20   Mr. St. John; is that right?
21   A.  Yes.
22   Q.  And after that, Mr. St. John reached out to you to
23   discuss further; is that right?
24   A.  Yes.  I don't know the exact date.
25        MS. MANDEL:  Well, let's look at -- let's bring
```

```
 1   up -- let's actually bring up Joint Exhibit 62, please,
 2   Miranda.  And I know that we've looked at this -- maybe just
 3   blow it up a little, Miranda, because it's a little hard to
 4   read.
 5   BY MS. MANDEL:
 6   Q.  We'll start with the e-mail on the bottom, the first
 7   e-mail on the page.  So the first e-mail --
 8            MS. MANDEL:  I'm sorry, Miranda, can you make it a
 9   tiny bit smaller, so we can just see who it came from.  Thank
10   you.
11   BY MS. MANDEL:
12   Q.  This e-mail came from Mr. St. John.  It went to you.  And
13   this was -- so we're like two days after you had returned
14   that -- that disability paperwork.  Does that make sense?
15   A.  Yes.
16   Q.  Okay.  And Mr. St. John said, "Hope your Friday is going
17   well."
18            He said, "I need your assistance as we continue the
19   dialogue around exploring reasonable accomodation.  What are
20   the specific expectations that Hacene shared with you for
21   2018 that you believe you cannot or limitedly perform?"
22            And then he says, "Your physician only indicates
23   that public speaking and social interaction be minimized.  To
24   the extent that public speaking and social interaction
25   is 'Deemed necessary' and that a plan be developed with your
```

1   physician."

2            So this is kind of working back what you and Dr.

3   Kissimian had explained?

4   **A.**  Yes.

5   **Q.**  "I would like to understand, from your physician's

6   perspective, in writing, the specific limits or maximum

7   percentage related to the specific expected duties.  Public

8   speaking and social interactions were the only items

9   specified in your physician's paperwork."

10           Do you see that?

11  **A.**  Yes.

12  **Q.**  And then he explained that this was going to be critical

13  in this process of kind of going through the accommodation

14  process.

15  **A.**  Yes.

16  **Q.**  Okay.  And then let's go to the top of this page and you

17  wrote back two days later, on February 4th.  This is from you

18  to Mr. St. John?

19  **A.**  Yes.

20  **Q.**  And you explained, you said, "Hacene and I had a general

21  discussion concerning changes he's considering making to make

22  my role more visible.  He didn't get into specifics, but

23  suggested this might include increased client visits, social

24  interactions, and presentations" and you say internal and

25  external?

1    **A.**  Yes.

2    **Q.**  "That's what prompted my initial email with him regarding

3    my disability.  We were supposed to have a follow-up

4    conversation to discuss specifics and I wanted him to

5    understand my situation, so that we could try to figure this

6    out together.  That conversation still hasn't happened, so I

7    can't provide you much additional detail at this point."

8              Is that right?

9    **A.**  Yes.

10    **Q.**  And then you asked Mr. St. John, just for clarification,

11    about what else he might need from your doctor, right?

12    **A.**  Yes.

13    **Q.**  Okay.  So we've looked -- this week we've reviewed I

14    think what Mr. Hannon has referred to as buckets of job

15    tasks; is that right?

16    **A.**  Yes.

17              MS. MANDEL:  Let's bring up Joint Exhibit 350,

18    please, Miranda.

19    BY MS. MANDEL:

20    **Q.**  This is this e-mail that Mr. Mekerri drafted talking

21    about what those buckets are; is that right?

22    **A.**  Yes.

23    **Q.**  So this was an e-mail from a couple of days later, now

24    we've gotten to February 6th, where Mr. Mekerri wrote to you,

25    with a copy to Mr. St. John, right?

1    **A.**  Yes.

2    **Q.**  And he explained, this is a one-on-one follow-up about

3    the executive director role that's the subject, right?

4    **A.**  Yes.

5    **Q.**  And I know you had a one-on-one with him in December of

6    2017, where he had talked about what that additional

7    visibility might be; is that right?

8    **A.**  Broadly, yes.  We discussed presentations for

9    pharmaceutical clients.

10   **Q.**  And you'd agree, wouldn't you, that this is now -- it's a

11   follow-up about what those specifics are?

12   **A.**  No.  I think this is based on a one-on-one we had just

13   prior to, like -- yeah, this was -- this was based on a one

14   on one that we had in 2018, not based on the December

15   meeting.

16   **Q.**  Okay.  So you had another one-on-one some time in the

17   first month of 2018?

18   **A.**  Yes.  I believe so.  I -- I would have to look at my

19   notes.

20   **Q.**  Okay.  And, in fact, Mr. Mekerri does refer to having had

21   a discussion with you of some type the day before; is that

22   right?

23   **A.**  That makes sense.  That was probably the one-on-one.

24   **Q.**  And Mr. Mekerri in his follow-up says, "As per our

25   conversations, I'm happy to explore potentially reasonable

1     accommodations, depending on the details that your physician

2     will provide.  I am listing below the specific duties within

3     the job description, along with the expectations to reach the

4     business goals.  As you already know, the percentage scope of

5     interactions, internal or external, is increasing in 2018 due

6     to the needs of the business and our aggressive commercial

7     goals."

8           Do you see that?

9     **A.**  Yes.

10     **Q.**  And then there are five bullet points below?

11     **A.**  Yes.

12     **Q.**  The first one is "SLT presentations."

13           Is SLT, that's the senior leadership team

14     presentations?

15     **A.**  Yes.

16     **Q.**  And "town hall COO/EVP meeting"?

17     **A.**  Yes.

18     **Q.**  COO is chief operating officer?  Is that --

19     **A.**  Yes.

20     **Q.**  And EVP is executive vice president?

21     **A.**  Yes.

22     **Q.**  And then beneath that, Mr. Mekerri provides some detail

23     about how many people might be there and how often they would

24     take place; is that right?

25     **A.**  Yes.

1  **Q.**  And so for the SLT presentations, which he lists, he says

2  up to -- well, actually for the whole category, up to 500

3  employees.  And then he says they would happen bi-weekly,

4  monthly, or quarterly, right?

5  **A.**  Yeah, the frequency and the number of employees depends

6  on the particular meeting.  The SLT meetings are very small

7  and you know, may involve, like, ten people.

8  **Q.**  And those are the ones that you testified earlier would

9  happen like on a bi-weekly basis?

10  **A.**  Yes.

11  **Q.**  And then there were really the big town halls which were

12  like all over the world and that was the bigger group?

13  **A.**  That was the bigger group, yes.

14  **Q.**  And then the next -- the next bullet point is, "Client

15  bid defense, issue resolution calls, Highland Heights client

16  site meetings, phone calls."

17        And it says, "Frequency:  Once a month at a minimum

18  for clients.  Attendees and audience:  Up to 50 attendees."

19        Right?

20  **A.**  Yes.

21  **Q.**  And actually just let's go back on the first bullet.  I

22  know you testified earlier today that you had already been

23  doing -- participating in those meetings, the SLT

24  presentations and the town halls, right?

25  **A.**  On rare occasions, I had to present at those meetings.

1   **Q.**  But you did attend those meetings?

2   **A.**  Yes.

3   **Q.**  Okay.  And I -- on the second bullet, you testified

4   earlier today about how you would be involved as needed with

5   presenting information to new customers?

6   **A.**  Are you -- what document are you referring to?

7   **Q.**  I'm talking about what your testimony has been so far

8   about providing some information to new customers about

9   things like reference ranges or what was happening in the

10  lab?

11  **A.**  Yes.  Usually through business development, an individual

12  or a project manager.  But yes.  Most of the time, my

13  interaction with clients was once their studies were already

14  underway.

15  **Q.**  And that's when they had questions about the reference

16  ranges or things like that?

17  **A.**  Right.

18  **Q.**  Then the third bullet is technical sales presentation,

19  internal and external, Highland Heights client site meetings,

20  and phone.  And it lists out frequency will be monthly or

21  quarterly as needed.  And then it said potentially up to 100

22  attendees?

23  **A.**  Yes.

24  **Q.**  And then the fourth bullet says for customer visits,

25  lunch and dinner and social interaction may occur?

1  **A.**  Yes.

2  **Q.**  That was about 60 to 80 percent of the time.

3       Do you see that?

4  **A.**  Yes.

5  **Q.**  In order to build business relationships.

6  **A.**  Yes.

7  **Q.**  And then finally is a bullet point that repeats what

8  we've seen in the job description, which was travel up to

9  30 percent.

10  **A.**  Yes.

11  **Q.**  Okay.  And then Mr. Mekerri said let me know if you need

12  further details.  I'm happy to provide them.  I'll do my best

13  to support you.

14  **A.**  Yes.

15  **Q.**  Okay.  And then after Mr. Mekerri sent you this list with

16  those five buckets, Dr. Kissimian sent a response; is that

17  right?

18  **A.**  Yes.

19  **Q.**  Let's look at that response from Dr. Kissimian.

20       MS. MANDEL:  Miranda, can we bring up Joint

21  Exhibit 433, please.

22  BY MS. MANDEL:

23  **Q.**  So this is an e-mail that's dated a few days later,

24  February 14th of 2018, from Dr. Kissimian to Chad St. John,

25  right?

**A.**   Yes.

**Q.**   And Dr. Kissimian said, "Chad, I've attached a document providing psycho education on social anxiety disorder, as well as recommended reasonable accommodations for Lisa."

        Do you see that?

**A.**   Yes.

        MS. MANDEL:  And let's go to the next page, please, Miranda.

BY MS. MANDEL:

**Q.**   So this is the attachment that Dr. Kissimian sent; is that right?

**A.**   Yes.

**Q.**   Okay.  And so the first few paragraphs, Dr. Kissimian is just providing information about what your anxiety disorder does; is that right?

**A.**   Yes.

**Q.**   Okay.  And let's?

        MS. MANDEL:  Miranda, can we just increase the size of that page a little bit and then we can go through it.

BY MS. MANDEL:

**Q.**   "Social anxiety disorder."  And that was one of your diagnoses at that time?

**A.**   Yes.

**Q.**   "Lisa's difficulty with socializing and public speaking is not a manifestation of shyness.  Social anxiety disorder

1    is a neurobehavioral disorder with biological and genetic

2    risk factors that lead to physical, behavioral, and cognitive

3    symptoms, which are pernicious and chronic in nature.

4            "In the past Lisa endured these work events and

5    presentations with intense discomfort and with the use of a

6    sedative. "

7            And let me just pause there for a minute,

8    Dr. Menninger.  Is Valium, like you talked about earlier, is

9    that a sedative?

10   **A.**  Yes.

11   **Q.**  "The sedative did help take the edge off, but also came

12   with side effects, including impaired attention,

13   concentration, short-term memory deficits, lethargy."

14           Lethargy is like exhaustion?

15   **A.**  Yes.

16   **Q.**  "And an extended length of time for her to return to her

17   cognitive baseline to complete the more analytical and

18   medical facets of her work.

19           "It is also important to note that the weeks

20   leading to the expected speaking engagement or social event

21   resulted in insomnia, panic attacks, GI discomfort, and

22   weight loss."

23           Do you see that, Dr. Menninger?

24   **A.**  Yes.

25   **Q.**  And in the next, Dr. Kissimian said, "A concrete way of

1   thinking about this disability is that her brain and body are

2   not able to tolerate public speaking engagements and

3   socializing, and it is as if her vocal cords and brain become

4   paralyzed while her blood pressure, heart rate, and breathing

5   all increase.  And it is for all of the above reasons that I

6   am recommending the following reasonable accommodations."

7         Do you see that?

8   **A.**  Yes.

9   **Q.**  And then she says, "Below are reasonable accommodations

10  for Lisa, so that she can continue to be a productive and

11  healthy member of your team."

12        And below that, this is the same language from

13  Mr. Mekerri's e-mail, but instead of a bullet, it now has a

14  number one.  Right?  But it's that same language that

15  Mr. Mekerri had listed out about SLT presentations, town

16  hall, COO and EVP meeting.  Do you see that?

17  **A.**  Yes.

18  **Q.**  Okay.  Thank you.

19        MS. MANDEL:  And Miranda, can we -- let's look at

20  those items one through five a little bit larger, please.

21  Thank you.  And can we just go up to one, first.  Thank you.

22  BY MS. MANDEL:

23  **Q.**  So for number 1, this is the S LT presentations, the town

24  hall.  Under reasonable accommodation, you would agree,

25  Dr. Menninger, that the language that was added here by

1  Dr. Kissimian was where it says "reasonable accommodation,"

2  right?

3  **A.**  Yes.

4  **Q.**  Okay.  It says, "reasonable accommodation, responsible

5  for all slides, handouts, presentation material with

6  necessary information, but will require a reader to be -- to

7  present to the group or can be -- prerecord the audio/video,

8  and it can be played at the meeting.  Available for questions

9  via e-mail after the meeting."

10          Do you see that?

11  **A.**  Yes.

12  **Q.**  And did you understand this to mean that Dr. Kissimian

13  was saying you would write the material, but someone else

14  would present it to the senior leadership team, to town

15  halls, to the executives.  Is that right?

16  **A.**  We were just brainstorming creative ways that we could,

17  you know, accommodate, potentially, if needed.  It didn't

18  necessarily have to be this.  This was just an example.

19  **Q.**  No, and I understand this.  But this was creative and it

20  says that you wouldn't actually do the presenting, right?

21  **A.**  Not in person.

22  **Q.**  Okay.  Well, let's go down to number 2.  Number 2, this

23  is the language that Hacene had drafted about client bid

24  defenses, issue resolution, calls.  Do you see that?

25  **A.**  Yes.

1    **Q.**  And then Dr. Kissimian's language falls right beneath

2    that, "Reasonable accommodations available via e-mail, text,

3    remote videoconferencing for representative of the client,

4    one to two person audience maximum."

5           And that's compared to what Mr. Mekerri had said,

6    which was up to 50 people, right?  Do you see under number

7    two, it says up to 50?

8    **A.**  Yes.

9    **Q.**  Okay.

10           "If it is a site meeting, surrogate or reader with

11    all necessary information, realtime access to me will be

12    available."

13           Do you see that?

14    **A.**  Yes.

15    **Q.**  And this is maybe a little confusing, because it says "to

16    me," and Dr. Kissimian was writing this, but I'm assuming the

17    "me" there is you, Dr. Menninger; is that right?

18    **A.**  Yes.

19    **Q.**  Okay.  Because you put this together with Dr. Kissimian;

20    is that right?

21    **A.**  No.  Dr. Kissimian put this together.

22    **Q.**  Okay.  The next item, the next bullet is number 3, client

23    site meetings.

24    **A.**  Yes.

25    **Q.**  And Dr. Kissimian added the language that says

 1    "reasonable accommodation," is that right?

 2    **A.**  Yes.

 3    **Q.**  It says reasonable accommodation would like a surrogate

 4    to attend -- and just a surrogate is someone instead of you,

 5    right?

 6    **A.**  Yes.

 7    **Q.**  Okay.  "But will be responsible for all problem solving,

 8    ideas for resolution, e-mail communicated to me a few days

 9    before the anticipated visit."

10            Do you see that?

11    **A.**  Yes.

12    **Q.**  The next item is technical sales presentation, internal

13    and external.  And it says, i.e., internal sales meeting.

14    And it says client site meetings, phone.  Do you see that?

15    **A.**  Yes.

16    **Q.**  And I think it's a little hard to read, but I think

17    before client site, it's HH, and that's Highland Heights; is

18    that right?

19    **A.**  I think so.

20    **Q.**  I know it's a little hard to read.  And it's underneath

21    that, Dr. Kissimian added the language that says, "Reasonable

22    accommodation"?

23    **A.**  Yes.

24    **Q.**  It says, "Excuse from sales presentations, but, again,

25    will provide any necessary data information for the reader or

1    surrogate to have at their disposal."

2              Do you see that?

3    **A.**  Yes.

4    **Q.**  And then number five, it says, "For customer visits,

5    lunch, dinner, and social interactions may occur."

6              Do you see that?

7    **A.**  Yes.

8    **Q.**  And then this is -- it gets kind of -- what Dr. Kissimian

9    wrote gets kind of bumped up.  It says surrogate -- that's

10   where her language begins, right?

11   **A.**  Which number are you -- oh, yes.

12   **Q.**  Yeah, this one is a lot harder, because it kind of gets

13   all bunched together.  But it's under number 5, the sort of

14   end of the second line.  That's where Dr. Kissimian's second

15   recommendation is added in; is that right?

16   **A.**  Yes.

17   **Q.**  And the accommodation that Dr. Kissimian recommended is

18   "Surrogate, as this is not her strength, skill set, and her

19   disability will flare with significant impairment.  She has

20   able to build business relationships in a more behind the

21   scenes fashion, and would like to brainstorm other potential

22   avenues, where she can add value, as she does understand that

23   this is an important part of the business."

24             Do you see that?

25   **A.**  Yes.

1  **Q.**  Okay.  And then number 6, below, this is where it says

2  travel, this is where we talk about the up to 30 percent that

3  came from your job description; is that right?

4  **A.**  Yes.

5  **Q.**  And Dr. Kissimian listed out as reasonable accommodation,

6  "When possible, traveling to Brussels, versus stateside."

7         Do you see that?

8  **A.**  Yes.

9  **Q.**  And stateside means like within the United States?

10  **A.**  Yes.

11  **Q.**  And that meant going to the Brussels lab, instead of

12  going to Highland Heights; is that right?

13  **A.**  Yes.

14  **Q.**  And that's because you specifically were finding it

15  really stressful to go to Highland Heights; is that right?

16  **A.**  Not totally.

17  **Q.**  Okay.  So --

18  **A.**  We were -- we were hiring -- as I mentioned earlier, we

19  were in the process of hiring an MD or Ph.D. qualified

20  candidate to serve as the lab director for the Highland

21  Heights lab.

22         I was still going to remain the CAP director for

23  the Belgium lab.  So it made sense that I would visit the

24  Belgium lab more at that point.

25  **Q.**  You had reported that it was especially stressful for you

 1    to go to Highland Heights, which was your home lab, right?

 2    **A.**   It was also a more stressful environment.  There was more

 3    interdepartmental conflict.  Also, I was the only female

 4    executive director there on site, so it -- it with my condition,

 5    it was a little bit intimidating, and I was concerned,

 6    especially, you know, after disclosing my disability.

 7    **Q.**   And so for you at this time, it was -- it was easier to

 8    fly to Brussels?

 9    **A.**   Yes.

10    **Q.**   In response to this communication from Dr. Kissimian,

11    Mr. Mekerri and Mr. St. John said that PPD would actually

12    accommodate you for a couple of these items; is that right?

13    **A.**   Yes.  But they changed the criteria for the fifth bullet.

14    **Q.**   Well, let's bring up that response.

15            MS. MANDEL:  Miranda, can we please bring up Joint

16    Exhibit 421.  Thank you.

17    BY MS. MANDEL:

18    **Q.**   This is an e-mail, Dr. Menninger, from Chad St. John to

19    you?

20    **A.**   Yes.

21    **Q.**   And it copied Mr. Mekerri, and I guess Mr. St. John sent

22    a copy to himself.

23            And Mr. St. John wrote to you, "Hacene has

24    confirmed that he is okay to accommodate points 1 and 5."  So

25    let's look below to what that was.  This is some highlighted

1    language, which is -- it's a little bit hard to see, it's

2    sort of grayed out, and it has a little asterisk under number

3    1.  And it says, "The accommodated expectation will now be to

4    include a designee."

5              Do you see that?

6    **A.**  Yes.

7    **Q.**  And you understand that that was PPD's response to you

8    about how they would -- they would be able to meet the

9    accommodation that was recommended by Dr. Kissimian, right?

10   **A.**  Yes.

11   **Q.**  And then the next item says, "Client bid defendants,

12   issue resolution calls," that same language we've seen a few

13   times now, right?

14   **A.**  Yes.

15   **Q.**  And it says, "The expectation is for Lisa to participate

16   in client bid defense issue resolution calls" -- and again,

17   HH is Highland Heights, right?

18   **A.**  Yes.

19   **Q.**  "Client site meetings, phone," and it says it's critical

20   for the business, right?

21   **A.**  Yes.

22   **Q.**  Okay.  Number 3, the technical sales presentation,

23   internal/external category, it says -- and the language that

24   Mr. St. John and Mr. Mekerri had added is where it says

25   "Lisa's participation."

1          Do you see that?

2     **A.**   Yes.

3     **Q.**   Okay.  "Lisa's participation as a Central Labs technical

4     leader is imperative in gaining perspective client's trust to

5     obtain new business."

6          Do you see that?

7     **A.**   Yes.

8     **Q.**   And then number four, customer visits, lunch/dinner and

9     social interactions?

10    **A.**   Yes.

11    **Q.**   And that's the one where Dr. Kissimian had said that you

12    should be excused from those interactions all together; is

13    that right?

14    **A.**   I believe she also said, Or brainstorm additional ideas.

15    **Q.**   And Mr. St. John and Mr. Mekerri said, "Lisa's

16    participation as a Central Labs technical leader is

17    imperative in gaining perspective client's trust to obtain

18    new business."  Right?

19    **A.**   Yes.

20    **Q.**   Okay.  And then on the next e-mail down -- I mean, not

21    the next e-mail, the next number down, it says number 5, and

22    it says travel up to 30 percent.  Again, that's the number

23    from your job description.  It says, "The accommodated

24    expectation will now be up to only 15 percent."  Right?

25    **A.**   Yes.

1   **Q.**   Okay.  And you understood that this was the response that

2   PPD was providing to what Dr. Kissimian had recommended; is

3   that right?

4   **A.**   Yes, except for number 5 wasn't really accurate, based on

5   what Dr. Kissimian wrote.

6   **Q.**   Well, Dr. Kissimian had written that your travel up to

7   30 percent to the extent possible should be international

8   travel, not to Highland Heights; is that right?

9   **A.**   To the Belgium lab, yes.

10   **Q.**   And specifically here, PPD was saying they would just cut

11   the travel expectation by half, right?

12   **A.**   Yes.  But I didn't have any issues with travel.  In fact,

13   I looked forward to making more frequent visits to the Global

14   labs.

15   **Q.**   And in fact, during this time period, you had been

16   looking at some upcoming trips to Brussels and to Shanghai, I

17   think coming up in the spring and summer following, right?

18   **A.**   Definitely to Brussels.  I don't think I had anything

19   firmly set for Asia -- for Singapore or Shanghai.

20   **Q.**   Okay.  And you actually -- you reported to Dr. Kissimian,

21   after receiving this response, that you thought that PPD's

22   response was promising, right?

23   **A.**   Where is that from?

24          MS. MANDEL:  Yeah, let's bring up Dr. Kissimian's

25   notes about that.

```
 1              Miranda, can we bring up Joint Exhibit 18, please.
 2      And let's look at Bates number 671, please.  Thank you.
 3      BY MS. MANDEL:
 4      Q.  This is an -- at the top it says it's a psychiatric
 5      follow-up visit.  This was Dr. Kissimian.  And it says, "DOS"
 6      is that date of service, as far as you know, Dr. Menninger?
 7      A.  I think that's DOB for date of birth.
 8      Q.  Oh, that's right.  Yeah, I do see where it says DOB.  But
 9      two items below that, do you see where it says "DOS"?
10              THE COURT:  Top of the page.
11              MS. MANDEL:  It's like --
12              THE COURT:  Maybe you can blow it up.
13              THE WITNESS:  Yes.  Sorry.  Yes.
14      BY MS. MANDEL:
15      Q.  Okay.  And let's look under, "History of present
16      illness," and it says, "Continues to isolate at home and
17      hardly leave her family."
18              Do you see that that is as of February 6th of 2018?
19      A.  Yes.
20      Q.  And it says, "Today introduced the concept of CBT."
21              Is that cognitive behavioral therapy?
22      A.  Yes.
23      Q.  Okay.  Did you do cognitive behavioral therapy with
24      Dr. Kissimian?
25      A.  We -- yes, we did both therapy and medication management.
```

1    **Q.**  So that was part of your treatment that you were doing

2    with Dr. Kissimian?

3    **A.**  We were experimenting with different things.

4    **Q.**  Okay.  And you noted -- it says, "She was able to speak

5    with both HR and her boss regarding the document for

6    accommodations."

7         Do you see that?

8    **A.**  Yes.

9    **Q.**  "And their response was promising"?

10   **A.**  Okay.  This was -- yes.  Yes.

11   **Q.**  Okay.

12   **A.**  This was before the meeting.

13   **Q.**  So this was after the company had given you information

14   about those five buckets, and after Dr. Kissimian had

15   provided back her recommended accommodations, right.  And at

16   that point you thought that things were promising?

17   **A.**  I did.  That was before I got the response on

18   February 26th, at the airport.

19   **Q.**  Because when you were flying back to Highland Heights?

20   **A.**  Yes.

21   **Q.**  Okay.  And it says, in the same paragraph, Dr. Menninger,

22   it says that at that point, you were isolating at home and

23   hardly leaving your family?

24   **A.**  Yes.

25   **Q.**  And I know you were just talking about being at the

1   airport and flying to Highland Heights, that was the one

2   visit you made to Highland Heights in 2018, right?

3   **A.**   Yes.  Hacene wanted me to time it with when the town hall

4   was going to occur.

5   **Q.**   And at that point, you had been isolating at home with

6   your family for some time?

7   **A.**   Since disclosing my disability.

8   **Q.**   So you had been pretty much at home with your family from

9   January to the end of February?

10  **A.**   Well, I was working in my office downstairs.  But, yes.

11  **Q.**   But physically, you weren't leaving the house?  That's

12  what I mean.

13  **A.**   Correct.

14  **Q.**   Okay.  And you were able to get on to a plane and fly to

15  Highland Heights at the end of February?

16  **A.**   I was and I had a panic attack.

17  **Q.**   Was that in the airport?

18  **A.**   No.  That was when I was at home.

19  **Q.**   Leading up to the trip?

20  **A.**   Yes.

21  **Q.**   How did you manage that panic attack?  I mean, like

22  deal -- cope with the fact that you were having a panic

23  attack?  Did you use medication for that?

24  **A.**   I was crying.  My husband was hugging me and trying to

25  console me and tell me it would be okay, because I was

1    scared.  I didn't know what to expect.  At this point, I had

2    not heard anything in terms of a response to the suggestions

3    that Dr. Kissimian had provided, so I was -- I was very

4    nervous.

5    **Q.**  Let's look at your later communication with Mr. St. John

6    and Mr. Mekerri about these accommodations that Dr. Kissimian

7    had drafted on your behalf.

8            MS. MANDEL:  Let's look at Joint Exhibit 141,

9    please, Miranda.

10   BY MS. MANDEL:

11   **Q.**  So let's look at your e-mail, which is at the bottom of

12   the page.  This was an e-mail that you wrote on March 24,

13   2018.

14   **A.**  Yes.

15   **Q.**  So this is, at this point, about a month after you had

16   the panic attack around that travel, right?  Is that right?

17   You were just describing having a panic attack before going

18   to Highland Heights towards the end of February of 2018, and

19   now we're in March of 2018.  About a month later, right?

20   **A.**  Correct.

21   **Q.**  Okay.  And you wrote this e-mail to Mr. St. John and

22   you -- if we -- you said you're writing to follow-up on his

23   e-mail regarding disability and potential need for reasonable

24   accommodation.

25            In the next paragraph you say, "I appreciate you

1  taking the time to highlight portions of my job description.

2  I am familiar with the essential functions of my position and

3  I'm not requesting any changes to those functions."

4          Do you see that?

5  **A.**  Correct.

6  **Q.**  Okay.  And you said, "I am capable of performing all of

7  my responsibilities, with or without accommodation."

8  **A.**  Yes.

9  **Q.**  Okay.  And then you said, "There are, however, certain

10  types of tasks, like formal group presentations, that are

11  challenging to my disability, and I'd ask that you consider

12  possible reasonable accommodations."

13          Do you see that?

14  **A.**  Yes.

15  **Q.**  Okay.  And in the next paragraph, you kind of remind them

16  how -- or you remind Mr. St. John, how that discuss had led

17  to Mr. Mekerri identifying three broad categories of duties

18  and responsibilities for which he believed that no

19  accommodation was possible.  That's those two, three, four

20  buckets?

21  **A.**  Yes.

22  **Q.**  Okay.  And then if we look down below, you said, "In any

23  event, based on my one-on-one with Hacene this past week..."

24          So referring to a recent meeting with Mr. Mekerri?

25  **A.**  Yes.

1   **Q.** "It does not appear that there are any activities or

2   events in the near future that would implicate my disability.

3   Given this, and how extremely busy we all are, it might make

4   sense to table this discussion until a particular task

5   arises."  Is that --

6   **A.** Yes.

7   **Q.** Okay.  And then you said, "Dealing with these issues in

8   context, I think, might make this whole issue seem less

9   daunting and help us engage in a more meaningful dialogue."

10   **A.** Yes.

11   **Q.** Did Dr. Kissimian help you write that e-mail?

12   **A.** No.

13   **Q.** Did anyone help you write that e-mail, Dr. Menninger?

14   **A.** Yes.

15   **Q.** And who helped you write that e-mail?

16   **A.** My attorney.

17   **Q.** Oh, okay.  And then the last kind of small paragraph, you

18   said you remain confident that we can work through this

19   together.  Right?

20   **A.** Yes.

21        MS. MANDEL:  Okay.  We can close out of that.

22   Thanks, Miranda.

23   BY MS. MANDEL:

24   **Q.** Dr. Menninger, I understand that you currently receive

25   Social Security Disability benefits from the federal

```
 1    government every month; is that right?

 2    A.   Yes.

 3              MS. MANDEL:   Let's bring up joint Exhibit 440,

 4    please, Miranda.

 5    BY MS. MANDEL:

 6    Q.   Dr. Menninger, this is -- at the top, it says this is

 7    "disability determination for Social Security pain and other

 8    symptoms."

 9              Do you see that?

10    A.   Yes.

11    Q.   And it has your name and it has a blocked out Social

12    Security number.  Do you see that?

13    A.   Yes.

14    Q.   Do you -- and it has a lot of handwritten notes.  Do you

15    recognize this as a form that you filled out?

16    A.   Yes.

17    Q.   And this was when you applied for government Social

18    Security benefits in January of 2019; is that right?

19    A.   The application was submitted much earlier.  This was a

20    supplemental document that was sent to me to fill out.  The

21    application started earlier, by a company called Genex, that

22    worked with UNUM, which was the company's disability

23    provider.

24    Q.   So -- and let's back up to give a little more context to

25    the jury on that.
```

```
 1              So you've testified so far this week that in June

 2      of 2018, you went out on a leave from your position at PPD;

 3      is that right?

 4      A.   Yes.

 5      Q.   And at the beginning of that leave, you had a number of

 6      days -- a good number of days of PTO, paid time off, that you

 7      were able to use to receive full pay?

 8      A.   Yes.  We had, like, an executive bank that I was able to

 9      be paid from.

10      Q.   Okay.  And then once you were done using that executive

11      bank of time, you -- you utilized short-term disability

12      benefits for pay; is that right?

13      A.   That's correct.

14      Q.   And then that transitioned, after a time, to what's

15      called long-term disability to provide you with pay?

16      A.   Yes.  That's correct.  But the short-term disability only

17      covered up to 60 percent of my pay.

18      Q.   Right.  It's not full pay.  But it has some tax benefits;

19      is that right?

20      A.   I'm sorry.  I didn't hear your question.

21      Q.   It has some kind of tax benefits, right?  Like the way

22      that that's taxed, instead of your pay?

23      A.   I don't know.

24      Q.   That's right.  I know this was a long time ago.  We don't

25      have to get into --
```

1   **A.**  I don't know if there's tax benefits.  I received a W-2,
2   so I had to report it and pay taxes.
3   **Q.**  Of course.  Of course.  And so as part of getting those
4   long-term disability benefits, part of that process was also
5   applying for government Social Security Disability benefits;
6   is that right?
7   **A.**  Yes.  That was a requirement by UNUM.
8   **Q.**  And UNUM was the company that was administering the long
9   term disability benefits for PPD?
10  **A.**  The short term and the long term, yes.
11  **Q.**  And you were describing a few moments ago, this form is a
12  supplement that was part of your application to receive those
13  government benefits?
14  **A.**  I received this form late.  I was already in Albuquerque,
15  so it was -- it was probably months after the initial
16  application had been submitted by Genex.  So this was just
17  maybe the final, like, documentation they needed before
18  making their decision and it had to be filled out by me.
19  **Q.**  And just for some context, because you referred to moving
20  to Albuquerque, that was during your medical leave in
21  December of 2018 that you moved to Albuquerque, New Mexico?
22  **A.**  Yes.  It was at the end of December 2018.
23  **Q.**  Okay.  And at which point you were still on medical
24  leave?
25  **A.**  Yes.

```
 1    Q.   Okay.  So now we have some more context for this form.

 2              MS. MANDEL:  Miranda, can we jump to Bates

 3    page 891, please.

 4    BY MS. MANDEL:

 5    Q.   And while Miranda is helping us with that, Dr. Menninger,

 6    you testified that you filled out this form, right?

 7    A.   Yes.

 8    Q.   That's your handwriting?

 9    A.   Yes.

10    Q.   Okay.

11              MS. MANDEL:  I think that's 690.  That's -- it

12    should be 891.

13              THE COURT:  Is this the page you want, or a

14    different page?

15              MS. MANDEL:  This is not the page I wanted.  Okay.

16    That's okay.  We can find that and come back to it.

17              So Miranda, let's get back out of that.  We'll come

18    back to it.

19    BY MS. MANDEL:

20    Q.   Dr. Menninger, before January 2018, you had seen

21    therapists at various points?

22              THE COURT:  Maybe you should take this down.  There

23    you go.  Okay.  Go ahead.

24    BY MS. MANDEL:

25    Q.   Is that right, Dr. Menninger?
```

```
 1    A.  Can you repeat the question?

 2    Q.  Before January 2018, you had worked with therapists at

 3    different points, right?

 4    A.  No.  Psychiatrists.

 5    Q.  I'm sorry, yes.  You had worked with psychiatrists at

 6    various points?

 7    A.  In Kansas -- I'm just blanking out on his name.  The one

 8    we were talking about earlier.

 9    Q.  Sure.  That was Dr. Everson?

10    A.  Yes.

11         MS. MANDEL:  Okay.  And let's -- let's pull up --

12    Miranda, can we pull up, again, P-18, or Joint 18?

13    BY MS. MANDEL:

14    Q.  And this is the first -- the notes of the first visit

15    that you had with Dr. Kissimian, in January of 2018, right?

16    A.  Yes.

17    Q.  And this is, you would agree, Dr. Kissimian's description

18    of what she learned from you during that first visit, right?

19    A.  Yes.

20         MS. MANDEL:  Okay.  Let's -- let's jump to the next

21    page, please, Miranda.

22    BY MS. MANDEL:

23    Q.  So under, "Family History" this was a family history that

24    you told Dr. Kissimian during this first visit in January of

25    2018?
```

1    **A.**   Yes.

2    **Q.**   It talks about your mother and your grandmother with

3    severe anxiety disorders.  Do you see that?

4    **A.**   Yes.

5    **Q.**   And it says that your mother cannot order for herself at

6    a restaurant?

7    **A.**   Yes.

8    **Q.**   Okay.  And then it also says your father was

9    involuntarily hospitalized for erratic and violent behavior?

10   **A.**   Yes.

11   **Q.**   "Denied substance abuse history."  That was for your

12   father, right?

13   **A.**   Yes.

14   **Q.**   Was unemployed throughout your life, and there was

15   schizophrenia on that side of the family, as well.

16   **A.**   Yes.

17   **Q.**   Do you see that?  Okay.

18           And then under "Developmental History," it's your

19   understanding this is like referring back to your childhood?

20   **A.**   Correct.

21   **Q.**   And it says, "Remembers mother as caring but timid and

22   distant at times and feeling she knew the motions of being

23   maternal but did not feel genuine.  Father she remembers as

24   unpredictable, volatile, and scary.  Remembers in the middle

25   of the night, he would come into the bedroom that she shared

```
 1    with her sister" --
 2                That's your sister, Tonya; is that right,
 3    Dr. Menninger?
 4    A.   Yes.
 5    Q.   -- "put on the light, and lecture them about something
 6    that was irrelevant that was hard to follow.
 7    A.   Yes.
 8    Q.   "Mother did leave her father and moved back to her
 9    hometown of Appleton, Wisconsin, to live with her
10    grandparents.  But then they reconciled, and he" --
11                And the "he" is your father?
12    A.   Yes.
13    Q.   -- "came back to only continue with the rages, violence,
14    and unpredictability"?
15    A.   Yes.
16    Q.   Do you see that?
17    A.    (Nods head.)
18    Q.   And then down below, it refers to your family situation
19    at that time, which was your husband, Mason, and your
20    daughter, Maya; is that right?
21    A.   Yes.
22    Q.   It also says that you at that time felt most connected
23    with your sister, Tonya, your husband, and your daughter?
24    A.   Yes.
25    Q.   Is that right?
```

1    **A.**   That's correct.

2            MS. MANDEL:   Let's go to the next page, please,

3    Miranda, 665.

4    BY MS. MANDEL:

5    **Q.**   So under "Panic and Social Phobia," it's like kind of

6    second paragraph in, do you see where it says that, "Lisa

7    remembers, as young as three or four, dreading school,

8    especially fear of being called on to answer a question"?

9    **A.**   Yes.

10   **Q.**   "If she was called on, her body and voice would shake,

11   and this experience was both physically and mentally painful

12   and exhausting"?

13   **A.**   Yes.

14   **Q.**   "This has continued into adulthood, and even at small

15   meetings when she needs to present three or four slides, the

16   physical sensations of anticipatory dread set in as well as

17   diarrhea, heart racing, sweatiness, and increased respiratory

18   rate."

19            Do you see that?

20   **A.**   Yes.

21   **Q.**   "Modifying Factors."  Is it your understanding that that

22   refers to things that kind of help make things a little

23   better?

24   **A.**   Yes.

25   **Q.**   And it says that, "Being with family and being inside

1    your home"?

2    **A.**   Correct.

3    **Q.**   Okay.  And then down below, where it says, "Psychiatric

4    ROS," do you have an understanding about what "ROS" means?

5    **A.**   It stands for review of -- systems -- review of systems.

6    **Q.**   So this is like your overall psychiatric health at that

7    time?

8    **A.**   Yes.

9    **Q.**   Okay.  And this is January of 2018, January 22nd, right?

10   **A.**   Yes.

11   **Q.**   Okay.  And it goes through -- it says "Denies depression,

12   mania, psychosis," but it says, "but does have some intrusive

13   thoughts of saying the right word, editing and re-editing all

14   emails before sending and looking for grammar or spelling

15   mistakes."

16           Do you see that?

17   **A.**   Yes.

18   **Q.**   And down below, right beneath that it says, "eating

19   disorder behavior."  You and your family are vegan; is that

20   right?

21   **A.**   Yes.

22   **Q.**   It says, "Weighs herself daily and has committed to

23   remaining the same weight, working with a trainer over the

24   Internet to gain strength and to compete in ultra long power

25   walking."

1    **A.**  Yes.  It's not totally accurate, the way it's worded, but

2    yes.

3    **Q.**  But you would agree these are Dr. Kissimian's impressions

4    from that first -- from that first appointment, right?

5    **A.**  Yes.

6    **Q.**  And then it lists out trauma, and it says, "Witnessed

7    domestic violence as a child, father holding a knife to her

8    mother's throat.  Also, father committed to the psychiatric

9    ward several times secondary to violent/unpredictable

10   behavior, and remembers always having to walk on eggshells

11   and never knowing what version of her father she would get."

12          Do you see that paragraph?

13   **A.**  Yes.

14   **Q.**  And then a couple of lines down, it says -- whoops -- it

15   says, "Past psychiatric history:  Outpatient level of care,

16   trial of Celexa, which she stopped."  And that was, I believe

17   you said earlier today, when we looked at the notes from

18   Dr. Everson, that that is a medication that's used for

19   anxiety and sometimes depression?

20   **A.**  Yes.

21   **Q.**  Which you stopped, "secondary to weight gain and also

22   feeling emotionally blunted, unknown dose or time on

23   medication."

24          And so she was noting that you had stopped this

25   trial of Celexa because you were concerned that you were

1 gaining weight on it?

2 **A.** It wasn't as much gaining weight, it was more -- it just

3 made me feel like I couldn't experience like extreme

4 happiness or extreme sadness. I was just kind of there and

5 that was the primary reason.

6 **Q.** And so Celexa hadn't been like a good way for you to

7 manage your anxiety symptoms. Is that a fair statement?

8 **A.** That's fair.

9   MS. MANDEL: And let's look at the next page, 666,

10 please, Miranda. Yeah. Thank you. And can you just

11 increase the size of that a little bit, please. Thank you.

12 BY MS. MANDEL:

13 **Q.** And again, this is from that first initial visit in

14 January of 2018. And under where it says -- it says, "Mood

15 fight or flight." Do you see that?

16 **A.** Yes.

17 **Q.** Okay. And it says, "affect nervous" and then a couple

18 lines down, it says, "thought content, public speaking fears.

19 Fears about saying the right word, fears about being around

20 others, prefers to avoid anxiety provoking activities

21 overvalued ideas about weigh."

22   Do you see that?

23 **A.** Yes.

24 **Q.** And then a couple lines down, Dr. Kissimian describes

25 what types of panic symptoms you have; is that right?

1   **A.**  Yes.

2   **Q.**  You see where it says, "Panic perceptions, difficulty

3   breathing, choking sensation, unpleasant feeling of

4   anticipation or threat, fear of losing control or dying."

5   **A.**  Yes.

6   **Q.**  And this was based on your description to Dr. Kissimian

7   in January of 2018 about what you experienced when you had

8   panic?

9   **A.**  Yes.

10  **Q.**  And then looking down at the -- under "assessment and

11  plan" and again, this is January of 2018, it

12  says, "49-year-old Caucasian female with a history of GAD."

13          Is that generalized anxiety disorder, as far as you

14  know?

15  **A.**  Yes.

16  **Q.**  "Panic with agoraphobia and social anxiety disorder.

17  Presents for her initial psychiatric evaluation after her

18  baselines high anxiety started to spiral when, at work, it

19  was suggested that she be more visible and have more of a

20  public presence."

21          Do you see that?

22  **A.**  Yes.

23  **Q.**  "Currently feeling fight or flight" and that's that

24  feeling of like you either need to leave the situation or do

25  something to sort of help yourself?

1    **A.**  It's not a feeling of -- yeah, you need to run away or

2    fight to survive.

3    **Q.**  And Dr. Kissimian was reporting that that's how you were

4    feeling in January of 2018, right?

5    **A.**  Yes.

6    **Q.**  And that's -- it says because you were having

7    catastrophic thinking about you potentially causing your

8    family becoming homeless and you were having this thought in

9    January of 2018?

10   **A.**  Yes.

11   **Q.**  And then Dr. Kissimian repeated, as well, some of that

12   family history, including "type 2 trauma, secondary to

13   father's volatile behavior, and witnessing domestic violence

14   between her parents."

15           Do you see that?

16   **A.**  Yes.

17   **Q.**  And then in the last full paragraph on the page, it

18   begins, "Social," and it has a colon.  Do you see that?

19   **A.**  Yes.

20   **Q.**  And it talks about you being a pathologist, and then

21   later in that paragraph, it says, "Concern for excessive

22   accommodation where all of her needs are met and she is not

23   asked or required to leave the house."

24   **A.**  Yes.

25   **Q.**  And you testified a few moments ago that, from that time

1   until the end of February, you really weren't leaving the

2   house.

3   **A.**   Correct.

4   **Q.**   And, in fact, since then, you've spent most of your time

5   in your house; is that right?

6   **A.**   It's been back and forth.  There's been times where,

7   like, usually when I move some place new and no one knows me,

8   then I would be okay to go for walks.  But once I feel like

9   I'm noticed, then I want to stay in the house.

10  **Q.**   And that's why you've tended towards places that are a

11  little bit more rural and a little less neighborhood based,

12  right?

13  **A.**   No.  No.  Actually, I feel better when I'm in crowds of

14  strangers, because it makes me feel like I'm not being

15  noticed.

16  **Q.**   Let's look at the notes from your next visit with

17  Dr. Kissimian, on February 2nd.

18           MS. MANDEL:  Can we jump to page 668, please,

19  Miranda?  Thank you.

20  BY MS. MANDEL:

21  **Q.**   So this is your next appointment with Dr. Kissimian,

22  about ten-ish days later; is that right?

23  **A.**   Yes.

24  **Q.**   Okay.  And this is the point at which you and

25  Dr. Kissimian had just provided that accommodation paperwork

1    to PPD; is that right?

2    **A.** Shortly afterwards, yes.

3    **Q.** And it says, "Chief complaint." It says, "I am just

4    worried all the time. I wake up with my heart already

5    beating fast, thinking about how I have to see the other

6    people that I work with at the end of the month after handing

7    in those letters to HR."

8           Do you see that?

9    **A.** Yes.

10    **Q.** And then it notes below that since your last visit, you

11    were continuing to isolate in your home and hardly leave your

12    family; is that right?

13    **A.** Yes.

14    **Q.** And then going down a couple of paragraphs, it says,

15    "Spoke at length about her experience in the work

16    environment, where she feels that she is more introverted and

17    analytical. She is being criticized for things that are

18    unchangeable."

19           Do you see that?

20    **A.** Yes.

21    **Q.** "Has difficulty advocating for herself, and has already

22    resigned to defeat in the corporate culture"?

23    **A.** Yes.

24    **Q.** And you would agree, Dr. Menninger, that this is before

25    you had any meetings with Mr. St. John and Mr. Mekerri to

```
 1    review what was in the accommodation paperwork, right?

 2    A.  Yes.  I was fearful about getting a response and -- after

 3    disclosing my disability.  And the -- the statement that I

 4    made about being introverted and analytical in the corporate

 5    culture was the corporate culture in general, not specific to

 6    PPD.  I was referring to my introverted nature and analytical

 7    nature, which is why I picked the field of pathology.

 8              MS. MANDEL:  Miranda, we can get out of that

 9    exhibit.  Thank you.

10    BY MS. MANDEL:

11    Q.  Dr. Menninger, I know we talked a little bit about you

12    being a runner at times.  You began running ultra marathons

13    in 2017, right?

14    A.  I wouldn't say I was actually running.  I was more

15    walking, seeing how long I could walk until, yeah, I couldn't

16    anymore, like during a 24-hour period.

17    Q.  And for the jury's benefit, can you tell us what an ultra

18    marathon is?

19    A.  I believe it's anything defined as longer than a marathon

20    distance.

21    Q.  So -- and a marathon is 26.2 miles, right?

22    A.  Yeah.  Yes.  An ultra marathon also can be time based, so

23    like a 24-hour race, where you just go as long as you can.

24    Q.  And sometimes you did those running, sometimes walking;

25    is that right?
```

```
 1   A.  At that time, yeah, I -- I wasn't a serious runner.  I'm
 2   not a good runner.  I just -- it was almost like a form of
 3   meditation for me.  It was calming, something I could do by
 4   myself.  And in a way, it just gave me strength.
 5   Q.  You did one of those ultra marathons when you were in
 6   Rhode Island -- or in Rhode Island, when you were living in
 7   Massachusetts; is that right?
 8   A.  Yes.  That was a 24 hour race, so you could stop,
 9   basically, whenever you felt like you had to.
10   Q.  And then you did two additional ones the next year, in
11   2018?
12   A.  Yes.  The same race, again.  And then 100K distance.  And
13   I was trying to use walking at that time as a form of
14   therapy, just to be outside, be calm, be by myself, and just
15   cope with what was going on.
16   Q.  And part of running an ultra marathon and walking an
17   ultra marathon, you need like people to basically help you on
18   the way; is that right?
19   A.  Usually the runners will be like a crew, but there's also
20   aid stations with volunteers set up.  So you can get food and
21   water and things like that.
22   Q.  And your husband, and sometimes your sister, would do
23   what's called crewing for you when you did these races?
24   A.  Yes.
25   Q.  And you also -- I know you said that you did that same
```

1    ultra marathon in Rhode Island, I think it was two years in a

2    row, right, 2017 and 2018?

3    **A.**   Correct.

4    **Q.**   And then you did one in Arizona in 2018, as well?

5    **A.**   Yes.

6    **Q.**   And actually, that one in Arizona, I think you did in

7    2018 and 2019, again?

8    **A.**   I tried.  I attempted.  I was not successful in 2019.

9    **Q.**   And you also did one in Colorado in 2019; is that right?

10   **A.**   Yes.

11   **Q.**   And some of those ultra marathons have more than 600

12   people competing in them; is that right?

13   **A.**   The one in Arizona.

14   **Q.**   That's a big one?

15   **A.**   Yeah.

16              THE COURT:  We'll stop here.

17              Ladies and gentlemen of the jury, just a schedule

18   update and a reminder.  So we're on track on the schedule

19   that I told you.  I have confirmed with the lawyers and you

20   should anticipate that Monday -- that Monday we'll go in the

21   afternoon.  So tomorrow, 9:00 to 1:00, Friday, 9:00 to 1:00,

22   nothing on Saturday, nothing on Sunday.  Monday, 9:00 to

23   1:00, break for lunch, 2:00 to 4:00.  And then Tuesday, back

24   to the 9:00 to 1:00 schedule.

25              And then so thank you for your attention, don't

```
 1    discuss the case among yourselves, don't discuss with anyone
 2    else.  Keep an open mind.  No independent research.  All rise
 3    for the jury.
 4              (The jury exits the courtroom.)
 5              THE COURT:  See you at 8:30, or is there no need?
 6    I'm happy to do it, if there's any --
 7              MR. HANNON:  If we could do 8:45, it would be
 8    better for me.
 9              THE COURT:  I'm happy to do 8:45, unless there's
10    something to talk about.
11              MS. MANDEL:  I think, at most, we would be talking
12    about the procedure with the deposition read-in, but I don't
13    think that's going to --
14              THE COURT:  It won't take very long.  All right.
15    8:45.  I'll see you then.  Have a good day.
16              (Court in recess at 1:02 p.m.)
17
18
19
20
21
22
23
24
25
```

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 22nd day of March, 2023.


/s/ RACHEL M. LOPEZ



_____
Rachel M. Lopez, CRR
Official Court Reporter



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

LISA MENNINGER,

　　　　Plaintiff,　　　　　　　　　　Civil Action No.
　　　　　　　　　　　　　　　　　　　　1:19-cv-11441-LTS

　　　v.

PPD DEVELOPMENT, L.P.,

　　　　Defendant.

_____


BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


JURY TRIAL
Day 4



Thursday, March 23, 2023
8:47 a.m.






John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts


Robert W. Paschal, CRR, RMR
Official Court Reporter
rwp.reporter@gmail.com

1                    **A P P E A R A N C E S**

2

3      On behalf of the Plaintiff:

4          HARTLEY MICHON ROBB HANNON, LLP
           BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
5          155 Seaport Boulevard
           2nd Floor
6          Boston, Massachusetts  02210
           (617) 723-8000
7          phannon@hmrhlaw.com
           hwatson@hmrhlaw.com

8

9      On behalf of the Defendant:

10         OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
           BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11         One Boston Place
           Suite 3500
12         Boston, Massachusetts  02108
           (617) 994-5700
13         rachel.mandel@ogletreedeakins.com
           patrick.curran@ogletreedeakins.com

14

15

16

17

18

19

20

21

22

23

24

25

**TABLE OF CONTENTS**

**TRIAL WITNESSES**

On behalf of the Plaintiff:                                    Page

LISA MENNINGER

      By Ms. Mandel                                       14

      By Mr. Hannon                                       52

      By Ms. Mandel                                       64

DEBORAH BALLWEG

      By Mr. Hannon                                       69

**EXHIBITS**

None

**P R O C E E D I N G S**

(In open court at 8:47 a.m.)

THE COURT: I see all counsel. You don't have to identify yourselves. I know who you are.

Okay. Other than Monday to Tuesday, anything else to talk about?

MR. HANNON: Nothing for the plaintiff, Your Honor.

MS. MANDEL: Nothing for us, Your Honor. Just want to talk about schedule.

THE COURT: Okay. So in terms of Monday to Tuesday, I have a few things -- let me see if I can work out, because I have a Monday -- I think Monday the whole afternoon is free. So for me, it's easy. Tuesday, I have all these various proceedings, so I need to move them. I think I can do that, but Kellyann is looking into that. So we'll have a better idea maybe at the break about that.

Assuming we do that, I'll tell the jury -- I mean, it's a little bit different for them, but they knew they were going to come in afternoons, so I'm okay. I don't have a problem with that. And I take it, it works better for, given where we are and given the out-of-court -- the out-of-state witnesses, scheduling for them?

MS. MANDEL: Your Honor, we have two different concerns. One is working with our out-of-state witnesses and we're working on seeing if they can change flights, family

```
 1    questions, but we'll have two separate causation questions.

 2    That's how I'm breaking it out.  That's -- so it seems that

 3    requires them to make separate decisions, explains them

 4    separately, but limits the amount of verbiage.

 5              MR. HANNON:  Makes sense.

 6              THE COURT:  You should go get your client.

 7              MR. HANNON:  Thank you.

 8              (Jury present.)

 9              THE COURT:  Everybody follow the instruction, no

10    discussion with yourselves, no discussion with anyone else,

11    no independent research?  Good.

12              All right.  So we resume.  Dr. Menninger is on the

13    witness stand.

14              I remind you you remain under oath.

15              And you can go ahead, Ms. Mandel.

16              MS. MANDEL:  Thank you.

17                           LISA MENNINGER

18        having been previously duly sworn, testified as follows:

19         CONTINUED CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

20    BY MS. MANDEL:

21    Q.   Good morning, Dr. Menninger.

22    A.   Good morning.

23    Q.   Let's start this morning by looking back at an exhibit

24    that we looked at yesterday, Exhibit 59.  This is your 2017

25    performance review; is that right?
```

```
 1    A.   Yes.
 2    Q.   And if you look at where -- it says the review period was
 3    the calendar year of 2017, right?
 4    A.   Yes.
 5    Q.   And in right beneath that, it says "due date was
 6    December 31, 2017."  Do you see that?
 7    A.   Yes.
 8    Q.   And we're going to -- let's just jump to the second page
 9    of that document.  We're going to take a quick look.  You
10    testified yesterday about your year end comments about hiring
11    scientific directors.  Do you recall that?
12    A.   Yes.
13    Q.   And we're just going to look very briefly at
14    Mr. Mekerri's year-end comments, which are on the left side
15    of the page.  And I think it's probably meant to say "lack of
16    scientific expertise."  Do you see that?
17    A.   Yes.
18    Q.   To Global Central Labs, that's the GCL, right?
19    A.   Correct.
20    Q.   And the right beneath that, Mr. Mekerri said -- Hacene --
21    and that's Mr. Mekerri's first name, is Hacene?
22    A.   Yes.
23    Q.   Okay.  "Hacene to connect with recruitment to bring
24    pathologist in-house."  Is that right?  Do you see that?
25    A.   Yes.
```

1    **Q.**  And beneath that, it says, "Molecular director in place."

2    And as far as you understand, was that referring to the

3    director, medical director specific -- or the lab director

4    with specific knowledge of molecular chemistry, I think you

5    called it yesterday; is that right?

6    **A.**  Yes.  Dr. Reddy.

7    **Q.**  That was Dr. Reddy.  Okay.  And to your memory, Dr. Reddy

8    was already in place as the molecular director at that time?

9    **A.**  Yes.

10    **Q.**  Okay.  Thank you.

11          MS. MANDEL:  Miranda, we can take that one down.

12          Let's pull up Joint Exhibit 38, and this is going

13    to test our eyes a little bit, but I think we'll be able to

14    see the key parts.

15    BY MS. MANDEL.

16    **Q.**  Dr. Menninger, this is a check that you received from

17    PPD; is that right?

18    **A.**  I'm not sure what this is in reference to.

19    **Q.**  Well, I -- let's look down at the -- we can look at the

20    bottom part of the page.  Do you see it says, "JP Morgan

21    Chase" and has a bank symbol towards the bottom?

22    **A.**  Yes.  I believe this was sent directly to my attorney.

23    **Q.**  Was sent to your attorney, Mr. Hannon; is that right?

24    **A.**  Yes.

25    **Q.**  And it's a check for about $27,645; is that right?

1    **A.**   Yes.

2    **Q.**   And do you see that it's made out to you and that it was

3    from PPD?

4    **A.**   Yes.

5    **Q.**   And this is returning money to you after you did not

6    exercise your stock options; isn't that right?

7    **A.**   That's incorrect.

8    **Q.**   Well, can you explain what -- what this check was for,

9    then, please?

10   **A.**   I had purchased stock.  I was given the option to invest

11   in the company at the same time that I was awarded additional

12   stock options.  So I had purchased stock, and upon my

13   termination, they forced -- forcibly bought the stock back.

14   And this check is for that, for the stock that I owned.

15   **Q.**   And returning your money to you at that point?

16   **A.**   Yes.

17   **Q.**   Let's now pull back up Exhibit 433, another one we looked

18   at yesterday.  You'll recall, Dr. Menninger, this is the

19   letter that Dr. Kessimian, your psychiatrist, sent to PPD on

20   February 14, 2018.  Do you recall that?

21   **A.**   Yes.

22   **Q.**   And we looked at it in some detail yesterday.

23          MS. MANDEL:  Let's -- let's go to the -- the next

24   page of the document, please, Miranda.

25

1  BY MS. MANDEL:

2  **Q.** If we look at the paragraph about two-thirds of the way

3  down the page that starts with "a concrete way of thinking of

4  this disability?" -- do you see that?

5  **A.** Yes.

6  **Q.** And the end of that paragraph, do you see where it says,

7  "And for all of the above reasons, I recommended the

8  following reasonable accommodations"?

9  **A.** Yes.

10 **Q.** And then just below that, Dr. Kessimian wrote, "Below are

11 reasonable accommodations for Lisa so that she can continue

12 to be a productive and healthy member of your team."

13      Do you see that?

14 **A.** Yes.

15 **Q.** And I believe you testified yesterday that you thought

16 Dr. Kessimian was -- was brainstorming here about some things

17 that PPD might be able to do.  Do you recall that?

18 **A.** Yes.  I was having weekly appointments with Dr. Kessimian

19 at that point, so I knew that that was the intent.

20 **Q.** And I understand that, in your understanding, that was

21 the intent.  Can you please tell us where in Dr. Kessimian's

22 letter she referred to this as brainstorming about ideas

23 versus instructing on reasonable accommodations that she

24 thought you needed?

25 **A.** I believe the specific brainstorming was mentioned in one

1    of the bullets.

2    **Q.**  Well, and we can certainly look at the -- so you mean the

3    bullets on that bucket, buckets 1 through 5?

4    **A.**  Correct.  But I know that she definitely did not state

5    that these are restrictions.

6    **Q.**  So let's just take another quick look at those buckets.

7    The first one is in front of the screen, right, in front of

8    us on the screen; is that right?

9    **A.**  Yes.

10   **Q.**  And here, Dr. Kessimian uses the language "reasonable

11   accommodation" before the suggestions; is that right?

12   **A.**  Where are you referring to?

13   **Q.**  The last paragraph on the page, you testified yesterday

14   that was Dr. Kessimian's language that she added here, right?

15   **A.**  Yes.

16          MS. MANDEL:  And then let's -- let's jump to the

17   next page of this, please, Miranda.

18   BY MS. MANDEL:

19   **Q.**  And looking at the second bullet, where it says Number 2,

20   Dr. Kessimian again wrote "reasonable accommodations" and

21   then listed out the request; is that right?

22   **A.**  Yes.

23   **Q.**  And then if we look at Number 3, again, Dr. Kessimian's

24   language was "reasonable accommodation," would you agree?

25   **A.**  Yes.

```
 1              MS. MANDEL:  And then let's scroll down a little
 2   bit, Miranda, to see Numbers 4 and 5.
 3   BY MS. MANDEL:
 4   Q.  For Number 4, again, Dr. Kessimian's language was to say
 5   "reasonable accommodation."  Do you see that?
 6   A.  Yes.
 7   Q.  And then for Number -- Number 5 and it's actually --
 8   that's the one about the customer visits, lunch, dinner, and
 9   social interactions.  This is -- we discussed yesterday that
10   Dr. Kessimian's language begins where it says "surrogate,
11   this is not her strength/skill set."  Do you see that?
12   A.  Which -- which bullet are you on?
13   Q.  Where it says Number 5.
14   A.  Yes.  I see -- I see that.
15   Q.  And the -- the only place that I see the word
16   "brainstorm" here is about other ways that you could engage
17   in business relationships that didn't involve social
18   interactions; isn't that right?
19   A.  Can you repeat your question?
20   Q.  Sure.  So if --
21              THE COURT:  It would be better -- not whether you
22   see it, Ms. Mandel, but whether it's in the document.
23   BY MS. MANDEL:
24   Q.  Number 5, do you see where it says, "for customer visits,
25   lunch/dinner and social interactions may occur"?
```

1    **A.**   Yes.

2    **Q.**   And then it says, after that, "expected 60 to 80 percent

3    of the time"?

4    **A.**   Yes.

5    **Q.**   And then it says, "In order to build business

6    relationships."

7    **A.**   Correct.

8    **Q.**   And that was the language that Mr. Mekerri had drafted,

9    right?

10   **A.**   Correct.

11   **Q.**   And then Dr. Kessimian's language starts after that,

12   where it says "surrogate," correct?

13   **A.**   Yes.

14   **Q.**   So Dr. Kessimian wrote "surrogate, as this is not her

15   strength/skill set and her disability will flare with

16   significant impairment"; is that right?

17   **A.**   Yes, that's what she wrote.

18   **Q.**   And then after that, Dr. Kessimian wrote, "She is able to

19   build a business relationship in a more behind-the-scenes

20   fashion"?

21   **A.**   Yes.

22   **Q.**   "And would like" -- it seems like it's missing the word

23   "to" -- "brainstorm other potential avenues where she can add

24   value."

25   **A.**   Yes.

1   **Q.**  And then in Number 6, on the travel bucket,

2   Dr. Kessimian's language is "reasonable accommodation -- when

3   possible, traveling to the Brussels site versus stateside."

4        Do you see that?

5   **A.**  Yes.

6   **Q.**  Okay.  And, Dr. Menninger, aside from the use of the word

7   "brainstorm" in Number 5, did you see in the document any

8   other place where Dr. Kessimian used the word "brainstorm"?

9   **A.**  Not the word "brainstorm."  These were just suggested

10  accommodations per Chad St. John's request, but I explained

11  to Chad during the meeting that these were not doctor -- my

12  doctor's restrictions.  There were no restrictions that she

13  provided.

14  **Q.**  Dr. Menninger, after you provided this letter -- or

15  actually Dr. Kessimian provided this letter, you never

16  provided another letter from Dr. Kessimian that said that you

17  did not need these accommodations, did you?

18  **A.**  I -- I received an email.  I was waiting for a response

19  from PPD after Dr. Kessimian sent this, and I received an

20  email in the airport when I was on my way to

21  Highland Heights, so that was the first time I saw a response

22  to -- to this.

23        I assumed that, since I was on site, we were going

24  to have a discussion around these suggested accommodations.

25  **Q.**  And my question is a little bit different, Dr. Menninger.

1   You didn't provide another letter from Dr. Kessimian or

2   another doctor at any point that said you did not have the

3   need for the accommodations that were listed in the letter

4   that's up in front of us; isn't that right?

5   **A.**  Dr. Kessimian was my only psychiatrist/physician at the

6   time.

7   **Q.**  And she never wrote another follow-up letter after this

8   saying that you didn't need these accommodations; isn't that

9   right?

10  **A.**  We were waiting for follow-up discussion with PPD.  This

11  was to start the conversation around potential

12  accommodations.  At this point, I did not know the specific

13  new task or frequency of those tasks that Hacene had

14  suggested for 2018.  So my assumption and my doctor's

15  assumption was that we were going to have further

16  conversations around that.  But she did -- she did her best

17  to provide recommendations with the information she had at

18  the time.

19  **Q.**  And this is the last letter that Dr. Kessimian sent to

20  PPD with regard to what would -- what her view was of your

21  need for reasonable accommodation; isn't that right?

22  **A.**  I'm not -- I don't recall.  I -- I did have a

23  conversation with --

24          THE COURT:  That answers the question, then.  All

25  she's asking you is whether -- if I recall correctly, the

1  question is whether there was another letter from

2  Dr. Kessimian.  If you don't recall whether there was another

3  letter or not, you've answered the question.

4         THE WITNESS:  Okay.

5         THE COURT:  I understand there may be more behind

6  that that you're thinking about, but that's exactly the

7  purpose of two -- back-and-forth.

8         The lawyers ask -- the hard thing about being a

9  witness, what you don't get to do -- this is true for

10  Dr. Menninger and every witness -- witnesses don't get to

11  come into the courtroom and simply tell you whatever it is

12  they want to tell you.  Lawyers ask questions; the witnesses

13  answer questions.

14         And the very reason we have a back-and-forth is

15  because Mr. Hannon may think there's a follow-up.  Sometimes

16  the follow-up questions are, "Why?"  And he might ask that

17  and those come on the next round.

18         Go ahead.  Next question.

19         MS. MANDEL:  Miranda, we can take that one down,

20  please.  Thank you.

21  BY MS. MANDEL:

22  **Q.**  Dr. Menninger, the other day we looked at some

23  handwritten notes that you had taken.  Do you recall that?

24  **A.**  Briefly.  I've looked at a lot of documents, but if -- if

25  you pull them up, I can --

1    **Q.**  Sure.  And we're going to do that.

2            Did you take notes after every conversation that

3    you had with Mr. Mekerri throughout the time you worked at

4    PPD?

5    **A.**  The majority of our meetings, our one-on-one meetings,

6    were canceled, or Hacene was traveling.  And I didn't know if

7    he was going to be in the office or not, so --

8            THE COURT:  She just asked whether you took notes

9    after each meeting or not.

10           THE WITNESS:  No.

11   BY MS. MANDEL:

12   **Q.**  You did take notes of some conversations in the sort of

13   early 2018 time period; isn't that right?

14   **A.**  Yes.

15   **Q.**  Did anyone instruct you to take those notes?

16   **A.**  My attorney.

17   **Q.**  Let's look back very briefly at just one part of those

18   notes.  That's Exhibit 21.

19           THE COURT:  Do you have a paper copy up there?  You

20   can use --

21           MS. MANDEL:  --

22           THE COURT:  You can also use the ELMO with a paper

23   copy.

24           MS. MANDEL:  That's what I was going to use.

25           (Pause in proceedings.)

1   BY MS. MANDEL:

2   **Q.**  Dr. Menninger, this is Exhibit 21, which we looked at the

3   other day.  I'm going to show you just one part of that.

4   This is part of those notes, and that's your handwriting; is

5   that right?

6   **A.**  Yes.

7   **Q.**  And at the top of the page, it says 1/15/18, so

8   January 15, 2018; is that right?

9   **A.**  Yes.

10  **Q.**  It says, "notes from recording"?

11  **A.**  Yes.

12  **Q.**  Did you record your conversation with Mr. Mekerri on

13  January 15th?

14  **A.**  Yes.

15  **Q.**  And you actually recorded three different phone calls

16  with Mr. Mekerri during this time period; isn't that right?

17  **A.**  Yes.

18  **Q.**  And you didn't ask Mr. Mekerri for permission to do that;

19  is that right?

20  **A.**  That's correct.

21  **Q.**  And you didn't tell him that you were recording the

22  conversations; is that right?

23  **A.**  That's right.

24  **Q.**  And were you aware at the time that that was a violation

25  of Massachusetts law?

```
1              MR. HANNON:  Objection.
2              THE COURT:  Sustained.
3    BY MS. MANDEL:
4    Q.  Dr. Menninger, we talked briefly yesterday about your
5    receipt of government Social Security benefits.  Do you
6    recall?
7    A.  Yes.
8    Q.  And we're going to put up Joint Exhibit 440.  And you
9    testified yesterday about completing some additional
10   paperwork in connection with that application in early 2019;
11   is that right?
12   A.  Yes.  Genex submitted the application, and then this was
13   sent to me.  This form was sent to me by Social Security.
14   Q.  And Genex is the company that helped you with that
15   process; is that correct?
16   A.  Yes.
17   Q.  Let's jump to the part of the document called your
18   function report.
19              MS. MANDEL:  And let's look at page 891, please,
20   Miranda.
21   BY MS. MANDEL.
22   Q.  And you filled out this form; is that right,
23   Dr. Menninger?
24   A.  Yes.
25   Q.  And I just want to look down at the question that says --
```

1  it's Number 5, under section B.  Do you see that?

2  **A.**  Yes.

3  **Q.**  It says, "How do your illnesses, injuries, or conditions

4  limit your ability to work?"

5  **A.**  Yes.

6  **Q.**  And that's your handwriting there?

7  **A.**  Yes.

8  **Q.**  And you wrote, "I cannot interact with other people now

9  (in person, by phone or computer) without experiencing

10  extreme panic attack and anxiety symptoms."

11         Do you see that?

12  **A.**  Yes.

13  **Q.**  And then below that, you describe the course of your day

14  at that time, which is early 2019; is that right?

15  **A.**  Yes.

16  **Q.**  And you described things like sending your daughter off

17  to school, reading, eating, running, and walking, sometimes

18  watching a television show; is that right?

19  **A.**  Yes.

20         MS. MANDEL:  Miranda, let's, please, jump to

21  page 895.

22  BY MS. MANDEL:

23  **Q.**  And this is right after you had moved to Albuquerque,

24  New Mexico; is that right?

25  **A.**  Yes.

```
 1    Q.  On this page of the form that you filled out for Social
 2    Security, under "hobbies and interests," you describe hiking
 3    and running in the mountains?  Do you see that?
 4    A.  Yes.
 5    Q.  And right -- right beneath that, you say, "Now that I'm
 6    in NM" -- is that New Mexico?
 7    A.  Yes.
 8    Q.  -- "I'm trying to get outside to run, walk four to five
 9    days a week.  The houses are not close together and I don't
10    have to worry about being forced into conversation with
11    people."
12              Did you write that?
13    A.  Yes.
14    Q.  And that accurately reflected how you were feeling at the
15    time?
16    A.  Yes.
17              MS. MANDEL:  Thanks, Miranda.  We can take that
18    down.
19    BY MS. MANDEL:
20    Q.  If you'll excuse me, I want to ask a little bit about
21    your weight, which you talked about earlier this week.
22    A.  Yes.
23    Q.  And, Dr. Menninger, I understand that your weight has
24    fluctuated somewhat overtime; is that right?
25    A.  Yes.
```

1   **Q.** Let's look at -- we'll look at a few sort of data points

2   on that. We'll look at Dr. Kessimian's note from February 2,

3   2018. And this is in -- part of Joint Exhibit 18. So you

4   this -- this says DOS, that's the date of service, right?

5   **A.** Yes.

6   **Q.** And this is Dr. Kessimian's note, right?

7   **A.** Yes.

8   **Q.** And this is February 2, 2018, which is just shortly after

9   you told PPD that you had a disability; is that right?

10  **A.** Yes.

11  **Q.** Let's look down at the bottom of that page. It has

12  some -- some basic vital information about you.

13  **A.** Yes.

14  **Q.** And you'd agree, wouldn't you, that it says, weight,

15  126 pounds?

16  **A.** Yes.

17  **Q.** Then let's -- just to get another data point, we'll look

18  at notes from your psychiatrist in New Mexico -- that was

19  Dr. Burbano?

20  **A.** Yes.

21  **Q.** -- from May of 2019. This is in Joint Exhibit 23. And

22  this is -- this is part of that note from Dr. Burbano; and,

23  again, it lists some vitals. And this is from May 2019, and

24  if you look under where it says "vitals, 2:02 p.m.," it has

25  your weight at 124 pounds. Do you see that?

```
 1   A.   Yes.

 2   Q.   And that was from spring 2019, right?

 3   A.   Yes.

 4   Q.   And then let's look at -- we'll get another data point.

 5   Let's look at a note from July of 2020.

 6        MS. MANDEL:  That's on Bates page 6 of that

 7   document, Miranda.  Thank you.

 8   BY MS. MANDEL:

 9   Q.   And this is on July 31, 2020, so a little more than a

10   year later.  It has some more vitals at the bottom of the

11   page, and it lists your weight there as 122 pounds --

12   A.   Yes.

13   Q.   -- is that right?  Okay.  Thank you.

14        I also wanted to ask a little bit more about your

15   history of taking some medications, Dr. Menninger.

16        MS. MANDEL:  Let's, please, bring up Exhibit 20.

17   BY MS. MANDEL:

18   Q.   If you recall, these are the notes from Dr. Everson and

19   Dr. Everson was your psychiatrist from when you lived in

20   Kansas before you relocated for the PPD job, right?

21   A.   Yes.

22        MS. MANDEL:  Okay.  So we're going to look at some

23   handwritten notes on Bates 1137, please, Miranda.

24   BY MS. MANDEL:

25   Q.   And this is where our eyes are really going to have to do
```

1    our work.  This -- it looks like this is Dr. Everson's

2    progress note from November 5, 2012, right?

3    **A.**  Yes.  I believe that's a "2."

4    **Q.**  It looks like.  I understand it's not --

5    **A.**  It might be 11.  I'm not positive.

6    **Q.**  In any event, you would agree that it's from a few years

7    before you began working at PPD; is that right?

8    **A.**  Yes.

9    **Q.**  Okay.  And Dr. Everson refers to your course of Valium,

10   it looks like, and I know you testified that Dr. Everson had

11   prescribed Valium to you for some time; is that right?

12   **A.**  Yes.

13   **Q.**  Beneath that, Dr. Everson also referred to what I believe

14   says Celexa and Ambien; is that right?

15   **A.**  Yes.

16   **Q.**  And those were also medications Dr. Everson was

17   prescribing to you as of about 2012, it could have been 2011;

18   is that right?

19   **A.**  Yes.

20   **Q.**  Okay.  And then beneath that, where it says "Comments,"

21   it says, I believe, "more SEs."  Is that more side effects?

22   **A.**  Yes.  I believe so.

23   **Q.**  "To the medications."  It looks like it has an up arrow

24   before the word "headaches"; is that right?

25   **A.**  Yes.

1   **Q.**   And it says more stress?

2   **A.**   I'm not sure what that word is.

3   **Q.**   Understood.

4   **A.**   But increased headaches.

5   **Q.**   And more of something?

6   **A.**   Yes.

7   **Q.**   Could be stress?

8   **A.**   Possibly.

9   **Q.**   Okay.  And then the next line says "off most of the

10   medications for a long time."  Do you see that?

11   **A.**   Yes.

12   **Q.**   And then it has that squiggle, which is about eight

13   months; is that right?

14   **A.**   Yes.

15   **Q.**   And then it looks like it says, "generalized anxiety

16   symptoms return, so back to Celexa"?

17   **A.**   Yes.

18   **Q.**   And it says, "She does feel better on Celexa," at the

19   end, I think; is that right?

20   **A.**   I can't see the complete bottom.

21   **Q.**   And the document itself --

22   **A.**   Yes.

23   **Q.**   -- is a black line.  That's what we have, but it looks

24   like just above that black line, it says she does feel better

25   on Celexa, right?

```
 1    A.   Yes.

 2    Q.   Okay.  And, again, this is from that 2011/2012 time

 3    period, right?

 4    A.   Yes.

 5    Q.   Okay.  Dr. Menninger --

 6              MS. MANDEL:  We're going to look back at Joint

 7    Exhibit 18 please, Miranda.

 8    BY MS. MANDEL:

 9    Q.   Yesterday we talked about your participation in a

10    number of ultra marathons in 2017, 2018, and 2019; is that

11    right?

12    A.   Yes.

13    Q.   Can you explain to the jury what an ultra walk is?

14    A.   It's a -- it's -- there's not technically something

15    called an "ultra walk."  It's -- in ultra marathons, because

16    the distance is so long, there's a lot of walking involved.

17    Most people don't run the whole thing.

18    Q.   So is it something longer than a marathon that you walk

19    some of instead run?

20    A.   I did mostly walking.

21    Q.   So ultra walks are also these 24-hour competitive races

22    where you do a lot of walking?

23    A.   Yes.

24              MS. MANDEL:  Okay.  Let's look at page 8702,

25    please, Miranda.
```

```
 1   BY MS. MANDEL.
 2   Q.   And this is one of Dr. Kessimian's notes.  This is from
 3   May 25, 2018, and this is shortly before you started medical
 4   leave; is that right?
 5   A.   Yes.
 6   Q.   And where it says "history of present illness," do you
 7   see that?
 8   A.   Yes.
 9   Q.   It says, "Since last visit, continues to isolate at home
10   and again uses the appointment to motivate her to leave the
11   house"?
12   A.   Yes.
13   Q.   Right?  And, again, at this point, you were for the most
14   part staying at home, right?
15   A.   I'm sorry.  Can you repeat the question?
16   Q.   Sure.  At this point in May of 2018, you were for the
17   most part staying in your home?
18   A.   Yes.
19   Q.   And then there's a statement about a conversation you had
20   with your lawyer.  After that, it says, "She has also decided
21   to finally take some leave in the beginning of June to see
22   her friends at the ultra walk"?
23   A.   Yes.
24   Q.   And, in fact, you did begin a leave of absence from PPD
25   the following week at the beginning of June, correct?
```

1  **A.** Correct. I had scheduled PTO, actually, before that from

2  PPD, so this was planned prior to taking medical leave.

3  **Q.** While we're on this May 25, 2018, note from

4  Dr. Kessimian, let's look at the next page.

5  　　　　MS. MANDEL: The next page. Thanks.

6  　　　　Sorry, I think it's actually one -- one page

7  further, Miranda.

8  　　　　Yep. Thank you.

9  BY MS. MANDEL:

10  **Q.** So under the plan, and this is what Dr. Kessimian would

11  write at the end of every appointment about sort of what's

12  coming up and what you're going to be doing, right?

13  **A.** Yes.

14  **Q.** And there are a few things listed. Number 5 is "continue

15  art therapy." At this time, you were participating in

16  art-based therapy; is that right?

17  **A.** Yes.

18  **Q.** And how long did you do that program for?

19  **A.** I was doing that in Dr. Kessimian's office.

20  **Q.** So that was part of her care?

21  **A.** Yes.

22  **Q.** And it also lists on Number 6, it says "CBT"?

23  **A.** Yes.

24  **Q.** And that was you testified yesterday was the cognitive

25  behavioral therapy?

     1    **A.**   Yes.

     2    **Q.**   And you were continuing with that at this point?

     3    **A.**   Yes.

     4    **Q.**   Number 7 says, "Coordination and communication with

     5    lawyer continues."  What's your understanding of what that

     6    meant?

     7    **A.**   I was communicating with my attorney.

     8    **Q.**   Let's --

     9    **A.**   This -- I was afraid at this point that I was being

    10    forced out of my job because of my disability, and so that's

    11    what Number 7 refers to.

    12    **Q.**   You said earlier this morning that you had been

    13    communicating with -- with a lawyer already as of

    14    January 2018.  When is the first time that you began speaking

    15    with a lawyer about your employment at PPD?

    16    **A.**   I believe it was after the December meeting with Hacene,

    17    where we went over the proposed changes to my role.

    18    **Q.**   Let's -- let's look back, actually, at the appointment

    19    you had the week before this with Dr. Kessimian.  Let's look

    20    at the notes from the May 18, 2018 appointment.

    21            MS. MANDEL:  And, Miranda, that's 699.

    22    BY MS. MANDEL:

    23    **Q.**   This is the -- the date of service says 5/18/18?

    24    **A.**   Yes.

    25    **Q.**   Okay.  And if you look down where it says, "throughout

1    the week, completed several art therapy assignments."

2    **A.**  I'm trying to -- oh.  Yes, I see that.

3    **Q.**  So you were continuing with your art therapy at this

4    point?

5    **A.**  Yes.  I was also trying to do some art at home.

6              MS. MANDEL:  Okay.  And let's -- let's go down to

7    the bottom of that page, please, Miranda.  A little bit --

8    let's just visualize the whole -- the whole page for a

9    second.

10    BY MS. MANDEL:

11    **Q.**  If you look at the biggest paragraph that's visible in

12    front of us right now, it starts with "mood" and has a colon.

13    Do you see that?

14    **A.**  Yes.

15    **Q.**  And at the bottom of that paragraph, Dr. Kessimian wrote

16    on -- about your May 18th appointment, "Has started to search

17    for new jobs and verbalize values to work with in arts and

18    help those that are marginalized at times by society."

19              Do you see that?

20    **A.**  Yes.

21    **Q.**  What types of jobs were you searching for at that time?

22    **A.**  At that time, I had a significant fear of being fired,

23    and so I was looking at potential positions at Rhode Island

24    School of Design in Providence.

25    **Q.**  And that would have been an art-spaced-type position?

1    **A.**  I was just seeing what types of positions they had open.

2    **Q.**  If we look at the bottom of that page, after it says0

3    "daughter and husband doing well," it says, "Safety:

4    Suicidal ideation has resolved."  Do you see that?

5    **A.**  Yes.

6    **Q.**  Let's pull up Dr. Kessimian's notes from a week later.

7    You were seeing her weekly at this point, right?

8    **A.**  Yes.  And I can't recall the date on this one.

9    **Q.**  Sure.  Sure.  This one was the May 18th one, so we'll

10   jump to the one that was from June 8th, a couple weeks later?

11   **A.**  Okay.

12           MS. MANDEL:  And, Miranda, that's 709, please.

13   Thank you.

14   BY MS. MANDEL:

15   **Q.**  And your medical leave from PPD began on the first week

16   of June, right?  It was June -- June 3rd; is that right?

17   **A.**  Yes.

18   **Q.**  So we'll look at Dr. Kessimian's note from June 8th,

19   which was a few days after that.  And under "history of

20   present illness," it refers to you being on medical leave?

21   **A.**  Yes.

22   **Q.**  And then it says, again, you applied for several jobs at

23   this point?

24   **A.**  Yes.

25   **Q.**  What types of jobs had you applied for at that point?

1    **A.**   I believe it -- they were all at -- at Rhode Island

2    School of Design.

3    **Q.**   Yeah, that's a bit of a mouthful.

4         And down -- down below, a little bit lower on that

5    page, it says, "Safety:  Denies suicidal ideation."  Do you

6    see that?

7    **A.**   Yes.

8    **Q.**   And you testified, I believe it was yesterday, that you

9    spent some time in the Butler Hospital partial hospital

10   program, and that was in early July of 2018; is that right?

11   **A.**   Yes.

12   **Q.**   Okay.  Let's look at Dr. Kessimian's notes from right

13   after that.

14        MS. MANDEL:  This is Bates 715, Miranda.

15   BY MS. MANDEL:

16   **Q.**   This is from -- it says date of service is 7/13/18?

17   **A.**   Yes.

18   **Q.**   And under history of present illness, Dr. Kessimian noted

19   that, "Since last visit, completed the partial program at

20   Butler."  Do you see that?

21   **A.**   Yes.

22   **Q.**   And this is referring to -- this is right when you left

23   that program, and then you went back to Dr. Kessimian for

24   additional treatment; is that right?

25   **A.**   Yes.

1    **Q.**  And then underneath that, Dr. Kessimian said, "She had

2    severe panic symptoms and a panic attack in group.  She was

3    expected to report on her weekend."  Do you see that?

4    **A.**  Yes.

5    **Q.**  Okay.  And then under that paragraph, it says, "No

6    medication changes were made during her treatment.  Continues

7    on current medication regimen and overall has noticed

8    improvement"?

9    **A.**  Yes.

10   **Q.**  And then, again, under "Safety," it says, "Denies

11   suicidal ideation" again?

12   **A.**  Yes.

13          MS. MANDEL:  Thank you, Miranda.  We're done with

14   that one for now.

15   BY MS. MANDEL:

16   **Q.**  Dr. Menninger, recently, in Oregon, you enrolled at

17   Portland State University to take a film class; is that

18   right?

19   **A.**  I applied, but I didn't actually go through with it.

20          MS. MANDEL:  Let's bring up Joint Exhibit 27,

21   please, Miranda.

22   BY MS. MANDEL:

23   **Q.**  Portland State University is near your home in Oregon?

24   **A.**  Yes.

25   **Q.**  And you're currently doing regular therapy with a group

 1   called Mindful Therapy Group; is that right?

 2   **A.** Yes.

 3          MS. MANDEL:  Okay.  Let's pull up Bates 420,

 4   please, Miranda.

 5   BY MS. MANDEL:

 6   **Q.** How often do you have therapy now with the Mindful

 7   Therapy Group?

 8   **A.** I see my therapist once a week, and I see the nurse

 9   practitioner once a month.

10   **Q.** And the nurse practitioner is for medication management?

11   **A.** Yes.

12   **Q.** And the weekly therapist is for talk therapy?

13   **A.** Yes.

14          MS. MANDEL:  Okay.  Miranda, can we just make

15   that -- thank you.

16   BY MS. MANDEL:

17   **Q.** And this is your progress note from that weekly therapy

18   for September 7, 2022; is that right?

19   **A.** Yes.

20   **Q.** And this is, really, just a few months ago, right?

21   **A.** Yes.

22   **Q.** Underneath where it says "D" and a colon, do you see

23   that?  It's at the bottom of what we're looking at?

24   **A.** Yes.

25   **Q.** It says, "Lisa reports today from her home in Portland,

1    Oregon in a neutral to anxious mood.  Describes feeling

2    encouraged enough over the last week to enroll in PSU" -- is

3    that the Portland state University?

4    **A.**  Yes.

5    **Q.**  To take a class?

6    **A.**  Yes.

7    **Q.**  And then the therapist said he endorsed that this was a

8    "constructive way to spend the time she has before her court

9    case."  Do you see that?

10   **A.**  Yes.

11   **Q.**  And so you testified that -- you applied for the course

12   at Portland State?

13   **A.**  Yes.

14   **Q.**  So let's -- let's look down below, the next substantive

15   comment says, "Lisa made a jump in progress this week as

16   evidenced by her enrollment at PSU.  She plans to take a

17   course on film study and hope to document her struggle."

18   **A.**  Yes.

19   **Q.**  Do you see that?

20           "This is progress as she's moving away from being

21   reactive to the elements toward proactive towards making

22   meaning of her struggles."

23   **A.**  Yes.

24   **Q.**  But is it your testimony that you did not pursue the

25   class at PSU?

1    **A.**  That's correct.

2    **Q.**  You've also talked to your current therapist and I

3    believe it's Andrew Drwenski; is that right?

4    **A.**  Yes.  I'm not sure how to pronounce his last name.

5    **Q.**  You've talked to him about ways to return to work; isn't

6    that right?

7    **A.**  Early on in therapy, yes.

8    **Q.**  Let's look at some of the notes about that.

9          MS. MANDEL:  Miranda, can we please pull up

10   Bates 278.

11   BY MS. MANDEL:

12   **Q.**  This is Mr. Drwenski's notes from a visit in November of

13   2021; is that right?

14   **A.**  Yes.  I believe this was right about the time I started

15   seeing him for the first time.

16   **Q.**  Okay.  And at this time, in November of 2021, it says,

17   "Suicide assessment, denies any current suicidal thought,

18   plan, or intent."  Do you see that?

19   **A.**  Yes.

20         MS. MANDEL:  And let's -- let's go down a little

21   bit more on that page, please, Miranda.  Let's go down to the

22   next page, 278, please.

23   BY MS. MANDEL:

24   **Q.**  So under the progress note where Mr. Drwenski wrote his

25   impressions and thoughts from the visit, do you see that?

A.  Yes.

Q.  It says "progress notes."  Okay.

        It says, "Lisa presents today as feeling somewhat disappointed and the results of her psych eval not giving much context.  This writer" -- and that's referring to Mr. Drwenski, is that right?  Is that your understanding?

A.  Yes.

Q.  -- "was concerned that this evaluation would likely be helpful, but not the cure of some of the issues she was concerned about."

        And then it says, "Discussed future goals, including find ways to make meaningful decisions regarding her treatment and finding ways to explore career options."

A.  Yes.

Q.  Do you see that?

        As a matter of fact, you haven't explored ways to return to work as a medical pathologist; is that right, Dr. Menninger?

A.  That's correct.

Q.  Have you tried to return to work as a pathologist even working fully from home?

A.  No.  I don't think that's possible.

Q.  Have you looked into returning to work as a pathologist reviewing charts for an insurance company?

A.  No.  Right -- right now, things related to my past career

1    are extremely triggering and that's why I -- I try to avoid

2    any associations that will trigger my PTSD.

3    **Q.**  And you haven't looked at returning to a job like you had

4    at the St. Luke's Hospital system in Kansas for many years;

5    is that right?

6    **A.**  That's right.

7    **Q.**  Where when did you last apply for a job of any type,

8    Dr. Menninger?

9    **A.**  It probably was the RISD one that we just talked about.

10   **Q.**  The ones in the arts field, to teach at the Rhode Island

11   School of Design?

12   **A.**  Yes.

13   **Q.**  Let's look at -- in this same exhibit with your notes for

14   Mindful Support Services --

15            MS. MANDEL:  Let's look at Bates 291, please,

16   Miranda.

17   BY MS. MANDEL:

18   **Q.**  This is another note.  This is from someone named

19   Dominique Wilson that's also at Mindful Support Services?

20   **A.**  Yes.  She's the nurse practitioner.

21   **Q.**  And this is the nurse practitioner who you explained is

22   part of your current treatment plan; is that right?

23   **A.**  Yes.

24   **Q.**  Okay.  And is -- is Dominique Wilson someone that you've

25   been seeing on a somewhat regular basis -- and I see

```
 1    "seeing."  I understand it's by telehealth -- but since you
 2    moved to Portland?
 3    A.   Yes.  She's actually based in Texas.
 4    Q.   Okay.  And the note that's in front of us is a progress
 5    note from December of 2021.  Looking down at the chief
 6    complaint or presenting problem, do you see that?
 7    A.   Yeah.  Yes.
 8    Q.   And the last sentence of that paragraph "denies" -- and I
 9    think "SI" is suicidal ideation thoughts; is that right?
10    A.   Yes.
11    Q.   And immediately before that, in listing out a number of
12    things, one of the things that Ms. Wilson lists is -- right
13    at the end of that sentence, it says "paranoid," and then it
14    says "regarding pending legal case"; is that right?  It's,
15    like, 2½ lines up from the end of that paragraph.
16    A.   Yes.
17    Q.   And let's look at -- we'll look at another data point in
18    the Mindful Support Services notes.
19            MS. MANDEL:  Miranda, can we pull up 414, please.
20    BY MS. MANDEL:
21    Q.   This is also from Dominique Wilson, the nurse
22    practitioner.  Do you see that?
23    A.   Yes.
24    Q.   And the visit date for this one is September 6, 2022.  Do
25    you see that?
```

1  **A.**  Yes.

2  **Q.**  And if we look at the -- --

3      MS. MANDEL:  If we can scroll down a tiny bit,

4  Miranda, so we can see the chief complaint or presenting

5  problem paragraph.

6  BY MS. MANDEL:

7  **Q.**  Where it says "history of presenting illness," it says,

8  "Ms. Lisa reported, 'I just signed up to take some college

9  classes in person.  I want to study film.'"

10      Do you see that?

11  **A.**  Yes.

12  **Q.**  And this is in quotes, right?  This is something that you

13  said to Ms. Wilson?

14  **A.**  I -- I believe so.  I assume I said some -- something to

15  that effect.

16  **Q.**  Okay.  And, again, at the last sentence of this

17  paragraph, it says, "She denies" -- and, again, "SI" is

18  suicidal ideation; is that right?

19  **A.**  Yes.

20  **Q.**  And there's that same language in the previous sentence.

21  It look you includes on the list of history of presenting

22  illness, and it include paranoid, and then in parentheses, it

23  says "regarding pending legal case."  Do you see that?

24  **A.**  Yes.

25  **Q.**  Thank you.

```
 1              MS. MANDEL:  Thanks, Miranda.  We're all set with
 2    that one.
 3    BY MS. MANDEL:
 4    Q.  Dr. Menninger, in Oregon, do -- you live near your mom
 5    and sister, I think you said?
 6    A.  Yes.  They live in Bend, Oregon, which is where we first
 7    moved to.  My family is now in Portland.
 8    Q.  So you and your husband and your child live in Portland?
 9    A.  Yes.
10    Q.  And your mom and your sister live in Bend?
11    A.  Yes.
12    Q.  And for those of us who are a little more East Coast
13    knowledgeable, can you just tell us how far is it from Bend
14    to Portland?
15    A.  I believe it's about a three hours' drive.
16    Q.  When did you move from Bend to Portland?
17    A.  We moved after our one year lease was up.
18    Q.  How often do you see your mom in a typical month?
19    A.  I think I've seen her maybe once in the past year.
20    Q.  And how often do you see your sister in a typical month?
21    A.  I've seen her a few times this year.  Maybe less.  It was
22    difficult with the pandemic.
23    Q.  Dr. Menninger, your daughter, how old is your daughter
24    now?
25    A.  Fourteen.
```

1  **Q.**  And what -- what type of school does your daughter

2  currently go to?

3  **A.**  She is homeschooling right now.

4  **Q.**  How long has your daughter been homeschooling for?

5  **A.**  We attempted two days at a public school when we moved to

6  Portland, and that was extremely triggering, and so we've

7  been homeschooling since then.

8  **Q.**  And if we think about we're now in March 2023, did your

9  daughter stop going to school in person when the pandemic

10  began in March 2020?

11  **A.**  Yes.  She was attending remotely.

12  **Q.**  And then at some point in the interim, you and your

13  husband switched to homeschooling her?

14  **A.**  Once Maya started eighth grade, when we moved to Portland

15  in 2000- -- or seventh grade was all remote due to the

16  pandemic, so Maya was attending remote from home.

17  **Q.**  Who primarily does your daughter's homeschooling?  Is

18  that you?  Your husband?

19  **A.**  We meet with Maya daily, and we're focusing right now on

20  a math placement exam that they need to pass in order to

21  start taking college courses at the local community college.

22  So that's what we're focusing on right now.

23  **Q.**  And when you say "we," that's you and your husband?

24  **A.**  Yes.

25  **Q.**  And so both of you are managing the homeschooling

1  together?

2  **A.**   The math tutorials placement practice courses are on the

3  computer, so there's not really a lot -- there's not really

4  anything we do other than we make sure she's doing these on a

5  regular basis.

6  **Q.**   In a typical week, let's say in 2023, how often are you

7  leaving your home?

8  **A.**   Just for doctors appointments, typically.

9  **Q.**   And, Dr. Menninger, aside from interacting with your

10  doctors or your healthcare treaters and your husband and your

11  daughter, how often are you interacting with other people on

12  a weekly basis?

13  **A.**   I -- I interact with my sister pretty frequently by text.

14  **Q.**   So aside from texting with your sister, medical

15  appointment interactions, and interactions with your husband

16  and your daughter, any other typical person-to-person

17  interactions that you're having?

18  **A.**   No.  I have a hard time trusting people right now, so --

19  and I've had a lot of stress and so, no, I don't really leave

20  the house except for doctors appointments or to take Maya

21  somewhere.

22  **Q.**   Your husband and your daughter are currently back in

23  Oregon; is that right?

24  **A.**   Yes.

25  **Q.**   You -- you flew here to be in Boston for the trial; is

```
 1   that right?

 2   A.  Yes.

 3   Q.  And did anyone fly with you?

 4   A.  No.

 5   Q.  During the course of this trial, Dr. Menninger, are you

 6   currently staying in a hotel in the Boston area?

 7   A.  Yes.

 8   Q.  And is anyone staying there with you?

 9   A.  No.

10           MS. MANDEL:  Thank you, Dr. Menninger.

11           I have no more questions at this time.

12           THE COURT:  All right.  Any redirect?

13           MR. HANNON:  Yes, Your Honor.

14           THE COURT:  Not required.

15           MR. HANNON:  May I proceed?

16           THE COURT:  Yes.

17           REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

18   BY MR. HANNON:

19   Q.  Dr. Menninger, are you faking it?

20   A.  I'm sorry; I didn't hear your last word.

21   Q.  Are you faking it?

22   A.  Am I faking what?

23   Q.  Your medical condition.

24   A.  Absolutely not.

25   Q.  All the drugs that you take on a daily basis, do you do
```

1    that because you want to win this lawsuit?

2    **A.**   Absolutely not.

3    **Q.**   The 36 pounds that you've lost since your first visit to

4    Dr. K in 2018, have you lost those because you want money?

5    **A.**   No.  It -- I'm suffering from the physical symptoms of

6    that.

7    **Q.**   Do you think about killing yourself every day?

8    **A.**   Not every day, but frequently.

9    **Q.**   And when you disclosed your disability to PPD in 2018,

10   did you do that because you wanted money?

11   **A.**   No.  I had a great salary and benefits at the time.  I

12   was afraid.

13   **Q.**   And when you had that February 28th meeting in 2018 and

14   they suggested a package, did you indicate you wanted it?

15   **A.**   No.  I -- I told them that I love my job, and I didn't

16   want to leave PPD, and could we just, you know, brainstorm

17   about some creative potential accommodations, if they were

18   even needed.

19   **Q.**   I want to follow up on a few other points raised by PPD

20   in their examination of you.  So one of the documents that

21   you looked at yesterday was your job description.  Do you

22   recall that?

23   **A.**   Yes.

24   **Q.**   Okay.  And you recall at the top of your job description,

25   it said "ED labs"?

1    **A.**  Yes.

2    **Q.**  Okay.  And I think you testified that it was your

3    understanding that other -- other peers, of course, had that

4    same job description?

5    **A.**  Yes.  That's what I was told by Chad St. John.

6    **Q.**  I'm going to show you Joint Exhibit Number 17.  It's a

7    little bit too bright.  Apologies for that.

8           Do you recognize what this is?

9    **A.**  Yes.  It looks like an organizational chart.

10   **Q.**  Okay.  And if you look down here on the company's

11   organizational chart -- and just to -- just to clarify, this

12   would be the organizational chart for the folks that reported

13   up to Mr. Mekerri, right?

14   **A.**  Yes, at that time.

15   **Q.**  Okay.  And you see there that on the organizational

16   chart, it identified you as "ED labs"?

17   **A.**  Yes.

18   **Q.**  And if we scroll over to the left here, you see it also

19   identifies Chris Clendening as ED labs, right?

20   **A.**  Yes.

21   **Q.**  Was Chris Clendening a medical doctor?

22   **A.**  No.

23   **Q.**  Did Chris Clendening have the same duties and

24   responsibilities as you at PPD?

25   **A.**  No.

1   **Q.**   Els -- I'm sorry; how do you pronounce her last name?   Or

2   Els.   I'm sorry.

3   **A.**   Els.

4   **Q.**   And you see there it identifies Els as ED labs; is that

5   right?

6   **A.**   Yes.

7   **Q.**   Okay.   Did Els have the same duties and responsibilities

8   as you did at PPD?

9   **A.**   No.

10   **Q.**   What was Els's role?

11   **A.**   Els was the site head of the Belgium lab.

12   **Q.**   You were asked on cross-examination about the

13   difficulties that your daughter had prior to your move to

14   Massachusetts.   Do you recall that testimony?

15   **A.**   Yes.

16   **Q.**   How was she doing when you moved?   Or I should say, how

17   was she doing after you moved?

18   **A.**   She was thriving after a few months at the school.   You

19   know, it took a little bit of time to get used to the new

20   school, but doing very well and loved the school.

21   **Q.**   Did any kind of bullying issues with respect to your

22   daughter play any role whatsoever in the deterioration of

23   your health condition in 2018?

24   **A.**   Can you repeat that question?

25   **Q.**   Sorry.   It was a long one.

```
 1              Did anything about your daughter being bullied, did

 2    that contribute at all to your deteriorating health condition

 3    in 2018?

 4    A.   No.

 5    Q.   You were asked questions on cross-examination about work

 6    travel you did in 2018.  Do you recall those questions?

 7    A.   Yes.

 8    Q.   The -- the work travel that you -- that you did in 2018,

 9    was -- was that done and planned in consultation with

10    Mr. Mekerri?

11    A.   Yes.

12    Q.   Did he ever ask you to do more work travel in 2018 than

13    you did?

14    A.   Yes.

15    Q.   And what was that?

16    A.   It was for July and August, I believe.

17    Q.   So that was travel that would have happened if you had

18    remained working at PPD; is that right?

19    A.   Yes.

20    Q.   And at the time of your medical leave in June of 2018,

21    did you, in fact, have additional work travel planned in the

22    future?

23    A.   Yes.

24    Q.   I'm going to show you Joint Exhibit Number 80.

25              Now, I'm going to show you Joint Exhibit Number 80.
```

1    So you recall this was a document we looked at yesterday on

2    cross-examination?  Do you see that?

3    **A.**   Yes.

4    **Q.**   Okay.  So this was the email communication concerning

5    the -- the requirements for the New York State standards; is

6    that right?

7    **A.**   Yes.

8    **Q.**   Okay.  And as you talked about yesterday, in the bottom

9    email here on this page, Kathy Dick, she expressed her view

10   concerning what certain requirements were relative to

11   New York State; is that right?

12   **A.**   Yes.

13   **Q.**   Did you agree with her assessment?

14   **A.**   For the role that was going to be filled permanently, but

15   not for me at that time.

16   **Q.**   Okay.  And do you see there, in Mr. McKinnon's email, the

17   middle of the page, he expressed concerned that this might

18   negatively impact the upcoming New York State inspections.

19   Do you see that?

20   **A.**   Yes.

21   **Q.**   Was he right?

22   **A.**   No.

23   **Q.**   What happened at the New York State inspection?

24   **A.**   It went extremely well, and the inspector was highly

25   complimentary toward the staff, the quality of our lab, and

**JA605**

1    me as the director.

2    **Q.**  And was that -- when was that?

3    **A.**  That was in November.

4    **Q.**  And was the subject that's addressed here in this email

5    communications here on this exhibit, was this in any way

6    brought up by Mr. Mekerri at your 360 meeting in December of

7    2017?

8    **A.**  No.

9    **Q.**  And if you look here at the top of the page, you'll see

10    this is an email from Brent McKinnon to Chad St. John on

11    March 8, 2018.  Do you see that?

12    **A.**  Yes.

13    **Q.**  Are you aware of any communications concerning the

14    subject between October 2017 and March 8, 2018?

15    **A.**  No.

16    **Q.**  Do you have any understanding as to why all of a sudden

17    on March 8, 2018, Mr. McKinnon is forwarding this email to

18    Mr. St. John?

19    **A.**  I had no idea.

20    **Q.**  We looked yesterday, I'm not going to show it to you

21    again, but we looked yesterday at the initial forms that you

22    and Dr. Kessimian had submitted in connection with your

23    accommodation request.  Do you recall those?

24    **A.**  Yes.

25    **Q.**  Okay.  And you identified in those forms, am I right,

```
 1    that it was in some way difficult for you to perform your job

 2    because of your disability; is that right?

 3    A.   Yes.

 4    Q.   Was that new?

 5    A.   No.

 6    Q.   Had -- had it -- had those challenges you faced, had

 7    those been the same challenges that you faced since you

 8    started at PPD?

 9    A.   Yes.

10    Q.   Had they prevented you from doing a good job?

11    A.   No.

12    Q.   You were also asked on cross-examination about concerns

13    you had about traveling to Highland Heights after you

14    disclosed your disability.  Do you recall that?

15    A.   Yes.

16    Q.   And what, if anything, about disclosing your disability

17    made it more difficult for you to travel to Highland Heights?

18    A.   I was concerned about how I might be viewed by others.

19    Q.   The people that you had disclosed your disability to,

20    where did they work?

21    A.   In Highland Heights.

22    Q.   On cross-examination, you were also shown another copy of

23    your -- right? -- you were shown the 2017 performance review.

24    Do you recall that?

25    A.   Yes.
```

1 **Q.** And opposing counsel, she pointed out that it had been

2 due on December 31, 2017; is that right?

3 **A.** Yes.

4 **Q.** Did you receive it then?

5 **A.** No. And I -- there were multiple due dates. There were

6 many due dates prior to that as well.

7 **Q.** And the first time you saw that review, was that before

8 or after you disclosed your disability?

9 **A.** That was after.

10 **Q.** How long after?

11 **A.** I didn't see it until almost the end of January --

12 **Q.** And --

13 **A.** -- of --

14 **Q.** I'm sorry. Go ahead.

15 **A.** Of 2018.

16 **Q.** Had anyone at PPD even told you that it was available for

17 review prior to the end of January 2018?

18 **A.** I kept checking, myself, because I didn't know what was

19 going on. And eventually, I had a call with Chad St. John at

20 the end of January, and he told me that it's in system, and I

21 can view it.

22 **Q.** Okay. And in terms of you looking for it, is it -- is it

23 right that that review was going to partially determine what

24 your bonus was; is that right?

25 **A.** Yes. Bonus and salary increase.

 1   **Q.**  Okay.  You were asked on cross-examination as to whether

 2   or not Dr. Kessimian ever provided PPD a letter saying that

 3   your reason -- that the accommodations that she proposed were

 4   not needed to perform the essential functions of your job.

 5   Do you recall that question?

 6   **A.**  Yes.

 7   **Q.**  Did PPD ever ask you for that letter?

 8   **A.**  I don't quite understand what you're asking.

 9   **Q.**  No worries.

10        Dr. Kessimian, she never provided PPD with a letter

11   that explicitly said, "Even if you don't give Dr. Menninger

12   these accommodations, she can still do her job," right?

13   **A.**  Right.

14   **Q.**  Okay.  Did PPD ever ask for that letter?

15   **A.**  No.

16   **Q.**  You were asked on cross-examination about seeking legal

17   advice.  Why -- why was it that you decided to seek legal

18   advice?

19   **A.**  I was terrified of disclosing my condition.  I didn't

20   know what would happen.  I thought I would be viewed as --

21   yeah, I -- viewed differently, viewed as defective and even

22   maybe lose my job.

23   **Q.**  Had you done, yourself, any sort of internet research

24   prior to seeking legal advice in connection with that

25   disclosure?

1    **A.**   Yes.  I wanted to see if there were any protections for

2    employees who had similar or same conditions that I had.

3    **Q.**  And did that research lead you to believe that you did?

4    **A.**   Yes.  I discovered that my conditions, in fact, are

5    considered a disability under the ADA.

6    **Q.**  And then you were asked some questions about the timing

7    of your request for medical leave in early June 2018.  Did

8    you request medical leave because you wanted to go walk an

9    ultra marathon?

10   **A.**   No.

11   **Q.**  I'm going to show you Joint Exhibit Number 18 again.  So

12   this is Dr. Kessimian's notes.  And I'm just going to direct

13   your attention to the -- so this is the 44th page of the

14   exhibit, and just for the record, it has the bottom in the

15   bottom right-hand corner that says 706.

16          And if you look up here at the top, the date of

17   service, that would be June 1, 2018; is that right?

18   **A.**   Yes.

19   **Q.**  So that's about a week after the note that the PPD's

20   lawyer just directed you to?

21   **A.**   I'm sorry; I can't remember what you directed me to.

22   **Q.**  No worries.  We'll skip the math.

23   **A.**   Okay.

24   **Q.**  And if you could, just look at where it says "chief

25   complaint."  And could you read that for the jury?

```
 1    A.  "I just can't do it anymore.  I am not sleeping, eating.

 2    I am having thoughts about ending my life, but I wouldn't do

 3    it because of Maya and Mason."

 4    Q.  And if we look at the -- the next page -- I'm sorry --

 5    two pages ahead in terms of Dr. K's plan, do you see there

 6    she writes, "Number 1, safety -- recommended immediate

 7    medical leave starting on Monday 2/2 to level of anxiety and

 8    safety issues, monitor GI distress and appetite."

 9            Do you see that?

10    A.  Yes.

11    Q.  Does that accurately reflect what Dr. Kessimian

12    recommended to you based upon this visit?

13    A.  Yes.

14    Q.  Did you follow her advice?

15    A.  Yes.

16    Q.  And you were asked questions on cross-examination about a

17    potential class at Portland State University.  Do you recall

18    that?

19    A.  Yes.

20    Q.  Okay.  Did you ever actually attend that?

21    A.  No.

22    Q.  Why not?

23    A.  I was afraid.

24    Q.  Do you want to get better?

25    A.  Absolutely.
```

1    **Q.**   Why?

2    **A.**   Because I want my family to be happy again and I feel

3    like -- I feel like it's my fault that Maya's had to endure

4    five years of hardship.  And I want to be there to see who --

5    who she becomes in life and I don't want to feel pain and

6    fear all the time.

7              MR. HANNON:  That's all I have.

8              THE COURT:  All right.  Recross?

9              **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

10   BY MS. MANDEL:

11   **Q.**   I just have a couple more questions, Dr. Menninger.

12             You spoke a few moments ago about your 2017

13   performance review and when you had an opportunity to review

14   that in January of 2018.  Do you recall?

15   **A.**   Yes.

16   **Q.**   And you have no knowledge yourself of when Mr. Mekerri

17   actually completed his portion of that review; isn't that

18   right?

19   **A.**   I -- it didn't look like it was ever completed.

20   **Q.**   Well, and I -- and I understand that that's your view,

21   but I just want to be clear.  My question is a little bit

22   different.  You have no knowledge, yourself, of when

23   Mr. Mekerri did his portion of the review; isn't that right?

24   **A.**   That's correct.

25   **Q.**   Thinking back to your communications and Dr. Kessimian's

1     communications with PPD with Mr. St. John, and with the

2     company in that January, February, March time period in 2018,

3     you were just asked a question about whether you were asked

4     for a follow-up letter from Dr. Kessimian.  Do you recall

5     that?

6     **A.**  Yes.

7     **Q.**  And I want to direct your attention to Joint Exhibit 419.

8     We're going to just -- for simplicity, put it up here in

9     front of you this way.

10          This is an email.  At the top of the page, you can

11     see this was sent from Mr. St. John to you on March 12, 2018.

12     Do you see that?

13     **A.**  Yes.

14     **Q.**  And -- well, now I want to blow up the text a little bit

15     more.

16          In this email, Mr. St. John said to you, "Dear

17     Lisa, thank you for your email.  We appreciate the ongoing

18     dialogue regarding your request for accommodation and want to

19     get back to you on those requests."

20          Do you see that?

21     **A.**  Yes.

22     **Q.**  And Mr. St. John went through a number of things that

23     were required as part of your job and what PPD's view was of

24     that.

25          I just want to specifically direct your attention

```
 1   to the very last paragraph before Mr. St. John signs off.  He
 2   says, "Please take another look at your job description,
 3   discuss it with your healthcare provide," and that was
 4   Dr. Kessimian, right?
 5   A.  Yes.
 6   Q.  "And let us know if there are other accommodations that
 7   would allow you to perform the essential functions of your
 8   job as outlined above."
 9           Do you see that?
10   A.  Yes.
11   Q.  And after you received this email from Mr. St. John, you
12   never provided another letter from Kessimian to PPD about any
13   kind of accommodations; isn't that right?
14   A.  I was not asked for a letter.  I was asked to discuss
15   with her, which I did.  And it was mischaracterizing it
16   because it was saying that would allow me to perform the
17   essential functions of my job, and that was not an issue for
18   me.
19   Q.  And just to simplify the question maybe, Dr. Menninger,
20   after you received this email from Mr. St. John, in fact,
21   after your February letter from Dr. Kessimian, you never
22   provided any other communication to PPD from
23   Dr. Menninger [sic] about --
24           THE COURT:  Dr. -- Menninger or from Dr. --
25           MS. MANDEL:  Thank you, Your Honor.
```

BY MS. MANDEL:

**Q.**  From Dr. Kessimian about what accommodations might help you do your job; isn't that right?

**A.**  We requested specific tasks that they --

THE COURT:  She's just asking you --

THE WITNESS:  Okay.

THE COURT:  -- I think whether after the February 26th letter from Dr. Kessimian -- if I recall -- is the question just whether another letter was provided from Dr. Kessimian?

MS. MANDEL:  Yes.  And if I may, Your Honor, I think it was, actually, like, February 14th was the letter from Dr. Kessimian, but, yes.  Yes.

THE COURT:  Ask the question again.

BY MS. MANDEL:

**Q.**  After Dr. Kessimian provided the letter that we've looked at a few times in mid-February of 2018, there were no other letters or communications from Dr. Kessimian to PPD, either from her or from you, that you provided to PPD; isn't that right?

**A.**  There were no letters from Dr. Kessimian.

**Q.**  And nor from any other doctor?

**A.**  Correct.

MS. MANDEL:  Okay.  Thank you.

THE COURT:  As in no more questions?

```
 1              MS. MANDEL:  No more questions at this time.

 2              THE COURT:  Okay.  Thank you very much.

 3              MR. HANNON:  I have nothing further, Your Honor.

 4              THE COURT:  That's good, because there is no more.

 5              MR. HANNON:  I know.

 6              THE COURT:  Right.  It doesn't matter whether you

 7     want another round, but I'm glad you don't.  There's only two

 8     rounds, never more than two.

 9              Dr. Menninger, you can step down.  Thank you -- and

10     return to counsel table.  Thank you very much.

11              Next witness, Mr. Hannon.

12              MR. HANNON:  Deborah Ballweg.

13              (Witness duly sworn.)

14              THE DEPUTY CLERK:  And can you please state your

15     full name and spell your last name for the record.

16              THE WITNESS:  Deborah Ballweg, B-a-l-l-w-e-g.

17              THE DEPUTY CLERK:  Thank you.

18              THE COURT:  Please be seated.

19              Go ahead, Mr. Hannon.

20              MR. HANNON:  I have some binders I'm likely to use.

21     May I approach the bench?

22              THE COURT:  Sure.

23              MR. HANNON:  May I approach the witness?

24              THE COURT:  Yes.

25
```

```
 1                    DEBORAH BALLWEG
 2          having been duly sworn, testified as follows:
 3          DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
 4   BY MR. HANNON:
 5   Q.   Good morning, Ms. Ballweg.
 6   A.   Good morning.
 7   Q.   How are you currently employed?
 8   A.   Currently employed as a VP of human resources at
 9   Thermo Fisher Scientific.
10   Q.   Okay.  And for how long have you held that role?
11   A.   Since 2020.
12   Q.   What -- what happened in 2020 that caused you to become
13   the vice president of human resources at Thermo Fisher?
14   A.   A restructure within our HR function.
15   Q.   Was there also an acquisition around that time?
16   A.   No.
17   Q.   Okay.  At some point, PPD was acquired by Thermo Fisher;
18   is that right?
19   A.   That's correct.
20   Q.   Okay.  And when was that?
21   A.   That was in December of 2022.
22   Q.   Okay.
23   A.   2021.  Sorry.
24   Q.   Okay.  So how long was it between Thermo Fisher's
25   acquisition of PPD and when you became an official
```

1    Thermo Fisher employee?

2    **A.**  About 18 months.

3    **Q.**  Okay.  And when you were -- your last position at PPD,

4    that was vice president of human resources, right?

5    **A.**  Correct.

6    **Q.**  And for how long had you been in that role?

7    **A.**  How long was I vice president?

8    **Q.**  Yes.

9    **A.**  I'm currently a vice president.

10    **Q.**  Sure.  My question was vice president of human resources

11    at PPD.

12    **A.**  From April of 2020 until the acquisition by Thermo Fisher

13    in December of 2021.

14    **Q.**  Okay.  So you actually were promoted in April 2020; is

15    that right?

16    **A.**  That is correct.

17    **Q.**  And prior to April of 2020, you had served as -- was it

18    executive director --

19    **A.**  That's correct.

20    **Q.**  -- of human resources?

21    **A.**  Yes.

22    **Q.**  Okay.  And that was the position that you held in April

23    of 2018; is that right?

24    **A.**  That is correct.

25    **Q.**  Okay.  When did you first join PPD?

1    **A.**    In October of 1994.

2    **Q.**    Okay.  And what was your position when you first joined?

3    **A.**    I believe it was a human resource representative.

4    **Q.**    And so your career at PPD ranged how many years?

5    **A.**    28 plus.

6    **Q.**    And during those 28 plus years at PPD, were those all

7    within HR?

8    **A.**    Yes.

9    **Q.**    In your role as executive director of HR at PPD, part of

10   your responsibilities included conducting workplace

11   investigations; is that right?

12   **A.**    That's correct.

13   **Q.**    Okay.  And when we say a "workplace investigation," can

14   you explain to the jury what that means?

15   **A.**    So in HR, our function is really to ensure that our

16   employees and managers work together effectively.  Our role

17   is a support function to make sure that we provide

18   opportunities to express concerns.  So when employees and

19   managers or employees and employees aren't able to

20   effectively communicate, our role would be to help facilitate

21   or investigate in situations where it may be necessary.

22   **Q.**    So would one example of a workplace investigation that

23   you'd be responsible for include claims of discrimination?

24   **A.**    Correct.

25   **Q.**    Claims of retaliation?

1    **A.**  Correct.

2    **Q.**  At some point in time in your work at PPD, did you come

3    to know Dr. Lisa Menninger?

4    **A.**  I did, yes.

5    **Q.**  And how did you know Dr. Menninger?

6    **A.**  Dr. Menninger was hired at our central lab facility I

7    believe in 2015.  An employee of mine, Chad St. John, would

8    have worked directly with her.  And in my routine visits to

9    that site, I would have been introduced to Dr. Menninger.

10   **Q.**  Okay.  And at some point in time, you learned that

11   Dr. Menninger had made a complaint concerning the way she was

12   being treated at PPD; is that right?

13   **A.**  That's correct.

14   **Q.**  Okay.  And do you recall when it was that this complaint

15   came to your attention?

16   **A.**  The complaint came in early 2018.

17   **Q.**  Do you recall if it was in April of 2018?

18   **A.**  I believe that's accurate, yes.

19   **Q.**  Okay.  And what -- well, strike that.

20          You recall that at that time, Dr. Menninger, she

21   complained that she was being mistreated by her boss, Hacene

22   Mekerri; is that right?

23   **A.**  That's -- yes.

24   **Q.**  She alleged that Mr. Mekerri was attempting to force her

25   out of her job?  Is that right?

1    **A.**   No.  She indicated that she felt she was being treated

2    unfairly because she disclosed her disability.

3    **Q.**   Okay.  Did she indicate what she thought the intent was

4    of that treatment?

5    **A.**   She felt it was unfair and she just wanted it to stop.

6    **Q.**   You learned of this complaint from Mr. St. John; is that

7    right?

8    **A.**   That's correct.

9    **Q.**   And Mr. St. John, do you recall he actually forwarded you

10   an email reflecting this concern from Dr. Menninger?

11   **A.**   That's accurate.

12   **Q.**   Okay.  And at that point in time, you -- you decided to

13   conduct an investigation; is that right?

14   **A.**   That's correct.

15   **Q.**   Okay.  Now, you -- you had conducted many investigations

16   in the past, hadn't you?

17   **A.**   I have, yes.

18   **Q.**   Okay.  And but more -- more specifically, as of that

19   point in time, you had extensive experience conducting

20   investigations, right?

21   **A.**   Correct.

22   **Q.**   You had received training regarding how to go about

23   conducting investigations?

24   **A.**   We did, yes.  Or I did, yes.

25   **Q.**   Okay.  And some of that training had actually happened as

1  recently as 2016, correct?

2  **A.**  Correct.

3  **Q.**  Some of that was provided by in-house counsel at PPD?

4  **A.**  Yes.

5  **Q.**  Some of that training was also provided by outside

6  counsel, right?

7  **A.**  That's correct.

8  **Q.**  In fact, the same law firm that represents PPD here

9  today, correct?

10  **A.**  Yes.

11  **Q.**  Okay.  And you -- you understood as of April 2018 that,

12  whoever did the investigation, needed to be impartial, right?

13  **A.**  Absolutely.

14  **Q.**  Okay.  Needed to be objective?

15  **A.**  Yes.

16  **Q.**  Needed to be a person who themselves was not involved in

17  the situation being investigated, correct?

18  **A.**  Intimately involved in the information that would have

19  been provided in the investigation, correct.

20  **Q.**  So you're saying that if they were involved, but they

21  weren't intimately involved, it would be okay for them to

22  serve as an investigator?

23  **A.**  "Involved" is a complex word.  I mean, awareness of the

24  situation, that's fine.  Involved, no.

25  **Q.**  How about working behind the scenes to draft the email

1    communications that were being complained about?  Would that

2    be the type of involvement that, from your perspective, would

3    disqualify someone from serving as an investigator?

4    **A.**  Again, I think that's a gray area.  I think if, the

5    review of emails is really to say, "Contextually, does this

6    align with the process, or am I following, you know, company

7    standard or protocol?" to me that would be -- that would be

8    fine.

9         If they're, basically, having knowledge of the

10    situation and responding as if they were the first person or

11    involved directly in that -- in that situation, then I think

12    that would be inappropriate.

13    **Q.**  So you believe some level of involvement by the

14    investigator into the issue being investigated is okay?

15    **A.**  Again, it really depends on what "involvement" is defined

16    as.

17    **Q.**  Okay.  Well, you had been involved for several months,

18    prior to beginning your investigation, into Dr. Menninger's

19    request for accommodation, hadn't you?

20    **A.**  I had been aware of the situation.

21    **Q.**  Okay.  Let's -- let's see when you became aware.  So I'm

22    going to direct you to Joint Exhibit Number 60.  And if you

23    look -- we'll start at the top of the page here.  So you see

24    this is an email to you from Chad St. John on January 15,

25    2018.  Do you see that?

1    **A.**   Yes.

2    **Q.**   Okay.  And this is an email to you and Jerry Williams,

3    right?

4    **A.**   Correct.

5    **Q.**   Can you tell the jury who Jerry Williams is?

6    **A.**   At the time, Jerry Williams was my manager.

7    **Q.**   Okay.  And if we looked down below here, we'll see this

8    was what Mr. St. John was forwarding to you was an email he

9    had sent to Dr. Menninger, right?

10   **A.**   Yes.

11   **Q.**   Okay.  And this was an email from Mr. St. John requesting

12   certain information from Dr. Menninger concerning her

13   disability and need for accommodation, right?

14   **A.**   That's correct.

15   **Q.**   Okay.  And -- well, strike that.

16          All right.  Now let's look at Joint Exhibit 223,

17   and so this was an email the very next day from Mr. St. John

18   to Mr. Williams, copying you.  Do you see that?

19   **A.**   Yes.

20   **Q.**   Okay.  And if we look below, he's -- he's forwarding to

21   you Dr. Menninger's response to his prior email, right?

22   **A.**   Yes.

23   **Q.**   Okay.  And his message to you here is -- at the top of

24   the page is, "I will continue to keep you posted," right?

25   **A.**   Well, it's intended to Jerry.  I was just in copy.

1    **Q.**  Okay.  But he did continue to keep you posted after this

2    email, right?

3    **A.**  Periodically, yes.

4    **Q.**  I'm going to show you now Joint Exhibit 213.  And so this

5    here is an email from Mr. St. John to you and Mr. Williams on

6    January 24, 2020 [*sic*].  Do you see that?

7    **A.**  Again, to -- Jerry copied to me.

8    **Q.**  Okay.  Is that an important distinction, from your

9    perspective?

10    **A.**  It is.  Generally, when you're on the copy line, it's --

11    if you have time, it's an awareness.  It's not something

12    that's, like, your immediate responsibility or actionable.

13    **Q.**  Okay.  So is it your testimony that you weren't -- you

14    weren't closely monitoring the situation as of January 24,

15    2018?

16    **A.**  I was aware, but I wasn't involved.

17    **Q.**  Okay.  And you see here that Mr. St. John, he provides an

18    update noting that "Nothing specific from Lisa, but that she

19    had an appointment to see her doctor on Monday afternoon of

20    this week."  Do you see that?

21    **A.**  I do.

22    **Q.**  Okay.  Now, are you aware that, at some point in time,

23    Dr. Menninger was provided an email from Mr. Mekerri that

24    contained five buckets of activities.  You've seen that

25    email, right?

Case: 23-2030 Case 1:19-cv-01443-LPS Document 654 Filed 03/31/23 Page 28 of 167 Document 234 Page 28 of 167 Entry ID: 6634402

78

1   **A.**  I have, yes.

2   **Q.**  Okay.  And you're aware as to why that email was provided

3   to Dr. Menninger, right?

4   **A.**  Yes.

5   **Q.**  Okay.  You're aware that Mr. Mekerri had told

6   Dr. Menninger that he was considering some changes to her

7   role in December of 2017, right?

8   **A.**  I believe Mr. Mekerri was highlighting the essential

9   functions of her job and the focus on specific ones, but not

10  changing her job.

11  **Q.**  So you don't think that the buckets related to new

12  activities?

13  **A.**  I believe the buckets were a further definition of the

14  major accountabilities of her role.

15  **Q.**  Were they new activities?

16  **A.**  They fell within the boundaries of the major

17  accountabilities of her role.

18  **Q.**  I'm asking a slightly different question.  I'm not asking

19  if they fell within the umbrella.  I'm asking whether these

20  were new activities that she had not actually been performing

21  up to that date.

22  **A.**  I don't think I can comment on what she was or was not

23  performing in her role, but they would have fell under that

24  umbrella or the buckets of the job description, the major

25  accountabilities of her role.

1    **Q.**  Okay.  So you don't know if she had been performing those

2    tasks or not?

3    **A.**  Correct.

4    **Q.**  Okay.  But you do know that that -- those buckets, that

5    those came in response to a request by Mr. St. John; is that

6    right?

7    **A.**  I'm sorry; a request of Mr. St. John for?

8    **Q.**  For Mr. Mekerri to provide those buckets?

9    **A.**  Correct.

10   **Q.**  Okay.  I'm going to show you here Joint Exhibit 193.

11              And we'll start at the top here.  So this is an

12   email from Mr. St. John on February 5, 2018, right?

13   **A.**  Correct.

14   **Q.**  And now you've moved to the to line and Mr. Williams has

15   moved to the cc line; is that right?

16   **A.**  Yes.

17   **Q.**  Would I be right to interpret that that your involvement

18   at this point has increased?

19   **A.**  Awareness, yes.

20   **Q.**  I asked about involvement.

21   **A.**  Situational.

22   **Q.**  Okay.  Had there been some discussion as of this point

23   noting that you were going take the lead here and

24   Mr. Williams was going to fall back?

25   **A.**  Not that I recall.

1   **Q.**   And Mr. St. John, he's forwarding you an email, right?

2   **A.**   Yes, he is.

3   **Q.**   Okay.  Let's look at the email he forwarded you.  And in

4   the second sentence, which I'll try to highlight, he writes,

5   "Please be specific bucketing any new duties and existing

6   duties that may have an increase beyond previous levels

7   expected in the role as the CL business continues to grow."

8   Do you see that?

9   **A.**   I do.

10   **Q.**   Okay.  And am I right it's your understanding that this

11   was the email from Mr. St. John that prompted Mr. Mekerri to

12   create the five buckets?

13   **A.**   Yes.

14   **Q.**   Okay.  I'm going to show you Joint Exhibit 180 now.  And

15   starting at the top, this is an email from Mr. St. John on

16   February 14, 2018, right?

17   **A.**   Yes.

18   **Q.**   Okay.  And, again, you're in the to line?

19   **A.**   Correct.

20   **Q.**   Mr. Williams is the cc?

21   **A.**   Yes.

22   **Q.**   And he writes, "Deb, FYI, we can now explore if the

23   recommended accommodations by her physician are reasonable

24   for the business."  Do you see that?

25   **A.**   Yes.

1    **Q.**  And this was an email in which Mr. St. John was, just to

2    turn to the next page, he attaches the communication from --

3    or at least one of the communications from Dr. Kessimian,

4    right?

5    **A.**  Yes.

6    **Q.**  Okay.  So you received this on February 14, 2018?

7    **A.**  Yes.

8    **Q.**  Okay.  I'm going to show you Joint Exhibit 172.  And

9    starting at the top, this is an email from Mr. St. John to

10   you on February 21, 2018.  Do you see that?

11   **A.**  Yes.

12   **Q.**  Okay.  And it's to you?

13   **A.**  Yes.

14   **Q.**  And now Mr. Williams, he's not even cc'd, right?

15   **A.**  Correct.

16   **Q.**  Okay.  Did something happen to cause Mr. Williams to no

17   longer be cc'd, to your knowledge?

18   **A.**  Not to my knowledge.

19   **Q.**  Okay.  And Mr. St. John, he writes in the second

20   paragraph -- well, I'm not going to read it, but just the

21   last sentence, it reads, "I will continue to keep you

22   posted."  Do you see that?

23   **A.**  I do.

24   **Q.**  Okay.  And he thereafter did continue to keep you posted,

25   right?

1    **A.**  As an FYI, yes.

2    **Q.**  He was only keeping you posted as an FYI?

3    **A.**  In many cases, yes.

4    **Q.**  I'm going to show you Joint Exhibit 277.  And starting at

5    the top here, this is an email from you to Mr. St. John on

6    February 22, 2018, correct?

7    **A.**  Yes.

8    **Q.**  And this is in response to that email we just looked at,

9    right?

10   **A.**  Yes.

11   **Q.**  And after thanking him, you write, "Can I suggest you (HR

12   generally takes the lead on these given the risk factor)

13   draft a response on his behalf and have him review."

14          Do you see that?

15   **A.**  Yes.

16   **Q.**  What did you mean by "risk factor"?

17   **A.**  So I was generally giving Chad feedback about the process

18   and the risk factor -- it's a sensitive topic.  We want to

19   make sure that we're making sure we're taking care of our

20   employees in any situation and helping our managers draft

21   sensitive documents.

22   **Q.**  Anything else?

23   **A.**  No.

24   **Q.**  I'm going to show you Joint Exhibit Number 192.  And the

25   top of the page, an email from Mr. St. John to you.  Do you

1  see that?

2  **A.**  Yes.

3  **Q.**  And now this is February 26, 2018, right?

4  **A.**  Yes.

5  **Q.**  Okay.  And looking at the -- just at the bottom of the

6  page, you see Mr. St. John, on February 23, 2018, wrote to

7  you, "Please let me know your thoughts on this draft so that

8  we can send a final version to Lisa soon."

9          Do you see that?

10  **A.**  I do.

11  **Q.**  Okay.  And do you know what the draft is that he's

12  referring to?

13  **A.**  I -- it's not attached.  I don't -- I don't know.

14  **Q.**  Didn't mean to be a trick question.

15          Let me turn to the next page.  You see here on the

16  next page, we have here, this is -- this is a draft email

17  from Mr. Mekerri responding to Dr. Menninger's requests for

18  accommodation, right?

19  **A.**  Yes.

20  **Q.**  Okay.  And this is what Mr. St. John was asking you to --

21  to review, correct?

22  **A.**  Yes.

23  **Q.**  And you did review it, right?

24  **A.**  Yes.  I said I was good with the draft.

25  **Q.**  Okay.  So you -- you approved it, right?

**A.** Yes.

**Q.** Okay. Showing you Joint Exhibit 186. Can you tell the jury what this is?

**A.** An email from Chad to me with an attached license coverage grid.

**Q.** Okay. And this email was sent to you on February 28, 2018, right?

**A.** Yes.

**Q.** Now, that's a -- that's a date that you've heard a bit about so far in this trial, haven't you?

**A.** Yes.

**Q.** You heard Dr. Menninger's testimony earlier that was the -- that was the meeting with Mr. St. John and Mr. Mekerri where they presented her the options she described?

**A.** Yes.

**Q.** Okay. Now, you -- you have taken the position that you -- you did not know that February 28th meeting was -- strike that.

Did you know as of February 28, 2018, that Mr. Mekerri and Mr. St. John were planning to meet with Dr. Menninger?

**A.** No.

**Q.** Did you know that they were planning to speak to her about options for her to exit the company?

**A.** No.

1    **Q.**  Well, let's look at what Mr. -- Mr. St. John wrote in

2    this email of that same date.  First, in the first sentence,

3    he uses the phrase "I mentioned to you yesterday."  Do you

4    see that?

5    **A.**  Yes.

6    **Q.**  Okay.  Am I right that the day before February 28th, on

7    February 27th, you and Mr. St. John had had a conversation;

8    is that right?

9    **A.**  It appears so, yes.

10   **Q.**  Okay.  You say that it appears so.  Are you not sure if

11   that conversation took place?

12   **A.**  We had many conversations.  I don't recall the exact

13   conversation with Chad.

14   **Q.**  Okay.  And he indicates that, in the meeting on

15   February 27th, he had mentioned to you a license coverage

16   grid.  Do you see that?

17   **A.**  I do.

18   **Q.**  Okay.  And, in fact, that's what's -- turn to the third

19   page here -- that's what's attached to the document.  Do you

20   see that?

21   **A.**  Yes.

22   **Q.**  Okay.  And you were aware, weren't you, that at least one

23   of the purposes of this -- well, actually, strike that.

24              He also told you how this had been developed,

25   right?

1    **A.**  By our QA department, yes.

2    **Q.**  Okay.  And in particular, Kathy Dick, right?

3    **A.**  Correct.

4    **Q.**  Okay.  And you understood that at least part of the

5    reason that this licensure grid had been created was in case

6    Dr. Menninger left the company, right?

7    **A.**  No, that's not accurate.

8    **Q.**  Let's look here at the bottom.  In the second to last

9    paragraph, Mr. St. John writes to you, "All of this is good

10   contextual information as work with delicately working Lisa

11   out, since we need to have her for coverage until someone

12   else is in the seat and ready and eligible for taking on the

13   various licensures."

14           Did I read that correctly?

15   **A.**  Yes.

16   **Q.**  Ms. Ballweg, the reference to Lisa is a reference to

17   Dr. Menninger --

18   **A.**  Correct.

19   **Q.**  -- isn't that right?  Yes?

20   **A.**  Yes.

21   **Q.**  Now, I'm going to show you Joint Exhibit 167.  So this is

22   an email from Mr. St. John to you the very next day, right?

23   **A.**  Yes.

24   **Q.**  And he writes, "Deb, I wanted to discuss the conversation

25   that Hacene and I had yesterday."  Do you see that?

1   **A.**   Yes.

2   **Q.**   Okay.  And you see that he had drafted a response that he

3   wanted you to look at, right?

4   **A.**   Yes.

5   **Q.**   Okay.  And you had -- you had already spoken to

6   Mr. St. John about what had happened the day before in his

7   meeting with Dr. Menninger, right?

8   **A.**   I had, yes.

9   **Q.**   You had -- you had spoken to him as you were driving

10  home; is that right?

11  **A.**   That is correct.

12  **Q.**   And -- and your account of that conversation is that

13  Mr. St. John told you that Dr. Menninger told him that she

14  couldn't do her job, right?

15  **A.**   No.  My recollection of the conversation was Hacene and

16  Dr. Menninger and Chad were talking about the accommodations

17  PPD could provide, and Lisa's -- and her doctor didn't

18  outline what those were.

19          And so the discussion was a continuation of, "Lisa,

20  what can PPD do to help you?" to which Lisa replied, "I can

21  do my job."  There was no real interactive discussion about

22  her disability and what accommodations she needed to perform

23  her duties.

24          And so the conversation escalated.  It was a

25  continual discussion:  "We really want to help you.  Your

1    doctor says you can't do these things.  How can we help you?"

2            Lisa is saying, "I can do my job," but yet we have

3    this document where her doctor says, "You cannot perform, you

4    know, these factors of your job."

5            And so Chad's recollection is that, at some point

6    in the conversation, Lisa kept saying, "What if I can't do my

7    job?  What if I can't do my job?"

8            And it came to a point where Chad was, like -- it

9    was a nonproductive discussion, and he says, "Well, I'm not

10   sure what we can do.  Perhaps we can offer you a consulting

11   opportunity or, you know, a package."  But it was very

12   premature to have that conversation.

13   **Q.**  Ms. Ballweg, you know that's not true, right?

14   **A.**  That is absolutely the truth.

15   **Q.**  Ms. Ballweg, you had seen the day before that

16   Mr. St. John was planning to delicately work Lisa out, right?

17   **A.**  The day before the -- the conversation --

18   **Q.**  Can you please answer my question.  You had seen the day

19   before that he wanted to delicately work her out, yes?

20   **A.**  There's context to that.

21   **Q.**  I'm not asking for the context.  I'm asking for what you

22   saw.  You saw that he wanted to delicately work her out, yes?

23   **A.**  With context, yes.

24   **Q.**  Okay.  And the next day -- I'm sorry -- later that day,

25   he reported back to you concerning that conversation, right?

1  **A.** Correct.

2  **Q.** Okay. And one of the things he told you about that

3  conversation was that Dr. Menninger had questions, right?

4  **A.** The way Chad relayed it to me is there was

5  back-and-forth. I wasn't there. He didn't tell me what she

6  had questions or that I recall him telling me that.

7  **Q.** Okay. So you don't recall him telling you that she had

8  questions regarding the items listed in buckets 2, 3, and 4?

9  **A.** During that specific phone call, no. It was just Chad

10 saying it was an unproductive conversation.

11 **Q.** Let's look at the email that Mr. St. John sent you the

12 next day. And in this draft email, he writes -- I think this

13 is the third sentence, strictly speaking -- "Additional

14 detail would only present the opportunity to select items in

15 each bucket you believe you can or can't do."

16         Do you see that?

17 **A.** I do.

18 **Q.** Okay. You know what that refers to, right?

19 **A.** Those are Mr. St. John's words. I don't know what he's

20 referring to.

21 **Q.** Well, if we turn to the next page, you'll see that

22 Mr. St. John's message here is forwarding you a message from

23 Dr. Menninger, right?

24 **A.** Yes.

25 **Q.** Okay. And this was the message that she had sent to him

```
 1   and Mr. Mekerri after that February 28th meeting, right?

 2   A.   Yes.

 3   Q.   And you see that she had wrote to him -- maybe written,

 4   apologize for the grammar -- "As I stated during our

 5   conversation, while I greatly appreciate your agreement to

 6   provide accommodations with respect to items 1 and 5 on

 7   Hacene's list of duties/responsibilities, I need some

 8   additional detail regarding items 2, 3, and 4.  As we

 9   discussed, I think there are many tasks that could fall

10   within those items that would not implicate my disability."

11           Do you see that?

12   A.   I do.

13   Q.   And you see she continues on that, If they can be more

14   specific regarding those tasks, she writes, "I think we can

15   have a more productive dialogue regarding which specific

16   tasks implicate my disability and what reasonable

17   accommodations may be available with respect to those

18   specific tasks."

19           Do you see that?

20   A.   Yes.

21   Q.   Was that information ever provided to Dr. Menninger?

22   A.   I don't think I'm in a position to confirm that.  I --

23   Chad was the one taking the lead on the accommodation.  The

24   conversations he had with Hacene and Lisa, I was -- wasn't

25   there for those.
```

1  **Q.**  Ms. Ballweg, didn't you conduct an investigation as to

2  whether or not PPD had properly handled Dr. Menninger's

3  request for accommodation?

4  **A.**  No.  I conducted an investigation that Dr. Menninger felt

5  she was being treated unfairly by her boss, Hacene Mekerri.

6  **Q.**  You conducted an investigation in -- it was spring of

7  2018, right?

8  **A.**  Yes.

9  **Q.**  Did anyone else at PPD conduct an investigation in spring

10  of 2018 concerning complaints made by Dr. Menninger?

11  **A.**  No.

12  **Q.**  You recall that, prior to bringing this litigation,

13  Dr. Menninger had first started by filing a complaint at the

14  Massachusetts Commission Against Discrimination, yes?

15  **A.**  I don't -- I probably should know that, but I don't

16  recall that.

17  **Q.**  No worries.  There's a binder in front of you.  If you

18  could turn to the fourth tab, please.  Do you recognize this

19  document?

20  **A.**  I don't think so.

21  **Q.**  If you turn to the eighth page, there's something there

22  you might recognize.

23  **A.**  Yes.  My signature.

24  **Q.**  Whose signature?

25  **A.**  My signature.

1   **Q.**  Okay.  And in that signature, you're providing a

2   verification, yes?

3   **A.**  Yes.

4   **Q.**  You are attesting, looking at the third line, you write,

5   "To the extent that I have personal" -- well, let me back up

6   for a second.

7          What you're attesting to is the accuracy of the

8   facts contained in this document to which you have personal

9   knowledge, right?

10  **A.**  Yes.

11  **Q.**  And you are affirming, under the penalty of perjury, that

12  such facts are true and correct, yes?

13  **A.**  I'm sorry.  Could you say that again?

14  **Q.**  You are affirming under the pain and penalty of perjury

15  that such facts are true and correct?

16  **A.**  They are true and correct.

17  **Q.**  Okay.  That was an oath to tell the truth?

18  **A.**  Yes.

19  **Q.**  Same oath you gave today, right?

20  **A.**  Correct.

21  **Q.**  Turn to page 4 of the document, please.

22          The second to last paragraph begins, "In late

23  spring 2018."  Do you see that?

24  **A.**  Yes.

25  **Q.**  Okay.  Please read along silently as I read out loud:

1     "In late spring 2018, Dr. Menninger complained that she felt

2     the company had not properly handled her accommodation

3     requests.  The company conducted a prompt and thorough

4     investigation and determined that, while Dr. Menninger did

5     not receive all of the specific accommodations that she had

6     demanded, the company had reasonably and appropriately

7     accommodated her disability, and there was no evidence of

8     discriminatory or retaliatory treatment."

9              Did I read that right?

10    **A.**  Yes.

11    **Q.**  Ms. Ballweg, you never actually conducted that

12    investigation, did you?

13    **A.**  Yes, I did.

14    **Q.**  Okay.  So it's your testimony now that you did

15    investigate whether or not Dr. Menninger has received proper

16    treatment with respect to her accommodations?

17    **A.**  Yes.

18    **Q.**  Okay.  Going back to the email we were just at a moment

19    ago, despite conducting that prompt and thorough

20    investigation, you never actually determined whether or not

21    Dr. Menninger was provided the additional detail she wanted

22    for buckets 2, 3, and 4?

23    **A.**  There were ongoing discussions between Chad, Hacene, and

24    Lisa about the buckets of information.

25    **Q.**  And my question, ma'am, is after your prompt and thorough

1    investigation, were you able to conclude whether or not the

2    information she asked for was ever provided?

3    **A.**  Sorry.  I'm just thinking.

4    **Q.**  Take your time.

5    **A.**  So during the investigation -- well, perhaps we'll get to

6    that.

7              The process of the accommodation request was at a

8    point where it was still an interactive discussion.  There

9    was no movement, no information from her doctor to move us

10   forward, so no more information had been presented by either

11   side, by Lisa and her doctor or PPD.

12   **Q.**  Okay.  So you've determined in your prompt and thorough

13   investigation that PPD never provided the additional detail

14   regarding items 2, 3, and 4 that she had requested in the

15   meeting on February 28th, correct?

16   **A.**  It was an ongoing discussion.  They hadn't provided it at

17   that point.

18   **Q.**  They had not provided it at what point?

19   **A.**  At the point of my investigation.

20   **Q.**  Your investigation in May?

21   **A.**  April.

22   **Q.**  Okay.  So as of April, PPD still hadn't provided the

23   information Dr. Menninger reflected here was asking for back

24   on March 1st, yes?

25   **A.**  It was still an ongoing process, so it was not submitted.

1    It was not provided by either party.

2    **Q.**  Okay.  And you knew why PPD didn't provide that

3    information, right?

4    **A.**  No.

5    **Q.**  Well, Mr. St. John told you, didn't he?

6    **A.**  No.

7    **Q.**  Let's look back at the first page.  When he wrote to

8    you -- or when he wrote in this draft email that "Adding

9    additional detail would only present the opportunity to

10   select items in each bucket you believe you can or can't do,"

11   you understood what he was referring to, right?

12   **A.**  No.  I wasn't part of those conversations.

13   **Q.**  In your prompt and thorough investigation, did you ask

14   him?

15   **A.**  Again, at the point of the accommodation request, there

16   was uncertainty of can my -- can Dr. Menninger do her job,

17   can she not do her job?  Are there accommodations she needs

18   to perform the essential functions of her job?  How can we

19   accommodate that?  Our intent was really to try to work with

20   Dr. Menninger on how we can help her perform her job.

21           But on the one hand, she said she could; the other,

22   she said she couldn't.  It was an ongoing conversation.

23   **Q.**  Ms. Ballweg, Mr. St. John told you that what he wanted to

24   pursue was an exit strategy; isn't that right?

25   **A.**  That is not accurate.

**JA643**

1   **Q.**   So in response to the email that we just looked at, you

2   decided that you needed to get some legal advice, right?

3   **A.**   Not in -- no.

4   **Q.**   Okay.  Lisa Noecker, she was in-house counsel for PPD at

5   the time, right?

6   **A.**   That's correct.

7   **Q.**   And specifically, she was the one that handled issues

8   concerning requests for accommodation?

9   **A.**   She handled employment concerns, yes.

10  **Q.**   Okay.  And that included requests for accommodations?

11  **A.**   Yes.

12  **Q.**   In fact, Ms. Noecker, she'd been one of the attorneys

13  that did that training on investigations we talked about

14  earlier, right?

15  **A.**   Yes.

16  **Q.**   Okay.  I'm going to show you Joint Exhibit 167.  Oh,

17  excuse me.  We were just looking at 167.

18           I'm going to show you Joint Exhibit 65.  And this

19  is an email exchange between you and Mr. St. John on March 5,

20  2018.  Do you see that?

21  **A.**   Yes.

22  **Q.**   And now Mr. Williams, he's now back on the cc line; is

23  that right?

24  **A.**   Yes.

25  **Q.**   Do you have an understanding as to why that was?

1   **A.**  I don't.

2   **Q.**  Okay.  I'm going to direct your attention to the third

3   page of the document.  And just for the record, this has, in

4   the bottom right-hand corner, the number ending 3951.  Do you

5   see here, on March 15th -- I'm sorry -- March 5, 2018, at

6   10:44 a.m., you had sent Mr. St. John an email copying

7   Mr. Williams, yes?

8   **A.**  Yes.

9   **Q.**  And you begin, after thanking Chad, you write, "I have

10   not sent to Lisa Noecker yet."  Do you see that?

11   **A.**  Yes.

12   **Q.**  Okay.  And that refers to a package of information that

13   you had asked Mr. St. John to prepare in order to send on to

14   Attorney Noecker; is that right?

15   **A.**  Yes.

16   **Q.**  Okay.  And that package of information, it related to

17   Dr. Menninger?

18   **A.**  It did, yes.

19   **Q.**  Okay.  And specifically her request for accommodation,

20   yes?

21   **A.**  Correct.

22   **Q.**  Okay.  And Mr. St. John, he put that package together,

23   right?

24   **A.**  I believe so, yes.

25   **Q.**  Okay.  And you then transmitted that information to

 1  Attorney Noecker, yes?

 2  **A.**  Well, as of this email, I hadn't sent it to Ms. Noecker.

 3  **Q.**  But you recall, subsequent to this, when you got the

 4  package, you made sure it had all the information it needed,

 5  right?

 6  **A.**  I don't recall sending it to Lisa Noecker.

 7  **Q.**  Okay.  I'm going to show you Joint Exhibit 87.  And this

 8  is an email from Mr. St. John to you on March 7, 2018.  Do

 9  you see that?

10  **A.**  Yes.

11  **Q.**  Let's just scroll down to the middle of the page.  You

12  write to Mr. St. John, "Sorry to come back to this again.

13  Now, could you please ensure the attached form is completed

14  in entirety with any pertinent attachments added?  I will

15  then send this doc and attachments to Lisa N. for review

16  before our discussion today."

17          Do you see that?

18  **A.**  I do.

19  **Q.**  And then he responds, and his response includes a number

20  of attachments; is that right?

21  **A.**  Yes.

22  **Q.**  Okay.  And those attachments, those reflect the

23  information you asked him to gather?

24  **A.**  Correct.

25  **Q.**  Okay.  And I direct your attention to one of those

1    attachments.  So this is the 14th page of the document, Bates

2    ending in 4078.  Can you tell the jury what this is?

3    **A.**  It's a form, part of the accommodation process.

4    **Q.**  Well, the top, it says, "Use the below information to

5    summarize information to be sent to Legal."  Do you see that?

6    **A.**  Yes.

7    **Q.**  Okay.  So this was gathering information to provide to

8    in-house counsel?

9    **A.**  Yes.

10    **Q.**  And the reference to HRG, is that human resources group?

11    **A.**  Human resources generalist.

12    **Q.**  Very good.  And the human resources generalist in this

13    instance was Chad St. John?

14    **A.**  Correct.

15    **Q.**  So this was Chad St. John completing this document, yes?

16    **A.**  Yes.

17    **Q.**  Let's look at what he wrote.  Moving to the second to

18    last -- I'm sorry -- the last page of the document, so the

19    bottom right-hand corner has "4083" on it.  Let's look at

20    what he was looking for.

21         In the bullet request for accommodation pending for

22    which HR generalist is asking for help, he wrote, "HR is

23    requesting guidance in responding to Lisa and assisting us

24    with potential options as we seek a path forward to an exit

25    strategy with consultancy as an element (or others options

1   not being considered now) to protect the business and the CL

2   licensure requirements."

3           Do you see that?

4   **A.**   I see that.

5   **Q.**   Okay.  You know what the word "exit" means?

6   **A.**   Leaving the organization.

7   **Q.**   You know what the word "strategy" means, right?

8   **A.**   Yes.

9   **Q.**   It's a way to make it happen.

10  **A.**   There's -- many ways of strategy in exiting the

11  organization take place.

12  **Q.**   And if we look at the bullet below, Mr. St. John, he

13  explained why he wanted an exit strategy, right?

14  **A.**   I'm sorry; was there a question?

15  **Q.**   There was.  In this bullet, he explained to you why he

16  wanted an exit strategy, right?

17  **A.**   It appears so.

18  **Q.**   He believed that Lisa Menninger could no longer do her

19  job.

20  **A.**   I believe he is indicating concern with her ability to

21  help grow the business and hit targets.

22  **Q.**   You're right.  That's a better description.  And he

23  reiterates in this note, just above, that it would be --

24  prefeed -- I think he means preferred.  "To package this

25  employee while also allowing them to consult to protect the

```
 1    CL licensure requirements that Lisa holds."  Do you see that?

 2    A.  I see that.

 3    Q.  Okay.  And you know what "package" means in this context,

 4    right?

 5    A.  It can mean a various number of things.

 6    Q.  You know he meant an exit package, right?

 7    A.  Again, there's all -- there's many different packages.

 8    Q.  Okay.

 9             THE COURT:  I'm going to pause you here,

10    Mr. Hannon, and take the morning break.

11             All rise for the jury.

12             (Jury not present.)

13             THE COURT:  Super crisp redirect, Mr. Hannon, and

14    super crisp and to the point recross, Ms. Mandel.  We have

15    examinations like that, then we'll easily get done by next

16    Friday.

17             MR. HANNON:  We'll do our best.

18             THE COURT:  But I'll tell them -- my plan is to

19    tell them at one o'clock when I let them go that we're on

20    track, but we're going to need that Tuesday, but no other

21    afternoons.  Make sense?

22             MS. MANDEL:  I'm sorry; Monday and Tuesday?

23             THE COURT:  Yes, Monday and Tuesday.  When I say

24    "Tuesday," I mean adding, yes.  But I'm not planning on

25    adding anything else absent snowstorms or unforeseen events.
```

1    That's -- you're both on board with that?

2              MR. HANNON:  Yes, Judge.

3              MS. MANDEL:  Yes.

4              THE COURT:  Okay.  All right.  Take the break.

5    We'll resume at 11:30.

6              (Court in recess at 11:16 a.m.

7              and reconvened at 11:30 a.m.)

8              THE COURT:  One minor -- I just want to bring up

9    with you that a juror just raised with Ms. Belmont and -- so

10   the juror who sits in seat 9, which is the second seat in the

11   back row closest to me, part of his job is he delivers

12   propane, I think you might remember.  And he can do -- be on

13   call from 5:00 or 7 p.m. till 7 a.m. the next morning.  And

14   sometimes when he's on call, he's on call, and he has a

15   beautiful night's sleep.  And some nights when he's on call,

16   there could be ten calls or one call, or whatever, and he can

17   be out.  And he wanted to ask Ms. Belmont whether or not he

18   could do it or not.

19              My inclination, tell me what you think, if you

20   agree, or if you have something different you propose, is

21   just at the end of the day, whether we have Ms. Belmont talk

22   to him and tell him I think he's free to do that if he wants

23   to.  Like we don't control what happens to them when they're

24   not in the courtroom, that's perfectly fine to do, but we

25   expect that he's able to be here and pay attention and use

1    his good judgment about that and I don't -- is that -- anyone

2    have any thoughts about that?

3              MR. HANNON:  That's fine here.

4              MS. MANDEL:  That's fine from our end.  I guess I

5    would just ask if Ms. Belmont can confirm, if that does

6    happen, that he affirmatively states that he is able to be

7    awake and pay attention to what is happening.

8              THE COURT:  I think I would have him -- Ms. Belmont

9    tell him that it's fine to do, but our expectation is that he

10   needs to be able to be awake and attuned and attentive during

11   the trial, and if at any point, he can't be, he should tell

12   us.  But I'm not going as to ask him to affirm each morning

13   that --

14             MS. MANDEL:  Understood.  Understood.

15             THE COURT:  Yes.  But I'll have her -- as long as

16   you're both fine with her doing that at the end of the day,

17   that's how I would handle it.

18             Fine.  Okay.  Great.  You can go get the jury,

19   Ms. Belmont.  And after 1:00, will you --

20             THE DEPUTY CLERK:  Yes.

21             (Jury present.)

22             THE COURT:  Please be seated.

23             Go ahead, Mr. Hannon.

24   BY MR. HANNON:

25   Q.  So, Ms. Ballweg, after learning that Mr. St. John was

1    looking for an exit strategy with respect to Dr. Menninger,

2    did you tell him that was inappropriate?

3    **A.**  Well, I know it to be inappropriate.  I don't know if I

4    told him that.

5    **Q.**  But you knew it was inappropriate?

6    **A.**  At this stage, yes.

7    **Q.**  Why?

8    **A.**  The interactive dialogue, discussions with Dr. Menninger,

9    had not resolved.

10   **Q.**  But you're not sure if you told that to Mr. St. John?

11   **A.**  I don't recall.

12   **Q.**  Any reason why you wouldn't have?

13   **A.**  No.

14   **Q.**  But you did pass along this request to Ms. Noecker,

15   didn't you?

16   **A.**  Chad sent the documents.  I indicated in my email that I

17   was going to send them.  I don't recall if I actually sent

18   them.

19   **Q.**  I'm going to show you Joint Exhibit 65.  And you see this

20   is an email exchange between yourself and Mr. St. John?

21   **A.**  Yes.

22   **Q.**  Okay.  And you see in your message to Mr. St. John, on

23   March 5, 2018, you had told him, "Will definitely have a path

24   forward for Lisa M. this week before you travel -- before

25   your travel."  Yes?

```
 1   A.   Yes.
 2   Q.   And you subsequently reported back to him concerning that
 3   path forward, didn't you?
 4   A.   I don't recall.
 5   Q.   Well, did you report back to him that PPD needed to
 6   answer Dr. Menninger's questions concerning buckets 2, 3, and
 7   4?
 8   A.   Again, the process was ongoing.  There was discussion
 9   between Dr. Menninger and Chad and Hacene about
10   Dr. Menninger's accommodations.  There was uncertainty about
11   what those were.  It was an ongoing process.
12   Q.   Sure.  I'm not asking what -- about the ongoing process.
13   I'm asking you about your actions in response to his inquiry.
14   And did you tell Mr. St. John that PPD needed to respond and
15   answer Dr. Menninger's questions regarding buckets 2, 3, and
16   4?
17   A.   I would have encouraged Mr. St. John to continue with the
18   process.
19   Q.   That wasn't quite my question, though.  My question is
20   specific to answering Dr. Menninger's questions regarding
21   buckets 2, 3, and 4.  Did you tell Mr. Johnson --
22   Mr. St. John to provide those answers?
23   A.   I -- I don't recall.
24   Q.   The path forward for Dr. Menninger that was decided upon
25   by PPD was to build a record that would either get her to
```

 1    quit or provide a basis for firing her; isn't that right?

 2    **A.** No. The path forward for Dr. Menninger was to try to

 3    help her any way we possibly could.

 4    **Q.** Except answering her questions regarding buckets 2, 3,

 5    and 4?

 6    **A.** It was an interactive process.

 7    **Q.** I'm going to show you Joint Exhibit 271. So you see

 8    here, this is an email with Mr. St. John forwarding you an

 9    email; is that right?

10    **A.** Yes.

11    **Q.** This is February 26, 2018?

12    **A.** March 26th.

13    **Q.** Excuse me. Thank you.

14            March 26, 2018?

15    **A.** Yes.

16    **Q.** Okay. And he forwarded you an email from Lisa Menninger,

17    right?

18    **A.** Correct.

19    **Q.** Okay. I'm just going to scroll to the first message in

20    this chain, which is here on March 12, 2018. Do you see

21    that?

22    **A.** Yes.

23    **Q.** Okay. So this was the email that Mr. St. John wrote to

24    Dr. Menninger in response to her March 1st email; is that

25    right?

1    **A.**   Yes, I believe so.

2    **Q.**   Okay.  And this was an email that he had worked on with

3    you?

4    **A.**   No, I don't believe Chad and I worked on it.  I would

5    have looked at the process, but I don't believe I recall

6    editing this for Chad.

7    **Q.**   Sure.  I didn't ask if you edited it; I asked if you

8    reviewed it.  Did you?

9    **A.**   Possibly.  I -- I -- there was a lot of exchanges.  I --

10   I don't recall specifically this one.

11   **Q.**   Okay.  When you conducted your prompt and thorough

12   investigation, did you -- did you review this email then?

13   **A.**   So during the prompt and thorough investigation, I met

14   with Dr. Menninger to outline why she felt that she was being

15   treated unfairly by her manager.

16   **Q.**   Not my question, ma'am.

17   **A.**   And she outlined a few areas that I looked into.

18   **Q.**   Sure.

19   **A.**   If you would have taken me to this email, I would have

20   reviewed it.

21   **Q.**   Not my question, though.  Did you review this email in

22   the course of your prompt and thorough investigation?

23   **A.**   I don't believe so, no.

24   **Q.**   Okay.  But you did review it at some point, right?

25   **A.**   Possibly.

1    **Q.**  Well, this is an email that -- this is an email chain

2    that Mr. St. John forwarded to you, right?

3    **A.**  Yes.

4    **Q.**  With a note, "We will want to discuss this further,"

5    right?

6    **A.**  Yes.

7    **Q.**  Okay.  This was an important issue, right?

8    **A.**  Yes.

9    **Q.**  And addressing this kind of important issue, that was an

10   important part of your job, right?

11   **A.**  It's highly likely that Chad and I did discuss this, yes.

12   **Q.**  And one of the things that Dr. Menninger had noted in her

13   email that was forwarded to you was reiterating her requests

14   for those -- information concerning those -- those three

15   items, right?

16   **A.**  Correct.

17   **Q.**  Okay.  And Mr. St. John's prior email, it hadn't actually

18   provided any detail concerning those three buckets, had it?

19   **A.**  I believe there were others, but not this one.

20   **Q.**  Excuse me?

21   **A.**  I believe there were other emails that provided the

22   buckets, but not this particular one.

23   **Q.**  Okay.  This email didn't actually answer her question

24   regarding the additional detail for buckets 2, 3, and 4; is

25   that right?

1    **A.**  Again, it's just asking for Dr. Menninger to go back to

2    her doctor and have more conversations about the

3    accommodations she needed to do her job.

4    **Q.**  So it did not answer the questions that Dr. Menninger had

5    asked back on March 1st, yes?

6    **A.**  I'm not sure that was the intent of the email.

7    **Q.**  That's fine.  I'm not asking what the intent was:  I'm

8    asking if you agree with me that it didn't actually --

9    **A.**  It didn't include any further information about the

10   buckets, no.

11   **Q.**  Okay.  And, in fact, as of this time, Mr. St. John had

12   been instructed not to provide that information; isn't that

13   right?

14   **A.**  I wasn't involved in conversations that he would have had

15   with Hacene about the particular details of Dr. Menninger's

16   role, so I don't know if Chad was instructed by Hacene or

17   not.

18   **Q.**  Well, during this time, you were -- you were interacting

19   directly with Lisa Noecker concerning Dr. Menninger's

20   accommodation request; isn't that right?

21   **A.**  I believe, at some point, the documents were probably

22   forwarded to doctor -- to Lisa Noecker.

23   **Q.**  Okay.  And you were, essentially, serving as a go-between

24   between Ms. -- I'm sorry -- Attorney Noecker and Mr. St. John

25   and Mr. Mekerri, yes?

1    **A.**   In an oversight position, yes.

2    **Q.**   And I'm going to show you Joint Exhibit 69.  No, that's

3    the wrong one.  So this is a March 28th email between -- the

4    top here -- it's an email from Mr. St. John and Mr. Mekerri.

5    Do you see that?

6    **A.**   Yes.

7    **Q.**   Okay.  And you see he is forwarding an email chain

8    between himself and you, right?

9    **A.**   Yes.

10   **Q.**   Okay.  Let me turn to the second page here.  In terms of

11   what you had forwarded there, what you had forwarded there

12   was something written by Attorney Noecker; is that right?

13   **A.**   Yes.

14   **Q.**   Back to the first page here, Mr. St. John is instructing

15   Hacene to add some details to the details he has discussed

16   with Lisa in their one-to-ones.  Do you see that?

17   **A.**   Yes.

18   **Q.**   Okay.  And then, in the last sentence, he writes, "Can

19   you please" -- "Can you please reply before tomorrow morning

20   since Deb and I need to review it and send it on the [*sic*]

21   Lisa N."  Do you see that?

22   **A.**   Yes.

23   **Q.**   Do you agree with me "Lisa N." is Lisa Noecker?

24   **A.**   Yes.

25   **Q.**   I'm now showing you Exhibit Number 142, Joint

1    Exhibit 142.  And this is a meeting invite for Mr. St. John;
2    is that right?
3    **A.**  It's just an email.
4    **Q.**  Okay.  Well, you see it has -- it has a proposed date and
5    time.  Do you see that there?
6    **A.**  Oh, yes.  Yes.
7    **Q.**  Okay.  So this is Mr. St. John looking to schedule a call
8    to speak with you, right?
9    **A.**  Yes.
10   **Q.**  Regarding the -- the email below from Dr. Menninger,
11   correct?
12   **A.**  To discuss the next steps, yes.
13   **Q.**  Okay.  And do you recall that meeting?
14   **A.**  I don't specifically recall that meeting.
15   **Q.**  Now, at some point in this back-and-forth, Mr. Mekerri
16   received some -- some advice from human resources, didn't he?
17   **A.**  I'm not sure what advice he would have received.
18   Specifically?
19   **Q.**  Advice regarding documenting performance criticisms of
20   Dr. Menninger.
21   **A.**  Any time in our role as HR, we would certainly encourage
22   managers to, you know, be very clear and transparent with
23   your employees about opportunities, challenges, just so we
24   can provide clarity and work together to resolve challenges.
25   And we would encourage documentation in those situations,

1    yes.

2    **Q.**  But in this particular situation, Mr. Mekerri was

3    encouraged to start documenting performance issues relative

4    to Dr. Menninger; isn't that right?

5    **A.**  I think Mr. Mekerri was encouraged to document throughout

6    his entire time with the organization.

7    **Q.**  And before Dr. Menninger disclosed her disability, he

8    never did.

9    **A.**  In 2017, through her performance review, he was

10   documenting.

11   **Q.**  We'll talk about the performance review in just a few

12   minutes.  Aside from that, he wasn't documenting alleged

13   performance issues of Dr. Menninger's prior to her disclosure

14   of her disability, right?

15   **A.**  He may or may not have.  I don't know the answer to that.

16   **Q.**  You didn't look at that when you conducted your prompt

17   and thorough investigation?

18   **A.**  One of the issues -- the issues that Lisa Menninger

19   raised around why she felt harassed or treated differently by

20   her manager was about her performance review.  Her

21   performance review was conducted in 2017 before she disclosed

22   her disability.

23   **Q.**  Hang on.  Your testimony is that she complained to you

24   about her performance review?

25   **A.**  She felt it was unfair that her performance review was

1     incomplete and she had a poor rating.

2   **Q.**   It wasn't a poor rating, was it, Ms. Ballweg?

3   **A.**   It was not.

4   **Q.**   It was a good rating, wasn't it?

5   **A.**   It was a great rating.

6   **Q.**   What she complained to you was that, after she disclosed

7     her disability, that her boss started treating her

8     differently, right?

9   **A.**   Yes.

10  **Q.**   What she complained to you was that, after she disclosed

11    her disability, it seemed like he was going out of his way to

12    criticize her, right?

13  **A.**   And one of the indications she cited for me to

14    investigate was her 2017 performance review.

15  **Q.**   One of, yes?

16  **A.**   Correct.

17  **Q.**   Not the only one, right?

18  **A.**   No.

19  **Q.**   One of the other instances that she complained about was

20    that it looked like he was going out of his way to provide

21    documentation of her alleged performance concerns, yes?

22  **A.**   No.

23  **Q.**   We'll get back to that, but for the time being, I'm

24    showing you here Exhibit -- Joint Exhibit 49.  And I realize

25    you're not a recipient of this email, but you see this is an

1  email from Mr. Mekerri to Mr. St. John on March 29, 2018.  Do

2  you see that?

3  **A.**  Yes.

4  **Q.**  Okay.  And he begins his email by saying, "As requested."

5  Do you see that?

6  **A.**  Yes.

7  **Q.**  Okay.  Is it your understanding that at or around this

8  time, Mr. St. John had requested that Mr. Mekerri begin

9  documenting his conversations with Dr. Menninger?

10  **A.**  I'm not sure what Chad would have -- through coaching, he

11  would have asked Hacene to, you know, document all of his

12  employees' conversations where it would be developmental or

13  opportunistic.

14  **Q.**  Okay.  So you're not sure if there had been a recent

15  request made specific to Dr. Menninger?

16  **A.**  I'm not aware of this email and I'm not aware of what the

17  intended request was about.

18  **Q.**  I'm going to show you Joint Exhibit 148.  Can you see

19  here Mr. St. John, he is forwarding you an email exchange he

20  had with Mr. Mekerri?  Do you see that?

21  **A.**  Yes.

22  **Q.**  Okay.  And he does -- he sends this to you on April 3,

23  2018?

24  **A.**  Yes.

25  **Q.**  Okay.  In terms of what Mr. St. John had written to

1    Mr. Mekerri, that's at the bottom of the page here, right?

2    **A.**  Yes.

3    **Q.**  Okay.  And you see here, Mr. St. John, he's providing

4    Mr. Mekerri some -- some coaching regarding documentation of

5    Dr. Menninger, yes?

6    **A.**  Yes.

7    **Q.**  Okay.  And in the -- in the second sentence, he writes,

8    "It will" -- I guess missing the word "be" -- "critically

9    important to follow up on your discussions with Lisa with

10   documentation to your manager file and to Lisa directly."

11           Do you see that?

12   **A.**  Yes.

13   **Q.**  Now, that -- that was an effort to create documentation

14   concerning Mr. Mekerri's alleged performance concerns, yes?

15   **A.**   In any situation, we would want to document in hopes that

16   we could provide clarity to our employees for performance

17   improvement, for growth.  This is Chad encouraging Hacene to

18   document for Lisa and anyone else who would have been having

19   performance issues.

20   **Q.**  Wasn't this about achieving an exit strategy?

21   **A.**   At the end of the day, we truly want to provide

22   opportunities for our employees.  In regards to

23   Dr. Menninger, it was very confusing.  Her doctor's

24   indicating she has limitations, or she has accommodation

25   requests.  It was uncertain as to the path forward in her

```
 1    role, holding the licensure for this organization to conduct
 2    the work that they do.
 3           There was an attempt to -- there was a desire to
 4    ensure we had the ability to protect the business.
 5    Q.  Is that a yes?
 6    A.  Could you restate the question, please?
 7    Q.  Wasn't this a strategy -- strike that.
 8           Wasn't this part of PPD's exit strategy?
 9    A.  No.
10    Q.  I'm going to show you Joint Exhibit 265.  And I want to
11    start at the first message here on this list, on this email
12    chain, excuse me.  So we have here an email from Chris Fikry.
13    Can you tell the jury who that is?
14    A.  Dr. Fikry is or was the lab leader.  He had
15    responsibilities for all of the Global Labs, where Hacene
16    Mekerri had responsibilities for just the Global Central Lab
17    and reported to Dr. Fikry.
18    Q.  So he's Mr. Mekerri's boss?
19    A.  Correct.
20           THE WITNESS:  Bless you.
21           THE COURT:  Thank you.
22    BY MR. HANNON:
23    Q.  And you see here on April 11, 2018, Mr. Fikry writes,
24    "What's timing on Lisa Menninger's exit?"  Yes?
25    A.  Yes.
```

Q. Okay. Now, he writes that to Jerry Williams, right?

A. Yes.

Q. That's your boss?

A. Yes.

Q. Okay. And we see here Mr. Williams, he forwards the email to you, right?

A. Yes.

Q. Okay. And he didn't ask you what Mr. Fikry was talking about, did he?

A. No.

Q. He didn't say, "What -- what exit?"

A. No.

Q. He asked, "Where is Chad on this one?" Right?

A. Yes.

Q. You'd agree that, as of this time, you would have kept Mr. Williams apprised of what Mr. St. John was doing in relation to Dr. Menninger, yes?

A. In what respect.

Q. All of them.

A. Jerry would have had a general sense of, again, the accommodation requests, the uncertainty.

Q. Looking up to your response, again, you don't -- you don't express any -- any surprise by Mr. Fikry's question, do you?

A. Well, I interpreted Mr. -- or Dr. Fikry's question --

1    **Q.**  We'll get to that in a second.  We'll just take it

2    step-by-step, if we may.  You didn't express any surprise

3    about Dr. Fikry's question, did you?

4    **A.**  I responded based on my interpretation of what

5    Dr. Fikry's question was about.

6    **Q.**  And let's look at your response.  You begin by saying

7    that, "Hacene gave her some tough feedback on a recent issue

8    and" -- is that follow-up?

9    **A.**  Yes.

10    **Q.**  -- "with email."

11          So your understanding as of this time was that

12    Mr. Mekerri was giving Dr. Menninger tough feedback; is that

13    right?

14    **A.**  Yes, on a recent issue.

15    **Q.**  How does tough feedback, in your mind, differ from just

16    feedback?

17    **A.**  I believe in this assistance, it was a GSK issue, and it

18    was at a level it was raised to Dr. Fikry's attention.  And

19    it required -- well, because of the -- the corporate

20    visibility of the issue with a key client, that it was tough

21    feedback -- great client.  The issues that were raised were

22    conducted in the lab that Dr. Menninger sat on top of.

23    **Q.**  You had told Mr. Mekerri to be tough with Dr. Menninger,

24    hadn't you?

25    **A.**  No.

1    **Q.**  You understood that Dr. Menninger had an anxiety

2    disorder, right?

3    **A.**  Social anxiety, yes.

4    **Q.**  Okay.  And you understood that because Dr. Menninger had

5    such a great rating for 2017, you couldn't just fire her,

6    right?

7    **A.**  From an HR perspective, there is a process to follow to

8    ensure that the risk to the organization is mitigated.  At

9    the end of the day, we, again, try to do whatever we can to

10    support our employees, to provide them fair treatment, to

11    help them develop and grow in situations where people are

12    given tough feedback, it's how we coach them, how do we help

13    them, how do we help them improve and move forward?

14    **Q.**  Okay.  Back to my question, though.  You knew that with a

15    rating of 3, you couldn't just fire her, right?

16    **A.**  It wouldn't be appropriate.

17    **Q.**  But if she quit, that would mitigate the risk, wouldn't

18    it?

19    **A.**  Well, anyone can leave their employment at any time.

20    **Q.**  And here at the bottom of what you wrote to Mr. Williams,

21    where you write, "Unless she self-selects . . ."  Do you see

22    that?

23    **A.**  Yes.

24    **Q.**  What does "self-select" mean?

25    **A.**  Voluntarily leave her job.

 1    **Q.**  Now, with respect to the tough feedback that

 2    Dr. Menninger was being provided, you were -- you were

 3    actually involved in drafting some of that, weren't you?

 4    **A.**  I don't believe so, no.

 5    **Q.**  Were you reviewing it before it went out?

 6    **A.**  Possibly.

 7    **Q.**  You're not sure?

 8    **A.**  I -- I don't recall.

 9    **Q.**  Was Attorney Noecker reviewing that tough feedback before

10    it went out?

11    **A.**  I -- I don't recall that either.

12    **Q.**  Was it typical for in-house counsel to review feedback

13    regarding performance issues before it was sent to a

14    client -- I'm sorry -- an employee?

15    **A.**  On occasion?  It would be appropriate, yes.

16    **Q.**  In this email we just saw from Mr. Fikry, Mr. Williams

17    wasn't the only person he was asking about -- about

18    Dr. Menninger's exit, was he?

19    **A.**  I believe he asked Chad as he visited the site.

20    **Q.**  It was something Dr. Fikry cared about, right?

21    **A.**  In terms of the financial health of the business,

22    Dr. Fikry had a vested interest in knowing if we had risk of

23    leaders leaving the organization, or being on a leave of

24    absence, or not being able to fulfill their job

25    responsibilities.

1   **Q.**  He didn't want someone with a mental health disorder

2   leading his lab, correct?

3   **A.**  That is incorrect.

4   **Q.**  Did you ask him why he was so interested in

5   Dr. Menninger's exit?

6   **A.**  Again, Chris Fikry, Dr. Fikry, had interest to protect

7   his business.  His interest is purely to ensure that he had

8   continuity of one of the larger pieces of his labs.

9   **Q.**  Didn't ask you that.  Did you ask Dr. Fikry why he was so

10  interested in knowing about the timing of Dr. Menninger's

11  exit?

12  **A.**  No, I don't recall asking him that.

13  **Q.**  Did you ever consider that maybe he was actually

14  motivated by some kind of discriminatory animus?

15  **A.**  No.

16  **Q.**  When you conducted your prompt and thorough

17  investigation, you didn't look into that, did you?

18  **A.**  No.

19  **Q.**  I'm going to show you now Joint Exhibit 118.  And you

20  recognize this email, yes?

21  **A.**  Yes.

22  **Q.**  And this is -- if we look at the -- the subject line,

23  this is some back-and-forth regarding a -- strike that.

24          The subject line includes "1:1 follow-up and

25  goals."  Do you see that?

```
 1   A.   Yes.
 2   Q.   And if we look a little bit further on, this chain starts
 3   here on the fourth page with an email from Mr. Mekerri to
 4   Dr. Menninger.  Do you see that?
 5   A.   Yes.
 6   Q.   Okay.  And this concerns him adapting Dr. Menninger's
 7   goals; is that right?
 8   A.   Yes.
 9   Q.   Okay.  Now, you were aware that Mr. Mekerri was going to
10   send that email, weren't you?
11   A.   Chad may have mentioned it, but I'm not 100 percent
12   certain I was aware.
13   Q.   Okay.  You understood that this -- that this was part of
14   the efforts to document alleged performance deficiencies with
15   respect to Dr. Menninger, right?
16   A.   No.
17   Q.   Well, you see here that Dr. Menninger, she provides a
18   very extensive response here to Mr. Mekerri's email, right?
19   A.   Yes.
20   Q.   Okay.  And backing up here to the first page -- sorry.
21   My fingers got in the way.  Backing up to the first page, you
22   see that Mr. Mekerri, he had drafted up a response to
23   Dr. Menninger's emails; is that right?
24   A.   Yes.
25   Q.   Okay.  And then, moving up, you see that Mr. St. John, he
```

1  had drafted a different email, or at least a sort of revised

2  email for Mr. Mekerri to send, right?

3  **A.**  Yes.

4  **Q.**  And you see he -- he sends this to you and he asks you

5  whether or not you agree; is that right?

6  **A.**  Yes.

7  **Q.**  Okay.  So he was asking for your -- for your input with

8  respect to this message, correct?

9  **A.**  Yes.

10  **Q.**  Okay.  Let's look at Joint Exhibit 119.  And this is an

11  email from Mr. St. John to you on April 18, 2018, right?

12  **A.**  Yes.

13  **Q.**  Okay.  And this one's from a slightly -- this one's

14  regarding a slightly different topic than we just looked at,

15  correct?

16  **A.**  Yes.

17  **Q.**  Okay.

18  **A.**  Uh-huh.

19  **Q.**  So -- but he sends you another draft, this time a draft,

20  it looks like, addressing Dr. Menninger's accommodation

21  requests, correct?

22  **A.**  Yes.

23  **Q.**  Okay.  And, again, he asks you, "Let me know your

24  thoughts," right?

25  **A.**  Yes.

1    **Q.**  I'm going to show you what's been marked as Joint

2    Exhibit 67.  And we see at the top of the page this is an

3    email from Mr. St. John to you on April 20, 2018, yes?

4    **A.**  Yes.

5    **Q.**  Okay.  And he's responding to an email that you had sent

6    earlier that day?

7    **A.**  Yes.

8    **Q.**  And you had written to Mr. St. John, "FYI . . . Could you

9    possibly work on a revised draft from Hacene to Lisa before

10    you head out for your terrific vacation?  I can have Hacene

11    respond with his while you are out and then you can use your

12    vacation as reason for the delay . . . Thanks."

13           Do you see that?

14    **A.**  Yes.

15    **Q.**  Okay.  Do you know what that refers to?

16    **A.**  A response to Dr. Menninger from Hacene.

17    **Q.**  Okay.  And when you write, "I can have Hacene respond

18    with his while you are out," what are you indicating there?

19    **A.**  Having Hacene take a look at this information and review

20    it while Chad's not in the office.

21    **Q.**  Were you intending to tell Mr. Mekerri to send an email?

22    **A.**  I wasn't intending to tell him -- I wasn't intending to

23    have him send an email, no.

24    **Q.**  I now show you Joint Exhibit Number 73.  That's an email

25    from you to Mr. Mekerri on April 25, 2018, yes?

1 **A.** Yes.

2 **Q.** And you write to Mr. Mekerri here in the second line,

3 "Below is the email response Lisa Noecker drafted for you to

4 reply to the latest exchange between you and Lisa Menninger."

5 Do you see that?

6 **A.** Yes.

7 **Q.** Okay. Am I right, Ms. Ballweg, that this email, the one

8 that you're providing to Mr. Mekerri to send, this was an

9 email that Dr. Menninger asked you to investigate?

10 **A.** Again, when I recall my conversation with Dr. Menninger

11 about why she felt she was being treated differently by her

12 manager, quality became one of the issues. Gedeon Richter

13 was one of a few clients she indicated, but I don't believe

14 she recalled this specific email or called it out. It was

15 she was being held to a different quality standard than every

16 other leader within the central lab.

17 **Q.** Well, she sent you a number of emails when you began your

18 conversation, correct?

19 **A.** Yes.

20 **Q.** Was this one of the emails she sent you?

21 **A.** I just don't recall. It -- I don't recall.

22 **Q.** Would you agree that if this was one of the emails that

23 she asked you to investigate, it would have been

24 inappropriate for you to conduct the investigation?

25 **A.** No, because I wasn't involved. At this point I was the

1    conduit between Chad having worked with Hacene on goals for

2    2018 for Dr. Menninger.

3    **Q.**   You're the conduit between whom?

4    **A.**   Sorry.  Between Lisa Noecker and Hacene.  And, obviously,

5    Chad was out on vacation.  I was filling in to help move this

6    process along.  I wasn't involved in the details.  I wasn't

7    involved with discussing with Hacene what the goals would be

8    for 2018.  That would all have been conducted between Chad

9    and Hacene.

10   **Q.**   So when you did your investigation, did you investigate

11   Lisa Noecker?

12   **A.**   No.

13   **Q.**   Why not?

14   **A.**   Again, in the investigation, Dr. Menninger pointed to, I

15   believe, seven incidents that she cited as support for why

16   she felt she was being treated unfairly.  And all seven of

17   those were thoroughly investigated.  If Lisa Noecker's name

18   would have been attached to any of those, from an

19   inappropriateness or as an individual who had information

20   about that situation, I would have had a conversation with

21   Lisa Noecker.

22   **Q.**   Well, you were having conversations with Lisa Noecker,

23   right?

24   **A.**   It was a challenging time.

25   **Q.**   Fair enough.  Challenging or not, you were having

1   conversations throughout this time with Lisa Noecker, right?

2   **A.**  And Chad and I were both having conversations

3   periodically with Lisa Noecker, yes.

4   **Q.**  And Lisa Noecker, she was the one pulling the strings

5   with respect to all of these different communications, wasn't

6   she?

7   **A.**  She was helping craft responses.

8   **Q.**  I'm now showing you Joint Exhibit 76.  I just direct your

9   attention to the bottom of the page.  Does that look like

10  it's an email from Mr. St. John to you on April 26, 2018?

11  **A.**  Yes.

12  **Q.**  And he's asking you whether or not there's any feedback

13  from Lisa Noecker on a response for him to send to Lisa

14  Menninger.  Do you see that?

15  **A.**  Yes.

16  **Q.**  Okay.  And then, in your response, you tell him, "I have

17  Lisa N's edited email for you to send; however, I need you to

18  wait until Monday."

19          Do you see that?

20  **A.**  I do.

21  **Q.**  Why did you need him to wait until Monday?

22  **A.**  I don't -- I don't know.

23  **Q.**  Going to show you Joint Exhibit Number 70.  And is

24  this -- is this the email with you forwarding him

25  Ms. Noecker's response and again asking him to hold off until

1    next week?

2    **A.**  It looks like it, yes.

3    **Q.**  Now I'm going to show you Joint Exhibit Number 71 --

4    excuse me.  That was -- we already looked at that one.

5           All right.  So let's look at Joint Exhibit

6    Number 115.  And you see here this is an email Mr. St. John

7    sent to you on April 28, 2018; is that right?

8    **A.**  Yes.

9    **Q.**  Okay.  And he's forwarding you a message he'd received

10   from Dr. Menninger?

11   **A.**  Yes.

12   **Q.**  And she complains that Hacene's -- I'm sorry --

13   Mr. Mekerri's treatment of her is getting worse?

14   **A.**  Yes.

15   **Q.**  She complains that he's mischaracterizing things?

16   **A.**  Yes.

17   **Q.**  She complains he's looking for any excuse possible to

18   criticize her leadership?

19   **A.**  Yes.

20   **Q.**  She complains that he never treated her like this before

21   she told him about her disability?

22   **A.**  Yes.

23   **Q.**  She states that her panic attacks are increasing and he's

24   making it really hard for her to do her job.  Do you see

25   that?

1    **A.**   Yes.

2    **Q.**   Okay.  Were you concerned when you read that?

3    **A.**   Very concerned that an employee would feel this way and I

4    certainly wanted to do whatever I could to assist her.

5    **Q.**   As of this point in time, did you have any personal

6    opinion as to whether or not what Dr. Menninger claimed here

7    was true or not?

8    **A.**   No.

9    **Q.**   Well, you see her message there starts, "See attached."

10   Do you see that?

11   **A.**   Yes.

12   **Q.**   And if we go and look at the attachment, you see here

13   this is -- this is an email chain regarding the one-to-one

14   follow-up and goals; is that right?

15   **A.**   Yes.

16   **Q.**   Okay.  And looking here at these -- the second page of

17   the attachment, so page 7 of the exhibit, in the bottom

18   right-hand corner, it has the Bates 867.  This chain included

19   an email that Mr. Mekerri had sent to Dr. Menninger, right?

20   **A.**   Yes.

21   **Q.**   And that was -- that was an email that you had -- you had

22   signed off on, correct?

23   **A.**   I believe I had awareness of.  I don't know if I signed

24   off on it.

25   **Q.**   You're not sure if you had an opportunity to provide

```
 1    comment?

 2    A.  Perhaps.

 3    Q.  Is this the same email that Lisa -- that you had

 4    forwarded to Mr. Mekerri telling him that it came from Lisa

 5    Noecker?

 6    A.  Yes.  Yes, it is.

 7    Q.  So when you got this email, going back to the first page,

 8    you've got -- you've got a complaint here from Dr. Menninger

 9    in this email on the first page, right?

10    A.  Yes.

11    Q.  Okay.  You understood that she was attaching that email

12    chain because it related to her complaint, right?

13    A.  Yes.

14    Q.  And it included an email that you had told Mr. Mekerri to

15    send, yes?

16    A.  Hacene and Chad worked on the email.  I helped move it

17    along when Chad was on vacation.

18    Q.  And you were the one ultimately who told Mr. Mekerri to

19    send it, yes?

20    A.  I'm not sure if it was myself or Chad.  I believe it was

21    Chad.  Chad sent it.  Chad sent to it Hacene.

22    Q.  After receiving this April 27, 2018, you decided to

23    conduct an investigation; is that right?

24    A.  Yes.

25    Q.  Okay.  Now, to be clear, there were other people within
```

1    human resources who could have done this investigation,

2    right?

3    **A.**  Yes.

4    **Q.**  Okay.  But the decision was made that it was going to be

5    you?

6    **A.**  Correct.

7    **Q.**  Okay.  And in conducting your investigation, you didn't

8    actually interview any of Mr. Mekerri's other direct reports,

9    did you?

10   **A.**  Again, conducting an investigation -- really wanting to

11   look at the concerns that the employee has.

12   **Q.**  Okay.

13   **A.**  In those concerns, if it was important to talk with other

14   members to gain perspective, to find more information about

15   those particular situations, I would have.  But there's also

16   a confidentiality piece where you want to make sure you're

17   not talking with all sorts of people across the organization

18   who don't have direct knowledge of that situation to ensure

19   confidentiality for the individual.

20   **Q.**  So that's a no, you did not speak to any of --

21   **A.**  In the investigation, there was no reason to talk with

22   others based on the issues that Dr. Menninger had raised.

23   **Q.**  So that's a no, you didn't speak to any of these other

24   direct reports?

25   **A.**  No, I did not.

1  **Q.** Did you understand that oversight of the Global Central
2  Labs was a shared responsibility amongst different
3  departments?
4  **A.** Say that again.
5  **Q.** Did you understand that oversight of the Global Central
6  Labs was a shared responsibility by various different
7  departments?
8  **A.** Yes.
9  **Q.** Okay. And you understood that part of Dr. Menninger's
10 complaint was that she was being blamed for errors happening
11 within the lab, right?
12 **A.** Yes.
13 **Q.** Okay. And in your investigation, you saw that, indeed,
14 Mr. Mekerri, was blaming Dr. Menninger for errors happening
15 in the lab, right?
16 **A.** Mr. Mekerri were pointing out that there were errors
17 increasing in the lab, and that Dr. Menninger, as the leader
18 of the lab, ultimately had held accountable to the quality
19 output of the lab, not blaming her, but holding her
20 accountable to ensure that quality is enhanced.
21 **Q.** What's the different between blaming a person and holding
22 them accountable?
23 **A.** Blaming an individual would be punitive. Holding someone
24 accountable would be saying, "Please put together a proposal
25 to enhance quality across this organization."

1   **Q.**  Did Mr. Mekerri ever say that?

2   **A.**  He adjusted the 2018 goal around quality in order to

3   raise the level of quality across the laboratory.

4   **Q.**  Not my question.  Did he say to Dr. Menninger,

5   "Dr. Menninger, could you please work on a plan to improve

6   quality?"

7   **A.**  I'm not sure what Mr. Mekerri said to Dr. Menninger.

8   **Q.**  You didn't find it out in your investigation?

9   **A.**  I investigated the level of quality errors occurring

10  within the lab.  Mr. Mekerri was holding all of his leaders

11  accountable to a higher level of quality.

12  **Q.**  Well, that's what Mr. Mekerri told you, right?

13  **A.**  As did our quality assurance executive director.

14  **Q.**  Who is not a member of Mr. Mekerri's team, right?

15  **A.**  He didn't need to be a member of team.  He's the quality

16  leader for that laboratory.

17  **Q.**  Right.  But Mr. Mekerri, he wasn't -- he wasn't holding

18  him accountable for it, right?

19  **A.**  Well, the nature of his job, he's held accountable to

20  high quality.

21  **Q.**  Not by Mr. Mekerri, right?

22  **A.**  By his boss, but right, no.

23  **Q.**  Who is not Mr. Mekerri, right?

24  **A.**  Correct.

25  **Q.**  Mr. Mekerri is responsible for holding his own direct

1  reports accountable, right?

2  **A.**  Yes.

3  **Q.**  And besides speaking to Mr. Mekerri, you did nothing to

4  determine whether or not the way he was treating

5  Dr. Menninger was similar to how he was treating his other

6  direct reports, did you?

7  **A.**  Mr. Mekerri was treating all of his leaders the same in

8  terms of the quality expectation of that operation.  There

9  were quality issues that were escalating in the

10  laboratory-based business.

11  **Q.**  Could you answer my question, please?

12  **A.**  Please ask the question again.

13  **Q.**  You didn't do anything besides talk to Mr. Mekerri to

14  determine whether or not he was treating his other direct

15  reports the same way he was treating Dr. Menninger?

16  **A.**  I talked to the quality assurance director, executive

17  director, Brent McKinnon.

18  **Q.**  Was Brent McKinnon involved in Mr. Mekerri's one-on-ones

19  with his direct reports?

20  **A.**  Brent McKinnon was involved in leadership team meetings

21  where Mr. Mekerri set the expectation to the entire

22  leadership team, of which Dr. Menninger and her colleagues

23  were all there.  The expectation from Mr. Mekerri was we are

24  going to raise the level of quality across this organization.

25          Brent was a partner with Mr. Mekerri in saying,

1    "Here's what I see from a quality perspective."  He provided

2    metrics and data that said quality across the lab needs to

3    improve, across all of central lab needs to improve.

4    Q.   That wasn't my question, though.  My question is whether

5    or not he had any information concerning what was conveyed in

6    Mr. Mekerri's one-to-ones with his other direct reports.  And

7    he didn't have that information, right?

8    A.   I don't -- Brent and Hacene could have talked about that.

9    I -- no, I did not ask that question, but it doesn't mean

10   they didn't talk about it.

11   Q.   Okay.  And in your role, you hadn't seen any email

12   communications where Mr. Mekerri was treating his other

13   direct reports the way he was treating Dr. Menninger in April

14   and May of 2018, had you?

15   A.   There were emails sent to the entire team, again, raising

16   the level of quality.

17   Q.   That wasn't quite my question, though.  And let me -- let

18   me ask an even better one.

19          So we've looked at email correspondence where you

20   were this go-between in terms of emails between Dr. Menninger

21   and Mr. Mekerri, right?

22   A.   Yes.

23   Q.   Some of those concerned addressing lab issues, right?

24   A.   Yes.

25   Q.   Okay.  Some of those concerned changing goals, right?

```
 1   A.   Yes.

 2   Q.   Were you getting those same email communications

 3   concerning Mr. Mekerri's other direct reports?

 4   A.   No.

 5   Q.   Were you aware of Mr. Mekerri provided his other direct

 6   reports any, in your words, "tough feedback"?

 7   A.   There was tough feedback.  There were discussions around

 8   the state of the business.  In 2018, the business was in

 9   growth mode, and there was a level of expectation for all the

10   leaders to do whatever it took to sell our business, to work

11   with clients, to reinforce the quality output of our -- of

12   our organization to routine customers for repeat business.

13   There was just a level of expectation that was raised with

14   everybody.

15   Q.   I asked about tough feedback?

16   A.   It could be tough feedback, yes.

17   Q.   Were you made aware of specific instances where

18   Mr. Mekerri was providing tough feedback to his other direct

19   reports the way he was doing it to Dr. Menninger?

20   A.   The business development team was getting tough feedback

21   about their commercial strategy.

22   Q.   We're not talking about business development.  We're

23   talking about Hacene Mekerri.

24   A.   Hacene Mekerri was giving tough feedback to our business

25   development team about the strategy of selling our business
```

```
 1    for 2018.

 2    Q.  Right.  But was he -- are you aware of any instances of

 3    him providing tough feedback to his other direct reports

 4    concerning these lab issues the way he was doing it to

 5    Dr. Menninger?

 6    A.  Well, the lab issues fall under Dr. Menninger, so giving

 7    tough feedback to other leaders around lab issues wouldn't be

 8    appropriate.

 9    Q.  Well, some of these other leaders, they were in charge of

10    other areas where these lab issues were occurring, right?

11    A.  The lab issues occur in the lab.

12    Q.  Yes.  And Mr. Mekerri's other direct reports also had

13    responsibility for lab oversight, right?

14    A.  You asked earlier -- there's project management.  There

15    are data management.  There are other functions that -- that

16    are not laboratory-based functions.  Those are the -- those

17    are the colleagues to Dr. Menninger.  She's the lab leader.

18    Q.  Some of those functions were where these problems were

19    occurring, right?

20    A.  No.  They were occurring within the laboratory.

21    Q.  Some were IT issues?

22    A.  Is that a question?

23    Q.  Yeah.

24    A.  There were IT components that impacted the laboratory

25    testing, yes.
```

1  **Q.**  Great.  Some were project management issues?

2  **A.**  The data provided, again, accountability for all the

3  departments to focus on quality.  The biggest area of impact

4  was lab, wasn't project management, it wasn't IT, it wasn't

5  data management.  It was the laboratory-based businesses.

6  **Q.**  My question was where the problems were coming from.

7  Some of the problems were coming from project management,

8  yes?

9  **A.**  Problems were occurring across the board, yes.

10  **Q.**  Okay.  And in a lab like this, problems happen all the

11  time, right?

12  **A.**  I'm not a laboratory-based person.  I --

13  **Q.**  Okay.  But you would agree with me that problems like

14  this, it would be impossible to eliminate them, right?

15  **A.**  In our industry, the only thing -- we don't manufacture

16  anything.  The only thing we have at the end of the day is

17  data, which makes our people our number one asset to our

18  organization.

19       If we don't have quality in everything we do and

20  integrity in how we do the testings and create that data, we

21  are not a successful business.  So quality has got to be top

22  of mind in every function across our business.

23       And Mr. Mekerri was attempting to raise that level

24  of quality to sell more, to strengthen our business in 2018,

25  to ensure that we could, you know, take care of our

```
 1    employees.  Everyone was held accountable to that same

 2    expectation.

 3    Q.  Ms. Ballweg, eliminating lab errors is impossible, isn't

 4    it?

 5    A.  To have zero errors when there's human interaction,

 6    likely, is very difficult, yes.

 7    Q.  Not very difficult, Ms. Ballweg.  It's impossible, right?

 8    A.  I'm not a scientific person.  I -- I assume some day

 9    there will be automation.  There will be ways to reduce human

10    error.  But, again, to strive to minimize that, to strive for

11    zero, yes, it's what we should all do in our industry.

12    Q.  Do you recall being deposed in this matter?

13    A.  It was a long day, many years ago, but yes.

14    Q.  Okay.  And you recall testifying at your deposition that

15    you recognize that eliminating all lab errors was impossible?

16    A.  Again, long day, lots of testimony.  Could -- or lots of

17    questions.  Do you mind --

18              THE COURT:  You asked if she recalls whether she

19    said that?

20              MR. HANNON:  Correct.

21              THE COURT:  That's all, whether you recall whether

22    you said that.

23              THE WITNESS:  I don't.

24              MR. HANNON:  Okay.

25
```

1  BY MR. HANNON:

2  **Q.**  You understood that Mr. Mekerri was telling Dr. Menninger

3  that his expectation for her was to prevent future lab

4  errors; is that right?

5  **A.**  To minimize errors, to enhance the quality of the lab,

6  yes.

7  **Q.**  Okay.  Did she communicate to you what she told us this

8  week that he was telling her that she needed to eliminate all

9  errors?

10  **A.**  What she communicated to me was that she was being held

11  accountable more so than anybody else around quality.  And

12  she was treated differently due to the -- Gedeon Richter and

13  the other quality issues that occurred in 2017.

14  **Q.**  Okay.  Let me ask you a bit of a slightly different

15  version of this question.  Would you agree with me that it

16  would have been inappropriate for Mr. Mekerri to tell

17  Dr. Menninger that his expectation going forward would be no

18  more lab errors?

19  **A.**  I don't think it would be inappropriate.  When we set

20  goals, we set stretch goals.  We don't always strive for

21  better.  Again, at the end of the day, all we have is our

22  quality and our data.  If we don't strive for perfection,

23  then we can't look our clients in the eye and say, "We've

24  done the best for you that we possibly can."

25  **Q.**  Are you familiar with the SMART acronym?

```
 1    A.   Yes.

 2    Q.   And tell us what that stands for.

 3    A.   SMART acronyms are goals.  They're specific, they're

 4    measurable, achievable, relevant, and time based.

 5    Q.   And back in 2018 when -- this time period we're talking

 6    about, was it PPD's policy to use SMART goals?

 7    A.   It wasn't a policy.  It was more of a practice.

 8    Q.   And the third one you mentioned, the A, what was that

 9    again?

10    A.   Accountable?

11    Q.   Achievable?

12    A.   Achievable.  Sorry.

13    Q.   Meaning it's something that you can actually do, right?

14    A.   Yes.

15    Q.   Okay.  In the course of your investigation, you weren't

16    working alone, were you?

17    A.   When you say "alone," no, I conducted the investigation

18    myself.

19    Q.   Lisa Noecker, she was also involved, yes?

20    A.   No, she was not.

21              (Pause in proceedings.)

22              THE COURT:  Next question, Mr. Hannon?

23              MR. HANNON:  One moment just to find this document.

24    Apologies.

25
```

1   BY MR. HANNON:

2   **Q.** Let's start here, Ms. Ballweg. Part of your

3   investigation included interviewing Mr. Mekerri; is that

4   right?

5   **A.** Yes.

6   **Q.** And one of the subjects that you interviewed him

7   concerning was that February 28, 2018 meeting with

8   Dr. Menninger, correct?

9   **A.** Yes.

10  **Q.** And you understood during the course of your

11  investigation that one of the issues that you were

12  investigating was -- was what occurred at that meeting,

13  right?

14  **A.** Yes.

15  **Q.** And Mr. Mekerri, in your interview, he denied the account

16  by Dr. Menninger; is that right?

17  **A.** He didn't recall the exchange, but recalled the topic

18  being raised by Chad.

19  **Q.** Did you ask him whether or not part of the goal of that

20  will meeting was to gently work Dr. Menninger out?

21  **A.** No.

22  **Q.** Would that have been material to your investigation if

23  you had learned in that meeting that Mr. Hacene and

24  Mr. St. John were trying to gently work Dr. Menninger out?

25  **A.** At the time, it was, again, interactive discussion with

```
 1    Dr. Menninger.  It was -- we didn't understood what her
 2    accommodation requests were.
 3              THE COURT:  I think he's just asking how it would
 4    matter to the investigation.
 5              Is that the question?
 6              MR. HANNON:  Yes, Your Honor.
 7              THE WITNESS:  I'm sorry; how -- what?
 8              THE COURT:  Whether that fact would have mattered,
 9    been material, I think was his question, to the
10    investigation.
11              THE WITNESS:  If Mr. Mekerri was trying to work
12    Dr. Menninger out of the organization, was the question, if
13    it was material?
14    BY MR. HANNON:
15    Q.  If he admitted to that when you interviewed him as part
16    of your investigation, would that have been a material fact?
17    A.  It would have been, yes.
18    Q.  Why?
19    A.  Because that would have been an unfair treatment to
20    Dr. Menninger.
21    Q.  If Mr. -- and you also interviewed Mr. St. John as part
22    of your investigation, right?
23    A.  That's correct.
24    Q.  And if Mr. St. John in the course of your investigation
25    admitted to you that part of the purpose of that
```

1    February 28th meeting with Dr. Menninger was pursuit of an

2    exit strategy, that would have been material to your

3    investigation, right?

4    **A.**   When I talked to Chad, the information that he shared

5    was -- again, it was a confusing time.  We didn't know what

6    Dr. Menninger was asking for.  In the discussion on

7    March 28th, it was an escalation of Lisa asking, "What if I

8    can't do my job?  What if I can't do my job?"

9            The premise of that meeting was to have this

10   interactive dialogue.  It was in no way a means to eliminate

11   her job or move her out of the organization.

12   **Q.**   To be fair, Ms. Ballweg, that's what you were

13   investigating, whether or not the purpose of the meeting was

14   to move her out of the organization, right?

15   **A.**   Was unfair treatment by her manager.

16   **Q.**   Well, not just her manager, but also human resources,

17   right?

18   **A.**   Her manager.

19   **Q.**   Okay.  So you didn't care whether or not Mr. St. John had

20   done anything wrong?

21   **A.**   Of course.  And, again, the investigation -- we're doing

22   our best for Dr. Menninger to say these are the situations

23   she brought forward.  Does the -- does the information show

24   that she's been treated differently because of her

25   disability?

1    **Q.**  So back to the question I asked a few minutes ago.  If,

2    in your interview of Mr. St. John, he had told you that, yes,

3    part of what we were trying to do in that February 28th

4    meeting was -- was an exit strategy for Dr. Menninger, would

5    that have been material to your investigation?

6    **A.**  Yes.

7    **Q.**  Why?

8    **A.**  Because at that point, we were working with Dr. Menninger

9    on how can we accommodate her, accommodate her in her job.

10   **Q.**  Okay.  Now, at some point in time, you wrote up a report

11   of your investigation in this matter, right?

12   **A.**  Yes.

13   **Q.**  And when you wrote up that report, you didn't make any

14   mention of the fact that you were aware that, on March 1st --

15   or, rather, subsequent to the 2/28 meeting -- Mr. St. John

16   was asking for an exit strategy, did you?

17   **A.**  That was a couple-part question.  Could you ask that

18   again, please?

19   **Q.**  Yeah, let me ask a slightly better one.

20           We saw earlier in that package that Mr. St. John

21   had put together for Lisa Noecker, he had requested there a

22   exit strategy for Dr. Menninger, right?

23   **A.**  Yes.

24   **Q.**  You didn't make any mention of that in your report,

25   right?

1   **A.**   No.

2   **Q.**   Okay.  We also saw earlier that, on the same day that

3   that meeting happened on February 28th, you'd gotten that

4   email from Mr. St. John about the -- about the licensure

5   grid, right?

6   **A.**   Yes.

7   **Q.**   And we saw in that email that you got that day, he had

8   made reference to gently working Lisa out, right?

9   **A.**   Again, context, but that's what it said.

10  **Q.**   Okay.  You didn't -- you didn't put that in your written

11  report of your investigation, did you?

12  **A.**   No.

13  **Q.**   I'm now going to show you Joint Exhibit Number 74.  And

14  I'm going to start here on the second page.  And so this is

15  an email from you to Chad St. John on May 22, 2018, yes?

16  **A.**   Yes.

17  **Q.**   And you're advising him that you're giving Dr. Menninger

18  feedback on the outcome of your investigation, right?

19  **A.**   Correct.

20  **Q.**   Turn to the first -- next page.  It says, "Good luck,

21  Deb."  Do you see that?

22  **A.**   Yes.

23  **Q.**   And then that's your response right there that's

24  highlighted, correct?

25  **A.**   Yes.

1    **Q.**   What would you call that emoji?

2    **A.**   Surprise?

3    **Q.**   Prior to PP- -- sorry, prior to Thermo Fisher's

4    acquisition of PPD, did you have any stock options?

5    **A.**   Yes.

6    **Q.**   And when -- let me ask a slightly different question I

7    meant to ask first.  Prior to PPD going public, did you have

8    stock options?

9    **A.**   Yes.

10   **Q.**   Okay.  And were those -- did you receive money in

11   exchange for those options when PPD went public?

12   **A.**   I did, yes.

13   **Q.**   How many options did you have?

14   **A.**   I'm not sure exactly the number.

15   **Q.**   More than 10,000?

16   **A.**   It's -- there were some part of PPD and then some were

17   the -- when we were private -- or publicly traded and some I

18   converted to Thermo Fisher.  So prior to that, it wasn't

19   10,000.  It was probably maybe 7,000.

20   **Q.**   Do you recall how much you received for each of those

21   options?  I just mean individual option, not the whole batch.

22          THE COURT:  Yes?

23          MS. MANDEL:  Objection, Your Honor.  We may require

24   a very brief sidebar.

25          THE COURT:  How much more do you have of this

```
 1   witness?
 2           MR. HANNON:  Probably another maybe 10 minutes, but
 3   might be 15 or 20.
 4           THE COURT:  Why don't you move on to a different
 5   topic, and then we talk about it without the jury, and then
 6   you can circle back depending on what happens.
 7           MR. HANNON:  Yep.
 8   BY MR. HANNON:
 9   Q.  So you've -- I want to talk a little bit about PPD's
10   policy regarding disabilities.  So in 2018, PPD, it had a
11   policy regarding accommodations; is that right?
12   A.  Practice more so than policy.
13   Q.  Okay.  Well, in your HR role, you were aware of the legal
14   obligation to provide accommodation; is that right?
15   A.  Yeah.  Yes.
16   Q.  And you had received training over the years concerning
17   what that legal obligation was?
18   A.  More so what our role is in, you know, conducting
19   discussions with our work force, but not the legal basis.
20   Q.  Okay.  Did you understand that, even if an employee could
21   do the essential functions of their job without
22   accommodation, that they might still be entitled to an
23   accommodation nonetheless?
24   A.  So they can do their job, but they need an accommodation?
25   At a -- yeah, we would have conversations with our employees
```

1   about that.  Sure.

2   **Q.**  My question is a little bit sort of more focused.  Were

3   you aware that, even an employee could do the essential

4   functions of their job without an accommodation, that there

5   might be instances where they would still be entitled to an

6   accommodation even though they can do their job without it?

7   **A.**  So I don't think I would be aware, because the situations

8   that we would get involved in from an HR perspective, there

9   would be a need for an accommodation.  "I cannot do this

10  piece of my job.  This is what I need to be accommodated to

11  do my job."  We would have the discussion around is it

12  reasonable, is it not?  So I guess perhaps I wasn't -- I

13  didn't come across a situation where that existed.

14  **Q.**  Okay.  Was it -- was it your belief, then, that if an

15  employee made a request for accommodation then that meant

16  they believed they couldn't perform the essential functions

17  of their job?

18  **A.**  It would -- yes.  The individual came forward with, "I

19  can't do my job.  Here's what I need to be accommodated," or

20  "I can't do a piece of my job."

21  **Q.**  So your understanding was, if they came forward and they

22  said, "I can do the essential functions of my job without an

23  accommodation," then they simply weren't entitled to one?

24  **A.**  No, I'm not saying that.  I'm just saying in the

25  situations that I've been involved in, the reasons we have

    1    conversations with our employees and help them through it is

    2    they come forward saying, "I have -- I have a disability.  I

    3    have a need to be accommodated.  This is what I need from an

    4    accommodation perspective based on what the duties are for my

    5    job."

    6           I'm unclear why someone would come forward and say,

    7    "I can do my job, and I don't need an accommodation," but

    8    then they do need an accommodation?  It's confusing.

    9    Q.  Well, there might be people who can do the essential

   10    functions of their job without accommodation --

   11           THE COURT:  I think at this point it should be

   12    focused to this case.

   13           MR. HANNON:  Sure enough.

   14    BY MR. HANNON:

   15    Q.  Did you appreciate that, even though Dr. Menninger said

   16    she could do the essential functions of her job without --

   17    without an accommodation, that if there was a reasonable

   18    accommodation available that would make it easier for her to

   19    do her job without suffering as severe consequences from her

   20    disability, that PPD had an obligation to provide it?

   21    A.  Was I aware?  No.  Would we have entertained that?

   22    Absolutely.

   23    Q.  You mentioned a few moments ago that when you conducted

   24    your investigation, that one concern you had was

   25    confidentiality; is that right?

1    **A.**   Yes.

2    **Q.**   And you understood that, when dealing with a request for

3    accommodation, that it was important to maintain

4    confidentiality; is that right?

5    **A.**   Yes.

6    **Q.**   And can you tell the jury why you -- why you thought that

7    was important?

8    **A.**   Certainly sharing individuals' health concerns is

9    something we wouldn't want to disclose to just anyone.  It's

10   a private matter.  We want to make sure that there's

11   confidentiality around that and the comfort of people sharing

12   with HR or their managers in working through that disability

13   or the needs they have to perform their job.

14   **Q.**   And did I hear you right that that was part of the reason

15   why you had not interviewed Mr. Mekerri's other direct

16   reports?

17   **A.**   Again, this -- the information that Dr. Menninger

18   provided me that said, "This is why feel I'm being unfairly

19   treated," had it pointed to me having discussions with

20   others, I would have investigated that.  But the situations

21   that she brought forward didn't require that, so I did not

22   speak with other colleagues of Dr. Menninger.

23   **Q.**   And was part of your reluctance to do so confidentiality?

24   **A.**   Right.  I wouldn't want to share with people who really

25   didn't have to -- or had no knowledge of that information,

1    yes.

2    **Q.**  I'm going to show you Joint Exhibit 174.  Who is Chris

3    Clendening?

4    **A.**  In 2018, I believe he was the executive director of the

5    project management team for the Global Central Labs.

6    **Q.**  He was Dr. Menninger's peer, right?

7    **A.**  Correct.

8    **Q.**  Okay.  And did you see here that Mr. St. John is

9    forwarding -- and I'll show you the document he forwards --

10   documentation provided by Dr. Menninger concerning her

11   request for accommodation?

12   **A.**  Yes.

13   **Q.**  Okay.  Were you aware that Mr. St. John had shared that

14   with Mr. Clendening?

15   **A.**  I don't believe I was aware.

16   **Q.**  Okay.  Are you aware of any legitimate reason for

17   Mr. St. John to share that information with Mr. Clendening?

18   **A.**  There would have been a compelling reason for Chad to

19   share something confidential, so I'm assuming there is one,

20   but I'm not sure what it is.

21   **Q.**  Mr. St. John never -- never shared with you that he had

22   some compelling need to share that with Mr. Clendening?

23   **A.**  If he did, I just don't recall.

24   **Q.**  You knew that it would be unlawful to discriminate

25   against Dr. Menninger based upon her disability; is that

1   right?

2   **A.**  Unlawful to discriminate based on her disability?  Yes.

3   **Q.**  You knew that it would be unlawful to retaliate against

4   Dr. Menninger for requesting an accommodation?

5   **A.**  Yes.

6   **Q.**  You knew that part of PPD's obligations in responding to

7   Dr. Menninger's request for an accommodation was -- included

8   answering questions that she had about -- about her role?

9   **A.**  There's an interactive dialogue between the employee and

10  the employer that includes her physician, so it would have

11  been a combination of all of that.

12  **Q.**  And you knew that if that back-and-forth included

13  questions that the employee had about their role, that

14  answering those questions would be part of the interactive

15  dialogue, yes?

16  **A.**  Again, the employee knows their job best.  I think it's

17  reasonable for the employee to say, "These are my tasks.

18  This is what I need to be accommodated."

19  **Q.**  My question is a little bit different, though.  But if

20  the employee comes back and asks questions, you understood

21  there was a legal obligation on the part of PPD to answer

22  them, yes?

23  **A.**  I don't believe I knew there was legal obligation to

24  answer those questions.

25  **Q.**  I think I heard your testify earlier today that you

```
 1    didn't think that Dr. Menninger specified what she was

 2    requesting in terms of accommodations; is that right?

 3    A.  Yes.

 4    Q.  Okay.  Staying on this exhibit here we have on the

 5    screen, you -- you've seen -- I believe the third page here.

 6    You've seen this document before, right?

 7    A.  Yes.

 8    Q.  Okay.  And, in fact, this was something that Mr. St. John

 9    had forwarded to you contemporaneously, right?

10    A.  Yes.

11    Q.  Okay.  And you saw that there were, indeed,

12    accommodations proposed here by Dr. Menninger's doctor, yes?

13    A.  Yes.

14    Q.  Okay.  But you -- you weren't involved in the actual task

15    of determining whether or not any of these accommodations

16    were reasonable, were you?

17    A.  No.

18    Q.  There's been some testimony in this trial about the fact

19    that Dr. Menninger at some point in time began working

20    remotely.  Are you familiar with that fact, that she worked

21    remotely?

22    A.  Yes.

23    Q.  And, in fact, you'd been involved in the process by which

24    it was -- she was given permission to work remotely, right?

25    A.  No.  It was not -- it was not -- within my role or scope
```

1    to approve that.

2    **Q.** Would you agree with me, ma'am, that if Mr. Mekerri was

3    concerned that Dr. Menninger's remote work status was causing

4    problems, that he could have revoked it?

5    **A.** That's how we coach our leaders, yes.

6              THE COURT: I'm going to stop you here, Mr. Hannon.

7              So, ladies and gentlemen of the jury, I want to

8    update you on the schedule.

9              Two things: One, I told you we were going to sit

10   Monday afternoon. We are going to do that. We're a little

11   bit behind schedule and I apologize for that. And it's -- to

12   get the case to you by Friday, which is what we are going to

13   do, it's going to require one more afternoon. And so we're

14   going to do -- not only the Monday afternoon I told you

15   about, but we'll do Tuesday afternoon, too. That will be the

16   only other afternoon that we are going to do. So tomorrow

17   will be 9:00 to 1:00. Monday and Tuesday will be 9:00 to

18   1:00 and 2:00 to 4:00 each of those two days. Wednesday and

19   Thursday will be 9:00 to 1:00. Friday you'll get the case.

20   You should anticipate staying all day Friday.

21             So that's the update on the schedule. There won't

22   be any other changes absent a blizzard or other acts of

23   nature beyond our control. So that's what the schedule is.

24             Don't -- one of you had a minor question about

25   something about the schedule outside work and Ms. Belmont has

1    an answer and will tell you.

2           If -- don't discuss the case among yourselves.

3    Don't discuss it with anyone else.  Don't do any independent

4    research.  Keep an open mind.  You haven't heard all the

5    evidence.  Thank you very much for your attention.

6           All rise for the jury.

7           (Jury not present.)

8           THE COURT:  Ms. Ballweg, you can stay there or step

9    down as you prefer.  I'm going to have a little discussion

10   with the lawyers.

11          First, just with respect to the schedule, I think

12   what all of you should think about, I'm really -- expect we

13   have to get it to the jury on Friday.  So I'm prepared to

14   continue to defer to all of you, the two of you, about all of

15   that; but I'm also, you know -- it occurs -- I could set time

16   limits.  I don't like doing that because you're both good

17   lawyers and I would prefer to leave it to all of you to work

18   out.  But I also think you have to be mindful of efficiently

19   proceeding and -- so that we can get it to the jury, which

20   means mapping out the time.

21          And one -- two little things, just observations,

22   not -- I don't mean -- you have a very hard job, both of you.

23   And I don't mean this in any way and I don't want you to take

24   it as a criticism.

25          You can be seated if you want, I'm sorry.

1    One is that, like, there's a certain amount of --

2    understandably and necessarily -- preliminarily foundation,

3    this email, someone got it, this or that.  But to the -- one,

4    try to dispense with that whenever it's really not necessary,

5    especially now, because the jury has -- this isn't the first

6    time a lot of these things are being shown to the jury.  So

7    you can speed through it.

8    They -- they now know who, like, Lisa N. is or, you

9    know, some of these things.  You don't -- they get that.  You

10   can skip, I think, those questions, and cover things once.

11   You don't need to sort of when you come to -- when there's a

12   related question about it, a different question, about

13   something you've already covered, you don't need to relay all

14   the foundation in the examination.

15   The other part you might think about, Ms. Mandel,

16   is just, with the computer stuff, I understand it's hard.

17   And -- but in each delay, in and of itself, is no big deal,

18   but what happens is the accumulation of them like -- I don't

19   know, sometimes it's the software.  Sometimes it's the

20   computer.  Sometimes it's -- I'm not going to sit here and

21   tell you that we have the latest and greatest system in the

22   world.  We have -- you know -- we are not Microsoft or

23   Google.

24   And -- but to the extent, you know, you can

25   eliminate those kinds of things, those 15 seconds multiplied

1    throughout a morning can add up to a lot of time, and I know

2    it's hard.  So I'm not criticizing you and I'm not

3    criticizing your assistant.  I know it's difficult.

4            But if you can, that also makes a big difference

5    and I'll tell you, one, it may -- it cuts out a lot of time.

6    It makes it more efficient.

7            The other is, in my experience, one thing I do is

8    talk to jurors after trials, not about the decision, but just

9    about if they have suggestions for that Court for us to do a

10   better job, if they have suggestions for the lawyers to do a

11   better job -- not different cases, but -- or different

12   evidence, but just the craft of lawyering, because I know

13   that there's less and less opportunities to try cases.

14           But one thing they bring up pretty much on their

15   own is they like things to go really fast, boom, boom, boom.

16   They like it to go boom, boom, boom with the technology.

17   Like, the exhibits pop up.  They like it to go boom, boom,

18   boom with the questions for, you know, both of you.  That's

19   just what they like.

20           They are -- it's not always -- I'm not saying that

21   expectation, which they have, is always realistic or one that

22   can be matched in -- and I'm not saying that -- but I am

23   saying for both of you to think about that, because that's

24   where, in my experience -- I don't have any information with

25   this jury -- but that's my experience from just about every

1    jury I've ever talked to.

2           And that too, like, can help sometimes just in

3    terms of getting to closing argument by next Friday, which is

4    what I want to do.  I don't mind if we get there earlier, but

5    I'm perfectly fine if we don't get there till Friday.

6           That leaves the issue you raised, your objection.

7    Are you going back to that or not?  Mr. Hannon?

8           MR. HANNON:  I'm sorry.  Yes.

9           THE COURT:  Yes.  Okay.  So what's the objection?

10          MS. MANDEL:  Your Honor, in the pretrial conference

11   last week, one of the motions in limine that we addressed

12   dealt with compensation information belonging to --

13          THE COURT:  Yeah, why is her -- like, the number of

14   options -- I mean, you didn't object at the time, but why is

15   the number of options she has -- you kind of circled away

16   from it when you said don't tell me how much you got total,

17   but why is her number of options relevant at all?

18          MR. HANNON:  There would be a few reasons.  So with

19   respect to the ones issued since the acquisition we talked

20   about last week, that would be one area where compensation of

21   some of these individuals might matter to the extent that

22   there's a question of kind of what's comparable.

23          THE COURT:  Well, but she's in HR.  She's got a

24   totally -- I guess my question to you would be this.  Right

25   now, I see that her salary, her options, her benefits, other

1    than the medical benefits, if you want to get into that,

2    because I would draw the inference that the medical benefits

3    made available at PPD were made available pretty similarly to

4    at least all management level employees in both management.

5          But the comp -- I have no idea whether Ms. Ballweg

6    is making ten X of what Dr. Menninger was making or one tenth

7    or anywhere in between, and I wouldn't expect there to be a

8    lot of correlations.  Same with stock options benefits.

9    Those kinds of things.  So it's like I don't see the

10   relevance.

11         MR. HANNON:  I'll save it for next week with a

12   better witness.

13         THE COURT:  Fine.  All right.  So that resolves

14   that.

15         MS. MANDEL:  And we may renew the objection.

16         THE COURT:  Renew -- and I guess the, like, first

17   thing I just ask, for the actual compensation that -- there

18   has to be some relevance and foundation that they could draw

19   an inference.

20         To me, I think the draw an inference from

21   Ms. Ballweg is making as to what Dr. Menninger was making is

22   beyond the scope of the jury.  It's not a reasonable

23   inference.

24         MR. HANNON:  Understood.

25         THE COURT:  Okay.  If you had a basis to draw the

```
1    inference, then we could talk about anything else, because
2    I'm not sure if that resolves it for you.
3              MS. MANDEL:  Your Honor --
4              THE COURT:  You can go right now.
5              MS. MANDEL:  The witnesses who are going to be here
6    next week, there's not someone who currently holds the
7    position that Dr. Menninger used to hold, even if we could
8    somehow establish those dots in time to show that this is
9    where Dr. Menninger would have been in, say, 2020, 2021,
10   2022, right.  Even if we could draw those inferences, and I
11   do maintain it would all be speculative, we're not going to
12   have a witness here who is exactly in the position that
13   Dr. Menninger --
14             THE COURT:  Here's what I suggest you do.  When you
15   think there's a witness who is coming who you think you are
16   going to be able the lay foundation for --
17             MR. HANNON:  Yeah.
18             THE COURT:  -- to draw that inference in which case
19   you want to ask the questions, let's meet at 8:30 that day or
20   give me a heads-up the day before, the day before the witness
21   is going to testify, so we can talk about it.  We can talk
22   about it and we can flesh out -- it may be that you get to
23   ask some foundation questions, and we'll see, but we'll have
24   an idea.
25             MR. HANNON:  I would -- I would suggest it's
```

```
 1    just -- just give me a shot to lay the foundation and I can

 2    ask the question, if you think I haven't gotten there, I

 3    haven't gotten there, and you'll sustain the objection.

 4         What I don't want to be in the position of is

 5    spotlighting my sort of strategy in terms of, you know, who

 6    I'm narrowing in on and exactly how I plan to sort of

 7    establish it, which then kind of gives the witness the

 8    advanced notice of --

 9         THE COURT:  I guess -- fair enough.  I guess what I

10    would say is this, I might want to hear from both of you a

11    little more about what kinds of connection might or might not

12    be sufficient even if we're not talking about specific

13    witnesses.

14         Because Ms. Ballweg, I just don't see it all.

15         MR. HANNON:  Understood.

16         THE COURT:  Yeah.  Okay.  Anything else for you,

17    Mr. Hannon?

18         MR. HANNON:  Nothing, Your Honor.

19         THE COURT:  Nothing for you?

20         MS. MANDEL:  No, thank you.

21         THE COURT:  Tomorrow -- so you have about how long

22    with Ms. Ballweg?

23         MR. HANNON:  22 minutes.

24         THE COURT:  Well, we're going to see.  Do you want

25    me to tell the jury 22 minutes?
```

```
 1                  MR. HANNON:  It'll be -- it'll be quick.
 2                  THE COURT:  Okay.
 3                  MR. HANNON:  Bang, bang, bang.
 4                  THE COURT:  And then you'll have how long with
 5      Ms. Ballweg?
 6                  MS. MANDEL:  Somewhere between one and two hours.
 7      It's hard to --
 8                  THE COURT:  So you have -- all right.  That's what
 9      I would expect.  A while.  So when we're done with
10      Ms. Ballweg, who we have tomorrow after that?
11                  MR. HANNON:  We have Tonya Hart, who is
12      Dr. Menninger's sister.
13                  THE COURT:  She's pretty quick?
14                  MR. HANNON:  She is, yes.  She also is from out of
15      town and she's scheduled to fly back on Saturday.
16                  THE COURT:  So I'm -- you're a half hour, I think,
17      with her?
18                  MR. HANNON:  Yes, that's right.  Could we possibly
19      start with her?
20                  THE COURT:  Hold on.
21                  How long do you think you'll be with her?
22                  MS. MANDEL:  I think no longer than a half hour.
23                  THE COURT:  What time's her plane?
24                  MR. HANNON:  On Saturday.
25                  THE COURT:  Oh.  So we will take her for sure --
```

```
 1    I'm prepared to take her out of order to accommodate and make
 2    sure we get her done, be I think we should go further with
 3    Ms. Ballweg, since we both -- like what you're both telling
 4    me is even if we started with her at 12:00 or to be cautious,
 5    you know, after the break, we could start with her after --
 6    something like that, and we would get her done, and then I
 7    think that would be better.
 8              Okay.  But we'll do that.  Either way, we'll have
 9    her done -- we'll -- we'll -- we can -- if we haven't done
10    with Ms. Ballweg at the break, we'll -- let's talk about it.
11    Maybe we'll start with her at 11:30.  Then we'll be done with
12    her and then we can resume.
13              And if we finish both of them, then what?
14              MS. MANDEL:  Then we get gold stars.
15              THE COURT:  Well, I'm prepared to give you verbal
16    gold stars if you do that, absolutely.  But then what
17    witness?
18              MR. HANNON:  Next up is our psychiatry expert,
19    Dr. Summergrad.
20              THE COURT:  Okay.  All right.  Okay.
21              Go ahead.
22              MS. MANDEL:  And I just -- now that we're going to
23    go the full day on Monday --
24              THE COURT:  Monday and Tuesday, that's what I told
25    them, I think.
```

```
 1              MS. MANDEL:  So Dr. Summergrad will otherwise be
 2     pushed to Monday morning, is my understanding.
 3              MR. HANNON:  Most likely.  We have a third-party
 4     witness, Dr. Kessimian, presently slotted for Monday.  So I
 5     need to reach out to her counsel and see if I can
 6     potentially --
 7              THE COURT:  How long is Summergrad?
 8              MR. HANNON:  I'm sorry?
 9              THE COURT:  How long is Summergrad?
10              MR. HANNON:  Probably two hours.
11              THE COURT:  Two hours for you?  He's the -- he's a
12     medical --
13              MR. HANNON:  Yeah.
14              THE COURT:  -- damage expert.
15              MR. HANNON:  One of the -- I mean, he's not the
16     financial expert, but --
17              THE COURT:  No, but I mean medical damage expert,
18     medical -- like, he's testifying to what her -- your client's
19     condition is and what -- his opinions about that?
20              MR. HANNON:  Yeah.
21              THE COURT:  Okay.  Two hours on direct?
22              MR. HANNON:  Yes.  Yep.
23              THE COURT:  Okay.  And -- I see.  And how long is
24     Kessimian?
25              MR. HANNON:  I think very short.  I would say maybe
```

1    half an hour.

2              THE COURT:  And how long are you with those two?

3              MS. MANDEL:  I think with Dr. Summergrad, our

4    estimate is approximately an hour.  And with Dr. Kessimian,

5    probably also an hour.

6              THE COURT:  So we'll finish both of them on Monday.

7    If you were two hours on direct, you're an hour, your -- your

8    three hours of direct, your two ours of cross, that's five

9    hours.  We have six hours, minus the break, so five hours and

10   45 minutes.  So that leaves 45 minutes, given what you've

11   established as your practice for super-focused, crisp

12   cross -- that was like a textbook example of a superb

13   redirect and superb recross.  We might finish both of them on

14   Monday.

15             Okay.  What time do you want to meet tomorrow?

16             MR. HANNON:  I'd like 8:45.

17             THE COURT:  I'm fine with 8:45 as long as you don't

18   think there's big issues.  It didn't sound like you

19   anticipate -- I mean, we've already heard from a lot of

20   Ms. Ballweg.

21             MS. MANDEL:  I think 8:45 is fine with us, as well.

22             THE COURT:  All right.  Fine.  I'll see you then.

23   Have a good night.

24             THE DEPUTY CLERK:  Court's in recess.

25             (Court in recess at 1:14 p.m.)

1    **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4              I, Robert W. Paschal, Registered Merit Reporter and

5    Certified Realtime Reporter, in and for the United States

6    District Court for the District of Massachusetts, do hereby

7    certify that pursuant to Section 753, Title 28, United States

8    Code, the foregoing pages are a true and correct transcript

9    of the stenographically reported proceedings held in the

10   above-entitled matter and that the transcript page format is

11   in conformance with the regulations of the Judicial

12   Conference of the United States.

13

14                        Dated this 23rd day of March, 2023.

15

16

17

18

19                        /s/ Robert W. Paschal
                          _____
20
                          ROBERT W. PASCHAL, RMR, CRR
21                        Official Court Reporter

22

23

24

25



1                       **A P P E A R A N C E S**

2

3    On behalf of the Plaintiff:

4        HARTLEY MICHON ROBB HANNON, LLP
         BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
5        155 Seaport Boulevard
         2nd Floor
6        Boston, Massachusetts  02210
         (617) 723-8000
7        phannon@hmrhlaw.com
         hwatson@hmrhlaw.com

8

9    On behalf of the Defendant:

10       OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
         BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11       One Boston Place
         Suite 3500
12       Boston, Massachusetts  02108
         (617) 994-5700
13       rachel.mandel@ogletreedeakins.com
         patrick.curran@ogletreedeakins.com

14

15

16

17

18

19

20

21

22

23

24

25

1                    **TABLE OF CONTENTS**

2

3                     **TRIAL WITNESSES**

4

5    On behalf of the Government:                    Page

6    DEBORAH BALLWEG

7         By Mr. Hannon                                5

8         By Ms. Mandel                               10

9    TONYA L. HART

10        By Mr. Hannon                              103

11        By Ms. Mandel                              126

12   DEBORAH BALLWEG, Continued

13        By Ms. Mandel                              142

14        By Mr. Hannon                              149

15

16

17                      **EXHIBITS**

18

19                                              Admitted

20   Number 450                                     48

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (In open court.)
 3              THE DEPUTY CLERK:  The United States District Court
 4      for the District of Massachusetts is now in session, the
 5      Honorable Leo T. Sorokin presiding.
 6              THE COURT:  Please be seated.
 7              I see all counsel.
 8              Anything to talk about?
 9              MR. HANNON:  Nothing here.
10              MS. MANDEL:  Nothing here, Your Honor.
11              THE COURT:  Good.  All right.  Then I'll come back
12      at two minutes to 9:00.
13              I forget, who's on the -- oh, Ms. Ballweg is on the
14      witness stand, right?  Just when we come back, just have her
15      take the witness stand, so when we come in, we're ready to
16      go.
17              MS. MANDEL:  Will do.
18              THE COURT:  Great.  All right.  We'll stand in
19      recess.
20              (Court in recess at 8:47 a.m.
21              and reconvened at 8:59 a.m.)
22              THE COURT:  Kellyann, will you go get the jury.
23              I got my stopwatch today, Mr. Hannon; 22 minutes.
24              MR. HANNON:  Judge, you're going to be so
25      impressed.
```

```
 1                THE COURT:  Oh, good.

 2                (The jury enters the courtroom.)

 3                THE COURT:  Good morning, ladies and gentlemen.

 4     Nobody discussed the case with anyone, among yourselves or

 5     anyone else.  No independent research?  Or anything else?

 6     Great.

 7                All right.  We proceed.

 8                I remind you, Ms. Ballweg, you remain under oath.

 9                Mr. Hannon, go ahead.

10                MR. HANNON:  Thank you, Your Honor.

11                          DEBORAH BALLWEG

12        having been previously duly sworn, testified as follows:

13          DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF, Cont.

14     BY MR. HANNON:

15     Q.  Ms. Ballweg, do you know what gaslighting is?

16     A.  No, I don't believe I do.

17     Q.  You've never heard the term before?

18     A.  I've heard the term.  I just don't know what it means.

19     Q.  Did you try to convince Dr. Menninger that you were going

20     to conduct a thorough and impartial investigation with

21     respect to the concerns that she raised?

22     A.  That was my commitment to Dr. Menninger, yes.

23     Q.  And you indicated to her that if there was anything going

24     on in terms of any of this untreatment -- I'm sorry, any of

25     this mistreatment that she alleged, that you were going to
```

```
 1  get to the bottom of it, right?
 2  A.   That I would thoroughly investigate and the findings I
 3  would look into for sure.
 4  Q.   And if it was there, you were going to find it, right?
 5  A.   I would weigh the information that was provided to me in
 6  a fair and unbiased way.
 7  Q.   And you understood that was important to her, right?
 8  A.   That's an important part of the process, yes.
 9  Q.   Well, but specific to Dr. Menninger, you knew that was
10  important, right?
11  A.   Of course.
12  Q.   And part of that was because you knew that she had mental
13  health issues, right?
14  A.   That she had disclosed a disability, correct.
15  Q.   Specifically mental health issues, right?
16  A.   Social anxiety, yes.
17  Q.   Okay.  And you knew she was very anxious about your
18  investigation, right?
19  A.   I'm not sure if she was anxious about the investigation.
20  Q.   Well, she frequently reached out to you to check in on
21  the status of the investigation, right?
22  A.   I believe Dr. Menninger and I had three conversations,
23  one at the onset of the investigation, one follow-up
24  conversation, where I had some questions, and then a third
25  discussion around the findings of the investigation.
```

 1   **Q.**  Okay.  My question is a little bit different.  Did she

 2   frequently contact you to get an update on the investigation?

 3   **A.**  I don't recall.  She may have.  I don't recall.

 4   **Q.**  I'm going to show you Joint Exhibit 242.

 5          So this is an e-mail exchange between yourself and

 6   Dr. Menninger; is that right?

 7   **A.**  That's correct.

 8   **Q.**  Okay.  And I'm just going to start here at the -- the

 9   first message in this chain.  It's the fourth page is blank.

10   We go to the third page.  And so this starts with an e-mail

11   from you to Dr. Menninger, on May 2, 2018; is that right?

12   **A.**  Yes.

13   **Q.**  Okay.  Is this the first time that you reached out to her

14   to let her know that you were going to conduct an

15   investigation?

16   **A.**  Yes.

17   **Q.**  And, in fact, you and Dr. Menninger met on May 2nd,

18   correct?

19   **A.**  I believe we did, yes.

20   **Q.**  Okay.  So Dr. Menninger, she only had a few hours, in

21   terms of prepping to speak with you about your investigation?

22   **A.**  She had the opportunity to tell me if the time wasn't

23   convenient.

24   **Q.**  Yeah, that wasn't my question.

25          Did you just give her a few hours to prep for your

1    conversation?

2    **A.**   I -- I put a time out there.  If it wasn't convenient for

3    Dr. Menninger, she had the right to say it wasn't convenient

4    for her to prep for our discussion.

5    **Q.**   And in looking at the response up, you see here that on

6    May 8th, there's an e-mail from Dr. Menninger to you?  Do you

7    see that there?

8    **A.**   Yes.

9    **Q.**   And she's asking you how long the investigation is going

10    to take?

11    **A.**   Correct.

12    **Q.**   And looking at the next page -- excuse me -- looking now

13    at the second page of the document, there at the bottom, you

14    see Dr. Menninger sends a follow-up e-mail on May 8th, with

15    some additional information; is that right?

16    **A.**   Yes.

17    **Q.**   Okay.  And then you respond back to her the next day,

18    letting her know you still have to speak to some folks,

19    right?

20    **A.**   Correct.

21    **Q.**   And you indicate you're hoping to have a final conclusion

22    for her by Friday?

23    **A.**   Correct.

24    **Q.**   And then you see she follows up, and she thanks you, and

25    asks you if you have any additional questions?

1    **A.**   Yes.

2    **Q.**   And then, looking at the first page here, you say you

3    have some follow-up questions; is that right?

4    **A.**   Yes.

5    **Q.**   Okay.  And then, in fact, on May 15th, you and

6    Dr. Menninger met again; is that right?

7    **A.**   Yes.

8    **Q.**   Okay.  And she answered your questions?

9    **A.**   She did, yes.

10   **Q.**   And then on Friday, May 18th, you see she -- she followed

11   up with you again, asking if there's any update.  Do you see

12   that?

13   **A.**   Yes.

14   **Q.**   And that's what leads to your response on May 18, 2018;

15   is that right?

16   **A.**   Correct.

17   **Q.**   Okay.  So you -- you understood this was very important

18   to Dr. Menninger, right?

19   **A.**   Yes.

20   **Q.**   Okay.

21               MR. HANNON:  That's all I have, Your Honor.

22               THE COURT:  Okay.  Thank you.

23               Any redirect?

24               MS. MANDEL:  Yes, Your Honor.

25               THE COURT:  You don't have to.

| | |
|---|---|
| 1 | **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT** |
| 2 | BY MS. MANDEL: |
| 3 | **Q.** Good morning, Deb. |
| 4 | **A.** Good morning. |
| 5 | **Q.** How are you doing? |
| 6 | **A.** I'm okay. Thanks. |
| 7 | **Q.** Can you tell the jury where you live? |
| 8 | **A.** I live in Hollandale, Wisconsin. |
| 9 | **Q.** And as far as you understand, why is your position based |
| 10 | in Wisconsin? |
| 11 | **A.** I was hired to support one of the labs; it was physically |
| 12 | located in Middleton, Wisconsin. |
| 13 | **Q.** And that's near where you live? |
| 14 | **A.** Correct. |
| 15 | **Q.** Did Chad St. John used to report to you at PPD? |
| 16 | **A.** He did, yes. |
| 17 | **Q.** What years did Chad report to you? |
| 18 | **A.** Chad started in the year 2013 and left in 2019, and he |
| 19 | reported to me for all of that time. |
| 20 | **Q.** Did you and Chad ever work out of the same physical |
| 21 | location? |
| 22 | **A.** No, we did not. |
| 23 | **Q.** As far as you understand, why did you and Chad work in |
| 24 | different physical locations? |
| 25 | **A.** So as HR professionals, we wanted to be able to have |

1    support at the larger sites within our organization, so that

2    we could be available to employees, to appreciate the

3    culture, to be there for coaching and counseling, just really

4    understand what's happening within the local location.

5    **Q.**   Can you explain the structure of HR support for the

6    Highland Heights Central Lab location in particular?  And

7    we're talking about the time period of, let's say, like 2015

8    to 2018.

9    **A.**   So Chad -- based on the site of the organization, Chad

10   was the sole HR practitioner for that site.  He would be

11   responsible for the full service HR support for the employees

12   and the managers at that location.

13   **Q.**   And what role did you play at that time with regard to

14   the Highland Heights Central Lab location?

15   **A.**   Because I sat in Middleton, my role was to support

16   Middleton's responsibilities, employees, and their

17   challenges, work with managers there.  And I had, as Chad

18   reported to me, oversight of that facility, but wouldn't be

19   involved in the day-to-day activities.

20   **Q.**   When did you first meet Dr. Menninger?

21   **A.**   I believe -- she started in 2015.  I would, as part of my

22   role, travel to various locations for leadership team

23   meetings, visiting with my employees.  And I believe I met

24   Dr. Menninger during one of those visits.  It was probably

25   late 2015, maybe early 2016.

1    **Q.**  And you recall meeting her -- do you recall meeting her

2    in person at that time?

3    **A.**  Yes, I do.

4    **Q.**  Did you have any involvement in the hiring of

5    Dr. Menninger?

6    **A.**  No, I did not.

7    **Q.**  Did you routinely provide day-to-day HR support in

8    connection with Dr. Menninger's position?

9    **A.**  No, I did not.

10   **Q.**  During the period of -- again, let's limit it to late

11   2016 to 2018, did you meet with Chad on a regular basis?

12   **A.**  We did, yes.

13   **Q.**  What was the structure of those meetings?

14   **A.**  They were generally routine meetings, what's happening

15   within the business, any concerns with the employees, the

16   culture, just a general where are we at from the state of the

17   business.

18   **Q.**  How often did those meetings occur?

19   **A.**  We met on a biweekly basis.

20   **Q.**  Were they by phone, video chat, some other format?

21   **A.**  This was before COVID, so we didn't have the technology

22   to do video chats, so it was really just by phone.

23   **Q.**  Do you recall the first time that Dr. Menninger's name

24   came up during one of those meetings with Chad?

25   **A.**  So she had started in, I think, the fall of 2015.  Her

1    name probably came up fairly frequent -- fairly soon

2    thereafter, just in the context of, as we onboard new

3    leaders, how are they feeling about their role, how are they

4    impacting their teams?  It would have been just how is she

5    onboarding and what's the impact to the team.

6    **Q.**  And what do you recall understanding about how that

7    onboarding and teamwork was going?

8    **A.**  Dr. Menninger, again, medical director, CAP CLIA for the

9    organization, important leader for our business.  Chad was

10   seeing early on her, perhaps, more timid approach to

11   leadership.  She -- again, when you come in, you want to make

12   sure that leaders are well established, that they're working

13   well with their employees, they're, you know, understanding

14   what the roles are and being there supporting and coaching.

15   Not that she wasn't doing some of that, she was just doing

16   that more from her office, she wasn't out, engaging with the

17   employees, just a little more behind-the-scenes-type leader.

18   **Q.**  And when you say -- I think you used the term "CAP CLIA"

19   for the organization.  And I understand you're not involved

20   in the medical or lab side, but what is your understanding of

21   what that means?

22   **A.**  So my understanding is for the Central Lab to be able to

23   conduct the business that they do, there has to be a licensed

24   medical director who reviews and releases results.  And

25   Dr. Menninger held those licensures to allow the business to

1   conduct the work that they did for clients.

2   **Q.**  And you testified just a moment ago about some of the

3   information you were learning early on from Chad.  Was this

4   typical of the type of information that Chad provided to you

5   during those, I think you called them the day-to-day, or the

6   one-on-ones that you had with Chad.  Was that typical of

7   those?

8   **A.**  Yes.  Yes it would be for all the leaders at central lab,

9   even financially what is the health of the business, just in

10   general the wellbeing and for our employee, our employees

11   feeling like they're being supported by their leaders, are we

12   creating a good environment, are we focused on their health

13   and wellbeing, are we focused on their development.  So, yes,

14   we would have those routine conversations about those types

15   of activities.

16   **Q.**  How did you respond when Chad gave you this update?  And

17   again, I think you said it was 2016?

18   **A.**  It was really just a coaching conversation.

19          MR. HANNON:  Objection.  Relevance.

20          THE COURT:  Overruled.

21          You can answer.

22          THE WITNESS:  Thank you.

23          It was really just a coaching opportunity, ensuring

24   that Chad would, you know, stay close to Dr. Menninger and

25   the team, and make sure that everybody felt that they were --

 1   that their needs were being met, and we were focused on

 2   contributing to the organization in an effective way.

 3   BY MS. MANDEL:

 4   **Q.**   Do you recall Chad bringing up those issues again with

 5   you at any point?

 6   **A.**   He did.  There was one manager within Dr. Menninger's

 7   team that was a bit challenging, a bit of a difficult

 8   personality, if you will.  And Chad brought up that he was

 9   helping coach Dr. Menninger to work with this leader to

10   ensure that her employees felt, again, supported.

11   **Q.**   With what frequency do you recall this came up in your

12   conversations with Chad?

13   **A.**   I believe that the employees were feeling -- there was

14   anxiety.  There was concern about this leader and her

15   interaction with them.  So it was fairly frequently, just to

16   ensure that things were moving forward.

17   **Q.**   And when you say "This leader," are you referring to the

18   other manager that you mentioned?

19   **A.**   So this would have been a leader reporting directly to

20   Dr. Menninger, yes.

21   **Q.**   From your perspective, did you understand that these

22   concerns got to a point where they were fully resolved?

23   **A.**   Yes.  So this leader had actually left the organization,

24   so that particular situation resolved, yes.

25   **Q.**   Do you recall hearing Dr. Menninger's name come up in any

1  other context in your regular meetings with Chad?

2  **A.**  Yes, there was a discussion around Dr. Menninger's

3  pending relocation to Massachusetts.

4  **Q.**  Did Chad bring this up with you?

5  **A.**  Yes, he did.

6  **Q.**  When did Chad raise this?

7  **A.**  This would have been likely early, maybe, spring of 2017.

8  **Q.**  And given your HR role in the company, what was your

9  professional opinion of this relocation plan?

10  **A.**  It was concerning.  A very, you know, credentialed

11  individual, executive leader, who has responsibilities for a

12  large part of the business not being on sight, again, being

13  there to create the environment of development and learning

14  and ensuring that we responded to our clients, and just

15  general oversight on laboratory based activities, to not have

16  a lab leader there was concerning from an HR perspective, as

17  it would be with any other significant leader not being on

18  site.

19  **Q.**  Did you share this opinion with anyone?

20  **A.**  Chad and I talked about it.  I believe he was going to

21  coach or share that sentiment with Hacene, Dr. Menninger's

22  manager.  And I would have shared that with my manager, as

23  well.

24  **Q.**  Did you become aware at any point that Dr. Menninger did

25  relocate to Massachusetts?

1    **A.**  Yes, I did become aware of that.

2    **Q.**  How did you become aware of that change?

3    **A.**  Chad would have informed me.

4    **Q.**  And at that point, did you become concerned that

5    Dr. Menninger had actually made the move?

6    **A.**  Again, for the same reasons, yes, that there was lack of

7    leadership on site for a team who, again, she's fairly new to

8    the organization, making sure that there was both development

9    oversight, as well as technical oversight for that team.

10   **Q.**  Did you speak directly with Mr. Mekerri about those

11   thoughts?

12   **A.**  No, I did not.

13   **Q.**  Was there a reason that you didn't speak directly with

14   Mr. Mekerri about that?

15   **A.**  Again, the structure of our HR team, I -- my day-to-day

16   activities were truly focused on the Middleton location.

17   Chad's responsibility would be to, you know, the maintenance

18   and wellbeing of that team, so it would have been, you know,

19   Chad's responsibility to have those coaching discussions or

20   discussions with Hacene directly.

21   **Q.**  Deborah, are you familiar with something called a nine

22   box talent review process?

23   **A.**  Yes.

24   **Q.**  What does that mean?

25   **A.**  So a nine box is really a tool.

```
 1                THE COURT:  "Nine" or "non"?
 2                THE WITNESS:  Nine.
 3                THE COURT:  Nine, like the number nine.
 4                THE JUROR:  Yeah.  Nine.
 5                THE COURT:  Got it.  Go ahead.
 6                THE WITNESS:  So the nine box is really a tool that
 7     leaders use to look at our leadership strength within our
 8     organization.  It's really a point in time document to say,
 9     as we think about succession planning and development
10     opportunities, where do we see the leaders impacting our
11     business.
12     BY MS. MANDEL:
13     Q.  And did PPD begin to use this nine box analysis at some
14     point that you recall?
15     A.  They did, yes.
16     Q.  When was that?
17     A.  So the concept wasn't new, but within the laboratory
18     based businesses, we started using that, I believe it was
19     2017 time frame.
20     Q.  Bringing up Joint Exhibit 401.  Do you see on the screen
21     in front of you, Deb, a document coming up with an e-mail?
22     A.  Yes.
23     Q.  Can you please describe the purpose of this December 20,
24     2017, e-mail, on the first page of the document that came
25     from you?
```

1    **A.**  Yes.  This was an e-mail to -- there's distinct labs and

2    each lab has a leader.  So it was an e-mail to these leaders,

3    indicating the procedure to complete nine boxes.  So we had,

4    you know, a point in time document concluded for that

5    particular year.  It was just a reminder that that was a

6    procedural expectation we had for the leaders.

7    **Q.**  Let's look at the second page of this document.  Is this

8    a nine box?

9    **A.**  This is the nine box, yes.

10   **Q.**  And can you just describe visually what we're looking at

11   on this page?

12   **A.**  So the nine box, again, when you look at the leadership

13   across a business unit, it's really where do we see people

14   who are going to continue to bring our business forward.  Who

15   are those that are, perhaps, high potential.  They're

16   creating your innovations for our organization.  But at the

17   end of the day, the nine box is used -- all of these leaders

18   are important to our business.

19          When you think about discretionary energy, at the

20   end of the day, when you have more time, where do we want to

21   invest in development opportunities for leaders.  Again,

22   those that are driving business forward, bringing innovative

23   and creative ideas.  So that was the purpose of the nine box,

24   to outline, who are those leaders that we want to spend time

25   developing them, providing opportunities.

1    **Q.** And as of this time in 2017, do you see names on here of

2    people who reported to Hacene Mekerri?

3    **A.** Yes.

4    **Q.** Do you see them -- are they all showing up in the same

5    box?

6    **A.** No, they are not.

7    **Q.** What does it mean that Dr. Menninger is listed in the

8    bottom middle box, where it says, "Limited progress"?

9    **A.** So by definition, again, a leader who is doing a great

10    job, performing, contributing to the organization, but

11    wouldn't have been viewed as a potential successor for Hacene

12    or another -- well, really for Hacene, as his direct report.

13    And, again, doing a good job, but not someone who is going to

14    be promoted or moving upward within the next cycle, which

15    would be the next year that we would evaluate this.

16    **Q.** What is your understanding of the input process that

17    resulted in Dr. Menninger's placement in that particular box

18    in 2017?

19    **A.** There would have been a discussion at the executive

20    leadership level, really, again, about aspirations, what are

21    these individuals aspire to do with their career, where are

22    they at from a development perspective?  And then there would

23    be data points from others who would work with that

24    individual to provide some data points and input.

25    **Q.** Did Dr. Menninger's placement in that limited progress

| | |
|---|---|
| 1 | box reflect her job performance in 2017? |
| 2 | **A.** No. Although performance is on the bottom axis, |
| 3 | performance is a factor, how are they performing in their |
| 4 | role, but it's not a performance indicator. |
| 5 | **Q.** Did Dr. Menninger's placement in this limited progress |
| 6 | box have consequences for her continued employment as |
| 7 | executive director of labs? |
| 8 | **A.** Absolutely not. That was not the purpose of the nine |
| 9 | box. |
| 10 | **Q.** And based on your recollection some years ago, based on |
| 11 | your recollection, do you see the names of other people who |
| 12 | reported to Mr. Mekerri in that limited progress box? |
| 13 | **A.** I -- the only one that I'm not sure of who -- where he |
| 14 | reported is Michael Furlong. All the others are not at the |
| 15 | Central Lab. |
| 16 | **Q.** They're not the Central Lab at all? |
| 17 | **A.** No. |
| 18 | **Q.** Deb, do you recall at some point becoming aware that |
| 19 | Dr. Menninger requested a disability accommodation? |
| 20 | **A.** Yes. |
| 21 | **Q.** And how did you become aware of that? |
| 22 | **A.** Chad would have informed me. |
| 23 | **Q.** Would that have been in the course of one of those |
| 24 | routine updates that you described? |
| 25 | **A.** Yes. |

1    **Q.**  Deb, another e-mail is coming up on the screen in front

2    of you.  This is Joint Exhibit 280.

3          Do you recall receiving this e-mail from Chad on

4    January 31, 2018?

5    **A.**  Yes.

6    **Q.**  Do you know who the "Diane" is that's referenced in the

7    first line of Chad's e-mail?

8    **A.**  You know, there was a Diane in our compensation

9    department, but it wouldn't make sense to be her.  So I

10   really don't know who that Diane is.

11   **Q.**  What do you recall thinking when you received this e-mail

12   from Chad?

13   **A.**  Well, certainly concern for the wellbeing of one of our

14   employees.  But also, you know, Chad's statement, you know,

15   not very specific and vague, a bit concerning, but certainly

16   wanted to make sure that he worked with Dr. Menninger and

17   followed the process to have discussions around her

18   accommodation request.

19   **Q.**  Before this time in January of 2018, did you have any

20   knowledge that Dr. Menninger had a disability of any type?

21   **A.**  No.

22   **Q.**  Before this time, were you aware of any limitations on

23   Dr. Menninger's ability to perform her job as executive

24   director of labs?

25   **A.**  No.

1   **Q.**  In the 2018 time period, what was your typical

2   involvement in an accommodation discussion involving a

3   Central Labs employee?

4   **A.**  I wouldn't have been involved in that at all.

5   **Q.**  I'm sorry, you wouldn't have been involved?

6   **A.**  I would not have been involved.

7   **Q.**  Did Dr. Menninger ever reach out directly to you in this

8   January time period to discuss her accommodation request?

9   **A.**  No, she did not.

10  **Q.**  How often during the discussions did you and Chad have a

11  follow-up about the accommodation process with respect to

12  Dr. Menninger?

13  **A.**  A few times, just to ensure procedures were being

14  followed.

15  **Q.**  And was that your role as Chad's supervisor?

16  **A.**  Yes.  In situations where, again, an employee comes

17  forward, hears my accommodation, these are my job

18  expectations, you know, Chad could work through that.

19              This was a little bit different where it was a

20  little unclear as to what was really being asked.  So I

21  got -- you know, I coached him a little bit more.

22  **Q.**  Deb, we're now looking at Joint Exhibit 278, which is a

23  February 14, 2018 e-mail from Chad to you.

24              Do you recall receiving this e-mail from Chad?

25  **A.**  Yes.

```
 1   Q.  And did you review the accommodation paperwork that Chad
 2   forwarded with this e-mail?
 3   A.  I would have cursorily looked at it, yes.
 4   Q.  And why did you look at it in a cursory manner?
 5   A.  Again, full confidence that Chad could handle, you know,
 6   the accommodation process with Dr. Menninger.
 7   Q.  After you received this e-mail on February 14th, did you
 8   offer any opinion or thoughts about whether the recommended
 9   accommodations from Dr. Menninger's physician were reasonable
10   for the business?
11   A.  No.  And I don't -- wouldn't have been in a position to
12   effectively state that.  I mean, Chad and Hacene know the
13   business better than I do.  They would be in a position to
14   have those conversations directly with Dr. Menninger.
15   Q.  Did you advise Chad about how to respond to e-mails or
16   how to word e-mails to Dr. Menninger as part of this
17   accommodation discussion?
18   A.  No, not -- no, not really.
19   Q.  When Chad had questions about how to deal with some of
20   the challenging parts of the discussion, did you weigh in?
21   A.  I would, yes.
22   Q.  And why was that?
23   A.  Again, it was -- it was a confusing time, not fully
24   understanding when Dr. Menninger said she could do her job,
25   but she needed the accommodations, just wanted to make sure
```

1    that we were clear in communicating to her at every -- at

2    every juncture.

3    **Q.**  Do you recall receiving this e-mail from Chad on

4    March 1st of 2018, a couple weeks later?

5    **A.**  Yes.

6    **Q.**  What was your understanding from your perspective of why

7    Chad would have sent you this draft e-mail to Dr. Menninger?

8            MR. HANNON:  I'm sorry, I don't believe the jury

9    has the document up on their screens.

10           THE COURT:  Oh, yes.

11           Kellyann, can you --

12           Thank you, Mr. Hannon.

13           Have it now?

14           THE JUROR:  (Affirmative responses).

15           THE COURT:  Go ahead.

16           THE WITNESS:  So Chad sent it to me for review,

17   going back to Dr. Menninger with here's what we are going to

18   accommodate, here's some accommodations we'll provide you,

19   and not -- or and stating that there were other

20   accommodations that were not going to be met.

21   BY MS. MANDEL:

22   **Q.**  And looking down at the draft e-mail that Chad sent to

23   you, did you have an understanding as to where the list of

24   job tasks had originated?  Where it had came from?

25   **A.**  Yes.  From Dr. Menninger's job description.

1    **Q.**  And there's -- it's a little hard to tell on this

2    document, but down below, there is -- underneath where it has

3    each number, like it says, Number 2, it says "Lisa's

4    physician e-mailed details."

5           Do you see that?

6    **A.**  I do.  Yes.

7    **Q.**  And then underneath each description, like "client bid

8    defense," for example, then it says "reasonable

9    accommodations," and it has language written in there?

10   **A.**  Yes.

11   **Q.**  Did you have an understanding about where that language

12   came from?

13   **A.**  My understanding is that came from Dr. Menninger's

14   physician.

15   **Q.**  Did you have an opinion about Chad's draft e-mail back to

16   Dr. Menninger that he sent to you here?

17   **A.**  I felt that it was fine.

18   **Q.**  From an HR standpoint, did you have an opinion about

19   whether it was okay to tell Dr. Menninger that PPD could not

20   accommodate certain things on this list, where it says "items

21   two, three, and four."

22   **A.**  So my understanding of the process is exactly that,

23   right.  It's an interactive process.  The employee indicates

24   here's what I need for an accommodation to do my job, and the

25   employer evaluates that.  Are these reasonable, are these not

```
 1    reasonable.  And they continue to have that conversation.
 2    But the employer truly has the ability to say no these are
 3    not reasonable which to perform the essential tasks of your
 4    job.
 5    Q.  And based on your position in HR, did you understand that
 6    these were parts of Dr. Menninger's job that had to be done?
 7                MR. HANNON:  Objection.
 8                THE COURT:  Overruled.
 9                THE WITNESS:  Yes.  They were from her job
10    description.
11    BY MS. MANDEL:
12    Q.  As far as you understood, did the accommodation
13    discussion and process ever hit a completion point?
14    A.  No.
15    Q.  And why -- why is it that you think it never hit that
16    point?
17    A.  There was discussions where Dr. Menninger said, "I can
18    perform the functions of my job, with or without an
19    accommodation," but her doctor's notes were indicating that
20    she couldn't do certain tasks that could exacerbate her
21    condition.  So there was this unsure, you know, lack of
22    clarity about what it is that we as an organization needed to
23    provide to help Dr. Menninger.
24    Q.  And as far as you understood from your position, what was
25    PPD's goal throughout these discussions?
```

1    **A.**   Truly to help Dr. Menninger with her accommodated

2    requests, to perform the essential functions of her job.

3    **Q.**   As part of your discussions with Chad during this time

4    period in 2018, did you and Chad ever talk about whether

5    Dr. Menninger was on a path to leave her role at PPD?

6    **A.**   No.

7    **Q.**   Did you ever understand from anyone at PPD that there was

8    a plan to remove Dr. Menninger from her position?

9    **A.**   No.

10   **Q.**   In spring of 2018, did you understand that Central Labs

11   was looking to replace Dr. Menninger?

12   **A.**   Not to replace Dr. Menninger, but, as she had indicated,

13   there were gaps in regulatory obligations or licensure, and

14   there was attempt to fill those gaps, but not to replace

15   Dr. Menninger.

16   **Q.**   Again, based on your understanding from HR, why would

17   there be a need to fill those gaps?

18   **A.**   Again, from a licensure perspective, the type of testing

19   that we would conduct, needing to have a licensed individual

20   sign off on those results to send them to our clients.

21   **Q.**   And is that spring 2018 time period the only time that

22   these discussions have come up at PPD?  And I should say with

23   regard to Global Central Labs.

24   **A.**   I'm sorry, could you say that again?

25   **Q.**   Yeah, I didn't ask that well.

1          As far as you understand from an HR perspective, is
2     this the only time that Global Central Labs was looking at
3     how to make sure licensure was covered?
4     **A.**   I think it was an ongoing -- spring of 2018.  I believe
5     that was -- yes, the time that they were looking at coverage
6     of licensure.  Yes.
7     **Q.**   And why was that time when licensure was being discussed
8     so much?
9     **A.**   Again, it was unclear as to Dr. Menninger's expectations
10    around the accountability -- or the accommodation process.
11    We were unsure -- again, we were in this interactive process.
12    We weren't sure what Dr. Menninger needed from the
13    organization.
14    **Q.**   And from a licensure standpoint, understanding your role
15    is in HR, what did you understand about why Dr. Menninger's
16    plans mattered for licensure?
17    **A.**   Because if Dr. Menninger wasn't on site or wasn't at the
18    organization conducting business, that we would have an
19    inability to perform the testing to get the results to our
20    clients.
21    **Q.**   In front of you now should be Joint Exhibit 186.  Do you
22    recall a conversation with Chad St. John about licensure
23    coverage, as referenced at the outset of your e-mail here?
24    **A.**   Yes.
25    **Q.**   Did you have an understanding as to why there was a

1    discussion.

2            Is that back on the screen?

3    **A.**   Yes.

4    **Q.**   Did you have an understanding as to why there was a

5    discussion in this e-mail, if you look down at the -- it's

6    about two-thirds of the way down the page, there's a

7    paragraph that says "all of this is good contextual

8    information."  Do you understand why there was a discussion

9    there about delicately working Lisa out "since we need to

10   have her for coverage until someone else is in the seat."  Do

11   you understand why that language was part of this discussion

12   about license coverage?

13   **A.**   So Lisa wasn't on site at the Central Lab.  I think there

14   was concern about what does the licensure require in terms of

15   having on-site leadership.  And so, again, from an HR

16   perspective, we just needed to be aware that there was a gap,

17   and if there was a need, from a recruitment perspective, to

18   fill the gap.

19   **Q.**   And why was it important to fill that gap?

20   **A.**   Again, we couldn't conduct the work that we do if we

21   didn't have certified, licensed individuals signing off on

22   the work.

23   **Q.**   As discussions continued between Chad and Dr. Menninger,

24   did you and Chad have phone conversations to talk about the

25   best approach from an HR standpoint?

1    **A.**  I'm sorry.  Could you say that again?

2    **Q.**  Sure.

3           As conversations between Chad and Dr. Menninger

4    continued, did you and Chad have phone conversations about

5    the best approach from an HR perspective?

6    **A.**  Yes.

7    **Q.**  At any point in those discussions, did you support Chad

8    in consulting with PPD's legal department for advice?

9    **A.**  Yes.

10    **Q.**  Why was that?

11    **A.**  Again, it was a confusing time.  I'm not sure what

12    Dr. Menninger was, again -- I can do my job.  I don't need

13    accommodation.  Her doctor saying she needs an accommodation.

14    Just wanting to make sure that we are following the process

15    and providing as good of information back to Dr. Menninger as

16    possible.

17    **Q.**  You've worked at HR for a long time, as you previously

18    testified.  Why was this discussion and this situation

19    particularly confusing, from your perspective?

20    **A.**  Again, when we get involved in a request for

21    accommodation situations, an employee is provided their job

22    description.  They go to their attending physician.  They

23    have a conversation, here's my job.  The doctor and the

24    individual work on what are, you know, the accommodated needs

25    that the employer could provide.  They bring that to the

 1    organization, HR, their manager, and the employee have this

 2    conversation.  It's determined, are these reasonable?  Are

 3    these not reasonable?  And it -- it's a pretty good

 4    conversation and there's resolution.  There's a start,

 5    there's a stop, and there's an interactive dialogue, and then

 6    we make a determination, and we move forward.

 7            In this situation, it just wasn't that

 8    straightforward.

 9    Q.  Moving forward from March to April, this is an e-mail

10    that Chad forwarded to you on April 10th.  If you look at

11    sort of the middle e-mail on this page.  And then you see

12    where you wrote back and you said, "I agree with your add.

13    Glad to see he's keeping it very compartmentalized."

14            Do you see that at the top?

15    A.  Yes.

16    Q.  What did you mean when you said to Chad "glad to see he

17    is keeping it very compartmentalized."?

18    A.  So certainly we want to be mindful of retaliation.  We

19    wanted to make sure that as Hacene is working to raise the

20    level of expectation for all of his leaders across Central

21    Lab for the year 2018, that we're very clear in communicating

22    this is not about, you know, your request for accommodation.

23    This is truly about helping the business become stronger in

24    the year 2018, and compartmentalizing those particular

25    situations.

1   **Q.**  And I believe you just said that Hacene was working to

2   raise the level for expectations for all leaders for 2018.

3   What do you mean by that?

4   **A.**  Again, 2018 was a year --

5          MR. HANNON:  Objection.  Lack of foundation.  It's

6   personal knowledge.

7          THE COURT:  Can you rephrase the question?

8   BY MS. MANDEL:

9   **Q.**  What was your understanding, Deb, as to what the lab's

10  expectations were for leaders in 2018?

11  **A.**  2018 was a growth year, and Hacene was asking all of his

12  leaders to step up, whether it was on the commercial end,

13  let's sell more, whether it was on the lab end, let's, you

14  know, raise awareness to what we do from a technology

15  perspective, to our data management team.  How can we

16  innovate our software to be swifter and faster to get the

17  results to our clients faster.  Every leader across the

18  business was asked to truly think about how we can help our

19  business grow and be stronger and more profitable for our

20  clients.

21  **Q.**  And when you say -- I think you said 2018 was a growth

22  time.  Why specifically 2018, as far as you know, from an HR

23  standpoint?

24  **A.**  Well, every year is a growth year, but Central Lab had

25  struggled from a commercial perspective, of selling of their

 1   business.  I believe in 2017.  And the company always had

 2   higher expectations year over year.  We were, at that point,

 3   the executives were thinking about public -- becoming a

 4   publically traded organization.  So I think just making sure

 5   that our financial outlook was very strong in which to take

 6   the company to a different level of -- from a shareholder

 7   perspective, to a different level.

 8   **Q.**  Deb, you should see Joint Exhibit 129 in front of you.

 9   And this is Chad forwarding an e-mail to you.  And down

10   below, you see the e-mail that was being forwarded to you,

11   and this is an e-mail from Dr. Menninger, from April 17th?

12   **A.**  Yes.

13   **Q.**  And do you recall seeing this e-mail?

14   **A.**  I do.

15   **Q.**  Did anything that is in the correspondence that Chad

16   forwarded to you as an FYI, did anything concern you?

17   **A.**  Yes.  The language that Dr. Menninger used about, you

18   know, twisting words and feeling like she's being targeted.

19   Certainly I was concerned, first and foremost, for

20   Dr. Menninger, that she was feeling like she wasn't treated

21   fairly, and I felt like I wanted to certainly help her.

22   **Q.**  After you received this e-mail on April 17th, what were

23   your next steps?

24   **A.**  I determined that an investigation would be appropriate.

25   **Q.**  Did you make that determination on your own, Deb, to do

1  an investigation?

2  **A.**  Yes.

3  **Q.**  Did Dr. Menninger ask you to do an investigation?

4  **A.**  No, she did not.

5  **Q.**  Did Dr. Menninger ever ask you to conduct an

6  investigation in a certain way?

7  **A.**  No, she did not.

8  **Q.**  In your HR role, were you in a position of making a

9  determination about who would conduct an investigation when

10  an issue came up?

11  **A.**  Yes.

12  **Q.**  In this particular situation, after reviewing the e-mail

13  that Dr. Menninger had sent, what did you conclude about who

14  should do the investigation?

15  **A.**  Given the -- the organization's structure, the

16  departments that worked together, just general knowledge of

17  the laboratory space, I felt -- and being someone who wasn't

18  necessarily involved in the day-to-day activities at the

19  Central Lab, I felt that I could be that individual.

20  **Q.**  Did you consider whether you had been too closely

21  involved with any of the underlying facts or people to do an

22  unbiased investigation?

23  **A.**  Yes.

24  **Q.**  What went into that thought process for you?

25  **A.**  Again, you know, Chad being the direct HR contact for the

1    site would have, you know, conversations and knowledge and

2    his involvement and awareness in a way that I wouldn't have

3    been aware certainly played into that decision.

4    Q.  Is there a particular process or rule that you follow for

5    determining if you shouldn't be the one to do an

6    investigation?

7    A.  Certainly.  Again, if I felt that I had, you know, direct

8    knowledge, had been part of conversations, participating in

9    decision making, you know, if I was involved in any of those

10   types of activities, I would certainly excuse myself from the

11   investigation.

12   Q.  And as we've seen over the last couple of days, you did

13   have some knowledge and some involvement.  Did you consider

14   whether that involvement made you not the right person to do

15   this investigation?

16   A.  Certainly took that into consideration.  I -- you know, I

17   was overseeing some of the exchanges, coaching Chad.  But,

18   again, not being on site, not having direct conversations

19   with the individuals, understanding, you know, the climate

20   that existed at that particular lab, knowing the other -- all

21   the other departments inter -- you know, play together,

22   collaborate, I'm not aware of that not being at that site.  I

23   felt that I could continue to be a fair and impartial

24   investigator.

25   Q.  And is that something that you view as your role in HR,

1    to be a fair, unbiased investigator?

2    **A.**   Absolutely.

3    **Q.**   Have you ever been aware of an employee complaint and

4    determined that you would not be able to do an unbiased

5    investigation?

6    **A.**   Yes.

7    **Q.**   Looking back at your experience so far in HR, as you

8    recall, how many times has that happened in your support of

9    Central Labs?

10   **A.**   So over the course of my time with the company, I

11   conducted over thousands of investigations.  I could recall,

12   for Central Labs specifically, two unique cases where I would

13   have said I'm just not the right individual to be part of

14   this investigation.

15   **Q.**   Why did you determine, in those situations, that you were

16   not the person to do the investigation?

17   **A.**   My role with those situations was much like Chad.  I was

18   having daily conversations with these participants.  I was

19   coaching them.  One was a situation where they felt their

20   manager was being impartial -- or being partial to another

21   individual in the organization.  And I had been coaching up

22   that individual who felt they were not being treated fairly

23   by their manager, coaching her, helping her through this

24   situation.  So it wasn't appropriate for me to be part of

25   that investigation.

1   **Q.**  And what about -- what was the other situation?

2   **A.**  The other situation was a hotline complaint.  And as we

3   evaluated the hotline complaint, an individual male manager

4   was being -- harassing female employees.  And in that one, I

5   worked directly with the male manager frequently.  You know,

6   I would, again, coach and counsel him, you know, would be in

7   meetings with him and these females.  So again, I had up

8   front knowledge about the situation, the individuals that

9   were cited in the complaint.  I just felt it was

10  inappropriate for me to be part of that investigation.

11  **Q.**  How did you handle those situations after you made that

12  determination?

13  **A.**  So I would raise that to my manager and my manager would

14  work with other leaders from an HR perspective, and it was

15  reassigned to other individuals.

16  **Q.**  Did you perform those investigations?

17  **A.**  No, I did not.

18  **Q.**  You mentioned a few minutes ago that you've done all

19  sorts of -- I think you said a lot of investigations at PPD.

20  What types of investigations does that include?

21  **A.**  So certainly harassment, discrimination, even things --

22  back in -- over the course of my career with the

23  organization, you know, if employees got into a difficult

24  discussion with another colleague, those were raised as

25  complaints that were looked into.  If managers weren't

1    behaving the way employees felt they should be behaving, I

2    would get involved in those.  It was just a number of

3    different scenarios that I would definitely investigate.

4    **Q.**  Of those, how many investigations have involved employee

5    complaints of discrimination or harassment?

6    **A.**  Probably around 40 to 50.

7    **Q.**  Do you have a typical practice for how you perform that

8    type of investigation?

9    **A.**  Yes.

10   **Q.**  What is that practice?

11   **A.**  So would certainly meet with the employee, making --

12   having the concern, wanting to understand and appreciate,

13   from their perspective, what is it that they see, what's

14   happening?  What information do you have to support that

15   positioning?  And then it's -- it's not always a straight,

16   linear line.  It's a bit of a road -- curvy road, if you

17   will, looking into their -- into their concerns.  Every

18   concern that they would raise would be looked into.  If it

19   that included talking with other individuals, we would talk

20   with other individuals.  And certainly all under the guise

21   of, you know, confidentiality, ensuring anyone we spoke to

22   understood their role, their expectation, and that, you know,

23   they wouldn't necessarily find out the results at the end of

24   the day.  And then, you know, thoroughly investigate what the

25   employee brought forward, and then we make a very impartial

1   determination on the findings and then report that back to

2   the individual making the complaint.

3   **Q.**  And I believe you just mentioned confidentiality.  How

4   did confidentiality impact how you choose who to speak to in

5   an investigation?

6   **A.**  So we absolutely want to protect our employees.  We want

7   to make sure that we create an environment that employees

8   feel valued and want to come to work every day.  So you have

9   to weigh is the -- if it's an individual who has, you know,

10   key information, certainly we need to speak with that person.

11   If it seems ancillary or not key and critical, maybe a minor

12   detail that would expose the situation -- people love to

13   talk, so we really just want to make sure that at the end of

14   the day, we're speaking with individuals who truly have the

15   right information to share in investigating the concerns of

16   that employee.

17          And again, we ask for confidentiality, and I would

18   love to believe that everybody uses the confidentiality

19   clause, but I know people do like to talk, so we would be

20   very cautious in that investigation.

21   **Q.**  And as you look back on investigations that you've done

22   in the past, do you sometimes see things that you might have

23   done differently or different people that you would have

24   talked to?

25   **A.**  Certainly.  Possibly.  You know, when you give the

1    feedback to an individual, you know, what about this or what

2    about that?  And if it was significant, certainly we would

3    take a look at that.  But generally, by the time you conclude

4    the investigation, you're looking at the factors that the

5    employee felt contributed to their feeling.  It's an

6    exhaustive investigation.

7    **Q.**  And you also said a moment ago that you do investigations

8    in a prompt manner?

9    **A.**  Yes.

10   **Q.**  What is the importance, from your view, of being prompt

11   in the investigation?

12   **A.**  So employees -- coming forward, right?  We owe them a

13   swift investigation.  But we certainly don't want to

14   sacrifice swiftness for incompleteness.  So we certainly want

15   to find all the information in the situation for the employee

16   as swiftly as we possibly can.

17          We are a large, global, you know, high-performing

18   organization.  People are traveling, people are out of

19   office, people are with clients.  So it does depend on their

20   availability.  But as best we can, we try to move as swiftly

21   as we can.

22   **Q.**  Do you sometimes find that to be a tough balance, the

23   swiftness, the promptness, and the thoroughness?

24   **A.**  Yes.

25   **Q.**  In what way is that challenging?

1    **A.**   Again, we want to make sure that we do the right job for

2    our employees.  We want to make sure we investigate

3    thoroughly their concerns that they brought forward.  And in

4    search of that information, you know, sometimes it might

5    be -- we need to involve our IT department, and they have to

6    be back and look at records.  And sometimes things take

7    longer, but it's important to make sure you have the data

8    before you make the determination.

9    **Q.**   When you do investigations in your HR role, do you go in

10   with preconceived notions about how they should come out?

11   **A.**   Absolutely not.

12   **Q.**   With respect to your investigations at PPD into

13   complaints of discrimination, harassment, have you ever

14   concluded that the complaint was justified?

15   **A.**   Yes.  There's times where that has occurred.

16   **Q.**   Does making that conclusion that the complaint was

17   justified -- strike that.

18           When you've made the decision that the complaint

19   was justified, what have been your next steps in those

20   situations?

21   **A.**   So at the conclusion, the findings would indicate, you

22   know, if there's a concern or not.  I would, you know, work

23   with my manager or other departments as needed from a

24   corrective action perspective.  What would be necessary here

25   for this particular situation?  And they're all unique, so

1    it's not always a one-size-fits-all approach.  Sometimes

2    there's been retraining of leaders, there's been retraining

3    of employees.  There's been disciplinary actions, there's

4    been terminations at times.  So it's really dependent upon

5    the particular situation.

6    **Q.**  Turning now to the investigation involving

7    Dr. Menninger's complaint, can you please describe the

8    process that you followed after you received that e-mail from

9    Chad that we looked at?

10   **A.**  Yes.  So I reached out to Dr. Menninger, scheduled time

11   to chat with her, to appreciate and understand, you know,

12   what it is that she -- she saw that contributed to her

13   feelings, explained, you know, the process, the

14   confidentiality, and then started talking to the individuals

15   who had information about those concerns that she raised.

16   **Q.**  And who did you determine that you should speak to as

17   part of the investigation?

18   **A.**  So, again, Dr. Menninger had a series of these are why I

19   feel I am being treated unfairly by my manager.  I believe

20   one was being not included in bid defenses or business

21   development meetings.  There was -- she felt her 2017 review

22   was unfair.  She was treated differently with her review.

23   There was quality -- she was held to a higher standard with

24   quality.  She was being excluded from recruitment processes.

25   And so she outlined the situations that she felt were

1    inappropriate.

2            I started investigating each one individually.

3    **Q.**  And you reviewed documents as part of your investigation,

4    as well?

5    **A.**  Yes.  If the situation required, you know, supporting

6    documentation, I would absolutely ask for that and review

7    them.

8    **Q.**  And you described meeting with certain people.  Were

9    those in-person meetings?

10   **A.**  No, again, I was in Wisconsin.  The majority of these

11   folks -- of course, Lisa was home based at the time.  A lot

12   of these folks were in Highland Heights, so they were all via

13   phone.  And it was before COVID, so it was definitely a phone

14   conversation.

15   **Q.**  Who was the first person that you talked to as part of

16   that investigation?

17   **A.**  Dr. Menninger.

18   **Q.**  Did you meet with Dr. Menninger just that one time or

19   more than once?

20   **A.**  We met a few times.

21   **Q.**  Did you keep notes of your meetings and things you

22   learned during the investigation?

23   **A.**  Yes.

24   **Q.**  Did you take those notes yourself?

25   **A.**  So, from my practice, and following the process,

1   everybody has their own uniqueness, but in my process, when I

2   speak with the individual who's raising the concern, just as

3   a matter of just empathetic listening, I actually handwrite

4   the notes.  I listen and I write them.  When you're on the

5   phone, I don't want the typing in the background.  I don't

6   want it to appear like I'm not listening and engaged in the

7   conversation.  So with Dr. Menninger, I handwrote notes as

8   she was indicating her concerns.  But when I met with all the

9   other individuals, I typed, explained that I'm going to be

10  typing the notes, if you hear just, you know, background

11  noise, it's just because it's more expedient for me to type

12  notes when we talk.  So that was my process with

13  Dr. Menninger.

14  **Q.**  And with -- in your conversations with Dr. Menninger, did

15  you transcribe the handwritten notes into typewritten notes?

16  **A.**  I did, yes.

17  **Q.**  And how soon after your conversations with Dr. Menninger

18  did you do that?

19  **A.**  I don't recall specifically, but again, matter of my

20  practice, you have to memorialize them as soon as possible,

21  so -- and my handwriting is not great.  So I would type them

22  up either that day or generally by the next day.

23  **Q.**  And this was typical -- was this typical of your

24  investigation practice?

25  **A.**  Yes.

1    **Q.**  Is it safe to say that the notes that you have in

2    connection with this investigation, did you take them all in

3    that spring 2018 time period?

4    **A.**  Yes.

5           MR. HANNON:  Objection, Your Honor, this should not

6    be shown to the jury as of yet.

7           THE COURT:  As of yet?

8           MR. HANNON:  Right.  This hasn't been offered yet.

9    I believe she's just showing it to the witness to lay

10    foundation, but I just wanted to note this wasn't a joint

11    exhibit.

12           THE COURT:  Fine.  Go ahead.

13           So you understand, ladies and gentlemen of the

14    jury, what happens is things are displayed on all the

15    screens, so for you and for members of the public on that TV

16    over there, when they're in evidence.

17           When they're not yet in evidence, then they're just

18    typically talked about or sometimes a foundation is laid.

19    Say, for example, the obvious example is things that -- PPD

20    obviously has all sorts of business activities and meetings

21    that have nothing to do with Dr. Menninger in this case, or

22    even other divisions or whatever, and evidence like that, no

23    one is offering that evidence.  But if they did, it would be

24    excluded because it's not relevant.  It doesn't have anything

25    to do with this case.  Right?  And so only -- so there has to

1 be a foundation laid, that whatever the evidence is is

2 relevant to this case or relevant to the particular issues.

3 That example I gave you is sort of not one any lawyer would

4 bring up or offer, but just to give you an outlier idea.  So

5 that's what Mr. Hannon is referring to, that the exhibit

6 hasn't been admitted yet into evidence, so that's all.

7    Go ahead.

8    MS. MANDEL:  Thank you.

9 BY MS. MANDEL:

10 **Q.**  And Deb, as you just heard, we need to understand what

11 this document is.  And I believe you can see it on the screen

12 in front of you.

13 **A.**  Yes, I can.

14 **Q.**  Is that right?

15    So I'm going to show you a few different pages at a

16 time and ask you about them.  The first page has a date of

17 May 2nd?

18 **A.**  Yes.

19 **Q.**  2018.

20    And it reflects discussion with Dr. Menninger,

21 executive director of Central Lab?

22 **A.**  Yes.

23 **Q.**  And it says by Ms. Ballweg?

24 **A.**  Yes.

25 **Q.**  And this document, I'm just showing you the second page

```
 1    of that.  Do you see that?
 2    A.  Yes.
 3              MR. HANNON:  Upon further reflection, I'm not going
 4    to have any objection to this document being offered in, so
 5    rather than do this twice and waste time, I'm happy to have
 6    the document admitted into evidence.
 7              THE COURT:  Fine.  You're offering it?
 8              MS. MANDEL:  That's fine.  Yes.
 9              THE COURT:  All right.  Then this document, I think
10    the entire set, yes.  The entire set is admitted.
11              All right.  You can show it to the jury, and you
12    don't need the foundation question.
13              So the foundation questions are why is it relevant,
14    what does it have to do with the case, but Mr. Hannon is not
15    objecting to the document, so it now has become an agreed to
16    and admitted exhibit, and it can be displayed to the jury.
17              We just need the -- do you have a number for it?
18              MS. MANDEL:  Yes, and I believe this will be 450.
19              MR. HANNON:  Correct.
20              THE COURT:  450 it is.  450 in evidence.  Go ahead.
21              (Exhibit No. 450 admitted into evidence.)
22    BY MS. MANDEL:
23    Q.  So Deb, I'm going to show you -- I'm going to go back.
24    We're a little farther ahead.
25              Okay.  So the first page of this document, again,
```

1    has a May 2, 2018 date.  Do you see that?

2    **A.**  Yes.

3    **Q.**  And I'm just going to show you -- this document has a

4    number of pages, but we're going to start with looking at the

5    first two pages, so that's the second -- I went too far

6    ahead.  So that's the second of those.  Do you see that?

7    **A.**  Yes.

8    **Q.**  So going back to the first page of this section, are

9    these the notes that you took after that -- or strike that.

10    Are these notes that you took in connection with that initial

11    conversation with Dr. Menninger?

12    **A.**  Yes.

13    **Q.**  And this is simply the typewritten version of those

14    notes?

15    **A.**  Correct.

16    **Q.**  And does this reflect a meeting that you had with

17    Dr. Menninger on May 2nd of 2018?

18    **A.**  Yes.

19    **Q.**  Can you describe for the jury what the purpose was of

20    that meeting on May 2nd with Dr. Menninger?

21    **A.**  Again, she had expressed in an e-mail to Chad that she

22    was feeling that Hacene was treating her differently.  And

23    this was my desire to do what I could to help Dr. Menninger,

24    met with her, and had her outline for me what were the issues

25    that contributed to her feeling that way.

1  **Q.**  And I see a number of items with numbers next to them.

2  **A.**  Yes.

3  **Q.**  What is that list of numbered items?

4  **A.**  These are the specific instances or issues that

5  Dr. Menninger pointed out that contributed to her feeling

6  like her manager was not treating her fairly.

7  **Q.**  And your notes here, this is a reflection of what you

8  learned from Dr. Menninger in that regard?

9  **A.**  Correct.  So the number one is the issue that she had

10  stated, which I, again, noted on our May 2nd discussion.  The

11  5/15 reference was a follow-up conversation I had after I

12  have conducted, you know, pieces of the investigation, there

13  were follow-up questions that I had for Dr. Menninger, so I

14  went back and asked her some additional questions.  So that

15  would be the 5/15 follow-up documentation.

16  **Q.**  So except where it says 5/15, these are notes of the

17  May 2nd meeting?

18  **A.**  Yes.

19  **Q.**  And where it says 5/15, did you add those notes after the

20  May 15th conversation with Dr. Menninger?

21  **A.**  That's correct.

22  **Q.**  So let's go through each of these.  Number one, it says,

23  "Work issues with Gedeon Richter, NGSP, BMS, and GSK.  Issues

24  are no more or less severe than historic issues, yet Hacene

25  has made them an issue;" and then it says semicolon

1    "e-mails"?

2    **A.**   Yes.

3    **Q.**   Can you explain what you learned from Dr. Menninger

4    during that May 2nd discussion about that particular concern?

5    **A.**   That there were -- that there were ongoing challenges

6    within the lab.  There were errors that were happening

7    throughout the course of her leadership, and that Hacene,

8    after she disclosed her disability, was raising these

9    concerns differently than he had historically.

10   **Q.**   And what did -- what did you understand -- you wrote --

11   where it says "e-mails," what was your understanding of what

12   that meant?

13   **A.**   That Lisa had provided e-mails in support of that.

14   **Q.**   And so does that reflect e-mails that you reviewed as

15   part of your investigation?

16   **A.**   Yes.

17   **Q.**   And immediately below that, there's a small letter (a),

18   and it has what I believe you testified was your addition in

19   light of a May 15th conversation?

20   **A.**   Correct.  I would have added information from the

21   follow-up conversation I had with Lisa.

22   **Q.**   And you say follow-up conversation.  What was the purpose

23   of the follow-up conversation?

24   **A.**   So as I was investigating and finding information that

25   related to is this a correct reflection?  Is she truly -- is

1    this truly occurring, there were questions that arose in

2    finding that data, and I wanted a follow-up question with

3    Lisa just to make sure that I was understanding her position,

4    and being able to clearly articulate and investigate her

5    concern.

6    **Q.**   And so does what appears in (a), under number one,

7    reflect what Dr. Menninger shared with you on May 15th in

8    connection with that first item?

9    **A.**   That's correct.

10   **Q.**   And just to go through that, it says, "Lisa indicated

11   that Hacene now will ask her in an accusatory way about

12   issues, like she did something wrong.  Lisa feels that Hacene

13   is going out of his way to document her performance and feels

14   the goals she has are impossible to meet."

15          Do you see that?

16   **A.**   Yes.

17   **Q.**   "Hacene, in response to GSK issue, sent her and Els an

18   e-mail asking them to be involved."

19          Do you see that, as well?

20   **A.**   Yes.

21   **Q.**   And that reflects what you learned at that time?

22   **A.**   That's what Lisa indicated, yes.

23   **Q.**   And then in number two below, this is the next item that

24   Dr. Menninger had indicated was a source of concern?

25   **A.**   Yes.  During that May 2nd meeting, this was the second

1    situation she felt was contributing to Hacene's change in

2    behavior.

3    **Q.**   And then this is -- you indicated, "Not invited to

4    participate in recruiting like in the past.  Hiring of

5    Patrick Mann to report to Lisa without her formally

6    interviewing, other interviews, Narine, not involved, but --

7    dotted line -- reporting relationship."

8    **A.**   Yes.

9    **Q.**   And that's what Dr. Menninger reported to you on May 2nd?

10   **A.**   Yes.

11   **Q.**   And then below that, where it has the number -- or the

12   letter (a), and it says 5/15, this is additional information

13   that you learned from Dr. Menninger; is that right?

14   **A.**   Correct.

15   **Q.**   And Dr. Menninger told you that Mr. Mekerri had a

16   conversation with her at the end of December?

17   **A.**   Yes.

18   **Q.**   And Dr. Menninger's recollection was about Dr. Menninger

19   having vetted candidates and then passing them along to

20   Mr. Mekerri.  Is that what you understand that to mean?

21   **A.**   Yes.

22   **Q.**   And number 3 below, it says, "New expectation to attend

23   bid defense and client visits."

24   **A.**   Yes.

25   **Q.**   "Is being asked to speak about topics that she's not

1 knowledgeable."

2 **A.** Yes.

3 **Q.** "Molecular, micro, and analytical pathology"?

4 **A.** Correct.

5 **Q.** And does this reflect what Dr. Menninger told you on

6 May 2nd was the source of concern?

7 **A.** It does, yes.

8 **Q.** And then beneath that, on -- with your 5/15 addition, do

9 you see that says, "Follow-up with Lisa." And then it says,

10 "Lisa indicated she had a discussion with Hacene in November

11 about being overwhelmed."

12 And based on your recollection at this time, was

13 that referring to November of the previous year?

14 **A.** November of 2017, yes.

15 **Q.** "She sent Hacene a list of responsibilities, but there

16 was no follow-up by either her or Hacene."

17 **A.** Yes.

18 **Q.** "She feels that Hacene doesn't have an overall awareness

19 of what her job as lab director entails."

20 **A.** Correct.

21 **Q.** And as far as you knew, that time period of

22 November 2017, was that before or after Dr. Menninger had

23 disclosed a disability?

24 **A.** That was before.

25 **Q.** Number 4 below, it says, "Not invited to 2018

```
 1    sales/marketing routine meetings.  Asked to have meeting
 2    request forwarded but has not happened."
 3    A.  Yes, another issue we talked about in the May 2nd
 4    meeting.
 5    Q.  And below that it says, "Town hall with Sharbaugh"?
 6    A.  Sharbaugh was our chief operating officer.
 7    Q.  "Not included in planning, no introduction while on
 8    site."
 9            Is that also reflecting something that
10    Dr. Menninger told you about on May 2nd?
11    A.  Correct.
12    Q.  And then on the next page, 2017, "No performance review
13    discussion, not much commentary in the review, but lower
14    ratings.  360 feedback with Hacene, but nothing more on
15    overall review from 2017."
16            Does that reflect information that Dr. Menninger
17    gave you on May 2nd?
18    A.  Yes.
19    Q.  And in, (a), beneath that, there's additional information
20    that Dr. Menninger provided; is that right?
21    A.  Correct.
22    Q.  And then the lest item is, "Discussion of exit package
23    and/or consulting role during review of accommodations."
24    A.  Correct.
25    Q.  And that's information that Dr. Menninger told you was
```

1    the basis of concern on May 2nd?

2    **A.** That was the seventh concern, yes.

3    **Q.** And in the first six that we've looked at, did you have

4    an understanding that those concerns related specifically to

5    Dr. Menninger's request for accommodation?

6    **A.** No.

7    **Q.** After you went through these concerns with Dr. Menninger

8    on May 2nd, what did you do next?

9    **A.** Then I started the investigation.

10    **Q.** And let's look at more notes.

11           These notes say May 4th, so that's two days later;

12    is that right?

13           THE COURT: Yes.

14           THE WITNESS: Two days later?

15    BY MS. MANDEL:

16    **Q.** And that indicates that this was a discussion with Chad

17    St. John?

18    **A.** Correct.

19    **Q.** And did you take these notes, as well?

20    **A.** I did, yes.

21    **Q.** Can you explain the structure of the notes that we're

22    seeing on the page in front of us?

23    **A.** So with Chad being the HR site -- the HR individual to

24    support the site, he would have knowledge of certain of these

25    items. So I walked through each of Dr. Menninger's issues

1   that she had reported to me and asked for Chad's perspective.

2   So the numbers are all seven, and did he have information,

3   relevant information related to any of those seven.  So the

4   (a)s on here would be what Chad's response was to the

5   questions.

6   **Q.**  Can you take us through each of those and explain what

7   your notes reflect and what your recollection is of what you

8   learned?

9   **A.**  Sure.  So work issues -- number one, the work issues,

10  Chad said that, "Hacene had shared that he discussed

11  lab-related issues with Lisa during their one-on-one

12  meeting," but Chad had not been involved, so he could not

13  corroborate that they actually had happened.

14  **Q.**  So you understood that Chad was saying he didn't have

15  anymore information on that?

16  **A.**  Right.  Chad is saying Hacene actually discussed it,

17  according to the discussions him and Hacene had, but Chad did

18  not sit in on those one-on-ones where Hacene would have been

19  sharing that information directly with Lisa.

20  **Q.**  And understanding that your role is in HR and not working

21  in the lab, do you understand what Gedeon Richter, NGSP, BMS,

22  and G SK are?

23  **A.**  They're clients.

24  **Q.**  Clients of PPD's?

25  **A.**  Clients of the Central Lab.

1    **Q.**  And moving down to number two, can you explain what you

2    learned from Chad in connection with that?

3    **A.**  "So not invited to participate in recruiting events."  So

4    from Chad's perspective, Dr. Fikry was concerned about the

5    amount of time that it was taking to fill certain roles

6    within the lab, and shared with Chad that there was a

7    concerted effort to reduce Lisa's role in that process, based

8    on her specificity, the needs of the role.  And then Chad was

9    in that meeting, and -- where Dr. Fikry shared that and then

10    counselled Hacene to share that with Dr. Menninger directly.

11          Chad shared that Lisa had expressed high work loud,

12    and that Hacene felt that not involving her in recruiting

13    would be helping her workload issues.  And Hacene had

14    indicated that he had shared that directly with

15    Dr. Menninger.

16    **Q.**  The next item, number 3, "New expectation to attend bid

17    defense and client visits," and being asked to speak about

18    topics that she is not knowledgeable and it lists some

19    topics?

20    **A.**  And again, Chad -- yes.

21    **Q.**  What did you learn from Chad about that?

22    **A.**  Chad, in leadership team meetings, knew about it, but he

23    was not party to all the discussions.

24    **Q.**  Number four, "Not invited to 2018 sales/marketing routine

25    meetings.  Asked to have meeting request forwarded but has

1   not happened."

2   **A.**   Chad didn't have any knowledge of that.

3   **Q.**   What about number five, the town hall with -- and I'm

4   going to mispronounce it again --

5   **A.**   Sharbaugh.  So the town hall with Sharbaugh, the town

6   hall was one where we had -- Hacene had decided to bring in a

7   client to speak with the entire Global Central Lab

8   population.  It was a very purposeful and focused meeting,

9   and there were no introductions of our chief operating

10  officer to anyone who was in the Highland Heights office, and

11  Chad, who had attended that meeting, was saying that that was

12  how it played out.

13  **Q.**   And understanding that -- you said no formal intros for

14  anyone in your notes here, you've just expanded on that

15  further.  Did you -- do you have a memory of additional

16  information that you learned from Chad that's not necessarily

17  written verbatim in these notes?

18  **A.**   Yeah, I didn't type every single word that everybody

19  said, so, yeah, there would be, maybe, nuggets here or there

20  that would not exactly be included.

21  **Q.**   Number 6, it says, "2017, no performance review

22  discussion, not much commentary in the review, but lower

23  ratings."

24          Do you see that?

25  **A.**   Yes.

**JA774**

1    **Q.**  And then there's a note below with (a), it says "Chad,"

2    and then it explains what you learned.  Can you explain that?

3    **A.**  So again, Chad working with Hacene confirmed that Hacene

4    did talk to her about her performance, about her goals and

5    behaviors, but not in the exact review form itself.  No

6    formal conclusion to the review.

7    **Q.**  And number 7 is, "Discussion of exit package or

8    consulting role during the review of accommodations."  And

9    we'll flip to the next page to see what your notes say there,

10   where it says (a).  Can you explain to the jury what you

11   learned from Chad, what you recall learning from Chad about

12   that item?

13   **A.**  Yeah.  So when I asked Chad who was in the meeting

14   talking about accommodations for Dr. Menninger, he indicated

15   that the meeting was unproductive -- let me make sure I read

16   this -- that there didn't seem to be a good exchange of how

17   can we support you.  And again, it's not listed here, but the

18   way Chad described it to me directly was it was a back and

19   forth.  Lisa indicating, "I can do my job," but then having

20   doctor's notes that say she couldn't do certain things to

21   exacerbate her condition.  And it just kept going back and

22   forth and back and forth, and Lisa kept saying, you know,

23   "What if I can't do my job?  What if I can't do my job?"

24   Chad felt compelled to fill in the blank of, well, you know,

25   hypothetically maybe we could look into a consulting

 1   agreement, like we did with Dr. Tadeo, or we could -- you

 2   know, maybe an exit package, just trying to move the

 3   conversation along, is how Chad described it.

 4   **Q.**  You just mentioned Dr. Tadeo, is that where it says

 5   "Frank Tadeo, consulting"?

 6   **A.**  I'm sorry.  Yes.

 7   **Q.**  And can you just explain for the jury what that means?

 8   **A.**  So Dr. Frank Tadeo worked for an acquired business in

 9   Pennsylvania.  The company decided to divest or sell that

10   piece of the business, but we wanted to retain the

11   intellectual knowledge that our employees are really, you

12   know, talented employees.  So Dr. Tadeo was asked to move to

13   our Virginia facility, where we were going to move the

14   vaccine testing.  And Dr. Tadeo decided he didn't want to

15   relocate, for whatever reason.  And of course, relocating to

16   the Virginia office was important to conduct work and set up

17   the vaccine lab and to be available to consult with our

18   employees.  We entered into a consulting agreement with

19   Dr. Tadeo.

20   **Q.**  In the last sentence of your notes here, Deb, it

21   says, "How can she service the licensure and still work

22   effectively?"

23   **A.**  Yeah.  Chad -- with Dr. Menninger holding our licensure

24   and, again, the uncertainty of what she needed from an

25   accommodation perspective, you know, she is our licensure

1   holder.  We are dependent upon her credentials to do the

2   business that we conduct.  And if she's unable to perform

3   certain key components of her job, how does that -- how does

4   that affect our organization?

5   **Q.**  Let's look at the next page of your notes.  These are

6   from May 7th.  And they say at the top, "Discussion with

7   Hacene Mekerri"?

8   **A.**  Correct.

9   **Q.**  And these are your notes?

10  **A.**  Yes, they are.

11  **Q.**  Did you have a conversation with Mr. Mekerri on May 7th?

12  **A.**  Yes, I did.

13  **Q.**  And like you did with the earlier notes, can you walk us

14  through what you discussed with Mr. Mekerri and what you

15  learned?

16  **A.**  Sure.  So the first one, you know, issues with clients,

17  Hacene confirmed he had discussions verbally with both

18  Dr. Menninger and her team about the challenges.  The current

19  issues happened close together and are very concerning.  They

20  are more severe than historical, in terms of impact to our

21  clients.  One led to an employee termination.  And a critical

22  event, which I believe the process required notifying senior

23  leaders of our -- senior executives of our organization when

24  critical events happen, asked her for an executive summary in

25  the corrections that she was making, specifically related to

1    those clients.

2              There was a new issue not raised in the past, which

3    was GSK, where samples actually got discarded.  Overall

4    business expectation.  You know, Hacene is setting overall

5    expectations for the entire business that we need to

6    eliminate or minimize all errors.  Lisa canceled the meeting

7    to discussed goals, rather sent a long e-mail.  Last week

8    Hacene had discussed goals with her, asked her to send -- or

9    sorry, "last week Hacene had discussed goals with her and

10   asked her to send Hacene revised goals, but nothing was sent

11   from Lisa."

12             So today, May 7, 2018, "asked if she can see other

13   goals at the ED level, her peers.  Willing to accommodate,

14   but she said, no, she didn't want to see them, because she

15   didn't want to have to share her own goals and would feel

16   uncomfortable sharing, so agreed not to disclose her

17   colleagues goals at the ED level, which was Clendening and

18   Els Pluymers.

19   **Q.**  Were Clendening and Els Pluymers, were those other

20   executive directors at the time?

21   **A.**  Yes, for Central Lab.

22   **Q.**  And looking back up to some of the earlier things that

23   you noted learning from Mr. Mekerri, it says one of the

24   issues -- after it says the more severe issue than

25   historically, one led to an employee termination?

**A.** Yes.

**Q.** And did you have an understanding if that was a termination of someone in the lab's kind of sphere of command?

**A.** Yes, it would have been a lab individual who was terminated because of their actions working on that particular client were inappropriate.

**Q.** The other -- the other thing, it says, "One new issue not raised in the past, GSK, with discarded samples."

What else did you learn about that issue in particular?

**A.** GSK, significant client, not just for the Central Lab, but for PPD in general --

**Q.** Is that GlaxoSmithKline?

**A.** Sorry. GlaxoSmithKline. Yeah. Sorry.

Yeah, significant issue. Samples are taken from patients. So when a sample is discarded, it's very concerning. You can't recover that sample. It's just gone. So again, not a normal error, not a typical error.

MR. HANNON: Objection.

THE COURT: What's the objection?

MR. HANNON: There's no foundation as to any personal knowledge of normal or -- actually, no foundation as to how she got that knowledge. Speculation.

THE COURT: Overruled, but maybe you should lay a

```
 1    little more foundation for it.
 2    BY MS. MANDEL:
 3    Q.  Deb, backing up a little bit on the GlaxoSmithKline --
 4    maybe I should just call it GSK -- discarded sample issue.
 5    Aside from your notes here and your meeting with Mr. Mekerri,
 6    did you have occasion, within HR, to know about this
 7    incident?
 8    A.  I would, yes, when they are significant events, I would
 9    be made aware from an HR perspective through discussions with
10    senior leaders in leadership team meetings, yes.
11    Q.  And when you say "significant events," can you explain
12    what a significant event is?
13    A.  So there are minor errors that occur in, you know,
14    manual -- manual interaction with conducting testing, you
15    know, wrong -- a wrong amount of solution goes in, what have
16    you.  But disposing of a sample is considered a -- you know,
17    is definitely a major -- a major and critical event in any
18    lab.
19    Q.  And over your years working in HR, supporting the lab's
20    business, have you come to be aware of -- I think you used
21    the term "major" or what was the --
22    A.  Critical event.
23    Q.  Critical event.  Have you come to become aware of other
24    critical events in the lab?
25    A.  Yes.
```

1    **Q.**  Do you recall what you learned in your HR role about this

2    particular critical event involving GlaxoSmithKline?

3    **A.**  So I learned about this from an HR perspective, because

4    again, not a -- a critical event, not typical, and it would

5    have included a discussion with HR about remediation. How do

6    we -- how do we correct this? How do we look at this

7    particular situation? And also aware because, again, GSK, a

8    very large client, for not only the Central Lab, but for all

9    of PPD, there was, I believe, senior executives needed to

10   speak with members of GSK, to just make sure we're

11   maintaining that relationship, and reassuring them that we do

12   have a quality mind and we are continuing to work effectively

13   for their product.

14   **Q.**  And within your role in HR, being aware of this as a

15   critical event, as far as you know, was Dr. Menninger

16   disciplined in any way?

17   **A.**  No.

18   **Q.**  As far as you know, did Dr. Menninger receive any type of

19   warning in connection with this?

20   **A.**  No.

21   **Q.**  And looking again at the last -- the last sentence of

22   this paragraph of your notes, can you just explain what it

23   meant? It says, "Didn't want to share her own, or would feel

24   uncomfortable sharing, so did not agree to disclose

25   Clendening and Pluymers' goals." What you learned from

1   Mr. Mekerri about that?

2   **A.**   So Mr. Mekerri, again, based on the quality events was

3   looking to change goals.  We were seeing some issues coming

4   out of the lab, appearing to be a little more egregious than

5   historic, wanting to change goals for 2018 around quality,

6   and working -- giving that feedback to Lisa, or

7   Dr. Menninger, apologies -- her wanting to see goals from

8   other executive directors on what does that goal look like?

9   How is it worded?  And Hacene said, you know, I'm happy to

10   accommodate that.  I'm happy to share with you what their

11   goals are, but I would feel it would be fair for me to share

12   what your goals are, as well, so we can all be, you know,

13   aligned as a leadership team.  But Dr. Menninger didn't feel

14   comfortable sharing her goals, so it wasn't -- it wasn't

15   shared amongst the executive directors.

16   **Q.**   Number two -- and number two is just copying over the

17   concern that had been raised; is that right?

18   **A.**   Correct.

19   **Q.**   Number 2, you then, below, have information from

20   Mr. Mekerri; is that right?

21   **A.**   Correct.  So Hacene basically said, you know, obviously,

22   had no conscious effort to exclude her in the interview

23   process.  He indicated she had been involved and aware of the

24   candidates.  She was made aware of Patrick Mann's hiring, not

25   directly involved with hiring Narine or Patrick, but she

1    certainly was made aware, that Dr. Menninger expressed

2    concern about her workload, and that this was one area to

3    help her work/life balance.

4              He had a verbal conversation with Lisa about the

5    role in recruiting, and with her stating that she felt

6    overwhelmed, he took on the initiative to recruit for her.

7    **Q.**  And given what you learned from Mr. Mekerri here, did you

8    have any reason, from an investigation standpoint, to be

9    concerned that there was a problem like Dr. Menninger had

10   raised to you?

11   **A.**  On face value, Dr. -- or Mr. Mekerri, you know, he was --

12   he was empathetic to Dr. Menninger.  He -- you know,

13   empathetic to her situation, allowed her to move to

14   Massachusetts.  He -- you know, wanting to help her lessen

15   the workload.  This, on face value, made sense, but I didn't

16   take it at face value.  I certainly asked recruiters.  You

17   know, Chad concerned that Dr. Fikry is asking for this to

18   move along swifter.  So there was more data that said, you

19   know, Hacene is acting in the best interest of his employee

20   to be helpful, but others said, yeah, this is -- I assume

21   we're going to get to the others, too, but there were others

22   who said, yeah, that was exactly what was happening.

23   **Q.**  And just to be clear, when you said that Mr. Fikry had

24   said -- or Dr. Fikry said he wanted this to move more

25   swiftly.  What was it that you understood Dr. Fikry wanted to

1   move more swiftly?

2   **A.**  One particular role had been open for a number of months,

3   I believe for almost a year.  And he wanted that position to

4   be more swiftly filled.

5   **Q.**  Looking down at number three, again, this repeats

6   Dr. Menninger's concern.  In your notes below, you reflect

7   information that you learned from Mr. Mekerri; is that right?

8   **A.**  Correct.

9   **Q.**  And I'll flip to the next page when you're ready.  But

10   can you explain what is on the bottom of this page that you

11   learned?

12   **A.**  So, again, Hacene saying this is not a new -- so

13   attending bid defenses and client visits is not a new

14   expectation.  Perhaps it -- it -- you know, at her level she

15   needs to be involved in these activities to support the

16   growth of the business.

17          Chris Clendening, working directly with clients

18   weekly in his executive director role in project management.

19   The sales numbers were very low in 2017, commercial sales,

20   and high expectations for the entire organization of Central

21   Labs in 2017.

22   **Q.**  And can you explain a little bit more?  You said that

23   Chris Clendening was an executive director, as well?

24   **A.**  Correct.

25   **Q.**  And based on your role in HR, what did you understand at

 1   that time that Chris Clendening's, like, sphere of
 2   responsibility was?
 3   **A.**  He was the executive director of project management, so
 4   conducting the studies, and he, during this time period, was
 5   working with clients directly.  He was traveling and meeting
 6   with clients, visiting clients, you know, selling our
 7   business, basically.
 8   **Q.**  And why was that significant for you to note as part of
 9   your response on number 3 about the new expectation?
10   **A.**  Again, not a new expectation for the role.  And if
11   Dr. Menninger felt that she was being treated differently
12   than others, you know, we have Chris Clendening doing it, so
13   it's not that she is being asked to do something that others
14   aren't doing, as well.
15   **Q.**  And so -- end of that page, it says, "Bringing in new."
16   And then let's flip to the next page.  And it
17   says, "Technologies in US/Europe APAC."  Do you see that?
18   **A.**  Yes.
19   **Q.**  "Asked her to understand these new capabilities and help
20   sell.  Revenues not on target yet, so need everyone pulling
21   their weight."
22           Can you explain what you understood Mr. Mekerri to
23   be saying in that part of your notes?
24   **A.**  Yes.  So part of the commercial effort to raise sales of
25   our business is to invest in new technologies.  And that was

1   happening both in our US and EMEA, or Europe and APAC

2   regions.  And certainly with Dr. Menninger's licensure and

3   knowledge, really needing her to, you know, be able to be in

4   a position to sell these new technologies, which could in

5   turn become a more solidified client base.  We could secure

6   more clients based on this new technology.

7   **Q.**  And what do you recall Mr. Mekerri explaining to you to

8   reflect in the last sentence of that paragraph that "revenue

9   is not on target yet"?

10  **A.**  So as a for-profit business, revenue is very important.

11  You sell your work.  Revenue turns into the work that you

12  perform, and then profitability is how well you do executing

13  that work in the streamlined fashion.  So revenue is really

14  the way that we measure, you know, success, financially, in

15  our business.  If we don't meet revenue targets, we are

16  unable to provide benefits and pay and bonuses and support

17  the company's desires to grow in research and development,

18  and investing in, you know, employees.  So it's very

19  important that revenue is a top of mind opportunity for

20  leaders to really, you know, sell our business and make us

21  profitable.

22  **Q.**  And after you learned this information from Mr. Mekerri

23  during your investigation and meeting with him, what did that

24  lead you, if anything, to conclude about the concerns

25  Dr. Menninger had raised?

1   **A.**  They are an essential function of her job.  Perhaps it

2   wasn't a focus during 2017, but it was certainly an ask to

3   focus for 2018.  It was a part of her job.  Hacene was asking

4   other leaders across the business to perform this same type

5   of activity, so it didn't -- it was not where she was being

6   treated differently from this ask of her boss.

7   **Q.**  Down below in the next item, number four, it says, "Not

8   invited to 2018 sales marketing routine meetings, asked to

9   have meeting requests forwarded, but that has not happened."

10           That was Dr. Menninger's concern, again, listed out

11   here?

12   **A.**  Correct.

13   **Q.**  And did you ask Mr. Mekerri about that?

14   **A.**  I did.  And the 2018 sales and marketing routine meetings

15   are hosted by Andrew Supp or Andy Supp, who at the time was

16   the commercial leader for Central Labs.  So it was his

17   meeting, his determination of the attendee list.  Hacene, who

18   is aware of those meetings, indicated that Dr. Menninger is

19   not included on the week's meeting, but she has three members

20   of her team who are invited, and his understanding is that he

21   would expect her direct reports to report back to her and the

22   team any significance from those meetings.

23   **Q.**  And in the last sentence, you note, "No request from her

24   to have her added."

25   **A.**  Right.  So Hacene indicated he hadn't received any

1    request from Dr. Menninger to attend those meetings.

2    **Q.**   Okay.  And back in the first sentence of that, that

3    little section, it says, "Andy Supp's meeting held biweekly,

4    marketing log call"?

5    **A.**   Yes.

6    **Q.**   What did you mean when you wrote that?  Or what did you

7    learn from Mr. Mekerri that led you to write that?

8    **A.**   So as Hacene described it, Lisa said none of the 2018

9    sales meetings/marketing routine meetings -- the marketing

10    routine meetings were called the marketing log call.  So it's

11    the same meeting.

12    **Q.**   It's referring to that same meeting that Dr. Menninger

13    had raised?

14    **A.**   Exactly.

15    **Q.**   Right.  In number five, the town hall concern?

16    **A.**   Yes.  So Hacene -- you know, again, like Chad said, there

17    were no formal introductions.  Mark is the representative

18    from Pfizer, another client of the Central Lab and PPD in

19    general.  Hacene introduced the client representative, but

20    there were no other formal introductions made.  So it didn't

21    exclude Dr. Menninger.

22    **Q.**   And just backing up, can you explain a little bit more

23    about what you understood the concern to be here in number

24    five, and then what you were trying to get from Mr. Mekerri

25    to understand more about it?

1   **A.**   So when discussing Dr. Menninger's concerns, she was

2   concerned that she was being excluded.  She was remote, I

3   believe, traveling back to Highland Heights to attend this

4   particular town hall, and that she wasn't introduced, she

5   wasn't -- introduced to either the audience or the members,

6   the participating members, Bill Sharbaugh, who's the chief

7   operating officer.  That was her concern about being treated

8   differently.  Her boss, Hacene, is saying that, as well as

9   Chad, that there were really no formal introductions made to

10   anyone during this town hall, and our visit by our COO, and

11   the representative from a client.

12   **Q.**   The next item, number six, about the 2017 -- the previous

13   year's performance review.  Can you explain what you learned

14   from Mr. Mekerri about this item?

15   **A.**   Hacene indicated that he did have a conversation with

16   Dr. Menninger.  He did not include an official document.  The

17   discussion went okay, but not an easy discussion, in his

18   opinion.

19        He shared feedback that he gathered on a 360

20   review.  It was -- that was a good and constructive

21   discussion.  And he had gathered 360 feedback on not just

22   Dr. Menninger's direct reports, but others -- others of his

23   direct reports.

24   **Q.**   And did you understand from Mr. Mekerri when these

25   conversations happened that he was talking about?

**A.** These conversations happened in 2017.

**Q.** And did you have an understanding, based on your discussion with Mr. Mekerri, about what it meant that it was not an easy discussion?

**A.** Again, I believe, based on some of the -- the client quality challenges, the -- giving, you know, Dr. Menninger, that feedback was not an easy discussion to have.

**Q.** Number seven, "Discussion of exit package and/or consulting role during review of accommodations." Can you explain what you learned from Mr. Mekerri during your investigation about this item?

**A.** So this was a meeting where Dr. Menninger was in Highland Heights, attending with Chad and Hacene, to talk about accommodations. Through Hacene's perspective, they were talking about her next step in the future of her role. He didn't recollect discussing a package or a new role. He recalls questioning her on what she wanted to do going forward, what she wanted to do in terms of her accommodations. There was misalignment in agreeing on a path forward. There was a high level discussion on alternative options, but the general direction -- general direction, but nothing firm or specific to her, predicated on her or PPD not being able to accommodate her.

**Q.** In your role doing an investigation here, Deb, did you have a concern about Dr. Menninger having one perspective

1 about what had happened during that conversation and

2 Mr. Mekerri and Mr. St. John having a different perspective

3 on what happened during that conversation?

4 **A.** Yes.

5 **Q.** Can you tell us more about that?

6 **A.** So certainly in interactive dialogue discussions, it's

7 important for everybody to be aligned and understanding what

8 we're working towards. And with misalignment, it's

9 concerning that, you know, both parties are not aware of our

10 next step and where we go forward. And it's -- the lack of

11 clarity is definitely concerning.

12 **Q.** And were you also concerned about just different

13 understandings by the people in the meeting about what

14 happened in the meeting, and especially Dr. Menninger's

15 concern that, you know, she had complained about what

16 happened in the meeting? Did you have concerns about that?

17 **A.** Yes.

18 **Q.** Coming out of this meeting that you had with Mr. Mekerri

19 about what had happened, what did you think about those

20 different perspectives about what had happened in that

21 meeting?

22 **A.** So Chad is saying there was, you know, discussion where,

23 you know, Dr. Menninger was, you know -- what happens if I

24 can't do my job? What happens if I can't do my job? Hacene

25 saying he doesn't have recollection of that. We heard, you

1   know, Dr. Menninger's perspective that the meeting started

2   with options.  So it's like there's just so much confusion,

3   how do we move forward?  Very concerning that there were

4   three distinct perspectives coming out of that meeting and no

5   validation of what truly happened.

6   **Q.**  And as of this point, if we go back to May of 2018, in

7   your sort of official capacity, in your role in HR, did you

8   have any knowledge of a concerted plan to move Dr. Menninger

9   out of her position at that point?

10  **A.**  No.

11  **Q.**  And at any point did you become aware of a concerted plan

12  to move Dr. Menninger out of her position?

13  **A.**  There was discussions around -- again, Lisa's request for

14  accommodation, her being remote, this uncertainty about where

15  we go, uncertainty about, you know, coverage.  There was

16  concern for, certainly, however, whatever happens, do we have

17  coverage for our lab from a licensure perspective.

18  **Q.**  Let's look at the next page of your notes.  These are

19  from a few days later, on May 11th.  And these

20  say, "Discussion with Andy Supp."?

21  **A.**  Yes.

22  **Q.**  And it says, "executive director of BD Central Labs"?

23  **A.**  Yes.

24  **Q.**  And is BD business development?

25  **A.**  Business development.  The commercial team, the sales

1    team.

2    **Q.**  And this page of notes only has one area of concern that

3    had been raised, right?  It only has that number four?

4    **A.**  Correct.

5    **Q.**  Is that the only topic that you spoke about with

6    Mr. Supp?

7    **A.**  That's correct.

8    **Q.**  And why is that?

9    **A.**  Because all of the other issues that Dr. Menninger raised

10   were irrelevant to Andy's role.  Andy would have no

11   information or be able to contribute to any of those other

12   topics.  So it's specifically solely related to the sales

13   meeting that he is the -- the owner and the host of.

14   **Q.**  And can you describe what you learned from Mr. Supp

15   during your meeting with him?

16   **A.**  So Andy, you know, as the owner and facilitator of that

17   meeting, you know, he sends out the meeting requests.  So he

18   monitors the distribution list of who's the invitee list.

19   Apparently, it's a pretty large group, make sure that anyone

20   who's left the company is removed.  He periodically reviews

21   it to add new members as the organization grows and changes.

22   And he certainly wants to make sure that it's a value add for

23   everybody, so if there's multiple members from each team,

24   that he calls that out, as well.

25            He did -- he worked with the departments, including

1    managers, to determine the appropriate representation.  That

2    was a specific marketing and routine meetings for the annual

3    sales meeting in 2018.  Andy worked with Hacene to make sure

4    they had the best participants outlined and identified.

5    **Q.**  And let me just pause you right there, it says in

6    parenthesis, "(First week of March in WILM)."

7           What does that mean?

8    **A.**  First week of March in Wilmington, North Carolina, which

9    at the time was the corporate headquarters for PPD.

10   **Q.**  So your understanding is that this annual sales meeting

11   had taken place in Wilmington?

12   **A.**  Correct.

13   **Q.**  And that was in March of 2018?

14   **A.**  Correct.

15   **Q.**  Okay.  Thank you.  Go ahead.

16   **A.**  So in advance, Andy had worked with Hacene to determine

17   the best participants at that meeting.  They discussed

18   content and breakout sessions.  And I've attended the sales

19   meeting, so it's a meeting that talks about, you know, what

20   is our sales focus for this year, how do we go after more

21   clients, how do we make sure we solidify those that we

22   currently have in-house.  And then there's break outs.  We

23   have different divisions of PPD.  The labs would break out

24   and talk about lab related activities.  And it's like a topic

25   every year would be determined to be, you know, a critical

1     one for that particular sales year.  So Andy and Hacene

2     worked out what that particular breakout session would be and

3     who best to represent that.  And because it was based on new

4     technologies, Hacene and Andy determined that Chris

5     Clendening would be the best participant for that particular

6     breakout session.

7     **Q.**  And that was another executive director working within

8     the labs business?

9     **A.**  Correct.  So Chris Clendening attended the sales meeting

10    in 2018, just for the breakout session.  He didn't attend the

11    entire sales meeting.  And no one -- no other participants

12    from the Central Lab were participate -- had participated in

13    that meeting.

14    **Q.**  And just to be absolutely clear, because it's now sort of

15    coming out of the pandemic, did you have an understanding as

16    to whether this was an in-person meeting in March in

17    Wilmington, North Carolina?

18    **A.**  Yes.  Yes, they were -- yes.  Up until the pandemic, they

19    were all in person.

20    **Q.**  Okay.  And just to go back to that last sentence, no

21    others from Central Labs participated as key to the meeting,

22    or vetted as key to the meeting.  What was -- in your view of

23    doing the investigation, what was the significance of that

24    statement?

25    **A.**  Again, Lisa felt that she was being treated differently

1   by her manager, but in this case, she wasn't.  She was

2   considered to be a participant in these breakout sessions,

3   just like all the other leaders, based on the topic of this

4   year.  Chris Clendening was the subject matter expert to

5   participate in that and no other participants from Central

6   Lab participated, inclusive of Dr. Menninger.

7   **Q.**  And coming out of this discussion with Mr. Supp on May

8   11th, did you make any preliminary determinations about what

9   Dr. Menninger's concern had been with regard to being

10   excluded from that meeting?

11   **A.**  Yes.  So she wasn't excluded because of her disability.

12   She was excluded because she wasn't the subject matter expert

13   for that particular year, just like her colleagues, everyone

14   else was excluded because of -- you know, they weren't at the

15   subject matter experts that contributed to this meeting.  She

16   wasn't treated any differently than any other leader or

17   member of the Central Lab.

18   **Q.**  We'll jump to your next -- we'll jump to your next page

19   of notes.  Here it says, "Talking points by phone."  And

20   there's not a date or sort of introduction at the top of

21   these notes.  Are these also notes that you typed, Deb?

22   **A.**  No.  These notes were provided by our legal department.

23   **Q.**  Okay.  Are these notes that reflect a conversation that

24   you had with Dr. Menninger?

25   **A.**  These are the notes -- yes.  These are the talking points

1     that I shared with Dr. Menninger at the conclusion of the

2     investigation.

3     **Q.** And these were -- were these talking points that you're

4     consulting as sort of an outline of that discussion?

5     **A.** Correct.

6     **Q.** Did they reflect information that you, yourself, had

7     learned during the investigation?

8     **A.** Yes. I had conducted the entire investigation and worked

9     with our legal department to draft the talking points.

10     **Q.** And jumping to the next page of your notes, they're dated

11     May 15th?

12     **A.** Yes.

13     **Q.** And these were notes that you took, Deb?

14     **A.** Correct.

15     **Q.** And it says, "Discussion with Brent Mann, senior

16     recruiter."?

17     **A.** Yes.

18     **Q.** Can you just describe Brent Mann's role, as far as you

19     understood it at that point, in 2018?

20     **A.** So Brent Mann was a -- or is a member of the human

21     resource team. He -- his function or purpose is to recruit.

22     So he's a recruiter that supported our Central Lab business

23     at the time and was the one who was recruiting for the

24     specific roles that Dr. Menninger said she was excluded for.

25     **Q.** And why did you speak to Mr. Mann?

1    **A.**   Again, Dr. Menninger feeling like she was excluded,

2    Hacene indicating that he had conversations with Lisa, with

3    Dr. Menninger.  But verbally discussing them, I wanted to,

4    again, ensure that the conversation actually did occur, so

5    it's another data point to say this actually occurred.

6           So I did bring Brent into the investigation, talked

7    about confidentiality, shared -- you know, very important for

8    him to share factually, honestly with me, and I would not be

9    getting back to him with any results, that this was just an

10   information sharing discussion.  When I talked to Brent, he

11   confirmed that there was a meeting in December of 2017,

12   between Hacene, Chad St. John, Brent Mann, the recruiter, and

13   Dr. Fikry.  It was mutually agreed that Hacene would become

14   the hiring manager and requirements for the opening would be

15   reviewed for better candidate alignment with business needs.

16   There was a slow process that had occurred previously.

17          After one year of the position being opened,

18   Dr. Fikry wanted Hacene to take it over to get it filled on a

19   swifter pace.  From Brent's vantage point, that Dr. Menninger

20   was selective about her candidates and sought to find the

21   perfect one at the expense of filling this important role.

22   Didn't evaluate the candidates from a learned skill, versus

23   one that necessary to hire.  And what that means is hiring a

24   candidate who you could spend time developing and coaching

25   and helping them develop skills, versus one that's inherently

1   exhibited by the candidate when they are hired.

2   **Q.** And at the first line of those notes, it says, "Confirm

3   meeting occurred on December 12, 2017."

4       Why did you note that?

5   **A.** Again, excuse me, Dr. Menninger was saying she was being

6   treated differently because of her accommodation request.

7   This meeting occurred well in advance of Dr. Menninger

8   disclosing her -- disclosing her need for accommodation.

9   **Q.** Did you reveal to Brent Mann that Dr. Menninger had

10  brought forward a disability request?

11  **A.** No.

12  **Q.** In fact, did you reveal that to any of the people that

13  you spoke to in connection with this investigation?

14  **A.** No.

15  **Q.** Did Mr. Mann report to you in HR?

16  **A.** No, he did not.

17  **Q.** In your role in HR, did you share with the other spheres

18  of HR, such as recruiting, that Dr. Menninger had brought

19  forward a disability accommodation request?

20  **A.** No.

21  **Q.** When you spoke with Mr. Mann, did Mr. Mann say anything

22  that led you to believe that Mr. Mann was aware that

23  Dr. Menninger had made a disability accommodation request?

24  **A.** No.

25  **Q.** You say in the third and a half line, before the end, it

1  says, "Brent's opinion is that Lisa Menninger was overly

2  picky with candidates."?

3  **A.**  Yes.

4  **Q.**  Do you have a recollection, as you sit here, if "overly

5  picky" was a term that Mr. Mann used?

6  **A.**  Yes, that's what he would -- he used.

7  **Q.**  On the next page of your notes, these you took on

8  May 17th.  Is that accurate?

9  **A.**  Yes.

10  **Q.**  And it indicates discussion with Brent McKinnon?

11  **A.**  Yes.

12  **Q.**  And next to his name it says "ED QA."

13  **A.**  Executive director of quality assurance department.

14  **Q.**  And is Brent McKinnon someone else with whom you spoke as

15  part of your investigation?

16  **A.**  That's correct.

17  **Q.**  And you have just one of the issues raised by

18  Dr. Menninger is listed here in your notes?

19  **A.**  Correct.

20  **Q.**  Why did you discuss only one of the concerns with

21  Mr. McKinnon?

22  **A.**  Brent is our QA executive.  All the other issues that

23  Lisa, or Dr. Menninger, raised were irrelevant to Brent.  He

24  wouldn't have had any significant contribution to any of the

25  other situations.  So, again, protecting confidentiality,

 1    making sure we just wanted to get the data around the

 2    quality.  Brent had the best information for me to

 3    investigate this particular issue that Dr. Menninger raised.

 4    **Q.**   During your discussion with Mr. McKinnon on May 17th, did

 5    you indicate to Mr. McKinnon that Dr. Menninger had revealed

 6    a disability at any point?

 7    **A.**   No.

 8    **Q.**   Did you tell Mr. McKinnon at any point during this

 9    meeting that Dr. Menninger had sought a disability

10    accommodation?

11    **A.**   No.

12    **Q.**   Did Mr. McKinnon say anything during this meeting that

13    led you to believe that Mr. McKinnon had any awareness of

14    those facts?

15    **A.**   No.

16    **Q.**   So you listed that concern number one?

17    **A.**   Yes.

18    **Q.**   And beneath that, you have some information noting what

19    you learned from Mr. McKinnon?

20    **A.**   Yes.

21    **Q.**   Can you describe for the jury what you learned from

22    Mr. McKinnon about this issue?

23    **A.**   So Brent indicated that there was a consistent

24    application minor, major, and critical events across

25    functions, meaning there were issues across the entire

1 organization, that currently there was a lack of

2 accountability by the business for all functions to really

3 work to closing those events timely.

4 **Q.** Can you explain what that means, as far as you

5 understand, based on what McKinnon said to close events

6 timely?

7 **A.** So to close an event, I believe, that they have to be

8 resolved in order to submit the results from the testing to

9 our clients. If events remain open, it delays either getting

10 the results to our clients and/or concluding the testing in

11 which to, you know, bill our clients and be paid for that

12 particular work. So these events are pretty important to be

13 timely closed.

14 **Q.** And just to pause there for one moment, an event, what

15 type of event?

16 **A.** It could be any error, any deviation, results don't --

17 results don't come in at the expected range. Anything that

18 doesn't go according to our standard operating procedures or

19 an assay, the method in which you use to conduct that work.

20 **Q.** Okay. I'm sorry, so go ahead, please, walking us through

21 what you learned from Mr. McKinnon.

22 **A.** So Brent confirmed that Hacene, through leadership team

23 meetings, is asking everyone across the Central Lab to give

24 closing of these events priority, and really working to close

25 them in a timely fashion, and that ongoing, there's going to

1   be quarterly meetings to discuss appropriate attention to

2   ensure that we keep an eye -- that they're keeping an eye on

3   closing these events timely.

4           Brent is -- indicated he is going to send e-mails

5   if he received this information and when.  Brent went on to

6   say that they were currently, with our larger client

7   GlaxoSmithKline, five CAPAs, corrective action, preventative

8   action, and that are categorized as major events within

9   central management and the lab groups.  And then Brent

10  expressed concern with the data in three specific categories.

11  **Q.**  And a couple lines up, you read that Mr. McKinnon is to

12  send you e-mails of who received this information and when.

13  And do you recall, Deb, if that actually happened?

14  **A.**  Yes, I believe he did send me the documents, yes.

15  **Q.**  And did you review those documents as part of your

16  investigation?

17  **A.**  Yes.

18  **Q.**  Okay.  And so then you said that Mr. McKinnon expressed

19  concern with data in certain categories?

20  **A.**  Correct.

21  **Q.**  Okay.  And just generally, what did you understand those

22  categories to be?

23  **A.**  Lack of accountability, holding employees accountable to

24  the timeliness of completing these events, lack of oversight,

25  and not acting with a sense of urgency within the

1  laboratory-based areas, leaders not necessarily doing rounds

2  and ensuring proper processes are followed while the testing

3  is being conducted, that he had shared that with Hacene

4  multiple times.  And then the third point was training was

5  not consistent or completed timely, and it's important to do

6  training because our clients can ask if our employees are up

7  to date with their learnings and their training, so it's

8  important to have the trainings completed timely, as well.

9  **Q.**  And did Mr. McKinnon indicate to you that these areas of

10  concern with the data in these three categories was something

11  specific to Dr. Menninger?

12  **A.**  No.  He was -- he was speaking to quality across all of

13  Central Lab, but also speaking to, you know, areas where he

14  saw concerns.  I mean, there's sample management had some

15  concerns, as well as the laboratory based groups, there was

16  concerns.

17  **Q.**  And in the last paragraph, can you explain what you

18  learned from Mr. McKinnon that you reflected there in your

19  notes?

20  **A.**  So as the quality assurance director, he's going to

21  continue, obviously, to raise awareness.  Brent doesn't

22  report into the business, he collaborates with the business

23  on the quality area.

24        He also cited that the current structure of the lab

25  group, where the Brussels leader reported it to

```
 1    Dr. Menninger --

 2    Q.  Is that Lorraine --

 3    A.  Lorraine McNamara, sorry.  Lorrain McNamara, Brussels

 4    site, had reported it to Dr. Menninger, and Narine -- I can't

 5    pronounce her last name, either, reporting to Hacene is

 6    causing concern that there's not, you know, an overall

 7    unified direction for the overall lab business.

 8    Q.  Did you make any initial conclusions about this

 9    particular set of concerns after meeting with Mr. McKinnon on

10    May 17th?

11    A.  It certainly felt better that there was an expectation

12    for quality being raised across all of the Central Lab.  It's

13    not just targeted at the labs.  It felt better that, you

14    know, Brent is having conversations with Hacene, and everyone

15    is being held accountable to raising the level of quality

16    across their business.

17              THE COURT:  I'm going to pause you here and we'll

18    take the morning break.

19              Ladies and gentlemen, all rise for the jury.

20              (The jury exits the courtroom.)

21              THE COURT:  All right.  We'll resume in 15 minutes.

22              MR. HANNON:  Your Honor, we had spoken yesterday,

23    we might need to take a witness out of order.  We have Lisa

24    Hart, Dr. Menninger's -- I'm sorry, not Lisa Hart, Tonya

25    Hart, Dr. Menninger's sister.
```

```
 1              THE COURT:  Why don't we do that after the break
 2       when we come back.  And then we'll take her, and we'll pause
 3       Ms. Ballweg's testimony.  We'll finish her and then we'll
 4       resume with Ms. Ballweg.
 5              MS. MANDEL:  Your Honor, could we just -- this
 6       particular document.  Could we just finish looking at this
 7       particular document?
 8              THE COURT:  How many more pages are there?
 9              MS. MANDEL:  We're like the third-to-last page.
10       We're close.  I think that would just make a little more
11       sense, and then pause.
12              THE COURT:  Are the three pages long or short
13       pages?
14              MS. MANDEL:  They're not short, but I think that it
15       will just give us a more logical place to pause.
16              THE COURT:  I'll tell you what, you're like a half
17       our with her?
18              MR. HANNON:  Correct.
19              THE COURT:  And you're about a half hour with her?
20       So I'll let you do a little bit, and I'll keep an eye on the
21       clock, but before 12:00, I'm going to pause you anyway --
22       I'll either pause you at the earlier of when you're done with
23       the three pages, or a little before 12:00, just to be sure we
24       finish that witness before 1 o'clock.
25              MR. HANNON:  Very good.
```

```
 1              MS. MANDEL:  Thank you.

 2              THE COURT:  Okay.  We'll take a 15 minute break.

 3              (Court in recess at 11:13 a.m.

 4              and reconvened at 11:30 a.m.)

 5              THE COURT:  Go get the jury.

 6              You can be seated.

 7              The witness we're taking out of order, I know it's

 8     Dr. Menninger's sister.  What's her name again?

 9              MR. HANNON:  Tonya Hart.

10              THE COURT:  Okay.

11              MR. HANNON:  I got that right?

12              MS. MENNINGER:  Yes.

13              (The jury enters the courtroom.)

14              THE COURT:  Go ahead, Ms. Mandel.

15              MS. MANDEL:  Thank you, Your Honor.

16     BY MS. MANDEL:

17     Q.   Deb, after you met with the witnesses in the

18     investigation that you described, did you make conclusions

19     about whether there was reason to be concerned about the

20     items that Dr. Menninger had raised?

21     A.   No, there was not concern.

22     Q.   So did you reach a conclusion on each of those items?

23     A.   Yes.  On each item, I reached a conclusion.

24     Q.   So on the -- and we'll look at some more notes in a

25     moment.  Did you communicate those results to Dr. Menninger?
```

1    **A.**  In summary form, yes.

2    **Q.**  When you say in summary form, what do you mean by that?

3    **A.**  So the talking points that we covered earlier were

4    provided to Dr. Menninger.

5    **Q.**  And did you keep notes of the conversation that you had

6    with Dr. Menninger?

7    **A.**  The May 15th one were included.

8    **Q.**  That was part of your investigation notes?

9    **A.**  Correct.

10    **Q.**  And then you met with -- did you meet with Dr. Menninger

11    another time to communicate results of what you learned in

12    the investigation?

13    **A.**  Yes.

14    **Q.**  And if you look at the next page of the exhibit that

15    should be in front of you, it has a date of May 18, 2018?

16    **A.**  Correct.

17    **Q.**  What do the notes from May 18th, 2018, that are in front

18    of you, what do they reflect?

19    **A.**  This is --

20    **Q.**  I asked that question badly.  So strike that.

21        Did you take the notes that are indicated on the

22    page in front of you on the screen?

23    **A.**  Yes, I did.

24    **Q.**  And are these notes of a conversation that you had on

25    May 18, 2018?

```
 1    A.  Yes.
 2    Q.  And who did you have this meeting with on May 18th?
 3    A.  To Dr. Menninger.
 4    Q.  You met with Dr. Menninger?
 5    A.  I'm sorry, yes.  With Dr. Menninger.
 6    Q.  Do the notes here -- and there are a couple more pages
 7    that we'll look at, do they reflect what you communicated to
 8    Dr. Menninger during that meeting?
 9    A.  Yes.
10    Q.  And I just want to make sure that I have the order of
11    meetings right.  You said you met with Dr. Menninger three
12    times.  Was this the last of those meetings?
13    A.  No.  There was one additional meeting.  I believe --
14    excuse me -- to cover overall summary of findings.
15    Q.  And is that what happened on May 18th, the overall
16    summary of findings meeting?
17    A.  Yes, I believe so.
18    Q.  Okay.  So let's go through your notes here.  And first of
19    all, do your notes here accurately reflect what you discussed
20    with Dr. Menninger on May 18th?
21    A.  Yes.
22    Q.  And so, again, we see those numbered items.  Do those
23    reflect the concerns that you understood from Dr. Menninger
24    as part of her complaint?
25    A.  Yes.
```

1  **Q.**  And so under number 1, you have an (a) and a (b), it says

2  "findings and then communication to Lisa"?

3  **A.**  Yes.

4  **Q.**  And where it says (a) and (b), it looks like under each

5  number, do you see that?

6  **A.**  Yes.

7  **Q.**  And do the "findings" reflect what you learned during the

8  investigation?

9  **A.**  Correct.

10  **Q.**  And what does the "communication to Lisa" reflect?

11  **A.**  The information relayed to Dr. Menninger about the

12  investigation and the outcome.

13  **Q.**  And that was by you?

14  **A.**  By me.

15  **Q.**  Okay.  So let's go through each of these.  So under

16  number one, this is the work issues with Gedeon Richter,

17  NGSP?  That one?

18  **A.**  Correct.

19  **Q.**  And what did you have in the way of findings with regard

20  to that issue?

21  **A.**  So the data that I reviewed indicated that there were

22  major quality issues, were more than double from the middle

23  of 2017 to April of 2018 than the prior year of 2016 to 2017.

24  And then the GSK situation specifically raised to a level of

25  executives in Wilmington.

1    **Q.**  And then beneath that you indicate what you communicated

2    to Dr. Menninger.  Can you explain what that was?

3    **A.**  Correct.  So I explained all of that to Dr. Menninger,

4    plus with increased events and high visibility issues

5    certainly aligned with added involvement from Hacene.

6    Therefore, it was reasonable for her manager to be talking

7    with her and discussing issues because there was a higher

8    level -- increased number and higher visibility issues

9    occurring before and after the disclosure of her disability.

10   **Q.**  Beneath that is -- that's number two, where Dr. Menninger

11   had raised her concern about not being included in

12   recruiting; is that right?

13   **A.**  Correct.

14   **Q.**  And beneath that, you indicate findings and

15   communications to Dr. Menninger.  Can you explain what your

16   findings were with regard to that concern?

17   **A.**  So Hacene indicated that he communicated to Dr. Menninger

18   in December of 2017 that he would be the hiring manager for

19   the open position due to the discussion with Dr. Menninger on

20   being overwhelmed with her duties and responsibility, and

21   that he would be taking over that responsibility and that the

22   position -- the process of filling that was taking well over

23   a year, with no viable candidates.

24   **Q.**  And what did you communicate to Dr. Menninger about that

25   on May 18th?

1    **A.**  So I communicated that finding, plus additionally that

2    during the follow-up discussion, that Dr. Menninger and I had

3    on May 15th, she indicated to me that she had sent -- having

4    sent Hacene a list of responsibilities in November, and at

5    his request, after telling him that Dr. Menninger felt

6    overwhelmed in her job, that he would become the hiring

7    manager, and that this occurred in December for that

8    currently open role.  And this all occurred prior to her

9    raising awareness of her disability.

10   **Q.**  And the next item down, number three, "New expectation to

11   attend bid defense and client visits."

12          What were your findings in that regard?

13   **A.**  Again, this is an expectation that was in her job

14   description, so it wasn't a new expectation.  It might be a

15   new focus for this coming year, but it certainly was not a

16   new expectation.  And that Hacene had made it very clear

17   sales numbers and revenues were low certainly in 2017.  He

18   had high expectations for all of Central Lab leaders,

19   including our business development team, which is inclusive

20   of Dr. Menninger.  The go forward strategy, you know, to

21   bring in the new technologies and that -- and that the need

22   to understand these new technologies and to sell that is an

23   expectation for all executive director lab roles across the

24   business.

25   **Q.**  And we'll look at the next page now.  It says (b),

1  communication to Dr. Menninger, and then it says "Above

2  information."

3          Can you explain what that meant?

4  **A.**  So all of that was related to Dr. Menninger in that

5  discussion.

6  **Q.**  And then the next item down, number four, about not being

7  invited to the 2018 sales meeting.  So you have actually two

8  different sets of findings and then you summarize

9  communication.  Can you explain what you found and what you

10 communicated to Dr. Menninger?

11 **A.**  Right.  So the issue with number four that Dr. Menninger

12 raised, two parts to it.  There was the sales meeting issue,

13 as well as the marketing log meeting issue.  The finding on

14 the sales meeting, which was held in Wilmington in early

15 March was hosted by Dr. Fikry and his sales team.  Andy Supp,

16 business development leader, was the decision maker on the

17 attendee list, not Hacene.  And that Andy and Hacene

18 determined the focus of the breakout sessions, and again,

19 based on subject matter expert, Chris Clendening would attend

20 that particular piece.  So all of that was relayed to

21 Dr. Menninger.  The -- do we just keep going?

22 **Q.**  Please.  Please.

23 **A.**  The finding on the marketing log meeting, again, Andy

24 Supp was the owner of that meeting.  He determined attendees.

25 Andy vetted the attendee list, where there were multiple

1    participants from the same team, asked them to determine who

2    was best to represent their function, and that Lorraine

3    McNamara is currently a lab representative who works for

4    Dr. Menninger, so there's representation in that meeting for

5    the lab.

6              All of that was related to Dr. Menninger.  And

7    again, they're not run or determined by Hacene, so he wasn't

8    in the position to treat her differently because he wasn't

9    the owner or the deciding factor in those situations.  I

10   encouraged Dr. Menninger to reach out to Andy Supp if she

11   felt she wanted to attend routine meetings and/or work with

12   Lorraine on a process, if she didn't feel like she was

13   getting the pertinent information she needed from those

14   meetings, to certainly work with her employee, Lorraine

15   McNamara, to gain that information.  And then just reminded

16   her that the sales meeting in 2018 was driven by, not her

17   manager, but Dr. Fikry and our business development team.

18   And that they had determined the agenda and the attendees.

19   **Q.**  The next item was the town hall.  And what did you find

20   in that regard and what did you communicate to Dr. Menninger?

21   **A.**  So with the town hall, again, no formal meeting prior to

22   the town hall where any introductions were had.  It was

23   really a very focused meeting to share our client and that

24   presentation.  So I shared that with Dr. Menninger.  She

25   wasn't treated differently.  Nobody was introduced in that

 1   meeting.

 2   **Q.**   The next item down relates to the 2017 performance

 3   review.  What were your findings in that regard and what did

 4   you communicate to Dr. Menninger?

 5   **A.**   So the discussion on Dr. Menninger's performance review

 6   for the year 2017 occurred in the year 2017, in December.  It

 7   focused on her 360 feedback, and -- which is part of the

 8   basis of her year-end review.  The process, the discussion,

 9   without seeing a review, and system forcing approval was also

10   conducted with two other colleagues.  The discussion ensuing

11   performance ratings occurred prior to raising an

12   accommodation request in January of 2018.  So she wasn't

13   treated differently than others.

14   **Q.**   And what did -- when you said this was conducted with two

15   other colleagues, what did that mean?

16   **A.**   So two other direct reports of Hacene at the time that

17   performance reviews needed to be moved forward to align with

18   our merit process, our compensation process, Dr. Menninger

19   and two other of her colleagues were also forced -- we had to

20   move them along in the process.  So she wasn't treated

21   differently in that process.  There were two others of her --

22   sorry -- there were two other of her colleagues that were

23   moved along, as well.

24   **Q.**   And in the last item, was the discussion of the "exit

25   package and/or consulting role."  And we'll have to go to the

1    next page for some of this, but at the bottom of this page,

2    under (a), it says findings.  Can you describe what you found

3    in this regard?

4    **A.**   So it -- the meeting was intended to be a working session

5    around work accommodations.  The conversation evolved to what

6    if I can't perform the duties of my job.  Chad had discussed

7    a hypothetical picture of what that might look like.  He

8    discussed to protect the business with the licensures needed,

9    potentially moving into a consulting role, and providing an

10   opportunity to seek alternative employment through an

11   arrangement, that was driven not by her manager, but by Chad.

12   **Q.**   And what was the significance, in your role as an

13   investigator, what was that significance to you?

14   **A.**   If Dr. Menninger felt that her manager was treating her

15   differently because of her disclosure of her disability, but

16   in this instance, the conversation or this information was

17   shared not by her manager, but by Chad St. John.

18   **Q.**   And we'll jump to the next page.  At the top of this

19   page, it indicates communication to Dr. Menninger.  And can

20   you explain what you communicated to Dr. Menninger?

21   **A.**   So all of what I just described, and then I shared that

22   when we had a discussion, a follow-up discussion on May 15th,

23   she asked me the same questions, what if I can't perform the

24   essential functions of my job.  If she's asking me what-if

25   type questions, she's going to get a what-if type response,

```
 1   and that doesn't mean that that's the path forward at this
 2   current moment, and shouldn't be translated that you're being
 3   forced out of the organization.
 4   Q.  And once you shared this information with Dr. Menninger,
 5   did she have a response to you?
 6   A.  She was disappointed.
 7   Q.  And what did -- what specifically did she say that
 8   indicated that she was disappointed?
 9   A.  It certainly wasn't the outcome that she was hoping for.
10   I felt badly.  I mean, I wish that, you know, things would
11   have turned out differently for Dr. Menninger, but I couldn't
12   change the outcome of an investigation based on what she saw
13   that just wasn't there.
14           THE COURT:  Is that the end of that document?
15           MS. MANDEL:  That's the end of this document.
16           THE COURT:  Okay.
17           So Ms. Ballweg, if you can step down for a moment.
18           So we're going to pause Ms. Ballweg's testimony
19   right here, because we have an out-of-state witness, who the
20   plaintiff is going to call who we want to finish before
21   1 o'clock, so that person can get back on a plane and go
22   home.  So we're going to pause Ms. Ballweg's testimony.  It's
23   not done.  Just keep it paused.  Mr. Hannon will call the
24   next witness, and when we're done with that witness, we'll
25   resume with Ms. Ballweg.  We do that here, we do that a
```

```
 1    variety of times just to accommodate people's schedule.

 2                Go ahead.

 3                MR. HANNON:  The plaintiff calls Tonya Hart.

 4                THE COURT:  Go ahead, Ms. Hart.

 5                And just take the notebook off the stand.

 6                MR. HANNON:  Yes.

 7                (The witness was duly sworn.)

 8                THE DEPUTY CLERK:  And can you please state your

 9    full name and spell your last name for the record.

10                THE WITNESS:  Tonya Louise Hart, and my date of

11    birth, is that what you said?

12                THE COURT:  No, you don't have to give your date of

13    birth.

14                We have rules about dates of birth and Social

15    Security numbers.  We keep them private.

16                Go ahead.

17                         TONYA L. HART

18           having been duly sworn, testified as follows:

19         DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

20    BY MR. HANNON:

21    Q.  Could you please tell the jury who you are.

22    A.  Tonya Louise Hart, and I'm Lisa's sister.

23    Q.  Okay.  And are you Lisa's older sister or younger sister?

24    A.  Older sister.

25    Q.  How far apart?
```

1   **A.**   About a year.  12 months.  12 and a half months apart.

2   **Q.**   Where did you and Lisa grow up?

3   **A.**   The first half of our life, we grew up in Conyers,

4   Georgia, a suburb of Atlanta, from -- up until 1978.  Lisa

5   was ten years old at the time.

6   **Q.**   And where did you move after Conyers?

7   **A.**   We moved to Appleton, Wisconsin.

8   **Q.**   Who did you live with in Conyers?

9   **A.**   In Conyers, we lived with my mother and father.

10   **Q.**   And what was the reason for the move?

11   **A.**   My mom had pretty much had enough with just what was

12   happening with my father, who had some mental health issues,

13   and we -- she wanted to separate and move Lisa and I up to

14   Wisconsin to be closer to her family.

15   **Q.**   And prior to moving, had you, yourself, observed any of

16   your father's mental health issues?

17   **A.**   Yes.

18   **Q.**   And just broadly speaking, what kinds of actions had you

19   observed?

20   **A.**   Just violent outbursts, days of really, just, depression,

21   but learning later that he had schizophrenia, understanding

22   now his behaviors, what they were like.  But as a kid, I did

23   not understand that.  He was yelling at my mother, throwing

24   things in the house, throwing food across the kitchen.  Just

25   this was going on for years.  And at some point, my mother

1    just had enough and was scared for herself and my sister and

2    I.

3    **Q.**  Okay.  And I should have asked this question earlier,

4    what do you do for work?

5    **A.**  I'm a nurse case manager.

6    **Q.**  Okay.  And where do you work?

7    **A.**  Bend, Oregon.

8    **Q.**  And do you work in a hospital?

9    **A.**  I work from home, but we do go into the office one day a

10   week.  So telecommute.

11   **Q.**  Okay.  And for how long have you been a nurse?

12   **A.**  Since 2010.

13   **Q.**  And do you live in Bend?

14   **A.**  Yes.

15   **Q.**  For how long have you lived there?

16   **A.**  Since November of 2019.

17   **Q.**  And who do you live with?

18   **A.**  My husband.

19   **Q.**  Do you have any kids?

20   **A.**  Yes.

21   **Q.**  How many?

22   **A.**  I have two kids.  They're adults.  And one is in the Navy

23   and one lives in Denver, where we raised the boys.

24   **Q.**  Okay.  So you mentioned that you, your sister, and mother

25   moved.  Did you continue to live with Lisa and your mother up

1    until the time you went to college?

2    **A.**  Yes.  However, Lisa was an exchange student, so yes.  Up

3    until the time that I went to college in 1985, my sister was

4    an exchange student in Norway my freshman year in college.

5    **Q.**  Okay.  And did you and Lisa attend the same college at

6    some point?

7    **A.**  Yes.

8    **Q.**  And where did you both go to school at the same time?

9    **A.**  At the same time, we went to University of Wisconsin in

10    Stevens Point for two years, 1985 to 1987.  When Lisa got

11    back from Norway, she started college there in 1986, I

12    believe.  And then we both transferred to University of

13    Georgia in 1989.

14    **Q.**  And was that in part because you could get in-state

15    tuition there?

16    **A.**  Yes.  My dad still lived in Georgia, so we were able to

17    get in-state tuition.

18    **Q.**  And did you and Lisa live together when you were at

19    school in Georgia?

20    **A.**  We did, yes.

21    **Q.**  And subsequent to college, was there ever another time

22    when you and Lisa lived together?

23    **A.**  Prior to college.

24    **Q.**  After college?

25    **A.**  After, subsequent, yes.  Yes.  We lived in Chicago after

1   I graduated from college.  I moved to Chicago and we were

2   roommates for a year.

3   Q.  And you know that at some point Lisa decided to become a

4   doctor; is that right?

5   A.  Yes.

6   Q.  And during the time that Lisa attended medical school and

7   went through her other work to become a doctor, did you and

8   her remain close?

9   A.  Yes.

10  Q.  And just give the jury a sense of sort of what the

11  frequency of your interaction with Lisa was during that time?

12  A.  I think during that time, I was busy raising boys.  Lisa

13  was going to medical school, so our -- I would say once every

14  month, once every month and a half, sometimes it would be a

15  little bit longer, just depending on how busy she was with

16  her studies.

17  Q.  And you were aware that what Lisa's subsequent jobs were

18  in Kansas and -- I'm forgetting where else.  Do you recall

19  where else she worked?

20  A.  She was working in Overland Park, Kansas.  She did her

21  residency in Virginia, I believe.

22  Q.  Okay.  And did you and Lisa continue to stay in touch

23  with that same level of frequency?

24  A.  Yes.

25  Q.  Okay.  And did you learn at some point that Lisa was

 1  going to work for PPD?

 2  **A.**  Yes.

 3  **Q.**  Okay.  And do you recall anything about Lisa's feeling

 4  about taking on that new job?

 5  **A.**  I recall that she was excited to start this job.  It was

 6  a good opportunity.

 7  **Q.**  Okay.  During the time of Lisa's various professional

 8  jobs, up until the time that she joined PPD, did you notice

 9  any change in her behavior or attitude or anything like that?

10  **A.**  No.

11  **Q.**  Since you first grew up with Lisa, was there anything

12  about Lisa that sort of stood out to you?

13  **A.**  Lisa, just growing up, I just remember her being really

14  shy, a little bit more withdrawn in family gatherings, going

15  to weddings, a funeral, just any big gathering where we had

16  to have interaction with our family, or extended family, I do

17  recall Lisa being a little bit more -- I was kind of more the

18  outgoing one, she definitely was more shy and harder for her

19  to make small talk, I guess, with her family.

20  **Q.**  And as you got older and pursued your professional

21  endeavors, did she ever share with anything -- prior to

22  joining PPD, about any kind of stress or anxiety she had?

23  **A.**  No.

24  **Q.**  Okay.  Now, at some point in time -- well, let me ask

25  this question first.

```
 1            Did you know before Lisa joined PPD that she
 2    suffered from social anxiety disorder?
 3    A.   No.
 4    Q.   Did Lisa ever share with you the fact that she was seeing
 5    a doctor in Kansas to help her with her anxiety?
 6    A.   Prior to PPD, no.
 7    Q.   Did she tell you that before PPD?
 8    A.   No.
 9    Q.   How was it that you found out about Lisa's diagnosis?
10    A.   She told me after -- she told me that there was a meeting
11    that she had with her employer, with PPD, her supervisor and
12    an HR person, and about a month after that meeting, that's
13    when she disclosed this -- what happened with the meeting.
14    And somewhere in that early 2018 time frame, she also
15    disclosed that she -- her psychiatrist was -- had diagnosed
16    her with generalized anxiety disorder, social anxiety
17    disorder, and panic disorder.
18    Q.   What do you recall Lisa telling you about that meeting?
19    A.   She basically thought -- I mean, Lisa thought this was
20    a -- this is what she was telling me, that she's -- she went
21    to this meeting thinking that the meeting would be to discuss
22    accommodations for her in her role as a clinical pathologist,
23    but instead the meeting was more of a -- not a discussion of
24    that, but more just felt that she was being essentially
25    pushed out of the company.
```

1   **Q.**  And as Lisa was describing this event to you, what was
2   her demeanor?
3   **A.**  Just -- I just remember her being very -- sounding very
4   scared, just feeling really hopeless.  And I could hear the
5   tone in her voice, just very shaky and tearful, a lot of
6   crying, just -- yeah, she was devastated.  She was doing a
7   good job, but she felt -- she told me that her reviews were
8   good with PPD, and any annual reviews that she had, she
9   scored well on her reviews, and just like a physical
10  disability, her mental health disability, she just felt like
11  she should have some accommodations made for her in her role.
12  She was doing a good job in her role.
13  **Q.**  When you -- when you learned that your sister had been --
14  had been diagnosed with a disorder, did that surprise you?
15  **A.**  A little bit.  I mean, I always knew Lisa was Lisa.  Just
16  growing up, she was reserved and shy, and that was Lisa.  But
17  she was really successful as far as her studies and getting
18  through med school.  She was functioning and she was doing a
19  good job as a clinical pathologist for Saint Luke's medical
20  system, another job that she had after that with a clinical
21  reference laboratory.  And she functioned really well and did
22  her job really well.
23  **Q.**  Did you ever have the opportunity to observe Lisa as a
24  mother?
25  **A.**  Yes.

1  **Q.**  When was that?

2  **A.**  In 2008, when my niece, her daughter, Maya, was born.  My

3  husband and I did travel to Kansas City, or Overland Park,

4  Kansas, a suburb of Kansas City, and spent approximately a

5  week, I believe, there.  And then there were some subsequent

6  visits after that, where I traveled alone to Kansas -- or to

7  Overland Park.  And this was when Maya was -- I'm guessing

8  she was probably three years old at that time.  And so there

9  were other visits after that, as well.

10  **Q.**  And what, if anything, did you notice about Lisa's

11  ability to cope with the stresses of being a mother?

12  **A.**  She functioned -- from what I observed, functioned fine

13  taking care of her daughter.

14  **Q.**  Now, you mentioned that you had the call with Lisa after

15  her meeting with HR and her boss.  Subsequent to that call,

16  did the frequency of your communications with Lisa change at

17  all?

18  **A.**  Yes.  Our communications did increase after that.

19  **Q.**  And why was that?

20  **A.**  I was very, very worried about her, really concerned for

21  her wellbeing.  She was having multiple panic attacks a day

22  is what she was telling me.  This was also shared by her

23  husband, Mason, to me, in separate phone calls.  And she --

24  she voiced, as well as her husband, Mason, voiced to me that

25  she was struggling with severe depression, suicidal thoughts

1   at times and she couldn't leave the house.  She just -- very

2   scared.  I know any time I were to call her, I would always

3   have to give her a little warning, and just send her a text

4   message that "Is this a good time to call?"  She was just

5   really, really struggling.  She had a lot of days where she

6   just couldn't come out of her room.  Yeah.

7   **Q.**  Had you ever seen Lisa like that before in her life?

8   **A.**  No.

9   **Q.**  At some point in 2018, did you go to visit Lisa?

10  **A.**  Yes.

11  **Q.**  And when was that?

12  **A.**  It was in August of 2018.

13  **Q.**  And was that surrounding any sort of event?

14  **A.**  Yes.  Lisa had participated in an ultra marathon.

15  **Q.**  And did Lisa indicate to you at the time why she wanted

16  to do the ultra marathon?

17  **A.**  The marathon, it was a big, very challenging thing.  Of

18  course, it was an ultra marathon.  This was an outlet for

19  Lisa.  This was her therapy.  It was something that she could

20  push through physically to help her with the mental pain that

21  she was having surrounding these -- this event with PPD, this

22  meeting with PPD.  And her doctor also agreed that this would

23  be very beneficial for her and was in agreement that she

24  should pursue that and that running was her therapy.  And the

25  ultra marathon being a long event, but it was just a way that

 1  she could push through something very difficult, and it
 2  helped her to know that she could -- by doing that, she could
 3  push through and keep going.
 4  **Q.**  While you were out visiting for the -- in connection with
 5  the ultra marathon, did you have an opportunity to talk with
 6  Lisa's husband, Mason, about her condition?
 7  **A.**  Yes.
 8  **Q.**  And where did that conversation take place?
 9  **A.**  It was at the -- we had taken Maya to swimming lessons,
10  and we were just sitting by the pool, and while Maya was
11  having her swim lesson, we just talked about how much Lisa is
12  struggling.  Mason shared with me the number of panic attacks
13  that she's been having daily, just very difficult for her to
14  function on a daily basis, significantly depressed, having
15  thoughts of self-harm on some days.  Very worrying for me.
16  **Q.**  Was Lisa present for that conversation?
17  **A.**  No.
18  **Q.**  So subsequent to that trip to Massachusetts, did you
19  continue to stay in regular contact with your sister?
20  **A.**  Yes.
21  **Q.**  And just generally speaking, what were your sort of
22  observations as you communicated with her?
23  **A.**  On -- some of the conversations were via text message,
24  some were phone calls.  Just on both, really, she just talked
25  about how difficult it was for her.  She also shared that

```
 1   she's, you know, continuing to have these daily panic

 2   attacks, difficulty sleeping.  She started requiring

 3   medication, benzodiazepines, specifically Clonazepam to be

 4   able to sleep.  She was having disturbing dreams involving

 5   PPD.  Just really finding it difficult to have any happiness.

 6             MS. MANDEL:  Your Honor, objection.  That's all

 7   hearsay.

 8             THE COURT:  What about that, Mr. Hannon?

 9             MR. HANNON:  State of mind.  As long as it's a

10   present mental condition.

11             THE COURT:  Overruled.  As to what Dr. Menninger

12   told her.  That's what you're referring to?

13             MR. HANNON:  Correct.  Exactly.  Yes.

14   BY MR. HANNON:

15   Q.  At some point in time, did Lisa move closer to you?

16   A.  Yes.

17   Q.  When was that?

18   A.  She moved -- her family moved to Bend, Oregon in the

19   summer of 2020.

20   Q.  And did she tell you what her motivation was for moving

21   to Bend, Oregon?

22   A.  She told me so that she could be closer to family for

23   herself and for my niece, Maya.

24   Q.  And beside yourself, were there any other family members

25   in that area?
```

1    **A.**  My mother.

2    **Q.**  Okay.  And after Lisa moved to Bend, Oregon, what was the

3    sort of frequency with your contact with her?

4    **A.**  Well, we were in the middle of the pandemic, so we did go

5    over to their house, and we would visit on the patio outside.

6    But, again, we were -- it was my husband, myself, Maya,

7    Mason, her husband, and Lisa.  So it was just difficult to

8    get -- to talk about just what she was going through in that

9    scenario, in that situation, with just all of us present.

10            I would have to give her warning, when we're

11    driving there, we're ten minutes away, we're five minutes

12    away.  Lisa just had a lot of fear, a lot of panic.  And I

13    just had to give her a heads up that we're arriving, or the

14    same as when I would make a phone call, I had to give her a

15    heads-up and ask if it was okay that we come in or that we

16    were going to arrive in a few minutes, you know.

17    **Q.**  So just to clarify that, so say, for example, that you

18    were going to visit Lisa's family, would it -- would you feel

19    comfortable just showing up and ringing the doorbell?

20    **A.**  Absolutely not.

21    **Q.**  And if you wanted to talk to her on the phone, would you

22    feel comfortable just calling her?

23    **A.**  No.  No.

24    **Q.**  What would you do before you called her?

25    **A.**  I would send her a text message asking if it was okay.

<div>

1   And if I didn't get a response, then I figured she was just

2   sleeping or just -- I always -- I prefaced this with -- I

3   always told Lisa, if I send you a text message, please don't

4   feel that you have to respond to me.  I know that you're

5   struggling and that you're most important right now.  Not me.

6   **Q.**  You mentioned the communication with her husband Mason at

7   the swim practice.  Did you have any subsequent conversations

8   with Mr. Menninger concerning Lisa's safety?

9   **A.**  Yes.  Mason called me on several occasions, up until even

10  just a couple of months ago, approximately, that he was

11  really worried about her.  She's not coming out of her room.

12  She doesn't come down for dinner --

13          THE COURT:  Why is that admissible?

14          MR. HANNON:  Well, it's still state of mind in

15  terms of a person --

16          THE COURT:  But somebody's state of mind, but why

17  is that state of mind?

18          MR. HANNON:  Why is his state of mind?

19          THE COURT:  Right.  In other words, like usually

20  it's percipient witnesses.  Obviously, Dr. Menninger's state

21  of mind isn't -- is relevant an issue.  And so her

22  observations or statements about things of that nature come

23  in for that.  But why about -- what about -- third parties

24  commentary, why isn't that hearsay?

25          That's your objection, isn't it?

</div>

Case: 23-2030 Case 1:19-cv-10441 1:19-cv-10441 Document 155 Document 155 Filed 03/31/23 Filed 03/31/23 Page 247 of 156 Page 247 of 156 Entry ID: 6634402

117

1    MS. MANDEL:  Yes, Your Honor.

2    MR. HANNON:  Well, his state of mind in terms of

3  whether or not he's worried is directly reflective of what he

4  was observing, just like if he were here testifying, "I was

5  really worried," you would let him testify that he was really

6  worried.

7    THE COURT:  That's because he would be here

8  testifying.

9    MR. HANNON:  Right.  But it's still the same

10  statement.  It's not a hearsay concern.

11    THE COURT:  It's an extra statement, because it's

12  the statements of this witness.

13    MR. HANNON:  But it's not hearsay.  It's the same

14  as him sitting in the box saying, "I was really scared," as

15  him telling her that he was really scared and then this

16  witness testifying to it.  It doesn't raise a hearsay issue.

17    THE COURT:  Why would his statement, when he's on

18  the witness stand, "I'm worried" be relevant?  He could say

19  the things he observed about her.  But why is his own state

20  of mind?  His own state of mind is not something that the

21  jury has to determine.

22    MR. HANNON:  Well, he can't necessarily testify to

23  what his wife told him, right?

24    THE COURT:  Well, he could.  That's his choice.

25    MR. HANNON:  No, it's spousal disqualification.

```
 1                  THE COURT:  Now, she -- only if she objects --
 2                  MR. HANNON:  It's a disqualification.  It's not a
 3      privilege.
 4                  THE COURT:  I'm not sure about that.  You can never
 5      testify?
 6                  MR. HANNON:  Disqualified.
 7                  THE COURT:  But in any event, that has to do with
 8      marital communications.  Many of these things aren't marital
 9      communications.
10                  MR. HANNON:  Discussions about self-harm and things
11      like that.  Those are --
12                  THE COURT:  It depends where they happened.
13                  MR. HANNON:  I'm pretty sure they weren't out in
14      public in front of people.
15                  THE COURT:  But one might infer that, right?  But
16      in any event, his -- so you're saying that his --
17                  Let me see you both at sidebar.
18                  MR. HANNON:  Sure.
19                  THE COURT:  I apologize for this, ladies and
20      gentlemen.  It's a little more complicated.
21                  (Bench conference concluded.)
22                  THE COURT:  It seems to me, one, sure -- what
23      you're saying is his state of mind, inferential, but from
24      which they can draw inference as to her condition.  But
25      ordinarily -- but his state of mind is not directly relevant.
```

```
 1    His state of mind is only possibly relevance is that from

 2    that they might be able to infer from his state of mind her

 3    condition.  So that's a relevance issue.  And so but even if

 4    he -- even if that -- even if that relevance is true, he

 5    can -- and he can -- and assuming he could get up and say my

 6    state of mind is, and presumably many of the things that he's

 7    worried about are not marital privilege disqualification or

 8    otherwise, she didn't come out of her room, she didn't do

 9    this, she didn't do that.  Those are not marital privilege.

10    I don't think, or he's not disqualified from testifying about

11    those things.

12            But putting that aside, then what you're having her

13    do is this witness is saying that's what was reported to me,

14    so that's him saying to her, "I am worried."

15            MR. HANNON:  Correct.

16            THE COURT:  And now she's testifying as to what he

17    said to her.

18            MR. HANNON:  (Nods head.)

19            THE COURT:  And so that's -- I mean, that's an

20    extra layer.  Why isn't that -- why wouldn't -- like, whether

21    or not -- first of all, the preference would be to hear from

22    him, because he directly would say it.  And now we have the

23    jury has to determine, if I let it in, one, does she

24    accurately report it, what he said to her?  Is she being

25    truthful and all of the things.  But if she's reporting what
```

1    he said to her, then if she's accurately reporting, they have

2    to evaluate his perception, his state of mind, which they

3    don't have him for.  That's the concern I have, that whether

4    or not it's exactly hearsay, it's also the concerns of the

5    hearsay rule.

6          MR. HANNON:  Sure.  So those concerns have already

7    been addressed by the drafters of the hearsay rule, which

8    created the exception for state of mind.

9          THE COURT:  Let me get the rule.

10         Okay.  Go ahead.  So you're saying that the

11   statement of the declarant, the declarant being

12   Mr. Menninger, "I am worried," is the statement of

13   then-existing mental physical condition, and that that's not

14   excluded, whether or not the declarant is available as a

15   witness.

16         MR. HANNON:  Correct.  Now it creates the question

17   of relevance, and Your Honor made the distinction between it

18   being directly relevant versus being circumstantially

19   relevant, and there's no rule under the hearsay that makes it

20   only admissible when it's directly relevant.

21         THE COURT:  I understand.  That's a relevance --

22   that's a 403 or --

23         MR. HANNON:  Correct.

24         THE COURT:  But even if the declarant -- so the

25   declarant's statement of then-existing state of mind is not

1    hearsay, I agree with that.  But that doesn't mean anybody

2    can -- like if she told her, she told you, and you told

3    someone else told and someone else, that's not admissible the

4    9th time through.

5              MR. HANNON:  Correct.

6              THE COURT:  Right.  So you're saying it's only

7    admissible because she directly heard it?

8              MR. HANNON:  Correct.  From the declarant, yes.

9              THE COURT:  What do you say about that?

10             MS. MANDEL:  Your Honor is also limited to that one

11   present sense impression, not the sort of expanded version of

12   the story, right?  He utters a present sense impression to

13   her and she repeats that.  That's limited.

14             THE COURT:  That's not present sense.  I think it's

15   an existing.

16             MS. MANDEL:  I'm sorry, yes.  She's providing much

17   more.

18             THE COURT:  I think you do have to be careful with

19   that.  I think you're right, you get the statement, but I

20   think you don't get everything surrounding it.

21             MR. HANNON:  I think you're right.  Yes.

22             (Bench conference concluded.)

23             THE COURT:  Before you continue, Mr. Hannon, let me

24   just explain for the jury's benefit.

25             So ladies and gentlemen, there's a rule called --

1    we have a legal rule of evidence -- remember I decide

2    evidence, what's sort of admissible or not.  We have a legal

3    rule of evidence called hearsay.  The short version of

4    hearsay, if such a thing exists, is that the purpose of a

5    hearsay rule, generally, is that you should hear from people

6    who are what we call percipient or direct witnesses, the

7    people who saw -- you think of an auto accident, the people

8    who saw the accident, the people who heard the accident, the

9    live witnesses, rather than what people said to other people,

10   and then you can evaluate those people.

11          But like many rules, that rule has exceptions.  So

12   one of the exceptions that we've been discussing here is

13   that -- one of the exceptions is that a witness, here

14   Ms. Hart, can testify to a statement from someone who's not

15   before you right now, as to what that person's then-existing

16   state of mind.  So the example of Mr. Menninger saying "I'm

17   worried."  That's the state of his mental condition.  So she

18   can, under the rules of hearsay, even though he's not here

19   testifying to that right now, that is an exception to that

20   rule, and she can.  And that's why I'm going to allow that.

21   But there are two things that you should know about that.

22          One is that what -- and that's part of what we're

23   discussing is how far the -- and the rule doesn't allow this

24   witness to testify to all sorts of other circumstances, just

25   as to that.  There are other exceptions to the hearsay rule.

1    There's at least 20, maybe more.  So there could be other

2    things of that nature that come in.  But that -- that's what

3    we were discussing and trying to think through.

4            And the second thing that, to make clear to you.

5    Mr. Menninger's state of mind is not actually directly -- is

6    not directly relevant in this case.  You aren't deciding what

7    happened to Mr. Menninger.  He's not a party to this case.

8    He has no claims.  In that sense, his state of mind is

9    irrelevant.  Its only relevance in this case, at least so

10   far, is that if you determined that that -- whatever you

11   determine about his state of mind from that, you may be able

12   to draw reasonable inferences.  I'm not saying you should.

13   It's up to you to decide what inferences to draw, but the

14   reason it's being admitted is for you to consider whether,

15   from that, you would draw inferences about Dr. Menninger's

16   condition or state of mind.  So that's really what the focus

17   is, but that's why it's being offered, and that's an example

18   of circumstantial evidence.

19           Anything either of you want to address about that

20   before we continue?

21           MS. MANDEL:  No, thank you, Your Honor.

22           MR. HANNON:  Good explanation.

23           THE COURT:  Thank you.  Go ahead.

24   BY MR. HANNON:

25   **Q.**  Ms. Hart, so just to kind of get back where we were, I

1     think I had asked you about subsequent conversations with

2     Lisa's husband. And just to make the question a bit crisper

3     here, so we're staying within the rules, subsequent to the

4     in-person discussion you mentioned earlier, have you had

5     subsequent conversations where Mr. Mason has shared with you

6     concerns that he was having concerning Lisa's health?

7     **A.** Yes.

8     **Q.** Okay. And staying limited to that subject, Mr. Mason

9     expressing to you concerns he was having at that moment about

10    Lisa's health, what do you recall about those statements?

11    **A.** I recall that Mason told me that he was very concerned

12    that she was not coming out of her room. She was just not,

13    you know, coming out for even dinner, just really worried

14    that she just wasn't functioning, and really worried that she

15    had given up, worried that she might do something. And he

16    was asking me for some help, any suggestions I have as far as

17    where I can take her -- or where he can take her if there's

18    an emergency. And he was just feeling overwhelmed is what

19    he's telling me. And I, in one of the phone calls, found

20    some facilities that he could have as a reference, if it came

21    to that point, where there was an emergency and he needed to

22    take her to a local ED, or a crisis stabilization center. I

23    just provided those for him. Really just trying to learn

24    what's happening. At that point, there was several moments

25    in time, I guess, that Lisa couldn't really talk to anybody.

1    She wasn't --

2    **Q.**  Well, hang on.  Let me just stop you there for a moment.

3           You mentioned asking questions about where to take

4    Lisa for an emergency.  What kind of an emergency did you

5    understand this was around?

6    **A.**  That she was having thoughts to self-harm herself.

7    **Q.**  And did you, in fact, help Lisa's husband to come up with

8    a plan of what to do in the event that she harmed herself?

9    **A.**  Yes.  I gave them the names of some facilities, their

10   phone numbers, I provided all the information, addresses, if

11   it comes to that point, which it -- they were there already.

12   It could have been five minutes from that phone call.  It was

13   that bad, where he could take her if need be.

14   **Q.**  Okay.  Have you made any -- have you made any

15   observations -- let me ask a better question.

16          As of today, how frequently do you communicate with

17   Lisa?

18   **A.**  Weekly.  We communicate by text and phone call.  There's

19   been more recently she's not been up for actual phone calls

20   and just easier to do text messages, because she's just been

21   so withdrawn and stressed out about what's happening with

22   this trial.  But I check in with her daily to every other

23   day, just to see how she's doing.  I know how she's doing,

24   but it's just more so that she knows that I'm here for her,

25   however I can support her.

1    **Q.**  Has Lisa shared with you at all anything about her desire

2    to get better?

3    **A.**  She desperately wants to get better.

4    **Q.**  And what -- what has she told you with respect to that

5    issue?

6    **A.**  She told me that she desperately wants to get better for

7    her family, for Maya.  My niece, her daughter, also struggles

8    with depression and anxiety, has been diagnosed with that.

9    And she's very worried about her and how this is all

10   effecting Maya and her mental health, as well.

11   **Q.**  And over the last several years, have your observations

12   of what have Lisa has been doing in terms of treatment and

13   everything else, is that all consistent with that desire to

14   get better?

15   **A.**  Yes.

16           MR. HANNON:  That's all I have, Your Honor.

17           THE COURT:  All right.  Cross-examination.

18           **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

19   BY MS. MANDEL:

20   **Q.**  Good morning.

21   **A.**  Good morning.

22   **Q.**  I guess at this point we're good afternoon.

23           I'm Rachel Mandel and I'm going to ask you some

24   questions, as well.

25   **A.**  Okay.

1    **Q.**  I understand that Bend is a few hours' drive from

2    Portland; is that right?

3    **A.**  Correct.

4    **Q.**  And Portland is where your sister lives?

5    **A.**  Correct.

6    **Q.**  Before today, when was the last time that you saw your

7    sister?

8    **A.**  Before today, the last time I saw Lisa was September of

9    last fall, last year.

10   **Q.**  September 2022?

11   **A.**  Correct.

12   **Q.**  And you recall, Ms. Hart, that at some point Lisa told

13   you that her doctor said she needed certain accommodations in

14   her job at PPD; is that right?

15   **A.**  Correct.

16   **Q.**  And Lisa told you that PPD said that they were not able

17   to meet some of those accommodations that her doctor said she

18   needed; is that right?

19   **A.**  What Lisa told me was that she went to a meeting with

20   PPD, and going into that meeting, she thought that there

21   would be a discussion to discuss accommodations for her job,

22   and instead it felt -- or she told me that it was more of a

23   meeting to give her an exit package.

24   **Q.**  And Lisa never told you what types of accommodations that

25   she had asked for from PPD; isn't that right?

1    **A.**  Correct.

2    **Q.**  You testified a few moments ago that -- actually, strike

3    that.

4              Starting in 2018, you started to have more regular

5    communication with your sister than you previously had; is

6    that right?

7    **A.**  Correct.

8    **Q.**  And at that time, your sister was living in

9    Massachusetts; is that right?

10   **A.**  Yes.

11   **Q.**  And you were living in Bend?

12   **A.**  No, not yet.  I was living in Denver, Colorado.

13   **Q.**  You were living in Denver.  Okay.  So before you moved to

14   your current home?

15   **A.**  Correct.

16   **Q.**  And at that point in 2018, how regularly were you seeing

17   your sister in person?

18   **A.**  Not regularly, because we lived on different ends of the

19   United States.  I had seen her in 2018 to help crew her race.

20   And prior to that, it had been several years.

21   **Q.**  Let's look at some text messages from that time period.

22              Ms. Hart, you should see some text messages showing

23   up on the screen; is that right?

24   **A.**  Yes.

25   **Q.**  And at the top, it says "Tonya ;" that's you, right?

1  **A.**  Yes.

2  **Q.**  And these are some text message, you may recall having

3  with your sister?  Is that right?

4  **A.**  Yes.

5  **Q.**  And you sent her some inspirational texts like an image

6  of Rosie the Riveter; is that right?

7  **A.**  Sorry.  Can you repeat that?

8  **Q.**  There's some inspiration texts with a picture on the

9  page?

10  **A.**  Yes.

11  **Q.**  And beneath that, that's where your sister, Lisa, wrote

12  back to you; is that right?

13  **A.**  Yes.

14  **Q.**  And she wrote, "I have an awesome doctor and an attorney

15  helping me.  Diagnosed with severe and chronic social anxiety

16  disorder, panic disorder, generalized anxiety disorder.

17  Lifelong, but getting worse."

18          Do you see that?

19  **A.**  Yes.

20  **Q.**  And your sister sent this to you in 2018, right?

21  **A.**  Yes.

22  **Q.**  And looking back earlier from this time when you and your

23  sister were roommates during college, which I believe you

24  mentioned just a bit ago, you had been aware at that time, as

25  well, that your sister had social anxiety and panic, correct?

1  **A.**  Back in college?

2  **Q.**  Yes, were you aware at that time?

3  **A.**  No.

4  **Q.**  Well, let's look at the next -- the next part of this

5  message.  This is from April of 2018.

6  **A.**  Yes.

7  **Q.**  And you wrote, "Just want to check in and see how you are

8  doing."  Is that right?

9  **A.**  Yes.

10  **Q.**  And at that point in April of 2018, your sister wrote

11  back and said, "Trying to in hang there.  It's been

12  challenging to get the panic attacks under control.  I

13  typically only leave the house to go to the doctor."

14  Do you see that?

15  **A.**  Yes.

16  **Q.**  And at this point, in April of 2018, you hadn't seen your

17  sister in person in some time; is that right?

18  **A.**  Correct.

19  **Q.**  It had been some years?

20  **A.**  2018.  I'm trying to recall.  My sister and her husband

21  and Maya had made a trip to Boulder, Colorado.  I can't

22  recall the dates of that, but Maya was still pretty young at

23  that time.  I just can't recall the year that that was.

24  **Q.**  But it was a good time before 2018?

25  **A.**  It was before 2018, yes.

1    **Q.**  And so fair to say at this point in 2018, you hadn't

2    observed, in person, what your sister's condition was at that

3    point?

4    **A.**  Correct.  It had been several years.

5    **Q.**  Let's look at -- well, actually, we'll pause on that for

6    a moment.  You testified just a bit ago, you said something

7    about crewing a race?

8    **A.**  Yes.

9    **Q.**  Is that right?  Can you explain what that means?

10   **A.**  Yes.  It was my first time doing it, so I was a little

11   bit of an amateur doing it.  But Lisa -- again, it was an

12   ultra marathon, so she had several laps that she would -- on

13   a course that she would run.  And when she came back to the

14   home area, where we all had our tents set up and supplies,

15   that's where I would meet her with -- an area where I could

16   refresh her water, her gels, a drink that she would use for

17   emergency, any snacks.  I'm trying to recall, change of

18   socks, whatever it needed -- needed -- whatever she needed to

19   have supplied to her to keep going.

20   **Q.**  And as far as you understand, is this something that is

21   typical when people compete in ultra marathons, to have

22   someone crew them?

23   **A.**  Yes.

24   **Q.**  And is that just given the length of the race and what's

25   involved in being there for so long?

1   **A.**   Correct.  Correct.

2   **Q.**   Let's look at another set of text messages from spring of

3   2018.  So the -- this is -- it says Saturday, May 26, 2018.

4   The part that's in sort of that turquoise color, that's from

5   Lisa to you; is that right, Ms. Hart?

6   **A.**   Yes.

7   **Q.**   Okay.  And Dr. Menninger said, "I spoke with my doctor

8   yesterday and she loved the idea of me still doing the ADU

9   race."  Is that the anchored down?

10  **A.**   Anchored Down Ultra.

11  **Q.**   Anchor Down Ultra marathon?

12  **A.**   Yes.

13  **Q.**   "As a form of therapy with no expectations.  Do you think

14  you could come and crew with Connor?  We will of course pay

15  for your flights."

16  **A.**   Yes.

17  **Q.**   Do you see that?  Is -- Connor is one of your sons?

18  **A.**   Yes.

19  **Q.**   Okay.  And so did you understand that this was your

20  sister inviting you to come out and crew for her for that?

21  **A.**   Yes.

22  **Q.**   And below it looks like you it said, "That sounds great"?

23  **A.**   Yes.

24  **Q.**   And Garret is another one of your sons?

25  **A.**   Yes.

1    **Q.** Okay. And you said, "I'll see if Connor can get off of
2    school and come with me."
3    **A.** Yes.
4    **Q.** And did you, in fact, go out to crew this race for
5    Dr. Menninger?
6    **A.** Yes.
7    **Q.** And that was in Rhode Island; is that right?
8    **A.** The race was in Rhode Island, yes.
9    **Q.** So you came out. It was from Denver, at that point?
10    **A.** Yes.
11    **Q.** From Denver to Rhode Island to crew the race?
12    **A.** They lived in Massachusetts, but very close to the race,
13    right.
14    **Q.** And did Dr. Menninger actually pay for your flights to
15    come out?
16    **A.** Yes.
17    **Q.** And that was for you and Connor?
18    **A.** No, that was just for myself. Connor could not make it.
19    **Q.** Okay. And let's look at Dr. Menninger then -- Lisa
20    responded to you and said, "I would love that so much. I'm
21    making some progress with my doctor and trying to accept my
22    authentic self. I'm also looking forward to some time off
23    and a possible trip to the mountains."
24    Do you see that?
25    **A.** Yes.

1    **Q.**  And this is in -- towards the end of May of 2018, right?

2    **A.**  Yes, I see a date on here.  It says June 7th.

3    **Q.**  Oh, so this is -- okay.  So the next message down is from

4    June 7th.  And then at that point, Dr. Menninger, Lisa, wrote

5    back to you, and said, "Just an update to let you know that

6    I've decided to start training again for the ADU as a form of

7    mental therapy while I'm on short-term disability."

8    **A.**  Yes.

9    **Q.**  And she says at the end, "Would love it if you could

10    still make the trip."

11    **A.**  Yes.

12    **Q.**  And then a couple of weeks later -- well, actually,

13    strike that.

14          You said you did, in fact, go out for the ultra

15    marathon?

16    **A.**  Yes.

17    **Q.**  Is that right?  And that was in August of 2018?

18    **A.**  Yes.

19    **Q.**  And at that point, did you stay with your sister and her

20    family in Dighton?

21    **A.**  Yes.

22    **Q.**  And then just -- is it, like, an overnight trip to go to

23    Rhode Island for the ultra marathon?  How does that work?

24    **A.**  I was there for a few days, but we commuted from their

25    home in Dighton, Massachusetts, to the race that morning.

 1    **Q.**  And did you crew the race alone for your sister?  Did her

 2    husband participate, as well?

 3    **A.**  I essentially crewed it alone.  They did come the

 4    following morning and -- so that I could get a little sleep,

 5    you know, maybe 45 minutes, an hour, I can't remember, and

 6    then they took over.

 7    **Q.**  And in the context of your sister participating in that

 8    anchor downs race, you witnessed her having some panic

 9    symptoms at that time around the race; is that right?

10    **A.**  It was the day before the race was the first panic attack

11    that I witnessed.

12    **Q.**  And Dr. Menninger, your sister Lisa, went ahead and did

13    the race after having had that panic attack?

14    **A.**  The race was the following day.

15    **Q.**  The race was the following day and did she end up doing

16    the race?

17    **A.**  She did, yes.

18    **Q.**  And it's -- the race is like 24 hours in total, right?

19    **A.**  I can't recall exactly, but I think it is, yes.

20    **Q.**  And do you have a recollection as to whether Lisa

21    finished the race, like got through to the end?

22    **A.**  She -- I believe she finished her goal.  It wasn't -- I

23    can't remember what -- if it was -- I think it was 100K race.

24    I don't think she finished 100K, but she finished what was a

25    goal for herself and that was to cross the finish line.

Case: 23-2030    Document: 155    Filed: 03/31/23    Page: 136 of 156    Case: 1:19-cv-10441-PBS Document: 155 Filed: 03/31/23 Entry ID: 6634402

136

1    **Q.**  And after that visit in August of 2018, when you crewed

2    that race, what was the next time that you saw your sister in

3    person?

4    **A.**  I believe my husband and I visited them, Lisa, Mason, and

5    Maya, in June of 2019.  We visited their home in Albuquerque,

6    New Mexico.

7    **Q.**  And that was after she relocated to Albuquerque?

8    **A.**  Yes.

9    **Q.**  And can you just describe, like, physically, what was

10    the -- was that home in a rural area?  In an urban area?

11    **A.**  I believe it was just outside of Albuquerque.  It was --

12    I can't remember the name of the -- of the area, no.

13    **Q.**  With like mountains and things around?

14    **A.**  Yes.  Uh-huh.  I think it was the Sandia Mountains is

15    what I'm recalling now.

16    **Q.**  And at that time in June of 2019, did you and Lisa spend

17    time outside together?

18    **A.**  Not alone with Lisa, but it was just to go outside and

19    look at the view that they had from the house.  It was just

20    really pretty and peaceful.

21    **Q.**  And when you say not alone with Lisa, you say it was the

22    whole family gathering?

23    **A.**  I believe Maya was with us and my husband and Mason were

24    inside.

25    **Q.**  Let's look at some additional text messages.  So this is

1  between you and your sister in February of 2019; is that

2  right?

3  **A.**  Yes.

4  **Q.**  And it looks like you reached out to your sister to ask

5  about how you stopped seeing her on Facebook; is that right?

6  **A.**  Yes.

7  **Q.**  And so you said, "Did you get off Facebook?  Everything

8  okay?"

9  **A.**  Yes.

10 **Q.**  So this is like between -- basically halfway between the

11 time you saw her in 2018 and the time you saw her in 2019.

12 Is that fair?

13 **A.**  Correct.

14 **Q.**  And then your sister explained to you that Facebook or

15 social media, it sounds like, was worsening her anxiety?

16 **A.**  Yes.

17 **Q.**  And then you also checked in.  You asked if there were

18 any updates about her job.  Do you see that below?  On

19 Saturday, February 2nd.

20 **A.**  Oh, yes, I see that now.

21 **Q.**  You see that.  Okay.

22          And then to see the full response, we're going to

23 go to the next page.  And then your sister responded to you

24 and said, "Thank you.  Maya is hanging in there with school

25 and hoping that she gets into the charter school."  Then she

1    told you that she was no longer working for PPD?

2    **A.**  Correct.

3    **Q.**  And she told you about her case against PPD; is that

4    right?

5    **A.**  Yes.

6    **Q.**  And at this point in 2019, how often would you say you

7    were communicating with your sister?

8    **A.**  I would say it varied, but at this point, maybe once

9    every week, couple of weeks.

10    **Q.**  But fair to say that this text message is the first you

11    understood about your sister not working anymore at PPD?

12    **A.**  This text message?

13    **Q.**  Yup, the green one in the middle of the page.

14    **A.**  Yes.  And as far as our communications, I mean, the text

15    messages were much more frequent than just once every week or

16    two weeks.  I'm referring to phone calls.

17    **Q.**  You would agree, though, that this text message in the

18    middle of the page, it sounds like this is the first time

19    that your sister was telling you that she was no longer

20    working at PPD; isn't that right?

21    **A.**  I believe so, yes.

22         MS. MANDEL:  If I may, Your Honor, I just want to

23    provide a document.

24         THE COURT:  Yeah, go ahead.

25         You don't have to do anything with that yet.

```
 1    She'll tell you what she wants you to do.
 2            THE WITNESS:  Okay.
 3    BY MS. MANDEL:
 4    Q.  Ms. Hart, you may recall that in August of 2020, you
 5    provided sworn testimony in connection with this case?
 6    A.  Yes.
 7    Q.  Do you recall that?  And I asked you some questions at
 8    that time?
 9    A.  Yes.
10    Q.  Does that sound familiar?  And you recall at that time
11    you swore under oath to tell the truth?
12    A.  Yes.
13    Q.  Just like you've done today?
14    A.  Yes.
15    Q.  Okay.  And sitting in a binder in front of you is a copy
16    of the written transcript from that deposition?
17    A.  Okay.  Yes.
18    Q.  And I'm going to ask you to turn to -- there are four
19    pages of testimony on every single page.  I'm going to ask
20    you to turn to the page that says "page 32" at the top.
21    A.  Okay.
22    Q.  And actually, let's first go to the bottom of page 31,
23    which is -- it's kind of a funny set up, but it's down on the
24    left?
25    A.  Okay.  I see it.
```

1  **Q.** And at that time when you testified under oath at your

2  deposition, I asked you, "Are you aware that Lisa suffers

3  from any other mental illnesses?"

4  　　　　Do you see that? That's at the bottom of page 31?

5  **A.** Oh, I do see. Yes.

6  **Q.** And at the top of page 32, that's your testimony where

7  you said, "I mean, I knew when we were roommates in college,

8  I knew she struggled with social anxiety at that time, I knew

9  she struggled with panic, not that I had witnessed at that

10  time."

11  　　　　Do you see that?

12  **A.** Yes.

13  **Q.** And does that refresh your memory about what you knew

14  about when you were roommates with Lisa in college, about

15  whether she had social anxiety or panic?

16  　　　　MR. HANNON: I'll just object, Your Honor. If

17  they're going to read the answer, it should be the full

18  answer and the question, as well.

19  　　　　THE COURT: She read the question.

20  　　　　MR. HANNON: Well, at least the full answer.

21  　　　　THE COURT: But the full answer, fair enough.

22  　　　　Why don't you just read the full answer.

23  BY MS. MANDEL:

24  **Q.** The rest of your answer was, "Lisa did tell me that her

25  psychiatrist had diagnosed, after this happened with PPD,

1    with panic disorder and generalized anxiety disorder, as well

2    as social anxiety disorder.  She also developed depression

3    and suicidal thinking, which I never saw any of that prior to

4    this meeting."

5            But Ms. Hart, does this refresh your recollection

6    about whether you had observed social anxiety and panic in

7    your sister at the time that you were roommates in college?

8    **A.**  At the time I didn't.  I just looked at it as she was

9    just not as comfortable in settings, for example, if we were

10   at a gathering together with friends.  I could see the

11   anxiety.  I never really knew of any diagnoses of social

12   anxiety or panic disorder at that time.  But I was -- I was

13   able to witness that she was uncomfortable and not as

14   outgoing in a group setting, especially if she had to make

15   small talk.

16   **Q.**  Well, that was your language at your deposition, right?

17   That you knew she had social anxiety and panic.  Isn't that

18   right?

19   **A.**  Yes.  I did go on to say I knew she struggled with some

20   panic, but not that I witnessed at the time.

21           MS. MANDEL:  Okay.  Thank you.  I have no further

22   questions at this time, Your Honor.

23           THE COURT:  Anything else?

24           MR. HANNON:  No, Your Honor.

25           THE COURT:  All right.  Ms. Hart, thank you very

1    much.  You're excused.

2              THE WITNESS:  Thank you.

3              THE COURT:  Ms. Ballweg, once she steps down, you

4    can return to the witness box.

5              And Ms. Mandel, maybe you can retrieve the notebook

6    that you have for Ms. Hart.

7              So now we resume with Ms. Ballweg, where we were

8    before.

9              Go ahead when you're ready, Ms. Mandel.

10                         **DEBORAH BALLWEG**

11     having been previously duly sworn, testified as follows:

12         **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT, Cont.**

13   BY MS. MANDEL:

14   **Q.**  Deb, in addition to the discussion that you testified

15   earlier that you had with Dr. Menninger about the results of

16   your investigation, did you send any written update to

17   Dr. Menninger about the outcome of the investigation?

18   **A.**  I believe I did, yes.

19   **Q.**  And up on the screen in front of you is an e-mail that

20   you sent, dated May 22nd of 2018?

21   **A.**  Yes.

22   **Q.**  Do you recall sending this e-mail to Dr. Menninger?

23   **A.**  Yes.

24   **Q.**  And in the first sentence, you said, "As we discussed by

25   phone today"?

```
 1   A.  Yes.

 2           THE COURT:  Hold on one second.

 3           The screens aren't working.

 4           THE DEPUTY CLERK:  Is this an exhibit?

 5           THE COURT:  Is this an exhibit in evidence?

 6           MS. MANDEL:  This is.  238.

 7           THE COURT:  Sorry.  Now?  Good.

 8           Why don't you repeat the question.

 9           MS. MANDEL:  Thank you.

10   BY MS. MANDEL:

11   Q.  Deb, you said in the first sentence here, "As we

12   discussed by phone today"?

13   A.  Yes.

14   Q.  And do you recall if, on May 22nd, you had a phone call

15   with Dr. Menninger about the outcome of the investigation

16   that you conducted?

17   A.  Yes.

18   Q.  What happened during that phone call?

19   A.  Again, just relayed to Dr. Menninger the outcome of the

20   investigation, my findings.

21   Q.  After this phone call that you had and this e-mail that

22   you sent on May 22, 2018, what did you next become aware of

23   with regard to Dr. Menninger's employment at PPD?

24   A.  That she had -- her doctor had recommended she take a

25   leave of absence.
```

1    **Q.** How long after that set of communications that you had

2    with Dr. Menninger did that happen?

3    **A.** I believe it was about a week later. I think it was

4    early June.

5    **Q.** Deb, can you describe for the jury, how do you view your

6    role at PPD with HR?

7    **A.** My role is a lot of things, but I guess foundationally my

8    role is one to really work with employees and managers on

9    resolving daily issues, complex issues, really being there to

10    make sure that our employees feel valued, that it's an

11    organization that supports their development, and that my

12    role is really to help ensure that the organization and

13    employees work together to achieve those goals.

14    **Q.** Can you describe your mindset when you started the

15    investigation into Dr. Menninger's concerns in the spring of

16    2018?

17    **A.** Certainly concerned that Lisa felt this way, or

18    Dr. Menninger felt this way, and wanted to ensure -- looked

19    into all of her concerns fairly, timely, but impartially, so

20    that I could conclude an investigation and give her some

21    findings.

22    **Q.** And what was your mindset when you completed the

23    investigation and you saw that Dr. Menninger didn't seem

24    happy?

25    **A.** Again, I felt concern for Lisa. You know, the outcome of

1    the investigation certainly didn't, in my opinion, go the way

2    she had expected or wanted.  However, again, at the end of

3    the day, I felt badly for her, but I couldn't change the

4    outcome of the investigation based on the fact that she saw

5    things that just weren't there.

6    **Q.**  Throughout the process of supporting the business and

7    Chad during this time period, and in the spring of 2018 and

8    when you were conducting the investigation, what goals did

9    you have?

10   **A.**  Again, to work with the employees, to make sure that they

11   felt they had an AVENUE in which to turn to for assistance,

12   to ensure that they had a path forward in conducting, you

13   know, their day-to-day activities.

14              MS. MANDEL:  This is Joint Exhibit 446.

15   BY MS. MANDEL:

16   **Q.**  You testified a few moments ago that shortly after the

17   investigation that you did was concluded, Dr. Menninger went

18   out on a medical leave.  Is that accurate?

19   **A.**  That's accurate.

20   **Q.**  And this e-mail here is from Dr. Menninger to you and to

21   Chad St. John, saying, "My doctor has advised me to take

22   medical leave effective immediately.  Please let me know if

23   there are any specific forms that I need to have her fill

24   out."

25              Do you see that?

Case: 23-2030 Case: 1:19-cv-10441-LTS Document: 150 Document: 116-9 Filed: 03/31/23 Date: 04/26/2024 Page: 146 of 156 Entry ID: 6634402

146

```
 1    A.   Correct.
 2    Q.   And as far as you recall, did Dr. Menninger, in fact,
 3    take a medical leave beginning immediately after this e-mail?
 4    A.   Yes, she did.
 5    Q.   After Dr. Menninger went out on medical leave, which was
 6    at this time, did you hold out hope that she would return
 7    from her leave?
 8    A.   Yes.
 9    Q.   Did Dr. Menninger ever return from her leave to work at
10    PPD?
11    A.   No.
12    Q.   Did you have communications with Chad or with others
13    about the hope that Dr. Menninger would return to her
14    position from medical leave?
15    A.   Yes.
16    Q.   And just generally, what was the nature of those
17    conversations?
18    A.   Certainly wanting to make sure that we, you know, offered
19    Lisa the ability to come back, you know, avenues in which to
20    reach out to anyone within the organization, HR specifically,
21    and that we had desires for her to return to her job.
22              MS. MANDEL:   This is Joint Exhibit 90.
23    BY MS. MANDEL:
24    Q.   Let's look at these e-mails regarding Dr. Menninger's
25    leave.   Down below, at the bottom of this page, is an e-mail
```

1    that Chad sent to Dr. Menninger, saying, "Please do let us

2    know if there is an additional alternative accommodation that

3    we can offer."  And this is from November of 2018.  Do you

4    see that?

5    **A.**  Yes.

6    **Q.**  And then Chad goes on, "PPD maintains that it does not

7    engage in any discriminatory or otherwise unlawful conduct."

8           Do you see that?

9    **A.**  Yes.

10    **Q.**  As far as you know, did Dr. Menninger ever respond to

11    this listing any other accommodations that the company could

12    offer that would allow her to return to work?

13    **A.**  No.  She did not.

14    **Q.**  And if we look at the e-mail above that Dr. Menninger

15    wrote back to Chad, where she said, "Given my current

16    condition and PPD's continued refusal to take any action to

17    address the conduct that cause, she was unable to suggest any

18    possible accommodations that would allow me to return to

19    work."

20           Do you see that?

21    **A.**  Yes.

22    **Q.**  And again, after this e-mail, you're not aware -- are you

23    aware that Dr. Menninger ever came forward with any

24    additional accommodations that she was asking PPD to offer?

25    **A.**  No, she did not.

Case: 23-2030   Case: 1:19-cv-01041-1129985   Document: 155   Filed: 03/31/23   Date 04/20/23   Page: 148 of 156   Entry ID: 6634402

148

```
 1   Q.  As far as you know, how did Central Labs handle the need

 2   for an executive director of labs during the time that

 3   Dr. Menninger was out on leave?

 4   A.  I believe there was a consultant that was brought in to

 5   cover the licensure, but there wasn't full-time coverage for,

 6   again, the licensure that she held.

 7   Q.  At some point, did Dr. Menninger's leave come to an end?

 8   A.  It did, yes.

 9   Q.  Do you recall approximately when that was?

10   A.  So from the time she left in June, until it was, I

11   believe, February 1st of 2019, the role was held open with

12   the hope and intention of bringing Dr. Menninger back to the

13   organization.  Administratively, the role being open that

14   long, we needed to make a change.  We needed to change

15   Dr. Menninger's status in the system and move forward.

16   Q.  And when did that happen?

17   A.  Her status was changed February 1st of 2019.

18   Q.  Deb, after the start of the COVID-19 pandemic, did PPD

19   look at whether some roles could be made remote?

20   A.  Yes.

21   Q.  Was the executive director of labs position ever made

22   into a remote position?

23   A.  No.

24   Q.  Through 2020, did it remain an in-person role in Highland

25   Heights, Kentucky?
```

1    **A.**  Yes, it did.

2    **Q.**  And did that role, in your role as HR, as far as you

3    know, did that role require in-person interaction through

4    2020?

5    **A.**  Yes.

6    **Q.**  How about in 2021?  Was it an in-person role in Highland

7    Heights, Kentucky?

8    **A.**  Yes.

9    **Q.**  And how about in 2022?

10   **A.**  Yes.

11   **Q.**  And how about now?

12   **A.**  Yes.

13          MS. MANDEL:  Thank you, Deb.

14          I have no more questions at this time.

15          THE COURT:  All right.  Go ahead, Mr. Hannon.

16          **REDIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

17   BY MR. HANNON:

18   **Q.**  Ms. Ballweg, did I hear you say that after Dr. Menninger

19   went out on leave, that PPD was holding out hope that she

20   would return?

21   **A.**  Yes.

22   **Q.**  I'm going to show you Joint Exhibit 229.

23          So this is a June 25th, e-mail exchange between

24   yourself and your boss, Jerry Williams, yes?

25   **A.**  Yes.

1   **Q.** This is a few weeks after Dr. Menninger had gone out on

2   leave, correct?

3   **A.** Correct.

4   **Q.** Looking at the second page here, the e-mail chain begins

5   with an e-mail from Chris Fikry, yes?

6   **A.** Yes.

7   **Q.** Mr. Mekerri's boss?

8   **A.** Yes.

9   **Q.** Mr. Fikry wrote, "Any update on Lisa's transition?"

10          Do you see that?

11  **A.** I do.

12  **Q.** Did you tell Dr. Fikry that PPD was still holding out

13  hope that Dr. Menninger was going to return?

14  **A.** Yes. This was -- excuse me, this was referring to

15  transition of the licensure. How do we protect our business?

16  **Q.** Not my question, ma'am.

17          Did you tell Dr. Fikry, in late June of 2018, that

18  PPD was still holding out hope that Dr. Menninger would

19  return?

20  **A.** I don't recall if I specifically said that to Dr. Fikry.

21  **Q.** Let's take a look. E-mail here on the first page, these

22  are your -- these are your draft responses back to

23  Dr. Fikry's questions, right?

24  **A.** Yes. It appears that way.

25  **Q.** Okay. So the -- the dark print, that's what Dr. Fikry

1  asked, and the light print, those are your draft responses,

2  right?

3  **A.**  Yes.

4  **Q.**  Okay.  And you wrote, "Lisa's leave of absence runs

5  through July 6th.  I anticipate her returning to work on

6  July 9th, but not 100 percent sure she won't extend, (gut

7  more than fact.)  She has a lawyer who's asked for employment

8  related documents.  Nothing official in terms of a complaint.

9  However, does open the door for conversations on

10  transitioning.  The traditional route requires her to return

11  to work, perform to level of expectation, be provided

12  feedback on where she falls short, then move forward with the

13  term request.  Again, her having an attorney who's made

14  contact with us will lead to a faster route of resolution."

15          Do you see that?

16  **A.**  Yes.

17  **Q.**  Did I hear you testify a few moments ago that

18  Dr. Menninger -- that you believe that she saw things that

19  weren't there?

20  **A.**  Based on my investigation of the seven areas, yes.

21  **Q.**  And that's what you told Dr. Menninger after your

22  investigation, right?

23  **A.**  I gave the feedback individually on all seven points,

24  yes.

25  **Q.**  And you told her that all of the things that she claimed

1 she was seeing, in terms of all the different treatment that

2 you thought she was getting, you told her that was all in her

3 head, right?

4 **A.** No. I pointed to evidence of why I felt she wasn't being

5 discriminated against in a point-by-point.

6 **Q.** And that she was just imagining it, right?

7 **A.** I pointed to evidence that said, "This is not factual."

8 I can't speak to what she felt.

9 **Q.** Did you point to the evidence that was factual?

10 **A.** Talking to Brent McKinnon about the QA stuff, talking to

11 the recruiter, talking to an e-mail support from Brent

12 McKinnon from a quality perspective. There was data to

13 support the findings.

14 **Q.** How about the memo from Mr. St. John in early March of

15 2018?

16 **A.** Which memo? Sorry.

17 **Q.** The one he drafted in connection with seeking legal

18 advice. Do you recall that memo?

19 **A.** There's been a series of memos.

20 **Q.** So your testimony here is you don't remember the memo

21 that we looked at yesterday concerning Mr. St. John seeking

22 legal advice?

23 **A.** We've looked at a number of memos, but that one

24 particularly? No, I did not look at.

25 **Q.** My question is, do you remember that memo now?

1  **A.**  I do.

2  **Q.**  Okay.  Do you remember the words he used, in terms of

3  what the advice he was looking for from Ms. Menninger?

4  **A.**  Not specifically, but in general, yes.

5  **Q.**  Exit strategy, right?

6  **A.**  Yes.

7  **Q.**  Dr. Menninger, she didn't imagine that, right?

8  **A.**  The investigation pointed to the seven facts that she

9  raised.  I investigated those seven points.

10  **Q.**  Did you investigate Mr. St. John seeking an exit

11  strategy?

12  **A.**  No.

13  **Q.**  Now, part of Dr. Menninger's complaint to you concerned

14  Mr. St. John, didn't it?

15  **A.**  It concerned her manager treating her differently due to

16  her disclosure of her disability.

17  **Q.**  It only concerned Mr. Mekerri?

18  **A.**  She felt she was being targeted and harassed by her

19  manager.

20  **Q.**  Okay.  She also told you about the options that were

21  presented at the start of the February 28th meeting, right?

22  **A.**  Yes.  By her manager.

23  **Q.**  And to be clear, when you interviewed her, in connection

24  with your investigation, she told you the same story about

25  that meeting that she told this jury, right?

1    **A.**  I don't recall where -- when Dr. Menninger and I had the

2    conversation, where she felt that was communicated.  The fact

3    that it was communicated wasn't contested; it was -- I don't

4    recall if she said it was at the beginning or what point of

5    the conversation.

6    **Q.**  So you don't recall whether Dr. Menninger's account of

7    that meeting, that she told you during your investigation,

8    you can't tell us if that's the same account that she gave

9    this jury?

10   **A.**  I can honestly say that the conversation about a package

11   or consulting occurred in that conversation.  But I'm not

12   100 percent certain where in that conversation, nor do any of

13   the three in that conversation.

14          THE COURT:  I'm going to stop you here, Mr. Hannon.

15          So ladies and gentlemen of the jury, don't discuss

16   the case among yourselves, don't discuss it with anyone else,

17   don't do any independent research.  Have a nice weekend.

18   Remember Monday, 9:00 to 1:00, and 2:00 to 4:00, same on

19   Tuesday, 9:00 to 1:00, 2:00 to 4:00, and then we're back to

20   the 9:00 to 1:00.

21          Thank you very much for your attention.  All rise

22   for the jury.

23          (The jury exits the courtroom.)

24          THE COURT:  Okay.  See you-all Monday morning,

25   8:45, unless you think there's a reason to meet earlier.

```
 1              MS. MANDEL:  8:45 works for us.

 2              THE COURT:  All right.  See you then.  Have a good

 3    weekend.  Safe travels, Ms. Hart.

 4              (Court in recess at 1:02 p.m.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4         I, Rachel M. Lopez, Certified Realtime Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, the foregoing pages

8    are a true and correct transcript of the stenographically

9    reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                          Dated this 24th day of March, 2023.

14

15

16

17              /s/ RACHEL M. LOPEZ

18

19

20         _____

           Rachel M. Lopez, CRR
21         Official Court Reporter

22

23

24

25



1      UNITED STATES DISTRICT COURT
       DISTRICT OF MASSACHUSETTS
2

3      _____

4      LISA MENNINGER,

5            Plaintiff,                    Civil Action No.
                                           1:19-cv-11441-LTS
6          v.

7      PPD DEVELOPMENT, L.P.,

8            Defendant.

9      _____

10

11         BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

                            JURY TRIAL
13                           Day 6

14

15

                       Monday, March 27, 2023
16                          8:35 a.m.

17

18

19

20

21     John J. Moakley United States Courthouse
       Courtroom No. 13
       One Courthouse Way
22     Boston, Massachusetts

23

       Rachel M. Lopez, CRR
24     Official Court Reporter
       raeufp@gmail.com

25

1                    **A P P E A R A N C E S**

2

3    On behalf of the Plaintiff:

4        HARTLEY MICHON ROBB HANNON, LLP
         BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
5        155 Seaport Boulevard
         2nd Floor
6        Boston, Massachusetts  02210
         (617) 723-8000
7        phannon@hmrhlaw.com
         hwatson@hmrhlaw.com

8

9    On behalf of the Defendant:

10       OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
         BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11       One Boston Place
         Suite 3500
12       Boston, Massachusetts  02108
         (617) 994-5700
13       rachel.mandel@ogletreedeakins.com
         patrick.curran@ogletreedeakins.com

14

15

16

17

18

19

20

21

22

23

24

25

**TABLE OF CONTENTS**

**TRIAL WITNESSES**

On behalf of the Plaintiff:                                    <u>Page</u>

DEBORAH BALLWEG

     By Mr. Hannon                                          20

     By Ms. Mandel                                          52

MARIANNA I. KESSIMIAN

     By Mr. Hannon                                          60

     By Ms. Mandel                                          75

     By Mr. Hannon                                         147

PAUL SUMMERGRAD

     By Mr. Hannon                                         151

     By Mr. Curran                                         201

     By Mr. Hannon                                         259

     By Mr. Curran                                         266

**EXHIBITS**

None

```
1                       P R O C E E D I N G S
2              (In open court.)
3              THE DEPUTY CLERK:  The United States District Court
4       for the District of Massachusetts is now in session, the
5       Honorable Leo T. Sorokin presiding.
6              THE COURT:  Please be seated.
7              So before we talk about -- I know you want to talk
8       about those exhibits.  I've read those; I'm ready to talk to
9       you about it.
10             Before we do, I want to talk to you about the
11      schedule a little bit, and something that I'm thinking of
12      doing, and I want to see what you think.
13             So one, I've been, as you know, a little bit
14      concerned that we're not going to finish by Friday when we
15      promised the jury, and I'm more concerned about it than I was
16      before, because one of the -- one or more of the jurors, on
17      the way out Friday afternoon, said to Kellyann something
18      like, "We're going to be done on Friday, right?"  And the
19      feeling that was, like, we really want to be done on Friday.
20      And so that makes me think what -- or I looked over how much
21      time we have between now and Friday, how much trial time,
22      given each day, 9:00 to 1:00, Monday to Friday, figuring all
23      that's trial time, plus today 2:00 to 4:00, plus tomorrow
24      2:00 to 4:00, minus the 15 minute break.  And that leaves us
25      a little more than 22.75 hours.  So forgetting about this
```

1   Friday afternoon after you were leaving.  So, yes, you will

2   receive this case no later than Friday afternoon for

3   deliberations.  Okay.  So -- and the schedule will be 9:00 to

4   1:00 today, 2:00 to 4:00 today, same tomorrow, back to 9:00

5   to 1:00, Wednesday and Thursday, Friday, 9:00 to 1:00, we'll

6   take a break for lunch and we'll -- you'll get the case

7   sometime in the afternoon.  I can't promise it will be at

8   2 o'clock, but you'll receive the case for deliberations

9   before 5:00 on Friday.

10          All right.  Go ahead, Mr. Hannon.

11          MR. HANNON:  Thank you, Your Honor.

12                      **DEBORAH BALLWEG**

13     having been previously duly sworn, testified as follows:

14    **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF, Continued**

15   BY MR. HANNON:

16   **Q.**  Good morning, Ms. Ballweg.  I'd like to begin by showing

17   you Joint Exhibit 450.

18          So Ms. Ballweg, this was a document that we looked

19   at last week, correct?

20   **A.**  Yes.

21   **Q.**  And the first page here, this was a typed up copy of your

22   notes from your conversations with Dr. Menninger; is that

23   right?

24   **A.**  Yes.

25   **Q.**  Okay.  The actual handwritten notes, you destroyed those;

1    is that correct?

2    **A.**   No, I did not.

3    **Q.**   Okay.  You still have those?

4    **A.**   Yes, I do.

5    **Q.**   Okay.  Do you have them here with you?

6    **A.**   No.

7    **Q.**   Do you know where they are right now?

8    **A.**   They're in my desk in Middleton, Wisconsin.

9    **Q.**   Did you review them prior to testifying in this matter?

10   **A.**   No.

11   **Q.**   Why not?

12   **A.**   I reviewed this document.

13   **Q.**   Okay.  So you believe that this document as a

14   comprehensive statement of the information that you learned

15   from Dr. Menninger in your investigation?

16   **A.**   Yes.

17   **Q.**   Let's look at the second page.  Here, the seventh item.

18   This concerns the events at the February 28, 2018, meeting,

19   right?

20   **A.**   Yes.

21   **Q.**   Okay.  That's all Dr. Menninger said?

22   **A.**   No.

23   **Q.**   And, in fact, part of what Dr. Menninger told you is that

24   when she was at that February 28, 2018, meeting, that Mr. St.

25   John and Mr. Mekerri, they weren't interested in talking

1   about her request for accommodations, right?

2   **A.** No, that's not accurate.

3   **Q.** She told you that all they wanted to talk about was her

4   separation from the company, right?

5   **A.** Dr. Menninger indicated they were discussing

6   accommodations, but they didn't receive any resolution.

7   **Q.** Well, she told you that Mr. Mekerri said that there were

8   not going to be any accommodations with respect to buckets

9   two through four, correct?

10  **A.** Correct.

11  **Q.** She told you that when she asked Mr. Mekerri for more

12  information regarding buckets two through four, he said he

13  wasn't going to provide it, right?

14  **A.** I wasn't in that conversation.

15  **Q.** I didn't ask what happened in the conversation. I asked

16  what Dr. Menninger told you about the conversation. She told

17  you that when she asked for more information regarding the

18  items in buckets two through four, that Mr. Mekerri refused

19  to tell her, correct?

20  **A.** I don't recall the exact way that she described it.

21  **Q.** Okay. Is that substantively what she told you?

22  **A.** She indicated that during the discussion, an exit package

23  or a consulting role was offered to Dr. Menninger.

24  **Q.** And she said no, I don't want that. I want my job.

25  Right?

1    **A.**   I was not part of the conversation.  I don't know what

2    was discussed.

3    **Q.**   You didn't ask Dr. Menninger?

4    **A.**   It was implied that she wanted to keep her job and we

5    were working towards resolution around what accommodations

6    she needed.

7    **Q.**   And during that meeting, she told you that she had asked

8    for more information concerning the items in buckets two

9    through four.  Yes?

10   **A.**   I don't recall if that's exactly how she stated it.

11   **Q.**   But substantively, that's what she told you, right?

12   **A.**   The way I recall the conversation is that Dr. Menninger

13   was meeting with Chad and her boss to talk about

14   accommodation requests.  During the conversation, there was a

15   point where there was no resolution, that Lisa -- that

16   Dr. Menninger was asking what if I can't do my job, what if I

17   can't do my job, and that's when Chad said, "Well,

18   hypothetically, we can look at an exit package or a

19   consulting arrangement."

20   **Q.**   That wasn't my question.  My question is about

21   Dr. Menninger's request for more information about the items

22   in buckets two through four.  Did Dr. Menninger tell you that

23   at the February 28, 2008 meeting, she asked for that

24   information?

25   **A.**   I don't recall.

1    **Q.** Okay. Let's look at what Mr. St. John told you. I'm

2    going to show you Joint Exhibit 257.

3              MS. MANDEL: Excuse me a second here.

4              Excuse me. Joint Exhibit 87.

5    BY MR. HANNON:

6    **Q.** So Ms. Ballweg, this is one of the e-mails that we looked

7    at on the first day of your testimony. Do you recall this?

8    **A.** Yes.

9    **Q.** This is the e-mail that Mr. St. John sent you on March 7,

10   2018, that contained that packet of info to send to PPD's

11   lawyer; is that right?

12   **A.** Yes.

13   **Q.** Okay. And this was just over a week after that

14   February 28th meeting had taken place, correct?

15   **A.** Yes.

16   **Q.** I'm showing you here the second to last page of the

17   exhibit. And you see here, Mr. St. John provided a timeline

18   of events; is that right?

19   **A.** Yes, it appears so.

20   **Q.** Okay. And you see here, Mr. St. John, he confirmed there

21   that Dr. Menninger had requested more information listed out

22   within the number two through four buckets, right?

23   **A.** Yes.

24   **Q.** Okay. And you know that Mr. St. John and Mr. Mekerri,

25   they refused to provide that, right?

1    **A.**   It appears Hacene said that he provided sufficient

2    detail.

3    **Q.**   And they weren't going to answer anymore questions,

4    right?

5    **A.**   Well, I think they would have answered more questions,

6    but there would be no more accommodations made outside of

7    items of one and five.

8    **Q.**   But specifically her request for additional information

9    about buckets two through four, they weren't going to provide

10   that, right?

11   **A.**   I believe he felt he provided sufficient detail.

12   **Q.**   Okay.  Well, you also knew from Mr. St. John that they

13   didn't want to provide that information, right?

14   **A.**   Well, I don't want to speak for Mr. St. John, but the

15   process was iterative.  So it was a discussion about what

16   accommodations does Dr. Menninger need, and then if there was

17   more information from her physician, there would be

18   additional discussions around what other accommodations could

19   be provided.

20   **Q.**   Well, let's let Mr. St. John speak for himself then.

21   Let's turn to the next page.

22          Excuse me.  Back up to the page before.  This is

23   page 17 of the 19-page document.  You see here, we have --

24   this is the draft e-mail response that Mr. St. John had

25   written, right?

1  **A.**  I believe so, yes.

2  **Q.**  Okay.  And he notes in there, "Adding additional detail

3  would only present the opportunity to select items in each

4  bucket you believe you can or can't do."

5          Do you see that?

6  **A.**  Yes.

7  **Q.**  That was the entire point of the interactive process,

8  wasn't it?  To figure out what she could and couldn't do?

9  **A.**  No.

10  **Q.**  Going back to your report here -- so again, this is joint

11  Exhibit 450.  I'll back up to the first page here.  So part

12  of this document reflects your conversation with

13  Dr. Menninger on May 2, 2018, right?

14  **A.**  Yes.

15  **Q.**  And some of it reflects a follow-up conversation you had

16  with her on May 15th, right?

17  **A.**  Yes.

18  **Q.**  Okay.  And it looks like for some of these items, you had

19  some follow-up questions for her on May 15th, right?

20  **A.**  Correct.

21  **Q.**  You didn't have any follow-up questions for her regarding

22  what happened at that February 28th meeting, did you?

23  **A.**  Because Chad confirmed, he was the one who indicated that

24  he discussed the exit package or consulting, not Hacene.  So

25  no follow-up questions were needed.

1   **Q.** So you had no follow-up questions for Dr. Menninger; is

2   that right?

3   **A.** Dr. Menninger was indicating that she was feeling

4   harassed by her manager, and in looking at this particular

5   situation, Chad St. John indicated he was the one who

6   mentioned it during that meeting on February 28th.

7   **Q.** Well, let's talk about that in terms of what

8   Dr. Menninger's complaints were about. I'm going to show you

9   Joint Exhibit 257.

10          And if we look in the middle of the page, this is

11   where you tell Mr. St. John that you're going to be following

12   up with a formal investigation, right?

13   **A.** Correct.

14   **Q.** Okay. And that follow-up with a formal investigation,

15   that's in response to the e-mail he had forwarded you on

16   April 28th?

17   **A.** I don't recall the date, but yes, it was an e-mail from

18   Chad.

19   **Q.** Okay. And that's the e-mail down below that we see here,

20   right?

21   **A.** I just see the FYI. I don't see the --

22   **Q.** Okay. Yeah, let's turn to the next page. Let's see what

23   the e-mail actually was here.

24          So this reflects, at the top here, an e-mail from

25   Dr. Menninger, right?

1  **A.**  Yes.

2  **Q.**  Okay.  And she has some complaints regarding Mr. Mekerri?

3  **A.**  Correct.

4  **Q.**  Okay.  And below, you see here there's also an e-mail

5  from Dr. Menninger to Chad St. John; is that right?

6  **A.**  Yes.

7  **Q.**  Okay.  And in that e-mail, she has some complaints about

8  Mr. St. John, doesn't she?

9  **A.**  About Chad or Hacene?

10  **Q.**  About Mr. St. John.

11  **A.**  Specifically -- is that a question?  I'm sorry, what was

12  the question?

13  **Q.**  The question was whether or not Dr. Menninger had

14  complaints about Mr. St. John.

15  **A.**  She felt like he was twisting her doctor's words and

16  refusing to answer her questions.  Yes.

17  **Q.**  Did you investigate that?

18  **A.**  No.

19  **Q.**  Because you knew it was true, right?

20  **A.**  It wasn't -- I wasn't part of the conversation.  I had no

21  opinion either way.

22  **Q.**  Going back to Joint Exhibit 450.  So you -- you

23  identified a number of issues that you were looking into; is

24  that right?

25  **A.**  Yes.

1    **Q.**  Okay.  And as you said, you've excluded any complaints

2    that Dr. Menninger had with respect to Mr. St. John, right?

3    **A.**  Yes.

4    **Q.**  Okay.  And with respect to the first issues, first issue

5    listed here, Dr. Menninger had complained that she was being

6    subjected to increased scrutiny by Mr. Mekerri; is that

7    right?

8    **A.**  From a quality perspective, yes.

9    **Q.**  Okay.  Well, she was saying that he was being very

10    accusatory, right?

11    **A.**  Specifically around some quality issues that were

12    occurring in the lab, yes.

13    **Q.**  That his tone had changed, right?

14    **A.**  Yes.

15    **Q.**  That it felt like he was going out of his way to document

16    her performance; is that right?

17    **A.**  Yes.

18    **Q.**  She complained that the goals he was creating were

19    impossible to meet.

20    **A.**  Yes.

21    **Q.**  Okay.  You didn't investigate any of those things, did

22    you?

23    **A.**  I would have asked questions of Brent McKinnon about the

24    tone of Hacene's interaction with his leadership team, with

25    Chad.  I did ask about that, yes.

1   **Q.**  Well, you didn't go back and ask Mr. Mekerri if these

2   allegations were true, did you?

3   **A.**  I asked Mr. Mekerri, during our discussion, why would

4   Dr. Menninger feel this way?  What would have created this?

5   Did he, in any way, change his behavior or his interactive

6   style with Dr. Menninger?

7   **Q.**  And it's your contention that that question is reflected

8   in your notes of your conversation with Mr. Mekerri?

9   **A.**  No.

10  **Q.**  So this right here, the items that is pointed to, those

11  were issues raised by Dr. Menninger on 5/15, right?

12  **A.**  Yes.

13  **Q.**  After 5/15, you did not go back and re-interview

14  Mr. Mekerri, did you?

15  **A.**  It was awhile ago.  I don't recall.

16  **Q.**  Well, if you had, there would be a note in this exhibit

17  reflecting that interview, right?

18  **A.**  Possibly, yes.

19  **Q.**  Okay.  And if there's no note reflected in an interview

20  of Mr. Mekerri after 5/15, it would be fair to assume that

21  interview didn't happen?

22  **A.**  Or the data -- yes.  Probably.

23  **Q.**  Now, you -- you knew as of this date that Mr. Mekerri was

24  making efforts to create a document trail of alleged

25  performance concerns with Dr. Menninger, right?

1   **A.**   I believe there were some performance issues that Hacene

2   was attempting to address with Dr. Menninger at the time,

3   yes.

4   **Q.**   He was being coached to document performance concerns,

5   yes?

6   **A.**   All managers are coached to document concerns.

7   **Q.**   Well, before Dr. Menninger disclosed her disability, you

8   hadn't been coaching him to document performance concerns

9   about her, had you?

10  **A.**   I wasn't coaching Hacene at all.

11  **Q.**   Not at all.

12          Let's take a look at Joint Exhibit 126.  This is an

13  e-mail exchange between yourself and Mr. St. John on

14  April 17, 2018?

15  **A.**   Yes.

16  **Q.**   And just to look at the second page -- well, actually,

17  strike that.

18          Let's look at the middle of the first page.  You

19  wrote, "Ask Hacene/draft response to be very specific about

20  how she didn't meet expectations."

21          Do you see that?

22  **A.**   Yes.

23  **Q.**   Those are your words.  Yes?

24  **A.**   Yes.

25  **Q.**   The "she" you're referring to there is Dr. Menninger?

1  **A.**  Yes.  And Chad is helping --

2  **Q.**  You've answered my question.  Thank you.

3          Ms. Ballweg, did you find your interview of

4  Dr. Menninger painful?

5  **A.**  I'm sorry, what was the word?  Painful?

6  **Q.**  Painful, yeah.

7  **A.**  No.

8  **Q.**  I show you now Joint Exhibit 244.  It's an e-mail from

9  you to Chad St. John on May 16, 2018, yes?

10  **A.**  Yes.

11  **Q.**  You write in the second sentence, "I had a 'painful'

12  follow-up with her yesterday."  Do you see that?

13  **A.**  I do.

14  **Q.**  That refers to your follow-up interview with

15  Dr. Menninger on May 15th, doesn't it?

16  **A.**  I was concerned about giving Dr. Menninger the feedback.

17  It was painful to me to have to go back and have a

18  conversation knowing that it wasn't the outcome that she had

19  intended.

20  **Q.**  Back to my question, this refers to your May 15th

21  conversation with Dr. Menninger; is that right?

22  **A.**  Yes.

23  **Q.**  You hadn't reached any findings as of May 15th, had you?

24  **A.**  That's correct.

25  **Q.**  Okay.  So the painfulness here, this wasn't a matter of

```
 1    telling Dr. Menninger she was wrong, was it?

 2    A.   No.  This was a follow-up, asking questions, after having

 3    talked with other folks about the issues that she had raised.

 4    Q.   And I now show you Joint Exhibit 301.  You have here an

 5    e-mail exchange between Mr. Mekerri and Dr. Menninger, on

 6    April 25, 2018.  Do you see it?

 7    A.   Yes.

 8    Q.   So this was some of the -- the back and forth that we

 9    looked at previously, concerning his request that she adopt

10    her goals.  Right?

11    A.   Yes.

12    Q.   Okay.  And during that correspondence, he offered certain

13    criticisms of her handling of recent lab issues; is that

14    right?

15    A.   Yes.

16    Q.   Okay.  And during the course of this back and forth,

17    Dr. Menninger, she provided rebuttals to those criticisms,

18    right?

19    A.   She did, yes.

20    Q.   Okay.  And in the course of your investigation, you never

21    determined whether or not Dr. Menninger's rebuttals of those

22    accusations were correct, did you?

23    A.   I was looking at the treatment of her manager towards her

24    before she disclosed her disability and after, and the errors

25    that were indicated occurred before and after she disclosed
```

1    her disability.

2    **Q.**   Okay.

3    **A.**   That was what I was looking into.

4    **Q.**   My question is a little bit different.  Did you

5    investigate as to whether or not Dr. Menninger's rebuttals,

6    where she pointed out why the criticism she was facing wasn't

7    factual, was or was not accurate?

8    **A.**   In my opinion, investigating that didn't -- I

9    investigated whether there were error rates, more or less,

10   and if her manager was treating her differently.

11   **Q.**   Right.  But error rates don't tell the whole story,

12   right?

13   **A.**   But Dr. Menninger was asking for, you know, her

14   manager -- or was indicating her manager was treating her

15   differently before she disclosed her disability, versus

16   after, based on the quality of the laboratory.  The quality

17   of the laboratory was -- the quality was decreasing.

18   **Q.**   Back to my question, though.  In terms of Dr. Menninger's

19   rebuttals, where she pointed out why the criticism wasn't

20   factual, did you investigate whether or not Dr. Menninger's

21   rebuttals were correct?

22   **A.**   There probably was some discussion with Brent McKinnon

23   about some of the information in there.  But did I

24   specifically one by one?  No.

25   **Q.**   Well, here, let's look at it this way.  Let's start with

1    Joint Exhibit Number 313.  So you see here, this is an

2    April 17th e-mail from Dr. Menninger, where she goes on, and

3    she rebuts some of these criticisms, right?

4    **A.**  Yes.

5    **Q.**  Okay.  And at your deposition -- well, let's do it this

6    way.  If you can open up the binder in front of you to the

7    first tab, please.

8          And that's the cover of your deposition transcript,

9    yes?

10    **A.**  Yes.

11    **Q.**  And if you turn to page 179, line 24.  Are you there?

12    **A.**  Yes.

13    **Q.**  Please read along silently as I read aloud.

14          "QUESTION:  My question was whether or not anything

15    that Dr. Menninger wrote in the April 17, 2018, -mail to

16    Mr. Mekerri was wrong.

17          "ANSWER:  I didn't evaluate this issue to that

18    level.  I am not a technical person.  This would be for the

19    quality department to really investigate.  I can't dispute if

20    it's true or not true."

21          Did I read that right?

22    **A.**  Yes.

23    **Q.**  Going back to your interview notes.  So again, we have a

24    Joint Exhibit Number 450.  With respect to item 2 here on

25    this first page, you did find in your investigation, didn't

1  you, that it was Mr. Mekerri who had decided to exclude

2  Dr. Menninger from the interview process?

3  **A.**  Because of the December -- or November discussion where

4  Dr. Menninger felt overwhelmed, Hacene was taking over and

5  helping her, by assuming some of these responsibilities.

6  **Q.**  Well, my question specifically relates to interviews,

7  that it was Mr. Mekerri who decided not to have Dr. Menninger

8  involved in these interviews; is that right?

9  **A.**  Again, because he was helping her in the process.  He was

10  conducting the interviews on her behalf.

11  **Q.**  Item number 3 here relates to "new expectation to attend

12  bid defense and client visits."  Do you see that there?

13  **A.**  Yes.

14  **Q.**  Fair to say that you learned in your investigation that

15  Dr. Menninger had never previously attended bid defenses; is

16  that right?

17  **A.**  Yes.

18  **Q.**  You also learned that she had not previously been

19  directly involved in doing client visits as part of the sales

20  process, correct?

21  **A.**  I believe she had been involved with client visits.

22  **Q.**  That she had actually gone out and visited clients as

23  part of the sales process?

24  **A.**  No, but had been available as a consult during that

25  process.

1   **Q.** Okay. Great. That's what she had done historically, but

2   you agree that she was being asked to do something different

3   now, right?

4   **A.** Accountability of her job, but something that she hadn't

5   done historically.

6   **Q.** Okay. Something historically she hadn't been asked to

7   do, right?

8   **A.** That's fair.

9   **Q.** Okay. But then with respect to item 4, Dr. Menninger

10   pointed out to you that she wasn't being invited to certain

11   sales and marketing meetings; is that right?

12   **A.** Yes. A routine marketing meeting.

13   **Q.** And she pointed out to you that seemed odd, right?

14   **A.** Yeah, just why wasn't she invited to that particular

15   meeting.

16   **Q.** Especially if all of the sudden there was this claimed

17   need to have her directly involved in sales, right?

18   **A.** Yes.

19   **Q.** And when you went and you actually spoke to the business

20   development folks, right?

21   **A.** Correct.

22   **Q.** Andy Supp?

23   **A.** Yes.

24   **Q.** Head of business development?

25   **A.** Yes.

```
1   Q.  And he told you that he didn't need Dr. Menninger
2   directly involved in those meetings, right?
3   A.  No.  Andy confirmed that there was a member of
4   Dr. Menninger's team on his routine marketing log calls.
5   Q.  And he cold you that he was perfectly satisfied with
6   that, right?
7   A.  I don't think he was satisfied or unsatisfied.  He said
8   there's a representative.  I'm assuming that they're talking.
9   If they're not, then, you know, I'm happy to add
10  Dr. Menninger.
11  Q.  But he didn't indicate that having Dr. Menninger there
12  was a significant need, right?
13  A.  Again, I don't think Andy had an opinion one way or the
14  other.  He said there's a representative from the lab.  If it
15  needs to be Dr. Menninger, then, you know, she can attend.
16  But he vetted the list to make sure there wasn't, you know, a
17  large -- too large of a group of folks at that meeting.
18  Q.  Now, let's look at the next page here, item number 6.
19  And this related to Dr. Menninger's 2017 performance review.
20  Right?
21  A.  Yes.
22  Q.  One of the things Dr. Menninger pointed out to you was
23  that it was odd that there wasn't much commentary in the
24  review, right?
25  A.  Yes.
```

1    **Q.** Okay. And she was right that there wasn't much

2    commentary in the review, right?

3    **A.** That's correct.

4    **Q.** Okay? In fact, there were various spots where

5    Mr. Mekerri had not written anything, right?

6    **A.** Yes.

7    **Q.** And, in fact, there was one spot where it looked like he

8    stopped mid sentence, right?

9    **A.** Yes.

10    **Q.** Okay. So she was right about that, correct?

11    **A.** Well, when I think about a performance review, the end of

12    the year is when it's, you know, officially completed, but

13    the performance review occurs throughout the entire year, one

14    on one conversations, discussions. It's an accumulation of

15    what you're discussing with that individual through the year.

16    So the end of the year is really just to finalize a full year

17    of discussion.

18    **Q.** I'm not sure I understand that answer. My question is

19    whether or not she was right that there was information --

20    I'm sorry, that if she was right that there was not much

21    commentary, and she was, wasn't she?

22    **A.** Correct.

23    **Q.** Okay. And she also noted that Mr. Mekerri had never

24    actually gone through his ratings with her and explained why

25    he had those ratings, correct?

1 **A.** Correct.

2 **Q.** And that was true, as well, wasn't it?

3 **A.** As with other employees that reported to him, yes.

4 **Q.** Okay.  Now, before doing any investigation here, you

5 already had some personal knowledge concerning

6 Dr. Menninger's 2017 review, didn't you?

7 **A.** In terms of forwarding it to completion, yes.

8 **Q.** The day after Dr. Menninger disclosed her disability, you

9 advanced her performance review in the system, didn't you?

10 **A.** And many others, yes.

11 **Q.** To your knowledge, did Mr. St. John thereafter go in and

12 modify the review?

13 **A.** No.

14 **Q.** Would it surprise you if he did?

15 **A.** No -- I mean, yes, it would surprise me if he -- the way

16 the system works is, when you advance it, it does not allow

17 for edits once it is to a completed form.

18 **Q.** Let's turn to the next page here in this document.  These

19 are your notes of your conversation with Mr. St. John; is

20 that right?

21 **A.** Yes.

22 **Q.** Okay.  And one of the things that he -- you asked him

23 about was whether or not Mr. Mekerri was treating

24 Dr. Menninger any differently; is that right?

25 **A.** Yes.

 1    **Q.**  Okay.  And Mr. St. John, did he say anything to you about

 2    the coaching he had been providing to Mr. Mekerri about

 3    documenting performance deficiencies of Dr. Menninger?

 4    **A.**  When we went through these specific issues, no.  But

 5    through our one-on-ones, I would have been aware of that.

 6    **Q.**  You already knew that he was coaching Mr. Mekerri to

 7    provide tough feedback to Dr. Menninger, right?

 8    **A.**  Coaching, yes.

 9    **Q.**  Tough feedback, right?

10    **A.**  Feedback.

11    **Q.**  You already knew that there was an effort to turn up the

12    heat on Dr. Menninger, didn't you?

13    **A.**  Again, looking at her disability and her accommodation

14    requests separately from performance, it -- that was the

15    intent, to segregate the two, to ensure that we kept them

16    segregated.

17    **Q.**  Let's turn to the next page here of your interview notes

18    with Mr. St. John.  So this -- this is what you wrote down in

19    terms of the version of events from the February 28th meeting

20    that Mr. St. John relayed to you in the course of your

21    information; is that correct?

22    **A.**  That's correct.

23    **Q.**  Did I hear you correctly that, when being questioned by

24    PPD's lawyers, that you heard three different versions of

25    what happened at the February 28th meeting?

1    **A.**   Yes.

2    **Q.**   Okay.  You heard Dr. Menninger's version, right?

3    **A.**   Yes.

4    **Q.**   There's this version from Mr. St. John, right?

5    **A.**   Yes.

6    **Q.**   And then you heard a different version from Mr. Mekerri,

7    right?

8    **A.**   Yes.

9    **Q.**   Did that indicate to you, Ms. Ballweg, that somebody was

10   lying?

11   **A.**   I think lying is a strong word.  I think it was a -- it

12   was a tense meeting.  It was unproductive.  Recollections

13   were apparently different.

14   **Q.**   And it never occurred to you that maybe those different

15   recollections were the result of someone being dishonest?

16   **A.**   No.  For what purpose?  I'm not sure why anyone would be

17   dishonest in relaying -- and again, when we do the

18   investigation, it's -- we really impel employees and managers

19   to be direct and honest about what happened in that meeting.

20   **Q.**   Wasn't Mr. St. John direct and honest to you back in

21   March, when he drafted those documents for in-house counsel?

22   **A.**   Chad was providing information.  We're a high -- PPD is a

23   high performing organization.  There's initiatives where we

24   spend time and energy investigating and providing

25   information, but they don't all -- they're not all executed.

1   **Q.** Why is there nothing in here in these notes of your

2   conversation with Mr. St. John about Dr. Menninger asking for

3   additional detail concerning buckets two through four?

4   **A.** I don't believe Chad and I discussed it.

5   **Q.** Why is there nothing in this note here about Mr. Mekerri

6   telling Dr. Menninger that there weren't going to be any

7   accommodations for buckets two through four?

8   **A.** That had already been communicated to Dr. Menninger.

9   **Q.** And Mr. St. John, he didn't mention that when you

10  interviewed him?

11  **A.** No.

12  **Q.** I'm going to turn your attention to the page in this

13  exhibit. In the bottom right corner, it has 332. And if you

14  look here, these are what you say are your notes with your

15  interview with Mr. McKinnon; is that right?

16  **A.** Yes.

17  **Q.** Okay. You described these as notes. Your discussion

18  with Mr. McKinnon was about an hour to an hour and 15

19  minutes, right?

20  **A.** Yes.

21  **Q.** Okay. And in terms of what you wrote down from that,

22  it's just this one page; is that correct?

23  **A.** Yes.

24  **Q.** During the course of this interview, Mr. McKinnon didn't

25  tell you that Dr. Menninger was performing poorly, did he?

1   **A.**   Brent wouldn't have been in a position to make that
2   observation.
3   **Q.**   So he didn't, right?
4   **A.**   It wasn't relevant to the investigation.
5   **Q.**   That's fine.  I'm just asking if he communicated that to
6   you that there were problems with Dr. Menninger's
7   performance.  And he didn't, did he?
8   **A.**   I wouldn't say performance.  I think he made a comment
9   about leadership and feeling that the team, perhaps, lacked
10  some leadership from a quality perspective.
11  **Q.**   Well, you said the other day that he was making comments
12  regarding the various groups overseeing the lab, right?
13  **A.**   I'm sorry.  What was your question?
14  **Q.**   Sure.  His quality comments, those weren't specific to
15  only Dr. Menninger, right?
16  **A.**   Correct.
17  **Q.**   He was saying that there were lots of areas for
18  improvement, right?
19  **A.**   Correct.
20  **Q.**   Okay.  He didn't indicate to you that any of the recent
21  lab problems had been attributable to anything that
22  Dr. Menninger had or had not done, did he?
23  **A.**   Well, he recognizes that quality issues occur within the
24  lab.  It's, again, oversight by the leadership team that
25  really needs to be engaged and aware and overarching

1    providing guidance and counsel to the team.  That was his

2    comments.

3    **Q.**  And you had seen from Dr. Menninger's e-mail exchange

4    from Mr. Mekerri, all the different things she was doing in

5    that regard, right?

6    **A.**  Yes.

7    **Q.**  That she was providing oversight of the team?

8    **A.**  That's her statement, yes.

9    **Q.**  That she was making sure these things were properly

10   investigated?

11   **A.**  That's -- yes, that's what she said.

12   **Q.**  That she was doing all the things she was supposed to be

13   doing, right?

14   **A.**  That's what she asserted, yes.

15   **Q.**  And you never found that to be false, did you?

16   **A.**  I didn't look into those.

17   **Q.**  Looking here at the bottom of the page, do you see here

18   that Mr. McKinnon, he did note one specific problem relating

19   to the reporting structure for Narine -- I'm not even going

20   to try to pronounce that last name, but do you see that

21   there?

22   **A.**  Yes.

23   **Q.**  Now, that was an issue that you were familiar with,

24   right?

25   **A.**  Cursory.

1  **Q.** Well, you had been involved in the decision to have

2  Narine report directly to Mr. Mekerri, weren't you?

3  **A.** I suppose Chad would have made me aware along the way,

4  sure.

5  **Q.** Well, you and Mr. St. John had actually met to discuss

6  how to explain that decision to Dr. Menninger, right?

7  **A.** I don't recall.

8  **Q.** I'll show you Joint Exhibit 154.

9  You see an e-mail there from Mr. St. John to

10  Mr. Mekerri, copying you?

11  **A.** Yes.

12  **Q.** Okay. He begins it by saying, "I spoke with Deb." Yes?

13  **A.** Yes.

14  **Q.** That's you?

15  **A.** Yes.

16  **Q.** Okay. And then he goes on to describe the reporting

17  relationship for Narine, right?

18  **A.** Yes.

19  **Q.** Okay. And then he provides some talking points in terms

20  of how to justify this to Dr. Menninger, right?

21  **A.** I don't think justify, but communicate.

22  **Q.** Who was Dr. Menninger's replacement?

23  **A.** Dr. Basel Kashlan.

24  **Q.** Do you recall when PPD first began recruiting

25  Dr. Kashlan?

1    **A.**  I wasn't involved in that.  I'm -- I'm not aware.

2    **Q.**  I'll show you Joint Exhibit 231.  I'm showing you here an

3    e-mail exchange between you and Mr. Williams.  Again,

4    Mr. Williams, that was your boss back at the time; is that

5    right?

6    **A.**  Yes.

7    **Q.**  And here in this June 4, 2018 exchange, you write to him

8    in response to the fact that Dr. Menninger had requested that

9    medical leave; is that right?

10   **A.**  I'm not sure what I was referring to there.

11   **Q.**  Okay.  Well, June 4th, that was two days after

12   Dr. Menninger had requested her medical leave.  Yes?

13   **A.**  Correct.

14   **Q.**  Okay.  And Mr. William's response includes, "How do we

15   cover and bridge until the new guy gets on board?"  Do you

16   see that?

17   **A.**  Yes.

18   **Q.**  The new guy he's referring to is Dr. Kashlan, isn't it?

19   **A.**  I don't know.

20   **Q.**  I'll show you Joint Exhibit 106.  You see this is a

21   June 1st e-mail from Mr. St. John to Jerry Williams, copying

22   you?

23   **A.**  Yes.

24   **Q.**  And you see that attachment there?

25   **A.**  Yes.

1  **Q.**  That's Basel Kashlan's resume, isn't it?

2  **A.**  Yes.

3  **Q.**  And am I right that while Dr. Menninger was on medical

4  leave, that PPD hired him to serve as an -- in an interim

5  position.  Isn't that right?

6  **A.**  I'm not sure of his employment details.  I know he was a

7  full-time employee or hired in -- I think it was June of

8  2019.

9  **Q.**  But he started well before that, right?

10  **A.**  I'm not sure what capacity, though.

11  **Q.**  Well, didn't PPD hire a doctor to come in and serve as an

12  interim replacement for Dr. Menninger?

13  **A.**  I believe so.

14  **Q.**  And wasn't that Dr. Kashlan?

15  **A.**  Again, as Dr. Menninger commented, there was gaps in

16  benches.  I'm not quite -- I don't recall exactly who was

17  hired when, to cover which benches.

18  **Q.**  You don't know who the medical doctor was in charge of

19  your lab?

20  **A.**  There was a consultant, Miriam Black, that had been used

21  historically, and she might have filled that gap.  I just --

22  I'm not sure if it was Miriam or when it was Basel, or

23  Dr. Kashlan.  I just don't recall.

24  **Q.**  You testified on your examination from PPD's counsel last

25  week that you thought Dr. Menninger's decision to relocate

Case: 23-2030   Document: 00118179985   Page: 156   Date Filed: 07/04/2024   Entry ID: 6634402
Case 1:19-cv-11441-LTS   Document 356   Filed 03/04/23   Page 49 of 273

49

1  was concerning.  Did I hear that right?

2  **A.**  Yes.

3  **Q.**  I'm going to show you Joint Exhibit 382.

4        It's an e-mail from Mr. St. John, on June 7th of

5  2017?

6  **A.**  Yes.

7  **Q.**  And Mr. St. John, he writes, "Lisa has also shared with

8  all the CL key stakeholders that she will be moving to the

9  Providence area/New England region for compelling personal

10  reasons the weekend of June 24th.  No concerns regarding her

11  physical move have been expressed or detected at this time."

12        Do you see that?

13  **A.**  Yes.

14  **Q.**  I'm going to show you Joint Exhibit 401.  So this is that

15  9-Box that we looked at on Friday.  Do you recall that?

16  **A.**  Yes.

17  **Q.**  And just for context, this was transmitted December 20,

18  2017, right?

19  **A.**  Yes.

20  **Q.**  Okay.  And as of December 2000 -- I'm sorry, December 20,

21  2017, am I right that Dr. Menninger's performance was right

22  on track?

23  **A.**  Yes.

24  **Q.**  You were asked some -- -- I'm sorry, you read us some

25  testimony last week concerning PPD's financial performance.

1   Do you know what PPD's revenue was in 2017?

2   **A.**   The overall company?

3   **Q.**   Yes.

4   **A.**   I don't recall.  It's a long while ago.

5   **Q.**   Would it be in the hundreds of millions?

6   **A.**   Not hundreds.  I don't recall.

7   **Q.**   How about 2018?  Was its revenue that year in the

8   hundreds of millions?

9   **A.**   I -- I don't recall 2018.

10  **Q.**   When it was acquired by Thermo Fisher, was for that

11  $17.4 billion?

12  **A.**   At the end of 2021, yes.

13  **Q.**   I now show you Joint Exhibit 186.

14           I lied.  I'm not going to show that to you.

15           Do you recall the testimony from Dr. Menninger's

16  sister on Friday?

17  **A.**   Yes.

18  **Q.**   And do you recall, there was a text message from

19  February 2nd, 2019, advising your sister that she no longer

20  worked at PPD?

21  **A.**   Yes.

22  **Q.**   Okay.  That was the day after Dr. Menninger's employment

23  at PPD had ended.  Am I right?

24  **A.**   What was the date again?  I'm sorry.

25  **Q.**   February 2nd.  She was terminated officially

1   February 1st, right?

2   **A.**   Administratively, her status changed February 1st of

3   2019.

4   **Q.**   So last document here.  I'm going to show you Joint

5   Exhibit 186.

6           So this is that e-mail exchanged we looked at a

7   couple of times between yourself and Mr. St. John on

8   February 28, 2018; is that right?

9   **A.**   Yes.

10  **Q.**   Okay.  And directing your attention here to the

11  highlighted portion, where Mr. St. John

12  references, "Delicately working Lisa out."

13          Did I hear you correctly when PPD's lawyer asked

14  you questions that you thought that was a reference to

15  Dr. Menninger's remote working status?

16  **A.**   It's -- yeah, to have coverage -- again, not knowing,

17  with the accommodation requests, you know, just wanting to be

18  in the position to ensure that there's coverage for the lab

19  to conduct business.

20  **Q.**   Sure.  My question is not about coverage.  My question is

21  specifically about forwards.  "Delicately working Lisa out."

22          What did you think that meant?

23  **A.**   Well, these are Chad's -- this is Chad's e-mail, but

24  again, coverage for the organization.

25  **Q.**   This was more than seven months after Dr. Menninger had

 1 | gone remote, right?

 2 | **A.**  What was the date of the e-mail again?

 3 | **Q.**  February 28, 2018.

 4 | **A.**  That timeline was correct, yes.  So --

 5 | **Q.**  She had been remote for a long time, right?

 6 | **A.**  And still working on filling the gaps that she identified

 7 | for the lab, yes.

 8 |             MR. HANNON:  That's all I have, Your Honor.

 9 |             THE COURT:  All right.  Recross.

10 |         **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

11 | BY MS. MANDEL:

12 | **Q.**  Good morning, Deb.

13 | **A.**  Good morning.

14 |             THE COURT:  Go ahead.  Whenever you're ready.

15 |             MS. MANDEL:  Ms. Belmont, do I have -- oh, there we

16 | go.

17 | BY MS. MANDEL:

18 | **Q.**  Deb, I'm pulling back up Joint Exhibit 450.  Do you see

19 | that in front of you?

20 | **A.**  I do, yes.

21 | **Q.**  And these are the notes that you took in connection with

22 | your investigation?

23 | **A.**  Correct.

24 | **Q.**  And this is -- on this first page, you've listed out the

25 | first five of the concerns that you were looking into.  Do I

1   understand that correctly?

2   **A.**   That's correct.

3   **Q.**   If we look down at number -- numbers 3 and number 4, do

4   you see those?

5   **A.**   Yes.

6   **Q.**   As far as you understood when you were doing the

7   investigation, were these two different issues that had been

8   raised?

9   **A.**   Yes.

10  **Q.**   And can you explain, based on your understanding, what

11  the difference was between numbers 3 and 4?

12  **A.**   So bid defense and client visits.  A bid defense is

13  working with our clients to -- they're looking for a proposal

14  of the work that we can do.  And it's really defending the

15  quality of the work we do, the project, the cost.  So it's

16  really helping either prospective clients or existing clients

17  with new work appreciate and understand the scope of the

18  project.

19          Certainly part of Dr. Menninger's job description

20  is a key accountability.

21          And client visits, it's not uncommon for senior

22  leaders of the business to attend client calls, whether

23  traveling to their office, attending meetings while they're

24  on site.  It's done consistently across all the labs, Central

25  Labs, and it certainly is included in that, as well, in terms

 1    of an expectation of our senior leaders sitting on top of

 2    specifically lab based businesses.  Vastly different than a

 3    marketing log call, which, the way I understand it, it's a

 4    weekly or biweekly call where they walk through heres the

 5    clients, here's the potential work that they can bring in.

 6    It's a routine meeting.  Vastly different than a bid defense

 7    or a client -- a client visit.

 8            And then the sales meeting, again, just a specific,

 9    once-a-year-meeting to bring the entire sales force together,

10    more like team building, and what is our focus and goal for

11    the next year, a little bit of education that goes along with

12    it.  And then for that particular year, breakout sessions to

13    talk about what specifically do we want to focus on with

14    three distinct labs within the organization, what

15    specifically do we want to focus on for this year, and kind

16    of carve out meetings, if you will, with specific people

17    talking about their specific area within PPD.  So four vastly

18    different things.

19    **Q.**  And you testified earlier that you consulted with

20    Mr. Andy Supp about number 4; is that correct?

21    **A.**  Correct.

22    **Q.**  And Mr. Supp's role, again, can you just explain what

23    that was?

24    **A.**  So Andy Supp -- excuse me -- is the executive director of

25    our business development team.  He would be the one hosting

1    those biweekly client log meetings with his team to make

2    sure, again, that we're following up on leads and we're

3    having an awareness of what new clients we might want to have

4    more discussions around.

5           And then the sales meeting, it was -- it's a sales

6    meeting.  So Andy was the one really coordinating the

7    meeting, bringing his team together, and being more of the

8    coordinator, if you will, of that particular meeting from a

9    Central Lab perspective.

10   **Q.**  And as far as you understood, Deb, did Andy Supp have any

11   relevant knowledge with regard to Mr. Mekerri's request that

12   Dr. Menninger attend bid defenses and client visits?

13   **A.**  I'm sorry.  Could you say that again?

14   **Q.**  Sure.  I'll ask that better.

15          Looking back at number 3, where Dr. Menninger had

16   raised concerns about Mr. Mekerri's expectations that she

17   attend bid defenses and client visits, as far as you

18   understood, was that something that Mr. Supp would have been

19   involved in at all?

20   **A.**  Yes.  Andy would be -- and his team would attend bid

21   defenses, as well as client visits.  But, again, not uncommon

22   for technical leaders to attend in addition to our business

23   development teams, again, to share technology, answer

24   questions.  But Andy would have been aware and involved in

25   both client visits and bid defenses.

1   **Q.**  Deb, can you tell the jury, what were your goals in doing

2   the investigation that you performed in May of 2018?

3   **A.**  Excuse me.

4          So whether Dr. Menninger or anybody else, the goal

5   of an investigation is, again, meet with the individual,

6   appreciate from their lens what it is that is, you know,

7   troublesome, bothersome to the individual, point by point, go

8   through and investigate, is there merit, is there anything

9   here that doesn't look right, doesn't feel right?  And as I

10  go through the investigation, is there any other information

11  or any other individuals who could provide documentation or

12  knowledge in which to make a fair assessment of the

13  situation?  And the same thing with Dr. Menninger's

14  situation.  I went through point by point.  You know, does

15  there -- is there an appearance of her manager treating her

16  differently because she disclosed her disability?

17         And in every one of those situations, there was

18  not -- there just wasn't proof that he was treating her

19  differently.  It's not -- at the end of the day, you know, as

20  leaders, we try to come to work with, you know, our game

21  face, but, you know, there's pressures.  The business was

22  going through a struggling time.  I mean, we all end up being

23  terse at times when we don't want to be.  Is that

24  problematic?  It's not nice, but it's not problematic.  It's

25  not nice.  It's just not nice.  But we don't know the whole

1    scenario of how people behave and what's going on with their

2    personal lives.

3           My goal really was to say was Dr. Menninger treated

4    differently after she disclosed her disability by her

5    manager.

6    **Q.**  And after you concluded your investigation and met with

7    all of these witnesses, what was your conclusion in that

8    regard?

9    **A.**  That she was not treated differently after she disclosed

10    her disability.

11    **Q.**  If Dr. Menninger had raised another complaint or concern

12    with you, would you have conducted another investigation?

13    **A.**  Yes.

14    **Q.**  I want to draw your attention back to Exhibit 244, which

15    you looked at a few moments ago.  And this is your e-mail

16    from May 16th at the top.  And we didn't look at the last

17    sentence of your e-mail there, where you said, "I will give

18    Hacene feedback, too.  We'll let you to know to also co-coach

19    him on his supervisory challenges.

20           Can you explain what you meant by that, Deb?

21           MR. HANNON:  Objection.  Beyond the scope.

22           THE COURT:  Overruled.

23           Go ahead.

24           THE WITNESS:  And I think I mentioned this when we

25    talked earlier about, you know, the amount of investigations

1    that I've done and how, at the conclusion, there are

2    opportunities for people to learn.  And so here, you know,

3    Hacene, in his leadership style, certainly could have been

4    more direct, could have been more communicative, could have

5    just, from a leadership perspective, approached the situation

6    better.  And our attempt is really to help leaders be the

7    best that they can be, help our employees to be the best they

8    can be.  So our role is to make sure that we give that

9    feedback, and encourage, you know, again, continuous

10   improvement in our desire to be, you know, great leaders.

11   **Q.**  And did you, in fact, provide that feedback to

12   Mr. Mekerri?

13   **A.**  I did, yes.

14   **Q.**  Was that in the same time period?

15   **A.**  It would have been after the conclusion of the

16   investigation, but I did, yes.

17   **Q.**  And you testified earlier about advising Mr. Mekerri to

18   keep performance discussions separate from disability

19   accommodation discussions.  Do you recall that?

20   **A.**  Yes.

21   **Q.**  And would you have advised any manager in that same

22   manner?

23   **A.**  Yes, absolutely.

24   **Q.**  And why is that, Deb?

25   **A.**  Again, we want to make sure that employees -- that

```
 1    there's a fair process with each one, and there's -- you
 2    know, and not an attempt to cross lines and confuse the
 3    situations.  The more you can compartmentalize the issues,
 4    the more clear it can be to the employee, as well as the
 5    manager going through that situation.
 6              MS. MANDEL:  Okay.  Thank you.  I have no more
 7    questions.
 8              THE COURT:  Okay.  Thank you.
 9              You can step down, Ms. Ballweg.
10              Next witness.
11              MR. HANNON:  The plaintiff calls Dr. Marianna
12    Kessimian.
13              THE COURT:  All right.
14              MR. HANNON:  Your Honor, may I retrieve the binder
15    from the witness stand?
16              THE COURT:  Yes.  Of course.  Go ahead.
17              THE DEPUTY CLERK:  And if you can remain standing
18    and please raise your right hand.
19              (The witness was duly sworn.)
20              THE DEPUTY CLERK:  Can you please state your full
21    name and spell your last name for the record.
22              THE DEPUTY CLERK:  Sure.  Marianna Isabel
23    Kessimian, K-e-s-s-i-m-i-a-n.
24              THE COURT:  Go ahead, Mr. Hannon.
25              MR. HANNON:  Sure.  Thank you.
```

| | |
|---|---|
| 1 | **MARIANNA I. KESSIMIAN** |
| 2 | having been duly sworn, testified as follows: |
| 3 | **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF** |
| 4 | BY MR. HANNON: |
| 5 | **Q.**  Good morning, Doctor. |
| 6 | **A.**  Good morning. |
| 7 | **Q.**  A little bit of advice, you'll want to pull the |
| 8 | microphone a little bit close, and it actually works best |
| 9 | when you speak directly into it? |
| 10 | **A.**  Got it. |
| 11 | **Q.**  All right.  Great.  Would you please introduce yourself |
| 12 | to the jury? |
| 13 | **A.**  Hi, I'm Dr. Marianna Kessimian.  Nice to meet you. |
| 14 | **Q.**  And Doctor, what do you do for work? |
| 15 | **A.**  Oh, sure.  I'm an outpatient psychiatrist. |
| 16 | **Q.**  And where do you work? |
| 17 | **A.**  In Providence, Rhode Island. |
| 18 | **Q.**  Okay.  And do you know Dr. Menninger? |
| 19 | **A.**  I do. |
| 20 | **Q.**  And how did you come to know Dr. Menninger? |
| 21 | **A.**  She came to me as a patient. |
| 22 | **Q.**  Okay.  And do you know when that was? |
| 23 | **A.**  I believe it was January of 2017. |
| 24 | **Q.**  Okay.  Well, we'll look at some notes in a second and |
| 25 | talk about some dates. |

1   **A.**  Sure.

2   **Q.**  But first, maybe you can talk a bit about your

3   background.  Where did you go to school?

4   **A.**  I graduated medical school from BU.

5   **Q.**  And when was that?

6   **A.**  That was in 2007.

7   **Q.**  Okay.  And did you do some kind of a residency or other

8   training afterwards?

9   **A.**  Yes.  I went to Brown University and I completed an adult

10  psychiatry residency training and a child and adolescence

11  fellowship after my adult training.

12  **Q.**  And when did you complete all of that?

13  **A.**  2013, I believe.

14  **Q.**  And what did you do after that?

15  **A.**  For three years, I worked at the Young Adult Behavioral

16  Health Life Span outpatient clinic, and then I transitioned

17  to private practice in 2017.

18  **Q.**  And where is your private practice?

19  **A.**  It's called Hartselle and Associates, and it's in

20  Providence, Rhode Island.

21  **Q.**  Do you have any kind of particular specialty or focus?

22  **A.**  I'm a generalist.  I have some expertise in eating

23  disorders in young adults, since I worked with them

24  specifically for three years, but I see all ages and all

25  diagnoses.

```
 1   Q.  Very good.  Have you ever testified in court before?

 2   A.  No.

 3   Q.  Oh, and before we move on, are you being compensated in

 4   any way for your testimony today?

 5   A.  No.

 6   Q.  And, in fact, are you appearing pursuant to a subpoena?

 7   A.  I am.

 8   Q.  Okay.  I'll try to make good use of your time.

 9           So just to start here, I'm going to show you what

10   we refer to as Joint Exhibit 18.  And do you see here at the

11   top it says, "Initial psychiatric evaluation"?

12   A.  Oh, I had the wrong year.  Yes.

13   Q.  Okay.  And it references Dr. Menninger there, right?

14   A.  It does.

15   Q.  Okay.  Would this be the notes from your first meeting

16   with Dr. Menninger?

17   A.  Yes.

18   Q.  Yes?

19   A.  Yes.

20   Q.  Okay.  Great.  And if you just give the jury a little bit

21   of sense in terms of how you go about making notes in your

22   typical practice?

23   A.  Yes.  So during the session, I jot down some notes, and

24   then afterwards, I complete a thorough psychiatric

25   documentation of the initial evaluation.
```

1    **Q.**  Okay.  And I'll direct your attention to the first

2    section here of your note, you reference a, "Presenting

3    complaint."  Do you see that?

4    **A.**  I do.

5    **Q.**  Do you typically include some kind of a -- of a statement

6    like that in your notes?

7    **A.**  Typically, yes.

8    **Q.**  And what does that generally include?

9    **A.**  It includes what the patient kind of presented that day

10   as their reason for seeking care.

11   **Q.**  Okay.  And what -- what do you recall about your first

12   meeting with Dr. Menninger, if anything?

13   **A.**  It doesn't stand out.  I think it was a typical interview

14   and first meeting.  She answered all of my questions.  That's

15   really it.

16   **Q.**  Okay.  And this sort of description here in terms of what

17   she said to you, the best of your knowledge, would that all

18   accurately reflect what you and she discussed?

19   **A.**  Yes.

20   **Q.**  And you know here, in this paragraph that I've just

21   highlighted, you referenced that Dr. Menninger would like to

22   maintain her current job and responsibilities.

23         Do you see that?

24   **A.**  I do.

25   **Q.**  Okay.  Do you recall if that was one of the reasons why

 1    she had come to see you that day?

 2    **A.**  Could you repeat the question?  Sorry.

 3    **Q.**  No worries.  Do you recall if that was one of the reasons

 4    why she came to see you that day?

 5    **A.**  Because she wanted to keep her current job and

 6    responsibilities?

 7    **Q.**  Yes.

 8    **A.**  Yes.

 9    **Q.**  Okay.  And do you recall getting involved in helping

10    Dr. Menninger submit some paperwork for an accommodation

11    request?

12    **A.**  I do.

13    **Q.**  All right.  Let me show you here Joint Exhibit 47.  And

14    is this an e-mail from you to Chad St. John?

15    **A.**  Yes.

16    **Q.**  And that's your e-mail address?

17    **A.**  It is.

18    **Q.**  Okay.  You begin, "Per our conversation, the forms are

19    attached."  Do you see that?

20    **A.**  I do.

21    **Q.**  Do you recall that conversation at all?

22    **A.**  Not specifically.

23    **Q.**  Okay.  I just want to direct your attention to the forms

24    that follow.  So you see the next page, it's captioned --

25    **A.**  Oh, yeah.

1    **Q.**  -- "Request for accommodation"?

2    **A.**  Uh-huh.

3    **Q.**  Did you complete this form?

4    **A.**  Yes.

5    **Q.**  Okay.  Did you complete it truthfully and honestly?

6    **A.**  I hope so.

7    **Q.**  Were you -- is it your practice to complete forms like

8    this truthfully and honestly?

9    **A.**  Yes.

10    **Q.**  Okay.  And here in Box 8, do you see there's a section

11    regarding recommended accommodations?  Do you see that?

12    **A.**  Yes.

13    **Q.**  Okay.  And one of your recommendations here was

14    that, "Any social of interaction or public speaking incident

15    to her role be minimized to the extent possible."

16           Do you see that?

17    **A.**  I do.

18    **Q.**  Okay.  And at the time, did you believe that that was

19    something that would have helped Dr. Menninger?

20    **A.**  I do.  I did.

21    **Q.**  And you also recommended that her role not be changed to

22    require any increased public speaking or social interactions.

23    Do you see that?

24    **A.**  I do.

25    **Q.**  Did you believe at the time that was something that would

```
 1   help Dr. Menninger do her job?

 2   A.  Yes.

 3   Q.  And then in the next section, there's a recommendation

 4   that a plan be developed for these activities, if they're

 5   necessary, in consultation with you or another healthcare

 6   provider.  Do you see that?

 7   A.  I do.

 8   Q.  Was that something else that you thought might help

 9   Dr. Menninger do her job?

10   A.  Yes.

11   Q.  Okay.  And in terms of why those were necessary, in box

12   number 6 here, there's a statement that, "Lisa's disability

13   makes it extremely difficult for her to engage in public

14   speaking and social interactions.  While Lisa has been able

15   to tolerate these types of activities to the extent that they

16   have been necessary for --" next page.

17   A.  Oh.  Okay.

18   Q.  "-- her job, they often caused her to suffer from anxiety

19   and other somatic symptoms."  Do you see that?

20   A.  I do.

21   Q.  Okay.  With respect to your recommendation that social

22   interactions be limited and public speaking be limited, was

23   it your understanding that Dr. Menninger was incapable of

24   doing those things?

25   A.  No.
```

```
 1   Q.  Okay.  Was it your intent to convey to PPD that she was
 2   incapable of doing those things?
 3   A.  No.
 4   Q.  During your phone call with Mr. St. John preceding this
 5   e-mail, do you recall telling him that Dr. Menninger was
 6   categorically unable to do those things?
 7   A.  No.  I don't remember saying that.
 8   Q.  Do you recall at some point submitting a more specific
 9   accommodation suggestion?
10   A.  I think I did.  When I reviewed some of the e-mails, I
11   thought I saw a form filled out, so yes.
12   Q.  Okay.  I'm going to show you Joint Exhibit 180.
13   A.  Okay.  Yup.
14   Q.  Does this look familiar?
15   A.  It does.
16   Q.  Okay.  And you see here at the top, it
17   says, "Psychoeducation regarding disability and accommodation
18   requests."  Do you see that?
19   A.  I do.
20   Q.  Okay.  What are you referring to there by
21   "psychoeducation regarding disability"?
22   A.  There is a lot of data to support that educating
23   employers or teachers, organizations about mental illness and
24   how it manifests sometimes can help them figure out within
25   their own system how to support their employee or a student,
```

1    so on and so forth.  So that's what I mean by

2    "psychoeducation."

3    **Q.**  And did you provide psychoeducation?

4    **A.**  I hope so.  I think I wrote a little bit about social

5    anxiety disorder and how it can impact well-being and how

6    it's physically also impacting Lisa.  So yes.

7    **Q.**  And if I just highlight this section here, would I be

8    right that that was the sort of psychoeducation that you were

9    trying to --

10   **A.**  Yes.

11   **Q.**  Did Mr. St. John or anyone else from PPD ever reach out

12   to you to get more information concerning this

13   psychoeducation?

14   **A.**  No.

15   **Q.**  Would you have provided more if they had asked for it?

16   **A.**  Yes.  I've gone to school systems and had meetings and so

17   on and so forth, so yes.

18   **Q.**  Okay.  And when you say you've gone to school systems,

19   you mean like in connection with an accommodation request?

20   **A.**  Correct.

21   **Q.**  And then below, we'll see here some recommendations you

22   provided concerning possible accommodations?

23   **A.**  Correct.

24   **Q.**  Okay.  And were these things that you had sort of

25   brainstormed with Dr. Menninger in terms of, you know,

1   creative ideas that might be available?

2   **A.**   Yes.

3   **Q.**   Okay.  Was it your intention to convey to PPD that

4   Dr. Menninger would only do her job if she got these

5   accommodations?

6   **A.**   Absolutely not.

7   **Q.**   Do you see here at the end, you note, "I am available for

8   further discussion"?

9   **A.**   I do.

10  **Q.**   I'm going to take you back to your treatment notes, Joint

11  Exhibit 18.  Besides what's contained in these notes, do you

12  have a sort of independent recollection of much of your care

13  of Dr. Menninger?

14  **A.**   I have an overall recollection, yes.

15  **Q.**   Yeah?  What's your overall recollection?

16  **A.**   My overall recollection is she was very open and willing

17  to do the work to get better, including taking medications,

18  letting me talk to whoever I needed to talk to to help her

19  get better.  But she did start to decline and she needed more

20  support.  But in general, she was very committed to trying to

21  get better.

22  **Q.**   And in terms of that decline, do you recall what that

23  decline led to?

24  **A.**   I believe a hospitalization.

25  **Q.**   And I'm going to show you your notes here from a visit on

1    June -- June 1, 2018.  And just to orient us, the top of the

2    highlighted section, it says, "DOS."  Would that be date of

3    service?

4    **A.**  Yeah.

5    **Q.**  So that generally reflects the date that you saw the

6    person?

7    **A.**  Yeah.

8    **Q.**  Okay.  In terms of the chief complaint that day, you

9    write, "I just can't do it anymore.  I am not sleeping,

10   eating.  I am having thoughts about ending my life, but I

11   wouldn't do it because of Maya and Mason."

12          Do you see that?

13   **A.**  I do.

14   **Q.**  Okay.  Do you recall anything about Dr. Menninger's visit

15   on that occasion?

16   **A.**  I just recall that she was in distress.

17   **Q.**  And was it at that point in time that you recommended

18   that she seek more advanced treatment?

19   **A.**  Yes.

20   **Q.**  It was at the hospital program you referred to earlier?

21   **A.**  Yes.

22   **Q.**  Okay.  And I'm just going to direct your attention to the

23   third page of that note.  In terms of your plan.

24          First item, "Safety, recommend immediate medical

25   leave starting on Monday 2/2 to level of anxiety and safety

1    issues, monitor GI distress and appetite."

2              Do you see that?

3    **A.**   Yes.

4    **Q.**   Okay.  And medical leave, would that be a medical leave

5    from work that you recommended?

6    **A.**   Correct.

7    **Q.**   And was that a safety issue from your perspective?

8    **A.**   Yes.

9    **Q.**   When you first began treating Dr. Menninger back in

10   January of 2018, did you have any safety concerns about her

11   then?

12   **A.**   No.

13   **Q.**   Did she express to you at that time any suicidal

14   ideation?

15   **A.**   No.

16   **Q.**   Subsequent to this note that we've been looking at here

17   from June 1, 2018, do you recall being contacted by

18   Dr. Menninger's husband at some point?

19   **A.**   I do.

20   **Q.**   And do you recall him expressing a safety concern to you?

21   **A.**   I do.

22   **Q.**   And could you just tell the jury what, if anything, do

23   you recall about that.

24   **A.**   I recall Mason being concerned that she was making

25   statements about wanting to end her life.

1  **Q.**  And did you get on the phone and talk Dr. Menninger
2  through that?
3  **A.**  I did.
4  **Q.**  As you were treating Dr. Menninger through this decline
5  that you've referenced, were you aware that she was having
6  discussions with her employer about possible accommodations?
7  **A.**  I was aware there were discussions, yes.
8  **Q.**  Okay.  Did Dr. Menninger express to you frustration over
9  the way that her employer was responding to those requests?
10  **A.**  At times I do remember her being concerned about some of
11  the -- her words being -- and even my words kind of being
12  used in a way that didn't feel good.  But my memory is also
13  that a lot of our sessions were not necessarily about only
14  work.  That was not necessarily the focus of the time that we
15  spent together.
16  **Q.**  Sure.  And were you spending time trying to get her to do
17  activities that might help with her healing; is that correct?
18  **A.**  Correct.
19  **Q.**  Things like going out for a walk?
20  **A.**  Yes.  Some exposures, as we call them, yes.
21  **Q.**  Playing with her daughter in the driveway?
22  **A.**  Yes.
23  **Q.**  Okay.  And I think you said that Dr. Menninger, she
24  was -- she was trying hard with those things?
25  **A.**  She really was, yes.

1    **Q.**  I'm going to direct your attention here to Joint

2    Exhibit 136.  And I'm just going to show you -- this is an

3    e-mail that Dr. Menninger wrote to someone at her company and

4    I just want to point out something that she wrote here.

5    "While you keep saying that you are committed to engaging in

6    a dialogue with me, I feel like you just keep twisting my

7    doctor's words and refusing to answer any of my questions."

8            Do you see that?

9    **A.**  I do.

10   **Q.**  Do you recall Dr. Menninger sharing that concern with you

11   at any point during her treatment?

12   **A.**  What's coming to mind is I had sent this document about

13   different leadership styles to -- I think it was Chad.  And

14   part of the one of the leadership styles was -- and I had

15   said it's kind of more behind the scenes, someone who's a

16   little more pragmatic, a little more quiet, but kind of

17   supports leadership in a different way, than being

18   extroverted or being the face of whatever.

19           And then what I do remember is that somehow those

20   words kept coming up, if she was asked to do something, or is

21   that behind the scenes enough, or something along those

22   lines, and those aren't exact quotes, but somehow those words

23   were kind of being used to question whether she was able to

24   do things at work.  That's what I recall.

25   **Q.**  I'm now going to show you Joint Exhibit 19.

1    **A.** Oh, yes.

2    **Q.** And just to orient you here, I'm going to show you the

3    second page of the document. And if you look here at the

4    bottom half?

5    **A.** Yes.

6    **Q.** You see there, it looks like this is a form that you

7    completed; is that right?

8    **A.** Correct.

9    **Q.** Okay. And in the section above, under "Diagnostic

10   Impressions," there's a question about, "The patient has

11   conceptualized the following areas as barriers in returning

12   to work." Do you see that?

13   **A.** I do.

14   **Q.** And you write, "Decline to accommodate, now with hostile

15   work environment."

16          Do you see that?

17   **A.** I do.

18   **Q.** And was the hostile work environment, is that what

19   Dr. Menninger had communicated to you?

20   **A.** Yes.

21   **Q.** Okay. Do you have a specific recollection, all these

22   years later, of what that consisted of, or would you just

23   refer to your notes?

24   **A.** I would probably refer to my notes. I remember the

25   behind the scenes. Oh, and I -- what was it -- I can't

1   remember.  There was something more to that, but it's not

2   coming to mind right now.

3   **Q.**  Okay.  That's all.

4

5           MR. HANNON:  That's all I have, Your Honor.

6           THE COURT:  Okay.  Cross-examination.

7           **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

8   BY MS. MANDEL:

9   **Q.**  Good morning, Dr. Kessimian.

10  **A.**  Good morning.

11  **Q.**  I'm Rachel Mandel.  I'm going to ask you some more

12  questions.

13          You treated Dr. Menninger in your practice in

14  Providence for about a year; is that right?

15  **A.**  That is.

16  **Q.**  From January of 2018 to early 2019; is that right?

17  **A.**  Correct.

18  **Q.**  And you saw her mostly in person in your Providence

19  practice?

20  **A.**  Correct.

21  **Q.**  And that was until Dr. Menninger relocated to New Mexico;

22  is that right?

23  **A.**  We might have had one or two virtual sessions, if she was

24  really struggling to leave her home, but then afterwards, we

25  had a few virtual sessions as she transitioned care to

 1  New Mexico.

 2  **Q.**  And you also talked on the phone and e-mailed with her

 3  attorney, Patrick Hannon, during that time; is that right?

 4  **A.**  A few times, yes.

 5  **Q.**  You testified that you first met Dr. Menninger on January

 6  22, 2018; is that correct?

 7  **A.**  Yes.

 8  **Q.**  And do you recall how Dr. Menninger first came to you as

 9  a patient?

10  **A.**  I think she was just a self-referral.  That's all I

11  remember.

12  **Q.**  And when you first met her on January 22nd of 2018, she

13  told you herself that she had generalized anxiety disorder,

14  social anxiety, and panic; is that right?

15  **A.**  Yes.

16  **Q.**  And you took that seriously, because she, herself, is a

17  physician; is that right?

18  **A.**  Yes.

19  **Q.**  Can you explain what agoraphobia is?

20  **A.**  So agoraphobia is eventually you have so much fear about

21  leaving your home that you can end up pretty isolative and

22  staying mostly confined to your home.

23  **Q.**  And that's something that you additionally diagnosed

24  Dr. Menninger as having; is that right?

25  **A.**  Yes, she was struggling with that.

1   **Q.**  And that was, again, as of January of 2018?

2   **A.**  Correct.

3   **Q.**  And that was based on Dr. Menninger's reports to you that

4   she was having difficulty leaving her home at all at that

5   point?

6   **A.**  I wouldn't say at all, but it was increasingly difficult

7   for her, yes.

8   **Q.**  And Dr. Menninger reported to you that she was motivated

9   to seek treat because her symptoms were, in turn, impacting

10   her daughter; is that right?

11   **A.**  Correct.

12   **Q.**  Do you recall how old her daughter was at that time?

13   **A.**  I know she went to Wheeler School.  I want to say middle

14   school, but I could be wrong.  Maybe elementary.  I'm unsure.

15   **Q.**  And she also told you at that time that she already, as

16   of January of 2018, had what she called spiralling fears

17   about work; is that right?

18   **A.**  Correct.

19   **Q.**  And that was that she might lose her job, even as of

20   January of 2018?

21   **A.**  My recollection is that -- and this is from my note, as

22   well, she had an end-of-the-year review, and at that time,

23   there were public speaking requirements that were introduced,

24   that were maybe not excessive, but were high expectations

25   about the amount of public speaking.  And I did receive a

1     form to support what she was saying to me.  And she had

2     recently also gone virtual, because she had left where she

3     was living to support her daughter, who had been struggling

4     in school, I believe.  So she had a recent relocation, she

5     was remote.

6             And what was your question again?  Now I've lost

7     it.

8     **Q.** That as of January of 2018, when Dr. Menninger first came

9     to you, she had reported fears of losing her job, and she --

10    **A.** So she was -- her fear was, I believe, more about would

11    she be able to fulfill these new responsibilities without

12    becoming very ill and without needing a lot of medication to

13    get through these responsibilities was more how I remember

14    her talking about it.

15    **Q.** And you had concerns about how she would handle leaving a

16    lot of medications?

17    **A.** I don't understand the question.

18    **Q.** Well, you testified a moment ago that Dr. Menninger

19    reported to you needing, I think you said, a lot of

20    medications to be able to do the things that were being asked

21    of her at work?

22    **A.** No.  I -- I guess what I was just trying to say from the

23    history is that she had done public speaking engagements

24    previously.  However, had needed some medication to support

25    her through that.

1          But now as the requirement was increasing -- and

2     these medications are in and out in a day, people use them

3     for flying, people use them for public speaking.  These are

4     medications that we use for specific fears, right?  But if we

5     have to face that fear every day, or we don't even know when

6     that's going to come up, right, then the requirement for your

7     body to get through those is going to need more medication,

8     and sometimes even with medication, we're not going to be

9     able to do it.  So that's what I mean by that.

10    **Q.**  And so as of your meeting with Dr. Menninger, one of your

11    initial goals was how to work with her to navigate all of

12    this at work; is that right?

13    **A.**  That was part of my initial goal, yes.

14    **Q.**  And let's pull back up Joint Exhibit 18.  And this is

15    your initial psychiatric evaluation note from that first

16    appointment that you had with Dr. Menninger; is that right?

17    **A.**  Yes.  Yes.

18    **Q.**  And towards the end of that first paragraph of your

19    description of what you learned from Dr. Menninger, you noted

20    that Dr. Menninger had already met with a lawyer at this

21    point and, in fact, that that lawyer would work with you to

22    do paperwork for her employer; is that right?

23    **A.**  I don't --  "To provide."

24    **Q.**  It's the second to last sentence of that first big

25    paragraph?

1    **A.**  Yes, that's what I wrote.

2    **Q.**  And that lawyer that you were referring to there is

3    Patrick Hannon there; is that right?

4    **A.**  Yes.

5    **Q.**  And let's look -- let's go a couple pages in.  This is

6    still part of that note from your first appointment; is that

7    right?

8    **A.**  Uh-huh.

9    **Q.**  And you noted on your mental status exam notes, you said

10   at the top of the page that Dr. Menninger appeared as tearful

11   at times, measured, pale, thin, initially anxious; is that

12   right?

13   **A.**  Correct.

14   **Q.**  And again, that was your initial impression the very

15   first time you met with her; is that correct?

16   **A.**  Yes.

17   **Q.**  And in part, your impressions, based on your first

18   meeting with her, helped educate you about what your next

19   steps might be in treating her; is that right?

20   **A.**  Correct.

21   **Q.**  And helped inform how you handled that accommodation

22   paperwork that you noted earlier in your note; is that right?

23   **A.**  Can you connect those two again?

24   **Q.**  Yeah, you testified a moment ago about earlier in your

25   note, you said that you were going to work with Dr. Menninger

1  about her accommodation paperwork?

2  **A.**  Oh, sure.

3  **Q.**  And your impressions that you're looking at here helped

4  inform what you filled out in that paperwork; is that right?

5  **A.**  Yeah.

6  **Q.**  Looking down at -- lower on the page, you talk about,

7  under "assessment and plan," do you see that?

8  **A.**  I do.

9  **Q.**  And you noted that her baseline high anxiety -- can you

10  explain what baseline high anxiety is?

11  **A.**  So some of us, temperamentally, can be more risk averse,

12  can be more aware of potential dangers in our environment,

13  we're more introverted, less extroverted, less risk-taking,

14  and highly responsible would be another part of that.  So

15  baseline, she's already quite anxious, and she already had

16  some anxiety regarding her daughter's well-being that she was

17  coping with, as well as there was a lawyer in her life, and

18  there was financial responsibilities that she was coping with

19  and a recent move.  So all of those, at her baseline, she

20  already had a high level of anxiety.

21  **Q.**  And this -- this started to spiral, you noted, when it

22  was suggested that she would be more visible at work; is that

23  right?

24  **A.**  Correct.  Correct.

25  **Q.**  And this was connected to this fight or flight feeling

1    that you described next; is that right?

2    **A.**    Correct.

3    **Q.**    And this is what you described as catastrophic thinking;

4    is that right?

5    **A.**    Fight or flight is separate than catastrophic thinking.

6    **Q.**    Those are two separate things.  So those are two separate

7    feelings that you understood Dr. Menninger had at the time?

8    **A.**    Correct.

9    **Q.**    And the catastrophic thinking was, again, that fear that

10    you mentioned earlier in your note that she was spiralling

11    and feeling like she might lose her job as of January 2018?

12    **A.**    Correct.

13    **Q.**    Is that right?  Okay.  And beneath that you note

14    Dr. Menninger's earlier traits of her upbringing and her

15    family life; is that right?

16    **A.**    Correct.

17    **Q.**    And you note that had she had trauma secondary to her

18    father's volatile behavior and the domestic violence that she

19    had witnessed; is that right?

20    **A.**    Correct.

21    **Q.**    And this was relevant to sort of where she was coming

22    from and what was otherwise impacting her; is that right?

23    **A.**    Sure.

24    **Q.**    And then down below, at the bottom of that page is where

25    you list out the diagnoses that you had coming out of this

1   visit; is that right?

2   **A.**   Uh-huh.

3   **Q.**   And that was the panic disorder with agoraphobia which

4   you described?

5   **A.**   Yes.

6   **Q.**   Is that -- the social disorder and the generalized

7   anxiety disorder, which Dr. Menninger self-reported to you;

8   is that right?

9   **A.**   Correct.

10  **Q.**   In looking at -- actually, one second.

11          And looking back at this page, you noted under --

12  you noted under "Social," you said pathologists working in

13  the private sector, sole financial contributor and then you

14  noted that husband empathic understanding partner, concern

15  for excessive accommodation, all her needs are met, and she

16  is not asked or required to leave the house.  Do you see

17  that?

18  **A.**   I do.

19  **Q.**   And that was referring to your concern that, in fact, Dr.

20  Menninger's husband was sort of accommodating her pushback

21  against leaving the house; is that right?

22  **A.**   Correct.

23  **Q.**   And in your professional opinion at the time, what impact

24  did that have, Dr. Kessimian?

25  **A.**   On what, specifically?

1 **Q.** Well, that was something that you noted as relevant in

2 her medical history or her psychiatric history. So why did

3 you think that was something important to note?

4 **A.** Well, just like everything is on a spectrum,

5 accommodation is also a spectrum. And so in order to get

6 better, anxiety leads to avoidance many times. There are

7 some vital functions we all have to do in life to just

8 survive. One of those would be able to leave the house, get

9 medication, talk to other people. And if those were all

10 going to be accommodated for Lisa because, I'm assuming, her

11 partner didn't want her to suffer and be in distress, that

12 would be problematic. So that would be a focus of concern.

13 **Q.** And that's something that you continued to work with

14 Dr. Menninger on; is that right?

15 **A.** Correct.

16 **Q.** And looking back at the previous page of your notes from

17 that January 22nd date, which you should have in front of

18 you, you also noted that Dr. Menninger had what you called

19 eating disorder behavior?

20 **A.** Could you highlight it?

21 **Q.** Yes. That's about two-thirds of the way down. The

22 paragraph begins "eating disorder behavior." Do you see

23 that?

24 **A.** Yes.

25 **Q.** And you noted that Dr. Menninger weighed herself daily

1   and was committed to remaining the same weight.  Do you see

2   that?

3   **A.**  I do.

4   **Q.**  And she also at the time was competing in ultra long

5   power walking; is that right?  It's in the end of that same

6   paragraph?

7   **A.**  Yes.  Yeah.

8   **Q.**  And again, that's something that you thought was a

9   relevant part of her psychiatric history; is that correct?

10  **A.**  Correct.

11  **Q.**  And, in fact, you continued to be somewhat concerned

12  about the eating disorder behavior throughout her treatment;

13  is that right?

14  **A.**  I continued to be concerned about her weight throughout

15  our treatment, yes.

16  **Q.**  And then let's look at what you developed as the plan

17  during this visit.  You noted here on the last page of your

18  note from that initial visit, some medication changes that

19  you were considering, and then you said, "Support

20  accommodations at work so that public speaking is not a core

21  requirement;" is that right?

22  **A.**  Correct.

23  **Q.**  Or work responsibility;" is that correct?

24  **A.**  Correct.

25  **Q.**  And that's because you wanted to minimize those effects

```
 1    that you had seen with the spiralling thoughts about work; is

 2    that right?

 3    A.  I think it's a little more complicated than that.  I

 4    think she has social phobia and one of the core issues with

 5    that illness is that public speaking, performance relating,

 6    any interaction where criticism, scrutiny is at risk can

 7    cause a cascade of physiological, behavioral issues for that

 8    person.  And so if we could minimize that for her, in this

 9    area, that would be ideal.

10    Q.  And coming out of this visit, you then filled out

11    documentation for Dr. Menninger to take back to her employer

12    at the end of January of 2018; is that right?

13    A.  I don't remember specifically.

14    Q.  Sure.  We'll look at that.

15    A.  Okay.

16    Q.  And in fact, you already looked at it earlier this

17    morning.

18    A.  Oh.  Okay.  Then yes.

19    Q.  This is an e-mail from you on January 31st, is that

20    right?

21    A.  Yes.

22    Q.  And this is the e-mail that you sent to PPD yourself; is

23    that right?

24    A.  Yes.

25    Q.  Okay.  And you indicated in your e-mail to Mr. St. John,
```

|    |                                                                                 |
|----|---------------------------------------------------------------------------------|
| 1  | you said, "Per our conversation, the forms are attached" and                    |
| 2  | that's because you also had a phone conversation with Mr. St.                    |
| 3  | John; is that right?                                                             |
| 4  | **A.** Yes.                                                                      |
| 5  | **Q.** And let's look at what you sent in this e-mail.                           |
| 6  | This is the form that you looked at a few moments                               |
| 7  | ago. Do you recall?                                                              |
| 8  | **A.** Yes.                                                                      |
| 9  | **Q.** And you explained in bold, in the middle of this page,                   |
| 10 | that Dr. Menninger has -- you listed out impairments, right?                    |
| 11 | You said panic disorder with agoraphobia --                                     |
| 12 | **A.** Yeah.                                                                     |
| 13 | **Q.** And social anxiety disorder and generalized anxiety                      |
| 14 | disorder?                                                                        |
| 15 | **A.** Correct.                                                                  |
| 16 | **Q.** And those were all diagnoses that you had endorsed as                    |
| 17 | part of your treatment in your visit earlier in January?                        |
| 18 | **A.** Yes.                                                                      |
| 19 | **Q.** And then if we -- if we look down at the section under                   |
| 20 | number 5 -- well, let's actually, let's look at number 4                        |
| 21 | first. You noted -- and it's a little harder to tell where                      |
| 22 | your writing begins, because it's not in bold, but you wrote                    |
| 23 | in that impairment is long term with a chronic course; is                       |
| 24 | that correct?                                                                    |
| 25 | **A.** Correct.                                                                  |

 1   **Q.**  And that meant that it didn't have an end point that you

 2   saw coming; is that right?

 3   **A.**  Many of my illnesses are chronic in nature, and they ebb

 4   and flow, according to certain stressors.  So it's just --

 5   yes, the impairment is long term with a chronic course, but

 6   that chronic course, there can be times where the symptoms

 7   are less sever, times where they're more severe.  If there's

 8   a stressor that's exacerbating those symptoms, they can

 9   become more severe.  But, yes, it is a chronic condition.

10   **Q.**  And in fact, that's what you reported in your answer to

11   number four, about what the nature of this impairment was?

12   **A.**  Correct.

13   **Q.**  Okay.  And then let's look down at number five, with

14   regard to where you described what the conditions would

15   limit, or how they might interfere with Dr. Menninger's

16   performance of the essential functions of her job.

17          Is that your language below where it says, "Lisa

18   suffers from panic disorder."

19          Do you see that?

20   **A.**  Yes.

21   **Q.**  So you wrote, "Lisa suffers panic disorder with

22   agoraphobia, social anxiety disorder, and generalized anxiety

23   disorder.  This disability significantly interferes with

24   Lisa's ability to perform major life activities, such as

25   thinking, concentrating, communicating and working."

1      And you wrote that, as well, correct?

2  **A.**  Correct.

3  **Q.**  "Lisa is most effected in social situations and when she

4  is required to speak in front of others.  Despite these

5  limitations, Lisa reports that she has historically fulfilled

6  the essential functions of her job without accommodation.

7  However, she frequently suffers from anxiety and other

8  somatic symptoms triggered by social interactions and public

9  speaking incident to her job.  Further, Lisa's supervisor

10  recently identified potential changes to her role involving

11  more public speaking and social interactions.  This has

12  caused Lisa to experience increased anxiety with somatic

13  symptoms, including diarrhea, heart racing, sweatiness, and

14  increased respiratory rate."

15      And you wrote all of that?

16  **A.**  I did.

17  **Q.**  Yeah.  Somatic symptoms, Dr. Kessimian, that is what's

18  like a physical response to feelings of anxiety.  Is that

19  right?

20  **A.**  Correct.

21  **Q.**  And that would include things like gastrointestinal

22  distress, the sweatiness, the racing heart rate; is that

23  right?

24  **A.**  Correct.

25  **Q.**  And you wanted to explain that those were things that

1    Dr. Menninger experienced in connection with the diagnoses

2    that you had given her; is that right?

3    **A.**   Correct.

4    **Q.**   Looking below, at number six, and this spans two pages,

5    this is where you were asked to explain which essential job

6    functions Dr. Menninger would have trouble performing; is

7    that right?  And your language below says, "Lisa's disability

8    makes it extremely difficult for her to engage in public

9    speaking and social interactions.  While Lisa has been able

10   to tolerate these types of activities to the extent that they

11   have been --" oops.  "-- necessary for her job, they often

12   cause her to suffer from anxiety and other somatic symptoms.

13   Any changes to her role that increase the need for public

14   speaking and/or social interactions will increase her anxiety

15   and worsen he somatic symptoms which will make it

16   substantially more difficult, if not impossible for Lisa to

17   perform her job."

18             And you wrote that, as well?

19   **A.**   Correct.

20   **Q.**   And that was your response to Dr. Menninger reporting to

21   you that there were some additional needs for social

22   interaction and public speaking coming with her job; is that

23   right?

24   **A.**   And a -- yes.  Yes.

25   **Q.**   And the next question says, "If the employee cannot

1    perform the essential function of his or her job or access

2    --"

3           THE COURT REPORTER:  I'm sorry.  Can you please

4    slow down just a little bit.

5           MS. MANDEL:  Yes.  Sorry.  "If the employee cannot

6    perform the essential functions of his or her job, or access

7    a benefit of employment, what accommodations would you

8    recommend?"

9    BY MS. MANDEL:

10   **Q.**  Do you see that?

11   **A.**  Yes.

12   **Q.**  And you wrote in response, "Given Lisa's disability, I

13   recommend that any social interaction or public speaking

14   incident to her role would be minimized to the extent

15   possible.  Additionally I recommend that her role not be

16   changed to require any increased public speaking or social

17   interactions."

18           Do you see that?

19   **A.**  I do.

20   **Q.**  And so you were recommending that the changes that had

21   been proposed in December of 2017 not be put in place; is

22   that right?

23   **A.**  Correct.

24   **Q.**  To the extent that social interactions and/or public

25   speaking is deemed necessary for Lisa's job, I recommend that

 1    a plan be developed for these activities, in consultation

 2    with me or another qualified healthcare provider."

 3            Is that right?

 4    **A.**  Yes.

 5    **Q.**  So essentially putting on the brakes for that type of

 6    thing, unless you or someone like you were being consulted?

 7    **A.**  Correct.

 8    **Q.**  Okay.  And then you explained how the accommodations that

 9    you were proposing would improve Dr. Menninger's job

10    performance in the next question.  Is that right?  In number

11    8?

12    **A.**  Yes.

13    **Q.**  And your response was, "Given Lisa's disability, I

14    recommend that any social interaction or public speaking

15    incident to her role be minimized to the extent possible."

16    So you repeated again what you had said a couple of times,

17    right?

18    **A.**  Yeah.

19    **Q.**  "Additionally, I recommend that her role not be changed

20    to require any increased public speaking or social

21    interactions."  And so again --

22    **A.**  Same thing.

23    **Q.**  -- you wanted to put the brakes on that.

24            "To the extent that social interactions and/or

25    public speaking is deemed necessary for Lisa's job, I

 1    recommend that a plan be developed for these activities, in

 2    consultation with me or another qualified healthcare

 3    provider."

 4              So, again, saying that if those things needed to be

 5    done, I would have to consult or someone else like me would

 6    have to consult in how that could be done; is that right?

 7    **A.**  Correct.

 8    **Q.**  Okay.  And then number 9, the question is what

 9    restrictions, if any, are you placing on Dr. Menninger's

10    ability to do her job?  Is that right?

11    **A.**  Yes.

12    **Q.**  And in connection with this, you had reviewed the job

13    description, correct?

14    **A.**  I had reviewed the public speaking requirements.

15    **Q.**  Okay.  And your response was, "Social interactions and

16    public speaking should be minimized as much as possible.  To

17    the extent Lisa is required to engage in social interactions

18    and/or public speaking, these activities should be planned in

19    consultation with her medical provider, in hopes of minimize

20    Lisa's anxiety and somatic symptoms."

21    **A.**  Yes.

22    **Q.**  And this was in part because you had observed what you

23    believed were somewhat concerning somatic symptoms or

24    physical manifestations of Dr. Menninger's anxiety; is that

25    right?

1    **A.**   And what she reported to me was causing her distress.

2    **Q.**   And so you wanted to make sure that she wasn't in

3    situations that would increase her level of symptoms; is that

4    right?

5    **A.**   No.

6    **Q.**   Well, so why would you have recommended --

7    **A.**   So I do recommend outside of work that she actually do --

8    does engage in activities that increase her somatic symptoms.

9    Right?  So going out to the mailbox, trying to engage in

10   talking to people in her neighborhood.  So the treatment for

11   anxiety is not about avoiding everything that causes you that

12   increased anxiety.  What I deemed was -- which seemed outside

13   of the -- which seemed like an excessive amount of public

14   speaking, if I remember correctly.  And that's coming from

15   someone who does not work and does not know exactly how much

16   public speaking is required of her position, in particular.

17   But the public speaking requirement that I remember was quite

18   broad.  It was very general.  I believe the first line said

19   up to 500 people biweekly, monthly, or quarterly.  That was

20   like number one, and that can happen once or twice, and then

21   it went down to 50 to 100 people, and I can't remember the

22   rate.  And it went down again.  So it was the fact that the

23   amount of public speaking that was being requested was at

24   such an extreme rate that I felt that was going to be

25   detrimental and that she was going to have -- she was going

1    to be flooded with symptoms from her sympathetic nervous

2    system, that she would not be able to recover.  Because you

3    also have to remember that with social phobia, it's not just

4    about the presentation.  It's the days leading up to the

5    presentation.  It's thinking about how you're going to say,

6    what you're going to say, what is someone going to comment,

7    how am I going to respond?  And she is losing weight, she is

8    very profoundly distressed about this.  And if there is a

9    way -- and again, this is just from my own knowledge of

10   physicians, I'm not a pathologist, I'm a psychiatrist, but

11   again, in my mind, this amount of public speaking for a

12   pathologist, I was just kind of like, what else does she do

13   for her job?  Because you would have to just be prepping for

14   public speaking the whole time you're working, as far as I'm

15   concerned, with the amount of public speaking that was being

16   requested of her.

17          The other thing with anxiety is structuring

18   expectations does help mitigate symptoms.  So if there was a

19   little bit more clarity regarding the rate of public

20   speaking, how many people were going to be there, I do

21   believe Lisa would work towards doing something.  That was

22   how she presented to me.  And if I recall, she even

23   offered -- there was a -- I want to say Belgium, but I could

24   have the country wrong.  There was one cohort internationally

25   where she felt very comfortable with her peers and very

1    comfortable presenting.  And she even said I would be more

2    than willing to like continue that cohort.  It's really these

3    kind of US -- I think she said US labs, but, again, I am not

4    privy to PPE -- PPD, I don't even know their name, what they

5    do for their company.  But she was willing to kind of meet in

6    the middle and try to find ways so that she could still do

7    facets that felt comfortable, that felt doable, again, while

8    in treatment, while taking medication, while doing exposures,

9    but this did feel like an extreme expectation.  And that's

10    what I was trying to shift, not that she should never do

11    things that cause her anxiety because many things were

12    causing her anxiety.

13    **Q.**  Dr. Kessimian, to just draw your attention back to that

14    accommodation paperwork that you filled out, it should be on

15    the screen?

16           MS. MANDEL:  I'm seeing it here.  Is it?

17           THE COURT:  Yeah, I have it, too.  You're talking

18    about the nine-question form?

19           MS. MANDEL:  Okay.

20    BY MS. MANDEL:

21    **Q.**  You should now have it on the screen in front of you your

22    accommodation paperwork that you filled out for

23    Dr. Menninger; is that right?

24    **A.**  Yes.

25    **Q.**  And you see that you signed this on January 31, 2018?

1   **A.**   I do.

2   **Q.**   And that was, in fact, before you filled out additional

3   paperwork where you, at that point, were aware of certain

4   buckets of job responsibilities that listed out the number of

5   people and the frequency.  Isn't that right?

6   **A.**   Oh, that is true.  That is true.  Correct.

7   **Q.**   So at this point, you were acting based on your

8   understanding of what Dr. Menninger had described to you and

9   her job description, and your understanding of what a

10  pathologist might do; is that right?

11  **A.**   Yes.  And my understanding, also, of the illness.

12  **Q.**   Correct.  And your understanding of what a pathologist

13  might do, in part, comes from your own medical training; is

14  that right?

15  **A.**   Yes.

16  **Q.**   And your belief that a pathologist often does sort of

17  behind the scenes work; is that right?

18  **A.**   Well, they run a laboratory.  Right?  And so it's not

19  direct patient care.  It's not bedside care.  So it is more,

20  I would guess, like quantitative, qualitative types of care,

21  and running a staff in a lab.  Right?  Labs have to run

22  smoothly, I would assume, as well.

23  **Q.**   And this is based on your own assumptions and knowledge,

24  having gone to medical school yourself, right?

25  **A.**   Correct.

1  **Q.**  Let's look at your notes from your next visit with

2  Dr. Menninger.  This was from a couple of days later.  This

3  was from February 2nd of 2018; is that right?

4  **A.**  Uh-huh.  Yeah.

5  **Q.**  And at this visit, you noted that Dr. Menninger reported

6  to you, "I'm just worried all the time.  I wake up with my

7  heart already beating fast, thinking about how I have to see

8  the people that I work with at the end of the month after

9  handing in those letters to HR."

10      Do you see that?

11 **A.**  I do.

12 **Q.**  And this was Dr. Menninger's report simply at having

13 handed in documents asking for an accommodation; is that

14 right?

15 **A.**  Correct.

16 **Q.**  And you felt that it was significant to note this as her

17 chief complaint; is that right?

18 **A.**  Yes.

19 **Q.**  And that's because even having that initial interaction

20 with her employer was having this impact on her.  Isn't that

21 right?

22 **A.**  Can you repeat the question?

23 **Q.**  Yeah.  The reason that you noted this as Dr. Menninger's

24 chief complaint at this time was because even having had a

25 conversation and starting the conversation with PPD about the

```
 1    need for an accommodation was having this impact on her.
 2    Isn't that right?
 3    A.  I noted it because it's what she said.
 4    Q.  And looking down at the sort of middle part of that page,
 5    you noted that you spoke at length about Dr. Menninger's
 6    experience in the work environment, where she feels that
 7    because she is more introverted and analytical, she is being
 8    criticized for things that are unchangeable.  Do you see
 9    that?
10    A.  Uh-huh.
11    Q.  And then you noted "has difficulty advocating for herself
12    and has already resigned to defeat in the corporate culture."
13         Do you see that?
14    A.  Yes.
15    Q.  And this was at just your second visit with
16    Dr. Menninger, a few days after she had told her employer
17    that she had an anxiety condition; is that right?
18    A.  I don't know what she specifically said to her employer.
19    Q.  Well, you provided an accommodation letter on January
20    31st, right?  We just looked at that?
21    A.  Yes.
22    Q.  And just two days later, at that point, you noted that
23    Dr. Menninger was having difficulty advocating for herself
24    and felt resigned to defeat at work, basically?
25    A.  Sure.  Yes.
```

1    **Q.** And during this same time period, Dr. Kessimian, you were

2    having communications, yourself, with Patrick Hannon,

3    Dr. Menninger's attorney; is that right?

4    **A.** I believe we e-mailed a couple of times and maybe talked

5    on the phone once.

6    **Q.** Let's look at --

7              MS. MANDEL: Before I bring up this Exhibit --

8              THE COURT: Which one is this?

9              MS. MANDEL: This is going to be --

10             THE COURT: What exhibit number is it?

11             MS. MANDEL: It's going to be -- the one that has

12   the BO on it.

13             Ms. Belmont, we may just have to bring it up.

14             THE COURT: You can bring it up just for the

15   witness now.

16             MS. MANDEL: Yeah.

17   BY MS. MANDEL:

18   **Q.** Here we have some e-mails from starting on February 3rd

19   at the bottom, and at the top it's from February 4th. Do you

20   see that?

21   **A.** I do.

22   **Q.** And this is an e-mail from you to Dr. Menninger, at the

23   top, on February 4th; is that right?

24   **A.** Correct.

25   **Q.** And actually, let's look, first, at the e-mail below.

1    Dr. Menninger forwarded to you an e-mail that she received

2    from Mr. St. John; is that right?

3    **A.**  Correct.

4            MR. HANNON:  Judge, I think it's just some

5    confusion from the jury in terms of why they can't see it.

6            THE COURT:  Because it's not yet in evidence.

7            Go ahead.

8            Thank you, Mr. Hannon.

9            Whenever I say it's just -- you can show it to the

10   witness or only the witness, that means it's not yet in

11   evidence.

12           Go ahead.

13   BY MS. MANDEL:

14   **Q.**  Dr. Kessimian, at the bottom of this page, you see that

15   Dr. Menninger had forwarded -- shown you an e-mail that she

16   had received from Mr. St. John; is that right?

17   **A.**  Yes.

18   **Q.**  And then up above that, she wrote to you, and there's

19   some discussion of having an appointment on an upcoming day;

20   is that right?

21   **A.**  Correct.

22   **Q.**  And then -- this is, again, on February 3rd,

23   Dr. Menninger reported to you that Mr. St. John had responded

24   to the forms that you had provided and she had provided at

25   the end of January; is that right?

1    **A.**  Could you repeat that question?  Sorry.

2    **Q.**  Sure.  The second paragraph of the February 3rd e-mail.

3    Do you see that in front of you?

4    **A.**  During our appointment yesterday?

5    **Q.**  Yes.

6    **A.**  Okay.

7    **Q.**  "During our appointment yesterday, Chad sent an e-mail

8    response to the forms that were submitted."  Do you see that?

9    **A.**  Yes.

10   **Q.**  And then Dr. Menninger reported to you "reading it

11   triggered an instant panic attack and made it hard for me to

12   focus on anything else for the rest of the day.  I copied and

13   pasted his e-mail below, and also forwarded it to Patrick for

14   guidance."

15          Do you see that?

16   **A.**  I do.

17   **Q.**  "I realize that the thought of face-to-face interaction

18   with my US colleagues on any level is triggering a

19   significant amount of anxiety and panic that I've been trying

20   to avoid at all costs."

21   **A.**  Yes.

22   **Q.**  "As you mentioned yesterday, travel in and of itself does

23   not trigger panic, but visiting the US lab does.  The ideal

24   arrangement for me would be to interact with them on a remote

25   basis only once the interim US lab director is in place,

1    March 1st.  I don't know if they will allow this, however."

2    **A.**  Yes.

3    **Q.**  And this was, again, on February 3rd, a couple days after

4    you sent that initial accommodation paperwork.  And

5    Dr. Menninger was providing further context for you about how

6    it really wasn't going to work for her to travel to the US

7    location because of her fear of the symptoms that it was

8    triggering; is that right?

9    **A.**  Correct.

10   **Q.**  And did you have awareness at this point, Dr. Kessimian,

11   that Dr. Menninger's primary work location was in Highland

12   Heights, Kentucky?

13   **A.**  I did not.

14   **Q.**  Because Dr. Menninger did not explain that to you?

15   **A.**  Or I may never have asked.

16   **Q.**  And then up above, you wrote an e-mail back to

17   Dr. Menninger the next day; is that right?

18   **A.**  Yes.

19   **Q.**  And you set up another appointment, and then you

20   explained that you were going to ask Mr. St. John, after you

21   consulted with Patrick Hannon, if he could list what the

22   specific expected duties were, so that you could talk with

23   Dr. Menninger about a percentage; is that right?

24   **A.**  Correct.

25   **Q.**  And you testified a couple moments ago about your desire

1  to have a little bit more information about the number of

2  people who would be at meetings, and how much time they would

3  take up of Dr. Menninger's schedule; is that right?

4  **A.**  I just needed information to help make recommendations.

5  That's what I was looking for.

6  **Q.**  And you were trying to get that additional information --

7  **A.**  Correct.

8  **Q.**  -- from Mr. St. John, Dr. Menninger, and at the same

9  time, consulting with Dr. Menninger's attorney?

10  **A.**  Correct.

11  **Q.**  And then you said after that, another option would be to

12  ask -- another option would be to ask what percentage of your

13  job duties could remain remote, as we are seeking

14  100 percent?

15  **A.**  Yes.

16  **Q.**  And that's because you were advocating for Dr. Menninger

17  to be able to work 100 percent remotely and not go to

18  Highland Heights at all?

19  **A.**  So I didn't know about Highland Heights, so that didn't

20  play a role in it.  My understanding was she was mostly

21  remote, and considering she wasn't doing well, to continue to

22  ask for remote.

23  **Q.**  Because that would have allowed her not to have those

24  social interactions that were concerning to you?

25  **A.**  Well, that would have let her symptoms at least not

1    worsen as she continues to get treatment.

2    **Q.**   Because it would have avoided the social interactions and

3    public speaking that concerned you; is that right?

4    **A.**   Correct.

5    **Q.**   And then the next paragraph you say, "I'm glad you're

6    listening to quiet."  What did that mean?

7    **A.**   So there's a book, and it's written by a Harvard lawyer,

8    I think her first name is Susan, I can't remember her last

9    name.  And the title of the book is *Quiet: The Power of*

10   *Introverts in a World That Can't Stop Talking*.  So I do

11   recommend this book to many of my patients who struggle with

12   anxiety and struggle with speaking up and advocating for

13   themselves and understanding that there's strength sometimes

14   in not being the loudest one in the room.

15   **Q.**   So you said, "And remember pace is important, and the

16   back and forth e-mails and questions."

17            And that was back and forth e-mails and questions

18   from PPD; is that right?

19   **A.**   From PPD to Lisa, not with me.

20   **Q.**   Yes.

21   **A.**   Yes.

22   **Q.**   And you said that was a good sign.  And good is in all

23   caps, right?  So you were pleased with that.  And they were

24   looking for more clarity and specifics?

25   **A.**   Correct.

1  **Q.** And then you ended the note by saying you would talk to

2  Patrick. And that was Patrick Hannon?

3  **A.** Correct.

4  **Q.** Dr. Menninger's attorney?

5  **A.** Yes.

6  **Q.** The next day. And then you would meet with Dr. Menninger

7  the next day after that, I think, which was a Friday? Is

8  that right?

9  **A.** It sounds like it. Yes.

10 **Q.** And you did, in fact, have that follow-up conversation

11 with her attorney the next day?

12 **A.** You know, I don't recall, but I'm going to have good

13 faith that I did.

14 **Q.** You have no reason to believe --

15 **A.** Yes, thank you.

16 **Q.** And during that follow-up conversation with Mr. Hannon,

17 in fact, you consulted about how you should word additional

18 requests to PPD; is that right?

19 **A.** I don't recall that.

20 **Q.** A couple of weeks later, or a few days later in February,

21 you received a list of specific job tasks that were required

22 for Dr. Menninger's work; is that right?

23 **A.** For public speaking, yes. That's the list I remember.

24 **Q.** And that's what you were talking about --

25 **A.** Yeah.

1    **Q.**  -- a few moments ago, with regard to what those speaking

2    and social interaction requirements would be?

3    **A.**  Correct.

4    **Q.**  Let's look at your response to that.

5           This is an e-mail from you to Chad St. John; is

6    that right?

7    **A.**  Yes.

8    **Q.**  And in this e-mail, you were the one sending this

9    information to Mr. St. John on Dr. Menninger's behalf.

10   **A.**  Correct.

11   **Q.**  Is that right?

12   **A.**  Yes.

13   **Q.**  And you testified a few moments ago that you -- you began

14   the document that you sent by providing I think it's called

15   psychoeducation?

16   **A.**  Correct.

17   **Q.**  Is that right?

18          And you would agree that this psychoeducation was

19   specific to Dr. Menninger.  It wasn't general.  It was really

20   about what she needed?

21   **A.**  Well, I would say social anxiety disorder is a

22   neural-behavioral disorder with biological and genetic risk

23   factors that lead to physical behavioral and cognitive

24   symptoms is general.  I would say it got more specific as the

25   paragraph went on.  And then, in general, I was trying to

1    give a concrete example of how to really think about it

2    physically, almost as if her vocal cords and her brain cannot

3    work with this type of exposure and the intensity of exposure

4    to this amount of public speaking.  So those are not specific

5    to Lisa.  Those are more general to people who struggle with

6    this disorder.

7             I think I became more specific when I tried to give

8    recommendations.

9    **Q.**  Well, in looking at the psychoeducation information that

10   you provided, really even in the first sentence, if you say

11   social anxiety disorder, you begin by talking about

12   Dr. Menninger in particular.  Do you see that?

13   **A.**  Yes.

14   **Q.**  And you would agree, wouldn't you, that throughout these

15   few paragraphs of information about psychoeducation, it was

16   in the context of Dr. Menninger's impairments that you had

17   diagnosed and your recommendations, correct?

18   **A.**  Correct.

19   **Q.**  And so you begin, in that first paragraph, by saying

20   "Lisa's difficulty with socializing and public speaking is

21   not a manifestation of shyness."

22   **A.**  Yes.

23   **Q.**  And then you say, "Social anxiety disorder is a

24   neural-behavioral disorder with biological and genetic risk

25   factors that lead to physical, behavioral, and cognitive

1   symptoms, which are pernicious and chronic in nature."

2   **A.**   Yes.

3   **Q.**   And the pernicious, that means -- I mean, these were

4   pretty serious?

5   **A.**   Correct.

6   **Q.**   And they were -- the symptoms were manifested in ways

7   that were serious and chronic, meaning they were not going to

8   be abating any time?

9   **A.**   That's not necessarily true.  Again, chronic does not

10  reflect symptom severity at a specific point in time or when

11  there's a specific exacerbating event or issue.  Chronic just

12  means that this is something that she has, she's going to

13  have it for a long time, but there are ways we manage chronic

14  illness, just like we manage asthma, allergies.  Right?

15  There's ways we can manage these things.

16  **Q.**   Sure and I'm not asking whether these are things that can

17  be managed?

18  **A.**   Oh.

19  **Q.**   It was chronic.  It was not going away, you know, say the

20  next day, the next week.  It was something that was sort of

21  there and not abating?

22  **A.**   Correct.

23  **Q.**   Okay.  And then the next paragraph, you explain, "In the

24  past, Lisa endured these work events and presentations with

25  intense discomfort and with the use of a sedative."

```
 1              And this was as reported to you by Dr. Menninger,
 2   correct?
 3   A.  Correct.
 4   Q.  "The sedative did help take the edge off, but also came
 5   with side effects, including impaired attention,
 6   concentration, short-term memory deficits, lethargy, and an
 7   extended length of time to return to her cognitive baseline
 8   to complete the more analytical and medical facets of her
 9   work."
10              And you wrote that, as well, with regard to
11   Dr. Menninger, correct?
12   A.  Correct.
13   Q.  And this was in addition to your own -- based on your own
14   medical knowledge, also a reflection of what Dr. Menninger
15   had reported to you, given that you had just started treating
16   her, correct?
17   A.  Yes.
18   Q.  And when you noted the side effects of the medication,
19   those are things that you can see with sedative medications,
20   correct?
21   A.  Correct.
22   Q.  And the lethargy, in particular, lethargy is becoming
23   tired or droopy eyed; is that right?
24   A.  I mean, lethargy has a lot of definitions.  What I
25   remember in particular that Lisa reported, to the best of my
```

        1    memory, is that it would take her a lot of recovery time

        2    after taking the sedative.

        3           So she could get through the event or the speaking

        4    engagement, but then the recovery after that, she was quite

        5    tired and drained after that.  And also the medicine,

        6    depending on what sedative you're using, sometimes can still

        7    be in your system.

        8           THE COURT:  I'm going to pause you here.

        9           Ladies and gentlemen, we'll take the morning break.

       10           All rise for the jury.

       11           (The jury exits the courtroom.)

       12           THE COURT:  All right.  We'll resume at 11:30.

       13           (Court in recess at 11:15 a.m.

       14           and reconvened at 11:31 a.m.)

       15           THE COURT:  Kellyann, you can go get the jury.

       16           (The jury enters the courtroom.)

       17           THE COURT:  Go ahead, Ms. Mandel.

       18    BY MS. MANDEL:

       19    **Q.**  Dr. Kessimian, you next described the symptoms that

       20    Dr. Menninger had, leading up to any type of speaking role or

       21    social event; is that right?

       22    **A.**  Correct.

       23    **Q.**  And you said it's important to note that the weeks

       24    leading to the expected speaking engagement or social event

       25    resulted in insomnia, panic symptoms, GI discomfort, and

1  weight loss?

2  **A.**  Correct.

3  **Q.**  And again, this was reported to you during your initial

4  appointment that you had with Dr. Menninger, correct?

5  **A.**  Yes.

6  **Q.**  You then said a concrete way to think of this

7  disability -- and this was your attempt to, I think as you

8  described, educate PPD about how Dr. Menninger's impairments

9  affected her in a very real way, correct?

10  **A.**  Yes.

11  **Q.**  Is that your her brain and body are not able to tolerate

12  public speaking engagements and socializing, and it is as if

13  her vocal cords and brain become paralyzed while her blood

14  pressure, heart rate, and breathing all increase, and it is

15  for all of the above reasons that I am recommending the

16  following reasonable accommodations."

17          And so again, this is where you wanted to make sure

18  PPD understood how tasks like public speaking or engaging in

19  social interaction physically impacted Dr. Menninger,

20  correct?

21  **A.**  Correct.  And I would add, I do recall that at some

22  point, Lisa reported that someone at work, and I don't know

23  who, said it's just shyness.  So that was another reason for

24  me to be very concrete in my description.

25  **Q.**  And it was actually Dr. Menninger reported that's

1    something that had been said to her from childhood; is that

2    right?

3    **A.**   Oh, that's not how I remembered it, but that could also

4    be true.

5    **Q.**   Let's look down at the bottom of this page. This is

6    where you started to list out the accommodations that you

7    were requesting on Dr. Menninger's behalf; is that right?

8    **A.**   Correct.

9    **Q.**   And the first item says, "SLT presentations, town hall,

10    COO/EVP meeting."

11        Do you see that?

12    **A.**   I do.

13    **Q.**   And do you recall that this was a list that had been

14    provided by Dr. Menninger's employer and you were going to

15    respond to each of these; is that right?

16    **A.**   Yes.

17    **Q.**   And did you have an understanding at this time, Dr.

18    Kessimian, about what SLT presentations, town halls, COO/EVP

19    meetings were?

20    **A.**   No.

21    **Q.**   But you did, in response to this, write up reasonable

22    accommodations, correct?

23    **A.**   Correct.

24    **Q.**   Okay. And then actually, below, it has the frequency

25    listed as well, in addition to the number of people who would

1    be present, right?

2    **A.**    Correct.

3    **Q.**    And you indicated earlier that you felt it would be

4    helpful for Dr. Menninger to know how often these things

5    might occur and how many people might be there; is that

6    right?

7    **A.**    Correct.

8    **Q.**    So this was providing that helpful information, correct?

9    **A.**    I struggle with the word "helpful."  It's providing me

10    information, but again, up to 500, to me, is so broad.  Does

11    that mean one to 500?  Frequency, biweekly, monthly and/or

12    quarterly?  That doesn't give me information.  That's --

13    that's a frequency I cannot define, actually.  So I question

14    how helpful this information was, other than the fact that it

15    was clear to me that she was going to be having to speak to

16    many people, very often.

17    **Q.**    And you'd agree, wouldn't you, that your response was to

18    list out what you felt would be a reasonable accommodation?

19    **A.**    Correct.

20    **Q.**    In light of this information?

21    **A.**    Correct.

22    **Q.**    And so let's look at what you wrote.  It's your language

23    where it says, "Reasonable accommodation" and has a dash,

24    right?

25    **A.**    Correct.

1    **Q.**  And you wrote, "Responsible for all slides, handouts,

2    presentation material, with necessary information, but will

3    require a reader to present to the group, or can prerecord

4    the audio/video and it can be played at the meeting."  And

5    let's look where it continues on in the next page "available

6    for questions via e-mail after the meeting."  Do you see

7    that?

8    **A.**  I do.

9    **Q.**  And this was your recommendation that actually

10   Dr. Menninger would prepare materials and someone else would

11   present them to these meetings of up to 500 people; is that

12   right?

13   **A.**  Yes.

14   **Q.**  And that's because you felt that this would keep her

15   healthy and keep her from experiencing those sort of severe

16   symptoms that you describe.  Is that right?

17   **A.**  Correct.

18   **Q.**  Okay.  So looking down below at the next item, and you

19   would agree that this was something that was also provided as

20   an explanation by PPD at the beginning of that paragraph 2;

21   is that right?

22   **A.**  Yes.

23   **Q.**  Where it says, "Client bid defense, issue resolution,

24   calls."  Did you have an understanding as to what "HH/client

25   site meetings" meant?

1    **A.**  Nope.

2    **Q.**  Because you didn't know at this time that Dr. Menninger's

3    primary work location was Highland Heights, Kentucky.  Is

4    that right?

5    **A.**  Correct.

6    **Q.**  "Phone."  And then it says, "Frequency, once a month at

7    minimum for client."  Do you see that?

8    **A.**  I do.

9    **Q.**  And then attendees/audience up to 50 attendees?

10   **A.**  Correct.

11   **Q.**  And that's, of course, a much smaller number than up to

12   500; is that right?

13   **A.**  But, again, the frequency would be once a month, it could

14   be daily, it could be twice a day.  Once a month, at a

15   minimum, for a client.  That was the information provided.

16   **Q.**  And so the fact that that type of interaction would be

17   requested of Dr. Menninger was concerning to you?

18   **A.**  Correct.

19   **Q.**  And so then you wrote the section beneath, where it says

20   "reasonable accommodations," and it has a dash?

21   **A.**  Correct.

22   **Q.**  "Available via e-mail, text, remote video, conferencing

23   for a representative of the client, one to two person

24   audience maximum."

25   **A.**  Uh-huh.

1    **Q.** "If it is a site meeting, surrogate or reader with all

2    necessary information, realtime access to me will be

3    available."

4            Do you see that?

5    **A.** Yes.

6    **Q.** And did you draft this language or did Dr. Menninger

7    draft this language?

8    **A.** I'm realizing there's a mistype. So Dr. Menninger and I

9    did this together, because I clearly don't work where she

10   works. And so in order to have some reasonable

11   accommodations, I needed some understanding of what her work

12   responsibilities were and what she felt she could do. And so

13   I meant to say Dr. Menninger will be available, not me. I

14   will not be available for that.

15           But yes, she did help me with the accommodations,

16   because I had to get from her perspective what she felt

17   willing and able to do.

18   **Q.** And she was the one with knowledge of what her job

19   entailed, right?

20   **A.** Right. Yes.

21   **Q.** And when you wrote "a surrogate or reader with all

22   necessary information," do you see that?

23   **A.** I do.

24   **Q.** And a surrogate or reader meant someone else to do the

25   actual presenting, correct?

1  **A.**  Correct.

2  **Q.**  And that would be, again, to sort of protect

3  Dr. Menninger from experiencing those terrible symptoms that

4  you described could happen with her anxiety?

5  **A.**  Yes.

6  **Q.**  The next item down, number 3, it says, "Client site

7  meetings"?

8  **A.**  Yes.

9  **Q.**  And did you, again, did you put together with

10  Dr. Menninger the language that says "reasonable

11  accommodation," and has a dash?

12  **A.**  I did.

13  **Q.**  "Would like a surrogate to attend, but will be

14  responsible for problem solving/ideas for resolution, if

15  e-mailed/communicated to me a few days before anticipated

16  visit."

17          And again, that "me," that's because Dr. Menninger

18  was writing this with you?

19  **A.**  Right.

20  **Q.**  And again, this refers to having a surrogate attend.  And

21  it was your intention that someone else would actually be

22  physically present for these meetings, correct?

23  **A.**  It was.

24  **Q.**  And again, to protect Dr. Menninger from those symptoms

25  that she would experience with the anxiety.

1   **A.**   Correct.

2   **Q.**   Looking down at the next item, number 4, technical sales

3   presentation, internal and external; i.e., internal sales

4   meeting.  And again, it says HH, that same abbreviation,

5   client site meetings and phone.

6   **A.**   Yes.

7   **Q.**   And you didn't have knowledge at this time as to what HH

8   referred to?

9   **A.**   I did not.

10   **Q.**   Because you didn't know that Dr. Menninger's main work

11   location was Highland Heights?

12   **A.**   Correct.

13   **Q.**   But Dr. Menninger was working on this with you?

14   **A.**   Yes.

15   **Q.**   And you, together, with Dr. Menninger, put together the

16   reasonable accommodation; is that right?

17   **A.**   Yes.

18   **Q.**   And it says, "Excused from sales presentations, but

19   again, will provide any necessary data information for the

20   reader or surrogate to have at their disposal."

21          Do you see that?

22   **A.**   I do.

23   **Q.**   And again, that's referring to someone else who's not

24   Dr. Menninger actually doing the in-person interaction part

25   of this; is that right?

1    **A.**  Yes.

2    **Q.**  And again, that was to protect Dr. Menninger from those

3    terrible symptoms; is that right?

4            MR. HANNON:  Objection as to the term "terrible."

5            THE COURT:  Overruled.

6    BY MS. MANDEL:

7    **Q.**  Down below, where it says number five, for customer

8    visits, do you see that?

9    **A.**  Yes.

10   **Q.**  This is for "customer visits, lunch, dinner, and social

11   interactions may occur, expected 60 to 80 percent of the

12   time, in order to build business relationships."

13   **A.**  Yes.

14   **Q.**  And then there's a dash.  Is that the language where you

15   and Dr. Menninger drafted, is that where it starts, where it

16   says "surrogate"?

17   **A.**  I believe so.

18   **Q.**  It says, "Surrogate, as this is not her strength/skill

19   set and her disability will flare with significant

20   impairment."

21   **A.**  Yeah.

22   **Q.**  That's your language, as well.

23           And significant impairment, is that -- that's

24   referring to those symptoms that you talked about previously,

25   correct?

 1   **A.**  Correct.

 2   **Q.**  And so a flare-up would be essentially a worsening of the

 3   symptoms like the paralyzed vocal cords, and the GI symptoms

 4   and things like that.

 5   **A.**  So I want to be clear, her vocal cords will not be

 6   paralyzed.  That was just a concrete example of how you could

 7   imagine why she's not able to do those things, but more of

 8   other symptoms such as tachycardia, sweating, feeling like

 9   this is the end of the world, GI distress, all of those

10   symptoms, yes.

11   **Q.**  And the weight loss, as well?

12   **A.**  Well, the appetite gets suppressed, and then that can

13   lead to weight loss, yes.

14   **Q.**  And it was your opinion, as you were writing here, that

15   lunches and dinners, customer visits with social interactions

16   would bring on those worsening symptoms?

17   **A.**  Correct.

18   **Q.**  And that's why you recommended, as the reasonable

19   accommodation, that a surrogate or simply a different person

20   do this?

21   **A.**  Correct.

22   **Q.**  You also said that she's able to build business

23   relationships in a more behind-the-scenes fashion?

24   **A.**  Yes.

25   **Q.**  And that was based on your understanding of what a

1    pathologist might be able to do that didn't involve the

2    social interactions?

3    **A.**   Yes.  And it was also Dr. Menninger did mention that she

4    had mentored some colleagues, more on an individual basis,

5    and had gotten -- I don't remember the exact language.  I

6    just want to be clear, but had gotten some good feedback that

7    they really appreciated her feedback and her guidance.  And

8    so part of -- that's also what we talked about.

9    **Q.**   And you thought that was something that she could do

10   instead of interacting with the clients?

11   **A.**   Correct.

12   **Q.**   And then the last one is number 6, and it says, "Travels

13   up to 30 percent."  And it's your language where it says

14   "reasonable accommodation," slash -- or dash, right?

15   **A.**   Correct.

16   **Q.**   And you wrote, "When possible, traveling to the Brussels

17   site versus state side."

18   **A.**   Correct.

19   **Q.**   And again, at this point, you had no knowledge that

20   Dr. Menninger's main work location was actually in Kentucky,

21   correct?

22   **A.**   I did not, no.

23   **Q.**   And your recommendation that travel be more to Belgium,

24   instead of in the US, was based on Dr. Menninger telling you

25   that she had discomfort about going to the lab in the US,

1   correct?

2   **A.**  Well, that she felt more comfortable going.  So if they

3   needed her to do traveling up to 30 percent, and that was a

4   requirement, a job requirement, that what she felt would be a

5   good accommodation for her would be that the majority of the

6   traveling be to another site where she had some colleagues

7   that she felt comfortable with, she felt very comfortable

8   presenting there, and had history with them.  So that's kind

9   of more how I looked at it.  Because, again, we were trying

10   to come up with solutions, right?

11   **Q.**  And one of those solutions was limiting Dr. Menninger's

12   travel to Highland Heights?

13   **A.**  Correct.

14   **Q.**  And this was in the context of you looking at just trying

15   to maintain her position as 100 percent remote, I think, was

16   your language, correct?

17   **A.**  Well, if she was traveling, would she be 100 percent

18   remote?

19   **Q.**  Well, if you recall, we looked at an e-mail that you had

20   written about wanting to maintain 100 percent remote.  That

21   was part of the goal that you were discussing with

22   Dr. Menninger?

23   **A.**  At the time?

24   **Q.**  At the time.

25   **A.**  Right.  At the time.

1    **Q.** And let's -- just to remind ourselves, let's look back.

2    You sent this e-mail on February 14th to Mr. St. John?

3    **A.** Okay.

4    **Q.** Is that right?

5    **A.** Yes.

6    **Q.** Okay. Let's look at the context of how you came up with

7    these accommodations.

8            MS. MANDEL: This is agreed Exhibit 451.

9    BY MS. MANDEL:

10    **Q.** Dr. Kessimian, this is an e-mail that you wrote to

11    Dr. Menninger on February 6, 2018, correct?

12    **A.** Yes.

13    **Q.** And this is between the time when you wrote the

14    accommodation, the initial accommodation documents on

15    January 31, and when you wrote the reasonable accommodation

16    request on February 14th. This kind of falls in the middle;

17    is that right?

18    **A.** Yes.

19    **Q.** And in this e-mail, Dr. Menninger had forwarded some

20    information below, and then you wrote back and said to

21    Dr. Menninger, you said, "Lisa, this information is helpful

22    and gives us a starting point."

23          And as far as you recall, was that the information

24    listing out those job tasks that you had looked at?

25    **A.** Yes.

1    **Q.**  "As far as those large presentations for over 100 people,

2    we are going to work with the lawyer" -- that was Patrick

3    Hannon?

4    **A.**  Yeah.

5    **Q.**  "Around you writing a presentation and having a surrogate

6    present the information."

7             Do you see that?

8    **A.**  I do.

9    **Q.**  And so, again, you were explaining to Dr. Menninger that

10   you and she would work with her lawyer to have a surrogate do

11   those things instead, as an accommodation request, right?

12   **A.**  That's what it says, yes.

13   **Q.**  "Since you are the" -- and it looks like maybe there's a

14   typo here, "Since you" -- it's supposed to say, "You are the

15   one."  Would you agree?

16   **A.**  Yes.

17   **Q.**  "Who most intimately understands all the things you

18   already do, start brainstorming on how you can contribute in

19   a more behind-the-scenes fashion."

20            And this was again you suggesting what you thought

21   of as more sort of classic pathologist work as something that

22   Dr. Menninger could suggest that she would be able to do?

23   **A.**  Could you repeat that one more time?

24   **Q.**  Sure.  You testified earlier about sort of your thought

25   about what a pathologist can do, you know, working behind the

1    scenes in a lab?

2    **A.**  I feel like my words are getting mixed up.

3            I testified that -- I think -- I was trying to

4    understand, from my understanding, Dr. Menninger had had --

5    had worked at this position for a couple of years.  I don't

6    know the exact timeline, and that she had good performance

7    reviews and was doing well, and then a new expectation of a

8    specially intense public speaking and social engagement

9    regimen was introduced, and at that time her symptoms

10   worsened, correct?  I mean, that's my understanding of the

11   timeline.

12           So I was referencing behind the scenes not about

13   the work that she does in the lab, but she had done something

14   for two years at this job, or however long she had the job,

15   that got her to the executive director lab position.  This is

16   my, again, my formulation just as a human being looking at

17   the information given to me.

18           So is there something that we can highlight that's

19   a little bit more behind the scenes, that doesn't have such a

20   social element, or a performance element that involves her

21   job responsibilities that we can put in here?  That's what I

22   meant by behind the scenes.

23   **Q.**  And as you testified, at this point, you didn't actually

24   even know where Dr. Menninger's main work location was; is

25   that correct?

 1    **A.**  Yes, I do hear that in your questioning.  I would also

 2    like to say, though, that my priority is not her work, it's

 3    her health.  So as far as maybe there are details missing or

 4    some kind of information that I didn't have the exact

 5    information, I was working with her work, because this was a

 6    specific stressor that I thought we could actually make some

 7    in-roads so that her symptoms would get better.  So that was

 8    my goal.  So I want to be clear about that.

 9    **Q.**  Because you were trying to protect her from those

10    symptoms?

11    **A.**  I do take issue with the word "protect."  I'm not

12    anyone's protector.  I am their doctor.

13          So she has a diagnosis, a clinical syndrome that

14    causes impairment for many people, but is manageable, again,

15    with things that is we do for our health:  accommodations,

16    changes, switches, things that we can do.  So that's what --

17    I'm not trying to protect anyone from anything; I'm trying to

18    help them navigate how to best cope with an illness.

19    **Q.**  And you were trying to help Dr. Menninger cope to avoid

20    as frequent incidents of those symptoms that you listed; is

21    that correct?

22    **A.**  I'm trying --

23          Can you say that one more time?

24    **Q.**  You were trying to help Dr. Menninger navigate her job to

25    avoid those symptoms coming up, to the extent that that was

```
 1    possible, correct?

 2    A.   Correct.

 3    Q.   Then after your statement about working in a more

 4    behind-the-scenes fashion, in the next line you say, "We will

 5    not send anything over until we run it by the lawyer."

 6              And again, that was Dr. Menninger's lawyer that you

 7    were also working with, Patrick Hannon, correct?

 8    A.   Correct.

 9    Q.   After the communication that you sent to PPD on

10    February 14th that we looked at, you e-mailed that

11    psychosocial education and the accommodations to

12    Mr. St. John.  Do you recall that?

13    A.   I do.

14    Q.   And after that, you didn't send Mr. St. John any other

15    letters about Dr. Menninger's ability to perform her work

16    tasks, did you?

17    A.   Not that I recall.

18    Q.   And you didn't have any other e-mail communications where

19    you sent any information to PPD about whether Dr. Menninger

20    could safely perform her job, correct?

21    A.   There was no communication.

22    Q.   You did, though, continue to work with her lawyer,

23    Patrick Hannon, and with Dr. Menninger, correct?

24    A.   Yes.  And but -- but I also want to clarify by "work with

25    her lawyer," I maybe e-mailed Patrick four times.  I never
```

 1    met him before today.  And I think maybe we talked on the

 2    phone, in summary, twice, maybe three times over the year.

 3    **Q.**  It's your testimony that you e-mailed Mr. Hannon four

 4    times?

 5    **A.**  It was not often.  It was not daily.  It was not weekly.

 6    I don't know the exact number.

 7    **Q.**  And let's look at one of those e-mails that you wrote to

 8    Mr. Hannon.  This is agreed Exhibit 452.

 9    **A.**  Oh, right.

10    **Q.**  And this is an e-mail that you wrote to Mr. Hannon, dated

11    April 8th.  Do you see that?

12    **A.**  Uh-huh.

13    **Q.**  And so this is -- you sent that e-mail to Mr. St. John on

14    February 14th.  This is then April 8th, so a little bit after

15    that, right?

16    **A.**  So February, April -- right.

17    **Q.**  So a little less than two months later, right?

18    **A.**  Yes.

19    **Q.**  And let's read what you wrote to Mr. Hannon at this time.

20    You wrote, "Patrick, I am meeting with Lisa, and the recent

21    back and forth e-mails with Chad, as well as the denial of

22    certain accommodations, is taking a significant toll on her

23    both her physically and mentally, where we are considering

24    more intensive treatment.

25            "Although Lisa has a 30-day PTO" --

1          That's paid time off?  Is that your understanding?

2     **A.**  It is, yeah.

3     **Q.**  -- "in addition to a 22-day leave bank that is accessible

4     for paid leave, she is concerned that if she decides to use

5     this resource, it will be used against her as a sign that she

6     cannot fulfill her job requirements."

7          Do you see that?

8     **A.**  I do.

9     **Q.**  And that was based on what Dr. Menninger told you some

10    time prior to April 8th, right?

11    **A.**  Correct.

12    **Q.**  "Is this accurate, or is she protected?"

13         And then you next wrote, "Also, I am not sure how

14    to word this, so I was hoping for some advice.  Chad

15    continues to mention my phrase "behind-the-scenes

16    leadership" --

17         And that's that term that we saw in your last

18    e-mail?

19    **A.**  Correct.

20    **Q.**  -- "and then when rejecting the proposed accommodations,

21    remarking that Lisa is going against the advice of her doctor

22    if she continues to perform these functions."

23         And you wrote that, as well, correct?

24    **A.**  Yes.

25    **Q.**  And then the next paragraph you said, "I want to clarify

1    that, as a physician, I make recommendation, but I am not

2    intimately knowledgeable, just like when I do it for children

3    in school, about what is feasible for the system to

4    accommodate, and that we could come together to brainstorm.

5    I can make some time to attend a meeting.  I am available by

6    telephone or Internet platform.  I have also attached

7    articles about pragmatic leadership versus charismatic

8    leadership."

9              Do you see that?

10   **A.**   I do.

11   **Q.**   So in fact, those articles that you mentioned about

12   leadership before, those are things that you sent to

13   Mr. Hannon, correct?

14   **A.**   That's what it seems like, yes.

15   **Q.**   And neither Mr. Hannon nor Dr. Menninger invited you to

16   come to a meeting with PPD; is that right?

17   **A.**   No one invited me, no.

18   **Q.**   As far as the "behind the scenes" phrase, and then you

19   say "which I now regret, to date Lisa has remotely attended

20   or been available via Webex conference call or e-mail and

21   dialed in, and just hasn't formally presented.  It is her

22   understanding that this method has worked to date, instead of

23   a surrogate.  We were hoping for status quo and also an

24   understanding of her more pragmatic versus charismatic

25   visible style."

```
 1              Do you see that?
 2    A.   I do.
 3    Q.   Okay.  And then you told Mr. Hannon you hope this helps
 4    at the end of the e-mail, right?
 5    A.   Yeah.
 6    Q.   So you indicated in this last paragraph of the e-mail
 7    that you now regretted writing that "behind the scenes"
 8    language in your previous document that you sent to PPD,
 9    correct?
10    A.   Yes, because I was concerned it was being misused.
11    Q.   But you testified just a few moments ago that you never
12    sent any follow-up letter or communication to PPD saying that
13    that actually wasn't what you meant to say, correct?
14    A.   Correct.
15    Q.   And then in this paragraph as well, you testified that
16    you were hoping for "status quo."  That was referring to
17    maybe there wasn't the need for a surrogate?
18    A.   Correct.
19    Q.   But, in fact, you never sent a follow-up letter or e-mail
20    to PPD saying that was the case, correct?
21    A.   Again, there was no communication between me and PPE or
22    whatever.  Yes.
23    Q.   Returning to your visits that you had with Dr. Menninger,
24    shortly after you sent that February 14th letter to PPD,
25    Dr. Menninger actually told you that HR and her boss had
```

1    responded in a promising manner.  Isn't that right?

2    **A.**  I'm -- is this on an e-mail or something?  Yes.  Then

3    yes.

4    **Q.**  And we can look at your notes, in fact.

5          Looking back at your notes from just after you sent

6    that information on February 14th, you'd agree that this was

7    your next appointment with Dr. Menninger on February 16th; is

8    that right?

9    **A.**  Yes.

10   **Q.**  And if you look at your language that you put in as your

11   notes after history of present illness --

12   **A.**  Uh-huh.

13   **Q.**  You noted that she, meaning Dr. Menninger, was able to

14   speak with both HR and her boss regarding the document for

15   accommodations.  Their response was promising?

16   **A.**  Yes.

17   **Q.**  So at this point, Dr. Menninger felt that things were

18   looking promising.  Isn't that right?

19   **A.**  That their response was promising.  Yes.

20   **Q.**  Let's look at your notes later on, from the same day.

21   Sort of a third of the way down, under "mental status exam,"

22   you say, "Thought content," and you say catastrophizing,

23   worse-case scenario, and many pessimistic thoughts."

24          Do you see that?

25   **A.**  I do.

1   **Q.**  And so even though, at this point, Dr. Menninger had

2   reported that HR and her boss had responded in a promising

3   manner, she was still having catastrophizing thoughts,

4   correct?

5   **A.**  Yes.  That's part of anxiety.

6   **Q.**  And at this point, in fact, even leaving the house at all

7   was a challenge for Dr. Menninger; is that right?

8   **A.**  I believe so.

9   **Q.**  And if we look at sort of the homework that you gave to

10  Dr. Menninger at this time, number 6, under "plan," her

11  homework was just to try to leave the house.  Isn't that

12  right?

13  **A.**  Correct.

14  **Q.**  Let's look at your notes from a couple of appointments

15  later.  These are your notes from the March 16th appointment

16  that you had with Dr. Menninger?

17  **A.**  Yes.

18  **Q.**  And in the second paragraph, you noted that

19  "Dr. Menninger continues to be assertive and proactive in her

20  discussions with work, regarding their desire for her to be

21  more visible and social."

22         Do you see that?

23  **A.**  I do.

24  **Q.**  "And their inability to think about another leadership

25  style that she would be able to provide that would also be

1   beneficial."

2         Do you see that?

3   **A.** Correct.

4   **Q.** And this is because you and Dr. Menninger were talking

5   about maybe other ways that she could work there as a

6   pathologist without doing some of these things that involved

7   social interaction, correct?

8   **A.** Correct.

9   **Q.** And again, under "homework," you set as a goal for

10   Dr. Menninger, just to get out to the driveway at that point;

11   is that right?

12   **A.** Yes.

13   **Q.** Let's go a couple of visits later.  This is when you saw

14   Dr. Menninger on March 30th?

15   **A.** Yes.

16   **Q.** And at this point you were treating with her about once a

17   week; is that right?

18   **A.** I do -- I mean:  Yes.

19   **Q.** And you noted in this note that Dr. Menninger still had

20   some work stresses, and you noted, as well, that she was

21   navigating some difficult client interactions; is that right?

22   **A.** That's what I wrote, yes.

23   **Q.** And did you have concerns about how those difficult

24   client interactions may be impacting her anxiety?

25   **A.** I'm sure I did.

1    **Q.**  And based on your experience at this point, having

2    treated Dr. Menninger for about two months, why would it have

3    been concerning that she would have difficult client

4    interactions that may impact her underlying impairments?

5    **A.**  Could you repeat that question?

6    **Q.**  Sure.  At this point you had been treating Dr. Menninger

7    for about two months, right?

8    **A.**  Yes.

9    **Q.**  Why would it have been concerning to you that she would

10   have had difficult client interactions at work, based on what

11   you had observed of her symptoms at this point?

12   **A.**  Well, I think difficult interactions are hard for all of

13   us, so as her psychiatrists and therapists, I would have been

14   concerned.  And then in addition, if her diagnosis is the

15   social phobia disorder, and it's an interaction with another

16   person that didn't go well, that's going to be especially

17   hard for Dr. Menninger.

18   **Q.**  Because with her diagnoses, difficult interactions for

19   people are especially challenging; isn't that right?

20   **A.**  I wouldn't state it quite like that, no.

21   **Q.**  Well, why is it, then, that a difficult client

22   interaction would have been particularly concerning in

23   Dr. Menninger's case?

24   **A.**  Well, I think, again, it's a stressor that would impact

25   any of us in our work environment.  And so all I wrote,

1    actually, is work stressors remain, and she has recently

2    navigated some difficult client interactions.  So that's just

3    a statement of what -- of fact.

4    **Q.**  And let's look at what you gave Dr. Menninger as sort of

5    homework from this visit.  You suggested that

6    Dr. Menninger -- you said, "Shift from CBT therapy for panic

7    and social phobia to more art therapy"; is that correct?

8    **A.**  Correct.

9    **Q.**  And art therapy is something that you do as part of your

10   practice; is that right?

11   **A.**  I do.

12   **Q.**  And Dr. Menninger was doing a fair amount of art therapy

13   in her visits with you, correct?

14   **A.**  She was.

15   **Q.**  And you had seen that that had a beneficial effect for

16   her, correct?

17   **A.**  It was helpful in therapy, yes.

18   **Q.**  And you were suggesting that she do more of that to help

19   with her anxiety symptoms?

20   **A.**  I did.

21   **Q.**  Let's look at a couple of weeks later.  These are your

22   notes from an April 13, 2018, visit with Dr. Menninger?

23   **A.**  Yes.

24   **Q.**  And let's look again at the plan.  Again, you recommended

25   that Dr. Menninger continue art therapy, correct?

 1    **A.**   I'm sure I did, yes.  Number 6.

 2    **Q.**   That's number 6, yeah.

 3           And number 8, you also noted "coordination and

 4    communication with lawyer continues."  And that would refer

 5    to coordination and communication with Patrick Hannon; is

 6    that right?

 7    **A.**   Correct.

 8    **Q.**   And you have another note from this same day,

 9    Dr. Kessimian?  Do you see that, also, 4/13/2018?

10    **A.**   Oh, that might be an error in documentation.  It would --

11    to be honest, I wouldn't write two notes in one day.

12    **Q.**   You would agree, though, that this was some time in April

13    of 2018?

14    **A.**   Most likely, yeah.

15    **Q.**   And you noted, it's actually in quotes, that

16    Dr. Menninger said to you, "I have found a sense of

17    empowerment in advocating for myself and my strengths, and I

18    am proud that my daughter is a witness to this."

19           Do you see that, Dr. Kessimian?

20    **A.**   I do.

21    **Q.**   And, in fact, Dr. Menninger was reporting to you how

22    good -- how empowered she felt having advocated on her own

23    behalf; is that right?

24    **A.**   Correct.

25    **Q.**   And this was having a positive impact on her daughter,

```
 1   Maya?
 2   A.  I'm not sure if it was having a positive impact on her
 3   daughter, Maya.
 4   Q.  But she at least was feeling good that her daughter got
 5   to see this?
 6   A.  Yes.
 7   Q.  And this was in the context of her advocating for herself
 8   in her position at PPD; is that right?
 9   A.  Correct.
10   Q.  You do note, though, that she's continuing to isolate at
11   home.  Do you see that?
12   A.  Yes.
13   Q.  And that she was continuing to lean on her husband for
14   support?
15   A.  Correct.
16   Q.  Which you had noted, throughout her treatment, that you
17   had concerns that her husband was kind of overly
18   accommodating her need not to leave the house, correct?
19   A.  Yes.
20   Q.  And again, under "plan," you noted your recommendation
21   that she continue art therapy?
22   A.  Uh-huh.
23   Q.  And as far as you recall, that was continuing at this
24   time?
25   A.  She was doing it with me and at home.
```

1 **Q.**  And also under your plan, number 2, you wrote "support

2 accommodations at work so that public speaking is not a core

3 requirement or work responsibility."  Do you see that?

4 **A.**  Uh-huh.

5 **Q.**  So this was you and Dr. Menninger continuing to advocate

6 for this into April of 2018?

7 **A.**  Yes.

8 **Q.**  And then after that, you say, "e-mail both lawyer and

9 patient with some response ideas and also options for patient

10 to take leave."

11 **A.**  Yes.

12 **Q.**  And again, as we saw, even maybe ten or so days before

13 this, you and Mr. Hannon were already talking about whether

14 leave would be the next step, correct?  We looked at that

15 e-mail that you --

16 **A.**  Yes.

17 **Q.**  At some point in May of 2018, Dr. Menninger reported to

18 you that she was planning to pursue some type of legal action

19 against PPD; is that right?

20 **A.**  I don't remember specifically.

21 **Q.**  Let's look at your note from May 18, 2018.

22 **A.**  Okay.

23 **Q.**  And you see after -- describing to you some adjustments

24 in medication, you say, under "history of present illness,"

25 you noted that Dr. Menninger was continuing to isolate at

1   home and that she made some type of decision with her lawyer,

2   with Mr. Hannon, right?

3   **A.**   Correct.

4   **Q.**   And you say, "In a way, although there is sometimes

5   resolution, it has been somewhat helpful."

6   **A.**   Yes.

7   **Q.**   And in fact, this was kind of a point where things were

8   looking up a little bit for Dr. Menninger, correct?

9   **A.**   Correct.

10   **Q.**   And you noted, again, under your plan, you said number

11   seven, "coordination and communication with lawyer," and

12   again, that was with Mr. Hannon, correct?  That was

13   continuing?

14   **A.**   Yeah.  And again, to just be very clear, this was just

15   under the plan because we had had communications at points in

16   her treatment, but there was no regular communication with

17   the lawyer.

18   **Q.**   And let's look down under -- actually, towards the top of

19   this page, under "safety."  This was as of May 18th.  You

20   noted that Dr. Menninger denied suicidal ideation at that

21   point, right?

22   **A.**   Correct.

23   **Q.**   Let's look ahead -- this is -- this is your note from

24   June 8th of 2018.

25   **A.**   No, that must be -- when did she take medical leave?

1    That would be the accurate date.

2    **Q.** And you noted, in fact, the end of your first

3    paragraph -- actually, let's go through the first paragraph.

4    You said "since last visit is on medical leave"?

5    **A.** Yes.

6    **Q.** And then you noted as well that Dr. Menninger had applied

7    to several jobs?

8    **A.** Yeah.

9    **Q.** And that was at your recommendation that she was applying

10   to jobs?

11   **A.** I can't remember if I specifically recommended that, but

12   it did seem like this was going to be the next step, yes.

13   **Q.** That it would be the next step to apply for a new job?

14   **A.** Yeah, to think about what else would be a good fit.

15   **Q.** And at the end of this paragraph, you noted that suicidal

16   ideation had resolved as of June 8th?

17   **A.** Correct.

18   **Q.** At some point, Mason Menninger, who is Dr. Menninger's

19   husband, reached out to you specifically because

20   Dr. Menninger had described having suicidal thoughts; is that

21   right?

22   **A.** Correct.  I believe there's an e-mail, if you want the

23   exact date.

24           MS. MANDEL:  Yes.  And we are going to look at that

25   e-mail.  So we can look at that together.

```
 1           This is agreed Exhibit 453.
 2    BY MS. MANDEL:
 3    Q.  You testified a little while ago when Mr. Hannon was
 4    asking you questions about Mason Menninger contacting you
 5    regarding Dr. Menninger's suicidal thoughts?
 6    A.  Yes.
 7    Q.  And this is an e-mail exchange between you and
 8    Mr. Mekerri.  It says October 15th.  Would you agree that
 9    this was October 15, 2018?
10    A.  Yes.
11    Q.  And in this -- the first e-mail at the top of the page,
12    Mr. Menninger wrote to you and said, "Thank you for reaching
13    out, her demeanor changed on the phone with you."
14    A.  Uh-hmm.
15    Q.  And you would agree that your interactions on the October
16    15th, it sounds like were phone and e-mail.  You didn't have
17    an in-person visit with Dr. Menninger, correct?
18    A.  Correct.
19    Q.  And Mr. Menninger, in the next sentence, said, "Lisa is
20    breakdown level emotional and very angry with me."
21    A.  Uh-huh.
22    Q.  And the long paragraph in the middle of the page, he
23    reported "We mostly had a conversation that looped over and
24    over."?
25    A.  Correct.
```

1    **Q.**  And then if we skip ahead to the middle of the paragraph,

2    it says, "She then points out as evidence anything else that

3    I do that is not directly involved in the case against her

4    company."

5          Do you see that?

6    **A.**  I do.

7    **Q.**  And your understanding is that was referring to her case

8    against PPD?

9    **A.**  (Nods head.)

10   **Q.**  "I am the caretaker of the family, cooking, cleaning

11   shopping most of the stuff involving Maya, et cetera.  I also

12   have a new job, but I have no expectation that any of those

13   roles would shift to Lisa given our current situation."

14         Do you see that?

15   **A.**  I do.

16   **Q.**  And that was Mr. Menninger reporting to you his attempt

17   to sort of balance things with Dr. Menninger's expectations

18   regarding his involvement in her claim against PPD, correct?

19   **A.**  Could you say that one more time?

20   **Q.**  Sure.  So in this e-mail, Mr. Menninger was reporting to

21   you that Dr. Menninger got angry with him and, in fact,

22   expressed suicidal ideation after she felt he was doing

23   things that weren't specifically pushing forward her case

24   against PPD.  Isn't that right?

25   **A.**  I just took it more as he was reaching out to me to

1    explain why Lisa had had an emotional breakdown.  That's kind

2    of how I was interpreting this information, his perspective.

3    **Q.**  And a couple of weeks later, Dr. Menninger reported to

4    you that she was able to participate in an ultra marathon,

5    correct?

6    **A.**  Correct.

7    **Q.**  And let's look at your note from that visit.  So this was

8    a couple weeks after you had heard from Mr. Menninger.  This

9    is your note from November 2, 2018?

10   **A.**  Correct.

11   **Q.**  And this is shortly before Dr. Menninger and her family

12   relocated to New Mexico, correct?

13   **A.**  I wasn't aware of that.

14   **Q.**  Underneath where it says, "History of present illness"?

15   **A.**  Correct.

16   **Q.**  It says, "Since last meeting was able to compete in an

17   ultra marathon with the support of her mother, daughter, and

18   husband."

19   **A.**  Uh-huh.

20   **Q.**  "Initially, her social phobia symptoms were severe, as

21   there was a large group of people at the start of the race,

22   which activated her symptoms, but as the race progressed, she

23   was able to find a solitary pace, and also continue to use

24   her coping mindfulness skills."

25            Do you see that?

```
 1    A.   I do.

 2    Q.   And at this point, you were seeing Dr. Menninger, or

 3    treating her, you said, about every week?

 4    A.   I don't remember the exact frequency, but we saw each

 5    other often.

 6    Q.   But this was about two weeks after that October 15th

 7    e-mail from Mr. Menninger, correct?

 8    A.   Okay.  Sure.

 9              MS. MANDEL:  Thank you.  I have no more questions

10    at this time.

11              THE COURT:  Thank you.

12              Any redirect?

13              MR. HANNON:  Very briefly, Your Honor.

14              THE COURT:  Sorry, you're not done.

15              THE WITNESS:  Oh, more?

16              THE COURT:  There's two rounds.  So there's the

17    direct examination Mr. Hannon did of you and then the

18    cross-examination by Ms. Mandel, and then there's one more

19    round.  So now Mr. Hannon can ask about anything that

20    Ms. Mandel asked about.  And then if she wants -- of course,

21    it's not required.  Mr. Hannon doesn't have to ask you any

22    questions.  And if he does, it's not required that Ms. Mandel

23    ask you any more questions, but if she does, it's limited to

24    whatever he asks about.

25              THE WITNESS:  Got it.  Thank you.
```

```
 1            THE COURT:  And then you're done.  And then can you
 2    get up and leave.
 3            MR. HANNON:  May I proceed, Your Honor?
 4            THE COURT:  There's a reason that you went to
 5    medical school and not law school.
 6            Go ahead.
 7            MR. HANNON:  Thank you.
 8        REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
 9    BY MR. HANNON:
10    Q.  Dr. Kessimian, was Lisa's exercise routine, was that
11    something you spoke to her about during therapy?
12    A.  At times.
13    Q.  And did you have any view in terms of whether that was
14    helpful or not helpful to her?
15    A.  I think in general, exercise is seen as helpful for
16    health.
17    Q.  And I want to direct you to your treatment notes here.
18    This is joint Exhibit 18.  And I'm going to direct you here
19    to page ending in 671.
20            And you looked at this on cross-examination.  This
21    was your meeting note with Dr. Menninger on February 16,
22    2018; is that right?
23    A.  Yes.
24    Q.  And, if you know, is it fair to say that this reflects
25    some level of improvement for Dr. Menninger?
```

1    **A.**  Yes.

2    **Q.**  And she notes that her sleeping is getting better?

3    **A.**  Uh-huh.

4    **Q.**  Her extremes not as bad?

5    **A.**  Yes.

6    **Q.**  And as of this time, you had been providing her therapy;

7    is that right?

8    **A.**  Correct.

9    **Q.**  You had also been -- you had also started medicating her;

10   is that right?

11   **A.**  Yes.

12   **Q.**  And despite her fears, Dr. Menninger reported that she

13   had been able to speak to both HR and her boss regarding the

14   document for accommodations; is that right?

15   **A.**  Correct.

16   **Q.**  And I think we saw reference in a prior note that there

17   was talk about Dr. Menninger concerning the importance of her

18   advocating for herself; is that right?

19   **A.**  Correct.

20   **Q.**  Was that something that you urged her to do?

21   **A.**  Yes.

22   **Q.**  Why?

23   **A.**  Again, I think overall for general well-being, being able

24   to define what we need and then ask for what we need, whether

25   that's from employees, employers, our partner, so on and so

1    forth, is an important skill to have, and so I did encourage
2    her to advocate for herself.
3    **Q.**  If we look at the next note here, on March 9, 2018, she
4    describes for you here this business meeting in Cincinnati.
5    Do you see that there?
6    **A.**  I do.
7    **Q.**  And you see here at the end that she notes to you that
8    she was able to assert herself; is that right?
9    **A.**  Correct.
10   **Q.**  Was that something that, over the coming weeks and months
11   as you treated Dr. Menninger, you continued to suggest that
12   she should do?
13   **A.**  Yes.
14   **Q.**  You were asked a question on cross about any additional
15   information that you -- you could have provided to PPD.  Do
16   you know if Dr. Menninger offered at one point for you to
17   provide additional information if they wanted to see it?
18   **A.**  I don't remember specifically, but she never denied any
19   requests for any type of disclosure when I worked with her.
20   **Q.**  Okay.  And then just lastly, just in terms of the
21   buckets, which I -- well, just to clarify in terms of the
22   timing of those, I think you were shown a -- do you recall
23   seeing an internal e-mail on cross-examination --
24   **A.**  Uh-huh.
25   **Q.**  -- from early February, where you were contemplating

```
 1   reaching out to PPD to get more information?

 2   A.   I saw the -- this e-mail.

 3         Is that what you're saying?

 4   Q.   Well, let me ask you a better question.

 5   A.   Okay.

 6   Q.   So these are the buckets that you ultimately provided

 7   specific recommendations for?

 8   A.   Correct.  Correct.  I didn't know they were called

 9   "buckets."

10   Q.   That's my word.  Sorry about that.

11   A.   Oh.

12   Q.   But just to be clear, this was sent to Lisa on

13   February 6, 2018.  Do you see that?

14   A.   I do.

15         MR. HANNON:  Okay.  All right.

16         That's all I have, Your Honor.

17         THE COURT:  All right.  Any recross?

18         MS. MANDEL:  No, Your Honor.

19         THE COURT:  All right.  Thank you very much.  Now

20   you're excused.

21         Next witness?

22         MR. HANNON:  Your Honor, the plaintiff calls Paul

23   Summergrad.

24         THE COURT:  All right.

25         (The witness was duly sworn.)
```

```
 1              THE DEPUTY CLERK:  Can you please state your full
 2    name, and spell your last name for the record.
 3              THE WITNESS:  Paul Summergrad, S-u-m-m-e-r-g-r-a-d.
 4              THE COURT:  Go ahead, Mr. Hannon.
 5              MR. HANNON:  Thank you, Your Honor.
 6                        PAUL SUMMERGRAD
 7         having been duly sworn, testified as follows:
 8         DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
 9    BY MR. HANNON:
10    Q.  Could you please introduce yourself to the jury.
11    A.  Hi.  Nice to meet you.
12    Q.  Can you tell them a little bit about who you are and what
13    you do.
14    A.  I'm the -- my job is that I'm the Dr. Frances S. Arkin
15    professor and chairman of the department of psychiatry at
16    Tufts University School of Medicine and Tufts Medical Center
17    in Boston where I'm psychiatrist in chief.  And I'm also,
18    separately from that, a professor of psychiatry and professor
19    of medicine at Tufts University School of Medicine.
20    Q.  And we'll go a bit more into detail on your
21    qualifications in a moment, but first, just to orient the
22    jury, how did you become involved in this case?
23    A.  I believe you reached out to me at some point, I don't
24    remember exactly when, asking if I might be able to assist
25    with a matter.
```

1  **Q.**  Okay.  And were you asked to review certain facts and

2  details concerning this matter?

3  **A.**  Yes, I was.

4  **Q.**  Okay.  Are you being compensated for your time?

5  **A.**  Yes, I am.

6  **Q.**  And prior to today, have you ever served as a, sort of,

7  so to speak, expert witness before?

8  **A.**  Yes.  Occasionally.

9  **Q.**  Does this comprise a significant amount of your

10  profession?

11  **A.**  No.  It's a small percentage of my activity.

12  **Q.**  Okay.  So when did you -- well, strike that.

13        Could you please walk us through your educational

14  background?

15  **A.**  So I went to college at the State University of New York

16  at Buffalo, and then did premed work before medical school at

17  the University of Rochester.  And then went back to Buffalo

18  for medical school from 1974 to 1978.  Beginning in 1978 to

19  1981, I was what's called an internal medicine resident,

20  meaning I was training in general adult medicine at what was

21  then Boston City Hospital, but it's now known as Boston

22  Medical Center.

23        I then worked for a year at the Bedford Veterans

24  Administration Hospital as an internist from 1981 to '82, and

25  then from 1982 to '85, I was a psychiatry resident at

1    Massachusetts General Hospital, which is one of the Harvard
2    Medical School teaching hospitals.  And then I stayed on
3    faculty there for the next, approximately, 20 years.  I still
4    have a courtesy appointment at Mass General, but I don't
5    practice there or teach there.
6            And in addition, I've done what's called
7    psychoanalytic training at the Boston Psychoanalytic Society
8    and Institute.  That started around 1983 and I don't think I
9    actually finished until 2009.
10   **Q.**  Okay.  And in terms of actually working as a doctor, can
11   you walk us through that?
12   **A.**  Yeah.  I mean, I've worked as a doctor since, you know,
13   graduating from medical school.  I work under supervision as
14   a resident.  So I did a lot of general medical care, a lot of
15   acute neurologic care at Boston City Hospital, Boston Medical
16   Center.  And then continued doing a lot of medical related
17   care within the context of psychiatry, both while I was a
18   psychiatry resident, and then after my -- and beginning my
19   employment at Mass General.  So I worked at Mass General
20   initially as the assistant director of the inpatient service
21   for two years, and I also worked at what was then the Erich
22   Lindemann Mental Health Center, which had inpatient beds
23   under the Commonwealth of Massachusetts for two years, and
24   then in 1987, I became the director and chief of inpatient
25   psychiatry at Mass general.  I did that around until I guess

1    1998 or 1999 and then took on some additional

2    responsibilities across what was then called the Partners

3    Healthcare System.  Now it's called Mass General Brigham.

4         And in 2004, I continued to do clinical practice

5    throughout this time, taking care of patients, taking care of

6    inpatients, outpatients in the emergency room, supervising

7    other physicians when they do that.  And then from 2000 to

8    2004, approximately, 1999 to 2004, I was the chief of

9    psychiatry and the executive vice president for medical

10   affairs and chief medical officer as what's now known as

11   Mass. General Brigham Salem hospital.  So I was overseeing

12   the psychiatric services there.  And then I was recruited to

13   come to Tufts in 2004.

14        And I've continued to see patients throughout that

15   time.  I take care of people in my outpatient practice, a lot

16   of people who have anxiety disorders, mood disorders.  I've

17   written a lot about people who have medical illnesses and

18   psychiatric illnesses in the way they interact with each

19   other.  I have attended on the inpatient services, consult

20   services, emergency room, been on-call, backed up our

21   residents, supervised residents to this day throughout my

22   time at Tufts.

23   Q.  Okay.

24   A.  And as well as overseeing the doctors in my department.

25   Q.  Do you still see patients today?

1   **A.**   Yes, I do.

2   **Q.**   Okay.  And I think I heard you mention that some ever

3   your work has involved mood disorders.  Did I hear that

4   right?

5   **A.**   (Nods head.)

6   **Q.**   Yes?

7   **A.**   Yes, it has.

8   **Q.**   Okay.  You got to say it out loud.

9   **A.**   Yes.  I'm sorry.

10  **Q.**   No worries.

11          Can you explain what a mood disorder is?

12  **A.**   Yeah.  So psychiatric illnesses are divided up into

13  different kind of categories.  One of the classic categories

14  is disorders of mood.  So people can have various kinds of

15  changes in their normal mood, either where they're very

16  depressed, sad, morose, or, in some cases, people can feel

17  quite energized, activated, what is sometimes referred to as

18  mania or hypomania.  So those are the broad bucket of mood

19  disorders.

20          Sometimes people can have mood disorders because

21  they have a stroke.  Sometimes people can have mood disorders

22  because they have an endocrinologic disorder.  Sometimes it

23  can happen because they have a very strong family history of

24  some type of illness that has been -- with a combination of

25  other social or personal events, has led to the onset of

```
 1    mood.
 2              And that can also affect thinking.  It can also be
 3    associated with anxiety symptoms.  And likewise, people can
 4    have anxiety symptoms that are also associated with mood
 5    disorders.
 6              There's a lot of what we sometimes call
 7    "co-morbidity" in psychiatric illness.  That's partially
 8    because our diagnostic system is not as good as it needs to
 9    be, and partially it's probably just the way we're built and
10    we're wired.
11    Q.  Would anxiety disorders fall within the umbrella of mood
12    disorders?
13    A.  No.  They're really separate disorders.
14    Q.  In treating patients, do you also have experience
15    treating patients with anxiety disorders?
16    A.  Yes, I do a lot.
17    Q.  Where would depression fall?  Would that fall in a mood
18    disorder?
19    A.  Depression really falls more as a mood disorder.  Anxiety
20    is really more an anxiety disorder.
21              There are certain disorders which used to be an
22    anxiety and now have kind of been carved out from that or
23    separated.  But there's a fair amount of overlap.  So, for
24    example, somewhere between 20 and 40 percent of people who
25    have anxiety disorders may develop mood disorders.  People
```

 1   who have mood disorders may develop anxiety symptoms or may

 2   have anxiety symptoms with them.  So you have to -- nature

 3   doesn't always get cut at the joints with this.

 4   **Q.**  I think I heard you mention that you also published

 5   articles; is that right?

 6   **A.**  Yes, I do.

 7   **Q.**  And just generally speaking, in what types of subjects

 8   have you been published?

 9   **A.**  Everything from health system design, to onset of mood

10   disorders secondary to strokes, to strategic planning in

11   psychiatry, to the role of inflammation, inflammatory

12   disorders in the onset and development of psychiatric

13   illness; through things related to suicide and health system

14   design, hospital organization, the development of what are

15   so-called medical psychiatric units, which is similar to the

16   units that I both designed at Mass. General and also have

17   overseen at Tufts.

18   **Q.**  Okay.  And do you hold any certifications?

19   **A.**  Yes.

20   **Q.**  What certifications?

21   **A.**  So I'm board certified in internal medicine.  I'm board

22   certified in psychiatry.  I'm board certified in what's

23   called psychosomatic medicine or -- it's a subspecialty of

24   psychiatry, psychosomatics.  I was board certified in

25   geriatric psychiatry, but I let that certification lapse

```
 1   because I really wasn't doing a lot of geriatric psychiatry
 2   at the time when I would have had to take that exam again.
 3   And I'm a graduate of the Boston Psychoanalytic Institute, so
 4   I have whatever certification, they basically made me a
 5   graduate analyst.
 6   Q.   Okay.  And during your professional career, have you been
 7   involved in any professional organizations or societies?
 8   A.   Yes.  Several.
 9   Q.   Which ones in the field of psychiatry?
10   A.   So I was very involved early in my career with the
11   Massachusetts Psychiatric Society and was president, I think,
12   1980 -- 1998 to 1999.  I was president of a group called the
13   American Association of Chairs of Departments in Psychiatry,
14   which is -- basically represents all the medical school
15   chairs in the United States and Canada.  I was president of
16   the American Psychiatric Association, which is the umbrella
17   organization for all psychiatry in the United States, from
18   2014 to 2015, and I'm currently the secretary for finances
19   and a member of the executive committee of the World
20   Psychiatric Association.
21   Q.   Okay.  Enough about you.
22            What, if anything, did you do to review the
23   information and facts relevant to this case?
24   A.   I reviewed medical records, materials that were sent to
25   me.  I reviewed some relevant psychiatric literature.  I also
```

```
 1   had the opportunity to meet twice with Dr. Menninger via
 2   Zoom, once in 2020 and once in 2022.
 3   Q.   Okay.  And these types of sources of information, are
 4   these the types of information that you would normally use in
 5   your profession to reach conclusions concerning a person's
 6   mental health?
 7   A.   Yes.
 8   Q.   Their abilities and capabilities?
 9   A.   Yes.  I mean, and things that didn't come in here, I read
10   notes from people.  I didn't actually speak to those
11   practitioners.  So that might come in under ordinary clinical
12   practice.  There might be additional laboratory information
13   that wasn't in these records that would come in, in the
14   ordinary clinical practice, so -- but other than that, yes.
15   Q.   Okay.  I'm going to start by showing you here Joint
16   Exhibit 28.
17            And Dr. Summergrad, so this is a request for an
18   accommodation form here completed by Dr. Kessimian -- let me
19   pause.  I'm sorry.  Go ahead.
20   A.   It's not showing on the screen.
21   Q.   Excuse me, I didn't press the button.  My mistake.
22            So Dr. Summergrad, this is the request for
23   accommodation form that we looked at earlier today with Dr.
24   Kessimian and I want to walk you through some of these and
25   ask you some questions here.
```

```
 1              So first, with respect to the first question in box

 2       number 1 here, it asks, "Does the employee," here

 3       Dr. Menninger, "have a physical or mental impairment that

 4       substantially limits one or more major life activities; a

 5       record or past history of such impairment; or being regarded

 6       as having a disability without the consideration of

 7       mitigating measures."

 8              Do you see that?

 9    A.  Yes, I do.

10    Q.  And do you see that Dr. Kessimian answered yes?

11    A.  Yes, I do.

12    Q.      `In your professional opinion, based upon your

13       experience and your review of the facts here, do you agree

14       with Dr. Kessimian?

15    A.  Yes, I do.

16    Q.  And with respect to the second box here, you see Dr.

17       Kessimian reflects that Dr. Menninger had a mental

18       impairment.  Do you see that?

19    A.  Yes.

20    Q.  And in your opinion, do you agree with that?

21    A.  Yes, that's correct.

22    Q.  Okay.  And then with respect to Dr. Menninger's mental

23       impairment, in your opinion, what was Dr. Menninger's mental

24       impairment as of the date that this form was completed on

25       January 31, 2018?
```

1    **A.**   So I think that she had, in my view at that point, two

2    mental impairments.  One was that she clearly had social

3    anxiety disorder and had had that since childhood.  And the

4    second was that she had panic disorder and then had that

5    since adolescence.

6              I was -- given the primacy of the social anxiety

7    disorder, I didn't add in generalized anxiety disorder.  I

8    thought that that was more, if you will, secondary to the

9    primary condition.  And the primary condition was and is

10   social anxiety disorder.

11   **Q.**   Okay.  Let's try to unpack that a little bit here.  What

12   is a disorder?

13   **A.**   So in general, in medicine, a disorder is a condition

14   usually accompanied by symptoms that tend to occur more

15   frequently together than not.  So, for example, if you have

16   heart disease, you may have shortness of breath, chest pain,

17   difficulty going upstairs, something like that.  Those kind

18   of things tend to track together.  They often have a specific

19   cause, although the cause may sometimes be unclear, like, for

20   example, fatigue, migraines.  There are many conditions where

21   we don't know exact causes, and they then have a natural

22   history course, a tendency to respond to conditions.  That's

23   the first part.

24             The second part is they have to cause suffering.

25   They have to cause disability, suffering.  Maybe not

1    disability exactly as you'd use it in an employment context,

2    but some degree of symptoms that are persistent and effect

3    people, even if at times those disorders go into remission.

4    Some disorders are acute.  They last for a short period of

5    time, a fever and an infection may come and go.  Some

6    disorders, hypertension, diabetes, asthma, many other

7    disorders, anxiety, can be chronic conditions, and some of

8    them are lifelong conditions.

9    **Q.**  And the mentioned social anxiety disorder.  Can you

10    explain to the jury what that is?

11    **A.**  So social anxiety disorder is a disorder that tends to --

12    it's associated with intense anxiety associated with certain

13    kinds of social or performance circumstances.  People with

14    social anxiety have difficulty introducing themselves to

15    other people, performing in front of different people, giving

16    a speech in front of other people.  They have -- they might

17    be viewed externally as being intensely shy or reclusive.

18    They have an intense fear, generally, of being exposed or

19    humiliated, so that if they're seen, they're worried that

20    something about them will be shown to be present which would

21    be embarrassing or humiliating.  Sometimes people are very

22    concerned, for example, about sweating.  Sometimes people are

23    very concerned about their gaze and somebody else noticing

24    that they're looking at them and that somehow people will be

25    aware of that.  It generally comes on in early adolescence.

1    It can come on as early as early childhood, so three, four,

2    five years of age.  It can often be seen in things like

3    separation anxiety, kids who have a hard time going off to

4    school.  So it's kind of at one extreme of a kind of

5    social -- people who are extraordinarily gregarious and love

6    to be in the public eye, and you have people who, at the

7    other extreme, really, really don't like that.  And

8    Dr. Menninger is in that extreme and that's why you'll find

9    people with social anxiety disorder.

10   **Q.**  You also mentioned panic disorder.  What is that?

11   **A.**  So panic disorder is -- panic attacks -- let me talk

12   about panic attacks and then I'll describe what panic

13   disorder is in that context.

14          People can have panic attacks due to a variety of

15   different disorders.  Panic attack is when you have a sudden

16   out-of-the blue of heart racing, shortness of breath,

17   lightheadedness, vertigo, fear, fear of going crazy, fear of

18   having some acute medical problem.  It is intense, lasts

19   somewhere per episode around 5 to 15 minutes, and can come on

20   out of the blue.

21          Sometimes people have multiple episodes like this,

22   but it's not clear what's provoking it.  Sometimes it is

23   clear, it can be seen in the context of something like a

24   social anxiety disorder.  Sometimes it's a setting of

25   something else that somebody else has, what we would call a

1   phobia around, some stimulus in the environment that makes

2   them really, really uncomfortable.  For some people, for

3   example, it's being in shopping malls, elevators, bridges,

4   tunnels, any place where they feel like their means of safe

5   escape is limited.

6           So panic disorder is when you have panic attacks,

7   without it necessarily being clear what it occurs in relation

8   to.

9           Now, Dr. Menninger has anxiety and panic in

10  relation to social situations.  She also had an adolescence

11  that emerged as something that was also occurring somewhat de

12  novo, in other words, without a particular percipient.

13  **Q.**  In diagnosing disorders in general and more specifically

14  the ones that you've talked about, how does a psychiatrist

15  such as yourself go about doing that diagnosis?

16  **A.**  Well, hopefully carefully and you listen to people.  You

17  gather as much information as you can.  In general, you want

18  to hear directly from people both what is bringing them in to

19  see you and then what their history has been.  And you want

20  to make sure you don't get tunnel vision and just focus on

21  what it is that they're bringing.  You want to make sure you

22  go through the rest of their medical history, any other

23  psychiatric symptoms that you may or may not have had, have

24  they had episodes, for example, of head trauma, of

25  concussion, febrile seizures.  Have they had episodes of

1    other kinds of illnesses that could effect their brain or

2    some other part of their body that could produce other

3    symptoms, because people don't come to the doctor just with

4    their mental symptoms and they leave their body behind.  They

5    bring the whole thing with them and you have to make sure you

6    gather all of that.

7         Sometimes it depends on the circumstances.  You may

8    need to gather information from past medical records, from

9    people's families, if they'll give you permission to do that.

10    And other times, obviously, other medical records, laboratory

11    studies, et cetera.  So the imaging studies, you know, CT

12    scans, MRIs, et cetera.

13    **Q.**   Okay.  Let me just jump in there.  In reviewing the

14    information that you described, is there some kind of

15    diagnostic criteria that's regularly used by experts in your

16    field?

17    **A.**   Yeah, so that's generally either the diagnostic and

18    statistical manual of psychiatric disorders, which is now in

19    its fifth edition.  There's a slight edit, what's called a

20    text revision, that just came out.  But basically it's in its

21    fifth iteration.

22         People also will use the *International*

23    *Classification of Diseases*, which, in the US, is in its tenth

24    edition, and internationally, it's in its eleventh edition.

25    And those are very similar in terms of -- now, again, those

1   are not, in and of itself -- they're necessary and important

2   to kind of put things in certain kinds of groupings, but they

3   don't suffice for clinical examination and/or other kinds of

4   medical literature.

5   **Q.**  Understood.  And in reaching the diagnoses that you did

6   with respect to Dr. Menninger having social anxiety disorder

7   and panic disorder, did you rely at all upon the diagnostic

8   criteria set forth in the DSM?

9   **A.**  Yes, I did.

10  **Q.**  And just generally speaking, how -- how did the

11  diagnostic criteria and the DSM compare to the information

12  that you gathered in your --

13  **A.**  It's very, very, very close.  I mean, she has -- speaking

14  first about social anxiety disorder, she has many of the core

15  attributes and has had that since childhood, difficulty in

16  being in certain kinds of social situations.  Fear, anxiety,

17  intense anxiety, panic associated with them, remaining

18  somewhat distant from other kinds of settings where those

19  kinds of feelings would come about.  And in addition, you

20  know, particular concerns around performance and also

21  sweating.

22  **Q.**  Why do you mention sweating?

23  **A.**  Well, one of the things that Dr. Menninger would do when

24  she presented was that, for example, when she gave a

25  presentation at work, she would put Kleenex under her arms,

1    in her axilla, what we would call the armpits because she

2    would sweat and she didn't want that to be visible to other

3    people.  And that was a way of basically protecting her sense

4    of pride in a public situation and also preventing some of

5    her symptoms from being very visible.

6    **Q.**  And from your clinical perspective, did that factor ring

7    true in terms of your opinion?

8    **A.**  Yes, it did.

9    **Q.**  And why is that?

10   **A.**  It's one of the concerns -- it's a specific concern that

11   people have with social anxiety disorders around -- it around

12   sweating and it's around public appearance.  We all have

13   concerns about how we appear in public.  That's natural and

14   normal, even as -- and again, this is an extreme version of

15   that, in terms of its intensity.

16   **Q.**  Looking back here at the form completed by Dr. Kessimian,

17   you see here that she had included in her document, there's a

18   reference to agoraphobia and generalized anxiety disorder.

19   Do you see that?

20   **A.**  Yeah.

21   **Q.**  Do you disagree with that?

22   **A.**  It's not that she doesn't have some elements of

23   generalized anxiety.  Generalized anxiety disorder is -- you

24   know, it's where you're constantly a little bit of tense and

25   worried about things all the time.  I mean, you know, just

1    you're constantly a little bit on edge, but it doesn't cause

2    overwhelming kinds of anxiety.  It doesn't cause the kind of

3    physiologic symptoms, the heart racing, the shortness of

4    breath, the lightheadedness that I was describing.  And

5    generally, people, if they restrict activities, they do it a

6    little bit, they don't it to an extreme degree.  It's not

7    like what we would call, again, a phobic avoidance.

8            You know, there's some people, for example, who

9    won't travel over bridges.  That's their -- or they won't go

10   on to a plane.  But they can do other kinds of -- they can

11   talk -- they can talk in front of people.  So again, there

12   are specific kinds of elements.

13           And then in terms of -- is there something else in

14   relation?

15   **Q.**  Yes, I'm sorry.  I took away the highlight.  I'm sorry.

16   The generalized anxiety disorder?

17   **A.**  Yes, that's the generalized anxiety disorder.  So she has

18   some of those elements again.  I guess I'm a lumper rather

19   than a splitter.  That's a term we sometimes use in medicine,

20   do you put things under one diagnosis, or do you separate

21   them out.  So I don't think that's wrong, it's just not what

22   I would focus on.

23   **Q.**  Very good.  Directing your attention to further down here

24   in what Dr. Kessimian wrote, in the next sentence, she notes

25   that "the disability significantly interferes with Lisa's

1　ability to perform major life activities, such as thinking,

2　concentrating, communicating and working."

3　　　　　Do you see that?

4　**A.** Yes, I do.

5　**Q.** Do you agree with that?

6　**A.** Yes.

7　**Q.** In addition to the list there, how, if at all, do

8　Dr. Menninger's mental impairments impact the life activity

9　of breathing?

10　**A.** So when people have -- is it okay if I expand a little

11　bit on anxiety and put that in context to breathing?

12　**Q.** Sure.

13　**A.** Well, anyway, anxiety is a normal thing, like pain.  We

14　have anxiety as a way of protecting us from danger.  So, you

15　know, life is filled with dangers.  If there's a car

16　careening towards you and you want to see it, you want to do

17　some -- you become very anxious and alert, so you activate

18　various parts of your nervous system, your sympathetic

19　nervous system, your stress reflexes, cortisol, et cetera, so

20　you can respond to danger.

21　　　　　And one of the things that we're most sensitive to

22　in the world is anything that affects our breathing, because

23　you don't breathe for a few minutes, you're going to die.

24　You know, the brain is intensely dependent on oxygen, and we

25　need to breathe in order to have oxygen.  The challenge is

1   that -- so what happens is with panic experiences of the kind

2   that Dr. Menninger has is one of the core cardinal elements

3   is you get an alarm.  The alarm system that goes off when you

4   can't breathe, but it goes off in response to other kinds of

5   stimuli.  So it's not going off because there's no oxygen.

6   It's going off because, again, different people, but in this

7   case social situations and social settings and then becomes

8   breathless.  So breathing becomes hard in those circumstances

9   and it may take some time to catch one's breath thereafter.

10  **Q.**  And these, the impact on breathing, thinking,

11  concentrating, communicating, working, were these -- were

12  these impacts that existed constantly, or were they more

13  episodic?

14  **A.**  No, they tend to be more episodic, although they can have

15  anticipatory elements, and they can have post-attack

16  elements.  So the anticipatory elements are if you knew that

17  every time you were walking down the street, a bear was going

18  to jump out of the woods, pretty soon you'd stop walking down

19  the street.  That's anticipatory anxiety.  And so people

20  begin to notice, "I'm having these attacks when I'm in, let's

21  say, I'm in an elevator."  People will avoid going in

22  elevators.  Or I'm having these attacks when people are

23  speaking, so they will avoid those kinds of things.  And if

24  you know you have to be in those settings, you kind of have

25  to gird your loins and get ready for what may feel like a

1    battle situation, a complex situation.

2            These episodes, for anybody, can make them feel

3    enervated, depleted.  They're very intense.  You're taking

4    your whole sympathetic nervous system and you're putting it

5    on to a kind of hyperdrive, and you're discharging it for 5,

6    15, 20, 25 minutes, and afterwards, people understandably

7    feel washed out.  So, yes, they're acute, they don't happen

8    all the time.  But they're not just the event, they're things

9    around the event, both before it and after it.

10   **Q.**  And with respect to Dr. Menninger in particular, were

11   there certain events or activities that triggered those

12   occurrences?

13   **A.**  Yes.

14   **Q.**  And what are they?

15   **A.**  I'm sorry?

16   **Q.**  What are they?

17   **A.**  So introducing herself to people that she wouldn't

18   otherwise know, especially if it was groups of people or a

19   range of people, but people that she otherwise was not

20   familiar with.

21           This goes back, actually, to childhood, even, you

22   know, introducing herself to playmates and kids at school

23   when she was very, very young.  And it also involves any

24   situation where she might be subject to being under public

25   awareness, public display, speaking, presenting herself,

1    where she'd be under the spotlight.  This is an anti --

2    people don't want to be under the spotlight.  They want to

3    kind of be hidden away.  They don't want to be seen in that

4    way.  And that's -- those are the kinds of things that would

5    generate this for people.

6    **Q.**  Looking here at -- still at Dr. Kessimian's note, she

7    reports, "Despite these limitations, Lisa reports that she

8    has historically fulfilled the essential functions of her job

9    without accommodation."

10           Do you see that?

11   **A.**  Yes, I do.

12   **Q.**  Is that in any way consistent with your opinion as to

13   Dr. Menninger's mental impairment?

14   **A.**  No, it isn't.

15   **Q.**  Can you please explain to us why?

16   **A.**  Because she found ways to -- she didn't request an

17   external accommodation.  She found ways of dealing with this.

18   Part of this was preparing herself.  Part of it was the

19   frequency or the infrequency with which she would do it.

20   Part of it was whether it was focused around people that she

21   knew, versus people that were strangers to her, or people

22   that she was just being introduced to.  And part of it was

23   use of small amounts of medication to help take the edge off

24   of the anxiety.

25   **Q.**  In your opinion, was it difficult for Dr. Menninger to

```
 1   engage in every type of interpersonal interaction?
 2   A.   No.  I don't think so.  Because there was certainly --
 3   you know, with her family, that was not the case, with people
 4   that she knew well.  When her activities were focused around
 5   technical or professional activities that were close to her
 6   expertise in terms of quality evaluation, laboratory
 7   function, and others, that would -- that would not be as much
 8   of an issue as, again, being introduced to a group of people
 9   or having to be introduced to and speak to a group of people
10   that she didn't know.
11   Q.   And is that -- is that unusual for this type of mental
12   impairment?
13   A.   No, it's actually quite typical.
14   Q.   I'm now going to show you here exhibits -- strike that.
15   We'll get back to that.  I'll show this to you later, since
16   we're almost at lunch.
17           Would it be -- would it be inconsistent with your
18   opinion that Dr. Menninger's supervisors had historically
19   marked her as being an excellent collaborator?
20   A.   No.
21   Q.   Why not?
22   A.   Because, again, it would depend on the context, the
23   setting, the relationship, the duration, and the numbers of
24   individuals, and the kind of tasks that were associated with
25   that.  So, again, if there were things that were close to her
```

```
 1    core skillset, or as a physician, if they were with a group

 2    that she knew well, if they were within a small group that

 3    was, again, known and trusted, she would be able to do those

 4    things.  You know, and again, people, you know -- she was

 5    able to utilize her skills and also, you know, it helps when

 6    you can utilize your intellectual skills, you know, in a

 7    particular set of tasks, and that helps, as well.

 8    Q.  Were public speaking activities, were those particularly

 9    difficult for Dr. Menninger?

10    A.  Yes, and they are classically for people who have social

11    anxiety disorder.  It's a hallmark of it.

12    Q.  Would that mean that it was impossible for Dr. Menninger

13    to engage in public speaking activities?

14    A.  No, it was possible, but with, again, a great deal of

15    preparation and strain and recovery time.

16    Q.  Would it at all be inconsistent with your opinion

17    concerning Dr. Menninger's mental impairment to learn that

18    when people at PPD saw her doing presentations, they thought

19    she was great?

20    A.  Not at all.

21    Q.  Why not?

22    A.  Because, again, if one is able to organize, again, within

23    a setting that is trusted, where there's enough time for

24    preparation -- but let me -- if I could, reasonable, by

25    analogy.  If somebody has heart disease, they may be able to
```

1  walk a block, or they may be able to walk a flight of stairs.

2  If you ask them to walk two or three flight of stairs, they

3  may not be able to do it.  So you have to know kind of what

4  the scope is and the range of what people are capable of

5  doing.  And again, within those settings and a lot of

6  preparatory time, she was able to do that, by all of their

7  reports, quite well.

8        MR. HANNON:  Your Honor, I'm switching on to

9  another topic.  Do you want me to stop?

10        THE COURT:  Keep going.  You have two more minutes.

11        MR. HANNON:  Okay.  Great.

12  BY MR. HANNON:

13  Q.  I'm going to show you Joint Exhibit 48.  And you recall,

14  this was one of the documents that we looked at today with

15  Dr. Kessimian?

16  A.  Yes.

17  Q.  Okay.  And have you -- is this one of the documents that

18  you reviewed in preparation for your work in this case?

19  A.  Yes, I have.

20  Q.  Okay.  And I'm going to look here at the second page.

21  And you see here, Dr. Menninger -- I'm sorry, Dr. Kessimian,

22  she has provided a number of proposed accommodations.  Do you

23  see those?

24  A.  Yes, I do.

25  Q.  Okay.  So we see one there on page 2 and then the

```
 1    rest there on --
 2              THE COURT:  I'll stop you here.
 3              MR. HANNON:  I knew it.
 4              THE COURT:  Yeah.  Good, you knew when it was going
 5    to be 1 o'clock.
 6              But look, we got the document in, he's ready to go,
 7    the jury recognizes the document.  When you return, you don't
 8    have to lay that foundation.  They'll be oriented.
 9              Ladies and gentlemen, so take a break for lunch,
10    1:00 to 2:00, we'll resume at 2 o'clock.  Thank you for your
11    attention.  Don't discuss the case among yourselves or with
12    anyone else.
13              All rise for the jury.
14              (The jury exits the courtroom.)
15              THE COURT:  All right.  So we'll resume at 2:00.
16    See you then.  Just before, so we can get the jury at 2:00.
17              And I'm going to give you that back, Mr. Hannon.  I
18    don't need that anymore.
19              MR. HANNON:  Thank you.
20              (Court in recess at 1:01 p.m.
21              and reconvenes at 1:59 p.m.)
22              THE COURT:  Please be seated.
23              Dr. Summergrad, you can take the witness stand.
24              Kellyann, you can go get the jury.
25              (Jury present.)
```

1        THE COURT:  Go ahead, Mr. Hannon.

2    BY MR. HANNON:

3    **Q.**  Dr. Summergrad, I would like to show you Joint

4    Exhibit 58.  This here is a copy of Dr. Menninger's 2016

5    performance review.  I just want to walk you through some of

6    the information on here and see how that compares to your

7    opinions.

8            I direct you here to the highlighted part with the

9    goal of, "To collaborate with lab, data management, and

10   finance to establish and standardize Global Lab metrics for

11   test volumes, supply costs and revenue generated per

12   test/test category."

13           Do you see that?

14   **A.**  Yes, I do.

15   **Q.**  And you note there that she was rated as "highly

16   effective"?

17   **A.**  Yes, I do.

18   **Q.**  Do you see there, it notes "excellent collaboration with

19   the GCL teams"?  Do you see that?

20   **A.**  Yes.  I do.

21   **Q.**  Okay.  Is that in any way inconsistent with your opinion

22   concerning Dr. Menninger's mental impairment?

23   **A.**  No, it isn't.

24   **Q.**  Okay.  The next one here, and you see part of the next

25   goal, the second sentence reads, "Work with SciTech team to

1    create validation plan upon instrument delivery to lab."

2          Do you see that?

3    **A.**  Yes.

4    **Q.**  You see there, again, she was rated "highly effective"

5    there, right?

6    **A.**  Yes.

7    **Q.**  And in terms of the -- excuse me -- in terms of the

8    comments by Mr. Mekerri, you see the second sentence reads,

9    "Lisa has been leading the effort successfully."

10          Do you see that there?

11   **A.**  Yes, I do.

12   **Q.**  Is that in any way inconsistent with your opinion of

13   Dr. Menninger's mental impairment?

14   **A.**  No, it isn't.

15   **Q.**  Next page here, see the goal I've highlighted:

16   "Collaborate with QA to identify and address GCL CAP/CLIA/NY

17   compliance and quality gap."

18          Do you see that there?

19   **A.**  Yes, I do.

20   **Q.**  Okay.  And do you see she was rated "highly effective"?

21   **A.**  Yes, I do.

22   **Q.**  Is that consistent with your opinion concerning

23   Dr. Menninger's mental impairment?

24   **A.**  Yes, it is.

25   **Q.**  Next goal, "Collaborate with task force and leadership

1    teams to clarify and redefine AP strategy and project plan,

2    identify gaps and propose solutions to meet client

3    expectations."

4            Do you see that?

5    A.   Yes, I do.

6    Q.   And, again, she was rated highly successful?

7    A.   Yes.  Highly effective.

8    Q.   I'm sorry.  Highly effective.  Thank you for correcting

9    me.

10           And you see the notes reflect the "AP task force

11   has been a great initiative for cross departmental

12   collaboration" and it goes on to say, "Lisa is exploring

13   collaboration with partner."

14           Do you see that?

15   A.   Yes, I do.

16   Q.   Is any of that inconsistent with your opinion concerning

17   Dr. Menninger's mental impairment?

18   A.   No, it isn't.

19   Q.   Going back to the document that we started before

20   lunch -- so this, again, is Joint Exhibit Number 48.  So this

21   was Dr. Kessimian's suggested accommodations; is that right?

22   A.   Yes.

23   Q.   Okay.  And you've -- you've reviewed these suggested

24   accommodations in the course of your work in this case?

25   A.   Yes, I have.

1  **Q.** Okay. And do you have an opinion as to whether or not

2  these accommodations would have assisted Dr. Menninger with

3  respect to the side effects of her mental impairment?

4  **A.** Yes, I do.

5  **Q.** And what's your opinion?

6  **A.** I think it would have been helpful to her.

7  **Q.** How so?

8  **A.** To the extent that it would have placed some limits on

9  the number, the frequency, the exact role that she would

10  serve in, I think that it -- it would, obviously, depend upon

11  exactly what she was being asked to do at any given moment.

12  Based on the materials here, I think it would be helpful

13  because it would have put some parameters around that.

14  **Q.** In your opinion, did Dr. Menninger need an accommodation

15  in order to continue doing her job?

16  **A.** No, I don't think she did.

17  **Q.** I'm now going to show you another document. This one is

18  Joint Exhibit Number 28. So this was the form we were

19  looking at earlier, right?

20  **A.** Yes, it appears to be.

21  **Q.** Okay. And now I want to direct your attention to the --

22  the proposed accommodation in Box 7. And do you see here

23  Dr. Kessimian's recommendation there that any social

24  interaction or public speaking incident to her role be

25  minimized to the extent possible?

1   **A.**  Yes, I see that.

2   **Q.**  Okay.  In your opinion, Doctor, would that have been an

3   accommodation that would have been helpful to Dr. Menninger

4   given her mental impairment?

5   **A.**  It would have been helpful, yes.

6   **Q.**  How so?

7   **A.**  Again, it would have limited the number, the intensity,

8   the roles that -- the frequency of these interactions in

9   these -- in these situations as proposed.

10  **Q.**  Directing your attention to the next sentence in that box

11  or button, Dr. Kessimian wrote, "To the extent that social

12  interactions and/or public speaking is deemed necessary for

13  Lisa's job, I recommend that a plan be developed for these

14  activities in consultation with me or another qualified

15  healthcare provider."

16          Do you see that?

17  **A.**  Yes, I do.

18  **Q.**  And in your opinion, would that -- would that have been

19  helpful to Dr. Menninger given the mental impairment that

20  you've talked about?

21  **A.**  Yes, it would be.

22  **Q.**  How so?

23  **A.**  Again, definition, clarity, understanding what elements

24  of her job were remaining the same or were changing, knowing

25  something about, again, the frequency and the extent of the

1   social interactions that would be required of public

2   speaking, all of that would allow her to both plan and be

3   helpful in the management of her day-to-day activities on her

4   job.

5   **Q.**  When you say it would have helped her plan, could you

6   help the jury understand why --

7   **A.**  So as I was -- mentioned earlier, the -- there's several

8   different phases to the response to social anxiety disorder.

9   One is the anticipatory phase, and this is true with many

10  anxiety disorders; a second is the actual event itself; and

11  then a third is the recovery phrase.

12         Knowing what the tasks were, how frequent they

13  were, who would be there, numbers of people that would be

14  there, et cetera, all of those would allow her both to

15  anticipate correctly and assess and also be able to manage

16  those events, as she had been managing various forms of

17  public speaking within her existing role, and then, also, to

18  recover from -- from the intensity of the anxiety that she

19  would likely have experienced and had experienced in similar

20  situations before.

21  **Q.**  And when you say it would have helped her manage, in your

22  opinion, what, if any, sort of coping mechanisms had

23  Dr. Menninger sort of developed to help her manage?

24  **A.**  Well, I think the first was knowing when things would

25  occur, knowing what role she would play, what role others

1  might play, whether she was presenting, whether somebody else

2  was presenting, and the numbers of individuals.  So all of

3  those things would allow her to set a framework around what

4  she was about to do.

5          And then, obviously, depending upon what those

6  things were, then it would define how she would experience

7  the actual event itself and the aftermath of the event.

8  **Q.**  Looking back here at Dr. Kessimian's suggestion, in your

9  opinion, was -- was a formal plan needed in order for

10  Dr. Menninger to -- to have some benefit from this planning

11  you've talked about?

12  **A.**  Can you help me understand what you mean by a formal

13  plan?

14  **Q.**  Sure.  Did there need to be a single comprehensive

15  document laid out that said with precise detail this will

16  happen then, this will happen then, this will happen then?

17  **A.**  I think it would depend on the set of circumstances and

18  the specifics that she was required to -- if, again, they

19  were modest, less likely; if they were more extensive, yes.

20  **Q.**  How about just additional communication with

21  Dr. Menninger concerning these expectations?  In your

22  opinion, would that have been helpful?

23  **A.**  It would have been extremely helpful to her.

24  **Q.**  Why?

25          MR. CURRAN:  Objection.

1          THE COURT:  What's the objection?

2          MR. CURRAN:  This is going into the area that

3     Your Honor ruled on summary judgment.

4          THE COURT:  What's the question, Mr. Hannon?

5          MR. HANNON:  The question concerns increased

6     communication.

7          THE COURT:  I think, for context, it's overruled.

8     You can answer.

9          THE WITNESS:  So there are two different pieces of

10    this.  One piece goes to the kind of heart and deepest

11    experience of having social anxiety, which is fear of being

12    exposed and humiliated.

13         So anything that is experienced as potentially

14    exposing one or their disability -- their tendency to sweat,

15    their feeling that they may be talking in a way that's not

16    clear, stammering, feeling overwhelmed -- anything that would

17    help clarify that would both be useful in general -- in other

18    words, for the planning purposes -- but it would also reduce

19    the sense of self-criticism and self-recrimination that often

20    attends people who have social anxiety.

21         What do I mean by that?  People who have these

22    kinds of conditions, many people often feel like they should

23    be able to manage things.  "What's the matter with me that I

24    can't manage things?  People will see that I'm anxious or

25    that I'm stammering or that I'm sweating or that I'm looking

1    in an odd way."

2            And all of those things will help people feel

3    worse.  It intensifies their sense of self-criticism and

4    diminishes their sense of well-being in those -- in those

5    settings.

6            So communication has two functions here.  One is to

7    let people know, "We hear this.  We understand this.  We --

8    this is what we're expecting of you.  We're not holding back

9    this information from you or criticizing you for having a

10   condition; b, this is what we expect you to do."  Both of

11   those things would be helpful.

12   BY MR. HANNON:

13   **Q.**  I'm now going to show you Joint Exhibit 115.  And just to

14   orient you, this is an e-mail chain.  I'm going to direct you

15   to a specific portion of it.  Excuse me.

16           I direct your attention here to the bottom.  Can

17   you see here Dr. Menninger writes, starting in the second

18   sentence, "While you keep saying that you are committed to

19   engaging in a dialogue with me, I feel like you just keep

20   twisting my doctor's words and refusing to answer any of my

21   questions."

22           Do you see that there?

23   **A.**  Yes, I do.

24   **Q.**  Okay.  From a -- from the perspective of a psychiatrist

25   with knowledge of Dr. Menninger's mental impairment, is that

1   statement significant to you at all?

2   **A.**  Yes, it would be.  I mean, I think it would make most

3   people feel uncomfortable, but it certainly would make sure

4   with social anxiety in an important work situation feel

5   anxious and worried and concerned.

6   **Q.**  And directing your attention to the next sentence, she --

7   I'm sorry.  Skipping ahead to the last sentence, she writes,

8   "If we can talk about the specific tasks that Hacene wants me

9   to do, I feel like we can come up with some kind of a

10  solution that works."

11          Do you see that?

12  **A.**  Yes, I do.

13  **Q.**  Okay.  And in your preparation for testifying, were you

14  aware that Dr. Menninger had made repeated requests for

15  additional information concerning items on certain buckets?

16  **A.**  Yes, I am.

17  **Q.**  And in your opinion, would providing that additional

18  detail that Dr. Menninger requested, would that, in and of

19  itself, help accommodate the impact of her disability?

20  **A.**  Yes.  I think it -- clarity and communication would have

21  helped her.

22  **Q.**  Are you aware that Dr. Menninger took a medical leave of

23  absence in early June of 2018?

24  **A.**  Yes, I am.

25  **Q.**  Okay.  And in the course of your work in this case, did

1    you make a determination as to how, if at all, her -- her

2    mental impairment had changed since January 2018 and when she

3    took her medical leave?

4    **A.**  Yes, I did.

5    **Q.**  And what is your opinion?

6    **A.**  So over the course of the spring, particularly as she

7    began to get more worried and concerned about her livelihood,

8    her work, and her ability to resolve the matters that she was

9    attempting to deal with, she began to develop symptoms of a

10   major depressive disorder.

11          And those symptoms included, by the time we got

12   to -- there were several.  She wasn't sleeping.  She wasn't

13   eating well.  She was increasingly worried in a different

14   kind of way, worried in a self-critical kind of stage.

15          She worried that she had put herself in a situation

16   where her livelihood was going to be affected and her family

17   was going to be affected.  And she became increasingly

18   suicidal and had substantial thoughts of self-harm.

19   **Q.**  You mentioned major depressive disorder.  What is major

20   depressive order?

21   **A.**  So within the broader category of mood disorders that I

22   talked about, there are depression, as a kind of general

23   category, as one of the two major categories, mania being the

24   other.

25          And within depression, there are a variety of

1  different kinds of depressive orders, and one of them is

2  called major depressive disorder, or major depression.  It

3  has certain elements and characteristics, and that's what I

4  believe she developed in the course of the late spring.

5  **Q.**  In your opinion, was it medically necessary for

6  Dr. Menninger to take leave from her employment in early June

7  2018?

8  **A.**  Yes.

9  **Q.**  Why?

10  **A.**  Because she was -- despite highly competent psychiatric

11  care and despite medication, she was getting worse, and she

12  was feeling increasingly unsafe and unwell; and she needed a

13  more sustained, engaged environment to support her through

14  that and to allow her to begin to regain some sense of floor

15  underneath her.

16  **Q.**  Now, Dr. Summergrad, in your opinion, did Dr. Menninger's

17  preexisting mental impairment, did that in any way contribute

18  to her development of major depressive disorder?

19  **A.**  Well, as I mentioned earlier, overlap between psychiatric

20  symptoms or syndromes is more common than not.  Certainly

21  with people who have anxiety disorder, somewhere between 20

22  and 40 percent of them will go on to develop depressive

23  disorders, major depression.

24          And so that is a risk factor.  It's a known risk

25  factor for the development of major depression, particularly

1   later in life.

2   **Q.**  In your opinion, did PPD's actions play any role in

3   Dr. Menninger developing major depressive disorder?

4   **A.**  Well, I think she felt like she didn't know where she was

5   headed.  She didn't have clarity in her mind about whether --

6   whether and in what way her job was changing.  I think she

7   felt in particular that -- that they were looking to have her

8   exit the organization, and I think she began to frankly beat

9   herself up somewhat around the fact that she had taken the

10  risk of exposing her disability.

11       And so I think she felt that, despite the fact that

12  it was important for her to disclose her disability, that it

13  led to reactions to her, which then made her feel even more

14  negatively towards herself.

15       And it was kind of like a -- you know, again, if a

16  core concern of social anxiety is a fear of being humiliated

17  or viewed negatively, and she began to feel like she was

18  experiencing that from the environment at work around her,

19  that kind of is confirmatory in a negative way for her,

20  rather than a positive way.

21  **Q.**  And more specifically, how did those feelings that you

22  described in terms of the company wanting her to exit from

23  the company, how, if at all, did that play into her

24  underlying mental impairment?

25  **A.**  Well, I think, again, it activated the very concerns she

1    had about being humiliated, and it also created real worries

2    about her financial well-being and the well-being of her

3    family and she's obviously very concerned about her family.

4    **Q.**  I heard you mention a moment ago something about

5    Dr. Menninger having disclosed her disability.  In your

6    opinion, was there anything about the fact of Dr. Menninger

7    telling her employer about her disability that was

8    significant here?

9    **A.**  I'm not sure what you mean by significant.

10   **Q.**  Well, in terms of her reaction when she subsequently had

11   those feelings of rejection.

12   **A.**  Well, I think that that, again, if a cardinal element

13   of -- of social anxiety is fear of being seen and exposed and

14   humiliated, and if one exposes oneself, one puts oneself in a

15   vulnerable situation -- so it's a risk.  And she was taking a

16   risk, not just a risk that was a risk in the normal course of

17   events, but a risk psychologically for her, as well.

18   **Q.**  Were you present for Dr. Menninger's sister's testimony

19   last week?

20   **A.**  I think I was for most of it.

21   **Q.**  Were you present when Ms. Hart noted that Dr. Menninger

22   hadn't previously shared her diagnosis with her?

23   **A.**  Yes.

24   **Q.**  Is that at all significant to you?

25   **A.**  Well, I think it's significant in a couple of ways.  One

1   is psychiatric illnesses in general and social anxiety in

2   particular are associated with a strong sense of shame, what

3   people sometimes call stigma.  There's external stigma, how

4   the world views oneself, and then there can also be internal

5   stigma, you know, a sense of why can't I do this, why can't I

6   manage this, why aren't I better in some ways, so, again, an

7   internal self-criticism.

8          So the fact that she hadn't disclosed to her

9   sister, you know, is open to a number of different ways of

10  thinking of it.  One was, again, you know, not wanting to

11  disclose all of this.  The other is that I thought her sister

12  said something that was very important during that period of

13  her testimony, which was she described Dr. Menninger as being

14  shy and reclusive.  So she knew that she had these

15  attributes.  I think if you go back 40, 50, 60 years,

16  whatever the exact time frame is, you know, that we're

17  talking about, people's awareness about mental disorders,

18  people's ability to talk about them was much less in general.

19  So I think there are at least a couple of different ways of

20  understanding this.

21         But, you know, people -- people even with their

22  family members hold things inside.  Not all of us tell

23  everything that's going on with ourselves.

24  Q.  In your opinion, the fact that Dr. Menninger had kept

25  this inside, did that increase the risk of what would happen

1   in the event that, when she disclosed this to PPD, they

2   rejected her?

3   **A.** I think it's a reflection of the fact that this was an

4   area of great sensitivity to her and that she was taking a

5   risk in her mind.

6   **Q.** Were you also present this morning for Dr. Kessimian's

7   testimony?

8   **A.** Yes, I was.

9   **Q.** Okay. And did you hear Dr. Kessimian testify about

10  Dr. Menninger's concerns about traveling to the

11  Highland Heights location after disclosure of her disability?

12  **A.** Yes, I did.

13  **Q.** And in your opinion, is that consistent with the -- with

14  the testimony you just provided?

15  **A.** Yes, in my opinion it is.

16  **Q.** How so?

17  **A.** The -- she had -- as I understand it, this was the

18  headquarters where she worked. This was the -- or the

19  headquarters of the lab that she was -- and the element

20  within PPD that she was -- had responsibility for.

21         And these were the people to whom she had disclosed

22  her disability, so it's a concern that it might be more

23  anxiety-provoking than going to some place that -- where

24  people didn't know about this, it was neutral, and those kind

25  of issues would not be implicated.

1  **Q.** If -- in your opinion, Doctor, if Dr. Menninger hadn't

2  suffered that sense of rejection from PPD that you've

3  described, would she have developed major depressive disorder

4  and required medical leave?

5  **A.** I think it's significantly less likely.  It's possible

6  she still would have developed it, but I think it would be

7  less likely.  I think it added substantially to her stress,

8  her self-criticism, and her sense of hopelessness -- which is

9  by the way, again, a cardinal symptom of major depression.

10  **Q.** What is?  The sense of hopelessness?

11  **A.** Hopelessness.

12  **Q.** You've indicated earlier that you've -- you've had an

13  opportunity to interview Dr. Menninger more recently; is that

14  right?

15  **A.** Yes.

16  **Q.** And when was that?

17  **A.** It was in late 2022.

18  **Q.** And was that to take an assessment concerning her sort of

19  current health?

20  **A.** Yes, and just to see how she was doing currently.

21  **Q.** Okay.  And just generally speaking, what, if any,

22  findings did you make based upon that evaluation?

23  **A.** I thought that she was still very depressed, not as

24  depressed, perhaps, in terms of suicidal ideation as June of

25  2018, but nevertheless still having substantial difficulties,

1    both with anxiety, her mood, her sense of hopelessness about

2    the future; and that she had become really, in some measure,

3    not maybe completely, but significantly housebound, which had

4    occurred before, but really, it had the quality of this being

5    kind of solidified or becoming kind of crystallized into a

6    situation or a pattern of being and behavior that I was

7    worried, frankly, would be hard for her to break out of.

8    **Q.**   Have you reviewed Dr. Menninger's notes from her medical

9    treatment up until the time of your most recent examination?

10   **A.**   Yes.

11   **Q.**   Okay.  And in your opinion, has -- has Dr. Menninger

12   sought appropriate medical treatment in an effort to try to

13   get her life back on track, so to speak?

14   **A.**   Yes, I think she has.

15   **Q.**   And in the review of that medical treatment, anything

16   there that has in any way suggested to you that, to use a

17   term of art, Dr. Menninger is faking it?

18   **A.**   No.

19   **Q.**   In your opinion, as of when you recently evaluated

20   Dr. Menninger, do you believe that she was able to return to

21   work?

22   **A.**   Not -- not at the time I evaluated her, no.

23   **Q.**   Why not?

24   **A.**   I think that her -- her -- both her anxiety, her

25   secondary development of being more housebound and

1    agoraphobic, her persistent depressive symptoms, even though

2    some elements of them are a little bit better when she's on

3    the -- on her -- on the fluoxetine, all of those make that

4    too difficult for her to imagine going back into a work

5    situation at this point.

6    **Q.**  And in your opinion, since Dr. Menninger first started

7    her medical leave in January of 2018, has her condition

8    gotten better, worse, or stayed the same?

9    **A.**  I would say it's gotten worse to the extent that it is

10   more habitual now.  It's been going on for a relatively long

11   time.  And like anything else in life, patterns, habits,

12   styles that develop become harder to break the longer they go

13   on.  And so it doesn't mean it's impossible, but it makes

14   it -- you have to come back from a greater distance, if you

15   will.

16   **Q.**  In your review of the medical records, did you learn that

17   Dr. Menninger was diagnosed with post-traumatic stress

18   disorder?

19   **A.**  Yes.

20   **Q.**  Yes?

21   **A.**  Yes, I did learn that.

22   **Q.**  Do you agree with that diagnosis?

23   **A.**  No, I don't.

24   **Q.**  Why not?

25   **A.**  So she has certain -- has developed, as another important

```
 1    part of her symptoms, has developed some symptoms that you
 2    see within the spectrum of what's called post-traumatic
 3    stress disorder.  In particular, she has -- she startles to
 4    noise or unexpected activities.  I think you may have noted
 5    that her sister mentioned that she texts her before she
 6    calls.  That's a kind of -- you know, not to kind of startle
 7    someone.
 8            Secondly, she's had very disturbing dreams, and the
 9    disturbing dreams are repetitive, and they are of --
10    consistently around work and work-related circumstances.
11            And one of the attributes of dreams that you see
12    with post-traumatic stress disorder is they represent pretty
13    nakedly; in other words, they're not disguised dreams where
14    you don't know quite where you are or what's going on.
15            This was at work where, you know, she's dealing
16    with the director of her program.  You know, she's fearful
17    that she's going to be -- she has to go hide.  She has to
18    run.  She fears that she's going to be hurt.
19            In some of her dreams, she mentions fears that
20    she's going to be reported to Vladimir Putin by the director
21    or someone else in the lab.  So these are very -- so that's a
22    second cardinal manifestation of post-traumatic stress
23    disorder.
24            So she has those, but what she lacks is she doesn't
25    have the diagnostic -- the way this diagnostic system is set
```

1   up, you have sometimes, like, A criteria and then B criteria.

2   And you can't quite get to B unless you have A, you know?  So

3   for example, if you have mania, you can't really have a manic

4   diagnosis if you don't have increased energy or increased

5   activity over, like, a seven-day period.  Then there are a

6   bunch of other subsidiary symptoms.

7         Likewise, with PTSD, you can't get to the other

8   symptoms to make the diagnosis unless you've got a

9   life-threatening fearful event that you went through,

10  generally, something where, you know, you've been shot at in

11  combat.  It's usually the direct experience of a

12  life-threatening event that's required to give you the

13  diagnosis of post-traumatic stress disorder.

14        Now, there are a lot of people who use that

15  language more loosely.  I don't -- I don't think that's the

16  right -- doesn't mean that the symptoms are not

17  significantly.  They're quite significant, but -- and that

18  they don't need to be treated, but it doesn't rise to the

19  level of giving her that as a diagnostic -- a diagnosis,

20  per se.

21  **Q.**  So just to clarify that, that last bit, Doctor, is

22  that -- in your opinion, are Dr. Menninger's PTSD-like

23  symptoms, are those any less painful of bothersome because of

24  the fact that she does not meet the diagnostic criteria?

25  **A.**  No, they are quite both bothersome and painful.

1  **Q.**   And --

2  **A.**   And just to add one other element that's important is --

3  is an avoidance of things that either directly represent or

4  symbolically represent where you felt traumatized.  So

5  somebody gets shot in a -- you know, in a grocery store.

6  They may avoid grocery stores, and they may avoid stores.

7  They may cross the street.  They may not go down the street

8  where there's a lot of, you know, shopping and those kinds of

9  things available.

10         So for her, part of this -- again, it doesn't rise

11  fully to that level, but part of the -- part of what she

12  experiences is an avoidance of things that are reminiscent of

13  where she feels that she was traumatized.

14  **Q.**   Doctor, if Dr. Menninger tried really, really hard,

15  shouldn't she be able to go back to work?

16  **A.**   Say that again?

17  **Q.**   If Dr. Menninger tried really hard, shouldn't she be able

18  to overcome her fears and depression and go back to work?

19  **A.**   Yeah, that's a misnomer about psychiatric illness.  You

20  know, the notion that if you just pull yourself up by your

21  bootstraps, you know -- you know, at the risk of quoting

22  Abraham Lincoln in federal court, Lincoln suffered from

23  severe depression; and in 1841, he wrote his partner's

24  sister, Mary Speed, that "a tendency to melancholy," which

25  was the 19th Century word for depression, "is a misfortune,

 1    not a fault."

 2              So it's really important not to blame people when

 3    they're going through these illnesses.  These are very real

 4    illnesses, and in some cases, they can be life threatening.

 5    **Q.**  And in your opinion, is the fact that Dr. Menninger has

 6    not returned to work, is that somehow indicative that she's

 7    not trying to get better?

 8    **A.**  No, I don't think so.

 9    **Q.**  In your opinion, do you believe that Dr. Menninger will

10    get better in the future?

11    **A.**  I don't know.  I can't -- it's -- I can't predict.  I

12    would hope so, but I don't know the answer to that.

13    **Q.**  Based upon your analysis, is there a significant risk

14    that she will never be able to return back to work?

15    **A.**  Yes, there's a significant risk.

16    **Q.**  And can you explain to the jury why that is?

17    **A.**  I think there are several things, some of which are kind

18    of psychiatric and some of which are common sense.  She has

19    developed a set of symptoms which are in a number of

20    different related categories, all of which have become

21    somewhat habitual.  I think you heard Dr. Kessimian talk

22    about how she was worried about her husband, Dr. Menninger's

23    husband, accommodating her too much; and, therefore, she was

24    prescribing certain kinds of activities, such as going out

25    walking.

1    Part of what we do when people have either

2    depression or anxiety in somewhat different ways is we do a

3    variety of things where we kind of, in a gradated way, expose

4    them to the things that they're either anxious about or

5    encourage what's called "behavioral activation."  Because

6    this has been going on for a long time and because this has

7    got both anxiety, mood, and some trauma-related symptoms, it

8    makes it more complicated.  So there's a lot of -- there's a

9    lot of things to come back from.

10    And then I think the other piece is -- I just

11   think, as a practical matter, one also has to deal with the

12   fact that being out of the work force for a number of years,

13   explaining that, you know, to people, figuring out what kind

14   of job you actually want to do, what your skills are, what

15   you're best able to do, so I think all of that, you know, as

16   she gets past some of these other things, if that's possible,

17   that's still another question that she's going to have to

18   deal with, which anyone who's been out of the work force for

19   a while would have to deal with.

20   **Q.**   What about Dr. Menninger's fear of rejection?  Is that

21   something else that might inhibit her future efforts to find

22   work?

23   **A.**   Certainly.  There's going to be apprehension and anxiety

24   that she has about putting herself forward.  Again, back to

25   the cardinal aspect of the -- the core of social anxiety is

```
 1   fear of being rejected, fear of being seen, fear of being
 2   seen in a negative way, fear of being humiliated.
 3            So that was already in the mix a long time ago.
 4   And she's had to, you know, over the course of her life, work
 5   through that.  But that's now been accentuated by all these
 6   sets of circumstances.
 7            MR. HANNON:  That's all I have, Your Honor.
 8            THE COURT:  All right.  Cross-examination.
 9            CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT
10   BY MR. CURRAN:
11   Q.  Good afternoon, Dr. Menninger -- Dr. Summergrad.
12   A.  Good afternoon.
13   Q.  Give me a second just to get set up here.
14            MR. CURRAN:  Your Honor, may I --
15            THE COURT:  Yes.
16            MR. CURRAN:  -- the witness and --
17            THE WITNESS:  Thank you, sir.
18   BY MR. CURRAN:
19   Q.  All right.  So, Dr. Summergrad, I think you expressed the
20   opinion that Dr. Menninger's medical condition has gotten
21   worse since she disclosed her disability to PPD?
22   A.  Yes.
23   Q.  Okay.  And that was in January of 2018?
24   A.  Yes.
25   Q.  And it's also your opinion that Dr. Menninger developed
```

1   major depressive disorder?  I think you testified to that

2   before?

3   **A.**  Yes.

4   **Q.**  And when did -- she developed that in the spring of 2018,

5   I think you said?

6   **A.**  I think that that's correct.

7   **Q.**  Okay.  So you didn't examine Dr. Menninger in

8   January 2018, correct?

9   **A.**  No, I did not.

10  **Q.**  In fact, you didn't meet her until August 7, 2020; is

11  that right?

12  **A.**  I'd have to look back to the dates on my interview, but

13  approximately then.

14  **Q.**  Okay.  Is it your recollection that your first meeting

15  with her was in 2020?

16  **A.**  That's correct.

17  **Q.**  Do you recall it being in August of 2020?

18  **A.**  I don't recall whether it was August or not.

19  **Q.**  Okay.  Well, you can take a look at the binder in front

20  of you.

21  **A.**  Uh-huh.

22  **Q.**  The first tab, I believe, is your report in this case.  I

23  think on page 1, it says when you met with Dr. Menninger.

24  **A.**  Yeah, it says August 7, 2020.

25  **Q.**  Okay.  So that was more than 2½ years after January 2018,

1  correct?

2  **A.**  That's correct.

3  **Q.**  And when you met with Dr. Menninger in August 2020, you

4  interviewed her for about two hours and 15 minutes; is that

5  right?

6  **A.**  That's correct.

7  **Q.**  Now, your interview with Dr. Menninger in August 2020,

8  that wasn't in person, correct?

9  **A.**  It was not, no.

10  **Q.**  It was conducted partly by Zoom and partly by telephone,

11  right?

12  **A.**  Yes.  I think at one point, the Zoom link went out and we

13  switched to telephone, but the majority of it was by Zoom.

14  **Q.**  Okay.  So in forming your opinion about Dr. Menninger's

15  health, mental health conditions and their progress in the

16  first few months of 2018, you relied on your interview with

17  her in 2020, as well as the medical records that you reviewed

18  and other documents?

19  **A.**  That would be correct.

20  **Q.**  All right.  And your opinion is based in part on what she

21  said to you in the August 2020 interview, correct?

22  **A.**  It would be, in part, correct.

23  **Q.**  In diagnosing patients in your own practice, you have to

24  rely on what they tell you, correct?

25  **A.**  I'm sorry?

1    **Q.**  In diagnosing patients in your own practice, you have to

2    rely on what they tell you, correct?

3    **A.**  In part.

4    **Q.**  Now, when you interviewed Dr. Menninger in August 2020,

5    she already filed this lawsuit, correct?

6    **A.**  I believe so.

7    **Q.**  Okay.  And her lawyers had hired you to provide an expert

8    opinion in the lawsuit.  That's why you were talking with

9    her, correct?

10   **A.**  I'm sorry.  I missed the last part of what you said.

11   **Q.**  Yeah.  Her lawyers had hired you to --

12          THE COURT:  You might want to lift the microphone,

13   see if it straightens up -- you're pretty tall.

14          MR. CURRAN:  Yeah, sorry.  I could --

15          THE COURT:  Just be louder.

16          MR. CURRAN:  Or I can just talk louder.

17          THE COURT:  There you go.

18          MR. CURRAN:  Yeah.  It's a little bit

19   uncomfortable.

20          THE COURT:  Stand up straight and just talk louder.

21   BY MR. CURRAN:

22   **Q.**  So her lawyers had hired you to interview her, right, in

23   connection with this lawsuit?

24   **A.**  They had hired me to provide an expert opinion to them.

25   **Q.**  Okay.  And you were interviewing -- interviewing her

 1   specifically in connection with your effort to -- to develop

 2   an expert opinion in this case, right?

 3   **A.**   That's correct.

 4   **Q.**   And she knew you were interviewing her for that purpose?

 5   **A.**   Yes.  I made that clear.

 6   **Q.**   Right.  And in evaluating what she was telling you during

 7   your meeting with her in August of 2020, did you consider the

 8   fact that the meeting was occurring in the context of her

 9   lawsuit against PPD?

10   **A.**   Can you explain?  I'm not quite sure what that means.

11   **Q.**   So what I'm trying -- I'll try to ask a better question.

12   Did you consider the context in which you were interviewing

13   her and when you were evaluating what she told you in that,

14   you know, she was talking to you in connection with your

15   interview with her, in connection with this lawsuit?

16   **A.**   Yes, among other things.

17   **Q.**   Okay.  And how did that inform your opinion?

18   **A.**   She was, you know, a litigant in a lawsuit, but I was

19   nevertheless interviewing her to try to understand the nature

20   of the course and the current state of her mental disorders,

21   if any.

22   **Q.**   Okay.  Now, in forming your opinions about

23   Dr. Menninger's mental state and the progress of her

24   conditions in 2018, you also relied on medical records that

25   you received concerning Dr. Menninger, correct?

1    **A.**  That's correct.

2    **Q.**  So you were also relying on what she told those

3    therapists, right?

4    **A.**  Those physicians and other people, yes.

5    **Q.**  Right.  Did you speak with any of her physicians and

6    other people?

7    **A.**  No, I did not.

8    **Q.**  All right.  Now, in forming your opinion in this case,

9    did you speak with Dr. Menninger's husband?

10   **A.**  No, I did not.

11   **Q.**  And did you speak with any of her other relatives?

12   **A.**  No, I did not.

13   **Q.**  What was the name of Dr. Menninger's therapist in 2018?

14   It was Marianna Kessimian, right?  You were here for her --

15   **A.**  Her doctor -- her psychiatrist was Dr. Kessimian.

16   **Q.**  Right.  Sorry, I don't mean to denigrate her by saying

17   "therapist," it was just the word I was using.  I understand

18   that she's a medical doctor.

19          And Dr. Kessimian was at the time a medical doctor,

20   correct?

21   **A.**  Correct.

22   **Q.**  And you reviewed Dr. Kessimian's therapy notes from 2018?

23   **A.**  Her therapy, her medical evaluation notes, her clinical

24   notes.  They were not just therapy notes.

25   **Q.**  Okay.  I'm going to show you a document that we've marked

1   as Joint Exhibit 18 in this case, which I think you've seen

2   before.

3   **A.**   Uh-huh.

4   **Q.**   So this first page is Dr. Kessimian's notes from

5   January 22, 2018, correct?

6   **A.**   That's what it says, yes.

7   **Q.**   All right.  And you reviewed these in connection with

8   forming your opinion?

9   **A.**   Yes, I did.

10   **Q.**   Now, this is -- about -- in the first paragraph, about

11   two-thirds of the way down, there's a sentence that begins

12   "her overall daily level of anxiety."  Do you see that?

13   **A.**   Yes, I do.

14   **Q.**   All right.  And it reads, "Her overall daily level of

15   anxiety and somatic symptoms of anxiety has increased."  And

16   that's in January of -- of 2018, correct?

17   **A.**   Yes.

18   **Q.**   And the next paragraph, the second sentence reads, "Today

19   for her appointment is the first time in weeks she has left

20   her home."

21            Do you see that?

22   **A.**   Yes, I do.

23   **Q.**   And she goes on to say, "She is married to an engineer,

24   who struggles with his own specific phobias, and he has taken

25   over all the family and childcare responsibilities."

```
 1              Do you see that?
 2    A.  Yes, I do.
 3    Q.  And then, skipping down to the next sentence, its reads,
 4    "After her appointment, she had planned to pick up her
 5    nine-year-old daughter, Maya, from school; and her daughter
 6    was excited and remarked that many of her peers do not
 7    believe that she has a mommy because they have never seen
 8    her."
 9              Do you see that?
10    A.  Yes, I do see that.
11    Q.  All right.  And this is all Dr. Kessimian's notes from
12    January of 2018, correct?
13    A.  Yes.
14    Q.  And this was before PPD has, you know, denied her
15    accommodations, correct?
16    A.  I believe so, correct, but after she disclosed her
17    disability.
18    Q.  Okay.  So she had disclosed her disability at this point?
19    A.  Yes.
20    Q.  That was something she chose to do, correct?
21    A.  I believe -- I believe so, yes.
22    Q.  It wasn't something that PPD did to her?
23    A.  No.
24    Q.  Turning to the next page, do you see, under family
25    history there, about halfway down the page?
```

1   **A.**   Yes.

2   **Q.**   And it reads, "Mother and maternal grandmother with

3   severe anxiety disorders, mother cannot order for herself at

4   a restaurant," and it also says about her father,

5   "Involuntarily hospitalized for erratic and violent behavior,

6   denies substance abuse history, unemployed throughout Lisa's

7   life, schizophrenia on her father's side of the family."

8            Do you see that?

9   **A.**   Yes, I do.

10  **Q.**   Did you consider whether this family history played any

11  role in causing Dr. Menninger's mental health disorders?

12  **A.**   Well, certainly the mother and the grandmother, if it is

13  accurate that they had severe anxiety disorders, would put

14  her at increased risk, just genetically, for developing a

15  severe anxiety disorder.

16            Most of what we consider major psychiatric

17  illnesses have a greater likelihood to be occurring

18  genetically.  There's some what we would call a genetic

19  loading or a genetic propensity, and they vary.  It varies by

20  the type of disorder.

21  **Q.**   And a little further down, there's a sentence that reads,

22  under "developmental history," "mother did leave her father

23  and move them back to her hometown."

24            Do you see that?

25  **A.**   Yes.

1   **Q.**  "Then they reconciled and he came back to only continue

2   with rages and violence and unpredictability."

3         Do you see that?

4   **A.**  Yes.

5   **Q.**  Did you consider that as well?

6   **A.**  Yes, I did.

7   **Q.**  And do you know whether Dr. Menninger ever witnessed the

8   erratic and violent behavior by her father that's referred to

9   her?

10   **A.**  My understanding is she did see her father be violent

11   toward her mother.

12   **Q.**  In what way?

13   **A.**  I don't recall exactly the way that that would -- that

14   occurred, but I believe she was -- she did witness --

15   **Q.**  Okay.

16   **A.**  -- his behavior.

17   **Q.**  Okay. Now, turning to the next page, at the top there,

18   in the second sentence, it reads, "She would rather avoid any

19   situation that calls for small talk, being social, meeting

20   new people, or even going to places where there could

21   potentially be a crowd and she would have to interact with

22   others."

23         Do you see that?

24   **A.**  Yes, I do.

25   **Q.**  And under "panic, social phobia," the next paragraph, she

```
 1    talks about Lisa remembering as young as three or four

 2    dreading school, especially fear of being called on to answer

 3    a question.

 4            "If she was called on, her body and voice would

 5    shake, and this experience was both physically and mentally

 6    painful and exhausting.  This has continued into adulthood

 7    and even at small meetings when she needs to present three or

 8    four slides."

 9            Do you see that?

10    A.  Yes, I do.

11    Q.  You do?  Okay.

12    A.  Yes.  I do.

13    Q.  So these, again, these are all symptoms of Dr. Menninger

14    that predate any action by PPD, correct?

15    A.  Yes.

16    Q.  Skipping down a little bit to a paragraph that was

17    discussed during Dr. Kessimian's testimony, do you see the

18    paragraph beginning "eating disorder behavior"?

19    A.  Yes.

20    Q.  It says, "Eating disorder behavior, weighs herself

21    daily."

22            Do you see that?

23    A.  Yes.

24    Q.  So according to these notes, in January of 2018,

25    Dr. Menninger is already exhibiting an eating disorder?
```

1    **A.**  Yeah, I'm more skeptical of that terminology and that

2    conclusion.

3    **Q.**  Why is that?

4    **A.**  There are specific criteria for whether someone has an

5    eating disorder as opposed to certain kinds of eating

6    proclivities.  Being vegan is not an eating disorder,

7    exercising is not on eating disorder.  In order to have an

8    eating disorder, you need to have a set of other symptoms and

9    criteria and, again, while it's possible that she would meet

10    those criteria, that isn't established through these notes

11    and the part of the reason why I didn't give her that

12    diagnosis.

13    **Q.**  Okay.  And Dr. Kessimian was the one who was actually

14    meeting with her at this time, correct?

15    **A.**  Yeah.

16    **Q.**  And you, again, didn't meet her until 2018, correct?

17    **A.**  That's correct.

18    **Q.**  Did you ask her about her eating behavior in 2018 when

19    you spoke with her in 2020?

20    **A.**  I did not.

21    **Q.**  Oh, and then in the next paragraph, under "trauma," it

22    says "witnessed domestic violence as a child (father holding

23    a knife to her mother's throat)."

24    **A.**  Yeah, and I do recall reading that, now seeing that.

25    **Q.**  All right.  Did you consider whether this could be a

```
 1   cause of her mental health disorders?
 2   A.   It certainly -- it's certainly unlikely to have helped
 3   her mental health.
 4   Q.   Okay.
 5   A.   And it also may be a risk factor for -- for example, her
 6   developing major depression.
 7   Q.   Okay.  So it's something, again, that preexists her
 8   employment with PPD that could have contributed to her
 9   developing depression and --
10   A.   Well, it's certainly a vulnerability that she had.
11   Q.   Okay.  Could -- as a vulnerability, though, what's the
12   difference between a vulnerability and a contributing factor
13   in causing a condition?
14   A.   I'm not quite sure what -- I mean, it would depend on
15   what you mean by a contributing factor.
16   Q.   Something that contributes to --
17   A.   So the way I was using the term "vulnerability" here is,
18   just to be explicit, we don't know the nature of her father's
19   diagnosis.  There are various terms that are thrown around
20   here.  We know that he was violent and he was erratic and
21   didn't work.  We know that there's, by report, a family
22   history of schizophrenia, but, you know, lots of diagnoses
23   that get carried around in medical records, and particularly
24   from 50, 60 years ago, are inaccurate.  And that's been well
25   demonstrated in a number of studies.
```

1      So he may have had schizophrenia.  He may have had

2   other problems.  He had may have had manic-depressive illness

3   or some other disorder that could have put her at greater

4   risk.  I simply, as a medical professional, don't know the

5   role that that plays, and that's what I was talking about

6   vulnerability.

7      Clearly, also, witnessing trauma is a vulnerability

8   for anybody.

9   **Q.**  Yes, so putting aside whatever condition her father was

10  diagnosed with or may have had, you know, just witnessing

11  what she witnessed, as recorded here, increased the

12  likelihood that she would be -- later develop major

13  depressive disorder and other disorders?

14  **A.**  It could.  I'm not saying it did.

15  **Q.**  Okay.  All right.  So I just flipped to the next page

16  while you were talking.  Sorry.

17  **A.**  It's okay.

18  **Q.**  Under "social," near the bottom of the page, do you see

19  it, there's a paragraph that begins "Social:"?

20  **A.**  Yeah.

21  **Q.**  "Social:  Pathologist working in the private sector.

22  Sole financial contributor to the household.  Husband

23  empathetic and understanding partner.  Concern for excessive

24  accommodation to the point where all her needs are met and

25  she is not asked/required to leave the house."

```
 1              Do you see that?
 2     A.  Yes, I do.
 3     Q.  All right.  So this, again, was something about
 4     Dr. Menninger that existed in January 2018 before PPD did
 5     anything to deny her accommodations, right?
 6     A.  Well, this -- this note occurs in January of 2018, I
 7     believe.
 8     Q.  Correct.
 9     A.  Right.  So to the extent that her disclosure of her
10     disability -- again, as you point out, her decision to do
11     that, but, you know, it could have contributed to some of
12     this.  But, again, it sounds like it's preexisting.
13     Q.  Okay.  And it certainly preexists, you know, the -- her
14     submitting her request for accommodations, and it preexists
15     her -- the rejection of her request for accommodation, right?
16     A.  Yes, and it preexists her, you know, good performance
17     evaluations that she had at PPD, as was demonstrated earlier.
18     Q.  Right.  Okay.
19              Now, just beneath that, there's a word -- or a set
20     of sentences, beginning diagnosis.  Do you see that?
21     A.  Yep.  Yep.
22     Q.  And do you understand this to be Dr. Kessimian's
23     diagnosis of Dr. Menninger at this time?
24     A.  Yes.
25     Q.  All right.  So at this point, there's no diagnosis of
```

1    major depressive disorder, right?

2    **A.**   That's correct.

3    **Q.**   And that -- you agree with that?  There's -- she didn't

4    have a major depressive disorder at this point?

5    **A.**   She didn't appear to be at that point, no.

6    **Q.**   Okay.  Did you say she didn't appear to be?

7    **A.**   Didn't appear to be suffering from major depressive

8    disorder at that point.  Correct.

9    **Q.**   And now at the bottom of that page, there's the word

10   "plan," and then the plan appears on the next page.  Do you

11   see that?

12   **A.**   Uh-huh, yes.

13   **Q.**   Now, the first item on the plan is "start fluoxetine."

14   Sorry if I mispronounce that?

15   **A.**   No, you got it right.

16   **Q.**   Oh, good.  "5 milligrams for one week and increase to

17   10 milligrams daily if no side effects."

18   **A.**   Uh-huh.

19   **Q.**   What is the brand name of fluoxetine?

20   **A.**   It was historically known as Prozac.  It's now no

21   longer -- I mean, there is still branded Prozac, but it's

22   been generic for quite some time.

23   **Q.**   Okay.  And is Prozac or fluoxetine, is that prescribed

24   for social anxiety disorder?

25   **A.**   It's prescribed for a wide range of both anxiety

1    disorders and major depression.

2    **Q.** All right. But it's appropriately prescribed for anxiety

3    disorders?

4    **A.** Yes, it is.

5    **Q.** Okay. All right. Turning to the next treatment note,

6    this is for February 2, 2018. Do you see that?

7    **A.** Yes.

8    **Q.** And you reviewed this in connection with forming your

9    opinion in this case?

10   **A.** And, by the way, can I just add one other thing about the

11   fluoxetine?

12   **Q.** Sure.

13   **A.** So the fact that Dr. Kessimian -- whose notes, I think,

14   were spectacular -- started her at 5 milligrams a day is a

15   little unusual. And it's likely that she -- again, most

16   people who start on this -- people take 20 million grams a

17   day. People often start at 10 milligrams a day, unless

18   they're much older, geriatric persons or persons that are on

19   other medications that will cross-react.

20           Theirs is one exception where people tend to start

21   very low, and that's when people have anxiety disorders. So

22   it leads me to think -- I don't know this for a fact, but my

23   inference is, my medical opinion would be, it would be likely

24   that she started that at a low dose that way along with the

25   Valium because she was concerned she was treating an anxiety

1    disorder, and there's a tendency for anxiety disorders to

2    require starting with very low doses.

3    **Q.**   Okay.  So the fact that it was a low dose contributes to

4    your belief that this was for -- prescribed for anxiety

5    disorders?

6    **A.**   Yes.

7    **Q.**   Okay.  All right.  So turning back to the February 2nd

8    note, the chief complaint there, Dr. Kessimian recorded, "I

9    am just worried all the time.  I wake up with my heart

10   already beating fast thinking about how I have to see the

11   people that I work with at the end of the month after handing

12   in those letters to HR."

13          Do you see that?

14   **A.**   Yes, I do.

15   **Q.**   And then it says, "history of present illness, since last

16   visit continues to isolate at home and hardly leave her

17   family," right?

18   **A.**   Right.

19   **Q.**   So, again, these are things that are a part of her mental

20   health conditions in early February of 2018?

21   **A.**   Yes.

22   **Q.**   At this point, all that's happened is she's disclosed her

23   disability to people at work, but they have not rejected her

24   requests for accommodations yet?

25   **A.**   Well, for somebody with social anxiety, all that -- all

1    that she's done is disclosing her anxiety; that's a very big

2    deal.

3    **Q.**  Right.  Yeah, I'm sorry.  I didn't mean to minimize it.

4    My point was just that PPD hasn't done anything to her at

5    this point, correct?

6    **A.**  Not that I'm aware of.

7    **Q.**  Okay.  And based on your review of the documents that you

8    were provided, there was nothing that you saw in those

9    documents indicating that they had --

10   **A.**  Well, I'd have to go back and look at them specifically,

11   but you know, again, I don't recall something from that

12   period of time.

13   **Q.**  Okay.  All right.  Two paragraphs down from that, there's

14   a paragraph that begins "spoke at length."  Do you see that?

15   **A.**  Yes.

16   **Q.**  "Spoke at length about her experience in the work

17   environment where she feels that, because she's more

18   introverted and analytical, she's being criticized for things

19   that are unchangeable.  Has difficulty advocating for herself

20   and is already resigned to defeat in the corporate culture."

21         Do you see that?

22   **A.**  Yes, I do.

23   **Q.**  So here she's talking about feeling that she's being

24   criticized for things that are unchangeable.  Do you see

25   that?

1    **A.**   Yes.

2    **Q.**   And she seems to be attributing that, not to

3    discrimination or retaliation or to rejection of her request

4    for accomodation, but to the fact that she's introverted and

5    analytical, right?

6    **A.**   Well, that's the way Dr. Kessimian phrased it in her

7    note.   I don't know directly what -- what exactly was

8    prompting those feelings.

9    **Q.**   Okay.   Well, they couldn't have been prompted by denial

10   of her accommodations, right?

11   **A.**   Or they could have been prompted by something else that

12   she either felt or was worried was changing in her

13   interactions with her colleagues or superiors.

14   **Q.**   My question was a little different.   It was they couldn't

15   have been -- these feelings couldn't have been prompted by

16   her -- denial of her accommodations, correct?

17   **A.**   No.   They were -- to the best of my knowledge, they were

18   not denied at that point.

19   **Q.**   And have you seen any documents or other evidence to

20   indicate that she was being subjected to any sort of

21   maltreatment by her superiors or co-workers at this point?

22   **A.**   Again, not that I recall.

23   **Q.**   Okay.   All right.   So flipping to the next page, at the

24   bottom, do you see under "diagnosis" there?

25   **A.**   Yes.

1    **Q.**  And so Dr. Kessimian didn't diagnose her with major

2    depressive disorder on February 2nd, correct?

3    **A.**  Correct.

4    **Q.**  Okay.  All right.  So this is the next note from

5    Dr. Kessimian on February 16, 2018.  Do you see that?

6    **A.**  Yes.

7    **Q.**  And under the history of her present illness, it says,

8    "Since last visit continues to isolate at home and hardly

9    leave her family."

10            Do you see that?

11   **A.**  Yes, I do.

12   **Q.**  So that's the same as the last two visits, right?

13   **A.**  No, I don't think so, actually.

14   **Q.**  Okay.  How is it different from what --

15   **A.**  So I think if you looked both at the chief complaint and

16   at the end of that paragraph, there are two pieces of

17   information that are quite important.  And --

18   **Q.**  My question is a little different and --

19   **A.**  Okay.

20   **Q.**  -- Mr. Hannon will have a chance to ask you questions

21   about that kind of stuff.  And you can certainly talk in

22   response to that.  But I -- you know, in order just to

23   preserve my time --

24   **A.**  Understood.

25   **Q.**  -- I would like you to focus on my question, which is,

1   under the "history of present illness," it says, "Since last

2   visit continues to isolate at home and hardly leave her

3   family."  That's the same as what she said at the last two

4   visits, correct?

5   **A.**  Yes.  That's not changed.

6   **Q.**  Okay.  And on the next page, under "diagnosis," the first

7   two are panic disorder with agoraphobia.  What is

8   agoraphobia, by the way?

9   **A.**  So agoraphobia is, the agora is -- I think it's a Greek

10  work that means "marketplace," and it literally means fear of

11  the marketplace, but it generally means fear of going out.

12  And it's either a fear of -- generally a fear of leaving the

13  house.

14  **Q.**  Okay.  And then "social anxiety disorder," and it goes on

15  to the next page, at the top, "generalized anxiety disorder."

16  Do you see that?

17  **A.**  Yep.

18  **Q.**  So still no major depressive disorder, right?

19  **A.**  Yep.

20  **Q.**  Now, this is the note from March 9th.  Again, under

21  "history of present illness:  She still continues to isolate

22  at home and hardly leave her family."

23          That's the same, right?

24  **A.**  Correct.

25  **Q.**  Oh.  Okay.  Sorry, I didn't hear what you said?

1   **A.**  Sorry.  I didn't -- I wasn't quite sure if there was a

2   question there.

3   **Q.**  Oh, yeah.  There was.

4          And then the next sentence reads, "Did attend a

5   business meeting in Cincinnati where she met with both Chad,

6   HR representative, and her boss Hacene to discuss

7   accommodations.  She was disappointed when they mentioned an

8   exit package/consulting position as she likes her job and

9   knows that she can do her job.  She was able to assert

10  herself and is now in a waiting period."

11         So Dr. Kessimian doesn't say she was devastated or

12  felt rejected by what happened at that meeting, right?  She

13  says she was disappointed, at least according to these notes

14  by --

15  **A.**  Well, according to these notes, and I think that's

16  the critical --

17  **Q.**  Yeah, and Dr. Kessimian was there with her and speaking

18  with her, right?

19  **A.**  Yes.

20  **Q.**  Do you have any reason to think that she wasn't

21  accurately recording her impressions of what Dr. --

22  **A.**  I think, you know, these are not -- most medical notes

23  are not veridical records.  They are not transcripts in the

24  same way that might exist here.

25  **Q.**  Understood, but when -- you make medical notes like this?

1    **A.**  I hope I make good medical notes like this.  Yes.

2    **Q.**  You make an effort to make them accurately reflect --

3    **A.**  I do.

4    **Q.**  -- what you were told?

5    **A.**  I do.

6    **Q.**  So you wouldn't use a word like "disappointed," if what

7    your actual impression was devastated or broken or --

8    **A.**  Fair enough.

9    **Q.**  Okay.  And it goes on to say, "She was able to assert

10   herself and is now in a waiting period."

11              So it looks like, at least according to these

12   notes, again, Dr. Menninger took some positives from the

13   meeting in that she was able to assert herself, correct?

14   **A.**  That's what it sounds like.

15   **Q.**  Okay.  A little bit down, down about two-thirds of the

16   way down the page, there's a paragraph that begins, "Also

17   worries."  Do you see that?

18   **A.**  Uh-huh.

19   **Q.**  She, "Also worries about her social anxiety disorder

20   might be impacting her daughter, Maya.  About two years" --

21   "about two years stopped saying 'I love you' to her parents.

22   Not sure what this is about, but it is bothersome to her."

23              Do you see that?

24   **A.**  Uh-huh.

25   **Q.**  Did you consider whether this issue with Maya could have

1    caused or contributed to Dr. Menninger's mental health

2    conditions?

3    **A.**  I think her situation with her family was very important

4    to her.  I don't see that as being discontinuous from what

5    she had been experiencing previously over the last period of

6    time with her daughter or with her husband.

7    **Q.**  Okay.  And my question was a little different, though.

8    It is:  Did you consider it as part of what could have caused

9    her mental health conditions?

10   **A.**  You know, it wasn't the primary focus of what we

11   discussed.  I certainly was aware that they had moved because

12   of concerns about her daughter.  I recalled that after

13   reviewing some additional records.

14   **Q.**  Okay.  So you discussed her daughter, her relationship

15   with her daughter, when you met with her and --

16   **A.**  We really didn't -- we focused primarily on her

17   historical symptoms and what was going on at work and what

18   happened at work and what she did at work and the -- the

19   history of her major psychiatric conditions.

20   **Q.**  You had reviewed these notes before you met with

21   Dr. Menninger?

22   **A.**  I don't -- I can't say that with absolute certainty.  I

23   think so.  I would believe I did.

24   **Q.**  In any cases, you didn't ask her about this note?

25   **A.**  I don't recall asking her about that.  I didn't recall

1    asking her about her -- her daughter in this particular note,

2    no.

3    **Q.**   Do you recall asking her about her daughter at all?

4    **A.**   Just only to the extent that I know that she had a

5    daughter, and I listed -- I went through family history, and

6    I know that she had moved because of concerns about school.

7    **Q.**   So you didn't consider whether the issues with her -- any

8    issues with her daughter might have contributed to her mental

9    health conditions?

10   **A.**   I was trying to understand primarily where she fit

11   diagnostically.

12   **Q.**   So is the answer no?

13   **A.**   I didn't ask her about her daughter in that sense, no.

14   **Q.**   Okay.  All right.  So this is page 3 from those notes on

15   March 9, 2018.  So as of this date, Dr. Kessimian still has

16   not diagnosed Dr. Menninger with major depressive disorder,

17   right?

18   **A.**   Yes.

19   **Q.**   Flipping to the next note from March 16, under "History

20   of Present Illness," "Since her last visit, continues to

21   isolate at home and hardly leaves her family."

22        So that's unchanged.  She's still doing that since

23   January, right?

24   **A.**   Uh-huh.

25   **Q.**   "Has not been able to walk around her neighborhood, and

1    this was the goal for the last week, secondary to her social

2    anxiety symptoms and fears that, at this point, it has been

3    such a long time that her neighbors have seen her that they

4    will seek her out and ask questions."

5         Have I read that correctly?

6    **A.**  Yes.

7    **Q.**  Did you ask for how long it had been since her neighbors

8    had seen her?

9    **A.**  I did not.

10   **Q.**  Okay.  And do you know?

11   **A.**  I don't.

12   **Q.**  And we saw that in the notes for January 22nd that, as of

13   that date, Dr. Menninger hadn't left her home in weeks,

14   right?

15   **A.**  Yes, I did see that.

16   **Q.**  So is fair to assume that this isolation from her

17   neighbors predates her first visit with Dr. Kessimian?

18   **A.**  I think it's not unreasonable to assume that.

19   **Q.**  And, again, that was before her accommodations were

20   denied, correct?

21   **A.**  That's correct.

22   **Q.**  And flipping to page 3 again, under "diagnosis," there's

23   still no diagnosis of major depressive disorder, right?

24   **A.**  Correct.

25   **Q.**  This is the note from March 23, 2018.

1   **A.**   Yep.

2   **Q.**   "History of present illness:  Since last visit continues

3   to isolate at home and hardly leave her family."  That's

4   again no change, right?  Same change as January 2018?

5   **A.**   Yes.

6   **Q.**   Skipping down a bit, "Continues to have intrusive

7   thoughts about what her neighbors might be thinking of her,

8   preventing her from going outdoors, including that it's been

9   such a long time since she has been outside that they are

10   thinking about what is wrong with her."

11              So she continues to be unable to encounter her

12   neighbors, right?

13   **A.**   Yes.

14   **Q.**   And she confirms that's been going on for a long time,

15   correct?

16   **A.**   Yes.

17   **Q.**   And under diagnosis, again, she -- this time, she adds a

18   diagnosis of sleep disturbance.  Do you see that?

19   **A.**   Yes, I do.

20   **Q.**   Okay.  But there's still no diagnosis of major depressive

21   disorder?

22   **A.**   No, although sleep disturbance can be an important

23   symptom of major depression.  There are other things that can

24   give you sleep disorder, as well.

25   **Q.**   What other things can give you sleep disorder?  Can --

1   **A.** Being on -- being on a medication like fluoxetine can

2   give you a sleep disorder.

3   **Q.** Can anxiety give you sleep disorder?

4   **A.** Generally not the same way, no.

5   **Q.** All right. Skipping to the next note, March 30th. She's

6   continuing to isolate at home and hardly leave her family,

7   correct?

8   **A.** Yes.

9   **Q.** And then after the blackouts there, it says, "Though, is

10  sad/frustrated that since coming out with her social anxiety

11  disorder, she's felt worse than she has ever -- than she has

12  ever had before, and now has doubts about her decision."

13          So it looks like she's attributing her feelings

14  to -- it doesn't look like she's attributing these feelings

15  to any -- what anything -- anything that -- any one at

16  work -- let me ask a different question, strike that. It

17  doesn't look like she's attributing these feelings to

18  anything that anyone at work has done in response to her

19  disclosing her disorder, right?

20  **A.** Well, based upon my review of the records and based on my

21  discussions with her, I think she felt that she was not

22  getting clear answers to a variety of issues that were of

23  concern to her, including the nature of her job description

24  or the accommodations that might or might not be forthcoming.

25  And I think that that caused her both to begin to feel worse,

1   but also begin to be self-critical about her decision to

2   reveal her illness.

3   **Q.**  Okay.  That's not what's reflected in these notes from

4   Dr. Kessimian, though, right?  Who saw her in --

5   **A.**  These notes don't discuss that.

6   **Q.**  Right.  They don't say anything about, you know,

7   frustration with not getting answers to --

8   **A.**  Yeah, it says work stressors remain and she's been

9   recently navigating some difficult client interactions, but

10   doesn't go into greater detail than that.

11   **Q.**  Did you consider the fact that -- or the possibility that

12   her worsening mental condition was due to the fact that she

13   felt self-conscious about having to disclose to others what

14   she -- that she had a mental health condition?

15   **A.**  I think that that is part of what -- what happened for

16   her.

17   **Q.**  Okay.  So that's part of what caused her worsening health

18   condition?

19   **A.**  Well, I think it was -- it was disclosing and then the

20   experience that she had of not being particularly -- she

21   didn't feel that people were being forthcoming with her about

22   the things that she had raised, and I think it -- it

23   intensified her feeling of doubt and self- --

24   self-recrimination.

25   **Q.**  Okay.  Under "Diagnosis" -- I flipped to two pages ahead.

1   Again, there's no diagnosis of major depressive disorder here

2   on March 30th?

3   **A.**   Correct.

4   **Q.**   This is the note for April 6th, "History of Present

5   Illness.  Since last visit, continues to isolate at home and

6   hardly leave her family."

7        Again, that's unchanged, correct?

8   **A.**   Yes.  But above that, it says, "I don't know how much

9   more I can handle without needing to go to the hospital,"

10  under her chief complaint.

11  **Q.**   Right.

12       And under -- a couple paragraphs down, under "Work

13  Stress," it says, "Work stressors remain, and she is recently

14  navigating some difficult client interactions."

15       You just pointed that out in the last note, right?

16  **A.**   Yeah.  And that seems to be continuing.

17  **Q.**   So it looks like she's talking about some difficult

18  client interactions, at least in part, right?

19  **A.**   It looks like that.

20  **Q.**   Yeah.  Did you ask her about those client interactions

21  when you spoke with her?

22  **A.**   We mainly diagnosed, again, from a diagnostic standpoint

23  and how her interactions with work were going.

24  **Q.**   Did you consider whether these difficult client

25  interactions may have caused her worsening mental health

```
 1   condition?
 2   A.  It -- I think that they all fall within the broad work
 3   domain.
 4   Q.  "The broad work domain."  So they're part of the broad
 5   work domain that you think caused her worsening health
 6   conditions?
 7   A.  No.  I think that they're part of what she experienced in
 8   a job which had a lot of responsibility and had challenges
 9   associated with it.  I don't think it was the primary thing
10   that was driving her mood or -- or sense of well-being.
11   Q.  Why is that?
12   A.  Because she was -- she was worried about what the nature
13   of her job was going to be.  She was worried about how she
14   would be able to manage, given her disability and uncertain
15   set of changes that were not fully defined for her.  And she
16   was --
17   Q.  She was also worried about her difficult client
18   interactions, right?  Because that's what she told
19   Dr. Kessimian.
20   A.  You know, I can't speak to that beyond what's here in the
21   note.
22   Q.  Well, we know that she told Dr. Kessimian that, right?
23   A.  Yeah.  Understood.
24   Q.  And you didn't ask her about that, correct, when you
25   spoke with her?
```

```
 1   A.   No.  We focused on other things.
 2   Q.   So this is the last page of that note for April 6th, and
 3   do you see the diagnosis there?
 4   A.   Yeah.
 5   Q.   And, again, there's no diagnosis of major depressive
 6   disorder in April?
 7   A.   That's correct.
 8   Q.   This is the note for April 13th, first of two.  We'll get
 9   to the second one in a minute.  Under "History of Present
10   Illness," the same, isolating at home, and she's saying she
11   uses this appointment to motivate her to leave the house.
12   This is basically unchanged since January of 2020 -- or 2018,
13   right?
14   A.   I'm sorry, say that again.
15   Q.   This is basically the same, unchanged since January of
16   2018?
17   A.   It's slightly different language there, but it's not
18   substantively changed.
19   Q.   Okay.  And the diagnosis on the last page of the notes,
20   again, no diagnosis of major depressive disorder, right?
21   A.   Correct.
22   Q.   All right.  So this is the second note.  You were here
23   when Dr. Kessimian was testifying this morning, correct?
24   A.   Yes.
25   Q.   And she testified that this was not April 13th, it was
```

1    some other date in April, right?

2    **A.**  Yes, I heard that.

3    **Q.**  All right.  Under "Chief Complaint," Dr. Kessimian

4    records, "I have found a sense of empowerment in advocating

5    for myself and my strengths, and I am proud that my daughter

6    is a witness to this."

7            Do you see that?

8    **A.**  Yes, I do.

9    **Q.**  So according to what she told Dr. Kessimian at this

10   point, this is April 6th -- or April -- some time in

11   April 2018, she's feeling a sense of empowerment and pride,

12   right?

13   **A.**  I'm sorry?  Say that again.

14   **Q.**  So as of sometime in April, whenever these notes were --

15   **A.**  Right.

16   **Q.**  -- she's feeling a sense of empowerment and pride,

17   correct?

18   **A.**  Yeah.  I think it's wonderful.

19   **Q.**  And you would agree that those are positive feelings?

20   **A.**  Yes.

21   **Q.**  And these aren't feelings she reported having back in

22   January 2018, correct?

23   **A.**  Not to Dr. Kessimian, no.

24   **Q.**  Okay.  Did she tell you she had them --

25   **A.**  No, she didn't.

1    **Q.**  Okay.  But she's continuing to isolate at home.  No

2    change in that since January of 2018, correct?

3    **A.**  Yes.

4    **Q.**  A couple of paragraphs down, "work stressors remain and

5    she's recently navigating some difficult client interactions

6    and boss interactions and has been complimented, but has also

7    had to take Valium."

8         Do you see that?

9    **A.**  Yes, I do.

10   **Q.**  When you met with Dr. Menninger did you ask her about her

11   having been complimented at this point?

12   **A.**  I don't think we discussed that, per se.

13   **Q.**  Okay.  A few paragraphs down, under "moot," it says,

14   "Mostly externally dictated.  Family life feels satisfied and

15   also slight glimmer and feeling more empowered at work."

16        Do you see that?

17   **A.**  Uh-huh, yes, I do.

18   **Q.**  And the next paragraph, "She reports two to three overt

19   panic attacks triggered by work, but none that were out of

20   the blue, which is an overall subtle improvement from her

21   initial evaluation."

22        Do you see that?

23   **A.**  Yes, I do.

24   **Q.**  So there's been some improvement, a subtle improvement,

25   but improvement with respect to her panic attacks since

```
 1   January of 2018?

 2   A.   Yeah, and there's a mention in earlier notes from

 3   Dr. Kessimian about subtle improvement that she attributes

 4   potentially to the fluoxetine.

 5   Q.   Okay.  Do you recall where that was?

 6   A.   Oh, it's several notes back.  It's several times, over

 7   several notes.

 8   Q.   Okay.  But here anywhere she didn't attribute it to the

 9   fluoxetine?

10   A.   No, not here.

11   Q.   And here's the diagnosis again.  No diagnosis of major

12   depressive disorder?

13   A.   None.

14   Q.   All right.  So we're now about halfway through April 2018

15   and Dr. Kessimian has not diagnosed Dr. Menninger with major

16   depressive disorder, correct?

17   A.   She has not.

18   Q.   And Dr. Kessimian continued treating Dr. Menninger

19   through most of the rest of 2018; is that right?

20   A.   Yes, that's my understanding.

21   Q.   And you reviewed Dr. Kessimian's treatment notes for that

22   period?

23   A.   Yes, I did.

24   Q.   Do you know how many times approximately she treated

25   Dr. Menninger in --
```

1  **A.**  I would have to go back and add them up.

2  **Q.**  Okay.  More than 20?

3  **A.**  No, I don't know exactly.  It's -- I don't want -- I

4  don't want to guess at a number.

5  **Q.**  Okay.  Well, you were here this morning when, I think,

6  Dr. Kessimian testified that she was seeing Dr. Menninger

7  more or less weekly?

8  **A.**  At some point, it became weekly.  I don't think it was

9  weekly in the very beginning.

10  **Q.**  Okay.  Now, we're not going to go through all these

11  notes, I'm sure you'll be disappointed to hear, but would you

12  agree with me based on your review of all the notes that

13  Dr. Kessimian did not include major depressive disorder as a

14  diagnosis of Dr. Menninger in any of the other notes that she

15  took?

16  **A.**  I would have to look forward.  Clearly, there was concern

17  about worsening suicidality, you know, in the -- in the early

18  June period.  I don't recall.  I'd have to look to see in

19  that note whether or not she diagnosed her with any other

20  condition at that point.

21  **Q.**  Okay.  Well, I don't want to go through all the notes,

22  but is it fair to say that you -- you don't recall seeing a

23  diagnosis of major depressive disorder?

24  **A.**  I would have to look back at the notes specifically.

25  **Q.**  Okay.  Well, then here's the note for April 27, 2018.

1    Under "Chief Complaint," she says, "I'm only sleeping for

2    three hours per night, and now I'm waking up with panic

3    attacks from sleep.  Things just keep getting worse, and

4    sometimes, if it wasn't for Maya and Mason, I would just want

5    this all to end.  I don't want you to worry about me.  I know

6    I won't end my life, but this suffering at times is

7    unbearable."

8            Do you see that?

9    **A.**   Yeah, I do.

10   **Q.**   She doesn't say what's causing these feelings, correct?

11   **A.**   You mean in her chief complaint?

12   **Q.**   Yes.

13   **A.**   No.  She just describes what she's experiencing.

14   **Q.**   Okay.  Do you see anywhere else in this note where she

15   says --

16   **A.**   I would have to read through the whole note.

17   **Q.**   Can you take a quick scan through it and see if you see

18   anything?

19   **A.**   See where it says, "Glimmer of therapeutic efficacy," in

20   the third paragraph from the bottom, where she's talking

21   about fluoxetine.  That's a period in her earlier notes.

22   That's what I was referring to before.

23           Mood, six out of ten -- so, you know, again,

24   that -- I believe that's not terribly dissimilar to what she

25   described before.  The sleep disturbance certainly sounds

```
 1    worse.
 2    Q.   Okay.  I just flipped to page 2.
 3    A.   Uh-huh.
 4    Q.   Do you see anything on there that indicates that the
 5    conditions she described in the first paragraph were caused
 6    by anything in particular?
 7    A.   Some passive suicidal ideation under "safety."
 8    Q.   Right.  Well, my question was, do you see anything there
 9    that indicates what caused these conditions?
10    A.   Nothing that caused them --
11    Q.   Okay.
12    A.   -- by cause -- or attribution of causation.
13    Q.   Okay.  You mentioned passive suicidal ideation.  What is
14    passive suicidal ideation?
15    A.   So suicidal ideation is a broad schema for psychiatrists.
16    It covers lots of different things.
17            Sometimes, people will describe the feeling that
18    they just don't want to be around anymore, but they wouldn't
19    do anything to actually end their lives; that, you know, if
20    God came and claimed them at night and they didn't wake up,
21    that would be all right with them.  That's what we call
22    passive suicide.  So it's a wish to die or a wish to be dead,
23    but not a wish to act on something.
24    Q.   Okay.  So that's passive suicidal ideation?
25    A.   That's correct.
```

1    **Q.**  Is there a nonpassive suicidal ideation?

2    **A.**  Yes.

3    **Q.**  What's that?

4    **A.**  Active suicidal ideation.  There is active suicidal

5    ideation in the setting of a formal intent or plan.  There's

6    command hallucinations to kill oneself.  There's all sorts of

7    different things.

8    **Q.**  So she denies an intent or plan, according to --

9    **A.**  That would be my inference from Dr. Kessimian's note.

10   **Q.**  And she says it, right?

11   **A.**  I'm sorry?

12   **Q.**  She says it in the second line, under "safety," "denies

13   intent" --

14   **A.**  Yeah, denies intent or plan.  That's correct.

15   **Q.**  Okay.  So this is the next page.  Diagnosis, again, no

16   major depressive disorder?

17   **A.**  Yep.

18   **Q.**  Here's the note from May 18, 2018.  You look down at the

19   bottom, under "safety, suicidal ideation has resolved."

20           Do you see that?

21   **A.**  Yeah, I saw that.

22   **Q.**  So whatever suicidal ideation she had reported in the

23   last note, that's been resolved now?

24   **A.**  Yes.

25   **Q.**  And this is the next month?

1   **A.**  Uh-huh.

2   **Q.**  All right.  And here, under "Diagnosis," again, no major

3   depressive disorder yet?

4   **A.**  No.

5   **Q.**  Okay.  All right.  So this is the note from May 25, 2018.

6   "Chief Complaint.  The internal investigation found no

7   evidence of discrimination."

8           Do you see that?

9   **A.**  Yes, I do.

10  **Q.**  Do you know what that refers to?

11  **A.**  Yes, I do.

12  **Q.**  What is that?

13  **A.**  That she -- there was an internal investigation that I

14  believe I was here for some of the testimony of your HR

15  director that reviewed this and didn't find evidence of

16  discrimination.

17  **Q.**  Okay.  And under "History of Present Illness," it says,

18  "Since last visit, continues to isolate at home and again

19  uses this appointment to motivate her to leave the house."

20          And that's similar to what we've seen --

21  **A.**  Yes.

22  **Q.**  -- in January, right?

23  **A.**  Yep.

24  **Q.**  A couple of sentences down in that paragraph, "She has

25  also decided to finally take some leave in the beginning of

```
 1    June to see her friends at the ultra walk."
 2              Do you see that?
 3    A.   Which paragraph is that?
 4    Q.   So it's the History of Present Illness paragraph.  It's
 5    just the last sentence in that paragraph, right after the
 6    blacked out --
 7    A.   Yes, I see that.
 8    Q.   So are you aware that she went out on medical leave in
 9    early June 2018?
10    A.   Yes, I am.
11    Q.   So it looks like she was already planning to take some
12    leave, according to this note, correct?
13    A.   That's what it look like.
14    Q.   Okay.  Do you know whether she, in fact, did the ultra
15    walk in early June?
16    A.   I don't know.
17    Q.   Did you ask her?
18    A.   I don't recall.  I know she went into a partial
19    hospitalization program in early June.
20    Q.   She went into a partial hospitalization program in early
21    June?
22    A.   Yeah.  At Butler Hospital.
23    Q.   So that was early June?
24    A.   I believe so, correct.
25    Q.   And so she couldn't have probably done the ultra walk if
```

1    she was in the hospital, right?

2    **A.**  Don't know.

3    **Q.**  All right.  A couple paragraphs down, it says, "Work

4    stressors remain but with a resolution in sight."

5             Do you see that?

6    **A.**  Yes.

7    **Q.**  So this was after the internal investigation came back

8    and found no --

9    **A.**  Yes.

10   **Q.**  Okay.  A little down, "Mood, six out of ten, mostly

11   externally dictated.  Family life feels satisfied, but work

12   life remains stressful and a sense that she cannot trust

13   anyone and they are scanning her for fault at all times and

14   there's little appreciation of effort to understand what her

15   role is in the company, though being able to assert herself

16   has in some ways been helpful."

17            Do you see that?

18   **A.**  Yes, I do.

19   **Q.**  Okay.  So, again, you know, she's asserting herself and

20   that's -- she's finding that helpful?

21   **A.**  Yes, and also notes that there's little appreciation of

22   or effort to understand what her role is in the company,

23   which has been stressful for her.

24   **Q.**  Right.  But she is continuing to work at it and assert

25   herself, it looks like --

1    **A.**   Uh-huh.

2    **Q.**   -- right?

3         All right.  Under -- in the last paragraph on that

4    page, after the blackout, there's a sentence that reads, "At

5    this time, discussed honestly that she has not utilized

6    higher levels of care of gold standard treatment, including

7    exposure, which is usually considered before disability is

8    granted."

9         Do you see that?

10   **A.**   Yes, I do.

11   **Q.**   What is "exposure"?

12   **A.**   So I think, if you remember Dr. Kessimian's testimony,

13   she was talking about how it -- if you have -- you have

14   something that causes you anxiety -- let's say it's -- it's

15   being outdoors or it's being in the presence of snakes or

16   something like that, or it might be, you know, other --

17   whatever the thing is.

18         What people do is they gently try to increase the

19   amount of time that people can spend in the presence of

20   what's called the phobic stimulus and teach people CBT,

21   relaxation, and other -- it's called "exposure."  Sometimes

22   with those -- obsessive compulsive disorder, it's called

23   "exposure and response prevention."  But it's a graduated

24   attempt to decondition whatever the things is that's a

25   particularly strong stimulus.

```
 1    Q.   Is group therapy a form of exposure?

 2    A.   No.  I mean, it could be for somebody with social

 3    anxiety.  It's not generally used that way, no.

 4    Q.   Okay.  But for someone with social anxiety, which is what

 5    Dr. Menninger had, it could be, correct?

 6    A.   It might be.  Again, I have not seen it used that way,

 7    so --

 8    Q.   Okay.  Do you know whether Dr. Menninger had done group

 9    therapy at this point?

10    A.   I don't know.

11    Q.   Do you know whether she ever did?

12    A.   I believe she was in group programs when she was at

13    Butler.

14    Q.   Has she done it since she left Butler?

15    A.   I don't know.  I've not seen it in any of the records.

16    Q.   Do you know whether it helped her at Butler?

17    A.   You know, again, hard to know exactly what helped at

18    Butler.  She certainly had some benefit from being in a

19    structured environment, which is typically what happens for

20    most people when they're -- when they're pretty suicidal

21    or --

22    Q.   Did you review the Butler health records?

23    A.   Yes, I did.

24    Q.   And so you don't recall, though, whether it said that the

25    groom therapy was helpful to her?
```

1   **A.**   Not per se.  I don't think it was broken out way.

2   **Q.**   Okay.  So on the next page, under "safety," it says

3   "denies suicidal ideation"?

4   **A.**   Uh-huh, yep.

5   **Q.**   Do you see that?  So no suicidal ideation on May 25,

6   2018?

7   **A.**   Yep.

8   **Q.**   Again, this is after --

9   **A.**   Yep.

10  **Q.**   -- the internal investigation came back negative, right?

11          And, again, under "diagnosis," no -- still no

12  diagnosis of major depressive disorder --

13  **A.**   Yeah.

14  **Q.**   -- correct?

15          So this is the note for June 1, 2018.  Do you see

16  that?

17  **A.**   Yep.

18  **Q.**   So it seems like her mental health condition has declined

19  pretty drastically since May 25th.

20  **A.**   Yes.

21  **Q.**   She didn't have any suicidal ideation on May 25th?  We

22  just saw that, right?

23  **A.**   Yes.

24  **Q.**   And now she's got passive suicidal ideation --

25  **A.**   Yep.

1    **Q.**  -- no intents or plan.

2         And she was feeling good about asserting herself on

3    May 25th.  We just saw that, right?

4    **A.**  Yes.

5    **Q.**  So do you know what, if anything, happened between

6    May 25th and June 1st that caused this?

7    **A.**  You know, I don't recall exactly.  I mean, I -- I

8    wouldn't want to guess.  You know, there are so many records

9    I've reviewed, but I would -- I think that there was some

10   further discussion about an exit plan, but I don't -- I'd

11   have to go back and look at the records specifically.

12   **Q.**  You think there was a discussion and exit plan after

13   May --

14   **A.**  I don't recall exactly, so I'm not going to guess.

15   **Q.**  Okay.

16   **A.**  I don't -- I can't, as I'm sitting here, without

17   reviewing the records, tell you exactly what happened in that

18   period.  But she clearly got worse at that period.

19   **Q.**  Okay.  Anything else that happened after May 25th and

20   before June 1st?

21   **A.**  Not that I'm aware of.

22   **Q.**  Okay.  And have you seen anything to indicate that PPD

23   threatened to fire her or take any other action against her

24   during that period?

25   **A.**  I'd have to look back at the records.  Not that I recall.

1    **Q.**  Okay.  All right.  So she's in pretty bad shape on

2    June 1st, but the diagnosis still -- there's no diagnosis of

3    major depressive disorder by Dr. Kessimian, correct?

4    **A.**  Yeah.

5    **Q.**  June 8th, she's on medical leave at this point, right?

6    **A.**  Right.

7    **Q.**  And if you look under "history of present illness," the

8    last phrase there says, "Suicidal ideation has resolved."  Do

9    you see that?

10    **A.**  Yep.

11    **Q.**  It says she's eating okay?

12    **A.**  Uh-huh.

13    **Q.**  Do you see that?

14    **A.**  Yep.

15    **Q.**  Okay.  And then down below, under "safety," again, it

16    says "Denies suicidal ideation, no intents or plan"?

17    **A.**  Right.  But it also says, higher up, "Continues to find

18    it hard to feel hope.  Feels apathetic, worthless, and

19    despondent."

20    **Q.**  Right.  But no suicidal ideation?

21    **A.**  Not that she reports there, no.

22    **Q.**  And she's eating okay?

23    **A.**  Yeah.

24    **Q.**  Okay.  Do you have any reason to believe that she

25    reported it to Dr. Kessimian but Dr. Kessimian didn't --

1    **A.**  No, absolutely not.

2    **Q.**  Do you have any reason to believe that she had suicidal

3    ideation --

4    **A.**  No.

5    **Q.**  -- but didn't report it?

6    **A.**  No.  I trust Dr. Kessimian's notes.

7    **Q.**  And, again, under "diagnosis," no diagnosis of major

8    depressive disorder?

9    **A.**  Yep.

10   **Q.**  So I think you testified before that you thought that, in

11   early June of 2018, she went to Butler Hospital?

12   **A.**  Yes.

13   **Q.**  All right.  So this is the note for June 29th.  Under

14   "history of past illness," it says, "Since last visit, is on

15   medical leave.  Plans to start the partial program on

16   Monday."

17   **A.**  Late June.  Yeah.

18   **Q.**  Okay.  So it was late June, not early June?

19   **A.**  Yeah.

20   **Q.**  All right.  It says, "She is sleeping slightly better but

21   still anxious."  But she's sleeping better, right --

22   **A.**  Yep.

23   **Q.**  -- according to this note?  She's also eating okay.  Do

24   you see that?

25   **A.**  Yep.

1    **Q.** "Suicidal ideation has returned, denies intent or plans."

2    So suicidal ideation is back now.  Do you see that?

3    **A.** I see that under "safety" where it says "denies suicidal

4    ideation."

5    **Q.** Right.  So it seems unclear here whether she has suicidal

6    ideation or not, right?

7    **A.** Point to me the -- yes, suicidal ideation -- so it sounds

8    like there's a conflict between the first -- the history of

9    the present illness and the safety --

10   **Q.** Right.

11   **A.** Right.

12   **Q.** So it's, at best, unclear whether she had suicidal --

13   **A.** -- yeah.

14   **Q.** -- ideation at this point?

15           And, again, under "diagnosis," the bottom of this

16   page and over on to the next page, nothing about major

17   depressive disorder?

18   **A.** Mmm.

19   **Q.** All right.  So this is a note for July 13, 2018.  "Since

20   last visit, completed the partial program at Butler.  She had

21   severe panic symptoms and a panic attack in group when she

22   was expected to report on her weekend.  As her turn

23   approached, she became tearful, started to hyperventilate,

24   and left the group" --

25           THE COURT REPORTER:  I'm sorry; if you could read

1    that --

2           MR. CURRAN:  Sorry.

3    BY MR. CURRAN:

4    **Q.**  -- "tearful, started to hyperventilate, and left the

5    group and was helped by her therapist in the program.  She

6    was able to return to the program and found existential

7    therapy as well as group therapy challenging and rewarding."

8           Do you see that?

9    **A.**  Yes.

10    **Q.**  Okay.  So it seems like the group therapy was helpful, at

11    least according to this note, right?

12    **A.**  I'm sorry; I couldn't hear what you said.

13    **Q.**  It seems like the group therapy was helpful, at least

14    according to this note?

15    **A.**  Yeah, helpful but also stressful.

16    **Q.**  Okay.  Well, it's supposed to be stressful, right, for

17    someone with anxiety?

18    **A.**  It depends.

19    **Q.**  It depends on what?

20    **A.**  It depends on what your therapeutic goals are.

21    **Q.**  What are the therapeutic goals -- what do you think the

22    therapeutic goals were at this point?  Or what --

23    **A.**  Well, I think the first therapeutic goal is to help her

24    feel comforted, secure, that people are listening to her,

25    that they're making sure that they understand what going on

1    with her, and that they're laying out a set of interventions

2    and treatments that are helpful.

3            You don't want to necessarily acutely make somebody

4    feel worse.  That may happen over the course of therapy, but

5    one needs to approach that very gingerly.  Just like if

6    you're a surgeon, you don't want somebody mashing on a hot

7    abdomen, you know, without going -- causing pain.  If there's

8    pain, you want to come to it, but you want to come to it very

9    gently.

10   **Q.**  So you disagree with the Butler Hospital psychiatrists

11   who had her do group therapy?

12   **A.**  You know, again, I'm not -- I'm not saying I disagree or

13   agree.  It's -- I'm just saying that a priority -- having

14   somebody panic in a group is not the kind of graduated

15   approach that I would want to see toward somebody with an

16   anxiety disorder like this.

17   **Q.**  Okay.  She found it rewarded, though, correct?

18   **A.**  That's what it says.

19   **Q.**  Right.  And under "safety" down below, it says "denies

20   suicidal ideations" --

21   **A.**  Yep.

22   **Q.**  -- "no intents or plans"?

23           And at the bottom of the next page, the diagnosis,

24   up to the next page, still nothing about major depressive

25   disorder?

```
 1   A.   Yep.

 2   Q.   So we could keep going through these.  I'm not going to

 3   take everybody's time doing that.  But, again, you don't --

 4   as you're sitting here today, you don't recall seeing any --

 5   any diagnosis by Dr. Kessimian of major depressive disorder?

 6   A.   I don't recall at the moment, no.

 7   Q.   Okay.  And Dr. Kessimian was the medical doctor who was

 8   caring for Dr. Menninger in 2018?

 9   A.   Yes.

10   Q.   And you didn't see her until a couple years later?

11   A.   That's correct.

12   Q.   All right.  Now, in 2017, Dr. Menninger was living in the

13   Cincinnati area; is that correct?

14   A.   That's my understanding.

15   Q.   And she'd been living there since 2015?

16   A.   That's my understanding.

17   Q.   All right.  And is it your understanding that, in 2017,

18   she moved to Massachusetts?

19   A.   Yes.

20   Q.   And then, within a year or two after that, she moved to

21   Albuquerque, New Mexico; is that right?

22   A.   That's my understanding.

23   Q.   And then a year or two later, she moved again to

24   Oregon --

25   A.   Yes.
```

1   **Q.**  -- is that right?

2          So in forming your opinion in this case, did you

3   consider whether or to what extent all these moves could have

4   caused or contributed to Dr. Menninger's worsening health

5   condition?

6   **A.**  I certainly didn't think that it was primary or even -- I

7   think they were more reactions to circumstances that she was

8   in rather than a causal factor.

9   **Q.**  So they were motivated by responses to things, right?

10  **A.**  Well, I think she was -- was trying to find a set of

11  circumstances that she felt more comfortable in and

12  ultimately closer to family in Oregon.

13  **Q.**  Well, the move to Massachusetts wasn't to be closer to

14  family, right?

15  **A.**  I think that was for schooling-related issues for her

16  child.

17  **Q.**  And the move to New Mexico wasn't for family, right?

18  **A.**  I don't believe there was family in New Mexico.

19  **Q.**  Okay.  And putting aside the motivation for the moves,

20  could the effect of the moves have been isolating and caused

21  her conditions to worsen?

22  **A.**  I think it's unlikely.

23  **Q.**  Why is that?

24  **A.**  These conditions are -- have to some degree -- you know,

25  she's already had many of these symptoms over a long period

```
 1   of time in her life.  And she wasn't particularly going out

 2   and doing a lot of social things to start with, either in --

 3   when she was in -- when she was in Massachusetts.

 4           So I don't see that as being a primary concern.  I

 5   think she was very concerned about her finances and her

 6   support of her family and work.  I think those things were

 7   very substantial to her, and I think she was pretty worried

 8   about her -- her -- keeping her family stable.

 9   Q.  Did you ask her whether she had a social network or a

10   group of friends in Cincinnati?

11   A.  We didn't -- we didn't discuss that.

12   Q.  Did you ask her whether she had a social network or group

13   of friends in Massachusetts?

14   A.  No.  We, again, focused primarily on her historic

15   symptoms and the work situation.

16   Q.  So you don't know as you're sitting here today whether

17   she had those things --

18   A.  I don't have great detail on that.

19   Q.  All right.  So then in March 2020, of course, we have the

20   beginning of the COVID-19 pandemic, right?

21   A.  Yes, we did.

22   Q.  And that continued for a few years and, officially, I

23   guess is still going on, right?

24   A.  Not for long, I gather.

25   Q.  Yeah, we've still got a couple weeks, I guess.
```

1          So in forming your opinion about the causes of

2     Dr. Menninger's conditions, did you consider whether or the

3     extent to which the pandemic could have caused or contributed

4     to her conditions?

5     **A.**   You know, I think the pandemic hasn't been good for most

6     people's conditions, but I don't see that, again, as primary

7     here.  I think this has been much more focused around the

8     change in her work environment and work circumstances.

9     **Q.**   Could it have been made it worse than it otherwise would

10    have been?

11    **A.**   The COVID-19 pandemic has made very little better for

12    anybody.

13    **Q.**   And did you consider that in forming your opinion as to

14    what the cause was?

15    **A.**   Yeah.  I didn't think it was a major factor.

16    **Q.**   Okay.

17    **A.**   She was already, as you noted, isolating quite a bit,

18    so --

19    **Q.**   So your -- in your director testimony, you referred to

20    post-traumatic stress disorder, correct?

21    **A.**   Yes, that I didn't think she had a diagnosis of

22    post-traumatic stress disorder.

23    **Q.**   Okay.  But you think that she has some symptoms?

24    **A.**   Oh, yeah, she definitely has some symptoms.

25    **Q.**   All right.  But in order to make a diagnosis of PTSD, you

1    would have to experience exposure or actual -- to actual or

2    threatened death or serious injury?

3    **A.**  Yeah.  That's the category A criteria.

4    **Q.**  All right.  Now, we saw before that in Dr. Kessimian's

5    records Dr. Menninger when she was a child, she witnessed

6    domestic violence, including seeing her father hold a knife

7    to her mother's throat?

8    **A.**  (Nods head.)

9    **Q.**  Would that qualify as an exposure to actual or threatened

10   death or serious injury for purposes of --

11   **A.**  You know, it certainly is a traumatic exposure and --

12   however, the period of time between that and the onset of her

13   symptoms is of such longer duration it's hard to attribute it

14   to that.

15        Secondly, her other symptoms that she had,

16   particularly in her dreams and some of the other symptoms I

17   mentioned, are much more related to work.  So I don't think

18   that helped her well-being seeing that.  I think that that's

19   pretty stressful.  But I don't think it puts the whole -- the

20   whole picture together.

21   **Q.**  All right.  Now, you testified that Dr. Menninger is

22   currently unable to work; is that right?

23   **A.**  Yes.

24   **Q.**  And you also testified that, in your opinion, there's a

25   significant risk that Dr. Menninger may be unable to work for

1   the rest of her expected work life?

2   **A.**   That's true.

3   **Q.**   When you say she's unable to work, in what type of job is

4   she currently unable to work?

5   **A.**   I don't think that she'd be able to -- be able to work in

6   most jobs, not being able to leave the house and not being

7   able to maintain a career that she's been trained for.

8   **Q.**   So she wouldn't be able to work in most jobs, or she

9   wouldn't be able to work in the career she's trained in?

10  **A.**   Well, she certainly can't work at present in the work

11  that she's been trained to do in her career.

12  **Q.**   Can she work at all, though?

13  **A.**   I don't think that she's -- I think that the level of her

14  anxiety, preoccupation, agoraphobia, other traumatic

15  symptoms, mood disturbance, all militate against her being

16  able to work currently.

17  **Q.**   Did you consider any other jobs besides the one that

18  she's been trained for or the one that she had at PPD that

19  she might be able to perform?

20  **A.**   You know, I'm not sure it's for me to make, you know,

21  vocational choices for anybody else, so --

22  **Q.**   Well, you're opining that she can't work, so

23  presumably --

24  **A.**   Yeah, I don't think that she can work anywhere near

25  the -- she can't get anywhere near, I think, the ability --

1   the things that she was trained to do.

2   **Q.**  All right.  But in any case, you can't say with certainty

3   that Dr. Menninger definitely won't be able to work again,

4   whether --

5   **A.**  No, and I've never said that.

6   **Q.**  Okay.  So, in your opinion, it's possible she may recover

7   or that her conditions may improve in the future to the

8   point --

9   **A.**  I would hope so, but I can't say that for any degree of

10   certainty.

11   **Q.**  But it's possible?

12   **A.**  It is possible.

13          MR. CURRAN:  I don't have any further questions at

14   this time.

15          THE COURT:  All right.  Any redirect?

16          MR. HANNON:  Yes, Your Honor.

17          May I proceed?

18          THE COURT:  Yes.

19          **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

20   BY MR. HANNON:

21   **Q.**  Dr. Summergrad, you were asked a number of questions on

22   cross-examination about possible causes of Dr. Menninger's

23   deteriorating health.  Do you recall those questions?

24   **A.**  Yes, I do.

25   **Q.**  What if any significance does the content of

1   Dr. Menninger's dreams have in trying to pinpoint what it is

2   that has caused her to be in the state that she is in?

3   **A.** Well, again, it's -- they're very transparent. They're

4   not terribly disguised. She's at work. She's in a work

5   situation. She's interacting with leadership from her work.

6   She feels that she has to hide, that she feels she's under

7   physical and other threat and that she's going to be reported

8   to, among other people, Vladimir Putin, which doesn't exactly

9   sound encouraging.

10  **Q.** Fair to say that President Putin did not charge her --

11  cause her decreased health?

12  **A.** Not -- I doubt it.

13  **Q.** You were also asked about your diagnosis of major

14  depressive disorder.

15  **A.** Yeah.

16  **Q.** And in connection with that, I'd like to draw your

17  attention to Joint Exhibit 25. So I'm showing you here the

18  fourth page of Joint Exhibit 25, and -- I'm not showing you

19  anything because I haven't pressed the button.

20          I'm now showing you the first -- the fourth page of

21  Joint Exhibit 25. And if you look here at the top, these

22  appear to be records from Butler Hospital?

23  **A.** Yep.

24  **Q.** And you see it reflects the treatment that she received

25  there in early July of 2018?

```
 1    A.   Correct.
 2    Q.   All right.  And if we look down here at the bottom, you
 3    see here now she now has a diagnosis of major depressive
 4    disorder.  Do you see that?
 5    A.   Yeah.
 6    Q.   Okay.
 7    A.   I agree with that.
 8    Q.   You were asked some questions on cross-examination about
 9    Dr. Menninger's suicidal ideation.  Does a person with major
10    depressive disorder have to think about killing themselves
11    every single day?
12    A.   No.
13    Q.   Is it common for a person suffering from major depressive
14    disorder with suicidal ideation for those -- for those
15    thoughts to come and go over time?
16    A.   Yes.
17    Q.   Does -- does a person with major depressive disorder, do
18    they occasionally have okay days?
19    A.   Yes.
20    Q.   The various notes that you looked at reflecting
21    occasionally upticks in Dr. Menninger's mental health, is
22    that reflective to you that she wasn't developing major
23    depressive disorder?
24    A.   No.
25    Q.   Is that reflective to you that she was obtaining proper
```

```
 1    medical care?
 2    A.  Yes.
 3    Q.  Is that reflective to you she was doing everything she
 4    could to try to get better?
 5    A.  Yes.
 6    Q.  And, in fact, Doctor, prior to PPD denying
 7    Dr. Menninger's requests for accommodations, she was showing
 8    some improvement; is that right?
 9    A.  Yes.
10    Q.  And let's take a look at that document that
11    Attorney Curran noted I could talk to you about on my
12    examination.  So I'm going to show you here Joint Exhibit
13    Number 18, and I'm going to show you the page that has 671 in
14    the bottom right-hand corner.
15    A.  Yep.
16    Q.  Okay.  And you see here that on February 16, 2018,
17    Dr. Menninger was reflecting some improvement; is that right?
18    A.  Yes.
19    Q.  Okay.  And is that -- is that consistent with your
20    overall opinion in this case?
21    A.  Yes, and the note where it says, in the history of the
22    present illness, she was able to speak to both HR and her
23    boss regarding the document for accommodations; their
24    response was promising.
25    Q.  And if we flip ahead here to the -- to the next entry, so
```

1    March 9, 2018 --

2    **A.**  Yeah.

3    **Q.**  -- so this would be after Dr. Menninger's meeting with HR

4    and her boss, right?

5    **A.**  Yes, on 2/28.

6    **Q.**  Okay.  And she notes that the -- the panic symptoms are

7    continuing?

8    **A.**  Yeah.

9    **Q.**  Okay.  And if you look at the plan from that treatment,

10   you'll see here that Dr. Kessimian made the decision to put

11   her homework on pause.

12   **A.**  Yep.

13   **Q.**  Do you see that?

14   **A.**  Yep.

15   **Q.**  And she notes that she's putting it on pause because of

16   the level of stress over the past week; is that right?

17   **A.**  Yep.

18   **Q.**  Now, if we look at the next entry here, Dr. Menninger is

19   showing that this week has been hard, especially after the

20   email from Chad.  Do you see that?

21   **A.**  Yes, I do.

22   **Q.**  Okay.  When a person like Dr. Menninger, with her mental

23   impairment, when they encounter some kind of event or

24   trigger, so to speak, does that necessarily impact them right

25   away, or might that kick in upon further reflection?

1    **A.**   It could be -- it could impact them right away.  It could

2    take some time to metabolize or even, you know, get

3    perspective on what's going on for them.

4    **Q.**   And --

5    **A.**   Not all of us figure out every stressor instantaneously

6    when it happens.

7    **Q.**   And if I could direct your attention here to the page on

8    the exhibit that ends 683, so this was the note from

9    March 30, 2018.  Do you see that?

10   **A.**   Uh-huh.

11   **Q.**   And so this is the note --

12   **A.**   Yep.

13   **Q.**   -- where she notes that it's -- that she's felt worse

14   than she has ever -- has before, and now has doubts about her

15   decision.

16   **A.**   Yep.

17   **Q.**   Do you see that?

18   **A.**   Yes, I do.

19   **Q.**   Is -- is that consistent with the opinions that you've

20   given the jury today concerning the --

21   **A.**   Yes.

22   **Q.**   -- causation?

23   **A.**   Yes.

24   **Q.**   And can you -- can you explain why this -- this

25   self-doubt --

1    **A.**   So, again, to go back to, you know, the core concern,

2    which is being seen, exposed, humiliated as a core worry

3    within -- within social anxiety, she exposed herself and then

4    felt like she was basically getting a message about exit,

5    consultation, et cetera.

6              So she's having -- she's having doubts about

7    whether she did the right thing and feels -- feels

8    vulnerable, feels things have changed and feels that -- and

9    she doubts that maybe she shouldn't have exposed herself in

10   this way.

11   **Q.**   Do those -- do those expressions of self-doubt, does that

12   reflect to you that it actually was Dr. Menninger's fault?

13   **A.**   No.   It reflects the kind of self-doubt, the negative

14   kind of ideation and thoughts that occur both in the setting

15   of social anxiety or the development of an incipient major

16   depressive disorder, which is, again, I think part of what

17   was developing over the later spring.

18   **Q.**   I'm now going to direct you to the treating note that

19   ends in 695.   So you -- here, this is from 4/27/18.

20   **A.**   Yeah.

21   **Q.**   Do you see that?

22   **A.**   Yeah.

23   **Q.**   And would this be one of the lower low points that

24   Dr. Menninger encountered up to this point?

25   **A.**   Yes.

1  **Q.** Okay. And if you look at the bottom, when she talks

2  about -- Dr. Kessimian's note at the end, it includes that

3  Dr. Menninger had a sense that she "cannot trust anyone, and

4  they are scanning her for fault at all times."

5  Do you see that?

6  **A.** Yes.

7  **Q.** Okay. And you see that was -- that was a reference to

8  her work life?

9  **A.** Yes.

10 **Q.** And is that consistent with the information that you

11 learned in your examination of Dr. Menninger that she was

12 feeling as though she was being targeted and rejected by her

13 employer?

14 **A.** Yes.

15 MR. HANNON: That's all I have, Your Honor.

16 THE COURT: All right. Any redirect -- recross?

17 MR. CURRAN: Just a little bit, Your Honor.

18 **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

19 BY MR. CURRAN:

20 **Q.** All right. Hello again, Dr. Summergrad.

21 **A.** Hi. How are you, sir?

22 **Q.** Better.

23 **A.** Good.

24 **Q.** So Attorney Hannon had asked you some questions about the

25 dreams that Dr. Menninger's had?

1    **A.**   Mmm.

2    **Q.**   And you mentioned that one of them features

3    President Putin?

4    **A.**   Mmm.

5    **Q.**   That, obviously, has nothing to do with PPD, I assume,

6    correct?

7    **A.**   Not that I'm aware of.

8    **Q.**   Okay.  And --

9    **A.**   But it does -- it does show her level of fear and threat.

10   **Q.**   Right.  What does it suggest about what she's fearing?

11   **A.**   She's fearing danger.  I mean, she's worried that

12   she's -- you know, the dreams are she's at work.  She

13   mentions the director.  She fears that she feels she has to

14   run and hide because she's afraid she's going to be hurt in

15   some way.

16   **Q.**   Okay.  Now, you're aware, obviously, that about a year

17   ago, Russia invaded Ukraine, correct?

18   **A.**   Yes.

19   **Q.**   So there's been a lot of talk in the news about Putin and

20   the state of the world and how it's causing danger in the

21   world?

22   **A.**   Right.  I believe these predate that discussion -- that

23   invasion.

24   **Q.**   When did these dreams occur?

25   **A.**   Well, I think she -- as I recall, she reported them to me

| | |
|---|---|
| 1 | in my first interview with her. |
| 2 | **Q.**  Did you note them in your first interview with -- |
| 3 | **A.**  Mmm. |
| 4 | **Q.**  You noted that she had dreams about Vladimir Putin? |
| 5 | **A.**  Mmm. |
| 6 | **Q.**  Could you take a look at your book, the first tab there? |
| 7 | THE COURT:  Which page? |
| 8 | BY MR. CURRAN: |
| 9 | **Q.**  Can you show me where in the report you talk about her |
| 10 | having dreams about Vladimir Putin? |
| 11 | **A.**  I don't think I mentioned it in the report. |
| 12 | **Q.**  You didn't mention it in the report? |
| 13 | **A.**  No, I don't believe so. |
| 14 | **Q.**  Maybe I heard you wrong, but I thought you just testified |
| 15 | that you did put it in your report? |
| 16 | **A.**  I'm sorry? |
| 17 | **Q.**  I may have heard you wrong, but I thought you testified |
| 18 | that you did put it in your report? |
| 19 | **A.**  No, I didn't say I put it in my report. |
| 20 | **Q.**  What did you say? |
| 21 | **A.**  I said that she reported the dreams to me in my interview |
| 22 | with her. |
| 23 | **Q.**  But you didn't put that in your report? |
| 24 | **A.**  No, I did not. |
| 25 | **Q.**  All right.  So Mr. Hannon was asking you about some |

1    questions about this treatment note from March 30, 2018?

2    **A.**    Mmm.

3    **Q.**    Do you recall that?  And he was pointing you to the part

4    right after the blocked out -- blacked out portion there

5    where it says "though is sad/frustrated that since 'coming

6    out' with her social anxiety disorder, she has felt worse

7    than she has ever have before and now has doubts about her

8    decision."

9             Do you see that?

10   **A.**   Yes, I do.

11   **Q.**   And I think you testified in response to Mr. Hannon's

12   questions that this has something to do with the way that she

13   was -- the way that PPD reacted to her disclosing her

14   disability?  Did you say that?

15   **A.**   Yes.

16   **Q.**   And what's the basis for that?

17   **A.**   That she felt that people around her had changed in their

18   behavior, that she felt that she wasn't -- she felt that she

19   was being distanced and not --

20   **Q.**   Nothing about that in this note, correct?

21   **A.**   No, there's nothing about that in this note.

22   **Q.**   And the note just talks about her feeling this way

23   because she had come out with her disability, correct?

24   **A.**   Correct.

25   **Q.**   Was it possible that she felt this way just because she

1   came out with disability and exposed herself?

2   **A.**   It's certainly -- it's certainly likely that that's a

3   part of what she -- again, social anxiety is associated with

4   fear of exposure, fear of being seen.

5   **Q.**   And so to say that it's based on the way people reacted

6   to it would be speculating based on this note, correct?

7   **A.**   Based on this note, it would be but there is other data.

8   **Q.**   Mr. Hannon was asking you some questions about -- or he

9   pointed you to some notes in February and early March where

10  someone -- early February, the notes suggested she was doing

11  better; and then in early March and later in March, there

12  were notes suggesting that she was doing worse.  Do you

13  recall that?

14  **A.**   Mmm.

15          THE COURT:  You have to say yes or no.

16          THE WITNESS:  Yes.  I'm sorry.  Yes.  Sorry.

17  BY MR. CURRAN:

18  **Q.**   So when you and I were talking, we took a look at this

19  note, which is the second April 13th note.

20  **A.**   Yes.

21  **Q.**   And so it appears like this is when she's doing better,

22  correct?

23  **A.**   Correct.

24  **Q.**   She's feeling a sense of empowerment?

25  **A.**   Yeah.

```
 1   Q.  So fair to say she's improved since the March notes that
 2   you were looking at?
 3   A.  Yeah, this fluctuates.
 4   Q.  Okay.  Now, I think you mentioned on direct that -- well,
 5   that you were leaving Tufts's chairmanship in June?
 6   A.  That's correct.
 7   Q.  Do you know why that is?
 8   A.  Yes.
 9           MR. HANNON:  Objection.  Beyond the scope.
10           THE COURT:  Sustained.
11           MR. CURRAN:  That's all the questions I have,
12   Your Honor.
13           THE COURT:  All right.  Thank you very much.
14   You're excused.
15           THE WITNESS:  Thank you.
16           THE COURT:  Do you have another witness?
17           MR. HANNON:  The next would be a read-on, which
18   would take probably a couple minutes to set up.
19           THE COURT:  All right.  I'll let him off the hook,
20   and we'll leave a minute early.
21           So don't discuss the case among yourselves.  Don't
22   discuss it with anyone else.  Don't do any independent
23   research.  A reminder -- tomorrow, 9:00 to 10:00 and again
24   2:00 to 4:00.
25           Thank you very much for your attention.  Have a
```

```
 1   nice day.

 2              All rise for the jury.

 3              (Jury not present.)

 4        THE COURT:  What's next?

 5        MR. HANNON:  We have to do the read-on.  We're

 6   probably going to save that for later, but we'll jump into

 7   the PPD folks that are here tomorrow.  We'll knock them out.

 8   If we have any extra time, we'll move on to the read on.

 9        THE COURT:  All right.  Anything else?

10        MS. MANDEL:  Not from our end.

11        THE COURT:  Okay.  See you tomorrow morning at 8:45

12   unless you send me things to review tonight.

13        Sounds good.

14        MR. HANNON:  Thank you.

15        THE COURT:  Thank you.

16              (Court in recess at 4:00 p.m.)

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T I O N

 2

 3            I certify that the foregoing is a correct

 4     transcript of the record of proceedings in the above-entitled

 5     matter to the best of my skill and ability.

 6

 7

 8

 9     /s/ Rachel M. Lopez                 March 27, 2023

10     /s/ Robert W. Paschal

11

12

13     _____          _____

14     Rachel M. Lopez, CRR              Date

15     Robert W. Paschal, CRR, RMR

16     Official Court Reporters

17

18

19

20

21

22

23

24

25
```



```
 1                        A P P E A R A N C E S

 2

 3     On behalf of the Plaintiff:

 4         HARTLEY MICHON ROBB HANNON, LLP
           BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
 5         155 Seaport Boulevard
           2nd Floor
 6         Boston, Massachusetts  02210
           (617) 723-8000
 7         phannon@hmrhlaw.com
           hwatson@hmrhlaw.com

 8

 9     On behalf of the Defendant:

10         OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
           BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11         One Boston Place
           Suite 3500
12         Boston, Massachusetts  02108
           (617) 994-5700
13         rachel.mandel@ogletreedeakins.com
           patrick.curran@ogletreedeakins.com
14

15

16

17

18

19

20

21

22

23

24

25
```

1                        **TABLE OF CONTENTS**

2

3                        **TRIAL WITNESSES**

4

5    On behalf of the Plaintiff:                                    Page

6    CHAD ST. JOHN

7            By Mr. Hannon                                            5

8            By Ms. Mandel                                           96

9    HACENE MEKERRI                                                 100

10   CHRISTOPHER FIKRY

11           By Mr. Hannon                                          197

12           By Mr. Curran                                          218

13           By Mr. Hannon                                          226

14   MASON MENNINGER                                                229

15

16

17                         **EXHIBIT**

18

19                          None

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (In open court at 9:03 a.m.)
 3              THE COURT:  You can go get the jury.
 4              And who is the next -- oh, you're going to call the
 5    next witness, right?
 6              MR. HANNON:  Yes, Judge.
 7              THE COURT:  Okay.
 8              MR. HANNON:  And, Judge, we've provided you a
 9    binder with respect to this next witness.  It should be up on
10    the bench there.
11              THE COURT:  Kellyann has it.  I'll get it from her
12    when she gets back.
13              (Jury present.)
14              THE COURT:  Please be seated.  Everybody follow my
15    instructions, no, discussion, no independent research?  Good.
16              All right.  Next witness, Mr. Hannon?
17              MR. HANNON:  Plaintiff calls Chad St. John.
18              THE COURT:  Mr. St. John, if you would take the
19    witness stand.
20              THE DEPUTY CLERK:  Sir, if you could raise your
21    right hand.
22              (Witness duly sworn.)
23              THE DEPUTY CLERK:  And can you please state your
24    full name and spell your last name for the record.
25              THE WITNESS:  Sure.  Chad Douglas St. John, S-t,
```

```
 1   period, J-o-h-n.
 2               THE DEPUTY CLERK:  Thank you.
 3               THE COURT:  Go ahead.
 4                        CHAD ST. JOHN
 5           having been duly sworn, testified as follows:
 6           DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
 7   BY MR. HANNON:
 8   Q.  Good morning, Mr. St. John.  Where do you currently
 9   reside?
10   A.  I reside in Liberty Township, Ohio.
11   Q.  Okay.  And what do you do for work?
12   A.  I'm an HR director currently.
13   Q.  Where do you work?
14   A.  At JBT, John Bean Technology.
15   Q.  Okay.  And you were formerly employed by PPD; is that
16   correct?
17   A.  That's correct.
18   Q.  And during what time period were you employed at PPD?
19   A.  2013 to 2019.
20   Q.  And did you have the same role throughout that period?
21   A.  No.  Actually, I joined there as a senior manager, and I
22   was promoted to associate director of human resources.
23   Q.  When were you promoted to associate director of human
24   resources?
25   A.  I think within the last two years approximately.
```

```
 1    Q.   The last two years of your employment at PPD?

 2    A.   Correct.

 3    Q.   So that would be sometime around 2016, 2017?

 4    A.   Yes.  I don't recall exactly, but that sounds right.

 5    Q.   Okay.  And when you were promoted, did you have

 6    responsibility for the HR function for the Global Central

 7    Labs?

 8    A.   Yes, sir, I did.

 9    Q.   Okay.  And you were -- you personally sat in

10    Highland Heights; is that right?

11    A.   Correct.

12    Q.   But your HR responsibility covered all of the labs, the

13    Global Central Labs across the world?

14    A.   Yes.

15    Q.   Okay.  And your employment with PPD ended in 2019, yes?

16    A.   Correct.

17    Q.   And that was because of a restructuring of the HR

18    function; is that right?

19    A.   Yes.  My role was eliminated.

20    Q.   Okay.  Did you do anything to prepare for your testimony

21    today?

22    A.   Not really.

23    Q.   Okay.  Did you meet with counsel for PPD?

24    A.   I did.

25    Q.   Okay.  How many times?
```

1    **A.**   Approximately three --

2    **Q.**   Okay.

3    **A.**   -- briefly.

4    **Q.**   When was the first time?

5    **A.**   A few weeks ago.

6    **Q.**   I'm sorry?

7    **A.**   Just a few weeks ago.

8    **Q.**   And who did you meet with?

9    **A.**   Rachel, sitting at the table here.

10   **Q.**   Anyone else?

11   **A.**   No, sir.

12   **Q.**   Okay.  And was that in person or was that remote?

13   **A.**   Remote.

14   **Q.**   Via Zoom?

15   **A.**   Yes.

16   **Q.**   And how long did that meeting last?

17   **A.**   I think it was maybe a couple hours.

18   **Q.**   And besides yourself and Ms. Mandel, was anyone else

19   present for that?

20   **A.**   No, sir.

21   **Q.**   When was the next time that you conferred with counsel

22   for PPD?

23   **A.**   It was all within the last couple of weeks, a few times.

24   **Q.**   Sure.  So we talked about the first time a few weeks ago.

25   When was the next time after that?

```
 1   A.   I think it was within the last week, uh-huh.

 2   Q.   And was that remote or in person?

 3   A.   Remote, Zoom also.

 4   Q.   Okay.  And who was there on behalf of PPD?

 5   A.   Just Rachel and I.

 6   Q.   And how long was that session?

 7   A.   Approximately two hours.

 8   Q.   And what was the next time that you met with someone from

 9   PPD?

10   A.   I think later on in the week, I think it was Friday.

11   Zoom, two hours.

12   Q.   And who was that with?

13   A.   Also with Rachel.

14   Q.   Anyone else?

15   A.   No.

16   Q.   Do you know Attorney Wexelblatt?

17   A.   I do not.

18   Q.   Okay.  Were you chatting with him earlier this morning?

19   A.   First time I've talked with him, yes, just this morning.

20   Q.   Okay.  Do you know what he does for work?

21   A.   I think he's linked with maybe the new company.

22   Q.   Thermo Fisher?

23   A.   Correct.

24   Q.   Okay.  I want to talk to you about Dr. Menninger now.

25   And we're going to start with a document here.  So I'm
```

1    showing you now Joint Exhibit -- about to show you Joint

2    Exhibit -- I'm now showing you Joint Exhibit 47.  And this is

3    an email from Marianna Kessimian to you on January 31, 2018.

4    Do you see that?

5    **A.**   Yes, I do.

6    **Q.**   Okay.  Do you -- do you recall this email?

7    **A.**   Yes.

8    **Q.**   Okay.  Is this something that PPD's lawyers showed you in

9    preparation for today's testimony?

10   **A.**   No, but I think I recall it.

11   **Q.**   Okay.  And do you recall this was an email in which

12   Dr. Menninger's doctor provided you some information

13   concerning her -- her mental health issues?

14   **A.**   Yes.

15   **Q.**   Okay.  You'll see here on the document there's a

16   reference to "per our conversation."  Do you see that?

17   **A.**   Yes, I do.

18   **Q.**   Does that recall to a conversation you had had with

19   Dr. Kessimian?

20   **A.**   Yes.

21   **Q.**   Do you recall anything about that conversation?

22   **A.**   I do.  What was interesting is this was a call prior to

23   the forms being completed, which was a bit unique; but I

24   asked for her to follow up with the completed forms in an

25   email, which she clearly did.

1    **Q.**  Who called who?

2    **A.**  Dr. Kessimian called me.

3    **Q.**  Okay.  And did she indicate that if you wanted to speak

4    further, she was available to do so?

5    **A.**  Yes.

6    **Q.**  Did you have her phone number?

7    **A.**  She may have provided it.  I can't recall.

8    **Q.**  Okay.  But you had her email address, right?

9    **A.**  Indeed.  It's right here.

10    **Q.**  Okay.  I'm now going to show you Joint Exhibit 200.  So

11    this is an email exchange between you and Dr. Menninger on

12    January 31, 2018; is that right?

13    **A.**  Correct.

14    **Q.**  Okay.  And just to scroll to the middle of the page here,

15    we see that Dr. Menninger is providing you a form regarding

16    her medical condition.  Do you see that?

17    **A.**  Yes.

18    **Q.**  And she made reference to the fact that her doctor will

19    be sending you something that day, as well?

20    **A.**  That's correct, yes.

21    **Q.**  And in response to Dr. Menninger's email, you tell her

22    that you will move it forward while keeping all information

23    confidential.  Do you see that?

24    **A.**  I do, yes.

25    **Q.**  And you understood it was important to Dr. Menninger to

1   keep the information confidential?

2   **A.**  Yes.

3   **Q.**  Okay.  You didn't do so, did you?

4   **A.**  I -- I did.  I did.

5   **Q.**  Let's look at Joint Exhibit 174.

6         Excuse me.  That's the wrong document.

7         Joint Exhibit 174, so this is an email from you on

8   February 14, 2018.  Do you see that?

9   **A.**  I do, yes.

10   **Q.**  And it looks like you're forwarding some information to

11   Chris Clendening?

12   **A.**  You know, I don't recall, but it looks like I did.

13   There's no comment attached.

14   **Q.**  That's fine.  We'll take it step by step.  The person in

15   the "to" line is Chris Clendening?

16   **A.**  Correct.

17   **Q.**  That was Dr. Menninger's peer, right?

18   **A.**  Actually, they were named interim site head at the time.

19   **Q.**  Excuse me?

20   **A.**  They were named interim site head and they were involved

21   in that operations' leadership over the site at that

22   particular moment in time.  That's context.  I don't recall

23   this specific email, but I think that context is important.

24   **Q.**  Okay.  Well, let's -- let's close the loop on that.  Your

25   testimony is that, as of February 14, 2018, Mr. Clendening

1    was site head?

2    **A.**   Yeah.

3    **Q.**   Did I hear that right?

4    **A.**   Interim is what --

5    **Q.**   Okay.   Interim site head.

6    **A.**   Uh-huh.

7    **Q.**   Interim head of what site?

8    **A.**   The central lab, Global Central lab, uh-huh.

9    **Q.**   What did that mean, being interim site head?

10   **A.**   Well, he had been named to be the leader of that site.

11   That's all I can recall.  I don't have any additional detail.

12   **Q.**   What does that mean to be leader of the site, though?

13   **A.**   That means operational and functional responsibility of

14   the entire central laboratory.

15   **Q.**   Wasn't that --

16   **A.**   Global --

17   **Q.**   -- Mr. Mekerri's job?

18   **A.**   It was.

19   **Q.**   So it's your testimony that, as of this date,

20   Mr. Clendening was taking over for Mr. Mekerri?

21   **A.**   She was -- as we were building the bench, my

22   understanding is they were ramping up his responsibilities,

23   and so he was part of that chain of command at that point in

24   time.  I don't recall additional detail.

25   **Q.**   What chain of command?

1 **A.** The interim site head for the Global Central Laboratory.

2 **Q.** Who had he taken on that responsibility from?

3 **A.** He was named at that point in time.  You'll have to ask

4 him about that.

5 **Q.** Do you not know?

6 **A.** I don't recall.

7 **Q.** The information that you're providing to Mr. Clendening

8 here, this is -- we'll scroll the next page -- the -- two

9 pages ahead.  This is information that you'd received from

10 Dr. Menninger's doctor, correct?

11 **A.** Correct.

12 **Q.** Okay.

13 **A.** Yes.

14 **Q.** Did you think it was appropriate to share this

15 information with Mr. Clendening?

16 **A.** You know, I can't recall this email.  But I must say

17 that, looking at it now, I probably wouldn't have forwarded

18 that.

19 **Q.** Okay.  In terms of the documents you've been looking at,

20 these all pertain to Dr. Menninger disclosing her disability

21 and requesting accommodation, correct?

22 **A.** Correct.

23 **Q.** And that discussion, that had been prompted by a

24 conversation between Dr. Menninger and her then supervisor

25 Mr. Mekerri, correct?

1    **A.**  Correct.

2    **Q.**  And that conversation had surrounded areas in which

3    Dr. Menninger's role had been suggested that it may be

4    changing or expanding; is that right?

5    **A.**  Yes.

6    **Q.**  And in the course of this -- strike that.  Let me show

7    you another document here.

8           So we're now looking at Joint Exhibit 62.  And we

9    see here this is an email from Dr. Menninger to you on

10   February 4, 2018.  Do you see that?

11   **A.**  I do, yes.

12   **Q.**  Okay.  And Dr. Menninger, in this note to you, she

13   provides some detail in terms of what prompted her to

14   disclose her disability and request accommodation, correct?

15   **A.**  Yes, correct.

16   **Q.**  Okay.  Fair to say you have no reason to believe that

17   what she wrote here is inaccurate?

18   **A.**  That's correct.

19   **Q.**  And in response to this note from Dr. Menninger, you

20   asked Mr. Mekerri to provide some additional detail; is that

21   right?

22   **A.**  I did, yes.

23   **Q.**  I show you Joint Exhibit 194.  So if we look here in the

24   middle of the page -- I'm sorry -- look at the bottom of the

25   page, we have here the email we had just looked at from

1   Dr. Menninger, right?

2   **A.**   Yes.

3   **Q.**   Okay.  And then on the top here, we have your reaching

4   out to Mr. Mekerri, right?

5   **A.**   Correct.

6   **Q.**   Okay.  And you're asking here, in the second line,

7   "Please be specific bucketing any new duties and existing

8   duties that may have an increase beyond previous levels

9   expected in the role as the CL business continues to grow."

10          Do you see that?

11  **A.**   I do.

12  **Q.**   Okay.  And thereafter, Mr. Mekerri, he put together a

13  list of buckets, right?

14  **A.**   Yes.

15  **Q.**   I'll show you Joint Exhibit 350.  These are the buckets

16  that Mr. Mekerri put together in response to your request; is

17  that right?

18  **A.**   That is correct.

19  **Q.**   Okay.  And these were provided to Dr. Menninger; is that

20  right?

21  **A.**   Yes.

22  **Q.**   Okay.  And in response to these buckets, Dr. Menninger's

23  doctor proposed some accommodations; is that right?

24  **A.**   Correct.

25          Thanks for expanding the font, by the way.

```
 1   Q.   Excuse me?

 2   A.   Thank you for expanding the font.  I appreciate that.

 3   Q.   No worries.  Yeah, if at any time you can't see anything

 4   or want to look at more of a document, please just let me

 5   know.  I'm happy to help.

 6            And after receiving the proposed accommodations

 7   from Dr. Menninger's doctor, you worked with Mr. Mekerri on

 8   drafting a response; is that right?

 9   A.   That's correct, yes.

10   Q.   And I'll show you Joint Exhibit 202.  So what we have

11   here is an email from you to Mr. Mekerri on February 23,

12   2018, correct?

13   A.   That's correct.

14   Q.   And this was the sort of first draft, so to speak, of the

15   response to the proposed accommodations?

16   A.   Yes.

17   Q.   And it looks like -- if I can highlight this sentence

18   here -- you note, "I would need to further understand you

19   [sic] wishes since I am interpreting some our previous

20   conversations on the topic."

21            Do you see that?

22   A.   I do.

23   Q.   Okay.  So would that be right that this is -- this is

24   your effort to sort of put into words what you had gathered

25   from Mr. Mekerri concerning his views?
```

1   **A.**   Yes.  And I wanted them to be very specific with his

2   refined wishes, yes.

3   **Q.**   Okay.  Your initial draft here provided no accomodation

4   with respect to bucket 1; is that right?

5   **A.**   That's correct.

6   **Q.**   Did provide an accommodation with respect to bucket 2?

7   **A.**   Yes.

8   **Q.**   No accommodation with respect to bucket 3?

9   **A.**   Correct.

10   **Q.**   Some accommodation with respect to bucket 4?

11   **A.**   Yes, in this draft.

12   **Q.**   And then some accommodation with respect to bucket 5,

13   yes?

14   **A.**   Correct.

15   **Q.**   And you -- you and Mr. Mekerri subsequently had some --

16   well, strike that.

17        Mr. Mekerri, he -- he subsequently edited this

18   email, right?

19   **A.**   I don't recall.

20   **Q.**   Okay.

21   **A.**   If you have a final draft, I'm happy to review that.

22   **Q.**   Sure.  I'm happy to show you.  I'm going to show you

23   Joint Exhibit 338.

24        Can you see here, this is later that same day,

25   right, February 23, 2018?

1    **A.**  Yes, I see that.

2    **Q.**  And you see there he provides a revised version of your

3    email, right?

4    **A.**  Yes.

5    **Q.**  Okay.  And in the revised version, now there is an

6    accommodation for bucket 1, right?

7    **A.**  Yes.  That changed from the original draft.

8    **Q.**  Okay.

9    **A.**  Yes.

10   **Q.**  There's now no accommodation for bucket 2, correct?

11   **A.**  That's correct, uh-huh.

12   **Q.**  No accommodation for bucket 3?

13   **A.**  Correct.

14   **Q.**  No accommodation for bucket 4?

15   **A.**  Correct.

16   **Q.**  And there's actually a different accommodation for bucket

17   5, right?

18   **A.**  Yes, to 15 percent.

19   **Q.**  Okay.  So he actually lowered the amount of travel; is

20   that right?

21   **A.**  Correct.

22   **Q.**  Did he indicate to you why he did that?

23   **A.**  He did not, that I can recall.

24   **Q.**  Okay.  And subsequent to receiving this draft from

25   Mr. Mekerri, you sought the approval of your boss; is that

```
 1   right?

 2   A.  Yes.

 3   Q.  And your boss at the time, that was Deborah Ballweg,

 4   correct?

 5   A.  Yes, Deb.

 6   Q.  And you subsequently -- strike that.

 7           Ms. Ballweg, she approved of the draft; is that

 8   right?

 9   A.  I don't recall.

10   Q.  Let me show you a document.  I'm going to show you Joint

11   Exhibit 192.  Do you see this is an email exchange between

12   yourself and Ms. Ballweg on February 26, 2018?  Yes?

13   A.  Yes.  Thanks for showing that.  It confirms it.

14   Q.  Sure.  And just for the record here, I'll just scroll

15   down a little bit.  You see that you had forwarded

16   Mr. Mekerri's email to Ms. Ballweg, yes?

17   A.  Correct, yes.

18   Q.  You had asked her for her thoughts, yes?

19   A.  Yes.

20   Q.  And she told you she was good with the draft, yes?

21   A.  Yes.

22   Q.  Okay.  And you thereafter provided it to Dr. Menninger;

23   is that right?

24   A.  Yes.

25   Q.  The date here --
```

```
 1                THE COURT:  Bless you.
 2                THE WITNESS:  Bless you.
 3    BY MR. HANNON:
 4    Q.   The date here is February 26, 2018; is that right?
 5    A.   Correct.
 6    Q.   Okay.  And you had a meeting with Dr. Menninger two days
 7    later on February 28, 2018; is that right?
 8    A.   That's what this indicates, yes.
 9    Q.   Okay.  And in advance of that meeting, you had -- you had
10    met with Ms. Ballweg, correct?
11    A.   I -- I can't recall if I met with her there.
12    Q.   Okay.
13    A.   Whether it was Team, Zoom, phone, I don't recall.
14    Q.   I'm now showing you Joint Exhibit 186.  You see here this
15    was an email from you to Ms. Ballweg on February 28, 2018,
16    yes?
17    A.   Yes.
18    Q.   And in the first sentence, you reference a license
19    coverage grid that "I mentioned to you yesterday."  Do you
20    see that?
21    A.   I do, yes.
22    Q.   So would I be right that you at least had a conversation
23    with Ms. Ballweg on February 27, 2018?
24    A.   Yeah, this email is a communication, but I don't know
25    when the prior communication to this -- but this is certainly
```

```
 1    an email to Deb talking about the license coverage and how
 2    critical it is.
 3    Q.  My question is a bit different, though.  I'm focusing on
 4    that first sentence, where it uses the phrase, "I mentioned
 5    to you yesterday."  Would I be right to read that to suggest
 6    that you had spoken to Ms. Ballweg on February 27th?
 7    A.  Yeah, I just don't know the method --
 8    Q.  That's fine.
 9    A.  -- phone, Zoom.
10    Q.  I want to scroll down here to the second-to-last
11    paragraph of your note, and you write to Ms. Ballweg, "All of
12    this is good contextual information as" -- I think you're
13    missing the word "we" -- "work with delicately working Lisa
14    out since we need to have her for coverage until someone else
15    is in the seat and ready and eligible for taking on the
16    various licensures."
17              Do you see that?
18    A.  I do see that.
19    Q.  Okay.  Now, this was something that you and Ms. Ballweg
20    had discussed in your conversation the day before?
21    A.  I don't know that we discussed that.  I don't recall the
22    specifics of the conversation.
23    Q.  Okay.
24    A.  I can say that what's very important is the coverage for
25    the business.  And, you know, to me, when her physician said
```

1    that she could not do the core elements of the job, that was

2    concerning and we had to protect the business.

3              So the question is:  Did she even want to continue?

4    And I think that that context is also very important to

5    state.

6    **Q.**  So you have a question in your mind:  Did Dr. Menninger

7    want to continue in her role?

8    **A.**  I think she probably wanted to.  I don't think her -- she

9    was aligned with her physician.  Her physician said all of

10    these elements of the job that were the main portion of the

11    job were not going to work for her.

12    **Q.**  So with that view in mind, your reference to "delicately

13    working Lisa out," that's a reference to her leaving her role

14    as medical director, correct?

15    **A.**  It could be her working herself out.  To me, I don't

16    recall -- I'm just sharing the context.  I think it's just

17    important.

18    **Q.**  And I'm just asking about those four words, "delicately

19    working Lisa out."  Those --

20    **A.**  Those four --

21    **Q.**  Let me finish the question, if I may.

22    **A.**  Yeah.

23    **Q.**  Those four words refer to Lisa Menninger leaving her role

24    as medical director at PPD, yes?

25    **A.**  As you point out, we don't -- the "we" is not included in

| | |
|---|---|
| 1 | that email.  So I don't know that that sentence is complete. |
| 2 | I -- seems like there's some stuff missing there and I think |
| 3 | that's an important point. |
| 4 | **Q.**  What's missing? |
| 5 | **A.**  Well, you pointed out a word "we" are working out.  It |
| 6 | doesn't say "we."  I don't think that that sentence was |
| 7 | complete. |
| 8 | **Q.**  Well, tell us.  As of February 28, 2018, who was working |
| 9 | on delicately working Lisa out of the organization? |
| 10 | **A.**  I think it could have been herself.  She was, you know -- |
| 11 | she said she could do the job.  The physician's saying she |
| 12 | can't do the job.  We just wanted to help.  I mean, we wanted |
| 13 | to help her. |
| 14 | I'm sure we'll go into a lot more on that, but I |
| 15 | look forward to sharing. |
| 16 | **Q.**  Sure.  Let's just stay with these four words before we |
| 17 | jump onto something else.  My question, which I'm not sure |
| 18 | I've gotten a clear answer to is -- |
| 19 | THE COURT:  Just the question. |
| 20 | BY MR. HANNON: |
| 21 | **Q.**  -- when you wrote those four words, were you referring to |
| 22 | Lisa Menninger leaving PPD? |
| 23 | **A.**  I don't know that I can accurately say that.  Elements of |
| 24 | that sentence are missing. |
| 25 | **Q.**  Later on that same day, you had a meeting with |

     1    Dr. Menninger and Mr. Mekerri, correct?

     2    **A.**  It does indicate that, yes.

     3    **Q.**  Okay.  Do you recall the meeting?

     4    **A.**  I do not.

     5    **Q.**  You have no recollection of that meeting?

     6    **A.**  Not every element of it.

     7    **Q.**  Any elements?

     8    **A.**  Just the high points of the accommodation.

     9    **Q.**  Okay.  So one of the things that happened at that meeting

    10    was you -- you presented Dr. Menninger with two options;

    11    isn't that right?

    12    **A.**  May I see that, if I could?

    13    **Q.**  See what?

    14    **A.**  Two options?

    15    **Q.**  It was a question.

    16    **A.**  I'm sorry?

    17    **Q.**  What transpired at the meeting on February 28, 2018?  You

    18    presented her two options, yes?

    19    **A.**  I think we talked about many things.  We talked about a

    20    couple of things in particular, to my recollection.

    21    **Q.**  Sir, did you present her two options?

    22    **A.**  I don't know that it was two.  We talked about many

    23    things.  I could tell you what I can recall.

    24    **Q.**  Did you provide her the option of taking an exit package?

    25    **A.**  I did.

1    **Q.**  Did you provide her the option of doing a short-term

2    consulting arrangement while somebody else was brought in to

3    fill her role?

4    **A.**  I did.

5    **Q.**  Okay.  And Dr. Menninger told you that she didn't want to

6    leave, right?

7    **A.**  Yeah.  She told us that she could do the job.

8    **Q.**  Right.  She told you that her -- her doctor was just

9    providing recommendations, right?

10    **A.**  I believe so.

11    **Q.**  Okay.  She told you that, of the buckets for which PPD

12    did not want to provide accommodations, there were actually

13    lots of things in those buckets she could do, right?

14    **A.**  She said that, but she didn't provide specificity.

15    **Q.**  Well, sir, she asked questions, right?

16    **A.**  She asked for additional accommodation, but with no

17    specificity.  It became a very circular conversation.  We

18    said, "Let us help you.  We want to help you."  And she says,

19    "I can do this," and I said, "But I've got a note here that

20    says your physician is saying this will harm you.  What do I

21    do?"

22           It was a horrible quandary.  I mean, she's saying,

23    "I believe I can do this job."

24           And I said, "Can you go back and talk to your

25    doctor and align on, you know, what you can do," right?

```
 1      "What are some ideas?  Give us something to look at," right?
 2      "The core elements of this job are what the physician is
 3      saying you can't do."
 4      Q.  Well, let's take a look at some correspondence from the
 5      day after that meeting.  I'm going to show you Joint
 6      Exhibit 167.
 7                  JUROR:  Can I ask a question?
 8                  THE COURT:  You have a question?
 9                  JUROR:  Yeah.
10                  THE COURT:  What you should -- can you -- what's
11      your question?
12                  JUROR:  I -- I think --
13                  Did you just mention you have no recollection about
14      the meeting with Lisa --
15                  THE COURT:  Hold on.
16                  JUROR:  -- just a moment ago?
17                  THE COURT:  So your question is did he just say
18      that he has no recollection of the meeting with Dr. Menninger
19      on --
20                  Was it February 28th -- on February 28th?  Is that
21      your question?
22                  JUROR:  Yeah.  Yeah.
23                  THE COURT:  Yeah, okay.  So you can -- that's
24      the -- so the way --
25                  So, ladies and gentlemen, just so -- we'll go over
```

 1    it again because this is the first time someone's had a

 2    question.  So you can always write your question down.  I'll

 3    take a look at it.  I'll pass it on to the lawyers, or I'll

 4    address it in some way.  Or you can raise your hand, as you

 5    did, and -- so that's a question that the juror would like

 6    answered.

 7         If either of you -- so the way -- because it's a

 8    question coming from one of you rather than from one of the

 9    lawyers, it's fair for them to have the chance to object to

10    the question, because the rules of evidence apply to your

11    questions.  This -- I'm not saying there's anything wrong

12    with your question, but the rules apply to your question just

13    the way they apply to questions from the lawyers, and they're

14    entitled to an opportunity --

15         So if either of you want to discuss it -- doesn't

16    mean you want to object -- but if you want to discuss it at

17    sidebar, I will; otherwise, you can just consider.

18         And what I do with questions is then just let the

19    lawyers ask the questions in -- as appropriate in the course

20    of their examination.

21         Do either of you wish to see me about that question

22    at sidebar?

23         MR. HANNON:  No, Your Honor.

24         MS. MANDEL:  No, Your Honor.

25         THE COURT:  All right.  So if you want to ask it,

1    you can.  You can fold it into your examination.

2              MR. HANNON:  Thank you, Your Honor.

3    BY MR. HANNON:

4    **Q.**  Mr. St. John, when I started to ask you about your

5    recollection of the February 28, 2018, meeting, didn't you --

6    didn't you indicate that you didn't recall the specifics?

7    **A.**  My apologies.  To clarify, I don't remember every element

8    of that meeting, but I do remember key elements, as I just

9    pointed out, the two elements that you stated that I do

10   recall, those two specific items, and shared that I did so.

11   So my apologies for the confusion.

12   **Q.**  Okay.  So let's -- let's get back to Joint Exhibit 167,

13   which I'm showing you here on the screen.  I actually want to

14   start here on the second page of the exhibit.  We have here

15   an email from Lisa Menninger to you on March 1, 2018, right?

16   **A.**  Correct.

17   **Q.**  Okay.  And she copies Mr. Mekerri?

18   **A.**  Yes.

19   **Q.**  Okay.  And in her March 1, 2018, email, she writes,

20   starting in the second sentence, "As I stated during our

21   conversation, while I greatly appreciate your agreement to

22   provide accommodations with respect to items 1 and 5 on

23   Hacene's list of duties/responsibilities, I need some

24   additional detail regarding items 2, 3, and 4.  As we

25   discussed, I think there are many tasks that could fall

1   within those items that would not implicate my disability.

2   If you can be more specific regarding the tasks that you

3   believe fall within these terms, I think we could have a more

4   productive dialogue regarding which specific tasks implicate

5   my disability and what reasonable accommodations may be

6   available with respect to those specific tasks."

7           Do you see that?

8   **A.**   I do.

9   **Q.**   Okay.  Now, that accurately reflects what Dr. Menninger

10   had said to you and Mr. Mekerri at that February 28, 2018

11   meeting, doesn't it?

12   **A.**   I believe so.

13   **Q.**   Okay.

14   **A.**   Yes.

15   **Q.**   And this was -- so with respect to the additional

16   information requested here, Dr. Menninger requested that

17   during your face-to-face meeting on 2/28, right?

18   **A.**   Yes.

19   **Q.**   Okay.  And you and Mr. Mekerri, you didn't provide the

20   information then, did you?

21   **A.**   We didn't.  You know, it's interesting to look at

22   items 2, 3, and 4.

23   **Q.**   You've answered my question, sir.  You didn't provide the

24   information, correct?

25   **A.**   Correct.

1    **Q.**  Okay.  And in response to this email from Dr. Menninger,

2    you didn't provide the information, right?

3    **A.**  Correct.

4    **Q.**  And Dr. Menninger, she made repeated subsequent requests

5    for that information, right?

6    **A.**  I believe so.

7    **Q.**  Okay.  And in all of those occasions, PPD did not provide

8    the information, right?

9    **A.**  I think we did provide information that we would not

10    provide accommodations for 2, 3, and 4.  There was no new

11    information to share.  I think that's a better way to put it.

12    **Q.**  Well, my question is more focused on answering this

13    specific inquiry, the additional detail regarding items 2, 3,

14    and 4.  That was never provided by PPD, correct?

15    **A.**  I wouldn't say never provided.  I just -- I think the

16    company had already shared the position.

17    **Q.**  Do you recall being deposed in this matter?

18    **A.**  I do.

19    **Q.**  Okay.  And if you look in front of you, there's a binder.

20    And if you open the binder to Tab Number 1, you'll find a

21    copy of your deposition.  And just for reference, if you look

22    at the first page of the deposition, would you agree with me

23    that this occurred back on July 28, 2020?

24    **A.**  Correct.  Yes.

25    **Q.**  Okay.  And it was -- it was via Zoom?

```
 1   A.  Yes.
 2   Q.  Back in the good old days of COVID?
 3   A.  Yeah.
 4   Q.  And after your deposition was done, you had an
 5   opportunity to review your transcript, correct?
 6   A.  I did.
 7   Q.  Okay.  And if you look at the second tab there in your
 8   binder --
 9          MR. HANNON:  And I'll just note, Your Honor, that
10   your versions have some extra pages here.  So does
11   Ms. Mandel's.  Mr. St. John's version just has his errata
12   sheet.  I took out the excess pages, just so we're on the
13   same page.
14   BY MR. HANNON:
15   Q.  You see there, Mr. Mekerri -- I'm sorry -- Mr. St. John,
16   this was a document where you acknowledge that you had
17   reviewed your transcript and noted any changes that you
18   thought were necessary?
19   A.  Yes.
20   Q.  Okay.  And you didn't make any changes, right?
21   A.  No, sir.
22   Q.  Okay.  Let's start with page --
23          THE COURT:  I'm not sure the changes make a
24   difference, but I'm not sure -- there are --
25          MR. HANNON:  You're looking at the wrong errata
```

```
 1    sheet.  So there was a --
 2            THE COURT:  Tab 2, the second page is an errata
 3    sheet.
 4            MR. HANNON:  Correct.  It's the wrong witness.  So
 5    there were -- there were multiple errata sheets provided to
 6    us at the same time, and my parallel --
 7            THE COURT:  So this errata sheet in the notebook
 8    you gave me as to Mr. St. John doesn't apply to his
 9    deposition?
10            MR. HANNON:  Just flip one more page, and you'll
11    get to his errata sheet.  Maybe two more pages.
12            THE COURT:  The next page is not --
13            MR. HANNON:  Maybe three?
14            THE COURT:  Three.  There's one that says "not
15    applicable."  You're saying that's the errata sheet for him?
16            MR. HANNON:  Correct.  Yes.
17            THE COURT:  I see.
18            MR. HANNON:  They were provided in all one package.
19    Apologize for that.
20    BY MR. HANNON:
21    Q.  So, sir, I was directing you to page 94 of your
22    transcript, and we'll start there on line 8.  And you see
23    there I -- I'm asking you questions about Dr. Menninger's
24    request at the February 28th meeting about additional detail
25    for buckets 2 through 4?
```

```
 1   A.   Yes.

 2   Q.   Do you see that?

 3   A.   Uh-huh.

 4   Q.   Yes?

 5   A.   Correct.

 6   Q.   Okay.  And if you can follow that questioning along, if

 7   you turn to page 95, line 20, you see there I ask you whether

 8   Dr. Menninger -- I'm sorry.  I asked you whether you had

 9   received multiple emails thereafter from Dr. Menninger

10   continually asking for additional detail concerning the items

11   listed in 2 through 4.  Do you see that?

12   A.   I do.

13   Q.   Okay.  And you indicated that she had?

14   A.   I do see that, yes.

15   Q.   Okay.  And then if we continue on, page 96, line 10 --

16              MS. MANDEL:  Objection, Your Honor.  The question

17   and the answer weren't actually read with accuracy, and I

18   just ask that the answer, in particular, which begins at the

19   bottom of page 95 and continues to the top of page 96, was

20   not accurately recapped.

21              MR. HANNON:  I'm happy to read the whole section,

22   Your Honor.

23              MS. MANDEL:  I just want to make sure we have

24   clarity with regard to what was said.

25              THE COURT:  Fine.  You mean the whole section from
```

1  94, line 12, to 96:15?

2          MR. HANNON:  Yeah, that's great.

3          MS. MANDEL:  I don't know that he has to read all

4  of it.  I do object to --

5          THE COURT:  I don't think it's necessary to read

6  all of it.  I suspect it's -- I think what you should do is

7  you can ask the question you want.

8          You made your point and you can ask -- you can have

9  him on your examination read that part in completeness, if

10  you wish, but I don't know that we need the whole three

11  pages.  It would be a lot to read.

12          MR. HANNON:  Okay.  All right.

13          THE COURT:  I'm not objecting, but I'm just

14  advising that I'm not sure -- if either of you want to ask

15  the whole three pages, then why focus on the whole three

16  pages?

17          MR. HANNON:  Okay.  Let's do the whole three pages

18  just so there's no secrets here.

19  BY MR. HANNON:

20  Q.  Starting at page 94, line 8, please read along silently

21  as I read aloud:

22          "QUESTION:  During that meeting, Dr. Menninger --

23          THE COURT:  If you're going to do that, it might be

24  more interesting for the jury if you read -- I don't know

25  that it's necessary to read all three pages.  I don't

1    think -- and Ms. Mandel hasn't raised a challenge to the --

2    to you suggesting there's something that you're hiding, you

3    know, or -- that there's not hiding, but that there's some

4    incompleteness.

5            She only suggested incompleteness on that Q&A at

6    the bottom of 95 and 96.  But if you're going to do that

7    whole part, I suggest you read the question and he just read

8    the answer.  At least it would be more engaging.

9            MR. HANNON:  Sounds fine.  Thank you.

10   BY MR. HANNON:

11   **Q.**  All right.  Mr. St. John, you're ready?

12   **A.**  Yes.

13           THE COURT:  Starting at page 94?

14           MR. HANNON:  Starting at page 94, line 8.

15   BY MR. HANNON:

16   **Q.**  "During that meeting, Dr. Menninger asked for additional

17   information concerning the information listed in buckets

18   Number 2 through 4, correct?

19   **A.**  "Yes.

20   **Q.**  "Was that information provided to her?

21   **A.**  "To my recollection, yes, it was.

22   **Q.**  "And what specifically was provided to her with respect

23   to Bucket Number 2?

24   **A.**  "I don't recall the detail.

25   **Q.**  "Do you recall Number 3?

```
 1   A.  "I don't recall the specificity, no.

 2   Q.  "How about Number 4?

 3   A.  "No.  I just -- I think he just covered what he had

 4   already written.  That's the only thing I can remember.

 5   Q.  "I'm sorry.  You think he just reiterated what was

 6   already written for those buckets?

 7   A.  "I believe so, yeah, but I can't recall for sure.

 8   Q.  "Okay.  But fair to say Dr. Menninger was asking for more

 9   information concerning those buckets, right?

10   A.  "I didn't -- I don't recall him being or him sharing

11   anything specific outside of what he has already provided her

12   with.

13   Q.  "But she was asking for something more, right?

14   A.  "She was, yes.

15   Q.  "And that was not given, correct?

16   A.  "Not to my recollection.

17   Q.  "Why not?

18   A.  "Don't know.

19   Q.  "Was that the last time that Dr. Menninger requested

20   additional information concerning the items listed in

21   buckets 2 through 4?

22   A.  "I don't recall.

23   Q.  "Didn't you receive multiple emails thereafter from

24   Dr. Menninger continually asking for additional detail

25   concerning the items listed in 2 through 4?
```

1  **A.**  "I know she requested, but I can't recall if it was

2  before the meeting or after, so I am foggy on the timeline.

3  She did ask more than once.  She asked several times, but I

4  don't know if it was after this meeting she continued to ask.

5  I don't recall.

6  **Q.**  "And she continued to ask you, right?

7  **A.**  "She did."

8          THE COURT:  You should read --

9  BY MR. HANNON:

10  **Q.**  There's another line.

11  **A.**  Oh.  "And I'm not sure if it was after this timeline.

12  **Q.**  "Did you ever provide the information?

13  **A.**  "I continued to reference what has already been provided

14  to her.

15  **Q.**  "Did you ever provide the additional information she was

16  asking for?

17  **A.**  "No."

18  **Q.**  So going back to the document we have up on the screen

19  here, which is Joint Exhibit 100 -- excuse me.  It's not

20  that.  It is Joint Exhibit 167.  After receiving this from

21  Dr. Menninger, you sent this to Ms. Ballweg, correct?

22  **A.**  Yes.

23  **Q.**  And you sent this to Ms. Ballweg that same day, right?

24  **A.**  Yes.

25  **Q.**  Okay.  And you provided the draft email; is that right?

1   **A.**   That is correct.

2   **Q.**   Okay.  And this was a draft response to Dr. Menninger,

3   correct?

4   **A.**   Yes.

5   **Q.**   Okay.  And in your draft response, you write in the third

6   sentence, "Adding additional detail would only present the

7   opportunity to select items in each bucket you believe you

8   can or can't do."  Is that right?

9   **A.**   Correct.

10  **Q.**   Okay.  And at least as of that the date, that was -- that

11  was something you didn't want Dr. Menninger to do, right, to

12  have the opportunity to select items in each bucket that she

13  believed she could or couldn't do?

14  **A.**   I -- I wouldn't say that.  We wanted additional

15  specificity to consider.  Adding additional detail would only

16  present the opportunity to select items in each bucket you

17  believe you can or can't do.

18  **Q.**   Isn't that what you wanted to know, though, what

19  Dr. Menninger could or couldn't do?

20  **A.**   Yeah, I just wanted to make clear that it wasn't shaded

21  in one direction or the other.  It was just stating we needed

22  more detail on what she could or couldn't do.

23  **Q.**   Well, you say you needed more detail.  Let's look back at

24  Dr. Menninger's note from March 1, 2018.  The bottom section

25  there I just highlighted, she writes, "Also, I wish to

1    reiterate that I'm capable of performing all functions of my

2    job with or without accommodation.  If you have any questions

3    regarding this or need confirmation from my physician that

4    this is the case, please let me know."

5              Do you see that?

6    **A.**  I do.

7    **Q.**  Okay.

8    **A.**  The problem is --

9    **Q.**  Now --

10   **A.**  But I'd like to make -- provide a complete answer, if I

11   could.

12             THE COURT:  If that's -- so here's the part --

13   if -- if you've answered the question he asked, that's all,

14   as the witness, you get to do.  You'll be examined by --

15             THE WITNESS:  Okay.

16             THE COURT:  -- I don't know if it's Ms. Mandel or

17   Mr. Curran -- Ms. Mandel.  And she'll ask you other

18   questions.  The difficult part about being the witness is you

19   only get to answer the question that's asked.

20             THE WITNESS:  Thank you, Your Honor.

21             THE COURT:  And so that's it.

22             Next question.

23             MR. HANNON:  Yes, Your Honor, so --

24             THE COURT:  You are free any time there's a

25   question, though, if it seems like it's framed as a yes-or-no

1    question, for example, to say, I don't feel I can answer it

2    as a yes-or-no question.  You can also say that.

3             THE WITNESS:  Thank you.

4             THE COURT:  You're welcome.

5             Go ahead.

6    BY MR. HANNON:

7    **Q.**  So now we're looking at your draft response to

8    Dr. Menninger's email from March 1, 2018.  Nowhere here in

9    your draft do you ask her to provide additional information

10   concerning her health issues, do you?

11   **A.**  You're correct.

12   **Q.**  Okay.  Nowhere in this draft message do you ask to have

13   her doctor send you additional information, right?

14   **A.**  Not in this email.

15   **Q.**  Okay.  You served in human resources for a long time,

16   right?

17   **A.**  Yeah.

18   **Q.**  You've been in human resources for -- was it 27 years

19   before joining PPD?

20   **A.**  Approximately, yes.

21   **Q.**  Okay.  And you dealt with accommodation requests before,

22   right?

23   **A.**  I have, yes.

24   **Q.**  And you were aware that, an employer, if they have

25   concerns about an employee's ability to do their job due to a

    1   health reason, that they can request a certification from
    2   their doctor, right?
    3   **A.**   Yes.
    4   **Q.**   Okay.  So as you're having this back-and-forth with
    5   Dr. Menninger in March 1, 2018, you knew that if you had
    6   concerns about her ability to do her job, you could ask her
    7   doctor for a certification regarding that, correct?
    8   **A.**   Correct.
    9   **Q.**   Okay.  Going back to the March 1st -- actually, strike
   10   that.  Let's stay with this exhibit for a moment.
   11           So you received this email from Dr. Menninger on
   12   March 1, 2018, and there had been a meeting planned for later
   13   that day, right?
   14   **A.**   That's correct.
   15   **Q.**   Okay.  And that meeting was to be with yourself and
   16   Dr. Menninger and Mr. Mekerri?
   17   **A.**   Yes.
   18   **Q.**   And after you received this email from Dr. Menninger, you
   19   canceled that meeting, correct?
   20   **A.**   Which meeting was this?  There -- we had one meeting.
   21   The second meeting was canceled.  I just want to make sure
   22   I'm clear.  We did talk with her.  It was the second meeting
   23   that was canceled.  I want to make sure that that's clear.
   24   Let me just take a look here.
   25   **Q.**   Just so we're clear, you had the meeting on

```
 1    February 28th, right?

 2    A.   Yes.  There we go, yeah.

 3    Q.   And when that meeting ended, you had asked her to

 4    consider possible paths forward, right?

 5    A.   Correct.  Yes.

 6    Q.   Okay.  And then you got this email from Dr. Menninger on

 7    March 1, 2018, right?

 8    A.   Yes.  Thanks for clarifying the timeline.  Appreciate

 9    that.

10    Q.   And then you canceled the follow-up meeting that had been

11    scheduled for later that day, right?

12    A.   I did, yes.

13    Q.   You eventually responded to Dr. Menninger's March 1st

14    email, right?

15    A.   I did.

16    Q.   Okay.  But that wasn't until March 12th, right?

17    A.   Can I take a look at that?

18    Q.   Sure.  Let me show you a document here.  I'm going to

19    show you Joint Exhibit 176.

20              Excuse me.  That's the wrong document.

21              Joint Exhibit 176 -- that's the one.  All right.

22    So this is your email response to Dr. Menninger's March 1st

23    email, right?

24    A.   Correct, on the 12th.

25    Q.   Okay.  And notably, this is -- this is a new email chain
```

1    that you created, right?

2    **A.** Correct.

3    **Q.** So if we look at the second page here, this isn't

4    actually responding backing back mail you had gotten from

5    her, correct?

6    **A.** Correct.

7    **Q.** Why was that?

8    **A.** You know, I cannot recall.

9    **Q.** And Mr. Mekerri, he was -- he was not actually involved

10   in drafting this email, right?

11   **A.** I cannot recall.

12   **Q.** If you can turn to page 111 of your deposition

13   transcript, and just for reference here --

14              THE COURT:  You just want him to read the bottom of

15   page 111 to the top of 112 to refresh his recollection?

16              MR. HANNON:  Yeah, I think that works, Your Honor.

17   Thank you.

18   BY MR. HANNON:

19   **Q.** If you'd just read to yourself your testimony on page 111

20   carrying over to line 2 of the next page, and let me know if

21   that refreshes your recollection as to whether or not

22   Mr. Mekerri was involved in drafting this email.

23   **A.** It was not.

24   **Q.** I'm sorry?

25   **A.** My testimony says --

```
 1              THE COURT:  Well, you've read it to yourself.  Now
 2    the question is, did that refresh your recollection?
 3              THE WITNESS:  It did.  Thank you, Your Honor.
 4              THE COURT:  Just ask him.
 5    BY MR. HANNON:
 6    Q.  And he was definitely not, right?
 7    A.  Correct.  That's what it says.
 8    Q.  Is it fair to say that people who were involved were HR
 9    leadership and legal?
10    A.  It indicates here could not recall if they were.
11    Q.  Okay.
12    A.  I cannot recall.
13    Q.  Okay.  As you sit here today, do you have a recollection
14    as to whether or not HR leadership and legal was involved in
15    drafting this document?
16    A.  I think legal was.
17    Q.  Okay.  What about your boss, Deborah Ballweg?  Was she
18    involved?
19    A.  I cannot recall.
20    Q.  I'm sorry?
21    A.  I can't recall that.
22    Q.  Okay.  I'm going to show you Joint Exhibit Number 87.
23    So, sir, this is an email that you sent to Ms. Ballweg on
24    March 7, 2018, yes?
25    A.  Yes, correct.
```

```
 1   Q.  And am I right that this email concerns you gathering
 2   information to send to PPD's legal team?
 3   A.  Yes.  This looks like that's what it was.
 4   Q.  Okay.  And you were working with Ms. Ballweg on that; is
 5   that right?
 6   A.  It looks like for this, yes.
 7   Q.  Okay.  And if we turn to the attachment here -- there's a
 8   few different attachments.  Let me get to the right one.  So
 9   I am now -- I'm on page 14 of the exhibit.  Just for the
10   record, it has 4078 at the bottom right-hand corner.  And you
11   see here on the top, it starts "HRG."
12          Do you see that?
13   A.  I do.
14   Q.  Okay.  And these were instructions to the human resources
15   group concerning filling out this form?
16   A.  Looks like that way, yes.
17   Q.  Okay.  And this was related to a legal request concerning
18   Dr. Menninger, right?
19   A.  Yes.
20   Q.  Okay.  And if we scroll forward, on the last page of the
21   documents, there's a section for "request for accommodation
22   pending for which HR generalist is asking help."
23          Do you see that?
24   A.  I do.
25   Q.  Okay.  HR generalist, would that be you in this context?
```

1    **A.**  Yes.

2    **Q.**  Okay.  And you note, "HR is requesting guidance in

3    responding to Lisa and assisting us with potential options as

4    we seek a path forward to an exit strategy, with consultancy

5    as an element (or other options not being considered now) to

6    protect the business and the CL licensure requirements."

7         Do you see that?

8    **A.**  I do.

9    **Q.**  Okay.  Does that accurately state the advice that you --

10   that you wanted to get from legal at that point in time?

11   **A.**  Yes.

12   **Q.**  Okay.  Exit strategy, that refers to Dr. Menninger

13   leaving PPD, correct?

14   **A.**  I think that -- that's a general term, "exit strategy."

15   It's like separation versus termination or -- you see what

16   I'm saying?  So I think it's a -- I don't know that that is

17   as clear as what you might be inferring.

18   **Q.**  Well, do I hear you right that you're saying it could be

19   a -- it could mean a voluntary separation, or it could mean

20   an involuntary separation?

21   **A.**  Correct.

22   **Q.**  Okay.  But either way, it refers to a circumstance in

23   which Dr. Menninger is no longer working with PPD, correct?

24   **A.**  Could be, yeah.

25   **Q.**  You're not sure?

1 **A.** Yeah, "seek a path forward to an exit strategy with

2 consultancy as an element," right?  So I don't -- I don't

3 know that it's as clear, but I'm comfortable with what you're

4 saying.

5 **Q.** I'm not sure what you're comfortable with.

6 **A.** I don't know that it's as clear, sorry.

7 **Q.** So "exit strategy" refers to Dr. Menninger leaving the

8 company either voluntarily or involuntarily, right?

9 **A.** I agree with that, yes.

10 **Q.** Either quitting or getting fired?

11 **A.** Yeah.

12 **Q.** And in the bullet below here, now there's a section for

13 HR management's recommendation.  Do you see that?

14 **A.** Yes.

15 **Q.** Okay.  That would be one of your bosses, right?

16 **A.** Correct.

17 **Q.** So Deborah Ballweg?

18 **A.** It doesn't specify Deb.  She's in the chain of command.

19 **Q.** She was your direct supervisor, right?

20 **A.** She was.

21 **Q.** Okay.  And in terms of what that recommendation says,

22 first it notes that supporting the recommendation to only

23 provide reasonable accommodation for points 1 and 5; is that

24 right?

25 **A.** Correct.

1    **Q.**   Okay.  And then it notes -- would I be correct in

2    interpreting that, the phrase that follows, as saying that

3    there's a preference to do a separation package with

4    Dr. Menninger that would allow her to consult for some time

5    to protect the licensure requirements?

6    **A.**   That's what it says, yes.

7    **Q.**   Okay.  And then it goes on to note that the business

8    believes Lisa can no longer fully service the CL business as

9    the senior lab leader to the degree that the business

10   requires to grow and hit aggressive business targets."

11           Did I read that right?

12   **A.**   Correct, yes.

13   **Q.**   So this request was sent off to PPD legal, right?

14   **A.**   Yes.

15   **Q.**   Okay.  And did they come up with an exit strategy?

16   **A.**   I don't believe that that's the way that this played out.

17   So I -- I don't think that's the way -- or what they

18   recommended or would have happened, right?

19   **Q.**   What did they recommend?

20           MS. MANDEL:  Objection.

21           THE COURT:  Sustained.

22           THE WITNESS:  You know, I honestly don't recall --

23           THE COURT:  There's no question pending.

24           THE WITNESS:  Okay.

25           THE COURT:  You can only answer the questions.

```
 1              THE WITNESS:  Got you.
 2   BY MR. HANNON:
 3   Q.  Discussions regarding an exit strategy for Dr. Menninger,
 4   those involved others within PPD as well, didn't they?
 5   A.  They did.
 6   Q.  Who else was involved in those discussions regarding an
 7   exit strategy?
 8   A.  I think within the chain of command of HR and legal.
 9   Q.  Who was Christopher Fikry?
10   A.  Chris was a vice president of -- leading labs.
11   Q.  He was Mr. Mekerri's boss, yes?
12   A.  Yes.
13   Q.  And were you aware at some point in time that Mr. Fikry
14   was inquiring concerning Dr. Menninger's exit from the
15   company?
16   A.  I don't recall.  Do you have an email or something we --
17   I can reference?
18   Q.  Excuse me?
19   A.  Do you have an email or something I can reference?
20   Q.  I will in a moment, but just to start, did -- do you
21   recall Mr. Fikry reaching out concerning Ms. Menninger's
22   potential exit from the company?
23   A.  I don't recall the details of that.
24   Q.  Okay.  Was -- besides HR and legal, did you speak with
25   anyone else within PPD regarding Dr. Menninger potentially
```

 1   exiting the company?

 2   **A.**  I don't recall ever having a conversation with the --

 3   outside of those folks --

 4   **Q.**  Okay.

 5   **A.**  -- the chain of command or legal.  I don't remember a

 6   conversation at all.

 7   **Q.**  So subsequent to the request for legal advice that we

 8   just looked at concerning an exit strategy, you began to

 9   coach Mr. Mekerri concerning --

10          MS. MANDEL:  Objection.  Your Honor, we didn't look

11   at any legal advice; and, in fact, it wouldn't be appropriate

12   for us to look --

13          THE COURT:  Sustained as to the form of the

14   question.

15   BY MR. HANNON:

16   **Q.**  Subsequent to looking back here at the memo we were

17   looking at earlier, subsequent to you sending this to

18   Ms. Ballweg, you began coaching Mr. Mekerri concerning

19   documenting performance criticisms of Dr. Menninger, didn't

20   you?

21   **A.**  I wouldn't -- I wouldn't say coaching.  I would say

22   understanding what his concerns were.

23   **Q.**  And instructing him to put concerns in writing, correct?

24   **A.**  Documentation practices.  I think that's a better way to

25   say it, yeah.

|   |   |
|---|---|
| 1 | **Q.**  Let's look at Joint Exhibit Number 69.  And just to |
| 2 | orient us here, at the bottom of the page here we have an |
| 3 | email from Ms. Ballweg on March 28, 2018.  Do you see that? |
| 4 | **A.**  Yes, uh-huh. |
| 5 | **Q.**  And I'll put the next page so we see what it is.  It's to |
| 6 | you, right? |
| 7 | **A.**  Yes. |
| 8 | **Q.**  Okay.  And then there's a whole slew of stuff here |
| 9 | that's -- that's been redacted -- |
| 10 | THE COURT:  So, ladies and gentlemen, there are |
| 11 | certain things you've seen that are redacted, like here.  And |
| 12 | then you've seen some other documents that have been admitted |
| 13 | that -- I think there was some from Dr. Kessimian's notes |
| 14 | that had little portions blacked out. |
| 15 | So the first thing is we're not hiding things from |
| 16 | you that, like -- and you shouldn't speculate about what's in |
| 17 | the blacked-out portions.  The reasons things are blacked out |
| 18 | is -- there's a couple reasons why something would be blacked |
| 19 | out. |
| 20 | One is, for example, people's Social Security |
| 21 | numbers would be blacked out, generally speaking, or |
| 22 | sometimes dates of birth are blacked out, just as a general |
| 23 | proposition, because we have general rules about certain |
| 24 | personal identifying information becoming exhibits and then |
| 25 | being public or something. |

```
 1              But another primary kind of information like that
 2    is attorney-client communications, advice, because that
 3    information is privileged whether it's -- whichever party
 4    it's from.  And so that also gets redacted because it's not
 5    admissible evidence and it's privileged.  And so you
 6    shouldn't draw any conclusions about what it means or any
 7    inference from it not being provided to you, either for or
 8    against either party.  It's just the rules.
 9              Go ahead.
10              MR. HANNON:  Thank you, Your Honor.
11    BY MR. HANNON:
12    Q.  So going back to this document here, what we're looking
13    at is this email to you from Ms. Ballweg.  She asked you,
14    "Can you get up with Hacene to explore Number 1 before our
15    call tomorrow?"
16              Do you see that there?
17    A.  I do.
18    Q.  And you tell her, "Will do"?
19    A.  Yes.
20    Q.  And then here's what you then tell Mr. Mekerri:  "Please
21    add some details to the details that you have discussed with
22    Lisa in your one-to-ones with her that she is referencing."
23              Do you see that?
24    A.  I do.
25    Q.  Okay.  And do you know what that refers to?
```

1   **A.**  I can't recall, but it's around good documentation

2   practices.  I mean --

3   **Q.**  So this is March 28, 2018, right?

4   **A.**  Yes.

5   **Q.**  Okay.

6   **A.**  Uh-huh.

7   **Q.**  Now, let's look at Joint Exhibit Number 49.  So this is

8   an email that Mr. Mekerri sent you the next day, right?

9   **A.**  It looks that way, yes.

10   **Q.**  Okay.  And this is in response to your email asking him

11   to provide you details about his one-to-one with Lisa, right?

12   **A.**  Yes.

13   **Q.**  And the reason for this documentation was you wanted to

14   build a record that would support a termination; isn't that

15   right?

16   **A.**  I don't think so.  I don't think that's right, as I read

17   through that.

18   **Q.**  There were other instances in which Mr. Mekerri was

19   provided instructions to document; isn't that right?

20   **A.**  Yeah, document, not leading to an outcome.

21   **Q.**  Let's look at Joint Exhibit 148.  In the middle of the

22   page here, this is you on April 3, 2018, right?

23   **A.**  Yes.

24   **Q.**  Okay.  And here you note in the second sentence, "It

25   will critically important to follow-up on your discussions

 1    with Lisa with documentation to your manager file and to Lisa

 2    directly."

 3              Do you see that?

 4    **A.**  Yes.

 5    **Q.**  Okay.  And that was actually something that Ms. Ballweg

 6    had told you to tell Mr. Mekerri, wasn't it?

 7    **A.**  I think she was referencing that, yes.

 8    **Q.**  And let's look at that record just to be clear.  So let's

 9    look at Joint Exhibit 68.  So we're looking here at an email

10    exchange between you and Ms. Ballweg?

11    **A.**  Yes.

12    **Q.**  And if we look here, we see that same language, or

13    similar language, to what you wrote to Mr. Mekerri?  "He

14    needs to follow up those discussions with documentation to

15    his manager file and importantly to Lisa directly."

16              Do you see that?

17    **A.**  Yes.

18    **Q.**  Okay.  And in addition to providing Mr. Mekerri these

19    instructions, you also talked about it with him in person,

20    correct?

21    **A.**  I can't recall that.

22    **Q.**  I'll show you Joint Exhibit 125.

23    **A.**  Yes.  That's correct.  Thank you.

24    **Q.**  Okay.  So just for the record, so you're telling

25    Ms. Ballweg here, "This coaching has occurred in two ways (in

1    writing via email and now I can confirm that it has taken

2    place verbally in a conversation I had with him around

3    11:20 a.m. today)."

4         Do you see that?

5    A.  Yes.  Coaching.

6    Q.  And that's coaching regarding the importance of

7    documenting criticisms to his manager file, correct?

8    A.  Correct.

9    Q.  In early April of 2018, Mr. Mekerri decided to adapt

10   Dr. Menninger's goals; is that right?

11   A.  Correct.

12   Q.  And you were involved in that?

13   A.  Yes.

14   Q.  I now show you Joint Exhibit 121 and we'll start here on

15   the second page.  This is a draft email that Mr. Mekerri sent

16   to you regarding the adaptation of Dr. Menninger's goals,

17   yes?

18   A.  Yes.

19   Q.  Okay.  And flipping back to the first page, you see here

20   at the bottom you -- you have a suggestion that he note that

21   "goals may continue to adapt with ample ongoing

22   communication"?

23   A.  Correct.

24   Q.  Okay.  And you sent that to Ms. Ballweg for her approval?

25   A.  Yes.

1   **Q.**  Okay.  And she approved?

2   **A.**  Looks that way, yes.

3   **Q.**  Okay.  Now, it was about this same time in early April of

4   2018 that Mr. Mekerri's boss was making inquiries about

5   Dr. Menninger.  Do you recall that?

6   **A.**  No --

7   **Q.**  Okay.

8   **A.**  -- I don't --

9   **Q.**  I show you Joint Exhibit 265.  Now, sir, you're not on

10   this email chain, correct?

11   **A.**  Correct, I'm not.

12   **Q.**  But if you look here, do you see that Mr. Fikry, he is

13   inquiring about Dr. Menninger's exit, right?

14   **A.**  I see that.

15   **Q.**  Okay.  Is that a coincidence that he uses that word,

16   "exit," that you had also used in that memo back in early

17   March?

18   **A.**  You know, I can't speak to his email or his intent.

19   **Q.**  You don't know?

20   **A.**  I don't.  I can't speak to that.

21   **Q.**  Okay.  So you don't know what he meant when he asked

22   "what's timing on Lisa Menninger's exit?"

23   **A.**  You'll have to ask him.

24   **Q.**  But you would agree that, in the context of talking about

25   an employee, that "exit" generally means separation?

```
 1    A.   It does to me, but that's all I can say.  I don't know.

 2    Q.   And if you look at Ms. Ballweg's response, she notes that

 3    Mr. Mekerri had recently given some tough feedback.  Do you

 4    see that?

 5    A.   I do.

 6    Q.   Do you know what that tough feedback refers to?

 7    A.   I do not.

 8    Q.   Okay.  Was that tough feedback that you and Ms. Ballweg

 9    had coached Mr. Mekerri to provide?

10    A.   No.

11    Q.   Did that refer to the goals email?

12    A.   I have no idea.  I'm not on this email.

13    Q.   Mr. Fikry, he was also making inquiries of others within

14    HR as to when Dr. Menninger was going to be exiting, correct?

15    A.   Looks that way.

16    Q.   I show you Joint Exhibit 124.  This is an email exchange

17    between yourself and Ms. Ballweg?

18    A.   Yes.

19    Q.   This is April 12th, right?

20    A.   Correct.

21    Q.   Next day?

22    A.   Actually on my birthday.  Just a side note.

23    Q.   And just turning forward here, at the bottom of the first

24    page, and you relay to Ms. Ballweg a conversation you had had

25    with Jerry Williams, correct?
```

1    **A.**  That is correct.

2    **Q.**  And Mr. Williams, he had communicated to you that

3    Mr. Fikry was inquiring about the timing of Dr. Menninger's

4    exit, right?

5    **A.**  That's what this indicates, yes.

6    **Q.**  Okay.  And you gave him the same answer, it looks like,

7    that Ms. Ballweg had provided Mr. Williams, right?

8    **A.**  I don't see any tough feedback talk there.  That wasn't

9    referenced.

10   **Q.**  You don't see the tough feedback?

11   **A.**  I'm sorry.  I don't.

12   **Q.**  No worries.  That's what my highlighter is for.

13          THE COURT:  I think you only highlighted the part

14   you want.

15          THE WITNESS:  Thank you.

16   BY MR. HANNON:

17   **Q.**  "Tough feedback" there?

18   **A.**  Yes.

19   **Q.**  Okay.  And, right at the end, "We are not close to a

20   change unless she self-selects."  Do you see that?

21   **A.**  I do, yes.

22   **Q.**  Would a change in that context be an exit?

23   **A.**  Yeah, if she self-selects.

24   **Q.**  And self-selects would be if she quit, right?

25   **A.**  Correct, yeah.

1    **Q.**  Now, at the time that Dr. Fikry was making these

2    inquiries, you knew that he had knowledge of Dr. Menninger's

3    request for accommodation, correct?

4    **A.**  I didn't have much interaction with him, so I can't -- I

5    don't recall.

6    **Q.**  But you had had interaction with him updating him on the

7    status of Dr. Menninger's accommodation request, hadn't you?

8    **A.**  I don't recall.  Do you have something you can share with

9    me?

10   **Q.**  I'll show you Joint Exhibit 197.

11   **A.**  Okay.  Thank you.

12   **Q.**  You're welcome.

13          So this was an exchange between yourself and

14   Dr. Fikry back on February 7, 2018, yes?

15   **A.**  Yes, this is.

16   **Q.**  Okay.  And --

17   **A.**  Correct.

18   **Q.**  -- you write to him, "The ball is now in Lisa and her

19   doctor's court to provide specific limitations" -- I'm

20   sorry -- "specific limitations linked with Lisa's anxiety of

21   public speaking and social interactions.  Hacene has recently

22   provided specifics (see attached) in writing around what the

23   business needs."

24          Do you see that there?

25   **A.**  I do.

1  **Q.**  Okay.  And you go on to say, "Once we have the reply from

2  Lisa's doctor, we can review them and determine if we want to

3  provide any reasonable accommodation.  If not, we can

4  consider providing her a package to move her out."

5          Do you see that?

6  **A.**  I do.

7  **Q.**  Okay.  Do you recall any subsequent communications with

8  Dr. Fikry concerning this subject?

9  **A.**  I do not, no.

10 **Q.**  I'm now going to show you Joint Exhibit 146.

11          Sorry.  Wrong document.  Let's go here instead.

12          I'm now showing you Joint Exhibit 50.  And if you

13 look at the subject line, I think this was an email chain

14 concerning those -- the requests for adapted goals we looked

15 at earlier, right?

16 **A.**  Yes.

17 **Q.**  Okay.  And if we flip back to the first page here -- I'm

18 sorry.  This is actually the third page.  This was the actual

19 email that Mr. Mekerri had sent Dr. Menninger requesting the

20 adapted goals; is that right?

21 **A.**  It looks that way, yes.

22 **Q.**  Okay.  And you see here one of the stated goals in 1(a)

23 is "elimination of lab issues, client complain, and audit

24 findings."  Do you see that?

25 **A.**  I do.

1    **Q.**  Would you agree with me, sir, that was an impossible

2    goal?

3    **A.**  I can't speak to that.  I don't know enough about the

4    detail.  I know there were quality issues and other issues at

5    that time, but I don't know the possibility of eliminating

6    them.  I mean -- I don't know.

7    **Q.**  Did PPD use something called "SMART goals"?

8    **A.**  We do.

9    **Q.**  And what does the A stand for?

10   **A.**  Achievable.

11   **Q.**  And what does that mean?

12   **A.**  Well, they need to be achievable, right?  The M is the

13   tough one.  It's measurable, right?  But I can't speak to

14   some of -- I can't speak to the business side of this, if

15   that's possible or not.

16   **Q.**  But you'd agree with me that it's very important that

17   when a manager sets goals, that they be achievable?

18   **A.**  Yeah.

19   **Q.**  I'm now going to show you Joint Exhibit 126.  And looking

20   at the first page here, I just want to direct your attention

21   to the second email.  On April 17, 2018, Ms. Ballweg writes,

22   "Got your message and other email.  Please help draft a

23   response for Hacene and one for yourself."

24           Do you see that?

25   **A.**  I do, uh-huh.

1   **Q.**  Okay.  Would I be right that the other email refers to

2   Dr. Menninger's correspondence with Mr. Mekerri concerning

3   her goals?

4   **A.**  I can't say that for sure.  I'm sorry.

5   **Q.**  But you see here Ms. Ballweg instructs you to, "Ask

6   Hacene/draft response to be very specific about how she

7   didn't meet expectations."

8           Do you see that?

9   **A.**  I do.

10  **Q.**  I now show you Joint Exhibit 301.  And you see here this

11  is an email from Mr. Mekerri to Ms. -- Dr. Menninger on

12  April 25, 2018?

13  **A.**  Yes.

14  **Q.**  And he starts his email, "Lisa, I am very surprised and

15  somehow disappointed by your response."  Do you see that?

16  **A.**  I do.

17  **Q.**  Okay.  Let's take a look at what he's responding to.  So

18  the email below here, we have an email from Dr. Menninger to

19  Mr. Mekerri on April 17th, right?

20  **A.**  Correct.

21  **Q.**  Okay.  And she -- she starts her email by saying, "I am

22  happy to adapt my 2018 goals to address whatever concerns you

23  may have," right?

24  **A.**  Yes.

25  **Q.**  She says, "However, I think you may have some

 1    misunderstanding concerning the 'recent lab issues' you

 2    reference in your email."  Do you see that?

 3    **A.**  I do.

 4    **Q.**  Okay.  And you go to the next page, Dr. Menninger, she

 5    goes on to provide her version of the lab issues, right?

 6    **A.**  Looks that way, yes.

 7    **Q.**  Now, fair to say you can't tell us if anything

 8    Dr. Menninger wrote in here is wrong, can you?

 9    **A.**  I can't.

10    **Q.**  And you would agree with me that Dr. Menninger's response

11    here, nothing about this is inappropriate, right?

12    **A.**  Wouldn't seem.

13    **Q.**  I'm sorry?

14    **A.**  It would not seem it's inappropriate.

15    **Q.**  Okay.  Can you tell us why, then, Mr. Mekerri said that

16    he was very surprised and somehow disappointed by her

17    response?

18    **A.**  I can't -- I can't speak to that sentence.

19    **Q.**  Well, this response we're looking here, the one that

20    starts with, "I'm very surprised and somehow disappointed by

21    your response," this wasn't -- this final version wasn't

22    drafted by Mr. Mekerri, was it?

23    **A.**  I don't recall.

24    **Q.**  Was this a document that you and Ms. Ballweg and in-house

25    counsel had all worked on together?

1  **A.**  You know, some of these elements, I do recall in the

2  email.  I don't recall that particular sentence.

3  **Q.**  I'm going to show you Joint Exhibit 118.  And if we look

4  here at the bottom, we have a draft response from

5  Mr. Mekerri, right?

6  **A.**  Yes.

7  **Q.**  Okay.  And he asked you to review, right?

8  **A.**  Yes.  He does have that sentence in here.  Thank you for

9  refreshing my memory.

10  **Q.**  He asked you to review, right?

11  **A.**  He does, yeah.

12  **Q.**  And you provide Ms. Ballweg a suggested revised version,

13  right?

14  **A.**  Correct.

15  **Q.**  You took out the thing about being disappointed, didn't

16  you?

17  **A.**  Well, my instinct now was my instinct then.

18  **Q.**  You didn't think it was appropriate?

19  **A.**  Correct.

20  **Q.**  But the folks above you, they didn't agree with that

21  assessment, did they?

22  **A.**  Maybe not.  Don't know.

23  **Q.**  We'll look at Joint Exhibit 67.  And, now, we've got some

24  more email correspondence between yourself and Ms. Ballweg,

25  yes?

1    **A.**   Yes.

2    **Q.**   She's asking you to work on a revised draft from Hacene

3    to Lisa before you head out for your terrific vacation.  Do

4    you see that?

5    **A.**   I do.

6    **Q.**   Okay.  And would you agree with me that that revised

7    draft concerns the email we were just looking at?

8    **A.**   Yes.

9    **Q.**   I'll now show you Joint Exhibit 144.  And now we have an

10   email from Mr. Mekerri with a -- with a new draft, right?

11   **A.**   Version 2 I see, yes.

12   **Q.**   Okay.  And was this something you had worked with him on?

13   **A.**   I think he recommended it.  I don't know who gave on what

14   points, but ultimately this was the final second draft.

15   That's all I know.

16   **Q.**   Okay.  And this is -- this is much, much lengthier than

17   his first version; is that right?

18   **A.**   Looks that way.

19   **Q.**   And you sent it to Ms. Ballweg; is that right?

20   **A.**   Yes, uh-huh.

21   **Q.**   And just looking at this version, this version is two

22   paragraphs long, right?

23   **A.**   Correct.

24   **Q.**   Okay.  And I think we saw in an email before that you

25   had -- you had a terrific vacation coming up?

1    **A.**  I did.

2    **Q.**  Okay.  Do you recall if you were -- if you were present

3    when the final version of the email was approved?

4    **A.**  I don't recall.

5    **Q.**  I'm going to show you Joint Exhibit 73.  And now we have

6    an email from Ms. Ballweg to Mr. Mekerri copying you, right?

7    **A.**  Yes.

8    **Q.**  Ms. Ballweg writes, "Below is the email response Lisa

9    Noecker drafted for you to reply to the latest exchange

10   between you and Lisa Menninger," right?

11   **A.**  Yes.

12   **Q.**  Okay.  And a bit lengthier than the version to -- you and

13   Mr. Mekerri came up with?

14   **A.**  Looks that way, yes.

15   **Q.**  Was it -- was it typical at PPD for in-house counsel to

16   get involved in email communications with an employee about

17   their annual goals?

18   **A.**  I don't quite recall.  I've not had it, that I can

19   recall.

20   **Q.**  During the course of the back-and-forth with

21   Dr. Menninger in April and May of 2018, Ms. Ballweg was --

22   was heavily involved in that dialogue, wasn't she?

23   **A.**  I don't know how involved.  I'm sorry.  I can't say.

24   **Q.**  Fair to say that you -- you weren't sending any emails

25   out to Dr. Menninger unless Ms. Ballweg approved them first?

1    **A.**  I think at that time frame, that is correct.  I think --

2    **Q.**  And -- and fair to say that you didn't want Mr. Mekerri

3    sending any emails off to Dr. Menninger unless you approved

4    them first.

5    **A.**  I would think that's what he would do, but I cannot

6    recall.  I don't want to speculate.

7    **Q.**  I'm going to show you Joint Exhibit 139.  This is an

8    email exchange between yourself and Ms. Ballweg on April 30,

9    2018, yes?

10   **A.**  Yes.

11   **Q.**  And just to orient us, I suppose, a little bit, let me go

12   to the middle email first.  And she's asking you, "Have you

13   sent her anything yet?"  Do you see that?

14   **A.**  I do.

15   **Q.**  Okay.  And this is in response to an email chain with

16   Dr. Menninger that you had forwarded to Ms. Ballweg; is that

17   right?

18   **A.**  Yes, it looks that way, uh-huh.

19   **Q.**  Okay.  Excuse me.

20           And she instructs you, "You can use your PTO as a

21   'I'm working from bottom up' with emails."  Do you see that?

22   **A.**  I do, yes.

23   **Q.**  Do you know what that referred to?

24   **A.**  Honestly, no.

25   **Q.**  Am I right that Ms. Ballweg had instructed you to delay

1    in responding to Dr. Menninger?

2    **A.**   I don't want to speculate.  I don't recall.

3    **Q.**   Let's look at the email above.  "I can definitely respond

4    with 'I'm working from bottom up with emails,' but I haven't

5    responded to her at all, to date, as requested."

6            Do you see that?

7    **A.**   I do.

8    **Q.**   Does that refer to a request you'd received from Deb

9    Ballweg?

10   **A.**   I can't recall for sure.

11   **Q.**   Let's look at Joint Exhibit 71.  And you see here this is

12   an email from Ms. Ballweg to you on April 27, 2018?

13   **A.**   I do.  I see that.

14   **Q.**   Okay.  And she asked you to please hold off sending until

15   next week; is that right?

16   **A.**   Yes, I see that.

17   **Q.**   And am I right that what she's asking you to hold off on

18   sending is an email to Dr. Menninger that had been drafted by

19   in-house counsel?

20   **A.**   Yes.  Thanks for refreshing my recollection.

21   **Q.**   I now show you Joint Exhibit 132.  Looking at the bottom

22   half of the page, is that the email that you delayed sending

23   at Ms. Ballweg's instruction?

24   **A.**   It looks like it is.

25   **Q.**   And you begin by telling Dr. Menninger, "I regretfully

1    was not able to respond to your recent email sooner due to it

2    being out of the office on PTO and have been working through

3    my email from the bottom up."

4          Do you see that?

5    **A.**  I do.

6    **Q.**  That wasn't true, was it?

7    **A.**  I wouldn't say that's not true.

8    **Q.**  I'm sorry?

9    **A.**  I said I was out on PTO and I was working through my

10   email from the bottom up when you get back.

11   **Q.**  Well, you say due to being out of the office being on

12   PTO; is that right?

13   **A.**  Yeah.

14   **Q.**  That wasn't the reason for the delay, was it?

15   **A.**  I wouldn't say that.  I think that was -- it was some --

16   what everyone has when they come back, right, from PTO?

17   They're working through email.  I think they knew that.  I

18   mean, it doesn't strike me now as inaccurate.

19   **Q.**  Let's look at the email that Dr. -- that you were

20   responding to here.  So on April 17, 2018, looking here at

21   the middle of the third page of the exhibit, Dr. Menninger

22   had sent you a note, correct?

23   **A.**  Yes.

24   **Q.**  That was April -- sorry.  And she expressed some

25   frustration over the continued failure to provide additional

```
 1   detail concerning buckets 2 through 4, right?
 2   A.  Correct.
 3   Q.  And among the frustration she expressed, she writes, "I
 4   feel like you just keep twisting my doctor's words and
 5   refusing to answer any of my questions."  Do you see that?
 6   A.  I see that.
 7   Q.  She also complains in this email about treatment she's
 8   receiving from Mr. Mekerri, correct?
 9   A.  I see that, yes.
10   Q.  She notes that his tone has drastically changed and he's
11   going out of his way to, quote, "document criticisms of my
12   performance that are utterly baseless."
13           Do you see that?
14   A.  I see that claim.
15   Q.  And she goes on, "It looks like he's trying to build a
16   case against me," right?
17   A.  I see that claim as well.
18   Q.  And she says, "Like you previously coached us to do when
19   dealing with a 'problem' employee."  Do you see that?
20   A.  I do.
21   Q.  Do you know what that references there?
22   A.  I do.  I coach all leaders on how to document and coach
23   so it doesn't get to disciplinary efforts, right?  Coaching
24   is having a conversation.
25   Q.  Who is Meredith James?
```

1   **A.**  I can't recall right now.

2   **Q.**  Was she one of Dr. Menninger's subordinates?

3   **A.**  In fact, I do remember the name.  Yes.

4   **Q.**  And you -- PPD had identified Ms. James as a poor

5   performer, right?

6   **A.**  It's been a long time ago.  I think so, yeah.

7   **Q.**  And you had coached Dr. Menninger in terms of how to go

8   about documenting performance issues with Ms. James, right?

9   **A.**  Yeah, when coaching was failing.

10  **Q.**  And Ms. James quit, right?

11  **A.**  I don't recall how she left.

12  **Q.**  Do you recall her filing an HR complaint regarding the

13  treatment that she was receiving?

14  **A.**  I don't remember those details, no, uh-uh.

15  **Q.**  Do you recall Ms. Ballweg investigating that?

16  **A.**  It's been a long time ago.  I don't.

17  **Q.**  Um --

18  **A.**  I know there was not an outcome.  I would have recalled

19  that if it were consequential to my career.

20  **Q.**  So that's Dr. Menninger's April 17th email, and there's

21  another email above that on April 27th, right?

22  **A.**  Yes.

23  **Q.**  And in those ten days, you -- you hadn't responded to

24  Dr. Menninger, correct?

25  **A.**  Yes.

1    **Q.** Okay.

2    **A.** That was -- that's correct.

3    **Q.** And in the April 7th -- I'm sorry, April 27th email, she

4    raises additional concerns about Mr. Mekerri's treatment,

5    right?

6    **A.** She does.

7    **Q.** Okay. And she notes that, "He is completely

8    mischaracterizing things and looking for any excuse possible

9    to criticize my 'leadership.'"

10          Do you see that?

11   **A.** I do.

12   **Q.** And she says, "He never treated me like this before I

13   told him about my disability." Do you see that?

14   **A.** I do see that.

15   **Q.** That's true, isn't it?

16   **A.** No.

17   **Q.** Prior to Dr. Menninger disclosing her disability, there

18   had been no effort to document alleged performance concerns

19   of Dr. Menninger's, had there?

20   **A.** I don't recall.

21   **Q.** Well, at some point in time, sir, you were -- you were

22   interviewed by Ms. Ballweg in connection with an

23   investigation of Dr. Menninger's complaints, right?

24   **A.** At some point, yes.

25   **Q.** And she gave you a little bit of homework, didn't she?

 1    **A.**  I don't recall.

 2    **Q.**  She tasked you with going and seeing whether or not there

 3    was any documentation of performance concerns before

 4    Dr. Menninger disclosed her disability, right?

 5    **A.**  Again, I don't recall.

 6    **Q.**  Let's look at a document.  Let's look at Joint Exhibit

 7    Number 75.

 8    **A.**  Sure.

 9    **Q.**  So this is an email you sent Ms. Ballweg on May 14, 2018,

10    yes?

11    **A.**  Yes.

12    **Q.**  Okay.  And you write, "Deb, I checked and cannot find any

13    additional emails from Hacene on Lisa's performance outside

14    of the one that I forwarded with Susan's feedback at that

15    time."

16              Do you see that?

17    **A.**  I do.

18    **Q.**  And the one document that you're referring to there, that

19    was 360 feedback that had been provided by a member of

20    Dr. Menninger's team, correct?

21    **A.**  I'm not looking at it, but if that's the one item that

22    you're sharing that was referenced, I --

23    **Q.**  Well, rather than take my word for it, let's look at a

24    document here.  So first, this one is May 14, 2018, right?

25    **A.**  It's the email date, yes.

| | |
|---|---|
| 1 | **Q.**  Okay.  And now if we look at Joint Exhibit 245, so this |
| 2 | would be an email that you had sent Ms. Ballweg earlier that |
| 3 | day, right? |
| 4 | **A.**  Yes, it looks that way.  Yes. |
| 5 | **Q.**  And this is -- scrolling below, this is 360 feedback from |
| 6 | Susan Pattison; is that right? |
| 7 | **A.**  Yes. |
| 8 | **Q.**  Okay.  And Mr. Mekerri had sent that to you on |
| 9 | December 11, 2017, saying "only as FYI"; is that right? |
| 10 | **A.**  Correct. |
| 11 | **Q.**  I mentioned before Ms. Ballweg's interview of you that |
| 12 | you understood that Ms. Ballweg was the person on behalf of |
| 13 | PPD responsible for investigating Dr. Menninger's complaints? |
| 14 | **A.**  Yes. |
| 15 | **Q.**  Okay.  Did you find that odd? |
| 16 | **A.**  No. |
| 17 | **Q.**  Was that typical that Ms. Ballweg would investigate |
| 18 | workplace complaints, even if she'd been involved the whole |
| 19 | time? |
| 20 | **A.**  We didn't have a lot of those.  In fact, I don't recall |
| 21 | another one.  So as an executive director of labs, I was an |
| 22 | associate director in HR.  It seemed reasonable to me that |
| 23 | she would be the one investigating. |
| 24 | **Q.**  Your interview with Ms. Ballweg was rather short, wasn't |
| 25 | it? |

```
 1    A.  I don't recall.

 2    Q.  She never asked you any specific questions, did she?

 3    A.  Again, I don't recall.  It's been a long time.

 4    Q.  Well, let's see what you wrote -- what you said back at

 5    your deposition.

 6    A.  Okay.

 7    Q.  If you can turn to page 188, please, line 8 --

 8              THE COURT:  So you're having him read this himself?

 9              MR. HANNON:  I'm going to read it out loud and ask

10    him to follow along.

11              THE COURT:  Are you just refreshing his

12    recollection?  He says he doesn't recall.

13              MR. HANNON:  Good point, Your Honor.

14              THE COURT:  I think you just have him read it to

15    himself.

16              MR. HANNON:  You're right.

17    BY MR. HANNON:

18    Q.  So if you can begin with 188, line 8, through 189,

19    line 2, please.

20              THE COURT:  Sometimes, ladies and gentlemen, people

21    don't remember things.  You can show them anything.

22    Typically lawyers show depositions, but you could show them

23    an ashtray.  You could show them anything you want, right?

24    An ashtray would seem odd, but anything that might prompt the

25    person to recall the events at the time.
```

```
 1              And you probably have your own experience of things
 2     you don't remember, but then you look back, and it could be a
 3     note, it could be something, it could be an object that
 4     related to the event, and it prompts you and you can recall.
 5              So you just -- Mr. Hannon is having him look at it
 6     or read it himself and when he's done, he'll ask the
 7     question, not for him to read this, but just to see if that
 8     refreshes his recollection.
 9              Sometimes the depositions are used for a different
10     purpose where a witness says something -- what we call
11     impeached -- where you said something -- the witness said it
12     was sunny the day of the accident, and then they're
13     cross-examined, they're impeached with their deposition where
14     at their deposition they said it was raining at the time of
15     the accident.  That's not refreshing their recollection.
16     That's confronting them with a prior statement that's
17     different than what they said in the courtroom, and that's
18     why they would read it.
19              Tell us when you're done reviewing that.  You're
20     done?
21              THE WITNESS:  Yes, Your Honor.
22              THE COURT:  Go ahead and ask questions.
23              MR. HANNON:  Thank you.
24     BY MR. HANNON:
25     Q.  So do you -- do you now recall, sir, that, either in your
```

```
 1    interview with Ms. Ballweg, she didn't ask you any specific
 2    questions?
 3    A.   I don't think there were questions provided to me, even
 4    by Dr. Menninger, with specificity.  So I wouldn't know and I
 5    didn't witness anything to provide any detail.
 6    Q.   Sure.  My question is about your interview with
 7    Ms. Ballweg during the course of her investigation --
 8    A.   Uh-huh.
 9    Q.   -- and specifically whether or not when Ms. Ballweg
10    interviewed you, she actually asked you any specific
11    questions.
12    A.   She asked me what I knew about it.
13    Q.   And she asked you if you ever witnessed anything that was
14    not fair and equitable in conversations between Dr. Menninger
15    and Mr. Mekerri, right?
16    A.   Correct.
17    Q.   And you said no?
18    A.   She asked that question, but I didn't witness anything.
19    Q.   And that was the end of your interview, right?
20    A.   It would seem.
21    Q.   I'm now going to show you Joint Exhibit 450, and I'm
22    showing you the third page of the document.  And so,
23    Mr. St. John, this is -- this is what Ms. Ballweg has told us
24    occurred during your interview and I want to direct your
25    attention to -- actually, strike that.
```

```
 1                Let me show you instead the findings here.  And so,
 2       just to orient everybody here, I'm showing you the part of
 3       the exhibit that has the May 18, 2018 date, and you see here
 4       it starts "Primary concerns provided by Lisa Menninger."  Do
 5       you see that?  Do you see that, sir?
 6       A.   I do.
 7       Q.   Okay.  Great.
 8                Now, just turning to the third page here, there's
 9       some text here.
10       A.   Thanks for increasing the font.
11       Q.   Sure thing.  And Ms. Ballweg wrote, "Above information
12       and reinforcing the discussion I had with Lisa on 5/15 where
13       she asked the same question of 'What if I can't perform the
14       essential functions of my job?'"
15                Do you see that?
16       A.   I do.
17       Q.   Okay.  Did you ever tell Ms. Ballweg that during the
18       February 28th meeting with Dr. Menninger and Mr. Mekerri, she
19       had asked the question, "What if I can't perform the
20       essential functions of my job?"
21       A.   I just don't recall that specific comment.
22       Q.   At PPD in early 2018, there was a formal review process
23       for employees, right?
24       A.   Yes.
25       Q.   And that formal review process required managers to
```

```
 1   complete a document online?
 2   A.  I believe so.
 3   Q.  Okay.  And the document was supposed to be completed by
 4   the end of the year, right?
 5   A.  Yes.
 6   Q.  Not everyone did that, right?
 7   A.  I don't recall.
 8   Q.  Okay.  And when you were corresponding with Dr. Menninger
 9   in January and February of 2018, she raised with you then
10   some concerns she had about her year-end review, right?
11   A.  I believe that's the case.
12   Q.  Okay.  She noted that Mr. Mekerri had never actually
13   reviewed it with her?
14   A.  I believe so.
15   Q.  She noted that there were sections that were never
16   actually completed?
17   A.  I don't recall that detail.
18   Q.  Okay.  Well, let's take a look at the document here.  I'm
19   going to show you Joint Exhibit 59.  And you see here this is
20   the 2017 performance review for Lisa Menninger?
21   A.  Yes.
22   Q.  And so here on the second page -- let's go to the third
23   page.  You see here there's a section on the review for the
24   manager to provide year-end comments, right?
25   A.  Yes.
```

 1    **Q.**  And it looks like Mr. Mekerri, he had stopped

 2    midsentence?

 3    **A.**  Yes.

 4    **Q.**  Okay.  And then looking below, the next box, he hadn't

 5    provided any comments at all?

 6    **A.**  Correct.

 7    **Q.**  And then, in the next page, he hadn't provided any

 8    comments at all?

 9    **A.**  That is correct.

10    **Q.**  And then the next page, he hadn't provided any comments

11    at all?

12    **A.**  Correct.

13    **Q.**  And then the next page, he hadn't provided any comments

14    at all?

15    **A.**  Also correct.  I do see ratings for each category.

16    **Q.**  And then the next page, no comments?

17    **A.**  Correct.

18    **Q.**  And then -- well, let's back up a second here.

19          Now, one of the sections on this review concerned

20    recruiting; is that right?

21          Excuse me.  That's the wrong one.

22    **A.**  Yeah.

23    **Q.**  One page back.  I'll get there eventually.

24          All right.  I'm now showing you the second page of

25    the exhibit, the top half here, and we have a goal that is to

1    expand scientific expertise and technical depth for GCL; is

2    that right?

3    **A.**   That is correct.

4    **Q.**   And that involved recruiting and hiring people at the

5    PhD/MD level; is that right?

6    **A.**   Yes.

7    **Q.**   Okay.  And Dr. Menninger's year-end comments, she

8    provides a description of her efforts.  Do you see that?

9    **A.**   I do.

10   **Q.**   Okay.  Anything in there that you think is wrong?

11   **A.**   Looks correct.

12   **Q.**   And Dr. Menninger's overall rating for 2017, that was a

13   three, correct?

14   **A.**   Yes, fully meets expectation.

15   **Q.**   And you -- at the time you had no opinion one way or the

16   other as to whether or not that was -- that was a proper

17   rating, correct?

18   **A.**   Correct.

19   **Q.**   Okay.  Now, you -- you had some involvement in the

20   completion of this review, didn't you?

21   **A.**   I don't recall that I did.

22   **Q.**   Okay.  In the -- in the performance review system, you

23   had the ability to modify reviews in the system, didn't you?

24   **A.**   I -- I don't know.  That's not a function I normally

25   would do, so --

 1    **Q.**  Okay.  I'm going to show you a document here -- well, let

 2    me ask this question first.  Do you recall on January 15,

 3    2018, going into the system and modifying this review?

 4    **A.**  I don't recall, no.

 5    **Q.**  Okay.  I'm going to show you a document to see if it

 6    refreshes your recollection.

 7            MR. HANNON:  Ms. Belmont, this document is not in

 8    evidence.  So this is -- identification -- BI.

 9    BY MR. HANNON:

10    **Q.**  So I'm just going to direct your attention here to a

11    highlighted portion of the document, sir.

12            MS. MANDEL:  Your Honor, we object to the use of

13    this exhibit.

14            THE COURT:  What's the objection?

15            MS. MANDEL:  This goes beyond the scope of what is

16    permissible in light of the summary judgment ruling on this

17    particular issue.

18            THE COURT:  Do you have anything else with this

19    witness, other than this topic, so I can look back at that at

20    the break?

21            MR. HANNON:  This is probably it.

22            THE COURT:  Why don't we take the morning break now

23    and then I'll look at it.

24            All rise for the jury.

25            (Jury not present.)

1    closely to what -- my instructions to you in the courtroom.

2    You will have those instructions in writing with you in the

3    jury room.

4            In addition, you will have a separate document from

5    me called the verdict form.  The verdict form will have

6    questions for you to answer and the questions pair with the

7    instructions.  And those are the questions that you -- on

8    each of those questions, you will have to be unanimous.  And

9    those -- and those questions are your verdict, if you will.

10           And so all of that will be explained in more detail

11    to you.  And in the meantime, I remind you you should not be

12    discussing the case among yourselves.  You should keep an

13    open mind.  You haven't heard all the evidence, you haven't

14    heard the instructions, and, obviously, shouldn't be

15    discussing the case with anyone else either.

16           All right.  Mr. Hannon, go ahead.

17           MR. HANNON:  Thank you.

18    BY MR. HANNON:

19    **Q.**  So, Mr. St. John, we left off -- I was showing you a

20    document, and my question to you, sir, is simply does this

21    document refresh your recollection as to whether or not you

22    made some modification to Dr. Menninger's 2017 performance

23    review on January 15, 2018?

24    **A.**  It does.  It does.

25    **Q.**  Okay.  And you did, in fact, make a modification to her

1    performance review on January 15, 2018; is that right?

2    **A.**  No.  It would indicate to just manually moving it forward

3    in the process, no comment, no change, other than moving it

4    forward in the process.

5    **Q.**  Okay.  And you did that on January 15, 2018?

6    **A.**  Correct.

7    **Q.**  Just one last document -- I apologize, this is way out of

8    order.  I skipped over it earlier.  I'm going to show you

9    Joint Exhibit 146.  And I'm not going to beat a dead horse

10    here, but -- so this is an email exchange between you and

11    Ms. Ballweg on April 12, 2018; is that right?

12    **A.**  Yes.

13    **Q.**  You're describing for her a quick interaction you'd had

14    with Mr. -- Chris F.; is that right?

15    **A.**  Yes.

16    **Q.**  Would that be Dr. Fikry?

17    **A.**  Yes, I'm sure it would be.

18    **Q.**  Okay.  And he asked how everything was going?

19    **A.**  Yes.

20    **Q.**  And you told him that Hacene is holding Lisa accountable?

21    **A.**  Yes.

22    **Q.**  Setting clear expectations?

23    **A.**  Correct.

24    **Q.**  And monitoring her performance clearly; is that right?

25    **A.**  Closely, yes.

1   **Q.**  Closely.  Thank you.

2           MR. HANNON:  That's all I have, Your Honor.

3           THE COURT:  All right.  Cross-examination or . . .

4        **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

5   BY MS. MANDEL:

6   **Q.**  Good morning, Chad.

7   **A.**  Good morning.

8   **Q.**  You testified earlier today about receiving

9   communications from Dr. Kessimian.  Do you recall that?

10  **A.**  Yes.

11  **Q.**  After the letter that you received from Dr. Kessimian

12  with accommodation requests dated February 14th, did you ever

13  receive another letter from Dr. Kessimian telling you that it

14  was okay for Dr. Menninger to engage in any particular work

15  tasks?

16  **A.**  No.

17  **Q.**  Did you ever receive any other communication from

18  Dr. Kessimian at all?

19  **A.**  No.

20  **Q.**  You testified a view moments ago -- or a little while ago

21  at this point, about some performance and quality issues that

22  you're aware of with respect to Dr. Menninger; is that

23  correct?

24  **A.**  I am.

25  **Q.**  Did Dr. Menninger ever receive any discipline in

```
 1   connection with any of those issues?
 2   A.  No.
 3   Q.  And did PPD ever fire or threaten to fire Dr. Menninger
 4   in connection with any of those issues?
 5   A.  No.
 6           MS. MANDEL:  Nothing further at this time,
 7   Your Honor.
 8           THE COURT:  All right.  Thank you very much.
 9           Anything else?
10           MR. HANNON:  Nothing further of Mr. St. John, no.
11           THE COURT:  All right.  Thank you very much,
12   Mr. St. John.  You're excused.
13           THE WITNESS:  Thank you.
14           THE COURT:  Next witness?
15           MR. HANNON:  Christopher Fikry.
16           MR. CURRAN:  Mr. Fikry -- his flight got delayed,
17   and so he won't be here for a little while.  He's --
18           MR. HANNON:  Hacene Mekerri via read-on.
19           THE COURT:  All right.  So as you know, ladies and
20   gentlemen, we're -- some of the witnesses, like Mr. St. John
21   and Mr. Fikry, obviously, are coming from out of state, so
22   we're -- the lawyers, really, pick the schedule, but they're
23   working with each other to accommodate the schedule.
24           So the next is a reading of a portion of the
25   deposition of Mr. Mekerri.  And so the way that -- is way
```

```
 1    that's going to work is --
 2              MR. HANNON:  May I approach?
 3              THE COURT:  Yes.  Just -- how do you anticipate it
 4    working?
 5              MR. HANNON:  What we have done, Your Honor, is we
 6    have merged together the respective portions that both
 7    parties want read in.  So we're just going to read in all
 8    sections through a straight read.
 9              THE COURT:  Okay.  So this is -- what you have seen
10    with other witnesses, right, is Mr. Hannon will ask questions
11    of what he wants to ask, and defense counsel will ask
12    questions of what they want to ask.
13              Here, Mr. Mekerri is not going to be here, so
14    they're reading his deposition.  And so it's just going to be
15    one read and you shouldn't -- you're going to read all the
16    questions?
17              MR. HANNON:  Yes, Your Honor.
18              THE COURT:  All right.  So, Mr. Hannon, is going to
19    read all the questions, but you shouldn't infer that these
20    are all things that he wants to put in, and it doesn't -- the
21    evidence, as I will tell you later, doesn't really matter who
22    put in the evidence.  The evidence is the evidence.  So he's
23    going to read all the questions and --
24              Is this someone from your office?
25              MR. HANNON:  Yes.  This is our paralegal, Your
```

```
 1    Honor.

 2              THE COURT:  So this is not, obviously, Mr. Mekerri.

 3    This is a paralegal from Mr. Hannon's office and she will be

 4    Mr. Mekerri for this purpose and she'll read the answers.

 5              And so these are just what -- the two of them thing

 6    should be presented to you.

 7              Yes?

 8              JUROR:  I just wondering why Mr. Mekerri is not

 9    here.

10              THE COURT:  I think that's a question we're going

11    to circle back to.  I just want to confer with the lawyers

12    about that and I -- I have the sense more than one of you

13    would like the answer to that question, so let me talk to the

14    lawyers about that and see what, if anything, they have to

15    answer for you about that.

16              Go ahead, Mr. Hannon.

17              MR. HANNON:  Thank you, Your Honor.

18              THE COURT:  I'll confer with them about that at

19    lunch and then I'll give you the answer to that at

20    two o'clock.

21              Is the answer -- location?  Is that -- do you both

22    think that's the answer?

23              MR. HANNON:  I'm sorry?

24              THE COURT:  Location is the answer?  Or do you

25    think we should discuss it?
```

1    MR. HANNON:  I think we should discuss just so it's

2    consistent.

3    THE COURT:  Fine.  Go ahead.

4    The testimony of

5    **HACENE MEKERRI**

6    having been duly sworn previously, was read into the record as

7    follows:

8    **Q.**  "Mr. Mekerri, good evening to you.  My name is Patrick

9    Hannon, I represent Lisa Menninger in connection with this

10   action.  Thank you for taking the time and speaking with us

11   via videoconference.  And just for the record, can you

12   identify where you are at present?

13   **A.**  "Sure.  I'm based in Singapore.

14   **Q.**  "Okay.  Are you currently employed?

15   **A.**  "Yes, I am.

16   **Q.**  "Okay.  Great.  So, Mr. Mekerri, how are you presently

17   employed?

18   **A.**  "I work for biomedical and life science solutions.  It's

19   a company that I set up when I came here in Singapore for

20   consistency, for supporting laboratory and pharmaceutical, to

21   support pharmaceutical companies, as well as, you know,

22   players from the clinical trials to work here in

23   Asia-Pacific.

24   **Q.**  "And, Mr. Mekerri, when did you form this consultancy?

25   **A.**  "It was in -- when I arrived here, some months after.  So

1   I would say probably May, May or June.  I'll have to come

2   back to you with the date.

3   Q.  "Would that be May or June of this year, 2020?

4   A.  "No, 2019, but it might be later.  I arrived here in

5   Singapore in April, so it took me some time, really, to

6   register the company.  But it might be that we registered in

7   summer, so probably July or August.  I don't have the date in

8   mind.

9   Q.  "Okay.  And what did you do for work prior to starting

10  this consultancy you referenced?

11  A.  "I was working for PPD, so I was the vice president of

12  Global Central Lab and vaccine.

13  Q.  "And what was your title immediately prior to leaving

14  PPD?

15  A.  "Prior to leaving PPD, vice president of Global Central

16  Lab and vaccine.

17  Q.  "For how long were you in that position?

18  A.  "Three years.

19  Q.  "How did you come to join PPD?

20  A.  "I've worked with LabCorp since 2015 and my former leader

21  at LabCorp had joined PPD as the global head of central lab,

22  and he informed me that they were looking for a global head

23  of central lab.  And that was end of 2015 and that's where we

24  started to have the discussions with the rest of the PPD

25  team.

1           "On November 2015, if I recall, I met with the

2    leadership team of PPD in Wilmington, North Carolina, at the

3    headquarters and -- yeah, I had to set up interviews with the

4    team.  They reviewed my experience with LabCorp, with MDS, my

5    experience in China as well, working as the leader of the

6    integration between LabCorp and Covance, my experience in

7    Germany as I worked there for about seven years, and,

8    obviously, all my experience for 20 years in the industry.

9           "And then I'd been selected and had the privilege

10   to serve as the vice president of Global Central Lab for PPD.

11   And we started to have a discussion in January 2016, if I

12   recall, but my starting date with PPD I flew from China to

13   France first in January.  And then in February, I flew from

14   France to US for work.  I worked with PPD on the visa as

15   well, so that I can work in the US.  I've had the great

16   privilege to receive an 01-Visa from the US homeland, the US

17   government, and then I was able to work in the US."

18           THE COURT:  Let me just pause you one second,

19   Mr. Hannon.

20           So, ladies and gentlemen of the jury, just so you

21   understand, obviously, there is a transcript of this

22   deposition.  That's what's being read.  You are not going to

23   have that transcript in the jury room.  You don't -- we

24   don't -- we won't have transcripts for the reasons I've told

25   you of all the other witness, and so for that reason, we

```
 1    don't give you this transcript because all the witnesses are

 2    equal, or to be treated equally, until you evaluate them.

 3              So you're, obviously, paying close attention, but

 4    that's an important -- I didn't want you to think that you'll

 5    have that.

 6              Go ahead, Mr. Hannon.

 7              MR. HANNON:  Thank you, Your Honor.

 8    Q.   "Okay.  And when you joined PPD, did you join as vice

 9    president of Global Central Lab and vaccine?

10    A.   "No.  I was just the vice president of Global Central

11    Lab.  The vaccine team or business was added to my

12    responsibilities later.  I think it was in 2017, but this has

13    to be checked with the data PPD team.  I think it was in 2017

14    that I got an additional -- additional responsibilities

15    within PPD.

16    Q.   "Okay.  And was there a person who was serving as vice

17    president of Global Central Lab prior to you joining PPD?

18    A.   "I think so.  You know, yes, they had a leader, but when

19    I joined, I understand that there was no leader, right?  So

20    probably there was a gap between when I joined and that

21    former leader.

22    Q.   "What were your duties and responsibilities as vice

23    president of Global Central lab when you joined PPD?

24    A.   "It was to lead the four central labs, the clinical

25    topography PPD had in Singapore, China, US, Highland Heights,
```

1    and Belgium, Brussels' laboratory in Europe.

2             I was, in fact, in charge of the global operations,

3    reaching the company objectives for PPD, making sure that the

4    clinical trials that PPD was running were running smoothly,

5    that we delivered on time the results, that we met as well

6    the company business objectives from a financial perspective,

7    as well.

8             I was responsible, as well, for the quality that --

9    the centralized business was in a highly regulated

10   environment, so we had to meet some quality objectives for

11   CAP, for ISO as well, which are some regulations that we were

12   following, yeah.  As the leader, Patrick, there were

13   activities, responsibilities that come with the role and

14   together with team that I had at the time was to meet those

15   objectives.

16   Q.   "How were your duties and responsibilities at PPD

17   different from the duties and responsibilities you would have

18   in your prior employment?

19   A.   "Probably having to deal with four labs, like, you know,

20   having to -- before I was the head of Europe for data

21   management.  So it was Germany and France.  And then I was

22   the head of Canada, so one side.  And after that, I was the

23   head of China.  This time, probably the difference would be

24   the fact that I have four sides, so the whole business.

25   Q.   "And when you first joined PPD, to whom did you report?

```
 1    A.   I reported to Dr. David Johnston.

 2    Q.   "And did you have direct reports when you first joined

 3    PPD?

 4    A.   "Yes.

 5    Q.   "And who were they?

 6    A.   "The head of laboratory, Dr. Menninger; the head of IT;

 7    the head of project management; the head of data management;

 8    and I'm sure I -- I always forget some folks, but that -- and

 9    some departments were reporting directly to the EVP.  The

10    sales force was reporting to the EVP, so that's a different

11    department that they have.

12    Q.   "So you mentioned that one of the roles reporting to you

13    was the head of lab; is that right?

14    A.   "Yes.  Lisa.

15    Q.   "And that was Dr. Menninger?

16    A.   "Yes.

17    Q.   "Okay.  And you mentioned there was also an IT role?

18    A.   "Yeah.  Patrick, I apologize.  I think that the IT was

19    reporting directly to -- excuse me -- to corporate group.  So

20    it was the data management.  But I'd like to correct that.

21    IT was not reporting to me.

22    Q.   "Okay.  But you mentioned there was a data management

23    role that reported to you?

24    A.   "Yes, uh-huh.

25    Q.   "And who was the individual in that role when you first
```

```
 1    joined PPD?

 2    A.   "It was Tracy, Tracy Watkins.

 3    Q.   "And you mentioned there was also a product management

 4    role that reported to you?

 5    A.   "Project, -- project management.

 6    Q.   "And who was it?

 7    A.   "At the beginning, it was Els Pluymers, and I have, as

 8    well, the head of Asia-Pac., Asia-Pacific.

 9    Q.   "So the head of Asia-Pacific was also reporting to you?

10    A.   "Yes, the senior director of Asia.

11    Q.   "And who was the individual in that role?

12    A.   "Esther E.

13    Q.   "So besides Dr. Menninger, the project management leader,

14    the data management leader, and the director of Asia-Pacific,

15    did you have any other direct reports when you started at

16    PPD?

17    A.   "Oh, I'm sorry -- I'm sorry if I forget some.  I'm sure I

18    forgot.  Dr. Miriam Block, she was kind of in direct line

19    with me and with Lisa.  Actually, I appreciated that Lisa

20    worked with her because we have two great scientists working

21    together.  But I remember Dr. Miriam Block, who has been a

22    consistent for PPD in helping us with the oncology project.

23    Q.   "Any other direct reports who you can recall?

24    A.   "No, I don't recall at this time.

25    Q.   "Okay.  And just before you left PPD, who were your
```

```
 1    direct reports at that time?
 2    A.   "The team in China that was based in Beijing, so, you
 3    know, the same as the people I described to you:  laboratory,
 4    project management, data management.
 5              So they had an indirect line with me and a direct
 6    line to their head of different departments.  So I was based
 7    in China as a managing director, and so all the departments
 8    that were running in the sites were, you know, indirectly
 9    reporting to me.
10    Q.   "When did your employment with PPD end?
11    A.   "It was February 2019.
12    Q.   "And how did the end of your employment come about?
13    A.   "It was my decision to leave PPD.  I worked there for two
14    years, and I've had, you know, the privilege to serve the
15    central lab, the vaccine business, and I've been working on
16    my succession plan for quite some time.  And we've -- I've
17    had -- you know, we've had great success with the team, so we
18    met our objectives.  We surpassed/exceeded our objectives,
19    financial objectives, from a quality perspective as well.  So
20    for me it was the right time, as well, to leave PPD after two
21    years.
22              "And I came from this region, too, in APAC, so I
23    wanted to return here in Asia to open my own business and see
24    how I can support the pharmaceutical companies here -- from
25    here in Asia.
```

 1          "So when I left PPD, I thanked the team, I thanked
 2   my leader, and prepared my move to Singapore.
 3   Q.  "Did you enter into any kind of agreement with PPD
 4   concerning the termination of your employment?
 5   A.  "In fact" --
 6          MR. HANNON:  You can keep going.
 7   A.  "Patrick, for me, it was the right time and it was pretty
 8   much my decision here, so I completed my resignation letter.
 9   I explained the rationale, and I sent to it my supervisor.  I
10   had three great years with PPD, you know, from a results
11   perspective; I think from an objective perspective and the
12   results.
13          "And, of course, it's not me alone.  It's the whole
14   team.  We had the best results, you know, we reached the best
15   results that PPD never had before from a central lab
16   perspective.  Never.
17          "From a sales perspective, we've added hundreds of
18   millions of sales.  From a testing perspective, we've added
19   months -- people assays.  And from a quality perspective,
20   we've added a lot of quality, regulatory requirements for CAP
21   or ISO.
22          "And I want to mention, as well, I've been
23   instrumental for that as well.  So for me, it was the right
24   time to leave PPD.
25   Q.  "Well, for example, a separation agreement, an agreement

1  that provides you severance compensation, any kind of written

2  agreement in connection with the end of your employment?

3  **A.**  "No.  I didn't have any severance package, no.

4  **Q.**  "Okay.  Do you know who took your role?

5  **A.**  "I believe -- yeah, I know.

6  **Q.**  "Who?

7  **A.**  "Chris Clendening.

8  **Q.**  "And Mr. Clendening, what had his role been while you

9  were at PPD?

10  **A.**  "He was the head of project management and data

11  management.

12  **Q.**  "I'm sorry, was he head of both project management and

13  data management?

14  **A.**  "Project management, yeah.  And we asked him as well to

15  take the data management, too.  Yeah.

16  **Q.**  "What was your understanding of Dr. Menninger's duties

17  and responsibilities when you joined PPD?

18  **A.**  "She was the head of -- the executive director of the

19  whole laboratory services, so she led inside the -- the group

20  of directors or managers that are working in the laboratories

21  that we had, so she was in charge, in fact, of the operations

22  and support team, that team to test the sample on time, in

23  charge as well of the quality.  She's been helping.

24      "Dr. Menninger has been our CAP handler or CAP

25  director.  So she was in charge, in fact, of ensuring that

```
 1    PPD met the CAP requirements so that we get the CAP
 2    certification.
 3            "So every two years we had an audit from the CAP
 4    team, and Dr. Menninger had been working with direct reports
 5    to ensure that we had that certification in Belgium and the
 6    US, as well as in Singapore and China.  She was also working
 7    with her peers to meet their objectives.  So from a project
 8    management perspective, for example, reviewing the results or
 9    reviewing the questions from the clients.
10            "With the QA team, she's been very helpful to reach
11    the certification of ISO that PPD got successfully.  So she
12    has worked with her team to get that certification in the US,
13    and that has been a great success, too, working with the
14    sales team, too, responding to the bids, the requests for new
15    proposal, yeah.  So she has multiple aspects of her role,
16    yeah.
17    Q.  "You mentioned the certification in the US that
18    Dr. Menninger worked on.  What was that certification?
19    A.  "CAP, the CAP accreditation, that is the same as ISO, the
20    ISO certification.  PPD, before I joined was -- PPD central
21    lab was working in getting the certification.  We had already
22    some audits from the ISO, CAP/ISO team, and we had some
23    findings, and one of the objectives that we put as a team was
24    to get that certification back to the central lab, and so
25    Lisa has worked -- and we got the certification in
```

| | |
|---|---|
| 1 | Highland Heights. |
| 2 | **Q.** "What is an ISO certification? |
| 3 | **A.** "The ISO is kind of a regulation certification that |
| 4 | drives the central laboratories for the highest quality and |
| 5 | qualified labs, in fact, for handing samples with a different |
| 6 | analyzer than we have.  So it's truly kind of a |
| 7 | certification, I would say, for central labs.  Not a lot of |
| 8 | central labs had that when I joined PPD, so we were very |
| 9 | happy to get that certification. |
| 10 | **Q.** "And is there a particular organization that gives that |
| 11 | certification? |
| 12 | **A.** "Yeah.  It's the -- we went through CAP, CAP/ISO. |
| 13 | **Q.** "Okay.  And do you know who the organization is that |
| 14 | gives the ISO certification? |
| 15 | **A.** When you say do I know, like, personally or -- I know CAP |
| 16 | because I've been working with -- for the -- for the -- with |
| 17 | the CAP team for the certifications that happen every year, |
| 18 | every two years.  But for the ISO, I must say that as a |
| 19 | certification that I have not had the experience before.  So |
| 20 | it was a great learning for me and it takes, really, teamwork |
| 21 | to meet the certification. |
| 22 | "So Lisa's team, as well as the QA team, did a |
| 23 | great job to have that certification. |
| 24 | "To answer your question, I've never worked closely |
| 25 | for the ISO certification before, so it was a great |

1    opportunity and great challenge for me.

2    **Q.** "Okay.  Had PPD ever had the ISO certification in the

3    past?

4    **A.** "Not the central lab, no.  No.

5    **Q.** "And was there any reason why it wanted to obtain an ISO

6    certification?

7    **A.** "Yeah.  I mean, it's like any certification, right?  It's

8    a great recognition for the lab to -- that we got quality

9    results and with a good -- yeah.  So it was key for us to

10   have that and to position PPD among, you know, the other

11   central lab as well.

12            "As I said, not all the central lab had that

13   certification, so this was a good -- a great achievement for

14   us together with all the other achievements related to the

15   business that we got.  So that was really, really great.

16   **Q.** "Okay.  And you also mentioned a CAP certification.  What

17   is CAP?

18   **A.** "CAP is another certification.  It's the College of

19   American Pathologists.  It's another accreditation provided

20   by a group of experts.  and I know that Lisa is also a CAP, a

21   CAP director.  So it's truly MDs, you know, PhDs, but many

22   MDs that are all scientists and have come up with really high

23   standards for laboratories and it's quite very -- which word

24   I could use? -- but with a high technicity, there's a high --

25   there's a documentation to follow.  There's data to review.

1          "And so it's -- it's -- so we have a group of

2     inspectors coming in every two years to recertify the

3     laboratories, interview the team, and I got to get

4     interviewed as well.  But I must say that most of the work is

5     done by Lisa and her team, as well as other departments, to

6     ensure that we meet the different criteria that CAP had set

7     up in order to be CAP accredited.

8          "The outcome of an inspection is either you have

9     zero findings and everything works perfect, or you can have

10    some deficiencies.  You know, I think Lisa would speak better

11    on this type of findings.

12         "But during my stay at PPD for the first inspection

13    that we had, we, in fact, got the -- the certification of

14    CAP, and that's for all the laboratories, not only one site,

15    but four sites.  So four times the CAP inspector come.

16    They're selected by the CAP director and they are usually

17    peers from the industry, and that's a team that goes to the

18    laboratory.

19         "We don't have the dates in the US.  They don't

20    inform us.  They will come and show up and then do their

21    audit.  I can take one day, two days usually, or more, and

22    they audit the different parts of the laboratory, the

23    different sections of the laboratory.

24    Q.   "You mentioned that part of Dr. Menninger's role at PPD

25    involved working with her peers; is that accurate?

1   **A.**  "Yeah, she -- we worked as a team, really.  If we met our

2   objectives, it was really like working together.  So working

3   with project management, data management, yes, we worked with

4   her peers" -- "she worked with her peers.

5   **Q.**  "And who in your review were Dr. Menninger's peers at

6   PPD?

7   **A.**  "Sorry, Patrick.  Can you repeat the question?

8   **Q.**  "Who would you view as having been Dr. Menninger's peers

9   at PPD?

10  **A.**  "Who are the peers of Dr. Menninger?  Is that the

11  question?

12  **Q.**  "Correct.

13  **A.**  "So the other department leaders.  For example, we spoke

14  about Chris Clendening earlier, but it can be, as well, the

15  head of data management, the head of -- so that's why they're

16  called 'peers,' right?  It's really like the different

17  leaders of the different departments that work with her.

18          "The clinical trial business is, I would say, quite

19  complex, right?  It takes a village to provide the results to

20  the sponsor, and so Lisa's team has to work, Lisa and her

21  team have to work with the kit production to make sure that

22  the kit goes to the site so that the sample is collected, the

23  patient sample is collected.

24          "Then you have to make sure that when the sample

25  comes back, it comes back on time, so there is logistical

```
 1   aspects as well when the sample is collected, to make sure
 2   that it's barcoded correctly, that it's entered correctly
 3   into the database.  So the sample reception plays a big role.
 4   And then it goes to the laboratory, to Lisa's team, for the
 5   testing through the medical technologist and the machine.
 6          "When the result is tested and released, then the
 7   lab report is sent to the investigator, who are looking for
 8   the results in order to deliver the information to the
 9   patient.  And when potential data -- data is available, then
10   the results are sent to the data manager -- also data manager
11   by the data management groups.
12          "And, of course, all of this is within the IT
13   system.  So the IT part is instrumental.  And so is, as well,
14   the quality, the quality system for the central lab under the
15   laboratory, so working with the quality -- the QA as well.
16          "And finally, of course, at the end you have the
17   patient and the client.  So project management is aware
18   throughout of the sample life cycle about the status of the
19   sample.  So that's why the laboratory works closely with
20   other departments.
21   Q.  "And did you ever observe any difficulties that
22   Dr. Menninger had with working with her peers?
23   A.  "And when you say 'difficulties,' Patrick, what does it
24   mean?
25   Q.  "Any problems that Dr. Menninger had working with her
```

```
 1   peers.  Did you ever observe any?
 2   A.  "I'm not sure.  In fact, that -- of the question or how
 3   to interpret the question here.  I've not seen myself, you
 4   know, difficulties from Dr. Menninger working with the other
 5   department leaders.  I think the communication was quite
 6   good, you know, and so I don't see difficulties.
 7   Q.  "Did any of Dr. Menninger's peers ever complain to you
 8   about Dr. Menninger?
 9   A.  "About Dr. Menninger -- again, you know, it's -- I'm not
10   sure about the question, because Dr. Menninger has been very
11   respected, you know, with PPD.  When I was with PPD, she -- a
12   CAP director, a CAP holder.  And so as a person, she has a
13   great reputation, and for me too.
14           "And so when you say Dr. Menninger, I would say no.
15   I think the people were working really well with her.
16   Q.  "Either prior to or around the time you started at PPD,
17   did anyone give you any information about Dr. Menninger's
18   performance in terms of if it was satisfactory or not
19   satisfactory, anything of that nature?
20   A.  "I don't recall, but as I said, Lisa's reputation was
21   great.  And I remember -- I walked in a lab with my leader at
22   the time; and we were aware, at that time, within the
23   oncology capabilities in Highland Heights for the anatomical
24   pathology unit, we were building the AP laboratory in
25   Highland Heights, the AP section, and Lisa and other team
```

1    members were working.

2              And I remember that it was really my first week,

3    right?  We even took a picture of the team together with my

4    leader with a helmet because of the construction.  And the

5    lab was a big success.  We had an AP section built in

6    Highland Heights.

7    **Q.**  "Did you hear anything negative about Dr. Menninger when

8    you joined PPD?

9    **A.**  "No.

10   **Q.**  "Would it be fair to say that all of the feedback that

11   you received concerning Dr. Menninger around the time of your

12   hire was very positive about Dr. Menninger's performance?

13   **A.**  "I would say yes.  When I joined PPD, I would say yes.  I

14   don't recall -- I don't recall any -- any wrong feedback.

15   **Q.**  "And what was your impression?

16             "Sorry to cut you off.

17             "What was your impression of Dr. Menninger when you

18   first met her?

19   **A.**  "Great.  Great.  Good impression.  I mean, very, very,

20   very knowledgeable.  She came, I believe, from another big

21   pharmaceutical company, Novartis -- I think it was Novartis.

22   I home it's Novartis -- with all the credentials that I

23   personally don't have.  So I'm really lucky to work with

24   people and scientists that have all that knowledge that I

25   need to run the business, right?  So very accomplished MD,

1    very accomplished CAP director, and very involved in the
2    laboratory.  So great.
3    **Q.**  "So when you became vice president of Global Central
4    Labs, where were you located geographically in terms of where
5    did you sit?
6    **A.**  "I was based in Highland Heights, so in northern
7    Kentucky, Highland Heights, where our central lab is located.
8    The main central lab is located in the US.
9    **Q.**  "And during your time as vice president of Global Central
10   Labs, did you also travel for work?
11   **A.**  "I did.  Yeah, I did travel in the different
12   laboratories, so Belgium, Singapore, and China, and also a
13   lot of travels with clients, too, within the US and in
14   Europe.  One of the clients even took me to east Europe.  So,
15   yeah, I traveled a lot.
16   **Q.**  "All right.  When you say that you traveled a lot, do you
17   have an estimate of how much time, either on a weekly,
18   monthly, or yearly basis you would be on the road?
19   **A.**  "I don't know, Patrick.  But I can tell you I was -- I
20   reached diamond status in one year and I've never had that
21   before.
22   **Q.**  "Okay.  Would it be accurate to say that half of your
23   time was spent on the road, or less than half of the time?
24   **A.**  "I don't think it was half of the time, because I needed
25   to be physically present in the US.

1    **Q.**  "Did you say that you needed to be physically present in

2    the US?

3    **A.**  "Yeah, yeah, yeah.  It's our main lab.  Most of our

4    business was out of the US, you know, like the main

5    activities were in the US, so I was most of the time in the

6    US, yeah.

7    **Q.**  "Dr. Menninger, she was at least originally also working

8    out of the Highland Heights location; is that right?

9    **A.**  "That's correct.  She had an office centimeters from my

10   office, like three doors.

11   **Q.**  "Okay.  And during the time period when Dr. Menninger was

12   working at Highland Heights as her primary location, how

13   frequently did you interact with her?

14   **A.**  "I would say we have kind of a weekly -- I think we had a

15   weekly meeting, you know, on our agenda.  So we met based on

16   our calendar.  She was very busy.  I mean, she also was the

17   lab director for the four labs, so a lot of responsibility.

18   So I would say, at a minimum, once a week, but it can happen

19   that we met, you know, during the week, right?  Her door was

20   open, you know, she had kind of an open-door policy, too, as

21   I have.

22          "So we could have also had some interaction when we

23   are not -- I mean, outside of our scheduled meeting.

24   **Q.**  "And based upon your observations of Dr. Menninger when

25   you were both working out of Highland Heights, did she

```
 1    primarily work in her office?

 2    A.   "Yes, uh-huh.

 3    Q.   "And I think you indicated her office was just a few

 4    doors down from yours?

 5    A.   "That's right.  She would spend time in the lab.  She

 6    went a lot.  You know, she was someone that was working face

 7    to face with her team, so she'd go to the pit and she had a

 8    meeting with her team.  I remember joining her for a meeting

 9    in the laboratory.  So she takes everyone in the laboratory,

10    all the MTs, and then she speaks to them about, you know, any

11    new instrument, any -- so any achievements as well.

12              "And so I remember meeting in the pit as well.  So

13    she spent time in the laboratory, like, you know, where the

14    analyzers are.

15    Q.   "And based upon your observations when Dr. Menninger was

16    working out of Highland Heights, how much of her time was

17    spent in the laboratory itself?

18    A.   "I'm sorry; I can't quantify because I can't see her, you

19    know, like in the office or in the lab.  I have, as well, my

20    responsibilities, so I can't really tell you the frequency.

21    Q.   "Do you know if it was on a daily basis?

22    A.   "Oh, I'm sure, yeah.  I'm sure she would spend some time

23    in the lab at least once a day, yeah.

24    Q.   "Were you actually there to observe that?

25    A.   "As I said, sometimes I joined here, you know, we do a
```

1    lab tour, for example, and when we have visitors as well,

2    other leaders from PPD, other EVPs joining us, so we go

3    together.  So, yeah, sometimes I'm there, or you know,

4    sometimes we deliver messages to the lab, so sometimes I've

5    seen that, yeah.

6    **Q.**  "So how frequently would you join Dr. Menninger in a trip

7    to the lab?  And, again, this is during the time that you

8    were both working out of Highland Heights?

9    **A.**  "I don't recall, really, the frequency, but -- I don't

10   recall.  I can't give you an accurate number.  I'd love to

11   tell you once a week.  I'd love to tell you two times.  But I

12   don't recall, really.  But I think it was -- it was quite

13   often.  I liked, as well, going to the lab.  I did that

14   often, even, you know, after she was working remotely.  I

15   like to walk in the laboratory, so I had that in my agenda as

16   well.

17   **Q.**  "During the time that you and Dr. Menninger were both

18   working out of Highland Heights, what was your view of

19   Dr. Menninger's work performance?

20   **A.**  "Good.  Good.  During my time with -- during my time when

21   she was working with me and from my perspective as a leader,

22   you know, I -- again, you know, we had the best year for the

23   central lab in 2016 and 2017.  And each of my team leaders

24   was part of the success and certainly Lisa was part of that

25   too, so I would say good.

1    **Q.**  "During the time that you and Dr. Menninger both worked

2    out of the Highland Heights location, did you believe there

3    were any deficiencies in Dr. Menninger's work performance?

4    **A.**  "No, I don't believe so, not that I recall.  Again, it

5    has been three years, Patrick, but on top of my memory and

6    for Lisa as well, the 2016 year when we worked together in

7    Highland Heights was a great year.

8    **Q.**  "And for part of the year in 2017, you were both in

9    Highland Heights, right?

10   **A.**  "That's correct.

11   **Q.**  "And during that period of time, can you recall any

12   deficiencies you observed in her work performance?

13   **A.**  "Not on the top of my mind.  I'm sure, probably, there

14   were some challenges that we could have.  You know, as I

15   explained earlier, it takes a village -- right? -- to run a

16   clinical trial.  So it takes communications with the data

17   management, with the sales team, with the laboratory, with

18   everyone.  So I'm pretty sure that there were some challenges

19   that we had to tackle, but all in all, I must say that Lisa

20   had done a great job when she worked together on site.

21   That's my perspective.

22   **Q.**  "Okay.  Now at some point Dr. Menninger began working

23   remotely; is that correct?

24   **A.**  "That's correct.

25   **Q.**  "How did that change come about?

1    **A.**  "Can you -- may I ask you to rephrase your question?

2    **Q.**  "Well, how did it come to be that Dr. Menninger entered

3    into a remote working status?

4    **A.**  "Maybe it would be the best to ask Dr. Menninger, I

5    guess, here, because I want to respect her condition there.

6    But she had been asking to work from home, to work remotely

7    from Cincinnati.  And so I worked with the HR team to make

8    that happen.

9            "I worked with her as well to ensure how to

10   continue to deliver and to work with the team, so I don't

11   recall in detail some of the process, how it went, but I know

12   that there was dialogue, a lot of communication internally

13   and then, at the end, kind of an email to the team announcing

14   that Lisa would work remotely in another city.  That was a

15   request coming from Lisa that she wanted to work remote.

16   **Q.**  "Besides human resources and Dr. Menninger, who else was

17   involved in that dialogue?

18   **A.**  "But I don't recall any other kind of members that was

19   involved in the decision.  In fact, I think -- I think maybe

20   it was me, HR, and Lisa, and then I wanted to get the

21   assurance that it would work from remote.  Probably, at that

22   time I -- I do not think that -- I think I had the leader

23   because the decision ultimately was me -- right? -- to

24   approve but with some assurance from HR.  So I would say

25   maybe the HR team was involved in that and Lisa, of course --

1    right? -- making sure that she can continue to operate and

2    deliver from where she is.

3    **Q.**  "Okay.  Thank you.

4            "Am I correct that, when assessing Dr. Menninger's

5    request to work remotely, that part of that process involved

6    you trying to make sure that she'd be able to perform her

7    duties and responsibilities while working remotely?

8    **A.**  "Yeah.  Yeah, I was.  I was.  I'm involved, yeah.

9    **Q.**  "Okay.  And did you ultimately reach a determination as

10   to whether or not she could perform her duties and

11   responsibilities remotely?

12   **A.**  "Can you repeat the question, Patrick?

13   **Q.**  "Did you ultimately reach a decision as to whether or not

14   you believed Dr. Menninger could perform her duties and

15   responsibilities remotely?

16   **A.**  "Yes.

17   **Q.**  "And what did you decide?

18   **A.**  "I approved.  We approved the relocation.

19   **Q.**  "And when you approved it, were you making the decision

20   that you believe she could perform her duties and

21   responsibilities remotely?

22   **A.**  "Yes.

23   **Q.**  "Now, you had mention before that you believed that

24   Dr. Menninger had spent time in the pit, so to speak.  Did

25   you have any discussions with Dr. Menninger in connection

1    with her request to go on remote status about whether or not

2    she'd still be visiting the pit periodically?

3    **A.**  "I don't recall the details, Patrick.  It has really been

4    quite some time, but I believe we did, yeah.  We discussed

5    that.  I think so, yeah.

6    **Q.**  "Okay.  What do you recall about those discussions?

7    **A.**  "I think I recall about the fact that she would visit the

8    laboratory on a regular basis; that she would come to the

9    site when requested, when the operations requested her; and

10   that she will be able to travel to the laboratory as frequent

11   as it was needed for the laboratory, yeah.  But the details,

12   I don't remember.

13   **Q.**  "Okay.  Was there any discussion with Dr. Menninger in

14   connection with her remote status as to how frequently she

15   would need to travel to Highland Heights?

16   **A.**  "I don't remember.  I think we discussed the frequency,

17   but I don't recall.  I mean, I don't remember -- I don't

18   remember the numbers.  We were -- I mean, you have to, from

19   my perspective, see the -- it is difficult after two years,

20   to be frank, but I just want to make sure that I share with

21   you the moment, right?  It was really a request from

22   Dr. Menninger to move; and, again, she'd be the best one to

23   share why and everything.

24            "So my end was to help her as well as she help

25   PPD -- right? -- and to make that happen, to make her move

1    happen and continue to operate.  At that time, it was really

2    something that she wanted to pursue, and I did my best with

3    other team members to fulfill her needs.

4    **Q.**  "And when you approved Dr. Menninger's request to work

5    remotely, did you have a specific expectation as to how

6    frequently she would travel to Highland Heights?

7    **A.**  "Yeah.  For what level -- and it's the same way as with

8    many other questions that you asked me before for those types

9    of leaders, right?  She had been an executive director of

10   laboratories, and she's an MD; so she really knows what she's

11   doing, right?  I think there is a lot of trust too that she

12   knows when is the right time to come to the laboratory and to

13   support the team.

14          "So -- and so I believe we discussed the frequency.

15   But, again, you know, she has an impressive background that I

16   don't have in science, so I trust her capabilities and her

17   knowledge of when is the right time to come to the

18   laboratory.  So, yeah.

19          "And that's the same with every other EDs that I

20   have.  The type of leadership that I was exerting, that I

21   exert in my career was really to empower the people, to coach

22   and to make the best of them so that we can reach our

23   objectives.

24          "So, yeah, I really counted on her as well to see

25   when she could come to the laboratory.  And, frankly, it was

 1    quite natural, because she was really saying that she would

 2    come when it's needed and take a plane and come for the CAP

 3    at least for the" -- "or for the requirements from the

 4    laboratory.  So I was confident that everything would

 5    continue to work smoothly.  And, again, the aim of PPD was to

 6    support her because it was her request to move.

 7    **Q.**  "Okay.  Did you have a role in determining

 8    Dr. Menninger's bonus at PPD?

 9    **A.**  "I do.  We have -- you know, we work -- you know, PPD has

10    set up a system, you know, where you have a certain budget

11    allocated, and based on the performance of the employee.  It

12    was the same for me as well and any other employee of PPD.

13    You can set up the amount for that employee, the amount of

14    the bonus, based on performance.

15    **Q.**  "Were you the one who ultimately decided how much of a

16    bonus Dr. Menninger got paid?

17    **A.**  "Yeah.  You know, again, I don't really recall the

18    details, but I worked with my -- the answer is, yes, Patrick.

19    And I'm the one who is really kind of suggesting or

20    recommending based on the performance.  But it would take,

21    you know, the involvement of the HR, you know, to explain

22    to -- how it works, the rating and how it translates into the

23    range for the compensation.  And you're there as well to

24    agree on the compensation for my leader.

25    **Q.**  "And in determining the amount of bonus that would be

1    paid, were you allotted some kind of a bonus pool?

2    **A.** "I believe so, yeah. Yeah.

3    **Q.** "And was that bonus pool something that you had a hand in

4    determining, or was that just, essentially, told to you?

5    **A.** "I believe it was told to me. I'm not able to -- it's

6    really standard, and it's -- I think it's like that for every

7    company, right? It's based on the company objectives and how

8    much we've reached of the objectives and then calculated.

9    It's calculated to the different departments.

10          "So, yeah, it's really based on the revenue that we

11    made, and they have agreed to follow. So I'm not putting a

12    random number there. It's really based on the range that is

13    given to the leader.

14    **Q.** "And in terms of making compensation decisions relative

15    to Dr. Menninger, did you also play a role in deciding

16    whether or not she would receive annual adjustments to her

17    base salary?

18    **A.** "'Annual adjustments.' What do you mean by annual

19    adjustments?

20    **Q.** "Pay raises.

21    **A.** "Yeah. Yeah. But it's really based on performance. So

22    if you -- and there are some guidelines with PPD, or with any

23    company, that based on the performance, when you allocate a

24    certain percentage, and then that percentage is part of a

25    pool that you have. But it's really within a range that is

1    given to me by the system and based on the performance.

2    **Q.**  "Okay.  Thank you for that.

3          "Now, do you recall at some point in time

4    Dr. Menninger disclosed to you that she had a disability?

5    **A.**  "I do.  I do remember.

6    **Q.**  "And what's your best recollection as to how that came

7    about?

8    **A.**  "Yeah.  She -- she -- I think I was at that time

9    traveling, but I wanted to discuss with her.  I mean, I had

10   the equal agenda, but I wanted, actually, just to make it

11   short and postpone it because I think I was in between two

12   flights.  But I remember that Dr. Menninger shared with me

13   the disability, her disability.  Yeah, it's not an easy thing

14   to share, I can imagine, for her.  And for me to hear that

15   when I was at the airport.  So I told her that -- you know, I

16   asked her to -- I think I asked her to send me an email to

17   follow up.

18         "This is the kind of thing, like many other things,

19   that I need to work with other people that got the knowledge

20   and know how to act on such -- with such a situation and

21   making sure that we help Lisa.

22         "So the first thing I did was really making sure

23   that I inform with the agreement of Lisa.  I asked her if I

24   can share that, the information, with HR, with Chad.  So I

25   remember that I acknowledged the information, and then I

1   shared the information with HR.

2   **Q.**  "Okay.  And what do you recall Dr. Menninger telling you

3   about her disability?

4   **A.**  "I don't have -- I don't recall really the detail, you

5   know, of the disability right now after two years.  But she

6   shared with me that, you know -- about the facts that she had

7   some difficulty.

8           "Do you want me to share what I have in mind

9   about -- of what she shared with me?  Is that your question?

10  **Q.**  "Yes.  Tell me your best recollection.

11  **A.**  "Mainly the fact that she can't -- or that it takes a lot

12  of effort for her to speak in public.  That was one of the

13  key aspects, you know, that she wasn't able to speak in

14  public.  But" --

15          MR. HANNON:  Hang on.  Can you read that again,

16  please?

17          THE READER:  From the beginning?

18          MR. HANNON:  Beginning with "that was."

19  **A.**  "That was one of the key aspects, you know, that she --

20  that she's able to speak in public, but it would take a lot

21  of effort for her to -- you know, to act in public, you know,

22  with numbers of people related to anxiety related to that.

23  So I think she really -- you know, I sensed from the email

24  that she sent that it was something that has always been

25  there for her and that it took a lot of effort for her to

1    disclose that disability.

2    **Q.**  "Were you surprised to learn that Dr. Menninger had such

3    a disability?

4    **A.**  "I was not aware before.  It was really the first time.

5    It's never great to hear, you know, from one of your

6    colleagues that she has a disability, right?  So I was

7    surprised, yes, because I was not aware and because I had

8    worked with her for two years where she has -- I've never

9    seen, you know, any challenges related to public speaking or

10   anxiety about the number of people.  You know, I had never

11   seen that before.

12           So it was a surprise, the fact that she had that

13   role for two years and that she had that disability for --

14   yeah, that's kind of a surprise that I had in my mind at that

15   time.  Yeah.

16   **Q.**  "Prior to Dr. Menninger's disclosure of her disability to

17   you, had you ever seen her do any public speaking?

18   **A.**  "Yes.  I've seen her doing public speaking before.  We do

19   have town halls.  It's something that I really wanted to make

20   sure that she was able to deliver messages, the strategy, the

21   achievements to the PPD's employees, to PPD central lab

22   employees, and so I've seen her, you know, working on town

23   hall, or as I mentioned earlier, delivering a mentioned -- a

24   message to the pit lab as well, to the group.

25   **Q.**  "I'm sorry.  Go ahead.

1    **A.**  "The town hall, we are speaking of hundreds of people,

2    500, 600 people.  The total employees of the central lab, 500

3    or 600 that we had at the time.  Because every time we want

4    to include everyone, and so we have invited people from

5    Belgium, from Asia, and so we had hundreds of employees

6    joining over the phone or by video.

7    **Q.**  "And besides the town halls, you referenced and the

8    delivering the message to the lab that you've referenced,

9    were there any other instances of public speaking that you

10   saw Dr. Menninger engaged in prior to the disclosure of her

11   disability?

12   **A.**  "Yeah.  She did a great job when we had the CAP

13   inspection.  She was the one delivering, you know, hosting

14   the CAP inspector.  And we had a big auditorium in

15   Highland Heights, a big room, and we invited whoever wanted

16   to come.  So we had a large team joining from laboratories

17   and she was delivering the positive message of the outcome.

18           "I also recall such -- such meeting involving Lisa.

19   **Q.**  "So besides the town halls you've referenced, delivering

20   the messages to the lab that you referenced, and the CAP

21   inspection, can you think of any other instances in which you

22   saw Dr. Menninger engaged in public speaking prior to the

23   disclosure of her disability?

24   **A.**  "You know, she had worked for a large team globally.  I

25   believe she was speaking or addressing the laboratory team

1   over the phone, too.  We had the Excel team, the senior

2   management team, so my team, and so she also was involved in

3   providing the date from a laboratory perspective to the

4   senior management team.

5          "I'm sure I've forgotten some other instances, but

6   that's really a great example of where she actually did a

7   great job.

8   Q.  "So at least as you sit here today, what you can recall

9   in terms of Dr. Menninger's public speaking prior to

10  disclosure of her disability was the town halls, delivering

11  messages to the lab, CAP inspection, and then providing

12  updates to the senior management team; is that right?

13  A.  "Yeah.  And, again, you know, that's just an exhaustive

14  list.  I don't think we should just limit it to those ones,

15  because there can be, as well, some client visits or audits

16  as well.  So there can be other -- or a visitor from -- that

17  we meet at the office joining.  So there might be others that

18  I missed, Patrick.

19  Q.  "Sure.  But I'm just asking what you can actually recall

20  having taken place prior to the disclosure of her disability.

21  Anything else beyond what you've already listed?

22  A.  "I'm sure there are others.

23  Q.  "Okay.  You mentioned earlier that Dr. Menninger had been

24  involved with town halls prior to disclosure of her

25  disability.  How many town halls can you remember

1    Dr. Menninger having participated in?

2    **A.**  "I can't remember, you know, precisely these questions,

3    this question, but I think we tried to have a town hall once

4    every quarter. I think that's the frequency that I put in

5    place. It might be more. It might be less, so I can't

6    respond to this precisely.

7    **Q.**  "Okay. Do you know if Dr. Menninger had participated in

8    all of these town halls?

9    **A.**  "I believe so. Yeah. Yeah. I have in mind that she was

10   there and she did a great job.

11   **Q.**  "Okay. And is it your recollection that she presented at

12   all of these town halls?

13   **A.**  "Yes, she presented.

14   **Q.**  "Okay. Do you have a recollection of how long her

15   presentations were?

16   **A.**  "I don't. I don't. Off the top of my mind, I would say

17   10 minutes, 10 to 15 minutes, but it might be less,

18   7 minutes. It was about that time, because we have to have

19   all the department leaders presenting and then, you know, you

20   have some Q&A. So I don't precisely -- I don't know.

21   Probably 7 to maybe 10 minutes.

22   **Q.**  "And did I hear you correctly before that you said she

23   did a great job with these presentations?

24   **A.**  "Yeah. I mean, I think -- I think those -- those -- you

25   know, those town halls are very appreciated by the team,

```
 1    because that's when you go over the achievements, the
 2    objectives.  So every one of my team, at the time, I really
 3    appreciated what they had done and what they had prepared,
 4    and Lisa is certainly part of them.  Yeah, she did great.
 5    Q.  "So she did a great job?
 6    A.  "Mmm.
 7    Q.  "Is that a yes?
 8    A.  "From my perception, yes.  Yes.
 9    Q.  "Okay.  You also mentioned that you saw her delivering
10    messages to the lab team.  What was your assessment of
11    Dr. Menninger's performance in performing that task?
12    A.  "Excellent.  Very good.  She was, you know, very -- yeah,
13    very good.  Good communication, good presence.  And it's a
14    really large team.  Very large team.
15    Q.  "And then you mentioned the CAP inspection, that there
16    was also a presentation component of that.  Is that right?
17    A.  "That's correct.
18    Q.  "How did Dr. Menninger perform with respect to the CAP
19    inspection presentation?
20    A.  "Very good.
21    Q.  "And then you indicated that you'd also observed
22    Dr. Menninger providing updates to the senior management team
23    periodically.  Did I state that correctly?
24    A.  "Uh-huh.
25    Q.  "Yes?
```

1    **A.**   "Yes.

2    **Q.**   "And do you have a recollection of how frequently she did

3    that?

4    **A.**   "No, I don't, because it depends as well on the agenda

5    items, you know, that we have.  So I wouldn't say that it's

6    always, you know, the lab to provide an update.  I tried to

7    let every team member to provide an update, and it's really

8    based as well on the type of information that we have to

9    share at the time.

10             "So, for instance, if there is a CAP inspection

11   coming, then that would take the role of presenting.  And if

12   there's any project related to the lab, then we have to -- we

13   heard from Lisa about it.  But I can't give you a number

14   because it's really based on the agenda of those meetings.

15   **Q.**   "And what was your assessment of Dr. Menninger's

16   performance in terms of providing those updates?

17   **A.**   "The same.  Good.  My assessment, good, very good.

18   **Q.**   "Let me direct your attention -- let me direct your

19   attention here to the second paragraph where it asked the

20   question, 'What specific accommodation are you requesting?'

21   Do you see that section?

22   **A.**   "I do.

23   **Q.**   "Okay.  And the first sentence reads, 'My psychiatrist

24   has recommended that any social interaction and/or public

25   speaking incident to my job be minimized/avoided as much as

1    possible.'

2         "Do you see that there?

3    **A.** "Yes, I do.

4    **Q.** "Okay.  Were there ways to minimize the amount of public

5    speaking that Dr. Menninger needed to perform in her role at

6    PPD?

7    **A.** "I mean, the obvious answer is to say yes, right?  And I

8    don't recall the depth of the conversation.  I think I tried

9    as much as I can to accommodate, together with the HR team,

10   on her request based on that disability.  I believe we took

11   action.

12        "One of the difficulties, Patrick, that you have to

13   understand as well -- and this is the same with everyone, is

14   to make sure that, you know, that the business continues to

15   run as well, right?  So the unfortunate -- obviously, you

16   know, I want to tell you, yes, we have to help Lisa.  You

17   know, we have to make sure that she feels better and that,

18   you know, she -- you know, that we accommodate her needs.

19        "But it's difficult for PPD, as well -- you

20   know? -- to make sure that the business continues to operate,

21   but definitely we need to take into account her disability,

22   yes.  And I believe we discussed with her to make sure that

23   we take in account her request.  I hope that answers your

24   question, Patrick."

25   **Q.** And then this is reading from a document:  "Further she

1    has recommended that my role not be changed in a manner that

2    would require increased social interaction and/or public

3    speaking.

4              "Do you see that?

5    **A.**    "Uh-huh.

6    **Q.**    "Yes?

7    **A.**    "Yes.

8    **Q.**    "As of the date of this document -- and I'll just scroll

9    down and show you it has a date of January 30, 2018 -- had

10   you and Dr. Menninger discussed the possibility of her role

11   being changed so as to require increased social interactions

12   and/or public speaking?

13   **A.**    "There were some discussions that we had with Lisa at the

14   end of the year related to those changes, but it was mainly

15   for her to be more included, you know, involved.

16             "What we've identified, the feedback that I

17   received, Patrick, was that the business needed more

18   scientific presence, more laboratory visibility, that we were

19   lacking in laboratory presence.  And so my aim was -- the

20   business aim was to -- we need to tackle that feedback and

21   that request for the business.

22             "As I mentioned earlier, the business had a

23   tremendous growth, which means, as well, more client

24   requests, more client interactions, more challenges, as well,

25   to tackle.  Presence from the lab was more welcome at that

1    time.

2    "I believe I had a discussion with Lisa in December

3    about that, and we've had as well some discussions related to

4    some feedback that I received from other departments about

5    that.

6    "So to answer your question, there are two aspects.

7    One is we need to make sure that we respect Lisa's

8    disability, and for that, I needed, you know, HR and really,

9    you know, to understand what's the -- what's the process

10    there, right?  You know, I need to understand as well how to

11    fulfill Lisa's requirements.  That's why I asked her to work

12    with Chad to provide -- to work with HR to provide the

13    information.

14    "The other aspect is we're a business, Patrick, and

15    we need to make sure that we continue to operate that

16    business -- that the business continues to operate.

17    Q.  "All right.  Let me unpack that a little bit.  So one of

18    the things that I think I heard you reference was that the

19    business needed more scientific presence.  Did I hear that

20    correctly?

21    A.  "Yes, that's correct.

22    Q.  "Okay.  And when you say more scientific presence, what

23    do you mean by that?

24    A.  "There was some more client needs.  There was some more

25    requests coming from the business as we grow, similar

1    requests from the team members.  I recall some more as well

2    requests from the sales team, as an example.  And so, yeah,

3    that's what I mean by having more scientific presence, is we

4    need to -- scientific is a pillar for the central lab, and so

5    that's why the business needed more scientific presence.

6    **Q.**  "You indicated there were more requests from customers,

7    and that was part of the need for additional scientific

8    presence?  Did I hear that correctly?

9    **A.**  "Yeah.  There were -- there were a lot of requests from

10   the sales team, for example, that required scientific

11   expertise or project management or from the team as well and

12   the lab from the employees themselves.

13   **Q.**  "Okay.  But is it your testimony that these additional

14   requests you referenced require Dr. Menninger to change the

15   way she was doing her job?

16   **A.**  "What I meant by "changing," because I knew -- I think.

17   That's the word I've mentioned in December.  Again, you know,

18   when you prepare for the performance appraisal and when you

19   prepare for the rating of your employee, you gather feedback,

20   right?  I mean, I don't make a decision alone.  I make a

21   decision by -- alone without information.

22            "I make decisions with getting feedback, getting

23   360s, and really entering that, all the information, in order

24   to provide a feedback and make a decision.  We'd done an

25   exercise in December with the whole senior leadership

1    management where I learned as well that the laboratory at PPD

2    central lab can provide more -- provide more -- that we can

3    increase our scientific presence there.

4         "I've learned throughout the year that the sales

5    team requested, as well, some more support from the lab, the

6    same way project management or the same way with the

7    laboratory.  So, again, another two years after, you know,

8    the details and the specifics are not easy to remember, but I

9    want to convey that the changes that I made is really the

10   need of having more presence of -- in the lab leadership

11   outside based on the nature of our business, the growth, and

12   the requests from the clients internally and externally.

13   **Q.**  "So are you saying that when you -- that what you

14   communicated to Dr. Menninger was you wanted her on site more

15   at the labs?

16   **A.**  "Actually, what I said was more the feedback, right?  I

17   think this was a matter of discussions.  I always try to --

18   and I think I mentioned it earlier -- I have a great and I

19   still have a great respect for Lisa; and I want to make sure

20   that, you know, we work together on what is possible --

21   right? -- and what is -- what is possible for her and what is

22   good for PPD.

23        "We have -- I mean, it's a company of 20,000

24   employees, right?  And they're all -- their responsibility in

25   the industry is crucial.  So my role is key to make sure that

1   we continue to deliver and continue to operate.  So the

2   conversation was more, yes, related to the performance of the

3   laboratory and the feedback that I received, so ensuring that

4   more presence and more visibility are ensured on the lab

5   leadership.

6   **Q.**  "But back to my question, sir, so when you were saying

7   more presence and more visibility, were you saying that you

8   wanted Dr. Menninger to spend more time at the lab?

9   **A.**  "Yeah, I don't recall the details, but I believe, you

10  know, that could have been a solution, too.  Yeah.  But I

11  don't recall the details of the conversation, sorry.

12  **Q.**  "You don't recall talking?

13  **A.**  "Yeah, I don't recall, you know, that we spoke really

14  about, you know, having her more present.  What I can share

15  with you is the fact that end of year in 2017 -- in 2017, you

16  know, at the end was -- with that growth, the need in the lab

17  was higher.  So we needed more presence.

18          "I'm sorry, Patrick, but I'm not sure if we

19  discussed this, really, you know, having her back to the

20  site, as long as, at least, you know, if we can tell that we

21  needed more visibility and more presence.

22          "And then I do believe that there were some -- you

23  know, some feedback from the teams requesting -- requesting

24  that too -- right? -- so requesting that presence and

25  visibility from the lab leadership.

1    **Q.**  "Let's just take a step back, Mr. Mekerri.  So you

2    referenced a few times a conversation you had with

3    Dr. Menninger concerning feedback?

4    **A.**  "I did.  I did.  We had the conversation.  I believe that

5    we had one in December 2017 after that 360 and based, as

6    well, on the performance.  So we had a conversation in

7    December, yeah.

8    **Q.**  "Okay.  So you have a conversation with Dr. Menninger in

9    December of 2017, and am I right that part of that

10   conversation concerned going over feedback you had received

11   through this 360 process?

12   **A.**  "Yeah.  That's what I -- you know, if memory -- it was a

13   performance appraisal, you know, discussion, where every time

14   I do for -- every time I do for performance, for an

15   appraisal, you know, I gather feedback, you know, from the

16   peers; and I ask them to, you know, give some names.  And

17   then I add to -- and then I gather feedback, and then, see,

18   based on that talent review exercise or other, you know,

19   conversations that I have had with Lisa during our

20   one-on-ones.

21         "So I think the outcome was really to discuss, you

22   know, how we can change that and how we can, you know, have

23   more presence and more visibility so that the team feels like

24   they receive, you know, what they are expecting and the same

25   from a client perspective.

1    **Q.** "Okay. So when you talked with Dr. Menninger about how

2    she could be more present and more visible, what did you talk

3    about?

4    **A.** "I don't recall the specifics, Patrick. I'm sorry. I

5    don't really remember the details. I'm pretty sure that I

6    had that 360 in front of me with the information. I remember

7    that it went well. I mean, I have -- again, I have a lot

8    of -- I have still -- I have a lot of respect for Lisa. I

9    appreciate her support and her -- and that's my style, too,

10    that I recognize, you know, her effort and her support to me

11    and to PPD. And I'm sure that I shared, as well, that there

12    were a lot of -- there was feedback as well from others

13    that -- there were some requests of presence and visibility

14    too. And I believe we discussed that as well before I asked

15    her to connect more with sales or with other people.

16    "So, yeah, it's a conversation I had with them.

17    The details, I can't remember.

18    **Q.** "Where did this meeting take place?

19    **A.** "Over the phone. Over the phone. I believe it was over

20    the phone when I was in -- in -- oh, in Virginia in the

21    vaccine lab. I think that was the day I had the meeting with

22    Lisa, so over the phone.

23    **Q.** "Is it your testimony that prior to the 360 feedback you

24    referenced, that people within PPD had expressed concerns to

25    you that there was more supervision needed at the lab site?

1    **A.** "From what I recall, yes.  That's why I asked for more

2    change in visibility, but I don't have the details with me

3    right now as we speak.  There were some more requests.  And I

4    think you asked me the question earlier, Patrick, to be

5    honest.  There was more requests for presence and visibility

6    in lab; and it was, you know, based on the needs of the

7    business, the growing number of clinical trials that we had,

8    and the challenges that we had at the time.

9           "And I'm going to repeat myself that my aim here,

10   as I said, is to make sure that Lisa finds peace here in this

11   process and understands that it's business actions --

12   right? -- and nothing -- nothing related to her disability,

13   but more related to the fact that the business was growing.

14   Lisa was working remotely and we needed to find a solution on

15   how to make sure the business could continue to operate based

16   on the challenges that we were having in the situation that

17   we were having.

18   **Q.**  "I had asked you who it was that told you or expressed to

19   you that the lab site needed more leadership prior to this

20   360 process.  Do you recall that question?

21   **A.**  "I do.

22   **Q.**  "Can you tell me now who it was?

23   **A.**  "I think my answer was that I don't remember, right?

24   Clearly the people, and it's still the same.  It may be that

25   I have the -- you know, the lab team, some people from the

 1  lab, her peers, so all the sales team, I think the sales --
 2  obviously, received that from the sales, you know, from the
 3  project management.  I just don't recall the names.  That's
 4  it.  But I did receive feedback from the business.
 5  **Q.**  "Let's put the names aside and let's just talk about the
 6  concerns.  What were the concerns that were expressed to you
 7  prior to the 360 process concerning Dr. Menninger's
 8  performance?
 9  **A.**  "You know, it's the same, right?  So because you ask me
10  where those concerns come from and then you ask me names, but
11  from what I recall, there were some challenges, you know,
12  with some -- some -- some clients.  There were some
13  challenges from a sale perspective from some other business
14  units as well.  So there were growing concerns.
15      "I know you're taking notes, but at least I'm
16  providing a non-exhaustive list, all that I can recall, but
17  there were concerns at that time with having no leadership in
18  the lab, so --
19  **Q.**  "No leadership what?
20  **A.**  "No leadership in the lab outside and that we needed more
21  presence, more visibility; and that's what I conveyed to Lisa
22  during my call in December, that I wanted to help her to make
23  some changes and implore her to be more visible, to be more
24  present.  I believe that was really my -- my -- you know, our
25  intent at that time.

1   **Q.**   "But backing up to the challenges that you say were

2   expressed to you prior to the 360 review process, you

3   indicated you thought some of those challenges related to

4   clients.  Did I hear that correctly?

5   **A.**   "Yeah.  Yes.  Yes, related to clients.

6   **Q.**   "And what did you hear in that regard?

7   **A.**   "Two years, Patrick.  I can't go into the details as

8   precise as two years ago, but I can recall, for instance, the

9   need for the sales team to provide more support in this, in

10  meetings, for example, and challenges, you know, like you can

11  have -- challenges, you know, in the laboratory -- you

12  know? -- or working with other departments.  So, yeah.

13  **Q.**   "What do you mean working with other departments?

14  **A.**   "Well, the feedback came, as I explained earlier, you

15  know, it's really a teamwork, right?  It's not only one

16  department that you handle with PPD, but multiple departments

17  in order to run the clinical trials.  So many departments are

18  involved working with lab.  QA is one of them, for example.

19  So the QA aspect is key regarding the audit process, the

20  challenges, you know, related to all the Q aspects.

21          "So that's an example of another department, too,

22  that could have raised some -- some of the issues in the lab,

23  so the quality is too.

24  **Q.**   "Let me just ask the question before you start to answer

25  it.  What I want to know is the concerns you actually

1    remember having been expressed to you.  Do you actually

2    remember having expressed to you concerns concerning

3    Dr. Menninger's work performance with respect to client

4    issues before the 360 review process?

5    **A.** "I do remember.  I do remember there were concerns, but I

6    don't remember, as I said, and I'm sorry if I repeat myself.

7    I don't remember precisely what the details or the specific

8    of the contents.

9    **Q.** "Okay.

10   **A.** "I don't have anything else.  Many things happened in two

11   years, but I think the main thing that I want to share with

12   you, Patrick, is there were concerns.  And I worked with Lisa

13   and shared with Lisa there are some feedbacks that I'm

14   receiving and we need to -- we need to work together.

15          "And I'm always putting myself inside, because her

16   success is my success.  Her failure is my failure too, right?

17   I mean, that's how a leader is noted, right?  I remember that

18   I shared with her that I will work with her and will make the

19   change so there's more visibility and the feedbacks are

20   better.

21          "Going into the details of what were those

22   challenges, I don't remember, Patrick.  sorry.

23   **Q.** "Okay.  That's fine.  And if you don't remember, you can

24   just tell me you don't remember.  That's perfectly fine.  So

25   you indicated that you have this"?

1     MR. HANNON:  So we can ignore that.

2     We'll go on to page 111, line 23.

3   **Q.**  "Okay.  You mentioned presence and visibility as being

4   two concerns that you have in December of 2017 with

5   Dr. Menninger's work performance.  Is that right?

6   **A.**  "That's right.  That's right.

7   **Q.**  "Okay.  Besides presence and visibility, do you have any

8   other concerns with Dr. Menninger's work performance as of

9   December 2017?

10  **A.**  "Yeah.  The presence.  The visibility.  I mean, the

11  challenges, right, that have been gathering in the 360 from

12  the other departments.  I'm so sorry that I repeat myself,

13  but, you know, I don't go to those meetings, and the

14  discussions without being unprepared and without gathering

15  the details, so that was based on feedback that we gathered

16  from the business.

17  **Q.**  "Okay.  But my question, sir, is just trying to identify

18  the concerns you had as of the time of that December 2017

19  meeting.  And so far, you've identified presence and

20  visibility.  Were there any other concerns you had concerning

21  Dr. Menninger's work performance as of December 2017?

22  **A.**  "The challenges that the lab was having, and when I say

23  presence and visibility, it's really the needs from other

24  departments to get the support from -- from -- for the

25  requests, right?  So, yeah.  Yes.

1   **Q.**  "Okay.  Besides the presence and visibility issues, the

2   challenges and the requests, any other concerns you had with

3   Dr. Menninger's performance as of your meeting with her in

4   December of 2017?

5   **A.**  "I would probably say that any other concern that the

6   business had and that I gathered and I don't remember, but

7   there may be some from others.  I don't recall.  I don't

8   recall.

9   **Q.**  "Okay.

10   **A.**  "I mentioned quality, Patrick.  I think that there was

11   some discussions related to the quality aspects, too, but the

12   best -- yeah.  Yeah.

13   **Q.**  "Okay.  Let's work through that list.  So you think there

14   may have been some concerns regarding quality aspects.  What

15   do you mean by that?

16   **A.**  "Quality is the, you know, response to the audits, the

17   findings, and I may miss, you know, some of the topics there;

18   but I do recall that there were some discussions related to

19   the quality, to the quality metrics, and required from

20   quality.  I don't recall the details.

21   **Q.**  "Okay.  And was there something that Dr. Menninger needed

22   to improve upon in order to address those quality issues?

23   **A.**  "She's a leader, you know?  She can -- I'm sure she can.

24   Yeah, she can provide support to the other department.

25   **Q.**  "Did you have any -- did you have reason to believe that

1    Dr. Menninger wasn't providing that support already?

2    **A.**   "Again, you know, we're speaking about 360 at that time

3    and the feedback that I received, right?  I would love to

4    tell you that, you know, everything was fine and everything

5    was great, but there were some challenges, and I needed to

6    share that with her, and we needed to have more -- you know,

7    some changes on the way we run that.

8    **Q.**   "What needed to change?

9    **A.**   "You know, more presence, more visibility, more actions

10   from the laboratory perspective working with the other

11   departments.  I think the response came from, you know,

12   working with Lisa, right?  Finding those actions to tackle

13   them.  Lisa is playing the role of the lab in working with

14   the other department in working on the -- on the job

15   descriptions, yeah.

16   **Q.**   "Wasn't she already doing that?

17   **A.**   "We had to -- you know, as I said, Patrick, you know, the

18   feedback comes from the business.  So I was just, you know,

19   kind of ensuring that we work together with Lisa to tackle

20   them, you know?  I would love to tell you everything was

21   fine, everything was great, but that was not the case, and

22   that's business growing -- you know? -- and -- yeah.

23   So . . .

24   **Q.**   "Sure.  I'm not asking you to tell me everything was

25   great.  I'm just asking you to answer my question, which is,

```
 1   you know, what was it that you believed needed to change as
 2   of December 2017 relative to Dr. Menninger's performance?
 3   A.   "You know, I believe that was, you know, really related
 4   to her presence, right? -- and visibility, right? -- and
 5   interactions with the team.  Again, it's, I think, two years
 6   ago, but having more presence in the lab and more
 7   interactions with her colleagues, tackling the challenges
 8   that we had, so helping her really to be more visible and
 9   working more with the other departments.  That was the intent
10   of the changes.
11   Q.   "What was the issue regarding Dr. Menninger's presence?
12   A.   "I think the fact that she was remote probably didn't
13   really help.  You know, it's a very, you know, busy role --
14   right? -- and very key role that she had, and I think being
15   far from the laboratory didn't really help to support the
16   team -- you know? -- or to be kind of connected, I would say,
17   with her peers that were on site, or with the needs of the
18   business.
19   Q.   "Besides being remote, was there anything else with
20   respect to Dr. Menninger's presence that you found to be an
21   issue in December of 2017?
22   A.   "I think -- and, again, I'm sorry if I don't recall the
23   specifics, but the sales team, I remember that there were, as
24   well, requests for more interactions, you know, with the
25   clients, with the bids with the sales team, the sales team,
```

153

1    including the presence, the scientific presence to support

2    the sales team and the bids and proposals.

3    Q.    "Sure.  Was Dr. Menninger not being sufficiently present

4    something that you thought contributed to quality issues?

5    A.    "Yeah, I think so.  And, again, I don't have -- I don't

6    recall, really, the details, but quality is a result -- or,

7    actually, reaching quality excellence is the result of the

8    day-to-day involvement of the whole team and ensuring that

9    the processes are really well -- are respected throughout the

10    work that was done by the lab.

11            "Qualities are -- so audit findings that we were

12    having that needed, you know, our responses.  You know, it's

13    just too two examples.  There are many other aspects.  And

14    the QA team would be the best to provide the details.

15            "But, yeah, I mean, this is where the lab leader

16    can help ensure the quality aspect.

17    Q.    "And how does the lab leader, through being more present,

18    include quality, from your perspective?

19    A.    "From my perspective, providing, you know, training, you

20    know, reviewing the -- that's my perspective, by reviewing

21    the processes and reviewing how they're applied in the

22    laboratory, correcting any deficiencies that have been

23    detected, providing trainings to ensure that the employee

24    have the know-how, you know, and working with the QA

25    department on site -- right? -- to ensure that we're

1    responding to those challenges, resolving them.

2    **Q.**  "Was it your belief back in late 2017, early 2018 that it

3    was at least important to document any serious performance

4    concerns you had?

5    **A.**  "Hey, Patrick, serious, it's a very big word -- right? --

6    because her performance went well, you know?  And I think I

7    mentioned that the discussion -- the conversation I had with

8    her in December was and always -- has always been, you know,

9    very positive.

10        "You know, I tried, and that's also my style.  You

11   know, I tried to show the great things, tried to show what

12   needs to be done and performed better, and I believe that

13   wasn't so demonstrated, that wasn't so shown displayed in the

14   grid or in the notation that I gave her.  So the notation

15   that I gave her wasn't so negative.  You know, it was just

16   positive.  And so that shows up well that it was.

17        "So we have concern, you know?  But at that time I

18   was really trying to, you know, work together to tackle the

19   challenges and show her as well that we needed -- the

20   business needed more from her.

21   **Q.**  "Did you view the issues that you raised, the challenges

22   that you raised in December of 2017, as serious performance

23   issues?

24   **A.**  "I would say the business started to really notice, you

25   know, that there were, you know, serious concerns, yeah.

1    Yeah.  So there were serious concerns or challenges at that

2    time, you know?

3    **Q.**  "And did you think it was important to reflect those

4    serious performance concerns in Dr. Menninger's written

5    performance appraisal?

6    **A.**  "You know, what I thought was it was important to discuss

7    the trigger, the challenges -- and trigger the challenges

8    that I mentioned, you know, make sure that we change that and

9    we do change it.  So I took that really seriously and agreed

10    to support her and make sure that, you know, we change that

11    into a success story.

12         "We've done that in the past, you know, resolving

13    issues and making it -- making them a success story.  So,

14    yeah, it's --

15    **Q.**  "So back to my question, sir, which is did you think it

16    was important to reflect those serious performance concerns

17    in documenting this written performance appraisal?

18    **A.**  "I think I answered this question already, Patrick.  You

19    know, at that level in organization, I do believe that the

20    communication discussion is key.  At the follow-up, there's a

21    mutual trust.  There's a -- there's a -- you know, brilliant

22    people and smart people really know what they have to do

23    based on the feedback that you give them.  And so I provided

24    the feedback and I'm sure that, you know, she had already

25    that kind of feedback received from others, too.  And it's

1  not -- you know, it's why I was there with her, to discuss

2  her.  It was key for me to share that to them.  The

3  performance document has been used.  It is a tool there to

4  support the conversation with your employee and prepare the

5  next step.

6  **Q.**  "So is that a no?

7  **A.**  "It's a no.  I mean, it's a yes and a no.  I mean, I

8  answered that question.  It cannot be summarized to a yes or

9  a no here.  I'm sorry, not the way I see it.

10  **Q.**  "Was there any reason not to include your serious --

11  these serious performance concerns in Dr. Menninger's written

12  performance appraisal?

13  **A.**  "Oh, there was no reason.  Again, I have to -- you have

14  two years after that.  We had the conversation, Patrick.  I

15  received the feedback, the business quality feedbacks, and I

16  shared my notes in the feedback I received.  It's never easy,

17  you know, to hear that things haven't been going so well, but

18  I think the end was really to help the employee and resolve

19  them, so it's not about writing, you know, the serious

20  concerned content.  It's really to share them, to share what

21  was the situation at that time.

22  **Q.**  "So is that a no, there was no reason to include them in

23  the written performance appraisal?

24  **A.**  "No.  I'm not sure I understand.  Again, it's the same.

25  I don't think it can be summarized into a yes or a no.  It is

1  important.  I think most important is the conversation I had

2  with her and the feedback from the business.  That document

3  is a tool.

4  **Q.**  "Okay.  But in using that tool, my question, sir, is if

5  you can think of any reason why not to include the alleged

6  serious performance concerns that you had in Dr. Menninger's

7  performance appraisal.

8  **A.**  "I don't remember.  I don't recall, you know, any reason,

9  no.  I think the conversation happened.  The performance and

10  the feedback from the team was there and, you know -- and the

11  outcome was -- again, was not from me.  The rating was good.

12  It was not a bad rating, you know, so I -- you know --

13  **Q.**  "Okay.  Prior to Dr. Menninger's disclosing her

14  disability to you, were you aware of PPD's policies and

15  procedures relative to disability accommodation?

16  **A.**  "I don't recall that.  What I can share with you is that

17  this is, for me, areas where I need professionals to work

18  with and in that case, you know, HR to support.  I was new in

19  the US, and so it's really to make sure that I got support

20  from people who know how to deal with such a situation and

21  respect -- to the condition that we -- that I was made aware

22  of.

23  **Q.**  "And who did you get that the support from?

24  **A.**  "You know, as it's written here, I worked with HR to help

25  and who was -- who has the knowledge and fact of the

1  different -- the specifics on how to work in such a

2  situation.

3  **Q.**  "So that would have included Mr. St. John?

4  **A.**  "Yeah, that's correct.  And I believe I asked,

5  respectively, Lisa to allowed me to speak with HR, which she

6  approved, and that's why I informed HR.

7  **Q.**  "Okay.  Besides Mr. St. John, is there any other source

8  that you looked to to determine what you needed to do in

9  response to Dr. Menninger's disclosure of her disability?

10  **A.**  "No, HR.  Chad St. John was my main contact and support

11  for these cases, because he would know internally with whom

12  to work and what kind of documents to provide.  So he was my

13  main contact.  No one else.

14  **Q.**  "Prior to Dr. Menninger's disclosure of her disability,

15  had you received any training from PPD on the subject of an

16  employee's -- a disabled employee's rights?

17  **A.**  "I don't recall as well.  I don't recall.  PPD has a lot

18  of, you know, guidelines and -- provide trainings.  I

19  apologize, but after two years, I left PPD.  Again, I left

20  PPD in two years of this case.  I don't recall the specifics

21  trainings.

22  **Q.**  "Did PPD's HR representatives ever inform you that there

23  was an obligation to engage in an interactive dialogue with

24  Dr. Menninger for the purpose of trying to identify

25  reasonable accommodations?

1    **A.**  "I don't recall the details, Patrick.  I don't recall.

2    **Q.**  "So the email I want to direct you to, it begins on PPD

3    Menninger 001227, and you see here it's an email from

4    Dr. Menninger to Mr. St. John on February 4, 2018?

5    **A.**  "Yes.  I see it now.

6    **Q.**  "Okay.  Can you take a moment.  I'll let you read that

7    email.  And then I'm going to have a couple of questions for

8    you concerning this email.  Just let me know when you're done

9    reading it.

10   **A.**  "Sure.  Okay.

11   **Q.**  "Let me direct you to the first sentence of the message

12   that Dr. Menninger writes to Mr. St. John.  She writes,

13   'Hacene and I had a general discussion concerning changes

14   that he's considering to make my role "more visible."'

15          "Do you see that?

16   **A.**  "Yes.

17   **Q.**  "Is that accurate?

18   **A.**  "Yeah.  If she wrote it, I believe that was the content

19   of our conversation.

20   **Q.**  "Then in the next sentence, she writes, 'He didn't get

21   into specifics, but suggested that this might include

22   increased client visits/social interactions and presentations

23   (internal and external).'

24          "Do you see that?

25   **A.**  "I see it, yeah.

1    **Q.**  "Okay.  Is that accurate?

2    **A.**  "If she wrote it, yeah.  Yeah, I believe we discussed

3    that.  Yes.

4    **Q.**  "And then skipping over the next sentencing, but going to

5    the fourth sentence in the paragraph, she writes, 'we were

6    supposed to have a follow-up conversation to discuss

7    specifics and I wanted him to understand my situation so that

8    we could try to figure this out together.'

9            "Do you see that?

10   **A.**  "Say it again?  Can you repeat that sentence for me?

11   **Q.**  "Sure.  The fourth sentence reads, 'We were supposed to

12   have a follow-up conversation to discuss specifics, and I

13   wanted him to understand my situation so that we could try to

14   figure this out together.'

15           "Do you see that?

16   **A.**  "Yes.

17   **Q.**  "Is that accurate, that you and Dr. Menninger were

18   supposed to have a follow-up conversation to discuss

19   specifics?

20   **A.**  "I don't recall the specifics, the details, Patrick.

21   **Q.**  "So you don't know if you were supposed to have a

22   follow-up conversation to discuss specifics?

23   **A.**  "I believe we discussed, you know, the fact that, you

24   know, the business requested more presence and visibility,

25   you know?  I'm not sure how much specifics we can get, but

1    it's true that I don't recall the specifics.  I was -- I

2    was -- I mean I don't recall the details, Patrick.  But what

3    I can tell you is that we discussed the fact that we needed

4    more presence from Lisa with the sales team, which is what

5    she described here with the client visits and social

6    interactions and presentations, internal and external, and

7    visibility in the lab.

8            "So this is in line with what I shared earlier

9    about my discussion with her in December.

10   **Q.**   "Do you recall any conversations subsequent to this

11   February 5th email in which you and Dr. Menninger discussed

12   the clarification that's referenced here?

13   **A.**   "I don't recall, Patrick.

14   **Q.**   "Okay.  And now if I can direct your attention here to

15   the top of the exhibit, am I right, this is an email from

16   Mr. St. John to you on February 5, 2018?

17   **A.**   "Yes, that's correct.

18   **Q.**   "And if I could direct your attention to the third

19   sentence, he writes, 'We need clarity to obtain specific

20   parameters from her physician within the buckets causing her

21   concern" -- and there's a parenthetical, '(public speaking

22   and social interaction.)'

23           "Do you see that?

24   **A.**   "Yeah, I see that.

25   **Q.**   "Subsequent to receiving this email from Mr. St. John,

1    what, if anything, did you do to identify the areas of

2    clarification for Dr. Menninger?

3    **A.**   "I don't remember, Patrick.  I don't remember.  I don't

4    remember.

5    **Q.**   "Okay.  Do you know if you spoke to anyone in connection

6    with determining what the additional clarification would be?

7    **A.**   "I don't remember.

8    **Q.**   "All right.  So directing you back up to the first page

9    of the document.  This is an email from you to Dr. Menninger,

10   correct?

11   **A.**   "That's correct.

12   **Q.**   "And your email begins, 'It was nice discussing with you

13   yesterday.'

14           "Do you see that?

15   **A.**   "I see that, yeah.

16   **Q.**   And then directing your attention down to the bullet

17   points here, can you explain to me how you drafted these

18   bullet points?

19   **A.**   "It was two years ago, Patrick.  I don't remember.  I

20   don't remember, but I believe it's based on the job

21   description and the business needs.  But I don't remember the

22   detail.

23   **Q.**   "Did you work with anyone in terms of drafting up these

24   bullet points?

25   **A.**   "I don't remember.  I don't remember.

1   **Q.** "Okay. If I could direct your attention to the first

2   bullet point --

3   **A.** "Sure.

4   **Q.** "-- under 'frequency,' it references biweekly, monthly,

5   and/or quarterly. Do you see that?

6   **A.** "I see that, yeah.

7   **Q.** Okay. Were any of these activities referenced here

8   occurring biweekly in February of 2018?

9   **A.** Yeah. I believe the SLT. I tried to remember the SLT

10  meeting. We tried to have it every two weeks.

11  **Q.** Okay. And how about town halls? What was the frequency

12  of town halls as of February 2018?

13  **A.** I would say quarterly.

14  **Q.** And about COO/EVP meetings? What was the frequency of

15  those?

16  **A.** You can have visits from, you know, some COOs. You can

17  have -- you can -- EVPs coming more than once. It depends on

18  their availability.

19  **Q.** Was Dr. Menninger engaged in COO/EVP meetings as of 2018?

20  **A.** I don't remember, Patrick, but if a COO or an EVP were

21  visiting, I tried to include everyone. So, certainly, you

22  know, Lisa would be -- as she was the leader of the lab --

23  would be invited as well. It was a great honor to receive

24  those emails. And so, yeah, she would have been included,

25  but I don't remember as of February, in fact.

```
 1   Q.  As of February 2018, were you anticipating that
 2   Dr. Menninger's attendance in SLT presentations was going to
 3   be increasing?
 4   A.  Increasing?  I'm not sure.  I'm not sure if I was
 5   expecting that.
 6   Q.  Okay.  How about town halls?  Were you anticipating that
 7   her visibility at town halls to increase?
 8   A.  I don't -- I'm not sure.  I would think, you know, it's
 9   the same, right?  She was the lab head, right?  So she would
10   be the one presenting in town hall.  Regarding increasing it,
11   I'm not sure, you know?
12   Q.  How about COO/EVP meetings?  Was this an area in which
13   you expected her visibility to increase in 2018?
14   A.  No, same, again, you know, wanted her as the lab leader,
15   and she'd be the right person to interact with the CEO and
16   EVP, with her knowledge and expertise.  She is the right
17   to -- person to present the lab.
18   Q.  But did you anticipate that her involvement in these
19   meetings would be increasing in 2018?
20   A.  Again, I'm not sure, Patrick.  All those meetings are
21   really based on -- the COO or EVP meetings are based on their
22   agenda, so I'm not the one inviting them.  I mean, of course,
23   I'd love if they could come every week, but it's based on
24   their agenda, so I can't answer that question.
25   Q.  Sir, I'm not asking you to predict what was going to
```

1   happen.  I'm just asking you what you were -- what your

2   understanding was when you wrote this and whether or not you

3   wrote this, your expectation -- excuse me -- or --

4            MR. HANNON:  Let me start over again.

5   **Q.**  Sir, I'm not asking you to predict what was going to

6   happen.  I'm just asking you what you were -- what your

7   understanding was when you wrote this and whether or not when

8   you wrote this your expectation was that COO/EVP meetings

9   were going to be a more frequent responsibility for

10  Dr. Menninger in 2018.

11  **A.**  Yeah, I -- I believe here, with the listing -- agreed to

12  try to help Lisa, you know, work out the, you know -- the

13  responsibilities and where, you know, she with her role can

14  help and then have the conversation with her physician as

15  well.

16           It was really the intent here, matching the

17  business needs with her -- you know, with her situation.

18  That's what's really the intent there.  And if I read the

19  tone of the email and the fact that I started with, "It was

20  nice discussing with you," I believe that was -- you know, I

21  shared, you know, those [*sic*] information, what I was

22  expecting, the details from her physician so that we can --

23  we can see where she was as well.

24  **Q.**  Looking up to the first paragraph of your email, the last

25  sentence reads, "As you already know, the percentage/scope of

```
 1   interactions, internal or external, is increasing in 2018 due
 2   to the needs of the business and aggressive commercial
 3   goals."
 4            Do you see that?
 5   A.  I see that.
 6   Q.  Did you have -- was it your expectation that
 7   Dr. Menninger's involvement in COO/EVP meetings was going to
 8   be increasing in 2018?
 9   A.  I have a similar response, Patrick.  I don't know.  I
10   don't have their agenda.
11   Q.  When you wrote this email to Dr. Menninger, was it your
12   expectation that her involvement in client bid defenses was
13   going to be increasing in 2018?
14   A.  The needs of the business increased, yes, and I think
15   that's what we discussed in December.
16            Here you have the details that you're asking for
17   about, and that's exactly what, you know, I told you about
18   December -- right? -- and the needs from the business, so
19   more bid defense, yes, more issue resolution calls, more site
20   meetings in Highland Heights, and that's as the business
21   grows, as the team requests more from the lab, lab
22   leadership.
23            So I think it was really a follow-up of the
24   conversation I had with her in December.
25   Q.  So the answer is yes, you expected that in 2018
```

```
 1   Dr. Menninger would have to be involved in client bid defense
 2   work?
 3   A.   The role of Lisa Menninger, the role of the lab
 4   leadership would request more client bid defense, more issue
 5   resolution calls, and more Highland Heights site meetings,
 6   the role -- the lab leadership, you know, is there really to
 7   respond to the sales needs and to the increased needs of the
 8   business?  That's what I wrote down there.  Yeah, yes.
 9   Q.   Okay.  But these goals, you had client bid defense, issue
10   resolution calls, HH/client site meetings, phone, these were
11   all things Dr. Menninger was already doing, right?
12   A.   Client bid defense, issue resolution calls, I believe,
13   you know, that's what I shared with you already, Patrick.
14   This is where the feedback I received in December was -- you
15   know, was pointing out -- right? -- the fact that we needed
16   more lab leadership.
17             So I would love to tell you, yes, she was involved;
18   and of course, you know, she was.  She was, yeah, helping.
19   But the business needed more, and that's why I wrote that
20   here as well, you know, so --
21   Q.   Go ahead.
22   A.   When you say you needed more -- oh.
23             MR. HANNON:  Oh, I'm sorry.  That's me.  My line.
24   Q.   When you say you needed more, do you mean more of doing
25   the same thing or doing something else to assist in these
```

1    tasks?

2    **A.**  Doing the same thing?  No.  If you did the same thing,

3    then you don't -- you know, you don't resolve that.  It's

4    really to do it, to make sure that you participate to a

5    client bid defense -- you know? -- and that you are involved

6    in the client site meetings and that you work with the team

7    and the issue resolution coming from the clients.

8            So it's not doing the same thing, because then we

9    would have the same problem, and we were pointing out that

10   earlier, right?  It's really to resolve to be more involved.

11   **Q.**  Be more involved how?

12   **A.**  By -- I mean, again, you know, here I go back to what I

13   said earlier.  When you lead a group of, you know, executives

14   and directors, they have, you know, the responsibility, and

15   it's part of the job description to find the response.

16           So I'm not here to say how -- right?  I'm just here

17   to make sure that I provide the support, the feedback on how

18   to make -- you know, on resolving those issues so -- and

19   that's why, you know, that we have those brilliant EDs,

20   right?  And so that's part of their role, to find out to how,

21   how to resolve those issues, being part of the client bid

22   defense and support -- you know? -- the sales team and be

23   part of the client site meetings in Highland Heights.

24   **Q.**  But you would agree there were -- there were different

25   ways that those goals could be achieved, right?

1   **A.**  I'm not sure I understand your question.

2   **Q.**  Are there different ways those goals could have been

3   achieve?

4   **A.**  You know, I'll answer the same way, Patrick.  Sorry.

5   You're asking the same question a different way, but you're

6   not -- you know, at that big level, you are working with

7   really brilliant and very -- or very bright.

8        They know how to resolve the solution, so here, you

9   know -- and it's really officers -- right? -- of the company.

10  So, you know, they have the highest responsibility within the

11  central lab.  So that question should be answered by the

12  employees here and by the EDs.  It was the same way with her

13  peers as well.

14  **Q.**  But, Mr. Kerri, this -- Mr. Mekerri, this whole dialogue

15  started with you indicating to Dr. Menninger that you wanted

16  her to be more visible, right?

17  **A.**  The business needed her to be more visible, yes, and me,

18  of course.  You know, I had to concur.  You're right.

19  **Q.**  All right.  And in response to urging her to be more

20  visible, this was one of the bullets you drafted in terms of

21  something she would need to work on, correct?

22  **A.**  That's correct.

23  **Q.**  What did you want her to do differently from what she was

24  already doing in terms of client bid defense, issue

25  resolution calls, and the rest of the items in this bullet?

1   **A.**  Well, that is where -- you know, I go back to what I

2   said, Patrick, you know, she has to find a -- I mean, in

3   every leader, I think that's part of the performance, you

4   know?  If we have more issue resolutions, if we have less

5   presence of the lab leader, any other leader, it would be

6   different.  So that leader, you know, would find the

7   solutions to tackle them.

8           So that's all part of the roles of the employee and

9   the part of the performance as well.  So, again, you know,

10  all of this is the results of 360 feedbacks, concerns that I

11  received from the team, and then we -- creating what is roles

12  and responsibility of the lab leader, you know?

13  **Q.**  Let's look at the next bullet point, which reads

14  "technical sales presentation, internal and external.  And

15  then (i.e., internal sales meeting) HH/client site meetings

16  phone."  Do you see that there?

17  **A.**  I do.

18  **Q.**  Okay.  Are those tasks that Dr. Menninger was already

19  performing as of February 2018?

20  **A.**  I don't remember, but -- I don't remember.  I -- I --

21  what I can share with you is that we had sales meetings where

22  each leader, you know, was preparing, you know, their section

23  or their strategy with the -- you know, the investment that

24  PPD has made to respond to the clients.  And all those

25  informations were very, very, very important for the sales

1   (i.e., internal sales meeting) HH/client site meetings

2   phone.'

3           "Do you see that there?

4   **A.**  "I do.

5   **Q.**  "All right.  Are those tasks that Dr. Menninger was

6   already performing as of February of 2018?

7   **A.**  "I don't remember.  But -- I don't remember.  I -- I --

8   what I can share with you is that we had sales meetings where

9   each leader, you know, was preparing, you know, their section

10  or their strategy with the, you know, the investment that PPD

11  has made to respond to the clients.  And all of those

12  informations were very, very, very important for the sales

13  team.  So, yeah, it's the responsibility of every section

14  leader or department leader to cover their session during the

15  sales meeting.  So I believe that Lisa was always a part of

16  that, presenting to the sales team, the lab, that section.

17  **Q.**  "How often?

18  **A.**  "I don't recall the frequency.

19  **Q.**  "How about client site meetings?  Had Dr. Menninger done

20  those as of February of 2018?

21  **A.**  "I don't remember.

22  **Q.**  "Let's look at the next bullet.  It says, 'For customer

23  visits lunch/dinner and social interactions may occur

24  (expected 60 to 80 percent of the time) in order to build

25  business relationships.'

Case: 23-2030 Case: 19-1449 Document: 003114198985 Document: 1378 Filed: 03/31/23 04/06/2023 Page: 129 of 232 Entry ID: 6634402

179

```
1              "Do you see that?
2    A.   "I do, yes.
3    Q.   "Was that something that Dr. Menninger was doing as of
4    February of 2018?
5    A.   "I don't remember.
6    Q.   "And then the next bullet, it says, 'travels up to
7    30 percent.'
8              "Do you see that?
9    A.   "I do.
10   Q.   "Now, is there anything here in this list of items that
11   addresses your alleged concern that Dr. Menninger wasn't
12   spending enough time in the Highland Heights lab?
13   A.   "Can you repeat the question, Patrick?"
14             MR. HANNON:  And then the question gets reread.
15             THE WITNESS:  "Yeah, I'm not sure I understand
16   these questions.  Sorry.  Here again, we're listing the
17   expectations from the business based on the growth and, you
18   know, the discussion that I had with her back in December.
19   So it's -- it's, you know, nothing about my expectations.
20   It's really expectations of the business, based on the
21   feedback, and those challenges that we had in 2017.
22   Q.   "So is that a no?
23   A.   "Yeah.  It's not a yes or a no.  I can't answer that
24   question.
25   Q.   "Why can't you answer it?
```

1    **A.**   "Because, as I shared, Patrick, here is the outcome of

2    the conversation we had and the summary of the challenges or

3    the rules and responsibilities of that, you know.  They

4    expected from the lab leader and based on the challenges that

5    we had in 2017.

6              "I'm requesting a break, please.  Requesting a

7    break."

8              MR. HANNON:  And I'll move ahead to page 167,

9    line 7.

10   **Q.**   "Mr. Mekerri, during that break, did you speak to anyone?

11   **A.**   "Yes.

12   **Q.**   "Who did you speak to?

13   **A.**   "Rachel and Lisa.

14   **Q.**   "Did you speak to them about the e-mails that we were

15   just talking about?

16   **A.**   "Yeah.  It's -- no.

17   **Q.**   "Are you going to refuse to answer my question based on

18   that instruction?

19   **A.**   "Yes.  Can you repeat the question, Patrick?

20   **Q.**   "Did you at some point conclude that Dr. Menninger, given

21   her disability, was not capable of performing the essential

22   functions of her job?

23              "You can answer, sir.

24   **A.**   "The intent was really to discuss with Lisa and also

25   match the business needs, right?  The intent was only to

1    understand, you know, Lisa's, you know, accommodation or need

2    for accommodation.  We need to understand them and also match

3    them with the business needs.  That all will be verified that

4    we've done and my, you know -- the approach that we have.  No

5    conclusion of anything related to the disability, no.

6    **Q.**  "So even after you got all the information that you got

7    concerning Dr. Menninger's disability, you still understood

8    that she could do her job, right?

9    **A.**  "I don't remember, you know, the specifics here.  But

10   again, you know, it's all based on Lisa's kind of discussions

11   with her physicians and what she was able to do and what

12   would be the accommodations.  So it was all, you know, based

13   on the feedback that we received.

14   **Q.**  "Sure.  And I appreciate that's what it was based on, but

15   I'm just trying to get a clear sense in terms of what your

16   state of mind was, given the information that you had

17   received.  And I think you're saying is that even after you

18   got all of this information, you still believe that

19   Dr. Menninger was capable of doing her job.

20           "Is that accurate?

21   **A.**  "No, it's not accurate.  I don't -- I don't -- I'm not a

22   physician.  I'm not her physician.  I'm not Lisa.  I respect

23   her disability.  And to do the best that I can for the

24   business needs.  I try to make the best of both cases.  But

25   that's really based on Lisa's and her doctor's request of

1    accommodation, not me.

2    **Q.**  "Right.  But based upon the information that they gave

3    you, did you believe she was still capable of doing her job?

4    **A.**  "Counsel, for that question, I again, you know -- it's a

5    decision of her physician and her ability.  You know, I would

6    never make a decision for -- you know, on their behalf.  It's

7    Lisa, so...

8    **Q.**  "You didn't have a view one way or another as to whether

9    or not Dr. Menninger was capable of performing her job?

10   **A.**  "No view.  No view.  And your question is really for Lisa

11   and her physician, not for me.

12   **Q.**  "Okay.  At some point in time, did you meet with

13   Dr. Menninger to discuss the accommodations that PPD was

14   willing to provide to her?

15   **A.**  "I do not recall.  I do not recall.

16   **Q.**  "Do you have any recollection of Dr. Menninger asking you

17   for additional detail regarding the items that you had

18   identified for her?

19   **A.**  "I told you earlier, I think, if I remember, there was

20   some back and forth for us to understand what is it that we

21   needed to accommodate.  Because when I hear, I read that,

22   right?  I -- which to reiterate that I'm capable of

23   performing all functions of my job, with or without

24   accommodation.  So, you know, it's really making sure that we

25   are there to help her, right, and based on the physician's

1    feedback."

2            MR. HANNON:  And then I ask the witness to scroll

3    down.

4            THE WITNESS:  "Yes.  Okay.  And again, go down.

5    Yeah, and so that part, again, is linked to the conversation

6    we had in December, where I mentioned about those changes and

7    where I mentioned about the feedback from the team and the

8    more issues that we were having in 2017, right?  So that's

9    why, you know, this is there and mentioned there.  Right?

10   Regarding the client bid defense, the issue resolution, and

11   the Highland Heights client site meetings and phone to

12   support the team, internal or external.

13   Q.  "Okay, back to my question, though, sir, which is --

14   we're on page PPD Menninger 001760.  The sentence that reads,

15   'As I stated during our conversation, while I greatly

16   appreciate your agreement to provide accommodations with

17   respect to items one and five on Hacene's list of

18   duties/responsibilities, I need some additional detail

19   regarding items two, three, and four.'

20           "Do you see that?

21   A.  "I do see that, yes.

22   Q.  "Okay.  Do you recall Dr. Menninger requesting that

23   additional detail?

24   A.  "No.

25   Q.  "Did you ever provide that additional detail?

1   **A.** "I don't remember.

2   **Q.** "Is there any reason why you would not provide that

3   additional detail if she asked for it?

4   **A.** "I don't remember, Patrick.

5   **Q.** "Do you know what Dr. Menninger is referring to when she

6   writes 'the proposed options about an exit package and

7   consulting arrangement.'?

8   **A.** "Yeah, I don't remember, really. You know, that

9   specifics of that conversation, so I don't remember.

10   **Q.** "Do you recall ever having any discussions with

11   Dr. Menninger concerning the subject of an exit package or

12   consulting arrangement?

13   **A.** "I do not. You know -- I do not. I do not recall.

14   **Q.** "Okay. Well let me walk you through what Mr. St. John

15   wrote, and I'm going to ask you if you believe this is --

16   that the information that he's stating here is accurate. His

17   draft e-mail here is, 'Lisa, as I stated in the meeting,

18   items two through four (specific accommodations from your

19   physician highlighted below) are all core items in the role

20   you are in and we need 100 percent in one through four for

21   the business to meet objectives.'

22        "Do you see that?

23   **A.** "Yes.

24   **Q.** "Do you know if that was an accurate statement as to what

25   was said to Dr. Menninger in the meeting that was referenced

Case: 23-2030    Document: 00118157985    Page: 1304    Date Filed: 03/31/2023    Entry ID: 6634402
Case: 1:19-cv-10441-PBS    Document: 1574    Filed: 03/31/23    Page: 185 of 232

185

1    here?

2    **A.**  "I do not recall.  I do not remember.

3    **Q.**  "Let's look at the next sentence.  'Adding additional

4    detail would only present the opportunity to select items in

5    each bucket you believe you can or can't do.'

6         "Do you see that?

7    **A.**  "I do, yes.

8    **Q.**  "Okay.  Were you reluctant to provide additional detail

9    concerning the items that were not being accommodated because

10   you did not want Dr. Menninger to select items in those

11   buckets that she believed she can or can't do?

12   **A.**  "No.  I do not remember, Patrick.

13   **Q.**  "Do you deny that was your concern, or are you just not

14   sure?

15   **A.**  "I do not remember.

16   **Q.**  "The next sentence says, 'There will be no accommodations

17   made outside of items one and five.'

18        "Do you see that?

19   **A.**  "Yes.

20   **Q.**  "Does that accurately reflect the determination that PPD

21   had made as of March 1, 2018, that there would be no

22   accommodations made outside of items one and five?

23   **A.**  "I do not remember.

24   **Q.**  "Mr. Mekerri, during the course of time that you were

25   talking with Dr. Menninger about her need for accommodations,

1    did you have discussions with anyone at PPD about potentially

2    moving her out of her role:

3    **A.**   "No, I don't remember.

4    **Q.**   "Is it possible you did and you just don't recall?

5    **A.**   "No, I do not remember.

6    **Q.**   "Do you recall beginning to look for a replacement for

7    Dr. Menninger in late February 2018?

8    **A.**   "I do not remember.  No, I do not remember that part.

9    **Q.**   "And as this dialogue was ongoing, did you ever direct

10   Dr. Menninger to spend more time in the Highland Heights lab?

11   **A.**   "I don't remember.  I don't recall.

12   **Q.**   "During the time that this dialogue was continuing, were

13   there additional requests being made by the sales team for

14   Dr. Menninger to participate in internal and external sales

15   meetings?

16   **A.**   "You'd have to ask the sales team, Patrick.  I don't

17   know.

18   **Q.**   "During the time that this dialogue continued, did

19   Dr. Menninger continue to perform her job?

20   **A.**   "I don't remember.

21   **Q.**   "At some point in time, Dr. Menninger took a medical

22   leave; is that right?

23   **A.**   "I don't remember.  I actually don't remember.

24   **Q.**   "Okay.  So you at least recall that at some point in

25   time, you needed to make arrangements to essentially cover

 1  Dr. Menninger's duties; is that right?

 2  **A.** "I don't remember.

 3  **Q.** "Okay.  So you have no recollection if, at some point in

 4  time, Dr. Menninger stopped performing the role that she was

 5  performing at PPD?

 6  **A.** "Yeah, I don't -- you know, that part I think is -- I

 7  don't remember the details, no.  I don't remember the -- you

 8  know, no.

 9  **Q.** "I'm sorry, what don't you remember?

10  **A.** "I don't remember.  I don't recall.

11  **Q.** "Okay.  Did you make any significant changes to how the

12  labs were being operated between the time that Dr. Menninger

13  left and the time that you left PPD?

14  **A.** "I don't remember.  I don't recall.

15  **Q.** "Were there any new significant initiatives that were

16  started to improve lab quality, subsequent to Dr. Menninger

17  leaving her post?"

18  **A.**  I don't remember, no.

19          MR. HANNON:  You read that wrong.

20          THE WITNESS:  "I don't remember the details.  No."

21          THE READER:  Apologies.

22  **Q.** "Did you feel that Dr. Menninger's symptoms deteriorated

23  after she disclosed her disability?

24  **A.** "I can't answer that question.  I don't know.  I don't

25  remember a deterioration on the performance.  I don't

1   remember.  What I can recall again is the conversation we had

2   in December, and the feedback I gave and the need of more

3   presence, visibility, a tackling of the challenges.  So more

4   presence in the lab that I mentioned earlier to tackle the

5   issues that we were having, but I don't remember if the trend

6   was going downwards, upwards.  No.

7   BY MR. HANNON:

8   **Q.**  "I'm going to show you share with you another document

9   here, and I'll refer to this as Exhibit 6, and for the

10  record, this is an e-mail chain that is Bates stamped PPD

11  Menninger 000866 through 870.  And I'm going to work from the

12  bottom up, Mr. Mekerri, but as always, if you need to see

13  more of the document to answer one of my questions, please

14  feel free and I'll be happy to show you more.

15          "Right now I'm showing you the last page of the

16  document, which is what purports to be an e-mail from you to

17  Dr. Menninger with the subject 'one-to-one followup and

18  goals.'

19          "Do you see that?

20  **A.**  "I do, yeah.

21  **Q.**  "Okay.  Do you recall this e-mail?

22  **A.**  "No.  But I'm reading it now.

23          "So what's the question, then, Patrick?

24  **Q.**  "My question for now is if you remember this e-mail?

25  **A.**  "Now that you showed it to me, yes.  I see that I wrote

```
 1    that e-mail.  But the details of those issues, I don't
 2    remember.  It's been two years ago, right?  So I do not
 3    remember this in detail.
 4    Q.   "Okay.  If I could direct your attention to the first
 5    sentence of your e-mail to Dr. Menninger, you write, 'As
 6    discussed yesterday, I would like to adapt new goals for
 7    2018, as I am concerned with the recent lab issues (Gedeon
 8    Richter, BMS, and NGSP).'
 9              "Do you see that?
10    A.   "I do.
11    Q.   "Now, the reference to goals for 2018, had you already
12    set goals for Dr. Menninger for 2018?
13    A.   "I do not remember.
14    Q.   "Was there a process in terms of how Dr. Menninger's
15    annual goals were to be set?
16    A.   "I do not remember.
17    Q.   "Would it refresh your recollection that the annual goals
18    were typically set at the beginning of the year?
19    A.   "It depends.  So I wouldn't, you know -- it depends on
20    the time frame that we have.  I don't remember, really, when
21    was the window for setting of the goals at that time.
22    Q.   "Okay.
23    A.   "It depends on when is the window of, you know, timeframe
24    when, you know, we are open in the system to enter the goals
25    and have those conversation and, as well, the availability of
```

Case: 23-2030   Case: 1:19-cv-10441-LTS-SB Document 157   Document 150   Filed 03/31/23   04/06/23   Page 190 of 232   Entry ID: 6634402

190

```
 1    the team members and the leader.
 2    Q.  "Did you talk to anyone before you sent this e-mail to
 3    Dr. Menninger?
 4    A.  "I do not remember.
 5    Q.  "Besides yourself, did anyone else play a role in
 6    drafting it?
 7    A.  "I do not recall.  I do not remember.
 8    Q.  "In the existing goals for Dr. Menninger for 2018, did
 9    they already address the concerns you referenced concerning
10    lab issues that you had discussed with her in December of
11    2017?
12    A.  "I do not remember again the specifics, but it's really,
13    again, linked with the conversation we had in December and
14    the growing concerns that I was hearing, you know, in the
15    lab, right?  And so this is really related to performance and
16    challenges that the lab was having.  And the same with all
17    the previous e-mails that you showed me, Patrick, with the
18    growth of the lab and the presence and visibility that we
19    needed.  So I do not remember, again, you know, how I wrote
20    that e-mail or when I wrote it.  But I do remember clearly
21    that we had issues and quite serious.  NGSP is very important
22    for the laboratory, as well as BMS.  Those are very serious
23    lab issues.
24    Q.  "Mr. Mekerri, my question, though, sir, is the 2018 goals
25    that you had originally set for Dr. Menninger, did those
```

1    address the issues that you claim to have raised with her in
2    December of 2017?
3    **A.**   "Yeah.  And that's -- that's -- you know, I think I
4    answered that question already, Patrick.  I don't remember,
5    you know, the goal setup.  I don't remember, really, that
6    process of setting up goals '18.  So I can't answer to your
7    question related to the goals of 2018, responding to the
8    challenges of 2017.
9    **Q.**   "But would that have been your normal practice, that if
10   an employee is having issues, to set goals to address those
11   issues?
12   **A.**   "If an employee have issues?  What -- what?  -- I'm
13   sorry.  I'm not clear on your question.  What kind of issues?
14   **Q.**   "Performance issues.  If a client -- if an employee that
15   reports to you has performance issues, would you normally try
16   to address those, at least in part, through the establishment
17   of their goals?
18   **A.**   "Yeah, I mean, it's what I said, Patrick.  I don't
19   remember the process of setting up goals for 2018.  I do
20   remember that I provided feedback in 2017 about the
21   challenges that we had.  And I was not the only one, but I
22   was the one making sure that I conveyed those to the lab
23   leader.  And with me providing -- be able to support, as
24   well, that we worked together to address them.  And here that
25   e-mail is a reflection of those issues that PPD was

1   experiencing in the lab, and ensuring that we have the right

2   level of support and dedication to tackle them.

3   **Q.** "So Mr. Mekerri, I'm not asking you what the actual goals

4   were.  I'm just asking you if it was your practice as a

5   manager to, if you had an employee with performance issues,

6   to address those performance issues, at least in part,

7   through setting annual goals?

8   **A.** "I do not recall, you know, Patrick, an example.  I do

9   not recall.  That's the answer to the question.

10  **Q.** "Okay.  What led you to adopt Dr. Menninger's -- or

11  rather, ask Dr. Menninger to adapt her goals in April of

12  2018?

13  **A.** "I do not remember.  I'm sorry.  I do not remember.

14  **Q.** "Now, you write in the second sentence, 'I need your full

15  attention and dedication to resolve them and be more

16  proactive to prevent any further issues.'

17          "Do you see that?

18  **A.** "Uh-huh.  I do.

19  **Q.** "Okay.  As of April 11, 2018, did you believe that

20  Dr. Menninger was not providing her full attention to her

21  responsibilities?

22  **A.** "Yeah.  It's linked to what I said for the December,

23  right?  You asked me if I had concerns.  I told you the

24  business had concern.  So here it's really to get Lisa to

25  pull through, you know.  And I tried to really gather the

```
 1    details.  I believed that she -- I believed that that was the
 2    exercise and the intent of that e-mail, based on the feedback
 3    that I received from the team.
 4    Q.  "My question, sir, is a little bit different.  I'm asking
 5    if you had any reason to believe, as of April 11, 2018, that
 6    Dr. Menninger was not providing her full attention to such
 7    matters.
 8          "Did you?
 9    A.  "I do not know.  I do not know.  I do not remember that.
10    Q.  "And then in that second sentence, you also reference
11    being more proactive to prevent any further issues.  Was it
12    your belief that on April 11, 2018, that Dr. Menninger was
13    not being proactive to prevent lab issues?
14    A.  "I do not -- I do not remember.  And I don't recall.
15    Here again, you know, here is, really, the issues, a
16    reflection, an example of the issues that I was mentioning
17    earlier.  And I offer, as well, some -- here we can read this
18    e-mail.  I believe the intent was really to offer some --
19    some role, because they're asking about how to tackle them.
20    What's the root cause.  I believe the intent was really to
21    provide some support on how to tackle them.  But we had major
22    issues in the lab in 2018 that needed to be tackled.
23    Q.  "So do I understand your answer that this e-mail was
24    intended to help Dr. Menninger to find ways to address
25    issues?
```

1   **A.**  "I do not recall the details.  I'm just reading, you

2   know.  You see, you show it, right?  I'm just reading.  When

3   it says, you know, being more proactive to prevent any

4   further issues, proactive in elimination of lab issues, I

5   believe these are guidance to ensure that the lab challenges

6   that PPD was experiencing are tackled accordingly and making

7   sure, as well, that they don't reappear.  So having some

8   preventative and corrective action.

9   **Q.**  "Mr. Mekerri, didn't Dr. Menninger ask you for

10  clarification in terms of how you thought she could achieve

11  these kinds of objections -- objectives?

12  **A.**  "I do not recall.  I think I already responded to that.

13  **Q.**  "I'm sorry, what do you mean you responded to that?

14  **A.**  "I do not know if I responded to the clarification or

15  not.  I do not recall.

16  **Q.**  "Did you think it would be appropriate for Dr. Menninger

17  to reply to this e-mail you sent on April 11, 2018, by asking

18  you for clarification of how you wanted her to go about

19  achieving these objectives?

20  **A.**  "I don't know.  I don't know.

21  **Q.**  "In the first sentence of your e-mail, in the

22  parenthetical, you reference Gedeon Richter.  Do you see

23  that?

24  **A.**  "I do.

25  **Q.**  "Was that a lab issue that you believe Dr. Menninger

1  could have avoided?

2  **A.** "I don't remember the detail of it.  I don't remember the

3  detail here.  I don't really recall the specifics.

4  **Q.** "Okay.  How about BMS?  Was that a lab issue that you

5  thought Dr. Menninger could have prevented?

6  **A.** "Sorry, I don't believe the -- I don't remember the

7  specifics.

8  **Q.** "That wasn't quite my question, sir.  My question was

9  whether or not you believed that BMS was a lab issue that

10  Dr. Menninger could have prevented.

11  **A.** "I don't know.  I don't remember, so I can't -- I can't

12  come back two years ago and talk to that question now.

13  **Q.** "And MGSP, is the lab issue referenced there, is that

14  something that Dr. Menninger could have prevented?

15  **A.** "Again, it has been two years, Patrick, and if I wrote

16  it, I think it reflects the challenges that the lab had and

17  the feedback that I was receiving from the team outside.

18  So -- and also from clients, but I don't remember, really,

19  though, the details.

20  **Q.** "But back to my question, sir.  Was the NGSP issue that's

21  referenced here, do you believe that was something

22  Dr. Menninger could have prevented?

23  **A.** "I do not remember the detail here.

24  **Q.** "So you don't know?

25  **A.** "I don't know.  I don't remember the details.

```
 1              "I need a break, as well.

 2    Q.  "Do you recall ever having discussions with Mr. Fikry

 3    concerning deficiencies in Dr. Menninger's work performance?

 4    A.  "No, I do not recall.

 5    Q.  "All right.  You mentioned earlier Chris Clendening, do

 6    you recall any communication that you ever had with

 7    Mr. Clendening concerning deficiencies with Dr. Menninger's

 8    work performance?

 9    A.  "No.

10    Q.  "Did you ever have conversations with Mr. McKinnon

11    concerning deficiencies with Dr. Menninger's work

12    performance?

13    A.  "No."

14              THE COURT:  That's it?

15              MR. HANNON:  That's the end of the transcript, Your

16    Honor.

17              THE COURT:  Okay.  That concludes Mr. Mekerri's

18    deposition -- or testimony read from his deposition.

19              You can step down.  Thank you.

20              Next witness, Mr. Hannon.

21              MR. HANNON:  Dr. Christopher Fikry.

22              THE COURT:  Okay.  Dr. Fikry, if you'd come forward

23    to the witness box.

24              (The witness was duly sworn.)

25              THE DEPUTY CLERK:  And can you please state your
```

```
 1   full name and spell your last name for the record.
 2              THE WITNESS:  Christopher Fikry, F-, as in Frank,
 3   i-k-r-y.
 4              THE COURT:  Have a seat.
 5              MR. HANNON:  I have a binder.
 6              May I approach the witness?
 7              THE COURT:  Yes.
 8                       CHRISTOPHER FIKRY
 9           having been duly sworn, testified as follows:
10           DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
11   BY MR. HANNON:
12   Q.  Good afternoon, Doctor.
13   A.  Good afternoon.
14   Q.  Could you please introduce yourself to the jury?
15   A.  My name is Chris Fikry.
16   Q.  And are you a doctor?
17   A.  I am.  And you can call my Chris.
18   Q.  Okay.  I have tend to be a little more formal than that,
19   so apologies if I call you Doctor, but --
20   A.  Whatever you like.
21   Q.  -- what do you do for work, sir?
22   A.  I work at Clario.  It's a drug development company.
23   Q.  And what's your role there?
24   A.  I'm the CEO.
25   Q.  And for how long have you been in that position?
```

1    **A.**  I joined July of last year.

2    **Q.**  And prior to that, had you been employed at PPD?

3    **A.**  Yes.

4    **Q.**  And tell us about your position at PPD?

5    **A.**  I ran the laboratory business at PPD from 2017 until

6    2022.

7    **Q.**  Okay.  And why did you leave PPD?

8    **A.**  I was offered the opportunity for my current role.

9    **Q.**  Did I hear you right that you ran the laboratory

10   business?

11   **A.**  That's correct.

12   **Q.**  Okay.  And am I right that, during your tenure at PPD,

13   there were sort of various laboratory units?

14   **A.**  That's right.

15   **Q.**  And the one that Dr. Menninger was involved in, that was

16   called Global Central Labs?

17   **A.**  That's correct.

18   **Q.**  Okay.  What were the others?

19   **A.**  We had a GMP business, which tested manufactured drug

20   product, a bioanalytical lab that did studies around the

21   dosing of drugs prior to use in humans.  We had a specialty

22   unit that did just vaccines work and another that did

23   biomarkers.  And the Central Lab is the one that actually

24   tested patient samples.  So these are both healthy and sick

25   people that have volunteered to participate in clinical

```
 1   trials.

 2   Q.   And with respect to your Global Central Labs

 3   responsibilities, was there a -- was there a general manager

 4   that reported to you?

 5   A.   Yes.  There's a general manager and a commercial lead for

 6   each of these businesses.

 7   Q.   Okay.  So just focusing on Global Central Labs, the

 8   general manager, what was their responsibilities, generally?

 9   A.   Overall responsibility of the P&L.  So financial

10   responsibility and quality responsibility for the business.

11   Q.   And then did I hear you right that, in addition to the

12   general manager for GCL, there was also a business

13   development lead for GCL?

14   A.   That's correct.

15   Q.   And that person also reported directly to you?

16   A.   Yes.

17   Q.   And during your tenure at PPD, who were the general

18   managers of the Global Central Labs?

19   A.   At the time in question we're talking about, 2017/2018,

20   was Hacene Mekerri, and then over time it transitioned to

21   Chris Clendening.

22   Q.   When you say that it transitioned over time, what do you

23   mean by that?

24   A.   When Mr. Mekerri stepped down, he left the company, Chris

25   Clendening took over.
```

1    **Q.**   Okay.  And what's your understanding as to why

2    Mr. Mekerri left?

3    **A.**   He voluntarily left.

4    **Q.**   Okay.  And when you left PPD, was Mr. Clendening, was he

5    still the general manager of Global Central Labs?

6    **A.**   That's correct.

7    **Q.**   Okay.  You're familiar with Dr. Menninger?

8    **A.**   Yes, we've met.

9    **Q.**   Okay.  And she was the medical director of Global Central

10   Labs for a period of time?

11   **A.**   Correct.

12   **Q.**   And what was your understanding of Dr. Menninger's duties

13   and responsibilities in that role?

14   **A.**   When I started, Dr. Menninger was the medical director

15   for the Central Laboratory, so she was our pathologist, she

16   held the medical license for that lab.  And so there are

17   three populations within this business, right?  There's

18   medical and scientific staff, which she was in charge of,

19   operations staff that actually ran the tests during the day,

20   and then the commercial team that are tasked with selling the

21   work.

22   **Q.**   Okay.  So Dr. Menninger's responsibilities were tied to

23   the scientific stuff?

24   **A.**   That's correct.

25   **Q.**   Okay.  And at some point in time, you met Dr. Menninger

1   in person; is that right?

2   **A.**  Yes, we've met in person.

3   **Q.**  Okay.  And you were able to chat with her; is that right?

4   **A.**  That's correct.

5   **Q.**  Okay.  And do you recall any impression that you had

6   based upon your meeting with her?

7   **A.**  In person, we met very briefly.  We were there for some

8   sort of client interaction, either an audit or a commercial

9   meeting, and Dr. Menninger and I met in the hallway and had a

10  brief discussion there.  And we spent some time afterwards

11  and I then spent time with each of her direct reports that

12  day.

13  **Q.**  Okay.  You didn't form any kind of negative impression of

14  Dr. Menninger based upon that interaction, did you?

15  **A.**  No.

16  **Q.**  Okay.  So in 2007, Mr. Mekerri, that was Dr. Menninger's

17  boss, right?

18  **A.**  2007?

19          THE COURT:  2007?

20          MR. HANNON:  I'm sorry, 2017.  My mistake.  Sorry.

21  It's been a long day.  Let me ask the question again.

22  BY MR. HANNON:

23  **Q.**  In 2017, Mr. Mekerri was Dr. Menninger's boss, right?

24  **A.**  Yes, she reported to the general manager.  That's

25  correct.

```
 1   Q.   Okay.  And during that same period, you were
 2   Mr. Mekerri's boss?
 3   A.   That's correct.
 4   Q.   Okay.  And during 2017, you don't recall receiving any
 5   feedback from Mr. Mekerri concerning Dr. Menninger's work
 6   performance, do you?
 7   A.   Work performance?
 8   Q.   Yeah.
 9   A.   No.  Not that I recall.
10   Q.   Okay.  And you -- during this time period, you didn't
11   work in Highland Heights, did you?
12   A.   I was based in North Carolina.  Our company's
13   headquarters were in North Carolina, but I did travel to the
14   Kentucky facility frequently.
15   Q.   Okay.  You -- at some point in time, you took some
16   interest in efforts to bring in more technical expertise into
17   the Global Central Labs; is that right?
18   A.   That's correct.
19   Q.   And you thought that was a good investment for PPD to
20   make?
21   A.   That's correct.  So we expanded the team, all three of
22   those groups, so the commercial, operational, and the medical
23   team.
24   Q.   Very good.  And part of the -- part of that expansion
25   involved having to recruit, to bring on board that additional
```

1    expertise, right?

2    **A.**  For -- yes, if we wanted to hire people, we had to

3    recruit, yes.

4    **Q.**  Okay.  And we're talking about technical expertise.

5    We're talking about either medical doctors or Ph.Ds, right?

6    **A.**  For the medical team?

7    **Q.**  Yeah.

8    **A.**  Yes.  You need to have some of the stuff, not all of the

9    technical staff are MDs or Ph.Ds, but there are some, yes.

10   **Q.**  The higher levels are, right?

11   **A.**  Yes, sir.

12   **Q.**  Okay.  And you would agree with me that recruiting for

13   those roles for the Highland Heights lab was somewhat

14   difficult, right?

15   **A.**  So it's in Kentucky.  It is not like recruiting for a

16   Cambridge Biotech.  It is tough to get people from the coast

17   to relocate to Kentucky, for sure.

18   **Q.**  Okay.  And you don't recall any communications you ever

19   had with Mr. Mekerri about Dr. Menninger's role in

20   recruiting, do you?

21   **A.**  I do not recall.  No.

22   **Q.**  Okay.  You never instructed Mr. Mekerri to have

23   Dr. Menninger stop being involved in recruiting, did you?

24   **A.**  I know in our deposition, you had presented some of these

25   e-mails, so I know there was some pressure I was applying to

1     them to expedite the hiring.

2     **Q.**  My question is a little bit different.  Do you recall

3     ever instructing Mr. Mekerri to remove Dr. Menninger from the

4     recruiting or hiring process?

5     **A.**  I don't recall that, no.

6     **Q.**  So in 2017, the Global Lab business itself, am I right

7     that you would describe that as a $700 million business?

8     **A.**  I don't remember the exact number.  It sounds like the

9     right ballpark.

10    **Q.**  Is that a reference to revenue?

11    **A.**  That is a reference to revenue, across all of the five

12    businesses.

13    **Q.**  Okay.  So that would be -- that would be PPD itself, just

14    to the best of your recollection, it would have been in the

15    approximately 700 millions of dollars of revenue in 2017?

16    **A.**  I would have to look, but that would not surprise me if

17    that was the number.  Right.

18            THE COURT:  I'm sorry, are you asking about PPD or

19    the lab business, or is there a difference?

20            MR. HANNON:  PPD.

21            THE WITNESS:  Oh, well, then --

22            MR. HANNON:  I'm sorry.

23            THE COURT:  Because the other question was the lab

24    business.

25            MR. HANNON:  Good point, Your Honor.

1    BY MR. HANNON:

2    **Q.**  So that $700 million estimate, that's just the lab

3    business that you ran; is that right?

4    **A.**  That's correct.

5    **Q.**  And then there were other businesses at PPD besides the

6    one you ran?

7    **A.**  That's correct.

8    **Q.**  Do you have a sense of what PPD's total revenue was in

9    2017?

10   **A.**  It would -- I don't know the exact number, it would be

11   multiple billion.

12   **Q.**  Do you have a sense of what its profit was?

13   **A.**  Of the whole business?

14   **Q.**  Yeah.

15   **A.**  I couldn't guess right now, but it was a public company,

16   so some of this is available.

17   **Q.**  Okay.  Do you know if the profit in 2017 would have

18   exceeded the billion dollars?

19   **A.**  I don't think, no.

20   **Q.**  Okay.  Exceeded 500 billion?

21   **A.**  For the entirety of the company?  I really can only speak

22   about the laboratory business.

23   **Q.**  Okay.  Let's focus on the laboratory business.  What was

24   the profitability of the laboratory business in 2017?

25   **A.**  You know, again, I don't have the exact number, but I

1 would gauge in between 25 and 30 percent of the revenue.

2 **Q.** So about 25 to 30 percent of that 700 million figure?

3 **A.** Would be the -- would be the EBITDA.  The company carried

4 a lot of debt, so the actual profit would be actually quite

5 low.

6 **Q.** Sure.  Got it.  And then 2018, that was actually a

7 significant growth year for the business; is that right?

8 **A.** I believe so, yes.

9 **Q.** Okay.  And can you give us a sense of what the revenue

10 was in 2018?

11 **A.** I'm sorry.  I can tell you that over my tenure there, it

12 roughly doubled.

13 **Q.** So doubled between 2017 and -- what year did you leave?

14 **A.** No, I would say from 2016 to 2022.  Again, if the numbers

15 are important, you know, we would have to look them up.  I

16 don't want to --

17 **Q.** Understood.  And were you still at PPD when it got

18 acquired by Thermo Fisher?

19 **A.** Yes.

20 **Q.** And am I right that it got acquired for $17.4 billion?

21 **A.** I don't know the exact number.  If it was in the press

22 release, then -- I just -- it sounds about right.

23 **Q.** Okay.  When -- you mentioned earlier that PPD went public

24 at some point; is that right?

25 **A.** Yes, sir.

1   **Q.** And do you recall what year that was?

2   **A.** I'm sorry, I should know.  2020.  I'm sorry --

3   **Q.** You don't sound very sure of that.

4   **A.** I'm not.

5   **Q.** No worries.

6   **A.** It roughly would have been 12 to 18 months prior to the

7   acquisition.

8   **Q.** Okay.  Do you know when the acquisition by Thermo Fisher

9   was?

10  **A.** It closed in December of 2021.

11  **Q.** Okay.  After PPD went public, do you know if employees in

12  the Global Central Lab business were given any kind of equity

13  awards?

14              MR. CURRAN:  Objection.

15              THE COURT:  Overruled.

16              You can answer.

17              THE WITNESS:  I don't recall the comp structure.  I

18  don't think so, because I think we still had equity from

19  being a private entity there.  But the HR team would be able

20  to give you the sort of sequence of how that all played out.

21  BY MR. HANNON:

22  **Q.** Okay.  Subsequent to the -- or in connection with the

23  Thermo Fisher transaction, do you know if there was any

24  equity award for leaders in the Global Central Lab business?

25  **A.** Nothing would have been specific for the Global Central

```
 1   Lab leaders, so that event -- the IPO wouldn't have done
 2   anything material for the team or the employees.  The
 3   acquisition would have triggered people's equity to vest.
 4   Q.  Okay.  Do you know if folks in -- or rather, if leaders
 5   in Global Central Labs got any kind of raises or bonuses in
 6   connection with either the company going public or being
 7   acquired?
 8   A.  In connection with those, I believe when Thermo Fisher
 9   acquired the business, they offered some retention bonuses to
10   the staff.  But I don't recall anything related to the IPO
11   nor to the close of the transaction.  So the company was
12   private, so those of us that had equity, the equity would
13   have vested after the acquisition, but nothing would have
14   happened after the IPO.
15   Q.  At some point in 2018, do you recall being aware of
16   discussions concerning Dr. Menninger potentially exiting PPD?
17   A.  In 2018?
18   Q.  In 2018.
19   A.  No, not to my recollection.  She was an employee in good
20   standing.
21   Q.  She was an employee in good standing in 2018?
22   A.  In the beginning part of the year.
23   Q.  Okay.  Was there a time during the year when she no
24   longer was an employee in good standing?
25   A.  I may misremember, but I believe she opted to leave the
```

        1    company towards the middle part of the year, towards the back
        2    end of the year.  I may have mixed up the date.
        3    Q.  Would it -- would it refresh your recollection if I told
        4    you that at some point she took a medical leave?
        5    A.  So that wouldn't change her -- she would still be an
        6    employee in good standing for that, yes.
        7    Q.  Okay.  So just to be clear, in terms of your
        8    understanding, is that Dr. Menninger remained an employee in
        9    good standing as of time that she took her medical leave?
       10    A.  She was never not an employee in good standing.
       11    Q.  Okay.  And in fact, when Dr. Menninger took her medical
       12    leave, you hoped that she would return.  Is that your
       13    testimony?
       14    A.  Yeah.  So we talked a little bit about Kentucky is an
       15    extremely difficult position to recruit for.  This is why
       16    earlier, when Dr. Menninger wanted to relocate to
       17    Massachusetts, we did our best to accommodate that, because
       18    it's quite an expensive proposition, and not easy to find the
       19    right person that is a boarded pathologist, that has clinical
       20    trials experience, and is willing to live in Kentucky.  So we
       21    wanted to do -- it was in our interest to do everything
       22    possible to make it work.
       23    Q.  I'm going to show you Joint Exhibit Number 265.
       24         Sir, I want to direct your attention to the e-mail
       25    here in the middle of the screen.  Do you see this is an

```
 1    e-mail from you to Jerry Williams on April 11, 2018?

 2    A.  Yes.

 3    Q.  And your subject is, "What's timing on Lisa Menninger's

 4    exit?"

 5            Do you see that?

 6    A.  Yes, sir.

 7    Q.  Can you tell us what you're referring to there?

 8    A.  So this is April.  This is prior to Dr. Menninger's

 9    medical leave.  There's some concern about servicing the

10    business and the clients that we have, so that's one element.

11    And then the second piece is just forecasting if

12    Dr. Menninger opted to leave the organization, which she did

13    ultimately, it's quite an expensive proposition to back-fill

14    the role, so we wanted to make sure that we had that in the

15    forecast going forward.  So we wanted to be prepared, either

16    way.

17    Q.  Okay.  So the exit, that's a reference to Dr. Menninger

18    leaving the company?

19    A.  So I wanted to make sure we understood, if she opted to

20    leave, what the cost would be.  And absent that, how we were

21    going to cover the rest of the business.  Because that would

22    also have financial implications if we had to hire more

23    people around.

24    Q.  Okay.  Was it your understanding as of April 11, 2018,

25    that Dr. Menninger was exiting the company?
```

1   **A.**   No, she was not.

2   **Q.**   Okay.  Did you ever ask Mr. Williams what the status of

3   Dr. Menninger's -- in terms of whether she is or isn't

4   leaving?

5   **A.**   I had concerns.

6   **Q.**   Okay.  And why did you have concerns?

7   **A.**   She had moved away from the laboratory and we were trying

8   to accommodate that, right?  So that had been going on for a

9   while.  And I had been getting some feedback from clients, as

10   well as the laboratory staff, that we needed more supervision

11   there.  And so I wanted to make sure we were prepared either

12   way.

13   **Q.**   Did it have anything to do with her disclosure of her

14   disability?

15   **A.**   No.

16   **Q.**   Okay.  By April 11, 2018, sir, you were aware that

17   Dr. Menninger had made a request for accommodation, aren't

18   you?

19   **A.**   I actually didn't recall the sequence of this, but at the

20   deposition, you had surfaced some e-mails that seemed to

21   indicate that I was notified by HR in the first quarter.

22   **Q.**   Okay.  So you agree with me that as of April 11th of

23   2018, you were aware that Dr. Menninger had disclosed her

24   disability?

25   **A.**   Prior, I had received an e-mail that she was seeking some

```
 1    sort of accommodation, beyond just living in Boston.

 2    Q.  Let's look at the e-mail that you referenced.  I'm going

 3    to show you Joint Exhibit 197.

 4              So this is the e-mail that you had received from

 5    Chad St. John on February 7th of 2018; is that right?

 6    A.  That's what it says, yes.

 7    Q.  Okay.  Is this the e-mail you referred to earlier that I

 8    showed you at your deposition?

 9    A.  I believe so, yes.

10    Q.  And this refreshed your recollection that, in fact, you

11    had been made aware of the accommodation request in February?

12    A.  No, I still didn't recall, but I acknowledged the e-mail.

13    Q.  Okay.  But you agree with me that, after seeing this

14    e-mail at your deposition, that you know that as of

15    February 7, 2018, you were -- you were aware of her request

16    for accommodation, yes?

17    A.  Yes.

18    Q.  Okay.  And let's look at the information that you were

19    aware of.

20              I'm sorry, it's a terrible highlighting job.

21              But in the second sentence of the second paragraph,

22    Mr. St. John writes, "The ball is now in Lisa and her

23    doctor's court to provide specific limitations linked with

24    Lisa's anxiety of public speaking and social interactions."

25              Do you see that?
```

```
 1   A.   Yes.
 2   Q.   Okay.  So as of the time you received this e-mail, you
 3   knew that Dr. Menninger's doctor was providing information,
 4   right?
 5   A.   Yes.
 6   Q.   Okay.  And it had to do with her anxiety of public
 7   speaking and social interactions, right?
 8   A.   Uh-huh.
 9   Q.   Yes?
10   A.   Yes.
11   Q.   Okay.  And then further on, Mr. St. John had written --
12   and again, this is terrible highlighting -- "Once we have the
13   reply from Lisa's doctor, we can review them and determine if
14   we want to provide any reasonable accommodation.  If not, we
15   can consider providing her a package to move her out."
16        Do you see that?
17   A.   I do.
18   Q.   Okay.  And so you know what a reasonable accommodation
19   refers to, right?
20   A.   Similar to allowing her to live in Boston.
21   Q.   I'm sorry?
22   A.   Similar to allowing her to live in Boston.
23   Q.   Okay.  Well, you understood that this had to do with her
24   anxiety with public speaking and social interactions, right?
25   A.   Yes.
```

1   **Q.**   Okay.  And where -- did you ask for any information about
2   what Dr. Menninger's doctors had provided?
3   **A.**   I don't recall.  I don't think I would have, because it
4   seems to suggest that we haven't received anything yet from
5   her physician, unless I'm misreading this.
6   **Q.**   Did you follow up at all between this e-mail and the one
7   in April, where you're inquiring about the exit, to check in
8   on the status of these discussions?
9   **A.**   Well, I believe the prior e-mail that you just showed was
10  from April, so following this, I wanted make sure that we
11  were covered, both in terms of having a medical director in
12  the lab, and that we were planning financially for if there
13  was some accommodations that we could meet and we have to
14  hire people around, that's one.  Or if we had to find another
15  medical director, that's another set of costs.  So we had to
16  be covered for any scenario.
17  **Q.**   Did you ever follow up with Mr. St. John to find out what
18  they had chosen, between whether they were going to
19  accommodate or whether they were going to provide her a
20  package to move her out?
21  **A.**   Not that I recall, no.
22  **Q.**   Weren't you interested in knowing?
23  **A.**   Of course.
24  **Q.**   Dr. Menninger had an important role in the lab, right?
25  **A.**   For sure.

1   **Q.**  And during this time period of February to April, you

2   were -- you were meeting with Mr. Mekerri on a regular basis,

3   weren't you?

4   **A.**  Yes.

5   **Q.**  How frequently?

6   **A.**  I tried to meet with my staff at least once a week, on

7   Mondays, and then individually.  And then the general

8   managers I would talk to throughout the week as issues came

9   up.

10  **Q.**  And during those regular meetings with Mr. Mekerri, did

11  Dr. Menninger's accommodation requests come up?

12  **A.**  No, not that I recall.

13  **Q.**  Can you think of any reason why during those one-to-ones,

14  regularly occurring, you wouldn't have checked in to see

15  about this medical director of Global Central Labs?

16  **A.**  I assumed he would surface it when we got the request

17  from the physician.  I didn't think this was going to be a

18  quick process.  So I don't know if this is something that

19  would be on the agenda every week.

20  **Q.**  And is it your testimony that as of the time that you

21  sent that e-mail in April inquiring about the timing of

22  Dr. Menninger's exit that you hadn't gotten any update

23  concerning this matter?

24  **A.**  Oh, I just don't recall.  This was six years ago, sir.

25  **Q.**  You mentioned earlier that you had -- you had -- you had

```
 1    seen this e-mail here, the February 7th e-mail at your
 2    deposition; is that right?
 3    A.  I believe so.
 4    Q.  Okay.  And if we turn -- if you open that binder in front
 5    of you -- well, actually, strike that.
 6             Before I ask that question, am I right that your
 7    deposition was in July of 2020?
 8    A.  Yes.
 9    Q.  And do you recall subsequently providing an affidavit in
10    connection with this lawsuit?
11    A.  I did review the affidavit, yes.
12    Q.  Okay.  And if you turn to the second -- there's a tab two
13    in your binder, and if you flip to that, there's no tab one,
14    I've got to warn you.  But if you go to tab 2, is that a copy
15    of the affidavit you submitted?
16    A.  Yes.
17    Q.  And the date of that affidavit is March 22, 2021, right?
18    A.  Yes.
19    Q.  Okay.  So that's, what, nine months after your
20    deposition?
21    A.  Yes.
22    Q.  Is that right?
23             And if you could turn to paragraph 10 of your
24    affidavit.  And if you could read along silently as I read
25    aloud:
```

```
 1              "I am aware that at some point during the first
 2     quarter of 2018, Dr. Menninger disclosed a disability and
 3     requested workplace accommodations.  I was not involved in
 4     these discussions and I am only aware that they occurred as a
 5     result of this litigation."
 6              Did I read that right?
 7     A.   Yes.
 8     Q.   Would you agree with me that's not true?
 9     A.   I'm sorry, what part of it is not true?
10     Q.   That you're only aware of the discussions as a result of
11     this litigation?
12     A.   Yes, I got the timing wrong.
13     Q.   Okay.  How long have you been involved in the lab
14     business?
15     A.   At PPD, from 2017 to 2022.
16     Q.   And prior to joining PPD, you worked for a company called
17     Quest?
18     A.   Quest Diagnostics.  Yes.
19     Q.   Is that a competitor of PPDs?
20     A.   No, but it is a laboratory business.
21     Q.   Okay.  For how long were you at Quest?
22     A.   Four and a half years.
23     Q.   Were you in the lab business prior to Quest?
24     A.   No.
25     Q.   Okay.  Would you agree with me, sir, that elimination of
```

Case: 23-2030    Document: 00118179985    Page: 137    Date Filed: 03/31/2023    Entry ID: 6634402
Case 1:19-cv-10441-LTS   Document 537   Filed 03/04/23   Page 228 of 282

218

1    all lab errors is an impossible goal?

2    **A.**   Yes.   In a laboratory of our type, it's not possible.

3              MR. HANNON:   That's all I have.

4              THE COURT:   All right.   Cross-examination?

5              **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

6    BY MR. CURRAN:

7    **Q.**   Hi, Chris.

8    **A.**   Hello.

9    **Q.**   So you were asked some questions by Attorney Hannon about

10   Dr. Menninger and her position at the labs?

11   **A.**   Yes.

12   **Q.**   Could you tell me what the -- sort of the basic job

13   duties were that someone in Dr. Menninger's position had to

14   deal with before?

15   **A.**   So the medical director for the laboratory has overall

16   clinical responsibility for the laboratory.   So that is

17   basically certifying that the results that are coming out are

18   of high quality and that the physicians that are ordering the

19   tests can rely on them to make clinical decisions.

20              In our case, in addition to that, the data was

21   collected by pharmaceutical companies ultimately to be

22   submitted to the FDA to determine if new drugs were safe and

23   effective.

24   **Q.**   Okay.   And I think you testified earlier that you became

25   aware at some point after you started that Dr. Menninger was

1  working remotely from Massachusetts; is that right?

2  **A.** Yes.

3  **Q.** All right. Did you have any concerns about that?

4  **A.** I did. It was not the type of working arrangement that I

5  had encountered in the past for that type of role. These are

6  sort of complex operations there and they often require some

7  on-site support for both the staff, and then certainly we

8  have clients coming through the operation frequently, and so

9  they like to see that the medical director is there and

10  engaged.

11  **Q.** And Dr. Hannon [sic] asked you some questions about --

12  becoming aware that Dr. Menninger had requested some

13  accommodations and had some disabilities. Do you recall

14  that?

15  **A.** So there were two pieces. When I started accommodation

16  to move here.

17  **Q.** Right.

18  **A.** And then subsequently in 2018.

19  **Q.** Right.

20  **A.** Further, yes.

21  **Q.** Yeah, February 2018, there was that e-mail that you saw,

22  where you saw that she had requested some additional

23  accommodations.

24  Did you want to force her to leave the company as a

25  result of that?

1    **A.**  No.

2    **Q.**  And what -- what was your reaction to hearing that, if

3    you recall?

4    **A.**  It's hard not -- so I don't recall the specifics of when

5    it actually happened.  It's hard not to be nervous about it,

6    right?  Because you're worried about continuity and coverage

7    in the operation, as well as just the financial impact of

8    having to recruit another pathologist.

9    **Q.**  Are you aware of any efforts by other people at the

10   company to force her to quit?

11   **A.**  No.

12   **Q.**  What is a quality control event in the context of the

13   Central Labs?

14   **A.**  I mean, broadly, you can think about it as anything that

15   would deviate from our written -- or standard operating

16   procedure, anything that would jeopardize the result that was

17   given to a physician, or anything that would delay the timing

18   of delivery.  Basically, anything going wrong in the process.

19   **Q.**  Got it.  Okay.

20           And during the first year of employment, so from

21   2017 to 2018, were there any quality control events in the

22   Global Central Labs?

23   **A.**  Yes, all laboratories have them, but we certainly did.

24   There was an uptick in events.

25   **Q.**  There was an uptick in events during that period.

1   Were there any that stick out to you that you

2   recall?

3   **A.** There were -- just by the nature of my position, there

4   were a number of clients that had escalated issues. And then

5   we would review these quarterly, so just the sheer number of

6   them became an issue.

7   **Q.** And what did you do in response to hearing about these

8   events?

9   **A.** Had discussions with both Mr. Mekerri, the general

10  manager of the business, as well as our quality lead and our

11  operations lead.

12  **Q.** And who was the quality lead?

13  **A.** Mr. McKinnon.

14  **Q.** And who was the operations lead?

15  **A.** So at -- we transitioned. So there were different

16  leaders for different pieces of the laboratory, so whether it

17  was the lab in Europe or the lab in Highland Heights had

18  different leaders. Part of the challenge is that there was

19  no clear operational lead when I started in Highland Heights.

20  **Q.** Okay. And Mr. Mekerri is one of the people that you

21  spoke with, correct?

22  **A.** Yes.

23  **Q.** Did you hear directly from clients about these issues?

24  **A.** Yes.

25  **Q.** Do you recall any clients you heard from specifically?

1    **A.**   The one that I still remember was GlaxoSmithKline.   They

2    were quite a large client for all of PPD.   They had a program

3    where they contacted me directly, because they had concerns

4    about how we were performing.

5    **Q.**   And were they upset?

6    **A.**   They weren't happy.   They were nervous that we were not

7    going to be able to deliver what they needed for their trial.

8    **Q.**   Was that unusual for you to be hearing directly from

9    clients about quality control issues?

10   **A.**   Clients would call me on a whole host of matters, so no.

11   I wouldn't say that's unusual.

12   **Q.**   Okay.   So you spoke to -- you said earlier that you spoke

13   to Mr. Mekerri about these.   And your purpose in speaking to

14   him was what?

15   **A.**   To try to come up with a plan for addressing these

16   concerns.   We had to, for that specific program, develop some

17   new tests.   And there was a tight timeline for when patients

18   were going to start showing up down the road, something like

19   six to nine months later.   So he to get the tests up and

20   running.   And if memory serves there were components that

21   were done, carried out outside the US.

22   **Q.**   And do you know whether Mr. Mekerri, in turn, spoke to

23   anyone about these issues?

24   **A.**   I don't recall.   But I do know that we changed the

25   project manager on the study as a first step towards

 1   remedying the situation.

 2   **Q.**   And do you know whether Mr. Mekerri spoke to

 3   Dr. Menninger about these issues?

 4   **A.**   I don't know how he dealt with it.

 5   **Q.**   Would you have expected him to have done so?

 6   **A.**   I would have, yes.

 7   **Q.**   Because Doctor -- if I recall correctly, you said that

 8   Mr. Mekerri reported to you?

 9   **A.**   Yes.

10   **Q.**   And did Dr. Menninger report to Mr. Mekerri?

11   **A.**   Yes.

12   **Q.**   Now, did you do anything to determine whether any

13   particular employee was at fault for any of these events?

14   **A.**   No.  Because I -- I don't think that's really the right

15   framework for driving this forward, right?  If you want to

16   get to a place -- because remember, these issues pop up all

17   the time.  These are, effectively, science experiments.  So

18   you can't have an environment where people feel like they're

19   going to be called out to task.  And in reality, in this

20   situation, I don't think anyone was particularly at fault.

21   The client was not happy.  We had an issue we had to resolve

22   for them, and so we had to come up with a plan of how we were

23   going to address this.

24   **Q.**   And what responsibility, if any, did Dr. Menninger have

25   with respect to resolving these quality control events and

1   helping to resolve them?

2   **A.**   Well, if you recall, there's a couple of groups here,

3   there's operations folks, and there are medical folks.  So at

4   this stage of where we are in this study, we're trying to

5   develop two new tests, so there's a lot of issues.  The test

6   is not working reliably.  And we need some help in trying to

7   figure out how to make it work.  So there's only a handful of

8   things that you can do to really address that.

9   **Q.**   And did Dr. Menninger have any role in helping to resolve

10  that issue?

11  **A.**   You know, I would expect our medical director to weigh

12  in, for sure.  She's ultimately responsible for that.  And so

13  no individual person is going to be an expert in every area,

14  but I think just sort of helping to roll up your sleeves and

15  understand, well, what is the issue?  Is this something where

16  we can add a piece of equipment?  Is this something where we

17  need to add technical resources?  You know, you can't expect

18  one person to have all of the ultimate answers, but you can

19  certainly expect the management team to come up with a plan.

20  **Q.**   And was Dr. Menninger a member of that management team?

21  **A.**   Yes.

22  **Q.**   And other folks were members of the management team, as

23  well, correct?

24  **A.**   Yes.

25  **Q.**   And those folks were also responsible?

```
 1   A.  Yes.

 2   Q.  Along with Dr. Menninger?

 3   A.  Yes.

 4   Q.  All right.  And would you expect that they were getting

 5   pressure, as well, to help resolve these problems?

 6   A.  Yes, from both me and from the client.

 7   Q.  To your knowledge, did Dr. Menninger ever receive any

 8   kind of discipline due to any of these quality control

 9   events?

10   A.  Not that I'm aware.

11   Q.  And do you think that she should have been disciplined in

12   connection with them?

13   A.  No.  She did not cause the issues.  The test was not

14   working.

15   Q.  Right.  And was her employment terminated due to any of

16   these quality control issues?

17   A.  No.

18   Q.  And was she ever in danger of being terminated due to any

19   of these issues?

20   A.  No.

21           MR. CURRAN:  That's all the questions that I have.

22           Thank you, Chris.

23           THE COURT:  All right.  Any redirect?

24           MR. HANNON:  Very briefly, Your Honor.

25       REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
```

1    BY MR. HANNON:

2    **Q.**  Just a follow-up.  Dr. Fikry, you were talking about the

3    issues involving GSK.  You identified the -- and am I right

4    that they were in a variety of different functional areas; is

5    that right?

6    **A.**  Yes, sir.

7    **Q.**  They had concerns about budgeting?

8    **A.**  Budgeting, timing, the assay working.

9    **Q.**  Okay.  And the area that I think you identified in terms

10    of falling within Dr. Menninger's team concerned making the

11    assay work; is that right?

12    **A.**  I think that would fall within her scope.  I think we're

13    all ultimately responsible for the totality of the program,

14    though.

15    **Q.**  Okay.  And with respect to the assay, this was -- this

16    was a test for gonorrhea; is that right?

17    **A.**  The drug was for gonorrhea, I don't know if we were

18    testing for gonorrhea itself, or how the drug reacts to

19    gonorrhea.

20    **Q.**  Okay.  And was this an area requiring expertise in

21    molecular microbiology?

22    **A.**  Yes.  Ultimately, I think you would need that.

23    **Q.**  And are you aware that in -- in that -- Dr. Menninger's

24    team included someone with a particular expertise in that

25    area?

1    **A.**   We had a microbiology department.

2    **Q.**   Okay.  And in 2018, was Dr. Paul Reddy, was he the person

3    with the most expertise in that area?

4    **A.**   I don't think so.  I'd have to check he resume.  I

5    believe Dr. Reddy was more of a -- he was a Ph.D, not an MD.

6    **Q.**   Okay.  But you mentioned before that you would have

7    expected there to be some kind of a plan developed; is that

8    right?

9    **A.**   That's right.

10   **Q.**   Okay.  Was there a plan developed?

11   **A.**   Ultimately, we did advance the program.  Yes.

12   **Q.**   Okay.  And then you mentioned -- I think I heard you use

13   a phrase, something to the effect of, "People shouldn't be

14   called out on the carpet for these quality events."

15          Did I hear that right?

16   **A.**   I did not use that phrase, but I think the sentiment I

17   would stand behind, unless it was malicious or -- but I don't

18   think that was the case in this -- with this GSK program.

19   **Q.**   Okay.  And is that concept sort of embedded in sort of

20   general policies?  And by that I mean that people who bring

21   forward lab errors that there shouldn't be punitive actions

22   taken against them?

23   **A.**   Just for bringing forth an issue?

24   **Q.**   Sure.

25   **A.**   No, you should not be penalized for identifying an issue.

1    **Q.**   Okay.  And generally when a root cause of a quality event

2    is discovered, am I right that the general policy at PPD is

3    not to take any kind of a punitive action against the person

4    who caused it, unless it was intentional?

5    **A.**   I'm sorry, unless it was intentional?  So certainly if it

6    was intentional, those are terminable offenses there.  But

7    generally, if you want a laboratory to be effective, you want

8    to create an environment where people are identifying issues

9    and coming up with solutions, as opposed to -- without fear

10   of retribution.

11           MR. HANNON:  That's all I have.

12           THE COURT:  Any recross?

13           MR. CURRAN:  No.

14           THE COURT:  All right.  Thank you very much.

15   You're excused.

16           MR. HANNON:  All right.  Your Honor, we have

17   another read on.  This one is going to be Mason Menninger,

18   played by my colleague, Hampton Watson.

19           I just need to touch base with opposing counsel for

20   one moment here.

21           (Counsel confers.)

22           MR. HANNON:  May I approach?

23           THE COURT:  Just one read of all -- whatever is

24   coming from this witness?

25           MR. HANNON:  All smashed together, Your Honor.

```
 1              THE COURT:  Okay.  Do you want me to give the
 2    similar explanation?
 3              MR. HANNON:  Okay.  I think we're fine, Judge.
 4              THE COURT:  All right.  Fine.
 5              You can be seated.  We're not going to swear you in
 6    as a reader.
 7              THE WITNESS:  Okay.
 8              MR. HANNON:  Since this is Ms. Mandel asking the
 9    questions, Ms. Mandel, would you like to do the questioning?
10              MS. MANDEL:  Sure, I can do it.
11              I just need to consult for one moment.
12              (Counsel confers.)
13              THE COURT:  I'm not sure they read it for
14    Mr. Mekerri, and I'm not sure you're going to read it for
15    Mr. Menninger, but both -- at a deposition, a person takes an
16    oath just like the witnesses you've seen take an oath.  So
17    the testimony that you heard was under oath, the testimony
18    that you're about to hear is under oath.  It's the same oath.
19              MS. MANDEL:  I'm just going to lower the
20    microphone.
21              Forgive me.  It's just a bit small.
22                             The testimony of
23                        **MASON MENNINGER**
24         having been previously duly sworn, was read into the
25                        record as follows:
```

1    BY MS. MANDEL:

2    **Q.**  "Good morning, Mr. Menninger.  I understand it is early

3    there and we appreciate you making yourself available first

4    thing in the morning.  My name is Rachel Mandel, and as

5    you've just heard, I'm an attorney for PPD, the defendant in

6    the lawsuit filed by your wife, Lisa Menninger.  The federal

7    rules of civil procedure give me the right to ask you

8    questions and require that you respond with complete and

9    truthful answers, as you've just taken an oath to do.  Do you

10   understand that?

11   **A.**  "I do.

12   **Q.**  "This format adds another layer of complication, which is

13   that we need to account for any sort of electronic

14   interference and delay.  And so as Justina just explained,

15   you can give just a brief pause after I ask the question to

16   make sure that Justina can get it down and we're not speaking

17   over each other.  And of course, Mr. Hannon may want to put

18   something on the record as well.  So we just need to account

19   for that.  If at any point you cannot hear me or you can't

20   hear Mr. Hannon and you see our lips moving on the screen,

21   please let us know as quickly as possible, so that we can

22   adjust for that.  In addition, if you do not understand any

23   of my questions, please let me know.  If you respond to a

24   question, I will assume that you've understood it.

25          "Does that make sense?

```
 1   A.  "It does.

 2   Q.  "Okay.  We can also take a break at any time, if you few

 3   need to, if you need to run to the restroom or grab water,

 4   whatever you need.  That's fine.  We'll just ask that you

 5   respond to the question that's pending at the time.

 6          "Mr. Menninger, have you ever given deposition

 7   testimony before?

 8   A.  "I have not.

 9   Q.  "Have you ever provided sworn testimony?

10   A.  "Not that I recall.

11   Q.  "Another sort of rule of the road is that we should

12   discuss at the outset is Justina can only take down verbal

13   responses.  It's a little easier to remember when we're in a

14   Zoom format, instead of in-person, but I see you're nodding

15   right now to acknowledge what I've said, and that's

16   completely normal and fine, but any response that you give

17   that's not verbal, Justina cannot take down into the record,

18   so you just need to accompany any head or hand gestures with

19   verbal responses, as well.  And the other thing, as Justina

20   mentioned, we can't speak over each other, because Justina

21   can't take down what two of us say at the same time.

22          "Does all of that make sense?

23   A.  "It does."

24          MS. MANDEL:  Okay.

25          THE COURT:  You can skip that.
```

```
 1              MS. MANDEL:  Okay.
 2   BY MS. MANDEL:
 3   Q.  "Mr. Menninger, you indicated to the court reporter a few
 4   moments ago that you're currently located in Bend, Oregon; is
 5   that correct?
 6   A.  "Correct.
 7   Q.  "Are you at home?
 8   A.  "I am.
 9   Q.  "Is there anyone there with you right now?
10   A.  "No, not in this room.
11   Q.  "Yes, I should have clarified.  Thank you for pointing
12   that out.  I meant is there anyone in that room with you?
13   A.  "No, there's not.
14   Q.  "Do you have any method of communication open in front of
15   you?
16   A.  "Other than Zoom, I do not.
17   Q.  "Okay.  Right.  I meant aside from Zoom, of course.
18   Mr. Menninger, have you taken any drugs or alcohol within the
19   past 24 hours that might impair your ability to testify
20   accurately today?
21   A.  "No, I have not.
22   Q.  "Can you state your full legal name, please?
23   A.  "Mason Daniel Menninger.
24   Q.  "Have you ever been known by any other names, aliases, or
25   nicknames?
```

1    **A.**  "No.

2    **Q.**  "What is your date of birth?

3    **A.**  "March 25, 1972.

4    **Q.**  "What is your current home address?

5    **A.**  "We are at 1496 Northwest Discovery Park Drive.  That's

6    in Bend, Oregon.

7    **Q.**  "Is that a single family residence?

8    **A.**  "It is.

9    **Q.**  "And do you rent that residence or own it?

10    **A.**  "We rent.

11    **Q.**  "And how long have you lived there?

12    **A.**  "About a month and a half.

13    **Q.**  "And who lives there with you?

14    **A.**  "My wife and my daughter.

15    **Q.**  "And is your wife Lisa Menninger?

16    **A.**  "It is.

17    **Q.**  "And is your daughter Maya?

18    **A.**  "Yes.

19    **Q.**  "And last name Menninger?

20    **A.**  "Yes.

21    **Q.**  "Before you lived at the home on Northwest Discovery Park

22    Drive, in Bend, Oregon, what was your previous residential

23    address?

24    **A.**  "We -- see if it's on my driver's license.  It is.  We

25    were at 340 Live Oak Road Northeast, in Albuquerque,

```
 1    New Mexico.
 2    Q.   "What was the reason for your move from Albuquerque,
 3    New Mexico, to Bend, Oregon?
 4    A.   "Lisa wanted to be closer to her family.
 5    Q.   "Is it your intention that your -- is it your intention
 6    that your wife has family that lives in Bend, Oregon?
 7    A.   "Yes.
 8    Q.   "And who are those family members aside from you and your
 9    daughter?
10    A.   "Lisa's sister and Lisa's mother.
11    Q.   "Is her sister Tonya Hart?
12    A.   "It is.
13    Q.   "And what is your wife's mother's name?
14    A.   "Nancy.
15    Q.   "Last name also Hart?
16    A.   "I believe she goes by Warren.
17    Q.   "Since you moved to Bend, Oregon a month and a half ago,
18    have you seen the Tonya Hart in person?
19    A.   "Yes.
20    Q.   "Based on your knowledge, has your wife seen Tonya Hart
21    in person in that same time period?
22    A.   "Yes.
23    Q.   "Based on your knowledge, when was the last time your
24    wife saw Tonya Hart in person?
25    A.   "I don't recall exactly.  About a week and a half ago is
```

1    my best guess.

2    **Q.**   "And when is the last time before that?

3    **A.**   "I'd say at least a week before that.  Yeah, I'm a little

4    fuzzy on the exact dates, but I could figure that out.

5    **Q.**   "How could you figure that out?

6    **A.**   "I believe probably ask Lisa or Tonya.

7    **Q.**   "And you just testified that you believe your wife last

8    saw Tonya Hart about a week and a half ago, and before

9    that -- and before that, a week before that time.  When

10   before that incident?

11   **A.**   "I'm sorry, I didn't understand the question.

12   **Q.**   "Understood.  I did not ask it well.

13          "You just testified that your wife last saw

14   Tonya Hart a week and a half ago, and the time before that

15   was a week earlier.  When was the time before that, as far as

16   you know, that your wife saw Tonya Hart?

17   **A.**   "I don't know" -- excuse me -- "I don't recall exactly.

18   In general, the time spacing is a week or more, so I would

19   guess an additional week.

20   **Q.**   "Since moving to Bend, Oregon, have you seen your wife's

21   mother, Nancy Warren?

22   **A.**   "Yes.

23   **Q.**   "And to the best of your knowledge, has your wife seen

24   her mother, Nancy Warren?

25   **A.**   "Yes.

1   **Q.** "And to your knowledge, when was the last time your wife

2   saw her mother, Nancy Warren, in person?

3   **A.** "It was fairly recent.  It was a few days ago.

4   **Q.** "And to the best of your knowledge, when before that did

5   your wife see Nancy Warren?

6   **A.** "Yeah, again, it's tricky for me to keep track of these

7   visits, but at least a week previous.

8   **Q.** "And the time before that?

9   **A.** "About the same -- about the same time frame.

10  **Q.** "Are you aware that your wife has brought a lawsuit

11  against her former employer, PPD?

12  **A.** "Yes.

13  **Q.** "Have you spoken about that lawsuit with Tonya Hart?

14  **A.** "I don't recall.  I'm not sure how I should categorize

15  it.  If I did, it was minimal.

16  **Q.** "When do you believe the last time you spoke to her about

17  the lawsuit was?

18  **A.** "As I said, I don't recall, so I'm not sure how I could

19  put a time frame to something I'm not sure happened.

20  **Q.** "Have you spoken about that lawsuit with Nancy Warren?

21  **A.** "I don't believe so.

22  **Q.** "You testified that you may have spoken with Tonya Hart

23  about your wife's lawsuit against PPD.  What do you recall

24  discussing with Tonya Hart about the lawsuit?

25  **A.** "I don't recall.  Okay.  Sorry.  I would -- since I don't

```
 1   recall for sure I've had this conversation, I certainly don't
 2   recall content.
 3   Q.  "Did you discuss with Tonya Hart that you were going to
 4   testify in a deposition today?
 5   A.  "No.
 6   Q.  "Did you discuss with Tonya Hart that she plans to
 7   testify in deposition?
 8   A.  "No.
 9   Q.  "Who have you spoken to about the fact that you were
10   testifying in deposition today?
11   A.  "Lisa.
12   Q.  "Meaning your wife?
13   A.  "Yes.
14   Q.  "Did you meet with an attorney to prepare for today's
15   deposition?
16   A.  "I'm not sure what constitutes "meet."  I spoke briefly
17   with Mr. Hannon on the phone regarding what to expect today."
18           MS. MANDEL:  Your Honor, I think could we skip --
19           THE COURT:  You're going to 15, line 14.
20   BY MS. MANDEL:
21   Q.  "Mr. Menninger, can you answer the question, please?
22   A.  "Yes.  That is my position.
23   Q.  "When did you last speak with Patrick Hannon before
24   today -- I should say, strike that.
25           "When did you last speak with Patrick Hannon before
```

```
1    the start of this deposition?
2    A.   "I believe it was the day before yesterday.
3    Q.   "Was that by phone?
4    A.   "Yes.
5    Q.   "And how long did that conversation last?
6    A.   "It was brief, 15 minutes, 20 minutes.
7    Q.   "Did you review any documents with Mr. Hannon?
8    A.   "I'm not sure I'm able to answer that question.
9    Q.   "You can answer that question.
10   A.   "No, I did not review any documents.
11   Q.   "Was anyone else present for that conversation?
12   A.   "Yes.
13   Q.   "Before that discussion that you've just described, when
14   did you last speak with Mr. Hannon?
15   A.   "I don't recall previously speaking with Mr. Hannon.
16   Q.   "Is it your testimony that your first communication with
17   Mr. Hannon took place the day before yesterday?
18   A.   "To the best of my recollection, yes.
19   Q.   "Mr. Menninger, are you currently employed?
20   A.   "Yes.
21   Q.   "Where are you employed?
22   A.   "You want the name of the company?
23   Q.   "Yes.
24   A.   "Okay.  It's Triangulate Labs.
25   Q.   "Okay.  And where is Triangulate Labs located?
```

1  **A.** "The last I recall, it's based in Cincinnati, Ohio.  It

2  might be in transition, so that's why I'm a little uncertain.

3  **Q.** "Are you a part owner of Triangulate Labs?

4  **A.** "Yes.

5  **Q.** "What percentage ownership do you have in the company?

6  **A.** "I own five percent.

7  **Q.** "I'm sorry, I didn't hear that.

8  **A.** "Five percent.

9  **Q.** "How long have you worked for Triangulate Labs?

10 **A.** "It's a little tricky to state.  I can tell you when I

11 first got paid by Triangulate Labs, but we acted as a company

12 before that time, so I'm not sure where to draw the line.

13 **Q.** "When did you first begin to draw salary from Triangulate

14 Labs?

15 **A.** "In June of 2018.

16 **Q.** "When did you begin to have an ownership in trust in

17 Triangulate Labs?

18 **A.** At the same date.

19 **Q.** Was there a time period before June of 2018 that you had

20 involvement with Triangulate Labs, but did not yet draw any

21 income from the company?

22 **A.** "Yes.

23 **Q.** "And what was that time period?

24 **A.** "We informally started the company in late 2016.

25 **Q.** "Is it accurate that from late 2016 to June 2018, you

1    performed work from Triangulate Labs, but did not receive an

2    income from the company?

3    **A.**  "Yes.

4    **Q.**  "As of now, what is your job title with Triangulate Labs?

5    **A.**  "I believe it is technical director.

6    **Q.**  "Have you ever held any other title with Triangulate

7    Labs?

8    **A.**  "No.

9    **Q.**  "Can you describe your job as technical director at

10   Triangulate Labs?

11   **A.**  "I would say that's my title.

12   **Q.**  "And what do you do as technical director?

13   **A.**  "Primarily software development and research.

14   **Q.**  "And what is the nature of the business in which

15   Triangulate Labs is involved?

16   **A.**  "Well, we're focused on computer vision and at the moment

17   finding clients who are interested in our product.

18   **Q.**  "Do you work on the design of 3D printing models?

19   **A.**  "Not currently.

20   **Q.**  "And did you previously work on that?

21   **A.**  "Yes.

22   **Q.**  "What is your annual salary from Triangulate Labs in

23   2020?

24   **A.**  "I don't think I've done the math.  My salary is 6,000 a

25   month, so multiply that by 12.

```
1    Q.   "And when did your salary from Triangulate Labs become
2    $6,000 a month?
3    A.   "In June of 2018.
4    Q.   "Has it remained $6,000 a month since June 2018?
5    A.   "Yes.
6    Q.   "Before June 2018, what sources of income did you have?
7    And let's start with the time period of January to June of
8    2018.
9    A.   "I did not have any sources of income.
10   Q.   "In 2017, did you have any sources of income?
11   A.   "No, I did not.
12   Q.   "In 2016, did you have any sources of income?
13   A.   "No, I did not.
14   Q.   "In 2015, did you have any sources of income?
15   A.   "No, I did not.
16   Q.   "Aside from your current employment at Triangulate Labs,
17   do you have any other employment currently?
18   A.   "No.
19   Q.   "In addition to the $6,000 a month in salary that you
20   received from Triangulate Labs, do you receive any income
21   from your part ownership interest?
22   A.   "No, I do not.
23   Q.   "Since June 2018, have you received any additional income
24   from Triangulate Labs as a result of your part ownership
25   interest?
```

1    **A.**  "I'm not sure what constitutes income.  I received

2    compensation for some equipment.

3    **Q.**  "Aside from that composition for some equipment and the

4    $6,000 a month that you have described, have you received any

5    other income from Triangulate Labs since June of 2018?

6    **A.**  "No, I have not.

7    **Q.**  "Do you currently receive medical benefits from

8    Triangulate Labs?

9    **A.**  "I do not.

10   **Q.**  "Mr. Menninger, have you received medical benefits from

11   Triangulate Labs?

12   **A.**  "I have not.

13   **Q.**  "Aside from the compensation that you have described

14   since June 2019, have you received any additional employment

15   benefits from Triangulate Labs?

16   **A.**  "No, I have not.

17   **Q.**  "Do you currently hold medical insurance?

18   **A.**  "Yes.

19   **Q.**  "What is the nature of that medical insurance?

20   **A.**  "It is through Lisa's insurance.

21   **Q.**  "What entity provides that insurance coverage?

22   **A.**  "I would have to look that up.

23   **Q.**  "Is it your understanding that the medical insurance that

24   you have just described is provided as part of a supplemental

25   Social Security benefits?

1   **A.**   "That is my understanding, yes.

2   **Q.**   "Since June of 2018, has either your daughter or your

3   wife received medical insurance benefits from Triangulate

4   Labs?

5   **A.**   "No, they have not.

6   **Q.**   "Mr. Menninger, you testified earlier that you moved from

7   Albuquerque, New Mexico, to Bend, Oregon, approximately a

8   month and a half ago, correct?

9   **A.**   "Correct.

10   **Q.**   "Did your wife and daughter make that move at the same

11   time that you did?

12   **A.**   "They did.

13   **Q.**   "Did you fly from Albuquerque, New Mexico, to Bend,

14   Oregon, approximately a month and a half ago?

15   **A.**   "No.

16   **Q.**   "How did you physically move from Albuquerque,

17   New Mexico, to Bend, Oregon?

18   **A.**   "We drove.

19   **Q.**   "And when you say 'we,' is that you, your wife, and your

20   daughter?

21   **A.**   "Yes.  My daughter didn't actually drive, but, yes.

22   **Q.**   "Fair point.

23           "And for the record, how old is your daughter?

24   **A.**   "She's 12.

25   **Q.**   "It's good that she didn't drive.

```
 1   A.   "Yes.
 2   Q.   "Did you utilize professional movers for your move from
 3   Albuquerque, New Mexico, to Bend, Oregon?
 4   A.   "Yes.
 5   Q.   "Did you and your wife personally pay for the expenses to
 6   move from Albuquerque to Bend, Oregon?
 7   A.   "Yes.
 8   Q.   "Did any other person or entity pay for any part of that
 9   move?
10   A.   "No.
11   Q.   "Mr. Menninger, is your wife currently employed?
12   A.   "No.
13   Q.   "Has your wife been employed in 2020?
14   A.   "No.
15   Q.   "Was your wife employed for any portion of 2019?
16   A.   "No.
17   Q.   "As far as you know, has your wife -- strike that.
18            "As far as you know, is your wife currently seeking
19   employment?
20   A.   "No, she is not.
21   Q.   "As far as you know, has your wife sought employment
22   during any portion of 2020?
23   A.   "No, she has not.
24   Q.   "As far as you know, did your wife seek employment during
25   any portion of 2019?
```

1    **A.**   "No, she has not.

2    **Q.**   "Mr. Menninger, in what year did you marry Lisa

3    Menninger?

4    **A.**   "2006.

5    **Q.**   "In what year did you first meet Dr. Menninger?

6    **A.**   "2005.

7    **Q.**   "How did you meet Dr. Menninger?

8    **A.**   "We met online.

9    **Q.**   "Was that through a dating website?

10   **A.**   "No.

11   **Q.**   "How did you meet online?

12   **A.**   "Through a website for people with common interests.

13   **Q.**   "Where were you living at the time that you met

14   Dr. Menninger?

15   **A.**   "San Antonio.

16   **Q.**   "Texas?

17   **A.**   "Correct.

18   **Q.**   "And as far as you recall, where was Dr. Menninger living

19   when you met her?"

20            MR. HANNON:  I'm fine reading that answer.

21            MS. MANDEL:  I don't want to leave everyone in

22   suspense.

23            "In Richmond, Virginia."

24            THE COURT:  That's reading the answer, right?

25            MS. MANDEL:  I'm sorry, yes, that was the answer.

```
 1              THE COURT:  That was the answer to the question.
 2              MS. MANDEL:  Your Honor, the next line that is not
 3    crossed out, it begins at the top.  It's sort of in the
 4    middle.
 5              THE COURT:  You really want page 20 -- what are you
 6    reading next?
 7              MR. HANNON:  Yeah.  I would just say to help with
 8    the process, to the extent that we need to add something from
 9    a previous page or something on to the next page just to get
10    a complete answer, that's fine.
11              THE COURT:  Just go ahead and do that, Ms. Mandel.
12              MS. MANDEL:  Sure.  Okay.  And so I'm just at the
13    bottom of page 27.
14    BY MS. MANDEL:
15    Q.  "And during what periods of time did you live in Overland
16    Park and maintain employment?
17    A.  "I maintained my job with New River Kinematics until
18    early 2008.
19    Q.  "Did you voluntarily leave that position in 2008?
20    A.  "The short answer is no.
21    Q.  "Were you terminated from that position in early 2008?
22    A.  "Yes.
23    Q.  "Where did you work after your termination from that
24    position?
25    A.  "I was not employed until I started a business.
```

1   **Q.**  "Is that Triangulate Labs that you reference as a new

2   business?

3   **A.**  "No.

4   **Q.**  "What was that new business?

5   **A.**  "It was Lifeform Studio.

6   **Q.**  "Is that light form studio?

7   **A.**  "Sorry, I get that a lot.  Lifeform.

8   **Q.**  "Lifeform?

9   **A.**  "L-i-f-e-f-o-r-m.

10  **Q.**  "And what type of business is Lifeform?

11  **A.**  "It was a challenging to describe business.  I took

12  photographs of individuals with a camera array, and turned

13  that into a 3D model, and turned those 3D models into a

14  printed model.

15  **Q.**  "And do you have any partners that business?

16  **A.**  "Lisa was a partner on paper, anyway, but it was my

17  studio.

18  **Q.**  "Did you draw income from that business?

19  **A.**  "Yes, in a sense, we had customers.

20  **Q.**  "During what years did you draw income from Lifeform

21  Studios?

22  **A.**  "It was only open in 2014.

23  **Q.**  "Does that mean that it did not operate in any calendar

24  year other than 2014?

25  **A.**  "Correct.

1    **Q.**  "What type of work did Dr. Menninger perform for Lifeform

2    Studios?

3    **A.**  "Mostly artistic decisions.  She helped design the layout

4    of the studio, helped with marketing material in some cases.

5    **Q.**  "How much income did you draw from Lifeform Studios in

6    2014?

7    **A.**  "I'm not sure how to qualify that.  The business was not

8    a success, so we ultimately -- it was all negative, so I'm

9    not sure how to state that.

10    **Q.**  "Did you draw any positive income from Lifeform Studios

11    in 2014?

12    **A.**  "In the sense that customers paid us for the work, we

13    did, yes.  But it didn't -- it never exceeded what we owed.

14    **Q.**  "Did Lisa Menninger draw any positive income from

15    Lifeform Studios?

16    **A.**  "The question is challenging for me.  I'm not sure how

17    to -- I'm not sure I understand positive income when we had

18    far more expenses than income.

19    **Q.**  "As far as you know, did Lifeform Studios pay a salary to

20    Lisa Menninger at any time?

21    **A.**  "No.

22    **Q.**  "During the time that Lisa Menninger had a business

23    interest in Lifeform Studios, was she otherwise employed?

24    **A.**  "Yes.

25    **Q.**  "And where was she employed while she was holding a

1  partnership in trust in Lifeform Studios?

2  **A.**  "I believe she was at CRL.

3  **Q.**  "As far as you know, did Lisa Menninger consider making

4  her wife at Lifeform Studios a full-time job?

5  **A.**  "No.

6  **Q.**  "Did you close Lifeform Studios at some point?

7  **A.**  "Yes.

8  **Q.**  "And when was that?

9  **A.**  "It closed to the public late 2014.  I think we

10  technically left the premises January 2015.

11  **Q.**  "After you closed Lifeform Studios, what is the next

12  employment that you held?

13  **A.**  "Triangulate Labs.

14  **Q.**  "Is it accurate that you did not hold any active

15  employment between Lifeform Studio and Triangulate Labs?

16  **A.**  "That is accurate, yes.

17  **Q.**  "Between the time that you worked at Lifeform Studio and

18  you began working at Triangulate Labs, did you have any

19  sources of income?

20  **A.**  "I think I had one or two consulting jobs, very limited.

21  **Q.**  "In what years did you hold those consulting jobs?

22  **A.**  "That I would have to look up, but it is in that time

23  span.

24  **Q.**  "Between 2014 and 2018, correct?

25  **A.**  "Yes.  Yes.  Certainly not in 2014.

1  **Q.** "Mr. Menninger, I'm not asking for any specific details,

2  but can you describe briefly what the reason was from your

3  termination from the job that you held in Richmond, Virginia?

4  **A.** "I'm not entirely sure.  I can only speculate.

5  **Q.** "Was there a reason given to you at the time of your

6  termination?

7  **A.** "My understanding is they -- what they referred to as the

8  remote work wasn't what they envisioned it would be.

9  **Q.** "Between 2014 and 2018, you did not hold regular

10  employment, correct?

11  **A.** "Correct.

12  **Q.** "How did you spend your time between 2014 and 2018?

13  **A.** "Primary raising our daughter.

14  **Q.** "Is it accurate to say that you were primary caretaker

15  for your daughter during that time period?

16  **A.** "I'm not sure if primary caretaker has special meaning.

17  I was with her throughout the day.

18  **Q.** "What was the reason for your family's move from

19  Cincinnati, Ohio, to Dighton, Massachusetts?

20  **A.** "We were struggling with Maya in school.  She experienced

21  bullying from students that we were unable to resolve fully.

22  She was given permission to work remotely, and we opened it

23  up to find a better school for her.

24  **Q.** "Maya was given permission to work remotely?

25  **A.** "Sorry.  Lisa, my wife, was given permission to work

```
 1   remotely.

 2   Q.  "Is that from her job at PPD?

 3   A.  "Correct.

 4   Q.  "During what calendar year did your daughter, Maya, begin

 5   to have these struggles at school?

 6   A.  "2015, the year we moved and she started school there.

 7   Q.  "Did Maya remain at that school in Cincinnati, Ohio, for

 8   two full years?

 9   A.  "Yes.

10   Q.  "How did you and your family select Dighton,

11   Massachusetts, as a place to move to?

12   A.  "Indirectly.  We selected the school.

13   Q.  "That's a school for Maya?

14   A.  "Yes.

15   Q.  "And what was that school?

16   A.  "Wheeler.

17   Q.  "And where is The Wheeler School located?

18   A.  "It's located in Providence, Rhode Island.

19   Q.  "How did you select The Wheeler School for your daughter?

20   A.  "An intense Internet search is how we narrowed it down,

21   and then we researched that one as well as we could from

22   online materials.

23   Q.  "How did you choose Dighton, Massachusetts, as a place to

24   live?

25   A.  "It was a combination of proximity and price to The
```

1    Wheeler School.

2    **Q.**  "Did you and your family utilize professional movers for

3    your move from Cincinnati, Ohio, to Dighton, Massachusetts?

4    **A.**  "Yes.

5    **Q.**  "Did you and your family pay for those movers?

6    **A.**  "We did.

7    **Q.**  "As far as you recall, did PPD pay for any portion of

8    that move?

9    **A.**  "They did not.

10   **Q.**  "During the time period that you lived in Cincinnati, did

11   your wife work from home or in an office?

12   **A.**  "She commuted to an office.

13   **Q.**  "Was that office in Highland Heights, Kentucky?

14   **A.**  "That is my understanding, yes.

15   **Q.**  "Do you recall during the time period that you lived in

16   Cincinnati, your wife worked from home at any point?

17   **A.**  "Yes.

18   **Q.**  "Was there any regular schedule on which your wife worked

19   from home during the time that you lived in Cincinnati?

20   **A.**  "Not that I was aware.

21   **Q.**  "Mr. Menninger, did you ever meet any of your wife's

22   colleagues from PPD in person?

23   **A.**  "Yes.

24   **Q.**  "Who are those colleagues?

25   **A.**  "I doubt I could come up with most names, but I met her

| | |
|---|---|
| 1 | boss, Hassan. |
| 2 | **Q.** "Is that Hacene Mekerri? |
| 3 | **A.** "Hacene.  Sorry.  Yes. |
| 4 |   "I met the person who was in charge of HR.  I |
| 5 | believe it was Chad. |
| 6 | **Q.** "Is that Chad St. John? |
| 7 | **A.** "I believe so. |
| 8 |   "A number of her other colleagues.  But we sat at a |
| 9 | restaurant, and it was loud, so I didn't really interact with |
| 10 | others who were at our table. |
| 11 | **Q.** "Can you describe your wife's demeanor when you first met |
| 12 | her in 2005? |
| 13 | **A.** "I would like to say she was excited to meet me.  Yes, |
| 14 | she -- we had talked on the phone, and it was a first-time |
| 15 | meeting, so she seemed excited to meet me in person. |
| 16 | **Q.** "As far as you know, was your wife under the care of a |
| 17 | psychiatrist in 2005? |
| 18 | **A.** "Not as far as I know. |
| 19 | **Q.** "As far as you know, was your wife under the care of a |
| 20 | psychiatrist at 2006" -- "in 2006? |
| 21 | **A.** "Um -- um -- I know she was at some point in Overland |
| 22 | Park, and I don't recall if it started in 2006. |
| 23 | **Q.** "Mr. Menninger, I note that you laughed a little when I |
| 24 | asked that question.  Is there a reason for that? |
| 25 | **A.** "Just me struggling with my memory. |

1   **Q.**   "You testified earlier that you lived in Overland Park

2   from 2006 to 2015; is that correct?

3   **A.**   "That is correct.

4   **Q.**   "Was your wife under the care of a psychiatrist for the

5   majority of the time that you lived in Overland Park?

6   **A.**   "I am uncertainly if it was for the majority of the time.

7   **Q.**   "Do you recall whether your wife was under the care of a

8   psychiatrist in 2007?

9   **A.**   "Again, I don't recall at what point she began care.

10  **Q.**   "Dr. Menninger" -- "Mr. Menninger, during the time that

11  you lived in Overland Park, Kansas with your wife, did you

12  observe her to be in a state of mind that you understood lead

13  her to seek psychiatric care?

14  **A.**   "Yes.

15  **Q.**   "Please describe those observations.

16  **A.**   "I observed her uncomfortable in social situations.

17  **Q.**   "What else?

18  **A.**   "That's what I directly observed.

19  **Q.**   "When did you first begin to observe that discomfort in

20  social situations?

21  **A.**   "I don't recall the first instance, but it was consistent

22  when we were invited to children's parties, for example.

23  **Q.**   "By children's parties, are you referring to parties

24  given by friends of your daughter's?

25  **A.**   "Their parents, correct.

1    **Q.**   "Are there any other contexts in which you observed your

2    wife's discomfort in social situations?

3    **A.**   "Not that I recall.

4    **Q.**   "As far as you understand, based on those observations,

5    was it that discomfort in the context of children's parties

6    that your wife sought psychiatric care?

7    **A.**   "I'm not sure I can answer that without revealing

8    conversations.

9    **Q.**   "During the time you lived in Overland Park, Kansas, did

10   you observe your wife exhibit discomfort in any other setting

11   aside from children's parties?

12   **A.**   "Not that I recall.

13   **Q.**   "Mr. Menninger, when did you your wife begin

14   participating in ultra marathons?

15   **A.**   "I'm trying to recall the first instance.  The first I

16   can recall offhand is when we lived in Dighton in 2017, I

17   believe.

18   **Q.**   "What does it mean that you crew ultra marathons for your

19   wife?

20   **A.**   "It means I'm there to support her as needed.  It varies

21   on the race, but often if there is a loop, I will be there on

22   a certain part of the loop and give her what she needs to

23   help her continue the race.

24   **Q.**   "Before 2017, did you observe your wife participating in

25   ultra marathons?

1    **A.**   "No, not that I recall.

2    **Q.**   "In 2017, how many ultra marathons did your wife

3    participate in?

4    **A.**   "I believe just the one.

5    **Q.**   "Where did the ultra marathon take place?

6    **A.**   "Rhode Island.

7    **Q.**   "In 2018, did you observe your wife participate in any

8    ultra marathons?

9    **A.**   "Yes.

10   **Q.**   "How many?

11   **A.**   "Two that I recall.

12   **Q.**   "And where did those take place?

13   **A.**   "Again in Rhode Island and in Arizona.

14   **Q.**   "And in 2019, did you observe your wife take -- strike

15   that.

16          "In 2019, did you observe your wife participate in

17   any ultra marathons?

18   **A.**   "Yes.

19   **Q.**   "How many?

20   **A.**   "Again, two, I believe.

21   **Q.**   "And where did those take place?

22   **A.**   "Lakewood, Colorado, and Arizona.

23   **Q.**   "Putting aside the ultra marathons that you've described

24   in your time, the time since you've known your wife, have you

25   observed her participate in regular marathons?

1    **A.**  "I'm concerned your question is a little specific.  I

2    don't recall if it was specifically a marathon.

3    **Q.**  "What do you recall that you're not sure if it qualifies

4    as a marathon?

5    **A.**  "Just the distance.  Sometimes they are half marathons or

6    beyond.

7    **Q.**  "In the time since you've known her wife, have you

8    observed her participate in running races?

9    **A.**  "Yes.

10    **Q.**  "Is that in addition to the ultra marathons you've

11    already described?

12    **A.**  "Yes.

13    **Q.**  "In 2020, have you observed her participate in any

14    running races?

15    **A.**  "No.

16    **Q.**  "In 2019, did you observe her participate in any running

17    races --

18    **A.**  "Oh --

19    **Q.**  "-- aside from the ultra marathons that you've already

20    described?

21    **A.**  "No.

22    **Q.**  "In 2018, did you observe her participate in any running

23    races aside from the ultra marathons that you've already

24    described?

25    **A.**  "No.

1   **Q.** "In 2017, did you observe her participate in any running

2   races aside from the ultra marathon that you've already

3   described?

4   **A.** "No.

5   **Q.** "When did you last observe your wife participate in a

6   nonultra marathon running race?

7   **A.** "I don't recall the year, but it was while we were in

8   Overland Park.

9   **Q.** "Mr. Menninger, you testified earlier that your wife

10   received permission to work remotely during her employment at

11   PPD, which allowed you and your family to relocate from

12   Cincinnati to Dighton, Massachusetts, correct?

13   **A.** "That is my understanding, yes.  That is what I said,

14   yes.

15   **Q.** "As far as you understand -- strike that.

16         "As far as you understand, did PPD offer any direct

17   support for your wife's relocation to remote location?

18   **A.** "I would struggle to answer that without revealing

19   conversation.

20   **Q.** "Mr. Menninger, did you yourself ever review any

21   communications from PPD in connection with the granting of

22   permission for your wife to relocate to a remote location?

23   **A.** "I don't believe so.

24   **Q.** "As far as you understand, Mr. Menninger, was there a

25   time when your wife began to suffer from generalized anxiety

1   disorder?

2   **A.**   "Are you asking when I believe it started?

3   **Q.**   "Yes.

4   **A.**   "I would struggle to answer that because it involves

5   conversations.

6   **Q.**   "Mr. Menninger, to be clear, I am asking for information

7   based on your observations of your wife.  I'm not asking for

8   you to reveal any confidential conversations that you have

9   had with your wife?

10   **A.**   "Can you repeat the question?

11   **Q.**   "Was there a time when you became aware that your wife

12   was suffering from generalized anxiety disorder?

13   **A.**   "Yes.

14   **Q.**   "And when was that?

15   **A.**   "While we lived in Overland Park.

16   **Q.**   "So between 2006 and 2015, correct?

17   **A.**   "Correct.

18   **Q.**   "Do you recall more specifically when in that time period

19   you became aware that your wife suffered from generalized

20   anxiety disorder?

21   **A.**   "It would probably coincide with when she's sought

22   therapy for that purpose.

23   **Q.**   "And what specifically did you observe that lead you to

24   be aware that your wife suffered from generalized anxiety

25   disorder?

1   **A.**  "As far as direct observations, only what I've already
2   stated.
3   **Q.**  "Did you observe changes in your wife and her conduct
4   that lead you to be aware that she suffered from generalized
5   anxiety disorder?
6   **A.**  "No.
7   **Q.**  "At some point, did you become aware that your wife
8   suffered from a panic disorder?
9   **A.**  "Yes.
10  **Q.**  "And when did you become aware of that?
11  **A.**  "When we discussed it.
12  **Q.**  "In what calendar year?
13  **A.**  "I'm not sure which year, but during the time frame in
14  Overland Park.
15  **Q.**  "Between 2006 and 2015?
16  **A.**  "Correct.
17  **Q.**  "What specifically did you observe that led you to be
18  aware that your wife suffered from panic disorder?
19  **A.**  "Are you asking me to describe her panic attack?
20  **Q.**  "If that's the conduct that led you to understand that
21  she suffered from a panic disorder, yes.
22  **A.**  "During one of our social situations, she sought me out
23  and was unable to communicate clearly.  Her breathing was
24  rapid.  She did her best to hold back tears, unable to fully
25  communicate what was happening to her.  And it took several

Case: 23-2030   Document: 155   Filed: 03/31/23   Page: 261 of 282
Case: 1:19-cv-10441-LTS   Document: 1570   Filed: 03/31/23   Page: 264 of 282   Entry ID: 6634402

261

|     |                                                                  |
| --- | ---------------------------------------------------------------- |
| 1   | minutes to recover enough to explain what she was                |
| 2   | experiencing.                                                    |
| 3   | **Q.**  "In what calendar year did that take place?             |
| 4   | **A.**  "I don't recall after -- after Maya was born.          |
| 5   | **Q.**  "Was your daughter born in 2008?                        |
| 6   | **A.**  "Correct.                                               |
| 7   | **Q.**  "Was your daughter a baby at the time?                 |
| 8   | **A.**  She would have -- if we were -- if we're attempting to  |
| 9   | narrow it down, she would have started school.                  |
| 10  | **Q.**  "Does that mean that your daughter was over the age of |
| 11  | five at the time?                                               |
| 12  | **A.**  "She started before five.  She started attending       |
| 13  | preschool in 2011.                                              |
| 14  | **Q.**  "Is it fair to say that it was between 2011 and 2015 that |
| 15  | you observed this panic attack?                                 |
| 16  | **A.**  "Correct.                                               |
| 17  | **Q.**  "What type of social situation was it that you were    |
| 18  | attending with your wife when this happened?                    |
| 19  | **A.**  "One of the children's parties.                         |
| 20  | **Q.**  "Was it the party of a friend of your daughter's?      |
| 21  | **A.**  "A classmate, yes.                                      |
| 22  | **Q.**  "As far as you can recall, was there a specific incident |
| 23  | or interaction that led to this panic attack?                   |
| 24  | **A.**  "Not that I witnessed, no.                              |
| 25  | **Q.**  "When your wife exhibited the symptoms that you've     |

 1    described, did you seek medical intervention?

 2    **A.**  "Not at that moment, no.

 3    **Q.**  "Was there a time after that, that you sought medical

 4    intervention as a result of what you observed?

 5    **A.**  "I'm uncertain if seeking therapy counts as medical

 6    intervention.

 7    **Q.**  "Yes.  Any type of intervention by healthcare

 8    professional as a result of what you observed.

 9    **A.**  "Yes.

10    **Q.**  "Can you please describe what you sought in the way of

11    medical intervention?

12    **A.**  "She found a therapist and was hopeful that that would

13    help her with these conditions.

14    **Q.**  "Do you recall the name of that therapist?

15    **A.**  "I do not.

16    **Q.**  "After the panic attack incident that you have just

17    described, did you observe any other such incidents affecting

18    your wife?

19    **A.**  "I don't recall if there were additional incidents that I

20    observed.

21    **Q.**  "In the time since you've known your wife, did you become

22    aware that she suffered from social anxiety disorder?

23    **A.**  "Yes.

24    **Q.**  "And when did you become aware of that?

25    **A.**  "Simultaneous with the generalized anxiety.

1   **Q.** "Did you observe anything in particular that made you

2   aware that your wife suffered from social anxiety disorder?

3   **A.** "Well, certainly the panic attack that I described, and

4   trying to separate conversations out.  She sought my company

5   whenever we were in social situations.

6   **Q.** "In the time since you've known your wife, have you

7   observed changes in her willingness to attend social

8   situations?

9   **A.** "Yes.

10  **Q.** "When did those changes take place?

11  **A.** "In early 2018.

12  **Q.** "What changes did you observe in early 2018?

13  **A.** "She was unwilling to participate in any social

14  situations.

15  **Q.** "Prior to early 2018, did you -- strike that.

16          "After the panic attack that you've described, and

17  until early 2018, did you observe your wife attend children's

18  parties?

19  **A.** "I am -- I don't recall for sure.

20  **Q.** "From early 2018 to the present, have you observed your

21  wife attend children's parties?

22  **A.** "She has not.

23  **Q.** "Has your daughter attended children's parties from early

24  2018 to the present?

25  **A.** "Yes.

```
 1    Q.  "Has your daughter attended children's parties from early
 2    2018 to the present that you attended?
 3    A.  "Yes.
 4    Q.  "I'm not asking about your confidential communications
 5    with your wife.  Putting that aside, do you have any separate
 6    knowledge as to why your wife has not attended children's
 7    parties from early 2018 to the present?
 8    A.  "I -- I'm not sure that I can -- I can respond to that
 9    without involving her conversations.
10    Q.  "In the time since you've known your wife, have you
11    become aware that she suffers from depression?
12    A.  "Yes.
13    Q.  "And when did you become aware of that?
14    A.  "Early 2018.
15    Q.  "How did you become aware of that?
16    A.  "Through observation, through conversations.
17    Q.  "Please describe those observations.
18    A.  "She had trouble getting through the day.  What I mean is
19    she was not willing, in some cases, to get out of bed.
20    Q.  "Starting in early 2018, how often did you observe your
21    wife have difficulty getting out of bed?
22    A.  "I don't know how to quantify it, but frequently.
23    Q.  "More than once a week?
24    A.  "I would say yes.
25    Q.  "More than twice a week?
```

1    **A.**  "Yes.

2    **Q.**  "More than three times a week?

3    **A.**  "Possibly.

4    **Q.**  "More than four times a week?

5    **A.**  "I'm -- I am uncertain at that point.

6    **Q.**  "Between early 2018 and now, has your wife's inability to

7    get out of bed with the frequency that you've described

8    changed?

9    **A.**  "I can say that it varies.  It exists, but it varies.

10   **Q.**  "So from the early 2018 time period that you've described

11   and now, has there been any time period during which your

12   wife has had difficulty getting out of bed more than four

13   times a week?

14   **A.**  "I -- I don't have that kind of data.  I'm not sure.

15   **Q.**  "Is it fair to say that from early 2018 to now, your wife

16   has difficulty getting out of bed more than three times a

17   week on a consistent basis?

18   **A.**  "That is my understanding.  Again, it's a challenge to

19   quantify.

20   **Q.**  "Mr. Menninger, your testified that your wife has had

21   trouble getting through the day since early 2018.  Aside from

22   being unwilling to get out of bed, what else have you

23   observed that leads you to believe that she has trouble

24   betting through the day?

25   **A.**  "A general lack of motivation.  She struggles to take

1   care of herself, and much of the rest of it is through

2   conversations with her.

3   **Q.**  "What have you -- strike that.

4          "What steps have you observed your wife taking to

5   attend to her depression from early 2018 until now?

6   **A.**  "She has sought therapy.  She takes medication as part of

7   the therapy.  She seeks physical activity on the advice of

8   the therapists.

9   **Q.**  "As far as you understand, is your wife currently in

10  therapy?

11  **A.**  "Yes.

12  **Q.**  "And what is the name of the therapist that she currently

13  treats with?

14  **A.**  "I -- I don't know the name of her therapist.

15  **Q.**  "In the time period of early 2018 until now,

16  Mr. Menninger, have you observed any changes in your wife's

17  mental state?

18  **A.**  "I would say depression constitutes a change in mental

19  state.  Do you mean in addition?

20  **Q.**  "In what way has her depression changed from early 2018

21  to the present?

22  **A.**  "Oh, I'm sorry.  I misunderstood the question.  I thought

23  you meant before 2018 until after.  I have -- yes, I have

24  observed changes over that time span, but those changes vary.

25  **Q.**  "What do you mean that they vary?

1    **A.**  "She has good days and bad days.  Well, I might take that

2    back.  She has okay days and bad days.

3    **Q.**  "Can you describe the changes that you have observed

4    since early 2018?

5    **A.**  "Are you asking how it varies from day-to-day?

6    **Q.**  "Yes.

7    **A.**  "Some days she barely functions and cannot take care of

8    herself, or is uninterested in taking care of herself.  Other

9    days she can and is almost social with myself and my

10   daughter, and perhaps her sister or her mother, if they get a

11   chance to visit.  Those are the okay days.

12   **Q.**  "At present, on a weekly basis, how many days does your

13   wife typically have when she can barely function in your

14   words?

15   **A.**  "Again, I can't -- I'm challenged to quantify.  She can

16   have a week of bad days.  Some of it is driven by context.

17   If a lot is going on with this case, she tends to have bad

18   days.  Yeah, I'm not sure I should add any commentary to

19   that.

20   **Q.**  "I'm asking about your observations, Mr. Menninger.  I'm

21   not asking for you to share communications that you've had

22   with your wife or with Mr. Hannon.  I'm asking only about

23   your observations.

24   **A.**  "I understand.

25   **Q.**  "With that in mind, can you please answer the question,

1    which was, at present, on a weekly basis, how many days does

2    your wife typically have where she can barely function?

3    **A.**  "I think it's an unanswerable question.

4    **Q.**  "Last week, how many days did your wife have where she

5    could barely function?

6    **A.**  "It was not a good week, so.

7    **Q.**  "I'm sorry, I didn't hear your response.

8    **A.**  "It was not a good week.  I would say she had trouble

9    five out of the seven days.

10   **Q.**  "Has that been consistent for August of 2020?

11   **A.**  "We're only two weeks in, so, yes, I would say so.

12   **Q.**  "And was that the case for July of 2020?

13   **A.**  "I think she had some better days in July, so perhaps

14   not.

15   **Q.**  "If we go back to January 2018 --

16   **A.**  "Yes.

17   **Q.**  "-- on a weekly basis, how many days did your wife have

18   when she could barely function?

19   **A.**  "I would guess roughly half.

20   **Q.**  "From the period of January of 2018 to the present, has

21   the number of days on a weekly basis when your wife has

22   barely been able to function, in your words, has that number

23   fluctuated between approximately half -- half and five out of

24   seven days?

25   **A.**  "It -- sorry, it's the first time that I've thought about

1    the quantity of days that are good versus okay.  If you're

2    asking for a trend -- are you asking for a trend?

3    **Q.**  "Well, if you'd like to respond by describing a trend,

4    that would be your prerogative?

5    **A.**  "Okay.  I see no trend.

6    **Q.**  "Mr. Menninger, before we took a break, you were

7    answering questions regarding the frequency with which your

8    wife was unable to get out of bed since January 2018.  Do you

9    recall that?

10   **A.**  "Yes.  Specifically early 2018.

11   **Q.**  "What do you mean by 'specifically early 2018'?

12   **A.**  "I believe I started with answering questions referring

13   to early 2018.

14   **Q.**  "Has there been any time period since -- strike that.

15   Has there been any time period from early 2018 to the

16   present, when you observed your wife having difficulty

17   getting out of bed fewer than three times per week?

18   **A.**  "My best understanding is no.

19   **Q.**  "You have now testified about your wife's difficulty

20   getting out of bed many times a week from early 2018 until

21   now.  Have you observed your wife be able to utilize any

22   sorts of assistance to be able to get out of bed on those

23   days?

24   **A.**  "I'm not sure what constitutes 'assistance.'

25   **Q.**  "Have you observed anything help your wife be able to get

Case: 23-2030 Case: 19-1441 Document: 1579 Document: 155 Filed: 03/31/23 Date: 04/06/2020 Page: 229 of 282 Entry ID: 6634402

270

1   out of bed on those days?

2   **A.** "No, nothing in particular.

3   **Q.** "From early 2018 until now, have there been days when you

4   have observed your wife stay in bed the whole day?

5   **A.** "No.

6   **Q.** "You testified earlier, Mr. Menninger, about your wife

7   struggling to take care of herself from January of 2018 to

8   now, correct?

9   **A.** "Early 2018, yes.

10  **Q.** "Early 2018 to now?

11  **A.** "Yes.

12  **Q.** "In what ways have you observed your wife struggling to

13  take care of herself?

14  **A.** "Sometimes she will not prepare food for herself.

15  **Q.** "I'm sorry, I did not hear that answer.

16  **A.** "Sometimes she will not prepare food for herself.  Sorry,

17  it switched.  Mostly, she will prefer to lay on the couch or

18  lay in bed and just not participate in normal daily

19  activities.

20  **Q.** "Have you had to provide additional care for your wife

21  when she has not been able to care for herself?

22  **A.** "Yes.

23  **Q.** "And what has that care entailed?

24  **A.** "Usually preparing something for her to eat, if she's

25  willing.

1   **Q.**   "What else?

2   **A.**   "Encouraging her to get out of bed or participate in a

3   family activity.

4   **Q.**   "Anything else?

5   **A.**   "Sometimes encouraging her to go to bed.  It seems a

6   little ironic.

7   **Q.**   "Anything else?

8   **A.**   "General encouragement.

9   **Q.**   "Anything else?

10  **A.**   "Nothing specific that I recall.

11  **Q.**   "Aside from your care for your wife, have you hired

12  outside day-to-day care for your wife?

13  **A.**   "No.

14  **Q.**   "Have you seen your wife's demeanor change since the

15  beginning of the COVID-19 pandemic?

16  **A.**   "That's hard to disentangle.  I think, generally, yes.

17  **Q.**   "In what way have you seen your wife's demeanor change

18  since the beginning of the COVID-19 pandemic?

19  **A.**   "She is less likely to venture out of the house.

20  **Q.**   "If we go back to the January of this year, how often on

21  a weekly basis did your wife leave the house?

22  **A.**   "I struggle a little, because it has varied quite a bit.

23  So that particular month, I am uncertain, but I can provide

24  general trends.

25  **Q.**   "What are those general trends?

1    **A.** "In January, we were new to Albuquerque, and she was

2    excited to get out, but it did not last.

3    **Q.** "Is that January of 2018 that you're referencing,

4    Mr. Menninger?

5    **A.** "2019. I believe you asked 2019.

6    **Q.** "2019?

7    **A.** "Yes.

8    **Q.** "In January of 2019, how many times a week did your wife

9    leave the house in Albuquerque?

10    **A.** "I really don't recall specific numbers. She did leave

11    the house, weather permitting.

12    **Q.** "What types of activities did she leave the house to do

13    as of January of 2019?

14    **A.** "Almost exclusively running.

15    **Q.** "Did she run alone?

16    **A.** "Yes.

17    **Q.** "Sat some point after January 2019, did the frequency

18    with which your wife left the house decrease?

19    **A.** "Yes.

20    **Q.** "And when did that change take place?

21    **A.** "Probably within a couple of months. Yeah, again, it's

22    tricky for me to recall because it varied a lot.

23    **Q.** "Once it hit the point when that frequency decreased, how

24    many time a week did your wife leave the house?

25    **A.** "Maybe once or twice.

1   **Q.**  "Since you observed that decrease take place, have there

2   been any further changes in the frequency with which your

3   wife leaves the house?

4   **A.**  "Yes.

5   **Q.**  "When did that change take place?

6   **A.**  "She start attempts to train for ultra marathons later in

7   the year.  So after, I'd say, May or June, she more

8   frequently ventured out for that purpose.

9   **Q.**  "In the latter half of 2019, did you observe your wife

10  leave the house for any other purpose other than ultra

11  marathon training?

12  **A.**  "She drove Maya to school in the later half, in the fall

13  of 2019.

14  **Q.**  "In the first half of 2019, did your wife drive your

15  daughter to school?

16  **A.**  "No.

17  **Q.**  "Is it your understanding that your wife did not drive

18  your daughter to school on the first part of 2019 due to her

19  mental state?

20  **A.**  "No.  Maya was able to take a bus.

21  **Q.**  "You testified that your wife has been less likely to

22  venture out of the house since the start of the COVID-19

23  pandemic.  Are there any other change that you've observed in

24  your wife since the start of the COVID-19 pandemic?

25  **A.**  "Again, tricky to answer.  I don't know of any changes

|     |                                                                        |
|-----|------------------------------------------------------------------------|
| 1   | coincide or caused by the COVID situation.                             |
| 2   | **Q.** "Since January 2020, what changes have you observed in          |
| 3   | your wife?                                                              |
| 4   | **A.** "She -- she is less likely to go outside now than she was       |
| 5   | in 2019.  Currently, other than visiting family members                |
| 6   | outside her house, she does not leave the house.                       |
| 7   | **Q.** "Have you observed your wife go running outside in 2020?        |
| 8   | **A.** "Yes.                                                            |
| 9   | **Q.** "When did you last observe your wife run outside in 2020?       |
| 10  | **A.** "I'd say at least a month ago.                                   |
| 11  | **Q.** "Since you moved -- so since you moved to Bend, Oregon,         |
| 12  | correct?                                                                |
| 13  | **A.** "Yes.                                                            |
| 14  | **Q.** "Is your wife currently planning to participate in any         |
| 15  | upcoming ultra marathons?                                               |
| 16  | **A.** "Not that I'm aware of.                                          |
| 17  | **Q.** "Is your wife currently planning to participate in any         |
| 18  | other upcoming running races?                                           |
| 19  | **A.** "No.  I will put out there that most of these races have        |
| 20  | been canceled.                                                          |
| 21  | **Q.** "But for the fact that races have been canceled in light       |
| 22  | of the pandemic, was your wife scheduled to participate in             |
| 23  | any races for the remainder of 2020?                                    |
| 24  | **A.** "Was she?                                                        |
| 25  | **Q.** "Yes.                                                            |

1   **A.**  "I don't believe so.  Our situation was too in flux for

2   us to plan that far ahead.

3   **Q.**  "Was that in light of your move from Albuquerque to Bend?

4   **A.**  "Correct.

5   **Q.**  "How has the move from Albuquerque to Bend affected your

6   wife's demeanor?

7   **A.**  "I believe it has helped her.  She enjoys being closer to

8   family.  We're all certainly frustrated that we can't do most

9   activities with them due to the COVID pandemic.

10  **Q.**  "Has the move from Albuquerque to Bend affected your

11  wife's demeanor in any other way?

12  **A.**  "I'm sorry; I think I missed a word.  Can you repeat?

13  **Q.**  "Has the move from Albuquerque to Bend affected your

14  wife's demeanor in any other way?

15  **A.**  "Not much that I understand.  Primarily, she's happy to

16  be closer to family.

17  **Q.**  "Did the move from Dighton, Massachusetts, to

18  Albuquerque, New Mexico, affect your wife's demeanor?

19  **A.**  "Yes.

20  **Q.**  "In what way?

21  **A.**  "We were concerned about being financially trapped in

22  Dighton, so it was a relief.

23  **Q.**  "Did you observe your wife's mental state improve after

24  moving to Albuquerque?

25  **A.**  "Initially, yes.

1  **Q.**  "Did you own a house in Dighton?

2  **A.**  "We rented.

3  **Q.**  "Did you own a house in Albuquerque?

4  **A.**  "Oh, I'm sorry; I take that back.  We owned a house in

5  Dighton.  We rented in Albuquerque.

6  **Q.**  "Did you sell the house in Dighton prior to your move to

7  Albuquerque?

8  **A.**  "We sold it after our move.

9  **Q.**  "After selling the house in Dighton, did that relieve the

10  feeling of being financially trapped?

11  **A.**  "Not totally.  To a degree.

12  **Q.**  "What else accounted for the relief of the feeling of

13  being financially trapped after moving from Dighton to

14  Albuquerque?

15  **A.**  "Are you asking me to describe why we felt that way?

16  **Q.**  "You testified that you had felt financially trapped in

17  Dighton, and that was alleviated upon moving to Albuquerque.

18  I'm asking you to describe what contributed to that.

19  **A.**  "We -- we moved to Dighton for a school that we could no

20  longer afford.  So not having to pay -- we wouldn't have been

21  able to pay tuition at that school, and we were concerned

22  that we would not have the funds to move if we stayed in

23  Dighton.

24  **Q.**  "How much was the tuition for your daughter's school on

25  an annual basis?

| | |
|---|---|
| 1 | **A.** "Oh, gosh. |
| 2 | **Q.** "I should clarify, at The Wheeler School. |
| 3 | **A.** "I don't have those numbers.  I'm sorry. |
| 4 | **Q.** "More than $10,000 a year? |
| 5 | **A.** "That is my understanding, yes. |
| 6 | **Q.** "More than $20,000 a year? |
| 7 | **A.** "I believe so. |
| 8 | **Q.** "More than $30,000 a year? |
| 9 | **A.** "I am not sure at that point.  I'm thinking that's |
| 10 | ballpark. |
| 11 | **Q.** "Did your daughter attend a private school in |
| 12 | Albuquerque? |
| 13 | **A.** "Eventually. |
| 14 | **Q.** "Does that mean that for a period of time, your daughter |
| 15 | attended a public school in Albuquerque? |
| 16 | **A.** "Yes. |
| 17 | **Q.** "What is the name of the private school that she |
| 18 | attended? |
| 19 | **A.** "At which location? |
| 20 | **Q.** "Albuquerque? |
| 21 | **A.** "Albuquerque Academy. |
| 22 | **Q.** "For how many school years did she attend the Albuquerque |
| 23 | Academy? |
| 24 | **A.** "She attended one semester. |
| 25 | **Q.** "And what was the tuition for the semester that she |

```
 1   attended the Albuquerque Academy?
 2   A.   "Again, I'm not the one who does the finances.  I don't
 3   recall exactly.
 4   Q.   "Was it more than $10,000?
 5   A.   "I believe so, yes.
 6   Q.   "More than $20,000?
 7   A.   "I think so.
 8   Q.   "More than $30,000?
 9   A.   "I believe that -- I believe it's in that ballpark.
10            THE COURT:  I'm going to stop you here.
11            All right.  Ladies and gentlemen, don't discuss the
12   case among yourselves; don't discuss it with anyone else;
13   don't do any independent research.
14            Just a reminder, tomorrow is just 9:00 to 1:00; on
15   Wednesday, Thursday, 9:00 to 1:00; Friday you will get the
16   case, anticipate being here all day.
17            Thank you for your attention.
18            All rise for the jury.
19            Have a nice day.
20            (The jury exits the courtroom.)
21            THE COURT:  Please be seated.  So who's -- you
22   finish this tomorrow, and what else?
23            MR. HANNON:  So we have two out-of-state witnesses
24   who are lined up for tomorrow.
25            THE COURT:  Who are they?
```

```
 1              MR. HANNON:  They are Mr. Clendening and

 2    Mr. McKinnon.

 3              MS. MANDEL:  In the other order, though.

 4              MR. HANNON:  In the other order.  Whatever order.

 5         But I have a damages expert, which I agreed to

 6    provide on Thursday.  He's coming from out of town, to make

 7    sure that we could get those --

 8              THE COURT:  On and off.

 9              MR. HANNON:  -- tomorrow --

10         I'm sorry?

11              THE COURT:  He's coming on Thursday, the damage --

12              MR. HANNON:  Correct.  Right.

13         So I think I may run into a situation where I may

14    be resting, subject to calling my damages expert out of

15    order.

16              THE COURT:  Fine.  How long are the McKinnon and

17    Clendening?

18              MR. HANNON:  I would guess ten to 15 minutes on my

19    side.

20              THE COURT:  And for you?

21              MS. MANDEL:  I would think not more than a half

22    hour for each on our side.

23              THE COURT:  All right.  So you're resting -- so

24    essentially after those two witnesses -- is this witness your

25    witness?
```

```
 1              MR. HANNON:  Both.

 2              THE COURT:  Both.  Okay.

 3              After this witness and those two witnesses, you

 4    rest, other than your damage expert?

 5              MR. HANNON:  Correct.

 6              THE COURT:  And then who would you be calling?

 7              MS. MANDEL:  Our only other witness at that point

 8    is our psych expert, Dr. Martin Kelly.

 9              THE COURT:  All right.  So will you call him

10    tomorrow, if there's time?

11              MS. MANDEL:  We had him scheduled, holding

12    Thursday.  We can see -- we can check on his availability for

13    tomorrow.

14              THE COURT:  It sounds like, otherwise, we'll finish

15    early tomorrow --

16              MS. MANDEL:  Right.

17              THE COURT:  -- because there's not that much more

18    with this, right?

19              MS. MANDEL:  And we'll certainly -- and we'll

20    certainly check on availability.

21              THE COURT:  It would be better, I think, if we

22    could go to 1:00.  I think the jury will be happier with us.

23              MS. MANDEL:  Is Mr. Jonas available tomorrow?

24              MR. HANNON:  No.  He's flying in, so -- we agreed

25    that he'd do Thursday, so he has a flight tomorrow.
```

```
 1                THE COURT:  All right.  So, then, we might finish
 2       the evidence Thursday; and if not, we'll finish it Friday.
 3                How long is the damage expert?
 4                MR. HANNON:  Half an hour, 45 minutes.
 5                THE COURT:  And how long is Dr. Kelly?
 6                MR. CURRAN:  Half an hour.
 7                THE COURT:  Okay.  So we'll finish Friday morning,
 8       for sure, maybe even Thursday.  Okay.  Good.  All right.
 9       Have a nice day.  I'll see you tomorrow at 8:45, unless I
10       hear from you that you want to be earlier.
11                MR. HANNON:  Very good.  Thank you.
12                THE COURT:  Have a good day.
13                (Court in recess at 4:03 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    C E R T I F I C A T I O N

 2

 3

 4          I certify that the foregoing is a correct

 5   transcript of the record of proceedings in the above-entitled

 6   matter to the best of my skill and ability.

 7

 8

 9

10   /s/ Rachel M. Lopez                    March 28, 2023

11   /s/ Robert W. Paschal

12

13

14   _____          _____

15   Rachel M. Lopez, CRR                  Date

16   Robert W. Paschal, CRR, RMR

17   Official Court Reporters

18

19

20

21

22

23

24

25
```



UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

LISA MENNINGER,

      Plaintiff,                 Civil Action No.
                                 1:19-cv-11441-LTS

     v.

PPD DEVELOPMENT, L.P.,

      Defendant.

_____

BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

JURY TRIAL
Day 8

Wednesday, March 29, 2023
8:53 a.m.

John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts

Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

```
 1                          A P P E A R A N C E S

 2

 3      On behalf of the Plaintiff:

 4          HARTLEY MICHON ROBB HANNON, LLP
            BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
 5          155 Seaport Boulevard
            2nd Floor
 6          Boston, Massachusetts  02210
            (617) 723-8000
 7          phannon@hmrhlaw.com
            hwatson@hmrhlaw.com
 8

 9      On behalf of the Defendant:

10          OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
            BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
11          One Boston Place
            Suite 3500
12          Boston, Massachusetts  02108
            (617) 994-5700
13          rachel.mandel@ogletreedeakins.com
            patrick.curran@ogletreedeakins.com
14

15

16

17

18

19

20

21

22

23

24

25
```

3

1               **TABLE OF CONTENTS**

2

3                **TRIAL WITNESSES**

4

5  On behalf of the Plaintiff:           <u>Page</u>

6  MASON MENNINGER               11

7  BRENT H. MCKINNON

8        By Mr. Hannon          39

9        By Mr. Curran          50

10       By Mr. Hannon          59

11  CHRIS E. CLENDENING

12       By Mr. Hannon          66

13       By Ms. Mandel          90

14       By Mr. Hannon         132

15       By Ms. Mandel         156

16

17

18                  **EXHIBIT**

19

20                None

21

22

23

24

25

```
1                    P R O C E E D I N G S
2           (In open court.)
3           THE DEPUTY CLERK:  The United States District Court
4    for the District of Massachusetts is now in session, the
5    Honorable Leo T. Sorokin presiding.
6           THE COURT:  Please be seated.
7           Okay.  So just in terms of scheduling, I think
8    that's the only issue Kellyann said.
9           Where are we?  We have a little more to read of
10   Mason Menninger, right?
11          MR. HANNON:  We're close to done.  Yeah.  I
12   understand the defense would like to take one of their
13   witnesses out of order this morning, which is fine on my end.
14          MS. MANDEL:  Not necessarily out of order.  Just,
15   as we had discussed yesterday, after -- I think we can
16   complete the Mason Menninger read-on.  And then after that it
17   was just to make sure Mr. McKinnon needs to be the next
18   witness just because of his flights.
19          MR. HANNON:  Okay.  So in terms of the schedule for
20   the day, we're going to finish Mason Menninger.  We're then
21   going to take Mr. McKinnon.  We will then do --
22          THE COURT:  You're going to call McKinnon?
23          MR. HANNON:  I will -- yeah.
24          THE COURT:  You're just going to call him out of
25   order.
```

```
 1            MR. HANNON:  Correct.  I'm then going to call
 2    Mr. Clendening.
 3            THE COURT:  Okay.
 4            MR. HANNON:  At that point, I'm going to rest,
 5    subject to --
 6            THE COURT:  Subject to you calling your --
 7            MR. HANNON:  My economics excerpt tomorrow.
 8            THE COURT:  Who's coming tomorrow?
 9            MR. HANNON:  Correct.
10            THE COURT:  Okay.  And then who are you going to
11    call?
12            MS. MANDEL:  And our -- and our witnesses have
13    really already been called, so our remaining witness will be
14    Dr. Martin Kelly, our psychiatric expert, who all -- because
15    of his schedule of patients and whatnot, is available to come
16    tomorrow morning.  I understand Mr. Jonas will testify first
17    and then we'll call Dr. Kessimian.
18            THE COURT:  Okay.  All right.  So you can rest, if
19    you wish, but what's -- I don't know that you -- you have to
20    rest then, because the next witness will be your witness.
21            MR. HANNON:  Sure.
22            THE COURT:  So we're likely to finish before
23    1 o'clock, is what you're telling me?
24            Will we finish those two witnesses by 1:00
25    tomorrow?
```

```
 1              MS. MANDEL:  I think so.

 2              MR. HANNON:  Probably.

 3              MS. MANDEL:  Your Honor, the one thing that we

 4    spoke about just briefly, Dr. Kelly, he's the witness who

 5    recently had surgery and is a little bit concerned about if

 6    it will take some assistance to get to the witness stand, and

 7    so working this -- we have spoken about it -- we're confident

 8    we will be down before 1:00 tomorrow, if it would be possible

 9    to take the morning break just after Mr. Jonas.

10              THE COURT:  Sure.

11              MS. MANDEL:  Break briefly for the restroom break

12    and then we can make sure that Dr. Kelly has no problem

13    getting --

14              THE COURT:  How long do you think the first person

15    will be, Jonas?

16              MR. HANNON:  45 minutes.

17              THE COURT:  And how long will you be with him?

18              MS. MANDEL:  Probably about a half hour on our end,

19    Your Honor.

20              THE COURT:  So an hour and a quarter.  Okay.  So

21    Kellyann, maybe the one thing to do is see if we can get the

22    refreshments and coffee and stuff for them a little earlier,

23    so that when we take the break at -- so that sounds like a

24    break between 10:00 and 10:30, depending on how it goes.

25              MS. MANDEL:  And it's possible that it will be even
```

```
 1    close to 11:00.  It's just --
 2              THE COURT:  Right.  But we'll get them early, so
 3    that then if we go early -- right.
 4              And then how long will Kelly be?
 5              MR. CURRAN:  Half hour, maybe.
 6              THE COURT:  And then?
 7              MR. HANNON:  Probably half hour, 45 minutes.
 8              THE COURT:  Okay.  All right.  Fine.  Okay.  I'm
 9    fine with that.
10              So basically, this is what we will do.  We'll
11    finish -- we'll go finish those witnesses you describe today,
12    essentially the read-in and the two other witnesses, and then
13    we'll be done for the day.  We'll do the two witnesses
14    tomorrow.  That will be all the evidence.  The -- I will -- I
15    don't -- I can't do the charge conference today, because I
16    have a sentencing this afternoon that is going to take
17    awhile.  And I'm going to -- and you haven't got the -- it's
18    not really fair for me to have the charge conference before
19    you've had an opportunity to read the instructions, it seems.
20    So I'm going to -- I will issue to you sometime today or this
21    evening the draft jury instructions in verdict form, and
22    you'll have them to chew over, and then we'll have the charge
23    conference tomorrow.
24              And give me one moment just to look.  I'm thinking
25    that -- I think what I want to do is have the charge
```

|   | |
|---|---|
| 1 | conference tomorrow and close on Friday for two reasons. |
| 2 | It's a really important case to Dr. Menninger.  It's a really |
| 3 | important case to PPD.  You spent a lot of time preparing |
| 4 | this case.  I don't really want to rush my response to your |
| 5 | comments, if any, to the jury instructions.  I will remind |
| 6 | you that, in the last case I had, just last week, they had |
| 7 | zero, neither side.  And -- but nonetheless, I recognize that |
| 8 | that's unlikely.  And so I just want to have the chance -- |
| 9 | there's, you know, somewhat complicated claims, and I want to |
| 10 | have the chance to thoughtfully respond, and it gives you |
| 11 | more time to prepare.  And so then we'll come in Friday |
| 12 | morning and you'll do closing arguments.  It means a little |
| 13 | bit of like potentially two short days for the jury, but I |
| 14 | think it's the only way to do it well, especially given other |
| 15 | criminal proceedings I have today and tomorrow in the |
| 16 | afternoons that I can't fairly move. |
| 17 | MS. MANDEL:  And so in terms of charge conference, |
| 18 | you think -- |
| 19 | THE COURT:  Sometime tomorrow. |
| 20 | MS. MANDEL:  Tomorrow afternoon. |
| 21 | THE COURT:  And I'll tell you -- it just depends. |
| 22 | Honestly, I'm not sure when.  Here's the constraints, it |
| 23 | depends on what time we finish.  If we finish before |
| 24 | 1 o'clock, we'll go right into it.  The constraints I have is |
| 25 | I have a 2 o'clock sentencing.  And so we'll do it -- if we |

```
 1    can do it -- but we will -- you need to eat lunch and I need
 2    to eat lunch, so we'll at least have a half-hour break for
 3    that.  And so maybe we do it before the sentencing, maybe we
 4    do it a little bit before.  It depends when we finish,
 5    otherwise we do it after.
 6              MS. MANDEL:  And Your Honor, just to make sure I
 7    understand, we're talking about tomorrow, though?  Not --
 8              THE COURT:  Right.  Not today.  We're not going to
 9    have the charge conference today, because you don't have the
10    charge, and I have to do a little bit more.  It's just about
11    done.  And I'm not going to issue it and ten minutes later
12    have a charge conference, because that doesn't seem fair or
13    in the spirit of the rule.  And then you'll just come back to
14    me, anyway, the next day.  So might as well just do it the
15    next day.
16              Okay.  Kellyann, go see if they're all here.
17              THE COURT:  Just so you know, depending on how
18    tomorrow goes for your own planning, there's a chance that I
19    might start -- tell the jury to come at 9:30 or 10:00 if I --
20    so depending on when we have the charge conference and how
21    much there is and what -- so that -- if I thought I needed --
22    wanted a little more time to talk to you or something
23    before -- because how long do you think you're going to be in
24    your closes, roughly?
25              MR. HANNON:  40 minutes.
```

```
 1              THE COURT:  I'm not holding you right now, but a
 2   ballpark.
 3              MR. HANNON:  40, 45 minutes.
 4              MS. MANDEL:  Something similar on our end,
 5   Your Honor.
 6              THE COURT:  All right.  So even with all of that,
 7   it's an hour and a half, roughly.  And the charge, 45
 8   minutes, I think, whatever.  So there's plenty of time for
 9   them to get it reasonably.
10              (The jury enters the courtroom.)
11              THE COURT:  Good morning, ladies and gentlemen.
12   Everybody follow my instruction, no discussion, no
13   independent research?  Good.
14              So just a couple quick points before we resume.
15   One is I told you you're going to get the case on Friday.
16   You will.  I've been going over the schedule with the lawyers
17   just now.  We're very much on track.  And before you leave
18   today, I will give you all the details about the schedule.
19   But just to remind you, today is just 9:00 to 1:00.
20   Tomorrow -- today is 9:00 to 1:00 at the most.  Tomorrow is
21   9:00 to 1:00 at the most.  Friday you'll -- will be the end
22   of the case and you'll receive it for deliberations.  Okay?
23              So when we broke, we were reading -- they were --
24   Ms. Mandel was asking the questions, and Mr. Watson, right?
25              MR. WATSON:  Watson, yes.
```

```
 1            THE COURT:  Mr. Watson was being Mr. Menninger and
 2     reading his answers and there's a bit more to that.  So
 3     they're going to continue that until they finish.
 4            Go ahead.
 5            MS. MANDEL:  And Your Honor, we're just going to,
 6     for context, go back a couple of questions, because we were
 7     sort of in the middle.
 8            THE COURT:  That's fine.
 9                    The testimony of
10                    MASON MENNINGER
11     having been duly sworn previously, was read into the record as
12                       follows:
13     BY MS. MANDEL:
14     Q.   "Did your daughter attend a private school in
15     Albuquerque?
16     A.   "Eventually.
17     Q.   "Does that mean that for a period of time your daughter
18     attended a public school in Albuquerque?
19     A.   "Yes.
20     Q.   "What is the name of the private school that she
21     attended?
22     A.   "At which location?
23     Q.   "Albuquerque.
24     A.   "Albuquerque Academy.
25     Q.   "For how many years did she attend Albuquerque Academy?
```

1     **A.**   "She attended one semester.

2     **Q.**   "And what was the tuition for the semester that she

3   attended at the Albuquerque Academy?

4     **A.**   "Again, I'm not the one who does the finances. I don't

5   recall exactly.

6     **Q.**   "Was it more than $10,000?

7     **A.**   "I believe so, yes.

8     **Q.**   "More than $20,000?

9     **A.**   "I think so.

10    **Q.**   "More than $30,000?

11    **A.**   "I believe it's in that ballpark.

12    **Q.**   "Did your daughter attend the Albuquerque Academy for the

13   spring semester of 2020?

14    **A.**   "Yes.

15    **Q.**   "Is your daughter scheduled to begin school in Bend,

16   Oregon in the fall of 2020?

17    **A.**   "Yes.

18    **Q.**   "In a private school?

19    **A.**   "No.

20    **Q.**   "In a public school?

21    **A.**   "Yes."

22        MS. MANDEL: Your Honor, if I may for context, just

23   read a couple of the questions at bottom of page 73?

24        THE COURT: Yes.

25   BY MS. MANDEL:

1 **Q.** "You mentioned earlier in passing that you have cats; is

2 that correct?

3 **A.** "Yes.

4 **Q.** "How many cats do you have?

5 **A.** "Two.

6 **Q.** "How long have you had those cats?

7 **A.** "I'm trying to remember.  It's about two and a half

8 years, I think.

9 **Q.** "Are those the only pets that you and your wife currently

10 have?

11 **A.** "Yes.

12 **Q.** "Have you previously had any other pets during the time

13 that you've been married to your wife?

14 **A.** "Yes.

15 **Q.** "What were those pets?

16 **A.** "One other cat.

17 **Q.** "When did you have that cat?

18 **A.** "She had this cat when I met her, so from when we moved

19 in together until it died of old age.

20 **Q.** "When did it die of old age?

21 **A.** "I'm not sure I recall the exact year.  I want to say

22 about 2010.

23 **Q.** "What effect did the cat's death have on your wife's

24 mental state that you observed?

25 **A.** "Nothing long term.  She was sad at the time.

1   **Q.**  "Aside from the cats that you've mentioned, have you and

2   your wife had any other pets during the time that you've

3   known her?

4   **A.**  "No.

5   **Q.**  "You testified that you currently have two cats.  Does

6   your wife take care of those cats?

7   **A.**  "Some of the time, yes.

8   **Q.**  "Has your wife's ability to care for the cats changed in

9   the two and a half years that you've owned the cats?

10  **A.**  "Overall, no.  Occasionally I will feed the cats if it

11  looks like they need food.

12  **Q.**  "Have you observed your wife's ability to care for your

13  daughter change from 2000 -- strike that.

14         "Changed from early 2018 to the present?

15  **A.**  "Yes.

16  **Q.**  "In what way?

17  **A.**  "It is harder for her to be present for our daughter.

18  So, you know, as a 12-year-old, she would approach us, and

19  sometimes Lisa is just not there to be approached.

20  **Q.**  "Any other ways in which you've observed your wife's

21  ability to care for your daughter change from early 2018 to

22  the present?

23  **A.**  "Nothing specific.  Lisa has done her very best to make

24  sure none of this affects Maya.

25  **Q.**  "When you say none of this, are you referring to your

```
 1   wife's anxiety and depression?
 2   A.   "Essentially, yes.
 3   Q.   "Are you referring to anything else?
 4   A.   "It's exacerbated by the ongoing case, so indirectly.
 5   Q.   "When you say it's 'exacerbated,' are you referring to
 6   your wife's anxiety and depression?
 7   A.   "Yes.
 8   Q.   "And by 'The case,' are you referring to her lawsuit
 9   against PPD?
10   A.   "Yes.
11   Q.   "Prior to January of 2018, did you ever observe your wife
12   have difficulty caring for your daughter?
13   A.   "I assume you mean early 2018.  Not that I recall.
14   Q.   "Mr. Menninger, did you ever meet your wife's father?
15   A.   "No, I did not.
16   Q.   "Was the last time that you observed your wife having
17   interaction with your sibling --"
18             MS. MANDEL:  Strike that.
19             Your Honor, I think just for context, if we read a
20   little more of page 77.
21             MR. HANNON:  I suggest page 77, line 19,
22   Your Honor.
23             THE WITNESS:  Sorry, there's a few pages that are
24   cut from our copy here.
25             THE COURT:  Why don't you just start there.
```

```
 1                 MS. MANDEL:  That's fine.
 2     BY MS. MANDEL:
 3     Q.   "Have you observed your wife have interaction with your
 4     sibling who lives outside of Dallas?
 5     A.   "Yes.
 6     Q.   "When did you last observe that interaction?
 7     A.   "The same occasion, so whenever we visited in the
 8     timeframe we were in Overland Park.
 9                 MR. WATSON:  Your Honor, I'm sorry.  There's some
10     pages that are missing, so it doesn't flow into the next.
11                 MR. HANNON:  Oh, right.
12                 THE COURT:  So ladies and gentlemen of the jury,
13     they're not reading the entire deposition, because not all of
14     it is -- the lawyers don't think all of it is relevant.  And
15     just as a general proposition, this is probably what I'm
16     going to tell you, and it comes as no surprise.  You are not
17     hearing everything that every human being knows about
18     everything in any way that is related to this.  You are
19     hearing the things that each lawyer thinks are relevant and
20     admissible.  And that's to focus you and give you what you
21     need.  And so they're only reading parts, and that's why
22     sometimes there's a question that they thought they weren't
23     going to read, but actually seems sensible to read for
24     context for something and that's what's going on.
25                 And now -- and the notebook that Mr. Watson has and
```

1    that we all have these notebooks that they're reading from,

2    don't even have every page of the deposition, so that's what

3    they're looking at now.

4    BY MS. MANDEL:

5    **Q.**   "When did you last observe your wife have a conversation

6    with another person about her anxiety?

7    **A.**   "Other than family members?

8    **Q.**   "Anyone.   Period.

9    **A.**   "Oh, anyone.   Well, certainly that happened during one of

10   our visits with her family.

11   **Q.**   "When was that visit?

12   **A.**   "I'm not sure.   We've had a handful since we've been

13   here.   So, um, yeah, I struggle to think of one in which

14   there was a significant conversation on that topic.

15   **Q.**   "When did you last observe have a conversation with

16   another person about her depression?

17   **A.**   "Again, it would also certainly be with a family member,

18   since we moved here.   It's challenging for me to give

19   specific times.

20   **Q.**   "When did such a conversation last take place?

21   **A.**   "Again, it's challenging for me to answer that.

22   **Q.**   "What did you observe your wife say about her depression

23   during such a conversation?

24   **A.**   "Essentially the same things that I've told you, that she

25   struggles to get out of bed and have any level of enthusiasm.

1    She shares her ambitions with her family, and then feels bad

2    when she can't follow through because of depression.

3    **Q.**   "What ambitions have you observed your wife share with

4    her family?

5    **A.**   "She wants to run.  She wants to run races.

6    **Q.**   "Any other ambitions?

7    **A.**   "That's about it, yeah.  She struggles with just that

8    one.

9    **Q.**   "What have you observed your wife say to her family about

10   anxiety?

11   **A.**   "I'm not sure she necessarily separates that out

12   conversation-wise.  I think she has stated that she is

13   concerned about going out of the house because of her

14   anxiety.

15   **Q.**   "Have you heard your wife speak with anybody else about

16   her panic disorder?

17   **A.**   "Outside of family, no.

18   **Q.**   "How about within the family?

19   **A.**   "Yes.  Her sister and her mother.

20   **Q.**   "What have you observed your wife say to her sister about

21   her panic disorder?

22   **A.**   "I recall her describing what they're like and when they

23   can occur.

24   **Q.**   "What have you observed your wife say about her panic

25   disorder in conversations with her mother?

1  **A.**  "I think overall, less than what she tells her sister,

2  essentially the same things, but just possibly without the

3  same detail.

4  **Q.**  "What did your wife say to your sister -- strike that.

5          "What did your wife say to her sister about what it

6  is like when a panic attack occurs?

7  **A.**  "Basically what I've already described, how she has

8  trouble communicating, trouble catching her breath, often

9  cries through it, describes just trying to get through the

10  moment.  Certain things with temperature, you know.  She

11  feels very hot, can get sweaty.  You know, just her sister is

12  a nurse, and I think, you know, these sort of descriptive

13  things are meaningful to her.

14  **Q.**  "Mr. Menninger, you testified earlier that you and your

15  wife met online based on similar interests.  Do you recall

16  that?

17  **A.**  "Yes.

18  **Q.**  "What are those similar interests?

19  **A.**  "We're both vegan.

20  **Q.**  "Vegan?

21  **A.**  "Yes.

22  **Q.**  "Any other similar interests?

23  **A.**  "Do we share similar interests other than that, is that

24  what you're asking?

25  **Q.**  "I'm sorry?

1   **A.** "Are you asking if we share any other interests other

2   than being vegan?

3   **Q.** "I'm asking what similar interests you cited as the basis

4   for your meeting online?

5   **A.** "Oh, oh, sure.  That.  It's essentially a lifestyle, so

6   that encompasses a lot.  It's more than just a diet.  I won't

7   go off on that tangent, but yes, we found it easy to

8   communicate with one another.

9   **Q.** "During the time that you and your wife lived in Dighton,

10  Massachusetts, your wife worked primarily from home, correct?

11  **A.** "Correct.

12  **Q.** "Did you ever observe your wife's interactions with

13  Mr. Mekerri during the time that she worked from home in

14  Dighton, Massachusetts?

15  **A.** "No, I'm not even sure I know who that is.

16  **Q.** "I'm referring to Hacene Mekerri?

17  **A.** "Oh, okay.  Sorry.  She's always referred to him by his

18  first name, as far as I can remember.  No, no, she had her

19  own office closed off, and when she worked, she -- yeah, I

20  had no interaction when she worked.

21  **Q.** "Did you observe your wife's interactions with Chad St.

22  John during the time she worked from home in Dighton?

23  **A.** "No, I did not.

24  **Q.** "Did you ever observe your wife's interactions with any

25  other colleagues at PPD during the time she worked at home in

1  Dighton?

2  **A.**  "No, I did not.

3  **Q.**  "Were you aware that at some point your wife disclosed

4  anxiety disorder to PPD?

5  **A.**  "Yes.

6  **Q.**  "I'm not asking about the contents of the conversation, I

7  want to be clear about that.  Did you become aware of that

8  through a conversation with your wife or by some other means?

9  **A.**  "Through a conversation with my wife.

10  **Q.**  "When did you become aware that your wife had disclosed

11  an anxiety order to PPD?

12  **A.**  "As it occurred.  I was aware that she was about to.  I

13  was aware that she did afterward.

14  **Q.**  "In the time that you've known your wife, Mr. Menninger,

15  have you ever worried about danger of her harming herself?

16  **A.**  "Yes.

17  **Q.**  "During what time or times did you have that worry?

18  **A.**  "I think the first occasion was while she was on medical

19  leave, so sometime in the first half of 2018.

20  **Q.**  "Are you referring to her medical leave from her

21  employment at PPD?

22  **A.**  "Correct.

23  **Q.**  "What formed the basis of your concern that your wife may

24  harm herself during the first half of 2018?

25  **A.**  "Her demeanor and her words.

```
 1    Q.   "What about your wife's demeanor during the first half of
 2    2018 led you to worry that she may harm herself?
 3    A.   "She seemed just very out of character for her.  She
 4    seemed almost angry, frustrated, at a breaking point
 5    essentially.
 6    Q.   "Was that a change from her demeanor before that point?
 7    A.   "In the sense that I had not seen that from her before,
 8    yes.
 9    Q.   "What behavior did she exhibit in the way of anger?
10    A.   "I think she felt angry that she had no means to escape
11    her situation.
12    Q.   "What situation?
13    A.   "That we had no ability or plans to sustain ourselves
14    financially and she felt -- yes, she felt there was no
15    obvious way to solve that.
16    Q.   "Is that no ability or plans to sustain yourselves
17    financially if she was unable to work?
18    A.   "Yes.
19    Q.   "Did your wife exhibit any specific behavior that showed
20    the anger that you described in the first half of 2018?
21    A.   "It was mostly conversationally, you know, directed
22    towards me.
23    Q.   "When you say directed towards you, are you referencing
24    conversations between you and your wife?
25    A.   "Yes.
```

1    **Q.** "Any other behavior towards you that you're referencing?

2    **A.** "No.

3    **Q.** "What behavior did your wife exhibit in the way of

4    frustration in the first half of 2018?

5    **A.** "Essentially the same. I feel like it's a lower level of

6    anger. She -- she felt there was injustice to her situation

7    and there was no obvious solution.

8    **Q.** "What specifically led you to believe that your wife was

9    in danger of harming herself?

10   **A.** "She said so.

11   **Q.** "Are you still referring to the time period of early --

12   strike that.

13          "Are you still referring to the time period of

14   first half of 2018?

15   **A.** "Yes.

16   **Q.** "Did you take any steps in the first half of 2018 in

17   response to your fear that your wife may harm herself?

18   **A.** "Yes.

19   **Q.** "And what are those steps?

20   **A.** "I contacted her therapist.

21   **Q.** "Was that Dr. Kessimian?

22   **A.** "Yes.

23   **Q.** "During what month in the first half of 2018 did you

24   contact Dr. Kessimian?

25   **A.** "I don't know based on my memory.

1    **Q.**  "Aside from the time period that you just described in

2    the first half of 2018, has there been any other time period

3    when you feared your wife may have harmed herself?

4    **A.**  "None to that amplitude, none to that effect.

5    **Q.**  "Aside from the contact that you just described with

6    Dr. Kessimian, have you ever taken any other steps in

7    response to your fear that your wife may harm herself?

8    **A.**  "I had very long conversations until I felt like she was

9    beyond that state of mind.

10   **Q.**  "Any other steps that you've taken in response to that

11   fear?

12   **A.**  "No.  Once I felt she was okay, no.

13   **Q.**  "Can you describe the contact that you had with

14   Dr. Kessimian in the first half of 2018?

15   **A.**  "I called her on the phone.

16   **Q.**  "Did Dr. Kessimian answer her phone?

17   **A.**  "I don't recall if it was right away, but eventually,

18   yes.

19   **Q.**  "Can you describe the conversation that you had with Dr.

20   Kessimian at that time?

21   **A.**  "I relayed to her Lisa's current state and asked what I

22   should do and asked if she could talk to her.

23   **Q.**  "And what did Dr. Kessimian say?

24   **A.**  "She was agreeable to talking with Lisa and they had a

25   conversation.

1   **Q.** "What did Dr. Kessimian say to you during that

2   conversation?

3   **A.** "Yeah, it was all very emotional, so it's hard to

4   remember specifically. She -- in general, she indicated that

5   I did the right thing by contacting her and I should see if

6   Lisa was willing to talk with her.

7   **Q.** "Do you recall any other communications that you had with

8   Dr. Kessimian regarding a fear that your wife may harm

9   herself?

10   **A.** "No, certainly nothing like that.

11   **Q.** "I am going to -- give me one moment. I am going to

12   share an exhibit on the screen."

13         MS. MANDEL: The transcript indicates in

14   parenthesis the introduction of an exhibit labeled Menninger

15   000608.

16   BY MS. MANDEL:

17   **Q.** "Mr. Menninger, Justina has just marked Exhibit 1, the

18   document that is shared on the screen. Do you see that

19   screen in front of you?

20   **A.** "Yes.

21   **Q.** "Okay. I'm going to give you control of the mouse, so

22   that you can scroll up and down. I will submit to you that

23   it is just a one page document that has a number at the

24   bottom that says Menninger 608. Can you take a moment to

25   look at this document, and let us know when you've had a

1   chance to do so?

2   **A.**  "I do see the document.  Do you want me to read through

3   it?

4   **Q.**  "Just take a moment to review it.  Let us know when

5   you've had a chance to do so.

6   **A.**  "Okay.  I've seen this.

7   **Q.**  "Mr. Menninger, do you mean that you've previously seen

8   this document?

9   **A.**  "I wrote this document.

10  **Q.**  "Do you recognize this as e-mail correspondence that you

11  had with Dr. Kessimian?

12  **A.**  "Yes.

13  **Q.**  "If you look at the upper right corner of the document,

14  there's a little star.  Do you see that?

15  **A.**  "Actually, it's blocked by our images.

16  **Q.**  "Yeah, let me tell you how you can see all of it.  If

17  you're in your Zoom settings on the side, do you have a panel

18  that has all the pictures right now?

19  **A.**  "Yes.

20  **Q.**  "Okay.  If you click on the smallest line, it should

21  reduce the pictures so that they no longer block the

22  document?

23  **A.**  "Okay.  I did that.

24  **Q.**  "Does that work for you?

25  **A.**  "Yes.

1   **Q.** "Okay. Do you now see that little star on the upper

2   right-hand corner of the document marked as Exhibit 1?

3   **A.** "By the date, October 15th?

4   **Q.** "Yes. Exactly.

5   **A.** "Yes.

6   **Q.** "Do you see how it just says October 15th and no year,

7   correct?

8   **A.** "I do.

9   **Q.** "Is it your understanding that this was October 15th of

10   2018?

11   **A.** "That would make sense to me, yes, as far as our -- where

12   we lived, yes.

13   **Q.** "What did -- what led you to write this e-mail to Dr.

14   Kessimian on October 15, 2018?

15   **A.** "I believe at the time -- and I think this refers to the

16   occasion in which I asked her doctor to speak with her

17   directly. So I was apparently off by the date of it. And my

18   concern was that the conversation only temporarily resolved

19   the situation and I was concerned about long term.

20   **Q.** "What conversation only temporarily resolved the

21   situation?

22   **A.** "When I handed the phone to Lisa to talk with her doctor,

23   when Lisa was feeling suicidal.

24   **Q.** "Mr. Menninger, was this October 15, 2018 communication

25   with Dr. Kessimian a second time that you communicated with

1   Dr. Kessimian about a fear that your wife may harm herself?

2   **A.**  "I don't recall.

3   **Q.**  "Is it your testimony that you communicated with Dr.

4   Kessimian in the first half of 2018 about a fear that your

5   wife may harm herself and in October 2018 about such a fear?

6   **A.**  "Oh, no.  This is definitely the occasion in which I

7   called the doctor to hopefully intervene.  I was simply off

8   in my estimate of time.

9   **Q.**  "Does looking at this e-mail, marked as Exhibit 1,

10  refresh your recollection as to when that communication took

11  place with Dr. Kessimian?

12  **A.**  "I mean, only in the sense that it provides a date and I

13  believe the date.

14  **Q.**  "Now that you've had an opportunity to review this

15  document, do you still believe that you had communication

16  with Dr. Kessimian in the first half of 2018 regarding

17  Dr. Menninger's potential harm to herself?

18  **A.**  "No.  This is the occasion that I was speaking of.

19  **Q.**  "Mr. Menninger, if you look farther down underneath the

20  line that's in the middle of this document?

21  **A.**  "Uh-huh, yes.

22  **Q.**  "Do you see there's another date.  It also says

23  October 15th?

24  **A.**  "Yes.

25  **Q.**  "And would you agree, this appears to be an e-mail

```
 1   message written by Dr. Kessimian, if you look at the left
 2   side of the page?
 3   A.  "Yes.
 4   Q.  "Based on your review of the lower half this document, do
 5   you believe this is the entirety of your e-mail communication
 6   from Dr. Kessimian about the management of your fear that
 7   Dr. Menninger may harm herself?
 8   A.  "The entirety of our e-mail conversation, yes, that seems
 9   likely.
10   Q.  "And now that you've had an opportunity to review this
11   document, do you believe that after October 15, 2018, you had
12   any further spoken communication with Dr. Kessimian about
13   your fear that your wife may harm herself?
14   A.  "Well, as you can see, I'm very bad with dates.  I did
15   share a session with Lisa and this doctor, but I don't recall
16   if it was before or after this occasion.
17   Q.  "You testified earlier, Mr. Menninger, that your wife is
18   not currently employed, right?
19   A.  "Correct.
20   Q.  "And as far as you know, your wife has not sought
21   employment since she left PPD, correct?
22   A.  "That is correct.
23   Q.  "Based your observations of your wife's current mental
24   state, do you believe that she could work in a job outside
25   your home at this point?
```

```
 1    A.   "I don't believe she could.
 2    Q.   "And without commenting on your confidential
 3    communications with your wife, what forms the basis of that
 4    belief?
 5    A.   "Part of it is her inconsistent days, having bad days and
 6    having okay days.  That would not be compatible with most
 7    working environments.  Also, what she has trained for, what
 8    she is good at is now something that she has a great deal of
 9    anxiety about.
10    Q.   "When you are referring to what she is trained for and
11    what she is good at, what are you referring to?
12    A.   "Working as a clinical pathologist, working in a
13    corporate setting, anything that is a direct reminder of her
14    time at PPD.
15    Q.   "Why do you believe that anything that is a direct
16    reminder of her time at PPD would be what she is good at?
17    A.   "Yeah, I'm a little confused by the phrasing.
18          "Could you restate the question?
19    Q.   "Mr. Menninger, you -- when asked what you were referring
20    to, you described what she is good at.  You described your
21    wife working as a clinical pathologist, working in a
22    corporate setting and anything that is a direct reminder of
23    her time at PPD.  I'm asking you to further explain that
24    answer.
25    A.   "Oh, you're asking why I believe that?
```

1    **Q.**   "Sure.  Start with that.

2    **A.**   "Okay.  That is essentially a description of her

3    nightmares.

4    **Q.**   "Is it your testimony that working as a clinical

5    pathologist, working in a corporate setting, and anything

6    that is a reminder of her time at PPD forms the basis of her

7    nightmares?

8    **A.**   "Yes.

9    **Q.**   "Based on your observations of your wife's current state,

10    do you believe that she is currently capable of working in a

11    job that could be performed from inside her home?

12    **A.**   "I'm uncertain.  It would depend on potentially the job,

13    how flexible the hours could be, if she could work around her

14    episodes of depression and anxiety.

15    **Q.**   "Between January of 2018 and the present, was there any

16    time period when you believe your wife could have worked in a

17    job outside the home?

18    **A.**   "I believe you're asking early January '18.  No, I don't

19    believe she could have done that.

20    **Q.**   "Between January '18 and the present, was there any time

21    period when you believed your wife could have worked in a job

22    that could be performed solely inside her home?

23    **A.**   "Between early 2018 and now, no.  The issue of -- the

24    basis of that is that working inside is not the primary

25    issue.

1   **Q.**  "What do you believe is the primary issue that has made

2   your wife unable to work in a job from early 2018 to the

3   present?

4   **A.**  "Anxiety, depression, the likely inability to schedule

5   around that, and she especially associates anxiety with her

6   career in pathology.  So it would -- it would almost

7   certainly have to be in a totally different field and I just

8   don't believe she is prepared mentally for a change like

9   that.

10  **Q.**  "Mr. Menninger, is it your belief as you sit here today

11  that your wife may never work again?

12  **A.**  "Yes.

13  **Q.**  "How has your wife's anxiety and depression affected your

14  marriage?

15  **A.**  "Not positively.  It's hard to be so close to someone who

16  feels so bad so much of the time.  That hasn't changed how I

17  feel about her, but that's just -- it's a struggle to have

18  that, yeah, in such close proximity, day in and day out.

19  **Q.**  "Did the nature of your marriage change between 2015 and

20  2018?

21  **A.**  "No.  Not that I can recall.  Not in any significant way.

22  **Q.**  "Mr. Menninger, why did you and your family move

23  specifically to Albuquerque, New Mexico, in 2018?

24  **A.**  "We -- we were concerned about being stuck in our current

25  location, unable to afford the school that we moved there

 1    for.  Maya would have ended up in the local public school,
 2    which we understood to not be very good.  So we took -- we
 3    were concerned that if we continued to spend the money we had
 4    where we were, we would no longer be able to afford to move.
 5    So we chose to move someplace with a lower cost of living and
 6    some place she would feel more at home.
 7    Q.  "Did you look at other options, aside from Albuquerque,
 8    New Mexico?
 9    A.  "We looked at many options, including where we ended up
10    here.
11    Q.  "Meaning you considered Bend, Oregon at that time?
12    A.  "Yes.
13    Q.  "Why did you elect to live in Albuquerque, New Mexico,
14    instead of Bend, Oregon in 2018?
15    A.  "I'm a little fuzzy on that now.  I think at the time, it
16    was just her mom.  Her sister moved there fairly recently, so
17    there's a little less incentive family wise.  Bend is higher
18    cost of living than Albuquerque and we were unfamiliar with
19    it.  Neither of us had been here.  She had lived in
20    Albuquerque for a while and really enjoyed it there, so we
21    saw that as a better opportunity.
22    Q.  "Based on your current salary level that you've described
23    and your wife's receipt of Social Security benefits, do you
24    feel that you and your family are now in a comfortable
25    financial state?

1    **A.** "Not long term, no.  My job is essentially a startup, so

2    there's always a little uncertainty with that.  And Bend is

3    relatively expensive.  So, yes, there's still uncertainty,

4    even now.

5    **Q.** "If your employment becomes more definite, would you feel

6    comfortable with your family's financial state longer term?

7    **A.** "Certainly.

8    **Q.** "Let's break for about five minutes."

9            THE COURT:  Skip that part.

10           MS. MANDEL:  Thank you.

11   BY MS. MANDEL:

12   **Q.** "Mr. Menninger, we're almost done.  I just have a few

13   more questions for you.  You testified a few moments ago

14   about a sense of financial uncertainty in connection with you

15   working for a startup, correct?

16   **A.** "Yes.

17   **Q.** "Are you currently looking for another job?

18   **A.** "No, I'm not.

19   **Q.** "Have you searched for any other employment since June of

20   2018?

21   **A.** "June 2018?  I believe I considered a job at Maya's

22   school, at The Wheeler School.  They had an opening for a

23   math teacher at the -- it seemed like a way to keep her in

24   that school potentially, but that did not work out.

25   **Q.** "Did you apply for that job?

1   **A.**  "I don't think it got to that point.  I contacted them,

2   and they essentially said they found someone for it.

3   **Q.**  "Have you applied for any job since June of 2018?

4   **A.**  "No.

5   **Q.**  "As you sit here today, do you have any plans to apply

6   for another job within the next six months?

7   **A.**  "I have no such plans.

8   **Q.**  "Are you currently seeking out any other employment

9   options beyond Triangulate Labs?

10  **A.**  "No, I'm not.

11  **Q.**  "Mr. Menninger, do you believe that it is important for

12  you or your wife to be at home for your daughter?

13  **A.**  "Certainly in the context of the current pandemic, yes.

14  **Q.**  "Prior to the current COVID-19 pandemic, did you believe

15  that either you or your wife should be primarily available

16  for your daughter at home?

17  **A.**  "I struggle to answer, because when she attended school,

18  she would not have been home.  So that wouldn't have applied.

19  Certainly during normal daily activities, when she is home,

20  one of us should be here.

21  **Q.**  "Before the onset of the COVID-19 pandemic, did your

22  daughter attend any sort of after-school care?

23  **A.**  "Not care so much.  She attended a club, I believe, at

24  one of her schools, so on certain nights, she would come home

25  later.

1   **Q.**   "Aside from you and your wife, did anybody else care for

2   your daughter in your home during calendar year 2020?

3   **A.**   "No.

4   **Q.**   "Is it your belief that either you or your wife should be

5   the only ones caring for your wife at home -- caring for your

6   daughter at home?

7   **A.**   "Again, without the context of the pandemic?

8   **Q.**   "Yes.

9   **A.**   "Okay.  I -- it really hasn't come up in our thoughts.

10   We -- I work from home, so it just isn't a question we

11   have -- we have discussed.

12   **Q.**   "In calendar year 2019, aside from you or your wife, did

13   anyone else care for your daughter in your home?

14   **A.**   "No.

15   **Q.**   "In calendar year 2018, aside from you and your wife, did

16   anyone else care for your daughter in your home?

17   **A.**   "No.

18   **Q.**   "What about calendar year 2017?

19   **A.**   "No.

20   **Q.**   "Do you anticipate, based on what you know now, that your

21   daughter will attend school in person for fall of 2020?

22   **A.**   "We anticipate she will not attend in person.

23   **Q.**   "Do you and your wife both intend to be home with your

24   daughter during the day throughout the remainder of 2020?

25   **A.**   "Yes."

```
 1              MR. HANNON:  I have a couple of questions.  Maybe I
 2     should read those in.
 3              THE COURT:  Sure.
 4              MR. HANNON:  If that works.
 5              THE COURT:  So Mr. Hannon will read -- those
 6     questions that Ms. Mandel read, she was asking those
 7     questions.  Now we're just about at the end and there's a
 8     couple of questions that Mr. Hannon asked, so just more -- I
 9     think you will get a better feel if he --
10              MR. HANNON:  I'll just do them from here, if that's
11     okay.
12              THE COURT:  That's fine.
13     BY MR. HANNON:
14     Q.   "Mr. Menninger, in your questioning by Ms. Mandel, you
15     were asked about the timing of events that occurred in 2018,
16     and I think you indicated initially you thought there was a
17     conversation that happened in the first half, but now you
18     think it happened in October.  Do you recall that testimony?
19     A.   "I do.
20     Q.   "Okay.  And I think I also heard you say that your
21     estimate, in terms of when your wife's depression symptoms
22     started was some time in the early part of 2018.  Did I hear
23     you correctly?
24     A.   "Yes.
25     Q.   "Okay.  Are you able to provide any more specific
```

1    estimate in terms of when those symptoms started, besides

2    early 2018?

3    **A.**  "Yes.  I recall the event of her receiving an exit

4    package offer and that being fairly traumatic for her.

5    **Q.**  "Okay.  Besides your understanding that there was some

6    event, can you provide any additional detail in terms of your

7    estimate of when these symptoms started?

8    **A.**  "No."

9              MR. HANNON:  That's all, Your Honor.

10              THE COURT:  Okay.  Thank you.  That concludes --

11              MR. HANNON:  Judge, just for the record, can we

12    note the date of the deposition?

13              THE COURT:  Yes.

14              MR. HANNON:  Which was August 13th of 2020.

15              THE COURT:  Okay.  That concludes that reading of

16    that deposition.

17              What's the next witness?

18              MR. HANNON:  The plaintiff calls Brent McKinnon.

19              THE COURT:  All right.  Mr. McKinnon, if you'd come

20    forward and take the witness stand.

21              (The witness was duly sworn.)

22              THE DEPUTY CLERK:  Can you please state your full

23    name and spell your last name for the record.

24              THE WITNESS:  It's Brent Harper McKinnon,

25    M-c-K-i-n-n-o-n.

```
 1                THE DEPUTY CLERK:  Thank you.

 2                THE COURT:  Have a seat.

 3                Go ahead, Mr. Hannon.

 4                MR. HANNON:  Thank you, Your Honor.

 5                     BRENT H. MCKINNON

 6           having been duly sworn, testified as follows:

 7           DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF

 8      BY MR. HANNON:

 9      Q.  Good morning, Mr. McKinnon.

10      A.  Good morning.

11      Q.  Sir, where do you live?

12      A.  I live in Pittsburgh, Texas.

13      Q.  Okay.  I might have guessed that.

14      A.  Yeah.

15      Q.  What do you do for work, sir?

16      A.  I work for Thermo Fisher Scientific.

17      Q.  And what do you do there?

18      A.  I'm vice president of quality assurance.

19      Q.  Okay.  And are you vice president of quality assurance

20      for any particular segment within Thermo Fisher?

21      A.  For the analytical services division.

22      Q.  Okay.  Were you previously employed by PPD?

23      A.  Yes.

24      Q.  And when were you employed by PPD?

25      A.  From March of 2015 until -- we were acquired by Thermo
```

1   Fisher in late 2020.

2   **Q.**  And what was your role at PPD when you were first hired

3   there?

4   **A.**  Executive director of quality for Global Central

5   Laboratory.

6   **Q.**  And can you give the jury an overview of what your duties

7   and responsibilities were in that role?

8   **A.**  Yes.  So I was responsible for quality assurance and

9   compliance, making sure that we complied with the regulatory

10  requirements for the Central Labs business, as well as our

11  internal procedures.  And so we would -- my team would audit

12  the -- the laboratory and the other support functions to make

13  sure that we were following our -- our defined processes.

14  **Q.**  Okay.  And you -- you moved into that role in March of

15  2015; is that right?

16  **A.**  Say that again?

17  **Q.**  You moved into that role in March of 2015?

18  **A.**  Yes, sir.

19  **Q.**  And the jury has heard some testimony about a gentleman

20  named Hacene Mekerri.  Did you ever report to Mr. Mekerri?

21  **A.**  No.

22  **Q.**  To whom did you report?

23  **A.**  I reported to Jay Dixon.

24  **Q.**  Okay.  And what was Mr. Dixon's title?

25  **A.**  Senior vice president of quality for PPD.

1    **Q.**  Do you know if Mr. Dixon and Mr. Mekerri were essentially

2    peers?

3    **A.**  Um -- yeah, I would say they're -- I would say they were

4    peers.

5    **Q.**  Okay.  But during the time that both you and Mr. Mekerri

6    worked at PPD, you would interact with Mr. Mekerri

7    frequently; is that right?

8    **A.**  That's correct.

9    **Q.**  Okay.  And when did you leave that role that you've

10    described that you started in March of 2015?

11    **A.**  In March of -- yeah, I think it was March of 2019, I --

12    my role was expanded to include all of PPD laboratories, so

13    I -- my agreement changed and somebody else back-filled my

14    role, just as the Central Labs quality leader.

15    **Q.**  Okay.  So that was March of 2019?

16    **A.**  Yes, sir.

17    **Q.**  And was that essentially a promotion?

18    **A.**  Yes.

19    **Q.**  So did you go from having control over just Global

20    Central Labs to all of PPD's labs?

21    **A.**  Yes.

22    **Q.**  And then your role, was that filled by one of your former

23    subordinates?

24    **A.**  It was.

25    **Q.**  And was that Kathy Dick?

1    **A.**   Yes.

2    **Q.**   And when -- at some point in time -- well, strike that.

3          When you first started working at PPD, did you work

4    at the Highland Heights facility?

5    **A.**   Yes, sir.  I started at Highland Heights in March of

6    2015.

7    **Q.**   Okay.  But you had responsibility for the global labs

8    throughout the -- the Global Central Labs throughout the

9    world?

10   **A.**   Yes, sir.

11   **Q.**   And at some point you went remote; is that right?

12   **A.**   Shortly after my role expanded to include the -- all of

13   the labs, I started working remotely there in northern

14   Kentucky.

15   **Q.**   Okay.  And was that -- was that -- in terms of being in

16   northern Kentucky, was that a personal choice?

17   **A.**   Well, part of it was I wanted Kathy to be able to step

18   into her role as the quality leader for the business, and so

19   I needed to back away to give her room to, you know -- just

20   to take ownership of her position.  And I could still, you

21   know, visit the lab and had an office there occasionally.

22   **Q.**   Okay.  And when you went remote, am I right that your

23   time on site dropped to about 10 percent; is that right?

24   **A.**   That's correct.

25   **Q.**   Okay.  Part of your role in -- when you were executive

1    director of quality for the Global Central Labs -- did I get

2    that title right?

3    **A.**  Yes.

4    **Q.**  When you had that role -- that was the role you had in

5    2017 and 2018; is that right?

6    **A.**  That's correct.

7    **Q.**  And part of your role involved investigations of quality

8    control events; is that right?

9    **A.**  Yes.  Of quality events, yes.

10   **Q.**  Okay.  And in that time period, PPD had a -- had a plan

11   in terms of how to address quality events; is that right?

12   **A.**  We had a procedure, yes.

13   **Q.**  It was a sort of carefully defined process in terms of

14   what would happen once a quality event was identified?

15   **A.**  Yes, sir.

16   **Q.**  Okay.  So I just want to take a few minutes and kind of

17   walk the jury through what that procedure was.  So during the

18   time period, there was a daily call to discuss quality

19   events; is that right?

20   **A.**  Yes.

21   **Q.**  And that daily call, that was attended by representatives

22   of various functional groups within the Global Central Labs;

23   is that right?

24   **A.**  Yes.

25   **Q.**  So part of that would include project management?

1  **A.**  Yes.

2  **Q.**  Some of that would include medical folks, like from

3  Dr. Menninger's team?

4  **A.**  I'm not sure what you mean by "medical folks," but yes.

5  I mean, from our -- the scientific affairs, the laboratory.

6  **Q.**  Okay.

7  **A.**  Our sample management team.  All of those support

8  functions would have the opportunity to be present for that

9  daily call.

10  **Q.**  What other functional groups were sort of involved in

11  those?

12  **A.**  I'm sure I'll leave some out, but we have a site services

13  group that managed communications with the clinical sites,

14  sample management, data management, IT, the scientific

15  affairs, quality control, quality assurance.  I think that's

16  probably it.

17  **Q.**  Okay.  And so all these different groups would be able to

18  send someone to participate in this daily call, right?

19  **A.**  Yes.

20  **Q.**  And am I right that during the daily call, any -- any new

21  quality events would be -- would be raised, right?

22  **A.**  That's correct.  Anything that was entered within the

23  last 24 hours would be discussed.

24  **Q.**  Okay.  And that discussion would focus first upon

25  identifying who should investigate the issue, correct?

1    **A.**   That's correct.

2    **Q.**   And how would you go about deciding who should do the

3    investigation?

4    **A.**   Well, it was really, like, where the occurrence, where

5    the quality event occurred as part of our process.  So, you

6    know, if it was an issue with, you know -- in sample

7    receiving, for example, then maybe sample management would

8    take that on.  So for the most part, the attendees would

9    speak up if they recognized that the quality event would have

10   occurred in kind of their area.  And if we made a mistake

11   during that time, incorrect assignment, then there was

12   opportunity to reassign as, you know, later in the process.

13   **Q.**   Okay.  And so would it be fair to say that essentially

14   the group on the call tries to identify the most -- the most

15   appropriate investigator, based upon what's known about the

16   problem at that time?

17   **A.**   Yes.

18   **Q.**   Okay.  And once the investigator is assigned, what is

19   that person supposed to do?

20   **A.**   Well, the -- that person would work with members of my

21   team, other members of operations to complete their

22   investigation.  So with the goal being to identify the root

23   cause of the problem, so that corrective and preventative

24   actions could be established to prevent recurrence of that

25   error.

1    **Q.**  And can you explain for the jury what you mean by root

2    cause?

3    **A.**   Root cause is really an investigational technique to

4    really get at the root of the problem, you know.  If -- you

5    know, if an error occurred in shipping, for example, you

6    know, was -- you know, if a box was dropped, like, well, why.

7    So you keep asking why until you really get to the root of

8    the problem, so you can -- you can employ a corrective

9    measure to avoid that mistake in the future.

10   **Q.**   Okay.  And in terms of root causes for quality control

11   events, sometimes those were just caused by human error,

12   right?

13   **A.**   Yes.

14   **Q.**   Sometimes were they caused by issues in terms of poorly

15   established process?

16   **A.**   Yes.

17   **Q.**   Sometimes were they -- were they IT issues?

18   **A.**   Yes.

19   **Q.**   So there can be lots of potential root causes for a

20   quality control event, right?

21   **A.**   That's correct.

22   **Q.**   And those root causes could have fallen within any one of

23   the various sort of functional responsibilities of the lab;

24   is that right?

25   **A.**   That's correct.

1    **Q.**  So during this -- during this daily call, would there

2    also be a sort of timetable set in terms of when the

3    investigation should be completed?

4    **A.**  Yes.  If I recall at that time, it was generally 30 days

5    for what we classify as minor or major quality events.  And

6    if it was a critical issue, then I believe there was a little

7    bit more time that was allowed to be -- for just the

8    thoroughness that's required.  And I think it was 45 days,

9    but I may be wrong.

10   **Q.**  Okay.  And you mentioned the minor/major/critical.  Was

11   that a sort of rating system that was used to classify

12   quality control events?

13   **A.**  Yes.

14   **Q.**  And could you explain for the jury a little bit in terms

15   of how to distinguish between a minor, major, or critical

16   event?

17   **A.**  So really, it's about the overall impact, the risk

18   associated, if it was a patient safety concern; if it could

19   affect the quality of the result, the accuracy of the result

20   that we are sending back to a treating physician, then it

21   would move higher on that scale.  If it was a sample that was

22   compromised, but yet we had an alternate sample, then it

23   would be minor, because we can recover easily from that type

24   of event.

25   **Q.**  But fair to say that the classification, minor, major,

1    critical, that's done before you even know what the root

2    cause of the problem is; is that right?

3    **A.**   It is and it can change as you learn more about the

4    investigation -- as you dig into the problem more.  So, yeah.

5    **Q.**   Okay.  And the investigator, when he or she is done with

6    the investigation, were they required to do some kind of

7    report?

8    **A.**   I'm sorry, can you repeat the question?

9    **Q.**   Sure thing.

10             When the investigator completed his or her

11   investigation, would there be a report?

12   **A.**   There -- it would end up in a report, yes.  We had a

13   template that they would populate in the -- in the system

14   that we had programmed to, you know, create a final report

15   once -- once all parties were comfortable with the content.

16   **Q.**   Okay.  And that report, that would address root cause?

17   **A.**   Yes.

18   **Q.**   It would address corrective action?

19   **A.**   That's correct.

20   **Q.**   And that report, that would go to the investigator's

21   manager; is that right?

22   **A.**   That's correct.

23   **Q.**   Okay.  And the investigator's manager would be

24   responsible for reviewing the report?

25   **A.**   That's correct.

1    **Q.**  And signing off on it?

2    **A.**  Yes.

3    **Q.**  Okay.  And then after the report was done, that would

4    then go to someone in your organization; is that right?

5    **A.**  Yes, sir.

6    **Q.**  And then they would also review the report, right?

7    **A.**  That's correct.

8    **Q.**  And they would see if they agree with the assessment of

9    the root cause?

10   **A.**  Yes.

11   **Q.**  And if they agree with respect to the corrective action

12   recommended; is that right?

13   **A.**  That's correct.

14   **Q.**  Okay.  You met Dr. Menninger for the first time when she

15   interviewed at PPD; is that right?

16   **A.**  That's correct.

17   **Q.**  And your initial interaction with her was very positive;

18   is that right?

19   **A.**  Yes.

20   **Q.**  You enjoyed the conversation?

21   **A.**  I did.

22   **Q.**  You supported her hiring?

23   **A.**  I did.

24   **Q.**  During the time that you worked with her, you worked well

25   with her; is that right?

1   **A.**  I did, yeah.

2   **Q.**  You found her to be technically very astute and capable;

3   is that right?

4   **A.**  Yes.

5   **Q.**  You found her personable?

6   **A.**  I did.

7   **Q.**  Easy to work with?

8   **A.**  Yes.

9   **Q.**  You thought she was a good listener and partner; is that

10  right?

11  **A.**  That's right.

12          MR. HANNON:  And that's all I have, Your Honor.

13          THE COURT:  All right.  Cross-examination?

14          **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

15  BY MR. CURRAN:

16  **Q.**  Good morning, Brent.

17  **A.**  Good morning.

18  **Q.**  Sorry.  I just have to get set up here.

19          So, Brent, could you explain what quality assurance

20  means in the context of the services that PPD Central Lab

21  business provides?

22  **A.**  For -- so quality assurance is really about not only

23  ensuring that we're complaint with the regulatory

24  accountabilities that, you know, we're -- that we're

25  controlled by and that we're governed by, but also just

```
 1    ensuring that, you know, we are providing repeatable, you
 2    know -- in the case of, you know, a clinical laboratory, that
 3    we're providing accurate results, you know, based on a
 4    controlled set of processes that we manage as part of our
 5    overall quality system.
 6    Q.   Okay.  And I think you mentioned, when Mr. Hannon was
 7    asking you questions, that you -- that you interviewed
 8    Dr. Menninger; is that right?
 9    A.   I did.
10    Q.   Okay.  And when was that?
11    A.   It was in mid 20 -- mid 2015.  Sorry.
12    Q.   Okay.  And did she seem anxious or nervous to you?
13    A.   No.
14    Q.   And I think you testified that you recommended that she
15    be hired?
16    A.   I did.
17    Q.   And then you worked together after that?
18    A.   Yes.
19    Q.   What kind of things did you work together on?
20    A.   Well, one of the first things we worked on together was
21    we were seeking accreditation to -- a clinical laboratory
22    standard referred to as iso 15189, and Dr. Menninger had
23    experience with that.  So she worked closely with my team to
24    create some energy around and excitement around that program.
25    And then just day-to-day stuff, you know, being there at the
```

1    lab together, you know, quality issues would come up.  You

2    know, we would work together on that.  But just day-to-day

3    business operations, type opportunities we had to engage with

4    one another.

5    **Q.**   Okay.  And I think you testified earlier that you worked

6    with another individual named Hacene Mekerri; is that right?

7    **A.**   I did.

8    **Q.**   And who is Mr. Mekerri, again?

9    **A.**   Mr. Mekerri was our business leader.  So he was -- I

10   don't recall his title specifically, but he was a vice

11   president of the -- you know, Global Central Laboratories.

12   But he was more over the business side of things.

13   **Q.**   And you didn't report to him, correct?

14   **A.**   No.

15   **Q.**   Did Dr. Mekerri ever ask you to provide him with feedback

16   regarding Dr. Menninger's job performance?

17   **A.**   He did.

18   **Q.**   And when was that?

19   **A.**   It was -- I believe it was in late 2017, as we were

20   preparing for our annual performance reviews.

21   **Q.**   Okay.  I'm going to show you now a document that's been

22   marked as Joint Exhibit 427, hopefully, if I can get it to

23   come up here.  And I did.

24          All right.  So do you recognize this document?

25   **A.**   I do.

1  **Q.**  What is it?

2  **A.**  This is an e-mail from myself to Mr. Mekerri in November

3  of 2017 where I responded to his request for feedback on his

4  leadership team.

5  **Q.**  Okay.  And after that blacked-out portion there, there's

6  a bullet point?

7  **A.**  Yes.

8  **Q.**  Is that where you provided your feedback to Mr. Mekerri?

9  **A.**  It is, yes.

10  **Q.**  Okay.  And in the first line you describe your feedback

11  about Dr. Menninger as mixed.  Do you see that?

12  **A.**  Yes.

13  **Q.**  What did you mean by that?

14  **A.**  Well, I had worked with her for a year-plus at that

15  point, two years.  And so I had really positive interactions.

16  But there was also some opportunities I saw for improvement

17  that I wanted to, you know, share with Mr. Mekerri.

18  **Q.**  Okay.  So you wrote, in that first line there, the

19  sentence beginning, "While."  "While I feel that Lisa is

20  technically strong and a very nice amenable person, she has

21  not demonstrated a leadership strength that I would expect.

22  Lisa has been very indecisive on numerous important matters;

23  e.g.; lab training, competency documentation, supervisory

24  responsibilities that have resulted in lingering compliance

25  concerns raised by internal auditors, SLT peers and

 1    customers."

 2              Do you see that?

 3    **A.**   Yes.

 4    **Q.**   And could you explain to the jury what you meant by that?

 5    **A.**   Yes.  So we -- through that second half of 2017, we had

 6    had cases where there were weaknesses in training.  There had

 7    been -- what I had discerned to be like kind of a general

 8    lack of supervision that led to some quality errors.  And

 9    then the lack of follow through and consistently achieving

10    our due dates for not only investigations, but also for

11    commitments that were made across, you know, through that

12    process.  So like a corrective action was planned, a due date

13    would be established, and then we wouldn't consistently hit

14    that date.  And that was really, you know, happening across

15    the board.

16    **Q.**   You also wrote that, "Since her decision to relocate, she

17    has been lackadaisical toward her time on-site in US lab."

18              Do you see that?

19    **A.**   Yes.

20    **Q.**   What were you referring to there?

21    **A.**   Well, the -- following her relocation, I rarely would see

22    her visit the lab, you know, following that relocation.

23    **Q.**   And do you recall approximately when it was that she

24    relocated?

25    **A.**   I think it was in mid 2017.

1   **Q.** Okay. And was there any problem with her being really

2   present on site at the lab, in your view?

3   **A.** Yes. In her role as the lab director for our New York

4   State Department of Health, there was an expectation that

5   there would be some on-site presence, and that concerned me.

6   **Q.** Now, these were just your opinions that you expressed

7   here, correct?

8   **A.** Absolutely, yes.

9   **Q.** It's possible that other people might have disagreed with

10   them, correct?

11   **A.** Correct.

12   **Q.** For example, Dr. Menninger might have disagreed that

13   these were issues for her?

14   **A.** Yes.

15   **Q.** But these -- were these your generally held opinions?

16   **A.** Yes.

17   **Q.** And you didn't have any animosity towards Dr. Menninger

18   at that time?

19   **A.** Absolutely not.

20   **Q.** But you don't have any as you're sitting here today,

21   right?

22   **A.** No.

23   **Q.** Okay. And I think you talked and testified in response

24   to some questions from Mr. Hannon about quality control

25   issues. Do you recall that?

**A.** Yes.

**Q.** Do you recall there being quality control issues in the early part of 2018?

**A.** Yes.

**Q.** And did you interact with Dr. Menninger with respect to any of those issues?

**A.** I don't recall.

**Q.** Okay. Were you ever interviewed in connection with an HR investigation into complaints by Dr. Menninger?

**A.** Yes.

**Q.** Who interviewed you?

**A.** Our VP of HR, Ms. Ballweg.

**Q.** And when was that?

**A.** I think it was in early spring of 2018.

**Q.** Okay. I'm going to show you a document now that's been marked as Joint Exhibit 450. And this is several pages into the document.

But so this appears to be the notes by Ms. Ballweg of her interview with you, in May of 2018. Do you see that?

**A.** Yes.

**Q.** Okay. Now, you didn't play any part in drafting this, correct?

**A.** No.

**Q.** But does what's represented as -- so -- under (a), it says "Brent McKinnon," do you see that?

1  **A.**  Yes.

2  **Q.**  And after that, there's some text, and it goes on down

3  for the rest of the page?

4  **A.**  Yes.

5  **Q.**  And does that appear to be what you -- consistent with

6  what you told Dr. -- or Ms. Ballweg?

7  **A.**  Yes, it is consistent, yes.

8  **Q.**  Do you have any reason to believe that this does not

9  accurately reflect what you told Deb Ballweg during your

10  interview with her?

11  **A.**  No, sir.

12  **Q.**  So in the second line, after your name, it begins,

13  "currently lack of accountability by business on working to

14  close events timely."

15         Do you see that?

16  **A.**  Yes.

17  **Q.**  Is that consistent with your views at the time?

18  **A.**  Yes.

19  **Q.**  And what did you mean by that?

20  **A.**  Like I had mentioned earlier, we weren't consistently

21  hitting our due dates for closure of investigations, and

22  furthermore, for -- we weren't closing out the corrective and

23  preventative actions by the commitment dates.

24  **Q.**  And then the next sentence reads, "Hacene, through

25  leadership team meetings, is asking everyone to give this

1    priority and to work towards closing all events timely."  Do

2    you see that?

3    **A.**  Yes.

4    **Q.**  Is that an accurate statement?

5    **A.**  It is, yes.

6    **Q.**  So was Hacene asking everyone at the leadership team

7    meetings to prioritize the quality control issues and to work

8    towards closing them?

9    **A.**  Yes, everyone.

10    **Q.**  And was Dr. Menninger one of those who attended those

11    meetings and whom Hacene was asking to prioritize the issues?

12    **A.**  Yes.

13    **Q.**  And were those others who attended those meetings?

14    **A.**  Yes.

15    **Q.**  And was Hacene asking them to prioritize those issues, as

16    well?

17    **A.**  Yes.

18    **Q.**  I think you testified earlier your boss at the time was

19    Jay Dixon; is that right?

20    **A.**  Yes.

21    **Q.**  All right.  And was he directing you to prioritize those

22    issues in the spring of 2018?

23    **A.**  Yes.

24    **Q.**  And is it fair to say that he was putting some pressure

25    on you to get that done?

**A.**   Yes.

**Q.**   And at the time of your interview with Ms. Ballweg in the spring of 2018, were you aware that Dr. Menninger had informed the company that she had a disability?

**A.**   No.

**Q.**   Were you aware that she had asked for accommodations of any kind?

**A.**   No.

**Q.**   Were you aware that Dr. Menninger had said she suffered from an anxiety disorder or panic attacks?

**A.**   No.

**Q.**   Had you ever seen her suffer a panic attack?

**A.**   No.

**Q.**   When did you first learn that Dr. Menninger had said she suffered from a medical condition or disability?

**A.**   I believe it was just like a day or two before my deposition, when I had the opportunity to read the complaint.

          MS. MANDEL:  I don't have any further questions. Thanks, Brent.

          THE COURT:  All right.  Redirect?

          MR. HANNON:  Yes, Your Honor.

          **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. HANNON:

**Q.**   Mr. McKinnon, when you were interviewed by Deborah Ballweg in May of 2018, you didn't tell her that the lab

```
 1  problems that have been occurring recently were
 2  Dr. Menninger's fault, did you?
 3  A.  No.
 4  Q.  And just looking back at the document, Joint Exhibit 450
 5  we were just looking at, the current lack of accountability
 6  by business, was there reference just to Dr. Menninger's
 7  group?
 8  A.  No.
 9  Q.  That was -- that was across the various functional areas
10  of the lab, right?
11  A.  That's correct.
12  Q.  Okay.  And the other functional areas of the lab, those
13  included the groups like sample management, right?
14  A.  That's correct.
15  Q.  And the various other groups we talked about early this
16  morning, right?
17  A.  That's correct.
18  Q.  Was one of those groups led by Chris Clendening?
19  A.  Yes.
20  Q.  Is he here in the courtroom?
21  A.  Yes.
22  Q.  Okay.  Is that him behind me?
23  A.  That is.
24  Q.  Okay.  I have never seen him before.  That was my next
25  question.
```

 1             Okay.  And with respect to lab issues in 2018, why
 2     is it that that -- that that call we talked about earlier
 3     happens every single day?
 4     **A.**   Well, the -- the triage call, as we refer to it, is
 5     important to have those within a timely manner of identifying
 6     the occurrence, so that the problem is not exacerbated,
 7     meaning you don't experience another occurrence before we're
 8     able to put a -- you know, stopgap measure in place, so
 9     things can get out of hand if you don't address it with a
10     sense of urgency.
11     **Q.**   But why every single day do you have to have that triage
12     call?
13     **A.**   Same -- the same answer.  I mean, it's -- because we had
14     quality events submitted every day.  I mean, I'm sure there
15     are some exceptions, but -- and as long as there was a
16     quality event, there was a need for a meeting.
17     **Q.**   Do you still have those triage meetings every single day?
18     **A.**   I don't know.
19     **Q.**   Any reason to believe you don't?
20     **A.**   No.
21     **Q.**   With respect to the other issues you raised for
22     Mr. Curran's examination, we also looked at some 360 feedback
23     you had provided to Mr. Mekerri.  Let's take a look at that.
24             All right.  So I'm now showing you Joint
25     Exhibit 427.  This was the 360 feedback we looked at earlier;

1    is that right?

2    **A.**   Yes.

3    **Q.**   So this is from November 29, 2017, correct?

4    **A.**   Well, my e-mail to Mr. Mekerri was on the 17th.

5    **Q.**   Oh.  Thank you.  Sorry about that.  That wasn't -- that

6    wasn't a trick question.  All right.  So November 17, 2017,

7    is when you're giving him this feedback, right?

8    **A.**   Yeah.

9    **Q.**   And do you recall that there was a -- there was an

10   inspection later on this year conducted by the New York

11   State?

12   **A.**   Can you repeat the question?

13   **Q.**   Do you recall there was an inspection conducted later

14   this year -- later -- let me ask a better question.

15          Later in 2017, after you sent this e-mail, New York

16   State did an inspection of the Highland Heights lab; is that

17   right?

18   **A.**   I believe so, yes.

19   **Q.**   And this e-mail that you sent to Mr. Mekerri on

20   November 17, 2017, this partly reflected concerns you had

21   about that upcoming inspection, right?

22   **A.**   Yes.

23   **Q.**   You thought that Dr. Menninger's remote status might be a

24   problem, right?

25   **A.**   I did.

```
 1    Q.   PPD passed that inspection, correct?

 2    A.   Yes.

 3    Q.   And in fact, Dr. Menninger, she was on-site for that

 4    inspection, right?

 5    A.   I believe so.

 6    Q.   Okay.  In terms of your comment about Dr. Menninger

 7    having been "lackadaisical toward her time on site in US lab"

 8    were you aware of what Dr. Menninger's travel schedule had

 9    been between the time she went on remote status and November,

10    17 of 2017?

11    A.   Not at all.

12    Q.   Okay.  You didn't know how much she had been traveling to

13    the other labs that she was responsible for?

14    A.   No.  No.

15    Q.   And in fact, after you sent this e-mail, Dr. Menninger

16    did travel to Highland Heights for that inspection for New

17    York State, correct?

18    A.   I believe so.

19    Q.   Okay.  With respect to your comment about "lack of bench

20    level supervision," were you aware of the efforts that

21    Dr. Menninger was making in 2017 to recruit additional bench

22    level supervision?

23    A.   I don't recall at this time.

24    Q.   Okay.  Do you know who Narine -- and I can't pronounce

25    her last name?
```

1    **A.**  I do.

2    **Q.**  You know who I'm talking about?

3    **A.**  I do, yeah.

4    **Q.**  Okay.  She was hired in early 2018; is that right?

5    **A.**  I don't -- I'm not sure.

6    **Q.**  Okay.  Do you recall what the role was that she was hired

7    into?

8    **A.**  It was a lab operations leadership role.  I'm not sure of

9    her title.

10   **Q.**  Okay, but essentially sort of an on-site lab operations

11   supervisor.  Is that fair to say?

12   **A.**  That's fair to say.

13   **Q.**  Okay.  And when you wrote this e-mail in November of

14   2017, were you aware that they were trying to fill that

15   position?

16   **A.**  I don't recall.

17   **Q.**  Okay.  Do you know who Dr. Paul Reddy is?

18   **A.**  I do.

19   **Q.**  And who is he?

20   **A.**  Well, he was brought in, I believe, to lead up our

21   molecular section of the lab.  That was his area of

22   expertise.

23   **Q.**  Okay.

24   **A.**  And then he also had some responsibility for our

25   biorepository, so our sample storage area.

1    **Q.**  Do you recall when he was hired?

2    **A.**  I do not.

3    **Q.**  Was it in 2017?

4    **A.**  I don't recall.

5    **Q.**  Do you recall at some point in time, Mr. Reddy, he became

6    the interim CAP director for the Highland Heights lab?

7    **A.**  Yes.

8    **Q.**  And that was shortly after this November 2017 e-mail;

9    isn't that right?

10    **A.**  I don't recall when he became interim director.

11    **Q.**  What does that mean, an interim CAP director?

12    **A.**  Well, it's just while you're waiting on a permanent

13    position to be filled, somebody can -- is qualified to step

14    into those shoes and play that role while you're searching

15    for a permanent director.

16    **Q.**  And when you say CAP director, what does that mean?

17    **A.**  Board certified pathologist that's capable of holding --

18    you know, has the credentials necessary to be designated the

19    CAP lab director, College of American pathologists.  And in

20    our case, for the US lab, also somebody that, you know -- we

21    needed somebody that could be in a similar lab director role

22    for New York State.

23    **Q.**  Okay.  And Mr. Reddy, is he still with PPD?

24    **A.**  I believe so.

25    **Q.**  But back in 2017/2018, did he -- he worked at Highland

```
 1   Heights, right?
 2   A.  Yes.
 3           MR. HANNON:  Okay.  That's all I have, Your Honor.
 4           THE COURT:  Any recross?
 5           MR. CURRAN:  No, Your Honor.
 6           THE COURT:  All right.  Thank you very much,
 7   Mr. McKinnon, you're excused.
 8           THE WITNESS:  Thank you.
 9           THE COURT:  Next witness?
10           MR. HANNON:  Chris Clendening.
11           (The witness was duly sworn.)
12           THE DEPUTY CLERK:  Can you please state your full
13   name and spell your last name for the record?
14           THE WITNESS:  Chris Evan Clendening.
15   C-l-e-n-d-e-n-i-n-g.
16           THE COURT:  Have a seat.
17           Go ahead, Mr. Hannon.
18           MR. HANNON:  Thank you, Your Honor.
19                   CHRIS E. CLENDENING
20        having been duly sworn, testified as follows:
21        DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
22   BY MR. HANNON:
23   Q.  Mr. Clendening, where are you from and what do you do?
24   A.  I'm from Cleves, Ohio and I'm the SVP of labs for PPD
25   Global Central Labs, division of Thermo Fisher.
```

```
 1   Q.   Do you live in Ohio presently?

 2   A.   I do.

 3   Q.   And you said you're a senior vice president of Global

 4   Central Labs?

 5   A.   Correct.

 6   Q.   Is that the position that Hacene Mekerri used to fill?

 7   A.   Yes.  In essence, yeah.

 8   Q.   Okay.  You say, "In essence," is it different now

 9   somehow?

10   A.   Yeah, so it's a little bit different in that at the time

11   Hacene had purview over the Central Lab and part of what we

12   call the vaccines lab.  My purview is only with regard to the

13   Central Lab.

14   Q.   Okay.  So your role is a little bit narrower than

15   Mr. Mekerri's?

16   A.   Yeah.  Specific to Central Lab, yeah.

17   Q.   Okay.  And how many folks do you have that report to you?

18   A.   About 10, 12.

19   Q.   Okay.  And does that include the medical director for the

20   Global Central Labs?

21   A.   It does.

22   Q.   And who's that?

23   A.   Dr. Kashlan.

24   Q.   And where does Dr. Kashlan live?

25   A.   He lives in Highland Heights, Kentucky.
```

1   **Q.**  Okay.  And when did you move into your role as senior

2   vice president of Global Central Labs?

3   **A.**  That would have been April-ish of 2019.

4   **Q.**  And how did that come about?

5   **A.**  Dr. -- or Mr. Mekerri resigned and, at the time, I was

6   positioned for that role.

7   **Q.**  I'm sorry, you said you were positioned for that role?

8   **A.**  Yeah, so I've been -- you know, I've been working up

9   through the organization.  I've been with the organization 17

10  years, and so, you know, I was kind of in a role there, on a

11  leadership role that would be then kind of the next step

12  would be moving into that role.

13  **Q.**  Okay.  And what was your position before you -- you moved

14  into the SVP role?

15  **A.**  I was executive director of project management and

16  project design.

17  **Q.**  And you reported to Mr. Mekerri?

18  **A.**  I did.

19  **Q.**  And who -- is there someone that took your place as

20  executive director of project management and project design?

21  **A.**  Yes.  So there was -- we ended up putting -- I think at

22  that time, Olivia -- or Carolyn Jackson was put into that

23  role for project management and project design.

24  **Q.**  And what does that role -- what is the executive director

25  of project management and project design do?

1    **A.**    So it's an executive -- it's an executive director level

2    within the labs, so they're all kind of titled ED of labs.

3    And then each division within the lab then has, essentially,

4    an addendum that describes your positions.  And for project

5    design and project management, if I kind of give you the high

6    level, what that is, I'll start with project design.  So when

7    you receive a protocol from the client, which outlines the

8    general, how the study is going to work, how patients are

9    going to be recruited, all those types of things, we take

10    that protocol, and we translate that protocol into our IT

11    systems.  Those IT systems then drive kit production that's

12    going to go out to sites and collect the blood samples from

13    the patients, the logistics.  All of those types of things

14    are going to come back in and get tested and that's what the

15    project design group did.

16              And then their project management was day-to-day

17    operations of managing at sort of a client level.  During

18    a -- during a clinical study, what you will see is typically

19    there's a weekly meeting that is set up.  They have those

20    meetings.  You're having that meeting with a client or a

21    larger CRO.  And the project management of the labs is really

22    to make sure are we getting the kits out to the patients, the

23    patients are getting the correct kits, they're getting their

24    correct samples done, getting those put back into the lab,

25    and then receiving all of those.  So they're sort of the

1  conductor of the train yard, as it were.

2  **Q.**  Okay.  So in your current role, you have Dr. Kashlan

3  reporting to you.  You have a person who serves as this

4  executive director of project management and project design;

5  is that right?

6  **A.**  Correct.

7  **Q.**  And you heard Mr. McKinnon's testimony about the sort of

8  different functional groups represented at those daily calls?

9  **A.**  Yup.

10  **Q.**  Are there other folks that report to you that sort of

11  oversee those different functional groups he was alluding to?

12  **A.**  Yes.

13  **Q.**  And what are they?

14  **A.**  So if I go through the functional groups as they exist,

15  so you've got project management and project design, which I

16  described.  You'll have a data management group, so they're

17  responsible for transferring the data back to the client.

18  You have an operations lead.  That operations group consists

19  of multiple departments within operations and that would be

20  what you heard, sample management, so the people that are

21  responsible for collecting the samples when they come through

22  the door.  You had a GSS group, which is global site services

23  group.  They're really for interacting with the sites at that

24  level.  And by sites, so I clarify that, that's the doctor's

25  office, right?  So they're interacting with the doctor's

 1    office to make sure that they're getting all the right data

 2    and all of that type of stuff is going on.  You've got a

 3    biorepository, which is in sample management as part of this

 4    whole piece.  You also have kit production and logistics,

 5    which is under operations, as well.  So that's manufacturing

 6    that blood collection kit and getting it out.

 7            The next group would be somebody like IT.  So IT

 8    would be represented in that group.  Of course, quality

 9    assurance would be there.  And then you've got the clinical

10    lab operations, which would be Dr. Kashlan's group, or --

11    just to make that distinction, when you talk about Global

12    Central Labs, that's a huge umbrella, but there's a -- the

13    core function is the laboratory function, which is a clinical

14    lab division.  So that's how all those groups would be kind

15    of stacked up around the Global Central Lab.

16    Q.  Okay.  And in terms of all of those functional areas that

17    you described, they all kind of work together in terms of the

18    functioning of the Global Central Labs?

19    A.  Absolutely.  And they're intimately interconnected.

20    Q.  Okay.  And since taking over as senior vice president of

21    Global Central Labs, do there still, on occasion, occur

22    quality control events?

23    A.  Sure.  Yup.

24    Q.  That daily triage call that Mr. McKinnon testified about,

25    does that still happen as of today?

1   **A.**   Yeah, unless there are no events, so there's no need to

2   have a call, if there's no events, right?

3   **Q.**   Okay.  But as of today, March whatever it is, 2023, no

4   one has yet succeeded in eliminating all of quality control

5   events within the Global Central Labs; is that correct?

6   **A.**   That is correct.

7   **Q.**   Dr. Kashlan, when did he first start working for PPD?

8   **A.**   I believe he was officially hired somewhere in the April

9   of 2019 time frame.

10   **Q.**   When did he first start working for PPD?

11   **A.**   Same.  April of 2019.

12   **Q.**   Okay.  He was working as a contractor before that?

13   **A.**   No.  Not that I'm aware of.  I think that we interviewed

14   him and then brought him on board.  And the only time -- the

15   only delay that I know in that was between the time that he

16   was moving from California to the Highland Heights office.

17   **Q.**   Do you recall who was filling his role before then?

18   **A.**   Dr. Reddy was acting CAP director.

19   **Q.**   With respect to Dr. Menninger, you learned in February of

20   2018 that Dr. Menninger had a -- had requested

21   accommodations; is that right?

22   **A.**   No.

23   **Q.**   When's the first that you learned that Dr. Menninger had

24   requested an accommodation?

25   **A.**   So the first I learned about the accommodations and the

|   | |
|---|---|
| 1 | details around those accommodations was only a few months |
| 2 | ago. |
| 3 | **Q.**  You didn't get an e-mail from Chad St. John in February |
| 4 | of 2018? |
| 5 | **A.**  I did.  I've subsequently seen that e-mail. |
| 6 | **Q.**  Okay.  You've seen it since.  Did you see it then? |
| 7 | **A.**  I did not. |
| 8 | **Q.**  Do you believe that it just didn't go in your e-mail box |
| 9 | or you overlooked it? |
| 10 | **A.**  It's completely possible that I overlooked it. |
| 11 | **Q.**  Was it your practice to watch your e-mail box carefully? |
| 12 | **A.**  Yeah.  On a daily basis, I triage e-mails and kind of |
| 13 | move those around, figure out what I'm going to work on on |
| 14 | that day. |
| 15 | **Q.**  But you think that one you just overlooked? |
| 16 | **A.**  Yeah, I don't recall receiving that e-mail. |
| 17 | **Q.**  As Dr. Kashlan's supervisor, you're familiar with his |
| 18 | compensation? |
| 19 | **A.**  Yes. |
| 20 | **Q.**  How is he currently compensated? |
| 21 | MS. MANDEL:  Objection. |
| 22 | THE COURT:  How?  Like just the categories? |
| 23 | MR. HANNON:  We'll start there, yes. |
| 24 | THE COURT:  Overruled to the extent you're |
| 25 | objecting to the categories. |

 1              THE WITNESS:  So there's a base pay.  There would

 2     be a bonus.  Depending on how he's performing, there could be

 3     a merit increase at the end of the year for the subsequent

 4     year.  And then there's some gradation of options in there

 5     that I'm sure that he would receive.

 6     **Q.**  Okay.  When you say "options," would that be some kind of

 7     an equity component to his compensation?

 8     **A.**  Yeah, like a stock option.

 9     **Q.**  Okay.  Are you familiar with the stock options that

10     Dr. Kashlan has received in connection with his work as the

11     medical director for Global Central Labs?

12              MS. MANDEL:  Objection.

13              THE COURT:  You're asking about right now?

14              MR. HANNON:  Yes.

15              THE COURT:  Sustained.  He worked for Thermo

16     Fisher.

17              MR. HANNON:  That's not the testimony.

18              THE COURT:  He testified that he works for Thermo

19     Fisher.  You're asking him right now about the compensation

20     scheme right now, right?

21              MR. HANNON:  Yes.

22              THE COURT:  I thought he did.

23              Did you testify that you're now employed by PPD as

24     a division of Thermo Fisher?

25              THE WITNESS:  Correct.

```
 1              MR. HANNON:  It's still PPD.

 2              THE COURT:  Yes.

 3              MR. HANNON:  Just because they're under the Thermo

 4     Fisher umbrella doesn't make them no longer PPD.

 5              THE COURT:  Correct.  But for relevance -- I got to

 6     get at least for relevance purposes, you need a foundation

 7     before you get to the -- well, you just want to find out what

 8     the options are right now?

 9              MR. HANNON:  In the same position that

10     Dr. Menninger had, as it exists today, what's the

11     compensation?

12              THE COURT:  All right.  I see what you're saying.

13     Okay.  I'll let you have that, but I still think there's a

14     connection issue.

15              Go ahead, I'll overrule that for now.  You can

16     answer -- why don't you ask the question again.

17     BY MR. HANNON:

18     Q.  Do you know what the equity package is that Dr. Kashlan

19     has today?

20     A.  I do not.  I do not know how those stock options are

21     allocated.

22     Q.  Okay.  Working backwards a bit, at the time that PPD was

23     acquired by Thermo Fisher, was there an award of equity to

24     Dr. Kashlan then?

25     A.  If he had been allocated any stock options under the PPD
```

```
 1  and he held those, then, yes, there would have been, because
 2  it was a direct transition.
 3  Q.  Okay.  So people who had stock options prior to the
 4  acquisition by Thermo Fisher, those, in some respect, got
 5  transferred into options for --
 6  A.  No.  No.  No, no, no.  It was a hard line.  So anything
 7  that was -- that you had had prior to the acquisition was
 8  cashed out and done.  That was it.
 9  Q.  Okay.  So anything prior to the acquisition was cashed
10  out, right?  And then was --
11            MS. MANDEL:  Objection.
12            THE COURT:  What's the objection?
13            MS. MANDEL:  This is going far afield from anything
14  that relates to the time period when Dr. Menninger was
15  employed.  And we're now --
16            THE COURT:  Overruled.
17  BY MR. HANNON:
18  Q.  Okay.  So the old stuff got cashed out.  Was there a --
19  was there a new reward of equity?
20  A.  There's probably a performance award in there or a time
21  award in there.  I don't know what that award, the equity
22  award bucket is or what it looks like.
23  Q.  Okay.  You mentioned base pay.  What's Mr. Kashlan's base
24  pay currently?
25            MS. MANDEL:  Objection.
```

**JA1469**

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  I think he's in the range of 275.
 3     BY MR. HANNON:
 4     Q.   Do you know what his most recent bonus was?
 5     A.   He probably would have been in the range of 30 to 40.
 6     Q.   You say probably.  Are you sure about that?
 7     A.   It's the best of my recollection.  I have to review all
 8     of those, a thousand peoples worth of stuff at the end.  So I
 9     get that all rolled up to me, and I have to review all of
10     those, but I think that's roughly about right.
11     Q.   Has compensation for that role, the medical director of
12     the labs, has that generally gone up, stayed the same, or
13     gone down since the time that you've been SVP of Global
14     Central Labs?
15     A.   So for the time that I've been in that role, it's been
16     about the same.  I mean, you get year on year merit
17     increases, but generally what the market bears is right
18     around that level.
19     Q.   And you were -- you had a role as executive director of
20     labs -- well, strike that.
21              I think you mentioned earlier -- and please tell me
22     if this is right -- that your sort of categorization within
23     the PPD structure, prior to your promotion, was executive
24     director of labs.  Did I hear that right?
25     A.   Correct.
```

 1   **Q.**  Okay.  And that was a sort of -- that sort of didn't

 2   describe your functional responsibility, but that's kind of

 3   the categorization by PPD; is that right?

 4   **A.**  Yeah.  So the level is really the hierarchy.  Right?  And

 5   then you had your -- essentially your swim lane or your lane,

 6   part of the business that you were in.

 7   **Q.**  Okay.  And you were aware that Dr. Menninger, she was

 8   also categorized as executor director of labs, right?

 9   **A.**  Correct.

10   **Q.**  Okay.  As executive director of labs, you had a -- you

11   had a compensation package in that role, correct?

12   **A.**  Correct.

13   **Q.**  Okay.

14       MR. HANNON:  Your Honor, I think I have enough

15   foundation at this point to ask the question that I want to

16   ask next, but you asked me to flag it for you.

17       THE COURT:  You can go ahead and ask and I'll see.

18       MR. HANNON:  Sounds good.

19       So pause for your answer here and we'll see what

20   the Judge does with it.

21   BY MR. HANNON:

22   **Q.**  When you were the executive director of labs, you had

23   stock options, right?

24       THE WITNESS:  Can I answer?

25       THE COURT:  Take a pause.  I'll see you both at

```
 1    sidebar just to clarify.
 2               (Bench conference concluded.)
 3               THE COURT:  So why can't he -- I guess the -- why
 4    can't he answer this?
 5               MS. MANDEL:  So there's absolutely no evidence on
 6    the record or that could be introduced that their
 7    compensation packages were relatable, that they were hired
 8    with similar basis for compensation.
 9               THE COURT:  I guess it does establish that it is --
10    that the compensation packages were related to their level,
11    as opposed to the individualized.
12               So as to the medical director, it's the same
13    position.  That's why I let that in.
14               MS. MANDEL:  He's not a medical director.
15               THE COURT:  But, right, he's not the medical
16    director.  So I think you should ask, like, we don't really
17    know how they -- I think -- something to suggest that he
18    believes or he knew that the compensation was, like, level.
19    He was at the same level at that time as Dr. Menninger.  He's
20    testified to that, executive director level, but he hasn't
21    testified that their compensation packages -- or particularly
22    what you focused on was the options and stocks, right?
23               MR. HANNON:  Right.
24               THE COURT:  That the options and stocks were
25    somewhat on a level basis, as opposed to individualized.
```

1          MS. MANDEL:  Your Honor, there's also the evidence

2    in the record that he's been employed by the company for a

3    lot of years, a lot of years longer than Dr. Menninger.  We

4    have no evidence as to the background of how compensation

5    levels was set, how equity was set.  This is all totally

6    speculative.  It's not information that's been established in

7    any way thus far.

8          MR. HANNON:  Well, I've got to build to it, right,

9    and the first question I have to ask is whether or not he had

10   stock options.

11         THE COURT:  And then I -- well, I think the first

12   question is not whether he had options, I think the first

13   question is whether he understands the -- well, I guess you

14   can ask him whether he had stock openings, yes or no, sure.

15   But the real question is does he know how -- for example, if

16   he says no, this isn't necessarily relevant to Dr. Menninger,

17   because the question is -- it's not evidence that she did,

18   but the real question, referring to Dr. Menninger, is what is

19   his understanding of how the compensation packages were set,

20   and were they set in a way that was class based, and what

21   were the factors that influenced it, so the jury, assuming

22   you get what you need, can infer it's what she had, right?

23   That's what you're looking for, isn't it?

24         MR. HANNON:  I don't think I need to show a perfect

25   apple-to-apples match.

```
 1              THE COURT:  No.
 2              MR. HANNON:  Right.
 3              THE COURT:  But what do you want him to infer from
 4   his testimony?  What do you want them to draw from this
 5   testimony?
 6              MR. HANNON:  It depends on what he knows, right?
 7   You know, he might have information concerning what those
 8   options that she had were worth.  He might have information
 9   in terms of, you know, what they would have turned into or if
10   they would have gone to --
11              THE COURT:  So I guess there's two different
12   questions, what are they worth, and what might she have.
13              MR. HANNON:  Yeah.  Right.
14              THE COURT:  You can ask him about -- I think you
15   can -- you've established enough that you can ask him
16   questions about what they might be worth.
17              MR. HANNON:  Right.
18              THE COURT:  As to things that relate to what she
19   might have, I don't know that you have any basis that he
20   would know, necessarily -- I'm not saying he doesn't, but I
21   don't understand he has any basis to even know that as to
22   that time, which would be relevant.
23              MR. HANNON:  Understood.
24              MS. MANDEL:  Your Honor, I think there's still also
25   no basis from which the jury could infer and I think it could
```

```
 1    confuse the jury that there's any correlation between, not
 2    only base compensation or bonus, but also whether his equity
 3    is relatable to his position.  They're --
 4             THE COURT:  But he's not asking so much about how
 5    much equity he has.  I don't think it's particularly relevant
 6    how much equity he has, it's relevant as to what he knows
 7    about either the price or about how it's ordered.  And if
 8    it's ordered to a class base -- I mean, a level base is like
 9    executive director.  Because that's what would be relevant.
10    Just he may -- not particularly.  I mean, there are too many
11    distinguishing factors between him and her that don't really
12    have much meaning to how -- as executive director.  Like he
13    wasn't the same level, but he's not an MD, I assume.
14             MS. MANDEL:  And their type of hire was completely
15    different.
16             THE COURT:  And so I don't know, like -- and you
17    already have information that goes to her compensation here,
18    but the relevant comparator.  The real issue is the stocks
19    and the options, I think, is what's driving it.
20             MR. HANNON:  Okay.  I think I have it clear sort of
21    picture of where you're wanting me to go.
22             (Bench conference concluded.)
23             THE COURT:  Go ahead.
24             MR. HANNON:  Thank you, Your Honor.
25    BY MR. HANNON:
```

1    **Q.**   So Mr. Clendening, when you were in that EVP -- I'm

2    sorry, when you were that ED of labs category, you were

3    awarded stock options; is that right?

4    **A.**   Correct.

5    **Q.**   Okay.  And you had -- do you recall the stock options

6    being broken up into Chapter 1 and Chapter 2?

7    **A.**   Yeah, I believe.

8           MS. MANDEL:  Objection.

9           THE COURT:  Overruled.

10           You can answer.

11    BY MR. HANNON:

12    **Q.**   And the Chapter 2 -- the Chapter 1 options, they had been

13    awarded some time in the 2015-'16 time frame; is that right?

14    **A.**   I don't recall the exact dates, but --

15    **Q.**   Okay.  And the Chapter 2 options, those came about

16    because there had been a -- within like a restructuring of

17    some sort; is that right?

18    **A.**   Correct.

19    **Q.**   Okay.  And I'm going to show you a document here, which

20    the jury saw a while back.  So this is Joint Exhibit

21    Number 33.  And I got to plug my thing in here.  I'm sorry.

22    And if you see here, these are options granted in July of

23    2017.  Do you see that?

24    **A.**   I do.

25    **Q.**   Okay.  And I'm going to show you -- well, the top here,

1   "Eagle I" options, do you see that?

2   **A.** I do.

3   **Q.** Do you recall that being the Chapter 2 options?

4   **A.** I don't recall whether that was Chapter 2 or Chapter 1.

5   **Q.** Okay. I'm going to show you Joint Exhibit 35 and I'll

6   see if that refreshes your recollection.

7         So you see here, we have a document showing options

8   with a grant date of December 29, 2015. Do you see that?

9   **A.** Uh-huh. Yes.

10  **Q.** And you see these are called, "X-Co options." Do you see

11  that?

12  **A.** Yes.

13  **Q.** Okay. So would you agree with me, these are the Chapter

14  1 options and the Eagle I options are the Chapter 2 options?

15  **A.** Yes, but I don't recall them being called "X-Co options,"

16  but...

17  **Q.** Okay. And in your role as ED of labs, did you have

18  Chapter 1 and Chapter 2 options?

19  **A.** Yes.

20  **Q.** Okay. When PPD went public, what happened to your

21  Chapter 1 options?

22  **A.** I don't recall how they handled those, whether they

23  rolled those over. But there was no -- there was -- let me

24  think about that. There may have been some pay out of those

25  at that time, if I recall.

1   **Q.**  Okay.  Do you have any knowledge or information

2   concerning the -- the value of those options at that time?

3   **A.**  No, I don't.

4   **Q.**  Okay.  Do you recall how many -- how many Chapter 1

5   options that you had at the time of the -- at the time PPD

6   went public?  Just a yes or no question first.

7   **A.**  I do not recall.

8   **Q.**  Okay.  And same question with respect to Chapter 2

9   options.  So let me show you P-94.  Do you have any knowledge

10   or information concerning what the Chapter 2 options were

11   worth at the time of PPD going public?

12   **A.**  No, I do not.

13   **Q.**  Okay.  Do you know how many Chapter 2 options you had?

14   **A.**  I do not.

15   **Q.**  You see here that Dr. Menninger had 25,660.  Do you see

16   that?

17   **A.**  I do.  About 25,000?

18   **Q.**  I'm sorry, it could be 25,000?

19        THE COURT:  I couldn't hear you.

20        THE WITNESS:  You said 25,000 -- oh, you're saying

21   the total options granted.  I was looking at the vested.

22        MR. HANNON:  No worries.

23   BY MR. HANNON:

24   **Q.**  To your recollection, is that approximately how many you

25   had?

```
 1    A.   I don't --
 2             MS. MANDEL:  Objection.
 3             THE COURT:  Sustained.
 4    BY MR. HANNON:
 5    Q.   To your knowledge, did ED of labs, did that position
 6    generally have equivalent equity packages?
 7    A.   I don't know if that's the case or not.
 8    Q.   Okay.  Currently, do folks at the ED of labs level have
 9    equivalent equity packages?
10    A.   I do not know if they do.
11    Q.   Subsequent to -- well, strike that.
12             Were you still in -- in the ED of labs role when
13    PPD went public?
14    A.   Yes.
15    Q.   And at the time that PPD went public and you were in that
16    ED of labs role, did you receive any additional equity?  Just
17    yes or no.
18    A.   I don't recall.
19    Q.   Okay.
20             MR. HANNON:  That's all I have, Your Honor.
21             THE COURT:  All right.  Any cross-examination?
22             MS. MANDEL:  Yes.
23             THE JUROR:  I actually have a question.
24             THE COURT:  Sure.  I'll take it.
25             THE JUROR:  Just a little context, just to
```

 1    understand the timeline.

 2              THE DEPUTY CLERK:  Okay.  So part of it is a

 3    question for the witness and part of it is for -- question, I

 4    guess, for the two of you, why don't you -- Ms. Belmont will

 5    let you take a look at it and I think the first

 6    question is -- if you wish to ask --

 7              THE JUROR:  The top part.

 8              THE COURT:  Right.  The first part is the question

 9    for the witness and I think -- you can take a look at it.

10    The first part seems like a perfectly permissible question to

11    me, if the two of you are amenable.

12              I think the second part is informational for the

13    two of you.

14              MR. HANNON:  If I may, I'll follow-up on that.

15              THE COURT:  The question, the first question.

16              MR. HANNON:  Yes.

17              THE COURT:  Go ahead.

18              We'll take that back.

19              If you want to look at it -- you can keep it for

20    now, Ms. Mandel.

21              MS. MANDEL:  I just wanted to write it down.

22              THE COURT:  Okay.  Go ahead.

23    BY MR. HANNON:

24    Q.  So you took over for Mr. Mekerri in April of 2019 you

25    said; is that right?

1  **A.**  Yeah, I think that's when I officially took the role.  He

2  had left prior to that.

3  **Q.**  Okay.

4  **A.**  He had left the organization -- I remember when he left.

5  I don't remember the exact day, but I remember when he left

6  because -- so that would have been in the -- probably in the

7  January/February time frame, I think, is when he left, only

8  because I remember having to do the merit bonus pool cycle to

9  get that completed in a timely manner for that to roll out.

10  So it would have been in it a time frame.  It could have

11  been -- I guess it could have been as late as February/March

12  time frame, but that's when he left.

13  **Q.**  But that's 2019?

14  **A.**  '19.

15  **Q.**  Right.  Okay.

16  **A.**  Yes.

17  **Q.**  The prior February, so February of 2018, Mr. Mekerri, he

18  hadn't left yet, right?

19  **A.**  Correct.

20  **Q.**  Okay.  Had you taken over any of Mr. Mekerri's

21  responsibilities as of that date?

22  **A.**  No.  Other than -- so if you're talking about what my

23  responsibilities were?

24  **Q.**  No, I'm asking about whether or not you had taken on any

25  of Mr. Mekerri's responsibilities, had you?

     1   **A.**  No.

     2   **Q.**  Had you started to transition into Mr. Mekerri's role as

     3   of that date?

     4   **A.**  No.

     5   **Q.**  Was there some interim role that you had taken on as of

     6   that date?

     7   **A.**  I did take on additional -- so you're talking about

     8   spring of 2018?

     9   **Q.**  February of 2018?

    10   **A.**  Yeah, I took on additional roles there, in February of

    11   2018.

    12   **Q.**  What were those additional roles then?

    13   **A.**  So I took on what was called the North American site head

    14   role.  And so that role was really to try to help and

    15   buffer -- so having three locations and having communication

    16   across all of those locations was tough.  And you had quality

    17   issues, quality events, investigations that were going on.

    18   So you really needed a site head for a North America, site

    19   head for EU, a site head for APAC, and so I had taken on that

    20   role as a site head for North America.

    21   **Q.**  Okay.  And did you have folks that reported to you in

    22   that role?

    23   **A.**  No, it was purely a title role.  It was a dotted line,

    24   having conversations with different folks.

    25   **Q.**  Did you have any supervisory responsibilities over

1    Dr. Menninger in that capacity, in that role?

2    **A.**  No.

3    **Q.**  Did that role require you to have knowledge of any

4    disability she might have?

5    **A.**  No.

6    **Q.**  Did that role require you to have knowledge of any

7    requests for accommodations she had made?

8    **A.**  No.

9            MR. HANNON:  And that's all I have.

10           THE COURT:  All right.  Ms. Mandel.

11           **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

12   BY MS. MANDEL:

13   **Q.**  Good morning, Chris.

14   **A.**  Good morning.

15   **Q.**  You testified a little while ago that you live in Ohio.

16   Did I get that right?

17   **A.**  Yeah.  So if you think about where the Central Lab is, in

18   Highland Heights, Kentucky, nobody knows where that is, so

19   that's actually across the river from Cincinnati, Ohio, so

20   it's right within the Kentucky, Ohio, and --

21   **Q.**  And I -- I heard you say that you do work daily in the

22   Highland Heights location?

23   **A.**  I do.

24   **Q.**  Is that right?

25           And how long have you worked for the company?

**A.** 17 years.

**Q.** Can you please describe for the jury, so that we laypeople can understand, what type of work is done out of Central Labs in Highland Heights?

**A.** So the primary focus, beyond all, is the clinical laboratory testing. So that is akin to if you went to your doctor's office, you got a blood sample taken, you go, you get your cholesterol back, you get all of those kind of stats, that's the type of testing that we do. It's a little bit more in depth in that, in that we're looking for particular markers that may show, you know -- that have safety concerns, so liver enzymes would be a perfect example for that. You're looking for those types of markers, and reporting those back to the physician, so that they can provide care to their patient. That's the primary focus of the Central Lab. But under that umbrella, there are multiple departments or wrap-around services that then help us actually obtain those samples. We mentioned the project management, the project design, they're setting up all of that protocol. And then there's kits that are being produced that are specific to that protocol. There's kits that are then going out to the doctor's office. That's part of your logistics team and your operations team. The samples are being collected at the doctor's office. Again, those are coming back through the logistics team. They come in through

1    the sample management team.  They're accepting those samples.

2    Those samples are then passed off and transitioned to the

3    clinical laboratory division within Central Lab.  They test

4    and run those samples.  Those results are then reported back

5    out to the doctor so that he can look at those and say, okay,

6    this is how it's going.  And then when the whole trial is

7    over, there's a data management team that takes all of that

8    data that's been collected through the entire trial, and we

9    pass that over to the client, which is typically a pharma

10   company, and they use that data to submit to the FDA to say

11   this is our drug.  We feel it's safe.  You know, here's all

12   the data that we have around that.  And there's also data --

13   our primary focus is around whether that's safety, but there

14   are other pieces of that that would say, well, is there an

15   efficacy here, right?  So is the drug doing what it's

16   supposed to do.

17   **Q.**  Can you describe the physical setup of the lab building

18   in the Highland Heights?

19   **A.**  So it's two floors.  But beyond that, it's really -- it's

20   really divided into office space, clean area, as we call it,

21   and dirty area.  And the dirty areas would be places where

22   you have to wear personal protective equipment.  You got to

23   remember that there's blood samples, urine samples, all kinds

24   of samples that are coming in there.  You have to assume that

25   those are infectious, right?  So there's infection and

1    control measures.  So there's dirty areas of the building and
2    then there are clean areas of the building.
3    Q.  And the clean area of the building, that's where there
4    are offices?
5    A.  Yes.
6    Q.  Do you have an office in that area?
7    A.  I do.
8    Q.  Who else has an office in that area of the building?
9    A.  So if I think down the wall, currently as it stands, so
10   you have Narine, who is the senior director, which she was
11   mentioned earlier.  She's a senior director of the lab.
12        We have a temporary office that gets shared between
13   a couple of folks from operations and from data management,
14   they're sharing that office, because we've run out of space.
15   Dr. Kashlan's office is there.  I'm trying to think if there
16   are any other offices available.  We have a facilities office
17   right there.  We have a health and safety person that's on
18   site in their offices there.  And then we have some general
19   offices that people can kind of pop in and out of.
20   Q.  In the lab space that you described, again, for us
21   laypeople, who is working in the lab, and what are they doing
22   on a daily basis?
23   A.  Mostly people that are working in the lab are -- really
24   from a supervisory level down.  So you do have some
25   supervisors that are spending time at the bench, and by

1    bench, I mean, you know, they're running samples.  And then

2    most of the other folks would be med techs or lab assistants.

3    **Q.**  Are any of those folks doctors?

4    **A.**  No.

5    **Q.**  Let's look at an organizational chart from the time

6    period of 2018.  You have in front of you -- this is a

7    document that's marked as agreed Exhibit 17.  Do you

8    recognize this document as an organizational chart from

9    around the time period of 2018?

10   **A.**  I do.

11   **Q.**  Can you please explain for us what is depicted in this

12   organizational chart?

13   **A.**  Yes.  So the -- I mean, we can go to the top level, David

14   Simmons and Bill Sharbaugh.  Those were the parent -- PPD

15   part of the organization, and then the PPD organization was

16   split into a lab services group and kind of nonlab services,

17   so Chris Fikry was over at the lab services group.  He

18   oversaw all of the divisions of labs that we had.  And then

19   Hacene Mekerri would have been over, as the VP of Global Lab

20   Services at that time, was over the Central Lab.  And you can

21   see all the folks, and I'll kind of go through those, left to

22   right, myself, Els Pluymers, Esther E.  All of those

23   divisions are -- even though they're monikered as ED of the

24   labs, they all have their swim lane, or they were their own

25   division.

1          For me, at the time, I would have been over project

2    management, project design.  Els would have been over

3    operations.  Esther headed up the APAC group.  John would

4    have been over data management.  Lisa would have been over

5    the clinical laboratory piece.  Megan would have been the

6    executive admin.  And then Pierre Joliceur was on the

7    vaccines, so it was a different business unit from Central.

8    **Q.**  And just for all of our edification, I know you said

9    Esther E. was over APAC.  Was that Asia Pacific?

10   **A.**  Oh, yes.  So that would have been our Singapore lab and

11   our China lab.

12   **Q.**  And you mentioned this, Chris, that a few of the folks on

13   that organizational chart, including you and Els and

14   Dr. Menninger, all have that title listed there as ED of

15   labs, or ED labs?

16   **A.**  Uh-huh.

17   **Q.**  Does that mean you all had the same job?

18   **A.**  No.

19   **Q.**  In what ways were your jobs distinguished?

20   **A.**  So really it was around the experience that you either

21   had to fulfill that role, or your credentials.  That's really

22   how it kind of boiled down.  So you know, there were distinct

23   lines within the business.  For me, project management, and

24   prior to this org chart, I had run operations, so I had --

25   Els and I were switched in 2017.  But in general, it really

1    depended on what your experience level was, to whether you

2    could fulfill the requirements of that job.  The one

3    exception of that would have been, really, around the

4    clinical lab division.  That is specially credentialed,

5    right?  You have to be credentialed with CAP, CLIA, iso -- we

6    won't go into iso, but New York State.  But all of those

7    credentials were necessary to be the lab director of the

8    clinical diagnostic.

9    **Q.**  And when you say "lab director," that's that swim lane

10   under Dr. Menninger's name?

11   **A.**  Correct.

12   **Q.**  And are you a medical doctor?

13   **A.**  I am not.

14   **Q.**  And safe to say you were not a medical doctor in

15   2017/2018?

16   **A.**  I am -- nope.

17   **Q.**  And to your knowledge, was Els a medical doctor in 2017

18   to 2018?

19   **A.**  No.

20   **Q.**  I'm going to show you a different document now, Chris.

21   This is a job description, Chris.  It should be showing up in

22   front of you, it says "ED labs"?

23   **A.**  Uh-huh.  Yup.  I see it.

24   **Q.**  Thinking back to that time period of 2017/'18, was this

25   your job --

```
 1              THE COURT:  What's the Exhibit number, just for the
 2   record?
 3              MS. MANDEL:  I'm sorry?
 4              THE COURT:  What Exhibit number?
 5              MS. MANDEL:  Oh.  171.
 6              THE COURT:  171.  Go ahead.
 7   BY MS. MANDEL:
 8   Q.  Was this your job description, Chris?
 9   A.  Is there only a single page to this?
10   Q.  No.  We can -- let's go through the pages.  So there's --
11   that's the first page.  This is the second page.
12   A.  Yeah, okay.  Go ahead.
13   Q.  This is the next page.  And then there's also an
14   addendum, as well.
15   A.  Yeah, and that's -- that would be the differentiator,
16   right?  Would be the addendum.
17   Q.  And how do you know, looking at this addendum, that this
18   wasn't your job description?
19   A.  You can't serve -- you have to be accredited, again, a
20   MD, a clinical pathologist to be able to be for New York
21   State accreditation, and to have those qualifications.
22   Q.  And I know you testified a little while ago that at times
23   you had done operations, at times you had done project
24   management.  Could you have taken over Dr. Menninger's role
25   over the lab itself?
```

1    **A.**   No, I could not.

2    **Q.**   Why is that?

3    **A.**   Because I don't carry those credentials.  I am not an MD

4    nor a Ph.D.

5    **Q.**   Chris, can you describe for the jury, what was the

6    trajectory of the Central Lab business in sort of the

7    2017/2018 time period?

8    **A.**   So 2017/2018 was a prepare for growth year.  Probably

9    even stretching back into 2016.  So all of those years, we

10   were really focused on how do we grow the business.  So it

11   was relatively flat, from a revenue/income standpoint.  And

12   so there was a lot of focus on what would we bring to market?

13   How would we differentiate ourselves from the other Central

14   Labs out there?  That's an important note.  It's not just one

15   Central Lab.  There are multiple Central Labs in the world.

16   And so how were we going to catapult ourselves into the next

17   level and transform the business to --

18   **Q.**   Did this require any changes in the approach that

19   business leaders were expected to take as you went from 2017

20   into 2018?

21   **A.**   Yeah, it was a tough -- because it was -- everybody --

22   the mantra around how we were running the business, so you

23   couldn't just run the part of the business that you needed to

24   run anymore.  We kind of had this mantra across the board

25   where everybody was in sales.  So not just your BD folks were

```
 1   in sales, but you were in sales.

 2   Q.  Let me just stop you there.  BD?

 3   A.  Yeah, so that's your business development or sales force.

 4   So we all participated in trying to sell to the client or

 5   have interactions with the client, so that you could learn

 6   what they needed so that we could then implement that in our

 7   space and then grow the business.

 8   Q.  And is that -- thinking back to likely 2017 and early

 9   2018, did you feel that pressure to be more involved in

10   sales, even though your role at the time I think was project

11   management?

12   A.  Absolutely.  Every day.

13   Q.  And how did you come to sort of feel that pressure?

14   A.  You know, you were just -- you were getting -- so there

15   were multiple what we call bid defenses.  So really -- and if

16   I classify those, a bid defense is like how am I bidding on a

17   project.  But really what we were doing were operational

18   meetings, how we were talking about the client about what we

19   could offer.  So there was a lot of client meetings that we

20   were going to.  There was a lot of travel that was involved.

21   Because, really, the way that this system worked, right,

22   wrong, or indifferent, but this is the way that it was, is

23   that your BD folks, or your business development folks, were

24   really the ones that were connecting with the client and

25   their outsourcing teams.  So they made the initial
```

1    introduction, and hey, can I get a meeting with you, and can
2    we talk about what we can offer to you as a Central Lab.
3            The problem with that was was that they didn't know
4    the business well enough to speak to it, so they had to bring
5    all of us along.  Right?  So we would go on all of these
6    trips, did a lot of travel, having conversations with a lot
7    of the pharma companies to try and sell, you know, our part
8    of the business, or listen to them and say, well, what could
9    we do differently?
10   **Q.**  How did you come to be aware of this increased
11   expectation that you were feeling?
12   **A.**  Well, so that comes from the highest levels down, right?
13   So I think as an overall PPD business, right, there was a
14   push to make sure that we were hitting revenue targets and
15   stretch goals to make additional revenue.  And so that was an
16   overarching goal for all of PPD.  And then each business
17   unit, which labs, Global Central Labs would have been no
18   different, you know.  You would get a target on this is where
19   we think you guys need to be for the next year, and so you
20   would have to try and sell from that.  And so that would come
21   down through Chris Fikry and Hacene, and you -- that's kind
22   of your goals for the year is that, hey, we want you to take
23   on this.
24   **Q.**  And given this environment that you've described in
25   2017/2018, did the company's style of interacting with

1    customers change during this time period?

2    **A.**  Yeah, so we went from one of the things -- and it still

3    exists today, actually.  So one of the transitions that we

4    went through was that we became high touch with the clients.

5    So you can exist as a Central Lab and just do the kind of

6    meat and potatoes testing that you always do, but it's really

7    not going to get you anywhere as far as growth.  Right?  They

8    wanted to see, well, what kind of novel ideas were you

9    bringing to the market.  And so we were pushing new IT

10    systems out into the market.  We were having conversations

11    with clients about what do those IT systems need to look like

12    that better serves you.  From my perspective and project

13    management, I was having discussions about, well, how do you

14    want project managers to interact with you.  Do we need to

15    remodel or reshape the way the project management looks.  Are

16    there going to be new tests, right?

17           So one of the big things is that in clinical

18    trials, as we see today, it's an ever changing dynamic on

19    what you're going to be working on.  Prior to COVID, you

20    know, there was a lot of oncology research, diabetes,

21    metabolic research going on, and then boom, suddenly you had

22    COVID, and everybody switched gears to doing COVID work.  So

23    there was a lot of conversation going on about how do we do

24    that.  So it was a really high touch, a lot of interaction

25    with the outsourcing folks, a lot of the science folks would

1    get involved, because you're trying to figure out what test

2    you're going to bring out, because you wanted to have those

3    ready by the time you got the clinical trial ready.  So it's

4    pretty dynamic during that period.

5    **Q.**  Chris, you testified already a little bit this morning

6    about the time period where you and Dr. Menninger were both

7    reporting up to Hacene Mekerri; is that right?

8    **A.**  Uh-huh.

9    **Q.**  And just in sort of laymen's terms, how would you

10   describe your role relative to Dr. Menninger's role at that

11   time?

12   **A.**  Yeah, so we were just colleagues, right, working under

13   the same umbrella.  She led the clinical laboratory division

14   and I led the project management and project design division.

15   **Q.**  And you testified a little earlier that, at some point in

16   early 2018, you took on some additional administrative

17   responsibilities at Central Lab?

18   **A.**  Yeah, I took on the North American site head role.

19   **Q.**  And as site head, did you generally stay abreast of

20   staffing availability for the lab business?

21   **A.**  Yeah, that was one of the tasks that was part of that

22   role, was that even though maybe a function didn't report to

23   you, you were trying to keep the -- everything functioning at

24   a local level.  So not just a global level, so my purview for

25   project management and project design would have been

1    globals.  So I was managing all of the global project

2    management and project design.  Now, on a local level, in the

3    North America site, I would help, you know, manage if there

4    were staffing issues, in that period of time, as I remember

5    it, one of the things that came up was the high incidents of

6    flu.  That, oddly enough, was a precursor to COVID.  But one

7    of the things in that site role -- that North American site

8    head role would have done was do I need to send

9    communications out to sample management to make sure that

10    they're staffed, you know, get a pulse check, are you okay,

11    do you have a lot of folks that are out sick, we want to make

12    sure that we're still able to receive all the samples that

13    are coming in, just generally aware of what's going on within

14    the organization, so that you can make sure that there wasn't

15    anything that was -- where the wheel was going to fall off

16    the bus, as it were.

17    **Q.**   So even for people who didn't technically report to you,

18    you had to be aware of staffing availability?

19    **A.**   Yup.

20    **Q.**   And you testified earlier this morning that it was -- I

21    think you said a few months ago, that you learned that at

22    some point Dr. Menninger had disclosed a disability to PPD?

23    **A.**   That's correct.

24    **Q.**   So safe to say, were you aware at any point in 2018 that

25    Dr. Menninger had disclosed a disability at PPD?

1   **A.**  I was not.

2   **Q.**  Did Mr. Mekerri ever mention to you that Dr. Menninger

3   had disclosed a disability?

4   **A.**  Did not.

5   **Q.**  Do you recall learning at some point that Dr. Menninger

6   had asked to relocate to Massachusetts?

7   **A.**  I do, yes.

8   **Q.**  And prior to that, had you seen Dr. Menninger on a

9   regular basis in Highland Heights?

10  **A.**  Yeah, I would frequently visit her office down the hall.

11  **Q.**  Did you have an opinion as to whether Dr. Menninger's

12  request to move to Massachusetts would work for the business?

13  **A.**  I did have an opinion.

14  **Q.**  And what was that opinion?

15  **A.**  I was concerned that you would be able to have that role

16  being remote.

17  **Q.**  Did you communicate this to Mr. Mekerri?

18  **A.**  I did.

19  **Q.**  And how did Mr. Mekerri respond to you about that?

20  **A.**  So Mr. Mekerri had a way about him.  So it was in one of

21  our one-on-ones, and I said, "Look, is this something really

22  that's feasible," right, "based on how we're interacting and

23  doing a lot of things?"

24          And he would give me the -- he gave me the hand

25  signals a lot of times when he wanted me to essentially end

 1   the discussion and say he's got it under control, and that
 2   was kind of what I got.
 3   Q.  From a practical standpoint, in your role in operations
 4   and then in project management, how did it impact things for
 5   your work when Dr. Menninger was no longer on site on a
 6   regular basis?
 7   A.  I think probably the biggest piece -- or the biggest
 8   piece that it would have impacted were the interactions,
 9   right?  So during that time, it was really important that we
10   were all having day-to-day interactions.  So there was a lot
11   of brainstorming that was going on.  They were having a lot
12   of discussions.  There were a lot of quality events that were
13   coming up in different departments.  And so you had to go
14   through and have those discussions to make sure that
15   everything was kind of staying on track.
16          And then in addition to that, I think you always
17   had the -- you had the looming New York State inspections and
18   CAP inspections and all of those types of things that we had
19   to make sure that we were doing, and I just felt that not
20   having that interaction on a daily basis and being able to
21   discuss the finer points of some of the things that you have
22   coming up, it made it tough.
23   Q.  Did you ever hear Mr. Mekerri say anything negative about
24   Dr. Menninger?
25   A.  No.

1    **Q.**  How would you describe Mr. Mekerri's management style?

2    **A.**  Mr. Mekerri was a bit hands-off.  So he liked to fly at

3    30 to 50,000 feet, as it were.  And then most of the time

4    what he would do is -- he relied on us heavily, right, and

5    delegated all of that, those actions to us.  So he really

6    just kind of delegated things to your swim lane.

7    **Q.**  What was your understanding of Mr. Mekerri's expectations

8    of his team of executive directors during that, sort of,

9    2017/2018 business build-out that you've described?

10   **A.**  So I think, in short, you know, we had these kind of mini

11   business units under the Central Lab, and you were

12   accountable for your business unit.  So he was looking to you

13   to -- if you needed to streamline something, if you had

14   quality events that you needed to deal with, if you had

15   innovations that you wanted to launch within your team, then

16   that was under your purview, and you were held accountable to

17   that.

18   **Q.**  And you said to be "held accountable"; what did that mean

19   to you, to be held accountable?

20   **A.**  I mean, at the end of the day, it's your part of the

21   business to run, and if you failed in that piece of the

22   business, then you, you know -- it was -- it ended up on your

23   year-end review.  And if you, you know, succeeded, that ended

24   up on your year-end review, as well.

25   **Q.**  And when you say be held accountable, was it your

```
 1   understanding that being held accountable meant that you were
 2   personally responsible for any issues that came up?
 3   A.   Yeah.  To some degree, I think that was the case, right?
 4   It was your part of the business to run it, so you're
 5   accountable for running that piece of the business.
 6   Q.   Let's look at another document.  This is Agreed
 7   Exhibit 291?  And I'm just going to show you -- can you see
 8   this document in front of you?
 9   A.   Yes.
10   Q.   And I'll just show you, it's an e-mail correspondence
11   that goes back some time in May of 2018.  But I want to focus
12   your attention on the first page of this document.  You'll
13   see at the top, there's an e-mail from Dr. Menninger to
14   Mr. Mekerri and to you, and it copies Mr. McKinnon, who was
15   just in the courtroom a bit ago, and Mr. St. John.  And in
16   this e-mail, Dr. Menninger indicates, "Hi Hacene.  Yes, I've
17   been involved.  I was corresponding with Jay about this issue
18   last week.  We're meeting daily about the root cause for the
19   latest issue involving improper sample storage temperature is
20   under investigation."
21        And then beneath that, you see an e-mail from
22   Mr. Mekerri, and that went to Els Pluymers, whose name we
23   just saw a little while ago, you, and Dr. Menninger.  Can you
24   explain your understanding of what was going on in this
25   e-mail correspondence?
```

```
 1   A.   Yeah.  If I recall --

 2            MR. HANNON:  Objection.

 3            THE COURT:  What's that --

 4            MR. HANNON:  Relevance to his understanding.  He

 5   can talk about what the underlying actions are, but in terms

 6   of what people meant in their e-mail, his interpretation

 7   isn't relevant.

 8            THE COURT:  Why don't you rephrase the question.

 9   BY MS. MANDEL:

10   Q.   The e-mail that's in the bottom half of the page, Chris.

11   Do you see that?

12   A.   Yes.

13   Q.   And you received that e-mail; is that right?

14   A.   I did.

15   Q.   And this e-mail, the first sentence says, "Lisa, Els,

16   involving you here as well to make sure that you're on top of

17   this serious issue."

18            Do you see that?

19   A.   Yes.

20   Q.   And then the next sentence down says, "You and Chris."

21   Is it your understanding that that Chris is you, given that

22   you received this e-mail?

23   A.   Yes.

24   Q.   "Please work together with QA to resolve the shared

25   responsibilities."
```

1    **A.**   Yes.

2    **Q.**   What do you recall understanding your role being when you

3    received this e-mail from Mr. Mekerri?

4    **A.**   So there's a lot of aspects to this.  I probably need to

5    explain why that's important.  So samples being stored

6    improperly, I think we talked about root cause.  So when that

7    happens, and occasionally it does, you need to be aware of

8    there are going to be multiple groups that are going to be

9    involved in that.  Number one, the group, sample management,

10   right?  Why did they store those improperly.  That's the

11   first issue, but we talked about how you have corrective

12   actions, right, and preventative actions.  But one of the key

13   things is that we'll rank whether this is minor or major or

14   critical, is are those samples still viable.  But that's a

15   lab component, so we're going to have -- so that's why you're

16   seeing many people involved here.  So from a lab standpoint,

17   do we feel like these samples are still viable.  From an

18   operations standpoint, which would have been Els at the time,

19   hey, what did you do in sample management, what do you got

20   going on there?  How did this happen?  And then why was I

21   involved would have been from a North American site head

22   standpoint, and probably my depth and breadth in running

23   operations six years prior to Els.

24   **Q.**   And when you received this e-mail on May 14, 2018, did

25   you understand this as indicating that you, yourself, were

1    responsible for any challenges with sample management or

2    sample storage?

3    **A.**  No, not me for sample storage.  That would have been on

4    Els's purview.

5    **Q.**  But you did receive this e-mail with a directive to you,

6    so why would you have gotten that e-mail, if you were not

7    responsible for sample storage?

8    **A.**  Because it happened in North America, and so they wanted

9    me to assist in that investigation, and help run that down.

10    **Q.**  When you received this e-mail correspondence that May,

11    did you perceive this as disciplinary towards you?

12    **A.**  No.

13    **Q.**  Why not?

14    **A.**  These kinds of things, I hate to say they happen all the

15    time, but these types of things happen.  And so really, it's

16    about, hey, can you get this investigation done.

17           The other piece of this, I think, that is

18    important, probably, to understand from a lab perspective --

19    and I mean Central Lab perspective, these investigations, I

20    think you heard before, are important because we are dealing

21    with patient samples.  It's not something where you can go

22    back and get this.  And there's an entire sense of urgency

23    around how you deal with that, when you have something that

24    is impacted.  Patients have spent time to donate this.

25    They've enrolled in these trials.  Clients have money that is

Case: 23-2030   Document: 1442-2   Page: 124   Date Filed: 03/31/2023   Entry ID: 6634402
Case: 1:19-cv-01055   Document: 1582   Filed: 03/14/23   Page: 114 of 163

111

1    invested in these types of things.  It's super critical when

2    things like this happen.  And they reach -- if you read

3    through that e-mail, they reach the highest levels of the

4    organization, and then came back down to say, hey, can you

5    get this -- make sure that this is under control.

6            So there's a real sense of urgency around making

7    sure that you find out why this happened, how you stop it,

8    and how you're going to prevent it from happening again,

9    because it's dealing with patient samples.  And so when I see

10   these kinds of e-mails, in fact, I issue these kinds of

11   e-mails today, to say, hey, we got to get this taken care of,

12   and get it taken care of in a timely manner.

13   **Q.**  Is that what you meant by accountability?

14   **A.**  Yeah.

15   **Q.**  And you just referenced these kinds of e-mails that you

16   received.  As far as you recall during this time period, were

17   you receiving other e-mails along these lines from

18   Mr. Mekerri?

19   **A.**  Oh, yeah, I would have received -- so this would have

20   been an e-mail that I got pulled into from -- you know, from

21   a site head standpoint, but I would have also received

22   e-mails on the project management and project design front.

23   **Q.**  And thinking back to when you were working more on the

24   operations side of things, did you ever have occasion to

25   become aware of quality issues?

1   **A.** Yes.

2   **Q.** How would you become aware of those?

3   **A.** So typically you become aware of quality issues in one of

4   two ways. Either you find it internally and it's surfaced

5   that way, and there's an event created, and you go through

6   the event process. Or it comes through external channels, so

7   typically, either from a contract research organization, so

8   somebody that's helping run the trial, or the client

9   themselves, will say, hey, we've spotted a problem, can you

10   take a look at this. And then that rolls into the quality

11   event system.

12   **Q.** And you've mentioned quality a number of times. And we

13   heard from Mr. McKinnon this morning, why is quality so

14   important in the lab context?

15   **A.** Well, because there's no -- there are no second chances,

16   right? Again, these are patient samples. There's no

17   do-overs, right? It's super important that you get it right.

18   There are some opportunities, you know, to go back and maybe

19   get a blood sample, but some of these trials, you're talking

20   about oncology, you're talking about tumor biopsies, and

21   slides and things that you'll never get again once they're

22   taken. So there's a sense of urgency around that whole

23   piece.

24   **Q.** Does that mean that there is an expectation in the

25   business that quality is always perfect?

```
 1    A.  No.  I mean, I think that -- I don't think that you can
 2    ever have a perfect scenario, right?
 3    Q.  If that's the case, how would you explain communications
 4    about having zero errors as a goal?
 5              MR. HANNON:  Objection.
 6              THE COURT:  Overruled, if he knows.
 7              THE WITNESS:  I'm sorry, the question was?
 8    BY MS. MANDEL:
 9    Q.  You testified just a moment ago, Chris, that it's not
10    achievable to have perfect quality, right?
11    A.  Uh-huh.
12    Q.  If that's the case, how would you explain communications
13    setting zero errors as a goal?
14    A.  Well, I think that's fine to have a goal, right?  I'm not
15    sure it's achievable.  And there's some realism there.  But,
16    you know, look, you -- again, these are patient samples, you
17    do want to try to get that right as much of the time as you
18    can.
19    Q.  What was Mr. Mekerri's role, as far as you understood in
20    2017/2018, with regard to quality issue in the lab?
21    A.  Mostly directing where the communication was going to go.
22    So if he were to find out something from either a client or
23    from the CRO side of the business, then typically he would be
24    receiving that and directing it to whatever department needed
25    to do the investigation particularly.
```

```
 1    Q.  At some point did you learn that Dr. Menninger was taking
 2    leave from her role as executive director of labs?
 3    A.  I did.
 4    Q.  Showing you a document that's Agreed Exhibit 287.  This
 5    is an e-mail from Megan Groat, who you saw in that
 6    organizational chart.  And this is from June 5th of 2018.
 7         Do you have a recollection of receiving this
 8    e-mail, Chris?
 9    A.  Yes.
10    Q.  And looking at this e-mail, this came from Mr. Mekerri,
11    and it looks like it went to a very long list of folks
12    working in the lab business; is that right?
13    A.  Yeah, virtually everyone.
14    Q.  And from your standpoint in your role, what impact did it
15    have for you to receive this e-mail on June 5th?
16    A.  So my immediate thought would have been, you know, what
17    gaps are we going to have to fill, right, to keep things
18    going.  I think, you know, having Dr. Reddy on there from the
19    technical lab inquiries piece, that was fine.  But there were
20    probably other things that we would need to consider.
21    Q.  And you've testified this morning that at some point
22    after you were the site head, as indicated in this exhibit,
23    Mr. Mekerri left and you took over that role, correct?
24    A.  Correct.
25    Q.  What -- based on your experience working in Central Labs
```

1   for 17 years, what is the role of the executive director of

2   the lab itself, the medical director?

3   **A.**  First and foremost, right, is to oversee the lab with

4   regard to the licensures.  So you're talking about CAP, CLIA,

5   iso, New York State, probably some interactions with the

6   Ministry of Health in Asia Pacific and some of those places.

7   So that is their primary focus.  They're also really -- they

8   have to set the reference ranges.  Reference ranges are is

9   your blood level normal or not.  So if you get something back

10  on your cholesterol or your glucose, whatever you see on your

11  lab report, there's a little range there that tells you are

12  you normal or not.  And they set those reference ranges and

13  evaluate those.

14          And then beyond that, the day-to-day operations of

15  the lab, making sure that everything is running smoothly.

16          And then, really, the other piece of this is

17  interacting with the clients to make sure that we have

18  line-of-sight to what their pipeline is.  So oftentimes

19  you'll meet with clients and we'll say, "Okay.  This is the

20  test that we have," and capabilities meeting.

21          And they'll say, "But we need you to bring up test

22  X, Y, and Z."

23          And we would evaluate that and say, well, does it

24  make sense to bring that up?  Do we subcontract that out

25  through a different lab?  If we do decide to bring that up,

1   and they're hoping to get that implemented, but having to

2   have that conversation on why we would need that.

3           Oftentimes there's a lot of scientific discussions,

4   and discussions that most people aren't going to pay

5   attention to from the clinical relevance to that, as far as

6   what they're bringing up.  But those types of things are

7   happening on a daily basis with the lab director.

8   Q.  And you described earlier --

9           THE COURT:  I'll stop you here.  We'll take the

10  morning break.

11          All rise for the jury.

12          (The jury exits the courtroom.)

13          THE COURT:  How much longer do you have?

14          MS. MANDEL:  A few moments.

15          THE COURT:  Okay.  And you?

16          MR. HANNON:  Five to ten.

17          THE COURT:  Okay.  So we'll take a break.  We'll

18  bring them back.  We'll finish with this witness.  That's it

19  for today, right?

20          MR. HANNON:  We have a jury question.

21          THE COURT:  So they would like to know why is PPD

22  HR CCed on this e-mail thread?  That's their question.

23          MS. MANDEL:  Did they say which e-mail thread?

24          THE COURT:  No.  You can look at it, but that's

25  just what it says.

```
 1              MR. HANNON:  I know what they're referring to.

 2              THE COURT:  But when they come back, I'll tell them

 3    I gave it to all of you, and you'll follow up as you wish on

 4    that.

 5              MS. MANDEL:  Let me make sure I heard correctly.

 6    Why was HR CCed, or why were they not CCed?

 7              THE COURT:  Why was HR CCed.  So I'll tell them

 8    we're done for the day, we'll go home.  I'll tell them

 9    tomorrow we have two witnesses.  One more witness for you,

10    which is your damage expert.  And then you anticipate that's

11    the end of your evidence, and then you anticipate one

12    additional witness, which is your medical expert, right,

13    Ms. Mandel?

14              MS. MANDEL:  Yes.

15              THE COURT:  And then that that will be the end of

16    the evidence tomorrow, and it could be a shorter day

17    tomorrow.  And I'll explain to them I have to do -- I have to

18    go over the instructions with you, I can't finish them until

19    we're done with the evidence, then we'll have closing

20    argument and charge on Friday, and they'll begin

21    deliberations on Friday.

22              All right.  Anything else?

23              MR. HANNON:  May we hear who the juror was that

24    provided the note?

25              THE DEPUTY CLERK:  It is the juror in the second
```

```
 1    seat in the front row, number 35.

 2              THE COURT:  It's not signed, but that is the person

 3    that gave it to her.

 4              All right.  Anything else?  And the note that came

 5    up, you had it, Ms. Mandel, which is fine, but did you give

 6    it back?

 7              MS. MANDEL:  I believe I returned it.

 8              THE COURT:  Okay.  Perfect.  And you can look at

 9    this one if you want, but then give it back to Ms. Belmont.

10              All right.  We'll stand in recess for 15 minutes.

11              (Court in recess at 11:17 a.m.

12              and reconvened at 11:31 a.m.)

13              THE COURT:  Kellyann, you can go get the jury.

14              (The jury enters the courtroom.)

15              THE COURT:  I passed along your question to the

16    lawyer, the lawyer -- the one you handed up as you were

17    walking out, and one or both of the lawyers will follow up on

18    that.

19    BY MS. MANDEL:

20    Q.  Chris, before we took a break --

21              THE COURT:  Just for everyone else, because they

22    might not have read it, the question was why was the HR

23    director or the HR person CCed on this e-mail.

24    BY MS. MANDEL:

25    Q.  Before we took a break, Chris, we looked at a couple of
```

1   e-mails, and we're going to look back at them to talk about

2   the question that's just come up.

3                   First looking at Exhibit 287, this is the

4   announcement message that came from Mr. Mekerri -- actually,

5   sent by Megan Groat, but the message was from Mr. Mekerri.

6   Do you see that in front of you?

7   **A.**  Yes.

8   **Q.**  And as we mentioned, we looked at this document, and

9   there are a lot of people that are listed in the "to" line

10  and the "CC" line.  That's where we found your name.  Do you

11  see that?

12  **A.**  Yes.

13  **Q.**  And in addition to your name in the CC line, I see Chad

14  St. John?

15  **A.**  Yes.

16  **Q.**  And Chad St. John worked in HR?

17  **A.**  Correct.

18                  THE COURT:  Keep your voice up.

19                  THE WITNESS:  Sorry.

20                  THE COURT:  No problem.

21  BY MS. MANDEL:

22  **Q.**  In your experience with PPD, did HR typically partner

23  with the business on things like staffing?

24  **A.**  Yeah, they partnered on the business related to

25  everything.  So they were involved in all the senior

```
 1   leadership team meetings.
 2   Q.  And so --
 3           THE JUROR:  Hold on.  That's not the e-mail.
 4           THE COURT:  That's not the e-mail.  Which e-mail is
 5   the one you --
 6           THE JUROR:  The prior document.
 7           MS. MANDEL:  We'll look at that one, too.
 8           THE COURT:  Fine.  Go ahead.
 9   BY MS. MANDEL:
10   Q.  And is it your understanding, Chris, that that's why Chad
11   would have been copied on an e-mail like this?
12   A.  Correct.
13   Q.  Okay.  And we'll bring up the other e-mail that we looked
14   at, as well.  And this is -- sorry, I'll bring this up so you
15   can actually see it better.
16           This is the e-mail that we looked at from May of
17   2018.  Do you recall that, Chris?
18   A.  Correct.  Yes.
19   Q.  And if you look down at the e-mail from May -- May 14th,
20   it starts kind of halfway down the page.  This is from Mr.
21   Mekerri and this went to you and Els Pluymers and to
22   Dr. Menninger.  Do you see that?
23   A.  Yes.
24   Q.  And it copied a number of people, Brent McKinnon, who
25   worked in quality; is that right?
```

```
 1   A.   Yes.

 2   Q.   And Kathy Dick also worked in quality?

 3   A.   Yes.

 4   Q.   And it copied Mr. St. John in HR.  Do you see that?

 5   A.   Yes.

 6   Q.   What is your understanding, having received this e-mail

 7   in May of 2018, as to why Mr. Mekerri would have included

 8   Chad St. John from HR in this type of communication?

 9   A.   In general, you know, I think that HR is copied because

10   they're involved in all of the aspects of business, and if

11   there's any accountability issues, then they're copied in on

12   it.  Or if there's announcements for large announcements that

13   are going out regarding staffing changes, or those types of

14   things, they were frequently copied on e-mails.

15   Q.   And you testified that you now hold the role that is, you

16   know, roughly equivalent to the one that Mr. Mekerri held?

17   A.   Correct.

18   Q.   And in your role, do you send out e-mails to your staff

19   about being accountable for issues that come up?

20   A.   Yes.

21   Q.   And when you send out those e-mails, do you at times

22   include HR, as well?

23   A.   Yes.

24   Q.   And is that for the reasons that you've just described

25   around accountability?
```

1    **A.**   Yeah, for accountability, and for, you know, just general

2    awareness.

3    **Q.**   Before we took a break, you were talking about what the

4    ED of labs, executive director of labs does.

5           Do you recall that?

6    **A.**   Yes.

7    **Q.**   And earlier this morning, you also testified about the

8    executive director of labs having an increased role with

9    regard to business development.

10           Do you recall that?

11   **A.**   Yes.

12   **Q.**   Is that still something today that you expect of the

13   executive director of labs?

14   **A.**   Yes.

15   **Q.**   And why is that?

16   **A.**   Well, it's really because there's an expectation from our

17   clients, right, that they have that interaction with our

18   executive director of the labs, and the people that hold

19   those scientific certificates.  So those interactions can be

20   of a couple of levels.  One, is there a scientific aspect

21   that we need to discuss and what that looks like, or are

22   there particular tests that we want you to bring up or

23   particular platforms.  Without giving any details, there's a

24   recent example where I've just added two new platforms to the

25   testing that we're doing, that were both client requests that

```
 1    Dr. Kashlan brought to me and said, hey, talking to this
 2    client, they want us to do this, thought it warrants this
 3    much work.  Are you willing to purchase the equipment?  Sure.
 4    So you know, those are the types of things where he's -- he's
 5    doing that unilaterally, right?  A lot of times having those
 6    conversations, or in the context of some of these larger
 7    meetings with bid defenses or capabilities meetings, and then
 8    he's bringing that back to me and saying this is what I think
 9    we need to do, and by the way, here's what diseases that
10    we're seeing are kind of hot, so this is where we need to --
11    what space we need to play in.
12    Q.   And you just mentioned the bid defenses, the client
13    meetings around bid defenses; is that right?
14    A.   Uh-huh.
15    Q.   And is that something that Dr. Kashlan is involved in?
16    A.   Yes.
17    Q.   And why is that specifically still important to the
18    business now?
19    A.   Because he has to assess that from a scientific level,
20    and the testing from a clinical pathology, right?  So if
21    you're looking at we oftentimes, when we're going into these
22    bid defenses or operational meetings that we're kind of
23    giving, you know, our spiel, as it were, he kind of knows --
24    he's done the research on what the clients, what space that
25    they're working in.  And so he brings that to the
```

 1    conversation and says, well, what about this platform?  Or
 2    they may have questions, if it's in an actual bid defense
 3    where they're saying, well, we typically want to run it on
 4    this platform, so you know, without getting into the minutia,
 5    right?  There could be two or three different platforms that
 6    you would run cholesterol on.  Well, which one is best,
 7    right, or which one is germane to your study.  Which one --
 8    so you know, there's all those types of those conversations.
 9    They may say, well, we typically run it on this platform, how
10    does that correlate with your platform.  And so he adds those
11    types of pieces of information to this discussion.
12    **Q.**  And understanding that there's been a global pandemic in
13    the interim, has that been something that Dr. Kashlan has
14    done pretty consistently since he started in 2019?
15    **A.**  Yeah, for all -- well, through 2019, prior to the
16    pandemic, he was definitely, you know, having those
17    conversations with clients.  And then certainly during the
18    pandemic, it was a mad scramble, right, to say, well, what
19    platforms are we using?  We were talking to platform
20    manufacturers.  We were talking to -- there were many levels
21    of discussions that were happening there to talk to the
22    clients.  Well, which one is the gold standard for the
23    testing.  And so all of that around COVID was, you know,
24    really conversations that he was having with the clients.
25    **Q.**  And during that same time period, has Dr. Kashlan

1   continued to give presentations within the company, as well?

2   **A.**   Yeah.  So we have -- so there -- everybody has to come to

3   the senior leadership team meetings.  We have folks that are,

4   you know -- that are part of those discussions.  A lot of the

5   stuff now is around financial -- you know, looking at the

6   financials of each department.  And so as you're -- he's

7   participating in all of those.  And of course, he's hosting

8   CAP inspections, those types of things, you know, both here

9   and abroad.

10  **Q.**   And all of those types of presentations that you've just

11  described, do you view those as critical parts of

12  Dr. Kashlan's job?

13  **A.**   Yeah.

14  **Q.**   And why is that?

15  **A.**   Well, it's important for the business, right?  So not

16  only is he fulfilling the medical licensure piece of it, but

17  he's contributing to the growth of the business, which is

18  kind of all what we're accountable for, right?  You all have

19  to be accountable for having those interactions, making those

20  connections with clients, figuring out where do we need to be

21  next, and driving the business forward.

22  **Q.**   I believe you testified earlier that Dr. Kashlan

23  relocated from California when he came to PPD?

24  **A.**   He did.

25  **Q.**   And that was in 2019 you said?

1    **A.**  I believe so.  Yeah, 2019.

2    **Q.**  Since Dr. Kashlan began working at PPD in 2019, has he

3    ever worked from a different location?

4    **A.**  No, he's always worked out of that office.  Other than,

5    and I'll clarify, during COVID there was some restrictions

6    that we put in place in the lab for infection control, and so

7    we had people on and off site.

8    **Q.**  And even during that time period, was Dr. Kashlan on site

9    with some regularity?

10    **A.**  Yes.

11    **Q.**  And why was that?

12    **A.**  A couple reasons.  Number one, I think that it was

13    important -- so just from a general management standpoint,

14    it's really important that the people, and especially during

15    COVID, we were asking the boots-on-the-ground people, so that

16    would be your med techs, your lab people, sample management,

17    those folks, again, there's no second chances, COVID or no

18    COVID.

19            You had patient samples coming in that had to be

20    tested.  These people were relying on us to provide them with

21    test results for their care and their management of that

22    care.  So when you're asking all of your people to come in

23    every day, all day, and be there, it's important for them to

24    see leadership there, as well.  Right?  They need to know

25    that the kind of the head of the whole thing is leading them

1  through this.

2          So otherwise, you end up with a situation where,

3  you know, you're going to end up with a lot of turn over,

4  because people don't see that leadership is behind it.

5  There's no presence there.  So that -- that is a primary

6  focus.  And then, of course, all of the COVID discussions

7  that we were having with clients, right, and having, you

8  know, those interactions, as well.

9  **Q.**  And you said COVID discussions with clients.  What did

10  that entail?

11  **A.**  So, again, those were happening during the height of

12  COVID, it seemed like every day.  Maybe it was a little less

13  than that, but on a really constant basis, a couple times a

14  week, at least, you were having conversations about what

15  platforms, what test, what test was giving you the best

16  result, which one had the best sensitivity.  So all of these

17  tests and these, you know, vaccine programs that were gearing

18  up, you had to provide testing for those.  And so there was a

19  lot of discussions with clients about, well, what does that

20  look like?  And so there's also the piece where he would be

21  having those conversation not only with the client about how

22  does this work, but he would also have to talk to the lab

23  staff and go, okay, well, if we brought in this --

24          And we brought in probably four or five different

25  pieces of equipment during COVID, where are we going to put

1    it, how is that going to impact workflow?  How do you guys

2    feel about this?  So he's having those types of discussions

3    with the staff training around the instrumentation.  Most of

4    that was happening in molecular, which is high complexity

5    testing.  It's not as simple as throwing it on a machine and

6    you get your glucose and your liver and cholesterol results.

7    It's a lot more complex.  So there was a lot of that type of

8    stuff that was going on and it means having meetings

9    internally with folks on the lab staff.

10   **Q.**  In light of what you've just described, in your current

11   role, would you be open to the idea of a medical director not

12   working on site on a daily basis in Highland Heights?

13   **A.**  I wouldn't.

14   **Q.**  And at any point from when you took over that role in

15   2019 to now, has there been a situation where you haven't had

16   a medical director on site with some regularity?

17   **A.**  No.

18   **Q.**  Thinking back to 2018 and your role being a little bit

19   different at that time, do you recall how the lab's

20   accreditation -- I know you've mentioned CAP, and ISO, and

21   New York State.  Do you recall how the lab's accreditation

22   was handled from the time that Dr. Menninger began medical

23   leave in 2018 and the time that Dr. Kashlan came on board in

24   2019?

25   **A.**  Yeah, so Dr. Reddy, Paul Reddy was kind of posted up for

1  those positions.  So he was credentialed enough to hold CAP

2  and get a spy on the CLIA stuff.  He was not credentialed

3  enough to do the New York State.  So in those scenarios, I

4  think a lot of those organizations are -- I won't say

5  forgiving, but they give you a bit of a grace period, right?

6  They know sometimes these types of things happen.  And so

7  they -- they will give you a period to say, okay, we

8  understand.  You had somebody leave.  We do expect you to get

9  this up to snuff, you know, over the next six months, or

10  whatever that is, and then they'll allow that.

11         So he was enough for the interim piece of that, but

12  we were still on the hunt for making sure that we would have

13  everybody that would cover all of those bases.

14  Q.  And I know you talked about that sort of grace period.

15  If an accrediting organization, whether it's New York State

16  or ISO, CAP, any of those, determined that Central Lab was

17  not in compliance with its requirements around having a lab

18  director, could that result in the loss of accreditation?

19  A.  It could, yes.

20  Q.  What would that mean for the business?

21  A.  It would shut it down.  Just based on the one CLIA, so

22  CLIA is governed by the CDC, and it's mostly a US

23  organization.  Having that accreditation and licensure allows

24  you as a lab to report out diagnostic samples, right?  So

25  you're doing those samples, you're reporting out those tests

1    for clinicians or the doctors to make assessments about their

2    patient.  If you don't have that, it all goes full stop,

3    right?

4              So luckily, they have a lot of conversation with

5    you, and they want to know how you're going to manage that

6    and get through it.  But if they -- push came to shove and

7    they wanted to say, "That's it," it would be full stop.

8    **Q.**  "Full stop" meaning shut down Central Labs' business?

9    **A.**  Correct.

10   **Q.**  Have you spoken with Dr. Kashlan about hiring someone

11   else to work in lab leadership who can also carry that

12   licensure?

13   **A.**  Yeah.  So one of the things that we consistently do in

14   the organization is we have the conversation about succession

15   planning.  So there's often a yearly conversation about, hey,

16   if you were to win -- I think usually the way that HR puts it

17   to me is, if you were to win the lottery tomorrow, who would

18   we put in your place?  And so we do that across the

19   organization.

20             So I've had that conversation with Dr. Kashlan, and

21   we are looking for somebody to bring in and have as a

22   secondary level to him.

23   **Q.**  Does that mean you're looking to remove Dr. Kashlan from

24   his role?

25   **A.**  No.

```
 1   Q.  Why would you having that conversation if you're not
 2   planning to remove him from the role?
 3   A.  Because anything can happen.  You have to be prepared
 4   for -- you have to have contingency plans, whether it's my
 5   role, any one of the other leaders' roles that we saw.  You
 6   have to have contingency.
 7           Specifically you have to have a contingency around
 8   that one.  Because that -- so could I be replaced?  Yes.
 9   Could a lot of the other folks be replaced in those roles?
10   Yes.  But that role is absolutely critical, because it's the
11   core of your business.  You can't report results, you can't
12   run the tests and get those out without having that role
13   covered.
14   Q.  So would this be like if my firm tries to find a backup
15   for me, since I'm a Massachusetts licensed attorney, they
16   want to be prepared?
17   A.  Yeah.  Only on steroids.  Right?  Because, again, my role
18   or somebody else's role is less -- if I'm being honest, is
19   less important than that medical director role.  That is the
20   key to how we run the entire operation is having that
21   licensure.
22           MS. MANDEL:  Thank you.  I have no further
23   questions at this time.
24           THE COURT:  All right.  Any redirect?
25           MR. HANNON:  Yes, Your Honor.
```

1      **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

2    BY MR. HANNON:

3    **Q.**  Mr. Clendening, let's start in February of 2018.  It was

4    in February of 2018 that you received that e-mail from

5    Mr. St. John that contained Dr. Menninger's request for

6    accommodation, right?

7    **A.**  Yeah.  I don't recall receiving it, but, yes, that was

8    the date on the document.

9    **Q.**  Well, let me show it to you, just so we're all on the

10   same page here?

11           MS. MANDEL:  Objection.  Scope.

12           MR. HANNON:  She covered this.

13           THE COURT:  Overruled.

14   BY MR. HANNON:

15   **Q.**  All right.  So we see here an e-mail from Mr. St. John to

16   you, yes?

17   **A.**  Correct.

18   **Q.**  That's your e-mail address?

19   **A.**  Yes.

20   **Q.**  Didn't make any mistakes in spelling it out?

21   **A.**  No.

22   **Q.**  You see there, this was sent just a few hours after

23   Mr. St. John had received it, right?

24   **A.**  Yes.

25   **Q.**  Okay.  And looking at the attachment, do you see here

1  it's something from a Dr. Marianna Kessimian.  Do you see

2  that?

3  **A.**  I do.

4  **Q.**  Yes?

5       MS. MANDEL:  Objection to scope.  This is beyond

6  anything --

7       THE COURT:  I don't think it was.  I think that you

8  didn't examine him about this specific e-mail, but I think

9  the topic came up.  So overruled.

10  BY MR. HANNON:

11  **Q.**  Was it part of your ordinary day --

12       THE COURT:  Just so you know, ladies and gentlemen,

13  so scope is, on redirect, Mr. Hannon -- the general rule is

14  Mr. Hannon is not allowed to go into topics that weren't gone

15  into by Ms. Mandel.  So that's why the objection -- and in

16  fact, as I'll tell you at the end, lawyers have a duty to

17  object.  They're supposed to object.  And the fact that they

18  object, you shouldn't infer anything from them.  And you

19  shouldn't -- other than the resolution of how I resolve it,

20  so either it's allowed or it's not allowed, but what it

21  means, it doesn't mean anything about either side, and you

22  don't infer anything about that.

23       So go ahead.

24  BY MR. HANNON:

25  **Q.**  Sir, in February of 2018, was it normal for you to

1    receive documents like this in your e-mail?

2    **A.**   No.

3    **Q.**   Fair to say that if you had read this in February of

4    2018, this was something that would have stuck out in your

5    memory?

6    **A.**   Yeah.

7    **Q.**   Okay.  And subsequent to receiving this document from

8    Mr. St. John, you were aware that there were efforts to try

9    to find people to replace Dr. Menninger, isn't that right?

10   **A.**   I don't know that it was to replace, but I know that it

11   was at least to have additional people.

12   **Q.**   And not just to have additional people, but to have

13   additional people who could fill her spot if she left,

14   correct?

15   **A.**   Correct.

16   **Q.**   Okay.  And you were involved in those discussions,

17   weren't you?

18   **A.**   In general, yeah.

19   **Q.**   Okay.  And when you were involved in those discussions,

20   you knew why they were happening, right?

21   **A.**   My understanding at the time as to why they were

22   happening is because of her not being on site.

23   **Q.**   Okay.

24   **A.**   Not with regard to this.

25   **Q.**   Well, sir, she stopped being on site in June of 2017,

1   right?

2   **A.** I don't know when she -- well, whenever that -- I

3   actually don't recall what the exact date was.

4   **Q.** It was months before you got that e-mail from Mr. St.

5   John in February, wasn't it?

6   **A.** I don't recall that.

7   **Q.** And then, sir, you learned that at some point

8   Dr. Menninger, she caught wind of the fact that PPD was

9   looking for people to potentially fill her spot.  Isn't that

10  right?

11  **A.** I never had that discussion with her.

12  **Q.** You didn't learn that she complained about that?

13  **A.** I did not.

14  **Q.** And then in May of 2018, Dr. Menninger, she sent out an

15  e-mail noting some specific areas where she thought PPD

16  should try to fill the gaps.  Isn't that right?

17  **A.** I don't recall.  If you have a copy of that e-mail, I'm

18  happy to take a look at it, but I don't recall.

19  **Q.** Sure thing.  I'm going to show you Joint Exhibit 106.

20          So this is an e-mail on June 1, 2018, from Chad St.

21  John, do you see that?

22  **A.** Yes.

23  **Q.** And that's to Jerry Williams.  Do you know who he is?

24  **A.** Yes.

25  **Q.** He was the head of HR back then, right?

1   **A.**  Correct.

2   **Q.**  Okay.  And if you look there in the subject, I'm sorry,

3   in the attachment line, you'll see a familiar name.

4   **A.**  Yes.

5   **Q.**  That's the resume of Basel Kashlan, right?

6   **A.**  Correct.

7   **Q.**  He was the gentleman who was eventually hired to replace

8   Dr. Menninger, correct?

9   **A.**  Correct.

10  **Q.**  Okay.  Let's take a look at how this e-mail chain began.

11          I'm sorry.  I went too fast.

12          So I'm showing you now the 12th page of the

13  exhibit, which has the stamp 809 in the bottom right-hand

14  corner.

15          Do you see that, Dr. Menninger, she had sent an

16  e-mail out on May 16, 2018.  Do you see that?

17  **A.**  Yes.

18  **Q.**  Okay.  And this was an e-mail that she sent to Mr. St.

19  John, copying you and Mr. Mekerri, right?

20  **A.**  Yes.

21  **Q.**  Okay.  And she identified some specific areas where she

22  thought there were compliance gaps; isn't that right?

23  **A.**  I don't know that these are compliance gaps, but whether

24  or not that was the intent, it appears to me she was making

25  recommendations on who we would need to cover some of these

```
 1   areas.

 2   Q.  And she's making specific reference to flow cytometry and

 3   microbiology.  Do you see that?

 4   A.  Yes.

 5   Q.  Okay.  And when you got this e-mail, you saw an

 6   opportunity, didn't you?

 7   A.  An opportunity for what?

 8   Q.  An opportunity for PPD to move forward with hiring an

 9   individual to replace Dr. Menninger?

10   A.  I would read that as hey, this is where we have gaps, and

11   we would need to fill those.

12   Q.  So this e-mail is May 16, 2018.  Do you see that?

13   A.  Yes.

14   Q.  Okay.  I'm now going to show you an e-mail from the

15   following day, Joint Exhibit 290.  And it's the bottom of the

16   page here, so you see an e-mail there from you?

17   A.  Yes.

18   Q.  On May 16th.  Do you see that?

19   A.  Yeah, I don't see the bottom page.

20   Q.  Go to the next page here.  We'll look at the message.

21   And the subject is "AP and flow."  Do you see that?

22   A.  Yes.

23   Q.  And this is an e-mail to Mr. Mekerri and Mr. St. John; is

24   that right?

25   A.  Correct.
```

| 1 | **Q.** You didn't include Dr. Menninger in this e-mail, did you? |
| 2 | **A.** No. |
| 3 | **Q.** Why not? |
| 4 | **A.** I don't recall. |
| 5 | **Q.** Let's look at what you wrote. |
| 6 | **A.** "Neo would have both. We could potentially bake that |
| 7 | into our agreement to serve as our licensure that we can." |
| 8 | So -- |
| 9 | **Q.** Let me ask you a question, if we may. Can you tell us |
| 10 | what that reference, "our agreement to serve as licensure" |
| 11 | refers to? |
| 12 | **A.** So for -- during this period of time, AP and flow, so AP |
| 13 | is anatomical pathology, right? That's oncology types of |
| 14 | studies. And if I remember correctly, and I'd have to look |
| 15 | for these dates, but there -- we had another person that was |
| 16 | on board, Patrick Mann, that was helping on the AP side of |
| 17 | things. He also subsequently left, and so we had a gap |
| 18 | across the board for anatomical pathology and flow cytometry. |
| 19 | NEO is a reference to Neo Genomics, which is a third party |
| 20 | lab that we could use, right, to do those types of services. |
| 21 | **Q.** And your reference at the end of "then we can --" |
| 22 | Can you finish that sentence for us? |
| 23 | **A.** I can't. |
| 24 | **Q.** Looking back at the next page and the reference |
| 25 | is, "Looping in Lisa;" is that right? |

1    **A.**   That's correct.

2    **Q.**   Okay.  And he notes that cost is the question, right?

3    **A.**   Yeah.  It's always a question.

4    **Q.**   And, in fact, looking back at the e-mail from a moment

5    ago that attached Mr. Kashlan's -- I'll show you Joint

6    Exhibit 106 again.  So this was the e-mail from a moment ago

7    that attaches Mr. Kashlan's resume; is that right?

8    **A.**   Yes.

9    **Q.**   Okay.  And Mr. Kashlan, as of this time, his most recent

10   experience, am I right, he had recently served as a medical

11   director?

12   **A.**   Yeah, I believe that's correct.

13   **Q.**   That was his background?

14   **A.**   Yes.

15   **Q.**   And as of this date, as of June 1, 2018, you'll see that

16   Mr. St. John reports that Mr. Mekerri had sent an e-mail

17   authorizing the funds to proceed; is that right?

18   **A.**   Yeah.  I'm assuming to recruit him.

19   **Q.**   Okay.  And you've testified today that Mr. Kashlan did

20   not start until 2019; is that right?

21   **A.**   Correct.

22   **Q.**   Okay.  I'd like to show you something here and see if it

23   refreshes your recollection as to that.

24           MR. HANNON:  Ms. Belmont, this is not in evidence.

25           And I'm just going to scroll down here, sir.

```
 1              THE COURT:  Just read it to yourself.
 2    BY MR. HANNON:
 3    Q.  Have you reviewed the document, sir?
 4    A.  Yes.
 5    Q.  Okay.  Does that refresh your recollection as to when
 6    Mr. Kashlan started?
 7    A.  No.  It's a LinkedIn profile.
 8    Q.  It doesn't refresh your recollection that he started in
 9    2018?
10    A.  No, it's a LinkedIn profile.  I don't -- I mean, my -- my
11    linked in profile dates are probably subject -- I don't --
12    that's not controlled by the organization.
13    Q.  You mentioned earlier that you had concerns about
14    Dr. Menninger working remotely.  Did I hear that correctly?
15    A.  Yes.
16    Q.  I'm going to show you Joint Exhibit 392.  And I
17    appreciate you're not on this document here, but I just
18    wanted to show you something and see if you agree with it.
19              I highlighted the wrong part.  I'm sorry.
20              Mr. St. John wrote, "Lisa has also shared with all
21    CL key stakeholders that she will be moving to the Providence
22    area/New England region for compelling personal reasons the
23    weekend of the June 24th.  No concerns regarding her physical
24    move have been expressed or detected at this time."
25              Do you see that?
```

1    **A.** Yes, I see that.

2    **Q.** Okay. And you see Mr. Mekerri is included on this

3    e-mail; is that right?

4    **A.** That's correct.

5    **Q.** And is it your testimony today that this e-mail is not

6    accurate?

7    **A.** I expressed my concerns directly to Mr. Mekerri. So what

8    Chad knew at that time, I don't know.

9    **Q.** Okay. But your testimony is that Mr. Mekerri knew of

10   your concerns at this time; is that right?

11   **A.** Sure.

12   **Q.** Okay. Do you have any reason to suspect that Mr. Mekerri

13   would have kept that from Mr. St. John?

14   **A.** I don't know that he would keep it from him, but I don't

15   know that he would communicate it, either.

16   **Q.** Well, you told us earlier in looking at one of the later

17   e-mails about how it was routine for Mr. Mekerri to share

18   information with Mr. St. John, right?

19   **A.** Yeah.

20   **Q.** If a problem arose in the lab, I think your testimony was

21   that he would keep Mr. St. John in the loop, right?

22   **A.** Correct.

23   **Q.** If one of Mr. Mekerri's senior leaders had serious

24   concerns about Dr. Menninger working remotely, do you think

25   that's something he would have shared with Mr. St. John, as

1  well?

2  **A.**  I can't speak to that.

3  **Q.**  With respect to the importance of being on site in

4  Highland Heights, there was some staff changed being made in

5  connection with Dr. Menninger's departure, right?

6  **A.**  Excuse me.  Repeat it?

7  **Q.**  I shouldn't have said "departure."  There were some staff

8  changes being made in connection with Dr. Menninger taking on

9  remote status, right?

10  **A.**  Staff changes?

11  **Q.**  Yes.  Dr. Reddy, he took on the role of the -- of the

12  official CAP supervisor on site, right?

13  **A.**  Paul Reddy?

14  **Q.**  I'm sorry, Mr. Reddy, yes.

15  **A.**  Yes.

16  **Q.**  Okay.  And there was also an open supervisor that was

17  being recruited for, right?

18  **A.**  I don't recall if there was or not at that time.

19  **Q.**  You mentioned earlier someone by the name of Narine?

20  **A.**  Narine.

21  **Q.**  Can you pronounce her last name for us?

22  **A.**  Khachatryan.

23  **Q.**  Okay.  And Ms. Kachatryan?

24  **A.**  Yeah.

25  **Q.**  She was hired into that supervisor role, right?

1   **A.**   Correct.

2   **Q.**   Okay.  And that was early 2018.

3   **A.**   I don't recall the exact date.

4   **Q.**   Does that sound about right, early 2018?

5   **A.**   Roughly, yeah.

6   **Q.**   Okay.  And I think one of the things that you mentioned

7   in terms of your concerns about having Dr. Menninger not on

8   sight was the inability to brainstorm.  Did I hear that

9   right?

10  **A.**   Yeah.

11  **Q.**   Okay.  Did you and Dr. Menninger do lots of

12  brainstorming?

13  **A.**   I would stop in her office from time to time, yeah, and

14  discuss.

15  **Q.**   How frequently?

16  **A.**   I would say I was probably there once a week.

17  **Q.**   And were you able to pick up the phone and call her when

18  she wasn't on site?

19  **A.**   Typically, it's really hard when you're trying to -- you

20  know, a lot of these pop-ins, you're literally popping in.

21  So everybody's booked back to back most days.  So a lot of

22  times you were finding 15 minutes, 20 minutes here or there

23  to have discussions.

24  **Q.**   So you found it hard to pick up the phone then to walk

25  into her office?

```
 1    A.   No, I have no problem picking up the phone.  It's just
 2    harder to communicate and have those discussions.
 3    Q.   It was harder to have the communications over the phone?
 4    A.   Yeah.
 5    Q.   Okay.
 6    A.   For me, personally.  Yeah.
 7    Q.   Okay.  Is that a common problem for you?
 8    A.   No.  I mean, I -- usually, when you're doing a
 9    brainstorming type of session, you would like to have
10    everybody kind of in the same room, right?
11    Q.   Well, you were running a Global Lab, right, sir?
12    A.   Correct.
13    Q.   You never had everybody in the same room?
14    A.   That's correct.
15    Q.   In fact, you had responsibilities for labs all over the
16    world, right?
17    A.   Correct.
18    Q.   And sometimes you had to brainstorm with your direct
19    reports?
20    A.   Yes.
21    Q.   And sometimes you did it over the phone?
22    A.   Correct.
23    Q.   You talked a bit about business development.  In 2018,
24    you weren't in charge of business development, were you?
25    A.   No.
```

1   **Q.**   That was ran by Andy Supp; is that correct?

2   **A.**   In 2018?  Yes, I think that's correct.

3   **Q.**   Okay.  And one of the things you talked about Mr. Kashlan

4   doing now is he gets involved in bid defenses; is that right?

5   **A.**   Yes.

6   **Q.**   How often does he do those?

7   **A.**   Probably weekly.

8   **Q.**   Okay.  And you know that for sure, he does them weekly?

9   **A.**   Yeah, I think there's at least one a week, on either some

10  sort of capabilities or client facing meeting.

11  **Q.**   Are you involved in those?

12  **A.**   Some I am and some I'm not.

13  **Q.**   Okay.  How do you decide which ones you're involved in

14  versus which ones you're not?

15  **A.**   Typically it's whether or not, you know, they require me

16  to speak to any of the pieces -- so a lot of times they're

17  going to pull me in.  If I need to make a larger commitment.

18  Right?  So if we're going to commit to doing something that's

19  going to have some sort of financial impact or the way that

20  we typically do things, then they would call me in so that I

21  can relay that commitment to the client.

22  **Q.**   Okay.  So if they're in a client bid defense and they

23  need someone who's not in the room, they can pull them in?

24  **A.**   Oh, that rarely happens.  I mean, usually the people are

25  set up in advance.  It's not a hey, call -- phone a friend

 1    type of scenario.  You usually -- you have a cast of

 2    characters, everyone that's going in there.  You know roughly

 3    what's going to be discussed.  So typically they'll send you

 4    an agenda that right, that says these are the things that

 5    we're going to want to talk about.  And so then each kind of

 6    person is lined up to speak to those.

 7    **Q.**  So there's time to prepare, right?

 8    **A.**  Yeah.

 9    **Q.**  There's time to plan, right?

10    **A.**  Uh-huh.

11    **Q.**  Yes?

12    **A.**  Yes.

13    **Q.**  You can know in advance when these meetings are going to

14    take place?

15    **A.**  Yeah, usually you get about a one-, two-week period.

16    **Q.**  And you know what topics are going to be discussed?

17    **A.**  Yeah, typically slides aren't finalized until last

18    minute.  Usually you're seeing those the day of, or the day

19    before.

20    **Q.**  Well, that depends upon your work flow and how quick you

21    get the work done, right?

22    **A.**  Yeah, but I'm just telling you what it typically is.

23    That's how it usually pans out, that people are getting them

24    the day before.

25    **Q.**  Sure, I didn't ask that question, but that's fine.

```
 1              You can find out who's going to be there, right?
 2    A.   Yes.
 3    Q.   You know what time of day it's going to happen?
 4    A.   Yes.
 5    Q.   Okay.  And those are -- that's -- that's all information
 6    that you're able to communicate to Dr. Kashlan, right?
 7    A.   He's involved in all the prep meetings.  So there's
 8    multiple -- so nobody goes into these just cold, right?
 9    There's prep meetings that happen.  There will probably be
10    three, four, five prep meetings before the actual event.
11    Q.   And all of that is more time to plan, right?
12    A.   It's more time to discuss.  You're having discussions
13    with the whole group.  So the whole cast of players is there
14    to talk about how should we present this, what the flow
15    should be like, what is your section, what kind of
16    information do we need from you, right?  All of that is
17    happening.
18    Q.   Sure.  And might there be opportunities -- well,
19    actually, strike that.
20              The nature of these bid defense meetings, these
21    didn't suddenly change in 2018, did they?
22    A.   The nature of them?
23    Q.   Yes.
24    A.   Well, I think we went from -- we had more -- we brought
25    more people in from the business, rather than just a few key
```

1   players, right?

2   **Q.**   Okay.   But in terms of the type of subject matter that

3   was being covered in client bid defense, that stayed the

4   same?

5   **A.**   No, I don't think that is the case.   Because you would be

6   talking about, again, during that period, you're talking

7   about what new assays, what new functionality.   So it's not

8   just the lab, right?   There was a ton of new functionality

9   that you would have.   So you had to bring in those folks to

10  have those discussions, as opposed to this is kind of the way

11  that we always do it.   So prior to that, you know, it was a

12  more high touch, more integrated model.

13  **Q.**   Well, that depends upon the specific client bid defense,

14  right?

15  **A.**   No, that was our general structure.

16  **Q.**   Well, you're defending bids for different types of

17  projects, right?

18  **A.**   Correct.

19  **Q.**   So some of them would have different specializations?

20  **A.**   Yeah, but you covered every group.   So you didn't -- you

21  covered the Central Lab and every piece within the Central

22  Lab, not just one.   So there was never a time where you would

23  go in and say this is our project management, our project

24  design, our sample management and data management, without

25  including lab and all the other pieces.   So everybody was

```
 1   included.
 2   Q.  Sure.  There was never a time that you would not do that,
 3   right?
 4   A.  Right.  I mean -- because it's under the entire Central
 5   Lab umbrella.
 6   Q.  Sure.  And who is actually responsible for planning these
 7   client bid defense meetings?
 8   A.  A lot of times it falls on the business development
 9   person.
10   Q.  So it would be Andy Supp, right?
11   A.  Well, or one of the folks underneath Andy.  Because
12   they're all -- they're regional, right?  So they're going to
13   have a different region.  Somebody on the East Coast, that
14   person is going to be dealing with the East Coast.  You might
15   have one in Europe that's dealing with the ones in Europe.
16   Q.  Sure.  So if Andy Supp or his team thought that they
17   needed Dr. Menninger for a client bid defense, they would be
18   the ones reaching out to her, right?
19   A.  Yeah.
20   Q.  Okay.  To your knowledge, did they ever do that prior to
21   her taking medical leave from PPD?
22   A.  I would assume so.  I don't have direct knowledge at that
23   period of time of who they reached out to and who they
24   didn't.  But, again, everybody was -- everybody was getting
25   on these calls at that time.
```

1    **Q.**  You talked about an e-mail here, Joint Exhibit 291, which

2    is -- I'm going to show it to you.

3            So this is the e-mail that you looked at in

4    questioning for Ms. Mandel.  And we noted earlier that HR was

5    on Mr. Mekerri's e-mail on May 14, 2018.  Do you see that?

6    **A.**  Yup.

7    **Q.**  Okay.  This type of e-mail chain, it wasn't common for

8    Mr. Mekerri to include Mr. St. John on these e-mail chains,

9    was it?

10   **A.**  Yeah, it was common to include Mr. St. John.  He was part

11   of the senior leadership team.

12   **Q.**  Okay.  So if the jury is to look at other e-mails,

13   concerning other client issues throughout 2018, your

14   expectation is Mr. St. John is going to be on those, too?

15   **A.**  He may include him, he may not.  You know, depending on

16   what type of, whether it was minor, major, critical, what

17   Mr. Mekerri, as far as how he included people on that, I

18   mean, I -- I can't speculate on that.

19   **Q.**  I'm not asking you to speculate.  I'm trying to clarify

20   your testimony.  Is your testimony that it was common for

21   Mr. Mekerri to include Mr. St. John on e-mail correspondence

22   concerning the investigation of lab issues?

23   **A.**  Yeah.  Or other issues.

24   **Q.**  Okay.

25   **A.**  I don't know that it's specific to lab issues.  It would

1    be across the board.  So it could be in project management.

2    It could in data management.  Hacene was well-versed in data

3    management, so those would commonly come out.  So, yeah.

4    **Q.**  And it was typical for him to include Mr. St. John on

5    those?

6    **A.**  Depending on the gravity of the situation.

7    **Q.**  Okay.  You see here Dr. Menninger's response.

8    **A.**  Yes.

9    **Q.**  She writes, "Yes, I've been involved and was

10   corresponding with Jay about this issue last week.  We are

11   meeting daily while the root cause for the latest issue

12   involving improper sample storage temperature is under

13   investigation."

14          Do you see that?

15   **A.**  I do.

16   **Q.**  Was that accurate?

17   **A.**  I couldn't say whether she was meeting daily or not.

18   **Q.**  You don't have any insight into that?

19   **A.**  No.

20   **Q.**  Okay.  And she notes, "with respect to the meeting daily

21   while the root cause for the latest issue."

22          Do you see that?

23   **A.**  Yeah.

24   **Q.**  As of this point in time, am I right, that no root cause

25   had been identified yet?

1    **A.**   For this particular issue in 2018?

2    **Q.**   Yes.

3    **A.**   I would have to look at the log and the event to see if

4    it was resolved.

5    **Q.**   Okay.  This particular storage sample issue, do you

6    recall what the root cause of that was?

7    **A.**   I do not.

8    **Q.**   Okay.  Do you recall if it had something to do with the

9    design of the study?

10   **A.**   It could have.  There's multiple ways that this could

11   be -- that this could go, from a root cause standpoint.

12   **Q.**   Sir, was it your group that was involved in the design

13   study?

14   **A.**   My group would have been involved in designing studies.

15   **Q.**   Okay.  And your group would have been responsible for the

16   design study, right?

17   **A.**   Correct.

18   **Q.**   Okay.  So this could have been an error in your group?

19   **A.**   Could have been.

20   **Q.**   And this customer here, GSK, at some point in time, the

21   project manager on this study was replaced; is that right?

22   **A.**   I don't recall.

23   **Q.**   Were you the project manager for the GSK study?

24   **A.**   No.

25   **Q.**   Do you know who was?

1    **A.** I don't.

2    **Q.** Just one last bit here, sir. I'm going to show you a

3    document. And again, this is not a -- this is not an agreed

4    exhibit.

5                THE COURT: Not in evidence you mean?

6                MR. HANNON: So this is --

7                THE COURT: Mr. Hannon, not in evidence?

8                MR. HANNON: Correct. This is not in evidence as

9    of yet.

10               Let me get the letter here, just so we -- this is

11   AD.

12               Safe to show? Ms. Ballweg?

13               THE COURT: Yeah, you can show.

14               MR. HANNON: Okay. Great.

15   BY MR. HANNON:

16   **Q.** So Mr. Clendening, I see here -- I'm showing you a

17   document -- you see here this is dated November 9, 2018, yes?

18   **A.** Yes.

19   **Q.** Okay. And you see here, the document has a -- has a

20   verification by Deborah Ballweg. Do you see that?

21   **A.** Yes.

22   **Q.** Okay. You know who Ms. Ballweg is, right?

23   **A.** Yes.

24   **Q.** Okay. And you see here that her verification notes that

25   to the extent that she has personal knowledge of the facts

```
 1    that she's affirming under the penalty of perjury, that the
 2    facts are true and correct.  Do you see that?
 3    A.  Yes.
 4    Q.  Okay.  I want to direct your attention to one of the
 5    facts stated here.
 6              THE COURT:  Just highlight what you want to ask
 7    about.
 8              MR. HANNON:  I'm sorry, Your Honor?
 9              THE COURT:  Just highlight what you want to ask
10    about before you --
11              It goes on to the next page?
12              What's the question, without repeating what's in
13    the highlight?
14              MR. HANNON:  Well, trying to establish if he
15    believes that's accurate or he disagrees with it.
16              THE COURT:  Well, you can ask him just that.
17              MR. HANNON:  Okay.
18    BY MR. HANNON:
19    Q.  Sir, do you agree that as of November of 2019 -- I'm
20    sorry.  As of November 9, 2018, that PPD had --
21              MS. MANDEL:  Objection.
22              THE COURT:  No, you can just ask him -- that's not
23    what I said.  You can ask him whether he knows if that's
24    correct or not, that statement that you've highlighted for
25    him, without repeating the statement.
```

```
 1                    MR. HANNON:  Okay.
 2                    THE COURT:  You can read the statement.  You know
 3          what the statement is, but that document is not now in
 4          evidence.  And you haven't offered the document, so I don't
 5          think it would be proper to read the document as part of your
 6          question, and particularly after the questions you've already
 7          asked.  So I think you can just ask him what you want, what
 8          your question purports to want to know is whether he agrees
 9          that that's accurate or not.
10                    So he's read it.  You've seen what's highlighted?
11                    THE WITNESS:  It's hard to see because it's on two
12          separate pages.
13                    THE COURT:  So he'll show you the next page.
14                    So you've seen what's on this page and he'll show
15          you the next page.
16                    And then your question is, is that accurate, right?
17          If he knows.
18                    MR. HANNON:  Sure.
19          BY MR. HANNON:
20          Q.  Is that accurate?
21          A.  I don't recall if that's accurate.  I've never seen this
22          document before so I don't know.
23          Q.  Sure.  But the fact that it's there, if that were true,
24          that was something that you would know, right?
25          A.  Not necessarily.
```

```
 1              MR. HANNON:  Okay.  Your Honor, I'd offer --

 2              THE WITNESS:  What's the date on this?  November 9,

 3    2018?

 4              MR. HANNON:  Yeah.

 5              Your Honor, I offer this as an exhibit.

 6              MS. MANDEL:  We object, Your Honor.

 7              THE COURT:  There aren't any other questions to ask

 8    the witness about it, right?

 9              MR. HANNON:  No.

10              THE COURT:  All right.  I'll reserve on that, so I

11    can hear you without wasting the jury's time.

12              Are you offering the document or just that one

13    sentence.

14              MR. HANNON:  Just that portion will be fine.  If

15    they want the whole document, we'll have the whole document,

16    but I just need that one --

17              THE COURT:  Okay.  We'll talk about that after.

18              Any other -- so you don't have any more question of

19    the witness?

20              MR. HANNON:  I'm done.

21              THE COURT:  Do you have questions?

22              MS. MANDEL:  Just a couple.

23              THE COURT:  Go ahead.

24              **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

25    BY MS. MANDEL:
```

```
 1   Q.  Chris, in 2018, did you have any control over whether
 2   Dr. Menninger remained employed?
 3   A.  No.
 4   Q.  In fact, at any point when you worked with Dr. Menninger,
 5   did you have control over whether she remained employed?
 6   A.  No.
 7   Q.  In 2018, were you in charge of hiring a new medical
 8   director for Central Labs?
 9   A.  No.
10           MS. MANDEL:  No further questions, Your Honor.
11           THE COURT:  All right.  Thank you very much.
12   You're excused.
13           Am I right, so we have the two witnesses left?
14           MR. HANNON:  (Nods head.)
15           THE COURT:  And neither of them today.
16           So let me tell you where we are, ladies and
17   gentlemen, for the rest of the case.  So Mr. Hannon, on
18   behalf of Dr. Menninger, has one more witness.  That's your
19   damage expert, right?
20           MR. HANNON:  Economic damage expert.
21           THE COURT:  Economic damage expert, and that expert
22   is not available today.  So that's why we're not hearing from
23   them.  And after that, after he calls that witness, I expect
24   that that's the end of the presentation of his case.  And
25   then the defendants have one more witness to call, and that
```

1    witness is their medical expert, right?

2              MS. MANDEL:  Yes.

3              THE COURT:  All right.  And that witness also is

4    not available today.  Both of them are available tomorrow.

5    So today, we're done early.  So in terms of -- right.  It's

6    like being let out of school early, right?  So just to give

7    you the rest of the schedule.

8              So we're done today for the day.  Tomorrow we will

9    start at 9 a.m.  We'll have those two witnesses.  We'll

10   certainly be done with them by 1 o'clock.  That's my

11   expectation.  It's possible we will go right up to 1 o'clock.

12   It's possible we'll finish a little bit early.  Either way,

13   tomorrow will be just 9:00 to 1:00.  Friday, you'll come in

14   and we'll have closing arguments, my instructions on the law

15   to you, and you will begin your deliberations, so you should

16   anticipate staying all day.  So that's the schedule for the

17   rest of the case.

18             And just so you understand, part of the reason --

19   you might be thinking why don't we just go all day tomorrow,

20   Judge.  And so the reason is this, my instructions to you on

21   the law, I share with them before I share them with you, so

22   they can comment and give me suggestions or objections or

23   corrections, or all sorts of back and forth interaction, and

24   so I can't really do until I've heard all the evidence.  So

25   that happens, and we'll do that tomorrow after the evidence

```
 1    is done.  And then that's why the next day we'll have closing
 2    arguments and charge.  And it also gives the lawyers a chance
 3    to prepare better after the evidence is done for their
 4    closing arguments.
 5              All right.  Yes.
 6              THE JUROR:  How long do you expect closing
 7    arguments to be?
 8              THE COURT:  I would think that the closing
 9    arguments would be in the zone between 45 minutes for each of
10    them, give or take a little bit.  And I would think that my
11    instructions on the law to you would be about 45 minutes or
12    so.  So you could expect to get the case certainly before
13    lunch.  All right.  Okay.
14              All right.  Don't discuss the case among
15    yourselves, don't discuss it with anyone else.  Keep an open
16    mind.  You haven't heard all the evidence or my instructions
17    on the law.
18              All rise for the jury and thank very much for your
19    attention.
20              And no independent research.
21              (The jury exits the courtroom.)
22              THE COURT:  Okay.  So your argument is it's a
23    statement of a party opponent on a relevant matter as to when
24    they hired.  It's relevant to some of your theories, right?
25              MR. HANNON:  Correct.
```

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS

 3

 4    _____

 5    LISA MENNINGER,

 6           Plaintiff,                Civil Action No.
                                       1:19-cv-11441-LTS
 7         v.

 8    PPD DEVELOPMENT, L.P.,

 9           Defendant.

10    _____

11

12      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                      JURY TRIAL
                         Day 9

15

16

                   Thursday, March 30, 2023
17                      8:59 a.m.

18

19

20
      John J. Moakley United States Courthouse
21    Courtroom No. 13
      One Courthouse Way
22    Boston, Massachusetts

23
      Rachel M. Lopez, CRR
24    Official Court Reporter
      raeufp@gmail.com
25
```

**A P P E A R A N C E S**

On behalf of the Plaintiff:

    HARTLEY MICHON ROBB HANNON, LLP
    BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
    155 Seaport Boulevard
    2nd Floor
    Boston, Massachusetts  02210
    (617) 723-8000
    phannon@hmrhlaw.com
    hwatson@hmrhlaw.com


On behalf of the Defendant:

    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
    BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
    One Boston Place
    Suite 3500
    Boston, Massachusetts  02108
    (617) 994-5700
    rachel.mandel@ogletreedeakins.com
    patrick.curran@ogletreedeakins.com

**TABLE OF CONTENTS**


**TRIAL WITNESSES**


On behalf of the Plaintiff:                                        Page

BRUCE R. JONAS

        By Mr. Hannon                                               7

        By Mr. Curran                                              27

        By Mr. Hannon                                              44

MARTIN KELLY

        By Mr. Curran                                              54

        By Mr. Hannon                                              73




**EXHIBIT**


                                                            Admitted

Number 456                                                        46




**MISCELLANEOUS**


                                                                Page

Jury Charge Conference                                           109

```
 1                    P R O C E E D I N G S
 2              (In open court at 8:59 a.m.)
 3              THE COURT:  Ready to go?
 4              MR. HANNON:  Two quick things?
 5              THE COURT:  Yeah.
 6              MR. HANNON:  When we rest, Your Honor, we have a
 7   number of joint exhibits, as you know.  We've been showing
 8   some to the jury as we go.  Ms. Belmont has kind of kept
 9   track of those.  I'd like all of the joint exhibits in
10   evidence.  I'm not sure if I need to formally move for that.
11              THE COURT:  I think it's fine if you want to say
12   before you rest, that all of -- I will -- I think I said to
13   the jury at the beginning that the joint exhibits sort of all
14   are automatically in when you bring them up.  But I'll say
15   that the all -- well, you can just say we'd like to move all
16   of the joint exhibits into evidence, and then I'll say that
17   and I'll say to the jury the ones you've already referred to,
18   they're already in evidence.  These are other ones that are
19   all in evidence.  You'll have them all in the jury room.
20              MR. HANNON:  Okay.  And then there may be some
21   duplicates that we're going to work to try to take some junk
22   out.
23              THE COURT:  Sure.
24              MR. HANNON:  So we've talked to Ms. Belmont about
25   that, and so we'll address that prior to --
```

```
 1              THE COURT:  I don't think I need to tell the jury
 2    about them, but I think that makes sense to take out
 3    duplicates.
 4              MR. HANNON:  And then secondarily, this may require
 5    more time than we have, there's an issue regarding the
 6    collateral source doctrine which applies to Mr. Jonas's
 7    testimony; specifically, the disability benefits that
 8    Dr. Menninger receives and whether or not that counts as
 9    mitigation.
10              We suggest in our jury instruction that the jury
11    decide whether or not to apply those as mitigation.  The
12    Court hasn't included those.  And I'm just wondering if the
13    Court has already decided the position regarding collateral
14    source, if that's a --
15              THE COURT:  Your position is that -- there's no
16    dispute factually that she receives those benefits?
17              MR. HANNON:  Correct.
18              THE COURT:  And the question is whether -- your
19    position is what?
20              MR. HANNON:  Our position is that there's a sort of
21    threshold determination of whether or not to count those as
22    mitigation, essentially, to deduct that in determining her
23    harm.
24              THE COURT:  As the jury has a -- the right to
25    either -- let's say the jury, just to make it simple, came up
```

1    with a hundred dollars as harm, and her collateral benefits

2    were $12.

3              MR. HANNON:  Right.

4              THE COURT:  That the jury could make a -- they

5    could just say $100 in harm and ignore the 12, or they could

6    say we would like -- we view it as mitigation and therefore,

7    we're at $88?

8              MR. HANNON:  Correct.  And I think there's a fair

9    question whether that's a jury question or a question for the

10   Court.  So I -- I think the right answer is the jury decides,

11   but -- but anyhow, I just flag it because if Your Honor had

12   already made a determination on that, we can leave some stuff

13   out of the direct, but it sounds like the Court has not made

14   a determination on that, so it sounds like we should put

15   everything in now, and we'll address this --

16             THE COURT:  I think that makes sense.  Do you have

17   a view on this?

18             MR. CURRAN:  We think that that makes sense.  We

19   can address it later.

20             THE COURT:  Okay.  Fine.  Let's go get the jury.

21             (Jury present.)

22             THE COURT:  Good morning, ladies and gentlemen.  No

23   one discussed the case, no one did any independent research?

24             Good.

25             All right.  Mr. Hannon, call your next witness.

```
 1              MR. HANNON:  The plaintiff calls Bruce Jonas.
 2              THE DEPUTY CLERK:  If you could raise your right
 3        hand.
 4              (Witness duly sworn.)
 5              THE DEPUTY CLERK:  Can you please state your full
 6        name and spell your last name for the record.
 7              THE WITNESS:  Bruce Robert Jonas, J-o-n-a-s.
 8              MR. HANNON:  May I proceed, Your Honor?
 9              THE COURT:  Yes.
10                          BRUCE R. JONAS
11          having been duly sworn, testified as follows:
12              DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
13        BY MR. HANNON:
14        Q.  Good morning, Mr. Jonas.
15        A.  Good morning.
16        Q.  Could you please explain to the jury what you do for
17        work?
18        A.  I'm a CPA, and for the last 30 years, I've been doing
19        damage calculations for litigation matters, working with
20        attorneys.
21        Q.  Okay.  Were you retained by my firm in connection with
22        this matter to do an economic damage calculation?
23        A.  Yes, I was.
24        Q.  Okay.  Before talking about that, I wanted to talk a
25        little bit about your background.  Could you describe your
```

| | |
|---|---|
| 1 | educational background for the jury, please. |
| 2 | **A.**   I graduated from Hofstra University in 1969 with a BBA in |
| 3 | accounting.  That was the extent of my formal education.  I |
| 4 | did get my CPA certificate in the State of New York in 1972. |
| 5 | I went to work immediately for Peat Marwick Mitchell, which |
| 6 | is the predecessor of KPMG, one of the four big accounting |
| 7 | firms.  It was eight when I started. |
| 8 | And I -- at Peat Markwick, I was an auditor and I |
| 9 | was a consultant, and at that point, I started doing |
| 10 | litigation work about 1978. |
| 11 | **Q.**   Okay.  And after you started doing litigation work, would |
| 12 | that be sort of doing analysis in support of litigation |
| 13 | matters? |
| 14 | **A.**   That's correct. |
| 15 | **Q.**   Okay.  And did you continue to focus on that area going |
| 16 | forward? |
| 17 | **A.**   To the -- as much as I could control it, yes, I did. |
| 18 | **Q.**   Okay.  And at some point in time, did you start your own |
| 19 | firm? |
| 20 | **A.**   In 1991, I formed Jonas & Welsch with Donald Welsch, who |
| 21 | had been an associate of mine at Peat Marwick. |
| 22 | **Q.**   And for -- what did you do at Jonas & Welsch? |
| 23 | **A.**   Again, we did exclusively litigation support work.  Our |
| 24 | practice was pretty evenly split, revenue-wise, between |
| 25 | matters involving individuals, things like that wrongful |

1    death, personal injury, and labor matters; and the other side

2    was commercial, breach of contract, thing like that.

3    **Q.**  Okay.  Any particular split between representing or

4    working on behalf of plaintiffs versus defendants?

5    **A.**  No.  We worked for either side.

6    **Q.**  Okay.  And in terms of the type of litigation support

7    matters, you mentioned about half -- half of the work,

8    revenue-wise, was personal; is that right?

9    **A.**  The three items I talked about, personal injury, wrongful

10   death, and labor.

11   **Q.**  And in those three areas, what kinds of litigation

12   support work did you do?

13   **A.**  Well, in the personal injury, wrongful death, and labor,

14   you're looking at a situation in which someone has allegedly

15   been harmed by someone else.  If the trier of fact were to

16   find that there was a wrongdoing which occurred, you're

17   trying to calculate what the losses were to the plaintiff,

18   what would they have earned had there been no wrongdoing,

19   versus what they can earn now, the difference being the

20   damages.

21   **Q.**  Okay.  And do you have any sense of how many of those

22   types of damage calculations you've done over the years?

23   **A.**  Thousands.

24   **Q.**  In connection with doing that damage calculation, did you

25   do any work with respect to the 9/11 Victims Fund?

1    **A.**   We did a tremendous amount of work with the VCF and Ken

2    Feinberg in the original victims compensation fund.   Ken

3    built the rules of the calculation around case law, which we

4    were very familiar with, because we had been doing that kind

5    of work.   And there were a number of times when he called us

6    in to help clarify some things and get it done the way he

7    wanted to do it.

8    **Q.**   Okay.   And you mentioned you started Jonas & Welsch in

9    1991.   What's the -- what's the status of Jonas & Welsch

10   today?

11   **A.**   At 12/31/2020, we kind of closed our doors.   My partner,

12   who is a few years older than I am, was having some medical

13   issues, and could not take the witness stand anymore.   So we

14   felt it was time to close the doors.   We contacted our

15   clients, told them that we would finish any work that was

16   in-house, but we weren't starting anything new.

17   **Q.**   And at that point in time, was this one of the projects

18   that was already started?

19   **A.**   Yes, that's correct.

20   **Q.**   Okay.

21   **A.**   I believe we wrote our report in October of 2020.

22   **Q.**   Okay.   And you expect this is probably the last time

23   you'll be testifying?

24   **A.**   This could be the last time.

25   **Q.**   Okay.   All right.   Can you describe for the jury, just as

1    a general overview, how it is that you go about doing a

2    damages calculation?

3    **A.**  Well, as I said, the objective is to try and figure out

4    what was lost, what would have been earned had there been no

5    wrongdoing versus what can now be earned in a harmed

6    situation, and the difference is damages.

7            It's really not rocket science.  There's a lot of

8    calculations, but there's not a lot of subjectivity in it.

9    You try and get an understanding of what the case is, the

10   fact patterns, amass as much data as is pertinent to that

11   case and pertinent to the calculations, and build a worksheet

12   and do the -- grind through the numbers.

13   **Q.**  Is this an exact science?

14   **A.**  No.  There's -- for example, in a case like this where

15   we're projecting forward, we don't have a crystal ball, so I

16   can't tell you exactly what's going to happen in 10 or

17   15 years from now.  But you try and build your calculations

18   and your estimates based on the historical patterns that have

19   existed, and that's the best information we have at the time

20   we're doing those calculations.

21   **Q.**  Very good.

22           And in the course of your -- doing your work in

23   this case, did you create some tables reflecting your

24   calculations?

25   **A.**  Lots of tables.

1   **Q.**   Okay.  I'm now going to show you Joint Exhibit 455.  And

2   is this one of the tables that you created based upon your

3   analysis in this case?

4   **A.**   Yes.  This accompanied my written report, the narrative,

5   and this was the exhibit that identifies -- excuse me -- what

6   the damages would be between 2018 and 2036 by each year.

7   **Q.**   Okay.  And we'll go through some of this in more detail,

8   but just to orient the jury a little bit, in calculating the

9   economic damages, did you take into account the value of any

10  stock options or equity that Dr. Menninger had?

11  **A.**   No.  You specifically indicated to me that that was not

12  part of my responsibility.

13  **Q.**   Okay.  Understood.

14         And then looking over here on the right side of the

15  table, you'll see here there's this fax reflecting this

16  was -- this was faxed yesterday.  Is that because you

17  identified an error in this table when you were preparing to

18  testify?

19  **A.**   Yes.  That last column that says "NPV," which stands for

20  net present value, the bottom number, which is the number

21  that we've concluded is the damage amount for the entire

22  period, that number is correct.  The intermediate numbers

23  were slightly off because we had one year in the past which

24  should have been in the future, which moved at discounting

25  very, very slightly.

1    **Q.**   Okay.  And just for the jury's reference, when you create

2    these tables, are these essentially Excel worksheets?

3    **A.**   Yes, they are.

4    **Q.**   So are there, you know, formulas imbedded in all these

5    various columns we see?

6    **A.**   Yes, there are.

7    **Q.**   Okay.  All right.  So let's dive in here and look here at

8    the -- one of the first columns.  So the first column here we

9    have is age.  And am I right that part of the work in doing a

10   calculation like this is trying to determine an individual's

11   expected work life?

12   **A.**   That's correct.  That's a critical part of the whole

13   calculation.

14   **Q.**   And --

15   **A.**   What you're trying to do, again, is what was lost because

16   of the alleged wrongdoing and for how long it was lost.

17   **Q.**   Sure.  And can you explain to the jury what -- what we

18   mean by "expected work life"?

19   **A.**   The technical definition is the point in time when an

20   individual voluntarily withdraws from the work force, what we

21   would call retirement.  I'm in that phase right now trying to

22   retire.

23             And there are tables that are prepared.  There's a

24   lot of science that goes into this, and we use recognized

25   authorities on calculating work life expectancy.  There are a

1    number of variables in that calculation, which is the current

2    age of the person, the gender of the person, and the highest

3    level of education, the top being a professional degree.

4    **Q.**  And when you look at those tables, is that, in part,

5    based upon what the current age of the individual is?

6    **A.**  Well, we've -- what we always do is we use the age at the

7    point of wrongdoing, so this was back in 2018.

8    **Q.**  Okay.  And the tables and materials that you've

9    referenced that you used in determining expected work life,

10   are -- to your knowledge, are those regularly relied upon by

11   experts in your field?

12   **A.**  Yes, sir, very frequently.  And they became the basis for

13   work life expectancy in the victims compensation fund.

14   **Q.**  Okay.  Looking here at wages and bonus, can you just tell

15   the jury what's -- what the components of that calculation

16   are?

17   **A.**  Wages and bonus.  We had to calculate what the calendar

18   year 2018 was, recognizing that there is a kick-up in salary

19   in April.  So we took information from compensation documents

20   provided by the defendant, took three months of one year,

21   nine months of the other year, and calculated what the

22   initial wages would be for the calendar year.

23          Then using a analysis of past performance, past

24   wages, we calculated what a growth rate was from one year

25   over the next, and that came out to 2.7 percent.  So we took

 1    the 2018 wages and rolled them forward, adding 2.7 a year to

 2    the wages.

 3    **Q.**  Okay.  Just unpack that a little bit here.  So I think

 4    you indicated that the first step was figuring out this 2018

 5    number; is that right?

 6    **A.**  That's correct.

 7    **Q.**  Okay.  And I'm going to show you another document here.

 8    This is going to be Joint Exhibit Number 14.  And you see

 9    here this would be Dr. Menninger's 2018 compensation

10    statement.  Do you see that there?

11    **A.**  I do.

12    **Q.**  Okay.  And it includes a line showing what her salary was

13    going to be effective April 1, 2018?

14    **A.**  Correct.

15    **Q.**  Okay.  And so did I hear you right that, because the --

16    because the pay increase went into effect April 1st, that

17    you -- you took that into account in figuring out what the --

18    **A.**  Three months of the old and nine months of the new.

19    **Q.**  Okay.  And then you included the bonus that would be paid

20    in 2018; is that right?

21    **A.**  Correct.

22    **Q.**  Okay.  In determining the 2018 wage and bonus number, did

23    you make a reduction, going back to Exhibit 454 here, based

24    upon -- sorry -- that's the wrong button.  Here we are.

25              Did you make a reduction based upon labor force

1   participation?

2   **A.**   Yes.   Let me explain what labor force participation is.

3   I mentioned earlier that the tables that we use for work life

4   identify the point in time when an individual -- excuse me --

5   would voluntarily withdraw from the work force.

6           And it's recognized amongst economists that,

7   between now and then, there are likely going to be times when

8   you are not employed, either voluntarily or involuntarily.

9   Your spouse gets a great job on the other side of the

10  country, and you have to leave and take off with that spouse,

11  and you're now out of work for three or four months.

12          We don't know when that -- that absence from the

13  work force is going to take place, but there -- again, there

14  are a lot of tools that the economists use to identify what

15  that amount is, the percent is, and we take that percent --

16  in this case, it was 3.24 percent, I believe -- out of each

17  year, because we don't know if it's going to happen in the

18  third year or the fifth year or not at all.   But we reduce

19  each year by that labor force adjustment.

20  **Q.**   Okay.   And then in terms of projecting the years going

21  forward -- so, for example, going from what you calculated

22  for 2018 going forward to 2019 -- can you walk the jury

23  through how you did that computation?

24  **A.**   Sure.   The -- once we've established what the wages would

25  be for 2018 and we know what the historical growth rate was

 1     year over year in wages, which was 2.7 percent, we grow the

 2     wages each year by 2.7 percent.

 3              The bonus is a percentage of the wages, so, again,

 4     we took the historical performance of bonuses and applied

 5     that to the wages to come up with the total wages and bonus.

 6     **Q.**   Okay.  So to just unpack that a little bit, you indicated

 7     that you determine the annual growth rate for salary would be

 8     2.7 percent?  Did I hear that right?

 9     **A.**   That's correct.

10     **Q.**   And when you say that was "historic," what do you mean

11     that was historic?

12     **A.**   In the years that Dr. Menninger was working for PPD, this

13     was year over year her wage growth.

14     **Q.**   Okay.  In your experience, is a calculation of

15     2.7 percent year over year wage growth, is that reasonable?

16     **A.**   It is reasonable, yes.

17     **Q.**   Okay.

18     **A.**   Again, going back to the victims compensation fund where

19     they use a whole different methodology to calculate growth,

20     they level out at age 55 at 3 percent.  So people who are 55

21     and older would recognize a 3 percent growth, so 2.7 is

22     certainly reasonable.

23     **Q.**   Okay.  And then you mentioned bonus, and I think I heard

24     you say that the bonus was a percentage of the salary; is

25     that right?

1   **A.**   The prior year salary, correct.

2   **Q.**   Okay.  And how did you determine what that -- what that

3   percentage would be?

4   **A.**   The same way.  We looked at the bonuses that were given.

5   We compared them to the base salaries and concluded that the

6   bonus was just under 20 percent of the salary.

7   **Q.**   Okay.  And did you review Dr. Menninger's offer letter in

8   connection with your work, as well?

9   **A.**   Yes, I did.  We read it.  And I think it indicated that

10  the target bonus was about 21 percent.

11  **Q.**   Okay.  So given the fact that Dr. Menninger's target

12  bonus was 21 percent, did you believe that using a target --

13  I'm sorry -- assuming a 20 percent bonus going forward was

14  reasonable?

15  **A.**   Yes, correct.

16  **Q.**   And then looking back here at your chart, so as these

17  numbers sort of grow year over year, is that -- is that based

18  upon those -- those same calculations you just described?

19  **A.**   Right.  It's principally the growth of 2.7 percent in the

20  salary, and then the corresponding growth of the bonus, which

21  is getting the 20 percent of that 2.7 bump each year.

22  **Q.**   What happens here in 2036?

23  **A.**   She turns 67.41 years, and that's the point in time that

24  we determined she would be withdrawing from the work force,

25  retiring, so it's only a partial year.

1    **Q.** Okay. All right. Let's look at the next column here.

2    You have benefits. Can you explain to the jury what -- what

3    the benefits here consist of?

4    **A.** There are three components of benefits. There's the

5    401(k), there's healthcare benefits, and there's the

6    employer-paid portion of Social Security.

7    **Q.** Let's take the first one last. Why do you consider

8    Social Security to be a benefit?

9    **A.** Well, the employer is putting money into the

10   individual's, quote, account, which they will benefit from

11   when they retire. Their benefits will be greater and there

12   is a cost to that greater benefit and we consider that a

13   benefit to be considered.

14   **Q.** And is that benefit something that employers are required

15   by law to provide?

16   **A.** Sure.

17   **Q.** And in terms of calculating the amount of that Social

18   Security benefit, how did you do that?

19   **A.** Well, we know what the percentage is, the employer

20   percentage. We also know at the top what the maximum being

21   paid in Social Security is each year. Over the past number

22   of years, we've calculated what the growth is in that base

23   number.

24          In other words, you're not paying Social Security

25   above a certain compensation amount. We did that calculation

1    and we made sure that the amount of employer-paid Social

2    Security did not exceed the basis of the salary component.

3    **Q.**   Okay.  And then you mentioned healthcare.  How did you go

4    about determining the healthcare benefit value?

5    **A.**   There is a tool that we use called "expectancy data."

6    It's regularly used by economists, especially forensic

7    economists.  And it compiles data from the United States

8    government which aggregates it in an hourly cost for a

9    particular type of benefit.

10            We can't measure the benefit that Dr. Menninger

11   would receive from that healthcare because I don't know if

12   she's going to be sick.  I don't know if she's going to be

13   hit by a truck.  I don't know if she's ever going to use

14   those benefits.  But I can measure the cost, and the tables

15   that the expectancy data provide are based on the type of

16   employment.  In this case, we use the table that was private

17   companies and in the category of professional and technical

18   services.

19   **Q.**   And is that methodology that you use, is that regularly

20   relied upon by experts in your field?

21   **A.**   Yes, it is.

22   **Q.**   Okay.  And then you mentioned 401(k).  Can you explain

23   for the jury what the -- what the 401(k) benefit is?

24   **A.**   Yes.  We saw in the handbook that there's a 401(k)

25   benefit.  If I remember correctly, it's half of what the

1    employee puts in, up to a maximum of 3 percent, half of the

2    6 percent that the employee puts in.  And we noticed that

3    Dr. Menninger was, in fact, putting in the maximum, so we

4    took that 3 percent and added it to the benefits.

5    **Q.**  Okay.  And was that 3 percent of the base salary?

6    **A.**  Yes.  Excuse me.  Yes.

7    **Q.**  And here's a real tough one.  The total column?

8    **A.**  Yeah, well, that's a calculator, column A plus column B

9    equals column C.

10   **Q.**  Good.  Okay.

11         Next section here is -- oops.  I did it again.  I'm

12   sorry.

13         All right.  We're back on 454.  The next column

14   here, we have "actual/mitigation."  Can you explain for the

15   jury what this represents?

16   **A.**  Well, we started in 2018, and our calculation would

17   compute the entire amount of 2018, but we have to subtract

18   out what she actually earned during that year.  And the

19   285,000 we got from a W-2 that she received from PPD.

20   **Q.**  Okay.  And just sort of more -- more sort of generally,

21   when you're doing a damage calculation, is part of what you

22   look at the anticipated earnings of the individual moving

23   forward?

24   **A.**  Could you repeat that question?

25   **Q.**  Yeah, that was a tough question.  Why does -- why in

1    doing a damage calculation did you -- do you look at the

2    actual/mitigation?

3    **A.**   It's the best evidence of what she actually received.

4    **Q.**   Okay.

5    **A.**   I don't know, as I sit here today, exactly what was --

6    that 285, what made it up, but that's what she got.

7    **Q.**   Okay.  And in doing your analysis, did we ask you to do

8    two separate calculations relative to mitigation?

9    **A.**   Yes, you did.

10   **Q.**   Okay.  And let me show you another document here.  So I'm

11   now showing you Exhibit 455.  And so is this the other

12   calculation you did?

13   **A.**   Yes, it is.

14   **Q.**   Okay.  And am I right that, with respect to the last

15   exhibit we looked at, these columns concerning the expected,

16   that should all be the same, right?

17   **A.**   Those should be identical --

18   **Q.**   Okay.

19   **A.**   -- with Exhibit A.

20   **Q.**   Okay.  And here in the actual mitigation, this is

21   different, right?

22   **A.**   From 2019, down, it's different.

23   **Q.**   Okay.  And is that because in this calculation, you

24   included certain -- certain benefits that Dr. Menninger

25   received?

1    **A.** Yes.  Yes, in 2019, she received 85,000 from Unum, which

2    I understand to be a disability insurer, perhaps; and

3    thereafter, the 29.9 is the Social Security disability that

4    she would get because she's disabled.

5    **Q.** Okay.  And am I right that in conducting both analyses,

6    you were asked to make the assumption that Dr. Menninger

7    continues to receive disability and does not return to work?

8    **A.** That's correct, for the remainder of her expected work

9    life.

10   **Q.** And just so we're complete here, can you tell the jury

11   what happens here in 2036?

12   **A.** Well, in 2035, I believe she hits 67; and the disability

13   becomes retirement Social Security, and you wouldn't get

14   both.  So we've terminated the disability in 2035, and there

15   would be none in 2036.

16   **Q.** Okay.  I'm going to take you back to Exhibit 454 here for

17   a moment.  And just looking here at the top line, so you told

18   us this -- the wage and bonus number, that was taken from

19   Dr. Menninger's tax records; is that right?

20   **A.** The W-2, correct.

21   **Q.** Okay.  And with respect to the benefits number here, we

22   see that on your chart here you have the expected benefits

23   being less than the actual benefits; is that right?

24   **A.** That's correct.

25   **Q.** Okay.  And am I right that, when you were doing this, you

1    assumed that Dr. Menninger had lost her company sponsored

2    health insurance during 2018?

3    **A.**   That's correct.

4    **Q.**   Okay.  And if the facts were to show to this jury that

5    she actually kept her health insurance throughout 2018, would

6    that -- would that mean that your numbers are off by --

7    **A.**   $3,944.

8    **Q.**   So that amount right there?

9    **A.**   The -- yes.

10   **Q.**   Okay.  All right.  Now let's look here at the losses

11   column.  So is this just simple math here?

12   **A.**   Correct.  It's subtracting the middle columns from the --

13   the first columns.

14   **Q.**   Okay.  And we see here on 454, since you're not including

15   the disability payments going forward, that the losses aren't

16   being reduced from 2019 forward, right?

17   **A.**   Correct.

18   **Q.**   And if we look at the other exhibit you did, 455, this

19   shows the jury what the math would be if you took those into

20   account?

21   **A.**   Yes, sir.

22   **Q.**   Okay.  Back to 454, here in the last two columns, we have

23   nominal and NPV.  Do you see that?

24   **A.**   I do.

25   **Q.**   And can you explain to the jury why -- why we have those

1  columns?

2  **A.**  The nominal column is the cumulative year over year.  So

3  in -- we add 2026 losses to the cumulative amount

4  through 2025 to come up with that nominal amount.  The total

5  amount would have been 7,447,000.

6  **Q.**  Okay.  So that would have been the total if you just --

7  if you just -- just added up the numbers, right?

8  **A.**  If you just add up the numbers.

9  **Q.**  All right.  Why -- why do we have, then, this column here

10  for NPV?

11  **A.**  NPV is the net present value and it works off of the

12  theory that a dollar today is worth more than a dollar

13  tomorrow.

14        We see it most frequently when you go buy a lottery

15  ticket.  You can buy a lottery ticket that's going to pay a

16  hundred million dollars.  If you take it over 20 years,

17  you'll get the hundred million dollars; but if you take it

18  all today, you -- excuse me -- you may only get $78 million

19  because the dollar today is worth more than it would be

20  spread over time.

21        Theoretically, you could take that 78 million and

22  invest it; and after 20 years, you would have 100 million.

23  **Q.**  Okay.  So in performing damage calculations, is it

24  typically for experts in your field to take into account the

25  net present value of the future income streams?

1   **A.**   Yeah.  If you want the true economic loss, you would have

2   to go through this net present value calculation.

3   **Q.**   Okay.  And just broadly speaking, how do you determine

4   net present value?

5   **A.**   I use the Excel spreadsheet formula.  A lot of us can go

6   back to our college days and find these enormous tables in

7   the back of textbooks, but Microsoft has put those into an

8   Excel spreadsheet, so I can put the formula in and it will

9   calculate the net present value.

10  **Q.**   Okay.  Now, in calculating the net present value here,

11  you have -- you have discounted, for example, Dr. Menninger's

12  anticipated earnings in 2021.  Do you see that?

13  **A.**   Yes.

14  **Q.**   And why did you do that?

15  **A.**   2021 is -- I don't know if you've got it lined up right.

16  **Q.**   I don't.  I did a bad job highlighting that.

17  **A.**   Okay.  Through -- since we did our report in 2020, the

18  damages in '18, '19, and '20 would have been considered in

19  the past.  Any damages after 2020 would be considered in the

20  future and -- excuse me -- if it's the future, that's the

21  piece that has to be discounted.  You're not discounting the

22  past.

23  **Q.**   So if you were doing this calculation --

24  **A.**   Excuse me.

25  **Q.**   -- as of today, for example, in order to determine

1   Dr. Menninger's damages through 2022, would you -- would you

2   apply discounting?

3   **A.**   No, I would not.

4   **Q.**   Okay.

5   **A.**   But my discounting would start at 2023 instead of 2021.

6   **Q.**   Okay.  Good.

7          MR. HANNON:  That's all I have, Your Honor.

8          THE COURT:  Okay.  Cross-examination.

9          **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

10   BY MR. CURRAN:

11   **Q.**   Good morning, Mr. Jonas.  Sorry.  I'm just getting set up

12   over here.

13   **A.**   Take your time.

14   **Q.**   So, Mr. Jonas, my name is Patrick Curran.  I'm one of the

15   attorneys for PPD.

16          MR. CURRAN:  Oh.  May I approach the witness,

17   Your Honor?

18          THE COURT:  You may.

19          MR. CURRAN:  Thank you.

20          Here you go, sir.

21          And, Your Honor, I think you already have --

22          THE COURT:  I do.

23   BY MR. CURRAN:

24   **Q.**   So, Mr. Jonas, I think you testified that you were

25   retained by Dr. Menninger's attorney to provide your opinion

1    in this case; is that right?

2    **A.**   That's correct.

3    **Q.**   And you're being paid by Dr. Menninger's counsel to

4    provide your testimony today, correct?

5    **A.**   That's correct.

6    **Q.**   I understand -- let's -- from your expert report, like,

7    your offices are in New York and New Jersey; is that right?

8    **A.**   Well, there's only three of us in the company.  I'm in

9    Long Island, Don Welsch, who is in New Jersey, and then the

10   young lady that does a lot of our work is a CPA in

11   North Carolina.

12   **Q.**   Okay.  So it's fair to say you had to travel up here to

13   testify today?

14   **A.**   I traveled up yesterday, but yes.

15   **Q.**   Oh, okay.  That makes sense.  And who paid for your

16   travel expenses?

17   **A.**   Nobody yet.  I expect to bill them.

18   **Q.**   Okay.  So you expect to be reimbursed?

19   **A.**   Yes.

20   **Q.**   Okay.  Now, in forming your opinion about the amount of

21   Dr. Menninger's damages in this case, you made a number of

22   assumptions; is that right?

23   **A.**   Either I made them or they were given to me.

24   **Q.**   Okay.  So one of those assumptions was that Dr. Menninger

25   will be able to work -- won't be able to work for the

1   remainder of her working life?

2   **A.**   That's correct.

3   **Q.**   Is that one of the assumptions you made because

4   Dr. Menninger's counsel asked you to?

5   **A.**   That's correct.  I think it's a little broader than won't

6   be able to work.  It's won't be able to work in a comparable

7   field.

8   **Q.**   Okay.  So it's not that she won't be able to work at all;

9   the assumption is she won't be able to work in a comparable

10  field?

11  **A.**   Right.

12  **Q.**   So if she were able to work at all, would that affect

13  these numbers?

14  **A.**   I think that's a legal question, whether the duty to

15  mitigate -- if she flips hamburgers, would that be considered

16  mitigation for her job.

17  **Q.**   Well, putting aside whether she has a duty to flip

18  hamburgers, if she gets a job flipping hamburgers and makes

19  money doing it, would that reduce the numbers in your report?

20  **A.**   I guess it could.

21  **Q.**   And you said you traveled up here yesterday, right?

22  **A.**   Correct.

23  **Q.**   So you obviously weren't in court on Monday?

24  **A.**   No.

25  **Q.**   All right.  So were you made aware that Dr. Menninger's

 1    medical expert testified on Monday testified that he can't

 2    say for certain that Dr. Menninger won't be able to work

 3    again for the rest of her working life and that it's possible

 4    she may be able to work again?

 5    **A.**  I'm unaware of any of that testimony.

 6    **Q.**  All right.  And to be clear, you're not offering an

 7    opinion today as to whether Dr. Menninger can or cannot work

 8    today or --

 9    **A.**  Clearly I'm not.

10    **Q.**  Okay.  All right.  I want to show you one of the

11    documents that Mr. Hannon was showing you.  And this is

12    Exhibit 455, and it's Exhibit B from your expert report, but

13    it's been admitted here as Joint Exhibit 455.

14           And Dr. Hannon [*sic*] went through the other version

15    of this one --

16           THE COURT:  Mr. Hannon.

17           MR. CURRAN:  Mr. Hannon.

18           MR. HANNON:  I've been called worse things,

19    Your Honor.

20           MR. CURRAN:  There is so many doctors in this case.

21    Sorry.  I keep getting -- getting mixed up.  So --

22           THE COURT:  Some people might think it's a

23    compliment for a lawyer to be called doctor.

24           MR. CURRAN:  Definitely.

25    BY MR. CURRAN:

1    **Q.**  So this was your calculation of the salary, bonus, and

2    benefit losses by Dr. Menninger on an annual basis starting

3    in 2018; is that right?

4    **A.**  That's correct.

5              MR. HANNON:  I'm sorry.  This one isn't on our

6    screen.

7              THE COURT:  It's not on your screens?

8              You have it.

9              You don't have it?

10             MS. MANDEL:  We don't have it over here.

11             MR. HANNON:  I don't need it.  That's fine.

12             MS. MANDEL:  We have other copies.

13             THE COURT:  Okay.  Fine.  As long as --

14             Ladies and gentlemen of the jury, you have it?

15             It's on my screen.

16             MR. CURRAN:  Okay.

17             THE COURT:  You have it there, right?

18             THE WITNESS:  I do.  I think this is terrific.

19   BY MR. CURRAN:

20   **Q.**  So this is Exhibit B.  This is the one in which you

21   subtracted the amounts that Dr. Menninger received and that

22   you expect to receive in Social Security disability --

23   **A.**  That's correct.

24   **Q.**  -- insurance?  Okay.

25             Now, am I correct that the numbers -- and you

1    testified about this, but I just want to make clear.  The

2    numbers in the column all the way to the right, those are

3    what you calculated the cumulative loss salary bonus and

4    benefit amounts to be each year, correct, at least in the

5    nominal field?

6    **A.**   Yes.

7    **Q.**   And the NPV is reduced for net present value?

8    **A.**   That's correct.

9    **Q.**   Okay.  So if the jury were to disagree with your

10   assumption that Dr. Menninger won't be able to work for the

11   rest of her working life through 2036 and instead finds that

12   Dr. Menninger would be able to return to work at some point

13   in the interim, so, for example, if she were able to return

14   to work in January 1, 2020, am I right that your opinion is

15   that her total lost salary, bonus, and benefits amount would

16   be $293,331?

17   **A.**   If she could go back to work on January 1, '20 -- 2020?

18   **Q.**   Correct.

19   **A.**   Yes, that's what the numbers would indicate, and I just

20   like to clarify; you said my assumption.  It was not my

21   assumption.  It was an assumption given to me.

22   **Q.**   Sorry about that.  Yes.  Okay.  Understood.

23            So if the jury were to disagree with the assumption

24   that you were provided by Dr. Menninger's counsel and were to

25   conclude that she would have been able to return to work on

 1    January 1, 2020, her lost wages, benefits and -- lost wages,

 2    bonus, and benefits would have been $293,331?

 3    **A.**   Yes.  And they can do that for any year through 2036.

 4    **Q.**   Right.  So if they determine that she could have -- she

 5    could go back to work, you know, January 1 of next year, then

 6    the amount would be, what?

 7    **A.**   Next year?  2024?

 8    **Q.**   Yeah.  So it would be the $1,639,797 number --

 9              THE COURT REPORTER:  I'm sorry.  Could you say that

10    number again slower?

11              MR. CURRAN:  Sorry.  1,639,797.

12              THE COURT:  I think it's 1 million -- I see the net

13    present value number, yes.

14              THE WITNESS:  1,992,000, is that what you got?

15    BY MR. CURRAN:

16    **Q.**   I think that's through -- through the end of 2024?

17    **A.**   Excuse me.  1,639,000.

18    **Q.**   Okay.  All right.  And the same goes for the rest of the

19    -- we don't have to go through all the rest of the years, but

20    that's -- that's --

21    **A.**   That's the calculation.  We provide that in case the

22    trier of fact wants something other than the full amount.

23    **Q.**   Understood.

24              Now, these numbers in here all depend, of course,

25    on whether the jury agrees with all your other assumptions,

1    correct?

2    **A.**  I didn't make a whole lot of assumptions.

3    **Q.**  Okay.  But to the extent that any of the assumptions you

4    did make turn out to be wrong, these numbers would be

5    incorrect, right?

6    **A.**  For example, what assumptions are you talking about?

7    **Q.**  All right.  So, for example, you assumed that, if not for

8    PPD's alleged conduct, Dr. Menninger's would have remained

9    employed with PPD in the position that she held at PPD in

10   2018 or in a similar position until sometime in 2036.

11   **A.**  Right.  I mean, if there was no wrongdoing, there's no

12   damage calculation at all.

13   **Q.**  Right.  I'm not -- actually, it's a slightly different

14   question.  It's not about wrongdoing.  The assumption is that

15   she would have -- if there were no wrongdoing, she would have

16   remained employed at PPD or in similar position until 2036?

17   **A.**  Correct.

18   **Q.**  Okay.  And that she wouldn't have retired earlier?

19   **A.**  And she wouldn't have retired early.

20   **Q.**  And it also assumes she wouldn't have, you know, for

21   example, decided to try and find a different job that more

22   aligned with her values, like maybe something in the arts?

23   **A.**  Can you repeat that, please?

24   **Q.**  Yeah.  It assumes that she wouldn't, at some point, have

25   decided to find another job that aligned more with her

```
 1    values, like something in the arts, for example, but that
 2    paid less?
 3    A.   Yes.  If she was making money into the future, yes, you
 4    would consider that mitigation.
 5    Q.   Okay.  And was the assumption that she would continue
 6    working at PPD or in a similar job 'till 2036, was that
 7    something that Dr. Menninger's attorneys asked you to assume?
 8    A.   They didn't give me a date.  I had to decide and estimate
 9    what her work-life was.
10    Q.   Okay.
11    A.   What -- the assumption that was given to me was that she
12    will not be able to work through the remainder of her work
13    life.
14    Q.   Okay.  And so that assumption was irrespective of when
15    the end of -- when you determined the end of her work life
16    would be, right?
17    A.   Correct.
18    Q.   Okay.  So you're asked to assume that she wouldn't work
19    for the rest of her life before you knew how long her work
20    life would be, right?
21    A.   In a similar position or a comparable position.
22    Q.   Right.
23              Your calculations also assume that the, despite her
24    disability, Dr. Menninger would have been able to perform all
25    the essential functions of her job at PPD or a similar job
```

1    with or without accommodations through 2036, right?

2    **A.**  I guess that's implicit, yes.

3    **Q.**  Okay.  Well, it's an assumption, right?

4    **A.**  I don't know that I specifically made that assumption.

5    She was working.  She was getting good reviews.  I assumed

6    that she would be able to continue that through her work

7    life.

8    **Q.**  Is it an implicit assumption?

9    **A.**  I guess it is, yeah.

10   **Q.**  Okay.  Now, after Dr. Menninger's attorneys hired you to

11   provide an opinion in this case, they provided you with

12   documents about Dr. Menninger's compensation and other things

13   relevant to your calculations, right?

14   **A.**  Correct.

15   **Q.**  Did they ever provide you with any documents or other

16   information about the fact that PPD was acquired by another

17   company called Thermo Fisher Scientific --

18   **A.**  No.

19   **Q.**  -- in 2021?

20   **A.**  No, sir.

21   **Q.**  They did not?  Okay.

22            So in forming your opinion about Dr. Menninger's

23   damages, you didn't consider the possibility that

24   Dr. Menninger wouldn't have remained in her position

25   following the acquisition by Thermo Fisher, right?

1  **A.**  I knew nothing of an acquisition.

2  **Q.**  All right.  Now, getting back to your assumptions, you

3  assumed that Dr. Menninger would have received wage

4  increases, I think you said, of 2.7 percent every year for

5  18 years; is that right?

6  **A.**  Correct.

7  **Q.**  All right.  And that was based on the fact that, during

8  the three-year period from 2016 to 2018, her annual average

9  wage increase was 2.7 percent; am I right about that?

10  **A.**  Correct.

11  **Q.**  Okay.  So, for example, if we look back at this exhibit,

12  455, it looks like you calculated that Dr. Menninger's salary

13  and bonus in 2023 would have been 360,000 -- $360,052, right?

14  **A.**  Correct.

15  **Q.**  Now, you got here yesterday, but did you come to court?

16  **A.**  No, I did not.

17  **Q.**  All right.  Were you informed that yesterday there was

18  testimony that the person who currently holds Dr. Menninger's

19  job is paid a base salary in the range of $275,000?

20  **A.**  I was unaware of that.

21  **Q.**  And that his most recent bonus was in the range of

22  $30,000 to $40,000?

23  **A.**  I was not informed about that, at all.

24  **Q.**  So the total of those two, on the high end of the bonus,

25  would be about $305,000, right?

1    **A.**  If that's the arithmetic, yeah.

2    **Q.**  Yeah, I mean, I got a C in math in college, so I --

3    **A.**  And that's why you became a lawyer.

4    **Q.**  Among -- among other problems, but yeah.

5             So am I right about that, my math?

6    **A.**  If your math is right, yes.

7    **Q.**  275 plus 40 is 305.  Does that sound right?

8    **A.**  275 and --

9    **Q.**  40?

10   **A.**  315, something like that.

11   **Q.**  Okay.

12             THE COURT:  You didn't get a C in math, did you?

13             MR. CURRAN:  You have better math than me.  Thank

14   you.  I'm glad you're here to check me math.  Obviously, I

15   got a C math.

16             THE WITNESS:  I am totally dependent upon Excel to

17   do arithmetic now.

18             MR. CURRAN:  Maybe I should have used Excel before

19   I wrote that down.

20   BY MR. CURRAN:

21   **Q.**  So 315.  But in any case, 315 is a lot less than 360,000,

22   right?

23   **A.**  Sure.

24   **Q.**  All right.  Now, after the three-year period from 2016 to

25   2018 that you used to project Dr. Menninger will receive

1   2.7 percent salary increases, PPD was acquired by

2   Thermo Fisher Scientific in 2021.  You don't know about that,

3   though, right?

4   A.   That's correct.

5   Q.   Okay.  And you don't know what Thermo Fisher's policies

6   or practices are with respect to salary increases for people

7   in the position that Dr. Menninger held?

8   A.   I have no knowledge of that at all.

9   Q.   All right.  But you're assuming that Dr. Menninger would

10  have continued receiving the same wage increases each year

11  after the acquisition?

12  A.   Yes, sir.

13  Q.   And now you also assumed that every year from 2019 to

14  2036, Dr. Menninger would have received an annual bonus equal

15  to 20 percent of her salary; is that right?

16  A.   Slightly less than 20.  Yes, sir.

17  Q.   Okay.  And the basis for that assumption was what?

18  A.   The bonuses she had received in the years preceding 2018.

19  Q.   And those years were 2016 and 2017?

20  A.   '16, '17, and '18, I believe.

21  Q.   And '18?  Okay.  So three years.

22          So you assumed that because Dr. Menninger received

23  an average bonus of 20 percent in three years, that she was

24  going to receive an equivalent bonus every year for 18 years?

25  A.   That's the best information we have.

1    **Q.** All right. And, again, the three-year period from 2016

2    to 2018, that was before Thermo Fisher acquired PPD?

3    **A.** If you say so.

4    **Q.** All right. And you don't know anything about

5    Thermo Fisher's policies or practices with respect to

6    paying --

7    **A.** Not at all.

8    **Q.** So, you know, according to the testimony we heard

9    yesterday and that I was talking about a minute ago, the

10    person who currently holds Dr. Menninger's position received

11    a bonus in the range of 30 to 40,000, and his salary is in

12    the range of $275,000, right?

13    **A.** You can't ask --

14          MR. HANNON: Objection.

15          THE COURT: You're asking him if it's right?

16    Sustained. He doesn't know.

17    BY MR. CURRAN:

18    **Q.** Do you recall that?

19    **A.** I recall you just told me that.

20    **Q.** Okay. Now, if we assume that person's bonus is at the

21    higher end of that range, 40,000, is that -- am I right,

22    that's about 15 percent of 275,000?

23    **A.** If that's what the arithmetic is, yeah. I don't know.

24    **Q.** So that's less than 20 percent, right?

25    **A.** If that's the arithmetic.

1    **Q.**  All right.  Do you know what factors go into determining

2    whether someone in the position that Dr. Menninger held at

3    PPD receives a bonus at all, or if so, how much?

4    **A.**  I don't know the criteria for the bonus, what -- I do

5    know how much she was getting.

6    **Q.**  All right.  And you don't know whether the factors that

7    apply now are the same as those that applied in 2016 to 2018?

8    **A.**  I do not.

9    **Q.**  And you don't know whether the US economy is going to

10   enter into a recession or even a depression at some point

11   between now and 2036?

12   **A.**  Yeah, I would be in a different business if I knew that.

13   **Q.**  Yes, for sure.

14          But you would agree with me it's possible to have a

15   recession or a depression in the next 18 years?

16   **A.**  And we could have a boom also.

17   **Q.**  Right.  But you're assuming that Dr. Menninger would not

18   only have remained employed throughout the period, but also

19   she would have continued getting wage increases and

20   20 percent bonuses every year, right?

21   **A.**  That's correct.

22   **Q.**  Okay.  Now, in calculating Dr. Menninger's damages, you

23   considered the fact that, from 2016 to 2018, PPD matched

24   50 percent of Dr. Menninger's 401(k) contributions; is that

25   right?

1   **A.**   That's right.

2   **Q.**   And you assumed that because Dr. Menninger had

3   contributed 6 percent of her annual salary each year, that

4   she would continue doing that for the rest of her working

5   life?

6   **A.**   That's correct.

7   **Q.**   What's the basis for that assumption?

8   **A.**   The historical performance.  Again, I don't have a

9   crystal ball to know exactly what's going to happen in the

10  future, but if you can look into the past, that is an

11  indicator of what's likely to happen in the future.

12  **Q.**   And the past you looked to was three years, right?

13  **A.**   I don't recall how many years it was.

14  **Q.**   So it was 2016, 2017, 2018?

15  **A.**   I don't recall how many years of 401(k) data we had.

16  **Q.**   Did you look at her contributions prior to the time that

17  she started working at PPD?

18  **A.**   No.

19  **Q.**   All right.  So if she started working at PPD in 2015, you

20  wouldn't have looking at anything before that, right?

21  **A.**   That's correct.

22  **Q.**   And what did you base your assumption on that's -- or I'm

23  sorry.  One of your assumptions is that Dr. Menninger's

24  employer would have continued PPD's practice of making

25  50 percent contributions every year to a 401(k)?

1  **A.**  Again, it's the historical pattern in the past.

2  **Q.**  Okay.  And I think, looking at your report, I think you

3  based your assumption on your PPD's US employee handbook?

4  **A.**  Yes.

5  **Q.**  And that was last updated in December 2016?

6  **A.**  I don't have it in front of me, but it could be.

7  **Q.**  Okay.  If you look at your report, page 4, note 13.

8  **A.**  Yep.

9  **Q.**  And that's the handbook, right?

10  **A.**  That's correct.

11  **Q.**  All right.  And you don't know whether Thermo Fisher

12  matches 401(k) contributions for people in the job that

13  Dr. Menninger held --

14  **A.**  I don't know anything about this other company.

15  **Q.**  All right.  So it's fair to say that your calculation of

16  Dr. Menninger's lost wages and benefits depends on a number

17  of assumptions, correct?

18  **A.**  What I would consider reasonable assumptions based on the

19  past.

20  **Q.**  Okay.  And if any of those assumptions turn out to be

21  unreasonable, if the jury thinks they're unreasonable, then

22  they would have to disagree with your calculations, right?

23  **A.**  Certainly.  For all we know, the 401(k) may jump to

24  10 percent, and they match 100 percent.  I mean, I don't know

25  that.  I can only go by what we have in the past.

```
 1              MR. CURRAN:  Thank you.  I don't have any further
 2   questions at this time.
 3              THE COURT:  All right.  Any redirect?
 4              MR. HANNON:  Just a few questions, Your Honor.
 5              THE WITNESS:  Do you want this back?
 6              MR. CURRAN:  You can hang on to for now.
 7              THE COURT:  Keep it for now.
 8              THE WITNESS:  A souvenir?
 9              MR. HANNON:  Something for your last hurrah.
10           REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
11   BY MR. HANNON:
12   Q.  Mr. Jonas, you were asked questions about the acquisition
13   of PPD.  If I were to tell you that it was acquired for
14   $17.4 billion, would that make you more or less confident of
15   your calculations?
16   A.  I don't think it would impact my calculations, because I
17   don't know if that's a lot or not a lot.  It was a bargain
18   price.  I don't know anything about that.
19   Q.  Okay.  And then you were asked about some testimony
20   yesterday.  Am I right that when you do damage calculations,
21   that you try to rely upon reliable information?
22   A.  As most -- as best we can -- the term is the best
23   available information.
24   Q.  Okay.  And some of that is assessing the credibility of
25   the source of the information, right?
```

1  **A.**  Absolutely.

2  **Q.**  And if you found that a person provided you information

3  and that person wasn't credible, would you rely upon it?

4  **A.**  If I knew that the information was bad, I would

5  definitely not rely on it.

6  **Q.**  And if you knew that the source of the information was

7  not credible, would that also cause you potentially not to

8  rely upon it?

9  **A.**  I would look for other ways to justify what I was being

10  told --

11  **Q.**  Okay.

12  **A.**  -- and not rely on that one source.

13  **Q.**  Okay.  And then you were asked questions about that

14  20 percent bonus estimate.  I want to show you one -- one

15  document here.

16        MR. HANNON:  This is -- this is a letter document

17  that's not in evidence, Ms. Belmont.  This will be

18  Exhibit BC --

19  BY MR. HANNON:

20  **Q.**  And, sir, I'm showing you what's been marked for

21  identification as Exhibit BC.  Is this Dr. Menninger's offer

22  letter that you reviewed?

23  **A.**  I believe it is.

24        MR. HANNON:  Okay.  Your Honor, we offer this into

25  evidence.

```
 1              THE WITNESS:  I mean, without reading the whole
 2    thing, it looks familiar.
 3              MR. CURRAN:  Sorry for the confusion, Your Honor.
 4    The numbers aren't matching up with what we had for this
 5    document.
 6              THE COURT:  I see.
 7              MR. CURRAN:  I don't think we have any objection to
 8    the document that's in front of the witness.
 9              THE COURT:  Fine.  So BC is admitted as -- what's
10    the next exhibit number?
11              THE DEPUTY CLERK:  456.
12              (Exhibit 456 admitted into evidence.)
13              THE COURT:  456.
14              Go ahead, Mr. Hannon.
15              And Ms. Belmont can display it to the jury.
16              MR. HANNON:  Thank you.
17    BY MR. HANNON:
18    Q.  So this is Dr. Menninger's offer letter from when she
19    started at PPD; is that right?
20    A.  I believe so.
21    Q.  Okay.  I'm just going to show you here, on the second
22    page, you mentioned before that there was something in here
23    regarding her bonus; is that right?
24    A.  That's correct.
25    Q.  And --
```

 1    **A.**  I think that's the fourth line in the first paragraph.

 2    **Q.**  Sure.  Sure.  So just looking at this -- and this is the

 3    part that says that the bonus target for your position is

 4    21 percent of your base salary earned in a given year?

 5    **A.**  Correct.

 6              MR. HANNON:  Okay.  That's all I have, Your Honor.

 7              THE COURT:  All right.  Any recross?

 8              MR. CURRAN:  No, Your Honor.

 9              THE COURT:  All right.  Thank you very much.

10    You're excused.

11              THE WITNESS:  Thank you.

12              THE COURT:  This is when you wanted to take the

13    break, right?

14              MS. MANDEL:  Yes, Your Honor.

15              THE COURT:  All right.  So, ladies and gentlemen of

16    the jury, we have one more witness.  And so we're going to --

17    that's the last witness today, the one more witness.

18              We're going to take the morning break now, which is

19    early.  Hopefully the coffee and refreshments are there for

20    you.  We'll see if our efforts, Ms. Belmont and mine, to

21    arrange that early succeeded.  So we'll take the break now.

22    Then we'll return, we'll have the other witness, and then

23    when that's done, that will be one o'clock or earlier, we'll

24    be done for the day.

25              All rise for the jury.

1          (Jury not present.)

2          THE COURT:  You know, Mr. Curran, you passed on

3     what clearly would have been the most devastating attack on

4     Mr. Jonas's credibility.

5          MR. CURRAN:  What was that?  He's from New York?

6          THE COURT:  Well, you could have asked him --

7          You're from Long Island, right?

8          THE WITNESS:  Right.

9          THE COURT:  In fact, you've spent most of your life

10     in the New York metropolitan area?

11          THE WITNESS:  That's correct.

12          THE COURT:  And you are not a die-hard fan of the

13     Boston Red Sox?

14          THE WITNESS:  It's opening day at Yankee Stadium

15     today.

16          THE COURT:  There you go.  That question -- he gave

17     it to you, and it's like.

18          MR. CURRAN:  I could've impeach him --

19          THE COURT:  You could have stepped down.

20          MS. MANDEL:  Your Honor, without revealing our

21     confidences too much, I will say there is a note in my

22     notebook to Patrick about that exact question.

23          THE COURT:  There you go.  So it's all on

24     Mr. Curran.  He was told what to do by you and he didn't

25     follow the advice of his partner in what was an obvious line

1    of cross-examination.

2              MS. MANDEL:  Well, Patrick and I have worked

3    together, I think at this point, for 14 years.  This is one

4    area where we disagree, so it's a point of contention.

5              MR. CURRAN:  I was afraid he might say he's a Mets

6    fan and then I'd have to come and attack him.

7              THE COURT:  So we have -- is there -- you're going

8    to rest --

9              MR. HANNON:  I have to rest technically, right?

10             THE COURT:  Yes.  So you'll rest when the jury

11   comes back.

12             MR. HANNON:  I'm just going the make that comment

13   regarding the exhibits and then I'll rest and --

14             THE COURT:  Why don't you make your -- assume he's

15   rested now.  I'll treat right now as if he's rested, so

16   whatever motions you want to make now, make them.  And I -- I

17   am now saying that they are deemed to have been made after he

18   rested, and after I've admitted the joint exhibits as if you

19   made it, so we don't have to spend time in front of the jury,

20   and after the jury leaves with Mr. Kelly if you want to renew

21   them -- but they are -- for the record, for the Court of

22   Appeals, they are as if whatever you say now is made after he

23   rests, which is what he's going to do when the jury comes

24   out.  I just don't see the point of having a sidebar in front

25   of the jury and make them sit there.

```
 1              Anything -- so he's effectively rested.  Are there
 2    any motions you want to make?  You don't have to, but I'm
 3    just giving you the chance.
 4              MR. CURRAN:  Yeah.  A motion for directed verdict,
 5    Your Honor.
 6              THE COURT:  All right.  Fine.  I will deny that.
 7              So anything else?  We're just going to get
 8    Mr. Kelly?
 9              MR. CURRAN:  Yes, Dr. Kelly.
10              THE COURT:  Okay.  So why don't we take a -- we'll
11    come back at 10:15.
12              How long do you think he's going to be?
13              MR. CURRAN:  Apparently, he's not here yet.  I know
14    he had a medical appointment this morning and so we're trying
15    to reach him and contact him, so -- hopefully he's walking
16    upstairs.
17              THE COURT:  So I'll come back at 10:15, and
18    hopefully he's on the witness stand, and if he's not,
19    hopefully you'll have an update as to where he is and
20    what his ETA.  Once he's on the witness stand, how long do
21    you expect him to be?
22              MR. CURRAN:  20, 25 minutes for me at most.
23              MR. HANNON:  A little bit longer than that.
24              THE COURT:  Okay.  All right.  Okay.
25              So assuming he's on at 10:15, we'll do the charge
```

```
 1    conference.  When he's done, we'll send the jury home and
 2    then we can do the charge conference then.  If he's not here
 3    at 10:15, maybe we'll do the charge conference then.
 4              Anything else?  Okay.
 5              (Court in recess at 10:04 a.m.
 6              and reconvened at 10:27 a.m.)
 7              THE COURT:  You can sit down.
 8              Dr. Kelly, are you able, when the jury comes back,
 9    to stand up to take the oath, or do you prefer to sit?
10              THE WITNESS:  Say again?
11              THE COURT:  So ordinarily, we have witnesses stand
12    just when they take the oath, and then they sit down.  I'm
13    just asking you, because of the medical issue that counsel
14    referred to, whether you're able to do that.  And if you are,
15    I'll do that, but if you would like me to accommodate you to
16    have you just seated, I'll just have Ms. Belmont just say
17    raise your right hand.
18              THE WITNESS:  Should I stand now?
19              THE COURT:  You don't have to stand now.  I'm just
20    asking which you want to do when she administers the oath?
21              THE WITNESS:  When the jury comes in, I'll stand
22    and --
23              THE COURT:  All right.  And then you'll remain
24    standing while she administers the oath, and then you'll sit
25    down?  Is that fine?
```

```
 1                So there are two times ordinarily you would stand.
 2     I'm -- it's fine.  One is we all stand when the jury comes
 3     in.  It seems like you're saying you're able to stand when
 4     they come in, correct?
 5                THE WITNESS:  Yeah.
 6                THE COURT:  Okay.  Then you would ordinarily --
 7     Ms. Belmont will ask you to raise your right hand to
 8     administer the oath of truth-telling to you.  And ordinarily,
 9     I would have you stand up when you take the oath.  If that's
10     difficult for you and you prefer to take the oath sitting
11     down, that's fine.  There's no legal --
12                THE WITNESS:  I'll stand for the oath.
13                THE COURT:  Fine.
14                Go get the jury.
15                (Jury present.)
16                THE COURT:  Mr. Hannon, anything else for you?
17                MR. HANNON:  No more witnesses, Your Honor.  The
18     plaintiff does move into evidence the remainder of the joint
19     exhibits that have not yet been offered.
20                THE COURT:  Okay.
21                MR. HANNON:  And with that, the plaintiff rests.
22                THE COURT:  All right.  So, ladies and gentlemen,
23     let me explain.
24                You have heard various exhibits referred to --
25     all -- most all of the exhibits -- all the exhibits have been
```

```
 1    referred to by number are -- were admitted into evidence
 2    along the way.  I think I told you that at the beginning when
 3    they referred to -- they had agreed to -- they were all
 4    agreed to and I admitted them.  So those are all in evidence.
 5            In addition, what Mr. Hannon has just referred to
 6    is there are other joint exhibits that haven't been talked
 7    about with witnesses, and those are admitted and in evidence.
 8    All of the things that are exhibits in evidence you will have
 9    in the jury room copies of them for you to look at during
10    your deliberations.  So that's one thing Mr. Hannon said.
11            The second he said is he rests.  What that means is
12    the plaintiff is done presenting their case and they have no
13    more evidence or witnesses.  So now we turn to the
14    defendant's case and their first witness.
15            MR. CURRAN:  The defense calls Dr. Martin Kelly.
16            THE COURT:  All right.  And so we've arranged
17    Dr. Kelly to already be in the witness box just to get going
18    and while we were taking care of some other things while you
19    were out.
20            So if you would just raise your right hand,
21    Dr. Kelly, for the oath.
22            (Witness duly sworn.)
23            THE DEPUTY CLERK:  And can you please state your
24    full name for the record?
25            THE COURT:  You can sit down.
```

```
 1                        MARTIN KELLY
 2            having been duly sworn, testified as follows:
 3       DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT
 4    BY MR. CURRAN:
 5    Q.   Good morning, Dr. Kelly.
 6            THE COURT:  Why don't you first state your name for
 7    the record, Dr. Kelly.
 8    BY MR. CURRAN:
 9    Q.   Would you state your name for the record, sir?
10    A.   My name is Martin Kelly, K-e-l-l-y.
11    Q.   And Dr. Kelly, what do you do for work?
12    A.   Say again?
13    Q.   What do you do for work?
14    A.   I'm a physician who practices the specialty of
15    psychiatry.
16    Q.   Okay.  And how did you become involved in this case?
17    A.   Say again, please?
18    Q.   How did you become involved in this case?
19    A.   In the fall of 2000, I got a call from someone in your
20    law firm asking if I would serve as a consultant on this
21    case.
22    Q.   Okay.  It might help if you pull the microphone a little
23    closer to you.
24            There you go.  Thank you.
25            So were you asked to review facts and details about
```

1  the case?

2  **A.**  Say again, please?

3  **Q.**  Were you asked to review facts and details about the

4  case?

5  **A.**  Yes.

6  **Q.**  And are you being compensated for the time that you spend

7  on the lawsuit?

8  **A.**  I'm sorry; I -- I'm not hearing you well.

9  **Q.**  Okay.  Are you being compensated for the time that you've

10  spent on the lawsuit?

11  **A.**  I haven't been to law school.  Again, I'm --

12  **Q.**  No, no.  I'm sorry.  Are you being compensated for the

13  time spent on the --

14  **A.**  Oh.  Yes, I hope so.

15  **Q.**  And could you please walk us through your educational

16  background?

17  **A.**  I received my premedical education at Boston College and

18  graduated with a bachelor of science in biology.  I then

19  attended Tufts University school of medicine and received my

20  MD from Tufts.  When I finished my medical school, I did a

21  medical internship at St. Elizabeth's Hospital and then did a

22  psychiatric residency at the Massachusetts Mental Health

23  Center.

24  **Q.**  With respect to your work as a doctor, could you walk us

25  through your work history?

```
 1    A.  I'm sorry.  I'm not hearing you well.
 2    Q.  I'm sorry.  With respect to your work as a doctor, could
 3    you walk us through your work history?
 4    A.  With respect to my work as a doctor, what?
 5    Q.  Can you walk us through your work history?
 6    A.  Yes.
 7    Q.  So what did you -- what did you do after finishing your
 8    residency?
 9    A.  When I finished my residency, I worked for a year and a
10    half at Boston State Hospital in Mattapan at the adolescent
11    unit there, and then in 1970, I went to the Brigham.  Then it
12    was the Peter Bent Brigham Hospital, and I've been on the
13    staff and had various positions at the Brigham and at Harvard
14    Medical School since that time.
15    Q.  Okay.  So how long approximately have you been working at
16    the Brigham and Women's Hospital?
17    A.  I think I'm starting my 54th year in July.
18    Q.  All right.  That's quite a while.  Can you explain to the
19    jury the status of your current engagement at Brigham and
20    Women's?
21    A.  Current status of my practice is I -- I have a very
22    small, private practice, which I'm going to be closing at the
23    end of May; and I have a forensic psychiatry practice.  I
24    have not taken any new cases for a couple years, but there
25    are a few in the pipeline.
```

1   **Q.**   So you're still seeing patients today?

2   **A.**   Yes.

3   **Q.**   Has any of your work with patients in your years as a

4   psychiatrist involved mood disorders?

5   **A.**   Yes.

6   **Q.**   And what are mood disorders?

7   **A.**   Mood disorders are conditions that the biochemistry of

8   the brain -- mood disorders used to be called

9   manic-depressive disorder.  Now it's call bipolar disorder.

10  It's a mood disorder and the primary disturbance is either

11  mania or depression.

12  **Q.**   Okay.  And have you diagnosed and treated people with

13  mood disorders?

14  **A.**   Yes.

15  **Q.**   Have you worked with patients who have anxiety disorders?

16  **A.**   Yes.

17  **Q.**   And could you explain to the jury what anxiety disorders

18  are?

19  **A.**   Could --

20  **Q.**   I'm sorry; could you explain to the jury what anxiety

21  disorders are?

22  **A.**   Anxiety disorders, there are many subtypes of anxiety

23  disorders.  There's generalized anxiety disorder, in which a

24  person just tends to be very nervous much of the time.

25  There's panic disorder, in which an individual will have

1   sudden panic reactions.

2           Panic disorder can come associated with

3   agoraphobia, so when someone is out and about, say, shopping

4   at a supermarket, they suddenly get a panic attack and they

5   just have to get out of the store.  They often will leave

6   their cart full of groceries and just -- "I got to get out of

7   here."

8           So those are the main anxiety disorders, and

9   there's also, which is at least an issue in this case, social

10  anxiety disorder, or social phobia.

11  **Q.**  Okay.  And in the course of your practice over the years,

12  have you diagnosed and treated people with anxiety disorders?

13  **A.**  Yes.

14  **Q.**  Now, aside from this case, are you currently doing any

15  other work that involves providing an expert opinion in

16  connection with a legal matter?

17  **A.**  I'm not -- I don't have any current patients that have

18  anxiety disorder.  I have a patient who has a mood disorder,

19  and I prescribed a prescription on Sunday to renew a

20  prescription for this gentleman.

21  **Q.**  Okay.  And are you currently doing any work aside from

22  this case that involves providing an expert opinion in a

23  lawsuit?

24  **A.**  I have a bunch of cases that are in my file cabinet and

25  many of them are pre-COVID.  So some of them may have settled

1    or gone away, but I don't -- have not been told about that.

2            I have recently been involved in helping out a

3    situation in which a four- to five-year-old youngster ran

4    down their driveway and was hit and killed by a Comcast

5    truck, and so I was advising the attorneys in that case.

6    **Q.**   Okay.  And currently about how much of your working time,

7    percentage-wise, do you spend on litigation-related work?

8    **A.**   My private practice has slowly diminished because I

9    haven't been taking new patients since 2005.  If I have seen

10   you before and you want to come back, that's okay; but I'm

11   not seeing new cases from scratch for the past 15-plus years.

12   **Q.**   Okay.  Have you published any articles in peer-reviewed

13   journals?

14   **A.**   Yes.

15   **Q.**   On what topics?

16   **A.**   Mostly in psychiatry, clearly, but a particular interest

17   in psychosomatic medicine, general hospital psychiatry.  The

18   Brigham does not have an inpatient psychiatric unit, and for

19   the first 25 years, we were a division of the department of

20   medicine and then got established as a department of

21   psychiatry.

22           So my publications are often in journals like the

23   *New England Journal of Medicine*, who's at risk for suicide

24   attempts in a hospital, who wants to read their record,

25   studying people who have signed out against medical advice

1   and what happens to them.

2          And I also coauthored a chapter in what was the

3   leading textbook of medicine about the psychiatric disorders,

4   a textbook that's called Harrison's textbook of medicine.

5   I've also published -- invited to do chapters in anesthesia

6   textbooks, how should you manage a patient who's receiving

7   psychiatric medications if they're going to be going under

8   anesthesia, do you continue them, do you stop them, things of

9   that sort.

10          So most of my publications have been in the medical

11   area and that's a core part of my identity and practice over

12   the years.

13   **Q.**   Okay.  Understood.

14   **A.**   As opposed to asylum psychiatry.  I did that at Boston

15   State Hospital for a year and a half, but we don't have an

16   inpatient unit, so I -- I don't do that kind of psychiatry.

17   **Q.**   Okay.  Do you hold any licenses or certifications?

18   **A.**   Yes.

19   **Q.**   What licenses or certifications do you hold?

20   **A.**   I have a license to practice medicine.  I've been board

21   certified in psychiatry.  And those are the main

22   certifications and licenses in the psychiatric profession.

23   **Q.**   Okay.  Have you held any teaching appointments?

24   **A.**   Say again, please.

25   **Q.**   Have you held any teaching appointments?

1    **A.**   Yes.

2    **Q.**   What teaching appointments have you held?

3    **A.**   When I was a resident at Mass Mental Health Center, I was

4    a teaching fellow in psychiatry for three years.  When I went

5    to Boston State Hospital, I had an appointment as an

6    instructor in psychiatry at Tufts University school of

7    medicine.  Tufts Medical School was kind of the department

8    that -- basically was the primary psychiatric department at

9    Boston State.

10              And then since I've been at the Brigham, I first

11   was an instructor in psychiatry and assistant professor of

12   psychiatry and currently associate professor of psychiatry at

13   Harvard Medical School.

14   **Q.**   Okay.  And what did you do to review the facts relevant

15   to this case?

16   **A.**   I'm sorry; please say again.

17   **Q.**   What did you do to review the facts relevant to this

18   case?

19   **A.**   I was sent, over the past now two or three years, many

20   records.  I'll try to remember most of them:  Dr. Kessimian,

21   who was the main treater around the time this situation

22   started; past psychiatric treatment with Michael Everson, who

23   is in Kansas City, where she was living at the time, and he

24   saw her, like, on three occasions and prescribed Valium;

25   Butler Hospital day hospital; Dr. Burbano in Albuquerque,

1     New Mexico.  Dr. Menninger moved from Massachusetts to

2     Albuquerque at the end of 2018, beginning of 2019.

3              And she's moved twice since then to Bend, Oregon,

4     where, apparently, she has family; and then approximately

5     2001/2002 [*sic*] moved to Portland, Oregon, and in both of

6     those situations was seen at a clinic by numerous

7     professionals.

8     **Q.**  And you reviewed the records in connection with that

9     therapy?

10    **A.**  Yes.

11    **Q.**  Did you review any deposition transcripts?

12    **A.**  I'm -- I -- I'm having trouble hearing you.

13    **Q.**  Oh, I'm sorry.

14    **A.**  Please.

15    **Q.**  Did you review any deposition transcripts?

16    **A.**  Oh, yes, yes.  I reviewed the deposition of

17    Dr. Menninger, Dr. Summergrad, my own deposition -- I was

18    deposed.  I reviewed various legal documents that were sent

19    to facilities to evaluate discrimination, positions of the

20    company PPD, and also Dr. Menninger's submission in regard to

21    this case.

22    **Q.**  And did you interview Dr. Menninger?

23    **A.**  Say again?

24    **Q.**  Did you interview Dr. Menninger?

25    **A.**  Yes, I did.

1    **Q.**   Okay.

2    **A.**   I interviewed her virtually December 9, 2020 --

3    **Q.**   Okay.

4    **A.**   -- I believe.

5    **Q.**   And are these the types of activities that you would

6    normally do, normally conduct, when you're evaluating a

7    patient?

8    **A.**   Clearly, doing an interview of the person is pretty

9    important if the person is around and, you know, is

10   accessible; but then you want to collect everything from some

11   factual matters.  I reviewed her requests for accommodations,

12   for example.  And I reviewed a bunch of emails in the

13   company, particularly in the spring of 2018 --

14   **Q.**   Okay.

15   **A.**   -- March, April, May -- several emails that involved her

16   and other people at the company.

17   **Q.**   And when you interviewed Dr. Menninger in December 2020,

18   for how long did you speak with her?

19   **A.**   The interview lasted approximately two hours and

20   20 minutes or so.

21   **Q.**   Now, Dr. Kelly, in the context of a mental health

22   evaluation, what is a disorder?

23   **A.**   Please say again.

24   **Q.**   What is a disorder in the context of a mental health

25   evaluation?

1   **A.**   The disorders that were in the records included primarily

2   social anxiety disorder, social phobia and treatment for

3   that.

4   **Q.**   Right.  But what I'm trying to ask, and I'm not doing it

5   very artfully, is what is a disorder, just sort of generally?

6   **A.**   I'm sorry; I just --

7   **Q.**   You can't hear me?  I'm sorry.

8   **A.**   The batteries in my hearing aids are running low, but I'm

9   having trouble.

10   **Q.**   I'll talk louder.  Sorry, I feel like I'm shouting.

11            THE COURT:  You're not.

12            MR. CURRAN:  What's that?

13            THE COURT:  You're not shouting.

14            MR. CURRAN:  I'm not.  Okay.

15   BY MR. CURRAN:

16   **Q.**   Just generally, what is a disorder?

17   **A.**   A disorder, a psychiatric disorder, is -- or a mental

18   disorder is a wide range of conditions.  They go from very

19   serious illnesses, such as schizophrenia, bipolar disorder,

20   paranoid disorders, and on the other spectrum, most of us

21   will be subject to some experience of grief.  In our

22   lifetime, we will lose someone who was important to us,

23   things of that sort.

24            I mean, in the news, in Nashville, that's a

25   terrible situation, and the parents have a disorder, which

1    is, you know, a grief disorder.  And that's not sensibly

2    thought of as an illness, like schizophrenia.

3           And then other disorders that are of concern can be

4    anxiety disorders, post-traumatic stress disorder,

5    personality disorders, who it's in the personality of the

6    individual.  And that often becomes problematic, often for

7    other people; and it can be a depressive personality, a

8    disgruntled, unhappy, gloomy individual pretty consistently.

9    There may be some variation.

10          And then there are other personality disorders:

11   hysterical personality disorder, narcissistic personality

12   disorder, antisocial personality disorder.  And so there's a

13   wide range of disorders, some of which are sensibly regarded

14   as illnesses -- bipolar disorder, schizophrenia -- and some

15   are reactive situations to events in the individual's life.

16   **Q.**  I see.

17          Now, in diagnosing mental health disorders

18   generally, in your practice, how do you go about forming a

19   diagnosis?

20   **A.**  Well, in a clinical setting, you -- the person makes an

21   appointment with you and you -- usually on the first

22   appointment, you may spend an hour or 90 minutes with the

23   individual clinically, and you take a history from the

24   individual.

25          And then you try to see if there are certain

1   patterns that lead to a particular diagnosis, highly

2   probable, but you also generally do a differential diagnosis.

3   If it's not A, it could be B, C, or D, and I will rule out

4   those conditions.

5   **Q.**   Okay.  Did you review the expert opinion that plaintiff's

6   medical expert, Dr. Summergrad, provided in this case?

7   **A.**   I did.

8   **Q.**   And did you see that Dr. Summergrad said in his opinion

9   that Dr. Menninger developed major depressive disorder in

10  2018?

11  **A.**   Yes.

12  **Q.**   What is major depressive disorder?

13  **A.**   Major depressive disorder is a mood disorder.  In the lay

14  press, it's often -- the person has a biochemical imbalance,

15  is the lay expression for it frequently.  But it's a

16  biological condition.  It tends to run in families, a high

17  probability of having a relative who's had it.  It typically

18  comes on in late adolescence, early adulthood, 20s.

19         And then over the course of the individual's

20  lifetime, they will have times when they are depressed.  And

21  in this day and age, people are aware of it, and so often

22  it's now spotted earlier.  And the biochemical dysregulation

23  of the mood is very frequently fixed with medications --

24  again, biological, genetic disorder, and a number of physical

25  symptoms that often goes with it -- early morning, you can

1     wake up too early, you don't need -- and you wake up often in
2     a gloomy situation or catastrophizing, "Oh, this could be a
3     problem for me today."
4           Sometimes there's tearfulness, withdrawal from
5     activities that you used to enjoy, withdrawal from
6     friendships, but it's time limited.  Before there were
7     medications, or shock treatments, the typical course was six
8     to nine months, occasionally longer.  So the person would be
9     depressed six or nine months later, they're coming up and
10    they're kind of back to themselves.
11    **Q.**   Okay.  Thank you.
12          So based on your evaluation of Dr. Menninger
13    through your interview of her and your review of her records
14    and other documents, did you form an opinion as to whether
15    Dr. Menninger has major depressive disorder?
16    **A.**   I did.
17    **Q.**   And what is your opinion on that question?
18    **A.**   In my opinion, she does not have this disorder.  I could
19    not find the typical life course of episodes of depression in
20    early adulthood and continued through life.
21          I don't know that she has a strong family history
22    of major depressive disorder.  When someone has a life event
23    that's distressing and depressing, that doesn't mean that
24    they have a major depressive disorder.  They may have some of
25    the symptoms -- they're sad, they don't want to be out and

1   about, they don't care to do things they used to do -- but

2   the general consensus, in my view, is that a major depressive

3   disorder is not precipitated by a life event, by a life

4   event.

5        It's the chemicals that control mood and how you

6   perceive your life get dysregulated, and they can be treated

7   with antidepressants, can be treated with shock treatments.

8   People can be very depressed and suicidal in both major

9   depressive disorder, but also situations that are reactive to

10  powerful, negative life events.

11  **Q.**  What sort of powerful negative life events are you

12  referring to there?

13  **A.**  Can you --

14  **Q.**  What sort of powerful negative life events are you

15  referring to there?

16  **A.**  I could not see -- well, I think she was very upset that

17  the accommodations -- some of the accommodations that she was

18  requesting, the company did not feel they -- it was

19  consistent with the job, apparently.  So -- but I think she

20  was shocked and surprised by that, and distressed.

21  **Q.**  Based on your interview with Dr. Menninger and your

22  review of her medical records and other documents, did you

23  form an opinion as to whether she was able to work?

24  **A.**  I did.

25  **Q.**  And what is your opinion?

**A.** That she has no new condition that would prevent her from working as a pathologist as she had during her residency, as she did in a hospital setting for a few years, as she did in a commercial laboratory, and then for a couple of years at PPD; that she, by her own estimate, was able to do a good job, and the company thought she was meeting their expectations.

**Q.** Dr. Kelly, do you believe that Dr. Menninger is faking?

**A.** No.

**Q.** So do you think that she genuinely believes that she has mental health disorders that keeps her from working?

**A.** I think she has a sincere but incorrect belief that she's disabled. Again, prior to asking for accommodations, she went to meetings, senior leadership team, traveled to Brussels on several occasions to supervise that laboratory and meet with people.

So she was functioning, in her own estimate, pretty well in September and October of 2017, and Mr. Mekerri thought she was meeting their expectations. There were some things he would like her to do some more of, but there was, in my view, no dramatic change in her job.

And, particularly, there was no -- she didn't suddenly develop a condition -- Alzheimer's disease, had a stroke, dementia -- that would interfere with her capacity to do the job of a pathologist. So there was no new condition.

1   She was surprised, tearful, very upset when they said to her

2   at a meeting at the end of February, we can do a couple of

3   things you want for accommodations, but there are several

4   that are just incompatible with being the scientific head,

5   main pathologist in this pretty big company that has

6   laboratories in Brussels and China and Singapore and in

7   Kentucky.

8   **Q.**  Now, I think you testified earlier that you had reviewed

9   the records, medical records from Bend, Oregon, and from

10  Albuquerque, New Mexico; is that right?

11  **A.**  Correct.

12  **Q.**  And do you have any concerns about the quality of

13  treatment that Dr. Menninger was receiving based on those

14  records?

15  **A.**  Well, many of the records are problematic, in my opinion.

16  There's a tremendous amount of cut and paste that goes on in

17  the records.  One example was Dr. Burbano, in Albuquerque,

18  literally took the paragraph that Dr. Kessimian had written

19  about her makeup, what kind of person she is, without

20  attributing it to Dr. Kessimian.

21        And most of the records are kind of chasing

22  symptoms rather than, okay, we have this woman who has

23  completed medical school, completed a residency, let's see if

24  we can get her back into the work force versus cataloging her

25  complaints and occasionally manipulating some of the

1    medications.

2    **Q.**  Are there certain kinds of treatment that she has not

3    received that you think might be beneficial?

4             MR. HANNON:  Objection.  This is beyond the scope

5    of the report, Judge.

6             THE COURT:  I think you should rephrase the

7    question, make it more focused.  There's a small piece, I

8    think, that would be within the report; but, mostly, I think

9    Mr. Hannon is correct.

10            If you look at the supplemental report, what I'm

11   referring to in the supplemental report in the second to last

12   paragraph, the last sentence --

13            So you understand, ladies and gentlemen of the

14   jury, while the lawyers look at that, so experts produce

15   written reports.  Generally speaking, juries don't see the

16   written reports.  The written reports are disclosures because

17   they're a different kind of witness, and I'll explain a

18   little bit more about this in the final instructions, they're

19   giving opinions, as you can see.  And you can see the experts

20   you heard in this case were not at PPD.  None of them ever

21   knew Dr. Menninger before they did their clinical interviews

22   or their forensic interviews for these evaluations, or what

23   have you.  And that's fine.  That's what experts do.

24            But because of that, there are certain requirements

25   about it because they're not the typical percipient witness,

```
 1    like the auto example, auto accident example, the person who
 2    saw the accident.  And so they make reports to disclose what
 3    their opinions are and that -- what they reviewed and what
 4    the basis of the opinion are, and then they are limited.
 5    They can't -- the whole point of that is to prepare the case
 6    so they're limited to the scope of that report.  They can't
 7    come up with new opinions, and that's the issue that's being
 8    addressed.
 9              Ready?
10              MR. CURRAN:  Yes.  Thanks, Your Honor.
11              THE COURT:  Go ahead.
12    BY MR. CURRAN:
13    Q.  Were you concerned about the treatment goals that her
14    treatment team has been setting for her?  Did you have any
15    concerns about that?
16    A.  Yes.  There was no kind of plan to get this graduate of a
17    medical school, completed a residency --
18              MR. HANNON:  Objection.  This is beyond the scope.
19              THE COURT:  Sustained.  I think this is beyond the
20    scope.
21              MR. CURRAN:  Okay.  All right.  I don't have any
22    further questions, Dr. Kelly.
23              THE COURT:  All right.
24              MR. CURRAN:  Thank you very much for your
25    testimony.
```

```
 1              THE COURT:  Cross-examination?

 2              MR. HANNON:  Yes, Your Honor.

 3              May I approach the bench?

 4              THE COURT:  Yes.

 5              MR. HANNON:  May I approach the witness?

 6              THE COURT:  Yes.

 7              MR. HANNON:  May I proceed, Your Honor?

 8              THE COURT:  Yes.

 9         CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

10   BY MR. HANNON:

11   Q.  Good morning, Doctor.

12   A.  (No response.)

13              THE COURT:  Can you hear him?

14              MR. HANNON:  I'm sorry.  I'll speak louder.

15   BY MR. HANNON:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  Sir, you mentioned earlier that you're no longer seeing

19   new patients; is that right?

20   A.  That's not correct.  I have a very small private

21   practice.  I prescribe antidepressants on Sunday to a patient

22   with major depressive disorder.  I'm going to see that person

23   next week virtually, and I'll be wrapping up my private

24   practice at the end of May.

25   Q.  My question, sir, was a little bit different.  You're no
```

```
 1   longer seeing new patients, right?
 2   A.   Oh.  That's correct.
 3   Q.   Okay.
 4   A.   Correct.  Sorry.
 5   Q.   In fact, sir, you stopped seeing new patients almost
 6   20 years ago, right?
 7   A.   Approximately.
 8   Q.   Okay.  And when you stopped seeing new patients
 9   approximately 20 years ago, there were about 20 patients in
10   your practice; is that right?
11   A.   Yes --
12   Q.   Okay.
13   A.   -- that --
14   Q.   And with when you were deposed in this matter a couple of
15   years ago, at that time, you were down to five patients,
16   correct?
17   A.   I'm sorry; say again, please.
18   Q.   At the time you were deposed in this matter a few years
19   ago, you were down to seeing about five patients; is that
20   right?
21   A.   That's correct.
22   Q.   And in the last 20 years, sir, you have not treated a
23   patient with social anxiety disorder, have you?
24   A.   I don't think so, no.
25   Q.   In the last 20 years, sir, you have not treated a patient
```

1    with panic disorder, correct?

2    **A.**   I -- I don't catalog things in that way.  I may have, at

3    any moment, 20 patients, or later, five patients, but that

4    can be a resolving cast, if you will.  Someone will ask to

5    come back and see me.  They have some issue that they think

6    I -- that I've treated 25 or 35 years ago.  So it's not like

7    they are the same five patients.

8            And those are just approximations of how my private

9    practice was.

10   **Q.**   Sure.  I'm not asking about the number right now.  I'm

11   asking about patients with panic disorder.  In the past

12   20 years, have you treated any patients with panic disorder?

13   **A.**   I think I might have, but I can't recall one off the top

14   of my head.  I don't catalog things that way, if you will.

15   **Q.**   Sure thing.

16           And since you stopped accepting new patients in

17   your practice, your work has largely focused on being an

18   expert consultant, correct?

19   **A.**   And mentor and teacher to residents in psychiatry and to

20   some relatively senior staff.  So I'm kind of the old guy,

21   let me run this case by him, and the like.  So I am active in

22   teaching, and that would involve residents and staff, people

23   who might be dealing with an anxiety disorder and they might

24   ask for my view of that.

25           But, again, I don't catalog things that way.  I

1  mean, how many of this and how many of that is not how I tend
2  to think.
3  **Q.**  When was the last time you were compensated for teaching?
4  **A.**  When was the last time I what?
5  **Q.**  You were compensated, you were paid for teaching?
6  **A.**  The system at Harvard Medical School is that the
7  hospitals are on the hook for the salary of the staff, and
8  you get a teaching appointment.  Currently, I'm associate
9  professor of psychiatry.  But the medical school doesn't pay
10  you for teaching.
11       So -- and I have -- I have not received a salary
12  for my teaching activities in, as you point out, close to
13  20 years.
14  **Q.**  Okay.  So in terms of where you earn your living, part of
15  that comes from your private practice; is that right?
16  **A.**  I didn't get the first part of that.
17  **Q.**  No worries.
18       In terms of how you earn your living, part of that
19  comes from your private practice?
20  **A.**  Yes.  And my forensic practice.
21  **Q.**  And that's it, right?
22  **A.**  Yes.
23  **Q.**  Okay.  So in terms of the way that you're compensated for
24  the mentoring and being available to ask questions, that's --
25  that's all part of your private practice, right?

**A.**   The acoustics for me in this courtroom are not very good.
Sorry.  Could you go through it again?  I'm sorry to ask you
to do that.

**Q.**   No -- no worries at all.

In terms of how you're compensated for mentoring,
that's -- that's solely from your private practice, correct?

**A.**   I'm not compensated for my mentoring.  Okay?  I don't
receive any salary for mentoring.  I do continue to teach.
Residents often will come to court with me, or I'll brief
them on the elements of the case.  So -- but I don't get any
money for that, yeah.  I'm tempted to say I do it as a
volunteer out of the goodness of my heart, but I don't.  I
don't need that.  And the forensic activities are very well
compensated.

**Q.**   Okay.  And we'll talk about the forensic activities in a
moment.

In terms of your teaching, do you actually teach
classes?

**A.**   Yes.

**Q.**   How often?

**A.**   COVID has interrupted things of that sort, so usually I
do a seminar, a two-hour block, one in the fall and one in
the spring.  One of them has to do with orienting the
residents to forensics psychiatry, and the one in the spring
tends to be about psychosomatic medicine and the like.

 1    **Q.**   Okay.  Let's focus on the --

 2    **A.**   I did much more of it, you know, in the past, but those

 3    are the main ones that I do now.

 4    **Q.**   Very good.  Thank you.

 5              In terms of the forensic psychiatry work that you

 6    do, how much of your professional time over the last ten

 7    years has been devoted to serving as an expert witness?

 8    **A.**   Forensic psychiatry generally is about 90 percent of my

 9    income.

10    **Q.**   And one of your repeat clients, so to speak, is the

11    Commonwealth of Massachusetts, right?

12    **A.**   Correct.

13    **Q.**   And the instances when you've worked on behalf of the

14    Commonwealth typically involve instances concerning whether

15    or not someone is competent to stand trial, correct?

16    **A.**   Correct.

17    **Q.**   And when the Commonwealth needs an expert to say that

18    someone is competent to stand trial, you're the guy they

19    call?

20    **A.**   Well, I wouldn't call them a client.  The Commonwealth is

21    often a court or a district attorney, and they want -- they

22    have some reason to question whether someone is competent to

23    stand trial.  So I -- I wouldn't quite agree with they want

24    someone to find the person "competent," kind of stuff.  For

25    the most part, district attorneys and courts just want

```
 1    competent opinions and --
 2    Q.   I didn't mean to cut you off.
 3              And when they want a competent opinion in that kind
 4    of a case, they come to you, right?
 5    A.   Say again, please.
 6    Q.   When the Commonwealth wants a competent opinion in that
 7    type of case, they come to you.  Yes?
 8    A.   Yes.
 9    Q.   You mentioned before a recent matter you became involved
10    with involving a child hit by a Comcast truck?
11    A.   Correct.
12    Q.   Did I hear that right?
13    A.   Correct.
14    Q.   Which side of the case were you retained on?
15    A.   The defense.
16    Q.   And what was the issue you were asked to examine?
17    A.   I -- I didn't examine anyone in that case.  I helped the
18    defense attorneys with understanding particularly the issues
19    for the mother of the child in anticipation of helping them
20    with a cross-examination of the plaintiff's expert.
21    Q.   So your work there surrounded trying to minimize the
22    impact on the mother of the child struck by the Comcast
23    truck?
24    A.   No.
25    Q.   Was there an allegation there that the mother had become
```

1    depressed as a result of the death of her child?

2    **A.**  Yes.

3    **Q.**  And was it your opinion there that she did not become

4    depressed?

5    **A.**  My opinion was that she was depressed, that this was a

6    tragic situation of a four- to five-year-old who ran down the

7    driveway going across the street to a friend's house, and

8    that she was in the house at the time, but her father was in

9    the driveway and saw the whole thing happening.

10             A terribly tragic situation.  But it was not my job

11   to minimize anything.  That was just tragic.  However, the

12   expert for the plaintiffs made some allegations that I

13   thought were exaggerations.

14   **Q.**  Did you believe the mother in that case had formed a

15   reactive depression?

16   **A.**  Yes.

17   **Q.**  And am I right it's your opinion in this case that

18   Dr. Menninger formed a reactive depression?

19   **A.**  Yes.

20   **Q.**  Now, you distinguish reactive depression from a major

21   depression disorder, correct?

22   **A.**  Major depressive disorder, yes.

23   **Q.**  And with respect to major depressive disorder, you take

24   issue with the word "major"?

25   **A.**  I do.

1    **Q.**  And in terms of the distinction that you draw between a

2    reactive depression and major depression -- I'm sorry --

3    major depressive disorder, really, the distinction to you is

4    what causes it, right?

5    **A.**  Correct.

6    **Q.**  In your opinion, sir, a reactive depression can be just

7    as painful as major depressive disorder.  Yes?

8    **A.**  It can be, depending on the circumstances, yes.

9    **Q.**  And, sir, it's your opinion that if someone develops

10    depression in response to some kind of life event, then that,

11    by definition, is not major depressive disorder, correct?

12    **A.**  Correct, basically.

13    **Q.**  That is not an opinion held by the entire psychiatric

14    community, correct?

15    **A.**  Nothing is held by the entire psychiatric community, but

16    I think it's generally thought that major depressive disorder

17    is a biological disorder, has genetic consequences; that it

18    responds to medications, antidepressant medications; has a

19    typical life history, onset in late adolescence, early

20    adulthood, over the decades, periods of being depressed, and

21    then getting treatment or spontaneously recovering.

22           But in terms of distress and painful, it depends on

23    the circumstances.

24    **Q.**  So let's unpack that a little bit.  So one thing you said

25    is that you believe that major depressive disorder has some

```
 1  kind of a biological piece to it; is that right?
 2  A.  Yes.
 3  Q.  So normally a person with major depressive disorder,
 4  there's some kind of family history that -- well, let me just
 5  stop there.  There's some kind of family history, right?
 6  A.  That's often the case, that there's a family history of
 7  depressive disorders.
 8  Q.  What about other psychological disorders?  Would that
 9  also be a potential risk factor, so to speak, for a person
10  developing major depressive disorder?
11  A.  Yes, it can be.
12  Q.  Sir, were you aware in this case of the family history of
13  Dr. Menninger?
14  A.  Say again, please.
15  Q.  In your work in this case, did you become aware of
16  Dr. Menninger's family history of mental health issues?
17  A.  Yes.  That's in the records.  I don't -- I don't -- there
18  was a comment in -- I believe it's Dr. Kessimian's records
19  that, on her paternal side and maternal side -- side, not
20  parents, necessarily -- that there was a history of
21  psychological problems.
22  Q.  And would that history of psychological problems in
23  Dr. Menninger's family, would that be a risk factor for her
24  to develop major depressive disorder?
25  A.  It could be, but I don't know enough of the details about
```

```
 1   her family history.  All of us have families that have some
 2   individuals that have psychological problems.
 3   Q.  But some more than others, right?
 4   A.  Yes.
 5   Q.  And the experiences you read about in Dr. Kessimian's
 6   notes concerning Dr. Menninger's parents, that's the kind of
 7   thing that would present a risk factor for major depressive
 8   disorder, yes?
 9   A.  Possibly.  You need to know more about what kinds of
10   problems, psychological problems, existed, their intensity,
11   their nature.  And in the records, I could not find any
12   comment other than on maternal and paternal side, there are
13   relatives that had psychological problems.
14   Q.  When you interviewed Dr. Menninger in this case, did you
15   ask her for additional detail concerning her parents' mental
16   health issues?
17   A.  I don't believe I did.
18   Q.  And in terms of the time frame that we're talking
19   about -- well, strike that.
20            Did you also see in the medical records that
21   Dr. Menninger's daughter also suffers from mental health
22   issues?
23   A.  There are comments in there that occasionally her
24   daughter has had problems in school and also has expressed
25   suicidal ideation.
```

1    **Q.** So would that be a yes?

2    **A.** Yes.

3    **Q.** Sir, would you agree with me that Dr. Menninger's family

4    history between both her parents and her daughter presents a

5    clear risk sign for development of major depressive disorder?

6    **A.** I would not.

7    **Q.** In addition to her family history, you saw that

8    Dr. Menninger, over the course of her life, had been

9    diagnosed with several disorders, right?

10   **A.** Dr. Kessimian?

11   **Q.** Pardon me if I misspoke -- that Dr. Menninger, over the

12   course of her life, had been diagnosed with several

13   disorders, yes?

14   **A.** The main one was anxiety disorder, general anxiety

15   disorder, GAD, and social phobia; and that was three

16   relatively brief visits in 2012 to 2015 in Kansas City.

17   **Q.** Sir, would you agree that having generalized anxiety

18   disorder is also a risk factor for the development of major

19   depressive disorder?

20   **A.** Not in my opinion.  I know that there are some people who

21   feel that in the field, but I don't think that there's a

22   strong correlation between generalized anxiety disorder and

23   major depressive disorder.

24   **Q.** Have you done specific research on that issue?

25   **A.** No.

1    **Q.**  Would you agree, sir, that having social anxiety disorder

2    also presents a risk factor for development of major

3    depressive disorder?

4    **A.**  You used the word "also."  I don't think that it is.

5    **Q.**  You'd agree that others in the psychiatric community

6    disagree with you?

7    **A.**  There are people in the psychiatric community that think

8    that that's a risk factor for depression, yes.

9    **Q.**  Well, not just depression, sir, major depressive

10    disorder, yes?

11    **A.**  Correct, yes.  There are some in the field.  I don't

12    subscribe to it, but there are some in the field that do.

13    **Q.**  Speaking of disagreements, you don't believe that

14    Dr. Menninger even had social anxiety disorder; isn't that

15    right?

16    **A.**  In my opinion, I think she is, in her makeup, an anxious

17    person.  If she has social anxiety disorder, it's been, over

18    the years, well managed with just taking a Valium pill for

19    some meetings.  So it's not a profound problem with her

20    functioning.  She believes she has functioned very well.  At

21    PPD, they thought her performance was fine.

22            So it's -- I could not find a major disruption in

23    her actual functioning doing what needed to be done.  Was she

24    experiencing some anxiety in meetings where she might have to

25    be more active?  Yes.  But that doesn't, for me, really get

        1    to a serious social anxiety disorder, social phobia.
        2    **Q.**  Sir, in your view, a person doesn't have social anxiety
        3    disorder unless their symptoms are visible to others; is that
        4    right?
        5    **A.**  That's not my opinion.  I don't think they have to be
        6    visible to others.  They have to have some problem with
        7    functioning if you have a pretty well established social
        8    phobia, social anxiety disorder.  It's got to be manifest in
        9    your work activities in this situation.
       10    **Q.**  And sometimes people with social anxiety disorder, they
       11    can manage those manifestations through medication, yes?
       12    **A.**  Yes.
       13    **Q.**  Would Valium be one of those medications?
       14    **A.**  Say again, please?
       15    **Q.**  Would Valium be one of those medications?
       16    **A.**  Yes.
       17    **Q.**  Medications like Valium have side effects, yes?
       18    **A.**  Yes.
       19    **Q.**  What are the side effects?
       20    **A.**  In my opinion, Valium is not a good drug for social
       21    anxiety disorder.  Valium tends to come on a couple hours
       22    after you take it and lasts for a couple of hours -- two to
       23    four.  There are short-acting antianxiety drugs that will
       24    come on in a half an hour and be washed out in two hours, and
       25    there's no hangover.

```
 1              And Dr. Menninger complained of kind of lingering
 2      effects after a meeting from taking the Valium.  So, yes,
 3      it's used that way, but my own sense is that there are better
 4      drugs without significant side effects, such as a kind of
 5      later-in-the-day hangover with the Valium.
 6      Q.  My question is, sir, is what are the side effects of
 7      Valium?
 8      A.  Generally, there aren't many serious side effects.  You
 9      can be sleepy.  You can be less cognitively efficient,
10      clouded kind of stuff.  Rarely, there are GI,
11      gastrointestinal problems, but those are the main ones that
12      occur to me.
13      Q.  Did Dr. Menninger report having side effects from taking
14      the Valium?
15      A.  Yes.
16      Q.  You also do not believe that Dr. Menninger had panic
17      disorder; is that right?
18      A.  Yes, I don't think she did.
19      Q.  You know that she reported having panic attacks?
20      A.  Say again, please.
21      Q.  You know that she reported having panic attacks?
22      A.  Yes.
23      Q.  Your opinion, sir, is those weren't actually panic
24      attacks, right?
25      A.  The context is she did not describe panic attacks prior
```

1   to the request for accommodations.  When they could not go

2   along with the accommodations, she was very anxious, "What's

3   going to happen to me?  What's going to happen to my family?"

4   and the like.

5           I would not call that a panic attack.  Panic

6   attacks are, again, conditions that tend to come on in early

7   adulthood and can be recurrent.

8   Q.  Let me describe for you an event, and please tell me if

9   this sounds consistent with a panic attack.  This would be

10   someone's observations of the individual.

11           "During one of our social situations, she sought me

12   out and was unable to communicate clearly.  Her breathing was

13   rapid.  She did her best to hold back tears, unable to fully

14   communicate what was happening to her, and it took several

15   minutes to recover enough to explain what she was

16   experiencing."

17           Doctor, does that sound like a person who's having

18   a panic attack?

19   A.  It would -- I would be curious as to the timing of that.

20   Was that before or after the request for accommodations?  If

21   it was before that she was having that experience, then that

22   would be a vote in the direction of panic attacks.

23   Q.  So it's only a panic attack if it happened before the

24   unlawful conduct she alleges?

25   A.  Again, I would be curious as to the timing of that

```
 1    comment.  Was it before or after she requested accommodations
 2    from PPD?  If it was before, then that would be a vote in the
 3    direction of that she has panic attacks.
 4    Q.  You know -- you know Dr. Summergrad, right?
 5    A.  I do.
 6    Q.  He has a good reputation in the psychiatric community?
 7    A.  Yes.
 8    Q.  Do you believe he was -- you -- strike that.
 9           You read his expert report?
10    A.  Yes.
11    Q.  Based upon your knowledge of Dr. Summergrad, would you
12    agree that the opinions expressed in his report are genuinely
13    held by him?
14    A.  I would assume so, yes.
15    Q.  No reason to think otherwise?
16    A.  No.
17    Q.  Going back to reactive depression, you agree that
18    Dr. Menninger developed a reactive depression in 2018; is
19    that correct?
20    A.  Yes.
21    Q.  And prior to the development of that depression,
22    Dr. Menninger had not previously shown symptoms of
23    depression, right?
24    A.  Correct.
25    Q.  In fact, sir, that's the -- that's one of the reasons why
```

1    you disagree with the diagnosis of major depressive disorder,

2    correct?

3    **A.**   Correct.

4    **Q.**   And, sir, you agree that Dr. Menninger's development of

5    reactive depression in 2018 was caused by PPD, yes?

6    **A.**   No.  I have a problem with the term "caused by."  It's --

7    I mean, reactive depression is not mysterious.  Something bad

8    happens in your life, and you react with sadness and upset,

9    and you're depressed and you're unhappy.  It's not like some

10   really tricky, arcane kind of problem.

11   **Q.**   But my question, sir, concerns what was the bad thing?

12   What was the life event that caused her to form this reactive

13   depression?

14   **A.**   That PPD considered her requests and apparently felt that

15   the requests that she had, 2, 3, and 4 on the list, were

16   incompatible with being the senior scientist, head

17   pathologist at PPD.

18   **Q.**   So to be clear, sir, you would agree with me that there

19   wasn't some other major life event that caused Dr. Menninger

20   to form major --

21   **A.**   I have a problem with the "caused."

22   **Q.**   Let me get the question out.

23   **A.**   It was an occasion, okay, precipitant, trigger.  But

24   caused -- this is probably a multifactorial situation.

25   It's -- think for a second about a light switch.  You go to

 1   the light switch and you flick it on and the light comes on.

 2   Did flicking the switch cause the light to go on?  Not

 3   really, because the electric company is on the street, there

 4   are wires into the house, there's wires -- kind of thing.

 5           So just because something happens after an event

 6   doesn't mean it is a cause of that event.

 7   **Q.**  Let's use your light switch analogy.  You'd agree with me

 8   that PPD's response to Dr. Menninger's request for

 9   accommodation was the light switch that brought on her

10   reactive depression?

11   **A.**  There's problems with analogies, but yes.  But, again,

12   "caused" is not something that I -- the cause could be that

13   her request was over the top.

14   **Q.**  Do you recall -- do you recall being deposed in this

15   matter?

16   **A.**  Say again?

17   **Q.**  Sorry.  Do you recall being deposed in this matter?

18   **A.**  Yes.

19   **Q.**  In the binder in front of you, at the first tab, you'll

20   find a copy of your deposition transcript.  If you could

21   please turn to page 59.

22   **A.**  Yes.  I have it.

23   **Q.**  And if you could look at -- it's actually page 58,

24   line 23 -- actually, I'm sorry.  Go to page 59.

25   **A.**  Page 51?

```
 1    Q.  59, line 5.  And please read along silently as I read out
 2    loud.  "What decision" --
 3    A.  I'm on page 59.  What line?
 4    Q.  Line 5, please.
 5            "What decision of the company do you believe caused
 6    her depression?"
 7    A.  Okay.
 8    Q.  "ANSWER:  --
 9    A.  I hope I've made it clear my problem with the word
10    "caused."
11            THE COURT:  Let him just first finish the question.
12    Hold on, Dr. Kelly.
13            You read that part.  What's the question, or you're
14    not done?
15            MR. HANNON:  I'm not done yet.  Let me read the
16    question and answer.
17            THE COURT:  Go ahead.
18    BY MR. HANNON:
19        "QUESTION:  What decision of the company do you believe
20    caused her depression?
21        "ANSWER:  The decision that the accommodations that she
22    was requesting, she can meet some of them, but several were
23    incompatible with the position she held in the company."
24        Did I read that right?
25    A.  Yes.
```

1   **Q.** Now, to be clear, sir, you go on to note that causation

2   here, you mean more precipitation, right?

3   **A.** Well, their response to her request surprised her. She

4   thought it would be no problem and she was very upset. I

5   have a problem with the word "caused," because maybe her

6   request for accommodations were inappropriately --

7   inappropriate and excessive.

8         So maybe that's where the chain of events should

9   start; but, again, I have problems with the word "caused."

10   **Q.** Following PPD's rejection of Dr. Menninger's

11   accommodation request, there was other conduct that

12   contributed to Dr. Menninger's depression; is that right?

13   **A.** I don't know what you're referring to.

14   **Q.** Well, you're aware that in early June of 2018,

15   Dr. Menninger's doctor recommended that she take a medical

16   leave, correct?

17   **A.** Absolutely not. Her doctor was against her taking

18   medical leave. She had decided she was going to, but if you

19   look carefully at Dr. Kessimian's records -- particularly,

20   for example, May 25th -- there's a quotation in there, "I

21   discussed honestly with her that she has not tried the gold

22   standard for treatment of social anxiety disorder; namely,

23   exposure therapy," which is correct.

24         So Dr. Kessimian didn't recommend that she take

25   leave, but rather was saying, "Ooh, slow down. Maybe you

1  ought to try some other approaches that will help you stay on

2  your job at PPD."  That's May 25th.

3  **Q.**  Sir, you would agree that Dr. Menninger became suicidal?

4  **A.**  She had passive suicidal ideation, which is described in

5  both Dr. Kessimian's record.  It was somewhat fleeting.  It

6  was expressed in the end of April and had resolved by

7  May 18th, which was her next visit.

8           And she reassured Dr. Kessimian that she was not

9  really suicidal.  It's just that this was weighing on her, it

10  was very hard, and the like; and that qualifies as passive

11  suicidal ideation.  "Some days, I wish I didn't wake up.  I

12  can't take this," as, in the field, can be regarded as

13  passive suicidal ideation.

14           "I know where my husband's gun is," that's suicidal

15  ideation, she's thinking about how she might do it, which is

16  not the case here.

17  **Q.**  Sir, you've seen instances in the past where a person

18  suffering from what you call "reactive depression" has taken

19  their own life, yes?

20  **A.**  Has taken?

21  **Q.**  Has killed themselves?

22  **A.**  Yes.

23  **Q.**  I'm going to show you Joint Exhibit Number 1.  Doctor,

24  this is an expert report that you prepared back in May of

25  2011; is that right?

```
 1   A.   That's correct.

 2   Q.   You prepared this report on behalf of a gentleman's -- on

 3   behalf of the family of Jeffrey Chaput; is that right?

 4   A.   Yes.

 5   Q.   Do you recall this case?

 6   A.   Somewhat, yes.

 7   Q.   Mr. Chaput had gotten hurt at work?

 8   A.   Yes, he did.  There was a heavy bucket full of weighty

 9   materials, and he had a crush injury of his hand and ongoing

10   pain that was not able to be treated easily.

11   Q.   And then he lost his job?

12   A.   Yes.  He couldn't do the work.

13   Q.   And then he could no longer provide for his family?

14   A.   And then he developed?

15   Q.   I said and then he was no longer able to provide for his

16   family?

17   A.   Yes.  That weighed very heavily on him.

18   Q.   And then he developed depression?

19   A.   Yes.

20   Q.   And then he killed himself?

21   A.   Yes.

22   Q.   I show you now Joint Exhibit 2.  Is this an expert report

23   that you prepared on behalf of the family of Gilbert Dube?

24   A.   Yes.

25   Q.   Mr. Dube got hurt at work?
```

1    **A.**   Yes.

2    **Q.**   He went on total disability?

3    **A.**   I'm not recalling that.  He might have.  I think they let

4    him go.

5              Okay.  Let me just --

6    **Q.**   The bottom sentence there, you see it says, "On

7    December 4, 2001, while collecting total disability"?

8    **A.**   Okay.  Yes.

9    **Q.**   And then he lost his job?

10   **A.**   Yes.

11   **Q.**   And then he had difficulty providing for his family?

12   **A.**   Correct.

13   **Q.**   And then he killed himself.

14   **A.**   Yes.

15   **Q.**   In your opinion, you note how his suicide was a complete

16   shock and surprise to his family and people who knew him

17   well, right?

18   **A.**   Yes.

19   **Q.**   He had historically been a strong, positive, somewhat

20   happy-go-lucky individual who prided himself on hard work,

21   right?

22   **A.**   Correct.

23   **Q.**   In both of these instances that we just looked at,

24   Mr. Dube and Mr. Chaput, you opined that the suicides were

25   causally related to the loss of their job; is that right?

 1   **A.**  Yes.

 2   **Q.**  Now let's take a look at Dr. Kessimian's notes.  I'm

 3   going to show you Joint Exhibit Number 18.  So we're looking

 4   at here the 44th page of the exhibit.

 5           Sorry, my highlighter is not working, but if you

 6   look towards the top of the page, you'll see there the "DOS:

 7   6/1/18."

 8           Do you see that?

 9   **A.**  Yes.

10   **Q.**  So you understand this is a note of a visit with

11   Dr. Kessimian on June 1, 2018?

12   **A.**  Yes.

13   **Q.**  The chief complaint of Dr. Menninger that day was, "I

14   just can't do it anymore.  I'm not sleeping, eating.  I'm

15   having thoughts about ending my life, but I wouldn't do it

16   because of Maya and Mason."

17           Do you see that?

18   **A.**  That's what the note says, yes.

19   **Q.**  My projector is not working right now, but are you aware,

20   sir, that that was the same visit on which Dr. Kessimian

21   recommended that Dr. Menninger take a leave of absence from

22   work?

23   **A.**  I have a notebook that's in the gallery with

24   Dr. Kessimian's notes in it.  Is it possible I could have

25   that on the stand?  It might solve the projection problems.

1    **Q.**  No.  If you can just tell the jury now if you recall if

2    it was on that visit on June 1, 2018 that Dr. Kessimian

3    recommended that Dr. Menninger take an immediate leave of

4    absence from work.

5    **A.**  Again, I'm -- the appointment right before this one,

6    May 25th, bottom of the first page, is very explicit, in my

7    opinion, about Dr. Kessimian's thoughts about how this ought

8    to be handled, not going on disability, not going into a day

9    hospital, not taking a leave of absence.

10          Again, I -- I'm a little bit at -- I'm having

11    difficulty dealing with it.  I have Dr. Kessimian's records

12    in my briefcase that an associate has and I could deal with

13    it directly to solve your projection problems.

14    **Q.**  Well, let me ask you a different question.  You'd agree

15    that a person suffering depression sometimes has good days?

16    **A.**  Yes.  There can be some fluctuation in things.

17    **Q.**  And they sometimes have bad days, right?

18    **A.**  Yes.

19    **Q.**  Yes?

20    **A.**  Yes.

21    **Q.**  And you mentioned before Dr. Kessimian's reference to

22    exposure therapy?

23    **A.**  Yes.

24    **Q.**  Did I hear that right?

25    **A.**  Yes.

1  **Q.**  And exposure therapy is --

2  **A.**  Oops.

3  **Q.**  Is that what it sounds like?

4  **A.**  Say again?

5  **Q.**  Is that essentially exposing a person to something that

6  sort of causes them pain or discomfort in order to help them

7  build a tolerance?

8  **A.**  Basically, that's the principle.  It can take various

9  forms.  Back in the '80s and '90s, people with a fear of

10  flying could go over to Logan Airport, could go into a

11  hangar, walk around an airplane, that kind of thing.  And

12  there's also the phenomena of habituation; namely, if you go

13  to meetings and master them, maybe with the help of

14  medication, then that's an exposure therapy that can be a

15  very effective treatment in social anxiety disorder.

16  **Q.**  Would you agree that, before engaging in exposure

17  therapy, you need to make sure that the person can withstand

18  the exposure without suffering self-harm?

19  **A.**  The exposure therapy initially causes -- likely -- I

20  should not use the word "cause."  A person will experience

21  anxiety; and then, over time, the exposure exercises lessens

22  the experience of anxiety.

23  **Q.**  My question, sir, though, is if you're going to treat

24  someone with exposure treatment, you want to make sure that

25  they're capable of handling the exposure, right?

1    **A.**   Yes.

2    **Q.**   And --

3    **A.**   You would not do it if you had serious concerns that this

4    would be very difficult, very, very difficult for the

5    individual and maybe we ought to go very slowly here.

6    **Q.**   And now that I've stalled long enough to fix my iPad,

7    let's take a look at Dr. Kessimian's recommendation on

8    June 1st.

9              So I'm showing you now Joint Exhibit 18 and you see

10   here, sir, Dr. Kessimian recommended immediate medical leave

11   starting on Monday -- it says "2/2" -- to level of anxiety

12   and safety issues, monitor GI distress and appetite.

13             Do you see that?

14   **A.**   It -- the reference to "2/2," that look like it's

15   February 2nd, which was, I think, the second appointment that

16   she had with Dr. Kessimian.  So I don't -- this may be in the

17   June time frame, but it doesn't kind of -- "Safety --

18   recommended immediate medical leave starting on Monday 2/2 to

19   level anxiety and safety issues, monitor GI distress and

20   appetite."

21   **Q.**   Well, let me help you orient in terms of when this is.

22   I'll turn back two pages.  And you'll see this is

23   Dr. Kessimian's note on June 1, 2018; do you see that?

24   **A.**   Then that probably is a typo of the 2/2, yeah.

25   **Q.**   So would you agree with me, sir, that on June 1, 2018,

1   Dr. Kessimian recommended immediate medical leave?

2   **A.**   Yes, it appears so.

3   **Q.**   Is it your opinion, sir, that Dr. Kessimian was -- was

4   wrong in concluding that that was necessary?

5   **A.**   It speaks for itself.  I mean, it at -- that is very

6   different from a May 25, 2018 note.

7   **Q.**   Sure.  I'm not asking you if it's different; I'm asking

8   you if you believe that Dr. Kessimian, that her advice here

9   was wrong.  Do -- do you have an opinion one way or the

10  other?

11  **A.**   I -- "recommended immediate medical leave," that's what

12  it says in that note.  Dr. Menninger had already decided to

13  go on medical leave.

14  **Q.**   That wasn't my question, sir.  My question is whether or

15  not you disagree with Dr. Kessimian's recommendation of

16  immediate medical leave.  Do you?

17  **A.**   I disagree that she should have had a medical leave.

18  **Q.**   I think I heard you say on examination from PPD's lawyers

19  that reactive depression should be treatable with drugs; is

20  that right?

21  **A.**   Reactive depression should -- what?

22  **Q.**   Is something you should be able to treat with drugs, yes?

23  **A.**   No.

24  **Q.**   You believe depression in general should be responsive to

25  drugs; is that right?

1      **A.**   In my opinion, major depressive disorder, a biological

2      genetic condition, is the only depressive disorder that

3      responds to medication via the chemical properties thereof.

4              Now, if you have a very sympathetic doctor and

5      prescribes a medication to help you with your reactive

6      depression and tells you, "I think it will help you," that,

7      in my opinion, is more likely to be a placebo effect given

8      the totality of those circumstances.

9      **Q.**   Well, sir, you've seen that over the course of

10     Dr. Menninger's treatment, that she's been taking drugs,

11     right?

12     **A.**   Off and -- well, for the most part, she has been taking

13     medications.  Occasionally, she comes off medication, usually

14     spontaneously, if she decides that she's going to stop the

15     medication.

16     **Q.**   Spontaneously?  What do you mean spontaneously?

17     **A.**   There's a sequence in the Portland clinic in 2022 in

18     which she decides when she's seeing the nurse practitioner

19     who is prescribing medications, she says to the nurse

20     practitioner, "I think I want to do this using the things

21     that I've learned from my counseling," and she comes off the

22     medication; and then a couple months later, she wants to go

23     back on it.

24              So she is significantly influencing the medication

25     choices.

1  **Q.**  She's trying to get better; isn't that right?

2  **A.**  I don't think she's malingering.  Okay?

3  **Q.**  So you'd agree --

4  **A.**  But --

5  **Q.**  -- that she's trying to get better?

6  **A.**  But she's resistant to talking about returning to any

7  medical-type activity in 2022, so even -- oops -- even

8  discussing it with her counselor.

9  **Q.**  And, sir, that's what people do when they have traumatic

10  events in their life, right?

11  **A.**  They can.

12  **Q.**  Your kid gets hit by a Comcast truck, you're probably not

13  ordering Comcast in the future, right?

14  THE COURT:  I think that's beyond the scope,

15  Mr. Hannon, of the medical expert's opinion, as to whether

16  you would be ordering Comcast or not.

17  BY MR. HANNON:

18  **Q.**  If you suffer a traumatic event that gives you suicidal

19  ideation, you're probably going to be concerned about putting

20  yourself back in that same position, yes?

21  **A.**  There was no evidence of suicidal ideation until the

22  April 23rd visit, and it was resolved two weeks later,

23  June 1st.  So at least until the end of April, there were no

24  suicidal issues while she was still active, albeit from a

25  distance, with PPD.

1    **Q.**  You believe that Dr. Menninger not -- strike that.

2         You believe that notwithstanding her depression

3    that Dr. Menninger is capable of returning to work; is that

4    right?

5    **A.**  Yes.

6    **Q.**  You're aware, sir, that Dr. Menninger was awarded

7    long-term disability benefits?

8    **A.**  Yes.

9    **Q.**  That was by Unum Insurance Company?

10    **A.**  Yes.

11    **Q.**  They concluded she couldn't work?

12    **A.**  Yes.

13    **Q.**  She was awarded Social Security disability benefits?

14    **A.**  I believe that's correct.

15    **Q.**  The United States government decided she was unable to

16    work?

17    **A.**  I don't know if it was the government.  It was the Social

18    Security Administration and the consultants.

19    **Q.**  They're notoriously tough to convince that someone with a

20    mental health disorder is unable to work, aren't they?

21    **A.**  Say again, please?

22    **Q.**  Social Security is notoriously difficult to convince that

23    a person with mental health problems is unable to work; isn't

24    that right?

25         MR. CURRAN:  Objection.

```
 1                THE COURT:  Overruled.  If you know.
 2                THE WITNESS:  They make a determination that she
 3      was eligible for disability benefits.
 4      BY MR. HANNON:
 5      Q.   And you think they got that wrong?
 6      A.   I do.
 7      Q.   And you think Unum got it wrong?
 8      A.   Say again?
 9      Q.   You think Unum got it wrong?
10      A.   Sorry.  Again?
11      Q.   Unum, the insurance company, you think they got it wrong,
12      too?
13      A.   My opinion is that she has no condition that would
14      prevent her from returning to the workplace as a pathologist.
15      Q.   You think Dr. Everson, the doctor that saw her in
16      Kansas City, you think that he was wrong, right?
17      A.   No, I don't think that.
18      Q.   Well, he diagnosed her with generalized anxiety disorder,
19      right?
20      A.   Yes.  He didn't diagnose her with disability.
21      Q.   And you think he was wrong about the generalized anxiety
22      disorder, right?
23      A.   I think that that's defensible, but I think it's pretty
24      clearly social anxiety disorder as a more precise diagnosis.
25      Q.   Okay.  So now you would diagnose her with social anxiety
```

1  disorder?

2  **A.**  Say again?

3  **Q.**  So you would agree with the social anxiety disorder

4  diagnosis?

5  **A.**  I think it's possible, but if it's present, it's a

6  pretty -- it's not a really major disruption in her capacity

7  to function.  She takes a Valium pill, is able to go to some

8  meetings.  It's not clear that she always takes it, but

9  that's the level of the "disorder," if you will, that she was

10  able to do things with just a small amount of Valium.

11  **Q.**  You know that Dr. Menninger, when she went to Butler

12  Hospital, that they diagnosed her with major depressive

13  disorder?

14  **A.**  Yes.

15  **Q.**  You believe they got that wrong?

16  **A.**  Yes.

17  **Q.**  You know that when Dr. Menninger was being seen by

18  Dr. Burbano in New Mexico, that Dr. Burbano diagnosed her

19  with major depressive disorder?

20  **A.**  Yes.

21  **Q.**  You believe Dr. Burbano got it wrong?

22  **A.**  Yes.

23  **Q.**  You know that Dr. Menninger's doctors in Oregon, they've

24  diagnosed her with major depressive disorder, yes?

25  **A.**  I think that's carried on in the records, yes.

1   **Q.**   And you think they got that wrong, right?

2   **A.**   I don't think she has it.

3          MR. HANNON:  That's all I have, Your Honor.

4          THE WITNESS:  For the reasons I spelled out a few

5   times today.

6          THE COURT:  That's it.  There's no question

7   pending, Dr. Kelly.

8          Any redirect?

9          MR. CURRAN:  No, Your Honor.

10          THE COURT:  All right.  Thank you very much.

11          Is that the remainder of -- no other witnesses,

12   right?

13          MR. CURRAN:  Yeah.  No other witnesses.

14          THE COURT:  Okay.  So, ladies and gentlemen --

15          So the defense rests; is that correct?

16          MR. CURRAN:  Correct, the defense rests.

17          THE COURT:  No rebuttal case, right?

18          MR. HANNON:  None, Your Honor.

19          THE COURT:  So, ladies and gentlemen, that

20   concludes all of the evidence in the case.  You still need to

21   keep an open mind.  You still can't discuss among yourselves.

22   You still can't discuss it with anyone else.  You still can't

23   do any independent research.  You haven't heard everything,

24   so we're going to end for the day.

25          You are going to come tomorrow morning.  We'll

```
 1    start.  We'll have the closing arguments from the lawyers.

 2    That will run, in total, about an hour and a half, give or

 3    take a little bit.

 4         We'll also have my instructions to you on the law

 5    and then you'll retire to the jury room.  We'll bring in the

 6    exhibits so you have them, then you can commence your

 7    deliberations, then you can discuss the case -- at that

 8    point, you can then discuss the case, obviously, among

 9    yourselves.  All right.

10         But for the moment, don't discuss the case among

11    yourselves.  Don't discuss it with anyone else.  Keep an open

12    mind.  Although you have heard all the evidence in the case,

13    you haven't heard from the lawyers.  They do not provide

14    evidence, but they do provide arguments that can be helpful

15    to you, and you haven't heard my instructions on the law.

16         All right.  All rise for the jury.

17         Thank you for your attention.

18         (Jury not present.)

19                    **JURY CHARGE CONFERENCE**

20         THE COURT:  So, Dr. Kelly, you're free to step down

21    and go on your way.  I have some things to talk to the

22    lawyers about.

23         Okay.  Mr. Hannon, have anything on the jury

24    instructions?

25         MR. HANNON:  I do, Your Honor.
```

```
 1              THE COURT:  Okay.
 2              MR. HANNON:  So beginning with the section
 3    concerning request for accommodation --
 4              THE COURT:  What page are you on?
 5              MR. HANNON:  Page 9.
 6              THE COURT:  Okay.
 7              MR. HANNON:  So the Court has included the concept
 8    in terms of that the entitlement to accommodation is
 9    triggered irrespective of whether or not the employee needs
10    it in order to perform the essential functions of the job.
11              THE COURT:  Yes.  I think that's what you wanted,
12    right?
13              MR. HANNON:  Yes.  But it's not consistently
14    reflected throughout the instruction.
15              THE COURT:  Okay.
16              MR. HANNON:  So throughout the instruction, it sort
17    of repeatedly reads that there -- that the employee needs to
18    show a need for the accommodation.
19              THE COURT:  Can you point me to a spot?
20              MR. HANNON:  So the first one I have flagged here
21    is on page 9 in describing the third element of the claim, so
22    references notice of the need for that accomodation.  And
23    that's -- that phrase --
24              THE COURT:  Put on notice of that -- of that
25    request for accommodation?
```

```
 1              MR. HANNON:  I think really the concept that we're
 2    driving at is entitlement, that an employee who has a
 3    disability and there's an accommodation available that will
 4    either allow them to perform an essential function or will
 5    alleviate the stress burden, et cetera, that that employee is
 6    entitled to it.  So --
 7              THE COURT:  Well, actually, that's not actually
 8    quite -- as a complete statement of law, that's incorrect.
 9              MR. HANNON:  Okay.
10              THE COURT:  Right?  Because it can't be an undue
11    burden.  You're not entitled to an accommodation that would
12    be an undue burden, and you didn't use the word "reasonable,"
13    right?  So an accommodation that would let you do the job, if
14    you have a disability, right, and you request an
15    accommodation, you're not entitled to that accommodation
16    unless that accommodation is also reasonable and that -- and
17    they don't prove that it's an undue burden.  You're entitled
18    to it, absent their proving that it's an undue burden, I
19    suppose.
20              MR. HANNON:  Your Honor --
21              THE COURT:  And it's the thing I'm thinking about
22    in the third -- what I was thinking about here is this.  And
23    one way to deal with it is to identify the specific
24    accommodations that are requested, but I was leery of doing
25    that, because it seemed to me hard to precisely do it in the
```

1    instructions.

2            But it seems to me that one of the issues here,

3    like, that comes out of the summary judgment -- and I don't

4    quite know what you're going to argue, but that

5    accommodations are -- have to be, for purposes of this case,

6    and I understand there's certain circumstances where what I'm

7    about to say wouldn't necessarily apply, but that they have

8    to be sufficiently requested.

9            So what the third element to me was driving at was

10   just the idea that -- not a complete statement of all the

11   things that Dr. Menninger needs to prove in order to win her

12   case, right?  And the third element we're not addressing the

13   first, second, and fourth.  It's simply that it has to be --

14           For example, they think of an accommodation that

15   was never discussed, never raised, not considered, that's not

16   a basis for finding that accommodation wasn't brought.  It

17   has to be one that was sufficiently direct and, like -- that

18   was put on notice of that accommodation.  That's what I was

19   thinking about from the footnote in the summary judgment.

20           MR. HANNON:  Understood.  Yeah.  And, again, just

21   the difficulty is the word "need" and --

22           THE COURT:  I totally understand.  So what if I

23   just said "to put the employer on notice of that

24   accommodation"?

25           MR. HANNON:  I'm fine with that.

```
1              THE COURT:  Okay.  Are there other places that you
2    think that occurred?
3              MR. HANNON:  Yes.
4              THE COURT:  Can you just tell me where they are now
5    before we go on to the next?
6              MR. HANNON:  Page 13 and 14.
7              THE COURT:  So just on page 13, the third line
8    under element 3, "So as to put the employer on notice of that
9    accommodation"?
10             And then you say in 14?  Oh, right at the top on
11   the second line, "on notice of that accommodation."  Anywhere
12   else?
13             MR. HANNON:  In terms of the word "need," I don't
14   see it anywhere else right now.
15             THE COURT:  Okay.  What else?
16             MR. WATSON:  Sorry, Your Honor, it's 16 and
17   Number 4 in the summary section.
18             THE COURT:  Oh, right.  Thank you.  16, Number 4.
19   So I'll change it, Number 4, "so as to put PPD on notice" --
20   let me just read it.
21             "On notice of that accommodation," so it's parallel
22   to the others.
23             Okay.  What else?
24             MR. HANNON:  So let's go to the discussion of the
25   third element.
```

```
 1              THE COURT:  This is page --
 2              MR. HANNON:  Well, actually, so page 13, the
 3     definition of what a reasonable accommodation is.
 4              THE COURT:  Yes.
 5              MR. HANNON:  So there, we -- it's being defined as
 6     a modification or adjustment that would enable the plaintiff
 7     to perform the essential functions of her job.  So that's --
 8     that's missing the other half of the concept.
 9              THE COURT:  Okay.  So or --
10              MR. HANNON:  My suggestion, Your Honor --
11              THE COURT:  Yes.
12              MR. HANNON:  -- would be to take this section that
13     we currently have that sort of explains that accommodations
14     are available even to those who can do their essential
15     functions.
16              THE COURT:  Which section?
17              MR. WATSON:  Bottom of 14, bleeding into 15.
18              MR. HANNON:  So I would -- I would suggest moving
19     that up, and that way you can create sort of a shorthand
20     reference to that sort of second concept.  You know, for
21     example, you can call it an equal benefit or something like
22     that just so we don't have to keep on repeating that verbiage
23     over and over again, which I think just will overcomplicate
24     the instruction.
25              THE COURT:  So just move that -- you're saying just
```

1    move the two sentence -- the qualified individual sentence at

2    the bottom of 14 and the one that follows to right after that

3    paragraph of reasonable accommodation or --

4            MR. HANNON:  So I think it goes in the definition

5    of what a reasonable accommodation is, so on 13 --

6            THE COURT:  I see.  Hold on one second.  Let me

7    just take a look at this for a second.

8            What if I just change on 13 -- hold on.

9            Before I do it, yes, Mr. Curran?

10           MR. CURRAN:  Yeah, can I be heard on this whole

11   topic, or should I wait?

12           THE COURT:  Sure.

13           MR. CURRAN:  Okay.  So the concept that's expressed

14   on -- at the bottom of 14 over to 15, I know that was

15   something you mentioned the other day that you were

16   considering working into the instructions.  To me, I mean,

17   that seems broader than the law, as I understand it.

18           You know, I understand that there's a reference in

19   the regulations --

20           THE COURT:  What do you propose?  Putting aside how

21   we do it in 13 or 14 on the -- like, the concept -- so what I

22   understand Mr. Hannon to be saying is, Judge, I'm fine with

23   the expression of the concept on page 14 and 15, but I just

24   think there's some tension with the way it's expressed in 14

25   and 15, given that in 13, it doesn't include that part of the

1    concept, so they don't mirror each other, and so square them

2    up in some way or other.

3              Is that fair, Mr. Hannon?

4              MR. HANNON:  It is.

5              MR. CURRAN:  My concern is with the concept that's

6    discussed on 14 and 15.

7              THE COURT:  Right.  So what do you say about the

8    concept?

9              MR. CURRAN:  So the concern is that I think it's

10   broad, to the extent it's saying --

11             THE COURT:  What do you propose it say?

12             MR. CURRAN:  -- stress or difficulties or other

13   disadvantages.

14             I think, you know, the regulations also have

15   benefits and privileges of employment, which the EEOC's

16   enforcement guidance refers to --

17             THE COURT:  Well, so, like, make it hypothetical.

18   You have an employee.  One of -- one function of the

19   employee's job is to give speeches at 500-person town hall

20   meetings, presentations -- not necessarily the whole

21   presentation, like if it's an hour-long meeting, but they're

22   going to speak at some portion of it, some meaningful portion

23   of it, right?  And let's just say that's an essential

24   function of their job.

25             And so the employee says, "I -- I've been doing

1  that fine," everyone's rated the person fine, there's no

2  issue with that; and they say, "But I have -- I have a social

3  anxiety disorder, general anxiety, and I would like a

4  reasonable accommodation.  I can continue doing this, but the

5  way I do this now is I take Valium," or whatever medication,

6  "and that has some issues and concerns, and I'd rather not

7  take medication, and so I want an accommodation.  I can do my

8  job, as is, without this accommodation.  I can keep doing

9  what I'm doing.  But I would like an accommodation because it

10 would make my job less stressful.  The accommodation I want

11 is I want a surrogate to speak."

12        Okay.  So putting aside -- let's assume that the

13 surrogate is reasonable in the sense that it doesn't pose an

14 undue burden on the company.  They can do it.  It doesn't

15 significantly limit the essential function in a material way.

16 Is the person -- the company could do it out of grace, right?

17        MR. CURRAN:  Right.  I mean, should they do it?  I

18 think they should.  Would I advised them to do it?  Yes.  I

19 don't think they're required to do it by the law.

20        THE COURT:  I see.  So you don't think in that

21 situation --

22        And you think they would be in that situation,

23 Mr. Hannon, required to do it?

24        MR. HANNON:  I do, yeah.  And my colleague,

25 Mr. Watson, has provided me some authority on that.  And one

```
 1   would be Bell v. O'Reilly Auto Enterprises, LLC.  It's a

 2   First Circuit 2020 case for federal law, and then under

 3   Massachusetts --

 4         THE COURT:  What does Bell say?  Just read me the

 5   relevant part.

 6         MR. HANNON:  "The district court erred here when it

 7   instructed the jury that, for a disabled employee to make a

 8   failure to accommodate claim he must demonstrate that he

 9   needed an accommodation to perform the essential functions of

10   his job."

11         MR. CURRAN:  I'm not disagreeing with that.  I

12   think you also have to work at the concept of benefits and

13   privileges of employment.  So, for example, if an employee

14   can't access the cafeteria, but they can still perform the

15   essential functions of their job, you know, the employer has

16   an obligation to --

17         THE COURT:  To make that available in some way.  So

18   that's a benefit of the job.  I understand.  But here we're

19   not talking about --

20         MR. CURRAN:  Right.  That's why I'm saying it's not

21   that case.

22         So I think that the First Circuit principle that's

23   articulated there is correct.  I think that --

24         THE COURT:  But there, they use -- oh, you think

25   they limited it to benefits?
```

```
 1              MR. CURRAN:  So what they're saying there was it
 2    was error to say it can only be related to the essential
 3    functions, which I think is correct.  But to say that -- to
 4    go beyond that and say you have to -- anything that reduces
 5    stress in the job, I don't think is what the law says.
 6              THE COURT:  I guess the question is what -- if I
 7    include this concept, that's -- I think it makes -- well --
 8              MR. HANNON:  Can I get to the other case?
 9              THE COURT:  What did you say?
10              MR. HANNON:  Can I get to the other case I was
11    going to mention?
12              THE COURT:  Yeah.
13              MR. HANNON:  So Ocean Spray, that's the SJC case,
14    and that spells this out in a bit more sort of helpful
15    detail.
16              And it notes there -- it specifies that in that
17    case, the individual -- reading here -- "Because of his
18    handicap and the unmitigated condition of his work
19    environment, Reposa took significantly longer to do his
20    repair work and worked under considerable stress that posed a
21    specific and significant risk to his cardiac status.
22              "In these circumstances, Reposa was entitled to
23    request accommodation, and his employer was obligated to
24    engage in the interactive process."
25              THE COURT:  I guess that gets to one of the other
```

1    points I was thinking about, is what is the level -- like --

2    stress is sort of a huge range, right?  You could have tiny

3    little bits of stress and you could have huge amounts of

4    stress and anxiety.

5         And I'm not sure that the employer's -- a

6    reasonable accommodation, I wouldn't think, is a modification

7    or work adjustment to the work environment that relieves any

8    conceivable stress suffered by a person who is disabled from

9    their disability related to their work.

10         I would think there's some quantum, and I guess the

11    question is if -- I included the concept because I thought it

12    was correct and -- but -- and I see the tension.  I agree.

13    It makes sense to say something.

14         What I was thinking was saying is, in A, would

15    enable the plaintiff to perform the essential functions of

16    her job, or -- and then the question is the other way, but to

17    relieve or -- is it just to alleviate the added stress,

18    difficulties, and other disadvantages, like I said?

19         MR. HANNON:  I think you got it right.

20         MR. CURRAN:  To me, I think, you know, the

21    hesitation Your Honor was expressing a minute ago about

22    there's got to be some level of stress, at least, I mean,

23    just any amount of stress, I don't think that's what the

24    *Ocean Spray* case was saying, at least as represented by

25    Mr. Hannon.

```
 1              THE COURT:  Hold on.

 2              So --

 3              MR. CURRAN:  And you know, the other thing about

 4    the Ocean Spray case, at least as represented by Mr. Hannon,

 5    is that what triggered the need for an interactive dialogue

 6    in that case was -- was finding out about this.  It wasn't as

 7    if they had to actually provide that accommodation.

 8              THE COURT:  Just give me one moment.

 9              Okay.  So I'm going to come back to that concept

10    here in just a minute, Mr. Curran.

11              MR. CURRAN:  Okay.

12              THE COURT:  So what I'm inclined to do at the

13    moment is to say, in (a), "would enable the plaintiff to

14    perform the essential functions of her job," just as it has

15    it on page 13, "or relieve the added stress, difficulties,

16    and other disadvantages a disabled employee may suffer in

17    performing their work."  That covers the concept on page 13

18    you wanted.

19              Then on page 14, "a qualified individual is

20    entitled to a reasonable accommodation even if they are able

21    to perform the essential" -- well, then do I even need this

22    definition here?

23              MR. HANNON:  I -- I think to -- rather than try to

24    jam everything in, I think the better approach is on 13 --

25              THE COURT:  Yeah.
```

```
1          MR. HANNON:  -- you have the first sentence, "A

2    reasonable accommodation is a modification or adjustment, the

3    manner in which a job is performed," period.  And then I

4    think you could -- you could introduce the concept from the

5    following page, you know, that a qualified individual is

6    entitled to an accommodation either, one, if it allows -- if

7    it would enable them to perform an essential function of

8    their job; or, two, if it would --

9          THE COURT:  Relieve the --

10         MR. HANNON:  -- blah, blah, blah.

11         THE COURT:  But the whole -- so put a period and

12   then say, "A qualified individual is somebody who can do the

13   job with a reasonable accommodation that would enable them to

14   perform it, or if the reasonable accommodation would

15   alleviate the added stress, difficulties," what have you,

16   "and the reasonable accommodations must also be feasible for

17   the employer to provide under the circumstances."

18         MR. HANNON:  I think just stretching out, right,

19   rather than trying to jam everything into a single sentence,

20   I think, would be easier.

21         THE COURT:  Yes, but you're saying basically just

22   move the whole qualified individual.

23         MR. HANNON:  Yeah.

24         THE COURT:  Okay.  I see what you're saying.  That

25   might make more sense.
```

1          And then -- okay.  So then if I'm going to say

2     that, Mr. Curran, what do you say I should say about what

3     quantum?  Or do either of you have a suggestion about that?

4          MR. CURRAN:  "Significant stress"?

5          THE COURT:  What do you say to that?

6          MR. HANNON:  I don't think that's right.

7          THE COURT:  What do you propose?

8          MR. HANNON:  I think you got it right the first

9     time.

10          THE COURT:  Any stress?

11          MR. HANNON:  But keep in mind, it's only some

12     additional stress caused by the disability.  So we're not

13     talking about --

14          THE COURT:  I understand.  Not stress performance.

15          MR. HANNON:  Right.

16          THE COURT:  But so any stress --

17          MR. HANNON:  Specifically tied to the disability.

18          THE COURT:  But then any amount?

19          MR. HANNON:  Right, because the idea is we get on

20     equal footing, right?  I've got a disability, and he doesn't.

21     But because of my disability, there's something that makes my

22     job harder.  I'm entitled to equal footing.

23          THE COURT:  Okay.  Your objection is noted.  I

24     won't play with the paragraph while you sit here, but you get

25     the general idea about how I'm going to do it and --

```
 1              MR. CURRAN:  Could I address the modifications that
 2     you were discussing before about eliminating the phrase "the
 3     need"?
 4              THE COURT:  Of course.
 5              MR. CURRAN:  Okay.  So I think there has to be some
 6     nexus between the notice and the accommodation, right?  Like,
 7     you can't -- there has to be a nexus between the
 8     accommodation and whatever it is that the person needs it
 9     for, whether it's for -- to help to do an essential function
10     or to -- to alleviate stress or whatever, right?  Like, you
11     can't just --
12              THE COURT:  Right.  But I think -- unless I'm
13     missing it, that the third element where that "need" word
14     came up, the point of that is you can't -- you have -- in the
15     context of this case, the accommodations and issues are the
16     ones that were requested.  You can't -- like, Mr. Hannon
17     can't stand up and say, "You know what?" -- he's a creative
18     guy -- and say, "You know, here's another accommodation that
19     they could have done."
20              And the jury might think, "Oh, that accommodation
21     would be reasonable and meet all the elements."  It's too
22     late for that.
23              Like -- and so the point of the third element is
24     simply that there was a request for accommodation and the
25     request was sufficiently direct and specific that PPD knew of
```

```
 1    that request, that accommodation request.  The fact that
 2    the -- the requested accommodation, assuming they find -- I
 3    mean, I would be surprised if they didn't -- if they came to
 4    the conclusion that no accommodations were requested in this
 5    case, but -- and that's not really, I don't think, your
 6    position, but --
 7           MR. CURRAN:  No, there isn't.  But there are a
 8    number of things the jury might think were a request for
 9    accommodation, but there was never any linking of that
10    articulation of "I need more specificity from you,
11    Mr. St. John."  There was no linking of that to her
12    disability.
13           So I --
14           THE COURT:  Well, but it says in the fourth
15    element, "The accommodations Dr. Menninger requested was
16    reasonable in that it was feasible for PPD to provide under
17    the circumstances and would have enabled Dr. Menninger to
18    perform the essential functions of her job."  And --
19           MR. CURRAN:  Where is that, Your Honor?  I'm sorry.
20           THE COURT:  On page 9, where I list the elements of
21    the first claim.
22           MR. CURRAN:  Yes.  No, I agree with that.  I think
23    the problem that crops up is that, when you're eliminating
24    the word "the need," for example, on page 16, in the
25    fourth -- summary of claim 1, fourth question, did
```

1   Dr. Menninger prove by a preponderance of the evidence that

2   she had made a request for an accommodation that was

3   sufficiently direct and specific so as to put PPD on

4   notice -- now it's going to say -- on notice of that

5   accommodation.

6           There's no nexus required by that question to --

7           THE COURT:  Hold on.  Let me look.

8           I think two things about that.  One is that, in

9   order on the summary, the -- to find that -- to answer

10  question 5 yes, they find by preponderance of the evidence

11  that one or more of the accommodations was reasonable, for it

12  to be reasonable, it has to either enable her to perform the

13  essential functions of her job, or it has to relieve added

14  stress.

15          MR. CURRAN:  I think that's true, but I think that

16  the request has to also be linked to that, doesn't it?

17          THE COURT:  I don't know what you mean.

18          MR. CURRAN:  I think the request for the

19  accommodation -- in order to sufficiently request the

20  accommodation, it has to be linked to the need for a relief

21  from stress or essential function.

22          THE COURT:  I'm not sure -- suppose she requests

23  that she wants a blue -- a blue -- she wants like a blue

24  laptop and like -- and she says, "I'm -- I have the social

25  anxiety disability, agoraphobia, and generalized anxiety

```
1    disorder disability, and I can't do my job unless you give me
2    a blue laptop."
3              MR. CURRAN:  That would be linking that to the
4    disability.
5              MR. HANNON:  I think that's right, Judge.  If I
6    just ask for a blue laptop and don't give any indication of
7    why the blue laptop --
8              THE COURT:  All right.  I'm fine.  So what do you
9    want me to say?
10             MR. HANNON:  I don't know, but --
11             THE COURT:  I mean, I agree, but I would have
12   thought the linking comes in then, okay.  That, like, either
13   it's not reasonable or even if it is reasonable you could
14   provide a blue laptop, it doesn't -- like, you don't need it
15   to perform the essential functions of your job.  But I'm
16   happy to -- I don't -- I agree that -- I guess I agree that
17   the thing you request, in the end, you have to prove,
18   plaintiff has to prove, that it would either enable her to do
19   an essential function of her job or relieve the added stress
20   and I --
21             MR. HANNON:  I think -- sorry to cut you off.
22             THE COURT:  No.  Go.
23             MR. HANNON:  I think his point is that it has to --
24   that the request has to put them on notice that the request
25   is somehow linked to the disability.
```

```
 1                THE COURT:  I see.  Is that what you're saying?
 2                MR. CURRAN:  Yeah.  That's what I'm trying to say.
 3      In fact, Mr. Hannon -- Dr. Hannon said it much more
 4      articulately than I did.  But, yeah, I mean, I think there
 5      has to be a link between -- in order to put the employer on
 6      notice that this is a request for an accomodation --
 7                THE COURT:  So what if we said to put the employer
 8      on notice of --
 9                MR. CURRAN:  I think "the need for" is okay, and I
10      think maybe your concern about that was that suggests it's
11      needed for essential functions; is that right?  And that's
12      too narrow?
13                So maybe the need -- and not to make it longer than
14      it is -- I know you want it to be shorter, but the need for
15      that accommodation in order to perform the essential
16      functions of the job, or to relieve stress, or alleviate
17      stress, or whatever the rest of that phrase was.
18                THE COURT:  What if we just said -- put employer on
19      notice of that accommodation because of the disability?  Or
20      the -- that accommodation and that it is requested because of
21      the disability?  Right?  That's really the issue?
22                MR. HANNON:  That does it for me, Judge.  I think
23      that's accurate.
24                MR. CURRAN:  I think -- I think that's okay,
25      Your Honor.
```

```
 1              THE COURT:  All right.  I'll change that in the
 2    third element on page 9, so it will read:  "So as to put the
 3    employer on notice of that accommodation and that it is
 4    requested because of the disability."
 5              And then I'll change it to square with that on
 6    page 13.  It will just be the same.  And on page -- carry
 7    over on 14 and in the summary question 4.
 8              MR. CURRAN:  I think that's right, Your Honor.
 9              THE COURT:  Okay.  Fine.
10              So back to the -- we resolved the -- and -- all
11    right.  The second thing you resolve, which is the square on
12    page 13 and 16 -- I'm sorry, not -- 13 and 14.  I did that.
13    Your objection is noted.
14              What else do you have, Mr. Hannon?
15              MR. HANNON:  One thing -- so on page 14 -- sorry --
16    first, on page 13, just the phrase, "on the face of things."
17              THE COURT:  Where are you?
18              MR. HANNON:  So --
19              THE COURT:  Page 13?
20              MR. HANNON:  Yeah, so page 13, the section we were
21    just in, the -- B, "is feasible for the employer to provide
22    under the circumstances, at least on the face of things."
23              THE COURT:  You want to add at least on --
24              MR. HANNON:  Yeah, the "at least on the face of
25    things" is the -- is the phrase from the case law, and I
```

```
 1    think it's important in terms of informing --
 2              THE COURT:  Do you disagree, Mr. Hannon -- I mean,
 3    Mr. Curran?
 4              MR. CURRAN:  No, I don't, Your Honor.
 5              THE COURT:  All right.  "At least on the face of
 6    things."  Okay.
 7              MR. WATSON:  And the case law, Your Honor, was
 8    Reed v. --
 9              THE COURT:  Which page?
10              MR. HANNON:  He's already ruled in our favor on
11    that.  So no need to give him case law.
12              MR. WATSON:  Sorry.
13              THE COURT:  No problem.  You don't want to snatch
14    defeat from the jaws of victory.
15              MR. HANNON:  Exactly right.  So turning to page 14,
16    the one beginning "fourth, Dr. Menninger must prove."
17              THE COURT:  I'm sorry I just -- oh, okay.  Yes.
18    Sorry.  Go ahead.  I see where you are.
19              MR. HANNON:  "Under the circumstances," and we'd
20    ask that it again be "at least on the face of things."
21              THE COURT:  "At least on the face of things."
22              What else?
23              MR. HANNON:  Did we address that -- on page 14,
24    under element 4, we need to have both concepts, both the
25    essential functions and relieve stress?
```

Case: 23-2030    Document: 00118179985    Page: 130    Date Filed: 03/31/2023    Entry ID: 6634402
Case 1:19-cv-10441-PBS    Document 1690    Filed 03/31/23    Page 130 of 178

130

```
 1                THE COURT:  I was going to move that back to -- the
 2     whole qualified individual would be back on what is a
 3     reasonable accommodation.
 4                MR. HANNON:  My reference is on page 14, the
 5     paragraph that begins "fourth, Dr. Menninger must prove."
 6                THE COURT:  Oh, I see.
 7                MR. HANNON:  It's really just a conforming edit.
 8     We just need to make sure we catch all the spots --
 9                THE COURT:  I'll do something to conform --
10                MR. HANNON:  -- that's there.  And, again, I would
11     suggest considering some kind of a shorthand.
12                THE COURT:  Yes.
13                MR. HANNON:  Yeah, and just to note, there's a
14     similar conforming edit is needed in the summary of the
15     elements on page 9.  That same issue appears there.  It just
16     makes reference to performing the essential functions of the
17     job.
18                THE COURT:  All right.  Okay.  And question 3.
19                All right.  What else?
20                MR. HANNON:  The statement on page 14 that the
21     accommodation is not reasonable if it requires changing an
22     essential function of the job or shifting any of the
23     functions.  I believe that's an incorrect statement of the
24     law.
25                And we had a specific -- in our proposed jury
```

```
 1    instruction with respect to identifying examples of what
 2    constitutes a reasonable accommodation, we had included two,
 3    which -- one of which is drawn --
 4              THE COURT:  What page?  What instruction are you
 5    on?
 6              MR. HANNON:  I'm looking at -- in page --
 7              THE COURT:  I mean, in your proposal.
 8              MR. HANNON:  What proposal is this?
 9              MR. WATSON:  Oh.  The plaintiff's proposal --
10              THE COURT:  What do you want me to say there,
11    either way?
12              MR. HANNON:  Well, I think it's an incorrect
13    statement of the law that it's not reasonable if it requires
14    changing, because the regulations specifically provide that a
15    reasonable accommodation includes modifying when and how an
16    essential job function is performed.
17              THE COURT:  Okay.  So you just want me to delete
18    the word "changing"?
19              MR. HANNON:  Yes.
20              THE COURT:  All right.  I'll eliminate that.
21              MR. HANNON:  And then -- yeah.  Yes.
22              And then --
23              Where are these in the instruction?  Where do we
24    add them?
25              MR. WATSON:  In our 13.
```

```
 1              MR. HANNON:  I know.  Where are they in the draft

 2    instructions?

 3              MR. WATSON:  Oh.  In this paragraph on 14.

 4              MR. HANNON:  Oh, okay.  Yeah.  So then the

 5    paragraph above on page 14, the one that begins, "depending

 6    on the circumstances" --

 7              THE COURT:  Uh-huh.

 8              MR. HANNON:  It provides a number of examples.  I

 9    think two examples were left out.  One is one I just

10    referenced, "modifying when or how an essential job function

11    is performed."  And that's taken from the regs.

12              THE COURT:  All right.  I'll add that.

13              MR. HANNON:  And then there's another one,

14    "Altering, reassigning, or eliminating marginal or

15    nonessential job functions."

16              THE COURT:  Read that again?

17              MR. HANNON:  "Altering, reassigning, or eliminating

18    marginal or nonessential job functions."

19              THE COURT:  "Altering" --

20              MR. HANNON:  -- "reassigning, or eliminating

21    marginal or nonessential job functions."

22              THE COURT:  All right.  I don't see why I

23    shouldn't -- I'll add those two things.

24              MR. HANNON:  And this -- I'm sorry.  There's one

25    more here.
```

```
 1              THE COURT:  Uh-huh.

 2              MR. HANNON:  This is all in your proposed

 3    Instruction Number 13.  It includes the provision of

 4    qualified readers or interpreters and that actually comes

 5    from the statute.

 6              THE COURT:  I'll add that as well.  Do you really

 7    want "interpreters"?

 8              MR. HANNON:  We don't need interpreters, Your

 9    Honor.

10              THE COURT:  Okay.

11              MR. CURRAN:  Your Honor, I'm a little concerned

12    about that just because I think -- I mean, the language

13    "readers" there doesn't refer to the type of reader that

14    Dr. Menninger was requesting, like, someone to read for her,

15    like, read what she was going to say.  I think it -- my

16    understanding of what the regulations is referring to is

17    having someone read to you stuff that you can't read

18    yourself.

19              THE COURT:  It may be that the statute meant that,

20    but I think this is a paragraph that's giving them examples

21    of what a -- it might include.

22              So I certainly think a -- providing someone, not a

23    reader for a person who might have been what they were

24    envisioning in statute, assuming that a close reading of the

25    statute, that's what -- it was limited that way.
```

```
 1            But it seems to me that a person who, under --
 2   depending on the circumstances and the essential functions of
 3   the job, having someone else read things in a sense that she
 4   was asking for a speaker might be a reasonable accommodation.
 5   It wouldn't necessarily be a reasonable accommodation.
 6            MR. CURRAN:  Yeah, I'm not saying that it would be,
 7   I'm just saying that if it's in the instructions, and the
 8   jury might read that as being, oh, well, that must be what's
 9   required.
10            THE COURT:  Well, no.  I think they won't read it
11   that way because it says, depending on the circumstances, a
12   reasonable accommodation might include these things and -- I
13   could add, potentially, a sentence at the end whether or not
14   something is a reasonable accommodation depends upon, you
15   know, a determination considering all the relevant facts and
16   circumstances.
17            MR. CURRAN:  That might be helpful, Your Honor.
18            THE COURT:  Do you object to that?
19            MR. HANNON:  I don't.
20            MR. CURRAN:  Would it be okay to add "interpreter,"
21   just to give it some context?
22            THE COURT:  Sure.  I'll add it if you want.
23            MR. CURRAN:  Thanks.
24            THE COURT:  Okay.  What else do you have,
25   Mr. Hannon?
```

         1          MR. HANNON:  So I think the next is -- well,

         2   actually, in -- on page 17, in terms of spelling out the

         3   elements, the courts include an element specifying knowledge,

         4   and that strikes me as being subsumed in the fourth element.

         5          And I think my only -- my only quibble with it -- I

         6   mean, it's -- aside from -- I'm not -- I'm not quite clear

         7   why it's there, but just in terms of spelling out what the --

         8   well, I'll just end there.  I just don't think it's -- I

         9   don't think it's needed as an extra element.  I think if the

        10   jury finds they did it in whole, or in part, because of her

        11   disability, then they had knowledge of her disability.

        12          I take that back.  Maybe -- maybe what I really

        13   want --

        14          THE COURT:  It doesn't really seem like in this

        15   case -- like, I do think they have to know.

        16          MR. HANNON:  Right.

        17          THE COURT:  This isn't -- in this case, I think,

        18   but I'll see what you all argue, there doesn't seem to be any

        19   dispute that Dr. Menninger sent the emails she sent on

        20   January 12th, and it was received by Mr. Mekerri and passed

        21   on to Chad St. John; and that before then, she hadn't

        22   notified anyone and that she wasn't regarded as having a

        23   disability before then; and after that, it was expressly

        24   clear.

        25          So it does seem like they need to know.  In this

```
 1    case, it just seems crystal clear, but --
 2              MR. HANNON:  Although, if they don't find -- they
 3    could -- they could find regarded as, right?  So --
 4              THE COURT:  Probably not before January 12th.
 5              MR. HANNON:  Correct.  Right.  But in terms of
 6    alleged anxiety disorder --
 7              THE COURT:  Do you want me to say --
 8              MR. HANNON:  Dr. Menninger --
 9              THE COURT:  -- that they knew that she had --
10              MR. HANNON:  Had a disability.
11              Well, no, I don't think that quite strikes it right
12    either.
13              I think the problem with it, it sort of -- you
14    know, they don't -- what if they're not sure, right?  What if
15    they're not sure if she actually has it or not?
16              THE COURT:  Which "they"?
17              MR. HANNON:  What's that?
18              THE COURT:  Which "they"?
19              MR. HANNON:  PPD.
20              THE COURT:  What if the jury is not sure if PPD --
21              MR. HANNON:  Or to put it, the jury find that PPD
22    is not sure, right?  So this is -- this is saying that PPD
23    knew that Dr. Menninger had an alleged anxiety disorder.
24              THE COURT:  What do you say?
25              MR. CURRAN:  How about "knew or regarded her as
```

1    having an alleged anxiety disorder"?

2              THE COURT:  How about that?

3              MR. HANNON:  What about "PPD had knowledge of

4    Dr. Menninger's" -- "Dr. Menninger's alleged anxiety

5    disorder"?

6              I think that captures the --

7              THE COURT:  Say that again?

8              MR. HANNON:  "Had knowledge of."

9              THE COURT:  That PPD --

10             MR. HANNON:  Had knowledge of, Dr. Menninger's

11   alleged anxiety disorder.  That would really address my

12   concern.

13             THE COURT:  You're okay with that, Mr. Curran?

14             MR. CURRAN:  I'm sorry.  So the change is from

15   PPD --

16             THE COURT:  "That PPD had knowledge of

17   Dr. Menninger's alleged anxiety disorder at the time it took

18   the alleged adverse action against her."

19             MR. CURRAN:  Yeah, that's fine, Your Honor.

20             THE COURT:  And then I'd make a conforming change

21   on page 18 to element 3, and I would make another conforming

22   change on page 22 to paragraph -- question 4.

23             Anything else?

24             MR. HANNON:  Two more things, Judge.  On page 18,

25   under the fourth element --

1      THE COURT:  Yep.

2      MR. HANNON:  -- the first paragraph of that

3  section, the paragraph beginning, "fourth, Dr. Menninger must

4  prove," the sentence that Dr. Menninger alleges that

5  Mekerri's February 6, 2018 email -- I think that's too

6  narrow.

7      Our request is that -- is that the Court not

8  attempt to define specifically what the -- what the adverse

9  actions are, that -- you know, to just instruct the jury what

10  it takes to constitute an adverse employment action and let

11  them determine whether or not one exists, rather than try to

12  sort of constrain their analysis, which I think requires

13  some -- a lot of wordsmithing.

14      If the Court's not inclined to take that approach

15  and leave it to the jury and the Court wants to constrain

16  them in some regard, then I have some alternative proposed

17  language with respect to that.

18      THE COURT:  What would that be?

19      MR. HANNON:  That would be "Dr. Menninger alleges

20  that PPD's creation of new goals and expectations for her

21  role as executive director was an adverse employment action

22  taken because of her disability."

23      THE COURT:  What do you say?

24      MR. CURRAN:  I like it better the way you have it

25  here, Your Honor.  I mean, that's consistent with the summary

1    judgment ruling, as well.

2              THE COURT:  Read that back again, Mr. Hannon.

3              MR. HANNON:  Yes.  "Dr. Menninger alleges that

4    PPD's creation of new goals and expectations for her role as

5    executive director was an adverse employment action taken

6    because of her disability."

7              THE COURT:  That seems fair, because the goals --

8    that wasn't -- that's not seeking to put into the case

9    something I eliminated on summary judgment.  I don't think I

10   said at summary judgment that there are no other conceivable

11   adverse actions.  I -- there were the ones that were put out

12   and that seems to me there's evidence from which they could

13   make their own decision about goals.

14             And -- so -- hold on.  Read that back again.  So,

15   "Dr. Menninger alleges that" --

16             MR. HANNON:  "PPD's creation of new goals and

17   expectations" --

18             THE COURT:  "PPD's creation of new goals and

19   expectations" --

20             MR. HANNON:  -- "for her role as executive

21   director" --

22             THE COURT:  -- "for her role as executive

23   director" --

24             MR. HANNON:  -- and then continuing on what you

25   had, "was an adverse employment action taken because of her

```
 1   disability."

 2              THE COURT:  Okay.  What else?

 3              MR. HANNON:  In the next paragraph, there's a

 4   statement that "adverse employment action is one that,

 5   standing alone, actually causes damage, tangible or

 6   intangible, to an employee."

 7              That's taken from a First Circuit decision that

 8   said that it wasn't error to give it in that particular case.

 9   I don't think it's a helpful statement of the law.  I think

10   it's confusing.  I don't know what it means.  I don't think

11   it's going to be helpful to the jury.

12              I think what it -- what it seems to suggest is that

13   if -- if two separate actions combined constitute an adverse

14   employment action -- well, rather, that the two actions

15   combined can't constitute an adverse employment action, that

16   you -- it has to be one discrete act, one time only, and

17   that -- and that thing in the whole -- in the whole --

18              THE COURT:  Are you objecting to the word "standing

19   alone" or to another part?  And what are you proposing?

20              MR. HANNON:  Yeah, I think the word "damages" is

21   misleading, as well.

22              THE COURT:  What do you want me to say?

23              MR. HANNON:  I -- I would take that sentence out.

24   And you give an example on the next page of a schedule

25   change -- right? -- that, of a schedule change of someone
```

```
 1    whose a parent, whose a young parent of school-aged children,
 2    that --
 3              THE COURT:  What do you say, Mr. Curran?
 4              MR. CURRAN:  I mean, I think the definition there
 5    is helpful and I think it's a correct statement of the law,
 6    so I'd be inclined to leave it in.
 7              THE COURT:  I'm going to think about that.  I'm not
 8    sure that -- I'm not worried that it's an incorrect statement
 9    of the law, but it may not be necessary or helpful.  So let
10    me -- I'll think about that.
11              What else, Mr. Hannon?
12              MR. HANNON:  In the next page, on page 19, the
13    second line, the right-hand side begins, "Rather, an employer
14    takes" material -- "materially adverse action against an
15    employee only if it" -- the "only if it" is an incorrect
16    statement of the law.
17              I think the quote that appears here is taken from a
18    First Circuit case, which notes that typically an adverse
19    action is these two examples.  But I don't think it's an
20    accurate statement of the law to say that it has to be one of
21    these two.  And, in fact, I think the example below regarding
22    the young parent is inconsistent with that.
23              THE COURT:  So what if I just say "against an
24    employee when"?
25              MR. HANNON:  I would --
```

```
1              THE COURT:  Or you're saying, "Typically when"?

2              MR. HANNON:  Or --

3              THE COURT:  "Rather, an employer takes a material

4    adverse action against an employee typically when it" --

5              MR. HANNON:  Right.

6              MR. CURRAN:  That's fine.

7              THE COURT:  Fine.  Okay.  Next?

8              MR. HANNON:  On page 19 -- I want to make sure that

9    my proposal here is -- so my ask here is on page 19 and sort

10   of giving these examples, I think there are -- there are

11   three more examples that the First Circuit has blessed.  One

12   is disadvantageous assignments.  Another is unwarranted

13   negative job evaluations.

14             THE COURT:  Is this in one of your instructions

15   that I can look at?

16             MR. HANNON:  I don't -- no?  It's not.

17             THE COURT:  Okay.  So you want me to add -- after 1

18   and 2 -- 3, 4, and 5?  Is that what you're saying?

19             MR. HANNON:  No.  So I think this would go in the

20   paragraph that begins, "For an employment action to be

21   adverse," and then the second sentence is, "However" --

22             THE COURT:  An assignment -- right.

23             MR. HANNON:  And then so somewhere in there, adding

24   a sentence, you know, "so to" or -- or just having a list

25   there, an assignment of more difficult job responsibilities.
```

Case: 23-2030    Document: 110443-1598    Filed: 03/31/23    Page: 143 of 178
Case: 1:19-cv-10441-LTS    Document: 1593    Date: 03/31/23    Page: 143    Entry ID: 6634402

143

1    So it could be, "However, an assignment of more difficult job

2    responsibilities, disadvantageous assignments, unwarranted

3    negative job evaluations, and toleration of harassment by

4    other employees."

5              THE COURT:  "Disadvantageous assignments" -- what's

6    the next?

7              MR. HANNON:  "Unwarranted negative job

8    evaluations."

9              THE COURT:  Next?

10              MR. HANNON:  "Toleration of harassment by other

11    employees."

12              THE COURT:  Okay.  All right.  Right there.

13              What else?

14              MR. HANNON:  Well, we'd ask also on 19, when you

15    say "more difficult job responsibilities," we'd ask that that

16    be changed to "responsibilities or expectations."

17              THE COURT:  I think it's enough.

18              Next?

19              MR. HANNON:  On page -- there's a -- where am I

20    here? -- does that bring us to pretext?  Yeah, okay.

21              So the next issue is page 20 here at the bottom

22    that the Court's proposed sort of *McConnell Douglas* burden

23    shifting --

24              THE COURT:  Yeah.  What do you have to say to it?

25              MR. HANNON:  We object to that.  We think the

```
 1    strong authority noting that that's not -- that's not an
 2    appropriate instruction.  It's not helpful to the jury.  It
 3    distracts the jury from the -- from the proper analysis,
 4    which is really looking at the elements of the claim.
 5         I also think it's not a fit here, you know, given
 6    that this is not -- you know, this is not really an instance
 7    where they're claiming they did things for proper reasons.
 8    They're more so claiming they didn't do the things we allege.
 9    So it's not an analytical fit anyhow.
10         THE COURT:  What do you say, Mr. Curran?
11         MR. CURRAN:  I think we are saying we did things,
12    like, for example, you know, sending Dr. Menninger's emails
13    about quality control issues, you know, asking -- asking her
14    to change her goals.  I think that, you know, our whole
15    argument for that as to why that's, you know -- A, it's not
16    discriminatory or retaliatory; and, B, there's legitimate
17    business purpose for it.  I do think it's helpful.
18         THE COURT:  I think -- I'm not sure I -- to be
19    candid with you, I took this from what the defendants
20    proposed.  It was something they were interested in and I
21    wanted to spark some discussion from all of you.
22         I think it's a little bit too tracking of *McDonnell*
23    *Douglas* to be helpful to the jury.  I do think that this
24    is -- to me, this is the right place.  It's about causation,
25    and the causation, really, question is why did they do what
```

1    they did?  And that seems to be a critical question and one

2    of the critical questions in this case for the jury.

3          There really isn't a dispute, for example, that

4    they didn't accommodate Dr. Menninger on 2, 3, and 4, or that

5    she did request some sort of accommodation on 2, 3, and 4.

6          And so something about -- I'm inclined to revise

7    this in some way, something like that they need to think

8    about what the reason is, and if they determine it's the true

9    reason, it's -- they have to think about what -- without

10   being quite as prescriptive as this is, something about what

11   is the reason and what they can infer if they decide reason

12   is incorrect if -- to be shorter.  I think that's what I

13   might do, but not right in front of you, and then you'll look

14   at it.

15         MR. HANNON:  So just a couple of comments on that.

16   So even sort of a *McDonnell Douglas* version of this, a couple

17   of things to guard against.  One is, I think, as sort of

18   currently drafted, it gives the incorrect impression that

19   pretext analysis is the only way of inferring --

20         THE COURT:  I'm not -- I'm going to try to put it

21   more in vein of, like, you know, in thinking about -- you

22   know, I'm not sure how to -- I'll have to read it after

23   lunch, but thinking about this to, you know, think about what

24   is the reason, and if it's a stated reason, if -- and have

25   they proven if the stated reason is not true and what was the

```
 1    reason, you know, and if their reason that they advanced
 2    isn't true, you can infer -- or what you can infer from that.
 3    Something like that, more in a general way, but sort of
 4    apropos of the prior paragraph, like timing.
 5              You can consider these things, there's some things
 6    to consider, and it depends on what you do with them.
 7              MR. HANNON:  Yep.  And there's one more thought.
 8    In doing that, obviously, you know, making clear that there
 9    may be multiple reasons for an action and they may have one
10    legitimate reason, and they may have other illegitimate
11    reasons.  So it's not a matter of just looking at --
12              THE COURT:  Right.
13              MR. HANNON:  -- one reason alone.
14              THE COURT:  Okay.  What else?
15              MR. CURRAN:  Could I just point out something on
16    page 20?
17              THE COURT:  Yes.
18              MR. CURRAN:  Just a typo.  So it looks like that
19    last sentence that carries over to 21, it says
20    "Dr. Menninger."
21              MR. HANNON:  Yeah.
22              MR. CURRAN:  I think that should be "PPD."
23              THE COURT:  As of -- "PPD has only the burden of
24    stating"?
25              MR. CURRAN:  (Nods head.)
```

```
 1              THE COURT:  Yeah, okay.
 2              MR. HANNON:  And just a little bit higher up, so on
 3    page 20, in the section about Massachusetts law --
 4              THE COURT:  Yes.
 5              MR. HANNON:  We would just ask a sentence just
 6    noting that it need not be the only cause.  We say that with
 7    respect to federal law, but that -- that's not entirely clear
 8    under Massachusetts law, as stated here, so I think the
 9    sentence -- "need not be the only cause."
10              THE COURT:  Okay.
11              MR. HANNON:  Turning to --
12              THE COURT:  We have to move quickly, because I have
13    a two o'clock hearing and I need to break for lunch, too.
14              MR. HANNON:  So in the retaliation claim, so
15    similarly as before, the top of 24, the Court's proposed sort
16    of spelling out specifically what the materially adverse
17    actions are --
18              THE COURT:  Yes.
19              MR. HANNON:  -- and I have the same position as in
20    the prior section, but -- but this one has an extra wrinkle,
21    which is, as the Court notes later on in this instruction the
22    jury is allowed to look at these things cumulatively.
23              THE COURT:  Yeah.
24              MR. HANNON:  So spelling them out as you look at
25    each of these individually to assess with this one thing --
```

```
 1              THE COURT:  What do you want it to say?

 2              MR. HANNON:  To not identify what the materially

 3    adverse actions are, to simply instruct the jury on what

 4    the -- what the standard is in determining if they took a

 5    materially adverse action and then let the jury decide if --

 6    if they did so.

 7              THE COURT:  Why not do that?

 8              MR. CURRAN:  My turn?  Okay.  Great.

 9              THE COURT:  Uh-huh.  Why not do that as to what he

10    said?

11              MR. CURRAN:  Oh, I'm sorry.

12              THE COURT:  No problem.  He's saying on top on

13    page 24, just eliminate the sentence, "Dr. Menninger alleges

14    three adverse actions."

15              Essentially that's what you're saying.

16              MR. HANNON:  I'm sorry, Your Honor?

17              THE COURT:  That's what you're saying, Mr. Hannon,

18    just eliminate on top of --

19              MR. HANNON:  Correct.

20              THE COURT:  Like, just to prove material adverse

21    action and then delete the rest of that.

22              MR. CURRAN:  I mean, I think that comes from your

23    summary judgment --

24              THE COURT:  No, I understand.  It does.

25              MR. CURRAN:  Yeah, and so we think it's --
```

```
 1              THE COURT:  What are the other -- I guess, it comes
 2    back to the same thing as the other one.  Like, there's one I
 3    did throw out at summary judgment.
 4              MR. HANNON:  What was that?
 5              THE COURT:  Which one?
 6              MR. HANNON:  I don't recall.
 7              THE COURT:  I know I did.  I can't remember right
 8    at the --
 9              MR. HANNON:  I'm pretty sure you did, too.
10              MS. MANDEL:  The performance review.
11              THE COURT:  The performance review.
12              MR. HANNON:  Yeah.  And then if -- If the concern
13    is we don't want the jury drawing that inference, then you
14    can instruct them on that.
15              THE COURT:  Well, it's double.  One is a very
16    unlikely concern as to you, which is I wouldn't want you to
17    argue that.  I wouldn't think you would do that.
18              But the other is -- right? -- the jury shouldn't?
19              MR. HANNON:  Right.
20              THE COURT:  So what's your proposal?
21              MR. HANNON:  My proposal remains just to -- just to
22    leave it as it is.  I don't think there's any risk of the
23    jury doing that.  If -- if that's what you need to tackle,
24    then, you know, giving an instruction that, you know, there
25    is -- there is insufficient evidence to -- you know, to find
```

1    that it was -- that that was an act of retaliation, that

2    would be an accurate statement of the law and what the Court

3    found at summary judgment.

4           THE COURT:  I'll think about that.

5           What's -- what else?  Anything else?

6           MR. HANNON:  So just -- there needs to be a

7    conforming edit towards the bottom of 24.  There's a

8    reference there that she meets the burden if she meets any of

9    the one, three -- the one, two, three --

10          THE COURT:  Oh, if I change that?  Yeah.

11          MR. HANNON:  Yeah.

12          On 25, there's a typo in the summary of claim 3, it

13   says, in element 1, it says "that she that she."

14          THE COURT:  Oh, yes.  Thank you.

15          MR. HANNON:  In the description of back pay and the

16   potential elements of that, we'd ask that the jury be

17   instructed that they can consider lost equity, as well.

18          THE COURT:  What about that?

19          MR. CURRAN:  I just think that there's -- that

20   would be pretty tremendously confusing for the jury, because

21   I don't think there's been evidence presented as to how they

22   would go about considering the equity --

23          MR. HANNON:  That, Your Honor --

24          MR. CURRAN:  -- and how that could be calculated.

25          MR. HANNON:  On that, Your Honor, there is an

```
 1   exhibit that's in evidence that does provide a calculation.
 2   It provides -- it essentially provides the estimate that PPD
 3   provided to her at the time that she got the equity.  So we
 4   don't -- we don't need to prove damages with --
 5            THE COURT:  I think I'll include that there, just
 6   adding to the list "lost equity."  And this is in the first
 7   paragraph.
 8            MR. CURRAN:  Could you note our objection to that,
 9   Your Honor?
10            THE COURT:  Yes.  Anything else?
11            MR. HANNON:  Your Honor, paragraph 29, just the --
12            THE COURT:  Page 29?
13            MR. HANNON:  Sorry, page 29.  Thank you, Judge.
14   I'm hungry, too.
15            Top of 29, the list -- this isn't a big deal, but I
16   would -- I'm not sure that that really makes a lot of logical
17   sense in terms of the way those are laid out.  I would
18   suggest making the fourth one first, keeping the second one
19   second, then putting the first one third, striking the third
20   one.  I think that makes it actually read with some -- some
21   more clarity.
22            But more of a suggestion than anything else.
23            THE COURT:  Okay.  I'll look at that.
24            MR. HANNON:  Yeah, so we had -- in Instruction
25   Number 32, we had a request.  Part of that request was --
```

1   this was our proposed Instruction Number 32.

2              THE COURT:  Yes.

3              MR. HANNON:  We asked the Court to instruct the

4   jury that you may award back pay if you find that PPD's

5   discriminatory or retaliatory conduct caused Dr. Menninger to

6   be able unable to work.

7              I think that that concept is sort of implicit in

8   the Court's instructions, but I think that's a useful

9   instruction and just sort of fills a bit of an analytical gap

10  that might otherwise exist.

11             THE COURT:  I think it says that in the first

12  sentence, "would have received but for their discriminatory

13  retaliatory conduct."

14             MR. HANNON:  Yeah, again, I think it's implicit.

15  What we've asked is a bit more explicit in terms of the

16  causal connection, making clear that if the --

17             THE COURT:  Yours is more like, though, you opened

18  the door, right?  That says, if this case, you may award; if

19  you don't find that, you can't award.  That would be

20  implicit.  It opens the door, but then it doesn't expressly

21  say what they could award.

22             I'm thinking, if they get to damages, they've found

23  that the question is something, right?  There's been a

24  liability finding if they're reading this.

25             MR. HANNON:  Yep.

1           THE COURT:  And so then what are the things they

2      can give?  They can give the things that are caused by or

3      because of the discriminatory retaliatory conduct.

4           MR. HANNON:  Yeah, but I think specifically the

5      point we're looking at is that if -- if the causal chain is

6      they engage in discrimination or retaliation, that that --

7      that that causes her to be unable to work, then they're

8      allowed to --

9           THE COURT:  What do you say, Mr. Curran?

10          MR. CURRAN:  I mean, I think it's already included

11     within the instruction, as it's, you know, written.  So I

12     don't think this is needed.

13          THE COURT:  I'll think about that.

14          Okay.  Anything else, Mr. Hannon?

15          MR. HANNON:  I mentioned this issue earlier,

16     Your Honor, regarding collateral source rule.

17          THE COURT:  Yes.

18          MR. HANNON:  And, again, I think the point is

19     someone has to decide -- we have a proposed Instruction

20     Number 35, would have the jury decide whether or not to --

21          THE COURT:  Right.  What do you say about that?

22          MR. CURRAN:  So I think there's a couple of

23     problems with this.  First --

24          THE COURT:  As a general proposition, though,

25     first, before we get to the specifics.

```
 1          MR. CURRAN:  I mean, I think that the collateral
 2   source rule can apply to some sorts of -- some kinds of
 3   payments.
 4          THE COURT:  So payments here are the Unum and the
 5   Social Security.  I guess the question is just can I give it
 6   to the jury.  It doesn't really explain it to them, but
 7   presumably it's, like, for them to decide?
 8          MR. HANNON:  Right.  But they're going to decide,
 9   they need to be given --
10          THE COURT:  Some instructions.  So I guess the
11   question is do you agree it should go to the jury?
12          MR. CURRAN:  I agree; I don't agree with this
13   instruction, though.
14          THE COURT:  Okay.  So the jury should decide
15   whether to count those things or not.  Again, assuming they
16   reach damages or are awarding her the -- you all agree that
17   the jury should make the decision as to whether to deduct for
18   the Unum and/or Social Security disability payments?  That's
19   my understanding of both your positions right now, unless you
20   tell me otherwise.
21          MR. CURRAN:  I don't think they can consider the
22   short-term disability or the long-term disability.
23          THE COURT:  Okay.  So -- but he didn't factor that
24   in, your guy.
25          MR. HANNON:  He factored in the short-term, not the
```

1    long-term.

2        THE COURT:  You want me to say Instruction

3    Number 35 -- what do you want me to say?

4        MR. CURRAN:  Some version of this that I would --

5    I'm not sure exactly how to phrase it.  I think that the

6    concepts that are missing from this are first that they would

7    have to be -- in order to get the Social Security disability

8    benefits included in, you know, our -- taken out --

9        THE COURT:  What if I just put another heading

10   right before emotional stress damages:  Collateral source

11   rule, you -- something like this:  "You have heard testimony

12   that -- you've heard testimony that Dr. Menninger received

13   short-term disability benefits, long-term disability

14   benefits, and Social Security disability benefits.

15        "You may decide whether to deduct from any front or

16   back pay damage awards you make.  The payments -- one or more

17   of these categories of payments.  In deciding whether to make

18   such deduction, you should be aware of a principle called the

19   'collateral source rule,' which is a wrongdoer's liability to

20   an injured person is not ordinarily to be reduced by the

21   amount of compensation received by an injured person from

22   collateral sources such as insurance or Social Security

23   benefits.

24        "Applying the rule means that the plaintiff might

25   receive a double recovery and -- but you -- if you find that

```
 1    there are countervailing circumstances that make it unjust to
 2    apply this rule, you may decline to -- you may not apply --
 3    you can determine not to apply it and you can make the
 4    deductions."
 5            MR. CURRAN:  I think the Social Security disability
 6    payments to be a collateral source, there has to be a showing
 7    of causation from the actions by us and her disability.
 8            THE COURT:  For it to be a collateral source that's
 9    been deducted?
10            MR. CURRAN:  Yes.
11            THE COURT:  Do you all even want to submit this to
12    the jury?  Do you want me to just say -- like, I'm not sure
13    what your position is.  Do you want them to deduct it or not?
14            MR. CURRAN:  I do want them to deduct it.
15            MR. HANNON:  I don't want them to deduct it.
16            THE COURT:  That, I understand.
17            Then my understanding of the general law is that
18    that they could deduct it if they find countervailing
19    circumstances, but the ordinary, like, default would be that
20    they don't deduct it.  How much -- what beyond that do you
21    want me to say to them?
22            MR. CURRAN:  I think that that's -- I think that's
23    right.  I think that's -- I don't think we need anything
24    beyond that.
25            THE COURT:  All right.  I'll say, You've heard this
```

```
 1    testimony.  There's a thing this thing called the collateral
 2    source.  Ordinarily, these are considered collateral source
 3    payments; and, ordinarily, you don't deduct them from the
 4    amount of front or back pay that you find, that you award to
 5    the plaintiff, unless you find countervailing circumstances
 6    that would make it unjust to do so.
 7           But the mere fact that she might recover double is
 8    not alone itself ordinarily enough to justify deducting.
 9           MR. HANNON:  Sounds good to me.
10           THE COURT:  Okay.  Next?
11           MR. HANNON:  I think just two last bits.  For
12    punitive damages, we had requested an instruction advising
13    the jury they may award punitive damages even without
14    awarding compensatory damages.
15           THE COURT:  What's your view on that, Mr. Curran?
16           MR. CURRAN:  I think that the law is that there has
17    to be compensatory damages in order for --
18           THE COURT:  So my understanding of the law is that,
19    in Section 1983 cases, there doesn't -- there does not have
20    to be an award of compensatory damages in order to award
21    punitive damages; but there is an older First Circuit case
22    that has not been overruled as far as I can tell, Kerr, which
23    seems to say in other cases that it might be required to get
24    compensatory damages in order to get punitives.
25           And my thought was to just not say anything about
```

1    it, just instruct them, and they'll consider and decide.  And

2    then if we could -- if you want to press the legal issue that

3    they needed -- I personally think it's highly unlikely in

4    this case that you're going to get punitive damages without

5    any compensatory damages.  In fact, I'd be close to shocked.

6            MR. HANNON:  Say no more, Judge.  Let's go get

7    lunch.

8            But -- what else do we have?  Yeah, no.  I'm fine

9    with that.

10           We had requested -- sorry.  I'm backtracking, but

11   this is the very end of it, Judge.  Our requested Instruction

12   Number 27, we had, "You may also" -- this goes in the

13   causation section -- "You may also infer a causal link from

14   evidence that a pattern of discriminatory or retaliatory

15   conduct began soon after the protected activity and only

16   culminated later in actual adverse action."

17           THE COURT:  I think that's mostly covered.  I'll

18   think about that.

19           MR. HANNON:  Okay.  And then the last, last, last

20   thing, I messed up earlier.  The first thing we looked at

21   regarding need for accommodation, that phrasing you had --

22           THE COURT:  Yeah.

23           MR. HANNON:  -- that was the right phrasing.  We

24   shouldn't change it, and I was wrong to suggest otherwise.  I

25   think the language that we came up with actually misstates

```
 1    the --
 2              THE COURT:  So you want me just to go back to "put
 3    the employer on notice of the need for that accommodation"?
 4              MR. HANNON:  I think that's fine, because then
 5    later on you explain exactly, when the need arises --
 6              THE COURT:  Do you have any --
 7              MR. CURRAN:  Yeah.
 8              THE COURT:  Fine.  Then I'll undo the conforming
 9    ones.
10              MR. HANNON:  Jury slip too?
11              THE COURT:  Yeah, do you have anything on the
12    verdict slips?
13              MR. HANNON:  Just a couple of things.  One is that,
14    for emotional distress damages, there's some recent case law
15    that says that, in order to do interest, we need to have the
16    jury apportion punitive damages -- rather, emotional stress
17    damages up till now and then emotional distress damages in
18    the future, because the emotional distress damages up till
19    now are going to be subject to prejudgment interest; and if
20    we don't have them apportioned, then there's no way to figure
21    out how much of those get the interest.
22              THE COURT:  Okay.  So you want me to do 4(c) as,
23    like -- in between 4(c) and 4(d) another question,
24    "What percent of this do you find attributable to emotional
25    distress she suffered up to and including today?"
```

```
 1              MR. HANNON:  I would suggest just doing it the same
 2    way you do back pay and front pay, so emotional distress up
 3    till now, emotional distress in the future.
 4              THE COURT:  Okay.  Okay.  I'll do that.
 5              MR. HANNON:  And then the verdict form says
 6    emotional distress in the near future, and I don't think
 7    limiting it to the near future is --
 8              THE COURT:  Okay.  So "Enter below the amount of
 9    emotional distress damages, if any, that she proved by a
10    preponderance that she suffered up to today because of PPD's
11    disability discrimination," and then a separate question,
12    "Enter below the amount of damages for emotional distress, if
13    any, that Dr. Menninger proved by the preponderance of the
14    evidence that she's reasonably likely to suffer in the
15    future" --
16              MR. HANNON:  Correct.
17              THE COURT:  -- "because of" -- yeah.  Okay.  Fine.
18              How much do you have?
19              MR. CURRAN:  Sorry.  Not a lot.
20              First is on page 12.
21              THE COURT:  Yep.
22              MR. CURRAN:  There's a paragraph in the middle of
23    the page there --
24              THE COURT:  Yes.
25              MR. CURRAN:  -- "if an employer has a concern."  We
```

```
 1    think that's an instruction for a case where there hasn't
 2    been any request for an accommodation, or a claim of
 3    disability, but the employee appears to be unable to perform
 4    their job, and so the employer can then, you know -- can then
 5    ask -- you know, ask for a certification or something of that
 6    kind.
 7             I mean, that's -- and this is one of the ones they
 8    requested.  And the cases that they cited for that, that was
 9    a situation.  I mean --
10             THE COURT:  It seems like it's a correct statement
11    of the law that, like, you could have asked for -- that PPD
12    could have asked for a certification.
13             MR. CURRAN:  Right.  But, I mean, if we do that,
14    we're at risk of, you know, violating the ADA, which isn't
15    included in this instruction either.  I mean, if we ask for a
16    certification and it turns out that we were wrong to do that,
17    because you're not allowed to just go around asking people
18    for certifications.
19             THE COURT:  No.  The time to ask for the
20    certification would have been after she says she can do the
21    job.
22             MR. CURRAN:  After she said --
23             THE COURT:  She says -- I mean, why wouldn't it be
24    that, like, in late February, they have their meeting and
25    then you can say -- I mean, it seems like that was within
```

```
 1   your ability to ask for.  That's what you're thinking about,
 2   right, Mr. Hannon?
 3              MR. HANNON:  Yes.
 4              MR. CURRAN:  So at that point, we have this -- you
 5   know, a note from the doctor saying she can't do --
 6              THE COURT:  Well, it doesn't expressly have the
 7   sentence, "She cannot do her job," right?
 8              MR. CURRAN:  No, it doesn't say she can't do her
 9   job.  It says these are the things that are required for her
10   to do her job, for her to do these aspects of her job.
11              THE COURT:  How would it violate the ADA to ask
12   for, at that point, a clarification or a medical
13   certification?  I'm not saying you have to do that, but --
14              MR. CURRAN:  I mean there's a risk, I mean, if it's
15   found to be unjustified.  I mean, I think, you know, to sort
16   of state that the employer always has an obligation to -- and
17   I understand here it's not saying obligation, but I'm
18   concerned that the jury could read it that way.
19              THE COURT:  Well, what do you want me to say
20   countervailing it?
21              MR. CURRAN:  So if the Court is inclined to keep
22   the instruction, then we would ask that it say, "In addition,
23   however, the law does not" -- and I can write this up and
24   give it to you, but I can also read it -- "However, the law
25   does not require an employer to make such a request under
```

 1    these circumstances."

 2              Also, "the law allows an employee who disagrees

 3    with her medical provider that certain accommodations are

 4    necessary to perform certain functions of her job, or who

 5    believes that her employer has misapprehended her medical

 6    provider's request for accommodations to ask her medical

 7    provider, or another medical provider, to submit a further

 8    certification or a clarification."

 9              THE COURT:  What do you think about that?

10              MR. HANNON:  I think it's all misleading,

11    particularly the phrasing around "other."  There was -- there

12    was never any -- any certification --

13              THE COURT:  We're going to pause on this, because

14    this is a little bit more complicated.

15              Just run through, without detail, what else you

16    have?

17              I think we'll have to pause.

18              MR. CURRAN:  Punitive damages, we'd ask that the

19    Court not provide that instruction.  We don't think that

20    there's been sufficient evidence to support that.

21              And, then, one small thing, on page 24, the top of

22    the page, under -- there's a paragraph that begins "Second,"

23    and then there's a list.  And Number 2 --

24              THE COURT:  Yeah.

25              MR. CURRAN:  So "PPD excluded her from the hiring

1    and recruiting decisions," comma, and we just ask that you

2    add "which she alleges was a core component," because these

3    are --

4              THE COURT:  I see.  If I leave it, I'll add that.

5              Okay.

6              MR. CURRAN:  That was it.

7              THE COURT:  Okay.  As to punitives, let me -- do

8    you have any response on punitives?

9              MR. HANNON:  We believe there's sufficient evidence

10   on that, Judge.

11             THE COURT:  All right.  I'll think about that.

12             As to the medical question, I think I need to stop

13   and have lunch and have a two o'clock hearing.  So why

14   don't --

15             You haven't heard more from them, have you,

16   Kellyann, about the two o'clock?

17             THE DEPUTY CLERK:  No.

18             THE COURT:  So the two o'clock, I don't quite know

19   how long it's going to last.  It's a sentencing.  If it were

20   just a sentencing, it would be 30 to 45 minutes, I'm just

21   thinking out loud, but he's trying to withdraw his guilty

22   plea, so it could be an evidentiary hearing.  It could be --

23   why don't you come at 2:45, and I'll talk to you about that

24   one issue and then -- then I'll revise the instructions and

25   issue them later.

```
 1          You don't have anything on the form?  The verdict
 2   form?
 3          MR. CURRAN:  I'm sorry?
 4          THE COURT:  Nothing on the verdict form?
 5          MR. CURRAN:  Oh.  No.  Nothing, Your Honor.
 6          THE COURT:  Okay.  Great.  I'll see you at 2:45.
 7   Thanks.
 8          (Court in recess at 1:32 p.m.
 9          and court reconvened at 2:46 p.m.)
10          THE DEPUTY CLERK:  The United States District Court
11   for the District of Massachusetts is now in session, the
12   Honorable Leo T. Sorokin presiding.
13          THE COURT:  So one issue left to talk about, just
14   to turn back to.  I want to find that page, Mr. Curran.  This
15   is on page 12.  That's the paragraph that was left to talk
16   about.
17          MR. CURRAN:  Yes.
18          THE COURT:  So start over as to this.  So one
19   request is that you'd like me to take it out.  Putting that
20   aside, I'll think about that, but I think that's unlikely.
21          The second alternative is you'd like me to adjust
22   it, add language, or change it.
23          So tell me -- start again.  I know you said before,
24   but tell me again what you want to do there.
25          MR. CURRAN:  Yeah.  So what we'd like to add, if
```

```
 1   it's going to stay in, would be the following:  I'll try to
 2   read it slowly, "However, the law does not require" --
 3              THE COURT:  Should this be at the end of the
 4   paragraph, or somewhere else?
 5              MR. CURRAN:  I think it should be at the end of the
 6   paragraph.
 7              THE COURT:  Okay.  Go ahead.
 8              MR. CURRAN:  All right.  "However, the law does not
 9   require an employer to make such a request under those
10   circumstances.  Also, the law allows an employee who
11   disagrees with her medical provider that certain
12   accommodations are necessary to perform certain functions of
13   her job, or who believes that her employer has misapprehended
14   her medical provider's request for accommodations, to ask for
15   her medical provider, or another medical provider, to submit
16   a further certification or a clarification."
17              THE COURT:  Okay.  What do you say about the
18   concepts and the words, Mr. Hannon?
19              MR. HANNON:  I'm sorry?
20              THE COURT:  What do you say about -- there's a
21   concept here that they want and then there's the words,
22   right?
23              MR. HANNON:  Yup.
24              THE COURT:  And do you have different views on the
25   two or the same.
```

1          MR. HANNON:  I do have different views.  I don't --
2     I don't think that there's any -- well, in terms of what the
3     law permits an employer -- an employee to do, I don't see
4     anything here that prompts that -- that instruction.  It's
5     stating an obvious -- an obvious fact.  And, you know, that
6     the employee can provide their employer any information that
7     they want, I don't think that's a principle of law.  I think
8     it's a -- again, it's just a -- it's just an obvious fact
9     that she's free to tell them whatever she wants to.

10          And to the extent that the Court thinks that
11     there's some benefit to instructing the jury on that obvious
12     issue, it shouldn't be phrased in a way to in any way sort of
13     suggest what the evidence in this case is.

14          So, for example, I think Mr. Curran's phrasing
15     references if the -- if they disagree with information
16     provided by their medical provider.  I don't think there's
17     any evidence here that she disagreed with her -- with her
18     medical provider.

19          So if there has to be any comment, I would suggest
20     that the -- that the comment be more general and just the
21     extent of, you know, the law does not impose any limits on,
22     you know, what information the employee may provide to their
23     employer concerning, you know, their disability or need for
24     accommodation, something like that.  I think that would
25     accurately describe it because there are some limits on what

```
 1    the employer can do.  There are no limits in terms of what an
 2    employee can provide.
 3              MR. CURRAN:  But I think the juror is not going to
 4    know that, you know, that there are limits on --
 5              THE COURT:  Hold on one sec.
 6              MR. CURRAN:  Sure.
 7              THE COURT:  What if I just added to the end, "The
 8    law imposes no limits on what an employee can provide -- what
 9    information an employee can provide to an employer regarding
10    an employee's disability, medical conditions, or ability to
11    perform job-related functions?
12              MR. HANNON:  I'm fine with that.
13              MR. CURRAN:  I'm fine with that, Your Honor.
14              THE COURT:  Okay.  I'll add that there.
15              Okay.
16              MR. HANNON:  I thought of one other nit, I'm sorry,
17    over lunch.
18              THE COURT:  Uh-huh.
19              MR. HANNON:  So this is something that came up this
20    morning.
21              THE COURT:  Yes.
22              MR. HANNON:  So Mr. Curran, on his questioning of
23    Mr. Jonas, posited a hypothetical of "What if she gets a job
24    flipping burgers," in terms of front pay.  I think the law
25    focuses on comparable employment in terms with respect front
```

```
 1    pay.  And I would just ask that that be clarified in -- I
 2    think there are three spots for that clarification.  So one
 3    is at the bottom of 28.  The second-to-last paragraph ends
 4    with other similar employment.  I would request that
 5    "similar" be changed to "comparable," just so there's no
 6    confusion on what's being referred to there.
 7            THE COURT:  You don't object to that, do you,
 8    Mr. Curran?
 9            MR. CURRAN:  I don't object.  I'm not sure there's
10    much difference between "similar" and "comparable."
11            THE COURT:  Well, I'm not sure, either.
12            But what else?
13            MR. HANNON:  And 29 at the top -- so that's the
14    list of things to -- that the jury can consider, that the
15    concept of comparable employment needs to be included --
16            THE COURT:  Earn the amount of earnings from
17    comparable employment?
18            MR. HANNON:  Correct.  And that would apply to
19    what's currently 3 and also what's currently 4.
20            THE COURT:  Anything else?
21            MR. HANNON:  That's all.
22            THE COURT:  Okay.  All right.  I will issue a
23    revised of both documents when we're done and then you'll
24    have those.
25            And so you want 40 minutes and 5 minutes?
```

```
 1              MR. HANNON:  Can I do 35 and 10?
 2              THE COURT:  Okay.  A shorter 10, but yeah.  Okay.
 3         And 45 for you?
 4              MS. MANDEL:  Yes, Your Honor.
 5              THE COURT:  Okay.  Fine.
 6              I think somewhere between 5 and 10.  I'm not going
 7         to pull the hook out --
 8              MR. HANNON:  Yup.
 9              THE COURT:  -- but I'm mindful of too long becomes
10         like not rebuttal and independent argument.
11              MR. HANNON:  Understood.
12              THE COURT:  That's what I'm concerned with.
13              Okay.  And then what I'm going to do with the
14         instructions, I'll docket them, so you have them on ECF.  But
15         I'm going to -- I've been thinking about this.  I might have
16         referred a little bit about this, maybe in the last trial,
17         but I'm going to give part of the instructions before your
18         closing arguments.  I'm going to give what amounts to -- if
19         you look at the jury instructions, everything from page 1 --
20         I'll modify the introductory paragraph, up to, on page --
21         right now, page 8, where it says elements of the claims.  So
22         that first part about what is evidence, how to think about
23         evidence, credibility, I'm going to do that first.  There are
24         a couple of reasons that I'm going to do that.
25              And then when you're done with your closing
```

1   arguments, I'll turn to my instructions starting with the

2   elements of the claims, and then say the elements, and how to

3   deliberate.  I'm doing that for two reasons.  Honestly, one,

4   it's rather boring, the instructions, to listen to.  So it

5   breaks it up; and then number two, when they're done with

6   your closing arguments, what they really want to hear from me

7   is the elements and then I can go right into that.  So that's

8   what I'm going to do.

9           Anything about that?

10          MR. HANNON:  No, Your Honor.

11          THE COURT:  Okay.

12          MR. CURRAN:  Can I just ask one question?

13          THE COURT:  Of course.

14          MR. CURRAN:  So I take it you're going to charge on

15   damages?  Is that --

16          THE COURT:  Oh, I haven't had -- honestly, I

17   haven't spent four seconds on this case since I last saw you.

18   So I reserved on that and so -- but that's one of the things

19   that I'm going to think about.  I'm going to make all the

20   changes we discussed.  I'm going to make -- I'll reserve

21   on -- the ones I reserved on, I'll resolve.  And then I'll

22   take care of it and I'll issue it on E CF, as soon as I'm

23   done, so you'll have it.  And I'll tell you that just where

24   I'm leaning, I'm leaning to give it, not because I -- because

25   I think in --

1          Generally speaking, on these kinds of issues, it's
2     better to give things to the jury than see.  If they decide
3     no punitives, then that's the end.  And if they decide
4     there's punitives, I can -- then we can always engage in
5     briefing and discussion.  And if I think it's improper, I can
6     take it away.  It's -- punitives, of course, focus is on the
7     conduct, not the harm.  Right?  Because it's not the level of
8     harm that justifies punitives.

9          MR. HANNON:  It's a factor.

10         THE COURT:  Factor.  But just to borrow example, a
11    Comcast driver could be driving down the road, he could be
12    driving perfectly reasonably and appropriately, not texting,
13    not speeding, sunny dry day, totally appropriate, and a
14    five-year-old could independently run out into the street,
15    and boom he kills them.  The damages far exceeds -- like in
16    human consequence what we have here.  I mean, we have a dead
17    child.  But -- and that may be, under the law, a factor, but
18    it would strike me, on that set of facts, it would be
19    improper -- I would take punitives away if they were awarded
20    because there's no -- like there has to be some outrageous or
21    whatever conduct.

22         I understand that's not this case, but --

23         MR. HANNON:  I was going to point out.  It can also
24    mean what happens after.  So if after the child is struck,
25    there's an effort to cover it up, and driving records are

```
 1   altered and on and on and on.

 2           THE COURT:  Sure, there could be postevent coverup

 3   and that could potentially be relevant.

 4           MR. HANNON:  Yeah.

 5           THE COURT:  So I'm mostly inclined -- but that,

 6   too, is not focused primarily on harm.  I'm not saying harm

 7   is irrelevant.  But I don't really understand the law to mean

 8   that if the harm is really bad, that, alone, can justify

 9   punitives.  I don't see how the harm in and of itself,

10   without misconduct, could justify punitives.  Because you're

11   punishing something and how can you punish if someone

12   didn't -- if they didn't do anything wrong, beyond the

13   ordinary wrong that gives rise to civil legal liability.  So

14   that's why I make that point.

15           So I will - I'm not -- I haven't conclusively

16   resolved it, but that's the way I think about it.  Would I --

17   if it were rewarded, is it obvious to me that I wouldn't make

18   a ruling about -- like would I entertain, seriously, a

19   motion?  I would.  But I don't know -- I haven't heard the

20   argument.  So maybe I would view it differently after I heard

21   the argument.  And so -- which isn't to say I have a view

22   about the merits of the case.  I don't, really.  I'm quite

23   happy that we have juries.  So -- but I'm inclined, it seems

24   to me that the more prudent and better course is to give it

25   to the jury.
```

```
 1              MR. HANNON:  And one thing I just thought of, I
 2   think you have some rulings under advisement with respect to
 3   certain exhibits.
 4              THE COURT:  One.
 5              MR. HANNON:  So one of them, for example,
 6   yesterday, the portion of the MCAD position statement, we had
 7   offered that, the bit about they --
 8              THE COURT:  Yes, I remember.
 9              MR. HANNON:  -- had hired the interim director.  So
10   then you have the other advisement.  I think you have a
11   couple of their exhibits that are offered, as well, under
12   advisement.
13              MS. MANDEL:  Yes, Your Honor.  There are --
14              So the MCAD position statement is one.
15              THE COURT:  That's Mr. Hannon's.
16              MS. MANDEL:  Right.  And then the ones I have
17   listed here are the letters that we used to designate them --
18   I think.
19              Is that a BO?  This top one?  BO, AD, and BI are
20   the ones.  We just cross-referenced the transcripts with --
21              THE COURT:  The only one that I'm aware of -- I'm
22   not saying there aren't others, that I recall reserving on,
23   is the one, the MCAD one that Mr. Hannon has referenced.  You
24   think there are other ones that I reserved on?  I guess I
25   would ask you what are those documents and are you pressing
```

1    that they be admitted?

2          As to yours, Mr. Hannon, the requested admitted is

3    denied, your rights are saved.  It's denied, one, because I

4    think it's cumulative.  We've already heard a lot of

5    testimony on it.  Two, I think the time for it -- to the

6    extent it's partially impeachment of Ms. Ballweg, and so

7    insofar as that, it's with Ms. Ballweg.  It's also, at the

8    time -- I see sort of its cumulative and raising side issues.

9    I'm not saying I would have ruled the same way had it come up

10    at a different point in the trial, but at a point at the very

11    end.  So I see it more as a 403 issue, so for those reasons,

12    it's denied, and your rights are saved.

13          MR. HANNON:  Well, the one that Your Honor just

14    ruled on, that was the only exhibit that I'm pressing that

15    was reserved, so...

16          MS. MANDEL:  And I believe we had one of the

17    e-mails between Dr. Kessimian and Dr. Menninger that was --

18    we met one morning.  I believe there were four e-mails and

19    one of them we reserved on, the others --

20          THE COURT:  Can you show me the document?

21          MS. MANDEL:  Yeah, let me --

22          THE COURT:  Do you remember which document this is,

23    Mr. Hannon?

24          MR. HANNON:  I do.  It was an e-mail correspondence

25    between Dr. Kessimian and Dr. Menninger.  The witness was

1    questioned about it.  Attorney Mandel essentially kind of

2    walked her through the content of the e-mail.  I don't think

3    the e-mail was ever actually offered.  I think after

4    Ms. Mandel went through the content with the witness, she

5    moved on to something else.  So I don't think this is

6    something that the Court actually held under advisement.

7               MS. MANDEL:  Well, I believe during our morning

8    conference, our understanding was during the morning

9    conference is there were three of them we wanted to use as

10   exhibits on one, I believe the issue is whether there was

11   foundation --

12              THE COURT:  Well, do you want it or not?

13              MS. MANDEL:  We would like it, yes.

14              THE COURT:  Okay.

15              (Counsel confers.)

16              THE COURT:  E-mail Ms. Belmont the document or

17   documents, and I will --

18              Are you objecting, Mr. Hannon?

19              MR. HANNON:  I am, Your Honor.

20              THE COURT:  All right.  I'll look at them and then

21   I'll just issue an E-order that says if they're in or they're

22   out.

23              MR. HANNON:  Okay.  And just for the record, I

24   think part of my objection is it wasn't offered.  And if it

25   had been offered, I would like to have redirected on it, but

1    because it wasn't offered, I would --

2              THE COURT:  Fine.  Okay.  I'll -- e-mail them so I

3    can look at them.  I just don't have them fresh in my head as

4    to exactly which e-mails they were.  I would like to look at

5    them and just copy Mr. Hannon on it.  Send them to

6    Ms. Belmont.  And as soon as you do, I'll look at them, and

7    I'll resolve it today.

8              (Court in recess at 3:04 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T I O N

 2

 3

 4            I certify that the foregoing is a correct

 5    transcript of the record of proceedings in the above-entitled

 6    matter to the best of my skill and ability.

 7

 8

 9

10    /s/ Rachel M. Lopez                  March 30, 2023

11    /s/ Robert W. Paschal

12

13

14    _____      _____

15    Rachel M. Lopez, CRR              Date

16    Robert W. Paschal, CRR, RMR

17    Official Court Reporters

18

19

20

21

22

23

24

25
```



UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

LISA MENNINGER,

      Plaintiff,                 Civil Action No.
                                 1:19-cv-11441-LTS
      v.

PPD DEVELOPMENT, L.P.,

      Defendant.

_____


    BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


JURY TRIAL
Day 10


Friday, March 31, 2023
8:51 a.m.


John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts


Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiff:

    HARTLEY MICHON ROBB HANNON, LLP
    BY:  PATRICK J. HANNON AND HAMPTON M. WATSON
    155 Seaport Boulevard
    2nd Floor
    Boston, Massachusetts  02210
    (617) 723-8000
    phannon@hmrhlaw.com
    hwatson@hmrhlaw.com


On behalf of the Defendant:

    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
    BY:  RACHEL REINGOLD MANDEL AND PATRICK M. CURRAN, JR.
    One Boston Place
    Suite 3500
    Boston, Massachusetts  02108
    (617) 994-5700
    rachel.mandel@ogletreedeakins.com
    patrick.curran@ogletreedeakins.com

1                           **TABLE OF CONTENTS**

2

3

4                           **MISCELLANEOUS**

5

6                                                               Page

7    Jury Instructions                                          11

8    Closing Arguments By Counsel For Plaintiff                 22

9    Closing Arguments By Counsel For Defendant                 50

10   Rebuttal Argument By Counsel For Plaintiff                 81

11   Jury Instructions                                          84

12   Verdict                                                    129

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       P R O C E E D I N G S
 2               (In open court.)
 3               THE DEPUTY CLERK:  The United States District Court
 4      for the District of Massachusetts is now in session, the
 5      Honorable Leo T. Sorokin presiding.
 6               THE COURT:  Please be seated.
 7               So one thing, Mr. Hannon filed a request for a
 8      supplement or a change to page 24.  I revised page 24.  So
 9      let me just tell you how I've revised it.  I've essentially
10      done three things.  I've -- Mr. Hannon, one thing he asked me
11      to do, was add basically -- I had three adverse actions, he
12      said make it five and the wording on some of them changed
13      slightly.  So I did that, I took his five.  I thought that
14      was fair.  But just for the record, I think that at
15      summary -- none of these were precluded by summary judgment.
16      I think the trial record supports it.  I'm not saying that I
17      do find it or anything, it's just for the jury to decide.  So
18      I think that's reasonable.  So I did that.
19               I deleted the paragraph at the end that you wanted
20      me to delete, Mr. Hannon, but in my wording of the change to
21      the first paragraph, I made a few other adjustments, in light
22      of -- I'll just read it to you and we're printing a copy so
23      you'll have them shortly.
24               So the first paragraph, the beginning of Element 2
25      on page four, the first part of it, it reads this way.
```

| 1 | Second -- I'll speed read a little, it doesn't change.  "Dr. |
| 2 | Menninger must prove she suffered a material adverse action. |
| 3 | For the purposes of this retaliation claim, Dr. Menninger |
| 4 | alleges that the adverse action was comprised of one or more |
| 5 | of the following alleged actions." |
| 6 |         Then it lists the five as Mr. -- six, sorry, as |
| 7 | Mr. Hannon proposed them.  I'm not going to read that for |
| 8 | you, because you have what he filed, right? |
| 9 |         MS. MANDEL:  (Nods head.) |
| 10 |         THE COURT:  All right.  Then the next sentence |
| 11 | says, "For this element, you must determine whether plaintiff |
| 12 | has met her burden to prove by a preponderance of the |
| 13 | evidence both that, (a), one or more of these alleged acts |
| 14 | occurred, and (b), if so, whether the proven acts amounted to |
| 15 | an adverse action, either individually or collectively." |
| 16 |         MR. CURRAN:  No objection. |
| 17 |         MR. HANNON:  Good here. |
| 18 |         THE COURT:  Okay.  All right.  Fine. |
| 19 |         All right.  Copies? |
| 20 |         THE LAW CLERK:  Yeah. |
| 21 |         THE COURT:  So if you can just give them to |
| 22 | Kellyann. |
| 23 |         THE DEPUTY CLERK:  I can pass them out. |
| 24 |         THE COURT:  It's a whole new copy, another tree |
| 25 | down, but it only changes on page 24. |

```
 1              MR. HANNON:  I've got one issue to raise.

 2              THE COURT:  Okay.

 3              MR. HANNON:  One more question to run by you.

 4              THE COURT:  Yeah.

 5              MR. HANNON:  So during my closing, what I'd like to

 6    tell the jury, with respect to the exhibits, is given the

 7    number of them and the lack of a cohesive organization that,

 8    if they're having trouble finding something, that they are

 9    permitted to ask a question, in terms of where a particular

10    document is located.  I would tell them that answering those

11    questions is a bit of a hassle.  It would be best if they

12    kind of made a full, comprehensive list, but that's something

13    that I would like to mention in my closing.

14              THE COURT:  Do we -- yes?

15              MS. MANDEL:  Offhand, it strikes me as something

16    that might be more appropriate to come from the bench,

17    instead of from one of us during closing.  It's sort of a

18    neutral statement.

19              THE COURT:  Let me first -- Kellyann, do they get

20    the -- they'll get a list, right?

21              THE DEPUTY CLERK:  They should, yes.

22              THE COURT:  That has the description.

23              THE DEPUTY CLERK:  Right.

24              THE COURT:  And then that will be on the CD, too?

25    I mean, on the computer screen or just on paper?
```

1          THE DEPUTY CLERK:  It might be just on paper.

2          THE COURT:  Okay.

3          MR. HANNON:  It's like 450 documents, though.  It's

4     going to be like finding a needle in a haystack.

5          THE COURT:  So I think that's -- I'm happy to tell

6     them that.  I don't mind telling them that.  I mean -- in the

7     exhibits, you know, and that I'm certainly going to tell

8     them, even though it's not in the instructions, that part --

9     I try not to ad lib generally from the written instructions,

10    but like I'm going to tell them there's -- I'm going to

11    explain how the CD thing works, not in detail, but they have

12    it and -- they're not going to have paper copies, correct?

13          MR. HANNON:  Right.

14          MS. MANDEL:  Correct.

15          THE COURT:  So the exhibits will only be on there

16    and they can -- I don't -- are you objecting to him saying

17    it, or just -- I will say that.  I understand you to be

18    saying that you'd like me to say it.  I will say to them that

19    they have this list, and I'm not going to invite questions.

20    I don't think I would -- just my own preference, but mostly

21    because it is a hassle, but I'm going to tell them about the

22    process for a question, and I'm going to tell them they write

23    it out, and I'll tell them that it sometimes takes a few

24    minutes, because we gather everyone, and I talk to all of you

25    before I answer any questions.

```
 1              And so, one, I will say something like that.  No
 2    problem.  I understand that's what you're requesting of me,
 3    right?
 4              MS. MANDEL:  Yes.
 5              THE COURT:  All right.  Are you objecting to
 6    Mr. Hannon saying it or not?
 7              MS. MANDEL:  I suppose I don't object to that
 8    statement.  It seems pretty neutral.
 9              THE COURT:  Okay.  So you can say it if you wish.
10              MR. HANNON:  Okay.  Thank you.  That's all I have.
11              THE COURT:  Sure.  Okay.
12              Anything for you?
13              MS. MANDEL:  No.  Thank you.
14              THE COURT:  Do you know if they're all there yet,
15    Kellyann?
16              THE DEPUTY CLERK:  I don't know.
17              THE COURT:  Why don't you go check and see.
18              If they are and they're ready, I'm happy to start a
19    little early, and if not --
20              THE DEPUTY CLERK:  Okay.
21              THE COURT:  So I was thinking about one thing, just
22    for both of you, I assume it's not coming up in the closings
23    this way, but I just wanted to bring it up.
24              So there's evidence that Dr. Menninger received
25    short-term disability, long-term disability, and Social
```

```
 1   Security Disability.  And I think that's relevant evidence in
 2   various ways.  The one issue that concerns me is that there's
 3   not much evidence, if any, about what is the criteria for
 4   awarding disability benefits under those policies and under
 5   the law.  And my understanding of the law is that it's not
 6   identical to the ADA for the -- what are the requirements to
 7   obtain disability, or necessarily identical to what a jury
 8   would have to determine to determine, say, that Dr. Menninger
 9   couldn't ever work again.  And so the only thing -- if -- I
10   don't know if either of you are planning to argue that it is
11   the same.
12              MR. HANNON:  No.
13              THE COURT:  Okay.  Because if you did, then I'd
14   feel like I'd need to explain to them that that's not the
15   law.
16              MR. HANNON:  Understood.  I'm not going to touch
17   that.
18              THE COURT:  Okay.  Fine.
19              MS. MANDEL:  Your Honor, just one thing to note
20   about our closing.  We do have a chalk that we'll be using.
21   We have sent an image of it to Dr. Menninger's counsel, as
22   well.
23              THE COURT:  Fine.
24              MR. HANNON:  And just on that, we do dispute the
25   accuracy of some of the facts asserted on the chalk, and if
```

```
 1    the Court could just give a very brief, you know, instruction
 2    on that, just that it's not evidence.  It's --
 3              THE COURT:  It's like part of the argument.
 4              MR. HANNON:  Yeah.
 5              (The jury enters the courtroom.)
 6              THE COURT:  Good morning.  Please be seated.  No
 7    one discussed the case among yourselves or with anyone else,
 8    no one did any independent research.  Right?
 9              Good.  Okay.  So we're ready to go.  Let me tell
10    you that -- the exact just sequence this morning, just so you
11    know how things are going to go and what's going to happen.
12              So my instructions are going to be -- I'm going to
13    break my instructions up into two parts.  I'm going to give
14    you, in a moment, the first part of my instructions, and
15    those instructions are about what is evidence, how to
16    understand the evidence, how to think about witnesses.
17    They're more general instructions like that.  And then that's
18    the first half of my instructions, you'll have everything
19    that I give you, you'll have it in writing when you go back
20    to the jury room, but that, essentially, the printed copy
21    that you'll get, it's like parts one and two.
22              And then you'll hear closing arguments and you'll
23    hear first from Mr. Hannon for the plaintiff, because they
24    bear the burden of proof, and then you'll hear from
25    Ms. Mandel for the defendants.  And then Mr. Hannon gets to
```

1   make a brief rebuttal, because they have the burden of proof.

2          And then you'll hear from me on the last two parts

3   of my instructions.  The main part of that is then what are

4   the things -- there are three claims here.  What does

5   Dr. Menninger have to prove for each of those claims.  And

6   I'll explain not only what the things are, but more detail

7   about how to understand each of those, and then I'll have the

8   last part of the instructions is a brief explanation of how

9   to think about -- what to do -- how to deliberate.  And then

10  you're done and you'll go back, and we'll give you the

11  exhibits and the instructions, and the verdict form, and

12  you'll start your deliberations.  Okay?

13         So first we'll begin with the first part of my jury

14  charge as I explained to you on those first two topics.

**JURY INSTRUCTIONS**

16         THE COURT:  So in defining the duties of the jury,

17  let me first explain the general rules.  It is your duty to

18  find the facts from all of the evidence in the case.  I will

19  describe the law to you and you must apply the law to the

20  facts as you find them.  You must follow the law as I

21  describe it, whether you personally agree with the wisdom of

22  the law -- whether or not you agree with the wisdom of the

23  law.

24         This instruction is a fundamental part of our

25  system of government by law, rather than by the individual

1    views of the judge and the jury.  It is your duty as jurors

2    to decide the case fairly and impartially regardless of any

3    person likes or dislikes, opinions, prejudices, bias, or

4    sympathy for one party or another.  You must make your

5    decision based solely on the evidence before you and

6    according to the law.

7            In following my instructions, you must follow all

8    of them.  They are all equally important.  The lawyers are

9    allowed to comment both on the evidence and on the rules of

10   law in their opening and closing statements.  But if what

11   they have said about the evidence differs from your memory,

12   then let your collective memory control.  If what they have

13   said about the law seems to differ in any way from my

14   instructions, you must be guided only by my instructions.

15   You must not read into these instructions or into anything

16   that I may have said or done during the course of the trial,

17   any suggestion from me as to the -- as to the verdict you

18   should return.  Whatever opinion I might have as to what your

19   verdict should be is utterly irrelevant.  The verdict is

20   yours, and yours alone, to render as the finders of the

21   facts.  While I intend to be as helpful as I can in providing

22   you with knowledge of the law that you will require to render

23   an intelligent and informed verdict, the law commits this

24   case to your sole determination as judges of the facts.

25            Plaintiff, you will recall, is the name we give to

1    the person or entity who brings a lawsuit.  In this case, the

2    plaintiff is Dr. Lisa Menninger.  We referred to the parties

3    sued as the defendant.  In this case, the defendant is PPD

4    Development, LP, which I'll refer to as PPD.

5         In a civil case such as this, a plaintiff bears the

6    burden of proving her case by a preponderance of the

7    evidence.

8         As I explained earlier at the beginning of the

9    trial, this is a much lower standard of proof than that of,

10   quote/unquote, proof beyond a reasonable doubt, the very high

11   standard that we apply in a criminal trial.  Proof by a

12   preponderance of the evidence does not require Dr. Menninger

13   to prove her case to any degree of mathematical certainty.

14   Rather, she must produce evidence which, when considered in

15   the light of all the facts and evidence in the case, leads

16   you to believe that her claims are more likely true than not.

17   If you find that Dr. Menninger meets this burden, your

18   verdict must be for her.  Should she fail to meet this

19   verdict -- this burden, your verdict must be for PPD.

20        In determining whether any fact at issue in this

21   case has been proven by a preponderance of the evidence, you

22   may consider the testimony of all witnesses, regardless of

23   who may have called them, and you may consider all exhibits

24   received in evidence, regardless of who may have produced

25   them.

```
 1                    Next is evaluating evidence.

 2                    Let me first review for you what is and is not

 3      evidence in a civil case.

 4                    Evidence is presented at trial in one of three

 5      ways:

 6                    First, through the sworn testimony of witnesses on

 7      both direct and cross-examination.

 8                    Second, evidence is presented through physical

 9      objects, such as documents, photographs, and videotapes that

10      are identified by a witness and admitted as exhibits during

11      the trial.

12                    And third, evidence is presented by stipulation;

13      that is, by agreement between the parties that certain facts

14      are true and need not be independently proven as such at

15      trial.

16                    Certain things are not evidence and should have no

17      influence on your verdict.

18                    One, arguments and statements by lawyers, as I

19      cautioned several times, are not evidence.

20                    What the lawyers have said over the course of the

21      trial or what they say in a few moments in closing argument

22      you may find helpful, even persuasive, but the facts are to

23      be determined from your own evaluation of the testimony of

24      the witness and exhibits, and from any reasonable inferences

25      that you choose to draw from the facts as you find them.
```

 1          Two, questions to the witnesses are not evidence

 2     and may only be considered in the sense that they give

 3     context or meaning to a witness's answer.

 4          Three, objections to questions are not evidence.

 5     Attorneys have a duty to their clients to object when they

 6     believe that a question is improper under the rules of

 7     evidence.  You should not be influenced by the fact that an

 8     objection was made.  If I sustained the objection, you should

 9     ignore the lawyer's question and any assertion of fact it

10     might have contained.  If I overruled the objection, you

11     should treat the witness's answer like any other.

12          Four, testimony that I excluded, struck, or which I

13     instructed you to disregard is not evidence.  If you heard an

14     answer to the question before my ruling sustaining an

15     objection, you are to disregard it.  That answer is not

16     evidence.  You should also ignore editorial comments made by

17     the attorneys during their presentations, particularly those

18     intended to characterize the testimony of witnesses.  Whether

19     or not a witness's testimony was believable on any particular

20     point is a determination that only you can make.

21          Five, notes, if you have kept them, are not

22     evidence.  They are a personal memory aid to be used to

23     refresh your recollection of the evidence during the

24     deliberations.

25          And finally, anything you may have seen or heard

```
 1    outside the courtroom during the course of the trial is not
 2    evidence.
 3              There are two kinds of evidence:  Direct and
 4    circumstantial.  Direct evidence is direct proof of a fact,
 5    such as testimony of a witness that the witness saw or did
 6    something.  Circumstantial evidence is indirect evidence;
 7    that is, proof of a fact or facts from which you could draw a
 8    reasonable inference that another fact exists, even though it
 9    has not been proven directly.
10              You all have experience in your everyday life
11    drawing inferences based on circumstantial evidence.  For
12    instance, imagine it was sunny when you arrived here this
13    morning, but just now someone walked into the courtroom
14    wearing a wet raincoat and carrying a dripping umbrella.
15    Without any words being spoken and without looking outside
16    for yourself, you might draw the reasonable inference that it
17    is now raining outside.  In other words, the facts of the wet
18    raincoat and the dripping umbrella would be circumstantial
19    evidence that it is raining.
20              You are entitled to consider both direct and
21    circumstantial evidence.  Neither type of evidence is
22    considered superior or inferior to the other.  The law
23    permits you to give equal weight to both.  It is for you to
24    decide how much weight to give to any piece of evidence.
25              Most evidence received at trial is offered through
```

1    the testimony of witnesses.  As the jury, you are the sole
2    judges of the credibility of these witnesses.  If there are
3    inconsistencies in the testimony, it is your function to
4    resolve any conflicts and to decide where the truth lies.
5    You are not required to believe the testimony of any witness
6    simply because the witness was under oath.  You may choose to
7    believe everything that a witness said, only part of it, or
8    none of it.  If you do not believe a witness's testimony that
9    something happened, that, of course, is not evidence that it
10   did not happen.  It simply means you must put aside that
11   testimony and look elsewhere for credible evidence before
12   deciding where the truth lies.

13           Often, it may not be what a witness says, but how
14   he or she says it that might give you a clue whether or not
15   to accept his version of the event as believable.  You may
16   consider:

17           A witness's character; his or her appearance and
18   demeanor on the witness stand; his or her frankness or lack
19   of frankness in testifying; whether the witness was
20   contradicted by anything that he or she said before trial;
21   whether his or her testimony is reasonable or unreasonable,
22   probable or improbable, in light of all the other evidence in
23   the case; how good an opportunity the witness had to observe
24   the facts about what he or she testifies; and whether his or
25   her memory seems accurate.

1          You may also consider the witness's motive for
2     testifying, whether he or she displays any bias in doing so,
3     and whether he or she has any interest in the outcome of the
4     case.  Simply because a witness has an interest in the
5     outcome of the case does not mean the witness is not trying
6     to tell you the truth.  But a witness's interest in the case
7     is a factor you may consider along with everything else.  You
8     may also consider the fact that a witness may be perfectly
9     sincere in his or her account of an event, and simply be
10    mistaken as to the truth.

11         In deciding whether or not to believe a witness,
12    keep in mind that people sometimes forget things, get
13    confused, or remember an event differently.  Memory is not
14    always reliable, and when someone recounts a story twice, it
15    will seldom be identical in every detail, unless it is a
16    memorized lie, or the witness is possessed of extraordinary
17    perception and recall.  It is for you to decide whether any
18    contradictions in a witness's testimony are innocent lapses
19    of memory or intentional falsehoods.  That may depend on
20    whether important facts or small details are at issue and how
21    important the facts might have appeared to the witness at the
22    time they were perceived.

23         The weight of the evidence does not necessarily
24    depend on the number of witnesses testifying for one side or
25    the other.  The law does not require any party to call as

1    witnesses all persons who may have been present at any time

2    or place involved in the case or who may appear to have some

3    knowledge of the matters in issue at this trial.  Nor does

4    the law require any party to produce as exhibits all papers

5    and things mentioned by the witnesses in the case.  You must

6    determine the credibility of each witness who testified and

7    then reach a verdict based on all of the believable evidence

8    in the case.

9          You should consider and decide this case as a

10    dispute between persons of equal standing in the community,

11    of equal worth, and holding the same or similar stations.

12    The defendant is a type of corporate entity known as a

13    limited partnership.  A limited partnership is entitled to

14    the same fair trial as a private individual.  All persons,

15    including equal limited partnerships stand equal before the

16    law and are to be treated as equals.

17          Expert witnesses.  I want to talk to you briefly

18    about that topic.  The rules of evidence, ordinarily, do not

19    permit witnesses to express opinions or conclusions.

20    Normally, witnesses testify as to the facts and the jury

21    draws conclusions from the testimony.  An exception to this

22    rule is testimony from those we call experts.  Witnesses who,

23    because of special training, education, skills, or knowledge,

24    have been expert in some art, science, profession, or

25    calling.  Such persons may state their opinions as to

1    relevant and material matters in which they process to be

2    experts, and they may state their reasons for their opinions.

3            In this case you heard expert opinions.  You should

4    consider each of the expert opinions received in evidence in

5    this case and give it as much weight as you think it

6    deserves.  An expert opinion is subject to the same rules

7    concerning reliability as the testimony of any other witness.

8    Just because a person is testifying as an expert does not

9    mean that you, the jury, have to accept that person's

10   opinion.  A person may be learned in some profession, but if

11   you should decide the opinion of this expert witness is not

12   based upon sufficient education and experience, or if you

13   conclude that the reasons given in support of his or her

14   opinion are not sound, or if you feel that the expert's

15   testimony is outweighed by other evidence, or if you find the

16   expert witness is not believable or credible, you may give

17   the opinion only so much weight, if any, as you think it

18   deserves.

19           Expert testimony must have a sound factual basis.

20   An expert's opinion amounting to speculation unsupported by

21   subordinate facts must be disregarded.  It is your

22   responsibility as jurors to determine what the facts are.

23   The fact that the Court has permitted an expert to testify

24   should not be seen by you, the jury, as any indication of the

25   weight you should accord with the expert testimony.

```
 1          So that concludes the first parts of my
 2    instructions to you.
 3          So now we'll have the closing arguments and then,
 4    after the closing arguments, I'll deliver to you my
 5    instructions on the law, which is essentially what are
 6    Dr. Menninger's claims, what does she have to prove for each
 7    claim, and how to understand in a little more detail, maybe a
 8    lot of detail, the specific elements of each of her claims
 9    and then some directions on deliberations.
10          A reminder now as we turn to the closing arguments,
11    I told you, the closing arguments can be helpful, they can be
12    persuasive, but they're not evidence.  And it's your
13    collective memory of the evidence in the end that controls if
14    it differs from what the lawyers say.  The lawyers are not
15    only entitled to speak to you, as I expect they will, but
16    they're also entitled, if they wish, to present to you what
17    we call chalks.
18          So you've seen documents in evidence and those will
19    be going to you in the jury room.  A chalk is a reference to
20    sort of what some of you might remember from grade school.
21    Literally things written on the chalkboard, right -- so, in
22    this era, sometimes people write things on a blackboard, but
23    sometimes they have an electronic copy.  And so you -- one or
24    both of the parties might present something like that, and
25    it's just like their words.  It's just something that is part
```

```
 1    of their argument.  They're entitled to present it and you
 2    treat it just the same.  It's not -- you won't have a copy --
 3    you won't have a transcript of what they say, and you won't
 4    have a copy of whatever they present to you in closing
 5    argument, unless it's already in evidence.  Then, of course,
 6    you will.  If they pull up an exhibit, you'll have that,
 7    because it's an exhibit, not because they pulled it up in
 8    closing argument.
 9              So -- and you view any argument and any chalks of
10    that nature they present, just like their argument in
11    totality.
12              Okay?  All right.
13              Go ahead, Mr. Hannon.
14              MR. HANNON:  Thank you, Your Honor.
15              **CLOSING ARGUMENTS BY COUNSEL FOR PLAINTIFF**
16              MR. HANNON:  Good morning.  I know it's been two
17    weeks since we started this adventure together and I know
18    you've seen a lot of documents, a lot of highlighting and all
19    of that.  I don't have time right now, thankfully for you, to
20    go back through all of that and I'm not going to try to.  I
21    might have the urge to show you a handful of documents and
22    I'll try to make those brief and not be too repetitive.  But
23    as the Judge alluded to, this is sort of our opportunity to
24    talk over the evidence that -- from our sort of perspective.
25    And I know you've all been paying very, very close attention,
```

1    so I'd like to spend my time right now sort of walking you

2    through not just the evidence, but how I sort of see it

3    fitting in with respect to the questions you have to answer.

4         Once we're done and the Judge instructs you on the

5    law, you're going to get a verdict slip that's going to have

6    a number of questions for you to answer, and that's going to

7    be your verdict.  And the Judge has already kind of shared

8    with us that, and what we expect he's going to instruct you

9    on.  So let me just sort of jump in there.

10        The first question you're going to have to answer

11   has to do with reasonable accommodation, specifically whether

12   or not PPD violated the law by failing to provide

13   Dr. Menninger a reasonable accommodation.  Reasonable

14   accommodation, I suspect, you're going to find is probably

15   the most complicated claim in this case.  And just by way of

16   preview, there's sort of three questions on sort of

17   liability, three questions on whether or not PPD acted

18   unlawfully.  The first one is going to be whether or not they

19   failed to provide a reasonable accommodation.  The second one

20   is going to be whether or not they, on the basis of

21   Dr. Menninger's disability, subjected her to an adverse

22   action, and the third one is going to be whether or not they

23   retaliated against her.

24        So it's going to be reasonable accommodation,

25   adverse employment action, retaliation.  And the sort of

```
 1    different analytical ways to sort of approach those different
 2    three claims, I think you're going to find that they go from
 3    most complicated to least complicated.  But I'm going to take
 4    them in order just to hopefully make some of this make sense.
 5              With respect to the accommodation claim, the first
 6    question surrounds Dr. Menninger's entitlement to an
 7    accommodation.  And as you're going to hear, part of that has
 8    to do with whether or not she had a disability.  And the
 9    Judge will instruct you in terms of what constitutes a
10    disability under the law.  I suspect -- I'm already showing
11    you something here.  I suspect you're going to find a
12    particular document helpful in addressing those questions.
13    So this is Joint Exhibit 47.  And you'll recognize here, this
14    was the initial request for accommodation form submitted
15    by --
16              It's not on your screen?
17              THE DEPUTY CLERK:  Are you on HDMI-1?
18              MR. HANNON:  I am on HDMI-1, yeah.
19              THE DEPUTY CLERK:  Okay.
20              THE COURT:  Something popped up for a second on my
21    screen, but it's gone.  I see your logo.
22              MR. HANNON:  We're there?
23              THE COURT:  No.
24              MR. HANNON:  Forget that.  You've seen the
25    document.
```

```
 1              THE JUROR:  It's there.

 2              MR. HANNON:  Of course it is.  I think

 3      Ms. Belmont's messing with me.

 4              So you'll recall seeing this document.  This was

 5      the initial correspondence of Dr. Kessimian with respect to

 6      the accommodation request.  You'll recall that this form kind

 7      of walks through a series of questions, mental impairments,

 8      substantially impairs a major life activity.  I expect that

 9      you're going to find that those questions largely track with

10      what the Judge is going to instruct you with respect to the

11      law, in terms of what qualifies someone as being disabled

12      under the law.

13              A couple of things that I'd ask you to keep in mind

14      and listen closely with respect to the Judge's instructions

15      on this issue.  One is that we talk about a major life

16      activity.  We include things like speaking, like breathing,

17      interacting with others.  It's a very broad list of the types

18      of things.  I expect you're going to hear from the judge

19      that, when you're deciding whether or not the impairment

20      substantially limits a major life activity, pay close

21      attention to what the judge says regarding this not being a

22      demanding standard; that this is intended to be applied

23      broadly in favor of expansive coverage.

24              I expect you're also going to hear that you have to

25      take into account instances that are episodic, and by
```

```
 1   "episodic," meaning you know, things that don't happen
 2   constantly, but there are episodes.  And I would suggest
 3   that, from the evidence in this case, the best example of
 4   that is like a panic attack, right?  That's not something
 5   that Dr. Menninger suffered constantly, it was an episode
 6   that would arise on occasion.  It was an episode that as you
 7   would -- as you heard, would restrict her ability to breathe,
 8   to talk, to think.  And I would suggest to you, that's really
 9   the sort of easiest example here, and when you look at these
10   different elements, to understand that she did, in fact, have
11   a disability under the law.
12          You'll also note that having a disability doesn't
13   necessarily have to prevent you from success.  Right?  There
14   are lots of people who have disabilities who, nonetheless,
15   are able to achieve, you know, fantastic things.  I expect
16   the Judge will provide a specific example, you know, for
17   example, somebody with a learning disability.  Just because
18   they're able to overcome that disability with extra study and
19   extra effort, doesn't mean they don't have a disability
20   within the meaning of the law.  Again, this is expansive
21   coverage.
22          So with respect to having a disability, I
23   anticipate that that should be a fairly easy question to
24   answer.
25          Moving on, you'll have to decide whether or not she
```

```
 1    was a qualified individual.  And you're going to hear there's
 2    sort of two pieces to that.  One is that she has sufficient
 3    education, skill, experience, qualifications for the job.
 4    And obviously, she did, right?  We know this was a job that
 5    she had been in for several years, she had been performing
 6    successfully, has a very impressive resume.  She was clearly
 7    qualified.
 8             The second piece of that same element concerns
 9    whether or not she could perform the essential functions of
10    the job.  And this is where the accommodation claim gets a
11    little bit complicated.  You heard the Judge mention earlier
12    the burden of proof, the more likely true than not true, and
13    you're going to find that on most elements, as the plaintiff,
14    we have the burden.  This one is a little bit different.
15    You're going to hear that with respect to establishing what
16    the essential functions of the job are, that that's going to
17    be PPD's obligation, to convince you it's more likely true
18    than not true that something was an essential function.
19             And the Judge will tell you what it means, an
20    essential function.  We expect he's going to tell you it's a
21    fundamental job duty of the position, and you're going to
22    hear there are essential functions, and then there are
23    nonessential functions, what we call marginal functions.  And
24    you'll have to decide what constitutes an essential function
25    versus a marginal one.
```

1          I would submit that, based upon the evidence
2     presented here, that's really not much of an issue.  Again,
3     Dr. Menninger was in the role for many years.  I submit to
4     you that there is no evidence that she was ever given a
5     particular assignment, a particular task that she was unable
6     to do.  She did the job.  It wasn't always easy.  Sometimes
7     it was hard.  Sometimes it caused her pain and distress, but
8     she got the job done.  There's no claiming here that she
9     didn't.  So I would submit to you that the evidence certainly
10    establishes that she was a qualified individual.
11         Turning to the next element, which has to do with
12    her request for an accommodation.  And you're going to hear
13    that the evidence has to show that she made a sufficiently
14    direct and specific request.  And I think one way of thinking
15    about that is if you all go back in the jury room, and you
16    guys think of an awesome idea of something that she could
17    have requested, it doesn't do me any good.  So the actual
18    request that they denied has to be something that's here in
19    the evidence, something that was actually talked about or
20    discussed during the time of the events at issue.  We can't
21    start new from whole cloth.  So you're going to have to
22    consider the things that are actually in the record that are
23    being talked about at the time.
24         Next comes to the actual accommodation itself.  Was
25    it reasonable.  And this is complicated, too.  So you're

```
 1    going to hear that, in the first instance, we have the burden
 2    of showing that it was reasonable, at least on its face.
 3    Right?  And this is something that they could do, taking into
 4    account some of the various factors that the Judge is going
 5    to provide you.  He's going to give you an example of what a
 6    reasonable accommodation is, and what a reasonable
 7    accommodation isn't, and then you have to evaluate what side
 8    of the ledger it falls on.
 9            If you find that it's reasonable on its face, then
10    the burden is going to shift to them to show that, providing
11    it wouldn't be an undue hardship.
12            So turning to the fact here, when we're talking
13    about a reasonable accommodation, I suspect that the first
14    inclination might be to look at the buckets and look at Dr.
15    Kessimian's proposed accommodations with respect to that.
16    And I suggest to you that that's fine.  I suggest to you that
17    if you look there that you're going to find that those were,
18    at least on their face, reasonable accommodations, in part
19    because the Judge is going to tell you that reasonable
20    accommodations include modifying when and how a function is
21    performed.  It's going to include altering, reassigning,
22    eliminating nonessential job functions.  He's going to tell
23    you that it includes things like that provision of qualified
24    readers.  I expect, if you look at Dr. Kessimian's e-mail
25    that, yes, those are, at least on their face, reasonable.
```

1    And we -- I expect when you consider the evidence you've

2    heard, there's been no evidence to establish that they've met

3    their burden to prove that any of that would cause an undue

4    hardship.

5         But I don't think this case is really about that

6    set of requests of accommodations.  I would submit to you

7    that what this case is really about is the first set of

8    request for accommodations, the one that Dr. Kessimian made

9    on January 31, 2018.  And if you recall what those were,

10    fundamentally two things.  Right?

11         First, try to minimize the public speaking and

12    social interaction to the extent that we can.  Right?  You're

13    going to see, there's no specific thing that has to be an

14    accommodation, right?  An accommodation doesn't need to fit

15    within a certain box, right?  So something like this

16    proposing that let's just simply try, to the extent we can,

17    to minimize public speaking.  I submit to you that's a

18    perfectly fine reasonable accommodation, right?  That's an

19    easy ask.  It's not a big one.  Right?  Let's just think

20    through what are the tasks that you really need her to do,

21    and can we try to alleviate some of her stress and some of

22    her symptomology by taking some of the other stuff off of her

23    plate.  That's a pretty good request, I would submit.

24         And then she says, and if you can't, right, if it's

25    deemed necessary, let's make a plan.  Right?  And let's

```
 1    figure it out.  Let's find a way that she can do those things
 2    and she can do these things in a way that's not going to
 3    cause her undue burden, undue stress.  Right?
 4            I submit to you from the evidence that you heard,
 5    that was a pretty good accommodation request, as well, that
 6    that's facially reasonable.  Right?  And the reason why I
 7    point to these, I suggest, as really being what this case is
 8    about, is because this is the way things actually played out.
 9    Right?
10            So we have the five buckets, right?  The five ways
11    that Mr. Mekerri said that the job was going to change and
12    grow, and all of that.  But none of those things ever
13    actually happened, right?  He gives her that list in
14    February.  By the time that she leaves at the start of June,
15    she hasn't been asked to do any of those extra new things.
16    Right?
17            Really, where those things come into play here is
18    that it's the anticipation.  It's the fear that those things
19    are going to happen.  It's the uncertainty.  And I'm going to
20    talk more about that in a moment.
21            But as we're talking about that, keep in mind what
22    Dr. Menninger is doing.  She's asking questions, right?
23    She's saying, can we talk about these things, can you give me
24    some more information regarding buckets two, three, and four.
25    She's doing exactly what Dr. Kessimian recommended.  Right?
```

1      If you're going to tell us that these are things she has to

2      do, let's make a plan.  Let's communicate.  Let's talk about

3      it.

4              Over and over again, she asked them, "Can you tell

5      me?  Can we talk about it?  These are things that I can do.

6      We can work with these things."  And time and again, they

7      didn't respond.

8              I'd submit to you that, in answering the first

9      question with respect to accommodation, that that is the

10     violation here that's most easily recognized.  And that's the

11     violation here that I would submit to you is the one that

12     really caused Dr. Menninger the most harm.  It was the -- it

13     was the not knowing.  It was the lack of a plan.  It was the

14     lack of understanding.  And Dr. Kessimian told them right

15     here, on January 31, 2018, that that was something that would

16     help alleviate the symptoms and stress of her disability.

17     And they denied it to her.

18             And they had no good reason for doing so.  You've

19     heard no explanation here in terms of why they couldn't give

20     her that extra detail.  You've heard no explanation here in

21     terms of why they couldn't just talk to her like a normal

22     human being.  What the evidence has shown was the reason why

23     they didn't talk to her, they didn't answer those questions,

24     they just didn't want her to succeed.  Right?  Because they

25     had decided in February of 2018 that she was going to exit

1    the company.  That was the strategy that they were pursuing.

2    And they denied her that accommodation, the one that they

3    knew was going to help her do her job, help alleviate the

4    stress and symptomology of her illness, and they did that

5    because they wanted her to fail, and they broke the law.

6             That's reasonable accommodation.

7             The next claim, as I mentioned, is discrimination

8    through an adverse employment action.  And this one has some

9    similarity to the first one.  So, again, you have to answer

10   questions about was she disabled?  Was she a qualified

11   individual with a disability?  Same law applies.  Same facts

12   apply.  So if you found that for the first one, you kind of

13   get to jump ahead a little bit when you get to the second

14   claim.

15            And really, assuming that you've -- you've answered

16   the first question the way that I suggest, when you get to

17   the second claim, really, the question is going to be whether

18   or not they subjected Dr. Menninger to an adverse employment

19   action.  And I think it's worth pausing with that

20   phrase "adverse employment action."

21            You're going to hear about two kinds of actions

22   here.  For the second question, you'll hear about "adverse

23   employment action," when we get to the retaliation piece,

24   we're going to talk about adverse action.  And the Judge will

25   instruct you in terms of what the distinction is.  I would

```
1   suggest that one easy way of thinking of it is adverse
2   employment action is just a higher standard.  And when we're
3   talking about adverse employment action, you're talking about
4   a material change to the terms and conditions of the
5   employment.
6           When we talk about retaliation, we're going to talk
7   about something different and I'll save that for then.
8           In evaluating whether or not Dr. Menninger was
9   subjected to an adverse employment action, you're going to be
10  asked to consider basically two things.  One concerns the
11  expectations for her role as executive director and the other
12  concerns the goals for her role as executive director.  And I
13  would submit to you that the evidence has shown that, after
14  they found out that Dr. Menninger had her disability, that
15  they took adverse employment action with respect to both.
16          And let me walk you through what I mean.  So first
17  concerns the buckets, the five buckets.  Right?  So prior to
18  Dr. Menninger disclosing her disability, there was supposed
19  to be an accommodation.
20          If you go back to Joint Exhibit 366.
21          Is that up on the screen?
22          THE JUROR:  (Affirmative responses).
23          MR. HANNON:  All right.  So this is the thing that
24  started it all, right?  This was Dr. Menninger's e-mail to
25  Mr. Mekerri, disclosing her disability.  You heard about what
```

1    the events were that led up to sending this e-mail and all of
2    that.  I want to highlight for you one little piece of
3    this -- I know I said I wasn't going to highlight --  "As you
4    mentioned that you'd like to discuss some ideas you have
5    regarding how to make my role more visible, I think it's
6    important that I make you aware of a medical condition that
7    I've been suffering from."
8          You'd like to discuss some ideas.  This was the
9    state of affairs prior to Dr. Menninger disclosing her
10   disability to PPD, that there was going to be a discussion
11   regarding how to potentially change or adapt her role in
12   order to allow her to provide more support towards these
13   business goals.  After she disclosed her disability, that
14   changed dramatically, right?  There was no -- there was no
15   discussion, there was no brainstorming, there was no back and
16   forth.  Right?  It became a very cold, very distant, very
17   arm's length sort of process.  Right?  Rather than have a
18   discussion about ideas, it became a list of buckets.  And
19   when Dr. Menninger asked for additional detail regarding
20   those list of buckets, they wouldn't talk to her about it.
21         Why does that matter?  Well, knowing what your job
22   is, I submit to you, is a material part of your employment.
23   And you heard that with respect to this particular role, that
24   the job descriptions were written very broadly, right?  You
25   heard Mr. Clendening, when he was up on the stand, I think he

1    confirmed that for you, that, you know, they all had these

2    sort of same general things, but then everyone had their own

3    swim lane. I believe that's the phrase he used. The idea

4    that, yes, it was broad, but they all had their own sort of

5    defined area that this was -- this was their role.

6         Prior to disclosing her disability, Dr. Menninger

7    had a swim lane. Right? She knew what her job was, she knew

8    what was expected of her, clearly defined, just like every

9    other employee was entitled.

10        After she disclosed her disability, she didn't have

11   a swim lane, anymore, right? They gave her a general sense

12   of it was going to be broader, but they wouldn't tell her

13   exactly what it is, right? Rather than have her own swim

14   lane, she had the whole pool. And when she asked them for

15   clarity in terms of helping her to understand where the ropes

16   were, what her swim lane was, they wouldn't tell her. And I

17   submit to you, that's a materially adverse employment action,

18   that the evidence shows that other employee, they got to know

19   what their job was, they got to understand what was expected

20   of them. But once Dr. Menninger disclosed her disability,

21   they were no longer willing to give her that clarity. They

22   were no longer willing to have that discussion.

23        And why was that? We'll get to that in a moment in

24   terms of the causation of this. But that's one of the

25   adverse employment actions that I submit the evidence

1    supports.

2         The other concerns the goals.  Right?  So we see on

3    the front end of this with respect to the changes to her

4    role, what they do there.  Let's look at the back end, right?

5    Because we see that later on in the year, into April and May,

6    they start talking about adapting goals.  They start talking

7    about, well, the expectation for your role now, the goal for

8    your role now is going to be eliminating lab issues.

9         That was never the expectation before, that was

10   never the requirement before, right?  They were moving the

11   goal posts on her in terms of trying to set an expectation,

12   trying to set a requirement that she achieve that objective.

13        And make no mistake, that's exactly what they did.

14   You go back and look at the criticisms that they offer of

15   her, look at the goals that they're trying to make.  The

16   standard that they're setting for her in April of 2018 is

17   that, if lab errors occur, that is reflective of a deficiency

18   on your part.  They changed the rules.  That had never been

19   like that prior to her disclosing her disability.  Prior to

20   her disclosing her disability, you heard what they did in

21   terms of lab errors.  You heard that lab errors happen all

22   the time.  You heart about that daily triage meeting.  You

23   heard about the extensive process they had for invetigating,

24   finding root cause, looking at corrective action.  Right?

25   There was a process, that was the expectation.  That was the

1     way she was judged.  And after she disclosed her disability,

2     they moved the goal posts.  That wasn't going to be good

3     enough anymore.  They were going to judge her by a different

4     standard and I submit to you that was an adverse employment

5     action.

6            A couple things to note as you listen to the

7     instructions from the Judge on this, listen carefully in

8     terms of from the perspective that you judge this, that

9     you -- you judge the adversity of these actions from

10    Dr. Menninger's perspective, someone in her circumstances,

11    someone who's living this the way that she lived it.

12           After finding that there was an adverse employment

13    action, obviously it turns to the question of why was that?

14    Why was it that they wouldn't give her the swim lane?  Why

15    was it that they moved the goal posts?  And I submit to you

16    that the evidence clearly shows it was because they knew she

17    was disabled.  There is a stark contrast between how they

18    treated Dr. Menninger before she disclosed her disability and

19    how they treated her after.  She went from being an asset in

20    the organization to being a liability.  Right?  PPD has told

21    you all the wonderful things that they did for Dr. Menninger

22    in terms of supporting her move from Kentucky to

23    Massachusetts, paying for her move when she started her job.

24    She was well compensated.  She was well respected.  Everyone

25    loved her.  And then they found out she was disabled and then

1    they stopped talking to her.  And then they started planning,

2    well, we got to have a backup plan here.  And then you heard

3    what they did.  You saw their own words.  You saw in writing

4    what they decided.  You saw in that February 28th e-mail, the

5    one that Mr. St. John sent to Ms. Ballweg, the one that

6    attached the coverage grid.

7         You saw those words, "delicately work Lisa out."

8    They made a decision.  They made a decision once they found

9    out she was disabled, they didn't want her anymore.  And that

10   was their choice.  And they started delicately, they float

11   the offer of a separation package and, you know, some

12   short-term consulting.  They tried it delicately.  She said,

13   no, I don't want -- I don't want a payoff.  I'm not doing

14   this because I want money or I want -- I want my job.  Right?

15   I just want to be able to care for my family and do the

16   things I've been doing.  And when the delicate approach

17   didn't work, they went for the tougher one, right?  Because

18   she wasn't going to go easy.

19        And they have no excuse for that.  When I

20   confronted Ms. Ballweg with those four words, "delicately

21   work Lisa out"?  What did she say?  Did she admit what was

22   obvious?  Did she admit that the words mean what they mean?

23   She didn't, because she couldn't.  Because if she did, she

24   would be admitting to breaking the law.  So what did she say?

25   "We were trying to help Lisa.  We were just trying to help

1   her."

2           Does that make sense based upon this evidence that

3   they were trying to help Lisa?  If they were trying to help

4   Lisa, wouldn't they have answered her questions?  If they

5   were trying to help Lisa, wouldn't they have treated her --

6   wouldn't they have talked to her?  Would they have done what

7   they did if they were trying to help Lisa?

8           They made the decision they didn't want her

9   anymore.  And that's directly related in terms of time and

10  sequence and all of that, to the disclosure of her

11  disability.

12          And they're going to try to tell you a different

13  story.  They're going to try to look at the past and say

14  maybe this all started when she started working remotely.

15  Well, okay, so we have this one e-mail with this one other

16  person who had concerns about her remote status, and maybe we

17  can tell a different story.  I submit to you, members of the

18  jury, those dots don't connect.  Right?

19          Consider this.  If they had concerns about

20  Dr. Menninger's remote status, why isn't that reflected in

21  the five buckets?  Right?  When Dr. Menninger is asking them,

22  okay, what are the things -- what are the new, additional

23  things you want me to do?  And Mr. Mekerri sits down to write

24  those, why doesn't he write down travel to Highland Heights

25  more frequently?  Why doesn't he say go and supervise your

1    staff more?  Why doesn't he say visit the pit more?  He

2    doesn't do any of that, because this had nothing to do with

3    that.  This was about taking more of a customer-facing role.

4    That's what the conversation was about in December, that's

5    what his e-mail was about in February when he laid out those

6    five buckets.  And they're trying to tell you a different

7    story now.

8            And consider, too, how the accommodation discussion

9    worked out, right?  What were the ones they agreed to

10   accommodate?  Well, one of them was the travel.  Does that

11   make sense?  If all of this had to do with their concern that

12   she wasn't coming to Highland Heights enough, right, to do

13   the most essential feature of her job, to provide scientific

14   oversight, if that was the concern, if that was a problem, do

15   they reduce her travel by half?  From 30 to 15 percent?  That

16   doesn't make any sense.

17           If that was a concern, if that was a problem, there

18   would be something reflected here in the documents to show

19   it.  Somebody would have asked.  We want you to go to

20   Highland Heights every month.  We want you to go to Highland

21   Heights more frequently.  That had nothing to do with this.

22   They came up with all of that later.  They came up with all

23   of that as a means of trying to justify what they did at the

24   end, of blaming her for lab errors.  It's not a true story.

25           The true story here, members of the jury, is that

1   they found out that she was disabled and it was scary.

2   Right?  We talked about that at the end of my opening

3   statement, when people find out that folks have disabilities,

4   especially mental health disabilities, our first reaction is

5   not, you know, great, come run my laboratory.  If that was

6   our first reaction, we wouldn't need laws like this, we

7   wouldn't need juries like you.  Right?  The natural reaction

8   is to have a little bit of fear, right?  The natural reaction

9   is to be a little bit ignorant, right?

10           But the law requires us to do better.  The law

11   requires us to put that fear aside, to put that ignorance

12   aside, and to rely upon actual facts.

13           And this wasn't some person they weren't familiar

14   with, this wasn't some person off the street that they didn't

15   have experience with.  This was Lisa.  They knew Lisa.  They

16   knew her talent, they knew her abilities.  They had seen it.

17   They judged her high.  They thought she was brilliant.  They

18   thought she was so good they wanted her out in front of

19   clients more.  That's how they viewed her.  Those were the

20   facts that they had.  But once they found out she was

21   disabled, once they got that scary information, they put the

22   facts aside, they let the fear -- they let the ignorance

23   dictate their actions, and that's how they broke the law.

24           Let me pause there for a moment about the law and

25   just say this.  This isn't about being woke.  Okay?  This

    1    isn't about creating safe spaces and some kind of snowflake

    2    culture.  All right?  This is about helping people work,

    3    right?  This is about people who want to have jobs, who want

    4    to earn money, who want to take care of their families, who

    5    want to pay taxes -- maybe don't want to pay taxes, but will

    6    pay taxes.  Right?  This is about allowing people like

    7    Dr. Menninger to be productive members of society.  Right?

    8    To add to our economy, not to be a drain on us, not to be

    9    what she is now, in terms of relying upon public assistance.

    10            So as you consider this evidence and what we're

    11    talking about here, this isn't about coddling, right?  This

    12    is about allowing an individual to do their job because

    13    they're good at it, because notwithstanding their

    14    disabilities, they have talents, they have abilities, and

    15    they can contribute, just like Dr. Menninger did for the

    16    years before they found out she was disabled.

    17            Let's talk about retaliation.  And I mentioned

    18    before that I would submit to you this is the easiest one.

    19    So for retaliation, it's really about this:  In response to

    20    Dr. Menninger requesting an accommodation, did they then take

    21    action against her, which a reasonable person doing that

    22    action might be dissuaded from coming forward?

    23            Can you say that a little -- the judge will say

    24    that better.  But I submit to you that that sort of concept

    25    is this.  If Dr. Menninger knew that once she disclosed her

1   disability that they were going to stop talking to her about

2   her role changes.  If she knew that after she disclosed her

3   disability they were going to start trying to formulate a

4   plan to delicately work her out; if she knew that after she

5   disclosed her ability, they were going to be looking for an

6   exit strategy to get her out of the company.  If she knew

7   that after she disclosed her ability, that they were going to

8   start increasingly scrutinize her actions, blaming her for

9   things that were not her fault, and changing her goals, would

10   she have ever raised her hand?  Would she have ever said, "I

11   have a disability and I would like an accommodation."

12           The answer is no.  Right?  No one would do that if

13   they knew that your employer could do that in response.  And

14   that's what the retaliation claim really kind of comes down

15   to, is whether or not the actions they took in response to

16   her making those requests, whether those are the kinds of

17   things that would dissuade someone from raising their hands

18   and coming forward.

19           It's a scary thing to do.  You heard it was a scary

20   thing for Dr. Menninger to do and you heard that she was

21   right to be scared, because they did exactly what she was

22   afraid they would do.

23           Which brings us to the issue of damages.  There's

24   three kinds of damages here.  One is financial.  It's the

25   economic damages, in terms of her lost compensation.  You've

```
 1 │ seen the numbers on that.  There's no exact science, right?
 2 │ There's no way of predicting with exactitude in terms of what
 3 │ would have transpired in the future, but that doesn't prevent
 4 │ you from awarding damages, right?  If that would prevent us
 5 │ from awarding damages, I wouldn't be here.  Right?  So you
 6 │ need to make a reasonable judgment based upon the evidence
 7 │ and the judge will talk to you a bit about that.
 8 │         Keep in mind the standard, right?  More likely true
 9 │ than not true.  And I would submit to you that the evidence
10 │ that we've presented on that, it's all based in fact, right?
11 │ It's all based in the record.  Mr. Jonas's numbers were based
12 │ upon her actual comp in 18.  You heard the estimates are all
13 │ kind of reasonable within ranges.  And you heard a little bit
14 │ of different evidence from Mr. Clendening.  I would ask you
15 │ all, consider the source.  I think you heard what the Judge
16 │ mentioned, part of your role here is to determine the
17 │ credibility of witnesses.  Did you find Mr. Clendening
18 │ credible?  Was there anything about his testimony that caused
19 │ you to believe that maybe he's not telling the truth, and I
20 │ would respectfully submit that his denial of remembering
21 │ seeing that e-mail from Mr. St. John would strongly suggest
22 │ that he's not a person you should trust or you should
23 │ believe.
24 │         THE COURT:  You're at 35, Mr. Hannon.
25 │         MR. HANNON:  I'm sorry, Your Honor?
```

1          THE COURT:  You're at 35.

2          MR. HANNON:  Okay.  Thank you.

3          So very quickly, front pay, again, this is not an

4    exact science.  Might Dr. Menninger, again, maybe someday be

5    able to return to work?  I certainly hope so.

6          Is she ever going to go back to working in a lab

7    like she did at PPD, one that has an HR function like they

8    did, that subjected her to what they did?  I submit to you

9    she's not.

10          As you heard from the -- from Dr. Summergrad in

11    this case, what she went through was her worst nightmare.

12    Right?  He told you about the underlying sort of phobic

13    concerns of this disability, the idea of sort of exposing

14    one's self and then being rejected and being humiliated.  I

15    submit to you, it's sort of like someone who's afraid of

16    flying.  Right?  It's not the flying that they're afraid of.

17    It's the crash.  Right?  And Dr. Menninger's fears here

18    surrounding social encounters and public speaking, it was the

19    fear that they were kind of like going to see her and reject

20    her.

21          And that's exactly what happened here; that when

22    she raised her hand and disclosed her disability, she showed

23    herself to them in a way that she didn't even show her own

24    sister, right?  And she took that huge risk and exactly what

25    she was afraid of is what happened, that when they saw her

1    true self, that they said, look, and they rejected her and
2    they humiliated her.
3          And the fear of going back into an environment to
4    suffer that rejection again, the fear of getting back on the
5    airplane after it crashed, I subject to you that's not easy
6    to overcome, especially when those fears and when that pain
7    gets to you a point where you start considering suicide,
8    where you have to be constantly medicated, where you're in
9    five years of treatment, and not doing so well.
10         So I would submit to you that judge the more likely
11   true than not true standard, that with the way the evidence
12   lies is that she's not likely to earn comparable employment.
13         And as you listen to the Judge's instructions, I
14   ask that you keep in mind that word "comparable." You heard
15   in the cross of Mr. Jonas the idea of, well, what if she goes
16   and flips burgers? That's not the question before you. The
17   question is comparable employment, something similar to what
18   she had before. And again, given her experience and given
19   her trauma, and given her physical health, I submit to you
20   that there is next to zero likelihood that she would ever
21   return to a job like this again, particularly a corporation
22   with an HR function.
23         Emotional distress. You've heard a lot of the
24   psychological, psychiatry evidence, underlying phobias and
25   all of that. And some of that may be hard to get, but some

1    of it we can understand in our common experience.  Our jobs

2    matter to us.  We take pride in our jobs.  And when you

3    succeed, despite your difficulties, dispute your drawbacks, I

4    submit you take more pride.  The fact that she had overcome

5    so much to get to this spot in her life.  The fact that she

6    was able to be the breadwinner, she was able to care for her

7    child, care for her husband, that's the kind of thing that

8    everyone takes pride in.  You saw from her expert witness,

9    Dr. Kessimian, hates seeing examples with, you know, people

10   who didn't already have disabilities and they went through

11   that kind of thing, and they kill themselves.

12          Here it's magnified.  Again, this wasn't just an

13   ordinary situation of somebody losing their job.  This was

14   someone's worst nightmare coming true and she has decent

15   days, and she has bad days.  And you've seen her ability --

16   you put her in fight or flight mode, she fights, and she's

17   good at it.

18          But consider this, what happened when she closes

19   her eyes at night, when she thinks back to what she's been

20   through, what her family's been through, when she considers

21   where she was, and where she is now.  When she thinks about

22   the impact on her daughter, and when she thinks about why it

23   all happened, right?  You heard Dr. Summergrad talk about

24   part of the concern being this sort of blaming yourself?  Why

25   did this all happen?  It happened because she raised her

1    hand?  It happened because she asked for help.  And I submit

2    to you every time she closes her eyes, that's what she has to

3    see, and that's what she has to live with.  And you heard

4    about her dreams and you heard about her nightmares, and

5    that's the life that she's lived for five years.  And I

6    submit to you, that's not going to change anytime soon.

7         The last issue with respect to damages you'll have

8    to consider is punitive damages.  And just a few comments on

9    that.  The judge will give you instructions there.  This is

10   outrageous behavior.  This was not an accident on PPD's

11   fault.  This wasn't just one person acting by themselves

12   doing something stupid.  This was a concerted effort, at

13   multiple levels of the organization, by some very, very,

14   smart, very, very experienced people.  They knew what the law

15   was.  They knew what their obligations were.  They knew

16   exactly what they were doing.

17        You saw the e-mail exchange between Dr. Fikry and

18   Ms. Ballweg, asking when is her exit.  What does she say?

19   We're a long way off unless she self-selects.  Unless she

20   quits.  Right?  That was the -- that was the strategy here.

21   That was the game.  Turn up the heat.  The delicate approach

22   didn't work.  Let's take the more aggressive approach.  Let's

23   drive her out.  Let's make it harder on her.  And they did

24   it, knowing she was disabled.  They did it, knowing she had

25   an anxiety disorder.  They knew they were playing with fire.

```
 1    They just didn't care.  It was a choice.  It was deliberate.
 2    It was outrageous.
 3             And they still do it today.  Have they shown any
 4    remorse?  Have they come here to this court?  Have they told
 5    you the truth?  Or have they continued to try to deflect?
 6    Have they continued to try to mislead?
 7             Again, this is important.  This is important to
 8    Dr. Menninger.  This is important to disabled people in
 9    general.  These are laws that have significant impact,' we
10    rely on people to follow them, and when they don't, they
11    cause harm, they cause significant harm here, and I submit
12    that an award of punitive damages is appropriate and
13    necessary, applying the factors as the Judge is going to tell
14    you in a few moments.
15             I might have a couple of minutes to respond after
16    the other side goes, depending on how much time I've taken,
17    but I do thank you for your time and attention, and that's
18    all for now.
19             THE COURT:  All right.  Thank you, Mr. Hannon, I
20    remind you, you do have three minutes.
21             Ladies and gentlemen, the statements of lawyers can
22    be helpful and persuasive, but they're not evidence.
23             Ms. Mandel.
24             **CLOSING ARGUMENTS BY COUNSEL FOR DEFENDANT**
25             MS. MANDEL:  This is a hard case.  You have
```

1    listened to testimony for two weeks about Dr. Menninger's

2    mental health challenges and her belief that her struggles

3    are all the fault of PPD.  It isn't easy to see Dr. Menninger

4    cry.  I'm sure you feel badly for her.  I know I do.  But

5    sympathy is not the legal standard here, as you will hear

6    from the Judge.

7         In fact, even if Dr. Menninger herself truly

8    believes that PPD is to blame for all of her challenges and

9    her struggles, that is not the legal standard.

10        No one questions that Dr. Menninger believes PPD is

11   at fault.  But the fact is, Dr. Menninger's troubles, her

12   challenges are not on the shoulders of PPD, as much as her

13   situation is sad and as much as she has internally believed

14   that PPD is to blame.  Merely asking an employee to do the

15   job that she has done well in the past, and even expanding

16   the job to include more tasks, is not discrimination.  It is

17   not retaliation.  It is simply what happens at work.

18        Listening to Mr. Hannon, you might have been

19   expecting to hear the moment when Dr. Menninger was

20   disciplined.  That never happened.  You might have been

21   waiting to hear about the moment when Dr. Menninger was

22   fired.  That never happened.  Let's look at the actual facts

23   that we've learned.

24        Dr. Menninger's job as an executive running a

25   global set of labs around the world, evolved as PPD's

1    business grew, and she worried that she couldn't do the

2    version of the job that the company needed. As soon as she

3    heard about these evolving expectations, back here, in

4    December 2017, she didn't tell PPD that she couldn't do the

5    job. She didn't go see a psychiatrist. She hired

6    Mr. Hannon. She hired a lawyer.

7         As soon as she learned that PPD expected more of

8    her, that was her first move.

9         And then, weeks later, she told PPD for the first

10   time that she has anxiety and was worried about whether she

11   could do the job. That didn't happen until here.

12   (Indicating). Only after that, she went to see a

13   psychiatrist, Dr. Kessimian, the first psychiatrist that she

14   had seen in years. We heard repeatedly that the mere act of

15   telling PPD about her anxiety sent Dr. Menninger into a

16   downward spiral. No one disputes that that happened, but

17   that's not something that PPD caused. That's not something

18   that PPD controlled.

19        Dr. Menninger's husband testified that she couldn't

20   get out of bed starting in January 2018. That happened back

21   here (indicating), before PPD had done any of the bad things

22   that Mr. Hannon said happened here. At that point, in

23   January of 2018, Dr. Menninger's own husband said she

24   couldn't get out of bed. Is that PPD's fault? PPD certainly

25   feels badly for Dr. Menninger that that happened, but it's

1    not PPD's fault.

2           PPD simply asked Dr. Menninger to do more of what

3    she had already been doing well.  Dr. Menninger told PPD that

4    she thought that that would be a problem because of her

5    anxiety and that is the point when she spiralled downward.

6    PPD hadn't done anything at that point, and she already

7    decided that PPD was to blame.

8           Mr. Hannon wants you to believe that PPD's meeting

9    with Dr. Menninger in late February 2018 is what sent

10   Dr. Menninger into the downward spiral.  But we know that

11   isn't true.  It's not just not supported by any evidence.

12   Again, Dr. Menninger's husband and her psychiatrist, Dr.

13   Kessimian, described that spiral starting weeks before, in

14   January of 2018.  Even Dr. Menninger's psychiatric expert,

15   Dr. Summergrad, he said that, too.  In fact, Dr. Menninger

16   had panic symptoms simply being in the airport on her first

17   trip to Highland Heights, in fact, the only trip to Highland

18   Heights in 2018, just being in the airport caused those panic

19   symptoms.  PPD didn't cause that.

20          The second that Dr. Menninger told PPD she had an

21   anxiety disorder, she had already convinced herself things

22   were terrible.  Her doctor talked about her catastrophic

23   thinking about that time and PPD hadn't done anything.

24   Dr. Menninger had disclosed her disability, but that's the

25   moment when the catastrophic thinking began.  Her husband

1    knew that, her psychiatrist knew that.  And remember, she had

2    already hire a lawyer before PPD did anything.

3         In her mind, PPD never had a chance.  You've heard

4    a lot of noise, but let's look at what we've actually learned

5    through the evidence.

6         Dr. Menninger's boss, Hacene Mekerri, cared about

7    her and wanted to support her.  When Dr. Menninger asked PPD

8    to accommodate her and let her live a thousand miles away

9    from her primary lab to take care of her daughter's mental

10   health needs and stop her from being bullied at school,

11   Mr. Mekerri said sure, pick up your family, move across the

12   country if that's what you need to do.  I'll support you,

13   even though others in the company are telling me it's a bad

14   idea.  I'll support you, move across the country to

15   Massachusetts, just come back here and run the lab.  And

16   Mr. Mekerri supported her.  The evidence is very clear.

17   There's no question that Mr. Mekerri supported that.

18        When Dr. Menninger didn't hold up her end of the

19   arrangement to come to Highland Heights regularly to run the

20   lab and lead her team, PPD didn't discipline her.  They

21   didn't give her a warning.  Mr. Hannon himself just told you

22   that.  They didn't tell her to move her family back to

23   Kentucky.  They simply asked her to be a more present leader.

24        When the business needs picked up for everyone, as

25   you've heard from multiple witnesses, Mr. Mekerri told all of

1     his executive directors, all of them, that they needed to be

2     more visible and work with customers.  Everyone got that same

3     message, not just Dr. Menninger.

4          And once Dr. Menninger said she couldn't do those

5     things, Mr. Mekerri never made her do them.  She was never

6     asked to do any of the things she said she couldn't do, not

7     one of them.  The discussions about whether Dr. Menninger

8     could and needed to do those things went on for four months.

9     That's what was happening in the spring of 2018.  But in

10    reality, Dr. Menninger traveled to Highland Heights,

11    Kentucky, where she was running a lab once during that time

12    period, just once, but no one disciplined her, no one told

13    her that he had to get on a plane and come more often.  She

14    came once.  You haven't heard any evidence, and there is no

15    evidence, that the company turned the screws to her and said

16    hey, you got to get on a plane, you have to get here, you

17    have to have more panic attacks, because it didn't happen.

18          PPD even said, "You can't come to our senior

19    leadership meetings?  Okay.  We'll hire a surrogate, we'll

20    have a surrogate do that.  We are not going to make you do

21    that if that's too hard for you.  It's hard for you to travel

22    to Highland Heights?  We'll just cut your travel requirement

23    in half.  PPD said we will do those things.  What they

24    couldn't do and what they said they couldn't do, kindly and

25    professionally, but firmly, is that they wouldn't have a

1    surrogate, they wouldn't hire another person to do her job as
2    the medical leader of the lab, talking to customers, helping
3    them get business from customers, answering the medical
4    questions.  Why?  Because Dr. Menninger, a clinical medical
5    pathologist, who is an executive in the company, she was the
6    top medical leader for the company, for their lab business,
7    and she needed to have those conversations for the business.
8    They simply couldn't let that go, even though they helped her
9    in all of the ways they could, she still needed to represent
10   the company's lab.  That was something they just couldn't
11   change.

12        We have seen many times the only two letters that
13   Dr. Menninger's physician ever sent to PPD.  The first, in
14   January of 2018, told PPD that Dr. Menninger had two types of
15   anxiety, a panic disorder and agoraphobia.  Mr. Hannon
16   reminded you of that letter this morning.  Dr. Kessimian said
17   in that letter that any need to increase social interaction,
18   any need to increase social interaction or public speaking
19   would worsen Dr. Menninger's symptoms.  She also said that
20   Dr. Menninger simply couldn't do those things without her
21   doctor's input.

22        She was an executive in the company, the top
23   medical leader in a set of global labs, and any increased
24   social interaction was a problem.  The company wanted to help
25   her, but that's a very serious instruction from her doctor.

```
 1              Then, after looking at the specifics of
 2    Dr. Menninger's job, and remember, not even knowing where her
 3    job was located, that it was a thousand miles away in a lab
 4    that Dr. Kessimian didn't even know about, she said, "In the
 5    weeks leading up to social interaction and public speaking,
 6    Dr. Menninger had serious physical symptoms, insomnia, panic
 7    attacks, gastrointestinal problems, and weight loss.  Her
 8    doctor's own words were that she couldn't tolerate these
 9    activities.  Doing them made it as if her vocal cords and
10    brain became paralyzed, while her blood pressure, heart rate,
11    and breathing all increased.  Those were her doctor's words.
12    And in fact, the last letter that she ever sent to PPD, they
13    were very worried.  They were concerned that Dr. Menninger
14    being asked even to do the basic parts of her job would
15    physically harm her.
16              Then her doctor said there were three categories --
17    that the three categories -- there were three categories that
18    require the company to put in place a surrogate.  A
19    surrogate, meaning not Dr. Menninger.  She would no longer do
20    those parts of her job.  She wouldn't speak to customers, she
21    wouldn't present internally for the company.  She wouldn't
22    help the company get new business for customers, even though
23    she was the top medical executive for the labs.
24              For one category, she even said Dr. Menninger can't
25    do it at all.  She can't go to dinner, she can't go to
```

```
 1    lunches.  She can't be socializing with the clients.  That's
 2    what the doctor said.  This worried PPD.  They weren't sure
 3    what to do.  They couldn't have Dr. Menninger in a position
 4    where she exposed herself to significant risk of physical
 5    harm, but they still needed to run a business.  This was
 6    confusing for them.  They wanted to help her, but they still
 7    needed to run their business.
 8            From Dr. Menninger's perspective, the company had
 9    three options.  First, she thought they should never have
10    asked her to do these things that were clearly part of her
11    job, and then she thought that if they did ask her to do
12    these things, they should actually have someone else spoke
13    for her, come to the meeting, speak to the customers, and
14    that she would prepare slides from Massachusetts for someone
15    else to present to the customers.  And when they said they
16    couldn't do, that they needed her to actually do this job,
17    then she wanted them to forget everything her doctor said,
18    forget about the terrible symptoms that her doctor described,
19    and say, actually, it's okay, I can do all the parts of my
20    job.
21            The company was legitimately confused.  Can you do
22    the job safely?  Can you not do the job safely?  What is it
23    that you actually want?  So were the conversations perfect?
24    Were they scripted by lawyers?  No.  They weren't perfect,
25    ideal conversations, because the company was confused, and
```

1    they were trying to help Dr. Menninger and follow her

2    doctor's instructions, and at the same time, run a business.

3    It wasn't easy.

4        There's one thing that's clear, though.  They had

5    Dr. Menninger's best interests at heart the whole time.

6    Remember.  Dr. Menninger herself testified, no one ever said

7    anything negative to her about having a disability.  And this

8    is the same company that, when she came forward and said my

9    daughter is having challenges, my daughter is distressed, my

10   daughter is being bullied, they said, no problem, move across

11   the country with your family.

12       Yet, again, when it was Dr. Menninger herself, the

13   company didn't say anything negative to her about her mental

14   health challenges.  They respected her greatly because of her

15   professional background and what she offered to the company,

16   and they just wanted to help her.

17       But, in fact, no matter what PPD did, Dr. Menninger

18   was never satisfied.  She had convinced herself that PPD was

19   out to get her the second she disclosed her disability in

20   January of 2018, before PPD even had a chance to help.  And

21   when PPD told her that they could do some, but not all, of

22   what her doctor had asked for, that still wasn't good enough.

23   When she desperately asked them what will happen if I can't

24   do my job?  What will happen if my mental health condition

25   stops me from doing what you need, they said don't worry, we

1    will probably help you be a consultant or work out an exit

2    package.  Don't worry.

3           Mr. Hannon wants you to believe that that was the

4    company trying to push her out.  But actually the company was

5    trying to help her figure out how to navigate this difficult

6    situation, and no matter what they said, she thought they

7    were out to get her.

8           And then she blamed them for assuming that she

9    couldn't do her job, but it was her doctor who said, "She

10   cannot tolerate the job."  Again, PPD's hands were tied.

11   Nothing they did seemed to please Dr. Menninger.

12          When Dr. Menninger said that Mr. Mekerri was being

13   unfair to her, the company immediately jumped in with an

14   investigation, in May of 2018.  Mr. Hannon wants you to

15   believe that PPD's investigation of Dr. Menninger's complaint

16   of unfair treatment was a sham.  A sham investigation is a

17   legal term and you'll hear from Judge Sorokin, there's a

18   legal standard to be a sham.  This simply doesn't apply here.

19   No investigation is perfect.  Certainly hindsight is 2020.

20   We can all sit here now and we can look at ways that it could

21   have been better.  Sure.  That's how life works.  Us sitting

22   in a courtroom five years later can say these are all the

23   ways things could have been done better.  But you heard

24   testimony about how this investigation lasted for two weeks,

25   involved -- actually, more than two weeks, involved the input

1    of multiple witnesses, review of documents.  Human resources

2    met with Dr. Menninger three times, more than they met with

3    any other witness.  Dr. Menninger had an opportunity to

4    provide her side of what happened, any information about what

5    she thought witnesses knew.  HR followed up on that.

6           The past two weeks, we've spent a lot of time

7    looking at that investigation, pouring over the details.

8    Whether it was perfect isn't the question.  But was it a

9    sham?  It went on for multiple weeks, involved multiple

10   witnesses, and a lot of documents.  What Dr. Menninger didn't

11   like about it was the conclusion.  She didn't like that the

12   investigation found that Mr. Mekerri hadn't been unfair.

13   Again, she didn't like the conclusion, but that does not make

14   the investigation a sham.

15          Mr. Hannon also wants you to believe that PPD's

16   e-mail about a focus on the desire to keep the lab running,

17   to keep quality levels high, to keep the business accountable

18   to customers are somehow evidence of a scheme to remove

19   Dr. Menninger from her job.  In fact, the company was

20   terrified that Dr. Menninger would leave her job.  And as

21   you've heard from multiple witnesses, if Dr. Menninger left

22   her job, if Dr. Menninger wasn't available to license the

23   lab, they couldn't operate their business.  There are no

24   second chances.  They had tissue samples, blood samples,

25   patient blood samples in the lab that couldn't be tested if

 1    Dr. Menninger didn't give the lab licensure.  That was
 2    critical to the company.  They didn't want Dr. Menninger to
 3    leave, but they needed a plan in case she did.  It would have
 4    been imprudent of them not to have some type of plan once
 5    they understood that Dr. Menninger might not be able to do
 6    her job.
 7            Most likely, each and every one of you, and all of
 8    us in this courtroom have written e-mails five, six years
 9    ago, that could be misinterpreted now by a room full of
10    strangers.  You can put e-mails up in different orders and
11    show you parts of one e-mail or another e-mail, and without
12    context, they might look terrible.  Sure.  That's
13    Mr. Hannon's job to make you think that some of the e-mails
14    in this case were designed with malicious intent toward
15    Dr. Menninger, but it's just not the truth.
16            You've seen that Dr. Menninger -- that
17    Dr. Menninger wasn't fired.  She wasn't disciplined.  In
18    fact, she went out on a medical leave that lasted for eight
19    months, and during that time, the company patched together
20    different people to cover the licensure of the lab.  They
21    didn't fire her.  They were hoping that she would come back.
22    So when they talked about an exit, when they talked about
23    what would happen if she left, that was important to them,
24    because her job wasn't easily replaceable.  They needed to
25    know what would happen and how to plan for that.  That's not

1    retaliation, that's not discrimination.  That's just good

2    business planning.  And you heard witnesses talk about how

3    they don't have a choice.  They always have to be in that

4    mode.  Because if they don't have a pathologist to run the

5    lab, they can't run a business.

6            Let's talk about what else was happening at this

7    same time.  We've heard Mr. Hannon himself was advising and

8    directing Dr. Menninger's psychiatrist through this whole

9    time period.  Dr. Menninger's psychiatrist and Mr. Hannon

10    actually started talking about Dr. Menninger taking a leave

11    weeks before she did.  This was all going on in the

12    background, being orchestrated to set PPD up for failure.

13    Dr. Menninger's psychiatrist herself said, and it's in the

14    notes that you have access to when you go back to the jury

15    room, that the timing of the leave actually would allow

16    Dr. Menninger to participate in an ultra marathon walk with

17    her friends.  Dr. Menninger's psychiatrist also sent

18    Mr. Hannon an e-mail saying that she, herself, regretted the

19    language that she had use in the accommodation letter.  Mr.

20    Hannon knew that, Dr. Menninger knew that, but PPD never knew

21    that.  No one ever sent a followup letter to PPD to say,

22    actually, forget it.  We don't need those accommodations.

23            And Dr. Kessimian never sent another letter saying

24    maybe you can try some other accommodations.  As Mr. Hannon

25    just said himself, the only accommodations that you can

1    consider are the ones that Dr. Kessimian herself recommended

2    in black and white, meaning hire a surrogate to do the key

3    parts of Dr. Menninger's job.  Mr. Hannon says now that Dr.

4    Kessimian's real request for accommodation was just minimize

5    the amount of public speaking.

6            But you've seen the documents.  You've seen so many

7    times in this courtroom, the letter from February 14th, that

8    Dr. Kessimian herself wrote, saying you need to have a

9    surrogate, someone else, do these key parts of

10   Dr. Menninger's job.

11           When Dr. Menninger went out on leave, PPD scrambled

12   to cover the management of the lab.  The leave started here.

13   They didn't actually hire someone new until here.  Months

14   after Dr. Menninger's medical leave ended.  They patched

15   together that coverage.  Does it make any sense that a

16   company that wanted to push her out of her job didn't hire

17   someone new for months after she went out on leave, and in

18   fact, months after her leave ended and she was on Social

19   Security benefits?  That doesn't make any sense.  Think

20   logically about that.  If the company wanted to push her out,

21   if the company had someone in the wings that they wanted to

22   put in place instead, they would have hired that person

23   before April of 2019.  It just doesn't make sense.

24           And again, Mr. Hannon can't point to any decision

25   to terminate or discipline Dr. Menninger.  It just didn't

1    happen.  I'm sure that during this trial, you are waiting for

2    that uh-huh moment of, oh, this is when she was disciplined.

3    This is when she was fired.  But it just never happened.  The

4    company continued to try to support Dr. Menninger.  It was

5    confusing.  They weren't sure if she could do her job or

6    couldn't do her job, what she wanted from them.  And they

7    tried their best.  In fact, they kept Dr. Menninger's job

8    open for her for eight months.  And only then, when she said

9    I'm not coming back, did they say, okay, now we have to hire

10    someone new.

11          In just a little bit, Judge Sorokin will give you a

12    list of questions that only you, members of the jury, can

13    consider.

14          You clear away all the noise, all the excitement,

15    and all the distractions that Mr. Hannon has worked so hard

16    to create, here is what you'll see through the evidence.

17          First, for Dr. Menninger's claim that PPD

18    wrongfully denied her accommodation request, based on the

19    statements of her own doctor, and the letters that that

20    doctor wrote to PPD, it was clear that Dr. Menninger could

21    not perform the essential functions of her job as an

22    executive in the company, starting in January of 2018, way

23    back here.  That's just black and white.  It's in Dr.

24    Kessimian's notes.  And not only that, but you heard

25    Dr. Menninger's husband's testimony that she couldn't get out

1    of bed starting in January of '18.  That is very sad.  No one

2    wants to hear that, but that's not anything that PPD did.

3         The accommodations that Dr. Menninger's doctor

4    asked for in writing, plain and simple, were not reasonable.

5    Just because a lawyer stands up in the courtroom and tells

6    you they were reasonable, and just because Dr. Menninger says

7    she really wanted those accommodations, that doesn't make

8    them reasonable.  The Judge will give you instructions about

9    what is a reasonable accommodation.  Dr. Menninger was an

10   executive at PPD.  She was the highest level person running a

11   lab, in fact, a global set of labs.  If she could not present

12   to people, could not talk to her colleagues, company

13   leadership, customers, she couldn't do the job.  An

14   accommodation that asked to excuse her from those

15   obligations, that's not reasonable.

16        PPD didn't have a legal obligation to hire a

17   surrogate to do major parts of Dr. Menninger's job in her

18   place.  The Judge's instructions will tell you exactly that

19   an accommodation is not reasonable if it requires shifting

20   any of the essential functions to another person.  Again,

21   shifting essential functions of a job to another person, that

22   is not something PPD had to do under the law.

23        The accommodations requested by Dr. Menninger's

24   doctor and rejected by PPD would have placed a burden on the

25   company that the law does not require.  PPD's lab business,

1    at its core, as we heard from everybody who testified,

2    including Dr. Menninger herself, relies on a doctor to

3    license the lab.  The job involves marketing to customers,

4    answering customer questions, presenting to company

5    leadership.  They cannot operate the lab if they don't have

6    an executive director of labs who can do those things.

7           The lab leader's visibility is critical to the

8    business.  With her requested accommodations, Dr. Menninger

9    was asking PPD to compromise its ability to run its business.

10   That is an undue burden under the law, as you will hear from

11   the Judge, and not something that PPD needed to do.

12          To be clear, this means that you can and should

13   find that PPD did not discriminate against Dr. Menninger by

14   not granting her the accommodations that she and her doctor

15   requested.

16          Second, for Dr. Menninger's claim that PPD took an

17   adverse action against her, based on her disability.  Asking

18   Dr. Menninger to do people-facing presentations and interact

19   with customers was not an adverse action.  The evidence is

20   clear that PPD told Dr. Menninger that she would need to do

21   this here (indicating) before she ever disclosed her

22   disability.  In addition, all the company ever did was ask

23   Dr. Menninger to do her executive level job.  She didn't feel

24   comfortable doing what she was being asked to do, but that's

25   all the company asked her to do.

 1          In addition, we heard that the company was asking

 2     all of its executive directors to do this at that time.  The

 3     business was expanding, they were growing.  They were working

 4     with more customers.  They needed their executives to be

 5     boots on the ground with customers.  It wasn't just about

 6     Dr. Menninger.  And again, they told her she was going to

 7     need to do this here (indicating), before she disclosed a

 8     disability to them.

 9          There is simply no evidence that PPD somehow

10     targeted Dr. Menninger or treated her differently because she

11     disclosed a disability when they told her you need to be more

12     present, you need to be in the lab where you were hired to

13     work, and you need to be present with customers.

14          Mr. Hannon just tried to convince you that --

15     describing five buckets of job tasks was, itself, somehow

16     cold and icing out Dr. Menninger.  This doesn't make any

17     sense.  We've seen evidence that it was Dr. Menninger who

18     said, "Tell me more about what this job entails.  Tell me

19     more about how you need me to interact with people." So the

20     company did that.  They gave her a list of things that she

21     needed to do that involved public-facing interactions and

22     social interactions, exactly as she asked, exactly as her

23     doctor said we need.  And once they did that, now, five years

24     later, Mr. Hannon is saying that was somehow icing out

25     Dr. Menninger.  It wasn't icing her out.  It was giving her

1    the information that she asked for.  Giving her that

2    information that she could take back to her doctor and talk

3    to her about.  In fact, if PPD hadn't done that, then

4    Dr. Menninger would have been saying that was wrong, too.

5    They just gave her the information that she asked for.

6            Asking Dr. Menninger to be accountable for the

7    lab's functioning and meet business goals was not an adverse

8    action.  You saw that Mr. Mekerri asked his other executive

9    directors to do exactly the same thing.  You even saw

10   e-mails.  The e-mails that Mr. Hannon showed you, they

11   weren't only directed to Dr. Menninger.  They were also

12   directed to the other executive directors.  Everyone needed

13   to make sure that they were stepping up their business

14   objectives, that they were doing what the customers needed.

15   It wasn't only Dr. Menninger.

16           And again, as you saw, no one made Dr. Menninger do

17   the things she said she couldn't do or her doctor couldn't

18   do.  They said these are the business directives; these are

19   the goals.  We need you as an executive to be held

20   accountable and hold your people accountable and help us meet

21   them.  There's nothing discriminatory about that.

22           The lab had increasing quality problems.  Customers

23   were complaining.  You heard this from three different PPD

24   witnesses, including witnesses who don't work for the company

25   anymore, have no vested interest in the outcome of this case.

|  |  |
|---|---|
| 1 | They all told you, and the e-mails speak for themselves, |
| 2 | there were customer complaints.  No one fired Dr. Menninger. |
| 3 | No one disciplined Dr. Menninger.  No one told her it was all |
| 4 | her fault.  They just said, "You're an executive.  You have |
| 5 | to hold your people accountable, help us fix this."  That's |
| 6 | all the company did.  There's nothing wrong with that.  They |
| 7 | have to be able to run their business.  If they couldn't tell |
| 8 | Dr. Menninger, "We need you to work with us to help fix these |
| 9 | problems," they couldn't run their business. |
| 10 |         And if the company had wanted to set up |
| 11 | Dr. Menninger for failure, why didn't they tell her she could |
| 12 | no longer live remotely?  Let's think about that imaginary |
| 13 | scenario for a minute.  If the company was trying to set up |
| 14 | Dr. Menninger to make it so that she couldn't function as she |
| 15 | disclosed her disability, and they felt that she wasn't |
| 16 | leading in the lab, that she wasn't there with her people, |
| 17 | why didn't Mr. Mekerri say, you know what, we're revoking |
| 18 | your remote work status, come back and live in Kentucky? |
| 19 | They never said that.  They just said you have to hold your |
| 20 | people accountable, you have to be accountable, help us fix |
| 21 | these problems. |
| 22 |         You also heard no evidence to tell you that PPD's |
| 23 | reasons for asking Dr. Menninger to do these things wasn't |
| 24 | truthful.  You heard multiple witnesses sit here and talk |
| 25 | about how all of the executive directors were asked to do the |

```
 1    same thing.  And in fact, the current medical director today
 2    is also asked to do those things.  You have no reason to
 3    doubt that this is simply part of PPD's business model.
 4           Next, for Dr. Menninger's claim of retaliation,
 5    there is no evidence that PPD tried to somehow coerce
 6    Dr. Menninger to quit her job.  Sure, Mr. Hannon has thrown a
 7    lot of e-mails in front of you to make you think that's what
 8    PPD was doing, but let's think about it for a minute.  The
 9    company never disciplined her.  They didn't tell her she had
10    to move her family back from Massachusetts.  They didn't fire
11    her.  In fact, you heard multiple levels of management,
12    including people who don't work for the company anymore, talk
13    about how contrary to wanting her to leave, even the person
14    who sent that e-mail about what is the exit plan, he said in
15    that chair, Mr. Fikry, and he told you, that was just about
16    planning.  We need to know if the medical director isn't
17    going to be here, because we have to plan for that.  We
18    cannot run this business without a medical director.
19           And think about it logically.  Would they have
20    waited all this time to hire a new medical director if they
21    wanted to push her out?  If PPD was somehow trying to
22    retaliate against Dr. Menninger for telling them she had
23    disability, they should have been right on it.  Hiring
24    someone new immediately when she left and trying to offer her
25    a package then.  They didn't do that.  They let her stay out
```

1    on leave for eight months before they hired someone new.

2         And there's no evidence that the company excluded

3    Dr. Menninger from hiring and recruiting decisions.  Simply

4    never happened.  Dr. Menninger herself told you that in

5    November of 2017, way back here (indicating), she told her

6    boss that she was having trouble doing all her work.  That

7    was Dr. Menninger's own report.  She sat here and testified

8    about that.  We've seen the evidence that Mr. Mekerri was

9    trying to help her out by taking over the recruiting efforts.

10   And when PPD was ready to make offers, they included her, and

11   they asked for her input.

12        Also, let's take a step back and think about

13   whether this makes any sense.  Mr. Hannon is asking you to

14   find that Dr. Menninger should have been included in hiring

15   meetings and interviews, during the same time that her doctor

16   said it would harm her to have more interactions with

17   strangers.  If Mr. Mekerri had asked her to do that

18   interviewing, had asked her to do the recruiting, we would be

19   here with Dr. Menninger actually telling us that that was the

20   problem.  Again, whatever PPD did was never good enough for

21   Dr. Menninger.  She just wasn't happy.  None of their

22   decisions seemed to please her.

23        Finally, there's no evidence that PPD did a sham

24   investigation when Dr. Menninger complained about doctor --

25   Mr. Mekerri's treatment.  As I said earlier, was the

 1    investigation perfect?  Of course not, but that's not the

 2    legal standard.  This investigation was not a sham and it was

 3    not retaliation.  Plain and simple.

 4            Now let's talk about what Mr. Hannon is asking you

 5    to do with damages and why it is simply wrong.  The events

 6    you heard about in this case happen five years ago.

 7    Dr. Menninger last actively worked at PPD five years ago.  A

 8    lot of time has passed.  Many of the key players in this

 9    case, other people who used to work for the company, they

10    don't work for the company anymore, either.

11            When Dr. Menninger last worked at PPD, COVID hadn't

12    happened, Putin hadn't invaded Ukraine, the world was a

13    different place.  But Mr. Hannon wants you to believe that

14    everything bad in Dr. Menninger's life, everything that has

15    happened in the last five years, it all rests on the

16    shoulders of PPD.  That doesn't make very much sense, does

17    it?  Mr. Hannon doesn't stop there.  Once he's done trying to

18    put PPD on the hook for all the bad things over the last five

19    years, he wants you to find that PPD is responsible for

20    paying Dr. Menninger's wages and benefits until 2036.

21            Think about that.  2036.  It's now 2023.  That

22    means Mr. Hannon is asking you to decide that even though

23    Dr. Menninger only worked for PPD for a few short years, PPD

24    should pay her wages until she would have retired, and that

25    that might not be until 2036.  Dr. Menninger turned 50 in the

1    last year that she worked for PPD, and Mr. Hannon wants you

2    to say that PPD should pay her wages until she would retire

3    at the age of 67.

4             Now, let's look at what we do know about

5    Dr. Menninger, and consider whether that makes any sense.

6    After her medical training, Dr. Menninger worked in the field

7    of pathology for a total of 12 years.  Dr. Menninger worked

8    as an executive director at PPD for less than three years.

9    Dr. Menninger is a licensed medical doctor.  She has

10   specialized training as a medical pathologist.  She went to

11   medical school and completed a residency program.  And,

12   despite what she claims and all of the sadness that she

13   reports in this case, she flew here from Oregon, where she

14   lives now.  She stayed in a hotel and she sat in this

15   courtroom for two weeks.  She spoke to all of you from the

16   witness stand, clearly and thoughtfully for the majority of

17   last week.  And she did so, even with streams of high school

18   students walking in and out of the room.

19            Is that somebody who can't work from now until

20   2036?

21            Mr. Hannon wants you to conclude that Dr. Menninger

22   cannot work at all during that time.  That doesn't seem

23   right.  Should PPD pay her until 2036?

24            Above all else, Mr. Hannon is asking you to

25   speculate.  In fact, the Judge will specifically instruct you

**JA1804**

1    that you cannot speculate in awarding damages in this case.

2    It must be proven with reasonable certainty that those

3    damages are payable.  That did not happen here.

4    Dr. Menninger actively worked at her executive role for less

5    than three years.  She worked in her last job before PPD for

6    five years, and the job before that, for four years.  She's

7    never stayed in a job for more than a handful of years.  Yet,

8    Mr. Hannon wants you to award her pay for 18 years.

9             Well, that would be a nice story to tell, there's

10   simply no evidence to support such a speculative award.  He

11   has presented no evidence to show that if PPD had done

12   something different, Dr. Menninger could have continued at

13   PPD or in a similar job for 18 years.  In fact, the only

14   evidence we do have is that Dr. Menninger has only stayed in

15   each job for a handful of years.

16            Mr. Hannon also wants you to speculate that even

17   though, as Dr. Menninger's own husband testified, she could

18   barely get out of bed in January of 2018, she would have been

19   able to continue to work as an executive at PPD, directing a

20   lab in Kentucky, through three years of the COVID pandemic,

21   and for years to come.  We heard just the other day from the

22   current head of the lab business that the medical director

23   now goes to work, in person, in Highland Heights, Kentucky,

24   every day.  He actively leads and manages the lab staff,

25   meets with customers to present business proposals, and

1    answer medical and scientific questions, and presents to

2    company leadership.  These were all things that

3    Dr. Menninger's own doctor said she was not able to do.  And

4    that was in January of 2018, before even she claims PPD did

5    anything wrong.

6            And remember that even when Dr. Menninger was still

7    employed by PPD, she moved multiple times.  She doesn't live

8    in Massachusetts, anymore, she doesn't live in Kentucky, she

9    moved to New Mexico, and then she moved twice within Oregon.

10   Dr. Menninger is no longer in a position where we can believe

11   she would have been doing this job at PPD for years to come.

12           Next, Mr. Hannon wants you to speculate that,

13   despite Dr. Menninger's anxiety disorders, agoraphobia, and

14   panic attacks that are triggered just at the thought of

15   answering the door, picking up the phone, that she would have

16   remained in an in-person job in Highland Heights, Kentucky

17   through the business's continued expansion, and three years

18   of a global pandemic.  While lots of jobs allow people to

19   hunker down in their basements during a pandemic, this is not

20   one of them.  The current medical director was there in

21   person on a regular basis throughout the heart of COVID.  The

22   person in charge of the business testified that this was

23   actually critical, even when the pandemic raged.  Why?

24   Because the blood, tissue, and tumor samples of patients

25   don't wait, and they don't give second chances.

1          The evidence is clear that Dr. Menninger could not

2     work in Highland Heights, even in January of 2018, and

3     there's simply no question that this wouldn't have gone on

4     through the pandemic with Dr. Menninger able to go and work

5     in-person in the lab.

6          Mr. Hannon also wants you to speculate that

7     Dr. Menninger would have stayed on as executive director

8     through the departure of her former manager Hacene Mekerri,

9     who hasn't worked for the company for years, and PPD's

10    eventual sale to Thermo Fisher.  Can we really speculate

11    about whether she would have stayed in the job through those

12    changes?

13         We heard about the clear expectation that the

14    medical director of working person would have near constant

15    dialogue with senior leadership and customers, and we have

16    heard no evidence at all that Dr. Menninger could or would

17    have stayed employed through those changes.  Plain and

18    simple.

19         We even heard that the only salary increases for

20    medical directors have been modest, just a little bit to

21    account for cost of living adjustments.  But Mr. Hannon wants

22    you to believe that, in a hypothetical world, Dr. Menninger

23    would have a base salary completely out of whack with what

24    the current medical director was making --

25         THE COURT:  Ms. Mandel, five minutes.

1          MS. MANDEL:  Thank you.  You heard Dr. Menninger's

2     expert say that his calculations didn't even account for

3     whether PPD's business would be sold.  His calculations were

4     speculation that ended several years ago, before the most

5     recent changes.

6          We also heard the testimony of Dr. Menninger's

7     husband that both he and Dr. Menninger have stayed home with

8     their daughter, and that they have no plans to change that.

9     They both work to homeschool their daughter.  Yet, Mr. Hannon

10    wants to you speculate that if PPD had done something

11    different over a few brief months in 2018, somehow

12    Dr. Menninger would have stayed in an executive level job,

13    running a global set of labs.

14         Perhaps most importantly, Mr. Hannon is asking you

15    to assume that there is no comparable work that Dr. Menninger

16    can do, even now.  She testified that she has not explored

17    working as a clinical pathologist in a home-based role,

18    something that wouldn't require her to ever leave her

19    basement.  You heard no testimony about her attempts to do

20    that because she hasn't.

21         These are huge assumption and they don't make any

22    sense.  Dr. Menninger is trained as a clinical pathologist.

23    She worked, for a few short years, in industry, trying a job

24    that was not compatible with her needs, but that doesn't mean

25    she can't work as a pathologist between now and 2036.  And in

1   fact, she has made no efforts to try.

2          Mr. Hannon wants you to give Dr. Menninger money

3   for what she claims are her lost wages from 2018 to 2036.

4   Think about whether that makes any sense.  He also wants you

5   to give Dr. Menninger money for what she and her team have

6   decided her stock options and her equity might be worth

7   today.  In fact, you've heard almost no actual evidence about

8   this, just a couple of documents, but no witnesses have even

9   been able to say what that would have been worth.  In fact,

10  Dr. Menninger's own economic expert sat right there yesterday

11  and told you that he, himself, was told not to consider the

12  value of those options in writing his report.

13         I don't think you have enough information to say

14  what Dr. Menninger's equity would be worth today.  I know I

15  don't.

16         There is no question, Dr. Menninger has had a lot

17  of sadness in her life.  In her childhood, she, her mother,

18  and her sisters escaped an abusive father, they moved across

19  the country from Georgia to Wisconsin to get away from him.

20  Dr. Kessimian described this as trauma in Dr. Menninger's

21  life.  She has long struggled with anxiety and panic attacks.

22  They were severe before she ever worked at PPD.  She couldn't

23  even go to children's birthday parties without having a panic

24  attack.  And we heard that Dr. Menninger's daughter was

25  bullied and had a lot of emotional turmoil throughout her

1    childhood into adolescence.  This is all very sad.  This is

2    all reason that Dr. Menninger's life has been difficult, but

3    it's not on the shoulders of PPD.

4         Dr. Menninger's own therapist in Oregon has

5    described her as having paranoia about PPD and her work

6    there.  All of her therapists note that she focuses intently

7    on PPD and this case.  Her own husband talked about that in

8    his testimony.  That is difficult for Dr. Menninger.  There's

9    no question about it.  But that does not entitle her to money

10   from PPD now.

11        Even if PPD had some missteps here and didn't

12   always say the right thing, you heard from the company's

13   witnesses that they just wanted to help her.  This is the

14   same company that let Dr. Menninger move across the country

15   when that's what her daughter needed.  It's the same company

16   that let her stay out on medical leave for eight months.

17   They're not evil.  They're not malicious.  They didn't act

18   with indifference to her legal rights --

19        THE COURT:  One minute.

20        MS. MANDEL:  They didn't know what to do and they

21   did the best they could.

22        Why does this matter?  Because Dr. Menninger is

23   here, asking you to award her more money than most of us will

24   ever see in our lives.  You need to think about whether that

25   makes any sense, whether you've seen any evidence to support

```
 1    that request, that claim.

 2              Members of the jury, we submit to you that you

 3    haven't seen that evidence.  We thank you for your service

 4    and request that you return a verdict in PPD's favor.  Thank

 5    you.

 6              THE COURT:  Thank you, Ms. Mandel.  I remind you,

 7    ladies and gentlemen, what the lawyers have to say can be

 8    persuasive and helpful, but it's not evidence, and you decide

 9    what the evidence is and what it shows.

10              So Mr. Hannon gets a brief rebuttal.

11              You have three minutes, Mr. Hannon.

12              MR. HANNON:  Three minutes.  Can I start when I get

13    my microphone on?

14              THE COURT:  Yes.

15              MR. HANNON:  Feel free to hit the buzzer when I hit

16    three.

17              THE COURT:  I'll tell you while he's getting ready,

18    so each side gets 45 minutes.  So it's a question of --

19    there's a limit.  Mr. Hannon can't say I'll do five minutes

20    and reserve 40 for rebuttal, when he needs to go first, it's

21    supposed to be a rebuttal, a response, so it depends on how

22    much time he spends on the first round, so that's why he gets

23    three.

24              Ready to go?

25              MR. HANNON:  Ready.
```

1       **REBUTTAL ARGUMENT BY COUNSEL FOR PLAINTIFF**

2           MR. HANNON:  So what was the light switch?

3   Remember the testimony from Dr. Martin yesterday?  What was

4   the light switch that put Dr. Menninger in this state?  It

5   wasn't her daughter getting bullied.  It wasn't the trauma

6   that she suffered as a child.  It wasn't her cat dying, as

7   you heard them question her husband about extensively.  It

8   wasn't President Putin invading Ukraine.  It was PPD.  It was

9   what they did in response to her after she took that risk;

10  after she exposed herself to them; after they rejected her,

11  after they humiliated her, after they subjected her to her

12  worst fears.  That was the light switch.  Don't take my word

13  for it.  Take their expert's word for it.

14          There's some allegation here that some of these

15  e-mails have not been presented to you fairly or somehow

16  these are being misinterpreted.  You'll have them back out

17  there.  I invite you to look at Joint Exhibit 167.  That's

18  going to be the draft e-mail that Mr. St. John sent to

19  Ms. Ballweg following the 2/28 meeting.  Joint Exhibit 186.

20  That's the one about delicately working Lisa out.  Joint

21  Exhibit 109.  This is going to answer the question about why

22  did they wait to officially hire Dr. Kashlan to replace her.

23  You're going to see Ms. Ballweg instructs Mr. St. John to try

24  before you buy.  Let's bring him on board in a smaller role,

25  see how you like him before we officially hire him and commit

1    to him.

2              Joint Exhibit 332, that's the exchange from

3    Dr. Fikry.  You heard Ms. Mandel characterize that.  She

4    characterized it as what is the exit plan.  That's not what

5    he asked.  He didn't ask what is the exit plan.  He asked

6    when is the exit.  It wasn't a matter of if she was going to

7    exit, it was a matter of when.

8              Joint Exhibit 194, that's critical in terms of

9    understanding what those buckets are that Mr. Mekerri came up

10   with.

11             Joint Exhibit 126.  You're going to see when they

12   were doing this criticism towards the end of her employment,

13   when they were changing these goals, they were telling her,

14   you're not meeting expectations.  You're failing.  The fact

15   that these errors are happening are your fault.  We're going

16   to hold you accountable and you'll see it there in that

17   document.

18             THE COURT:  Just over 30 seconds.

19             MR. HANNON:  Joint Exhibit 394, that's going to

20   answer the question regarding equity.  She made the reference

21   regarding the husband's testimony about January.  You recall

22   he clarified that.  It was early 2018, some time after a

23   meeting.  He told you he wasn't good with dates.

24             You've seen this for two weeks.  Right?  She has

25   seen this for five years.  Seeing what they've done over the

1    last two weeks, you've seen how they've lied, how they've

2    mischaracterized things, how they've trying to avoid

3    responsibility.  It's not speculation to give her damages.

4    It's not speculation to --

5              THE COURT:  Mr. Hannon.

6              MR. HANNON:  She's done her part and I ask you now

7    to do yours.

8              Thank you, Your Honor.

9              THE COURT:  Thank you, Mr. Hannon.

10             Same reminder, arguments of counsel can be

11   persuasive, but they're not evidence.

12                         **JURY INSTRUCTIONS**

13             THE COURT:  All right.  That brings us to the last

14   part, which are my instructions to you.

15             So you'll have, in the jury room a document --

16   first of all, you'll have a written copy of what I'm reading

17   to you, and when you'll go to the jury room, you'll have one

18   copy of what I'm reading to you, but you will be -- I will be

19   printing 11 additional copies of the instructions, and you'll

20   get them however fast the printer is, essentially.  So a few

21   minutes after, so you know that that's coming.  So then you

22   just have -- you each have your own copy and it makes it a

23   little easier.

24             So I want to turn to the principles of law that

25   govern the specific claims and defenses made in this case.

1          Dr. Menninger has presented three claims for your

2     decision.  First, she alleges she faced disability

3     discrimination because PPD, her employer, failed to provide

4     her with a reasonable accommodation.  Second, she alleges

5     that she faced disability discrimination because she

6     experienced disparate treatment based on an adverse

7     employment action PPD took against her.  And third, she

8     alleges PPD retaliated against her for requesting an

9     accommodation for a disability.

10         And I'll now explain the elements of each of these

11    claims one by one.

12         Claim 1 is the disability discrimination for

13    failure to reasonably accommodate.  Federal law and

14    Massachusetts law both require employers, upon request, to

15    provide reasonable accommodation to employees who are

16    disabled, unless the accommodation would impose an undue

17    hardship on the employer.  To succeed on her claim that

18    defendant engaged in disability discrimination by failing to

19    provide her with a reasonable accommodation, plaintiff need

20    not show that defendant had discriminatory intent, but she

21    must instead prove by a preponderance of the evidence all of

22    the following.

23         First, Dr. Menninger had a disability within the

24    meaning of anti-discrimination laws.

25         Second, Dr. Menninger was a quote/unquote,

1   qualified individual for the job, meaning that she both, one,

2   possessed the necessary skill, experience, education, and

3   other job related requirements for the position of executive

4   director for defendant's Global Central Labs, and two, could

5   have performed the essential functions of the executive

6   director position with or without reasonable accommodation.

7       Third, that Dr. Menninger made a request for an

8   accommodation that was sufficiently direct and specific so as

9   to put the employer on notice of the need for that

10  accommodation.

11      And fourth, the accommodation that Dr. Menninger

12  requested was, quote/unquote, reasonable, and PPD failed or

13  refused to provide the requested accommodation.

14      If Dr. Menninger proves all four of these elements

15  by a preponderance of the evidence, then PPD bears the burden

16  of proving, by a preponderance of the evidence, that the

17  accommodation Dr. Menninger proposed would have been an undue

18  hardship on PPD.

19      First, Dr. Menninger must prove that she had a

20  disability within the meaning of anti-discrimination laws.

21  Dr. Menninger suffered a disability if any of the following

22  are true:

23      One, she suffered from a physical or mental

24  impairment, that quote/unquote, substantially limited one or

25  more of her, quote/unquote, major life activities.

1           Two, she had a record of such impairment.

2           Or three, she was regarded by PPD as having a

3       physical or mental impairment.

4           A physical or mental impairment is any

5       psychological disorder or condition, cosmetic disfigurement,

6       or anatomical loss affecting one or more body systems, such

7       as neurological, musculoskeletal, special sense organs,

8       respiratory, including speech organs, cardiovascular,

9       reproductive, digestive, genitourinary, immune, circulatory,

10      hemic, lymphatic, skin, and endocrine.

11          Or two, any mental or psychological disorder such

12      as intellectual disability, formally termed -- formally

13      termed, quote/unquote, mental retardation, organic brain

14      syndrome, emotional or mental illness, and specific learning

15      disabilities.

16          The term major life activity includes, but is not

17      limited to:

18          Caring for one's self, performing manual tasks,

19      seeing, hearing, eating, sleeping, walking, standing,

20      sitting, reaching, lifting, bending, speaking, breathing,

21      learning, reading, concentrating, thinking, communicating,

22      interacting with others, and working.

23          And the operation of a major bodily function,

24      including functions of the immune system, special sense

25      organs and skin, normal cell growth, and digestive,

1    genitourinary, bowel, bladder, neurological brain,

2    respiratory, circulatory, cardiovascular, endocrine, hemic,

3    lymphatic, musculoskeletal, reproductive functions.  The

4    operation of a major bodily function includes the operation

5    of an individual organ within a body system.

6              The requirement that a disability substantially

7    limit a major life activity is not intended to be a demanding

8    standard and the phrase should be construed broadly in favor

9    of expansive coverage.  An impairment need not prevent or

10   significantly or severely restrict the individual from

11   performing a major life activity in order to be considered

12   substantially limiting.  Further, the determination of

13   whether an impairment substantially limits a major life

14   activity must be made without regard to the ameliorative

15   effects of mitigating measures.  An impairment that is

16   episodic or in remission is a disability if it would

17   substantially limit a major life activity when active.

18             The non-ameliorative effects of mitigating

19   measures, such as negative side effects of medication, or

20   burdens associated with following a particular treatment

21   regime may be considered when determining whether an

22   individual's impairment substantially limits a major life

23   activity.

24             In determining whether an individual has a

25   disability, the focus is on how major life activity is

1    substantially limited and not on what outcome an individual
2    can achieve.  For example, someone with a learning disability
3    my achieve a high level of academic success, but may
4    nevertheless be substantially limited in the major life
5    activity of learning because of the additional time or effort
6    he or she must spend to read, write, or learn compared to
7    most people in the general population.

8            An individual meets the standard for, "Regarded as
9    having" a physical or mental impairment, if the individual
10   establishes that she has been subjected to unlawful
11   discrimination because of an actual or perceived physical or
12   mental impairment, whether or not the impairment limits or is
13   perceived to limit a major life activity.

14           The second element Dr. Menninger must prove is that
15   she was a qualified individual for the job under the law.  As
16   stated above, in order to be a qualified individual,
17   Dr. Menninger must prove by a preponderance of the evidence
18   that she both, one, possessed the necessary skill,
19   experience, education, and other job-related requirements for
20   the position of executive director for defendant's global
21   labs.  And two, could have performed the, quote/unquote,
22   essential functions of the executive director position at the
23   time that PPD took the alleged adverse employment action
24   against her, with or without reasonable accommodation.  While
25   Dr. Menninger bears the burden to prove by a preponderance of

1   the evidence these two requirements to be considered a

2   qualified individual, PPD bears the burden to prove by a

3   preponderance of the evidence what the essential functions of

4   Dr. Menninger's position were.

5          If an employer has a concern about whether an

6   employee with a known disability can perform her job, the law

7   permits the employer to make inquiries about the employee's

8   ability to perform job-related functions.  Permissible

9   inquiries include asking for a medical certification from the

10  employee that the employee is able to perform essential job

11  functions with or without accommodation.  Additionally, if

12  the employer has a reasonable belief, based on objective

13  evidence, that a medical condition will impair an employee's

14  ability to perform the essential functions of her job, then

15  the employer may require the employee to submit to an

16  independent medical examination.  The law imposes no limits

17  on what information an employee can provide to an employer

18  regarding her disability, medical conditions, or ability to

19  perform job-related functions.

20         The term "essential functions" means the

21  fundamental job duties of the employment position the

22  individual with a disability holds or desires.  The

23  term "essential functions" does not include the marginal,

24  that is, nonessential functions of the position.  In

25  determining the essential functions of the plaintiff's job,

1    you may consider the plaintiff's job description, as well as

2    the nature of the employer's particular business.  You may

3    also consider, one, the employer's judgment as to which

4    functions of the job are essential; two, the amount of time

5    spent on the job performing the function in question; three,

6    the consequences of not requiring a person to perform the

7    function; four, the work experience of people who have held

8    the job; five, the current work experience of people in

9    similar jobs; six, whether the reason the position exists is

10   to perform the function; seven, whether there are a limited

11   number of employees available among -- available -- a limited

12   number of employees available for the performance of the

13   function that can be distributed; eight, whether the function

14   is highly specialized and the individual in the position was

15   hired for his or her expertise or ability to perform the

16   function.  No one factor is necessarily controlling.  You

17   should consider all of the evidence in deciding what

18   functions, if any, PPD has established, by a preponderance of

19   the evidence, were essential functions of Dr. Menninger's job

20   as executive director of PPD's Global Central Labs.

21          A reasonable accommodation is a modification or

22   adjustment to the work environment or to the manner in which

23   a job is performed.  A reasonable accommodation enables a

24   plaintiff to perform the essential functions of her job.  Or

25   a reasonable accommodation is something that alleviates the

1   added stress, difficulties, and other disadvantages that

2   arise from a disability, even when the employee can perform

3   the essential functions of the job without the reasonable

4   accommodation.  In all cases, a reasonable accommodation must

5   be feasible for the employer to provide under the

6   circumstances, at least on the face of things.

7          Please refer to the section coming up under

8   Element 4 for further explanation of what qualifies as a

9   reasonable accommodation.

10         The third element is -- regards sufficiently direct

11   or specific requests.  As to each accommodation she seeks to

12   prove was reasonable but denied to her, Dr. Menninger must

13   prove she made a request for that accommodation that was

14   sufficiently direct and specific so as to put the employer on

15   notice for the need of that accommodation.  Any

16   accommodations not sufficiently requested at the time of the

17   underlying events cannot be considered as possible reasonable

18   accommodations for purposes of this claim.

19         In other words, when you move on to the fourth

20   element below, you may only consider those accommodations you

21   believe were requested in a sufficiently direct and specific

22   way so as to put the employer on notice of the need for that

23   accommodation, and you may not consider any potentially

24   reasonable accommodations that Dr. Menninger did not

25   sufficiently request from PPD at the time of the underlying

1    events.

2              Fourth, or the fourth element, Dr. Menninger must

3    prove that the accommodation she requested was reasonable.

4    In evaluating this, you'll refer back to the definition I

5    read to you a moment ago under Element 2.  Dr. Menninger must

6    also prove -- as well as the factors I describe in a moment.

7    Dr. Menninger must also prove that PPD failed or refused to

8    provide the requested accommodation.

9              Depending on the circumstances, a reasonable

10   accommodation might include, among other things, one,

11   modifying or adjusting a job application process to enable a

12   qualified applicant with a disability to be considered for

13   the position; two, making the existing facilities used by

14   employees readily accessible to and usable by persons with

15   disabilities; three, job restructuring; four, a part-time or

16   modified work schedule; five, reassignment to a vacant

17   position; six, acquisition or modification of equipment or

18   devices; seven, the adjustment or modification of

19   examinations, training materials, or policies; eight,

20   modifying when and how an essential job function is

21   performed; nine, altering, reassigning, or eliminating

22   nonessential job functions; or ten, the provision of

23   qualified readers or interpreters.  Whether something is a

24   reasonable accommodation is a determines you make based upon

25   your consideration of all the surrounding circumstances.

1           An accommodation is not reasonable if it requires

2    eliminating or excusing an inability to perform any essential

3    functions of the job, if it requires shifting any of the

4    essential functions of the job to other employees, if it

5    requires creating a new position for the disabled employee,

6    or if it creates an undue hardship for the employer.

7           Finally, as to any requested accommodation you find

8    to be reasonable, you must determine whether PPD failed to

9    provide that accommodation to Dr. Menninger.

10          Undue hardship.  If you find Dr. Menninger has

11    proven by a preponderance of the evidence all four elements

12    of this claim, you must consider whether the reasonable

13    accommodations that you found PPD failed to provide imposed

14    an undue hardship on PPD.  On this question, PPD bears the

15    burden to prove that all of the accommodations that you found

16    were both reasonable and not provided by PPD imposed an undue

17    hardship.

18          An accommodation imposes an undue hardship if it

19    would create significant difficulty or expense for PPD,

20    considering the nature and cost of the accommodation, the

21    overall financial resources of PPD, the effect of the

22    accommodation on expenses and resources, and the impact of

23    the accommodation on the operations of PPD.  This last

24    consideration, the impact of the accommodations on PPD's

25    operations includes the accommodation's impact on the ability

1    of other employees to perform their duties, and the impact

2    that the accommodation has on PPD's ability to conduct its

3    business.

4         If you find that there was at least one reasonable

5    accommodation, that satisfied all of the elements above, but

6    that did not impose an undue hardship on PPD, then that

7    reasonable accommodation can support liability on this claim,

8    even if other reasonable accommodations would impose an undue

9    hardship.  In other words, for PPD to win this claim based on

10   undue hardship, they must show that all, not just one, of the

11   reasonable accommodations sufficiently requested by and

12   denied to Dr. Menninger would have imposed an undue hardship.

13        Now I'm going to give you a summary of some of

14   the -- of the questions that you'll need to think about in

15   order to resolve the first claim, which is the discrimination

16   based on failure to reasonably accommodate.

17        One, did Dr. Menninger prove by a preponderance of

18   the evidence that she had a disability within the meaning of

19   anti-discrimination laws?

20        Two, did Dr. Menninger prove by a preponderance of

21   the evidence she possessed the necessary skill, education,

22   experience, and other job-related requirements for the

23   position of executive director of defendant's Global Central

24   Labs?

25        Three, did Dr. Menninger prove, by a preponderance

1   of the evidence, she could have performed the essential

2   functions of the executive director position with or without

3   reasonable accommodation?  PPD bears the burden to prove by a

4   preponderance of the evidence which functions of the

5   executive director position were essential.

6           Four, did Dr. Menninger prove, by a preponderance

7   of the evidence, she made a request for accommodation that

8   was sufficiently direct and specific so as to put PPD on

9   notice of the need for that accommodation?

10          Five, did Dr. Menninger prove by preponderance of

11  the evidence that one or more of the accommodations you found

12  that she sufficiently requested was reasonable?

13          Six, did Dr. Menninger prove by a preponderance of

14  the evidence that PPD failed to provide at least one

15  accommodation that you found to be both reasonable and

16  sufficiently requested?

17          If you answer to -- if your answer to one or more

18  of Questions 1 to 6 above is "no," then you must answer "no"

19  to Question 1 on the verdict form.

20          And Question 1 is your resolution of this claim.

21          If your answer to all of Questions 1 to 6 above is

22  "yes," then you must answer "yes" to Question 1 on the

23  verdict form, unless you find that for all of the

24  accommodations you found to be reasonable, sufficiently

25  requested, and denied to Dr. Menninger by PPD, that PPD has

1    proven, by a preponderance of the evidence, that all of these

2    accommodations would have imposed an undue hardship on PPD,

3    in which case you answer "no" to Question 1.

4          Claim 2.  Dr. Menninger also accuses PPD of

5    discriminating against her based on her disability by taking

6    adverse employment action against her.  To succeed on this

7    claim, Dr. Menninger must prove by a preponderance of the

8    evidence all of the following:

9          First, Dr. Menninger had a disability within the

10   meaning of anti-discrimination laws.

11         Second, she was a qualified individual for the job,

12   meaning that she both possessed the necessary skill,

13   experience, education, and other job-related requirements for

14   the position of executive director of defendant's Global

15   Central Labs, and could have performed the essential

16   functions of the executive director position at the time that

17   PPD took the alleged adverse employment action against her,

18   with or without reasonable accommodation.

19         Third, that PPD had knowledge of Dr. Menninger's

20   alleged anxiety disorder at the time it took the alleged

21   adverse employment action against her.

22         And fourth, that PPD took an adverse employment

23   action against Dr. Menninger and that PPD did so in whole or

24   part because of her disability.

25         First, Dr. Menninger must prove she had a

 1    disability within the meaning of the anti-discrimination

 2    laws.  Here you refer back to the definition I already gave

 3    to you on the first claim.

 4         Element 2, which is qualified individual, you refer

 5    back to the definition of qualified individual provided under

 6    Claim 1, Element 2.  The same definition here.

 7         Knowledge, which is the third element,

 8    Dr. Menninger must prove, by a preponderance of the evidence,

 9    that PPD had knowledge of Dr. Menninger's alleged anxiety

10    disorder at the time it took the alleged adverse employment

11    action against her.

12         Element 4, adverse employment action and causation.

13    Fourth, Dr. Menninger must prove by a preponderance of the

14    evidence that PPD took an adverse employment action against

15    Dr. Menninger and that PPD did so, in whole or in part,

16    because of her disability.  Dr. Menninger alleges that PPD's

17    creation of new goals and expectations for her role as

18    executive director was an adverse employment action taken

19    because of her disability.

20         To determine whether Mr. Mekerri has proven this

21    element, you must first decide whether PPD took an adverse

22    employment action against her.  A trivial harm is

23    insufficient.  The fact that an employee is unhappy with

24    something that his or her employer did or failed to do is not

25    enough to make that act or omission an adverse employment

1   action.  Likewise, subjective feelings of disappointment or

2   disillusionment concerning an employment action do not

3   constitute an adverse action.  Rather, an employer takes

4   materially adverse action against an employee typically when

5   it, one, takes something of consequence away from the

6   employee; for example, by discharging or demoting the

7   employee, reducing his or her salary, or taking away

8   significant responsibilities.  Or two, fails to give the

9   employee something that is a customary benefit of the

10  employment relationship; for example, by failing to follow a

11  customary practice of considering the employee for a

12  promotion after a particular period of service.

13          For an employment action to be adverse, it must

14  have materially changed the conditions of Dr. Menninger's

15  employment, which means that it must be more disruptive than

16  a mere inconvenience, or an alteration of job

17  responsibilities.  However, assignment of more difficult job

18  responsibilities, disadvantageous assignments, unwarranted

19  negative job evaluations, or toleration of harassment by

20  other employees could qualify as adverse actions.  Likewise,

21  an employee may meet this standard by showing that her

22  employer intentionally assigned new job duties to target her

23  known disability, such as by selecting tasks that would be

24  more difficult due to the disability.

25          Whether an action is materially adverse should be

1    judged from the perspective of a reasonable person in

2    Dr. Menninger's position, considering all of the

3    circumstances and the context in which the events took place.

4    For example, a schedule change in an employee's work schedule

5    may make little difference to many workers, but may matter

6    enormously to a young parent with school-aged children.

7         If you find that PPD took an adverse employment

8    action against Dr. Menninger, you must next determine whether

9    Dr. Menninger's disability was a cause of the adverse action.

10   The definition of "cause" here differs under federal and

11   state law.  You will have to determine separately whether she

12   has met her burden under federal and state law.

13        For this claim, under federal law, you must decide

14   whether Dr. Menninger's disability was a but-for cause for

15   the adverse action you found.  To prove that her disability

16   was a but-for cause, Dr. Menninger does not have to prove

17   that disability was the only reason for the adverse action.

18   It is enough if Dr. Menninger proves by a preponderance of

19   the evidence that if not for her disability, the adverse

20   actions would not have occurred.

21        Under Massachusetts law, you must decide whether

22   Dr. Menninger's disability was a determinative cause of the

23   adverse action.  Dr. Menninger's disability was a

24   determinative cause if it contributed significantly to the

25   adverse actions; that is, that it was a material and

1   important reason for the adverse action.  To prove that

2   disability was a determinative cause, Dr. Menninger need not

3   prove that disability was the only reason for the adverse

4   action.

5        Under both federal and state law, you are permitted

6   to consider the timing and sequence of events when assessing

7   causation.  For example, if adverse action is taken against a

8   satisfactorily performing employee in the immediate aftermath

9   of the employer's becoming aware of the employee's disability

10  or protected activity, where adverse actions follow closely

11  on the heels of protected activity, or where there's an

12  evidence of a pattern of discriminatory or retaliatory

13  conduct that began soon after the protected activity, and

14  only culminated later in actual adverse action, you may

15  consider the timing and sequence of those events in your

16  analysis of whether Dr. Menninger has proven causation under

17  either the federal or the Massachusetts causation standard.

18       Under both federal and state law, you may consider

19  any legitimate, nondiscriminatory reason or explanation

20  stated by PPD for any employment decision that you determine

21  was an adverse action.  You may assess whether the reasons

22  stated were a pretext for discrimination or retaliation; that

23  is, whether it was the true reason for the decision.  Not all

24  pretexts are necessarily designed or intended to conceal

25  discrimination or retaliation, though that may be the purpose

1    the of a pretext.  Regarding pretext, your focus is on PPD's

2    state of mind, not on whether PPD's reason was, in your view,

3    a good, foolish, or unprofessional business decision.

4          Remember that Dr. Menninger bears the burden to

5    prove by a preponderance of the evidence that disability

6    discrimination or retaliation was under federal law the

7    but-for cause of the adverse action, and under Massachusetts

8    law the determinative cause of the adverse action.  Neither

9    law requires her to prove that disability discrimination or

10   retaliation was the only cause, though she must prove that it

11   was the but-for cause under federal law or determinative

12   cause under Massachusetts law.

13         And the reason here I refer to discrimination and

14   retaliation is because you use the same causation instruction

15   not only for this discrimination claim, but for the

16   retaliation claim that I'm going to talk to you about in a

17   minute.  So that's why, even though it might seem a little

18   confusing at first.

19         So a summary of the questions for Claim 2 are the

20   following of what Dr. Menninger must prove:

21         One, did Dr. Menninger prove by a preponderance of

22   the evidence she had a disability within the meaning of the

23   anti-discrimination laws?

24         Two, did Dr. Menninger prove by preponderance of

25   the evidence that she possessed the necessary skill,

 1    experience, education, and other job-related requirements for

 2    the position of executive director for defendant's Global

 3    Central Labs?

 4           Three, did Dr. Menninger prove by a preponderance

 5    of the evidence that she could have performed the essential

 6    functions of the executive director position, with or without

 7    reasonable accommodation?

 8           Here, PPD bears the burden to prove by a

 9    preponderance of the evidence which functions of the

10    executive director position were essential.

11           Four, did Dr. Menninger prove by preponderance of

12    the evidence that PPD had knowledge of Dr. Menninger's

13    alleged anxiety disorder at the time it took the alleged

14    adverse employment action against her?

15           Five, did Dr. Menninger prove by a preponderance of

16    the evidence that PPD took an adverse employment action

17    against Dr. Menninger?

18           Six, causation.  Under the federal law, did

19    Dr. Menninger prove by a preponderance of the evidence that

20    her disability was a but-for cause of the adverse employment

21    action, and by Massachusetts law, did she prove by a

22    preponderance of the evidence that her disability was a

23    determinative cause of the adverse employment action?

24           If your answers to any one or more of Questions 1

25    to 5 and 6(a), that's the federal causation question, was

1    "no," then you must answer "no" to Question 2A on the verdict

2    form.  2A is your verdict on the federal claim, Claim 2.  If

3    your answer to question -- and if your answers to Question 1

4    to 5 and 6(a) were all "yes," then you must answer "yes" to

5    Question 2A on the verdict form.

6          Similarly, for 2B on the verdict form, which is the

7    Massachusetts claim, if any one of more of your answers to

8    these Questions 1 to 5 and 6(b) were "no," then you must

9    answer "no" to Question 2B.  But if your answers to questions

10   1 to 5 and 6(b) were all "yes," then you must answer "yes" to

11   Question 2B.

12         So for the second claim, there's two questions on

13   the verdict form, one for federal law and one for

14   Massachusetts law.

15         Retaliation, the third claim.  Dr. Menninger's

16   third claim is that PPD retaliated against her for requesting

17   an accommodation for a disability.  A claim for retaliation

18   is separate and distinct from a claim for discrimination.

19   Accordingly, Dr. Menninger does not need to succeed under a

20   discrimination claim in order to prove retaliation.  In order

21   to recover for retaliation, Dr. Menninger must prove all of

22   the following by a preponderance of the evidence:

23         First, that she engaged in conduct that is

24   protected under the anti-discrimination laws; second, that

25   she suffered a materially adverse action; and third, that

1   there was a causal connection between the materially adverse

2   action and Dr. Menninger's protected conduct.

3        Dr. Menninger must first prove she engaged in

4   conduct that is protected under the law.  An employee's

5   request for accommodation constitutes protected conduct as a

6   matter of law.  This is true even if the employee does not

7   meet the statutory definition of disability, or is otherwise

8   not entitled to any accommodation, so long as the employee

9   makes the request in good faith.

10        Element 2.  Second, Dr. Menninger must prove she

11  suffered a materially adverse action.  For the purposes of

12  this retaliation claim, Dr. Menninger alleges that the

13  adverse action was comprised of one or more of the following

14  alleged actions:

15        One, PPD tried to coerce her to quit; two, PPD

16  tried to manufacture grounds for her termination; three, PPD

17  refused to clarify the anticipated changes to her role; four,

18  PPD established unrealistic expectations and goals for her

19  role; five, PPD diminished her involvement in hiring and

20  recruiting decisions which she alleges was a core component

21  of her role; and six, PPD conducted a sham investigation into

22  her complaints of mistreatment.

23        For this element, you must determine whether

24  plaintiff has met her burden to prove by a preponderance of

25  the evidence both that, (a), one or more of these alleged

1   acts occurred, and (b), if so, whether the proven acts
2   amounted to an adverse action, either individually or
3   collectively.

4           With respect to showing an adverse action,
5   Dr. Menninger's burden under her retaliation claim is
6   different than under her claim for discrimination.  To be
7   actionable as retaliation, an adverse action does not need
8   to, quote, relate to the terms and conditions of employment,
9   quote.  Instead, Dr. Menninger need only prove that a
10  reasonable employee would have found the challenged action
11  materially adverse, which, in this context means it well
12  might have dissuaded a reasonable worker from engaging in
13  protected conduct.  Material adversity is judged from the
14  standpoint of a reasonable person in the employee's position,
15  meaning a person with all of the same conditions as
16  Dr. Menninger and in light of all the relevant circumstances.

17          In determining whether PPD subjected Dr. Menninger
18  to a materially adverse action, you should consider all of
19  the relevant evidence; that is, you should consider whether
20  PPD's cumulative actions in response to her protected request
21  for accommodation might well have dissuaded a reasonable
22  person with her disabilities from requesting an
23  accommodation.

24          Causation.  Third, if you find that Dr. Menninger
25  engaged in protected conduct and suffered a materially

1    adverse action, you must determine whether Dr. Menninger

2    proved that protected conduct caused one or more of the

3    actions that you found to be materially adverse.

4         Please refer to the explanation of causation

5    provided under Claim 2, Element 4, including the explanation

6    of the differing legal standards under federal and

7    Massachusetts law.  That same definition applies here; except

8    that, instead of consideration whether her disability was a

9    but-for and/or determinative clause as you did under Claim 2

10   above, here you must consider whether Dr. Menninger proved by

11   a preponderance of the evidence that her alleged protected

12   conduct was the but-for and/or determinative cause of any

13   materially adverse actions that you found under this

14   retaliation claim.

15        Here is a summary of the questions for the

16   retaliation claim:

17        One, did Dr. Menninger prove by a preponderance of

18   the evidence that she engaged in conduct that is protected

19   under anti-discrimination law?

20        Two, did she prove by a preponderance of the

21   evidence that she suffered a materially adverse action?

22        And three, causation under federal law, did she

23   prove by preponderance of the evidence that her protected

24   conduct was a but-for cause of at least one materially

25   adverse action; or under Massachusetts law, did she prove by

1    a preponderance of the evidence that the protected conduct

2    was a determinative cause of at least one adverse action.

3              If your answers to any one or more of these

4    Questions 1, 2, and 3(a) was "no," then you must answer "no"

5    to Question 3A on the verdict form.

6              Just as Claim 2 and Claim 3, there's two questions

7    on your verdict form, one for federal claim, and one for the

8    state law claim.

9              If your answers to Questions 1, 2, and 3(a) were

10   all "yes," then you answer "yes" to Question 3A, which is the

11   federal law question.

12             Similarly, for Question 3B, if your answers to

13   Questions 1, 2, and 3(b), any one of them were "no," then you

14   answer "no" to Question 3B.  And if your answers to 1, 2, and

15   3(b) were all "yes," then you answer "yes" to 3B on the

16   verdict form.

17             That brings me to damages.  We're at 11:22.  I'm

18   done with most of the instructions, but there's a bit more to

19   go.  If you're game, I'll keep going and we'll just finish,

20   and then we'll be done.

21             Does that sound fine?

22             THE JURORS:  (Indicating affirmatively.)

23             THE COURT:  Good.  Okay.  Great.

24             Damages.  If you find that PPD discriminated

25   against Dr. Menninger based on her disability or retaliated

1    against her for engaging in protected activities, then you

2    must determine whether it has caused Dr. Menninger damages,

3    and if so, you must determine the amount of those damages.

4    In addition to proving her claims, except where I instruct

5    you otherwise, she bears the burden to prove her damages by a

6    preponderance of the evidence.

7         Uncertainty in the amount of damages does not bar

8    recovery, and mathematical precision is not required.

9    However, you must not speculate, conjecture, or guess in

10   awarding damages.  The award is acceptable, as long as it is

11   based on just and reasonable inferences from the evidence.

12   You will reach the damages issue only if you find that PPD is

13   liable to Dr. Menninger for discrimination or retaliation or

14   both.

15        The fact that I am instructing you on damages does

16   not mean that I am attempting in any way to suggest to you

17   what your verdict should be.  Any suggestion from any of the

18   lawyers in this case during opening or closing statements as

19   to the value of this case or the amount of damages you should

20   award is not evidence, and is not binding upon you in any

21   way.  If you award damages, you should do so in accordance

22   with my instructions and based on your determination of an

23   appropriate damage award.

24        The categories of damages that you may consider

25   awarding to Dr. Menninger, if you find that PPD is liable to

1    Dr. Menninger, are as follows:

2         One, back pay; two, front pay; three, emotional

3    distress; and four, punitive damages.

4         I will now instruct you as to each of these

5    categories.

6         Back pay.  If you determine that PPD discriminated

7    against Dr. Menninger based on a disability, or retaliated

8    against her for requesting an accommodation of a disability,

9    then Dr. Menninger may be entitled to recover back pay, which

10   is the amount of the lost salary, bonuses, equity, the value

11   of employment benefits and health insurance benefits that

12   Dr. Menninger would have received, but for PPD's

13   discriminatory or retaliatory conduct, from the date of the

14   adverse employment decision or the failure to provide a

15   reasonable accommodation until today.

16        The plaintiff has a duty to limit or,

17   quote/unquote, mitigate her damages by seeking other

18   comparable employment.  A comparable job is one that offers

19   similar compensation, long-term benefits, opportunities for

20   promotion, job responsibilities, working conditions, and

21   status.  However, if you find that Dr. Menninger was unable

22   to mitigate her damages because PPD's discriminatory and/or

23   retaliatory conduct caused her to be unable to perform

24   comparable work, then so long as you find that to be the

25   case, Dr. Menninger does not have a mitigation duty, and you

1     should not reduce her recovery for that period of time.

2          If and only if you find that some at point in time

3     Dr. Menninger was able to perform comparable work, then it is

4     still PPD's burden to prove to you that Dr. Menninger failed

5     in her duty to mitigate damages by seeking other comparable

6     employment.  PPD meets this burden only if it is proven to

7     you that:

8          One, one or more discoverable opportunities for

9     comparable employment were available in a location at least

10    as convenient as the place of former employment; two,

11    Dr. Menninger unreasonably made no attempt to apply for any

12    such job; and three, it was reasonably likely that

13    Dr. Menninger would have obtained one of those comparable

14    jobs.

15         The duty of mitigation does not require plaintiff

16    to go into another line of work, accept a demotion, or take a

17    demeaning position.  If PPD has proven the three elements of

18    mitigation that I have just read to you, then you should

19    reduce any back pay awards to Dr. Menninger by the amount

20    that PPD has proven that she could've earned in wages and

21    benefits at the comparable job.

22         Please write the amount of back pay, if any, that

23    you award to Dr. Menninger on Question 4A of the verdict

24    form.

25         Front pay.  If you determine that PPD discriminated

1     against Dr. Menninger based on a disability or retaliated

2     against her for requesting accommodation of a disability,

3     then you must also calculate separately, as future damages, a

4     monetary amount equal to the present value of the wages and

5     benefits that Dr. Menninger reasonably would have earned in

6     the future in her employment with PPD, but for PPD's

7     discrimination and/or retaliation against Dr. Menninger,

8     minus the amount of wages and benefits that Dr. Menninger may

9     reasonably be expected to earn in the future via other

10    comparable employment.

11            You cannot speculate in awarding front pay.

12    Rather, the determination of the amount of the award, if any,

13    must be proven with reasonable certainty.  In determining

14    front pay, you should consider and weigh the following

15    factors:

16            One, the availability of other comparable

17    employment opportunities; two, Dr. Menninger's probable date

18    of retirement or date of future employment; three, the amount

19    of earnings, including salary and benefits, that

20    Dr. Menninger probably would have received between now and

21    her projected retirement date or date of future comparable

22    employment; and four, the possibility of inflation and wage

23    increases in the future.

24            If you award damage to Dr. Menninger for losses she

25    will suffer in the future, keep in mind that the plaintiff

Case: 23-2030 Case: 19-1044 Document: 1661 Document: 185 Filed: 03/31/23 Date: 04/06/2023 Page: 123 of 138 Entry ID: 6634402

113

1   cannot be awarded damages that overcompensate the losses that

2   she suffered because of the defendant's conduct.  In order to

3   avoid overpaying Dr. Menninger, you must consider that the

4   amount of money you give her today for future losses can be

5   put in the bank, where it can earn interest.  So in making an

6   award for future damages, you must determine the amount of

7   money, that, if invested today at a reasonable rate of

8   interest, would in the future provide Dr. Menninger with the

9   amount of money that you calculated she will lose in the

10  future as a result of PPD's conduct.

11          Please write the amount of front pay, if any, that

12  you award to Dr. Menninger on Question 4B of the verdict

13  form.

14          You have -- collateral sources.  You have heard

15  testimony that Dr. Menninger received compensation from

16  sources such as short- or long-term disability insurance,

17  Social Security Disability benefits, and unemployment

18  insurance.  These are considered, quote/unquote, collateral

19  source payments under a principle called the collateral

20  source rule.  Ordinarily, under that rule, you do not deduct

21  these collateral source payments from the amount of front or

22  back pay that you decide to award to the plaintiff, unless

23  you find that there are countervailing circumstances that

24  would make it unjust to apply the collateral source rule.

25  The mere fact that the plaintiff may receive a double

1    recovery is not alone enough to justify a deduct in the

2    collateral source payments from the front or back pay award.

3         Emotional distress damages.  Third, if you find

4    that Dr. Menninger has been discriminated against, retaliated

5    against, or both, you may also award her reasonable damages

6    for her physical and emotional distress.  Physical and

7    emotional distress includes pain, discomfort, indignity,

8    depression, fear, anxiety, or humiliation, suffered as a

9    result of the discrimination, retaliation, or both.  Although

10   uncertainty in the amount of damages does not bar discovery

11   and mathematical precision is not required, you must not

12   speculate, conjecture, or guess in awarding damages.

13        To recover for physical and emotional distress,

14   Dr. Menninger may, but is not required to, present evidence

15   of physical injury or physical manifestation of her distress,

16   nor is she required to show that she sought psychiatric

17   consultation.  That said, an award of emotional distress

18   damages must rest on substantial evidence, and its factual

19   basis must be made clear on the record.  Some factor that is

20   you should consider include, but are not limited to:

21             One, the nature and character of the alleged harm;

22             Two, the severity of the harm;

23             Three, the length of time that Dr. Menninger has

24   suffered and reasonably expects to suffer;

25             And four, whether Dr. Menninger has attempted to

1    mitigate the harm, for example, by counseling or by taking

2    medication.

3           In addition, Dr. Menninger must show a sufficient

4    causal connection between PPD's unlawful acts and her

5    emotional distress.  Dr. Menninger is not entitled to

6    compensation for any emotional distress or related symptoms

7    which preexisted PPD's actions.  She is entitled to full

8    compensation for the full emotional distress that you find

9    that PPD caused her, even if it is greater than what a

10   reasonable person in her position would suffer, including

11   exacerbation of preexisting symptoms.

12          In other words, she is entitled to full

13   compensation for the increase in her anxiety, depression, or

14   other distress that is caused by PPD's unlawful actions, even

15   if you determine that an average person in her situation

16   would not have experienced the same level of emotional

17   stress.  However, she is not entitled to compensation for

18   emotional distress that arises from causes other than PPD's

19   actions.

20          You may award Dr. Menninger damages for her

21   emotional distress, even if you do not award back pay or

22   front pay.

23          For emotional stress damages you award, if any, you

24   will need to determine which portion arose up to and

25   including today and which portion, if any, she is likely to

1    suffer in the future.  Please write the amount of emotional

2    distress damages, if any, that you award to Dr. Menninger for

3    emotional stress she suffered up to today because of PPD's

4    discrimination and/or retaliation on Question 4C of the

5    verdict form.

6              Please write the amount of emotional distress

7    damages, if any, that you award to Dr. Menninger for

8    emotional distress that she is reasonably likely to suffer in

9    the future because of PPD's discrimination and/or retaliation

10   on Question 4D of the verdict form.

11             Punitive damages.  Lastly, if you find that PPD has

12   intentionally discriminated or retaliated against Dr.

13   Menninger, or both, you may consider whether punitive damages

14   are warranted.  Punitive damages are different from

15   compensatory damages.  Unlike compensatory damages, which

16   compensate the victim for the harm she has suffered, the

17   purpose of punitive damages is to punish the defendant for

18   conduct that is outrageous, because of the defendant's evil

19   motive or reckless indifference to the rights of others.

20             To find that punitive damages should be awarded,

21   you must find that more than intentional discrimination or

22   retaliation occurred.  Punitive damages may be awarded only

23   where the defendant's conduct is outrageous or egregious.

24             Punitive damages may be awarded only when

25   Dr. Menninger has proven by a preponderance of the evidence

1    that, one, the individual who engaged in the discriminatory

2    act or practice was acting in a managerial capacity; two, he

3    or she engaged in the discriminatory act or practice while

4    acting in the scope of his or her employment; and three, that

5    his or her conduct was not only intentional, but also was

6    outrageous or egregious, or that he or she acted with malice

7    or with reckless indifference to the rights of the disabled.

8          If Dr. Menninger has proved these facts, then you

9    may award punitive damages, unless PPD proves by a

10   preponderance of the evidence that the conduct or action by

11   the managerial employee was contrary to its good-faith

12   efforts to prevent discrimination in the workplace.  In

13   determining whether an employee of PPD was a supervisor or

14   manager for PPD, you should consider the type of authority

15   that he or she had over Dr. Menninger, and the type of

16   authority for employment decisions PPD authorized him or her

17   to make.

18         In determining the amount of a punitive damage

19   award, if any, you should also consider:

20         One, the egregious or outrageous character or

21   nature of PPD's conduct; PPD's wealth in order to determine

22   what amount of money is needed to punish PPD's conduct, and

23   to deter any future acts of discriminates or retaliation;

24   three, the actual harm suffered by Dr. Menninger; four, the

25   magnitude of any potential harm to other victims if similar

1    future behavior is not deterred; five, whether there was a

2    conscious or purposeful effort to demean or diminish the

3    class of which Dr. Menninger is a part, or if there was a

4    conscious or purposeful effort to demean or diminish

5    Dr. Menninger because she was a member of that class; six,

6    whether PPD was aware that the discriminatory or retaliatory

7    conduct would likely cause serious harm or recklessly

8    disregarded the likelihood that serious harm would arise;

9    seven, PPD's conduct after learning that the initial conduct

10   would likely cause harm; and eight, the duration of the

11   wrongful conduct and any concealment of that conduct by PPD.

12        If you do award punitive damages, you should fix

13   the amount by using calm discretion and sound reason.  Keep

14   in mind that you're not required to award punitive damages.

15   The amount of the award must not reflect bias, prejudice, or

16   sympathy toward any party, but the amount can be as large as

17   you believe necessary to fulfill the purpose of punitive

18   damages.

19        If you find punitive damages are warranted against

20   PPD, please answer yes to Question 4E on the verdict form,

21   and then write the amount of punitive damages you award to

22   Dr. Menninger in Question 4F.  If you find that punitive

23   damages are not warranted against PPD, please answer no to

24   Question 4E on the verdict form, and skip Question 4F.

25        So lastly, with respect to your deliberations, it's

1   almost time for you to begin those deliberations.

2          Here are a few words about that.

3          Each of you brings to your jury service your life

4   experiences and knowledge.  This serves only as a background

5   for your common sense and judgment.  In rendering your

6   verdict, you must consider only and decide the case solely

7   upon the evidence you heard in court in light of my

8   instructions.  Each of you must decide the case for yourself,

9   but you should do so only after considering all of the

10  evidence and listening to the views of your fellow jurors.

11  Do not be afraid to change your opinion if you think that you

12  are wrong after hearing the opinions of your fellow jurors,

13  but do not come to a decision simply because other jurors

14  insist that it is right, and do not surrender an honest

15  belief about the weight and effect of the evidence simply in

16  order to reach a verdict.

17         The case has taken a great deal of time and effort

18  to prepare and to try.  There is no reason to think that it

19  could have been better tried, or that another jury would be

20  better qualified than you are to decide it.  It is important,

21  therefore, that you reach a verdict if you can do so

22  conscientiously.  Your verdict must be unanimous as to each

23  of the special questions on the verdict form that I am going

24  to ask you to answer.  Your answers will be recorded on the

25  verdict slip by your foreperson.  The fact that one of you is

1    the foreperson does not give that person special status in
2    your deliberations.  You are all equal.
3            Your first order of business will be to select a
4    foreperson.  The foreperson will have the same voice and the
5    same vote as the other deliberating jurors.  The foreperson
6    will act as the moderator of the discussion and will serve as
7    the jury's spokesperson.  The foreperson's most important
8    obligation is to ensure that any juror who wishes to be heard
9    on any material issue has a full and fair opportunity to be
10   heard by his or her fellow jurors.  When the jury has reached
11   a verdict, the foreperson will fill in the appropriate
12   answers, sign and date the verdict slip, and inform the court
13   officer that the jury is read to return to the courtroom.
14           Whenever you need a recess for any purpose, your
15   foreperson may declare a recess.  Do not discuss the case
16   during a recess.  All of your discussions of the case should
17   occur only when you're all together, and your foreperson has
18   indicated that deliberations may proceed.
19           If it becomes necessary during your deliberations
20   to communicate with me, you may do so by sending a note
21   through the court officer.  The note must be signed by your
22   foreperson.  No member of the jury should ever attempt to
23   communicate with me, except by such a signed writing.
24   However, in doing so, do not tell me how you stand, either
25   numerically or otherwise, on any issue before you, until you

```
 1   have reached a verdict.
 2            On matters touching simply on the arrangements for
 3   your meals, schedule, and convenience, you are free to
 4   communicate with the court officer or Ms. Belmont orally,
 5   rather than in writing.  You are not to communicate with
 6   anyone but me about the case, however, and then only in
 7   writing.
 8            When you have reached your verdict, your foreperson
 9   should fill in, date, and sign the verdict slip to state the
10   verdict upon which you all agree.  You will then return with
11   your verdict to the courtroom.  Your verdict must be
12   unanimous; that is, you must be unanimous as to each of the
13   answers that you answer on the jury form.
14            Let me pause here.  That is the end of my
15   instructions to you.  I need to talk briefly to the lawyers
16   at sidebar for a moment before you retire to the jury room.
17   And let me explain, just logistically, one last point about
18   the exhibits, and the like.
19            So when you return to the jury room --
20            Is it already all set, Kellyann?
21            THE DEPUTY CLERK:  No.
22            THE COURT:  How long do you think it will be?  He's
23   having a problem?
24            THE DEPUTY CLERK:  Ten to 15.
25            THE COURT:  So when you retire to the jury room, in
```

1    a minute or two, you're actually not going to be able to

2    start your deliberations yet.  Let me tell you why, because

3    you're not going to have the evidence yet.  You're going to

4    have the verdict form; you're going to have the instructions

5    that I just read to you; but the exhibits aren't going to be

6    ready for you.  Let me tell you why.

7         The answer is this:  We have a digital system.

8    You've seen that TV in there?  You probably might have wanted

9    to watch like Comcast or who knows what, and you discovered

10   that it doesn't do that.  It's not connected to the Internet.

11   There's no YouTube.  There's no cable TV.  It's an internal

12   system.  And we can load, just like you've seen in court, all

13   of the exhibits, we can load the exhibits onto that.

14   Ms. Belmont is doing that.

15        Ordinarily, Ms. Belmont has it already all done

16   before now.  But there's been a little, today, snafu with the

17   technical system.  As you haven't already figured out, while

18   we have a lot of resources, we're not Microsoft, Amazon, or

19   Google.  So we're working on that.  We think in ten minutes,

20   or so, we'll have it.

21        Once we have them, you'll have a remote.

22   Ms. Belmont will show you how to use it, and you'll be able

23   to see, call up on the screen all the exhibits.  You'll also

24   have a printed index to all the exhibits.  There are a lot of

25   exhibits in this case.  You've seen a lot of them, but there

1    is also more than the ones you've seen.

2            A couple cautions about this:  One, the numbers

3    mean nothing.  I think I told you that during the trial.

4    There is no significance to the numbers that -- don't draw

5    any conclusions.  Don't draw any conclusions because there

6    could be blank numbers.  There could be missing numbers.  It

7    could be 100 to 110.  It doesn't mean anything.  There are

8    lots of different reasons throughout the case and different

9    purposes, and they're not renumbered now because that would

10   make life too difficult for the lawyers.  So don't draw any

11   conclusions about that.

12           All right.  I think that's all I have for you.

13   I'll see counsel at sidebar.

14           (The following discussion held at the bench.)

15           THE COURT:  Anything for you, Mr. Hannon?

16           MR. HANNON:  Just one clarification.  And this was

17   right here at the top of 26.

18           THE COURT:  What page?

19           MR. HANNON:  Page 26.  It's a little unclear in

20   terms of which questions you're referring to.

21           THE COURT:  Oh.

22           MR. HANNON:  So -- because this actually, oddly,

23   corresponds to what's on the verdict slip, as well.  So I

24   think you mean "Questions 1, 2, and 3(a) above."  So you say

25   that everywhere else, you just didn't say it here.  I'm fine

 1   simply making the notation on the copy that goes back with
 2   the jury.
 3            THE COURT:  Okay.  And then here (indicating).
 4            MR. HANNON:  Yes.  Yup.
 5            THE COURT:  I'm going to print eleven more copies,
 6   and we'll put that word in the printed copies.
 7            All right.  That's it for you?
 8            MR. HANNON:  That's it for me.
 9            THE COURT:  Anything for you?
10            MR. CURRAN:  Nothing.
11            MS. MANDEL:  No.
12            THE COURT:  Okay.
13            (Bench conference concluded.)
14            THE COURT:  So two more minor things.  One, you'll
15   notice on page 26, there's a handwritten word I've just
16   written in.  It's not a substantive word.  It's just a slight
17   clarification for you.  I don't think I need to explain it to
18   you, it will be more than obvious to all of you what it
19   means.  And you'll have this copy in the jury room.
20            We are going to print eleven more copies.  That's
21   my practice.  I don't wait -- the reason that I don't have
22   them right now is I wait until the very end, because
23   sometimes, like this correction that the lawyers have pointed
24   out to me about this one word that's just, like,
25   clarification.  So we'll print the eleven copies now.  The

```
 1    printed eleven copies won't have the handwritten, because
 2    they'll have it typed in.  So that will be different.  It's
 3    not significant, just so you know.  And the eleven copies
 4    will come shortly.
 5              How are we doing?
 6              THE DEPUTY CLERK:  I actually need to go downstairs
 7    to do it.
 8              THE COURT:  So what's going to happen is
 9    Ms. Belmont will take you back to the jury room, she has to
10    go downstairs because this computer is not working to create
11    the electronic copy that goes to that system.  And so -- but
12    once she brings you in, she'll go down and she'll do that,
13    and she'll be back and once it's ready and give you that.
14              You're not going to have paper copies of the
15    exhibits, because there were too many to print.  Okay?
16              All rise for the jury.  Thank you for your
17    attention.
18              (The jury exits the courtroom.)
19              THE COURT:  Have you all given your contact
20    information to Ms. Belmont?
21              MR. HANNON:  We have.
22              THE COURT:  All right.  So you're all set.
23              MR. CURRAN:  We have.
24              THE COURT:  Okay.  So I'll let you know when
25    there's a question, and if for some reason this -- loading
```

```
 1    the documents on to the system turns into some bigger problem
 2    that -- electronically, I don't know quite what the issue is,
 3    but if it isn't resolved in 10 or 15 minutes, Ms. Belmont
 4    will let you know and we'll figure out what to do.
 5              MR. HANNON:  Okay.  And you want us within five
 6    minutes?
 7              THE COURT:  Five -- well, five is great, if you can
 8    do five.  If you're offering five, accepted.  I'm surprised
 9    you offered that --
10              MR. HANNON:  It wasn't an offer, Your Honor.
11              THE COURT:  I think that was an offer.
12              MR. HANNON:  It wasn't an offer.
13              THE COURT:  Was that not an offer and acceptance
14    counsel?
15              MR. CURRAN:  We're going to stay here.
16              MS. MANDEL:  We'll be here.
17              THE COURT:  So I'm surprised, Mr. Hannon, you'd
18    make that offer, because, you know, have you read this book
19    called Never Split the Difference.
20              MR. HANNON:  I haven't, no.
21              THE COURT:  It's written by the retired FBI's lead
22    hostage negotiator, and never split the difference comes
23    from -- he says when I'm negotiating to release people and
24    they have four hostages, he can't say, you know, you can kill
25    two and I'll take two.  His answer is I want all four, plus
```

```
 1   you.  So it's all about how to negotiate with people.  He
 2   would tell you, don't start with five minutes, when what you
 3   want is 15.  So five is great, but a little more than five, I
 4   know it -- but not like a half hour.
 5              MR. HANNON:  Okay.
 6              THE COURT:  Because as soon as they get it -- as
 7   soon as we get it, I'll want to hear from all of you.
 8              MR. HANNON:  Understood.
 9              THE COURT:  So I have -- I know the case is not
10   over, but I had -- I'm fine to say something to all of you
11   about a couple of things, since I'm not the finder of fact,
12   that I don't think bears on any possible post-trial motions
13   or appeals, recognizing that at least one of you will be
14   unhappy -- well, there's a reasonable likelihood that one of
15   you would be unhappy, potentially both of you are unhappy.
16   In my experience, oftentimes when people leave the courtroom
17   and I decide things, I've left everybody unhappy.  But if you
18   want me to -- if you're okay with that, I'll do that.  If you
19   want me to do it on the record, I'll do it on the record.  If
20   you're comfortable with me doing it off the record, I'll do
21   it off the record.
22              MR. HANNON:  No difference here, Your Honor.
23              MS. MANDEL:  No difference here, as well.
24              THE COURT:  So you can be seated.  So I think I
25   would prefer to do it just for the six of you at sidebar.
```

```
 1   I'll do it off the record, and then if you want to put
 2   anything on the record afterwards, or something, we could.
 3            (Discussion held off the record.)
 4            THE COURT:  I just want to say, I had an
 5   off-the-record discussion with both counsel and their
 6   clients.  Both counsel, as I understand it, agreed to go off
 7   the record and were comfortable going off the record.  What I
 8   explained off the record was just sort of some compliments
 9   with respect to counsel's performance and their closing
10   arguments.  I made some personal comments to Dr. Menninger
11   with respect to my hope for her ability to be able to get
12   better.  I made some comments to Dr. Menninger and
13   Ms. Ballweg with respect to sort of how the system of justice
14   works and how it can be hard for people, even though we're
15   not intending it to be hard for them.  And some suggestions,
16   irrespective of the verdict, which I have no view on, as
17   to -- at the moment, as to PPD one way to learn from this is
18   try to look back and try to learn from experiences.
19            And does any of you want to add anything to the
20   record regarding what happened off the record?
21            MR. HANNON:  Nothing here, thank you.
22            MS. MANDEL:  Nothing here, thank you.
23            THE COURT:  All right.  Fine.  That's it.  Thank
24   you.
25            (Court in recess at 11:55 a.m.
```

```
 1              and reconvened at 3:23 p.m.)
 2                         VERDICT
 3         THE COURT:  So we have a verdict, I understand.
 4         So, Kellyann, go get the jury.
 5         Do you need to wait for Ms. Ballweg or no?
 6         MS. MANDEL:  No.  She had to get on her flight
 7    home, so --
 8         THE COURT:  Okay.
 9         (Pause in proceedings.)
10         (Jury present.)
11         THE COURT:  Ladies and gentlemen, I understand you
12    have a verdict.  All right.
13         JUROR:  Yes.
14         THE COURT:  Okay.  Ms. Belmont, if you would get
15    the verdict form.
16         Careful.
17         Okay.
18         THE DEPUTY CLERK:  Ladies and gentlemen of the
19    jury, please listen to the verdict as it is recorded.
20              In the matter of Lisa Menninger v. PPD Development,
21    L.P., Civil Action Number 19-11441:
22              Question 1:  Discrimination -- Failure to Provide
23    Reasonable Accommodation Claim.
24              Question 1:  Did Dr. Menninger prove by a
25    preponderance of the evidence that PPD unlawfully
```

1    discriminated against her by failing to provide her with a

2    reasonable accommodation?

3            Yes.

4            Question 2:  Discrimination -- Disparate

5    Treatment/Adverse Employment Claim.

6            Question 2A:  Did Dr. Menninger prove by a

7    preponderance of the evidence that PPD unlawfully

8    discriminated against her by taking an adverse employment

9    action against her under federal law (applying the federal

10   "but-for" causation standard)?

11           Yes.

12           Question 2B:  Did Dr. Menninger prove by a

13   preponderance of the evidence that PPD unlawfully

14   discriminated against her by taking an adverse employment

15   action against her under Massachusetts law (applying the

16   Massachusetts "determinative cause" causation standard)?

17           Yes.

18           Question 3:  Retaliation Claim.

19           Question 3A:  Did Dr. Menninger prove by a

20   preponderance of the evidence that PPD unlawfully retaliated

21   against her under federal law (applying the federal "but-for"

22   causation standard)?

23           Yes.

24           Question 3B:  Did Dr. Menninger prove by a

25   preponderance of the evidence that PPD unlawfully retaliated

1   against her under Massachusetts law (applying the

2   Massachusetts "determinative cause" causation standard)?

3           Yes.

4           Question 4:  Damages.

5           Question 4A:  Enter below the amount of "back pay,"

6   if any, that Dr. Menninger proved by a preponderance of the

7   evidence that she lost because of PPD's disability

8   discrimination and/or retaliation.

9           1,565,000.

10           Question B:  Enter below the amount of "front pay,"

11   if any, that Dr. Menninger proved by a preponderance of the

12   evidence that she will lose because of PPD's disability

13   discrimination and/or retaliation.

14           $5,465,000.

15           Question 4C:  Enter below the amount of damages for

16   emotional distress, if any, that Dr. Menninger proved by a

17   preponderance of the evidence that she suffered up to today

18   because of PPD's disability discrimination and/or

19   retaliation.

20           $5 million.

21           Question 4D:  Enter below the amount of damages for

22   emotional distress, if any, that Dr. Menninger proved by a

23   preponderance of the evidence that she is reasonably likely

24   to suffer in the future because of PPD's disability

25   discrimination and/or retaliation.

```
 1              $2 million.

 2              Question 4E:  Do you find that punitive damages are

 3    warranted against PPD?

 4              Yes.

 5              Question 4F:  Enter below the amount of punitive

 6    damages that you award to Dr. Menninger.

 7              $10 million.

 8              Signed by the foreperson and dated March 31, 2023.

 9              So say you, Mr. Foreperson?

10              JUROR:  Yes.

11              THE DEPUTY CLERK:  So say you all members of the

12    jury?

13              THE JURY:  Yes.

14              THE COURT:  Ms. Mandel, do you wish the jury be

15    polled?

16              MS. MANDEL:  Yes, Your Honor.

17              THE COURT:  All right.  Ms. Belmont, if you would

18    poll the jury.

19              THE DEPUTY CLERK:  So, ladies and gentlemen of the

20    jury, please listen for your juror number.  When it is

21    called, please indicate whether you agree with the verdict as

22    it has been recorded.

23              Juror Number 2.

24              JUROR:  Yes.

25              THE DEPUTY CLERK:  Juror Number 35.
```

```
 1                    JUROR:  Yes.

 2                    THE DEPUTY CLERK:  Juror Number 30.

 3                    JUROR:  Yes.

 4                    THE DEPUTY CLERK:  Juror Number 7.

 5                    JUROR:  Yes.

 6                    THE DEPUTY CLERK:  Juror Number 32.

 7                    JUROR:  Yes.

 8                    THE DEPUTY CLERK:  Juror Number 12.

 9                    JUROR:  Yes.

10                    THE DEPUTY CLERK:  Juror Number 33.

11                    JUROR:  Yes.

12                    THE DEPUTY CLERK:  Juror Number 34.

13                    JUROR:  Yes.

14                    THE DEPUTY CLERK:  Juror Number 16.

15                    JUROR:  Yes.

16                    THE DEPUTY CLERK:  Juror Number 24.

17                    JUROR:  Yes.

18                    THE DEPUTY CLERK:  And Juror Number 27.

19                    JUROR:  Yes.

20                    THE COURT:  All right.  Do either of you have any

21      business which you think we need to do with the jury?

22                    MR. HANNON:  Nothing here, Your Honor.

23                    MS. MANDEL:  No, Your Honor.

24                    THE COURT:  All right.  Ladies and gentlemen of the

25      jury, thank you very much for your service.  Thank you very
```

 1   much for your time and your attention during these two weeks.

 2   You are now discharged from jury service, and you're free to

 3   go.  You are free from my instructions to you of don't

 4   discuss the case, obviously, among yourselves or with anyone

 5   else.  You can do that.

 6          I do have one suggestion, one request.  The

 7   suggestion is that you -- simply, the conversations that you

 8   all had among yourselves in the jury room, you -- that's for

 9   your own decision as what to do about them, but I suggest to

10   people that they keep that among themselves, that there's --

11   that's just -- you don't have to.  There's no court rule that

12   says you can't.

13          The lawyers are not allowed to talk to you about it

14   without my permission, but -- which they haven't asked and I

15   haven't given.  But you're not limited from talking about it;

16   on the other hand, I suggest you respect sort of each other

17   in terms of the joint decision you came to.

18          And then the request I have is simply, while you're

19   done with me, you're free of me and any of my directions or

20   instructions, my request is you wait a few minutes.  I have a

21   minute or two with the lawyers, and then I will come back,

22   and I just like to thank jurors personally for the time and

23   service that you've rendered.

24          And now, though you're no longer a jury,

25   nonetheless, out of respect for your service and your

```
 1    verdict, we all rise for the jury.
 2                (Jury not present.)
 3                THE COURT:  Two things -- one, anything else to be
 4    addressed before we stand in recess?
 5                MR. HANNON:  Just in terms of timing for an
 6    application for attorney's fees, we -- there could be a
 7    judgment first and then the application and then an amended
 8    judgment with the attorney's fees, or do you want to hold on
 9    the judgment while we do the application for attorney's fees?
10                THE COURT:  I don't care.  I could enter a final
11    judgment on Monday that had the -- the verdict, we'll enter
12    today.  The final judgment, there's more claims in the case
13    than were resolved by the jury, so the final would encompass
14    the jury's verdict plus the other claims that I ruled out at
15    summary judgment, if I ruled the claims out or just issues,
16    but whatever.
17                And then -- so I'm indifferent.  I'm happy to wait,
18    do the application for fees, and then include that, or I
19    could do an amended, whatever you prefer.
20                MR. HANNON:  I think it would be easier just to
21    wait for the fees, but --
22                THE COURT:  Fine.  So we'll enter the verdict, but
23    we won't enter judgment.  So you-all set a date when you want
24    to file your motion.
25                MR. HANNON:  Ten days?
```

```
 1                THE COURT:  Fine.  No problem.
 2                MR. HANNON:  I'm a terrible negotiator.
 3                THE COURT:  I don't believe that, but -- but
 4      nonetheless, if you want more --
 5                MR. HANNON:  No.  Ten days is good, Your Honor.
 6      Thank you.
 7                THE COURT:  Fine.  I'll say two weeks to respond,
 8      and if you need more time, then you can.
 9                Is there anything else to address at the moment?
10                MS. MANDEL:  Not at the moment.
11                THE COURT:  All right.  Fine.
12                I -- it's my practice to go back and thank the
13      jurors and to ask them if they have suggestions in two ways.
14      I don't talk to them about their decision.  I tell them I
15      meant what I said.  I'm really not interested -- it's their
16      verdict and for them to decide.  I do ask them if they have
17      suggestions for us and suggestions for lawyers.
18                If I hear anything, if you stick around, I'm happy
19      to share what they said with you, but you don't have to stick
20      around.  It's up to you, and I won't tell them whether you
21      stick around or not.  I just tell you that so, if you want
22      to, you can wait and I'll come back.
23                I meant what I said at sidebar, I thought -- what I
24      told you all before the verdict.  I told you before, I had no
25      idea what they would do, and I often don't; but in any event,
```

```
 1    that's where it stands.

 2                Is there anything else?

 3                MR. HANNON:  Nothing here, Your Honor.

 4                MS. MANDEL:  Nothing here.

 5                THE COURT:  All right.  Should I come back out or

 6    not?  I'll only come back out if you're going to wait.

 7                MR. HANNON:  I'll wait, Your Honor.

 8                MR. CURRAN:  We'll wait, Your Honor.

 9                THE COURT:  Fine.  I'll be back in a few.

10                (Court in recess at 3:36 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T I O N

 2

 3

 4          I certify that the foregoing is a correct

 5   transcript of the record of proceedings in the above-entitled

 6   matter to the best of my skill and ability.

 7

 8

 9

10   /s/ Rachel M. Lopez                    March 28, 2023

11   /s/ Robert W. Paschal

12

13

14   _____         _____

15   Rachel M. Lopez, CRR             Date

16   Robert W. Paschal, CRR, RMR

17   Official Court Reporters

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

LISA MENNINGER,

                Plaintiff,

v.

PPD DEVELOPMENT, L.P.,

                Defendant.

Civil Action No.  1:19-CV-11441-LTS

*Leave to File Granted on May 18, 2023*

**DEFENDANT'S COMBINED MEMORANDUM OF LAW IN SUPPORT OF ITS**
**RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION**
**<u>FOR A NEW TRIAL OR, IN THE ALTERNATIVE, REMITTITUR</u>**

135880656_41

**JA1869**

**TABLE OF CONTENTS**

<div align="right"><u>Page</u></div>

INTRODUCTION ................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................. 5

I.     PPD HIRES MENNINGER TO RUN ITS LABORATORIES AND
ENGAGE IN A VARIETY OF PUBLIC-FACING ACTIVITIES. ............................ 5

II.    MENNINGER INFORMS PPD OF HER MENTAL DISABILITY AND
PPD ATTEMPTS TO REASONABLY ACCOMMODATE HER;
MENNINGER ABANDONS HER POSITION AND SUES PPD. ......................... 6

III.   THE COURT GRANTS PARTIAL SUMMARY JUDGMENT THAT
PPD ENGAGED IN A GOOD FAITH INTERACTIVE PROCESS AND
DID NOT FOSTER A DELIBERATE PLAN TO REMOVE
MENNINGER, BUT SENDS THE CASE TO A JURY THAT
AWARDS MENNINGER $24 MILLION. ................................................... 9

ARGUMENT ON RULE 50(B) MOTION ....................................................... 11

I.     THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF
LAW IN FAVOR OF PPD AS TO MENNINGER'S
DISCRIMINATION CLAIMS. .................................................................. 11

     A.    The Trial Record Forecloses a Jury Finding That Menninger Was
a Qualified Disabled Person Under State or Federal Law, Thus
Defeating Both Discrimination Claims .......................................... 12

     B.    Menninger Failed to Demonstrate That PPD Refused To Provide
Her With Any Requested Reasonable Accommodations. .................. 17

     C.    Menninger Failed to Establish That She Suffered an Adverse
Employment Action by PPD Because of Her Disability. .................. 19

II.    THE COURT SHOULD GRANT JUDGMENT IN FAVOR OF PPD ON
MENNINGER'S RETALIATION CLAIMS BECAUSE SHE FAILED
TO PROVE ANY ADVERSE ACTION CAUSALLY CONNECTED
TO A PROTECTED ACTIVITY. .............................................................. 23

     A.    Menninger Did Not Present Sufficient Evidence That PPD Tried
to Coerce Her to Quit .................................................................. 24

     B.    Menninger Did Not Present Sufficient Evidence That PPD
Attempted To Manufacture Grounds For Her Termination—And

i

The Court's Legal Conclusions at Summary Judgement Foreclose Such A Finding. ............................................................. 25

C.   Menninger Failed To Establish That PPD Refused To Clarify The Anticipated Changes To Her Role—And Her Own Evidence Disproves It. ..................................................................... 25

D.   Menninger Did Not Present Sufficient Evidence That PPD Established Unrealistic Expectations For Her Role. ..................... 26

E.   Menninger Did Not Present Sufficient Evidence That PPD Excluded Her From Hiring and Recruiting Decisions. .................. 26

F.   Menninger Did Not Present Sufficient Evidence That PPD Conducted A "Sham" Investigation Of Her Complaints. .............. 26

III.   THE COURT SHOULD STRIKE THE PUNITIVE DAMAGES AWARD BECAUSE IT IS EXCESSIVE, UNSUPPORTED BY EVIDENCE, AND CONTRARY TO LAW. ........................................... 28

ARGUMENT ON MOTION FOR NEW TRIAL ................................................ 32

I.   THE COURT SHOULD ORDER A NEW TRIAL BECAUSE THE COMPENSATORY DAMAGES AWARD IS EXCESSIVE AND NOT SUPPORTED BY THE EVIDENCE. ........................................................ 32

A.   The Jury's Award of Nearly $5.5 Million in Front Pay Is Excessive, Not Supported by the Evidence, And Contradicted By The Verdict. .......................................................... 33

B.   The Jury's Award Of $7 Million For Emotional Distress Damages Is Excessive And Untethered To PPD's Conduct. ........... 35

II.   THE COURT SHOULD ORDER A NEW TRIAL DUE TO INSTRUCTIONAL ERRORS THAT TAINTED THE VERDICT ................... 36

III.   THE COURT SHOULD ORDER A NEW TRIAL BECAUSE MENNINGER'S LEGALLY DEFICIENT DISCRIMINATION CLAIMS TAINTED THE JURY'S EVALUATION OF HER RETALIATION CLAIMS ......................................................................... 38

ARGUMENT ON REMITTITUR ........................................................................ 39

CONCLUSION .................................................................................................. 40

135880656_41

# INTRODUCTION

In every critical respect, the evidence at trial was clear and not genuinely disputed. Even before PPD Development, L.P. ("PPD") had any knowledge of Plaintiff Dr. Lisa Menninger's ("Menninger") emotional disorder, it informed her in December 2017 of the need to increase her focus on client outreach and business development due to the evolving needs of the company and growing client demands. As PPD explained, these expectations applied to senior management generally, not just Menninger. Nor were these responsibilities new to Menninger herself. Indeed, they comprised the first two "Essential Functions" listed in her job description when she joined PPD as its Executive Director of Global Laboratories in August 2015.

Several weeks after being informed of the need for increased client engagement, Menninger informed PPD of her mental disabilities for the very first time. Menninger's psychiatrist wrote to PPD, in no uncertain terms, that "any changes to [Menninger's] role that increase the need for public speaking and/or social interactions . . . would make it substantially more difficult, if not impossible, for [her] to perform her job." In other words, Menninger's doctor told PPD that Menninger was incapable of participating in the client outreach and business development that PPD needed. Instead, Menninger requested that PPD hire a second qualified employee, or burden an existing one, to stand in for Menninger in critical public-facing roles, including during almost all client interactions. While the facial unreasonableness of this request strongly suggested that a reasonable accommodation would not be possible, PPD nonetheless initiated a dialogue with Menninger in an effort to accommodate her as best it could. Those discussions abruptly ended due to Menninger's request that they be postponed indefinitely. Menninger does not contend, and the record does not suggest, that PPD required Menninger to perform *any* task she felt unable to perform. Yet Menninger claimed that this interactive process (which the law mandated) itself caused her significant emotional distress. In light of that distress,

1

she requested, and PPD granted, six months of paid medical leave. It was not until two months after her paid leave had ended, when Menninger still had not returned to work and informed PPD she had no intention of doing so, that PPD finally ended her employment. At summary judgment, the Court ruled that PPD had undisputedly engaged in a good-faith effort to accommodate Menninger and that its termination of her employment was entirely unrelated to her disability. Nonetheless, based on these same facts, the jury awarded Menninger $24 million in damages, including *$10 million in punitive damages*.

Because no reasonable interpretation of the trial record supports a verdict for Menninger, PPD is entitled to the entry of judgment in its favor. Several critical, undisputed facts underscore why. For instance, Menninger's psychiatrist requested five accommodations for Menninger's disability: (1) a "reader" to give all internal "town hall" and Senior Leadership Team presentations on Menninger's behalf; (2) a "surrogate or reader" to give all client presentations and attend client meetings or phone calls involving more than two persons; (3) a "surrogate" to give all technical sales presentations to PPD personnel or clients; (4) a "surrogate" to attend all client visits and social gatherings; and (5) a reduced travel schedule (typically required to perform on-site laboratory visits). PPD readily accepted the first and fifth requests. The three requests to hire a "surrogate" to interact with and present to clients, however, went far beyond what the law requires—and for good reason. For the "surrogate" to be effective in developing business, PPD would, in effect, have had to employ a second Executive Director, capable of engaging with sophisticated clients and presenting on complex medical issues concerning PPD's offerings, for the sole purpose of performing *Menninger's* job responsibilities.

Menninger's case rests on her claim that PPD's failure to accept these requested accommodations was unlawful. The law says otherwise: "[A]n employer is not required to assign

135880656_41

existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability." *Krennerich v. Inhabitants of Town of Bristol*, 943 F. Supp. 1345, 1351 (D. Me. 1996) (internal quotation omitted).   Despite her unreasonable demands, PPD did not end its dialogue with Menninger.   Instead, it asked Menninger to suggest other accommodations that might enable her (rather than a "surrogate") to perform the necessary public-facing responsibilities.   It was at this point that Menninger summarily cut short the discussions.   Rather than respond with other ideas for accommodation, Menninger requested that she and PPD table their discussions indefinitely. Shortly thereafter, she went on six months of paid medical leave.   Only when Menninger expressed no intention of ever returning to work did PPD end her employment.

These undisputed facts, most of which come directly from Menninger and her psychiatrists' testimony at trial and contemporaneous statements, preclude a finding that any reasonable accommodation would have permitted Menninger to perform the essential functions of her job.   And, even if such a reasonable accommodation were conceivable, Menninger failed to satisfy her burden of showing that she both proposed, and PPD rejected, it during her employment.   Nor did Menninger produce evidence that she ever experienced an adverse employment action—let alone an adverse employment action taken *because of* her mental disability.   Indeed, the record does not support a finding that *any* harm Menninger may have experienced was actually caused by PPD's allegedly unlawful conduct, rather than by the debilitating symptoms that define her underlying condition.   In short, the trial record confirms that Menninger's claims never should have gone to the jury.

Even apart from its untenable finding of liability, the jury's outsized award of $24 million must be set aside.   Not only is the award excessive to the point of being unmatched in any

135880656_41

comparable case—it is internally inconsistent and otherwise unsupported by the evidence. For instance, the jury's front pay award of nearly $5.5 million cannot be reconciled with its own verdict. Menninger cannot be a "qualified handicapped person" capable of performing the demanding role of Executive Director at PPD and, at the same time, so fragile that the legally required dialogue about accommodations rendered her incapable of performing any gainful employment for the next eighteen years of her life. Yet the jury's verdict presupposes both.

The jury's $10 million punitive damages award is even more egregious. At trial, the Court rightfully expressed hesitancy to even instruct the jury on punitive damages—emphasizing during the charging conference that, if punitive damages were awarded, the Court would "entertain, seriously, a motion" challenging the award and consider "tak[ing] it away." (Doc. No. 159 at 171:24-172:7, 173:7-19.) It should do so now. Punitive damages require a showing that PPD's actions were not merely actionable, but willful, maliciously motivated, outrageous, or recklessly indifferent to Menninger's fundamental rights. Nothing in the trial record even remotely supports such a finding. To the contrary, the evidence establishes that PPD attempted to accommodate Menninger, kept the lines of communication open, provided a lengthy medical leave, and did not end Menninger's employment until she expressed no intention of ever returning to work. This Court's prior finding that PPD engaged in a good faith effort to accommodate Menninger (Doc. No. 81 at 12 ("Order")) is irreconcilable with the jury's award of punitive damages.

It is evident that the jury had great sympathy for Menninger and her condition. But that sympathy appears to have blinded the jury to the legal standards it was required to apply. Now that we have seen the entirety of Menninger's evidence, there is no doubt that the jury's verdict is excessive and inconsistent with the evidence at trial. It should be set aside. Judgment should be entered for PPD, or a new trial ordered, or at the very least the punitive damages award should be

135880656_41

set aside and other excessive damages award significantly reduced.

## FACTUAL AND PROCEDURAL BACKGROUND

I.    **PPD Hires Menninger to Run its Laboratories and Engage in a Variety of Public-Facing Activities.**

In August 2015, PPD hired Menninger as the Executive Director for Laboratory Operations for its Global Central laboratories.  (Doc. No. 151 at 164:2-4, 167:11.)  Her written job description outlined six "Essential Functions," the first two of which included: "business development," "operational leadership," and "Support[ing] Business Development in obtaining new customers and maintaining [client] relationships."   (Ex. 350.)   The position also expressly required Menninger to possess "Excellent communication/***interpersonal skills with [the] ability to participate in business development activities***," to "***present capabilities and solutions to clients***, respond to regulatory audits, prepare ***and present*** budgets/forecasts to senior management," to have "***Excellent marketing and negotiation skills***," and to frequently interact with others.  (*Id.* (emphasis added).)

Approximately one year after Menninger was hired, she requested to work exclusively remotely due to family circumstances.  (Doc. No. 153 at 73:17-23.)  PPD accommodated her request, and Menninger relocated across the country in June 2017.  (Doc. No. 157 at 122:22-25, 123:2-8; Doc. No. 153 at 75:8-10.)   Approximately five months later, Menninger told her supervisor, Hacene Mekerri ("Mekerri"), that she was "overwhelmed," and Mekerri asked her to provide a list of her daily responsibilities to assess how best to help her manage them.  (Doc. No. 155 at 67:21-68:6; Doc. No. 151 at 178:1-4; Ex. 378.)  At this time, Mekerri also received mixed feedback about Menninger's performance from several colleagues.  (Exs. 372-75, 377.)   In December 2017, Mekerri discussed these and other related issues with Menninger during her annual performance review.  (Doc. No. 152 at 32:19-22, 33:2-13.)

5

Menninger admitted at trial (and the Court similarly found in its ruling on summary judgment) that during their December 2017 meeting, before Menninger had informed PPD of her disability, Mekerri informed Menninger that PPD "was bolstering efforts to encourage more visibility and productivity among its senior leadership to increase sales and support business development." (Order at 3 (citation omitted); *see also* Doc. No. 152 at 32:19-33:5.) The trial testimony likewise confirmed that Mekerri had informed Menninger that this shift in emphasis was in response to the evolving "needs of the business" and that "it was the same way with [Menninger's] peers as well." (Doc. No. 157 at 138, 140, 145, 152-53, 169.)

## II.    Menninger Informs PPD of Her Mental Disability and PPD Attempts to Reasonably Accommodate Her; Menninger Abandons Her Position and Sues PPD.

On January 11, 2018, several weeks *after* PPD informed Menninger of the need to be more public facing, Menninger told PPD for the first time that she suffered from emotional and psychological disorders and would not be able to perform the public-facing responsibilities of her role. (Doc. No. 152 at 43:7-21, 44:5-25.) PPD immediately connected Menninger with its Human Resources department, which provided her with PPD's disability accommodation request form. (Ex. 201.) As the jury heard, according to both Menninger and her psychiatrist, Dr. Kessimian, Menninger's mental health continued to deteriorate significantly at this time. (Doc. No. 153 at 155-58.) She was engaged in "catastrophic thinking," did not leave the house for weeks, and struggled to get out of bed each morning. (*Id.* at 155-56.) Shortly after PPD provided Menninger with an accommodation request form, she submitted the form along with a letter from Dr. Kessimian, which stated that "***any changes*** to [Menninger's] role that increase the need for public speaking and/or social interactions" would make it "substantially more difficult, ***if not impossible*** for Lisa to perform her job." (Doc. No. 153 at 105:1-17, 110:4-8; Ex. 405 (emphasis added).)

Menninger subsequently requested additional information on PPD's expectations going

6

135880656_41

JA1877

forward.  (Ex. 201.)  In response, Mekerri sent an email to Menninger in early February 2018 listing five categories of public-facing responsibilities: (1) Senior leadership team presentations, "Town Hall" meetings, and meetings with the Chief Operating Officer and Executive Vice President ("Bi-weekly, monthly and/or quarterly"); (2) "Client Bid Defense," "Issue resolution calls," meetings at Highland Heights Laboratory, and client meetings in-person and by phone ("Once a month at a minimum [per] client"); (3) "Technical Sales presentation[s] internal and external," including client presentations in-person and over the phone ("Monthly, Quarterly, as needed"); (4) meals and "social interactions" during "customer visits . . . in order to build business relationships" ("expected 60-80% of the time"); and (5) "Travels" ("Up to 30%").  (Ex. 350.)  Mekerri also explained: "As you already know, the percentage/scope of interactions, internal or external, is increasing in 2018 due to the needs of the business and our aggressive commercial goals."  (*Id.*)  Menninger does not dispute that she was already engaged in each of these responsibilities to some extent.  (Doc. No. 151 at 182:24-183:11.)

Menninger's psychiatrist responded by making five accommodation requests related to each of these categories: (1) a "reader" (i.e., surrogate employee) to give all internal town hall and Senior Leadership Team presentations on Menninger's behalf (acknowledging that this would require PPD to prohibit real-time questions); (2) a "surrogate"  employee to give all client presentations and attend client meetings or phone calls involving more than two persons; (3) a "surrogate" employee to give all technical sales presentations, including to PPD's clients and Menninger's colleagues; (4) a "surrogate" employee to attend all client visits and social gatherings; and (5) a reduced travel schedule (typically required for on-site laboratory visits).  (Ex. 48.)

PPD accepted the first and fifth of these requests, permitting Menninger to forego giving many internal presentations and agreeing to significantly reduce her travel.  (Ex. 182.)  PPD

7

135880656_41

**JA1878**

declined, however, to accept the other three requests, explaining that those responsibilities for engaging with PPD's clients "are critical for your level and for the growth of the business." (*Id.*) Shortly thereafter, on February 28, 2018, Menninger met with Mekerri and PPD's Associate Director of HR to discuss next steps. (Doc. No. 152 at 68:18-69:13.) During the meeting, the HR Associate Director proposed the possibility of transitioning to a consultant role, which would not require public-facing responsibilities, or an exit package. (*Id.* at 69:15-70:21.) Menninger declined and requested additional detail regarding PPD's denial of the three requested accommodations. (*Id.* at 70:22-71:9.) PPD referred to the job description applicable to the role for which she was hired, and stated that "it is not reasonable for PPD to . . . do away with core requirements such as that you attend business development meetings, dinners, bid defenses, etc. [because] [t]hese are not 'behind the scenes' functions." (Ex. 157.) PPD asked her, however, to let it "know if there are other accommodations that would allow [her] to perform the essential functions of [her] job." (*Id.*) About a month later, Menninger emailed the HR Associate Director indicating that she was currently not being asked to do anything which she felt unable to do—*i.e.*, she was "capable of performing all of [her] responsibilities with or without accommodation"— and suggested they "table this discussion." (Ex. 271.) As Menninger testified at trial, she received an annual salary raise, effective April 1, 2018. (Doc. No. 153 at 13-14.) She also testified that she received a yearly performance bonus "every year" that she worked for PPD. (*Id.* at 14:12-14.)

Several weeks after Menninger ended their accommodation discussions, she informed PPD's HR Associate Director that she believed Mekerri was "starting to target [her] because of [her] disability." (Ex. 132.) This complaint was escalated to Deborah Ballweg, PPD's Executive Director of Human Resources, who promptly investigated. (Ex. 450.) Ballweg interviewed Menninger, PPD's Associate Director of HR, Mekerri, and three other employees—and concluded

135880656_41

that Mekerri was not targeting Menninger because of her disability.  (*Id.*)  Just over one week after her claim was unsubstantiated, Menninger informed PPD that her psychiatrist advised she take medical leave.  (Ex. 233.)  According to Menninger and her psychiatrist, the process of determining how to accommodate her disability had, itself, caused severe emotional distress requiring a medical leave.  (Exs. 459-60.)  PPD did not object, and Menninger remained on leave for the next eight months, six of which were paid.  (Ex. 90.)  Menninger then informed PPD that she did not intend to return to work.  (*Id.*)  After receiving this notification, PPD ended its employment of Menninger in February 2019.  (Doc. No. 151 at 163:23-24.)

The trial record establishes that Menninger's current replacement, Dr. Basel Kashlan, performs each of the public-facing responsibilities described in Menninger's job description and Mekerri's February 2018 email as "critical parts" of his role.  (Doc. No. 158 at 122:3-127:8.)

On June 28, 2019, Menninger sued PPD alleging disability discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA") and Chapter 151B of the Massachusetts General Laws.

### III.   The Court Grants Partial Summary Judgment that PPD Engaged in a Good Faith Interactive Process and Did Not Foster a Deliberate Plan to Remove Menninger, But Sends the Case to a Jury That Awards Menninger $24 Million.

In partially granting PPD's motion for summary judgment, the Court determined that the record was undisputed on several critical points: (1) PPD engaged in a good-faith interactive process in an attempt to reasonably accommodate Menninger's disability (Order at 12); (2) PPD did not engage in a "'deliberate plan to remove' Menninger from her position" (*id.* at 15); and (3) PPD did not lower Menninger's 2017 performance rating due to her disability, since the reduced performance rating pre-dated PPD's knowledge of her disability (*id.* at 17).

The Court then set the case for trial in order for the jury to determine the following questions: (1) whether Menninger was a "qualified handicapped person" capable of performing

9

135880656_41

JA1880

the essential functions of her job (*id.* at 10-11); (2) whether any of the following constituted an unlawful adverse action: (a) Mekerri's February 2018 email outlining five categories of public-facing responsibilities in response to Menninger's request for additional detail on PDD's expectations for 2018 (*id.* at 14-15); (b) PPD's HR director proposing the possibility of a severance package or transitioning to a consultant role, which would not require public-facing responsibilities (*id.* at 16-18); (c) PPD allegedly "exclud[ing] Menninger from hiring and recruiting decisions within her unit" after she informed Mekerri that she felt "overwhelmed" in 2017 (*id.* at 3, 18); or (d) PPD allegedly conducting a "sham investigation" into Menninger's complaint to HR that Mekerri was targeting her due to her disability (*id.* at 19-20).

At the close of Menninger's case, PPD challenged the sufficiency of the evidence supporting her claims, moving for a directed verdict. (Doc. No. 159 at 50:4-5.)  The Court denied the motion.  (*Id.* at 50:6.)  In addition, the Court instructed the jury, over PPD's objection and despite the Court's own hesitancy, on the issue of punitive damages.  (Doc. No. 160 at 116:11-118:24; Doc. No. 159 at 171:24-172:7, 173:7-19.)

The Court also instructed the jury, over PPD's objections, that the definition of a reasonable accommodation includes the provision of a "reader."  (Doc. No. 160 at 93:22-23.)  While the statute includes the provision of "readers or interpreters" as a method for relaying information to a visually or hearing-impaired person, it does *not* suggest that it is reasonable to require an employer to hire another qualified employee to *stand in* and perform her substantive public-facing responsibilities, which is the type of "reader" Menninger requested.  42 U.S.C. § 12111(9)(B); *see also* MCAD Guidelines § III.D.  In his closing, Menninger's counsel highlighted this instruction as validating Menninger's request for a "reader."  (Doc. No. 160 at 29:19-25.)

The jury returned a verdict against PPD on both the federal and state claims of

10

135880656_41

**JA1881**

discrimination and retaliation.  (*Id.* at 129:22-131:3.)  It awarded Menninger $1,565,000 in back pay, $5,465,000 in front pay, $5,000,000 in past emotional distress, $2,000,000 for future emotional distress, and $10,000,000 in punitive damages.  (*Id.* at 131:4-132:7.)

## ARGUMENT ON RULE 50(b) MOTION

Federal Rule of Civil Procedure 50 provides that a defendant may move for judgment as a matter of law ("JMOL") if "a reasonable jury would not have a legally sufficient evidentiary basis" to find for the plaintiff on that issue.  Fed. R. Civ. P. 50(a)(1).  If the Court does not grant the motion under Rule 50(a), the defendant may renew its motion under Rule 50(b) "[n]o later than 28 days after the entry of judgment."  *Id.* at 50(b).  In response to a Rule 50(b) motion, the Court may allow the jury's verdict to stand, order a new trial, or direct the entry of judgment as a matter of law on one or more issues for which the jury's verdict lacked a legally sufficient evidentiary basis. *Id.* at 50(b)(1)-(3).  The First Circuit instructs that courts should grant the motion if "the evidence could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment" on the issue at hand.  *Primarque Prods. Co. v. Williams W. & Witts Prods. Co.*, 988 F.3d 26, 34 (1st Cir. 2021) (internal quotations and citation omitted).

## I.   The Court Should Grant Judgment as a Matter of Law in Favor of PPD as to Menninger's Discrimination Claims.

Menninger's disability discrimination claims are premised on two theories of liability under both state and federal law:[1] (1) PPD failed to reasonably accommodate her disability; and (2) PPD subjected her to disparate treatment as a result of her disability.  (Doc. No. 160 at 85:1-9.)  To prevail under either theory, Menninger was required to show that she "was a 'qualified

---

[1] As the First Circuit has explained, "Massachusetts's handicap discrimination statute [Chapter 151B] . . . is nearly identical to the ADA" and "we analyze the statute in exactly the same manner as the ADA."  *Audette v. Town of Plymouth*, 858 F.3d 13, 20 n.8 (1st Cir. 2017) (internal quotations omitted); *see also Mulloy v. Acushnet Co.*, 460 F.3d 141, 154 (1st Cir. 2006) ("[F]ederal case law construing the ADA should be followed in interpreting the Massachusetts disability law."  (internal quotation omitted)).

135880656_41

handicapped person' capable of performing the essential functions of [her] job with reasonable accommodation." *Smith v. Bell Atl.*, 63 Mass. App. Ct. 702, 711 (2005); *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 153 (1st Cir. 2009).

The evidence at trial forecloses such a finding—and thus both theories necessarily fail. Even if Menninger were able to overcome this issue (which she cannot), her discrimination claims fail for several independent reasons as well. As to her discrimination claim alleging a failure to accommodate, Menninger did not establish that PPD "refused to provide" any *reasonable* accommodations that she actually "requested," and that "as a result of this refusal, [she] suffered some harm." *Smith*, 63 Mass. App. Ct. at 711. As for her disparate treatment theory, Menninger did not show that PPD ever took "an adverse employment action against her because of, in whole or in part, her protected disability." *Sensing*, 575 F.3d at 154 (quoting *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002)). Each of these fatal shortcomings is described in turn.

### A. The Trial Record Forecloses a Jury Finding That Menninger Was a Qualified Disabled Person Under State or Federal Law, Thus Defeating Both Discrimination Claims.

There is no violation of discrimination law unless the disabled employee is *otherwise qualified* for the employment position in question. *See Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 126 (1st Cir. 2017). Both state and federal law define a "qualified" disabled person as one who is capable of performing the "essential functions" of the employment position with or without a reasonable accommodation. 42 U.S.C. § 12111(8); Mass. Gen. Laws c. 151B, §§ 4, 1(16). A disabled employee who *cannot* fulfill her essential job functions, even with reasonable accommodation, is not a "qualified individual" and thus discrimination law does not apply. *Pena v. Honeywell Int'l, Inc.*, 923 F.3d 18, 27 (1st Cir. 2019).

An "essential function" is a "fundamental job duty," including any "individual or idiosyncratic characteristics of the job." *Kvorjak v. Maine*, 259 F.3d 48, 55 (1st Cir. 2001) (internal

12

quotations and citations omitted).  Courts routinely hold that an employer's "view of [the employee's] job requirements" is owed "substantial weight."  *Mulloy v. Acushnet Co.*, 460 F.3d 141, 150 (1st Cir. 2006); *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997).  This deference to the employer's determination takes into account the employer's unparalleled insight into what tasks are necessary, and how to allocate them among positions, to best serve the company's needs.  Such deference also reflects the general principle that, even in employment discrimination law, courts and juries do not sit as "super personnel departments."  *Arroyo-Audifred v. Verizon Wireless, Inc.*, 527 F.3d 215, 221 (1st Cir. 2008).

Here, PPD's "view of [Menninger's] job requirements" was encapsulated in a job description provided to her at the time of her hiring, years before it learned of her disability.  That job description unequivocally describes her "Essential Functions" as including the following: providing "operational leadership to laboratory services," including "***business development***"; "Support[ing] ***Business Development in obtaining new customers and maintaining relationships***"; providing "***business updates to senior leadership***"; overseeing the "quality assurance and quality control aspects of the lab"; interacting "***frequently with internal personnel and outside representatives*** at various levels"; and participating and presenting "***at meetings with internal and external representatives***."  (Ex. 350 (emphasis added).)  Moreover, the Executive Director position expressly required Menninger to possess "excellent communication/***interpersonal skills with [the] ability to participate in business development activities***," to "***present capabilities and solutions to clients***, respond to regulatory audits, prepare ***and present*** budgets/forecasts to senior management," to have "***Excellent marketing and negotiation skills***," and to frequently interact with others.  (*Id.*)

13

These public-facing responsibilities, which Menninger does not dispute were always part of her role as Executive Director (Doc. No. 152 at 57:11-21, 76:1-17), were essential when Menninger was hired in 2015, and were even *more* so in 2018 due to the growing "needs of the business." (Ex. 350.) PPD required her to "be more involved": to "participate [in] client bid defense[s]," be personally "involved in the client site meetings," and "work with the team and the issue resolution [requests] coming from the clients." (Doc. No. 157 at 168.) These expectations were not unique to Menninger: "It was the same way with her peers"; it was "part of the job description" of "executives and directors" to help "find the response" to issues as they arose, by "being part of the client bid defense and support" and "part of the client site meetings." (*Id.* at 168-69; *see also id.* at 138, 140, 145, 152-53 (describing how PPD resolved to focus on these areas due to repeated feedback from clients and its sales team that increased client interactions and a strong "scientific presence," including involvement of laboratory leadership, were necessary to meet the growing demands of an expanding client base); Ex. 350; Order at 3.) Trial testimony similarly established that Menninger's current replacement, Dr. Basel Kashlan, performs each of these duties as "critical parts" of the position today. (Doc. No. 158 at 122:3-127:8.) This "experience of [the employee] who ha[s] taken over [Menninger's] job functions since h[er] termination" is an objective indicator of how the employer has defined the role and "supports the conclusion" that those functions are essential. *Mulloy*, 460 F.3d at 153.

Nonetheless, Menninger argued at trial that because these public-facing responsibilities had previously comprised a relatively small part of her day-to-day activities, they could not be deemed essential. (Doc. No. 152 at 44:7-12, 57:11-21, 76:13-17.) This argument fails for at least two legal reasons. *First*, the frequency of a task is not determinative of whether it is essential; even tasks "which are in fact rarely or *never* performed" may still be considered essential if

135880656_41

removing the function "would fundamentally change the nature of the job."  MCAD Guidelines §
II.B (emphasis added); *see also*, *e.g.*, *Cox v. New England Tel. & Tel. Co.*, 414 Mass. 375, 390
(1993) (finding that pole climbing was an essential function for telephone technicians even though
the duty was performed on relatively "few occasions").

*Second*, "past [job] performance" is not a reliable indicator of what tasks "are essential"
going forward.  *Jones v. Walgreen Co*., 679 F.3d 9, 16 (1st Cir. 2012).  The precise mix of a
position's essential tasks may—and frequently does—evolve over time, such as in response to
market dynamics and a growing client base like what occurred here.  *See*, *e.g.*, *Kvorjak*, 259 F.3d
at 55-58 (affirming dismissal of discrimination claim where employer's evolving economic needs
led it to close certain field offices, requiring plaintiff employee to undergo significantly longer
commute that caused severe pain in light of physical disability).

Even if there were room to dispute whether every aspect of these public-facing
responsibilities was essential to Menninger's position, there is no reasonable dispute that *some*
amount of increase in Menninger's public-facing responsibilities was essential to her Executive
Director role.  Indeed, the trial record shows that by the end of 2017, PPD had concluded, as it was
entitled to, that adjusting the balance of job responsibilities in favor of these public-facing roles
was essential to the company's evolving economic needs.  And the trial record shows that this
conclusion was reached *prior* to its knowledge of Menninger's disability, and that these activities
were expected not just of Menninger, but of every "executive and director" on PPD's management
team.  (Doc. No. 157 at 168-69, 138, 140, 145; Doc. No. 152 at 42:14-18; Ex. 350; Order at 3.)

Nor is it disputed that Menninger's own psychiatrist confirmed, in the clearest of terms,
that Menninger could not undertake any more social interactions to meet PPD's evolving needs:
"any changes of [Menninger's] role that increase the need for public speaking and/or social

135880656_41

interaction . . . [would] make it substantially more difficult, if not impossible for [her] to perform her job." (Doc. No. 153 at 109:24-110:8; Ex. 405.)

That central, uncontested fact is devastating to Menninger's discrimination claims. The only accommodations Menninger requested and that PPD declined were those that would have required PPD to either hire an additional employee with comparable qualifications, or burden an existing, qualified employee to fulfill Menninger's public-facing duties. (*See, e.g.*, Ex. 182.) Yet the law is clear that neither constitutes a "reasonable accommodation." Employers are not required "to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job." *Krennerich*, 943 F. Supp. at 1351 (internal quotations and citations omitted); *Laurin v. Providence Hosp.*, 150 F.3d 52, 60 (1st Cir. 1998).

Menninger's attempt to obfuscate the nature of her request by characterizing it as merely providing a "reader" cannot withstand scrutiny. A "reader," as contemplated by discrimination law, provides auxiliary support; it does not *stand in for* an employee in the exercise of critical functions requiring the same substantive knowledge and judgment for which the employee was hired. Menninger has nineteen professional licenses and certifications, including a board certification in pathology. (Ex. 3.) She has worked as a physician, staff pathologist, and laboratory director. (Doc. No. 151 at 165:18-166:19.) That experience was not incidental to her role as Executive Director of PPD's laboratory operations—it is *why* she was hired. Simply because another person can "read" Menninger's prepared notes does not mean that person could fulfill Menninger's responsibilities to engage with sophisticated clients, or present on and answer questions relating to complex medical issues. As Mekerri testified at length, client development is about *interacting with* the client, listening to their concerns, answering their questions, following up to identify opportunities for improved service, and generally providing confidence that PPD is

16

the appropriate company to handle the client's needs.  (Doc. No. 157 at 138, 140, 145, 152-53; Ex. 350.)  As common sense suggests, and PPD's client feedback confirmed—these functions can only be performed with the active involvement of someone with the appropriate skill, qualifications, experience, and familiarity with the company.  (Doc. No. 157 at 138, 140, 145, 152-53, 167-69.)

To state more fully Menninger's proposal is to refute it.  We have now seen the extent of Menninger's evidence and this much is clear: She was not a "qualified handicapped person capable of performing the essential functions of [her] job with reasonable accommodation."  *Smith*, 63 Mass. App. Ct. at 711 (citation omitted).  Based on the trial evidence, her discrimination claims (on either theory) never should have been submitted to the jury—and the Court should now enter judgment for PPD.

### B. Menninger Failed to Demonstrate That PPD Refused To Provide Her With Any Requested Reasonable Accommodations.

As described above, there is no evidence to suggest that any reasonable accommodation existed that would have permitted *Menninger* (rather than someone else) to perform the essential public-facing responsibilities of her job.  Indeed, Menninger's own psychiatrist believed firmly that no such accommodation existed, and the only option was to outsource those responsibilities to a "surrogate" (Doc. No. 153 at 109:14-110:8; Ex. 405)—which the law expressly does not require, *supra* section I.A.

Yet even if a reasonable accommodation did conceivably exist, Menninger's failure-to-accommodate theory still fails because she never proposed it to PPD during her employment.  *See Feliciano v. State of Rhode Island*, 160 F.3d 780, 787 (1st Cir. 1998) (plaintiff could not proffer accommodation at trial absent evidence "she sought the [accommodation]" during employment); *Canis v. Coca-Cola Enters., Inc.*, 49 F. Supp. 2d 73, 81 (D.R.I. 1999) ("The issue is not whether 20-20 hindsight suggests accommodations in addition to those that [defendant] considered.").

17

Instead, Menninger only ever proposed two *reasonable* accommodations—both of which PPD readily accepted, but which proved insufficient to enable Menninger to perform the responsibilities of her role.  That PPD accepted some of Menninger's requested accommodations, while declining only those that the law expressly does not require, does not establish that PPD failed to reasonably accommodate her.  "[A]n employer is neither required to provide an employee with an accommodation of her choice nor to create a new position."  *Enica v. Principi*, 544 F.3d 328, 342 (1st Cir. 2998).  Instead, the law requires an employer to engage in a good-faith "interactive process" with the employee in an effort to identify a reasonable accommodation that is both feasible and sufficient.  *See* 29 C.F.R. § 1630.2(o).  As the Court held at summary judgment, there is no reasonable dispute that PPD satisfied this requirement.  (Order at 12.)

On the other hand, the burden to come forward with a reasonable proposal that "would [have] enable[d] *her* to perform the essential functions of *her* job, but also that, at least on the face of things, [was] feasible for the employer under the circumstances"—unequivocally belonged to Menninger.  *Echevarria*, 856 F.3d at 127 (emphasis added); *Reed v. LePage Bakeries, Inc*., 244 F.3d 254, 259 (1st Cir. 2001) (collecting cases); *see also Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 n.8 (1st Cir. 2005).  Indeed, the "failure to accommodate" theory of disability discrimination requires a plaintiff to demonstrate that she participated in the process by "request[ing] such accommodation," and that the defendant "refused to provide it."  *Alba v. Raytheon Co.*, 441 Mass. 836, 843 n.9 (2004); *see also Flaherty v. Entergy Nuclear Operations, Inc*., 946 F.3d 41, 55 (1st Cir. 2019).  But here, the trial record establishes that the *only* requested accommodations PPD declined were those that are unreasonable as a matter of law.  *Krennerich*, 943 F. Supp. at 1351 (Employers are not required "to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job."  (internal

18

quotations and citations omitted)); *see also Ortiz-Martinez v. Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 603 (1st Cir. 2017) (Where a requested accommodation is facially unreasonable in terms of its impact "on [the employer's] operation of the business," the employer is not required to adopt it.).

As the Court ruled at summary judgment, there is no reasonable dispute that PPD engaged in a good faith effort to identify a reasonable accommodation.  (Order at 12.)  It was *Menninger* who unilaterally stopped the accommodation discussions, requesting they be put on hold until she was asked to do something she felt she could not.  (Doc. No. 152 at 81:14-24.)  That time never came.  The reason it never came is that PPD *never* asked Menninger to do anything she felt uncomfortable doing; and the reason those discussions never resumed is because Menninger subsequently left on an extended medical leave before informing PPD that she would not return to work.  (Exs. 271, 233, 90.)  Thus, as a matter of law, Menninger failed to demonstrate that she proposed a reasonable accommodation that PPD refused to implement.

### C.  Menninger Failed to Establish That She Suffered an Adverse Employment Action by PPD Because of Her Disability.

Not only does the record *foreclose* a finding that Menninger was a qualified employee capable of performing the essential functions of her position—Menninger has also failed to establish that PPD ever took an adverse employment action against her because of her disability. Thus, her discrimination theory premised on disparate treatment fails for that reason as well.  *See Sensing*, 575 F.3d at 154 (To prevail under a disparate treatment theory, a plaintiff must show that "her employer took an adverse employment action against her because of, in whole or in part, her protected disability." (cleaned up) (quoting *Carroll*, 294 F.3d at 236)).

The only potential adverse employment action on which the Court submitted Menninger's discrimination claims to the jury was PPD's setting "new goals and expectations for [Menninger

19

in her] role as Executive Director." (Doc. No. 160 at 98:16-19.) Menninger argued throughout trial that Mekerri's February 2018 email outlining five categories of expectations for 2018 constituted the imposition of new responsibilities, and thus materially and adversely altered the conditions of her employment. (Doc. No. 152 at 57:2-64:20.) But the trial evidence establishes that those responsibilities were neither *new* nor ever *imposed*.

The law defines an adverse employment action as "any material 'disadvantage[] in respect to salary, grade, or other objective terms and conditions of employment.'" *Sensing*, 575 F.3d at 154 (citation omitted); *Kleya v. Karl Storz Endovision, Inc.*, 385 F. Supp. 3d 99, 106 (D. Mass. 2019) (citation omitted) (describing the ADA's substantively identical conception of an adverse employment action as "one that affects employment or alters the conditions of the workplace, and typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits"). The adverse action must be "substantial enough to have materially disadvantaged [the] employee." *Yee v. Mass. State Police*, 481 Mass. 290, 296-97 (2019) (internal quotations and citations omitted). "There must be 'real harm'; 'subjective feelings of disappointment and disillusionment' will not suffice." *King v. City of Boston*, 71 Mass. App. Ct. 460, 468 (2008) (citations omitted).

As described above, each and every one of the responsibilities described in Mekerri's email and discussed subsequently with Menninger was also part of her position when she was hired in 2015. (Ex. 350.) In fact, those responsibilities were expressly described as "Essential Functions" in her job description. (*Id.*) Menninger does not dispute this—and acknowledged (as she must) that she engaged in most of these responsibilities from the beginning of her tenure at PPD. (Doc. No. 151 at 182:24-183:11.) Her contention is merely that the *frequency* of those responsibilities

135880656_41

was expected to increase.  (*Id.* at 183:18-21.)  An increased focus on, or frequency of, pre-existing responsibilities does not constitute an adverse employment action.  Such a conception would cripple every employer's ability to evolve to meet market demands, just as PPD did here.  *See*, *e.g.*, *Burns v. Johnson*, 829 F.3d 1, 10 (1st Cir. 2016) ("The change must be more disruptive than a mere inconvenience or an alteration of job responsibilities." (citation omitted)); *Morales–Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010) ("Reassignment . . . may be actionable" only if it involves "significantly different responsibilities.").  Indeed, while Menninger complained about Mekerri's supervision of her job performance, such as compliance and quality controls in the lab (Doc. No. 152 at 113:4-8), that type of routine personnel function, even if the employee does not welcome it, does not constitute an adverse employment action.  *See King*, 71 Mass. App. Ct. at 469 ("'[T]he mere fact that an employee is displeased by an employer's act . . . does not elevate that act . . . to the level of a materially adverse employment action.'" (citations omitted)).

Nor were these alleged "changes" to Menninger's responsibilities ever imposed.  Once again, Menninger does not dispute that PPD never required her to perform increased public-facing duties before she began her extended medical leave.  Instead, these changes were merely *discussed* between Menninger and PPD.  And the only relevant discussions that post-dated PPD's awareness of Menninger's disability are those that occurred pursuant to the interactive process to evaluate potential reasonable accommodations.  Those discussions cannot possibly constitute an adverse employment action—they are specifically required by law.  Not only do they present no "material disadvantage" related to the "objective aspects of the work environment," *id.* at 468—*but the law requires that they take place*, 29 C.F.R. § 1630.2(o) (describing an employer's duty to "initiate an informal, interactive process with the individual with a disability in need of the accommodation").

21

What's more, even if Menninger had shown that PPD's conduct constituted an adverse employment action (which she has not), the evidence unequivocally precludes finding that this action was taken "because of" her disability. *Sensing*, 575 F.3d at 154; *Carroll*, 294 F.3d at 236. This is so for at least three reasons. *First*, Menninger was notified of the changes in PPD's expectations in December 2017—weeks *before* Menninger informed PPD of her disability. (Doc. No. 152 at 43:7-21, 44:5-25; Ex. 62.) After Menninger disclosed her disability, Mekerri's February 2018 email was sent as part of the ensuing interactive process, and in direct response to Menninger's request for additional detail regarding PPD's expectations. (Doc. No. 152 at 70:22-71:9.) "[A]n adverse employment decision that predates a protected activity cannot be caused by that activity." *See Muñoz v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R.*, 671 F.3d 49, 56 (1st Cir. 2012). So too where "the adverse employment decision was contemplated but 'not yet definitively determined' before the protected activity took place." *Id.*

*Second*, it was undisputed at summary judgment, and further confirmed by Mekerri's testimony at trial, that these were expectations of *all* "senior leadership" employees—not just Menninger—in order to "increase sales and support business development" company-wide. (Order at 3; Doc. No. 157 at 168-69.) That PPD "required the same from other [employees] in similar circumstances" is strong evidence that the action was taken "for legitimate non-retaliatory reasons" and unrelated to her disability. *Cherkaoui v. City of Quincy*, 877 F.3d 14, 29 (1st Cir. 2017); *Joseph v. Wentworth Inst. of Tech.*, 120 F. Supp. 2d 134, 141 (D. Mass. 2000) (finding no adverse employment action in a Title VII case where plaintiff failed to show the action "was targeted at her in any way," as it applied to "entire department").

*Third*, the record establishes that Dr. Basel Kashlan, who replaced Menninger following her eight months of medical leave, performs each of the public-facing responsibilities described in

22

Mekerri's February 2018 email as "critical parts" of his role today.  (Doc. No. 158 at 122:3-127:8.) This "experience of [the employee] who ha[s] taken over [Menninger's] job functions since h[er] termination also supports the conclusion" that those functions are "essential," and thus were imposed for a legitimate, non-discriminatory purpose.  *Mulloy*, 460 F.3d at 153.  Disparate treatment law prevents an employer from treating a disabled employee worse than similarly situated employees because of her disability; it does not entitle her to be exempted from the same duties that are expected of similarly situated employees, including her replacement.

## II. The Court Should Grant Judgment In Favor Of PPD On Menninger's Retaliation Claims Because She Failed To Prove Any Adverse Action Causally Connected To A Protected Activity.

To prevail on her retaliation claim, Menninger was required to prove that: (1) she "engaged in a protected activity"; (2) she experienced an "adverse action"; and (3) "the protected activity was causally connected to the adverse action." *Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 85 (1st Cir. 2019); *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 35 (1st Cir. 2010).  While "[r]equesting an accommodation is protected conduct," Menninger did not establish any adverse action by PPD or the requisite causal connection to her protected activity.  *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007).

Unlike an "adverse employment action" in the discrimination context, an "adverse action" in the retaliation context need not be "directly related to [the terms of] employment." *Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 49 (1st Cir. 2015).  As to Menninger's retaliation claim, the Court submitted six allegedly adverse actions to the jury for consideration: (1) PPD attempted to coerce Menninger to quit her position; (2) PPD attempted to manufacture grounds for Menninger's termination; (3) PPD refused to clarify the anticipated changes to Menninger's role; (4) PPD established unrealistic expectations for her role in an effort to drive her out of the company; (5) PPD excluded Menninger from hiring and recruiting decisions; and (6) PPD

23

135880656_41

**JA1894**

conducted a sham investigation into her complaint to human resources.[2]  (Doc. No. 160 at 105:10-22.)  None was sufficiently supported by evidence at trial, such that judgment should be entered in PPD's favor as to Menninger's retaliation claims as well.

## A.  Menninger Did Not Present Sufficient Evidence That PPD Tried to Coerce Her to Quit.

As evidence for this proposition, at trial Menninger pointed to the fact that PPD's HR Associate Director proposed the possibility of transitioning to a consultant role that would not require public-facing responsibilities, or accepting a severance package, during their February 28, 2018 meeting.  (Doc. No. 152 at 123:25-124:10, 69:15-70:11.)  But there is no indication or evidence whatsoever that PPD pressured Menninger to accept these proposals—nor is there any dispute that Menninger immediately declined them.  (*Id.*)  "Merely proposing a change," as PPD did, "does not, in and of itself, constitute a materially adverse action.  To qualify, *the proposal must be brought to fruition.*"  *Ahern v. Shinseki*, 629 F.3d 49, 56 (1st Cir. 2010) (emphasis added) (citations omitted) (confirming that a "propos[ed] [] change in an employee's schedule" could not constitute an adverse action for retaliation claim under Title VII because not implemented).  This is true even where, unlike here, the record shows an employer levied a "threat" against an employee that "never materialized."  *Goguen v. Quality Plan Adm'rs*, No. 975874, 2000 WL 282485, at *6 (Mass. Super. Ct. Feb. 11, 2000).  And even where, unlike here, the record shows an employee "was *pressured* to sign the severance agreement" or otherwise accept the proposal, there is no adverse action if not consummated.  *Saari v. Allegro Microsystems, LLC*, 436 F. Supp. 3d 457, 465 (D. Mass. 2020) (emphasis added).  Thus, PPD's offer to transfer Menninger to a consulting

---

[2] As with Menninger's discrimination claims, courts routinely look to federal law in considering Chapter 151B retaliation claims.  *See Brader v. Biogen Inc*., 983 F.3d 39, 54 (1st Cir. 2020) ("The Massachusetts Supreme Judicial Court [ ] consistently applies federal law in evaluating disability discrimination and retaliation claims.").  The First Circuit has also held that Title VII cases provide "guidance on the proper analysis of ADA retaliation claim[s]." *Soileau v. Guilford of Maine, Inc*., 105 F.3d 12, 16 (1st Cir. 1997).

24

position that did not involve client interactions, or to accept a severance package, as a matter of law cannot qualify as a materially adverse action.

### B. Menninger Did Not Present Sufficient Evidence That PPD Attempted To Manufacture Grounds For Her Termination—And The Court's Legal Conclusions at Summary Judgement Foreclose Such A Finding.

This theory lacks any legal basis whatsoever.  Even if Menninger showed at trial that PPD had attempted to manufacture grounds for her termination—which she did not—it still is not actionable because any such plan was never "brought to fruition" and thus not "materially adverse."  *Ahern*, 629 F.3d at 56.  As the Court held at summary judgment: "No reasonable jury could find . . . . that [Menninger's] termination nearly eight months after she took a medical leave, and where she showed no sign of intending to return to work, was discharge under the pretext of performance issues."  (Order at 15 (quotations and citations omitted).)  There was no evidence at trial to the contrary.

### C. Menninger Failed To Establish That PPD Refused To Clarify The Anticipated Changes To Her Role—And Her Own Evidence Disproves It.

Menninger herself testified that Mekerri promptly responded to her request for additional clarity with his email in February 2018.  (Doc. No. 152 at 70:22-71.)  That email organized PPD's expectations into five distinct categories of duties and included information on the expected frequency of each task, as well as expected number of attendees at the anticipated meetings and presentations.  (Ex. 350.)  That alone would suffice to disprove this claim.  Yet the record establishes that PPD also engaged in ongoing discussions with Menninger regarding its expectations and possible accommodations until *she* emailed PPD in March 2018 requesting that those discussions be tabled.  (Ex. 271.)

135880656_41

### D. Menninger Did Not Present Sufficient Evidence That PPD Established Unrealistic Expectations For Her Role.

This claim also fails. The record establishes that the expectations which Menninger now contends were part of an effort to push her out of her position, were adopted prior to PPD's knowledge of Menninger's disability (*see*, *e.g.*, Ex. 428), in response "to the needs of the business" (Ex. 350) and client feedback (Doc. No. 157 at 138, 140, 145, 152-53), made applicable to all senior management (Order at 3; Doc. No. 157 at 168-69), and continue to apply with equal force to Menninger's replacement after her departure (Doc. No. 158 at 122:3-127:8).

### E. Menninger Did Not Present Sufficient Evidence That PPD Excluded Her From Hiring and Recruiting Decisions.

Menninger also contended that after disclosing her disability to PPD, she was excluded from key hiring and recruiting decisions that had previously been a core role of her job. (Doc. No. 152 at 84:18-23.) Yet the trial evidence showed that, to the extent Menninger was excluded from any interviews with potential candidates, it resulted from her specific request to reduce her on-site visits to the Kentucky lab in November 2017, before PPD knew of her disability, due to her "fe[eling] overwhelmed" in her position as Executive Director. (Doc. No. 155 at 67:21-68:6, 97:3-6.) An action taken *at an employee's request*—particularly one taken *prior to the employer's knowledge of her disability*—cannot possibly be a retaliatory adverse action. *See Rivera-Rocca v. RG Mortg. Corp.*, 535 F. Supp. 2d 276, 288 (D.P.R. 2008) (finding no adverse action for ADA retaliation claim where plaintiff "requested a change in employment" and change "took place before plaintiff [engaged in protected conduct]"); *Muñoz*, 671 F.3d at 56 (Where an "adverse employment decision was contemplated but 'not yet definitively determined' before the protected activity took place," it "cannot be caused by that activity." (citation omitted).)

### F. Menninger Did Not Present Sufficient Evidence That PPD Conducted A "Sham" Investigation Of Her Complaints.

Menninger's final alleged adverse action concerns a so-called "sham" investigation PPD

26

135880656_41

JA1897

conducted into her complaint that Mekerri was "targeting her" because of her disability.  In April 2018, Menninger complained to HR that Mekerri's communications regarding her job performance were impermissibly related to her request for accommodation.  (Doc. No. 152 at 122:9-14; Doc. No. 154 at 72:20-73:5.)  PPD's Executive Director of HR investigated the complaint, interviewing PPD's HR Associate Director, Mekerri, three other employees, as well as Menninger herself numerous times.  (Ex. 450.)  The Executive Director then detailed her findings in writing; concluded that Mekerri's concerns regarding Menninger's performance were unrelated to, and predated his knowledge of, Menninger's disability; and promptly communicated this conclusion to Menninger.  (*Id.*)  Nonetheless, Menninger contends that this investigation was a "sham."  (Doc. No. 155 at 5:15-6:8.)  The trial record shows otherwise.

A "sham investigation" is a term of art—and merely because an employee disagrees with the investigator's conclusion, or even where the investigation was flawed, the investigation does not qualify as a sham unless a higher standard is met.  *See*, *e.g.*, *Billings v. Town of Grafton*, 515 F.3d 39, 53 (1st Cir. 2008) ("[A]n employee's displeasure at a personnel action cannot, standing alone, render it materially adverse."); *see also Forsythe v. Wayfair Inc.*, 27 F.4th 67, 70, 74 (1st Cir. 2022) (rejecting employee's disagreement with outcome of employer's investigation as an indication that it was deficient).

Where, as here, the employer considers corroborating evidence, including by interviewing a host of key witnesses, there is no basis under the law for concluding the investigation was conducted in bad faith or as a "sham."  *See Forsythe*, 27 F.4th at 74-76; *Gyulakian v. Lexus of Watertown, Inc.*, 475 Mass. 290, 302-03 (2016).  Here, Menninger's characterization of the investigation as a "sham" amounts to nothing more than her disagreement with its outcome, which is legally insufficient.  *See*, *e.g.*, *Billings*, 515 F.3d at 53; *Forsythe*, 27 F.4th at 73.

135880656_41

In sum, because the trial record establishes that PPD attempted to accommodate Menninger's disability, granted her six months of paid medical leave, only ended her employment after she expressed no intention of ever returning—*and* never undertook any adverse action against her, let alone because of any protected activity, the jury's retaliation verdict cannot stand, and the Court should enter judgment as a matter of law in favor of PPD on Menninger's retaliation claim.

## III. The Court Should Strike The Punitive Damages Award Because It Is Excessive, Unsupported By Evidence, And Contrary To Law.

Before the Court submitted this case to the jury, it expressed significant hesitancy to even provide a punitive damages instruction given the state of the record, and stated that, should punitive damages be awarded, it would "entertain, seriously, a motion" challenging the award and could always "take it away":

> "I'm leaning to[ward] giving [the punitive damages instruction], not because I— because I think in—Generally speaking, on these kinds of issues, [it] is better to give[] things to the jury th[e]n see. If they decide no punitives, then that's the end. And if they decide there's punitives, I can, then we can always engage in briefing and discussion. And if I think it's improper, *I can take it away*. It's—punitives, of course, [the] focus is on the conduct, not the harm." (Doc. No. 159 at 171:24-172:7 (emphasis added).)
>
> *****
>
> "But I don't really understand the law to mean that if the harm is really bad, that, alone, can justify punitives. I don't see how the harm, in [and] of itself, without misconduct, could justify punitives. Because you're punishing something and how can you punish if someone didn't—if they didn't [do] anything wrong, beyond the ordinary wrong that gives rise to civil liability. . . .Would I—if it were rewarded, is it obvious to me that I wouldn't make a ruling about—*like I would entertain, seriously, a motion?   I would*." (*Id.* at 173:7-19 (emphasis added).)

The Court proceeded to give the instruction (over PPD's objection (*id.* at 163:18-20)), and the jury awarded Menninger an astounding $10 million in punitive damages (Doc. No. 160 at 132:5-7.) Yet even if the Court believes that PPD's conduct was actionable, no reasonable interpretation of the evidence supports *any* punitive damages award, let alone one so excessive.

28

**JA1899**

Not all discrimination or retaliation claims warrant punitive damages.  *See Haddad v. Wal-Mart Stores, Inc.*, 455 Mass. 91, 110 (2009).  "An award of punitive damages requires a heightened finding beyond mere liability," and *even* "beyond a knowing violation of the statute." *Id.*  To support a punitive damages award, Menninger was required to prove that PPD's conduct was "so offensive that it justifies *punishment* and not merely compensation." *Id.* (emphasis added). PPD's conduct must have been "outrageous, because of [its] evil motive or [its] reckless indifference to the rights of others." *Dartt v. Browning-Ferris Indus.*, 427 Mass. 1, 17 (1998). There must be evidence that PPD engaged in "a *conscious or purposeful effort to demean*" Menninger because of her protected class, and that PPD *knew* its conduct would cause significant harm. *Haddad*, 455 Mass. at 111 (emphasis added).

The trial record shows that PPD's conduct did not even come close to meeting this standard. As the Court found in its summary judgment decision, PPD attempted to accommodate Menninger by reducing some of her responsibilities and placing her on an extended medical leave at her request.  The Court stated:

> PPD allowed two of her requested accommodations.  Mere rejection of the other proposed accommodations, however, does not necessarily mean that PPD did not engage in an interactive process. . . . PPD engaged, responded, and gave explanations for why it could not grant the other accommodations. . . . PPD responded that it remained 'committed to an open dialogue' and would continue to review requests for accommodation as she raises them.

(Order at 12-13.)  Indeed, Menninger herself conceded that PPD never actually required her to engage in any duty that she said she could not perform.  (Ex. 271.)

Courts routinely reject punitive damages awards in similar circumstances.  For example, in *Smith v. Bell Atlantic*, 63 Mass. App. Ct. 702, the Court affirmed the trial court's refusal to issue a punitive damages instruction in a reasonable accommodation action.  In affirming the trial court, the appellate court invoked the well-established standard that punitive damages may be awarded

29

135880656_41

only for conduct that is "outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Id.* at 721.  The Court explained:

> On the facts presented, there was no basis for finding that the company intentionally or willfully violated the law or that its conduct was evil in motive.  [Plaintiff] contends, however, that 'outrageousness' in the form of 'reckless indifference' reasonably could be found based upon the evidence that she repeatedly requested the same accommodations, they were endorsed by the company's doctors, and yet the company, through its supervisors, failed to support her work-at-home arrangement after nominally agreeing to it.  Although the evidence was sufficient to demonstrate that [Plaintiff's] immediate supervisors should have been more attentive to her needs, we agree with the trial judge that no reasonable jury could find that the company's behavior rose to the level of reckless indifference.

*Id.*  The Court added that, "[e]ven if the jury could have found that the company's accommodations fell short in all the ways alleged, the company's behavior, while actionable, was not so egregious as to warrant the condemnation and enhanced deterrence that underlie the imposition of punitive damages." *Id.* at 722.  The same is equally true here.

Similarly, in *Tobin v. Liberty Mutual Insurance Co*., the First Circuit held that punitive damages were improper because the evidence showed the employer had considered potential accommodations.  553 F.3d 121, 148 (1st Cir. 2009).  The *Tobin* court stated: "At each point, ***consideration was given—whether or not correctly, but consideration was given***—by the defendant to the relevant factors.  This is not one that comes within either the federal or the state definition of punitive damages." *Id*. (emphasis added).  It made no difference that the evidence showed "that the company was unjustified" in denying the requested accommodation. *Id.* at 149.  Indeed, the Court expressly noted there was "troubling evidence," "implausible testimony" from the employer's witnesses, and allegations tending to support that the employer attempted to "orchestrate[]' [the employee's] discharge." *Id.* at 148-49.  And yet, it held punitive damages were improper.

135880656_41

In a similar context, the First Circuit in *Heagney v. Wong* affirmed a jury's judgment for a plaintiff on his Chapter 151B claim, yet reversed the jury's award of punitive damages. 915 F.3d 805 (1st Cir. 2019). *Heagney* explained that there was simply "no basis for a reasonable jury to find that the defendant was aware that the discriminatory conduct would likely cause serious harm, or recklessly disregarded the likelihood that serious harm would arise . . . . Nor could a jury have reasonably concluded that the defendants engaged in a *conscious or purposeful effort to demean or diminish the class of which the plaintiff is a part (or the plaintiff because he or she is a member of the class)*." *Id.* at 824-25 (cleaned up) (emphasis added). So too here.

In contrast, those cases where courts have upheld punitive damages awards reflect a degree of egregiousness altogether absent here. *See Burnett v. Ocean Props., Ltd.*, 987 F.3d 57, 70 (1st Cir. 2021) (upholding punitive damages award where employer entirely *ignored* three separate requests from its paraplegic employee for automatic door accommodation, and employee "experienced difficulty with the doors every day for months until he resigned"); *Arrieta-Colon v. Wal-Mart P.R., Inc.*, 434 F.3d 75, 83 (1st Cir. 2006) (upholding punitive damages award for hostile work environment claim where plaintiff was subjected to continuous harassment, complained to three supervisors, and "[n]o investigation was ever undertaken").

This controlling case law cannot be reconciled with the jury's award of *any* punitive damages—let alone its astounding award of $10 million. For the reasons discussed above, there is no basis to find that PPD violated the law *at all*. But, even if Menninger did make out a claim, it is impossible to conclude that PPD's conduct was egregious. As the Court itself recognized in its summary judgment decision, PPD engaged in a good faith interactive process with Menninger and accepted two of her accommodations requests. While PPD expressed commitment to a continued dialog, Menninger put their discussions on hold indefinitely. PPD also took reasonable

31

steps to investigate Menninger's claim of retaliation and never forced Menninger to engage in activities that she said she could not perform. While the jury might have sympathized with Menninger, or doubted the sufficiency of PPD's response, none of the evidence Menninger presented at trial demonstrated the malice or reckless indifference required to warrant punitive damages. More simply put, as the Court itself suggested during the charging conference, the award should be vacated. Allowing it to stand would constitute a serious miscarriage of justice.

### ARGUMENT ON MOTION FOR NEW TRIAL

"[A] district court wields 'broad legal authority' when considering a motion for a new trial"—"much broader than its power to grant a JMOL." *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009) (quoting *de Pérez v. Hospital del Maestro*, 910 F.2d 1004, 1006 (1st Cir. 1990)). "[U]nlike review of JMOL, the new trial motion standard of review is concerned with whether the verdict is against the weight of the evidence, an assessment made through the lens of abuse-of-discretion review and not requiring that [courts] take the evidence in favor of the verdict." *Id.* at 438. To that end, the Court is expected "to *independently* weigh the evidence." *Id.* at 436 (emphasis added); *see also MacQuarrie v. Howard Johnson Co.*, 877 F.2d 126, 132 (1st Cir. 1989). And "whenever, in its judgment, the action is required in order to prevent injustice," the court "has the power *and duty* to order a new trial." *Jennings*, 587 F.3d at 436 (emphasis added) (internal quotations and citations omitted). The record in this case compels the Court to exercise its broad authority to grant a new trial here.

I.    **The Court Should Order a New Trial Because the Compensatory Damages Award Is Excessive and Not Supported by the Evidence.**

The jury awarded Menninger a staggering $14 million in compensatory damages: $1,565,000 in back pay; $5,465,000 in front pay; and $7,000,000 in past and future emotional distress. (Doc. No. 160 at 131:4-132:1.) Yet Menninger worked for PPD for just over three years

135880656_41

from August 2015 to February 2019—*including* her eight-month medical leave.  Moreover, as the Court itself found, after PPD was made aware of Menninger's disability, it engaged in a good-faith interactive process in an effort to reasonably accommodate her (Order at 12) and never engaged in any "'plan to remove' Menninger from her position" (*id.* at 15-16).  For these and other reasons discussed below, any reasonable interpretation of the record confirms that the jury's award far exceeds that which is "causally related to the defendant's wrongdoing" and impermissibly renders Menninger "more than whole."  *Conway v. Electro Switch Corp.*, 402 Mass. 385, 388 (1988) (internal quotations and citations omitted).

A.      **The Jury's Award of Nearly $5.5 Million in Front Pay Is Excessive, Not Supported by the Evidence, And Contradicted By The Verdict.**

Economic damages "may not be determined by speculation or guess"—but must instead be "proved with reasonable certainty as attributable to the employer's misconduct."  *Id.* at 389-90 (citations omitted).  Future lost earnings are subject to particular scrutiny.  *Tobin*, 553 F.3d at 141.  "An award of front pay that extends over many years to an estimated retirement date should be examined carefully . . . since the greater the period of time upon which a front pay award is calculated in a case involving an at-will employee the less likely it is that the loss of future earnings can be demonstrated with any degree of certainty or can reasonably be attributed to the illegal conduct of the employer."  *Cummings v. Std. Reg. Co.*, 265 F.3d 56, 66 (1st Cir. 2001) (internal quotations omitted).

Menninger's expert economist, Dr. Jonas, testified that Menninger's actual economic losses equaled $5,758,267 when factoring in Social Security and disability benefits.  (Doc. No. 159 at 35:5-13; Ex. 455.)  To reach that conclusion, he employed an analysis that cannot withstand the prescribed level of scrutiny—and which depends entirely on a series of assumptions that are not merely unsubstantiated, but directly contradicted by the factual record.

135880656_41

*First*, Dr. Jonas assumed that Menninger, who was 49 years old when she last worked for PPD, would be unable to work in any comparable position for the "remain[ing] [18 years] of her working life." (Doc. No. 159 at 28:24-29:7; Exs. 26, 233.) This assumption informed every one of Dr. Jonas's findings—and is directly contradicted by the factual record. Menninger's psychiatric expert declined to support Dr. Jonas's assumption. Instead, the expert stated merely that he did not "know" and "can't predict" whether Menninger would ever be able to return to work. (Doc. No. 156 at 199:9-12.) And while his testimony might have been equivocal—Menninger's was not. At trial, Menninger testified that, during her paid medical leave (which post-dated her last interactions with the company), she submitted multiple job applications and was actively seeking employment. (Doc. No. 154 at 38:22-24, 39:9-40:2.) And yet Dr. Jonas based the entirety of his economic analysis on the assumption that Menninger would never work for the next two decades of her life.

*Second*, Dr. Jonas assumed that Menninger, a three-year employee of PPD, would have continued to work for PPD for the next 18 years past the standard retirement age of 65, in the same position, and earning the same salary. (*Id.* at 34:7-12; Ex. 455.) The record shows, however, that Menninger had never lasted with any employer for more than five years. (Ex. 3.) And, even before there was any discussion of more public-facing activities, Menninger already felt "overwhelmed," her mental health had declined considerably leading to an additional diagnosis, and her performance rating had dropped. (Doc. No. 153 at 106:8-19; Doc. No. 155 at 67:21-68:6, 97:3-6.) And what's more, Menninger testified at trial that in January 2018, even before she and PPD began discussing potential accommodations, Menninger's psychiatrist documented that she was engaged in chronic "catastrophic thinking," she had trouble getting out of bed, and had not left the house for weeks due to her psychological decline. (Doc. No. 153 at 155-58.) All of these facts

34

135880656_41

JA1905

strongly suggest Menninger would not have lasted as Executive Director for another 18 years, even if PPD had hired a surrogate employee to perform her public-facing responsibilities.

Even more fundamentally, the jury's front pay award of nearly $5.5 million is logically inconsistent with the jury's own verdict. Menninger cannot have been *both* a "qualified handicapped person," capable of performing the demanding role of Executive Director at PPD for another 18 years, and, at the same time, have been so fragile that the legally required process of discussing accommodations was enough to render her incapable of working for the rest of her life. Yet the jury's verdict presupposes both. For all of these reasons, the jury's wildly excessive front pay award should be set aside and a new trial ordered.

**B. The Jury's Award Of $7 Million For Emotional Distress Damages Is Excessive And Untethered To PPD's Conduct.**

PPD cannot be held liable for any emotional harm that lacks a "sufficient causal connection" to its alleged "*unlawful* act." *Stonehill Coll. v. Mass. Comm'n Against Discrimination*, 441 Mass. 549, 576 (2004) (emphasis added). It is not enough that Menninger may have genuinely experienced emotional suffering during and following her employment at PPD. Nor is it enough that Menninger may have experienced emotional suffering due to PPD's *lawful* acts, such as informing her of its expectations regarding senior management's responsibilities. Damages for emotional harm are only valid when they are specifically linked to an employer's *unlawful* and *discriminatory* conduct. *Id.* This required causal connection is wholly absent from the trial record.

Menninger's own expert psychiatric witness could not identify a specific action or omission by PPD that caused Menninger's alleged psychological harm. (Doc. No. 153 at 190-93.) Rather, he opined that Menninger's injuries resulted from her own self-perpetuating anxiety that PPD might somehow reject her. (*Id.*) At trial, Menninger described how she has suffered from

35

social anxiety disorder and panic attack disorder since childhood.  (Doc. No. 156 at 161:1-5.)  Her expert psychiatric witness explained at length how 20 to 40 percent of "people with anxiety disorder will go on to develop depressive disorders, major depression" at some point in their lives. (*Id.* at 188:19-23.)  The trial record also establishes that Menninger's emotional state was declining by January 2018, prior to any of the alleged adverse actions, when she was diagnosed with agoraphobia (Doc. No. 153 at 106:8-19), felt unable to leave the house for weeks on end (*id.* at 155-56), and was engaging in chronic and debilitating "catastrophic thinking" (*id.* at 155).  While Menninger claimed at trial that she later experienced severe emotional distress due specifically to the interactive process with PPD (Exs. 460, 459)—that process is not merely lawful, it is *required* by law.  What's more, Menninger testified that she was actively seeking other employment *after* she had unilaterally terminated that interactive process.  (Doc. No. 154 at 38:22-24, 39:9-40:2.)

PPD has never disputed that Menninger suffers from severe mental disabilities.  However, discrimination cases, like this one, present a unique challenge.  Unlike cases of discrimination against a physically disabled employee, where any emotional harm resulting from an employer's allegedly unlawful conduct is easily distinguishable from the pre-existing physical disability, Menninger's debilitating emotional distress is part of her underlying condition.  PPD cannot be held responsible for Menninger's pre-existing disability, nor the debilitating symptoms that define it.  The jury's award did just that.  It is this Court's duty to set such an unjust award aside.

## II.    The Court Should Order A New Trial Due To Instructional Errors That Tainted The Verdict.

Granting a motion for a new trial is appropriate where a jury instruction was "misleading or gave an inadequate understanding of the law" and thus "affected the outcome of the trial."  *First Act, Inc. v. Brook Mays Music Co.*, 429 F. Supp. 2d 429, 432 (D. Mass. 2006) (internal quotation and citation omitted).  Jury instructions that are correct as a matter of law yet "made unduly

36

confusing" are also grounds for a new trial.  *Teixeira v. Town of Coventry*, 882 F.3d 13, 16 (1st Cir. 2018).  This is particularly so where the jury instruction pertains to a critical issue.  *Id.*

That standard is easily met here.  One of the most central issues at trial was whether PPD failed to reasonably accommodate Menninger's disability.  Over PPD's objection, the Court instructed the jury that a reasonable accommodation could include, for instance, "the provision of qualified *readers* or interpreters."  (Doc. No. 160 at 93:22-23; Doc. No. 159 at 133:11-134:21 (emphasis added).)  This is deeply problematic.  Throughout trial, Menninger referred to her requested accommodations that PPD hire a surrogate to give presentations on her behalf as a request for a "reader."  (Doc. No. 153 at 128:4-18; Ex. 433.)  As the Court noted during the charging conference, the MCAD Guidelines and Title 42 indeed state that a "'reasonable accommodation' may include . . . the provision of qualified readers."  42 U.S.C. § 12111(9)(B); *see* MCAD Guidelines § III.D.  Yet it is undisputed that the term "reader," as it appears in the statute and Guidelines, refers to an individual provided for purposes of *reading* material that a disabled employee is otherwise incapable of reading herself, including, for instance, due to the employee's vision impairment.  42 U.S.C. § 12111(9)(B); *see* MCAD Guidelines § III.D.  These sources do *not* suggest that hiring the type of "reader" Menninger requested, i.e., another qualified employee to stand in for Menninger in performing her essential client-facing functions, is *per se* reasonable.  Yet because the Court's jury instruction invoked the same term without drawing this critical distinction—it strongly suggested something the statute and Guidelines do not.

It is difficult to overstate how much this instruction jeopardized the fairness of the jury's deliberations.  For context, during Menninger's closing argument at trial, her attorney told the jury that "the Judge is going to tell you that reasonable accommodations include . . . things like that provision of qualified readers.  I expect, if you look at Dr. Kessimian's e-mail that, yes, those are,

135880656_41

at least on their face, reasonable." (Doc. No. 160 at 29:19-25.) Moments later, the Court instructed the jury that reasonable accommodations can include precisely what Menninger had requested of PPD: the provision of a "reader." (*Id.* at 93:22-23.) The prejudice to PPD warrants a new trial.

## III.   The Court Should Order A New Trial Because Menninger's Legally Deficient Discrimination Claims Tainted The Jury's Evaluation Of Her Retaliation Claims.

As discussed at length above, the undisputed trial record—including ample evidence submitted by Menninger herself—forecloses several elements required to sustain her discrimination claims.  Accordingly, those claims never should have been submitted to the jury. Yet despite the inadequacy of the evidence as a matter of law, the jury heard over and over, including in the Court's instructions, that they could find PPD had unlawfully discriminated against Menninger, which became the context for PPD's supposed retaliation against her.  If the Court does not enter judgment for PPD on Menninger's retaliation claim as a matter of law, it should grant a new trial so that a new jury can evaluate the evidence allegedly supporting Menninger's retaliation claim on its own merits.

There is no doubt that these claims were inextricably linked within the evidence submitted at trial; *and* in the narrative Menninger presented to the jury; *and* in the jurors' minds during their deliberations.  For instance, one of the potential adverse actions submitted to the jury in support of Menninger's retaliation claim was that PPD's investigation into her complaint against Mekerri constituted a "sham."  The sole support for this contention was the investigator's conclusion that no discrimination had occurred.  Yet all the evidence submitted at trial supports the same conclusion.  The investigation cannot have been a sham purely for failing to find discrimination where none existed.  It is impossible to discern to what extent Menninger's "sham" investigation theory contributed to the jury's verdict, just as it is impossible to discern how much of the jury's single damages award was tied to Menninger's inadequate discrimination theory.  And given the

38

nature of Menninger's narrative—which revolved heavily around her allegations that PPD had failed to accommodate her disability and subjected her to disparate treatment because of it—it is entirely plausible, if not probable, that the jury never would have found for Menninger on her retaliation claim had it been tried on its own.

"It is settled law that, when multiple claims are submitted to a jury . . . , a new trial is required if some of the claims should not have been submitted and the jury's consideration of those claims may have affected the verdict. . . . [because] it is impossible to tell whether consideration of the improperly submitted claims may have affected the verdict." *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 468 (1st Cir. 1996); *see also*, *e.g.*, *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 30 (1st Cir. 2002) (remanding for new trial on damages after affirming ruling for plaintiff on hostile work environment and constructive discharge claims but reversing as to retaliation: "We have no way of knowing what portion, if any, of the compensatory and punitive damages awards was based on the jury's erroneous finding of retaliation. Accordingly, we have no choice but to remand for a new trial <u>as to damages</u> for the hostile work environment and the constructive discharge." (emphasis added)).  Under these circumstances, the jury's verdict is not valid.

## ARGUMENT ON REMITTITUR

If the Court declines to award PPD judgment as a matter of law or order a new trial, it should, at the very least, remit the jury's patently excessive verdict.  Remittitur is warranted where, as here, a damages award "fails to exhibit a 'rational appraisal or estimate of the damages that could be based on the evidence before the jury.'"  *First Act*, 429 F. Supp. 2d at 437 (citations omitted); *see also Koster v. TWA*, 181 F.3d 24, 34 (1st Cir. 1999) (remittitur is appropriate where an award is "grossly disproportionate" to the "injury established by the evidence").  The jury's $24 million verdict is wholly unjustified and bears no relation to PPD's actual conduct.

"Awards in comparable cases are instructive" in considering remittitur.  *Aponte-Rivera v.*

<div align="center">39</div>

<div align="center">JA1910</div>

*DHL Sols. (USA), Inc*., 650 F.3d 803, 811 (1st Cir. 2011); *see also, e.g., Soto-Lebron v. Fed. Express Corp.*, 538 F.3d 45, 69 (1st Cir. 2008) (affirming that courts frequently consider comparator judgments in evaluating the appropriateness of a jury's damages award).

Recent awards in Massachusetts and elsewhere confirm that the instant verdict is unmatched in *any* comparable case.[3]  This damages award—which is unmatched in any comparable case in this district—is grossly excessive in every conceivable respect.  Permitting it to stand would be a miscarriage of justice.

## CONCLUSION

Based on the evidence presented at trial, no reasonable jury could conclude that Menninger established her claims of disability discrimination or retaliation, or the propriety of punitive damages.  For the foregoing reasons, the Court should enter judgment in favor of PPD in its entirety; in the alternative, the Court should order a new trial on the matter; or, at the very least, the Court should strike the punitive damages award and significantly remit the jury's astounding damages award.  The law compels the Court to act.  We respectfully implore it to do so.

---

[3] *See, e.g., Kelley v. Airborne Freight Corp.*, Case No. 1:94-cv-10137-WAG (D. Mass. 1996) (awarding **$3,326,858 total damages** for age discrimination and wrongful termination); *Eustace v. Springfield Pub. Schools*, Case No. 17-30158 (Mass Sup. Ct. 2022) (awarding **$903,599 total damages** where school's volatile environment caused teacher to develop disabling anxiety, depression, and high blood pressure); *DaPrato v. Mass. Water Res. Auth.*, Case No. 1584CV03687 (Mass. Sup. Ct. 2018) (awarding **$1,235,000 total damages** where employer refused long-time employee medical leave to undergo surgery and terminated him immediately afterwards); *Dimanche v. Boston Carmen's Union*, Case No. 1584CV03219 (Mass. Sup. Ct. 2018) (awarding **$490,500 total damages** to employee terminated on basis of race and national origin); *Pellegrino v. Nat'l Assn. of Govt. Emps*., Case No. CV2003-00438 (Mass. Sup. Ct. 2006) (awarding **$630,000 total damages** for sexual harassment and failure to accommodate inability to drive due to physical disability); *Edwards v. City of Boston*, Case No. 1684CV02365 (Mass. Sup. Ct. 2021) (awarding **$945,190 total damages** for failing to investigate claims against him before termination and retaliation for filing suit); *Russo v. Shaw's Woodworking Inc*., Case No. 1583CV00144 (Mass. Sup. Ct. 2018) (awarding **$61,250 total damages** for sexual harassment and unwanted touching, retaliation, and wrongful termination); *Heagney v. Wong and City of Fitchburg*, Case No. 4:15-cv-40024 (D. Mass. 2017) (awarding **$1,500,000 total damages** for employment discrimination, defamation, emotional distress, and damage to reputation and earning capacity); *Haddad v. Wal-Mart Stores*, Case No. CV2005-00274 (Mass. Sup. Ct. 2007) (awarding **$1,972,774 total damages** for gender-based wage discrimination, retaliation, and wrongful termination).  *Cf. Luppold vs. Flores, N.P.*, Case No. 1681CV01287 (Mass. Sup. Ct. 2023) (awarding **$20 million total damages for medical malpractice resulting in wrongful amputation of limb**).

40

135880656_41

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.

/s/ *Rachel Reingold Mandel*
Rachel R. Mandel (BBO# 660495)
Patrick M. Curran (BBO# 659322)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
Facsimile:  (617) 994-5701

Jack S. Sholkoff (admitted *pro hac vice*)
Catherine L. Brackett (admitted *pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
400 S. Hope Street
12th Floor
Los Angeles, CA 90071
Telephone: (213) 239-9800
Facsimile: (213) 239-9045

ROPES & GRAY, LLP

Douglas H. Hallward-Driemeier (BBO# 627643)
ROPES & GRAY, LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 508-4600
Facsimile: (202) 508-4650

John P. Bueker (BBO# 636435)
ROPES & GRAY, LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050

Attorneys for Defendant
PPD DEVELOPMENT, L.P.

Dated:  June 9, 2023

41

135880656_41

**JA1912**

## CERTIFICATE OF SERVICE

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on June 9, 2023.

*/s/ Rachel Reingold Mandel*
Rachel Reingold Mandel

42

135880656_41

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

    Plaintiff,

    v.

PPD DEVELOPMENT, L.P.,

    Defendant.

Civil Action No: 1:19-CV-11441-LTS

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S POST-TRIAL MOTIONS UNDER RULES 50(b) AND 59(a)**

## INTRODUCTION

PPD blames everyone but itself. Armed with a bevy of new lawyers, it takes aim at the jury's verdict with an "everything but the kitchen sink" attack, often misstating the facts and, in every instance, ignoring the evidence (and permissible inferences) that support the jury's verdict.

This was a well-tried case, presented to an attentive and thoughtful jury. They were focused, they asked good questions, and, in the end, they unanimously determined that PPD has no one to blame but itself. The jury's award was very substantial, but for good reason. *PPD broke Lisa Menninger*. The depth of harm she has suffered is difficult to imagine, let alone articulate, but everyone who sat in that courtroom knows that it is extraordinary.

PPD did not cause this suffering by accident. The evidence shows that PPD executed on a coordinated "exit strategy" formulated at the highest levels of its organization. PPD knew it was breaking the law. It knew that, given Dr. Menninger's mental health, it was likely going to cause her significant harm. And PPD did it anyway.

The jury's verdict was the product of evidence, not error. It should be left intact and PPD's efforts to cast itself as the victim in this tragic story should be roundly rejected.

## ARGUMENT

### I.     The "Renewed" Motion for Judgment as a Matter of Law Should Be Denied.

A renewed motion for judgment as a matter of law may only be granted if the evidence "points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Crane Sec. Techs., Inc. v. Rolling Optics AB, 337 F. Supp. 3d 48, 51 (D. Mass. 2018) (Sorokin, J.) (quoting Monteagudo v. Asociación de Empleados del Estado Libre Asociado de Puerto Rico, 554 F.3d 164, 170 (1st Cir. 2009) (citations omitted). The Court must examine "the evidence presented to the jury, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the jury verdict." Id. (quoting

2

Cigna Ins. Co. v. Oy Saunatec, Ltd., 241 F.3d 1, 8 (1st Cir. 2001) (citations omitted)). Further, "As the name implies, a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) is bounded by the movant's earlier Rule 50(a) motion," and the movant "cannot use such a motion as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." Monteagudo, 554 F.3d at 171.

    A.  Aside From the Punitive Damages Issue, PPD's Arguments Have Been Waived Because it Failed to State any Grounds for its "Directed Verdict" Motion, as Required by Rule 50(a).

Rule 50(a) requires the moving party to "specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). Here, PPD merely requested "a directed verdict" without stating any basis. Tr. 9, 50:4–5. That is not enough under First Circuit precedent, which requires that a Rule 50(a) motion be "sufficiently specific so as to apprise the district court of the grounds relied on in support of the motion." Parker v. Gerrish, 547 F.3d 1, 11–13 (1st Cir. 2008).

PPD's failure to state any grounds for its "Directed Verdict" request precludes it from making a "renewed" motion under Rule 50(b). Jones ex rel. U.S. v. Massachusetts Gen. Hosp., 780 F.3d 479, 487–88 (1st Cir. 2015) ("It is well-established that arguments not made in a motion for judgment as a matter of law under Rule 50(a) cannot then be advanced in a renewed motion for judgment as a matter of law under Rule 50(b).") (quoting Costa–Urena v. Segarra, 590 F.3d 18, 26 n. 4 (1st Cir. 2009)).

In Jones, a party (Mr. Jones) orally moved under Rule 50(a) solely on the issue of damages at the close of the evidence, and later filed a Rule 50(b) motion challenging the sufficiency of the evidence to support the verdict. 780 F.3d at 488. The First Circuit held that Mr. Jones waived his Rule 50(b) sufficiency-of-the-evidence challenge by omitting it from his Rule 50(a) motion. Id.

Here, PPD raises a number of arguments in its post-trial Rule 50(b) motion challenging the

sufficiency of the evidence supporting Dr. Menninger's discrimination (ECF Doc. No. 181 at 15)[1] and retaliation claims (Id. at 27). But, exactly as in Jones, PPD did not raise a sufficiency-of-the-evidence challenge, or indeed any specific challenge, in its Rule 50(a) motion, which results in waiver. PPD's groundless Rule 50(a) motion for judgment as a matter of law left nothing to be "renewed," thus, its Rule 50(b) contentions are waived and not properly before this Court.

Of note, PPD cannot claim that it somehow preserved a Rule 50(b) argument by raising similar arguments at summary judgment; that argument is foreclosed by binding precedent. Jones, 780 F.3d at 488; Parker, 547 F.3d at 12 ("we have held that even if a defendant raises qualified immunity at summary judgment, the issue is waived on appeal if not pressed in a Rule 50(a) motion.")

Arguably, PPD's Rule 50(b) argument with respect to punitive damages stands on different footing. PPD asserted at the charge conference that there was insufficient evidence to warrant an instruction on punitive damages. The First Circuit has not recognized the raising of arguments at a charge conference to negate the need for a proper Rule 50(a), Santos-Arrieta v. Hosp. Del Maestro, 14 F.4th 1, 11 (1st Cir. 2021), and at least one Court in this District has rejected that argument. Bradley v. Cicero, No. CV 18-30039-MGM, 2021 WL 294286, at *3 (D. Mass. Jan. 28, 2021) ("His objection was to jury instructions. . . . counsel for Defendants should have explicitly raised a motion for judgment as a matter of law based on qualified immunity. . . Accordingly, the court deems Defendants to have waived qualified immunity for purposes of a Rule 50 motion."). Nonetheless, the Court clearly stated that it would reserve ruling on the issue until after the jury had returned its verdict.[2] Plaintiff did not object to that approach then, so she will not do so now.

---

[1] These page numbers are those stated in the header, not the footer of the page.

[2] PPD repeatedly claims that the Court was "hesitant" to instruct the jury on punitive damages, but that is not what the Court expressed during the charge conference. The Court simply said it was reserving on the issue because that made the most practical sense.

4

For the foregoing reasons, however, all other arguments raised by PPD challenging the sufficiency of the evidence at trial have been waived, and its Rule 50(b) motion should be denied on that basis.

### B.  The Evidence Overwhelmingly Supported the Award of Punitive Damages.

Under the highly deferential standards of Rule 50(b), the punitive damages award must be upheld if, when reading the evidence in the light most favorable to the verdict, and drawing the inferences in Dr. Menninger's favor, a reasonable jury could have concluded that PPD's actions met the legal standard for punitive damages. Burnett v. Ocean Properties, Ltd., 987 F.3d 57, 69–70 (1st Cir. 2021). Here, PPD does not argue that there was any instructional error on the standard, and both parties agree that punitive damages could be awarded if PPD's actions were "outrageous, because of its evil motive or its reckless indifference to the rights of others," as determined by the factors listed by the Court in its charges to the jury. see Tr. 10, 116:18–19, 117:18–118:11. Those factors are:

> **One**, the egregious or outrageous character or nature of PPD's conduct; [**two**,] PPD's wealth in order to determine what amount of money is needed to punish PPD's conduct, and to deter any future acts of discriminates or retaliation; **three**, the actual harm suffered by Dr. Menninger; **four**, the magnitude of any potential harm to other victims if similar future behavior is not deterred; **five**, whether there was a conscious or purposeful effort to demean or diminish the class of which Dr. Menninger is a part, or if there was a conscious or purposeful effort to demean or diminish Dr. Menninger because she was a member of that class; **six**, whether PPD was aware that the discriminatory or retaliatory conduct would likely cause serious harm or recklessly disregarded the likelihood that serious harm would arise; **seven**, PPD's conduct after learning that the initial conduct would likely cause harm; and **eight**, the duration of the wrongful conduct and any concealment of that conduct by PPD.

Id. (emphasis added).[3]

---

[3] PPD incorrectly argues that "There **must** be evidence that PPD engaged in "a conscious or purposeful effort to demean" Menninger because of her protected class, and that PPD "knew its conduct would cause significant harm." ECF Doc. 181 at 32 (emphasis added). These considerations are **factors** in a multi-factor test, but neither is a prerequisite in itself to awarding punitive damages. Haddad, 455 Mass. at 111.

Notably, PPD focuses its argument entirely on the sufficiency of the evidence supporting Dr. Menninger's **failure to accommodate** claim, but the punitive damage award must be upheld if the evidence supporting **any** of her successful claims supported an award of punitive damages. Bell v. O'Reilly Auto Enterprises, LLC, 626 F. Supp. 3d 141, 168 (D. Me. 2022). PPD's failure to address any argument to Dr. Menninger's retaliation claim is especially striking, as evidence of intentional retaliation will typically suffice to support a punitive damages award. Che v. Massachusetts Bay Transp. Auth., 342 F.3d 31, 41 (1st Cir. 2003).

Circumstances that have justified awarding punitive damages have included those where "upon learning of the plaintiff's [disability] condition, the defendant endeavored to bring about the plaintiff's termination." Handrahan v. Red Roof Inns, Inc., 43 Mass. App. Ct. 13, 23, 680 (1997). Punitive damages were also upheld in Gyulakian v. Lexus of Watertown, Inc., 475 Mass. 290, 305 (2016), in which the defendant undertook a "woefully insufficient" sham investigation after learning of unlawful harassment.

Here, the jury was presented with overwhelming evidence from which it could have properly found that PPD's actions were outrageous or at least recklessly indifferent to Dr. Menninger's rights. Focusing particularly on Dr. Menninger's retaliation and disparate-treatment claims, the evidence permitted the jury to find that PPD tried to coerce Dr. Menninger to quit; manufactured false grounds for Dr. Menninger's termination; and established new goals and expectations for Dr. Menninger's role that PPD knew were impossible—all evidence of a purpose to demean a disabled employee (Factor 1). When Dr. Menninger complained of mistreatment and expressed that PPD's actions were already causing severe panic attacks, PPD doubled down on its misconduct by undertaking a sham "investigation." (Factor 7). The evidence showed that PPD took these actions with knowledge of Dr. Menninger's disorder and awareness or reckless

6

disregard for how much its conduct would harm her (Factor 6); that PPD tried to cover up its misconduct in the Spring of 2018 and consistently continued to cover up its actions through trial, where its witnesses gave false and contradictory testimony[4] (Factor 8); and as discussed below that PPD's actions actually did cause profound harm to Dr. Menninger that has lasted for over 5 years and will continue to harm her significantly into the future (Factors 3 and 8). Not only that, the evidence permitted the jury to find that PPD knew of its legal obligations not to discriminate and retaliate against a disabled employee who requested accommodations, yet did so anyway—thereby acting in the face of a perceived risk of unlawfulness. Indeed, PPD *consciously perceived* the risk that its actions would violate the law, because its HR officials **asked its own lawyers to help foment an "exit strategy" to get rid of Dr. Menninger**, in which its in-house counsel actively participated. The jury could properly have found this conduct egregious and outrageous in character (Factor 1) justifying and necessitating deterrence (Factor 3). See Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 82 (1st Cir. 2001) (evidence "that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful," supports a jury finding "that strong medicine is required to cure the defendants' disrespect for the law." (quoting BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 576–77 (1996)).

There is a strong evidentiary basis for these findings. To begin, PPD knew it is illegal to discriminate and retaliate against a disabled employee who requested an accommodation for a disability; and PPD knew that it had a legal obligation to extend a reasonable accommodation. Tr. 4, 148:13–15, 153:24–153:11 (Ms. Ballweg). Cf. Bell v. O'Reilly Auto Enterprises, LLC, 626 F. Supp. 3d 141, 174–76 (D. Me. 2022) (evidence that company officials received ADA training

---

[4] See Ciccarelli v. Sch. Dep't of Lowell, 70 Mass. App. Ct. 787, 798 (2007) (jury free to draw conclusion that superintendent's testimony denying earlier knowledge was an act of lying to cover up wrongdoing).

7

supported punitive damages award under federal standard). PPD was aware of the risk of harm to Dr. Menninger because it was put on notice of Dr. Menninger's anxiety disorder on January 11, 2018 when Dr. Menninger disclosed her disability, Exhibit 366; again on January 31st when Dr. Menninger and Dr. Kessimian submitted the initial accommodation request, Exhibits 47, 220; and on February 14th when Dr. Menninger and Dr. Kessimian submitted the second accommodation request (responsive to Mr. Mekerri's five buckets) that included Dr. Kessimian's "psychoeducation" about social anxiety disorder. Exhibit 180 (Mr. St. John forwards the request to Ms. Ballweg and her boss Jerry Williams).

By February 27th Mr. St. John and Ms. Ballweg were discussing "***delicately working Lisa out***" (emphasis added), directly showing that PPD was planning to try to get Dr. Menninger out of its company. Exhibit 186 at 1177; see also Tr. 4, 88:21–23 (Ms. Ballweg). The next day, on February 28th, Mr. St. John and Mr. Mekerri tried to coerce Dr. Menninger to quit. Mr. St. John began the meeting with Dr. Menninger and Mr. Mekerri by immediately presenting her with just two options: an exit package, or a consulting arrangement for a couple of months "until they could find somebody who could replace me who had my qualifications." Tr. 2, 69:14–25 (Dr. Menninger); Tr. 7, 24:24–25:4 (Mr. St. John). Neither option would allow Dr. Menninger to keep her job. Id. Mr. Mekerri tried even harder to coerce Dr. Menninger to quit by telling her that PPD "did not want to hurt my reputation," Tr. 2, 75:5–8, a thinly veiled threat that she would be fired (and her reputation tarnished) if she did not quit.

The next day, March 1st, Dr. Menninger sent a follow-up email asking for more detail about buckets 2–4, reiterating her ability to do her job without accommodation, and offering to provide confirmation from her physician that she could do her job. Exhibit 332. Mr. St. John cancelled the follow-up meeting that was scheduled for 3:30 PM that day and lied to Dr. Menninger

that he was going to be "considering the items conveyed in your email." Exhibit 333. What Mr. St. John actually did first was to email Mr. Mekerri and Ms. Ballweg a draft response to Dr. Menninger **explicitly refusing** to answer her question about buckets 2–4, which showed that Mr. St. John, Mr. Mekerri and Ms. Ballweg had no intention whatsoever of clarifying the changes to Dr. Menninger's role or responding appropriately to her request for accommodation. Exhibit 167 at 1116 ("Adding additional detail would only present the opportunity to select items in each bucket you believe you can or can't do").

Ms. Ballweg (copying her boss Jerry Williams) then instructed Mr. St. John to prepare a packet for PPD's in-house counsel Lisa Noecker, Tr. 4, 97:12–15, Exhibit 65. Mr. St. John's packet, Exhibit 87, explicitly asked Attorney Noecker for help with an "**exit strategy**" (emphasis added) to get rid of Dr. Menninger. Id. at 4083; Tr. 7, 47:7–11 (Mr. St. John). As Mr. St. John testified, this packet <u>was</u> sent to legal, Id. 48:13–14 Ms. Ballweg meanwhile lied under oath that St. John did not want to pursue an "exit strategy," Tr. 4, 95: 23–25; and lied that she did not "recall" sending the packet to counsel, Id. 98:6, even though her contemporaneous email (Exhibit 65 at 3950) said she would be sending the packet to Attorney Noecker. Ms. Ballweg admitted at trial that looking for an "exit strategy" was an "inappropriate" response to Dr. Menninger's accommodation request, Tr. 4, 104:3. The jury could have found she knew at the time that she was violating the law. Further, the jury could have found that Ms. Ballweg, Mr. Mekerri, and Mr. St. John lied—outrageously—when they attempted to claim that Mr. St. John and Mr. Mekerri were just trying to "help" Dr. Menninger during the February 28th meeting when they tried to coerce her to quit and subsequently when they were actually asking PPD's lawyers to help them get rid of her. <u>See</u> Tr. 4, 87:19–88:23 (Ms. Ballweg); Tr. 7, 23:10–13 (Mr. St. John); Tr. 7, 129:18–21, 182:25 (Mr. Mekerri).

9

Later in March PPD began trying to manufacture grounds for Dr. Menninger's termination. Ms. Ballweg worked as a go-between with Attorney Noecker, Tr. 4, 109:23–110:24, Exhibit 69, as she coached Mr. St. John, Tr. 5, 36:16–17 ("I was . . . coaching Chad"), to in turn coach Mr. Mekerri to begin subjecting Dr. Menninger to increased scrutiny and documentation of alleged performance issues. Tr. 4, 114:25–115:12; see Exhibits 68 at 4257); Exhibit 148; Tr. 7, 53:24–54:7 (Mr. St. John). Shortly after this coaching began, Mr. Mekerri's boss (Chris Fikry) emailed Ms. Ballweg's boss (Mr. Williams) to ask "**Whats timing on Lisa Menninger's exit?**" Exhibit 265. Mr. Williams then forwarded the message to Ms. Ballweg asking her "Where is Chad on this one. . .??" Id. Ms. Ballweg responded matter-of-factly that "Hacene gave her some tough feedback" but that "We are not close with term[ination]" because Dr. Menninger got a "3 rating for 2017 and just now starting to document) unless she self-selects." Id. Ms. Ballweg admitted it would have been inappropriate to terminate someone who just got a 3 rating, and that "self-selects" meant quit. Tr. 4, 119:14–25.

This evidence permitted the jury to find that Dr. Menninger's supervisor, along with his supervisor, three levels of the human resources department, ***and in-house counsel***, were all colluding to achieve Dr. Menninger's "exit" because she was disabled and had requested accommodation. Further demonstrating PPD's duplicitousness, Mr. Fikry admitted that at the time of PPD's summary judgment motion, he submitted a <u>false affidavit</u> to this Court claiming that he was "not involved" in the "discussions" about Dr. Menninger's request for workplace accommodations, and that he was "only aware" that those discussions occurred "as a result of this litigation." Tr. 7, 217:1–12.

In furtherance of their unlawful scheme, Mr. Mekerri then adjusted Dr. Menninger's annual goals on April 11, 2018 to include "elimination of lab issues." Exhibit 50 at 300. Multiple

witnesses confirmed that PPD had an established practice requiring goals to be "achievable," which is the A in the acronym SMART, Tr. 4, 140:25–141:14 (Ms. Ballweg), Tr. 7, 61:7–10 (Mr. St. John), and that "elimination of lab issues" was an <u>impossible</u> goal. E.g., Tr. 7, 218:2 (Mr. Fikry). Mr. Mekerri made this change with the help of Mr. St. John and approval of Ms. Ballweg. Tr. 7, 55:9–56:2 (Mr. St. John). The jury could have found PPD deliberately imposed this *impossible* term or condition of employment on Dr. Menninger in April with conscious desire to set her up for failure to "justify" a termination, and/or to pressure her to "self-select" by quitting.

After Dr. Menninger complained in writing on April 27, 2018 that Mr. Mekerri's treatment of her was getting "worse" and was causing her to experience increased panic attacks, Exhibit 115—providing PPD with additional notice that its actions <u>were</u> causing, and <u>would cause</u> Dr. Menninger severe harm (Factor 6)—Mr. St. John told her that PPD would launch a "fair and impartial" investigation. Tr. 2, 122:9–18 (Dr. Menninger). The jury heard overwhelming evidence, including serially contradictory and dishonest testimony from Ms. Ballweg, that PPD conducted this "investigation" as a sham, with intent to cover up its wrongdoing and achieve Dr. Menninger's exit (Factor 7).

PPD knew how important the investigation was to Dr. Menninger and that she was very anxious about its outcome. Tr. 5, 6:7-9:19 (Ms. Ballweg). (Factor 6). PPD also knew conducting a sham investigation was unlawful: Ms. Ballweg had received training on how to conduct investigations, including from PPD's in-house counsel and outside counsel who represented PPD at trial, and understood the need to be objective and impartial. Tr. 4, 73:18–74:15 (Ms. Ballweg). There were other people within HR who could have conducted the investigation besides Ms. Ballweg. Tr. 4, 130:25–131:3 (Ms. Ballweg). Ms. Ballweg admitted it would be inappropriate to

11

investigate a matter in which she was personally involved, id. 74:20–24, but disingenuously testified that she was merely "aware" of the situation rather than "involved." Id. 75:20.

The evidence showed Ms. Ballweg had not only been deeply "involved" from the outset, but had *personally directed and coordinated* many of the very actions about which Dr. Menninger complained. Mr. St. John had kept Ms. Ballweg closely informed after Dr. Menninger disclosed her disability and through each step of Dr. Menninger's requests for accommodation, through PPD's February 26th rejection email, which Ms. Ballweg approved in advance. Exhibits 60, 223, 213, 193, 180, 172, 277, 192. Ms. Ballweg knew back in February that Mr. St. John was trying to "delicately work[] Lisa out," and received his email saying so in writing, Exhibit 186. She worked closely with Mr. St. John on the packet he drafted for Attorney Noecker seeking help with an "exit strategy." Exhibits 65, 87. She worked as a go-between with Attorney Noecker starting in late March to plan Mr. Mekerri's deliberate efforts to "document" pretextual issues with Dr. Menninger's performance. Exhibits 68, 69, 148. And she coordinated and reported on the status of these "exit strategy" efforts with Mr. Williams (her boss) and Mr. Fikry (Mr. Mekerri's boss) so that they would know the "timing" of when Dr. Menninger's "exit" was finally achieved. Ex. 265.

Dr. Menninger's April 27th email to Mr. St. John (Exhibit 115) that triggered Ms. Ballweg's investigation combined two email threads that PPD had been trying to keep separate and "compartmentalized"— one about her request for accommodation (Ex. 115 at 861–65) and one about Mekerri's changes to her annual goals (Ex. 115 at 866–71). **The evidence showed that Ms. Ballweg was directly involved in reviewing and approving PPD's communications to Dr. Menninger in both of these threads**. Exhibits 119 (reasonable accommodations) and 118 (Goals). Not only that, Ms. Ballweg specifically had forwarded to Mr. Mekerri a draft for him to send (which became Mr. Mekerri's April 25th email in the Goals thread) that was written by Attorney

12

Noecker. Exhibit 73. But when Ms. Ballweg was confronted with Exhibit 118 she falsely denied being aware in advance of Mr. Mekerri's April 25th email. Tr. 4, 122:9–12, 123:7–9. She further denied that Mr. Mekerri's April 25th email was part of PPD's efforts to document alleged performance deficiencies with Dr. Menninger, which the jury could find was a lie. Id. 122:13–16.

Ms. Ballweg continued to contradict herself, initially refusing to give a straight answer when asked to acknowledge that Mekerri's April 25th email was one of the emails Dr. Menninger had asked to be investigated, Tr. 4, 125:7–126:9; then claiming she was not "involved" in Mr. Mekerri's email because she had merely served as a "conduit" between Attorney Noecker and Mr. Mekerri, id.; but then admitted that she did know Dr. Menninger had attached Mekerri's email because it related to Dr. Menninger's complaint. Id. 130: 11–13. Ms. Ballweg implausibly lied that she "would have had a conversation" with Attorney Noecker "If Lisa Noecker's name would have been attached to any of" the seven matters about which Dr. Menninger complained. Id. Ms. Ballweg did not investigate Attorney Noecker even though Ms. Ballweg knew Attorney Noecker was helping to craft this and other responses from PPD to Dr. Menninger. Id. 126:10–127:7.

There was also evidence that Ms. Ballweg's "investigatory" interviews were a mockery. Mr. St. John admitted that her only question was whether he "witnessed anything that was not fair and equitable in conversations between Dr. Menninger and Mr. Mekerri," and that was it. Tr. 7, 77:13–20. The jury could have inferred that Ms. Ballweg actually used this "investigatory interview" to ask Mr. St. John for help finding documentation that would show performance feedback from Mr. Mekerri pre-dating Dr. Menninger's disclosure of disability—in other words, she was not investigating Dr. Menninger's complaint but rather, trying to find evidence PPD could use to help cover up its efforts to achieve Dr. Menninger's "exit." Exhibits 75, 245; Tr. 7, 72:25–74:10 (Mr. St. John).

<div align="center">13</div>

There were many more contradictions in Ms. Ballweg's testimony about her investigation even on basic issues. Ms. Ballweg signed a sworn declaration to the MCAD that her "prompt and thorough" investigation had included an investigation of whether PPD had properly handled Dr. Menninger's accommodation requests. Tr. 4, 91:12–93:10. But she claimed at trial that she did <u>not</u> investigate PPD's handling of Dr. Menninger's request for accommodation. <u>Id.</u> 91:1–5. Then she testified that she <u>did</u> investigate PPD's handling of Dr. Menninger's accommodation requests, <u>id.</u> 93:11–13, and that the February 28, 2018 meeting between Mr. St. John, Mr. Mekerri, and Dr. Menninger was within her investigation's scope. <u>Id.</u> 142:6–9. Then she contradicted herself again, denying that investigating the actions of Mr. St. John fell within her investigation's scope. <u>Id.</u> 144:12–18.

Ms. Ballweg admitted that it would have been material to her investigation's findings if she knew that Mr. St. John and Mr. Mekerri's conduct in their February 28, 2018 meeting with Dr. Menninger were part of an effort to gently work Dr. Menninger out of the company, or as part of an exit strategy, because ***PPD was at that point supposed to be working with Dr. Menninger to determine how it could have accommodated her in her job***. <u>Id.</u> 142:22–145:9. But her investigation made no mention of the facts that Ms. Ballweg knew from her own personal involvement that showed she, Mr. Mekerri, Mr. St. John, Attorney Noecker, Mr. Williams, and Mr. Fikry all shared those exact motives. The jury could have found that Ms. Ballweg knew there was a "concerted plan to move Dr. Menninger out of her position," and indeed Ms. Ballweg did not even explicitly deny knowing there was such a plan when asked directly. Tr. 5, 77:11–17. The jury could have found that Ms. Ballweg uttered an egregious and outrageous lie, with conscious intent to demean Dr. Menninger, when she claimed that the discriminatory and retaliatory conduct Dr. Menninger complained about "just wasn't there." Tr. 5, 102:11–13.

14

The jury could also have found Ms. Ballweg lied when she testified that she "held out hope" that Dr. Menninger would return from medical leave, Tr. 5, 146:5–8, because on June 4, 2018 (at the same time Dr. Menninger took medical leave) Ms. Ballweg's boss was already emailing her about logistics for "the new guy" who became Dr. Menninger's replacement—Dr. Basel Kashlan. Tr. 6, 47:2–48:13; Exhibit 231.

As discussed below, the reason Dr. Menninger had taken medical leave in early June was that PPD's conduct had caused her to no longer want to live. She suffered severe emotional distress with frequently periods of suicidality for five years and continues to suffer today.

The jury was overwhelmingly justified in concluding that "strong medicine" is needed to punish PPD for its brazen, duplicitous, and harmful conduct.

### C. Even if PPD's Other Arguments had not Been Waived, They Would Also Fail

PPD's other arguments challenge the sufficiency of the evidence on four issues: (1) whether Dr. Menninger was a "qualified" disabled person, meaning capable of performing the essential functions of her job with or without accommodation, (2) whether she was denied a "reasonable" accommodation, (3) whether she was subjected to an adverse action and (4) whether she was subjected to retaliation. We address each argument in turn.

#### 1. Qualified

It was undisputed at trial that Dr. Menninger's disability had not historically prevented her from successfully performing the essential functions of her role. This included many of the client-facing activities identified in Mr. Mekerri's "buckets." Thus, the primary questions for trial were (1) to what extent, if any, were Mr. Mekerri's desired expansion of these responsibilities "essential" and (2) to what extent could Dr. Menninger tolerate any such "essential" activities, with or without reasonable accommodation.

15

PPD bore the burden of proof on the first question, and the jury could have rightfully determined that PPD failed to meet it. Indeed, even in its post-trial briefing, PPD does not identify the specific task(s) that it was "essential" for Dr. Menninger to either start doing or start doing more of. Further, it offers no explanation for why, if such activity was essential to Dr. Menninger's role, she was never asked to do it (or do more of it) in the months that followed Mr. Mekerri's "buckets" email. At bottom, PPD rests on nothing more than the vague, self-serving testimony of Mr. Mekerri and his former colleagues, all of which the jury could find lacking credibility.

But even if the jury were compelled to find that some increase in Dr. Menninger's client-facing responsibilities was "essential," there was ample evidence from which the jury could infer that Dr. Menninger could have tolerated such an increase. In particular, the jury heard evidence from Dr. Summergrad concerning the "coping" mechanisms that Dr. Menninger had developed, which included the use of medication. Further, the jury heard that certain accommodations— such as allowing Dr. Menninger to plan for and recover from her customer facing activities— would have helped her utilize these coping skills to deal with increases to her customer facing responsibilities. Viewing the evidence as a whole, and in the light most favorable to the verdict, the jury could properly infer that—more likely than not—Dr. Menninger could have utilized her coping mechanisms to tolerate any essential changes to her role, either with or without accommodation.

PPD's arguments to the contrary are without merit. First, contrary to PPD's suggestion otherwise, evidence of how Dr. Menninger had historically performed her job is highly relevant to determining what functions are "essential." As the Court instructed the jury, numerous factors may be considered to determine what functions are essential, including "the amount of time

16

spent on the job performing the function" and "the work experience of people who have held the job." PPD not only failed to object to these instructions—PPD included these factors in its own requested jury instruction. (ECF 114-1, 18).[5]

Second, Dr. Kessimian's statement concerning how Dr. Meninger *might* be impacted by changes to her role is hardly the "devastating" evidence that PPD wishes it were. Dr. Kessimian simply stated that (1) increasing Plaintiff's customer-facing responsibilities would have made it more difficult for her to do her job, and (2) at some unspecified level of increase, it might become impossible for Dr. Meninger to do her job. Exhibit 54. Neither statement precluded the jury from finding that, whatever increase may be "essential" (if any) was within Dr. Menninger's ability to tolerate using her coping mechanisms (with or without accommodation).

The evidence, particularly when viewed in the light most favorable to the verdict, fully supports the jury's factual findings.

### 2. "Reasonable" Accommodation

As it must, PPD builds its argument by brazenly misstating the evidence. Particularly breathtaking is its assertion that "Menninger's own psychiatrist believed firmly that…the only option was to outsource [Dr. Menninger's] responsibilities to a 'surrogate.'" (Doc. No. 181 at 20.) Dr. Kessimian never said that, and in fact her testimony was quite the opposite. (Doc. No. 153 at 68-69.)

It is also remarkable that PPD makes no mention of the reasonable accommodations suggested by Dr. Kessimian on January 31, 2018. Exhibit 28. As the Court will recall, it was these accommodations that Plaintiff's counsel focused on in closing arguments—specifically the

---

[5] The Court should take note of PPD's citation to <u>Jones v. Walgreen Co.</u>, 679 F.3d 9, 16 (1st Cir. 2012), for the proposition that "past job performance is not a reliable indicator of what tasks are essential going forward." The case says nothing of the sort, and PPDs misleading description of its hold (without even a <u>see</u> cite) is emblematic of the liberties it has taken with misstating the trial record.

requests that Dr. Menninger's "role not be changed to require any increased public speaking or social interactions" and, if that was not possible, "a plan be developed for these activities…" Id. As it did at trial, PPD makes no argument as to why these requested accommodations were not "reasonable" or otherwise could not have been provided.

But a more fundamental gap in PPD's argument is its failure to acknowledge the burden shifting framework at play. Again, it is PPD's burden to first show that a particular job function is essential. If the jury could have reasonably found that PPD failed to meet that burden with respect to any of the items in buckets 2-4, the failure to accommodate Plaintiff by removing or altering that one non-essential task would be enough to sustain the jury's verdict. See MCAD Guidelines § II.C. Put differently, PPD needed to pitch a perfect game on the "essential function" issue in order to have any hopes of avoiding liability for failure to accommodate.

Whether PPD sustained its burden was obviously a question for the jury to decide, and the evidence relied upon by PPD was hardly overwhelming. Further, as discussed above, the jury was permitted to consider how Plaintiff had historically performed her job in deciding whether all of the items in buckets 2-4 were essential. Viewing the evidence in the light most favorable to the verdict, the jury could rightfully conclude that one or more of the items in those buckets were non-essential, and that PPD broke the law by failing to accommodate that non-essential task.

Of course, even if the evidence had been so overwhelming as to require the jury to find that PPD proved each and every facet of buckets 2-4 were essential (it wasn't), there was still ample evidence from which the jury could find that at least one of the proposed accommodations was reasonable. (Again, only one is needed to sustain the jury's verdict) For example, Dr. Kessimian's request that Dr. Menninger be permitted to "develop a plan" for these increased activities is something that PPD could have easily done. Instead, however, PPD refused to

provided Dr. Meninger any additional detail concerning the items in these buckets and effectively made it impossible for to develop such a plan.

Similarly, while PPD takes great umbrage with the possible provision of a "reader," that was an appropriate accommodation for the jury to consider, and which was supported by the evidence. There is no rule of law that limits a particular accommodation to a particular disability. If providing a "reader" for any of the tasks in items 2-4 would have ameliorated the burden of Dr. Menninger's disability, and if it would not have imposed an "undue burden" on PPD, the jury was right ruling in her favor.

Again, these were factual issues for the jury to consider and decide based on the hundreds of exhibits and days of testimony provided at trial. PPD advances no credible argument to suggest that this issue should have removed from the jury's consideration.

> 3.    Adverse action.

PPD argues that the evidence could not have supported a finding in Dr. Menninger's favor on her disparate treatment claims for three reasons: (1) the new goals and expectations contained in Mr. Mekerri's February 6, 2018 email (Exhibit 350, i.e., the five buckets) were already part of Dr. Menninger's job and yet also—contradicting the foregoing claim—were never "imposed"; that (2) increasing of "pre-existing responsibilities" for some reason "does not constitute an adverse employment action"; and (3) the evidence did not support causation. Each of these arguments is without merit.

As an initial matter, Dr. Menninger presented evidence of more adverse actions than just the February 6, 2018 email, as PPD seems to assume. Dr. Menninger's theory was that PPD created "new goals and expectations" for her role as Executive Director in the Spring of 2018 because of her disability. See Tr. 10, 98:12-19 (final jury charges). But as the Court made clear at the charge

19

conference, those new goals and expectations were <u>not</u> limited only to the five buckets in Mr. Mekerri's February 6, 2018 email; the Court noted that its summary judgment order (ECF Doc. 81 at 14) had not found that Mr. Mekerri's February 6, 2018 email was the only conceivable adverse employment action. Tr. 9, 138:19–140:2. PPD <u>did not object</u> to Dr. Menninger's trial theory of adverse action based upon "new goals and expectations" and <u>did not argue</u> that the evidence could only support the February 6, 2018 email theory of adverse action alone. <u>Id.</u>

The evidence that PPD ignores included that beginning on March 26, 2018 (see Exhibit 49), Mr. Mekerri's tone drastically changed to harsh and accusatory (where it had previously been friendly and informal) and he began launching a fusillade of "tough feedback" to Dr. Menninger on various lab issues. Tr. 2, 92–113; Exhibits 49, 50, 301, 320. Mr. Mekerri had never involved himself in lab issues in that manner before and had never "documented" issues in that manner. <u>Id.</u> 93:3–11. <u>Citing</u> these "lab issues," on April 10, 2018, Mr. Mekerri announced he wanted to change Dr. Menninger's 2018 annual goals—the core expectations of her job for that year, on which she would have been evaluated at year's end, see Tr. 1, 190:3–7—to include <u>impossible</u> "new goals and expectations" such as "elimination of lab issues" as well as eliminating client complaints and "quality issues." Exhibit 50. Indeed on April 10th, he told Dr. Menninger that he expected her to prevent the labs from having issues in the future. Tr. 2, 98. Mr. Mekerri later instructed that Dr. Menninger's "job" was to, essentially, personally involve herself in lab issues and "handle" them, which was both unrealistic and totally outside of PPD's standard processes. <u>Id.</u> 108–10. As discussed above, the jury could have found this conduct was part of PPD's deliberate "exit strategy" to set Dr. Menninger up for failure and justify termination. This evidence alone, which PPD does not challenge in any way, was sufficient to support the jury's liability on Dr. Menninger's disparate treatment claim by itself.

The evidence also supported the jury finding that Mekerri's February 6, 2018 email was an adverse employment action. As to PPD's contradictory first argument, that Mekerri's new expectations were both already in existence and yet were never imposed, the evidence (including Mr. Mekerri's email, Exhibit 350) supported a finding that Mr. Mekerri's email represented an announcement of new expectations of Dr. Menninger's job with present effect. Cf. Burns v. Johnson, 829 F.3d 1, 11 (1st Cir. 2016) (rejecting similar argument that officially announced, changed job duties could not be adverse). There is no evidence that PPD considered these expectations to be only potential or hypothetical ideas for the future; rather, Mr. Mekerri described the expectations as being newly imposed for "2018," in light of PPD's changing business goals. Id.

Second, PPD cites no authority for the notion that a vast, sudden increase in certain job responsibilities cannot be adverse if the employee had already performed those responsibilities on a limited basis. The governing test, as the Court observed at summary judgment (ECF Doc. 81 at 14–15), is whether an employer's action would be materially adverse to a reasonable employee in Dr. Menninger's circumstances. The jury could have found the drastic increase in scope in public speaking and other social interactions, that were inherently difficult for an employee with Social Anxiety Disorder, was materially adverse. Further, the evidence easily showed that the new expectations described in Mr. Mekerri's February 6, 2018 email were "significantly different" from the job that Dr. Menninger had been performing, as required to be material. See Burns, 829 F.3d at 10. For example, Mr. Mekerri suggested Dr. Menninger might have to give public SLT presentations as often as "biweekly" and technical sales presentations as often as "monthly." Exhibit 350. Dr. Menninger had at that point only participated in two or three SLT presentations, Tr. 2, 58:18–23, and just one internal technical sales presentation, id. 62:21–25.

21

Third, PPD's causation argument simply misrepresents the record. In 2017, Mr. Mekerri did not implement the job expectations captured by his February 6, 2018 email. Rather, he told Dr. Menninger vaguely that there would be some changes to her role, involving more public speaking and social interactions, to make her more "visible." Tr. 1, 183:24–184:3. Dr. Menninger disclosed her disability on January 11, 2018, and it was in response to that disclosure, and Dr. Menninger's initial accommodation request of January 31st, that Mr. Mekerri announced <u>for the first time</u> the expectations captured by his email on February 6th. Lastly, PPD falsely claims that the expectations in Mr. Mekerri's February 6, 2018 email were imposed on all "senior leadership" employees as well as Dr. Menninger's replacement, Dr. Kashlan. The testimony PPD cites does not support that claim, as there is no evidence that <u>the specific scope and frequency expectations</u> described in Mr. Mekerri's February 6, 2018 email were imposed on anyone but Dr. Menninger.

### 3.   The evidence supported Dr. Menninger's retaliation claims.

PPD argues that the jury's verdict on Dr. Menninger's retaliation claims must be overturned because the evidence did not support a finding that PPD engaged in <u>*any*</u> of the six forms of retaliatory conduct that the Court sent to the jury. Those were:

> (1) PPD tried to coerce Dr. Menninger to quit; (2) PPD tried to manufacture grounds for her termination; (3) PPD refused to clarify the anticipated changes to her role; (4) PPD established unrealistic expectations and goals for her role; (5) PPD diminished her involvement in hiring and recruiting decisions; and (6) PPD conducted a sham investigation into her complaints of mistreatment.

Tr. 10, 105:15–22. Beyond the "sufficiency of the evidence" contention, PPD also raises a variety of newly formed arguments—never articulated at trial—for why some of these theories could not have been materially adverse as a matter of law.

As a threshold matter, PPD raised no objection to the Court instructing the jury on <u>each</u> of these theories, either at the charge conference on Day 9 or on Day 10 when the jury was charged. PPD's arguments are therefore waived for multiple reasons. But even if the Court entertains PPD's

22

arguments, they are without merit. The evidence supported the jury finding that PPD engaged in each of the 6 alleged adverse actions, and that they were materially adverse.

To be clear, Dr. Menninger was not required to prove <u>all</u> of the 6 theories of retaliation in order to prevail on her retaliation claims. The Court correctly instructed the jury, without objection from PPD, that Dr. Menninger's burden was to prove that "one or more" of those six alleged acts occurred, and that the proven acts amounted to an adverse action "either individually or collectively." Tr. 10, 105:23–106:3. The Court also correctly instructed the jury, without objection from PPD, on the *contextual* standard for material adversity:

> . . .Dr. Menninger need only prove that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from engaging in protected conduct. Material adversity is judged from the standpoint of a reasonable person in the employee's position, meaning a person with all of the same conditions as Dr. Menninger and in light of all the relevant circumstances.

Tr. 10, 106:4–16. <u>See</u> <u>also</u> Summary Judgment Order (ECF Doc. 81 at 16–19). This standard correctly stated the law under <u>Burlington N. v. White</u>, 548 U.S. 53, 69 (2006), which holds that "Context matters. . . a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others."

For these reasons, the Rule 50(b) motion must be denied if the evidence, read in the light most favorable to Dr. Menninger and granting all permissible inferences in her favor, supported a finding that PPD engaged in one or more acts that individually or collectively might well have dissuaded Dr. Menninger from requesting an accommodation. The evidence clearly supported that finding.

First, for the reasons discussed above concerning PPD's Rule 50(b) punitive damages argument, the evidence easily supported a jury finding that PPD engaged in the retaliatory conduct captured by points (1), (2), (4), and (6). PPD is wrong to suggest that the adverse actions of (1)

23

pressuring an employee to quit and (2) attempting to manufacture grounds for her termination can never be materially adverse as a matter of law. That ignores the *contextual* standard of <u>Burlington Northern</u> on which the Court instructed the jury—again, without objection from PPD. The jury was well warranted in finding that a reasonable employee in Dr. Menninger's position, that is, with Social Anxiety Disorder, would have been dissuaded from disclosing her disability and requesting an accommodation if she knew that her employer would immediately try to get rid of her. As Dr. Menninger testified, she was "terrified of disclosing my condition. I didn't know what would happen. I thought I would be viewed . . . differently, viewed as defective and maybe even lose my job." Tr. 4, 61:19–22. Like the hypothetical "mother with school-age children" referred to in <u>Burlington Northern</u>, 548 U.S. at 69, Dr. Menninger was a mother and wife and sole financial provider for her family and was "devastated" by the efforts to pressure her to quit on February 28th, Tr. 2, 71:18–72:12 and "terrified" by Mr. Mekerri's new efforts to document her, <u>Id.</u> 94:3–12, and impose impossible goals for her job. <u>Id.</u> 97:22–98:11. And as explained below in the emotional distress discussion, Dr. Menninger experienced essentially a confirmation of the fears of being judged and humiliated that are the core aspects of her Social Anxiety Disorder. On point (4), as discussed above the evidence showed that PPD imposed unrealistic expectations and goals on Dr. Menninger's role, including that she might have to give presentations as often as biweekly, that she would "eliminate" lab issues, quality issues, and even client complaints—which was impossible in a lab like PPD's—and that she would "handle" lab issues so that they would never happen.

On point (6) PPD argues baselessly that an investigation cannot be a "sham" if the investigator interviews witnesses and considers evidence. That is incorrect as a matter of law, as the same could be said of the investigation that the jury permissibly found to be a "sham" in

Gyulakian v. Lexus of Watertown, Inc., 475 Mass. 290, 301–04 (2016). In Gyulakian, some of the reasons that the investigation was a "sham" included that the investigator was biased against the plaintiff from the outset; the investigator failed to interview witnesses that were likely to have witnessed the alleged harasser's conduct; and the investigator somehow failed to find evidence of a sexualized workplace even though a former manager had circulated a memo regarding the harasser's inappropriate behavior. Id. at 303. Here for the reasons discussed above, Ms. Ballweg's bias against Dr. Menninger, resulting from her own extensive personal participation in PPD's "exit strategy" was orders of magnitude worse than the bias of the investigator in Gyulakian, who merely said that he "honestly didn't believe" the plaintiff's allegations when he first heard them. Id. at 302. There was evidence that Ms. Ballweg failed to interview any of Mr. Mekerri's direct reports to determine if he was truly holding all of his reports accountable as opposed to targeting Dr. Menninger, even though Ms. Ballweg knew that lab problems were not happening only under Dr. Menninger's purview. Tr. 4:131:7–138:9. And as discussed at length above Ms. Ballweg's investigation, predictably, did not examine any of the evidence of PPD's "exit strategy" to "delicately work Lisa out" that she had personally participated in behind Dr. Menninger's back. See, e.g., Id. 121:9–18 (admitting she failed to investigate Mr. Fikry's "timing of Lisa Menninger's exit" email).

The evidence supported a jury finding of retaliation on point (3), that PPD refused to clarify the changes to Dr. Menninger's role. Mr. Mekerri's February 6, 2018 email was anything but clear, given his bizarre "frequency" ranges such as "biweekly, monthly and/or quarterly." Exhibit 350. As Dr. Kessimian cogently explained, "That doesn't give me information. .. that's a frequency I cannot define, actually." Tr. 6, 114:9–16. In the February 28th meeting Dr. Menninger begged Mr. Mekerri and Mr. St. John to provide more clarity about the items in Mr. Mekerri's email, but "They

25

said they could not. They would not go into further detail." Tr. 2, 71:1–9. She asked Mr. St. John

for more detail in her follow-up email on March 1st, Exhibit 332, but his response (Exhibit 176)

did not answer her question. Id. 78:8–15. Mr. St. John's draft response, Exhibit 167, showed that

he was deliberately refusing to do so because "Adding additional detail would only present the

opportunity to select items in each bucket you believe you can or can't do." The jury saw, including

in Exhibit 119, that St. John continually refused to provide any more detail to Dr. Menninger about

the changes to her role. Dr. Summergrad and Dr. Kessimian both testified that due to the nature of

her anxiety, it would have been very helpful to Dr. Menninger to understand what level of public

speaking and social interactions was going to be expected of her. Tr. 6, 95:1–22 (Dr. Kessimian);

181:23–182:4 (Dr. Summergrad), and Dr. Summergrad found that PPD's "lack of clarity"

contributed significantly to Dr. Menninger developing major depression. Tr. 6, 189:4–20. PPD

was deliberately refusing to answer Dr. Menninger's questions because it was orchestrating an

"exit strategy," and that lack of clarity was materially adverse because it exacerbated Dr.

Menninger's anxiety.

Finally, the evidence supported retaliatory theory (5), that PPD excluded Dr. Menninger

from recruiting and hiring decisions that were material to her role. Recruiting was an important

part of Dr. Menninger's job, and one of her explicit annual performance goals for 2017, because

at the time Dr. Menninger went remote PPD decided to hire new scientific expertise to hold certain

certifications (CAP director and New York stakeholder) for the Highland Heights lab. Tr. 1,

197:13–198:18; Tr. 3, 16:21–18:16 (Dr. Menninger); Exhibit 59 (2017 performance review) at

482. Despite this, in 2018, contrary to typical practices, Dr. Menninger was left out of the recruiting

and hiring process completely for two pathologists who were being interviewed to hold those very

sorts of certifications, as well as the process for another associate director who replaced Dr.

Menninger's former direct report and took on a dotted-line reporting to Dr. Menninger. Tr. 2, 83:19–84:22, 88:1–89:11. Dr. Menninger was blindsided by these decisions and learned about them from a text message from her direct report. Id.; Exhibit 41. The exclusion prevented her from being able to use her specialized expertise to evaluate the qualifications of the candidates PPD was interviewing, and Mr. Mekerri was unprepared to do that. Id. at 89:1–11. PPD's brief falsely suggests that Dr. Menninger *requested* that Mr. Mekerri exclude her from hiring and recruiting after a conversation in November 2017 where she told Mr. Mekerri she was "overwhelmed." But there was no evidence that Dr. Menninger made any such "request." What the evidence did show was that in November 2017 Mr. Mekerri asked Dr. Menninger about the duties of her job; she sent him a list of duties; and then he never brought that up again. Tr. 1, 177:1–178:5. The only evidence PPD cites to show that Mr. Mekerri supposedly told Dr. Menninger about his purported plan to "help" her by taking the lead on recruiting was Ms. Ballweg's testimony from her "investigation." The jury was entitled to disregard Ms. Ballweg's testimony, which was contradictory and nonsensical: in almost the same breath she claimed that Mr. Mekerri had "no conscious effort" to exclude Dr. Menninger from the interview process, but also that Mr. Mekerri excluded Dr. Menninger because he consciously wanted to "help [Dr. Menninger] lessen the workload." Tr. 5, 67:21–68:15.

## II.    **The Motion for New Trial or Remittitur Should Be Denied.**

As with its Rule 50(b) motion, PPD bears a heavy burden to succeed on its request for a new trial or remittitur. "A district court should only grant such motions if the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 554 F.3d 164, 174 (1st Cir. 2009). The Court must "review the evidence in the light most favorable to the prevailing party" and may "grant remittitur or a new trial on damages only when the award

exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it." E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc., 40 F.3d 492, 502 (1st Cir. 1994).

### A. The Overwhelming Evidence of Dr. Menninger's Extreme Emotional Distress Supported the Jury's Award of Emotional Distress Damages.

PPD does not contend that the evidence was insufficient to show severe emotional distress—PPD actually concedes in its Memorandum that Dr. Menninger suffers from severe mental disabilities and suffered severe distress during and after 2018.[6] Rather, PPD challenges the jury's emotional distress award solely on grounds of causation.

The evidence at trial left no doubt that PPD caused Dr. Menninger's severe emotional distress. PPD's own expert characterized PPD's response to Dr. Menninger's request for accommodation as the "light switch" that triggered Dr. Menninger's depression. Tr. 9, 91:7–13, 92:19–25 (Dr. Kelly).[7] That causal connection was supported by trial testimony of several witnesses and further documented in Dr. Kessimian's contemporaneous treatment notes (Exhibit 18), as well as Dr. Kessimian's June 2018 statement in support of Dr. Menninger's medical leave (Exhibit 19).

In January 2018, Dr. Menninger had anxiety about the anticipated changes to her role and about her disclosure of her disability. Tr. 1, 184:5. But she was not depressed and had no suicidal ideation. Tr. 2, 50:3–20; Ex. 18 at MENNINGER000665 (Jan. 22, 2018). Rather, she loved her job, which gave her a feeling of purpose, and she worked very hard. Tr. 2, 125:24–125:14. Her job

---

[6] PPD falsely claims that it "has never disputed that Menninger suffers from severe mental disabilities." In fact, PPD hired an expert who opined that Dr. Menninger did not have major depression and had no mental condition that was severe enough to prevent her from working. Tr. 9, 67:12–70:7 (Dr. Kelly) ("**I think she has a sincere but incorrect belief that she's disabled"**) (emphasis added) and repeatedly elicited testimony at trial apparently intended to show that Dr. Menninger's running of ultramarathons was inconsistent with her claims of severe emotional distress.

[7] Of course, expert testimony on this point was not required to meet Plaintiff's burden. Causation only needed to be proved by a preponderance of the evidence, not to a reasonable degree of scientific certainty.

was important to her because she was the sole income provider for her family. Id.; see also Tr. 1, 188:7–9. After requesting accommodations, taking medication, and visiting Dr. Kessimian three times, Dr. Menninger was showing improvement in her anxiety as of February 16, 2018. Ex. 18 at MENNINGER000671; Tr. 6, 147:20–148:15.

The circumstances changed markedly for the worse starting at the February 28, 2018 meeting. When St. John immediately presented her with the two options of an exit package or consulting role, Dr. Menninger was "in shock" and became "very emotional." Tr. 2, 69:23. She was scared, and was crying and panicking, and pleaded with St. John and Mekerri to talk about the tasks in the buckets that they had said they could not accommodate. Id. 70:25–71:7. She felt the weight of being the sole financial provider for her family and felt as if she were pleading for her family's survival. Id. 71:18–72: 12. After this meeting Dr. Menninger began having "severe and frequent" panic attacks as she awaited Mr. St. John's response to her March 1, 2018 follow-up email. Id. 78:3–7. She was shocked when during this interim she received a text (Exhibit 41) from her direct report Dr. Reddy telling her that PPD had made offers to two pathologists, which was a sign PPD was moving fast to replace her. Id. 83:5–18. After Mr. St. John's unresponsive March 12, 2018 email arrived, Dr. Menninger felt even worse. Id. 79:19. Dr. Menninger's decline was documented in Dr. Kessimian's treatment notes, which reported her distress about the "email from Chad [St. John]" and how her social anxiety worsened so that she could no longer walk around the neighborhood. Ex. 18 at MENNINGER000677.

By March 30th she felt worse than ever before. Id. at 683. Around this time, Dr. Menninger called her sister Tonya Hart and told her about the February 28th meeting, and Dr. Menninger was shaky, tearful, and devastated. Tr. 5, 109:10–110:12. Then, in April, Dr. Menninger was "terrified" when Mr. Mekerri began sending her aggressive emails to "document" her performance, Tr. 2, 94:

3–7, and was even more terrified when Mr. Mekerri changed her annual performance goals to include impossible tasks like "eliminating lab issues." Id. 100:13–16. She accurately perceived that PPD was trying to force her out of the company. Id. 103:22–23.

By late April Dr. Kessimian documented Dr. Menninger's first onset of thoughts about killing herself, as Dr. Menninger's suffering was at times unbearable. Ex. 18 at 695–96. Dr. Menninger testified at length about the suffering and rapid deterioration to her health that this caused: among other things she couldn't sleep, suffered gastrointestinal distress, and was afraid of losing her job; she had multiple panic attacks per day; and would wake up in the middle of the night with sweating, shaking, rapid heart rate, and rapid breathing. Tr. 2: 113:11–115:14. Her sister Ms. Hart corroborated this testimony, reporting that Dr. Menninger was struggling with severe depression and suicidal thoughts—a state in which Ms. Hart had never seen her sister before in her life. Tr. 5, 111:20–112:8.[8]

Dr. Menninger decided to report her concerns about PPD's treatment of her to HR, which felt like the last chance she had to try to save her job and protect her family. Tr. 2, 125:18–22. But when Ms. Ballweg told her that "no evidence" of discrimination or retaliation had been found Dr. Menninger felt "hopeless." Id. Worse, she felt she had failed her family and did not want to live anymore. Id. 114:5–10. Dr. Kessimian saw Dr. Menninger on June 1st and recommended immediate medical leave because Dr. Menninger was so suicidal that continuing to work was a risk to her safety. Ex. 18 at 706, 708; Tr. 6, 70:8–71:8 (Dr. Kessimian); Ex. 19 at 777. Dr.

---

[8] Dr. Menninger explained what a panic attack feels like: "Some are worse than others, but in general, my breathing becomes very rapid. My heart rate becomes very rapid. I start sweating. I get shaky. My voice gets shaky. Sometimes I'm unable to talk if it's really bad, and I just -- I'll have tears come down my face. And it's very scary. I get GI distress, which is embarrassing because then I feel like I have to go to the bathroom; and, you know, I'm, like, embarrassed by that. And the more the symptoms escalate, it just makes me panic more and more. So it's just this awful spiral of, like, the symptoms just keep escalating, and you can't stop it. And it's like feeling trapped, and sometimes you feel like you have like an out-of-body experience, and you are just, like, not even aware of what's going on around you." Tr. 1, 186:9-23.

Kessimian specifically identified the reason for Dr. Menninger's mental state as "decline to accommodate, now with hostile work environment." Ex. 19 at 777; Tr. 6, 74:14–20.

Dr. Menninger had by this point developed Major Depressive Disorder. Tr. 6, 187:6–10 (Dr. Summergrad); Ex. 25 at 119 (Butler Hospital treatment notes dated July 11, 2018). Dr. Summergrad explained that the causes of Dr. Menninger's major depression included the "lack of clarity" with which PPD had left her about the changes to her role, and her feeling that PPD was looking to have her "exit the organization." Tr. 6, 189:4–20. Further, Dr. Menninger's disclosure of her disability caused her to experience the realization and confirmation of the very fears that are the "cardinal" elements of her social anxiety disorder: fears of being seen, exposed, and humiliated. This made her feel even more negatively about herself and contributed significantly to her feelings of hopelessness, a cardinal symptom of major depression. Id. 189:15–193:11.

The jury heard evidence that Dr. Menninger has tried desperately to get better. Tr. 2:127:17–21 (Dr. Menninger); Tr. 5, 126:1–15 (Ms. Hart); Tr. 6, 69:16–21, 72:16–25 (Dr. Kessimian); Tr. 6, 194:11–14 (Dr. Summergrad); see also Exhibits 22–27 (medical treatment notes). Tragically and despite this, Dr. Menninger continued to suffer profoundly for the nearly five-year period from June 2018 through the time of trial.

Dr. Menninger struggled for years with her sleep. See, e.g., Tr. 2, 130:7–8. She has recurring, frequent nightmares involving people she works with at PPD, in which she has to hide or run away, and fears being harmed or killed. Tr. 2, 129: 3–14 (Dr. Menninger); Tr. 196:8–23 (Dr. Summergrad). She was diagnosed with Post-Traumatic Stress Disorder, see, e.g., Ex. 23 at 7 (Dr. Burbano medical records), Tr. 2, 127:6 (Dr. Menninger), and has for years experienced post-traumatic symptoms such as startle responses to noise or unexpected activities, avoidance of the triggers of trauma, and the aforementioned dreams whose content presents the cause of the trauma

31

nakedly (i.e., a dream literally about PPD and people who she used to work with there). Tr. 6, 195:25–196:23 (Dr. Summergrad).

Dr. Menninger's mental distress brought her weight down by a full quarter, from 120 pounds to 90. Tr. 2, 129:23–130:2. The jury could visually compare Dr. Menninger's gaunt physical appearance and strained affect with that of her sister Ms. Hart, who is just 12.5 months older, Tr. 5, 104:1 (Ms. Hart), who had a healthy weight and happy affect, almost as if presented with before-and-after frames showing the effects of Dr. Menninger's suffering. Dr. Menninger described her present mental state in heartbreaking terms:

> But I don't know if I'm going to be able to experience happiness again. I don't know what the statistics are on that. I -- I just want my family to be okay and happy. I just -- this is so unfair to my child. And I really just want -- I want them to have a happy life.
>
> [. . .] there's days when I'm just curled up in the fetal position in bed and I cannot get out of bed because of fear. It's hard to trust anyone. I don't know who I can trust. I feel like everyone's out to hurt me, whether it's intentional or not. And so I just don't want to even put myself in the position where that might happen.

Tr. 2, 128:6–23.

Most seriously, Dr. Menninger experienced serious feelings of wanting to kill herself, not every day, but frequently between 2018 and the trial. Tr. 3, 29:23–30:5; Tr. 4, 53:7–8. In August 2018 Dr. Menninger's husband described to her sister his deep worry about Dr. Menninger because Dr. Menninger was having multiple panic attacks daily, was significantly depressed, and had thoughts of self-harm. Tr. 5, 113:9–15. In October 2018, Dr. Menninger's suicidal thoughts resulted in a terrified call from her husband Mason to her psychiatrist Dr. Kessimian. Exhibit 453; Tr. 6, 143:3–145:2 (Dr. Kessimian). Dr. Menninger continued to have passive suicidal ideation after moving to New Mexico. See, e.g., Ex. 23 at 25 (Feb. 7, 2020 treatment notes). Later, in 2021 when Dr. Menninger moved to Bend, Oregon, her husband spoke again to her sister about his worry that she would hurt herself, and Ms. Hart gave him a list of emergency facilities' addresses

32

**JA1945**

and phone numbers so that he would know where to take her. Tr. 5, 124:11–125:13. Worst of all, shortly before the trial Dr. Menninger felt so suicidal that she began drafting a suicide note to her child, who had been the reason Dr. Menninger was so determined to get better. Tr. 3, 19–24; Tr. 2, 128:6–16.

The evidence, in sum, overwhelmingly supported the jury's finding that PPD caused Dr. Menninger profound emotional distress that will continue to affect her in the future.

### B. The Evidence Supported the Jury's Front Pay Award.

PPD first argues that there was insufficient evidence that Dr. Menninger would be unable to perform comparable work through the remainder of her work life.[9] The jury's findings are reviewed under a deferential standard: "Massachusetts law is clear that uncertainty in the award of future damages does not bar their recovery, and we have said that the generousness of a jury's award does not alone justify an appellate court in setting it aside' unless it is shown to exceed any rational appraisal or estimate of the damages." Kelley v. Airborne Freight Corp., 140 F.3d 335, 355 (1st Cir. 1998) (cleaned up).

The evidence supported the inference that Dr. Menninger would, more likely than not, be unable to perform comparable work for the remaining 13 years until her projected date of retirement (PPD does not challenge Mr. Jonas's determination of Dr. Menninger's projected retirement date). Dr. Menninger testified that she wanted to work at PPD until her retirement. Tr. 2, 53:19–20. Cf. Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 104 (2009) (citing similar testimony and affirming 19-year front pay award). Yet the evidence showed PPD's discriminatory and retaliatory responses to her disclosure of disability and request for accommodation left her deeply traumatized. She experienced panic in her old Massachusetts home merely for being in the

---

[9] It bears mention that PPD did not object to the jury being instructed as to the availability of a front pay award and, further, made no objection to the admission of Mr. Jonas' projections regarding the same.

basement where she had worked for PPD. Tr. 3, 25:20–24. She was diagnosed with PTSD by multiple providers, see, e.g., Ex. 23 at 7 (Dr. Burbano medical records), Ex. 27 at 254 (Portland, Oregon treatment records), and suffered traumatic triggers from things associated with her former career. Tr. 4, 45:23–46:2. Her experience left her with "a lot of fear" and "a lot of lack of trust," and she testified that a major reason for being unable to work was that she was "too traumatized to trust . . . that I won't get hurt like this again." Tr. 2, 130:5–7. The jury could have inferred that Dr. Menninger's trauma from her last work experience will prevent her from holding a similar job.

The jury heard additional evidence supporting its finding that Dr. Menninger will, more likely than not, be unable to perform comparable work again.[10] Dr. Menninger's husband Mason's testified that Dr. Menninger's anxiety and depression were closely tied with her career in pathology—i.e., precluding her ability to perform comparable work—and that she would not be able to work again. Tr. 8, 32:1–12. Dr. Summergrad confirmed that there was a "significant risk" that Dr. Menninger would not be able to work again. Tr. 6, 199:15. As Dr. Summergrad explained, PPD's conduct directly hit Dr. Menninger in exactly this "cardinal aspect" of her social anxiety, which included "fear of being rejected"; Dr. Summergrad believed this would "certainly" inhibit her ability to work again. Tr. 6, 200:23–201:6 (Dr. Summergrad). Dr. Summergrad further explained that Dr. Menninger had anxiety, a hopeless mood about the future, "persistent" depressive symptoms, agoraphobia, and a crystallized pattern of being significantly if not completely housebound, and that all of these things together would be cumulatively very difficult to come back from. Id. 193-200.

---

[10] Dr. Menninger's social anxiety disorder was defined by a fear of exposure to scrutiny, judgment, embarrassment, and humiliation. E.g., Tr. 6, 86:3–8 (Dr. Kessimian), 162:18–21, 184:9–12 (Dr. Summergrad). Those were exactly the fears (along with hurting her career or losing her job) that made Dr. Menninger fearful of disclosing her disability in the first place: "There's a stigma with mental illness, and I was afraid that people would view me as defective and that that might hurt my career opportunities, my job." Tr. 1, 187:25–188:2; see also Tr. 2, 44:20–23.

There was nothing improper or unusual about the length of this front pay award. "Lengthy front pay awards have been sustained under G.L. c. 151B, as well as under Federal law, where circumstances indicated that plaintiffs would have difficulty in obtaining comparable employment." Haddad, 455 Mass. at 104 (collecting cases affirming 14, 30, 19, over 20, and 17-year front-pay awards).

Second, PPD argues that the evidence shows Dr. Menninger would not have continued to work at PPD until her retirement, and therefore that the assumptions on which her front pay award was calculated were flawed. This challenge fails because the basis of calculating Dr. Menninger's front pay was supported by the evidence and did not exceed any rational appraisal of her damages, Kelley, 140 F.3d at 355. As stated above the jury was entitled to credit Dr. Menninger's testimony that she wanted to remain at PPD through retirement, and using her projected PPD earnings was both a rational and commonplace methodology to calculate front pay. See, e.g., Haddad, 455 Mass. at 102–104 (in determining front pay the jury should consider the "amount of future earnings, including salary, bonuses and benefits that the [p]laintiff would have received but for the [d]efendant's unlawful discrimination,"); Kelley, 140 F.3d at 355. It is also a methodology to which PPD did not object at trial.

PPD's suggestion that Dr. Menninger would "not have lasted" at PPD is meritless, as the jury properly could have considered that Dr. Menninger loved her job, Tr. 2, 125:24–25, had just received a great performance rating for 2017, Tr. 4, 113:5 (Ms. Ballweg), and was fully capable of thriving at PPD as she had for the first 2.5 years of her employment. Tr. 2, 46:2–9 (Dr. Menninger).

Third, PPD contends that Dr. Menninger's inability to work precludes her receipt of front pay. That argument is frivolous[11] because the First Circuit has repeatedly held that plaintiffs may recover back and front pay when they become unable to work (and unable to mitigate their losses) due to disability caused by the employer. Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 142 (1st Cir. 2009) (affirming front pay award through plaintiff's projected retirement date); Johnson v. Spencer Press of Maine, Inc., 364 F.3d 368, 384 (1st Cir. 2004); Blockel v. J.C. Penney Co., 337 F.3d 17, 27–28 (1st Cir. 2003). PPD cites no authority to the contrary.

### C. The Jury Was Correctly Instructed on Reasonable Accommodations.

PPD's complaint about the "reader" instruction merits little comment. The Court's instruction accurately stated that a "qualified reader" is a type of accommodation that may be reasonable under appropriate circumstances. The Court's instructions made clear that it was for the jury to decide whether, based on the fact and circumstances here, such an accommodation would have been "reasonable." That is an accurate statement of the law, and there was no error or other prejudice. Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 80 (1st Cir. 2001) ("the central inquiry reduces to whether, taking the charge as a whole, the instructions adequately illuminate the law applicable to the controlling issues in the case without unduly complicating matters or misleading the jury."

### III.    There is No Basis for Remittitur and PPD Provides None.

PPD asks the Court to remit the jury's verdict based on mere conclusory assertions that the jury's verdict was "grossly excessive" and did not exhibit a "rational appraisal or estimate of the damages that could be based on the evidence before the jury." PPD offers no developed reasoning or argumentation to explain these contentions aside from a single argument that the jury's verdict

---

[11] The Court rejected a similar argument at summary judgment, Order (ECF Doc. No. 81) at 10 n.10 premised on alleged "estoppel" by Dr. Menninger's receipt of Social Security disability benefits.

exceeded the "total damages" allowed in other "recent awards." PPD provides one string-cited footnote of unrepresentative and hand-picked cases, but offers no analysis of the verdicts and does not even bother to explain the separate components of damages that they contained.

This paltry argument fails to present the Court with a reasoned basis for remittitur, and the issue should be deemed to have been waived. The standard that the Court must apply is not whether the "total damages" in this award was greater than some other case, but whether the damages awarded were adequately supported by the evidence presented at trial. Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 579 (1st Cir. 1989) (affirming verdict for over $5 million). Indeed, both the First Circuit and the SJC have cautioned against the dangers of blindly comparing verdicts. See id. at 579–80; Griffin v. Gen. Motors Corp., 380 Mass. 362, 371 (1980) (reasoning from "comparative verdicts" from various jurisdictions "is a dangerous game, to say the least."); see also Charles v. Leo, 96 Mass. App. Ct. 326, 350 (2019) (defendants bore the burden to demonstrate excessiveness and to the extent they sought to have the judge compare the verdict with others, "they were required to address the relevant dimensions along which the awards might be compared.").

Beginning with back pay and front pay, PPD cites no specific evidence or argument challenging the jury's calculations. There is no basis to judicially un-do the jury's front-pay and back-pay awards because the jury was entitled to find that PPD caused Dr. Menninger to be unable to work through its unlawful discriminatory and retaliatory actions, and that she will be unable to work through her date of projected retirement for the reasons stated above.

Turning to emotional distress, the Court's power to review a jury's determination of emotional distress damages is limited. As the First Circuit has held, a jury verdict should not be disturbed merely because it is extremely generous or because the court thinks that the damages are

considerably less. <u>Diefenbach v. Sheridan Transp.</u>, 229 F.3d 27, 32 (1st Cir. 2000). "[C]onverting feelings such as pain, suffering, and mental anguish into dollars is not an exact science" and, consequently, the jury's assessment will be upheld so long as it "'does not strike such a dissonant chord that justice would be denied were the judgment permitted to stand.'" <u>Correa v. Hosp., S.F.</u>, 69 F.3d 1184, 1198 (1995). "[M]erely showing that the damage award is generous in comparison to other (hand-picked) cases is insufficient to warrant relief." <u>Id.</u> Again, PPD offers no specific argument to challenge the jury's award and fails to explain why the hand-picked verdicts it cites offer a meaningful basis for comparison.

In any event, the evidence of Dr. Menninger's profound suffering fully supported the jury's substantial award of emotional distress damages. The jury demonstrated thoughtfulness and care in dividing its award between a more robust award of $5 million for <u>past</u> distress, which was supported by voluminous testimony and documentary proof summarized above, compared to a more modest figure of $2 million for the emotional distress Dr. Menninger is likely to continue suffering in the future that is inherently a matter of projection. And contrary to PPD's argument, other courts have indeed sustained emotional distress awards of similar sizes. <u>Osorio v. Source Enterprises, Inc.</u>, No. 05 CIV. 10029 (JSR), 2007 WL 683985, at *5 (S.D.N.Y. Mar. 2, 2007) (upholding total $7.877 million in damages for emotional distress and harm to reputation on claims for retaliation under Title VII and New York law, and defamation); <u>Griffey v. Dep't of Corr.</u>, No. 354322, 2022 WL 2900390, at *43 (Mich. Ct. App. July 21, 2022) (upholding two emotional distress awards of $4.25 million and $4.35 million respectively for husband and wife co-plaintiffs on race discrimination and retaliation claims where plaintiffs suffered chronic conditions including PTSD and major depression from which they were unlikely to recover); <u>Brovont v. KS-I Med. Servs., P.A.</u>, 622 S.W.3d 671, 683 (Mo. Ct. App. 2020) (upholding award of $6 million in non-

38

economic losses to medical doctor in whistleblower retaliation case and allowing punitive damages of $5 million versus one defendant and $10 million versus another defendant); Coachman v. Seattle Auto Mgmt., Inc., No. C17-187 RSM, 2019 WL 4695660, at *1 (W.D. Wash. Jan. 3, 2019), aff'd, 787 F. App'x 416 (9th Cir. 2019) (sustaining and affirming award for $4,697,248 in noneconomic losses in disability discrimination and failure-to-accommodate claims).[12] The cases PPD cites are not factually comparable. E.g., DaPrato v. Massachusetts Water Res. Auth., 482 Mass. 375, 394 (2019) (plaintiff got a new job in just three months and merely "consulted" a doctor for anxiety); Haddad v. Wal-Mart Stores, Inc., No. 05-0274, 2007 WL 6027568 (Mass. Super. Jan. 18, 2007) (plaintiff got new job in 6 months).

The recent $20 million verdict in a medical malpractice case cited by PPD also bears some consideration. While PPD likely cites the verdict to suggest that Dr. Meninger's recovery should not be on par with an individual who lost their leg, that is a point on which reasonable minds may differ. As our societal view of mental health has evolved, we now recognize that afflictions like depression and PTSD are no less "real" or debilitating than other forms of bodily harm. If offered the choice of losing a limb or suffering the unabating anguish that Dr. Menninger has suffered for the past five years, many might very well surrender the leg.

Finally, to the extent PPD requests the Court to remit the jury's award of punitive damages, PPD offers no developed argument or case law whatsoever that would justify the Court's interference with the jury's reasoned decision to set the amount of punitive damages at $10 million. Particularly given the jury's decision to award **less** in punitive damages than it awarded in compensatory damages, and considering the significant noneconomic portion of the compensatory

---

[12] Because the Coachman court opinions do not discuss the emotional distress evidence in any detail, Dr. Menninger attaches here as Exhibit A a copy of the plaintiff's post-trial opposition to the defendant's motion for new trial in Coachman, which at pp. 12–13 summarizes the evidence of emotional distress. That evidence is significantly less severe than the evidence presented in this case at trial.

damages, the Court has no basis to disturb the jury's award here. See Aleo v. SLB Toys USA, Inc., 466 Mass. 398, 415 (2013) (so long as the award is within a single-digit ratio of punitive to compensatory damages, that is, no more than 9:1, the award will not typically qualify as impermissibly excessive, particularly if the award contains a substantial non-economic component) (affirming $18 million punitive damages award at 7:1 ratio where harm was primarily noneconomic).

It is PPD's burden to demonstrate excessiveness, and PPD plainly cannot meet that burden here without developed argument. Charles v. Leo, 96 Mass. App. Ct. 326, 351 (2019) (**reversing** lower court's remittitur of $10 million punitive damages award to $2 million where jury awarded $888,159.83 in compensatory damages).[13] Punitive damages awards are by definition qualitative and intangible, which is why the jury, not the Court, is entrusted with the responsibility to "make the difficult and uniquely human judgments that defy codification and that build discretion, equity, and flexibility into a legal system," and to determine the amount that appropriately declares its "moral condemnation." Id. (cleaned up; citations omitted). The jury is permitted to take the financial position of the defendant into account when determining the amount of punitive damages, which means that much higher awards may properly be assessed against much wealthier defendants even where all other considerations are equal. DaPrato v. Massachusetts Water Res. Auth., 482 Mass. 375, 393 (2019).

---

[13] Massachusetts law controls this analysis to the extent it provides the rule of decision. See McMillan v. Mass. Soc. For Prevention of Cruelty to Animals, 140 F.3d 288, 306 (1998) (citing Browning–Ferris Ind. v. Kelco Disposal, 492 U.S. 257, 278 (1989)). Here, the Court gave one instruction on punitive damages applicable to both the federal and Massachusetts-law claims, and Dr. Menninger prevailed on all counts under both federal and Massachusetts law. The Court has a duty under First Circuit case law to allocate the punitive damage award between Dr. Menninger's state and federal-law claims (treating it as "fungible" between state-law and federal law claims) so as to maximize her recovery. Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 66 (1st Cir. 2005); accord Burnett v. Ocean Properties, Ltd., 422 F. Supp. 3d 400, 428 (D. Me. 2019), aff'd, 987 F.3d 57 (1st Cir. 2021); Bell v. O'Reilly Auto Enterprises, LLC, 626 F. Supp. 3d 141, 185 (D. Me. 2022). Putting these principles together, nearly all of the punitive damages award should be construed as awarded under Massachusetts law and therefore Massachusetts law controls the issue of whether the jury's award is grossly excessive or shocking to the conscience.

In this case, the ratio of punitive to compensatory damages was substantially **less** than 1:1 (specifically it was 1 to 1.403), and the compensatory damages included a large noneconomic component. That ratio comes nowhere close to the legal definition of excessive.[14] The jury properly considered the undisputed evidence that PPD was acquired by Thermo Fisher Scientific in 2021 for $17.4 billion, Tr. 6, 50:10–12 (Ms. Ballweg), in assessing a significant award. Finally, the Defendant's conduct easily qualified as outrageous for all of the reasons discussed above. In any event it was PPD's burden to show excessiveness, and PPD did not do so.

### CONCLUSION

For the reasons set forth above, Defendant's post-trial Motions should be denied.

<div style="margin-left:40%">

Respectfully submitted,
Lisa Menninger,
By her attorneys,


*/s/ Patrick J. Hannon*
Patrick J. Hannon (BBO #664958)
Hampton M. Watson (BBO #705983)
Hartley Michon Robb, LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
phannon@hmrhlaw.com
hwatson@hmrhlaw.com
(617) 723-8000
Attorneys for Plaintiff Lisa Menninger

</div>

Date: July 7, 2023

---

[14] Compare Toussaint v. Brigham & Women's Hosp., No. SUCV20142253B, 2018 WL 4760536, at *1 (Mass. Super. Aug. 21, 2018) where the jury awarded $3.213 in total compensatory damages including $2.75 million in emotional distress, and $25 million in punitive damages. The precedents suggest this award, at about a 7.78:1 ratio, would have been affirmed if challenged. That ratio applied here would have meant the punitive damages were $108 million. The jury's punitive damages award of $10 million reflected its calm and dispassionate judgment as to the degree of damages necessary to punish an extremely wealthy defendant for outrageous conduct, while keeping the punitive figure rationally tethered to the size of compensatory harm and coming nowhere close to the boundaries of what has been considered excessive.

## CERTIFICATE OF SERVICE

     I Patrick J. Hannon certify that on July 7, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Defendant by electronically serving its counsel of record.

<div align="right">

*/s/ Patrick J. Hannon*
Patrick J. Hannon

</div>

42

# **EXHIBIT A**

Chief Judge Ricardo S. Martinez

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

TROY COACHMAN,

                              Plaintiff,

  vs.

SEATTLE AUTO MANAGEMENT, INC. dba
MERCEDES BENZ OF SEATTLE and AL
MONJAZEB

                              Defendants.

CASE NO.: 2:17-CV-00187-RSM

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR NEW
TRIAL, OR IN THE ALTERNATIVE,
REMITTITUR**

**NOTING DATE: NOVEMBER 23, 2018**

# I. INTRODUCTION

Defendants move for a new trial on seven separate grounds. Each is unpersuasive. They argue the jury's findings were against the weight of the evidence; and that they were prejudiced by the Court's erroneous evidentiary and legal rulings and by alleged misconduct of Plaintiff's counsel. Alternatively, Defendants argue for the extraordinary remedy of remittitur. Each of Defendants' arguments is contrary to the law and the facts.

The Court is familiar with the evidence presented during the eight-day trial. In brief, Mr. Coachman was the Finance Director of Mercedes Benz Seattle. He had surgery and lost the use of his vocal chords due to cancer. Thereafter, he spoke using a voice prosthesis that altered the sound of his voice. His doctors released him to return to work. But his employer refused to return him to work or accommodate him, and instead, fired Mr. Coachman over email.

During trial, Defendants claimed that Mr. Coachman rejected an open sales manager position, which, they asserted, was offered to him as a disability accommodation.[1] They claimed that, having rejected the open position and being unable "to communicate clearly" because of his disability, Defendants had to terminate Plaintiff's employment.[2] Each of these claims was thoroughly discredited at trial.[3] Plaintiff presented evidence demonstrating that Defendants failed to engage in the interactive process and failed to offer available reasonable accommodations.[4] And

---

[1] Ex. A (Trial Transcript Excerpts), Tr. Trans. **185:16-21** (Hicks). Declaration of Beth Bloom (11/19/2018) ("Bloom Decl.") All references to Exhibits A, B, C, D, and E are attached to the Bloom Declaration.

[2] Ex. A Tr. Trans. **170:19-23 (Hicks); 13:3-7, 140:22-141:8** (Monjazeb).

[3] The general manager Jason Graham and Plaintiff both testified credibly that Coachman was never offered a sales manager position. Ex. A, Tr. Trans. **27:6-15, 28:19-22** (Graham); **121:3-16** (Coachman). Further, Plaintiff testified he would have accepted the sales manager position if offered to him. Ex. A, Tr. Trans. **122:11-16, 126:15-22, 172:14-20 (Coachman)**. Plaintiff, his medical providers, friends, family, and subsequent employer all testified credibly that Mr. Coachman was able to communicate clearly as of January 2015. Ex. A, Tr. Trans. **126:2-9** (Coachman); **150:19-151:2** (Repanich); **73:12-25, 74:18-75:8** (Stimson); **104:14-22** (Bunton); **11:9-12:3** (Borgert). General Manager Jason Graham testified that firing Mr. Coachman was never a consideration; he could have found a way to retain Coachman; and did not do so only because Owner Defendant Al Monjazeb directed him not to be involved. Ex. A, Tr. Trans. **6:25-7:22, 28:10-18, 32:12-13, 33:7-16** (Graham).

[4] Ex. A, Tr. Trans. **30:16-18, 31:12-32.13** (Graham) (coffee meeting not part of interactive process), **127:13-128:10**

beyond that, he presented direct evidence of discrimination[5] and evidence that Defendants would not have fired him but for his voice disability.[6] After he retained a lawyer, Defendants offered him reinstatement to his former position.[7] Plaintiff rejected this offer because he was already working and feared retaliation if he returned.[8] The unanimous jury found these facts established violations of the Americans with Disabilities Act and the Washington Law Against Discrimination. Dkt. 75.

Plaintiff lost his long-time job, lost his home, and was seriously emotionally harmed by the conduct of his employer. The jury rightfully allowed him $236,812 for economic damages and $4,697,248 for compensatory damages. Dkt. 75. The jury did justice, nothing more. Defendants have had their day in court. There is no factual or legal basis for a "do over."

## II.    AUTHORITY & ARGUMENT

Courts do not grant new trials unless the verdict "[i]s against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997). "Doubts about the correctness of the verdict are not sufficient grounds for a new trial: the trial court must have a firm conviction that the jury has made a mistake." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1372 (9th Cir. 1987). "A jury verdict should be set aside only when the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010) (citations omitted). Remittitur is rarely granted. *In re Exxon Valdez*, 270 F.3d

---

(Coachman) (Monjazeb never responded to his request for meeting); **89:6-12, 122:11-16, 125:8-20** (Coachman) (would have accepted transfer, part-time work, medical device, or additional medical leave but employer never offered them), **141:23-142:16, 143:2-21** (Clark) (explaining professional standards used by human resource professionals).
[5] Ex. A, Tr. Trans **9:9-20** (Graham) ("[Mr. Monjazeb] was concerned how we dealt with high line customers, how the customers would feel about it. . . .I know it was a concern how customers would react to it."), **14:6-13** (Capps) ("… [Mr. Monjazeb] was worried about the image that we would portray, that the customers would be uncomfortable hearing an unconventional voice like that.").
[6] Ex. A, Tr. Trans **36:24-38:4** (Monjazeb).
[7] Ex. A, Tr. Trans **84:21-85:6** (Coachman); 131:24-132:10 (Monjazeb).
[8] Ex. A., Tr. Trans. **84:21-85:6** (Coachman).

1215, 1247–48 (9th Cir. 2001).

**A. The Clear Weight of the Evidence Supports the Jury's Verdict.**

On a Rule 59 motion for a new trial, the trial court may weigh the evidence and credibility of the witnesses. *See Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990). But the court is "not justified in granting a new trial merely because it might have come to a different result from that reached by the jury." *Id.*

**1. The Weight of the Evidence Established Plaintiff's Request For An Accommodation and ADA Liability (Jury Instruction No. 12).**

Defendants argue that a new trial is appropriate because the jury found Plaintiff requested an accommodation when they claim he did not. Dkt. 104 at 3:5-4:9. This argument fails because it is undisputed that Mr. Coachman requested medical leave for his laryngectomy surgery.[9] Under *Humphrey v. Mem'l Hosps. Ass'n*, Defendants had an ongoing duty to explore alternative accommodations if they believed ending Mr. Coachman's medical leave in January 2015 would be ineffective. 239 F.3d 1128, 1138-39 (9th Cir. 2001)*;* The Court correctly rejected this argument at trial and should do so again here.[10]

**2. The Weight of the Evidence Established Plaintiff Reasonably Refused Defendants' Offer of Reinstatement.**

Defendants next argue that a new trial is appropriate because the jury rejected their affirmative defense of an "unconditional offer of reinstatement." Dkt. 104 at 8:15-9:5. Defendants first argue that Exhibit A-36 supports their claim. But this exhibit was neither offered nor admitted. Dkt. 70. Next, Defendants invite the Court to commit error by usurping a credibility assessment

---

[9] Ex. B, Trial Tr. **104:8-12** (Coachman). *See also* Ex. B, Trial Tr. **64:12-23** (arguing in closing that request for medical leave met necessary elements of Instruction 12).

[10] Moreover, Defendants do not explain why a new trial is the appropriate remedy where they do not attack the jury's findings on the remaining two disparate treatment claims.

made by the jury. Dkt 104 at 9:1-3. When a witness is impeached at trial, credibility is central to the jury's determination, and the court owes "a decent respect for the collective wisdom of the jury." *Landes Const.,* 833 F.2d at 1371. The jury could credit Mr. Coachman's statement that he was already working and "didn't feel safe" to return to his employer.[11] They found his decision to reject the offer (whether unconditional or not) reasonable. Dkt. 74 (Jury Instruction No. 16). The Court should accept the findings of the jury.

### B.   The Legal and Evidentiary Rulings of the Court were Correct.

A court may grant a new trial as a result of an erroneous evidentiary ruling, but only if that ruling substantially prejudiced a party. *Ruvalcaba v. City of Los Angeles,* 64 F.3d 1323, 1328 (9th Cir. 1995). Erroneous jury instructions and the failure to give adequate instructions are also bases for a new trial where a party is substantially prejudiced. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990). Defendants cannot meet this standard.

### 1.   The Admission of Plaintiff's Medical Records (Ex. 56) Was Proper.

Defendants claim a new trial is warranted because the Court erred in admitting Attending Physician Statements. Dkt. 104 at 4:10-5:21. Mr. Coachman testified he received the completed forms from his doctor and gave them to his employer. [12] By the time of trial, his doctor was deceased. The Court admitted the records over Defendants' objections.[13] Dkt. 70. Although, the documents contained all indicia of trustworthiness, no records custodian declaration accompanied the exhibit. Dkt. 105-2; Fed. R. Evid. 807. A copy of the missing records custodian declaration establishing the medical records' authenticity accompanies this brief. Ex. D (dated Sept. 18, 2018

---

[11] Ex. B, Tr. Trans. **84:21-85:6** (Coachman).
[12] Ex. C, Tr. Trans. **109:24-114:8** (Coachman).
[13] Ex. C, Trial Tr. **114:9-20**. Defendants moved *in limine* to exclude the medical records. Dkt. 25. The Court denied the motion finding the records admissible as business records and as notice to the employer. Dkt. 44 at 7-8.

addressed to Sheryl Willert), Bloom Decl; Fed. R. Evid. 803(6) and 902(11). In addition, Defendants cross-examined two other medical providers, who testified Plaintiff was ready to return to work.[14] This ministerial error is harmless and not a basis for a new trial. *See* Fed. R. Evid. 60(a).

### 2. The Court Properly Barred Defendants From Arguing That An Offer of Reinstatement Made After an Unlawful Discharge May Negate Liability.

Defendants claim they were prejudiced by the Court's ruling precluding them from arguing to the jury that Defendants accommodated Mr. Coachman by offering him reinstatement *after* they fired him because of his disability. Dkt. 104 at 9:6-10:5. This is not the law. An offer of reinstatement does not negate liability. It may toll liability for backpay. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 232 (1982). This bizarre argument was fully briefed and correctly rejected by the Court during trial. Dkts. 65-66; Ex. C, Trial Tr. **15:21-24** (Court ruling).

The credible evidence at trial established Defendant Monjazeb made the decision to fire Mr. Coachman instead of providing available reasonable accommodations for Mr. Coachman's voice disability.[15] Available accommodations included transfer to another vacant position and continued medical leave.[16] The employer produced no evidence that it would be an undue hardship to provide either accommodation.[17] *See also* Dkt. 74 (Jury Instr. 14-Undue Hardship). These facts established a failure to accommodate as the jury correctly found. See Dkt. 74 (Jury Instr. No. 13-WLAD Failure to Accommodate); Dkt. 75 (verdict).

Mr. Coachman's disability, disparate treatment, and failure to accommodate claims accrued at the time he was fired rather than accommodated. *Kuehn v. Snohomish Cty*, 186 Wn.

---

[14] Ex. C, Tr. Trans. **73:19-25, 75:3-8** (Stimson); **150:19-151:2**, (Repanich) (he was "absolutely" ready to work).
[15] Ex. C, Tr. Tran. **14:12-15:4, 67:3-24** (Monjazeb) (unpaid leave was possible accommodation in January 2015). The employer did not contest that Coachman had a known impairment which substantially limited his ability to perform his job. Dkt. 45-1 ¶¶ 12; 22 (Pre-Trial Order); Dkt. 5 ¶ 5.2 (Answer).
[16] Ex. C, Tr. Tran. **14:12-15:4, 20:18-24, 67:3-24** (Monjazeb); **175:15-19, 186:4-9** (Hicks); **135:18-24, 136:18-20, 137:21-138:5** (Clark).
[17] Ex. C, Tr. Tran. **175:15-19, 186:4-9** (Hicks); **14:12-15:4** (Monjazeb).

App. 1044 (2015); *Humphrey,* 239 F.3d 1136, 1138-39. This fact makes Defendants' reliance on *Wheeler v. Catholic Archdiocese* inapposite. 65 Wn. App. 552, 559-561, 563-564 (1992). *Wheeler* addressed the accrual of liability *after* discharge – an issue not before this Court. *Id.* (challenging not the firing but the failure to notify about post-termination vacancies). Defendants' conduct after discharge is not relevant. No case holds that liability can be reversed by offering a disabled employee reinstatement after wrongful termination.

### C. Plaintiff's Counsel Engaged in No Misconduct. Defendants Had the Opportunity to Object at Trial to Cure Any Claimed Prejudice But Did Not.

The losing party after a jury trial will often claim that conduct of counsel has tainted the verdict. Wright & Miller, 11 Fed. Prac. & Proc. §§ 2805, 2809. Most motions on this ground are denied. *Id.* Whether misconduct of trial counsel has been so egregious as to require a new trial is a decision committed to the broad discretion of the court. *See Landes Const.,* 833 F.2d at 1371-72. However, a new trial should only be granted where the "flavor of misconduct ... sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 516-17 (9th Cir. 2004). *See also Cooper v. Firestone Tire & Rubber Co.,* 945 F.2d 1103, 1107 (9th Cir. 1991) (declining to grant a motion for a new trial based on alleged misconduct in closing argument).

### 1. Plaintiff's Counsel Did Not Examine a Witness About Other Complaints Against the Defendants. The Unsolicited Response Was Harmless.

Defendants claim a new trial is appropriate because Plaintiff's counsel engaged in prejudicial misconduct by eliciting testimony about other employee complaints in contravention of the Court's *in limine* order. Dkt. 104 at 5:22-7:11 But, as set forth in the transcript excerpt, this is not what happened. *Id.* at 6:4-21. On redirect, to uncover bias, Mr. Whitehead asked a witness why he had made statements hostile to Plaintiff's interest while employed by Mercedes Benz

Seattle. *Id.* Defense counsel had elicited these prior statements on cross-examination. The witness explained he feared reprisal if he did not provide hostile statements helpful to his employer. *Id.* at 6:4-12. The witness added, "One of our employees had filed a complaint –." *Id.* Defense counsel immediately objected. The Court sustained the objection. The witness made no further statement. *Id.* At a sidebar, Plaintiff's counsel argued that the employer had opened the door by relying upon unfavorable statements made under duress. Ex. E, Trial Tr. **22:18-23:3** (Whitehead argument). The Court did not permit further inquiry. Ex. E, Trial Tr. **23:4-9** (Court ruling). In the context of an eight-day trial, it can hardly be said that utterance of eight words volunteered by a witness about an unexplored complaint so permeated the trial with prejudice as to support a new trial.

### 2. Plaintiff's Closing Argument Requesting that the Jurors Restore The Dignity That Had Been Taken From Him was Proper.

Defendants claim now that Plaintiff's counsel's argument regarding emotional distress damages was "unequivocally punitive" because counsel improperly sought "disgorgement" rather than damages for the harms suffered. Dkt. 104 at 7-8. But it is the nature of trial to bring vigorous, ethical advocacy to the courtroom. *Settlegoode,* 371 F.3d at 518*; see also Strange v. Les Scwhab Tire Center of Wash., Inc.,* No. C06-0045RSM, 2010 WL 11527268, at *5 (W.D. Wash. Jan. 8, 2010) (some "emotionally charged language" during closing is a "well-accepted" trial tactic). Counsel never urged the jury to punish Defendants. The record does not contain improper argument and certainly none to justify setting aside the judgment of a jury.

Plaintiff's Counsel focused on the evidence of emotional distress and how to fairly value those harms during closing argument. Ex. E, Trial Tr. **57:19-59:3** (urging jurors to consider the evidence of each type of harm and "how bad," "how long," and "how much longer" Mr. Coachman would endure each harm). In one illustration focused on personal indignity, Counsel contrasted the company's discriminatory treatment, offensive statements, and aggressive litigation tactics

with Mr. Coachman's dedicated and exceptional service to the company.[18] Counsel suggested $4,240,000 could be a fair value for the loss of personal dignity over the past four years and into the future. *Id.* at **61:18-62:11**. If Defendants believed this argument was improper they did not object, which might have allowed a curative instruction, if the Court believed one was necessary.

The federal courts erect a "high threshold" to claims of improper closing arguments raised for the first time after trial in civil cases. *Hemming v Tidymans's Inc.,* 285 F.3d 1174, 1193 (9th Cir. 2002). In evaluating the likelihood of prejudice, the Court must consider "the totality of circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself," *Hemming*, 285 F.3d at 1193.

There was no call to punish the Defendants and no inflammatory language. *See Zweizig v NW Direct Teleservices, Inc.,* 331 F.Supp.3d 1171, (D. Or. 2019) (finding even direction to jury to "send a message" with its damages award was not punitive). The closing argument was an appeal to fairness.[19] Plaintiff's counsel did not flout the Court's rulings as Defendants suggest but argued as the Court directed.[20] Both parties established that sales numbers and profits were closely tracked by the dealership and by Mr. Coachman and his peers as a stand-in for the sense of pride, accomplishment, and competition they felt in their work.[21] Other witnesses acknowledged Mr.

---

[18] Ex. E, Trial Tr. **60:16-62:14**. Defendants argue that the $1,000,000 annual profit figure was incorrect. But it is the number provided by Defendant Monjazeb in trial. Ex. E, Tr. Trans. **33.13-17, 75:15-17, 76:17-23** (Monjazeb).
[19] Ex. E, Trial Tr. **57:19-22; 58:10-13; 62:8-18**.
[20] Ex. E, Tr. Trans **57:1-4** (arguing the Defendants' $13 million company could afford any reasonable accommodation). The Court instructed counsel to direct argument about the company's financial condition toward the Defendants' "undue hardship" defense and to avoid reference to the individual Defendant's personal wealth. Ex. E, Tr. Trans. **16:15-17:2**. Counsel did not mention Defendant's personal wealth at any point in closing.
[21] Ex. E, Tr. Trans. **133:23-134:12** (Kindle) (describing dealership work culture in which employee sales numbers were openly followed "like sports" to gauge employee performance and individual contributor success), **8:17-25** (Capps) (acknowledging jealousy at Coachman's high profit level). Defendants made the profits of the finance department and its role as the "financial engine" of the dealership a central theme. *See, e.g.,* Ex. E, Tr. Trans. **111:12-111:22** (D opening argument) (arguing Coachman was "integral" to the profit of the business).

Coachman's need, not only to work, but to achieve excellence. This pride contrasted with the sense

of shame, betrayal, and personal indignity Mr. Coachman felt when he learned he was "unwanted

and "thrown away" after fourteen years of service.[22] In context, the brief reference to Coachman's

profit generation was isolated and not prejudicial. *See, e.g., Jadwin v. Cty. Of Kern*, 767 F.Supp.2d

1069, 1083-1087 (E.D. Cal. 2011) (even call to jury to consider employer's size and resources in

closing argument not a basis for new trial).

Counsel sought $9.42 million dollars in total compensatory damages while emphasizing

that her calculation was merely opinion.[23] The jury returned less than half this amount, allowing a

precise figure of $4,697,248 for compensatory damages. Dkt. 75. The jury received proper

instruction on calculating an emotional distress award. Dkt. 74 (Jury Instr. 15). The court instructed

the jury that the argument of counsel was not evidence, an admonition that the Court must presume

the jury followed. *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1270-71 (9th Cir. 2000).

Given the strength of the case and the evidence of emotional harm, the verdict suggests, not

passion, but careful deliberation and adherence to the Court's instruction.

### D. Remittitur of Non-Economic Damages is Not Appropriate Given the Evidence Establishing Plaintiff's Harms and Losses

Failing every other argument, Defendants argue that the verdict is just too large. But Courts

afford "substantial deference to a jury's finding of the appropriate amount of damages." *In re*

*Exxon Valdez*, 270 F.3d at 1247–48 . A district court "*must* uphold the jury's findings unless the

amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on

speculation or guesswork." *Id.* (emphasis in original). The Court views the evidence concerning

---

[22] Ex. E, Tr. Trans **159:24-160:6**, **179:10-23** (Costa); **43:11-12, 43:21-25** (Saxton) ("It's an incredible sense of pride for Troy in doing not just a good job, but an exceptional job."); **92:25-93:6, 93:21-94:15** (Matteson) (describing sense of pride in work and betrayal); **130:18-22; 136:8-14** (addressing indignity of being fired over email by owner of a "million dollar company"), **129:20-22** (recalling loss of job was emotional four years later) (Coachman).
[23] Ex. E, Trial Tr. **62:18-63:2** (closing).

damages in the light most favorable to the prevailing party. *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir. 1987), *amended on other grounds by* 817 F.2d 609 (9th Cir. 1987). The Court *must* uphold the jury's verdict here given the substantial evidence of harm.

At trial, Plaintiff established that he was seriously harmed by Defendants' failure to accommodate his disability and related decision to terminate his employment. He lost his income, his health insurance, his disability benefits, and endured despair and humiliation, causing him to seek counseling.[24] Without disability benefits, Mr. Coachman was unable to provide for himself when his cancer returned in 2015.[25] He then lost his home, which was devastating and isolating for him.[26] The jury correctly concluded that Defendants' unlawful conduct was the proximate cause of each of these harms. Dkt. 75 (Question No. 7) Eight witnesses gave unrebutted testimony about the humiliation, personal indignity, fear, anxiety, and anguish Plaintiff suffered.[27] Add to this the fact that Mr. Coachman was recovering from cancer as these events unfolded, and that returning to work was the driving motivation for his recovery, and there is little wonder why the jury returned a large compensatory damages verdict.

Nevertheless, Defendants seek to undo the jury's verdict as "excessive." They first argue that the jury failed to consider testimony by Plaintiff's oncology social worker about Plaintiff's other life stressors. To the contrary, the jury understood the importance of Ms. Matteson's testimony. Defendants apparently did not. Ms. Matteson testified about Plaintiff's emotional

---

[24] Ex. A, Tr. Trans **138:8-144:8, 144:19-24, 145:12-146:2** (Coachman), **139:20-141:25, 181:11-25** (Campbell) (not eligible for disability benefits after termination), **171:5-172:11** (Costa) (returning to work was "all he could talk about" through his cancer recovery. When Coachman lost his job it was crushing because with the cancer, surgery, and loss of his voice, "he had already gone through so much already" and the job loss was "just another blow"); **92:25-93:6; 93:21-94:6, 94:11-15, 95:8-12, 95:21-96:1, 99:1-6, 99:15-25** (Matteson) (stating opinion that firing caused emotional distress), **100:9-16** (Matteson) (other life stressors made Coachman more susceptible to emotional injury from firing), **41:23-43:1, 48:4-13** (Saxton) (loss of Coachman's job after recovering from multiple bouts of cancer caused him to have a "loss of faith" and was "just turning the knife."), **154:15-155:6** (Repanich).
[25] Ex. A, Tr. Trans **144:19-24; 145:12-146:2** (Coachman).
[26] *Id.*; **177:10-18, 178:7-15** (Costa) (describing pain of moving out of his home and into a mobile home:, "we were packing up his life . . . it was taken away from him"), **52:8-17** (Saxton) (new residence was "not his home.").
[27] *See e.g.,* note 24 *supra.*

distress stemming from his termination, his sense of betrayal at his employer, how his firing upended his "meaning and purpose in his life," and how Plaintiff's hard upbringing could make the loss of his job significantly more traumatic.[28] Considering the totality of Ms. Matteson's testimony and the strength of the seven other unrebutted witnesses supporting emotional distress damages,[29] there was ample evidence from which the jury could conclude that Defendants caused Plaintiff serious emotional harm and indignity worthy of significant compensation. The jury could also conclude that Mr. Coachman was especially susceptible to harm. *See* Dkt. 74 (Jury Instr. 18-Particular Susceptibility) (Jury Instr. 17 – Aggravation of Pre-Existing Condition). Plainly put, Defendants hurt Mr. Coachman badly and the jury's verdict was commensurate with his harms.

Defendants other "excessiveness" argument is that damages awarded to Plaintiff were greater than damages awarded in other cases. Dkt. 104 at 10-12. The Court should reject this argument as well. Under Washington law, "it is improper to assess the amount of a verdict based upon comparisons with verdicts in other cases." *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 33-34 (1993).[30] This is because awards in other cases are "rarely dispositive given the fact specific nature of damages claims." *Hendrickson v. Cooper,* 589 F.3d 887, 892 (7th Cir. 2009); *see also Dolenz v. United States,* 443 F.3d 1320, 1322 (10th Cir. 2006) ("it is a difficult and often fruitless task to compare damages in one case with those in another"). This case is based primarily on the WLAD given the size of the verdict and the application of damages caps under the ADA. *See Passantino v. Johnson & Johnson Consumer Prod., Inc.,* 212 F.3d 493, 509 (9th Cir. 2000) (trial court may allocate compensatory damage award to state law claim in light of

---

[28] Ex. A, **92-96, 99-100** (Matteson).

[29] Defendants single out Ms. Matteson's testimony, but do not address the testimony of Brandon Kindle, Sonya Costa, Shirley Bunton, Troy Coachman, Carole Stimson, Marie Repanich, or Kamala Saxton, all of whom testified concerning their first-hand observations of Mr. Coachman's emotional distress damages.

[30] Reliance on state law is appropriate authority on a challenge for excessive verdict when the underlying claim is based, in part, on state law. Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2802 (3d ed.); *see Browning-Ferris Indus. Of Vermont, Inc. v. Kelco Disposal, Inc*., 492 U.S. 257, 278-79 (1989).

statutory caps). The Court should judge the case on its merits rather than comparators. *See Adcox.*

Even assuming *arguendo* other verdicts are somehow relevant, Defendants have set the stage for an unfair comparison. They begin with a straw man argument.[31] There is no set ratio of economic and non-economic damages. If there was a ratio, then the value of emotional harms suffered by a hotel owner would always be greater than the harms of the hotel housekeeper. Happily, this is not the law. Second, Defendants unfairly limit their review of recent verdicts to disability discrimination cases. All individual employment discrimination and retaliation verdicts share the same jury instruction and are equally persuasive. *See* Wash. Pattern Jury Ins. 330.81. A more expansive survey of Washington employment cases finds many compensatory damage recoveries in the multi-million-dollar range. Bloom Decl. ¶ 7 and Exhibit G (Employment Litigation Comparators). Finally, the size of the 10-person jury, their attentive, serious-minded, conscientious efforts, the unanimity of their verdict, and the precision of their exacting award of $4,697,248 for compensatory damages belies the Defendants claim that the award was based on anything other than the substantial evidence of emotional distress. Dkt. 75. The Court should not disturb their verdict simply because Defendants were unhappy with the ultimate result.

**E.      Plaintiff Requests Attorney's Fees and Costs.**

Plaintiff has incurred 54.4 hours of attorney time totaling $24,225 and costs of $1235.10 opposing this motion. Bloom Decl. ¶¶ 8-12. Plaintiff requests recovery on post-trial briefing.

## III.      CONCLUSION

For the reasons stated above, the Court should deny Defendants' request to set aside the jury verdict or, in the alternative, for remittitur.

---

[31] Citation to *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408 (2003), analyzing the constitutionality of a punitive damages award, is irrelevant since compensatory damages do not implicate due process concerns. Even so, the Ninth Circuit has approved many high-ratio punitive damages awards. *See, e.g., Swinton v. Potomac Corp.,* 270 F.3d 794, 818 (9th Cir. 2001) (upholding a 28 to 1 punitive to compensatory damages ratio).

DATED this 19th day of November, 2018.

FRANK FREED SUBIT & THOMAS LLP

*s/ Beth Barrett Bloom*
Beth Barrett Bloom, WSBA No. 31702
*s/ Anne Silver*
Anne Silver, WSBA No. 51695
Attorney for Plaintiff Troy Coachman
705 Second Avenue, Suite 1200
Seattle, Washington 98104
(206) 682-67111

SCHROETER GOLDMARK & BENDER

*s/ Jamal N. Whitehead*
Jamal N. Whitehead, WSBA No. 39818
810 Third Avenue, Suite 500
Seattle, WA 98104
Tel: (206) 622-8000
whitehead@sgb-law.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Hannelore Ohaus, certify and state as follows:

1.      I am a citizen of the United States and a resident of the state of Washington; I am over the age of 18 years and not a party of the within entitled cause. I am employed by the law firm of Frank Freed Subit & Thomas LLP, whose address is 705 Second Avenue, Suite 1200, Seattle, Washington 98104.

2.      I caused the foregoing document to be served upon counsel of record at the address and in the manner described below, on November 19, 2018.

| | |
|---|---|
| Sheryl J. Willert, WSBA #08617<br>Jeffery M. Wells, WSBA #45840<br>WILLIAMS, KASTNER & GIBBS PLLC<br>601 Union Street, Suite 4100<br>Seattle, WA 98101-2380<br>Telephone: (206) 628-6600<br>swillert@williamskastner.com<br>jwells@williamskastner.com<br><br>Attorneys for Defendants | [ ] U.S. Mail<br><br>[ ] ABC Legal Messenger<br><br>[ ] Facsimile<br><br>[ ] E-Mail<br><br>[X] Via CM/ECF |
| Howard M. Goodfriend, WSBA # 14355<br>Catherine W. Smith, WSBA # 9542<br>Ian C. Cairns, WSBA # 43210<br>1619 8th Avenue North<br>Seattle, WA 98109<br>Telephone: (206) 624-0974<br>howard@washingtonappeals.com<br>cate@washingtonappeals.com<br>ian@washingtonappeals.com<br>Attorneys for Defendants | [ ] U.S. Mail<br><br>[ ] ABC Legal Messenger<br><br>[ ] Facsimile<br><br>[ ] E-Mail<br><br>[X] Via CM/ECF |

I hereby declare under the penalty of perjury of the laws of the State of Washington that the foregoing is true and correct.

DATED at Seattle, Washington on this 19th day of November, 2018.

_s/_ Hannelore Ohaus
Hannelore Ohaus

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LISA MENNINGER,

               Plaintiff,

v.

PPD DEVELOPMENT, L.P.,

               Defendant.

Civil Action No.  1:19-CV-11441-LTS

**Oral Argument Requested**

**Leave to File Granted
on July 12, 2023**

## DEFENDANT'S REPLY IN SUPPORT OF RENEWED
## MOTION FOR JUDGMENT AS A MATTER OF LAW AND
## <u>MOTION FOR A NEW TRIAL OR, IN THE ALTERNATIVE, REMITTITUR</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................. 3

I.  PPD DID NOT WAIVE ITS RIGHT TO SEEK JUDGMENT UNDER
    RULE 50(B) .......................................................................................................... 3

II. THE COURT SHOULD GRANT PPD JUDGMENT AS A MATTER
    OF LAW AS TO MENNINGER'S DISCRIMINATION CLAIMS
    BECAUSE SHE WAS NOT A "QUALIFIED HANDICAPPED
    PERSON" AND PPD ATTEMPTED TO REASONABLY
    ACCOMMODATE HER ........................................................................................ 5

    A.   Menninger Was Not a Qualified Handicapped Person, and Thus
         Both Her Discrimination Theories Fail as a Matter of Law. ............... 6

    B.   Menninger's Failure-to-Accommodate Claim Also Fails for the
         Independent Reason That PPD Met Its Legal Duty to Attempt to
         Reasonably Accommodate Her. ........................................................... 8

III. THE COURT'S "READER" JURY INSTRUCTION WAS
     MISLEADING AND HIGHLY PREJUDICIAL UNDER THE
     CIRCUMSTANCES OF THIS CASE ................................................................. 10

IV. THE COURT SHOULD GRANT PPD JUDGMENT AS A MATTER
    OF LAW AS TO MENNINGER'S RETALIATION CLAIM BECAUSE
    SHE DID NOT SUFFER AN ADVERSE ACTION BECAUSE OF
    PPD'S CONDUCT. ............................................................................................. 13

V.  THE JURY'S $24 MILLION DAMAGES AWARD IS CONTRARY TO
    LAW, UNSUPPORTED BY THE EVIDENCE, EXCESSIVE, AND
    WELL OUTSIDE THE RANGE OF *ANY* COMPARABLE DECISIONS
    IN THIS JURISDICTION. .................................................................................. 16

    A.   The Court Should Strike the Jury's Punitive Damages Award as
         Contrary to Law. ................................................................................ 16

    B.   The Jury's Award of $7 Million in Emotional Distress Damages
         Is Excessive ....................................................................................... 19

    C.   Menninger's Front Pay Award Is Speculative and Contradicts the
         Evidence ............................................................................................ 20

    D.   Menninger Offers No Comparable Verdict in This Jurisdiction. ...... 20

CONCLUSION .............................................................................................................. 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bain v. City of Springfield*,
    424 Mass. 758 (1997) ............................................................................................... 15

*Bell v. O'Reilly Auto Enters., LLC*,
    626 F. Supp. 3d 141 (D. Me. 2022) ...................................................................... 17

*Benson v. Wal-Mart Stores E., L.P.*,
    14 F.4th 13 (1st Cir. 2021) ...................................................................................... 6

*Billings v. Town of Grafton*,
    515 F.3d 39 (1st Cir. 2008) ................................................................................... 15

*Blockel v. J.C. Penney Co.*,
    337 F.3d 17 (1st Cir. 2003) ..................................................................................... 4

*Bryant v. Caritas Norwood Hosp.*,
    345 F. Supp. 2d 155 (D. Mass. 2004) ................................................................. 14

*Burnett v. Ocean Props., Ltd.*,
    987 F.3d 57 (1st Cir. 2021) ................................................................................... 17

*Che v. Mass. Bay Transp. Auth.*,
    342 F.3d 31 (1st Cir. 2003) ................................................................................... 17

*Ciccarelli v. Sch. Dep't of Lowell*,
    70 Mass. App. Ct. 787 (2007) .............................................................................. 17

*Dixon v. Int'l Bhd. of Police Officers*,
    504 F.3d 73, 81 (1st Cir. 2007) ............................................................................ 14

*Forsythe v. Wayfair Inc.*,
    27 F.4th 67 (1st Cir. 2022) .................................................................................... 15

*Freadman v. Metro. Prop. & Cas. Ins. Co.*,
    484 F.3d 91 (1st Cir. 2007) ................................................................................... 10

*Gauthier v. Sunhealth Specialty Servs., Inc.*,
    555 F. Supp. 2d 227 (D. Mass. 2008) ................................................................. 14

*Gessy Toussaint v. Brigham & Women's Hospital*,
    Case No. SUCV2014-2253-B (Mass. Sup. Ct. 2018) ......................................... 20

*Gonzalez-Bermudez v. Abbott Labs P.R., Inc.*,
    990 F.3d 37 (1st Cir. 2023) ................................................................... 5

*Gyulakian v. Lexus of Watertown, Inc.*,
    475 Mass. 290 (2016) ................................................................... 5, 17

*Handrahan v. Red Roof Inns, Inc.*,
    43 Mass. App. Ct. 13 (1997) ................................................................... 18

*Heagney v. Wong*,
    915 F.3d 805 (1st Cir. 2019) ................................................................... 17

*Jennings v. Jones*,
    587 F.3d 430 (1st Cir. 2009) ................................................................... 13

*John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*,
    322 F.3d 26 (1st Cir. 2003) ................................................................... 12

*Jones ex rel. United States v. Massachusetts Gen. Hosp.*,
    780 F.3d 479 (1st Cir. 2015) ................................................................... 5, 6

*Jones v. Nationwide Life Ins. Co.*,
    696 F.3d 78 (1st Cir. 2012) ................................................................... 10

*Jones v. Walgreen Co.*,
    679 F.3d 9 (1st Cir. 2012) ................................................................... 6, 7

*Jones v. Walgreen Co.*,
    765 F. Supp. 2d 100 (D. Mass. 2011) ................................................................... 8

*Kelley v. Airborne Freight Corp.*,
    Case No. 1:94-cv-10137-WAG (D. Mass. 1996) ................................................................... 20

*Kiely v. Teradyne, Inc.*,
    85 Mass. App. Ct. 431 (2014) ................................................................... 16, 17

*Krennerich v. Inhabitants of Town of Bristol*,
    943 F. Supp. 1345 (D. Me. 1996) ................................................................... 7, 10, 11

*Lattimore v. Polaroid Corp.*,
    99 F.3d 456 (1st Cir. 1996) ................................................................... 13

*Laurin v. Providence Hosp.*,
    150 F.3d 52 (1st Cir. 1998) ................................................................... 8, 10, 11

*Marinelli v. Potter*,
    661 F. Supp. 2d 69 (D. Mass. 2009) ................................................................... 14

iii

*Mulloy v. Acushnet Co.*,
    460 F.3d 141 (1st Cir. 2006) .......................................................................... 7

*O'Connor v. Huard*,
    117 F.3d 12 (1st Cir. 1997) .......................................................................... 12

*Ortiz-Martinez v. Fresenius Health Partners, PR, LLC*,
    853 F.3d 599 (1st Cir. 2017) ........................................................................ 10

*Parker v. Gerrish*,
    547 F.3d 1 (1st Cir. 2008) .............................................................................. 5

*Pena v. Honeywell Int'l, Inc.*,
    923 F.3d 18 (1st Cir. 2019) ............................................................................. 5

*Russell v. Cooley Dickinson Hosp., Inc.*,
    437 Mass. 443 (2002) .................................................................................. 14

*Sepúlveda-Vargas v. Caribbean Rests., LLC*,
    888 F.3d 549 (1st Cir. 2018) .................................................................. 15, 16

*Smith v. Bell Atl.*,
    63 Mass. App. Ct. 702 (2005) ........................................................... 5, 12, 16

*Stonehill Coll. v. Mass. Comm'n Against Discrimination*,
    441 Mass. 549 (2004) .................................................................................. 19

*Tobin v. Liberty Mut. Ins. Co.*,
    553 F.3d 121 (1st Cir. 2009) ........................................................................ 18

*Tompson v. Dep't of Mental Health*,
    76 Mass. App. Ct. 586 (2010) ....................................................................... 5

*Trinh v. Gentle Comms., LLC*,
    71 Mass. App. Ct. 368 (2008) ..................................................................... 15

*Zimmerman v. Direct Fed. Credit Union*,
    262 F.3d 70 (1st Cir. 2001) .......................................................................... 17

**Statutes**

42 U.S.C. § 12111(9)(B) ................................................................... 2, 10, 13

**Other Authorities**

29 C.F.R. 35.104 .......................................................................................... 10

*Black's Law Dictionary* (11th ed. 2019) ....................................................... 5

Fed. R. Civ. P. 50(a) ................................................................................................................4, 5

Fed. R. Civ. P. 50(b) .............................................................................................................3, 4, 5

v

## **INTRODUCTION**

Menninger suffers from a debilitating condition that prevented her from performing the essential functions of her position without accommodations that are, as a matter of law, unreasonable.  PPD tried in good faith to find ways that might permit Menninger to continue in her role, or to find another role for which she was suited.  But, while Menninger's illness is lamentable, PPD was not required to, in effect, hire another employee to fulfill essential functions of Menninger's job.  As the evidence at trial showed, PPD tried to reasonably accommodate Menninger and did not retaliate against her.

When Menninger and her psychiatrist told PPD that it was "impossible" for Menninger to increase her public-facing duties without incurring significant risk to her mental health, PPD took them at their word, as it was entitled to do.  As the trial evidence established, and as this Court observed at summary judgment: "In contrast to situations where an employer 'completely disregarded' an employee's requests for help, 'extended no response at all to [employee's] requests, and failed to give any explanations for its failure to do so,' PPD engaged, responded, and gave explanations for why it could not grant the other accommodations." (Doc. No. 81 at 12-13.) Simply put, PPD engaged in good faith in the legally required interactive process.

Indeed, far from engaging in some grand conspiracy to exit Menninger, as her Opposition tries to suggest, the evidence at trial established exactly what this Court found at summary judgment: "No reasonable jury could find that [the] predominantly internal communications allegedly showing that PPD was trying to force Menninger out affected the terms and conditions of her employment.  Neither could they find that her termination nearly eight months after she took a medical leave, and where she showed 'no sign of intending to return to work,' was [a] discharge under the pretext of performance issues." (Doc. No. 81 at 15 (citations omitted).)  Instead, when Menninger and her psychiatrist made clear that no reasonable accommodation existed, PPD did

1

not terminate Menninger—as happened in almost every case the Opposition cites.  PPD offered her the opportunity to transition to a consulting role that would not require Menninger to perform any of the public-facing duties that Menninger's psychiatrist stated she was incapable of performing.  Unlike hiring a surrogate employee to perform essential aspects of Menninger's job, PPD's proposal of an alternative role is not merely *reasonable* under the law—it is precisely the kind of accommodation the ADA contemplates.  42 U.S.C. § 12111(9)(B) (defining "reasonable accommodation" to include "reassignment" to another position).  Faced with a truly impossible situation, PPD believed that this was the best available option under the unfortunate circumstances—as it provided Menninger with an opportunity to keep working.  Menninger's attempt now to portray these, and PPD's other good faith efforts, as acts of unlawfulness—and as so egregious as to support punitive damages—is contrary to law and highlights how, if this jury's verdict were upheld, the law would put employers like PPD in an impossible position.

What this case has always come down to is this:  Menninger could not do the job that PPD needed her to do.  PPD's business needs had legitimately evolved; and unfortunately, in the words of Menninger and her psychiatrist, Menninger's mental disorders made it "impossible" for her to meet these needs.  While PPD sympathizes with Menninger for her medical situation, PPD did not cause it, and cannot be held liable for it.  Menninger ignores salient facts evidencing good faith on the part of PPD, relies on outdated and irrelevant case law, seeks to benefit from an erroneous jury instruction that all but guaranteed the jury's flawed verdict, and leans on emotional appeals that cannot form the basis of liability.

Menninger failed to meet her burden of establishing that she was capable of performing her job with reasonable accommodation.  This failure defeats both of her discrimination claims.  In her Opposition, Menninger omits her psychiatrist's dispositive statement that it was "impossible" for her to perform her public-facing duties.  She omits that PPD readily accepted two

of her five accommodation requests—denying only those that the law deems categorically unreasonable. She further ignores that it was she who ended the accommodations discussions as part of the interactive process. And, among other things, she ignores this Court's finding at summary judgment that PPD engaged in a good faith effort to accommodate her.

Menninger's legally insufficient discrimination claims inevitably tainted the jury's consideration of her retaliation claim as well, which at the very least must be retried. PPD should, however, be granted judgment on the retaliation claim, as Menninger was unable to prove any adverse impact, or any causal connection to her disability. Instead, Menninger complains of the very things the law requires, such as PPD's attempt to identify accommodations, including an alternative role, and engagement with legal counsel to ensure compliance with the law.

At an absolute minimum, these facts, which are fully substantiated by the evidence in the trial record, are irreconcilable with the jury's punitive damages award. The Court was right to be hesitant about sending the punitive damages question to the jury in the first place. (Doc. No. 159 at 171-73.) In defense of that award, Menninger cites outdated case law to suggest that facts establishing *liability* are sufficient to support *punitive damages*—a proposition that countless more recent cases explicitly reject. The jury's verdict is improper as a matter of law, excessive as a matter of fact, and tainted by error. It is this Court's duty at this point to correct those improprieties, excessiveness, and errors by setting aside the jury's unjust verdict.

## ARGUMENT

### I.  PPD DID NOT WAIVE ITS RIGHT TO SEEK JUDGMENT UNDER RULE 50(B).

PPD did not waive its right to seek judgment pursuant to Rule 50 of the Federal Rules of Civil Procedure. The Court should reject Menninger's assertion that, merely because PPD moved for a directed verdict without specifying the precise reasons, PPD cannot challenge the sufficiency of the evidence in its Rule 50(b) Motion. This assertion has been squarely rejected by the First

3

Circuit under identical circumstances.

In *Blockel v. J.C. Penney Co.*, a case on all fours with the instant action, Blockel sued her former employer, J.C. Penney, for retaliation and failure to reasonably accommodate her disability. 337 F.3d 17, 21 (1st Cir. 2003). Like PPD, J.C. Penney orally moved for "directed verdict." *Id.* at 25 n.2. Before J.C. Penney specified its grounds, the court immediately noted that the "[m]otion for directed verdict has been filed, and it's on the record, and the Court denies it." *Id.* On appeal, Blockel argued that J.C. Penney had somehow waived its arguments under Rule 50(b) by failing to specify any grounds for judgment as a matter of law under Rule 50(a). *Id.* at 24-25. The First Circuit disagreed, rejecting an argument identical to Menninger's argument:

> "J.C. Penney's Rule 50(a) motion was *cut short by the judge's pronouncement that the motion was considered filed and denied*. Although generally it is incumbent upon a party to enunciate the specific basis for a motion for judgment as a matter of law, *see* Fed. R. Civ. P. 50(a)(2), here, the district court foreclosed J.C. Penney's opportunity to make its arguments with any specificity. *Under these circumstances J.C. Penney cannot be faulted for failing to provide more detail*."

*Id.* at 25 (emphasis added) (footnote omitted). That is exactly what happened here:

| ***Blockel* Transcript** | ***PPD* Transcript** |
|---|---|
| COUNSEL: [W]e did want to proceed with our motions for directed verdict on certain issues. | THE COURT: Are there any motions you want to make? You don't have to, but I'm just giving you the chance. |
| THE COURT: I never noticed that you filed one at the close of plaintiff's evidence.[1] I said at the time that I believed after the evidence was complete. | MR. CURRAN: Yeah. A motion for directed verdict, Your Honor. |
| COUNSEL: I believe that we— | THE COURT: All right. Fine. I will deny that. So anything else? We're just going to get Mr. Kelly? |
| THE COURT: Motion for directed verdict has been filed, and it's on the record, and the Court denies it. | MR. CURRAN: Yes, Dr. Kelly. |
| *Blockel*, 337 F.3d at 25 n.2. | (Doc. No. 159 at 50:4-9.) |

As in *Blockel*, the Court's immediate denial of PPD's motion for a directed verdict

---

[1] Despite the *Blockel* court's reference to a motion for directed verdict being "filed," J.C. Penney only ever moved for directed verdict orally, without specifying any grounds. *See* Defendant-Appellant's Reply Brief, *Blockel v. J.C. Penney Co.*, Nos. 02-1927 and 02-1946 (1st Cir. Mar. 14, 2003), 2003 U.S. 1st Cir. Briefs LEXIS 17, at *5.

4

indicated that no further specification was required.  Thus, PPD "cannot be faulted for failing to provide more detail" in order to preserve its arguments as to the insufficiency of Menninger's trial evidence.  *Id.*  There was no confusion on the Court's part as to the meaning of PPD's "motion for directed verdict."[2]  And there is no basis for confusion now.  Nonetheless, in an attempt to manufacture confusion, Menninger cites decisions in which the moving party: (1) was provided ample opportunity to specify the grounds for its Rule 50(a) motion, but did not; or, (2) did do so, but then sought to raise *other* grounds in its Rule 50(b) motion.  (Opposition ("Opp.") at 3-4 (citing *Parker v. Gerrish*, 547 F.3d 1, 11-13 (1st Cir. 2008); *Jones ex rel. United States v. Massachusetts Gen. Hosp.*, 780 F.3d 479, 487-88 (1st Cir. 2015)).  Such circumstances do not exist in this case.

The Court should consider and grant PPD's motion for judgment pursuant to Rule 50(b).

## II.  THE COURT SHOULD GRANT PPD JUDGMENT AS A MATTER OF LAW AS TO MENNINGER'S DISCRIMINATION CLAIMS BECAUSE SHE WAS NOT A "QUALIFIED HANDICAPPED PERSON" AND PPD ATTEMPTED TO REASONABLY ACCOMMODATE HER.

Menninger did not, and cannot, show that she was a "'qualified handicapped person' capable of performing the essential functions of [her] job with reasonable accommodation."  *Smith v. Bell Atl.*, 63 Mass. App. Ct. 702, 711 (2005) (internal quotations and citations omitted).  This legal shortcoming is fatal to both of her discrimination claims.  *See, e.g.*, *Tompson v. Dep't of Mental Health*, 76 Mass. App. Ct. 586, 593-94 (2010); *Pena v. Honeywell Int'l, Inc.*, 923 F.3d 18, 27 (1st Cir. 2019).  Her failure-to-accommodate claim also fails for the independent reason that the evidence shows PPD met its legal obligation to attempt to reasonably accommodate her.

---

[2] Menninger ignores that the term "directed verdict" possesses a particular meaning—that "there is no legally sufficient evidentiary foundation on which a reasonable jury could find for the other party."  Motion for Directed Verdict, *Black's Law Dictionary* (11th ed. 2019).  Thus, moving for "directed verdict" preserved challenges to the "sufficiency of the evidence as to a finding of liability" as well as the appropriateness of punitive damages.  *Gyulakian v. Lexus of Watertown, Inc.*, 475 Mass. 290, 299-300 (2016); *see Gonzalez-Bermudez v. Abbott Labs P.R., Inc.*, 990 F.3d 37, 45 (1st Cir. 2023) (arguing "no evidence to support" claim preserved all arguments in renewed motion regarding insufficiency of the evidence; Rule 50 does not require "technical precision").

### A. Menninger Was Not a Qualified Handicapped Person, and Thus Both Her Discrimination Theories Fail as a Matter of Law.

Both Menninger and her doctor told PPD that Menninger could not perform the additional public-facing duties required for her position. An individual unable to perform the essential duties of her job is not a "qualified handicapped person" under the law. Thus, the threshold viability of both her discrimination theories depends on her assertion that these public-facing duties were not essential—or in the alternative, that they were essential, but that PPD should not have believed Menninger and her psychiatrist when they stated it would be "impossible" for Menninger to perform them. (Opp. at 16-17.)

The first problem with Menninger's position is that her own view of the essentiality of the job functions must give way to PPD's judgment on that issue. *Jones v. Walgreen Co.*, 679 F.3d 9, 14 (1st Cir. 2012) ("[T]he applicable statutory and regulatory framework accords *a significant degree of deference* to an employer's own business judgment regarding which functions are essential." (emphasis added)); *Benson v. Wal-Mart Stores E., L.P.*, 14 F.4th 13, 27 (1st Cir. 2021) ("We are not tasked with second-guessing an employer's legitimate business judgment about what is required of its employees."). Thus, it matters little whether Menninger believed that the public-facing duties were essential to her job; PPD did, and its judgment is not only afforded substantial deference, but is also supported by the other evidence at trial.

In fact, the *only* evidence that these public-facing duties were not essential is Menninger's own self-serving testimony that they weren't essential *prior to 2018*. This does not change the fact that PPD deemed these duties essential *as of 2018*, and that PPD made this determination *before* it knew of Menninger's social anxiety and panic disorders.[3] As the evidence established at

---

[3] In the Opposition, Menninger characterizes as "misleading" PPD's description of the holding in *Jones*. (Opp. at 17.) PPD cited *Jones* for the proposition that Menninger's "past [job] performance" is not a reliable indicator of what tasks "are essential" going forward. (Combined Memorandum of Law ("Motion") at 15 (quoting *Jones*, 679 F.3d at 16).) PPD accurately quoted and characterized *Jones*. Here, as in *Jones*, Menninger's status as a "qualified handicapped person" must be assessed at the time of the alleged adverse action. 679 F.3d at 20. As in *Jones*, Menninger's

6

trial, Menninger's increased public-facing duties were in response to client feedback and essential to PPD's continued growth, and PPD made the decision to emphasize these duties among its senior leadership before it ever learned of Menninger's disability. (*See*, *e.g.*, Ex. 350; Doc. No. 157 at 138, 140, 145, 152-53; Doc. No. 158 at 98:5-101:16.)

These duties were not new. Indeed, they appear on the face of Menninger's job description (Ex. 350)—which is the starting point for the essential-functions inquiry, *Jones*, 679 F.3d at 14. The evidence also established that the employee currently serving in Menninger's position, Dr. Basel Kashlan, continues to perform the public-facing duties as a *core* part of his role (Doc. No. 158 at 122:3-127:8). *Mulloy v. Acushnet Co.*, 460 F.3d 141, 153 (1st Cir. 2006) (essentialness of duties may be shown through evidence of successor's work experience).

Incredibly, Menninger asserts that even if the increased public-facing duties were essential, the "jury could infer that Dr. Menninger could have tolerated such an increase." (Opp. at 16.) Menninger makes this assertion after she and her doctor explicitly told PPD (as confirmed at trial) that she suffered from a mental illness that made it impossible to perform the public-facing responsibilities that PPD required. (*See*, *e.g.*, Doc. No. 153 at 105:1-17, 110:4-8; Ex. 405.) The record conclusively establishes that the *only* accommodations Menninger specifically requested and that PPD declined (which is all that is legally relevant)—were those that would have required PPD to either hire an additional employee with comparable qualifications, or burden an existing, qualified employee who would be tasked with fulfilling Menninger's public and client-facing duties. (*See*, *e.g.*, Ex. 182.) Neither action constitutes a "reasonable" accommodation. *Krennerich*

---

restrictions were revealed by her doctor's communications, on January 31 and February 14, 2018 (Exs. 405, 48)—and PPD was "on firm ground" in relying on her doctor's own words. 679 F.3d at 20. "*Even if we assume that [she] was fully capable of performing the essential functions of her job [in 2017], . . . competent evidence foreclosed the same conclusion after that date.*" *Id.* (emphasis added). Whether Menninger was capable of performing her essential functions as they existed in 2017 is irrelevant to whether she was capable of doing so in 2018, after PPD's business needs changed and Menninger's condition had worsened, as confirmed by her own doctor. (Ex. 18.)

*v. Inhabitants of Town of Bristol*, 943 F. Supp. 1345, 1351 (D. Me. 1996); *Laurin v. Providence Hosp.*, 150 F.3d 52, 60 (1st Cir. 1998). Yet Menninger's own psychiatrist confirmed repeatedly that these accommodations—categorically unreasonable as a matter of law—were the *only* ones that would permit Menninger to perform her job, since "[a]ny changes to her role that increase[d] the need for public speaking and/or social interactions . . . would make it substantially more difficult, if not ***impossible***, for [Menninger] to perform her job." (Ex. 405 (emphasis added); Doc. No. 153 at 109:24-110:8.) The law is clear that an "employer is obviously not obligated to offer an 'accommodation' to an employee that is contrary to medical advice and would place the employee at risk." *Jones v. Walgreen Co.*, 765 F. Supp. 2d 100, 108 n.3 (D. Mass. 2011), *aff'd*, 679 F.3d 9 (1st Cir. 2012). Internal PPD e-mails reflect that its HR department was rightly concerned that Menninger's psychiatrist's statement foreclosed Menninger from participating in functions that were already "a large part of her standard role but ***increasing due to our growth***." (Ex. 280 (emphasis added).)

In short, the evidence establishes beyond any doubt that Menninger was not capable of performing the public-facing duties that were essential to her role as Executive Director of Global Laboratories. The law thus forecloses a finding that she was a qualified handicapped individual. The Court should therefore grant judgment in PPD's favor on both her disparate treatment and failure-to-accommodate theories of discrimination.

## B. Menninger's Failure-to-Accommodate Claim Also Fails for the Independent Reason That PPD Met Its Legal Duty to Attempt to Reasonably Accommodate Her.

Despite Menninger's attempt to manufacture confusion in her Opposition, the undisputed evidence at trial proves the following sequence of events: (1) In November 2017, Menninger informed her supervisor, Mekerri, that she felt "overwhelmed" in her current position, and Mekerri asked her to provide a list of her daily responsibilities to assess how best to help her manage them (Doc. No. 155 at 67:21-68:6; Doc. No. 151 at 178:1-4; Ex. 378); (2) Menninger's mental health

8

was declining, and, unbeknownst to PPD, she was suffering from the mental disorder agoraphobia (Doc. No. 153 at 106:8-19); (3) In December 2017, before PPD had any knowledge of Menninger's condition, Mekerri informed Menninger that, as a member of senior leadership, she would need to perform additional public-facing duties in response to client feedback and in support of PPD's continued growth (Doc. No. 157 at 138, 140, 145, 152-53); (4) On January 11, 2018, Menninger informed Mekerri of her disability for the first time (Ex. 366); (5) As of January 22, Menninger was formally diagnosed with agoraphobia, and her mental health had worsened precipitously, as "[t]he very prospect of making Menninger more visible with increased client visits and social interactions caused great distress for Menninger resulting in increased anxiety" and a litany of "somatic symptoms"  (Ex. 405; Ex. 18 (Menninger's January 22, 2018 psychiatric evaluation stating her distress was related to a "year review at her job where she was encouraged to be 'more visible' and 'think about doing more public speaking'")); (6) At this time, and prior to any alleged misconduct by PPD, Menninger was unable to leave the house for weeks on end (Doc. No. 153 at 155-56) and was engaged in chronic and debilitating "catastrophic thinking" (*id.* at 155); (7) On January 31, Menninger provided a note from her psychiatrist stating it was *impossible* for her to perform the public-facing duties of her job (Ex. 405); (8) On February 14, Menninger proposed five specific accommodations (Ex. 48), two of which PPD readily accepted, but it declined those the law deems categorically unreasonable, and provided reasoned explanations for why it could not provide Menninger with a surrogate in the remaining areas due to the nature of its business (Exs. 182, 158); (9) On February 28, PPD offered Menninger the opportunity to transition to a consulting role, which she rejected (Doc. No. 152 at 69:15-70:21).

Through no fault of anyone, the situation was untenable: PPD needed an Executive Director of Global Laboratories who could actively engage with clients, which Menninger was unable to do.  Under such circumstances, the law is clear: employers are *not* required to adopt

every accommodation a disabled employee requests.  *See, e.g.*, *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 103 (1st Cir. 2007) ("In addition to making a sufficient request concerning a known limitation, the plaintiff must also show that the proposed accommodation is reasonable— that it 'would enable her to perform the essential functions of her job.'"); *Ortiz-Martinez v. Fresenius Health, PR, LLC*, 853 F.3d 599, 602-603 (1st Cir. 2017).  This principle applies with even greater force in this case, where the *only* specific accommodations Menninger requested and that PPD denied are those the law deems unreasonable.  *See, e.g.*, *Laurin*, 150 F.3d at 60.  The law does not require PPD to abandon its legitimate business strategy in order to permit Menninger to remain in her current role while "contribut[ing] in a more behind the scenes fashion" (Ex. 451). *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 88 (1st Cir. 2012) ("[R]easonable accommodation by the employer does not require the elimination of an essential function of the job." (internal quotations omitted)).  Menninger's failure-to-accommodate claim rests entirely on her legally erroneous contention that PPD's refusal to either hire a "surrogate," or abandon its business strategy, was unlawful.  (Doc. No. 153 at 109:24-110:8; Ex. 405.)  The law says otherwise.  *See, e.g.*, *Freadman*, 484 F.3d at 103; *Laurin*, 150 F.3d at 60; *Krennerich*, 943 F. Supp. at 1351.

PPD sought to reasonably accommodate Menninger, but due to her disability, no reasonable accommodations would enable her to perform the job.  The Court should grant judgment as a matter of law on Menninger's claim for failure to reasonably accommodate.

## III.   THE COURT'S "READER" JURY INSTRUCTION WAS MISLEADING AND HIGHLY PREJUDICIAL UNDER THE CIRCUMSTANCES OF THIS CASE.

It is undisputed that the term "reader," as it appears in the statute and Guidelines, refers to an individual (or, in some instances, a software program) provided to read material that a disabled employee is otherwise incapable of reading—typically due to a vision impairment.  42 U.S.C. § 12111(9)(B); MCAD Guidelines § III.D; *see also* 29 C.F.R. 35.104 (defining "auxiliary services" under ADA regulations as including: "Qualified readers; taped texts; audio recordings;

10

Braille materials and displays . . . or other effective methods of making visually delivered materials available to individuals who are blind or have low vision."). These sources do not suggest that hiring the type of "reader" Menninger requested—*i.e.*, another qualified employee to stand in as Menninger's surrogate—is per se reasonable. In fact, the law specifically says that hiring a "surrogate" in this fashion is not "reasonable," and hence not required. *Laurin*, 150 F.3d at 60; *Krennerich*, 943 F. Supp. at 1351.[4] The heavy burden imposed on an employer by hiring a second stand-in employee, or burdening an existing one with additional tasks, simply does not compare with the relatively light burden of making available software or a "reader" for a visually impaired but otherwise qualified employee.

Over PPD's objection, the Court instructed the jury that a reasonable accommodation, as a matter of law, could include "the provision of qualified *readers* or interpreters." (Doc. No. 160 at 93:22-23; Doc. No. 159 at 133-34.) PPD objected, concerned that the instruction's use of the same term Menninger had used to mean something quite different—"reader"— might mislead the jury into believing the statute and Guidelines *require* something that the case law explicitly rejects.

While the Court may have believed it was merely offering the jury an example of what might constitute a reasonable accommodation under certain circumstances, PPD's concern was validated when Menninger's attorney exploited this very ambiguity in the instruction in closing:

> "So turning to the fact here, when we're talking about a reasonable accommodation, I suspect that the first inclination might be to look at the buckets and look at Dr. Kessimian's proposed accommodations with respect to that. . . . [I]f you look there . . . you're going to find that those were, at least *on their face, reasonable accommodations, in part because the Judge is going to tell you* that reasonable accommodations include modifying when and how a function is performed. . . .

---

[4] Due to the nature of PPD's business and Menninger's particular role, her request that PPD hire a "surrogate" or "reader" to stand in for her is even *more* patently unreasonable than in the average case. Menninger has nineteen professional licenses and certifications, including a board certification in pathology. (Ex. 3.) She is a medical doctor who has worked as a staff pathologist and laboratory director. (Doc. No. 151 at 165:18-167:19.) That experience was not incidental to her role as Executive Director of PPD's laboratory operations—it is *why* she was hired. (*Id.* at 164:7-9.) Simply because another person can "read" Menninger's prepared notes does not mean that person could fulfill Menninger's responsibilities for presenting to sophisticated clients or answering questions on complex medical issues.

11

*He's going to tell you that it includes things like that provision of qualified readers.*
I expect, *if you look at Dr. Kessimian's e-mail that, yes, those are, at least on their face, reasonable*." (Doc. No. 160 at 29:12-25 (emphasis added).)

On this point, the Opposition makes only one defense: that the Court's instruction is "an accurate statement of the law." (Opp. at 36.) But that misses the point. A jury instruction may offer an *accurate account of law*—yet still be erroneous because it is confusing or, as here, actually misleading. *See, e.g., John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 49 (1st Cir. 2003) (a jury instruction is improper, warranting reversal, where it misleads, misstates, or "unduly complicates the correct legal standard"); *O'Connor v. Huard*, 117 F.3d 12, 15 (1st Cir. 1997) (Jury instructions must "adequately reflect the law applicable to the controlling issues *without tending to confuse or mislead the jury*." (emphasis added)).

It is difficult to overstate how much Menninger's counsel's exploitation of this instruction affected the fairness of the jury's deliberations. Whether Menninger was a qualified handicapped individual—*i.e.*, one capable of performing her essential functions with reasonable accommodation—is among the <u>*most critical*</u> issues in this case, because both of her discrimination theories depend on it. Central to the parties' dispute is whether Menninger's requested accommodations were indeed reasonable; if they were not, then she is not a qualified handicapped person, and the anti-discrimination laws do not apply, *Sensing*, 575 F.3d at 153; *Smith*, 63 Mass. App. Ct. at 711. The jury was misled to believe—*contrary* to what the law actually states—that Menninger's request for a "reader" to substitute for her in public-facing roles was reasonable under the law, and that she was capable of performing her job with this "reasonable" accommodation.

Counsel's subsequent exploitation of this jury instruction tainted the entirety of the jury's verdict. This error alone warrants granting PPD's motion for new trial.[5]

---

[5] Despite Menninger's suggestions to the contrary (*see, e.g.*, Opp. at 27-28), the Court has broad authority to order a new trial. *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009). In ruling on a new trial motion, the Court does <u>*not*</u> give deference to the jury's verdict, and must instead "independently weigh the evidence." *Id.* "[W]henever, in its

## IV.     THE COURT SHOULD GRANT PPD JUDGMENT AS A MATTER OF LAW AS TO MENNINGER'S RETALIATION CLAIM BECAUSE SHE DID NOT SUFFER AN ADVERSE ACTION BECAUSE OF PPD'S CONDUCT.

At a minimum, PPD is entitled to a new trial on Menninger's retaliation claim.  For the reasons described above and in PPD's Motion, Menninger's own evidence forecloses a finding that she was capable of performing her essential functions with *reasonable* accommodation as of 2018; and it establishes that the only accommodations she specifically requested, and that PPD denied, are those deemed unreasonable as a matter of law.   It is clear that Menninger's discrimination claims never should have proceeded to a jury.  That they did, particularly with the instruction suggesting that Menninger's request for a "reader" was reasonable as a matter of law, inevitably tainted the jury's consideration of her retaliation claim.  If the Court does not direct a verdict for PPD on Menninger's retaliation claim, it should order a new trial so that the claim may be considered without the taint of the deficient discrimination theories.  *See Lattimore v. Polaroid Corp.*, 99 F.3d 456, 468 (1st Cir. 1996).

To try to preserve her retaliation claim, Menninger asserts that actions taken by certain PPD personnel—including the very efforts PPD made to accommodate her disability—constituted retaliatory conduct.  (Opp. at 20.)  For instance, Menninger emphasized at trial and throughout her Opposition that PPD offered her an exit package or opportunity to transition to a consulting position, arguing this alone demonstrates unlawful retaliation.  (Opp. at 8, 29.)  That turns the law on its head.  To accommodate Menninger's disability, PPD was willing to offer her a position that would not require the public-facing duties she stated she could not perform.  This is precisely the kind of "reasonable" accommodation the ADA contemplates.   42 U.S.C. § 12111(9)(B) ("reasonable accommodation" includes reassignment to open positions).   Indeed, "[w]hen a

---

judgment, the action is required in order to prevent injustice," the Court is not only empowered, but has a "*duty*," to order a new trial.  *Id.* (emphasis added).

plaintiff employee rejects a reasonable accommodation offered by her employer, as [plaintiff] did here [by rejecting a new position], she is precluded from recovering under the ADA for her employer's alleged failure to provide a reasonable accommodation." *Bryant v. Caritas Norwood Hosp.*, 345 F. Supp. 2d 155, 168-69 (D. Mass. 2004). Massachusetts is even "less generous" to plaintiffs, *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 454 (2002)—as it "does not require that an employer provide a 'reasonable accommodation' in the form of a reassignment to new or different position," *Gauthier v. Sunhealth Specialty Servs., Inc.*, 555 F. Supp. 2d 227, 240 (D. Mass. 2008). The Court should reject Menninger's invitation to punish PPD for suggesting another appropriate position as a reasonable accommodation.

Menninger also emphasizes, at length, that PPD engaged with its counsel to develop an "exit strategy" for Menninger. (*See*, *e.g.*, Opp. at 7.) Yet as this Court held at summary judgment, "No reasonable jury could find that predominantly internal communications allegedly showing that PPD was trying to force Menninger out affected the terms and conditions of her employment." (Doc. No. 81 at 15.) Based on the evidence at trial, that statement is equally true in the retaliation context: No reasonable jury could find that these internal communications had *any* adverse impact on Menninger whatsoever, let alone the "materially adverse" impact the law requires. *See Marinelli v. Potter*, 661 F. Supp. 2d 69, 78 (D. Mass. 2009); *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 81 (1st Cir. 2007).

Most critically, as described above, PPD reasonably (and correctly) believed Menninger was unqualified for her position, and that her inability to perform her public-facing duties (with or without reasonable accommodation) would undermine PPD's business needs. It could, lawfully, have terminated her at that point. It did not. Instead, PPD engaged its legal department to ensure that its actions were consistent with law—not, as Menninger claims, to retaliate against Menninger. To hold that involving counsel supports a retaliation claim would create adverse incentives,

*discouraging* precisely what the law should want to *encourage*.

Menninger also suggests that Ballweg's investigation of her complaint against Mekerri was, itself, an adverse action sufficient to prove retaliation.  (Opp. at 24-25.)  Yet Ballweg, who interviewed five individuals as a part of the investigation (Ex. 450), cannot be faulted for failing to uncover evidence of Mekerri's alleged discriminatory or retaliatory behavior—when the entirety of Menninger's trial evidence has failed to uncover the same.[6]  *See, e.g.*, *Trinh v. Gentle Comms., LLC*, 71 Mass. App. Ct. 368, 378 (2008) (investigation not a "whitewash," "where [plaintiff's] contentions were not corroborated"); *Billings v. Town of Grafton*, 515 F.3d 39, 53 (1st Cir. 2008) ("[A]n employee's displeasure at a personnel action cannot, standing alone, render it materially adverse."); *Forsythe v. Wayfair Inc.*, 27 F.4th 67, 70, 74 (1st Cir. 2022) (employee's disagreement with outcome of investigation does not indicate it was deficient).

Menninger next points to Mekerri's designation of "eliminating lab issues" as one of her annual performance goals, labeling that an act of retaliation.  (Opp. at 6, 11, 30.)  But every company must be able to set *goals* for employees (Doc. No. 158 at 112-13, 109-11), and asking Menninger to try to eliminate issues in the labs—which had arisen in her absence (Ex. 377; Doc. No. 158 at 105)—is a far cry from the "impossible" hurdle Menninger claims it to be.  And in any event, setting this goal caused Menninger no harm.  *See, e.g.*, *Sepúlveda-Vargas v. Caribbean Rests., LLC*, 888 F.3d 549, 555 (1st Cir. 2018) ("[P]laintiff must show that a reasonable employee would have found the challenged action materially adverse," which means "*it must produce a significant, not trivial harm*." (emphasis added) (internal quotations and citations omitted)).

---

[6] It is well established that an employee's mere impressions that, after a protected activity, her supervisor began conveying "hostility" and "second-guess[ing]" her *cannot*, as a matter of law, demonstrate retaliatory animus or establish retaliation. *Bain v. City of Springfield*, 424 Mass. 758, 766 (1997).  An employee's "subjective and intangible impressions . . . must not be considered," as they are "too easy to imagine," and therefore "have no place in defining the standards for legal intervention in the often fraught and delicate domain of personnel relations."  *Id.* Thus, the mere fact that Mekerri questioned aspects of Menninger's performance while PPD was trying to reasonably accommodate her does not establish a claim of retaliation.  And, notably, Menninger admitted the veracity of some of Mekerri's criticisms.  (*See* Ex. 300 at 2-3; Ex. 291.)

Finally, Menninger claims, without legal support, that Ballweg's knowledge that PPD believed Menninger to be unqualified (a belief the law squarely supports), and of its consequent desire that she transition to a new position or leave the company, makes Ballweg's investigation a "sham." (Opp. at 11-13, 25.) Yet Ballweg's awareness of these facts does *not* constitute awareness of any alleged *misconduct* by Mekerri, despite Menninger's efforts to suggest otherwise. Nor is Ballweg's awareness legally relevant—because neither her investigation nor its findings had *any adverse impact on Menninger whatsoever*. *See, e.g.*, *Sepúlveda-Vargas*, 888 F.3d at 555.

In short, because she failed to come forward with meaningful evidence of any adverse action, Menninger failed, as a matter of law, to prove that PPD retaliated against her for informing the company of her disability or engaging in any other protected conduct. The Court should grant judgment to PPD on her retaliation claim or order a new trial on that claim.

## V.  THE JURY'S $24 MILLION DAMAGES AWARD IS CONTRARY TO LAW, UNSUPPORTED BY THE EVIDENCE, EXCESSIVE, AND WELL OUTSIDE THE RANGE OF *ANY* COMPARABLE DECISIONS IN THIS JURISDICTION.

### A. The Court Should Strike the Jury's Punitive Damages Award as Contrary to Law.

The law is clear: "An award of punitive damages requires a heightened finding *beyond mere liability* and also beyond a knowing violation of the statute." *Kiely v. Teradyne, Inc.*, 85 Mass. App. Ct. 431, 440 (2014) (internal quotations and citations omitted) (emphasis added). Punitive damages require conduct that is "'outrageous, *because of the defendant's evil motive or his reckless indifference to the rights of others*.'" *Smith*, 63 Mass. App. Ct. at 721 (emphasis added). A finding of **both** "*intentional **and** outrageous*" misconduct is "*a precondition for punitive damages*." *Haddad v. Wal-Mart Stores, Inc.*, 455 Mass. 91, 93 (2009) (emphasis added). There is nothing in the record that even *approached* the high bar required for imposing punitive damages.

Unsurprisingly, Menninger cannot cite a single decision where punitive damages were held appropriate under circumstances analogous to this case. Instead, Menninger's defense of the jury's

16

punitive damages award rests on a critical misstatement of the law: that "evidence of intentional retaliation will typically suffice to support a punitive damages award." (Opp. at 6.) Massachusetts and the First Circuit have expressly rejected that standard. In *Haddad*, 455 Mass. at 110, the Supreme Judicial Court "set forth a new standard describing the circumstances in which punitive damages may be awarded." Since then, a finding of intentional discrimination or retaliation, alone, is *never* sufficient to award punitive damages. *Kiely*, 85 Mass. App. Ct. at 440. Indeed, the First Circuit has stated that "no post-*Haddad* case" has "sustain[ed] an award of punitive damages" based solely on "a defendant's deliberate or knowing violation of Chapter 151B"—on either a discrimination or a retaliation claim. *Heagney v. Wong*, 915 F.3d 805, 822 n.4 (1st Cir. 2019).

With no applicable case law to support her award of punitive damages, Menninger relies on a hodgepodge of cases that either predate *Haddad* or are wholly inapplicable to the Chapter 151B context—and that, in any event, involve employer conduct far more egregious than anything proven here: *Burnett v. Ocean Props., Ltd.*, 987 F.3d 57 (1st Cir. 2021) (non-binding Maine decision that did not consider Chapter 151B's punitive damages standard, and where employer willfully *ignored* each of plaintiff's requests for accommodation); *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31 (1st Cir. 2003) (pre-*Haddad* decision where plaintiff was subjected to racial slurs and other abuse and demoted in retaliation for complaints); *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70 (1st Cir. 2001) (pre-*Haddad* decision where employee was demoted, shunned, and reassigned to an undesirable office in response to her pregnancy and complaints); *Bell v. O'Reilly Auto Enters., LLC*, 626 F. Supp. 3d 141 (D. Me. 2022) (non-binding Maine decision where employer rejected disabled employee's request for accommodation and instead terminated him outright); *Gyulakian v. Lexus of Watertown, Inc.*, 475 Mass. 290 (2016) (employer knew of ongoing sexual harassment and continuously refused to address it); *Ciccarelli v. Sch. Dep't of Lowell*, 70 Mass. App. Ct. 787 (2007) (pre-*Haddad* decision where employee was terminated after

17

agreeing to testify against employer in another action); *Handrahan v. Red Roof Inns, Inc.*, 43 Mass. App. Ct. 13 (1997) (pre-*Haddad* decision where employer terminated disabled employee for violating a new rule adopted *after* the disclosure of her disability).

As evidence of allegedly "egregious" misconduct, Menninger points to some internal PPD e-mails that she says show PPD sought to "delicately work [her] out" after she stated she could not perform her job. (Opp. at 25.) But not only was PPD's desire to do so based on its reasonable— and legally supported—belief that Menninger was unqualified for her position, the law is clear that an employer's "orchestrated" discharge of an employee is, alone, insufficient to uphold a punitive damages award. *See Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 148 (1st Cir. 2009).

Not one of the decisions Menninger relies upon—including even those that predate *Haddad*—involve the situation in the instant action, where the employer: (1) never terminated, demoted, or took any other identifiable adverse action against the employee; (2) engaged in a good-faith interactive process, as this Court found at summary judgment (Doc. No. 81 at 12-13); (3) investigated the employee's complaint, complete with interviews and written findings (Ex. 450); *and* (4) allowed an eight-month medical leave, until she communicated she did not plan to return (Ex. 90). Menninger's authorities all involve a degree of *undeniably intentional* harm that is altogether absent from this case. Indeed, here there is no evidence of any kind that PPD had an "evil motive" or "reckless indifference" toward Menninger. (*See* Motion at 28-32.) To the contrary, this is the same employer who readily permitted Menninger to work remotely from the other side of the country when she needed to care for her daughter (Doc. No. 157 at 122:22-24, 123:2-8; Doc. No. 153 at 69:8-11); accepted Menninger's requested accommodation in two of five areas, declining only those that are deemed unreasonable as a matter of law (Exs. 182, 158); sought advice from counsel to ensure it was adequately accommodating Menninger's disability (Ex. 87); and ultimately granted her *eight months* of medical leave (Ex. 90).

18

The Court's hesitancy to send the punitive damages question to the jury in the first place was well-founded.  (Doc. No. 159 at 171-73.)  And, in the end, the Court should strike the punitive damages because Menninger failed to meet the truly high legal standard for "evil motive" or "reckless indifference" necessary to uphold it.  While the jury may have sympathized with Menninger, or doubted the sufficiency of PPD's response, it did not possess evidence supporting a claim for punitive damages.  Even if Menninger's evidence would support a finding of liability, Massachusetts has *rejected* that mere liability is enough to support imposing punitive damages.

## B.  The Jury's Award of $7 Million in Emotional Distress Damages Is Excessive.

Menninger's emotional distress award is improper because she failed to "show a sufficient causal connection" between any *unlawful* act and her resulting emotional distress.  *Stonehill Coll. v. Mass. Comm'n Against Discrimination*, 441 Mass. 549, 576 (2004).  Menninger's psychiatrist stated that Menninger, whose debilitating emotional disorders long predate any affiliation with PPD (Doc. No. 156 at 161:1-5; Doc. No. 153 at 106:13-19), was suffering increased mental health symptoms merely because PPD informed her she would need to take on a more public-facing role.  (Ex. 18.)  This occurred before PPD ever learned of Menninger's disability, before Menninger requested any accommodations, and before Menninger complained about Mekerri's attitude towards her.  In fact, *Menninger's own expert trial witness declined to confirm whether any of PPD's actions actually "play[ed] any role in Dr. Menninger developing major depressive disorder*" (Doc. No. 156 at 189:2-3 (emphasis added)); could not link a specific action, comment, or failure to reasonably accommodate to any alleged psychological harm (*id.* at 190-93); and conceded that Menninger's debilitating anxiety arose from the very act of disclosing her disability and concern for the future, *even absent any response from PPD* (*id.*).  On this record, no reasonable jury could find Menninger's emotional harm occurred *because of* PPD's conduct—let alone allegedly *unlawful* conduct.  The jury's $7 million emotional damages award cannot stand.

19

**JA1996**

## C. Menninger's Front Pay Award Is Speculative and Contradicts the Evidence.

The jury's economic damages award made Menninger far more than whole and is grossly excessive. The jury's front pay award of nearly $5.5 million is logically inconsistent with the jury's own verdict. Menninger cannot have been *both* a "qualified handicapped person," capable of performing the demanding role of Executive Director of Global Laboratories at PPD for another 18 years and, at the same time, have been so fragile that PPD's mere request for more public-facing activities, and then participating in the legally required process of discussing accommodations, was enough to render her incapable of working for the rest of her life. Yet the jury's verdict presupposes both.

## D. Menninger Offers No Comparable Verdict in This Jurisdiction.

Menninger criticizes PPD's selection of damages awards in comparable decisions in this district (Motion at 40), claiming the cited decisions are distinguishable. (Opp. at 39.) Menninger purports to establish a more comparable list of decisions, but unlike PPD's list, not a single one is from the Commonwealth of Massachusetts or the First Circuit. (*Id.* at 38-39.) Neither PPD nor Menninger has identified a single employment decision in this district in which the jury's verdict exceeded approximately $3.3 million and was upheld. *See Kelley v. Airborne Freight Corp.*, Case No. 1:94-cv-10137-WAG (D. Mass. 1996) (awarding $3,326,858 for age discrimination and wrongful termination).[7] The instant award, on its face, is grossly excessive and improper.

## CONCLUSION

For the foregoing reasons, the Court should grant judgment for PPD, or in the alternative, order a new trial. At a minimum, it must strike the punitive damages and remit the verdict.

---

[7] The matter of *Gessy Toussaint v. Brigham & Women's Hospital*, Case No. SUCV2014-2253-B (Mass. Sup. Ct. 2018), involved an award of $176,000 in back pay; $287,000 in front pay; $2.75 million in emotional distress damages; and $25 million in punitive damages. The defendants' motions for judgment and new trial or remittitur were never adjudicated, because the parties settled for an undisclosed amount.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


/s/ *Rachel Reingold Mandel*
Rachel R. Mandel (BBO# 660495)
Patrick M. Curran (BBO# 659322)
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
Facsimile:  (617) 994-5701

Jack S. Sholkoff (admitted *pro hac vice*)
Catherine L. Brackett (admitted *pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
400 S. Hope Street
12th Floor
Los Angeles, CA 90071
Telephone: (213) 239-9800
Facsimile: (213) 239-9045


ROPES & GRAY, LLP

Douglas H. Hallward-Driemeier (BBO# 627643)
ROPES & GRAY, LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 508-4600
Facsimile: (202) 508-4650

John P. Bueker (BBO# 636435)
ROPES & GRAY, LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050


Attorneys for Defendant
PPD DEVELOPMENT, L.P.

Dated:  July 28, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the within document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing on July

28, 2023.

<p align="right"><i>/s/ Rachel Reingold Mandel</i><br>Rachel Reingold Mandel</p>

57512011.v1-OGLETREE

**2018 Compensation Statement for 2017 Performance Year**

Dear Lisa Menninger,

On behalf of the entire senior leadership team, I sincerely thank you for the unique role you played in PPD's success in 2017. Our accomplishments and results speak volumes about the caliber of our 20,000+ colleagues around the world and our capabilities when we act as **One PPD**. Most importantly, we made a real impact in helping to get new therapies to patients in need.

We appreciate your ongoing dedication to your work and to PPD.

Sincerely,

David Simmons
Chairman and CEO

| Pay | |
|---|---|
| Current | USD 265,536.58 |
| Total Increase | USD 5,045.20 |
| New (eff 1 Apr 2018) | USD 270,581.78 |

| Bonus Award | |
|---|---|
| Bonus Award | USD 44,342.52 |

Notes:

- This statement is for information purposes only. Where required by local legislation, necessary formal documentation will be issued in due course.

- Bonus payments will be made in March and will reflect tax deductions as required by applicable tax laws. In the U.S., bonuses are taxed at a flat rate of 22% for Federal withholdings as well as applicable Social Security, Medicare, State and local tax withholdings.

- Per PPD US Benefit Plan documents, required benefit deductions are also made from the bonus payment, if applicable.





CONFIDENTIAL



EXHIBIT
P-17
JA2001

MENNINGER000520

Initial Psychiatric Evaluation

1/22/18

Patient Personal Details

Name: Lisa Menninger
Preferred name : Lisa
Age : 49
DOB:     ▮1968
DOS: 1/22/18
Who referred them : Self

Presenting Complaint: " I have GAD, social anxiety and panic and I have hit a crisis point after my end of the year review"

History of presenting complaint : 49 yo Caucasian female with a past psychiatric history significant for GAD. Panic with agoraphobia and social anxiety disorder presents for an initial psychiatric evaluation after an end of the year review at her job where she was encouraged to be " more visible" and " think about doing more public speaking". Lisa self identifies as extremely shy/ introverted since she can remember. She has sought psychiatric care in the past to help her with presentations during medical school and residency and currently uses valium 5 mg as needed for social/ public speaking responsibilities, but mostly has created a life that caters to her strengths and weaknesses and is a pathologist ( minimal patient interaction), that oversees labs ( attention to detail, precision and perfectionism ) all over the world for a private sector company.  She is able to fulfill her job responsibilities within these limitations but recently she was given this feedback and her worries began to spiral ( she was going to be fired, that her family would be homeless and this would be all her fault) .  Her overall daily level of anxiety and somatic symptoms of  anxiety has increased.  She was advised by work to procure documentation supporting both her diagnosis and workplace restrictions/ accommodations.  She then met with a lawyer that will be working with this writer to provide all the necessary paperwork to her employer.  Reports that recently her body has been in " fight or flight" mode 24/7.

Lisa would like to maintain her current job and responsibilities, where she finds her current symptoms especially interruptive is in her personal and family life.  Today for her appointment is the first time in weeks she has left her home ( she works remotely ).  She is married to an engineer, who struggles with his own specific phobias, and he has taken over all the family and child care responsibilities ( grocery shopping, cooking, playdates, birthday parties, drop off and pick up from school ) .  After her appointment she had planned to pick  up her 9 yo daughter , M▮▮▮, from school and her daughter was excited and remarked that many of her peers do not believe that she has a mommy because they have never seen her.

                                    MENNINGER000663

**JA2002**

Inpatient/partial hospital : Denies

Safety:  Denies current or past suicidal ideation  , self injury, problematic substance use / violent/ assaultive behavior/  or legal history

Medical History: unremarkable
Neurological history:  febrile seizures on phenobarbital 6 months- 5 years of age, concussion during seizure at young age

Current Medications

| Psychotropic medication | Other medications | Side Effects |
|---|---|---|
| Valium 5 mg BID as needed | | None |

Past Medication trials – Celexa- self discontinued, weight gain and emotional blunting

Family history : Mother and maternal grandmother with severe anxiety disorders, mother cannot order for herself at a restaurant , unsure if ever hospitalized or on medication.  Father- involuntarily hospitalized for erratic and violent behavior, denies substance abuse history, unemployed throughout Lisa's life , schizophrenia on her father's side of the family

Developmental history
        Remembers mother as caring but timid and distant at times and feeling that she knew the motions of being maternal but it did not feel genuine
Father she remembers as unpredictable, volatile, and scary , remembers in the middle of the night he would come into the bedroom she shared with her sister, put on the light and s lecture them about something irrelevant and that he was hard to follow.  Mother did leave her father and move them back to her hometown of Appleton Wisconsin, to live with their grandparents, but then they reconciled and he came back to only continue with the rages, violence and unpredictability

Social situation : married to Mason, met online,  partner has specific fear of flying and seeing doctors and is prescribed Xanax for these situations, was an engineer at NASA, most recently staying at home and caring for their 9 y o daughter .  They relocated from Cincinnati to RI for their daughter, wanted a more liberal environment and felt that Wheeler school would be a good fit

Feels most connected to her sister ( Tanya,)  husband and daughter.

CONFIDENTIAL                                                                                    MENNINGER000664

Her motivation to change is external and more for her daughter then herself. She would rather avoid any situation that calls for small talk, being social, meeting new people, or even going to places where they could potentially be a crowd and she would have to interact with others.

Panic/ social phobia: Lisa remembers as young as 3 or 4 dreading school, especially fear of being called on to answer a question. If she was called on, her body and voice would shake and this experience was both physically and mentally painful and exhausting. This has continued into adulthood and even at small meetings when she needs to present 3 or 4 slides the physical sensations of anticipatory dread set in as well as diarrhea , heart racing, sweatiness, and increased respiratory rate .

Modifying factors: being with her family, being inside her home

Review of systems: GI: diarrhea when anxious or anticipates a social gathering/ demand, low appetite
Neurological- denies headaches/ migraines
Skin – at times when cold/ anxious will break out in hives

Baseline temperament: Timid, shy, risk averse, perfectionistic, sensitive, creative, low activity level

Psychiatric ROS: Denies depression, mania, psychosis, BDD, self injury, substance abuse, though has " ocd " tendencies of overthinking does not meet clinical criteria for OCD and denies aggressive, Contamination, or somatic obsessions, but does have some intrusive thoughts about saying the right word, editing and re editing all emails before sending looking for grammar/ spelling mistakes .

Eating disordered behavior- vegan and her entire family is vegan , weights herself daily and is committed to remaining the same weight, working with a trainer over the internet to gain strength and compete in ultra long power walking

Trauma: Witnessed domestic violence as a child ( father holding a knife to her mother's throat) , also father committed to the psychiatric ward several times secondary to violent / unpredictable behavior and remembers always having to walk on eggshells and never knowing what version of her father she would get.

Denies physical/ sexual abuse or sexual assaults

Past Psychiatric history : Outpatient level of care, trial of celexa which she stopped secondary to weight gain and also feeling emotionally blunted, unknown dose or time on medication
Valium 5 mg as needed for many years , denies daily use, history of abusing this medication

Current Therapist name: none

CONFIDENTIAL                                                                                    MENNINGER000665

**JA2004**

Mental Status Exam

Appearance and Behavior :  tearful at times, measured, pale, thin, initially anxious but warmed throughout interview, good eye contact, well groomed

Speech: Normal rate, rhythm and volume

Mood: "fight or flight"
Affect: nervous
Thought Process: Linear and logical
Thought content: public speaking fears, fears about saying the right word, fears about being around others, prefers to avoid anxiety provoking activities, overvalued ideas about weight
Attention and concentration: adequate for interview
Panic: perceptions of difficulty breathing / choking sensation , unpleasant feeling of anticipation or threat , fear of losing control or dying
Insight: fair
Judgment: fair

Assessment and plan:

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for an initial psychiatric evaluation after her baseline high anxiety started to spiral when at work it was suggested that she be " more visible" and have more of a public presence .  Currently feeling " fight or flight" chronically without relief and now with catastrophic thinking that she will be the cause of her family's demise into homelessness and despair.

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder

Plan

1. start fluoxetine 5 mg for one week and increase to 10 mg daiy if no side effects
2. support accommodations at work so that public speaking is not a core requirement / work responsibility
3. continue valium 5 mg 1-2 times daily for acute anxiety
4. Start CBT therapy for panic and social phobia , once weekly with this writer

Marianna Kessimian, MD 1/23/18 2:23 pm

CONFIDENTIAL

MENNINGER000667

Psychiatric Follow up
E&M Codes : 99214, 9036
Name: Lisa Menninger
DOB:
Age:
DOS: 2/2/18
Present at appointment: patient

Chief Complaint : " I am just worried all the time, I wake up with my heart already beating fast, thinking about how I have to see the people that I work with at the end of the month after handing in those letters to HR"

History of Present Illness: since last visit continues to isolate at home and hardly leave her family .

She denies any overt panic attacks but that secondary to staying close to her routine ,does not want to take valium daily secondary to side effects of headache and sedation

Spoke at length about her experience in the work environment where she feels that because she is more introverted and analytical she is being criticized for things that are unchangeable. Has difficulty advocating for herself and is already resigned to defeat in the corporate culture.

Has been taking fluoxetine 5 mg daily without any benefit or any side effects

Social or family history update : daughter and husband doing well

Safety: Denies

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROs: Cardiac: " heart racing", " sweaty"

| Current Medications | Other Medications | Side effects: denies |
|---|---|---|
| Fluoxetine 5 mg daily Valium 5 mg as needed | | Adherence : yes |

Vitals
Height: 5feet 4 inches
Weight:126 lbs
Respiratory rate: 16
Pulse: 63
Pulse ox: 99% RA

Constitutional: General appearance : pale, anxious, tearful at times , good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious
Thought Process : linear
Thought content: catastrophizing, worst case scenario , many pessimistic thoughts
Perceptions: denies
Judgment: fair
Insight :fair

Assessment and plan:

Medication management: 15 minutes, family/ supportive therapy skills : 45 minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder

Plan

MENNINGER000669

1. Increase fluoxetine 5 mg to 10 mg daily
2. support accommodations at work so that public speaking is not a core requirement / work responsibility
3. continue valium 5 mg 1-2 times daily for acute anxiety , declined taking daily to help reduce anxiety while Prozac reaches steady state
4. continue CBT therapy for panic and social phobia , once weekly with this writer- today reviewed thinking traps

The rationale for the utilization of the above medication was explained along with potential risks and benefits. Alternative treatment options were discussed. Potential side effects were reviewed. The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.

Marianna Kessimian, MD

CONFIDENTIAL

MENNINGER000670

Psychiatric Follow up
E&M Codes : 99214, 9036
Name: Lisa Menninger
DOB:
Age: 49
DOS: 2/16/18
Present at appointment: patient

Chief Complaint : " I am now sleeping 6 hour per night and it seems like my extremes are not as bad"

History of Present Illness: since last visit continues to isolate at home and hardly leave her family .  Today introduced concept of CBT, how thoughts, mood and behavior are connected as well as her avoidant behavior .
She was able to speak to both HR and her boss regarding the document for accommodations.  Their response was promising .

Has been reading quiet and has found the book helpful and interesting.  Has been adherent to the fluoxetine and overall no side effects and maybe a glimmer of therapeutic efficacy,

She denies any overt panic attacks but that secondary to staying close to her routine – especially worried about  having to travel for work and go to Cincinnati this coming week as she is scheduled to have a work review in person.

Worked together to define her working schemas that she is a failure and her only successes are her family connection and marriage.  She continues to live an inauthentic life where on the inside she is warm, thoughtful and creative but comes across as cold, serious and distant secondary to her social anxiety worries.

Has been taking fluoxetine 10 mg daily with some subtle benefit , denies any side effects

Social or family history update : daughter and husband doing well

Safety: Denies

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROs: Cardiac: " heart racing", " sweaty"

| Current Medications | Other Medications | Side effects: denies |
|---|---|---|
| Fluoxetine 10 mg daily Valium 5 mg as needed | | Adherence : yes |

CONFIDENTIAL                                                MENNINGER000671

| Ambien CR 12.5 at bedtime | | |
|---|---|---|

Constitutional: General appearance : pale, anxious,  less tearful good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious
Thought Process : linear
Thought content: catastrophizing, worst case scenario , many pessimistic thoughts
Perceptions: denies
Judgment: fair
Insight :fair

Assessment and plan:

Medication management: 15 minutes, family/ supportive therapy skills : 45 minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive- other-focused
Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder

                                   MENNINGER000672

Generalized Anxiety Disorder

Plan
1. Increase  fluoxetine 10 mg daily to 20 mg daily
2. support accommodations at work so that public speaking is not a core requirement / work responsibility
3. continue valium 5 mg 1-2 times daily for acute anxiety , declined taking daily to help reduce anxiety while  Prozac reaches steady state
4. Continue ambien CR 12.5mg as the work issues are resolved
5. continue CBT therapy for panic and social phobia , once weekly with this writer- today reviewed working schemas of I am failure
6. Homework goal is for her o leave her house and go for a walk, first with her husband and then go running by herself


The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed. Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.



Marianna Kessimian, MD

MENNINGER000673

Psychiatric Follow up
E&M Codes : 99214, 9036
Name: Lisa Menninger
DOB: ▓▓▓▓63
Age: 49
DOS: 3/09/18
Present at appointment: patient

Chief Complaint : " the panic symptoms continue, but now they don't come out of the blue, I know the trigger"

History of Present Illness: since last visit continues to isolate at home and hardly leave her family . Did attend a business meeting in Cincinnati where she met with both Chad, HR representative and her boss Hacene to discuss accommodations. She was \disappointed when they mentioned an exit package/ consulting position as she likes her job and knows that she can do her job. She was able to assert herself and is now in a waiting period.


Finished quiet and felt empowered by its message.   Has been adherent to the fluoxetine 20 mg  and overall no side effects and maybe a glimmer of therapeutic efficacy,  Continues to use ambien 12.5 mg and is sleeping through the night

She reports 2-3  overt panic attacks 1. When the car arrived to pick her up at the airport
2. used valium before a group meeting

Worked together to define her working schemas that she is a failure and her only successes are her family connection and marriage.  She continues to live an inauthentic life where on the inside she is warm, thoughtful and creative but comes across as cold, serious and distant secondary to her social anxiety worries.

Also worries about how her social anxiety disorder may be impacting her daughter Maya- about 2 years stopped saying I love you to her parents – not sure what this is about, but it is bothersome to her.  Looking for ways to connect.

Has been taking fluoxetine 20 mg daily  benefit , denies any side effects

Social or family history update : daughter and husband doing well

Safety: Denies

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROs: Cardiac: " heart racing", " sweaty"

                    MENNINGER000674

| Current Medications | Other Medications | Side effects: denies |
|---|---|---|
| Fluoxetine 20 mg daily Valium 5 mg as needed Ambien CR 12.5 at bedtime | | Adherence : yes |

Constitutional: General appearance : pale, anxious,  more spontaneous smiles , good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious
Thought Process : linear
Thought content: catastrophizing, worst case scenario , many pessimistic thoughts
Perceptions: denies
Judgment: fair
Insight :fair

Assessment and plan:

Medication management: 15 minutes, family/ supportive therapy skills : 45 minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive

accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder

Plan
1. Continue fluoxetine 20 mg daily
2. support accommodations at work so that public speaking is not a core requirement / work responsibility
3. continue valium 5 mg 1-2 times weekly for acute anxiety , declined taking daily to help reduce anxiety while Prozac reaches steady state
4. Continue ambien CR 12.5mg as the work issues are resolved
5. continue CBT therapy for panic and social phobia , once weekly with this writer-
6. Homework goal on pause considering level of stress over the past week


The rationale for the utilization of the above medication was explained along with potential risks and benefits. Alternative treatment options were discussed. Potential side effects were reviewed. The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.



Marianna Kessimian, MD

CONFIDENTIAL

MENNINGER000676

Psychiatric Follow up
E&M Codes : 99214, 9036
Name: Lisa Menninger
DOB: ████ 63
Age: 49
DOS: 3/16/18
Present at appointment: patient

Chief Complaint : " this week has been hard, especially after the email from Chad"

History of Present Illness: since last visit continues to isolate at home and hardly leave her family. Has not been able to walk around her neighborhood as this was the goal for the last week secondary to her social anxiety symptoms and fears that at this point it has been such a long time that her neighbors have seen her, they they will seek her out and ask questions.

Continues to be assertive and proactive in her discussions with work regarding their desire for her to be " more visible" and social ( dinner, mingle) and their inability to think abut another leadership style that she would be able to provide that would also be beneficial.

 Has been adherent to the fluoxetine 20 mg  and overall no side effects and maybe a glimmer of therapeutic efficacy,  Continues to use ambien 12.5 mg with ok effect, this week sleep was especially poor 2/2 the work stress.
Overall anxiety level remain 5/10 with a peak of 9/10 when panic occurs

Mood: 5/10- mostly externally dictated , family life feels satisfied, under

She reports 2-3  overt panic attacks triggered by work, but none that were out of the blue , which is an overall subtle improvement from her initial evaluation.

Worked together to define her working schemas that she is a failure and her only successes are her family connection and marriage.  She continues to live an inauthentic life where on the inside she is warm, thoughtful and creative but comes across as cold, serious and distant secondary to her social anxiety worries. Reviewed emotion mind vs rational mind vs wise mind and the pendulum for her tends to swing between rational and then emotional mind with difficulty in wise mind

Has been taking fluoxetine 20 mg daily  benefit , denies any side effects

Social or family history update : daughter and husband doing well , husband, Mason is applying for a science teacher position at Wheller

Safety: Denies

MENNINGER000677

**JA2016**

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROs: Cardiac: " heart racing", " sweaty"

| Current Medications | Other Medications | Side effects: denies |
|---|---|---|
| Fluoxetine 20 mg daily<br>Valium 5 mg as needed<br>Ambien CR 12.5 at<br>bedtime | | Adherence : yes |

Constitutional: General appearance : pale, anxious,  more spontaneous smiles , good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious
Thought Process : linear
Thought content: catastrophizing, worst case scenario , many pessimistic thoughts
Perceptions: denies
Judgment: fair
Insight :fair

Assessment and plan:

Medication management: 12 minutes, family/ supportive therapy skills : 48 minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm

CONFIDENTIAL

MENNINGER000678

Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder

Plan
1. Increase  fluoxetine 20 mg daily to 40 mg daily
2. support accommodations at work so that public speaking is not a core requirement / work responsibility
3. continue valium 5 mg 1-2 times weekly for acute anxiety , declined taking daily  to help reduce anxiety while  Prozac reaches steady state
4. Continue ambien CR 12.5mg as the work issues are resolved
5. continue CBT therapy for panic and social phobia , once weekly with this writer-
6. Homework goal – going into driveway with ███ to jump rope or to chalk

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed. Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.

Marianna Kessimian, MD

MENNINGER000679

Psychiatric Follow up
E&M Codes : 99214, 9036
Name: Lisa Menninger
DOB: ███53
Age: 49
DOS: 3/23/18
Present at appointment: patient

Chief Complaint : " I haven't been sleeping well, thins at work are stressful and now they have hired a few people and did not involve me in the process"

History of Present Illness: since last visit continues to isolate at home and hardly leave her family. Was able to quickly do down the driveway and play a little with her daughter. Continues to have intrusive thoughts about what her neighbors might be thinking of her, preventing her from going outdoors including that it has been such a long time since she has been outside that they are thinking about what is wrong with her.

This week at work there has been high demand and she has been working on delegating tasks and leaning on some of her trusted colleagues.

Has been adherent to the fluoxetine 40 mg and overall no side effects and maybe a glimmer of therapeutic efficacy, Continues to use ambien 12.5 mg with ok effect, this week sleep was especially poor 2/2 the work stress., discussed the addition of hydroxyzine in the middle of the night so that she can have a full night of rest.

Overall anxiety level remain 5/10 with a peak of 9/10 when panic occurs , worried about what will happen to her family if she loses her job

Mood: 5/10- mostly externally dictated , family life feels satisfied,

She reports 2-3 overt panic attacks triggered by work, but none that were out of the blue , which is an overall subtle improvement from her initial evaluation.

Worked together to define her working schemas that she is a failure and her only successes are her family connection and marriage. She continues to live an inauthentic life where on the inside she is warm, thoughtful and creative but comes across as cold, serious and distant secondary to her social anxiety worries.

Social or family history update : daughter and husband returning from a vacation to see his family doing well , husband, Mason is applying for a science teacher position at Wheeler

Safety: Denies

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROs: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects: denies |
|---|---|---|
| Fluoxetine 40 mg daily Valium 5 mg as needed Ambien CR 12.5 at bedtime | | Adherence : yes |

Constitutional: General appearance : pale, anxious,  more spontaneous smiles , good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious
Thought Process : linear
Thought content: catastrophizing, worst case scenario , many pessimistic thoughts
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair

Assessment and plan:

Medication management: 12 minutes, family/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

MENNINGER000681

Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Sleep disturbance

Plan
1. Continue fluoxetine 40 mg daily
2. support accommodations at work so that public speaking is not a core requirement / work responsibility
3. continue valium 5 mg 1-2 times weekly for acute anxiety , declined taking daily  to help reduce anxiety while  Prozac reaches steady state
4. Continue ambien CR 12.5mg  for sleep disturbance ,as the work issues are resolved
5. Start hydroxyzine 25 mg as needed for sleep disturbance , take 1-2 tablets if wakes up after taking ambien
6. continue CBT therapy for panic and social phobia , once weekly with this writer
7. Homework goal –go outside again with █████

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed. Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.

Marianna Kessimian, MD

CONFIDENTIAL

MENNINGER000682

Psychiatric Follow up
E&M Codes : 99214, 9036
Name: Lisa Menninger
DOB: ████63
Age: 49
DOS: 3/30/18
Present at appointment: patient

Chief Complaint : " I feel in colors, it has always been that way, blue seem to provide me calm and then warm colors induce stress "

History of Present Illness: since last visit continues to isolate at home and hardly leave her family. ████████████ her lawyer ██████████████████
████████████████ Though is sad/ frustrated that since " coming out " with her social anxiety disorder she has felt worse then she has ever have before and now has doubts about her decision.

Work stresses remain and she has recently navigating some difficult client interactions .

Has been adherent to the fluoxetine 40 mg  and overall no side effects and maybe a glimmer of therapeutic efficacy,  Continues to use ambien 12.5 mg with ok effect, was able to use the hydroxyzine and found it helpful without the lasting sedative effects of valium, willing to use for acute anxiety.

Overall anxiety level remain 5/10 with a peak of 9/10 when panic occurs , worried about what will happen to her family if she loses her job

Mood: 5/10- mostly externally dictated , family life feels satisfied,

She reports 2-3  overt panic attacks triggered by work, but none that were out of the blue , which is an overall subtle improvement from her initial evaluation.

Worked together to think about shifting treatment as classic CBT techniques seem to fall flat, and Lisa reports color being more of the way she experiences her feelings vs cognitions , will shift to art therapy in session

Social or family history update : daughter and husband doing well

Safety: Denies

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROs: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects: denies |
|---|---|---|
| Fluoxetine 40 mg daily Valium 5 mg as needed Ambien CR 12.5 at bedtime Hydroxyzine 25 mg as needed 2-4 times daily | | Adherence : yes |

Constitutional: General appearance : pale, anxious, eyes brimming with tears at times , good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious
Thought Process : linear
Thought content: catastrophizing, worst case scenario , many pessimistic thoughts
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal

Assessment and plan:

Medication management: 12 minutes, family/ ACT/ DBT therapy skills : 48 minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

CONFIDENTIAL                                                                    MENNINGER000684

Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Sleep disturbance

Plan
1. Continue fluoxetine 40 mg daily
2. support accommodations at work so that public speaking is not a core requirement / work responsibility
3. continue valium 5 mg 1-2 times weekly for acute anxiety , declined taking daily  to help reduce anxiety while  Prozac reaches steady state
4. Continue ambien CR 12.5mg  for sleep disturbance ,as the work issues are resolved
5. Continue hydroxyzine 25 mg as needed for sleep disturbance , take 1-2 tablets if wakes up after taking ambien , and also utilize during the day
6. Shift from  CBT therapy for panic and social phobia to more art therapy , once weekly with this writer
7. Homework goal s- on pause until work stresses are more settled.

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Marianna Kessimian, MD

MENNINGER000685

Psychiatric Follow up
E&M Codes : 99214, 9036
Name: Lisa Menninger
DOB: ████63
Age: 49
DOS: 4/06/18
Present at appointment: patient

Chief Complaint : " It has been a hard week, I just don't know how much more I can handle without needing to go to the hospital, but at the same time I don't ant to give them any ammunition to fire me"

History of Present Illness: since last visit continues to isolate at home and hardly leave her family. Received an email response form HR which she forwarded to this writer. Seems to be some miscommunication regarding what leadership for a introvert might look like vs an extrovert.
Though is sad/ frustrated that since " coming out " with her social anxiety disorder she has felt worse then she has ever have before and now has doubts about her decision.

She continues to struggle with panic and sleep disturbance . tried hydroxyzine in the middle of the night after the effect of the ambien CR 12.5 mg stops working. Reports that although the hydroxyzine is effective it has quote a lag time and then it is difficult to wake up in the morning .

Work stresses remain and she has recently navigating some difficult client interactions .

Has been adherent to the fluoxetine 40 mg  and overall no side effects and maybe a glimmer of therapeutic efficacy, more with mood stability. Continues to use ambien 12.5 mg with ok effect, willing to trial for acute anxiety during the day.

Overall anxiety level remain 5/10 with a peak of 9/10 when panic occurs , which continues at a high rate and frequency.

Mood: 5/10- mostly externally dictated , family life feels satisfied,

She reports 2-3  overt panic attacks triggered by work, but none that were out of the blue , which is an overall subtle improvement from her initial evaluation.

Engaged in art therapy today and shared her connection with natural images that are powerful in their quiet- glaciers ad in their vastness-

Social or family history update : daughter and husband doing well – did not get job at school, is looking into alternative employment/ teaching opportunities

MENNINGER000686

Safety: Denies

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROs: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects: denies |
|---|---|---|
| Fluoxetine 40 mg daily Valium 5 mg as needed Ambien CR 12.5 at bedtime Hydroxyzine 25 mg as needed 2-4 times daily | | Adherence : yes |

Constitutional: General appearance : pale, anxious, eyes brimming with tears at times , good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious, sad
Thought Process : linear
Thought content: catastrophizing, worst case scenario , many pessimistic thoughts
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal

Assessment and plan:

Medication management: 12 minutes, family/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

CONFIDENTIAL                                                                 MENNINGER000687

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm

Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive- other-focused

Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Sleep disturbance

Plan
1. Continue fluoxetine 40 mg daily , ambien 12.5 CR rx written with 2 refills
2. support accommodations at work so that public speaking is not a core requirement / work responsibility – email both lawyer and patient with some response ideas , and also options for patient to take leave
3. continue valium 5 mg 1-2 times weekly for acute anxiety , declined taking daily  to help reduce anxiety while  Prozac reaches steady state
4. Continue ambien CR 12.5mg  for sleep disturbance  an combine with hydroxyzine 25 mg at night the work issues are resolve
5. Continue hydroxyzine 25 mg as needed for sleep disturbance , take 1-2 tablets if wakes up after taking ambien , and also utilize during the day
6. Shift from  CBT therapy for panic and social phobia to more CBT informed art therapy , once weekly with this writer
7. Homework goal - on pause until work stresses are more settled.

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed. Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.

Marianna Kessimian, MD

Psychiatric Follow up
E&M Codes : 99214, 9036
Name: Lisa Menninger
DOB: ███████ 63
Age: 49
DOS: 4/13/18
Present at appointment: patient

Chief Complaint : "This week I am back to feeling less hopeful, and more that I am failing my failure" "

History of Present Illness: since last visit continues to isolate at home and again uses this appointment to motivate her to leave the house.

She continues to struggle with panic and sleep disturbance and together have decided to "weather the storm" . Her lawyer ███████████████████████████ ████████████████████████████████████████████ She has not tried using the hydroxyzine during the day as needed to give her some relief.

Work stresses remain, Valium is used 1-2 times per week for upcoming 1:1 meeting with her supervisor

Has been adherent to the fluoxetine 40 mg and overall no side effects and maybe a glimmer of therapeutic efficacy, more with mood stability, no panic that is " out of the blue" .

Overall anxiety level remain 5/10 with a peak of 9/10 when panic occurs , which continues at a high rate and frequency.

Mood: 6/10- mostly externally dictated , family life feels satisfied,  but work lif remains  stressful and a sense that she cannot trust anyone and they are scanning her for fault at all times,

She reports 2-3  overt panic attacks triggered by work, but none that were out of the blue , which is an overall subtle improvement from her initial evaluation.

Engaged in art therapy today and shared her connection with natural images that are powerful in their quiet- glaciers and in their vastness-city life where there are many people, movement but a sense of being anonymous and alone and struggles with " the middle" which is suburban life, mortified of even walking around her neighborhood because she does not want to strike up conversation.

Social or family history update : daughter and husband doing well

Safety: Denies

Coping skills: utilized some of the sensory techniques, and also the deep breathing exercises,

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects: denies |
|---|---|---|
| Fluoxetine 40 mg daily Valium 5 mg as needed Ambien CR 12.5 at bedtime Hydroxyzine 25 mg as needed 2-4 times daily | | Adherence : yes |

Constitutional: General appearance : pale, anxious,  eyes brimming with tears at times  , good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious, sad
Thought Process : linear
Thought content: catastrophizing, worst case scenario , many pessimistic thoughts
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone

Assessment and plan:

Medication management: 12 minutes, family/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

CONFIDENTIAL

MENNINGER000690

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm

Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Sleep disturbance

Plan
1. Continue fluoxetine 40 mg daily
2. support accommodations at work so that public speaking is not a core requirement / work responsibility – email both lawyer and patient with some response ideas , and also options for patient to take leave
3. continue valium 5 mg 1-2 times weekly for acute anxiety
4. Continue ambien CR 12.5mg  for sleep disturbance  an combine with hydroxyzine 25 mg at night the work issues are resolve
5. Continue hydroxyzine 25 mg as needed for sleep disturbance , take 1-2 tablets if wakes up after taking ambien , and also utilize during the day
6. Continue art therapy
7. Homework goal - on pause until work stresses are more settled.
8. Coordination and communication with Lawyer continues

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.


Marianna Kessimian, MD

Psychiatric Follow up
E&M Codes : 99214, 9036
Name: Lisa Menninger
DOB:⬛⬛63
Age: 49
DOS: 4/13/18
Present at appointment: patient

Chief Complaint : " I have found a sense of empowerment in advocating for myself
and my strengths and I am proud that my daughter is a witness to this"

History of Present Illness: since last visit continues to isolate at home and this
weekend leaned on her husband for support in completing a comprehensive report.


She continues to struggle with panic and sleep disturbance and together have
decided to "weather the storm"

Work stresses remain and she has recently navigating some difficult client
interactions and boss interactions and has been complimented but has aso had to
take Valium

Has been adherent to the fluoxetine 40 mg  and overall no side effects and maybe a
glimmer of therapeutic efficacy, more with mood stability.

Overall anxiety level remain 5/10 with a peak of 9/10 when panic occurs , which
continues at a high rate and frequency.

Mood: 6/10- mostly externally dictated , family life feels satisfied, and also slight
glimmer and feeling more empowered at work

She reports 2-3  overt panic attacks triggered by work, but none that were out of the
blue , which is an overall subtle improvement from her initial evaluation.

Engaged in art therapy today and shared her connection with natural images that
are powerful in their quiet- glaciers ad in their vastness-

Social or family history update : daughter and husband doing well – did not get job
at school, is looking into alternative employment/ teaching opportunities

Safety: Denies

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROs: reviewed, negative and noncontributory

MENNINGER000692

| Current Medications | Other Medications | Side effects: denies |
|---|---|---|
| Fluoxetine 40 mg daily<br>Valium 5 mg as needed<br>Ambien CR 12.5 at<br>bedtime<br>Hydroxyzine 25 mg as<br>needed 2-4 times daily | | Adherence : yes |

Constitutional: General appearance : pale, anxious,  eyes brimming with tears at times , good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious, sad
Thought Process : linear
Thought content: catastrophizing, worst case scenario , many pessimistic thoughts
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal

Assessment and plan:

Medication management: 12 minutes, family/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Sleep disturbance

Plan
1. Continue fluoxetine 40 mg daily , ambien 12.5 CR
2. support accommodations at work so that public speaking is not a core requirement / work responsibility – email both lawyer and patient with some response ideas , and also options for patient to take leave
3. continue valium 5 mg 1-2 times weekly for acute anxiety , declined taking daily  to help reduce anxiety while  Prozac reaches steady state
4. Continue ambien CR 12.5mg  for sleep disturbance  an combine with hydroxyzine 25 mg at night the work issues are resolve
5. Continue hydroxyzine 25 mg as needed for sleep disturbance , take 1-2 tablets if wakes up after taking ambien , and also utilize during the day
6. Continue art therapy
7. Homework goal - on pause until work stresses are more settled.

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed. Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.


Marianna Kessimian, MD

MENNINGER000694

Psychiatric Follow up
E&M Codes : 99214, 9036
Name: Lisa Menninger
DOB: ▮▮▮▮63
Age: 49
DOS: 4/27/18
Present at appointment: patient

Chief Complaint : "I am only sleeping for three hours per night, and now I am waking up with panic attacks from sleep. Things just keep getting worse, and sometimes it if it wasn't for Maya and Mason , I would just want this all to end,. I don't want you to worry about me, I know I won't end my life but this suffering at times in unbearable"

History of Present Illness: since last visit continues to isolate at home and again uses this appointment to motivate her to leave the house. Her symptoms are worse, with panic attacks waking her from sleep , and only able to sleep with 3 hours even with the combination of ambien 12.5 mg and hydroxyzine.

Her lawyer continues ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮ but waiting for responses or a non response also lead to increased symptoms. Lisa did try to use the hydroxyzine during the day but it was to sedating , consider the volume and precision of her work responsibilities.

Throughout the week, has been trying the distraction / sensory skills, the cold immersion during panic to induce a dive response of lowering her heart rate was not helpful.

Work stresses remain, Valium is used 1-2 times per week  at 15 mg  for upcoming 1:1 meeting with her supervisor

Has been adherent to the fluoxetine 40 mg  and overall no side effects and maybe a glimmer of therapeutic efficacy, more with mood stability, but panic " out of the blue:  has returned

Overall anxiety level remain 8/10 with a peak of 9/10 when panic occurs , which continues at a high rate and frequency.

Mood: 6/10- mostly externally dictated , family life feels satisfied,  but work life remains  stressful and a sense that she cannot trust anyone and they are scanning her for fault at all times,  and that there is little appreciation or effort to understand what her role is in the company.

Started session with a progressive muscle relaxation exercise that involves visualizing a color. Also worked on DBT skill of radical acceptance with visualization.  Accept that she is going to have these paranoid/ failure thoughts and think of them as snowflakes falling onto stone, fully formed, real, impactful but then dissipate when they hit the stone.  Thoughtful disclosure about own anxiety and using thoughts on a cloud visualization to decrease distress.

Social or family history update : daughter and husband doing well, also was able to talk to her sister about what has been going on and her sister was understanding and supportive.

Safety: Some passive suicidal ideation which is new, will  continue to monitor, denies intent or plan, protective is devotion to her family

Coping skills: utilized some of the sensory techniques, and also the deep breathing exercises,

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects: denies |
|---|---|---|
| Fluoxetine 40 mg daily Valium 5 – 15 mg as needed 1-2 times per week Ambien CR 12.5 at bedtime Hydroxyzine 25 mg as needed 2-4 times daily | | Adherence : yes |

Constitutional: General appearance : pale, anxious, thin, tearful at times,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious, sad
Thought Process : linear

CONFIDENTIAL                                                    MENNINGER000696

Thought content: catastrophizing, worst case scenario , many pessimistic thoughts
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social
anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic
disorder , type II trauma secondary to father's volatile behavior and witnessing
domestic violence between her parents ,temperament- risk averse, sensitive, slow to
warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse,
introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-
other-focused
Social : Pathologist working in the private sector- sole financial contributor to the
household, husband empathic and understanding partner, concern for excessive
accommodation to point where all her needs are met and she is not asked /required
to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Sleep disturbance

Plan
1. Continue fluoxetine 40 mg daily
2. support accommodations at work so that public speaking is not a core
   requirement / work responsibility – email both lawyer and patient with
   some response ideas , and also options for patient to take leave
3. Disconinue Valium nd start klonopin , 1 mg at bedtime and also 1- 1.5 mg in
   the day for acute panic
4. Continue ambien CR 12.5mg  for sleep disturbance , stop combination with
   hydroxyzine
5. Continue art therapy – given 2 homework assignments
6. Homework goal - on pause until work stresses are more settled.
7. Coordination and communication with Lawyer continues

CONFIDENTIAL                                                    MENNINGER000697

8. 8. RTC in 2 weeks

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed. Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.


Marianna Kessimian, MD

CONFIDENTIAL

MENNINGER000698

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ████63
Age: 49
DOS: 05/18/18
Present at appointment: patient

Chief Complaint : " The klonopin 0.75 wasn't enough, I was waking up in the middle of the night again, so I went back to the 1 mg dose. "

History of Present Illness: since last visit continues to isolate at home and again uses this appointment to motivate her to leave the house. She has made the decision with her lawyer to ████████████████████████ In a way , although there is some time to resolution, it has been somewhat helpful.

Her anxiety remains high, and is accompanied with GI distress , poor appetite and continued panic symptoms. .

The results of the internal investigation are not completed.

Throughout the week, completed several art therapy assignments which she considered helpful as she works on identifying and coping with strong emotions. Shared these pieces with this writer.

Work stresses remain, klonopin 1.5 mg used for acute panic , is used 1-2 times per week and 1 mg at bedtime for sleep., a lower dose was not effective.

Has been adherent to the fluoxetine 60 mg and overall no side effects and maybe a glimmer of therapeutic efficacy, will continue to monitor,

Overall anxiety level remain 8/10 with a peak of 9/10 when panic occurs , which continues at an increased frequency, limiting her functionality.

Mood: 6/10- mostly externally dictated , family life feels satisfied, but work life remains stressful and a sense that she cannot trust anyone and they are scanning her for fault at all times, and that there is little appreciation or effort to understand what her role is in the company. Though being able to assert herself has in some ways been helpful. Has started to search for new jobs and verbalized values to work within the arts to help those that are marginalized at times by society.

Social or family history update : daughter and husband doing well.

Safety: Suicidal ideation has resolved

Coping skills: utilized some of the sensory techniques, and also the deep breathing exercises, and continues to create art within session, reading a book with her daughter about synesthesia

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects: GI distress |
|---|---|---|
| Fluoxetine 60 mg daily Ambien CR 12.5 at bedtime Klonopin 1 mg at bedtime ,and an additional 1.5 mg once a week for acute anxiety | | Adherence : yes |

Constitutional: General appearance : pale, anxious, thin, tearful at times,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious, sad
Thought Process : linear
Thought content: slightly less catastrophizing, worst case scenario , many pessimistic thoughts  but with some glimmers of self advocacy and effectiveness
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

MENNINGER000700

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm

Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Sleep disturbance

Plan
1. Conitnue  fluoxetine 60 mg daily to target continued anxiety and panic symptoms – monitor GI distress and appetite
2. support accommodations at work so that public speaking is not a core requirement / work responsibility
3. continue  bedtime dose of klonopin from 1 mg,  0.75 mg, was ineffective
4. Continue ambien CR 12.5mg  for sleep disturbance
5. Continue art therapy – given 2 homework assignments – bfore and after hands and also something that invokes fear
6. CBT/ Exposure Homework goal - on pause until work stresses are more settled
7. Coordination and communication with Lawyer continues
8. RTC in 1 week

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed. Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.

Marianna Kessimian, MD

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ███ 63
Age: 49
DOS: 05/25/18
Present at appointment: patient

Chief Complaint : " The internal investigation found no evidence of discrimination"

History of Present Illness: since last visit continues to isolate at home and again uses this appointment to motivate her to leave the house. She has made the decision with her lawyer to ████████████████████████ She has also decided to finally take some leave in the beginning of June to see her friends at the Ultra walk.

Her anxiety remains high, and is accompanied with GI distress , poor appetite and continued panic symptoms. . Since the diarrhea continues and is bothersome , discussed decreasing the dose of fluoxetine back to 40 mg.

Did not complete her art therapy assignments 1. Realized that she can paint only what she feels in the moment vs thinking about what makes her scared. Also has been using facebook to connect with other in the synesthesia community.

Work stresses remain but with a resolution in sight , klonopin 1.5 mg used for acute panic , is used 1-2 times per week and 1 mg at bedtime for sleep. Though many days continues to feel tired which is mostly multifactorial from medication side effects, chronic high levels of worry and stress, poor appetite and daily diarrhea.

Has been adherent to the fluoxetine 60 mg but with daily diarrhea.

Overall anxiety level remain 8/10 with a peak of 9/10 when panic occurs , which continues at an increased frequency, limiting her functionality.

Mood: 6/10- mostly externally dictated , family life feels satisfied, but work life remains stressful and a sense that she cannot trust anyone and they are scanning her for fault at all times, and that there is little appreciation or effort to understand what her role is in the company. Though being able to assert herself has in some ways been helpful. Has started to search for new jobs and verbalized values to work within the arts to help those that are marginalized at times by society. Also her husband was able to secure a part time job to ease the transition.

Discussed ██████████████ with her lawyer who ██████████ At this time discussed honestly that she has not utilized higher levels of care of gold standard treatment including exposure which is usually considered before disability is granted.

MENNINGER000702

Social or family history update : daughter and husband doing well.

Safety:  Denies suicidal ideation

Coping skills: utilized some of the sensory techniques, and also the deep breathing exercises, and continues to create art within session, reading a book with her daughter about synesthesia

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects: GI distress |
|---|---|---|
| Fluoxetine 60 mg daily Ambien CR 12.5 at bedtime Klonopin 1 mg at bedtime ,and an additional 1.5 mg once a week for acute anxiety | | Adherence : yes |

Constitutional: General appearance : pale, anxious, thin, tearful at times,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious, sad
Thought Process : linear
Thought content: slightly less catastrophizing, worst case scenario , many pessimistic thoughts  but with some glimmers of self advocacy and effectiveness
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone

MENNINGER000703

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Sleep disturbance

Plan
1. Decrease  fluoxetine 60 mg to 40 mg daily  daily to target continued anxiety and panic symptoms – monitor GI distress and appetite
2. support accommodations at work so that public speaking is not a core requirement / work responsibility
3. continue  bedtime dose of klonopin from 1 mg,  0.75 mg, was ineffective
4. Continue ambien CR 12.5mg  for sleep disturbance
5. Continue art therapy
6.  CBT/ Exposure Homework goal - on pause until work stresses are more settled
7. Coordination and communication with Lawyer continues
8.  RTC in 1 week

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed. Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.

CONFIDENTIAL                                                    MENNINGER000704

Marianna Kessimian, MD

CONFIDENTIAL

MENNINGER000705

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ████ 53
Age: 49
DOS: 06/01 / 18
Present at appointment: patient

Chief Complaint : "I just can't do it anymore, I am not sleeping, eating, I am having thoughts about ending my life, but I wouldn't do it because of ████ and Mason"

History of Present Illness: since last visit continues to isolate at home and again uses this appointment to motivate her to leave the house. She continues to decline as she tries to maintain her job, with additional fear and worry that she will make an error. She is sleeping poorly, eating poorly, chronically fatigued, unable to find peace, having passive suicidal ideation.

The decreased rate has decreased the intensity of the GI distress but it remains.

Work stresses remain and have only increased and although a resolution is in sight she finds it hard to find hope, feels apathetic, worhless and despondent, and considering her recent anxiety levels , poor sleep, safety issues, discussed medical leave starting Monday June 4th, 2018.

Panic/ GAD: Klonopin 1.5 mg used for acute panic ,and for scheduled meetings with her direct supervisor. is used 1-2 times per week and 1 mg at bedtime for sleep..

Has been adherent to the fluoxetine 40 mg but with daily diarrhea.

Overall anxiety level remain 8/10 with a peak of 9/10 when panic occurs , which continues at an increased frequency, limiting her functionality.

Social or family history update : daughter and husband doing well.

Safety:  passive suicidal ideation, no intent  or plan

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects: GI distress |
|---|---|---|
| Fluoxetine 40 mg daily Ambien CR 12.5 at bedtime | | Adherence : yes |

CONFIDENTIAL                                    MENNINGER000706

| Klonopin 1 mg at bedtime ,and an additional 1.5 mg once a week for acute anxiety | | |
|---|---|---|

Constitutional: General appearance : pale, anxious, thin, tearful at times,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious, sad
Thought Process : linear
Thought content: passive suicidal ideation, more hopeless, more pessimistic, intense thoughts of failure and disconnection
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive

MENNINGER000707

accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Sleep disturbance

Plan
1. Safety- recommended immediate medical leave starting on Monday 2/2 to level of anxiety and safety issues., monitor GI distress and appetite
2. continue  bedtime dose of klonopin from 1 mg
3. Continue ambien CR 12.5mg  for sleep disturbance
4. Continue art therapy
5.  CBT/ Exposure Homework goal - on pause until work stresses are more settled
6. Coordination and communication with Lawyer continues
7.  RTC in 1 week

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.


Marianna Kessimian, MD

MENNINGER000708

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ▮▮▮63
Age: 49
DOS: 06/08 / 18
Present at appointment: patient

Chief Complaint : Social phobia, acute stress disorder

History of Present Illness: since last visit is on medical leave, has applied to several jobs and overall is finding the process disheartening and discouraging.. She is sleeping slightly better, but still anxious about settlement/ resolution , eating ok, continues to be chronically fatigued, but suicidal ideation has resolved.

GI distress improved, will continue to monitor.

Continues to find it hard to find hope, feels apathetic, worthless and despondent, but with some subtle improvement since taking leave.

Panic/ GAD: Klonopin 1.5 mg used for acute panic , has not needed for since starting medical leave, self discontinued 1 mg at bedtime for sleep but was not able to sleep through the night.

Has been adherent to the fluoxetine 40 mg .

Overall anxiety level remain 8/10 with a peak of 9/10 when panic occurs , which continues at an increased frequency, limiting her functionality.

Social or family history update : daughter and husband doing well.

Safety:  Denies suicidal ideation, no intent  or plan

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects:  mild GI distress |
|---|---|---|
| Fluoxetine 40 mg daily Ambien CR 12.5 at bedtime Klonopin 1 mg at bedtime ,and an additional 1.5 mg | | Adherence : yes |

CONFIDENTIAL                                                                        MENNINGER000709

**JA2048**

| once a week for acute anxiety | | |
|---|---|---|

Constitutional: General appearance : pale, anxious, thin, tearful at times,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious, sad
Thought Process : linear
Thought content: passive suicidal ideation, more hopeless, more pessimistic, intense thoughts of failure and disconnection
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Sleep disturbance

Plan
1.  Safety- on medical leave, but continue to struggle with minimal structure and many catastrophizing thoughts
2.  continue  bedtime dose of klonopin from 1 mg
3.  Continue ambien CR 12.5mg  for sleep disturbance
4.  Continue art therapy
5.   CBT/ Exposure Homework goal - on pause until work stresses are more settled
6.  Coordination and communication with Lawyer continues
7.   RTC in 1 week

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed. Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.


Marianna Kessimian, MD

CONFIDENTIAL

MENNINGER000711

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ████63
Age: 49
DOS: 06/29 / 18
Present at appointment: patient

Chief Complaint : Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: Since last visit is on medical leave,  plans to start the partial program on Monday.  She is sleeping slightly better, but still anxious about settlement/ resolution with job , eating ok,  continues to be chronically fatigued, suicidal ideation has returned , denies intent or plan.

GI distress improved, will continue to monitor.

Continues to find it hard to find hope, feels apathetic, worthless and despondent, discussed being more humane to herself.

Panic/ GAD: Klonopin 1.5 mg  for acute panic, continues 1 mg at night.

Has been adherent to the fluoxetine 40 mg with less GI distress.

Overall anxiety level remain 8/10- mostly job related  with a peak of 9/10 when panic occurs ,the frequency of panic has decreased.

Social or family history update : daughter and husband doing well.

Safety:  Denies suicidal ideation, no intent  or plan

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects:  denies |
|---|---|---|
| Fluoxetine 40 mg daily Ambien CR 12.5 at bedtime Klonopin 1 mg at bedtime ,and an additional 1.5 mg once a week for acute anxiety | | Adherence : yes |

CONFIDENTIAL                                                                    MENNINGER000712

**JA2051**

Constitutional: General appearance : pale, anxious, thin, tearful at times,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious, sad
Thought Process : linear
Thought content: continues with " what ifs" , all or nothing thinking
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder

Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, but continue to struggle with minimal structure and many catastrophizing thoughts
2. continue bedtime dose of klonopin from 1 mg
3. Continue ambien CR 12.5mg for sleep disturbance
4. Continue art therapy
5. CBT/ Exposure Homework goal – will start partial hospital program at Butler in the beginning of July
6. Coordination and communication with Lawyer continues
7. RTC in 2 week s/p discharge from partial

The rationale for the utilization of the above medication was explained along with potential risks and benefits. Alternative treatment options were discussed. Potential side effects were reviewed. The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.

Marianna Kessimian, MD

CONFIDENTIAL

MENNINGER000714

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ▮▮▮▮63
Age: 49
DOS: 07/13 / 18
Present at appointment: patient

Chief Complaint : Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: Since last visit completed the partial program at Butler .
She had severe panic symptoms and a panic attack in group, when she was expected
to report in her weekend. As her turn approached, she became tearful, started to
hyperventilate and left the group and was helped by her therapist in the program.
She was able to return to the program and found existential therapy as well as
group therapy challenging and rewarding.

No medication changes were made during her treatment. Continues on current
medication regimen and overall has noticed improvement.

Continues to feel anxious at times, especially with changes for her daughter.

Panic/ GAD: Klonopin 1.5 mg  for acute panic, continues 1 mg at night.

Has been adherent to the fluoxetine 40 mg with less GI distress.

Overall anxiety level remain 6-7/10- mostly job related  with a peak of 9/10 when
panic occurs ,the frequency of panic has decreased.

Social or family history update : daughter and husband doing well.

Safety:  Denies suicidal ideation, no intent  or plan

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects:  denies |
|---|---|---|
| Fluoxetine 40 mg daily Ambien CR 12.5 at bedtime Klonopin 1 mg at bedtime ,and an additional 1.5 mg once a week for acute | | Adherence : yes |

CONFIDENTIAL

MENNINGER000715

| anxiety | | |
|---|---|---|

Constitutional: General appearance : pale, anxious, thin, tearful at times,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious, sad
Thought Process : linear
Thought content: continues with " what ifs" less " should" , all or nothing thinking
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone WNL

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:

CONFIDENTIAL                                                    MENNINGER000716

Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, but continue to struggle with minimal structure and many catastrophizing thoughts , this week  focused in leaving the house to walk, bonding with her daughter, practicing coping skills and improving communication with her husband
2. continue  bedtime dose of klonopin from 1 mg
3. Continue ambien CR 12.5mg  for sleep disturbance
4. Continue art therapy
5. CBT/ Exposure Homework goal – continue to go outside more then once a day, dive to grocery store / appinments on her own
6. Coordination and communication with Lawyer continues
7. RTC in1 week s/p discharge from partial

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Marianna Kessimian, MD

MENNINGER000717

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ███63
Age: 49
DOS: 07/20 / 18
Present at appointment: patient

Chief Complaint : Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: Since last continues to struggle with anxiety and worse case scenario thinking. ████████ with Lawyer regarding ████████ Tearful in session when discussing ok, well what would happen if disability was not extended and you had to quit your job.

Self care- starting to embrace herself and make time for herself .

Continues to feel anxious at times, especially when thinking about how her professional shift may impact her daughter.

Panic/ GAD: Klonopin 1.5 mg  for acute panic, continues klonopin 1 mg at night.

Has been adherent to the fluoxetine 40 mg.

Overall anxiety level remain 6-7/10- mostly job related  with a peak of 9/10 when panic occurs ,the frequency of panic has decreased since she is lo longer working and is on disability.

Social or family history update :Difficult for her husband to communicate with her as these changes also impact him as well.

Safety:  Denies suicidal ideation, no intent  or plan

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects:  denies |
|---|---|---|
| Fluoxetine 40 mg daily Ambien CR 12.5 at bedtime Klonopin 1 mg at bedtime ,and an additional 1.5 mg once a week for acute |  | Adherence : yes |

MENNINGER000718

| anxiety | | |
|---|---|---|

Constitutional: General appearance : pale, anxious, thin, tearful at times,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious, sad
Thought Process : linear
Thought content: continues with " what ifs" less " should" , all or nothing thinking
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone WNL

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive- other-focused
Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:

CONFIDENTIAL                                                    MENNINGER000719

Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, but continue to struggle with minimal structure and many catastrophizing thoughts , this week  focused in leaving the house to walk, bonding with her daughter, practicing coping skills and improving communication with her husband
2. continue  bedtime dose of klonopin from 1 mg
3. Continue ambien CR 12.5mg  for sleep disturbance
4. Continue art therapy
5.  CBT/ Exposure Homework goal – continue to go outside more then once a day, dive to grocery store / appointments on her own, engaging more in self care.
6. Coordination and communication with Lawyer continues
7.  RTC in1 week , will have a joint meeting with her husband

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.


Marianna Kessimian, MD

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ████ 63
Age: 49
DOS: 08/03 / 18
Present at appointment: patient

Chief Complaint : Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: Since last continues to struggle with anxiety and worse case scenario thinking, the disability compliant has been filed and now the timeline is out of her control. Continues with poor seep, and daily panic attacks, is using coping skills and medication

Self care- starting to embrace herself and make time for herself .

Today her husband, Mason, in session to help with the daily communication and try to understand where there is a breakdown, as they both come to the conversation with automatic thoughts and frustrations with recent changes and transitions

Panic/ GAD: Klonopin 1.5 mg  for acute panic, continues klonopin 1 mg at night.

Has been adherent to the fluoxetine 40 mg.

Overall anxiety level remain 6-7/10- mostly job related  with a peak of 9/10 when panic occurs ,the frequency of panic has decreased since she is lo longer working and is on disability but as the date approaches her to return to work without resolution.

Social or family history update :Difficult for her husband to communicate with her as these changes also impact him as well, will incorporate family treatment sessions in the process.

Safety:  Denies suicidal ideation, no intent  or plan

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects:  denies |
| --- | --- | --- |
| Fluoxetine 40 mg daily Ambien CR 12.5 at bedtime | | Adherence : yes |

MENNINGER000721

| Klonopin 1 mg at bedtime ,and an additional 1.5 mg once a week for acute anxiety | | |
|---|---|---|

Constitutional: General appearance : pale, anxious, thin, tearful at times,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: panicky
Affect: anxious, sad
Thought Process : linear
Thought content: continues with " what ifs" less " should" , all or nothing thinking
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone WNL

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive

MENNINGER000722

accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, but continue to struggle with minimal structure and many catastrophizing thoughts , this week  focused in leaving the house to walk, bonding with her daughter, practicing coping skills and improving communication with her husband
2. continue  bedtime dose of klonopin from 1 mg
3. Continue ambien CR 12.5mg  for sleep disturbance
4. Continue art therapy, more at hoe, now with more CBT insession
5. CBT/ Exposure Homework goal – continue to go outside more then once a day, dive to grocery store / appointments on her own, engaging more in self care.
6. Coordination and communication with Lawyer continues
7. RTC in1 week , will have a joint meeting with her husband

The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed. Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.

Marianna Kessimian, MD

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ████63
Age: 49
DOS: 08/08 / 18
Present at appointment: patient over DOXY

Chief Complaint : Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: Since last continues to struggle with anxiety and worse case scenario thinking, as the timeline for return to work approaches, panic symptoms, isolation and insomnia have increased.

Conitnues to work with her lawyer regarding ████████ so she can be provided accommodations and support. However this process seems to be mired in delays , which only serves to increase her anxiety.

Panic/ Acute stress/ Insomnia : Klonopin 1.5 mg  for acute panic, continues klonopin 1 mg at night with Ambien however recently early morning awakening has returned without the ability to go back to sleep

Has been adherent to the fluoxetine 40 mg.

Overall anxiety level remain 6-7/10- mostly job related  with a peak of 9/10 when panic occurs ,the frequency of panic has increased over the last week as many what if sremain, today session done remotely as difficult for patient to leave home.

Social Phobia: continues to engage in exposures to help decrease the intensity and frequency of these symptoms.  Has been walking around her neighborhood which she was not able to do a few months ago secondary to worries that her neighbors would see her and want to engage in conversation, ask her questions, or have assumptions about why she has been absent.  She is working toward walking a marathon as a way to be within a group of people but still doing a solitary activity. Also tried to attend her daughter's swim meet but this was difficult and many " safe" zones were constructed to help her throughout ( for example her husband could not leave her side) , she did manage to get through it by excusing herself at times.

Social or family history update :marital strain secondary to illness

Safety: reports passive suicidal ideation, no intent  or plan

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects: denies |
|---|---|---|
| Fluoxetine 40 mg daily Ambien CR 12.5 at bedtime Klonopin 1 mg at bedtime ,and an additional 1.5 mg once a week for acute anxiety | | Adherence : yes |

Constitutional: General appearance : pale, anxious, thin, tearful at times,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear
Thought content: m nay social phobia fears,  chronic feelings of inadequacy, continues with " what ifs" less " should" , all or nothing thinking
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone WNL

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm

                                        MENNINGER000725

Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, but continue to struggle with minimal structure and many catastrophizing thoughts , this week  focused on leaving the house to walk, bonding with her daughter, practicing coping skills and improving communication with her husband
2. increase  bedtime dose of klonopin from 1 mg to 1.5 mg to target both sleep disturbance and increased panic symptoms
3. Continue ambien CR 12.5mg  for sleep
4. CBT/ Exposure Homework goal – continue to go outside more then once a day, dive to grocery store / appointments on her own, engaging more in self care.
5. Coordination and communication with Lawyer and disability  continues
6.  RTC in 2 weeks , secondary to this writer's vacation
7. The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.


Marianna Kessimian, MD

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ████63
Age: 49
DOS: 08/24 / 18
Present at appointment: patient over DOXY

Chief Complaint : Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: Since last visit, had "one of my worse panic attacks" " I am in an excrutiating amount of emotional pain " " I want to run away and be alone" before participating in ultramarathon, was able to use husband and sister for support as well as her rescue klonopin dose and participate in the marathon.

Continues to struggle with anxiety, worsening sleep, inability to reach a baseline calm as disability and settle conversations with her employer and lawyer are ongoing. .

Today discussed filing for federal disability secondary to her symptoms, as even after settlement is reached with current employer, and alternative job options are considered, the severity of her symptoms in quite limiting as her work responsibilities as a physician, especially without accommodations, cannot be met.

Also discussed if UNUM has an independent psychiatrist that can distinguish disability if they disagree with the clinical recommendation of this writer.

Continues to work with her lawyer regarding ████████████ so she can be provided accommodations and support.  However, this process seems to be mired in delays, which only serves to increase her anxiety.  Recent update was that ██ ████████████████████████████████████████████████████

Panic/ Acute stress/ Insomnia : Klonopin 1.5 mg  for acute panic, continues klonopin 1 mg at night with Ambien , continues to struggle with initial insomnia and multiple awakenings which leads to feeling exhausted the next day and more irritable and susceptible to anxiety.

Has been adherent to the fluoxetine 40 mg.

Overall anxiety level remain 6-7/10- mostly joband social anxiety related with a peak of 9/10 when panic occurs,the  frequency of panic has increased over the last 2 weeks.

Social Phobia:  continue fluoxetine 40 mg daily and klonopin 1 mg for acute panic, continues to engage in exposures to help decrease the intensity and frequency of these symptoms.  Able to participate in ultra marathon.

Social or family history update:  marital strain secondary to illness

Safety: Denies suicidal ideation

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects:  denies |
|---|---|---|
| Fluoxetine 40 mg daily Ambien CR 12.5 at bedtime Klonopin 1 mg at bedtime ,and an additional 1.5 mg once a week for acute anxiety | | Adherence : yes |

Constitutional: General appearance: pale, anxious, thin, tearful at times,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear
Thought content: many social phobia fears,  chronic feelings of inadequacy, continues with " what ifs" less " should" , all or nothing thinking
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone WNL

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

MENNINGER000728

Complex Medical Decision Making: Moderate: regarding the following issues.

49 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, but continue to struggle with minimal structure and many catastrophizing thoughts , these ast 2 weeks week  focused on participating in marathon and leaving the house once daily
2. Continue bedtime dose of klonopin1.5 mg to target both sleep disturbance and increased panic symptoms
3. Continue ambien CR 12.5mg  for sleep
4. CBT/ Exposure Homework goal – continue to go outside more then once a day, dive to grocery store / appointments on her own, engaging more in self care.
5. Start group therapy both as an exposure and to augment individual therapy
6. Coordination and communication with Lawyer and disability continues, start application for SSDI
7.  RTC in 1 weeks
8. The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian  verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

CONFIDENTIAL

MENNINGER000729

Marianna Kessimian, MD

CONFIDENTIAL

MENNINGER000730

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ████ ⁄63
Age: 50
DOS: 08/31 / 18
Present at appointment: in person appointment

Chief Complaint : Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: Had some temporary relief when disability was extended to October 4th but this did not last as the settlement end of her employment with PPD remains unknown and her lawyer ████████████████████████████

Continues to struggle with anxiety, worsening sleep, inability to reach a baseline calm as disability and settle conversations with her employer and lawyer are ongoing.

Today tackled some recent avoidance behavior ( her computer in the basement) and also delivering and accepting the belief that she can only survive if Maya and Mason are present and available to her.

Continues to work with her lawyer regarding ██████████████ so she can be provided accommodations and support.  However, this process seems to be mired in delays, which only serves to increase her anxiety.  Recent update was that ████ ████████████████████████████████████████████

Panic/ Acute stress/ Insomnia : Klonopin 1.5 mg  for acute panic, continues klonopin 1 mg at night with Ambien , continues to struggle with initial insomnia and multiple awakenings which leads to feeling exhausted the next day and more irritable and susceptible to anxiety.

Has been adherent to the fluoxetine 40 mg.

Overall anxiety level remain 6-7/10- mostly job and social anxiety related with a peak of 9/10 when panic occurs, the  frequency of panic has increased over the last week.

Social Phobia:  continue fluoxetine 40 mg daily and klonopin 1 mg for acute panic, continues to engage in exposures to help decrease the intensity and frequency of these symptoms.

Social or family history update:  marital strain secondary to illness

Safety: Denies suicidal ideation

Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects:  denies |
|---|---|---|
| Fluoxetine 40 mg daily Ambien CR 12.5 at bedtime Klonopin 1 mg at bedtime ,and an additional 1.5 mg once a week for acute anxiety | | Adherence : yes |

Constitutional: General appearance: pale, anxious, thin, less tearful,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear
Thought content: many social phobia fears,  chronic feelings of inadequacy, continues with " what ifs" less " should" , all or nothing thinking
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone WNL

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm

Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, but continue to struggle with minimal structure and many catastrophizing thoughts
2. Continue bedtime dose of klonopin1.5 mg to target both sleep disturbance and increased panic symptoms
3. Continue ambien CR 12.5mg for sleep
4. CBT/ Exposure Homework goal – continue to go outside more then once a day, drive to grocery store / appointments on her own, engaging more in self care.
5. Registered for group therapy both as an exposure and to augment individual therapy
6. Coordination and communication with Lawyer and disability continues, application for SSDI on hold
7. RTC in 1 week
8. The rationale for the utilization of the above medication was explained along with potential risks and benefits. Alternative treatment options were discussed. Potential side effects were reviewed. The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial.


Marianna Kessimian, MD

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ████63
Age: 50
DOS: 09/07 / 18
Present at appointment: in person appointment

Chief Complaint : Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: Continues to struggle with sleep disruptions, core features of both social phobia and panic as the final outcome of her disability and leave from work at PPD remains uresolved.

Today tackled both long standing working schemas form her neglectful childhood including abandonment, mistrust and emotional deprivation and how some of these issues have leaked into adulthood and continue to be problematic on the road to recovery.

Continues to work with her lawyer regarding ████████ so she can be provided accommodations and support and has also reached out to unum to understand her options for long term disability. However, this process seems to be mired in delays, which only serves to increase her anxiety

Panic/ Acute stress/ Insomnia : Klonopin 1.5 mg  for acute panic, continues klonopin 1 mg at night with Ambien , continues to struggle with initial insomnia and multiple awakenings which leads to feeling exhausted the next day and more irritable and susceptible to anxiety.  Today discuused switching klonopin to lorazepam to help mitigate daytime sedation , converted her 1 mg of klonopin at bedtime to 2 mg of lorazepam .

Has been adherent to the fluoxetine 40 mg.

Overall anxiety level remain 6-7/10- mostly job and social anxiety related with a peak of 9/10 when panic occurs, the frequency of panic has decreased over the last week but with increased isolation and avoiddance

Social Phobia:  continue fluoxetine 40 mg daily and discontinue klonopin 1 mg for acute panic and use lorazepam as its duration is shorter and may help decrease daytime fatigue and sedation, continues to engage in exposures to help decrease the intensity and frequency of these symptoms.

Social or family history update:  marital strain secondary to illness

Safety: Passive suicidal ideation, denies intent or plan
Illicit drug use/ Nicotine : Denies

CONFIDENTIAL                                    MENNINGER000734

**JA2073**

ROS: 10 point ROS: reviewed, negative and noncontributory

| Current Medications | Other Medications | Side effects: daytime faith= |
|---|---|---|
| Fluoxetine 40 mg daily Ambien CR 12.5 at bedtime Klonopin 1 mg at bedtime ,and an additional 1.5 mg once a week for acute anxiety | | Adherence : yes |

Constitutional: General appearance: pale, anxious, thin, less tearful,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear
Thought content: many social phobia fears,  chronic feelings of inadequacy, continues with " what ifs" less " should" , all or nothing thinking
Perceptions: denies
Associations : intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone WNL

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

CONFIDENTIAL                                                        MENNINGER000735

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm

Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, but continues to struggle with minimal structure and many catastrophizing thoughts
2. discontinue bedtime dose of klonopin1.5 mg, trial of lorazepam to mitigate daytime sedation  to target both sleep disturbance and increased panic symptoms
3. Continue ambien CR 12.5mg  for sleep
4. CBT/ Exposure Homework goal – continue to go outside more, go to gym, then once a day, drive to grocery store / appointments on her own, engaging more in self care.
5. Registered for group therapy both as an exposure and to augment individual therapy
6. Coordination and communication with Lawyer and disability continues, application for SSDI on hold
7.  RTC in 1 week
8. The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Marianna Kessimian, MD

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ▮▮▮▮ 63
Age: 50
DOS: 09/14 / 18
Present at appointment: in person appointment

Chief Complaint : Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: Continues to struggle with sleep disruptions changed
dosing schedule for her fluoxetine and also decreased Ativan from 2 mg to 1 mg,.
core features of both social phobia and panic as the final outcome of her disability
and leave from work at PPD remains unresolved. Continues with "What if" and
"worst case scenario thinking" , isolating, tearful, not able to get out of the house and
excessive daytime fatigue.

Today introduced opposite to emotion action s her avoidance, isolation and
hibernation are taking a toll on her physical and emotional health.

Continues to work with her lawyer who reached out to this writer to prepare to
attend a meeting with her employer to come to a resolution of this issue.

Panic/ Acute stress/ Insomnia : Ativan 1mg  for acute panic, continues ativan 1 mg
at night with Ambien , continues to struggle with initial insomnia and multiple
awakenings which leads to feeling exhausted the next day and more irritable and
susceptible to anxiety.  Today discussed being mindful and scheduling a daily nap as
a way for her to listen to her body and brain's messages and needs.

Has been adherent to the fluoxetine 40 mg.

Overall anxiety level remain 6-7/10- mostly job and social anxiety related with a
peak of 9/10 when panic occurs, the frequency of panic has increased over the last
as a date has not been solidified for remediation.  Continues with increased
avoidance and isolation and is no longer leaving the house to walk.

Social Phobia:  continue fluoxetine 40 mg, changed dosing time to bed to see if this
would mitigate daytime sedation.  Symptoms remains problematic, limit her
functioning and her ability to leave her home.

Social or family history update:  marital strain improved

Safety: Passive suicidal ideation, denies intent or plan
Illicit drug use/ Nicotine : Denies

ROS: 10 point ROS: reviewed, + general: fatigue,

appetite: variable
sleep: disrupted

Otherwise negative and noncontributory

| Current Medications | Other Medications | Side effects:  daytime fatigue |
|---|---|---|
| Fluoxetine 40 mg daily Ambien CR 12.5 at bedtime Ativan 1 mg at bedtime ,and an additional 1 mg as needed for panic | | Adherence : yes |

Constitutional: General appearance: pale, anxious, thin,tearful,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear nd logical
Thought content: many social phobia fears, chronic feelings of inadequacy,
continues with " what ifs" , "catastrophizing thoughts"  less " should" , all or nothing
thinking
Perceptions: denies
Associations :intact
Judgment: fair
Insight :fair
Musculoskeletal: gait and station normal , tone WNL

Assessment and plan:

Medication management: 12 minutes,  CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social
anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder , type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm

Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

Social : Pathologist working in the private sector- sole financial contributor to the household, husband empathic and understanding partner, concern for excessive accommodation to point where all her needs are met and she is not asked /required to leave the house.

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, but continues to struggle with minimal structure and many catastrophizing thoughts
2. Continue fluoxetine 40 mg at bedtime with 1 mg of Ativan
3. Continue ambien CR 12.5mg for sleep
4. CBT/ Exposure Homework goal – working on identifying schemas continue to leave house 1-2 times daily
5. Registered for group therapy both as an exposure and to augment individual therapy –
6. Coordination and communication with Lawyer and disability continues, application for SSDI on hold
7. RTC in 1 week
8. The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Marianna Kessimian, MD

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ███ 63
Age: 50
DOS: 09/21 / 18
Present at appointment: in person appointment

Chief Complaint : Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: Continues to struggle with high anxiety, panic, sleep and appetite disruption as the date for the medication hearing is in the process of being confirmed. At this time no information provided regarding the options or consideration and also the role/ expectations of her attendance as well as this writer's attendance.

Today continued to review life traps, also practice scanning her mind and body for anxiety

Continues to work with her lawyer who reached out to this writer to prepare to attend a meeting with her employer to come to a resolution of this issue.

Panic/ Acute stress/ Insomnia : Ativan 1mg  for acute panic, continues ativan 1 mg at night with Ambien , continues to struggle with initial insomnia and multiple awakenings which leads to feeling exhausted the next day and more irritable and susceptible to anxiety.

Has been adherent to the fluoxetine 40 mg, switched dosing time to evening as this may mitigate some daytime sedation.

Overall anxiety level remain high  6-7/10- mostly job and social anxiety related with a peak of 9/10 when panic occurs, the frequency of panic continues at same rate and intensity as the date has not been solidified for remediation and the end of her temporary disability in approaching. Continues with increased avoidance and isolation, finding it difficult to leave the house unaccompanied or to go to her basement and use the computer that she used for work.

Social Phobia: continue fluoxetine 40 mg.    Symptoms remains problematic, limit her functioning and her ability to leave her home.

Social or family history update:  marital strain improved

Safety: Passive suicidal ideation, denies intent or plan

Illicit drug use/ Nicotine: Denies

ROS: 10 point ROS: reviewed, + general: fatigue,
appetite: variable
sleep: disrupted

Otherwise negative and noncontributory

| Current Medications | Other Medications | Side effects:  daytime fatigue |
|---|---|---|
| Fluoxetine 40 mg at bedtime<br>Ambien CR 12.5 at bedtime<br>Ativan 1 mg at bedtime ,and an additional 1 mg as needed for panic | | Adherence : yes |

Constitutional: General appearance: pale, anxious, thin, tearful,  good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear and logical
Thought content: many social phobia fears, chronic feelings of inadequacy,
continues with " what ifs" , "catastrophizing thoughts"  less " should" , all or nothing
thinking
Perceptions: denies
Associations: intact
Judgment: fair
Insight: fair
Musculoskeletal: gait and station normal, tone WNL

Assessment and plan:

Medication management: 12 minutes, CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

MENNINGER000741

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder, type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector husband empathic and understanding partner, less concern for excessive accommodation as the financial burden has shifted from patient to partner

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, but continues to struggle with minimal structure and many catastrophizing thoughts
2. Continue fluoxetine 40 mg at bedtime with 1 mg of Ativan
3. Continue ambien CR 12.5mg  for sleep
4. CBT/ Exposure Homework goal – working on identifying schemas continue to leave house 1-2 times daily
5. Registered for group therapy both as an exposure and to augment individual therapy- start date of group rescheduled
6. Coordination and communication with Lawyer and disability continues, application for SSDI on hold
7. RTC in 1 week
8. The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Marianna Kessimian, MD

MENNINGER000742

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ████ 63
Age: 50
DOS: 10 /03/ 18
Present at appointment: in person appointment

Chief Complaint : Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: Continues to struggle with high anxiety, panic, sleep and appetite disruption as the date for the mediation approaches.  Has been spening more time isolating, and sleeping.
Has a better understanding of her role in the meeting and that this is the first step in a multi step process which is some ways has been reassuring.

Today continued to review life traps, also practice scanning her mind and body for anxiety, has been using walking as her mindfulness practice focusing in on how her muscles are responding and feeling as a way to stay present focused vs future focused.

Panic/ Acute stress/ Insomnia : Ativan 1mg  for acute panic, continues ativan 1 mg at night with Ambien , continues to struggle with initial insomnia and multiple awakenings which leads to feeling exhausted the next day and more irritable and susceptible to anxiety.

Has been adherent to the fluoxetine 40 mg, switched dosing time to evening as this may mitigate some daytime sedation.

Overall at this point considering severity of external pressure, difficult to determine if her overall daytime fatigue has improved with the change from clonazepam to lorazepam.

Overall anxiety level remain high  6-7/10- mostly job and social anxiety related with a peak of 9/10 when panic occurs, the frequency of panic has increased in rate and intensity with medication scheduled for next week, whichhas also led Lisa to increased isolation and hopelessness.  Continues with increased avoidance, finding it difficult to leave the house unaccompanied or to go to her basement and use the computer that she used for work.

Social Phobia:  continue fluoxetine 40 mg.      Symptoms remains problematic, limit her functioning and her ability to leave her home.

Social or family history update:  marital strain improved, supportive spouse

Safety: Passive suicidal ideation, denies intent or plan

Illicit drug use/ Nicotine: Denies

ROS: 10 point ROS: reviewed, + general: fatigue,
appetite: variable
sleep: disrupted

Otherwise negative and noncontributory

| Current Medications | Other Medications | Side effects:  daytime fatigue |
|---|---|---|
| Fluoxetine 40 mg at bedtime<br>Ambien CR 12.5 at bedtime<br>Ativan 1 mg at bedtime ,and an additional 1 mg as needed for panic | | Adherence : yes |

Constitutional: General appearance: pale, anxious, thin, tearful, wringing her hand
good eye contact

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear and logical
Thought content: many social phobia fears, chronic feelings of inadequacy,
continues with " what ifs" , "catastrophizing thoughts"  less " should" , all or nothing
thinking
Perceptions: denies
Associations: intact
Judgment: fair
Insight: fair
Musculoskeletal: gait and station normal, tone WNL

Assessment and plan:

CONFIDENTIAL                                   MENNINGER000744

Medication management: 12 minutes, CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder, type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector husband empathic and understanding partner,  less concern for excessive accommodation as the financial burden has shifted from patient to partner

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
  1. Safety- on medical leave, at times continues to have suicidal thoughts
  2. Continue fluoxetine 40 mg at bedtime with 1 mg of Ativan
  3. Continue ambien CR 12.5mg  for sleep
  4. CBT/ Exposure Homework goal – currently in survival mode as medication day approaches, encouraged to focus on safety, rest and medication adherence  return to exposures after meeting as attending the meeting itself is an exposure for her social anxiety disorder
  5. Registered for group therapy both as an exposure and to augment individual therapy- start date of group rescheduled
  6. Coordination and communication with Lawyer and disability continues, application for SSDI on hold
  7.  RTC in 1 week
  8. The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

CONFIDENTIAL

Marianna Kessimian, MD

MENNINGER000746

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ███████ 63
Age: 50
DOS:  1/08/19
Present at appointment: patient over DOXY as she transitions to a new provider in NM

Chief Complaint: Social phobia, acute stress disorder, panic with agoraphobia

History of Present Illness: Relocating to New Mexico where she can hike, be outside and has more land and space between neighbors and also fresh start away from the disability lawsuit has been helpful for acute panic symptoms.  Lisa is currently not taking any psychotropic medication and has found that her energy level and sleep are improved while sleep remains stable.

Remains tearful in session regarding guilt about relocating fo her own health and stability as her daughter is struggling to acclimate to a new school/ climate and culture.


Panic/ Acute stress/Insomnia:  all symptoms decreased secondary to low stress, low risk environment, as challenges mount will continue to monitor for recurrence and also help with scheduling follow up , local care.

Overall anxiety level remains moderate 4-5/10- mostly about her family's health and adjustmen to move.   Has been working on separating herself from case, allowing the lawyer to handle and updates  and letting go of that she cannot control.

Social Phobia: Symptoms remain problematic, limit her functioning but fidning it easier to leave her home to go hiking and go on walks.
Did not respond to beta blockers in the past and needed high doses of valium for minimal relief, and this is all supported by her genetic testing,

Social or family history update:  marital strain improved, supportive spouse, worried about her daughter
financial strain- temporary disability approved until the end of February , waiting on approval for long term disability

Safety: Denies suicidal ideation, denies intent or plan

Illicit drug use/ Nicotine: Denies

ROS: 10 point ROS: reviewed, + general: less fatigue
appetite: variable

CONFIDENTIAL                                                        MENNINGER000747

sleep: improved

Otherwise negative and noncontributory

| Current Medications | Other Medications | Side effects: |
|---|---|---|
| None | | Adherence : |

Constitutional: General appearance: pale, anxious, thin, tearful

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear and logical
Thought content: many social phobia fears, chronic feelings of inadequacy,
continues with " what ifs" , "catastrophizing thoughts"  less " should" , all or nothing
thinking , thoughts that she is a burden to her family
Perceptions: denies
Associations: intact
Judgment: fair
Insight: fair

Assessment and plan:

Medication management: 12 minutes, CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social
anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic
disorder, type II trauma secondary to father's volatile behavior and witnessing
domestic violence between her parents ,temperament- risk averse, sensitive, slow to
warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse,
introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-
other-focused

                                                                MENNINGER000748

Social : Pathologist working in the private sector husband empathic and understanding partner, less concern for excessive accommodation as the financial burden has shifted from patient to partner

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, recent relocation has helped, suicidal thoughts have resolved
2. Consider SNRI trial in near future  with a local psychiatrist will see a few times over DOXY as she transitions to a new provider
3. Coordination and communication with Lawyer and disability continues, application for SSDI in process,
4. Video session scheduled for 2 weeks
5. The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.


Marianna Kessimian, MD

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ████63
Age: 50
DOS:  01/22/19
Present at appointment: patient over DOXY as she transitions to a new provider in NM, has an appointment in mid MARCH 2019

Chief Complaint: Social phobia, panic with agoraphobia, MDD, moderate recurrent

History of Present Illness: continues to struggle with core symptoms of social phobia, these symptoms  limit her ability to leave the home, go to school events with her daughter.

Remains tearful in session thinking about how others may judge or criticize her and also feeling that she needs to prove her "pain"

Completed forms for disability, finding it difficult to answer some of the questions, and also was officially terminated form PPO and both of these events activated her acute panic symptoms and acute stress.

Panic/ Acute stress/Insomnia:  all symptoms have increased secondary to recent events stress, has an appointment to transfer care to a local provider

Overall anxiety level remains moderate 4-5/10- mostly about her family's health and adjustment to move.   Has been working on separating herself from case, allowing the lawyer to handle and updates and letting go of that she cannot control.

Social Phobia: Symptoms remain problematic, limit her functioning but finding it easier to leave her home to go hiking and go on walks secondary to the weather and also less risk of running into neighbors as she has more land, location more rural

Did not respond to beta blockers in the past and needed high doses of valium for minimal relief, and this is all supported by her genetic testing,  continue to minor for worsening off of SSRI

Social or family history update:  marital strain improved, supportive spouse, worried about her daughter , her daughter's mood and making friends at her new school

financial strain- temporary disability approved until the end of February , waiting on approval for long term disability , completed application , medical record faxed

Safety: Denies suicidal ideation, denies intent or plan

Illicit drug use/ Nicotine: Denies

ROS: 10 point ROS: reviewed, + general: less fatigue
appetite: variable
sleep: improved

Otherwise negative and noncontributory

| Current Medications | Other Medications | Side effects: |
|---|---|---|
| None | | Adherence : |

Constitutional: General appearance: pale, anxious, thin, tearful

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear and logical
Thought content: many social phobia fears, chronic feelings of inadequacy,
continues with " what ifs" , "catastrophizing thoughts"  thoughts that she is a burden
to her family , thought that if she does interact with other people utside her
immediate family they will judge and criticize her
Perceptions: denies
Associations: intact
Judgment: fair
Insight: fair

Assessment and plan:

Medication management: 12 minutes, CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social
anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic
disorder, type II trauma secondary to father's volatile behavior and witnessing

CONFIDENTIAL

MENNINGER000751

domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm

Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

Social : Pathologist working in the private sector husband empathic and understanding partner,  less concern for excessive accommodation as the financial burden has shifted from patient to partner

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1.  Safety- on medical leave, recent relocation has helped,  suicidal thoughts have resolved
2.  Consider SNRI trial in near future  with a local psychiatrist will see a few times over DOXY as she transitions to a new provider
3.  Coordination and communication with Lawyer and disability continues, application for SSDI in completed by patient , and medical record faxed
4.  Video session scheduled for 2 -3weeks
5.  The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Marianna Kessimian, MD

CONFIDENTIAL

MENNINGER000752

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ███████63
Age: 50
DOS: 02/11/19
Present at appointment: patient over DOXY as she transitions to a new provider in NM, has an appointment in mid MARCH 2019

Chief Complaint: " I am worse then I have ever been"

Social phobia, panic with agoraphobia, MDD, moderate recurrent

History of Present Illness:  Lisa reached out this writer in between appointments after she noticed her depressive symptoms were returning and her overall anxiety symptoms were starting to increase.  Restarted fluoxetine 20 mg and today would like to continue titration to 40 mg.  Realizing that although the SSRI did not lead to remission, they did help her tread water and now she feels like she is sinking again. Her symptoms have reverted to depression and life paralyzing anxiety, not leaving the house. " I was really spiraling down" " something really minor will trigger feelings of " I don't want to live anymore"" it doesn't take much to throw me into all these symptoms"

She has only left house over last few weeks to go to the mailbox and is having suicidal ideation. Struggling with " how I got to this place" , no longer hiking, going for walks.

Denies suicidal plan intent, access to firearms and at this point does not think a partial program would be helpful.  Feels supported by her husband Mason who works from home which decreases safety risk.

Panic/ Acute stress/Insomnia:  all symptoms have increased secondary to recent increase in symptoms, has an appointment to transfer care to a local provider

Overall anxiety level severe 2-3/10.   Has been working on separating herself from case, allowing the lawyer to handle and updates and letting go of that she cannot control.

Social Phobia: Symptoms remain problematic, limit her functioning with acute worsening

Did not respond to beta blockers in the past and needed high doses of valium for minimal relief, and this is all supported by her genetic testing,  continue to minor for worsening off of SSRI

Social or family history update:  marital strain improved, supportive spouse, worried about her daughter , her daughter's mood and making friends at her new school

financial strain- temporary disability approved until the end of February , waiting on approval for long term disability , completed application , medical record faxed

Safety: Passive suicidal ideation, denies intent or plan

Illicit drug use/ Nicotine: Denies

ROS: 10 point ROS: reviewed, + general: less fatigue
appetite: variable
sleep: improved

Otherwise negative and noncontributory

| Current Medications | Other Medications | Side effects: |
|---|---|---|
| None | | Adherence : |

Constitutional: General appearance: pale, anxious, thin, tearful

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear and logical
Thought content: many social phobia fears, chronic feelings of inadequacy, continues with " what ifs" , "catastrophizing thoughts"  thoughts that she is a burden to her family , thought that if she does interact with other people they are judging her, passive suicidal ideation
Perceptions: denies
Associations: intact
Judgment: fair
Insight: fair

Assessment and plan:

Medication management: 12 minutes, CBT/ ACT/ DBT therapy skills : 48  minutes

MENNINGER000754

Complex Medical Decision Making: Moderate:  regarding the following issues.

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy through doxy, secondary to recent move to New Mexico.

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder, type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm

Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

Social : Pathologist working in the private sector husband empathic and understanding partner,  less concern for excessive accommodation as the financial burden has shifted from patient to partner

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1.  Safety- reviewed plan as passive SI has returned- on medical leave, recent relocation has helped,  suicidal thoughts have returned
2.  Restarted Prozac, considering she has been on medication before and this writer is long distance, titrate back to 40 mg where Lisa had some mild symptom reduction Consider SNRI trial in near future  with a local psychiatrist will see a few times over DOXY as she transitions to a new provider
3.  Coordination and communication with Lawyer and disability continues, application for SSDI in completed by patient , and medical record faxed
4.  Video session scheduled for 2 -3weeks
5.  The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Marianna Kessimian, MD

CONFIDENTIAL

MENNINGER000755

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ████63
Age: 50
DOS:  02/26/19
Present at appointment: patient over DOXY as she transitions to a new provider in NM, has an appointment in mid MARCH 2019


Chief Complaint: "Prozac is a helping a little with the depression, I want to increase it to 60 mg because I am not convinced that my GI symptoms before were entirely from the medication"

Social phobia, panic with agoraphobia, MDD, moderate recurrent

History of Present Illness:  Lisa reports that the increase of fluoxetine from 20 to 40 mg has helped her mood move from despair and hopelessness but her anxiety continues and at times she continues to "hide from to the world"

She continues to struggle in leaving the house day to day without her husband or daughter with her.  If she is in their company she has been leaving on the weekend to enjoy the art scene near her new home.

Her social security application was approved which has helped decrease the amount of stress.

Denies suicidal ideation, plan or intent

Panic/ Acute stress/Insomnia:  all symptoms have slightly decreased in intensity but remain problematic

Overall anxiety level moderate to severe.

Social Phobia: Symptoms remain problematic, limit her functioning with acute worsening which has resulted in her staying home and inside unless accompanied by her spouse or daughter.  Continues to think others will not understand her social anxiety, but will judge or criticize her for her difficulties and this leads her to social isolation

Social or family history update: supportive and understanding spouse, recently approved for social security benefits

Illicit drug use/ Nicotine: Denies

MENNINGER000756

ROS: 10 point ROS: reviewed, + general: more daytime fatigue, takes 2 hour nap daily
appetite: variable
sleep: improved

Otherwise negative and noncontributory

| Current Medications | Other Medications | Side effects:  daytime fatigue |
|---|---|---|
| Fluoxetine 40 mg daily | | Adherence : yes |

Constitutional: General appearance: pale, anxious, thin

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious
Thought Process : linear and logical
Thought content: many social phobia fears, chronic feelings of inadequacy, continues with " what ifs" , "catastrophizing thoughts" malignant self doubt, , thought that if she does interact with other people they are judging her
Perceptions: denies
Associations: intact
Judgment: fair
Insight: fair

Assessment and plan:

Medication management: 12 minutes, CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy through doxy, secondary to recent move to New Mexico as she transitions to a new provider.

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder, type II trauma secondary to father's volatile behavior and witnessing

MENNINGER000757

domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm

Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

Social : Pathologist working in the private sector husband empathic and understanding partner,  less concern for excessive accommodation as the financial burden has shifted from patient to partner

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- suicidal ideation has resolved
2. Increase Prozac from 40 to 60 mg
3. Coordination and communication with Lawyer and disability continues, application for SSDI in completed by patient , and was awarded.
4. This is last appointment new provider appointment on 3/19/19.
5. The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Marianna Kessimian, MD

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ██████63
Age: 50
DOS:  10 /19/ 18
Present at appointment: in person appointment

Chief Complaint : Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: Had mediation meeting which left matters unresolved and also left her feeling more hopeless as the recommended settlement was quite low and she would not be able to support her family.

As the week progressed tension and hopelessness continued to increase.  Her husband became concerned for her safety as she made some suicidal statements. This writer was able to reach out and problem solve with both Lia and her husband.

Today in session, Lisa was able to complete a functional analysis regarding this event and an additional safety assessment was completed.

Continues to struggle with high anxiety, panic, sleep and appetite disruption, her weight has dropped significantly and she is now at 110 lbs, oreviously was at 120 lbs.

Today focused on coping with unmanageable emotions in more adaptive vs maladaptive ways.

Panic/ Acute stress/ Insomnia : Ativan 1mg  for acute panic, continues ativan 1 mg at night with Ambien , continues to struggle with initial insomnia and multiple awakenings which leads to feeling exhausted the next day and more irritable and susceptible to anxiety.

Has been adherent to the fluoxetine 40 mg and with ambien.

Overall anxiety level remain high  6-7/10- mostly job and social anxiety related with a peak of 9/10 when panic occurs, when she has an unexpected social interaction while walking and trying to practice her mindfulness.
The frequency of panic has increased in rate and intensity as the medication did not lead to resolution and also added an additional financial burden.  If she continues to pursue disability and accommodation her current lawyer would require a ████ retainer which at this time would not be feasible.

Continues with increased avoidance, finding it difficult to leave the house unaccompanied or to go to her basement and use the computer that she used for work.

Social Phobia:  continue fluoxetine 40 mg.     Symptoms remains problematic, limit her functioning and her ability to leave her home.

Social or family history update:  marital strain improved, supportive spouse

Safety: Passive suicidal ideation, denies intent or plan

Illicit drug use/ Nicotine: Denies

ROS: 10 point ROS: reviewed, + general: fatigue,
appetite: variable
sleep: disrupted

Otherwise negative and noncontributory

| Current Medications | Other Medications | Side effects:  daytime fatigue |
|---|---|---|
| Fluoxetine 40 mg at bedtime<br>Ambien CR 12.5 at bedtime<br>Ativan 1 mg at bedtime ,and an additional 1 mg as needed for panic | | Adherence : yes |

Constitutional: General appearance: pale, anxious, thin, tearful

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear and logical
Thought content: many social phobia fears, chronic feelings of inadequacy, continues with " what ifs" , "catastrophizing thoughts"  less " should" , all or nothing thinking , thoughts that she is a burden to her family
Perceptions: denies
Associations: intact

CONFIDENTIAL                                                                 MENNINGER000760

Judgment: fair
Insight: fair
Musculoskeletal: gait and station normal, tone WNL

Assessment and plan:

Medication management: 12 minutes, CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social
anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic
disorder, type II trauma secondary to father's volatile behavior and witnessing
domestic violence between her parents ,temperament- risk averse, sensitive, slow to
warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse,
introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-
other-focused
Social : Pathologist working in the private sector husband empathic and
understanding partner,  less concern for excessive accommodation as the financial
burden has shifted from patient to partner

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, at times continues to have suicidal thoughts –
   managed an acute decompensation with her husband this past week
2. Continue fluoxetine 40 mg at bedtime with 1 mg of Ativan
3. Continue ambien CR 12.5mg  for sleep
4. CBT/ Exposure Homework goal – currently in survival mode as mediation
   continues
5. Registered for group therapy both as an exposure and to augment individual
   therapy- did not attend secondary to crisis has an ultra marathon next week
   which connects her with nature and allows her to engage with her
   parasympathetic nervous system
6. Coordination and communication with Lawyer and disability continues,
   application for SSDI on hold
7.  RTC in 1 week

CONFIDENTIAL                                                              MENNINGER000761

8.  The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Marianna Kessimian, MD

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ███████63
Age: 50
DOS:  11/2/18
Present at appointment: patient

Chief Complaint: Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: since last meeting was able to compete in an ultra marathon with the support of her mother, daughter and husband.  Initially, her social phobia symptoms were severe as there was a large group of people at the start of the race which activated her symptoms, but as the race progressed she was able to find a solitary pace and also continue to use her coping/ mindfulness skills.

Settling back in after her race has been difficult.  Lisa reports ongoing fatigue and listlessness which then morphs into excessive guilt because she does not have the energy to help maintain the house, cook, or prepare for their upcoming move.

Continues to struggle with high anxiety, panic, sleep and appetite disruption.

Panic/ Acute stress/ Insomnia : Ativan 1mg  for acute panic, continues Ativan 1 mg at night with Ambien

Has been adherent to the fluoxetine 40 mg.

Overall anxiety level remain high  6-7/10- mostly job and social anxiety related with a peak of 9/10 when panic occurs, when she has an unexpected social interaction while walking and trying to practice her mindfulness.

The frequency of panic has increased in rate and intensity as the mediation did not lead to resolution and also added an additional financial burden. There has been some concrete decision, they have put their home on the market, to help ease some of the financial strain.

Continues with increased avoidance, finding it difficult to leave the house unaccompanied or to go to her basement and use the computer that she used for work.

Social Phobia:  continue fluoxetine 40 mg.     Symptoms remain problematic, limit her functioning and her ability to leave her home.

Social or family history update:  marital strain improved, supportive spouse, financial strain- putting house on the market

CONFIDENTIAL                                                                                          MENNINGER000763

**JA2102**

Safety: Passive suicidal ideation, denies intent or plan

Illicit drug use/ Nicotine: Denies

ROS: 10 point ROS: reviewed, + general: fatigue,
appetite: variable
sleep: disrupted

Otherwise negative and noncontributory

| Current Medications | Other Medications | Side effects:  daytime fatigue |
|---|---|---|
| Fluoxetine 40 mg at bedtime<br>Ambien CR 12.5 at bedtime<br>Ativan 1 mg at bedtime ,and an additional 1 mg as needed for panic | | Adherence : yes |

Constitutional: General appearance: pale, anxious, thin, tearful

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear and logical
Thought content: many social phobia fears, chronic feelings of inadequacy,
continues with " what ifs" , "catastrophizing thoughts"  less " should" , all or nothing
thinking , thoughts that she is a burden to her family
Perceptions: denies
Associations: intact
Judgment: fair
Insight: fair
Musculoskeletal: gait and station normal, tone WNL

Assessment and plan:

                                                  MENNINGER000764

Medication management: 12 minutes, CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder, type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector husband empathic and understanding partner,  less concern for excessive accommodation as the financial burden has shifted from patient to partner

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, at times continues to have suicidal thoughts, denies plan
2. Continue fluoxetine 40 mg at bedtime, discontinue Ativan 1 mg to address daytime sedation
3. Continue ambien CR 12.5mg for sleep
4. Registered for group therapy both as an exposure and to augment individual therapy
5. Coordination and communication with Lawyer and disability continues, application for SSDI on hold
6.  RTC in 1 week
7. The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Marianna Kessimian, MD

CONFIDENTIAL

MENNINGER000765

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ████63
Age: 50
DOS:  11/09/18
Present at appointment: patient

Chief Complaint: Social phobia, acute stress disorder , panic with agoraphobia

History of Present Illness: Since last meeting stopped taking Ativan 1 mg daily and his has helped with her daytime fatigue, but remains more tired than her baseline. Also sleep is sonehwta more disrupted bt at this point able to fall back asleep.

Jolted by a voicemail from HR about returning to work and this increased her generalized anxiety. However, she was able to use her coping skills and call her lawyer to ██████████████. Lisa reports ongoing fatigue and listlessness which the ██████████████t because she does not have the energy to help maintain the house, cook, care for her daughter, or prepare for their upcoming move.

Continues to struggle with high anxiety, panic, sleep and appetite disruption.

Panic/ Acute stress/ Insomnia : Ativan 1mg  for acute panic as needed , discontinue Ativan 1 mg at night, and continue Ambien CR 12.5 mg

Has been adherent to the fluoxetine 40 mg, will decrease from 40 to 20 mg.

Overall anxiety level remain high  6-7/10- mostly job and social anxiety related with a peak of 9/10 when panic occurs, when she has an unexpected social interaction, call form her employer.  Has also not been able to walk which is her mindfulness practice

The frequency of panic has increased in rate and intensity as the mediation did not lead to resolution and also added an additional financial burden recent phone call form HR and also her disability on partially extended There has been some concrete decision, they have put their home on the market, to help ease some of the financial strain.

Continues with increased avoidance, finding it difficult to leave the house unaccompanied or to go to her basement and use the computer that she used for work. No longer exercising

Social Phobia:  decrease fluoxetine 40 mg to 20 mg.    Symptoms remain problematic, limit her functioning and her ability to leave her home.

                                                    MENNINGER000766

Social or family history update:  marital strain improved, supportive spouse, financial strain- putting house on the market

Safety: Denies suicidal ideation, denies intent or plan

Illicit drug use/ Nicotine: Denies

ROS: 10 point ROS: reviewed, + general: fatigue,
appetite: variable
sleep: disrupted

Otherwise negative and noncontributory

| Current Medications | Other Medications | Side effects:  daytime fatigue |
|---|---|---|
|  Fluoxetine 40 mg at bedtime<br>Ambien CR 12.5 at bedtime<br>Ativan 1 mg as needed for panic |  | Adherence : yes |

Constitutional: General appearance: pale, anxious, thin, tearful

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear and logical
Thought content: many social phobia fears, chronic feelings of inadequacy, continues with " what ifs" , "catastrophizing thoughts"  less " should" , all or nothing thinking , thoughts that she is a burden to her family
Perceptions: denies
Associations: intact
Judgment: fair
Insight: fair
Musculoskeletal: gait and station normal, tone WNL

Assessment and plan:

Medication management: 12 minutes, CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder, type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector husband empathic and understanding partner,  less concern for excessive accommodation as the financial burden has shifted from patient to partner

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, suicidal thoughts have resolved
2. Decrease fluoxetine 40 mg to 20 mg at bedtime,
3. Continue ambien CR 12.5mg for sleep
4. Registered for group therapy both as an exposure and to augment individual therapy
5. Coordination and communication with Lawyer and disability continues, application for SSDI on hold
6.  RTC in 1 week
7. The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Marianna Kessimian, MD

CONFIDENTIAL                                                  MENNINGER000768

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ███████ 63
Age: 50
DOS: 11/16/18
Present at appointment: patient

Chief Complaint: Social phobia, acute stress disorder, panic with agoraphobia

History of Present Illness: Since last meeting stopped taking Ativan 1 mg daily and
has decreased fluoxetine to 20 mg has helped with her daytime fatigue, so she has
been able to participate more in the moving process.

Continues to struggle with high anxiety, panic, sleep and appetite disruption.  These
symptoms are exacerbated by continued communication with PPD and their HR
department.  She reports "I can't undo the downward spiral", "Can't stop my body
from reacting the way that it does".  Discussed risk/ benefit ration of trying to come
up with different/ more creative ways to return to work vs moving forward with
disability.

Panic/ Acute stress/Insomnia: Ativan 1mg  for acute panic as needed , discontinue
Ativan 1 mg at night, and continue Ambien CR 12.5 mg

Has been adherent to the fluoxetine 20 mg.

Overall anxiety level remains high 6-7/10- mostly job and social anxiety related
with a peak of 9/10 when panic occurs, when she has an unexpected social
interaction, call/ email from her employer.

The frequency of panic has increased in rate and intensity as the mediation did not
lead to resolution and also added an additional financial burden recent phone call
form HR and also her disability on partially extended.   There has been some
concrete decision, they have put their home on the market, to help ease some of the
financial strain.

Continues with increased avoidance, finding it difficult to leave the house
unaccompanied or to go to her basement and use the computer that she used for
work. No longer exercising

Social Phobia:  Continue fluoxetine 20 mg.    Symptoms remain problematic, limit
her functioning and her ability to leave her home.

Social or family history update:  marital strain improved, supportive spouse,
financial strain- putting house on the market, relocating and also moving daughter
out of private school and into public school.

CONFIDENTIAL                                                                 MENNINGER000769

Safety: Denies suicidal ideation, denies intent or plan

Illicit drug use/ Nicotine: Denies

ROS: 10 point ROS: reviewed, + general: fatigue,
appetite: variable
sleep: disrupted

Otherwise negative and noncontributory

| Current Medications | Other Medications | Side effects:  daytime fatigue |
|---|---|---|
|  Fluoxetine 20 mg at bedtime<br>Ambien CR 12.5 at bedtime<br>Ativan 1 mg as needed for panic | | Adherence : yes |

Constitutional: General appearance: pale, anxious, thin, tearful

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear and logical
Thought content: many social phobia fears, chronic feelings of inadequacy,
continues with " what ifs" , "catastrophizing thoughts"  less " should" , all or nothing
thinking , thoughts that she is a burden to her family
Perceptions: denies
Associations: intact
Judgment: fair
Insight: fair
Musculoskeletal: gait and station normal, tone WNL

Assessment and plan:

CONFIDENTIAL     MENNINGER000770

Medication management: 12 minutes, CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic disorder, type II trauma secondary to father's volatile behavior and witnessing domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm
Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused
Social : Pathologist working in the private sector husband empathic and understanding partner,  less concern for excessive accommodation as the financial burden has shifted from patient to partner

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1. Safety- on medical leave, suicidal thoughts have resolved, but anxiety symptoms remains and are frequent and severe
2. Continue fluoxetine 20 mg at bedtime,
3. Continue ambien CR 12.5mg for sleep
4. Registered for group therapy both as an exposure and to augment individual therapy
5. Coordination and communication with Lawyer and disability continues, application for SSDI on hold
6.  RTC in 1 week
7. The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Marianna Kessimian, MD

Psychiatric Follow up
E&M Codes : 99214, 90836
Name: Lisa Menninger
DOB: ████ 63
Age: 50
DOS:  11/30/18
Present at appointment: patient

Chief Complaint: Social phobia, acute stress disorder, panic with agoraphobia

History of Present Illness: Since last meeting some good news is that Unum works
with another company to help apply for social security disability.   Continues to get
email messages from the HR department of PPD, which results in increased panic
and increased avoidance.  Continues to struggle getting out of house, " haven't
exercised" " not eating well" , " I am going to focus on my health"  but overall does
feel less tired now that she is no longer taking Ativan at bedtime.


Panic/ Acute stress/Insomnia: continues on fluoxetine 20 mg daily, worried that the
ambien she has been taking at night is leading to some short term memory
problems which she remembers happening the last time she was taking this
medication.  Stopped taking ambien, but sleep is now more disrupted .  Discussed
alternatives for sleep including trazodone, but is hesitant to trial another
medication.  Also discussed genomind testing.

Has been adherent to the fluoxetine 20 mg.

Overall anxiety level remains high 6-7/10- mostly job and social anxiety related
with a peak of 9/10 when panic occurs, when she has an unexpected social
interaction, call/ email from her employer. Utilized her resources and asked her
lawyer to ████████████████ .

Social Phobia:  Continue fluoxetine 20 mg.    Symptoms remain problematic, limit
her functioning and her ability to leave her home.  did not respond to beta blockers
in the past and needed high doses of valium for minimal relief.

Social or family history update:  marital strain improved, supportive spouse,
financial strain- putting house on the market, relocating and also moving daughter
out of private school and into public school.

Safety: Denies suicidal ideation, denies intent or plan

Illicit drug use/ Nicotine: Denies

ROS: 10 point ROS: reviewed, + general: fatigue,
appetite: variable

sleep: disrupted

Otherwise negative and noncontributory

| Current Medications | Other Medications | Side effects:  improved daytime fatigue |
|---|---|---|
| Fluoxetine 20 mg at bedtime<br>Ativan 1 mg as needed for panic | | Adherence : yes |

Constitutional: General appearance: pale, anxious, thin, tearful

Mental Status exam:

Orientation: to person, place and time
Speech : soft at times, normal rate and rhythm
Language : fluent
Attention and concentration: adequate for interview
Mood: worried
Affect: anxious, sad
Thought Process : linear and logical
Thought content: many social phobia fears, chronic feelings of inadequacy,
continues with " what ifs" , "catastrophizing thoughts"  less " should" , all or nothing
thinking , thoughts that she is a burden to her family
Perceptions: denies
Associations: intact
Judgment: fair
Insight: fair
Musculoskeletal: gait and station normal, tone WNL

Assessment and plan:

Medication management: 12 minutes, CBT/ ACT/ DBT therapy skills : 48  minutes

Complex Medical Decision Making: Moderate:  regarding the following issues.

50 yo Caucasian female with a history of GAD, panic with agoraphobia and social
anxiety disorder presents for medication and therapy

Biological: Maternal side with social phobia, GAD and father side with psychotic
disorder, type II trauma secondary to father's volatile behavior and witnessing

MENNINGER000773

domestic violence between her parents ,temperament- risk averse, sensitive, slow to warm

Psychologically: empathic, caring , responsible, intelligent, timid, risk averse, introverted, thoughtful, quiet , perfectionistic at times, highly critical of self, passive-other-focused

Social : Pathologist working in the private sector husband empathic and understanding partner,  less concern for excessive accommodation as the financial burden has shifted from patient to partner

Diagnosis:
Panic disorder with agoraphobia
Social Anxiety Disorder
Generalized Anxiety Disorder
Acute Stress Disorder
Sleep disturbance

Plan
1.  Safety- on medical leave, suicidal thoughts have resolved, but anxiety symptoms remains and are frequent and severe
2.  Continue fluoxetine 20 mg at bedtime,
3.  discontinue ambien CR 12.5mg for sleep, using OTC diphenhydramine consider trazodone
4.  Registered for group therapy both as an exposure and to augment individual therapy- has not attended to date and now with move and relocation pending is not feasible
5.  Coordination and communication with Lawyer and disability continues, application for SSDI on hold, reviewed recent answers to questions posed by Unum which were faxed
6.  Multiple med trials with significant side effects discussed Genomind testing which patient agreed to to do, this was perfrmed in session
7.   RTC in 1 week
8.  The rationale for the utilization of the above medication was explained along with potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient/ parent/ guardian verbalized an understanding of this information and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Marianna Kessimian, MD

MENNINGER000774



**Attending Physician Statement Behavioral Health**
The Benefits Center
P.O. Box 100158, Columbia, SC 29202-3158
Toll-free: 1-800-858-6843  Fax: 1-800-447-2498



02875006707218601

| Name of Patient (Last Name, Suffix, First Name, MI) | | | | | | | | | | | | Social Security Number | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M | E | N | N | I | N | G | E | R | | L | I | S | A | | | | | ▓ | 1 | 7 | 0 | 6 |

| Date of Birth (mm/dd/yy) | Patient Occupation |
|---|---|
| ▓ 6 8 | C L I N I C a l   P A T H O 4 O 6 1 S T |

**TO BE COMPLETED BY PHYSICIAN OR TREATING PROVIDER**
Instructions: Please complete, sign and date this form.

Primary diagnosis PANIC with Agoraphobia    ICD Code F32.1

Secondary diagnosis SOCIAL PhobiA    ICD Code F40.10

Is the patient's condition work related? ☐ Yes ☐ No ☒ Unknown ↑ Work Stress, ↑ Symptoms

Has the patient been treated for the same/similar condition in the past?
☒ Yes – (mm/dd/yy) 1990's   ☐ No   ☐ Unknown

Have you recommended to your patient to stay home from work? ☒ Yes ☐ No

If yes, effective what date? (mm/dd/yy) 6|4|18

Please provide your rationale for recommending disability leave: In outpatient psychiatric tx since 6/4/18, her panic symptoms, appetite, increased disturbance, insomnia all worsened with appropriate medication trials. At first with hopelessness & suicidal ideation over last month as accommodations for social phobia were declined.

Recent hospitalizations: Admission (mm/dd/yy) N/A  Discharge (mm/dd/yy) _____

Location: _____

Current treatment plan/start date: PHP _____ IOP ✓ Therapist/counselor _____
Contact information: MARIANNA KESSIMIAN, weekly psychiatry & therapy appointments

Current medications/dosages: Fluoxetine 40 mg, Ambien CR 12.5@ bedtime,
Klonopin 1 mg@bedtime, 1 mg as needed for acute panic symptoms

Please support your opinion with the following information.

**BEHAVIORAL OBSERVATIONS**

Date of initial exam: (mm/dd/yy) 1 22 18   Date of next exam: (mm/dd/yy) 6 8 18

Behaviors observed during the exam: Tearful, apathetic, psychomotor retardation, limited eye contact.

Psychomotor activity and ability to apply effort: ☐ Unremarkable ☒ Impaired  If impaired, describe:
overall anxious & with psychomotor retardation, averting gaze, tearful

Presented with appropriate dress and hygiene in session: ☒ Yes ☐ No  Describe:

| Speech: ☐ Slurred | ☐ Pressured | ☒ Soft | ☐ Under Productive |
|---|---|---|---|
| ☐ Stammering | ☐ Loud | ☐ Over Productive | ☐ Other |

Risk to self/others: Suicidal Ideations ☒ Yes ☐ No  Homicidal Ideations ☐ Yes ☒ No

Plan Reported: ☐ Yes ☒ No  If yes, please describe:

Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries.
CL-1178 (05/16)

MENNINGER000775



**Attending Physician Statement Behavioral Health**
The Benefits Center
P.O. Box 100158, Columbia, SC 29202-3158
Toll-free: 1-800-858-6843  Fax: 1-800-447-2498


02875006707218602

Name of Patient (Last Name, Suffix, First Name, MI)

| M | E | N | N | I | N | G | E | R | | L | I | S | A | | |

## PATIENT SELF REPORT OF ACTIVITIES OF DAILY LIVING

Is the patient currently performing any of the following?:
☐ Volunteer Work    ☐ Work at a lesser demanding job    ☐ Self-employment
☐ Attending School    ☑ No work activities in any capacity

Significant weight/appetite changes: ☑ Yes ☐ No  If yes, describe:
126 lbs to 118 lbs- 8 lb weigh loss  ↑ GI distress

Sleep disturbance: ☑ Yes ☐ No  If yes, describe:
intid insimnia - Started ambien  also med, hydroxyprines
currently on klonopin

Socialization problems: ☑ Yes ☐ No  If yes, describe:
works remotely, only excursion outside is to mailbox and
treatment

Cleans/Maintains residence: ☑ Yes ☐ No    Performs routine shopping: ☐ Yes ☑ No

Pays bills: ☑ Yes ☐ No    Operates motor vehicle: ☑ Yes ☐ No

## DIAGNOSTIC IMPRESSIONS

Patient's perspective: The Patient has conceptualized the following areas as barriers in returning to work.
☐ Increase in work demands    ☐ Conflicts with supervisor    ☐ None
☐ Anticipation of relapse    ☐ Recent unfavorable work evaluation
☐ Dissatisfaction with the job    ☑ Other decline to accommodate, now with hostile work environment

## BACK TO WORK STATUS

Has a return to work date been discussed with the patient?  ☐ Yes ☑ No
Has the patient  ☐ Improved  ☐ Regressed  ☑ Not changed

Return to work target date: (mm/dd/yy) N/A

☐ Able to work now, but with accommodations/modifications.  Please list:


Would this patient benefit from Vocational Rehabilitation Services/Assistance?  ☑ Yes  ☐ No

FRAUD NOTICE:  Any person knowingly files a statement of claim containing false or misleading
information is subject to criminal and civil penalties.

## SIGNATURE OF ATTENDING PHYSICIAN/TREATMENT PROVIDER

**The above statements are true and complete to the best of my knowledge and belief.**

Physician Name (Last Name, Suffix, First Name, MI) Please Print
KESSIMIAN    MARIANNA  I           M.D
                                              Degree

Medical Specialty  PSYCHIATRY

Address  10 Elmgrove Avenue           RI  02906
City  PROVIDENCE                State    Zip

Telephone Number  401 829 6943   Fax Number 858-975-3157   Physician's Tax ID Number: 82-3104946

Are you related to this patient?  ☐ Yes  ☑ No  If yes, what is the relationship?

X _____          6/5/18
**Physician Signature**                        Date

NPI 1922203884

CL-1178 (05/16)                                MENNINGER000776

**JA2115**

Addendum: UNUM
Attention Debbie Smith, RN
Patient: Lisa Menninger
Claim Number: 15263333
Policy Number: 501313

How is return to work integrated into the patient's treatment plan?

At this point in time and considering the last year of back and forth conversations with her employer without resolution, several medication trials, hospitalization, gastrointestinal distress, weight loss, suicidal ideation, marked restriction in daily activities, difficulties in maintaining social functioning , repeated episodes of decompensation and marked difficulties maintaining concentration, the potential risks of returning to a hostile and unforgiving work environment outweigh the potential benefit to the patient.  Therefore, the treatment plan is focused on safety, setting, reduction of symptoms, continued therapy and medication management.

If you have concerns regarding return to work as it relates to current psychiatric symptoms, please detail.

Yes, I have significant concerns and therefore will not be recommending return to work at this time.  Lisa continues to struggle with the biological sequelae of her neurobehavioral disorders which include social anxiety disorder and panic disorder with agoraphobia.

This includes increased muscle tension, tachycardia, diaphoresis, appetite suppression, weight loss, autonomic hyperactivity, difficulty speaking and chronic fear that others will notice her symptoms. These active, frequent and intense symptoms have restricted her ability to leave her home and participate in her family life without many accommodations and restrictions.  She continues to push herself and has made significant gains (attends therapy once a week in persons vs remotely, picks up her daughter from school) continues to struggle with leaving the house to shop, buy groceries or exercise secondary to risk of running into others.  The back and forth with her employer contributes to increase in symptom severity and frequency and makes it difficult for her to make substantial therapeutic gains.

Would your patient be able to perform the same occupation with a different supervisor, department or employer.

No

If not, please explain.

Please refer to the above symptoms as support in answering this question.


Is a more intensive level of mental health treatment being considered?

MENNINGER000777

Yes, throughout our doctor patient relationship and our weekly appointments, I am always evaluating for adequate and appropriate treatment setting. Lisa has attended partial hospital program when safety became an issue and continues to participate an outpatient care. Mental healthcare is built upon the least restrictive setting that is clinically appropriate and is in constant flux.

What is the estimated date for improvement in condition: unknown.

MENNINGER000778

Addendum: UNUM
Attention Debbie Smith, RN
Patient: Lisa Menninger
Claim Number: 15263333
Policy Number: 501313

How is return to work integrated into the patient's treatment plan?

At this point in time and considering the last year of back and forth conversations with her employer without resolution, several medication trials, hospitalization, gastrointestinal distress, weight loss, suicidal ideation, marked restriction in daily activities, difficulties in maintaining social functioning , repeated episodes of decompensation and marked difficulties maintaining concentration, the potential risks of returning to a hostile and unforgiving work environment outweigh the potential benefit to the patient.  Therefore, the treatment plan is focused on safety, setting, reduction of symptoms, continued therapy and medication management.

If you have concerns regarding return to work as it relates to current psychiatric symptoms, please detail.

Yes, I have significant concerns and therefore will not be recommending return to work at this time.  Lisa continues to struggle with the biological sequelae of her neurobehavioral disorders which include social anxiety disorder and panic disorder with agoraphobia.

This includes increased muscle tension, tachycardia, diaphoresis, appetite suppression, weight loss, autonomic hyperactivity, difficulty speaking and chronic fear that others will notice her symptoms. These active, frequent and intense symptoms have restricted her ability to leave her home and participate in her family life without many accommodations and restrictions.  She continues to push herself and has made significant gains (attends therapy once a week in persons vs remotely, picks up her daughter from school) continues to struggle with leaving the house to shop, buy groceries or exercise secondary to risk of running into others.  The back and forth with her employer contributes to increase in symptom severity and frequency and makes it difficult for her to make substantial therapeutic gains.

Would your patient be able to perform the same occupation with a different supervisor, department or employer.

No

If not, please explain.

Please refer to the above symptoms as support in answering this question.

Is a more intensive level of mental health treatment being considered?

MENNINGER000779

Yes, throughout our doctor patient relationship and our weekly appointments, I am always evaluating for adequate and appropriate treatment setting.  Lisa has attended partial hospital program when safety became an issue and continues to participate an outpatient care.  Mental healthcare is built upon the least restrictive setting that is clinically appropriate and is in constant flux.

What is the estimated date for improvement in condition:  unknown.

MENNINGER000780



MICHAEL J. EVERSON, M.D.

## Psychiatric Evaluation

Patient's Name: _Lisa Menninger_    Date: _4/27/11_

Date of Birth: _███ 68_    Chronological Age: _42_    Gender: _F_

Reason for Evaluation: _Anxiety_

## History of Present Difficulties:

_Anxiety → Problem since childhood._
_Panic attacks 2⁰, fearful..._
_fears of Public speaking, social contact,_
_worry about everything, ... Anxiety_
_..._ _Anxiety is chronic +_
_daily. Sleep generally 6/night._

_..._ _history of depression - ⊘ x 7-8 years._

_Stress → 3 y/o child - husband..._

**Current Symptoms:**

**Mood Disturbance:**

| | |
|---|---|
| _✓_ Depressed or sad mood most days | ____ loss of energy |
| ____ irritability | ____ decreased concentration |
| ____ feelings of worthlessness or guilt | ____ thoughts of death |
| ____ SI/HI ____ >2 weeks ____ >3 months ____ >6 months ____ >1 year | |
| ____ anhedonia | ____ appetite change increase / decrease |
| ____ sleep change increase / decrease | ____ psychomotor agitation / retardation |
| ____ period(s) of irritable, elevated or expansive mood | ____ grandiosity |
| ____ more talkative, pressured speech | ____ racing thoughts |

MENNINGER001132

NAME:_____

____hypersexuality                                              ____mood lability

____symptoms vary day to day ___present 4 or more days ____last for > 1week

____numerous episodic mood fluctuations lasting at least 2 years ____3 or more episodes in a year

**Anxiety:**

____excessive anxiety & worry resulting in                  ____symptoms of increased arousal
      impaired functioning

____obsessive thoughts. Ego dystonic ____yes ___no.        ____compulsive behavior

____flashbacks                                              ____intrusive thoughts or recollections

____nightmares                                              ____avoidance of associated stimuli

____dissociative episodes

____history of trauma. Duration of symptoms ____2 days-4 weeks ____>4 weeks

____panic episodes, frequency _____

____Anxiety about being in places/situations from which escape may be difficult

____excessive anxiety about an number of things, most days, for >6 weeks

____marked fear of social situations in which embarrassment may occur

**Thought Disturbance:**
____hallucinations                                          ____delusions

____ideas of reference                                      ____thought disorganization, speech disorganization
____negative symptoms

____associated with mood disturbance. Symptoms in absence of mood symptoms ____Yes ____No.

## Past Psychiatric History:

## Past Medication:

MENNINGER001133

NAME:_____

**Past Medical History:**

Primary Care Physician: _____

Illnesses:_____

_____

_____

Surgeries: _____

Traumatic Injuries/Head Injuries/Seizures:

_____

Medications (prescription, OTC, herbals):

Valium 6. gd PRN

ALLERGIES: _____ PCN _____

**Social History:**

Lives in OP, HS c fam.

Hobbies → exercise, movie, arts 3 y/o child

Resides with: Spouse____ Alone____ Other____

Marital status of patient: ____ Married ____ Years ____ Divorced ____ Year ____ Single

Number of marriages____ Duration(s)_____

Abuse_____

Legal_____

Highest level of education: SABA → 8

Employment: Pathologist -

Tobacco: _____

Alcohol Use: rare

Drug Use: _____

Family History: Mom's side ? anxiety

father → was convicted

MENNINGER001134

3

NAME: _____

**Mental Status Examination:**

**Appearance:** ____ Appropriately dressed and groomed.

____ Other _____

✓ No grossly apparent facial or physical abnormalities

____ Other _____

✓ Calm and cooperative _____

____ Other _____

✓ No Tics, tremors, or AIMs

**Psychomotor Activity:** ✓ Normal ____ Agitation Present ____ Retardation Present

**Coordination:** ____ No fine or gross motor deficits noted.

____ Other _____

**Speech:** ✓ Normal rate, volume, tone, and articulation.

____ Pressured ____ Soft, muted ____ Abnormal rhythm ____ Poor articulation

____ Stuttering ____ Echolalia ____ Monotone

____ Other _____

**Orientation:** ✓ Person ✓ Time ✓ Place ✓ Circumstance

**Cognition:** Concentration ____ Good ✓ Adequate ____ Poor

Immediate, recent, remote memory ✓ Intact ____ Other _____

Vocabulary ____ Large ✓ Adequate ____ Poor

Fund of knowledge ✓ Adequate ____ Poor

**Mood:** ____ Good ✓ Fair ____ Depressed ____ Anxious ____ Other _____

**Affect:** ____ Full Range ✓ Bright ____ Constricted ____ Blunted

____ Flat ____ Anxious ____ Angry ____ Sad ____ Other _____

____ Appropriate for circumstance ____ Other _____

**Thought Process:** ✓ Logical and sequential ____ Circumstantial ____ Tangential

____ Other _____

**Thought Content:** ✓ Denies / No Evidence of Hallucinations or Delusional thought

____ Other _____

**Judgement/Insight:** ____ Good ✓ Fair ____ Poor ____ Grossly Impaired.

**Dangerousness to self and others:**

✓ No history of aggressive behavior toward others

✓ Denies homicidal ideation, intent, plan

✓ No history of suicide attempts

MENNINGER001135

NAME: _____

___ Denies current suicidal ideation, plan, intent

**Diagnostic Impressions:**

Axis I: _____

Axis II: ___ No Diagnosis

___ Deferred

___ Other _____

Axis III: _____

Axis IV: ___ Problem related to primary support group ___ Problems related to social environment ___ Educational Problems ___ Occupational Problems ___ Housing Problems ___ Economic Problems ___ Problems with access to health care ___ Legal problems ___ Chronic Physical or Mental illness ___ Other _____

Axis V: ___ Current GAF ___ Highest in past year

**Treatment Plan:**

① _____

② _____

Return visit scheduled: _____

*The rationale for the utilization of the above medication was explained along with potential risks and benefits. Alternative treatment options were discussed. Potential side effects were reviewed. The patient verbalized an understanding of this information and was given the opportunity to ask questions. Informed consent was given for the medication trial*

The patient was encouraged to call at any time should questions, emergencies, or other difficulties arise.

_____
Michael Everson, M.D.

Time Spent in Evaluation: _____

MENNINGER001136

5

# Psychiatry Progress Note

**Patient Name** _Lisa Menninger_     **Date** _4/5/11_

Psychotherapy ☐     Med Management ☑
Time In                    Time Out _18_

**MSE**

**Current Medications**

Valium 5 BID prn
Celexa 60 1c
Celexa 40 2d     Ambien CR 12.5

**Comments**

More Sx's to the
medication → ↑
headaches, more stress

Off most of the medication
for a long time (~8 months)
Generalized anxiety symptoms
returned so back to Celexa
40 mg a day. She does

**Grooming:** ☐ *Good* ☐ Fair ☐ Poor

**Cooperative:** ☐ *Yes* ☐ No

**P-Motor Activity:** ☐ *WNL* ☐ ↑ ☐ ↓

**Eye Contact:** ☐ *Good* ☐ Fair ☐ Poor

**Speech:** ☐ *WNL* ☐ ↑ ☐ ↓ _____

**Delusions:** ☐ *No* ☐ Yes _____

**Hallucinations:** ☐ *No* ☐ Yes _____

**Ideas of Reference:** ☐ *No* ☐ Yes _____

**Suicidal Ideation:** ☐ *N* ☐ Y ☐ Plan ☐ Intent

**Homicidal?** ☐ *No* ☐ Yes

**Mood:** ☐ *Euthymic* ☐ Depressed ☐ Other

**Affect:** ☐ *Full* ☐ Dysphoric ☐ Euphoric ☐ Labile
☐ Bewildered ☐ Blunted ☐ Constricted
☐ Irritable ☐ Flat ☐ Other

**Cognitive:** ☐ A & *OX3* ☐ Other _____

**Memory:** ☐ *WNL* ☐ Impaired →
☐ Imm ☐ Recent ☐ Remote

**Intellect:** ☐ *WNL* ☐ ↑ ☐ ↓

**Abstraction:** ☐ *Intact* ☐ Concrete

**Concentration:** ☐ *Intact* ☐ Impaired

**Insight:** ☐ *Intact* ☐ Impaired

**Judgment:** ☐ *Intact* ☐ Impaired

feel getting ____

**DIAGNOSIS**

Axis I _____ GAD / Social anxiety _____

Axis II _____

Axis III _____

Axis IV
- [ ] Problems with Primary Support Group
- [ ] Problems related to Social Environment
- [ ] Educational Problems
- [ ] Occupational Problems
- [ ] Housing Problems
- [ ] Economic Problems
- [ ] Problems with Access to Health Care
- [ ] Problems with Legal System/Crime
- [ ] Chronic Degenerative Disease
- [ ] Other _____

Axis V

GAF Present    10  15  20  25  30  35  40  45  50  55  60  65  70  75  (80)  85  90  95  100

GAF Last Year  10  15  20  25  30  35  40  45  50  55  60  65  70  75  80  85  90  95  100

**Plan**

Medication    ☒ No Change  ☐ Change    ☐ Labs _____

Psychotherapy? ☐ Yes Therapist _____    **Goals**

- [ ] The rationale for the above medication was discussed with the patient.
- [x] Possible common side effects of medication were discussed with the patient.
- [ ] Written information about medication was given to the patient.
- [ ] The risk/benefit ratio of medication was discussed with the patient.
- [ ] The option for treatment without medication was discussed with the patient.
- [x] The patient verbalized understanding of the treatment plan and agreed to treatment.
- [x] The patient understands he/she may call at any time prior to the next appointment with questions or concerns, and if an emergency arises.

**Risk Assessment** (Leave blank if no change from last visit) Rating scale: Highest (5) to Lowest (1)

Probability of remaining in OP treatment vs need for higher level of care:   5   4   3   2   1
Capacity to comply with medical advice:   5   4   3   2   1
Would patient benefit from managed care program of free supportive f/u calls?   _____ Y   _____ N
Primary Care Physician contacted/aware?   _____ Y   _____ N

Return _6-12 months_ Length _____ Signature _____ Date _____

Patient Name _____

Form by Steven D. Segraves, M.D. (Revised 5/04)
MENNINGER001138
REORDER 0409727

JA2126



**PSYCHIATRY ASSOCIATES**
# PAKC
**OF KANSAS CITY** ·

Patient: **Lisa Menninger**
Date of Birth: ████ 1968
Date: 07/30/2015 06:57 AM
Visit Type:
Provider: **Michael J Everson**

Encounter Details:
Medication:

| Brand | Dose | Sig Desc |
|---|---|---|
| VALIUM | 5 mg | take 1 tablet (5MG) by oral route 2 times every day |

## Psychiatric Evaluation

**Date of Birth:** ████ /1968
**Age:** 46 y/o
**Gender:** Female

## HISTORY OF PRESENT DIFFICULTIES:

The patient presents for anxiety. She has had anxiety sicne childhood. Last seen at PAKC 3 years ago. She has been using the valium PRN. She has a lot of stress at work. She will move for a new job. She has been off the celexa for about 1 year or more. She does not use the valium much - except for presentations.

Current Stress: new job

## PAST PSYCHIATRIC HISTORY:

Psychiatrist: PAKC
Psychologist: None
Inpatient Hospitalizations: None
Suicide attempts: None

MENNINGER001139

JA2127

Past Medications:

**PAST MEDICAL HISTORY:**
Illnesses: None
Surgeries: shoulder
Medications: Valium  PRN,
Allergies: PCN

**SOCIAL HISTORY:**
The patient lives in OP, Ks with family.
Marital status: Married
Highest level of education: Medical school
Employment: Pathologist
Substances: Occ alcohol

**Family History:**
Anxiety on mothers side

**Mental Status Exam:**
Grooming: Fair
Psychomotor activity: Within normal limits
Cooperative: Yes
Eye contact: Good
Speech: Within normal limits
Delusions: None
Hallucinations: No
Ideas of reference: No
Suicidal ideation: No
Homicidal:  No
Mood: Some anxiety
Affect: full
Cognitive: Alert and oriented x3
Memory: Within normal limits
Intellect: Within normal limits
Abstraction: Intact

MENNINGER001140

Judgment: Intact

**Diagnostic Impression:**

**Axis I**: GAD

**Axis II**: defer

**Axis III**: None

**Axis IV**: n/a

**Axis V**: 60

**Treatment Plan:**
Continue valium 5 mg BID PRN.  The side effects of the medications were discussed in detail and they will call if there are any problems.

**Return Visit**: PRN

**Time Spent with Patient**: 30 minutes

The rationale for the utilization of the above medication was explained along with the potential risks and benefits.  Alternative treatment options were discussed.  Potential side effects were reviewed.  The patient verbalized an understanding of this informatic and was given the opportunity to ask questions.  Informed consent was given for the medication trial.

Psychiatry Associates of Kansas City, PA
8900 State Line Road Suite 380, Leawood, KS 66206

Electronically signed by Michael J. Everson MD on 07/30/2015 01:24 PM

MENNINGER001141

Get more visibility
① Candidate Lab Ops - Narine
     Worked for Quest

1/6   Slides we prepared discuss c̄ team

ISO --15189 EU
Reorg. on site head for US confid. for now
Chris Clendening -

Hacene

Updating CQ

1/9  Pat call:
    Goals - increase interaction for K + Katie
                         Methal - Seattle
✗ China                Cell Netix
              Town Hall - last week Feb.
Mid. Feb. -      NH

MENNINGER001142

**JA2130**

MENNINGER001143

1/15/18

Hacene call:
Need to speak to further

3:09 → 5-10 min
Find a better place to speak (backgroud noise)
"I Had no idea"
"Was sorry to hear that"

Travelling to PP today + then some other labs

Ack. the situc
① what it means from a bus. pers.
② Share c̄ Jerry or Chad ↳
medical doc. to forward
Travel o client
☆ make sure we act in right
way
☆ Chad Share c̄ Chad
Respect PPD 1:1

Soone bit this week
Take it easy business
some reg. of position
discuss further
obviously travel need to take
into account

Prob Wed connect

SLT

MENNINGER001144

**JA2132**

MENNINGER001145

1/15/18 Notes from recording

First of all, I acknowledge the situation, the condition

I think probably what I'd like to do is to discuss it further on what it means from a business perspective.

What is it that you could do? and ? counts + whether that has any impact, that's one.

And two, the right thing to do is to share with Jerry or Chad and any medical documents that you can forward to Chad or Jerry, that would be the right thing to do.

And two for travel and client perspective ~~then that~~ I know that is really unfortunate but again, this is a situation that you have and that I need to recognize that and make sure that we act in the right way ~~for~~

I stated that I ~~love~~ am committed to PPD. I love my job. I love the company. I wish this was something I could control. It's really hard. I'll reach out to Chad and share my medical records + go from there.

*Unfortunately this is something I can't control. It's making me feel kind of shaky right now?*

Once again, that's really unfortunate. Let's see what we can do. I'm sure he has some ?

MENNINGER001146

**JA2134**

MENNINGER001147

I think it will probably be business as usual. I know there are some requirements from your position perspective, + what we could expect from that. And we'll see, with Poluru as well... and I'll discuss further with you once I'm in my office on what we can do. Obviously with your travel and things like this, we have to take that into ~~consideration~~ account as well.

I will connect with Chad if you don't mind I'll give him a call. You can expect that conversation with him. He will tell you the right thing to do.

I'm sure you and your Dr. will work on what's possible + what's not and that's fine.

Will connect with me probably Wed. + we can discuss again.

MENNINGER001148

MENNINGER001149

Hacene Meeting 2/5/18

Korea — no competitors there yet

Business goals for 2018 ?
    Objectives for lab
Set up: Meeting with Esther, ~~Isaac~~, Hacene, Bevan
Invite

Email Poluru responsibilities / Comm. to supervisors
List                            hold off for now

Goals for me 2018 - 3-4 create this week

MENNINGER001150

MENNINGER001151

Asked how I was doing & since they last time we spoke. Stated that he was sharing with me the next steps on the email that I sent him. & the he was glad things were moving in the right way to support me.

I stated that its hard for me to talk about. and that I'm getting some treatment. I worked with Chad to get all of the documentation that he needed.

Felt anxious and stated that this is the one topic that makes me feel really anxious. I feel better that I'm getting help and trying to be open about it regarding my work situation. I'm looking forward to working with you and Chad to work out something that will be the best for PPD and me and still allow me to contribute to the level that I feel like I can.

~~His expectations:~~ Had a follow up conversation with Chad about the status and wanted to clarify his expectations with me.
① He wants my work as ED of Labs to be recognized ~~by others~~ at every level
   - to be more visible and more involved in the business from client meetings SLT ~~etc~~ and Town Hall presentations that I was involved in in the past and coming on site to HN lab when possible

He stated that this is the kind of thing that I've done in the past (presenting at the SLT and Town Hall) Also thought I had been part of a client meeting once on the phone + he wants to have my expertise in front of clients to present the bio strategy.

MENNINGER001152

MENNINGER001153

And to present to the sales team our lab strategy.

I stated that in the past I've had to take medication to get through some of those situations based on what I've been diagnosed with. It's very challenging and my concerns were around his increased expectations.

So that's what I think I need to work with my physician and HR on. But that was how I interpreted the conversation + that's what I communicated as my understanding to Chad.

He stated that he would send me an email to document what we discussed and what type of activities are with the job, but he's pretty optimistic that there will be a good follow up. Asked if my physician was involved to which I replied yes. Said that he would copy Chad on this email and specify the requirements of the ED job.

Stated that he didn't think this was a surprise from any of the other EDs in that they present at Town Halls and is part of the job description.

He wishes me the best and wants to see where we can continue to work together on finding a solution. Said ok and that sounds great.
Then brought up performance review and said that he was happy to go through the documentation and discuss if I wanted. Stated there were some expectations that weren't met and that the rating averaged a 3.

MENNINGER001154

MENNINGER001155

I stated that it would be helpful to have some specific feedback or examples so that I know what areas I need to work on. That was my challenge was that I didn't know precisely what areas I need to focus on going forward.

I then asked him if he had specific business goals that he wanted me to create for 2018. Wants me to send him what my objectives are based on what we discussed in September as a team.

APAC - If we can and it makes sense from a financial perspective we increase the test menu. If we see that there is a test or investment needed and we don't expect increased volume in the future, let's continue to send out or cont. to test in Europe or NA.

    Set up 30 min. meeting c̄ Hacene, Esther + Berrah

① Clarify what Poluru will do vs what I will do during interim period + send email to Hacene.

② Meeting invite

③ My goals 2018

MENNINGER001156

MENNINGER001157

~~Kesus~~

[redacted]

Hacene call  2/12/18

3 candidates (next week)
① Michael Wang —

② Patrick Mann — on site

③ Alex Rider —

Book Travel —

AD - ~~Native~~ Narine
Quest
   Move ahead ?
   Not finalized

✱ ✓Send goals to Hacene
  Discuss ā Chad Polura / Sup.
         No broad announcement
✓Book travel

MENNINGER001158

MENNINGER001159

Talking points ~ Poluru role change

Job Addendum
    L

Hacene  Call  PR discussion   2/16/18

~~Marketing~~ ~~Call~~
Propose  1:1 call c̄ Esther

Share 1:1 PR  Face-to-Face

✱ ~~Cytogenetics~~ ~~Celgene~~  ~~Hole~~
   Cytology - CCF - ~~Celgene~~ Abbott
✱  No NY sites, so no issue

   ✱ Cytogenetics - Celgene →PPL

MENNINGER001160

**JA2148**

MENNINGER001161

My notes right after 2/28 meeting with Chad and Nacene

- Implied it would be temp. (e.g. few months)

Consulting / Package as options (no details) Exit medical leave?

Kept stating that cats. are part of JD I stated th. I cou p<sup>d</sup> all resp. in cats. just formal PP pres. would → P.A.s Dinners, etc. ∅ P.A.'s

Stated that they didn't want me to do st aq wh. M.D. stat. I cou do. Me.: She did not st. I couldn't do. wanted to find creative ways to accom. Stated that they did. not want me to be medicated + for st to happen

Want to speak F+F again before I leave Stated that we're just having a discussion + that nothing has been decided.

I asked if they would list the specific tasks that are expected w/in the cats. (e.g. PP presentations) as lumping everything together isn't factual in terms of what I'm able to do w/in triggering P.A.s

Nacene Stated that he would not want me to affect my health or go against my doctor's ~~~~~~~~~ by having to medicate to get through the presentations. They brought up other activities, i.e., lg. client calls, groups, unplanned, unexpected. all of which I stated would not → P.A. if it didn't involve formal pres. + that I current do + can do w/o any issue.

"The business is bigger than all of us." "I like you as a person ... not personal." I stated that I do not want to leave PPD

MENNINGER001162

**JA2150**

Also stated that there are things I do in the that
other EDs don't do & visse versa even though
we have the same JD

Wacene asked me to consider the options that Chad
presented.
Stated that they're not trying to force me out.

Stated that they didn't want to hurt my reputation
(not sure what that meant)

Sta

Doc.

MENNINGER001163

Bringing instruments in to APAC
Ampliprep — F/u with Poluru
in APAC (SG)
    F/u with Esther on staff + Ampliprep

China — vol. ↑
    someone on leave, need MT support - open
    recruiting

"How are you?"  Stated that I'm doing well
& continuing with appointments with my
                                    doctor

Narine — Mon.
① — off report to Hacene
    Director, Lab dotted line to me
    Work ē team locally
        & closely with Lorraine

② Sara, Matt, Ronnie report to her
    → Josh

Chad

Global
AP
Reporting
to me

Patrick Mann — selected by team
    pathologist - finishing fellowship
    Finalizing available in July
    HN          to start

    Hacene to join 1:1 ō me + Lorraine tomorrow
        to discuss Narine
Need to support APAC team
New award-Sanofi. — cont. strategy to ↑ capabilities

MENNINGER001164

MENNINGER001165

BMS – email send email
IT – with Hacene
    sum. PA, CA
      from

David Berro –
GR
when finalize data review
Els
data review

Narine's objectives: Think of lab objectives
    Dec. Strategy              Finance
    ↑ authorizations           quality
    Client interactions
    Support lab in US
    cost /rev              And stated that
    Me/Lorraine share     he clearly comm.
                          in his email & the
                        → announcement went
                            that out.

Hacene kept misunderstanding my question
about clarifying Narine's role with respect to
Poluru's sections. He kept interpreting that
I was asking ~ reporting structure. I
tried to clarify that I was asking ~
admin. type functions that Meredith
used to cover. & relationship to Poluru as
acting CAP/CLIA Director for US.
                He stated that he would follow
        most    up ~ P. Mann to see if qualified to
            cover flow. I mentioned that it was still
        a compliance gap.

MENNINGER001166

MENNINGER001167

Hacene 1:1 Call 4/9/18

p. 2

Third p.m.

What applies to 6R vs. other data
Follow - up
Hacene Look ok

① Table of preventive action
   no names listed

②️ Table Plausibility                    Table
                                          Preventive actions
                                          when
                                          bullets

③ Re-write follow - up
   Refer to table 3                       Conclusion of
                                              6D errors

                        does not see us   Re-write F/U
Goals:          want to see               action to make
stated          any more issues           more clear
that he   ① * Lab quality    like 6R, BMS, MSP
will send
an email  ② Working with sales  - Asked to be invited to
regarding   + other dept.           meeting
          "Lack of decision-making  related to lab strategy
          "Show leadership"   ⌣  Did not give any specific
Next  ③ "Act as the leader"     examples  referred to 360°
P.S.:     What are the successes / taking over   review
          ____                                    in Dec.

          Email on Patrick - can share c̄ supervisors
        * Keith / Karen  "fine with that"
          Team                                   any update
                          Asked if the   MENNINGER001168  ns
                          on Ps flows qual. fications
                                          N: still checking
                                              into that

MENNINGER001169

Mentioned that I should be part of meetings with Chris Fikry + show leadership on those calls (I stated that I'm happy to do that but need to be invited to them)

Always speaks in generalizations & gives no specific evidence of what I need to improve upon (e.g. decision making)

Wants me to change my goals - ask if he could provide specifically what he wants me to include

MENNINGER001170

MENNINGER001171

Hacene 1:1 Call 01 MAY 2018

Set tone of meeting
goals 2018

At our level can't go into much detail

proactively
Write goal to eliminate lab issues

Referred to First email bullet that
I should could provide more granularity)
Will not provide specifics related to
how I should adapt my goals

My responsibility
not his

Stated that we do this
day in day out but are
happy to expand of these
goals



MENNINGER001172

MENNINGER001173

May 7, 2018 1:1 Hacene

Adopt my goals

GR issue eliminating
BMS
BSK

Doesn't ~~happen~~ want issues above to happen anymore

Wants me to update my goals to make more precise

Can we have a conversation with HR

Reach out to Chad to discuss adding meeting to discuss goals

Stated that I felt there was a disconnect between Hacene & I in that I highlighted in my email how I was addressing his concerns & am not clear on how we would like me to expand on them. Does he have any examples that he can share from other team members so that I could get a better idea of what he's looking for. Hacene sugg. a team SLT Meeting to discuss. Stated that I would be more comfortable with having the discussion with Chad + the 2 of us to ensure that we're aligned and following the CI's approach.

*[left margin, sideways:]* Hacene still will not give me specific examples + is asking me to provide that granularity + send to him

Gave update on YF situation
Recruiting for APAC candidate
He updated about Neogenomics expanding into APAC for AP.

MENNINGER001174

MENNINGER001175

SMART Goals

Specific
Measurable
Achievable (agreed, attainable)
Relevant (reasonable, realistic, + resourced, results-based)
Timely

Hacenc goals that support clients, quality

"Perception"

Me: Is there any evidence
bec. I do these activities
each & everyday.

Will expand more
details to existing goals
more examples
      SciTech

Mentioned 360 Feedback & said they couldn't
provide specific examples for confidentiality
reasons. Asked for evidence as that would be from
Chad: "A lot of critical items"    their perspective

Stated that I'm not aware of any
process that can completely eliminate
error (Chad suggested to "state minimize" instead)
                            Proactive.

I gave ex of POS project being "proactive"
not reactive (GD was reactive not)

Asked
if there
if any
is any
evidence
that I'm
not doing
these things

Refer
to email
+ re-state
what I'm
already
doing

Send update list of expanded
goals to Hacenc/Chad.
Work on this weekend
Incorp. GR prevent measures
AP
SciTech

MENNINGER001176

**JA2164**

MENNINGER001177



Accomodate.

PP present

These are not MD restrictions
Belie
Chad: Not going to provide additional
detail?

Deb, Hacene, Chad
Send to Chad
goals

I kept trying to steer the discussion back
to providing specific tasks so the we could
have a productive dialogue around possible
accom. Chad kept trying to change the
subject to talk about goals.
I stated that Im fine with adapting my
goals per our earlier discussion & would
work on a draft to send to him over the
weekend.

We also discuss areas where there are compliance
gaps, strategy for recruiting doctoral level sci.
Lab of transparency from Hacene about MENNINGER001178 ing
candidates & not including me in process. Lack of

MENNINGER001179

forwarding invite to me for any recurring sales meetings when he said that he would on 2 sep. occasions (1 when I was onsite, & belive the other was during a 1:1 call)

Felted target by Hacene since disclosing my disability.
Issues have been occuring across mult. depts since I started at PPD, but Hacene only started documenting it as an issue with me after I disclosed my disability

Chad focused on "bid defense" I stated I had not presented at trade shows etc. Yet via webex

Stated that I'm not doing well as a result of whats transpired since disclosing my disability

Chad acknowledged the job descriptions are at the same level (ED) but our responsibilities are different

Doctor sent rec. for accom, not restrictions directly to Chad ~~to~~ per his request

Chad said that I sent them to him as well (need to check)

Chad asked if Hacene had conversation with me about ~~screening~~ candidates due to my taking over recruiting workload. I stated that I never ~~ask~~ mentioned this being an issue with respect to workload. Last year I would find cand. who were tech. qual, but that Hacene felt was not a good fit for PPD. We decided to let him screen first & send any prospects to me for the technical review & interview.

Restated that I can perform all essential ~~duties~~ of JD w/ or w/o reas. accom. Certain things like PPD pres.

MENNINGER001180

**JA2168**

MENNINGER001181

are challenging due to my disability. This is an example of a specific task that triggers panic attacks I need to know clear what tasks are expected in the categories 2-4 that Hac. listed in order for doctor to provide addit. suggest. recom.

He said she should state what tasks I can & cannot perform. I stated again that she did not provide any restrictions but she needs to know what the specific tasks are that PPD expects of me in order to provide recomm.

Chad kept implying that I needed to get a medical release from her.

Also mentioned that performance should be based on facts & objective evidence rather than perceptions of others who I may not work closely with. Hacene is only getting their perspective & may not know full context Asked for specific example & that said they could not disclose for confidentiality reasons. Mentioned that I hardly interacted with Hacene (cancelled many 1:1s & freq does not respond to emails) Stated that I don't think he fully knows what I do day in /day out. And mentioned that when I sent him a list per his request he never responded to it or discussed it with me.

*360 review*

Stated that I am "proactive" & they should now assume that I'm not with data/evidence or from others perceptions. The need to also provide specific examples if they have that belief

MENNINGER001182

MENNINGER001183

Also mention that I was concerned about confidentiality & if anyone other that Chad, Harene, and Deb knew about my disability. Chad said he had not disclosed to others & that that would be a violation.

Had concerns that I was being singled out since disclosing disability even though issue happen in other depts. of sr. leaders as well. I do not have evidence since I'm only see emails that I'm included on.

Also mentioned that I can't take PTO out of fear / no backup
Chad said that I could and encouraged work-life balance

MENNINGER001184

MENNINGER001185

Hacene Call 1:1   5/14/2018

What could have been done to prevent
                                      GSK issue?
Focus on GSK

① Make sure Poluru on top of issue
   clinical significance on neg samples

F/U
for   ② Other samples involving correct SM
Wed
SLT
     Josh other studies storage communication

     Fett

Need
to    VNV
know
root
cause!

          GSK
     Chris Draft Report Today → Clinical Team

     Tested w/in ? days
     Pos samples look good
     Neg. "    NG tested ok → -70C

     Pass drool → -70
202  Nasal samples kept at 4°C
     Saliva
     Manual process      Action Items:
                         Means reporting times
                         Reci

MENNINGER001186

MENNINGER001187

Deb B. Call  5/15/18
↳ 7 areas that she's looking into

① Recruiting changes

Emails → tone

Clerical

Stated that I felt like they were
trying to force me out (Nacene + Chad)

~~She~~ Deb kept asking about the 360 dis.
+ was it linked to performance review)
State we went through pos. + opp. for
improve ? ex for dec. Nac. expect ↑ client
vis. + form PP pres → disclose disability

Did I com. that I was overwhelmed
implying that's why I was taken out
of loop for recruiting (I clarified)

Talked at length ~ rec. for accom. / specific
tasks - Deb said I should know what those
are Nacene can add to those

Said I felt like I was being forced out
since disclosing disability

Deb ~~statt~~ asked/said, but didn't Nacene mention
expect. client meetings /pres. before I disclosed
disabil. in Dec. Yes → disc.

✓ Send emails showing change in tone

MENNINGER001188

**JA2176**

MENNINGER001189

5/16

Chad, Chris, Hacene

Lab FTE/Vol.

Chris staffing
    Fine with staffing right now

Andy - Future microbiology proj. current GSK studies

① NY reg.    Micro
            Flow cytometry    to Chad        Discussed
                                            compliance
    Aug. First week HH                      gaps
    July                    See how it goes w/ Pd.
                            CC exam
                            Hacene - checking of
                            Patrick's certifications in
                            progress

Agreed to visit 1st week Aug.    Ck c Poluru +
                                            Miriam
Brussels in July for Gap Assessment

Meeting on F/u on
to email I
sent
re: compliance

MENNINGER001190

**JA2178**

MENNINGER001191

Deb F/U Call 5/22/18

Did not find any discri ~~evid. of~~

Performance Events double in lab
GSK
Client visits - Job D. require

Recruiting not a related to disability
accom.

Hacene
Lorraine

Brought up
to GSK
CAPAS

① Meeting
Dec about
reporting
he said
she said

Will not share evidence
no correlation found

② Sales meeting not decided by Hacene
per Deb — by Andy + Chris Fikray (spike
on oct
my direct
reports
was
invited
Lorraine

Stated that I was disappointed
+ could she share in writing how
she drew her conclusions

Ask if I've seen trending in lab
quality events
Only received an email on 5/15

Quality Events should not be punitive
per IDO of people won't report them
out of fear

Said the events data needs to be normalized
to vol. using six sigma or percents as an
example. Also pointed out that I asked
for qualified staff as ~~were~~ b we are not
in compliance

MENNINGER001192

**JA2180**

MENNINGER001193