# No. 23-2030

In the

# United States Court of Appeals

for the

# First Circuit

**Lisa Menninger,**

*Plaintiff-Appellee*,

**v.**

**PPD Development, L.P.**,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
District of Massachusetts, No. 1:19-cv-11441

## BRIEF OF AMICUS CURIAE
## THE NATIONAL ASSOCIATION OF MANUFACTURERS
## IN SUPPORT OF APPELLANT AND REVERSAL

Morgan, Lewis & Bockius LLP
Stephanie Schuster
Douglas W. Baruch
Jennifer M. Wollenberg
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: 202.739.3000
stephanie.schuster@morganlewis.com
douglas.baruch@morganlewis.com
jennifer.wollenberg@morganlewis.com

*Counsel for Amicus Curiae*

## <u>TABLE OF CONTENTS</u>

INTEREST OF AMICUS CURIAE ........................................................................... 1

INTRODUCTION ................................................................................................... 2

ARGUMENT ......................................................................................................... 4

    I.    THE ADA DOES NOT REQUIRE EMPLOYERS TO HIRE TWO
        WORKERS TO DO ONE JOB ............................................................... 4

        A.    A Worker Who Cannot Perform The Essential Functions Of
            The Job Herself Is Not A "Qualified Individual." ............................. 6

        B.    A Stand-In To Perform An Employee's Essential Job Functions
            Is Not A "Reasonable" Accommodation ......................................... 11

    II.    IMPOSING A DUTY ON EMPLOYERS TO HIRE STAND-INS
        TO PERFORM ESSENTIAL JOB FUNCTIONS IS BAD POLICY .... 13

CONCLUSION ..................................................................................................... 15

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Local Union 26*,
    895 F.3d 141 (1st Cir. 2018) ...................................................................5

*Baughman v. Walt Disney World Co.*,
    685 F.3d 1131 (9th Cir. 2012) ................................................................4

*Calef v. Gillette Co.*,
    322 F.3d 75 (1st Cir. 2003)...............................................................7, 10

*Claiborne v. Recovery Sch. Dist.*,
    690 F. App'x 249 (5th Cir. 2017)..........................................................10

*Conn. Nat'l Bank v. German*,
    503 U.S. 249 (1992)..................................................................................6

*DiFiore v. Am. Airlines, Inc.*,
    561 F. Supp. 2d 131 (D. Mass. 2008)......................................................6

*EEOC v. Amego, Inc.*,
    110 F.3d 135 (1st Cir. 1997).......................................................5, 9, 13

*EEOC v. Womble Carlyle Sandridge & Rice, LLP*,
    616 F. App'x 588 (4th Cir. 2015) .........................................................11

*Exby-Stolley v. Bd. of Cnty. Comm'rs*,
    979 F.3d 784 (10th Cir. 2020) ................................................................9

*Hatchett v. Philander Smith Coll.*,
    251 F.3d 670 (8th Cir. 2001) ...............................................................11

*Hunt-Watts v. Nassau Health Care Corp.*,
    43 F. Supp. 3d 119 (E.D.N.Y. 2014)......................................................12

*Jones v. Sw. Gas Corp.*,
    2019 WL 6729314 (D. Nev. 2019).........................................................8

*Kvorjak v. Maine*,
    259 F.3d 48 (1st Cir. 2001)......................................................................8

*Mass. Mut. Life Ins. Co. v. Aritech Corp.*,
    882 F. Supp. 190 (D. Mass. 1995) ........................................................ 6

*Peters v. City of Mauston*,
    311 F.3d 835 (7th Cir. 2002) ............................................................. 11

*PGA Tour, Inc. v. Martin*,
    532 U.S. 661 (2001) ........................................................................ 13

*Sch. Bd. of Nassau Cnty. v. Arline*,
    480 U.S. 273 (1987) ..................................................................... 8, 11

*Southeastern Cmty. Coll. v. Davis*,
    442 U.S. 397 (1979) ....................................................................... 8, 9

*Thompson v. Microsoft Corp.*,
    2 F.4th 460 (5th Cir. 2021) ............................................................... 8

*Toomer v. City Cab*,
    443 F.3d 1191 (10th Cir. 2006) .......................................................... 4

*US Airways, Inc. v. Barnett*,
    535 U.S. 391 (2002) ................................................................... 11, 13

**Statutes**

29 U.S.C. § 794 .................................................................................. 8

42 U.S.C. § 12010(a)(3) ..................................................................... 13

42 U.S.C. § 12111(8) ........................................................................... 6

42 U.S.C. § 12111(9)(B) ...................................................................... 9

42 U.S.C. § 12112(b)(5)(A) .............................................................. 5, 11

**Regulations**

28 C.F.R. § 35.104 .............................................................................. 9

29 C.F.R. § 1630.2(m) ......................................................................... 7

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, the National Association of Manufacturers ("NAM") states that it is a non-profit, tax-exempt organization located in the District of Columbia. The NAM has no parent corporation, and no publicly held company has 10% or greater ownership in it.

## <u>INTEREST OF AMICUS CURIAE</u>

The National Association of Manufacturers ("NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in all 50 states and in every industrial sector.  Manufacturing employs 13 million men and women, contributes $2.85 trillion to the United States economy annually, has the largest economic impact of any major sector, and accounts for over half of all private-sector research and development in the nation.  The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.[1]

---

[1]    Pursuant to Rule 29(a)(4)(E), the NAM states that no party's counsel authored this brief in whole or in part, and no party, party's counsel, or other person (other than the NAM, its members, or its counsel) contributed money that was intended to fund preparing or submitting this brief.

## **INTRODUCTION**

This case represents a radical departure from established principles of civil rights law.  Title I of the Americans with Disabilities Act ("ADA") requires employers to make accommodations for employees with disabilities, so long as the employee is "qualified" for the job and the accommodation is "reasonable."  The district court ignored these important limitations on employers' obligations to accommodate, refusing to set aside a $24 million verdict in favor of an employee who was not qualified for the job and who demanded the patently unreasonable accommodation that her employer hire and pay *someone else* to perform essential functions of the plaintiff's job.  Reversal is necessary to ensure that employers in this circuit are not saddled with impossible obligations that Congress never intended.

 The plaintiff in this case is a high-level executive whose job required that she interact with clients to maintain and grow business.  Because her disabilities made it difficult, if not impossible, for the plaintiff to interact with clients, she demanded a stand-in—a second highly skilled worker to carry out these core job responsibilities.  Title I of the ADA unambiguously *does not* require employers to provide such extraordinary accommodations.

Employers only have a duty to accommodate employees who are "qualified"—that is, who can perform the essential functions of the job *themselves* with or without a reasonable accommodation.  That is the only interpretation

supported by the statute's plain language.  It also is consistent with decades of precedent from the Supreme Court, this Court, and other courts of appeals.  In fact, no court has ever reached a different conclusion.

That a "reader" may be an appropriate accommodation for a qualified employee does not change this result.  The ADA and implementing regulations plainly refer to readers as persons who help communicate written information to a person with a vision impairment.  Readers help such persons perform the essential functions of the job themselves; readers do not do the job for them.

Regardless, even for qualified employees, the ADA requires employers to make only "reasonable" accommodations—those that, in the typical case, are not unduly burdensome financially or administratively.  In likely every case, much less the typical case, a duty to pay two workers to perform a single job imposes an excessive, undue financial burden on an employer.  An employment structure that has two persons sharing a job designed and intended for one—in terms of payroll, benefits, seniority, opportunities for advancement, credit for new business, and myriad other issues employers administer for their workforce—would uniformly be unduly burdensome to implement and manage.  Which is to say, the accommodation requested in this case is facially unreasonable and thus not required under Title I of the ADA as a matter of law.

Finally, wholly apart from the statute's plain language and precedent, construing Title I to require employers to hire a stand-in to perform essential job functions for an employee with a disability is bad policy that would lead to perverse outcomes. Congress enacted Title I to increase employment opportunities for persons with disabilities. Yet the onerous obligation to pay two workers to do one job—at the peril of a multi-million dollar judgment—would force employers who hire persons with disabilities to choose between restructuring and eliminating jobs to the detriment of the entire workforce, including would-be employees with disabilities, or enduring the significant competitive disadvantages that such an extraordinary burden would entail.

For these reasons and others, discussed below, the Court should reverse, vacate the judgment, and make clear that Title I of the ADA does not require an employer to hire a surrogate or stand-in to perform the essential functions of a position held by a person with a disability.

## **ARGUMENT**

## I. **THE ADA DOES NOT REQUIRE EMPLOYERS TO HIRE TWO WORKERS TO DO ONE JOB.**

While undoubtedly sweeping civil rights legislation, the ADA does not require covered entities to accommodate disabilities no matter the cost. *See, e.g.*, *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) (covered entities "are not required to make any and all possible accommodations"); *Toomer*

*v. City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006) ("[T]he ADA does not seek to equalize without exception. The ADA does not require *all* accommodation at *any* cost for *all* disabilities.") (emphases in original). "[N]o legislation pursues its purposes at all costs." *Acosta v. Local Union 26*, 895 F.3d 141, 146 (1st Cir. 2018) (Souter, J.). Congress specifically limited covered entities' obligations to make accommodations in various ways.

Relevant here, under Title I of the ADA, employees need only "mak[e] *reasonable* accommodations to the known physical or mental limitations of an otherwise *qualified individual* with a disability." 42 U.S.C. § 12112(b)(5)(A) (emphases added). The emphasized terms, "qualified individual" and "reasonable," are distinct-but-related limitations on an employer's duty to accommodate an employee's disability in the workplace. *See EEOC v. Amego, Inc.*, 110 F.3d 135, 141 (1st Cir. 1997) ("Although the qualification analysis could be understood to subsume the concept of reasonable accommodation, we think it analytically sounder to treat the two topics separately."). As explained below, each of these limitations, independently, should relieve an employer of an obligation to grant the sort of accommodation requested by the plaintiff-executive in this case—that her employer hire a surrogate or stand-in employee to perform essential functions of the plaintiff's job, such as interacting with and presenting to clients.

**A.    A Worker Who Cannot Perform The Essential Functions Of The Job Herself Is Not A "Qualified Individual."**

A plain-language analysis of the statutory definition of "qualified individual" shows that an employee who needs someone else to perform essential job functions is not "qualified" for the job. *See Conn. Nat'l Bank v. German*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Congress defined "qualified individual" to mean "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."   42 U.S.C. § 12111(8).   That definition plainly contemplates that *the employee with a disability*, not someone else, is the person "who … can perform the essential functions of the employment positions."

Set off and enclosed by commas, the phrase "with or without reasonable accommodation" is a nonrestrictive clause that is "not essential to the meaning of the sentence." *DiFiore v. Am. Airlines, Inc.*, 561 F. Supp. 2d 131, 135 (D. Mass. 2008); *see id.* ("[I]t is a rule of grammar that nonrestrictive or parenthetical clauses in sentences are set off by commas."); *Mass. Mut. Life Ins. Co. v. Aritech Corp.*, 882 F. Supp. 190, 195 (D. Mass. 1995) ("[T]he sentence 'Lawyers who are charlatans should be flogged' is quite different from the sentence 'Lawyers, who are charlatans, should be flogged.' In the first sentence the relative clause, not being set

off with commas, *defines* a certain class of lawyers; the clause limits its antecedent. In the second sentence, because of the commas, the relative clause is merely descriptive, and all lawyers take a beating.") (emphasis in original). As with an interrupting parenthetical, the sentence can and should be correctly read without the nonrestrictive clause. Thus, plainly read, a "qualified individual" is "an individual who … can perform the essential functions of the employment position."

This is not new ground. The EEOC, the agency charged with enforcing Title I of the ADA, interprets the statute the same way: "The term 'qualified,' with respect to an individual with a disability, means that *the individual* satisfies the requisite skill, experience, education and other job-related requirements of the employment position *such individual* holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m) (emphases added). This Court and others recognize that "[a]n employer has no duty to modify an essential function of a job," and "[i]f *the plaintiff*, with or without accommodation, cannot perform an essential function of the job, then *he* is not a qualified individual and there is no duty to accommodate." *Calef v. Gillette Co.*, 322 F.3d 75, 86 n.8 (1st Cir. 2003) (emphases added).

As a result, this Court and others uniformly have determined that an employer has no duty under the ADA to hire someone else to perform the essential functions of the plaintiff's job. "The law does not require an employer to accommodate a

disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous." *Kvorjak v. Maine*, 259 F.3d 48, 57 (1st Cir. 2001) (cleaned up); *see, e.g.*, *Thompson v. Microsoft Corp.*, 2 F.4th 460, 468 (5th Cir. 2021) (rejecting employee's request that employer "hir[e] someone to work with [him] on a full-time basis" because that request "excused [the employee] from performing essential functions" and thus rendered the employee "not a qualified person under the ADA"); *Jones v. Sw. Gas Corp.*, 2019 WL 6729314, at *5 n.1 (D. Nev. 2019) (holding plaintiff was not qualified when she requested that her employer have "other employees cover her responsibilities or hire a temporary worker"); *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 288 n.17 (1987) ("When a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any 'reasonable accommodation' by the employer would enable *the handicapped person* to perform those functions.") (emphasis added).

Indeed, more than forty years ago, the Supreme Court rejected the argument that a person with a disability is "qualified" under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, so long as he "would be able to meet the requirements of a particular program in every respect except as to limitations imposed by their handicap." *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 1006 (1979). The Court held that such an expansive interpretation "would prevent an institution from

8

taking into account any limitation resulting from the handicap, however disabling," whereas "the plain meaning of the statutory language" shows that a "qualified person is one who is able to meet all of the program's requirements *in spite of his handicap*." *Id.* (emphasis added). The ADA's analogous provisions must be interpreted the same way. *See, e.g.*, *Amego*, 110 F.3d at 142 n.3 ("[C]aselaw interpreting the Rehabilitation Act of 1973 is applicable to the ADA.").

Title I's reference to "qualified readers" as a potential accommodation for a qualified employee, 42 U.S.C. § 12111(9)(B), is fully consistent with this plain-language interpretation. A "reader" *assists* an employee whose vision impairment prevents her from reading independently in the course of her employment. As ADA regulations make clear, "qualified readers" are one example of "effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 35.104. As an "auxiliary aid," a reader helps an employee do the job herself, rather than doing the employee's job for her. *See, e.g.*, *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 799 (10th Cir. 2020).

For instance, a qualified reader may read a financial report to a securities trader who is blind, but the reader does not decide how to interpret the information or whether to act on it. Likewise, a qualified reader may assist a law clerk with low

vision by reading aloud cases or portions of a party's brief, but the reader does not analyze the case law or make recommendations to the judge.

Here, by contrast, the plaintiff-executive did not ask the employer for an aid to assist *her* in performing essential job functions. The plaintiff requested that another worker stand-in for her and perform essential job functions, such as delivering presentations, communicating with clients, and developing new business. Put another way, the plaintiff did not contend that *she* can perform the essential functions of her job with support. She literally asked her employer to hire *someone else* to do so. That is no different than demanding the employer modify or eliminate essential functions. As a matter of law, a plaintiff who cannot perform essential functions herself is not a "qualified individual" under the ADA. *See, e.g.*, *Calef*, 322 F.3d at 86 ("An employer may base a decision that the employee cannot perform an essential function on an employee's actual limitations, even when those limitations result from a disability."); *Claiborne v. Recovery Sch. Dist.*, 690 F. App'x 249, 254–55 (5th Cir. 2017) ("[T]he ADA does not require the employer to relieve the employee of any essential functions of the job, modify the actual duties, or reassign existing employees or hire new employees to perform those duties.") (cleaned up).

### B.     A Stand-In To Perform An Employee's Essential Job Functions Is Not A "Reasonable" Accommodation.

Employers only have to make "reasonable" accommodations. 42 U.S.C. § 12112(b)(5)(A). Analyzing whether a stand-in employee is a "reasonable" accommodation leads to the same result as the analysis of whether the requesting employee is "qualified" in the first instance. An accommodation is "not reasonable if it … imposes undue financial or administrative burdens" on the employer. *Arline*, 480 U.S. at 288 n.17 (cleaned up). Reasonableness is assessed in terms of whether the request is "reasonable on its face, *i.e.*, ordinarily or in the run of cases," rather than based on unique facts specific to any employer or employment position. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002).

An accommodation that requires an employer to pay a second worker to perform the essential functions of another worker's job is facially unreasonable. *See, e.g.*, *EEOC v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 593 (4th Cir. 2015) ("[A]n accommodation is not reasonable under the ADA if it 'reallocate[s] essential functions.'") (quoting 29 C.F.R. § 1630.2 (o)(1)(ii)); *Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002) (holding requested accommodation "unreasonable because it requires another person to perform an essential function of [the plaintiff's] job"); *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 675 (8th Cir. 2001) ("[A]n employer is not required to hire additional employees or assign those tasks that the employee could not perform to other

11

employees."); *Hunt-Watts v. Nassau Health Care Corp.*, 43 F. Supp. 3d 119, 134 (E.D.N.Y. 2014) ("Plaintiff's proposed accommodation is also not reasonable because it amounts to having other employees do her job for her, and would result in Defendant having to employ two professionals to perform the job of one podiatrist."). Ordinarily, and in the run of cases, such a patently onerous obligation would impose undue financial and administrative burdens on an employer. Financially, the employer would have to pay two workers to complete one job, potentially doubling the cost of any position held by a worker with a disability. That would be an extraordinary financial burden regardless of the position, but the burden is especially pronounced in the context of highly skilled, senior-executive positions, like the one at issue in this case, that command significant compensation.

The administrative burdens would be no less onerous. An employer would face extraordinary difficulties administering a regime where two workers together perform one job—among other things, it would complicate payroll, benefits, vacation requests, bonus eligibility, and day-to-day management of the position. Take the job at issue here, which required the plaintiff to be the face of the company when interacting with clients. It would be an administrative nightmare for a company to convince its clients that they should have confidence in it when its designated representative is unable to speak with them. It would be equally difficult

to track which worker is responsible for new business—or the loss of existing business.

Moreover, whether a request is reasonable "in the run of cases" is evaluated with reference to what other courts and agencies have done. *See Barnett*, 535 U.S. at 403–04 (evaluating what other courts have held to determine whether a requested accommodation is reasonable). From this perspective, it is telling that *no court has ever held* that Title I of the ADA (or any other antidiscrimination law) requires an employer to hire a second worker to perform essential job functions that a worker with a disability admittedly cannot perform herself. Indeed, this is a perfect example of an accommodation that is per se unreasonable.

## II. IMPOSING A DUTY ON EMPLOYERS TO HIRE STAND-INS TO PERFORM ESSENTIAL JOB FUNCTIONS IS BAD POLICY.

"Congress enacted the ADA … to remedy widespread discrimination against disabled employees." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). Congress specifically determined that legislation was needed because "discrimination against individuals with disabilities persist[ed] in such critical areas as employment …." 42 U.S.C. § 12010(a)(3). "At its core, Title I of the ADA is about protecting the disabled from discriminatory employment action based on stereotypes and fear." *Amego*, 110 F.3d at 142 (citing H.R.Rep. No. 101–485, pt. 3, at 45 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 468). Perversely, construing Title I to require employers to hire a surrogate or stand-in to perform essential job

functions—or else face enormous and devastating liability, like the $24 million verdict in this case—may well achieve the precise opposite.

For example, a duty to hire a surrogate or stand-in is likely to place a company that employs persons with disabilities at a competitive disadvantage in several ways. As discussed above, such a business will have a less efficient workforce and higher costs for comparable positions than its competitors, not to mention the administrative burdens and infrastructure necessary to support a two-person-one-job structure. The same company also may offer inferior or less consistent client service (*e.g.*, by having an unknown surrogate stand in for the company's designated representative at client meetings) than its competitors.

To avoid results like these, employers may resort to restructuring jobs in ways that are detrimental to workers and employers alike. For instance, as a matter of simple economics, employers may decide to eliminate good positions, provide lesser compensation for skilled positions to mitigate the risk of paying double, or invest more heavily in automation and other alternatives that put employees out of work. In sum, forcing a two-person-one-job standard will inevitably result in lower-paying—and potentially fewer—jobs, including for persons with disabilities. There is no reason to interpret Title I of the ADA, contrary to the plain meaning of the key statutory provisions, to achieve these undesirable results that Congress surely never intended.

14

## <u>CONCLUSION</u>

The Court should reverse, vacate the judgment, and make clear that Title I of the ADA does not require employers to hire a surrogate or stand-in to perform the essential functions of a position held by a person with a disability.

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

Dated: April 15, 2024

s/ Stephanie Schuster
Stephanie Schuster
Douglas W. Baruch
Jennifer M. Wollenberg
1111 Pennsylvania Avenue NW
Washington, DC 20004
T: 202.739.3000
stephanie.schuster@morganlewis.com
douglas.baruch@morganlewis.com
jennifer.wollenberg@morganlewis.com

*Counsel for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(G), I certify that this brief complies with the type-volume limitation set forth in Rule 29(a)(5) because it contains 3,257 words.

s/ Stephanie Schuster
Stephanie Schuster
