**No. 23-2030**

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

LISA MENNINGER,

*Plaintiff-Appellee,*

*v.*

PPD DEVELOPMENT, L.P.,

*Defendant-Appellant.*

_____

On Appeal from a Judgment of the
United States District Court for the District of Massachusetts
Docket No. 1:19-cv-11441-LTS

_____

## BRIEF OF DEFENDANT-APPELLANT
## PPD DEVELOPMENT, L.P.

_____

Douglas Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4600
Douglas.Hallward-Driemeier@ropesgray.com

John Bueker
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000
John.Bueker@ropesgray.com

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendant-Appellant PPD Development, L.P., is a wholly owned subsidiary of Thermo Fisher Scientific, Inc., which is a publicly traded corporation.

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ...................................................................................v

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD.......................... ix

PRELIMINARY STATEMENT ..............................................................................1

JURISDICTIONAL STATEMENT .........................................................................5

STATEMENT OF THE ISSUES.............................................................................5

STATEMENT OF THE CASE.................................................................................6

      A.    Dr. Menninger's Tenure at PPD..........................................................6

            1.    PPD Hires Dr. Menninger to Run Its Global Central Labs and Engage in Public-Facing Business Development Activities. ......................................................................6

            2.    PPD Asks Its Executive Directors, including Dr. Menninger, to Redouble Their Efforts to Engage with Clients. ...............................................................................8

            3.    Dr. Menninger Informs PPD of Her Disability for the First Time and Requests Accommodations, Including a "Reader."...............................................................................9

            4.    PPD Grants Certain of Dr. Menninger's Accommodations Requests. ...................................................13

            5.    Dr. Menninger Accuses PPD of Targeting Her; PPD Investigates..................................................................14

            6.    Dr. Menninger Takes Eight Months of Medical Leave Before Her Employment Is Terminated...................................15

      B.    This Litigation. ..................................................................................17

            1.    Dr. Menninger Files Suit; the District Court Grants Partial Summary Judgment.....................................................17

2.      At Trial, the Parties Focus on Whether Dr. Menninger Was a Qualified Individual and Whether Her Requests for a "Reader" or "Surrogate" Were Reasonable. ...................18

3.      The Court Denies PPD's Motion for a Directed Verdict..........20

4.      Over PPD's Objections, the District Court Instructs the Jury that a "Reader" Is a Reasonable Accommodation and that the Jury Can Award Punitive Damages. .....................20

5.      The Jury Returns a $24 Million Verdict, Including $10 Million in Punitive Damages; the Court Denies PPD's Post-Trial Motions. ...................................................22

SUMMARY OF THE ARGUMENT ....................................................24

ARGUMENT ......................................................................................28

I.      PPD Is Entitled to Judgment as a Matter of Law on Dr. Menninger's Disability-Discrimination Claims.................................................................28

   A.      The District Court Legally Erred in Finding That PPD Waived Its Rule 50 Challenge to Dr. Menninger's Discrimination Claims.................................................................................29

   B.      Dr. Menninger's Discrimination Claims Fail as a Matter of Law Because Providing a Stand-In for Client-Facing Responsibilities Is Not a Reasonable Accommodation and Because PPD Set Those Expectations Before It Knew of Her Disability. ............................................................................31

      1.      Dr. Menninger Was Not A "Qualified" Disabled Employee. .........................................................32

      2.      Dr. Menninger Did Not Experience an Adverse Employment Action "Because of" Her Disability....................39

   C.      Dr. Menninger's Claims Fail Even on Plain Error Review. ..............41

II.     The District Court's "Reader" Instruction Was Erroneous and Prejudicial and Therefore Entitles PPD to a New Trial. ...............................43

   A.      The District Court's "Reader" Instruction Misled the Jury. ..............44

B.    Without the "Reader" Instruction, the Jury May Well Have Returned a Verdict for PPD on Both Dr. Menninger's Discrimination and Retaliation Claims. ..............................................47

III.    The Jury's Punitive Damages Award Is Unsupported by the Evidence and Almost Certainly the Direct Result of the Erroneous "Reader" Instruction. .........................................................................................50

CONCLUSION .........................................................................................55

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Barber v. Nabors Drilling U.S.A., Inc.,*
130 F.3d 702 (5th Cir. 1997) ...............................................................37

*Bastien v. Goddard,*
279 F.3d 10 (1st Cir. 2002)...................................................................49

*Blockel v. J.C. Penney Co.,*
337 F.3d 17 (1st Cir. 2003)......................................................30, 31, 32

*Boadi v. Ctr. for Hum. Dev., Inc.,*
239 F. Supp. 3d 333 (D. Mass. 2017)...................................................40

*Calef v. Gillette Co.,*
322 F.3d 75 (1st Cir. 2003)..........................................................35, 37

*Chestnut v. City of Lowell,*
305 F.3d 18 (1st Cir. 2002) (per curiam) (en banc)..........................42

*Cornwell Ent., Inc. v. Anchin, Block & Anchin, LLP,*
830 F.3d 18 (1st Cir. 2016)..................................................................29

*Costa-Urena v. Segarra,*
590 F.3d 18 (1st Cir. 2009)..................................................47, 48, 50

*Cox v. Corr. Med. Servs., Inc.,*
No. 06-10350, 2007 WL 2873049 (E.D. Mich. Sept. 26, 2007) .......46

*Cox v. New Eng. Tel. & Tel. Co.,*
414 Mass. 375, 607 N.E.2d 1035 (1993)...........................................35

*Dartt v. Browning-Ferris Indus.,*
427 Mass. 1, 691 N.E.2d 526 (1998)..................................................51

*Diaz-Fonseca v. Puerto Rico,*
451 F.3d 13 (1st Cir. 2006).................................................................43

*Drumgold v. Callahan,*
707 F.3d 28 (1st Cir. 2013)..............................................44, 45, 47, 48

*E.E.O.C. v. Amego, Inc.*,
  110 F.3d 135 (1st Cir. 1997)................................................................33

*Exby-Stolley v. Bd. of Cnty. Comm'rs*,
  979 F.3d 784 (10th Cir. 2020) ...........................................................46

*Gonzalez-Bermudez v. Abbott Lab'ys P.R. Inc.*,
  990 F.3d 37 (1st Cir. 2021)................................................................32

*Harris v. FedEx Corporate Services, Inc.*,
  92 F.4th 286 (5th Cir. 2024) ..................................................52, 53, 54

*Heagney v. Wong*,
  915 F.3d 805 (1st Cir. 2019)..............................................................53

*Jones v. Walgreen Co.*,
  679 F.3d 9 (1st Cir. 2012)............................................................35, 36

*Kennedy v. Town of Billerica*,
  617 F.3d 520 (1st Cir. 2010).............................................................44

*Kiely v. Teradyne, Inc.*,
  85 Mass. App. Ct. 431, 13 N.E.3d 615 (2014) ..................................51

*Krennerich v. Inhabitants of Town of Bristol*,
  943 F. Supp. 1345 (D. Me. 1996) .....................................................38

*Kvorjak v. Maine*,
  259 F.3d 48 (1st Cir. 2001)....................................................33, 35, 38

*Lattimore v. Polaroid Corp.*,
  99 F.3d 456 (1st Cir. 1996)...............................................................43

*Laurin v. Providence Hosp.*,
  150 F.3d 52 (1st Cir. 1998)...............................................................38

*Marrero v. Goya of P.R., Inc.*,
  304 F.3d 7 (1st Cir. 2002)...........................................................44, 50

*Mulloy v. Acushnet Co.*,
  460 F.3d 141 (1st Cir. 2006)......................................................*passim*

*O'Rourke v. Tiffany & Co.*,
   988 F.3d 23 (1st Cir. 2021)....................................................................40

*Pena v. Honeywell Int'l, Inc.*,
   923 F.3d 18 (1st Cir. 2019)....................................................................33

*Putnam Res. v. Pateman*,
   958 F.2d 448 (1st Cir. 1992)..................................................................48

*Sanchez-Lopez v. Fuentes-Pujols*,
   375 F.3d 121 (1st Cir. 2004)..................................................................45

*Sarkisian v. Austin Prep. Sch.*,
   85 F.4th 670 (1st Cir. 2023)...................................................................38

*Shane v. Shane*,
   891 F.2d 976 (1st Cir. 1989)..................................................................47

*Smith v. Bell Atl.*,
   63 Mass. App. Ct. 702, 829 N.E.2d 228 (2005) ..................................53

*Soto-Lebron v. Fed. Express Corp.*,
   538 F.3d 45 (1st Cir. 2008)....................................................................29

*Tobin v. Liberty Mutual Insurance Co.*,
   553 F.3d 121 (1st Cir. 2009).......................................................52, 53, 54

*Jones ex rel. U.S. v. Mass. Gen. Hosp.*,
   780 F.3d 479 (1st Cir. 2015)..................................................................31

*United States v. Pena-Lora*,
   225 F.3d 17 (1st Cir. 2000)....................................................................42

*US Airways, Inc. v. Barnett*,
   535 U.S. 391 (2002)................................................................................1

*Waters v. Day & Zimmermann NPS, Inc.*,
   23 F.4th 84 (1st Cir. 2022)....................................................................29

**Statutes**

28 U.S.C. § 1291 ......................................................................................5

28 U.S.C. § 1331 ......................................................................................5

28 U.S.C. § 1367 ................................................................................5

42 U.S.C. § 1981a ........................................................................51, 52

42 U.S.C. § 12111 ....................................................................*passim*

42 U.S.C. § 12112 ............................................................................40

42 U.S.C. § 12117 ..............................................................................5

42 U.S.C. § 2000e-5 ...........................................................................5

Mass. Gen. Laws c. 151B, § 1 (2024) ................................................33

Mass. Gen. Laws c. 151B, § 4 (2024) ..........................................33, 40

**Other Authorities**

28 C.F.R. § 35.104 ...........................................................................46

29 C.F.R. App. § 1630.9(d) ...............................................................46

Fed. R. Civ. P. 50 ....................................................................*passim*

Fed. R. Civ. P. 59 .......................................................................23, 24

MCAD Guidelines on Disability Discrimination in Employment
    § II.B ...........................................................................................35

MCAD Guidelines on Disability Discrimination in Employment
    § III.D..........................................................................................46

## <u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>

Pursuant to Federal Rule of Appellate Procedure 34(a)(1) and First Circuit Rule 34.0(a), Defendant-Appellant PPD Development, L.P., respectfully submits that oral argument will assist the Court in resolving this appeal, which arises from a $24 million judgment, including $10 million in punitive damages, awarded following a ten-day jury trial. This case presents important legal questions regarding the preservation of a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50, as well as the extent of an employer's legal obligations to its disabled employees, including whether an employer can be required, as a "reasonable accommodation," to provide a "surrogate" to perform a disabled employee's substantive work responsibilities, such as conducting client meetings.

## PRELIMINARY STATEMENT

The Americans with Disabilities Act ("ADA") and the Massachusetts anti-discrimination statutes strike a careful balance. Although they "seek[] to diminish or to eliminate" the employment barriers "that far too often bar those with disabilities from participating fully in the Nation's life," they do ***not*** "demand action beyond the realm of the reasonable." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002). If affirmed, the judgment below would upset this careful balance by effectively requiring employers to hire and pay a second senior executive to perform a disabled employee's essential tasks. This Court's precedent makes clear that the law imposes no such obligation, *see Mulloy v. Acushnet Co.*, 460 F.3d 141, 153 (1st Cir. 2006), and the judgment below must be set aside.

When PPD Development, L.P. ("PPD") hired Dr. Lisa Menninger as its laboratory Executive Director in 2015, the position's job description stated that she must "[s]upport[] [the] [b]usiness [d]evelopment [team] in obtaining new customers and maintaining [client] relationships." JA2919.[1] PPD did not know that Dr. Menninger suffered from a disability when it hired her or when it informed her in December 2017 that, because of the company's business objectives, she and her fellow executives needed to increase their focus on client-facing tasks, including

---

[1] Citations to "Add" refer to the addendum bound at the rear of this brief. Citations to "JA" refer to the separately submitted joint appendix. Citations to "Doc." refer to entries on the district court's electronic docket.

interacting directly and personally with clients.  Dr. Menninger only later informed PPD of her disability, and her psychiatrist only later informed PPD that requiring her to be more client-facing would make it "substantially more difficult, if not impossible, for [Dr. Menninger] to perform her job."  JA2941-JA2942.

The evidence at trial was unequivocal that, once PPD learned of Dr. Menninger's disability, PPD did what the law requires, and more.  After PPD provided, at Dr. Menninger's request, more details about the public-facing tasks it needed her to perform, Dr. Menninger's psychiatrist told PPD that Dr. Menninger would need another employee to perform those tasks in her stead.  Her psychiatrist referred to the other employee as a "reader" or "surrogate."  JA2587-JA2588.  What followed was the statutorily required interactive process to explore ways to accommodate Dr. Menninger's disability—in which, the district court confirmed, PPD participated in good faith.  JA74-JA75.  PPD accepted several requested accommodations, including having another employee present for Dr. Menninger at internal meetings.  PPD declined, however, to have another employee stand in for Dr. Menninger in critical client-facing interactions.  That said, at no time after learning of her disability did PPD ever force Dr. Menninger to engage in any client-facing business development.  To the contrary, PPD offered to find Dr. Menninger other roles that would not require meeting with clients.  Dr. Menninger, however, asked to postpone further discussions before taking leave, including six months paid.

PPD accommodated this request, keeping Dr. Menninger's position open until she made clear that she would not return.

This case should never have gone to a jury. Asking Dr. Menninger, in her role as Executive Director, to focus more on client-facing tasks before PPD even knew she was disabled was not, as a matter of law, an adverse employment action. Regardless, Dr. Menninger was not a "qualified" individual entitled to bring a disability-discrimination claim under the ADA or Massachusetts law in the first place. Dr. Menninger's treating psychiatrist was explicit that Dr. Menninger could continue in her position only if PPD hired someone else to perform her client-facing roles, and that asking Dr. Menninger to do so herself would be detrimental to her health. JA2582-JA2588. Thus, no accommodation would have enabled **Dr. Menninger** (rather than a "surrogate") to perform her essential job functions, and her request for a stand-in employee to perform those functions was an unreasonable request for accommodation that PPD had no legal duty to grant. PPD did what the law requires—it granted Dr. Menninger reasonable accommodations and offered to find her a different position that would not require direct client engagement. And yet, the district court not only let Dr. Menninger's claims go to the jury, but affirmed a $24 million verdict in Dr. Menninger's favor—including $10 million in punitive damages.

Compounding its erroneous denial of judgment for PPD as a matter of law, the district court gave a misleading jury instruction, which directly contributed to the unconscionable award.  At Dr. Menninger's request, and over PPD's objection, the court instructed the jury that a "reader" is an example of a reasonable accommodation.  Of course, that term as it appears in the statute from which the instruction derived refers to someone or something that merely reads *to* a vision-impaired employee, not a person who stands in *for* a senior executive to conduct client meetings and address client concerns in real time.  But it was the latter meaning—"reader" as synonymous with stand-in or "surrogate"—that Dr. Menninger's psychiatrist used in her accommodations request and that Dr. Menninger used throughout trial.  Unsurprisingly, Dr. Menninger's trial counsel seized on this ambiguity during his closing argument, telling the jury that the reasonable "reader" accommodation referred to in the instruction was the same as the unreasonable "reader" (in reality, "surrogate") accommodation that Dr. Menninger requested.  The misleading "reader" instruction therefore almost certainly influenced the jury's verdict and its punitive damages award.

The jury's award of $10 million in punitive damages is particularly egregious given the district court's own recognition that PPD had engaged in good faith in the interactive process of seeking a reasonable accommodation for Dr. Menninger's disability.  If the verdict is allowed to stand, any employer that denies *any*

accommodation request—even an accommodation that this Court has already held unreasonable as a matter of law—will be at risk of a run-away jury verdict. That is contrary to this Court's precedent and to the careful balance struck by the disability laws. The Court should restore that balance and reverse the judgment below.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a) and 42 U.S.C. §§ 2000e-5(f)(3) and 12117(a) because it asserts claims under the Americans with Disabilities Act, as well as related claims under Chapter 151B of the Massachusetts General Laws. Following a jury verdict on March 31, 2023, the district court entered final judgment in favor of Plaintiff-Appellee on May 12, 2023. Add6. The district court denied Defendant-Appellant's motions for judgment as a matter of law and for a new trial on November 1, 2023, Add11-Add34, and Defendant-Appellant timely filed a notice of appeal on November 29, 2023, JA2972. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from a final decision of a district court.

## STATEMENT OF THE ISSUES

1.    Whether PPD preserved its Rule 50(b) sufficiency-of-the-evidence arguments as to Dr. Menninger's disability-discrimination claims where it timely moved "for a directed verdict" under Rule 50(a) at the close of Dr. Menninger's case, which the court immediately and summarily denied.

-5-

2.    Whether a reasonable jury could find for Dr. Menninger on her disability-discrimination claims where PPD did not know she was disabled until after it took the only alleged adverse action against her and where the only requested accommodation that PPD denied—the provision of a surrogate—would not have enabled her (rather than someone else) to perform her essential job functions and is an accommodation this Court has held unreasonable as a matter of law.

3.    Whether, in the context of this case, the district court erred in instructing the jury that a reasonable accommodation includes the provision of a "reader," where the statute refers to a "reader" who reads material to a visually impaired employee, but where Dr. Menninger's requested "reader" accommodation referred to a surrogate employee to perform her essential job functions.

4.    Whether a $10 million punitive damages award can be sustained where there was no evidence of malice or reckless disregard, the district court found at summary judgment that PPD engaged with Dr. Menninger in a good-faith interactive process, and the district court's erroneous instruction tainted the jury's deliberation.

## STATEMENT OF THE CASE

**A.    Dr. Menninger's Tenure at PPD.**

### 1.    *PPD Hires Dr. Menninger to Run Its Global Central Labs and Engage in Public-Facing Business Development Activities.*

PPD is a clinical research organization that helps pharmaceutical companies test new drugs, research vaccines, and organize and analyze data from clinical trials.

JA264, JA1309-JA1310.   PPD's Global Central Labs division, headquartered in Kentucky, focuses on clinical laboratory testing.  JA1309-JA1310, JA1483.

In August 2015, PPD hired Dr. Lisa Menninger to be Global Central Labs' Executive Director for Laboratory Operations.  JA259, JA262.  Dr. Menninger's impressive qualifications—a board certification in pathology and over a dozen other professional licenses, JA259-JA265—convinced PPD that she would be capable of discussing complex scientific issues with PPD's sophisticated clients, which PPD had listed as an essential function of the role.  JA1228, JA1235-JA1236, JA2919.  Moreover, Global Central Labs requires several medical licenses and clinical credentials in order to operate and remain compliant, JA1311, JA1489, and PPD expects that the Labs' Executive Director for Laboratory Operations will hold these credentials.  If the Executive Director for Laboratory Operations position were unfilled, even temporarily, the Labs' business could be shut down.  JA1522-JA1523.

As the "only medical doctor who had oversight of the laboratory operations," Dr. Menninger's responsibilities were varied and significant.  JA262.  In addition to "planning, reviewing, and approving validations of new testing," JA268, Dr. Menninger was responsible for addressing client concerns and helping win new business for PPD.  Indeed, the first two "Essential Functions" in Dr. Menninger's written job description highlighted "business development," and "[s]upport[ing] [the] [b]usiness [d]evelopment [team] in obtaining new customers and maintaining

-7-

[client] relationships." JA2919. Dr. Menninger was also charged with "operational leadership," requiring her to communicate and interact with her colleagues, regulators, and clients frequently. *Id.* Dr. Menninger's written job description expressly required her to demonstrate "[e]xcellent communication/interpersonal skills with [the] ability to participate in business development activities," to "present capabilities and solutions to clients, respond to regulatory audits, prepare and present budgets/forecasts to senior management," and to have "[e]xcellent marketing and negotiation skills." JA2920.

## 2. *PPD Asks Its Executive Directors, including Dr. Menninger, to Redouble Their Efforts to Engage with Clients.*

By the end of 2017, PPD's business had stagnated, so PPD's executive management team developed a plan to differentiate Global Central Labs from its competitors by focusing on client relationships. JA1491-JA1494. PPD specifically tasked its operational leads, like Dr. Menninger, with bringing their subject-matter expertise to bear in client pitches, bid defenses, and other engagements involving public speaking and the discussion of complex scientific topics with clients, and to take a more "high touch" approach to client care. *Id.*

Dr. Menninger's boss, Mr. Mekerri, first communicated PPD's need to redouble focus on client engagement to Dr. Menninger during a meeting in late December 2017. JA310, JA313. Mr. Mekerri explained that, because of the evolving needs of the business, Dr. Menninger, like other PPD leaders, needed to

play a more "visible" role with clients. JA313, JA1287. Mr. Mekerri suggested that Dr. Menninger might be asked, for example, to present to "large pharmaceutical clients" and directly address the scientific aspects of their product concerns. JA313. When, for the first time, Dr. Menninger told Mr. Mekerri that "those types of presentations ma[de] [her] anxious," Mr. Mekerri attempted to "reassure" and "encourage" Dr. Menninger, reminding her that he had seen her successfully give presentations in the past. JA313-JA314. Dr. Menninger did not, at this time, mention her disability to Mr. Mekerri. JA314, JA2923.

### 3.     *Dr. Menninger Informs PPD of Her Disability for the First Time and Requests Accommodations, Including a "Reader."*

A few weeks later, on January 11, 2018, Dr. Menninger told PPD about her disability for the first time. JA314-JA315. In an email to Mr. Mekerri, Dr. Menninger explained that, because of her generalized anxiety disorder and social anxiety disorder, "increased client visits/social interactions and presentations (internal and external)" would "be difficult" and would "present[] some very significant challenges." JA2923. Mr. Mekerri expressed his support, *id.*, and connected Dr. Menninger with Chad St. John from PPD's human resources department, JA2625. Mr. St. John provided Dr. Menninger a "Request for Accommodation Form" and "Physician's Statement for Accommodation Form," and he told Dr. Menninger that he "look[ed] forward" to engaging in an "interactive"

-9-

process to help "identify or substantiate [Dr. Menninger's] disability" and develop "effective accommodations." *Id.*

By that time, Dr. Menninger's mental health had already deteriorated significantly. Dr. Menninger met with her psychiatrist, Dr. Marianna Kessimian, on January 22, 2018. JA2002. In her treatment notes from that session, Dr. Kessimian wrote that Dr. Menninger had not left her home in "weeks" and that her thoughts were beginning to "spiral." JA2002-JA2005. Just over a week later, on February 2, 2018, Dr. Kessimian noted that Dr. Menninger was "worried all the time," dreaded "see[ing] the people that [she] work[s] with," and had "already resigned [herself] to defeat in the corporate culture." JA2007-JA2009.

Based on these initial sessions, Dr. Kessimian worked with Dr. Menninger to complete PPD's accommodation forms. JA920, JA942-JA943. During this time, both Dr. Kessimian and Dr. Menninger consulted with Patrick Hannon, the same attorney who later represented Dr. Menninger at trial. JA956, JA959, JA981.

With Dr. Menninger's and Mr. Hannon's input, Dr. Kessimian completed the "Request for Accommodation" on Dr. Menninger's behalf and returned it to PPD on January 31, 2018. JA2941. In the completed form, Dr. Kessimian reported that Dr. Menninger "suffers from Panic Disorder with agoraphobia, Social Anxiety Disorder, and Generalized Anxiety Disorder." *Id.* Although Dr. Menninger had "tolerate[d]" job-related public speaking and social interactions in the past, Dr. Kessimian

-10-

cautioned that, if those activities became more frequent, Dr. Menninger's anxiety would increase, her somatic symptoms would worsen, and it would be "substantially more difficult, *if not impossible*, for [Dr. Menninger] to perform her job." JA2941-JA2942 (emphasis added). Accordingly, Dr. Kessimian recommended that Dr. Menninger engage in job-related social interactions and public speaking only after developing a plan "in consultation with [Dr. Kessimian] or another qualified health care provider." JA2942.

On February 2, 2018, Mr. St. John emailed Dr. Menninger for additional information to "continue the [dialogue] around exploring reasonable accommodation[s]." JA2628. Dr. Menninger told her psychiatrist, Dr. Kessimian, that Mr. St. John's email "triggered an instant panic attack" and made her realize that the "thought of face-to-face interaction with my US colleagues on any level is triggering a significant amount of anxiety/panic that [she had] been trying to avoid at all costs." JA958.

Two days later, on February 4, Dr. Menninger asked Mr. St. John for specifics about how PPD expected her to engage with internal and external clients. JA2848. On February 6, 2018, Dr. Menninger's boss, Mr. Mekerri, responded by sending Dr. Menninger a list of "specific duties" related to PPD's "commercial goals" and commitment to increased external engagement, as referenced in their December conversation, along with Dr. Menninger's job description—which listed "business

-11-

development" as the first two "Essential Functions." JA2919. In response, Dr. Kessimian asked Dr. Menninger to "start brainstorming on how [she could] contribute in a more behind the scenes fashion" and suggested developing a plan for a "surrogate to" handle "large presentations." JA981.

A week later, on February 14, 2018, Dr. Kessimian responded to PPD on Dr. Menninger's behalf. JA2586. She cautioned PPD that, because of Dr. Menninger's disorder, Dr. Menninger's "brain and body are not able to tolerate public speaking engagements / socializing." JA2587. Dr. Kessimian then proposed a series of what she maintained were "reasonable accommodations" so that Dr. Menninger could "continue to be a productive and healthy member of [PPD's] team." JA2587-JA2588. With respect to travel, Dr. Kessimian proposed that Dr. Menninger focus on visits to the Global Central Labs location in Brussels, rather than to its main location in Kentucky. JA2588. And with respect to internal PPD presentations, Dr. Kessimian suggested that PPD provide a "reader to present to the group," with Dr. Menninger "available for questions via email after the meeting." JA2587-JA2588. As accommodations for client bid defenses, client site meetings, technical sales presentations, and customer visits, Dr. Kessimian proposed that, for each task, PPD provide a "surrogate or reader," "surrogate," or "reader/surrogate" to attend meetings and answer questions based either on "real time access" to Dr. Menninger

or "problem solving / ideas" and "necessary data information" provided by Dr. Menninger in advance.  JA2588.

### 4. *PPD Grants Certain of Dr. Menninger's Accommodations Requests.*

PPD agreed, in a response provided on February 26, to provide Dr. Menninger a "designee" for most *internal* presentations, and PPD agreed to cut Dr. Menninger's travel expectations in half (even though PPD considered her regular physical presence at the Kentucky location a critical component of her job).  JA2819.  PPD could not, however, agree to accommodate Dr. Menninger's request for a reader or surrogate to attend client bid defenses, technical sales presentations, and customer visits in her place.  *Id.*  As Mr. St. John explained, it was "imperative," based on Dr. Menninger's "level" and the business's needs, that Dr. Menninger engage with clients directly and participate personally in technical presentations to gain client trust and obtain new business—especially considering the "expectation from [PPD's] clients" that they will discuss technical and scientific questions with "the people that hold . . . scientific certificates."  *Id.*; JA1515.  To accommodate this request, PPD would have had to hire a second Executive Director with the same scientific credentials and experience as Dr. Menninger, something PPD was not willing, or required, to do.  *See* JA1515.

Two days later, on February 28, 2018, Mr. St. John, Mr. Mekerri, and Dr. Menninger met in person to continue the interactive process.  During that meeting,

Mr. St. John asked Dr. Menninger to consider either transitioning to a consultant role, which would not require client-facing responsibilities, or accepting an exit package. JA340-JA341. Dr. Menninger refused. She insisted that she wanted to continue doing her job with or without an accommodation, despite her own psychiatrist's note suggesting that she could not engage with clients or colleagues without putting her health at risk. JA1154-JA1155.

As PPD and Dr. Menninger continued the interactive process, they eventually reached a temporary resolution. Although Dr. Menninger had continued to request information about the "specific [client-engagement] tasks" PPD expected her to perform, in March 2018, with no such "activities or events in the near future that would implicate [her] disability," Dr. Menninger suggested that she and PPD "table this discussion [about accommodations] until a particular task arises." JA2640. Mr. St. John agreed, reminding Dr. Menninger that PPD was "committed to an open dialogue." JA2710.

### 5. *Dr. Menninger Accuses PPD of Targeting Her; PPD Investigates.*

Two weeks later, on April 17, 2018, Dr. Menninger responded to Mr. St. John's email. She blamed PPD for "twisting [her] doctor's words and refusing to answer any of [her] questions," and she accused Mr. Mekerri of "starting to target [her] because of [her] disability." JA2709-JA2710. She also interpreted Mr. Mekerri's request that she focus her goals on the "[e]limination of [l]ab [i]ssues,

client complain[ts] and audit findings," JA2721, as an "unrealistic" demand for perfection, JA368-JA369.  Ten days later, she reported that "[t]hings with [Mr. Mekerri] [were] getting worse."  JA2709.

PPD investigated Dr. Menninger's accusations.  Mr. St. John escalated Dr. Menninger's complaint to his boss, PPD's Executive Director of Human Resources, Deborah Ballweg.  JA2743.  Although Ms. Ballweg knew about Dr. Menninger's accommodation requests and had "oversee[n] some of the exchanges" with her, she had had no direct conversations with Dr. Menninger or Mr. Mekerri.  JA751.  Accordingly, Ms. Ballweg "felt that [she] could . . . be a fair and impartial investigator."  *Id.*  During her investigation, Ms. Ballweg interviewed six PPD employees, including Mr. St. John and Mr. Mekerri, and she met with Dr. Menninger several times to discuss her accusations.  JA2946-JA2958.  On May 18, 2018, Ms. Ballweg met with Dr. Menninger and explained that, based on her investigation, she had concluded that PPD had not retaliated against Dr. Menninger because of her disability or requests for accommodation.  JA807-JA817.

### 6. *Dr. Menninger Takes Eight Months of Medical Leave Before Her Employment Is Terminated.*

On June 2, 2018, two weeks after Ms. Ballweg conveyed to Dr. Menninger her investigative conclusions, Dr. Menninger informed PPD that her psychiatrist had "advised [her] to take medical leave, effective immediately."  JA2861.  Dr. Menninger's paid leave started the next day and continued for six months, until

December 1, 2018.  JA860-JA863, JA2686.  In November 2018, PPD told Dr. Menninger that it "remain[ed] interested in helping [her] return to work and offering [her] any support that [she] need[ed]."  JA2686.  Dr. Menninger told PPD that her psychiatrist "was unable to suggest any possible 'accommodations' that would allow [Dr. Menninger] to return to work at this time."  *Id.*  PPD then placed Dr. Menninger on an "unpaid personal leave of absence," which ended on February 1, 2019.  JA863, JA2686.

From early June 2018 through February 1, 2019, PPD "held [Dr. Menninger's role] open."  JA863.  At the same time, given that Global Central Labs could not operate successfully or maintain its accreditation if its Executive Director was on indefinite leave, PPD began developing an "exit strategy," and "delicately working [Dr. Menninger] out," including by engaging in the lengthy process of recruiting Dr. Menninger's potential successor.  JA1320-JA1321, JA2685, JA2825.  Still, PPD expressed its "hope and intention of bringing Dr. Menninger back to the organization."  JA863.  In February 2019, when Dr. Menninger's unpaid personal leave of absence ended, and she had still not returned to work, PPD terminated her employment.  *Id.*

-16-

### B.    This Litigation.

#### 1.    *Dr. Menninger Files Suit; the District Court Grants Partial Summary Judgment.*

On June 28, 2019, Dr. Menninger sued PPD, alleging disability discrimination and retaliation.  PPD answered Dr. Menninger's complaint, Doc. 8, and, after more than a year of discovery, moved for summary judgment, Doc. 43.  At summary judgment, the parties disputed whether Dr. Menninger was a "qualified" individual under applicable law, Doc. 44 at 9-10; Doc. 65 at 6-11, and whether PPD had refused to provide any reasonable accommodations, Doc. 44 at 14-15; Doc. 65 at 11-12.  On March 22, 2022, the district court granted PPD's motion in part.  JA63.

In its summary judgment opinion, the district court narrowed Dr. Menninger's claims in two key respects.  First, it held that, as a matter of law, PPD had engaged in the required interactive accommodations process in good faith.  JA74-JA75.  The court determined that, far from "completely disregard[ing]" Dr. Menninger's requests, PPD had "engaged, responded, and [explained] why it could not grant [certain] accommodations."  *Id.* (cleaned up).  Second, the court limited Dr. Menninger's disparate-treatment claims to a single potentially adverse action:  Mr. Mekerri's February 6, 2018 email setting forth PPD's expectations for Dr. Menninger.  JA76-JA78.  The court noted, however, that, because "the increase [in public speaking and client interactions] was discussed initially prior to [PPD's] knowledge of the disability," a reasonable jury could conclude Mr. Mekerri's

February 6 email "had no connection to the disability."  JA77.  Dr. Menninger's narrowed claims proceeded to trial.

> **2.**    ***At Trial, the Parties Focus on Whether Dr. Menninger Was a Qualified Individual and Whether Her Requests for a "Reader" or "Surrogate" Were Reasonable.***

During ten days of trial, the parties' presentations to the jury focused on two key issues:  whether Dr. Menninger could perform her job's essential functions with or without an accommodation, and whether her request for a "reader" or "surrogate" was reasonable.

First, with respect to the essential functions of Dr. Menninger's position, PPD's employees and former employees testified that PPD had always expected its executive directors to engage with clients.  JA1227-JA1228, JA1251, JA1284-JA1285, JA1492-JA1493, JA1507-JA1509.  PPD's current Senior Vice President for Global Central Labs testified that Dr. Menninger's replacement, Dr. Basel Kashlan, participates in client bid defenses, which require him to discuss issues with clients "from a scientific level" "[p]robably weekly," and that business development efforts and client engagement are a critical part of his job.  JA1515-JA1518, JA1538.

The jury also heard testimony that, as soon as PPD told Dr. Menninger about its renewed focus on client engagement in December 2017—before anyone at PPD knew about Dr. Menninger's disability—Dr. Menninger's health immediately deteriorated, and she could no longer perform these essential job functions.

Although PPD's expert, Dr. Martin Kelly, speculated that it was "PPD's response to Dr. Menninger's request for accommodation [that] was the light switch that brought on [Dr. Menninger's] reactive depression," JA1643, testimony from Dr. Menninger, Dr. Kessimian, and Dr. Menninger's husband all indicated that Dr. Menninger experienced debilitating anxiety *before* PPD was aware of her disability and *before* PPD responded to Dr. Menninger's specific requests on February 26, 2018.  JA278-JA279, JA933, JA1379-JA1380, JA2819.  Dr. Kessimian even testified that, by January 2018, Dr. Menninger could not perform her essential job functions without an accommodation and that, without further assistance from medical professionals or other accommodations, any increase in Dr. Menninger's client engagement would seriously threaten Dr. Menninger's health.  JA946, JA948-JA949, JA968.  Dr. Paul Summergrad, Dr. Menninger's expert witness, disagreed—but he did not treat Dr. Menninger or even meet her until 2020.  JA1036, JA1057-JA1058.

Second, the parties focused on whether Dr. Menninger's request for a "reader" or "surrogate" was reasonable.  There was no dispute at trial that Dr. Kessimian's references to a "reader" or "surrogate" in her February 14 email did not mean someone to "read" to Dr. Menninger, but instead a substitute employee responsible for both presenting pre-prepared slides and remarks as well as answering questions and responding to client concerns in real time.  Indeed, Dr. Kessimian testified that, when she told PPD that Dr. Menninger needed a "surrogate or reader," she meant

"***someone else who's not Dr. Menninger actually doing the in-person interaction part.***" JA973-JA976.  Neither party presented any testimony or evidence suggesting that the "reader" or "surrogate" described in Dr. Kessimian's accommodation request would be anything other than a stand-in for Dr. Menninger—someone fully capable of interacting and engaging with highly sophisticated pharmaceutical clients and addressing their technical scientific concerns.

### 3.    *The Court Denies PPD's Motion for a Directed Verdict.*

Outside the jury's presence, and after Dr. Menninger called her last witness, the district court asked PPD's counsel to "assume [Dr. Menninger has] rested" and make "whatever motions [PPD's counsel] want[s] to make." JA1601-JA1602.  The district court told PPD, however, that it did not "have to" make any motions at all. JA1602.  PPD's counsel made a "motion for directed verdict." *Id.*  The district court immediately responded, "All right.  Fine.  I will deny that." *Id.*

### 4.    *Over PPD's Objections, the District Court Instructs the Jury that a "Reader" Is a Reasonable Accommodation and that the Jury Can Award Punitive Damages.*

During the charge conference, the parties disagreed about two jury instructions.  First, Dr. Menninger asked the district court to instruct the jury that, as a matter of law, a "qualified reader[] or interpreter[]" can be a reasonable accommodation.  JA151-JA152, JA1685.  For support, Dr. Menninger argued that the phrase "qualified reader[] or interpreter[] . . . actually comes from [a] statute,"

42 U.S.C. § 12111(9)(B), which provides a non-exhaustive list of reasonable accommodations.  JA1685.

PPD objected, explaining that, in context, "reader" in the statute does not "refer to the type of reader that Dr. Menninger was requesting"—"someone to read for her" or "read what she was going to say"—but instead refers to someone who reads **to** a person whose vision is impaired.  *Id*.  Because the statute uses "reader" in a completely different sense than how Dr. Kessimian used it in her February 14 letter, PPD objected that the term "reader" would mislead the jury.  Specifically, PPD worried that, "if [reader is] in the instructions . . . the jury might read that as being, oh, well, [what Dr. Menninger requested] must be what's required."  JA1686.  The district court overruled PPD's objection.  Rather than omit the requested instruction, the court inserted the phrase "or interpreters" after "readers" and included an additional sentence to the effect that whether an accommodation is "reasonable" is "based upon [the jury's] consideration of all the surrounding circumstances."  JA1685-JA1686; Add35-Add36.

Second, PPD's counsel argued that the district court should not instruct the jury on punitive damages because Dr. Menninger had not presented sufficient evidence to support them.  JA1715.  After pondering the question aloud, the court disagreed and instructed the jury on punitive damages.  JA1723-JA1725.

**5.** ***The Jury Returns a $24 Million Verdict, Including $10 Million in Punitive Damages; the Court Denies PPD's Post-Trial Motions.***

The parties then presented their closing arguments. As PPD anticipated, Dr. Menninger's counsel specifically highlighted the district court's "reader" instruction during his argument. First, he told the jury that the court would instruct them that a reasonable accommodation "includes things like [the] provision of qualified readers." JA1759. Then, in his very next sentence, he encouraged the jury to "look at Dr. Kessimian's e-mail" and urged the jurors to conclude that "yes, those [proposed accommodations] are, at least on their face, reasonable." *Id.* The court then instructed the jury, informing the jury that a reader could be a reasonable accommodation and that the jury could award punitive damages against PPD. JA1823, JA1846-JA1848.

So instructed, the jury returned a verdict against PPD on both the federal and state discrimination and retaliation claims. JA1859-JA1861. It awarded Dr. Menninger $1,565,000 in back pay, $5,465,000 in front pay, $5,000,000 in past emotional distress, $2,000,000 for future emotional distress, and $10,000,000 in punitive damages. JA1861-JA1862.

PPD renewed its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), raising multiple challenges to the sufficiency of the evidence. JA1882-JA1903. PPD also moved for a new trial or remittitur under Rule

59, contesting the district court's "reader" instruction and the jury's damages award. JA1903-JA1911.

The district court denied both post-trial motions in a November 1, 2023 order. As to the Rule 50(b) motion, the court determined that most of PPD's challenges were waived.  Add17-Add23.  Although PPD had moved for directed verdict, which was immediately and summarily denied, the court held that PPD could and should have articulated the specific bases for the motion *after* the court had denied the motion.  *Id.*  The court did not disagree (as the transcript reflected) that it "den[ied]" PPD's "motion for directed verdict" immediately after counsel made the oral motion, but stated that PPD had failed to take several opportunities thereafter, including later that day or the next, to further explain the grounds of PPD's already-denied motion. Add19-Add21.  The court held that PPD had thus failed to preserve its sufficiency-of-the-evidence arguments, except for its contention that the jury's punitive damage award was excessive and unsupported.  Add24.

With respect to punitive damages, the court characterized the jury's award as "remarkable," Add26, and noted that the "evidence adduced at this trial could have permitted a jury to make different findings and reach different conclusions than this jury did," Add34.  Notwithstanding its own prior ruling at summary judgment that it was beyond dispute that PPD had engaged in the interactive discussion of accommodations in good faith, JA74-JA75, the court decided that the trial record

-23-

was sufficient for a reasonable jury to conclude that "PPD acted with malice or reckless indifference to Menninger's rights in the course of its responses to her request for an accommodation and/or her HR complaint," Add26.

The district court also denied PPD's Rule 59 motion.  Although the court agreed that "reader" and "surrogate"—which Dr. Kessimian's email used interchangeably—have different meanings, Add29, the court nonetheless held that PPD's challenge to the "reader" instruction was "without any legal or factual support," Add28.  According to the court, the instruction was not legally problematic because it was "taken directly from 42 U.S.C. § 12111(9)(B)," and because the jury had been reminded to consider the reasonableness of any accommodation "based upon . . . all the surrounding circumstances."  Add28-Add29.  Further, the court stated that the instruction was not prejudicial because, based at least in part on the court's own "word search of the parties' closing arguments" for the word "reader," the case "did not hinge, entirely or even significantly, on whether Menninger was entitled to have a 'reader' make presentations on her behalf."  *Id.*

This appeal followed.

## **SUMMARY OF THE ARGUMENT**

The verdict below is irreconcilable with two unassailable principles of disability-discrimination law.  First, a plaintiff cannot prevail on a disability-discrimination claim unless they can perform the essential functions of their job with

-24-

a "reasonable accommodation." Second, a plaintiff cannot prevail on a disparate-treatment theory of disability discrimination unless their employer knew that they were disabled when it took the claimed adverse action.

These basic principles foreclose Dr. Menninger's claims. First, the only reasonable conclusion from the evidence at trial was that Dr. Menninger's disability prevented her from continuing in her role unless PPD provided a surrogate employee to perform certain of her essential job functions—an accommodation that this Court has held is ***not*** a "reasonable" one. Second, the evidence was unequivocal that PPD did not learn of Dr. Menninger's disability until ***after*** it took the only arguably adverse employment action against her—asking her to increase her public speaking and client interactions. Accordingly, no reasonable jury could have found for Dr. Menninger on her disability-discrimination claims, and the district court should not have let the jury consider them.

This Court should review the district court's ruling to the contrary *de novo*, because PPD timely moved for a directed verdict at the close of Dr. Menninger's case, and the court immediately and summarily denied it, indicating that it understood the bases for the motion (which had also been the bases for PPD's summary judgment motion and the focus at trial) and rejected them. Even if this Court somehow finds that PPD failed to preserve these challenges, Dr. Menninger's claims are so fundamentally deficient that they fail even on plain error review.

But letting the jury consider these claims was only the first of the district court's errors. The second was effectively dictating a verdict in Dr. Menninger's favor by instructing the jury that a "reasonable accommodation" includes what this Court has said it does not: the provision of a surrogate to perform essential functions of the job. Although "taken directly from 42 U.S.C. § 12111(9)(B)," Add28, the jury instruction that a reasonable accommodation includes "the provision of qualified readers" was erroneous in the context of the evidence at trial. The term "reader" in the statute unambiguously refers to a person or program that reads material *to* a vision-impaired employee. The "reader" requested by Dr. Menninger, who is not vision-impaired, was something completely different: a surrogate employee with comparable credentials and experience who would simply do her job for her. But despite the critical importance to Dr. Menninger's case of the question whether PPD refused to provide her a ***reasonable*** accommodation, the court did not clarify for the jury that the same word was being used in two radically different ways—one to refer to an accommodation that is sometimes reasonable and one to refer to an accommodation that never is. Compounding this error, Dr. Menninger's trial counsel exploited the term's ambiguity in the jury instructions during his closing argument (as PPD had anticipated in raising its objection) by telling the jury that the "reader" in the instruction was the same as the "reader" in Dr. Kessimian's letter. As a result, the jury was left with the false impression that Dr. Menninger's requested

-26-

accommodation was reasonable as a matter of law.  Understood in this context, the instruction was legally erroneous.

That error almost certainly influenced the verdict.  When it came time to deliberate, the jury had been told—implicitly by the court and explicitly by Dr. Menninger's counsel—that PPD was unwilling to provide Dr. Menninger an accommodation that the law deemed reasonable.  From this legally distorted vantage point, the jury had almost no choice but to return a verdict in Dr. Menninger's favor. Had it been properly instructed, however, it easily could have found for PPD on the basis that the only accommodation that would have allowed Dr. Menninger to perform her essential job functions was ***unreasonable*** as a matter of law—thus defeating Dr. Menninger's disability-discrimination claims, and likely her retaliation claim as well.

The "reader" instruction also almost certainly influenced the jury's $10 million punitive damages award—damages which the jury should not even have considered in the first place.  The district court found at summary judgment that PPD had engaged in good faith with Dr. Menninger in an interactive process to identify reasonable accommodations.  PPD agreed to provide several of Dr. Menninger's proposed accommodations.  Punitive damages were, therefore, unsupported as a matter of law.  That the jury nonetheless awarded $10 million is almost undoubtedly the result of the court's erroneous reader instruction, which twisted the jury's entire

view of the evidence by giving the false impression that PPD had brazenly refused to provide Dr. Menninger with an accommodation to which she was legally entitled.

In sum, Dr. Menninger's disability-discrimination claims were facially deficient, the district court prejudiced the entire verdict with an erroneous jury instruction, and that erroneous instruction very likely led the jury to award Dr. Menninger $10 million in punitive damages. Therefore, this Court should grant PPD judgment as a matter of law on the disability-discrimination claims and remand for a new trial on the retaliation claim. Alternatively, and at the very least, it should strike the award of punitive damages as legally unsupported.

## **ARGUMENT**

## I. PPD IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON DR. MENNINGER'S DISABILITY-DISCRIMINATION CLAIMS.

This Court reviews the denial of a Rule 50(b) motion for judgment as a matter of law *de novo*. *Soto-Lebron v. Fed. Express Corp.*, 538 F.3d 45, 56 (1st Cir. 2008). This Court must reverse such denial if the prevailing party's case "reveals no legally sufficient evidentiary basis for a reasonable jury to find for that party." *Id.* (cleaned up).

Dr. Menninger's disability-discrimination claims should never have gone to the jury, as they fail as a matter of law. And contrary to the district court's determination, PPD properly preserved its challenge to these claims in its Rule 50(a)

motion.[2]  But even if this Court finds that those challenges were waived and reviews only for plain error, these claims still fall short.

### A.   The District Court Legally Erred in Finding That PPD Waived Its Rule 50 Challenge to Dr. Menninger's Discrimination Claims.

Although a Rule 50(b) motion for judgment as a matter of law must be preceded by a Rule 50(a) motion for a directed verdict, in *Blockel v. J.C. Penney Co.*, 337 F.3d 17, 25 (1st Cir. 2003), this Court held that a party need not specify the precise reasons for a Rule 50(a) motion when a district court summarily denies it. In *Blockel*, as here, the plaintiff sued her former employer for retaliation and failure to reasonably accommodate her disability.  *Id.* at 23.  Like PPD, the employer in *Blockel* orally moved for "directed verdict."  *Id.* at 25 n.2.  The employer did not specify the grounds for its motion, and the court immediately noted that the "[m]otion for directed verdict has been filed, and it's on the record, and the Court denies it."  *Id.*[3]

---

[2] "It is not clear from [this Court's] precedent what standard of review . . . appl[ies] in evaluating a trial court's determination that an argument made in a Rule 50(b) motion was preserved in a Rule 50(a) motion."  *Cornwell Ent., Inc. v. Anchin, Block & Anchin, LLP*, 830 F.3d 18, 25 (1st Cir. 2016).  However, because the question whether PPD preserved its sufficiency-of-the-evidence arguments in its Rule 50(a) motion turns on the interpretation of this Court's precedent, and of a federal rule, this Court's review should be *de novo. See Waters v. Day & Zimmermann NPS, Inc.*, 23 F.4th 84, 93 (1st Cir. 2022).

[3] Despite the court's reference to the motion for directed verdict being "filed," the employer in *Blockel*, like PPD here, moved for directed verdict only orally.  *See* Def.-Appellant's Reply Br., *Blockel v. J.C. Penney Co.*, Nos. 02-1927 and 02-1946 (1st Cir. Mar. 14, 2003), 2003 U.S. 1st Cir. Briefs LEXIS 17, at *5.

On appeal, the plaintiff in *Blockel* argued that her employer had waived its arguments under Rule 50(b) by failing to specify any grounds in its Rule 50(a) motion. *Id.* at 24-25. This Court disagreed. *Id.* at 25. It explained that the employer's Rule 50(a) motion was "cut short by the judge's pronouncement that the motion was considered filed and denied." *Id.* Although it is "generally . . . incumbent upon a party to enunciate the specific basis for a motion for judgment as a matter of law," the Court held that the district court had "foreclosed [the employer's] opportunity" to do so. *Id.* "Under these circumstances," the Court reasoned, the employer "cannot be faulted for failing to provide more detail." *Id.*

*Blockel*'s reasoning applies here. As in *Blockel*, PPD's counsel timely moved for a directed verdict. JA1602. And the district court, as in *Blockel*, immediately and summarily denied the motion, indicating that, regardless of the grounds for the motion, which were already familiar to the court because PPD had previewed them in its summary-judgment briefing (Doc. 44 at 9-10, 14-15), the court would deny it. JA1602. This is not a case (like the cases the district court cited in its post-trial order) where the movant was invited to specify the grounds for its motion but declined to do so or indicated only certain grounds, without mentioning those raised later. *See, e.g.*, *Jones ex rel. U.S. v. Mass. Gen. Hosp.*, 780 F.3d 479, 487-88 (1st Cir. 2015). To the contrary, PPD moved for a directed verdict without providing more detail because PPD had no reason to suspect that the court required, wanted,

or would even permit further explanation.  Nor, as *Blockel* confirms, can PPD be blamed for failing to make a record as to the bases for its motion *after* the motion was denied.  *See* 337 F.3d at 24-25 & n.2.

The district court's focus in its post-trial order on the "many opportunities" PPD had to argue its directed-verdict motion after the district court ruled, Add20-Add21, is therefore beside the point:  Once a directed-verdict motion is summarily denied, a movant need not thereafter futilely recite the reasons for its motion to preserve the issues for appeal.  *See Blockel*, 337 F.3d at 24-25 & n.2.  Where, as with the preservation of sufficiency challenges, so much rides on a procedural rule, parties must be able to rely on clearly defined lines.  Based on objective facts, PPD's conduct was precisely the same as that of the movant in *Blockel*.  Whether its motion was preserved or waived cannot depend on the trial judge's subsequent assessment of its subjective understanding of the situation and whether it would have permitted further explanation of grounds post-denial.  Accordingly, PPD's sufficiency-of-the-evidence challenges are preserved, and the district court erred in concluding otherwise.

    **B.**    **Dr. Menninger's Discrimination Claims Fail as a Matter of Law Because Providing a Stand-In for Client-Facing Responsibilities Is Not a Reasonable Accommodation and Because PPD Set Those Expectations *Before* It Knew of Her Disability.**

Because the district court's waiver determination was erroneous, this Court should review the sufficiency of the evidence for Dr. Menninger's discrimination

-31-

claims *de novo*. *See Gonzalez-Bermudez v. Abbott Lab'ys P.R. Inc.*, 990 F.3d 37, 43 (1st Cir. 2021). Construing the facts in the light most favorable to the verdict, only one conclusion can be drawn: Dr. Menninger's claims fail as a matter of law. In particular, the evidence was unambiguous that Dr. Menninger (1) was not a "qualified" disabled person—which forecloses both her disparate-treatment and failure-to-accommodate claims—and (2) did not suffer an adverse employment action "because of" her disability—which independently forecloses her disparate-treatment claim.

### 1.    *Dr. Menninger Was Not A "Qualified" Disabled Employee.*

A disabled employee who cannot perform her job's "essential functions" even with a "reasonable accommodation" is not "qualified" and thus not eligible to bring a discrimination claim. *See* 42 U.S.C. § 12111(8); Mass. Gen. Laws c. 151B, §§ 1(16), 4(16) (2024); *Pena v. Honeywell Int'l, Inc.*, 923 F.3d 18, 27 (1st Cir. 2019). Accordingly, to prevail on her discrimination claims, Dr. Menninger needed to show that she could perform her essential job functions with or without a reasonable accommodation. *See Pena*, 923 F.3d at 27. No reasonable jury could find that Dr. Menninger met her burden.

a.    Interfacing with Clients Was an Essential Function of Dr. Menninger's Position That She Could Not Perform.

An "essential function" is a "fundamental job duty," including any "individual or idiosyncratic characteristics of the job." *Kvorjak v. Maine*, 259 F.3d 48, 55 (1st

-32-

Cir. 2001) (cleaned up).  The evidence at trial showed unequivocally that interacting with clients, including through presentations and other public speaking, was an essential function of Dr. Menninger's role as Executive Director.

To start, an employer's "view of [the employee's] job requirements" is owed "substantial weight," *Mulloy*, 460 F.3d at 150; *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997)—and PPD viewed client interaction as essential to Dr. Menninger's job.  Years before PPD learned of Dr. Menninger's disability, Dr. Menninger's job description included various forms of "business development" as "Essential Functions" of her role.  JA2919.  These public-facing responsibilities, which Dr. Menninger does not dispute were always part of her role as Executive Director, JA328, JA347, were essential when Dr. Menninger was hired in 2015, and were even more so in 2017 and 2018, JA2918-JA2919.  PPD required her and its other senior leaders to "participate [in] client bid defense[s]"; be personally "involved in the client site meetings"; and "work with the team and the issue resolution [requests] coming from the clients."  JA1286.

Trial testimony similarly established that Dr. Menninger's replacement, Dr. Kashlan, performs each of these duties as "critical parts" of the position today. JA1515-JA1520.  This "experience of [the employee] who ha[s] taken over [Dr. Menninger's] job functions since [her] termination" is an objective indicator of how

the employer has defined the role and "supports the conclusion" that those functions are essential.  *See Mulloy*, 460 F.3d at 153.

In the face of this lopsided evidence, Dr. Menninger's counterarguments were unavailing.    Dr. Menninger contended that, because these public-facing responsibilities had previously comprised a relatively small part of her day-to-day activities, they were not essential.  JA315, JA328, JA347.  But a task's frequency does not determine whether it is essential; even tasks "which are in fact rarely or never performed" may still be essential if removing the function "would fundamentally change the nature of the job."  MCAD Guidelines on Disability Discrimination in Employment § II.B; *see, e.g.*, *Cox v. New Eng. Tel. & Tel. Co.*, 414 Mass. 375, 390, 607 N.E.2d 1035, 1043-44 (1993) (pole climbing was an essential function for telephone technicians even though the duty was performed on relatively "few occasions").  Moreover, "past [job] performance" is not a reliable indicator of what tasks "are essential" going forward.  *Jones v. Walgreen Co.*, 679 F.3d 9, 16 (1st Cir. 2012).  The precise mix of a position's essential tasks may—and frequently does—change, such as in response to market dynamics and a changing client base.  *See, e.g.*, *Kvorjak*, 259 F.3d at 55-58 (affirming dismissal of discrimination claim where employer's evolving economic needs led it to close certain field offices, requiring plaintiff with physical disability to undergo significantly longer commute that caused severe pain).

-34-

The trial record was also clear that Dr. Menninger's treating physician had informed PPD at the time that Dr. Menninger **could not** perform these essential, client-facing tasks herself.  JA2583-JA2584, JA2587-JA2588.  The requested accommodation was to have **someone else** perform the tasks, which means, as a matter of law, that Dr. Menninger was not "qualified."  *See Calef v. Gillette Co.*, 322 F.3d 75, 86 n.8 (1st Cir. 2003) ("If the plaintiff, with or without reasonable accommodation, cannot perform an essential function of the job, then he is not a qualified individual and there is no duty to accommodate.").

> b.  The Only Accommodation That PPD Denied Was for Someone Else to Perform Dr. Menninger's Essential Job Functions for Her, and Such Accommodation Is Unreasonable as a Matter of Law.

Although Dr. Menninger and her trial expert, Dr. Summergrad (who met Dr. Menninger only after this suit was filed), testified that she could have completed these essential job tasks without any accommodation, JA347, JA1036, the contemporaneous evidence was entirely different.[4]  Dr. Kessimian, her treating psychiatrist, reported that, in January and early February 2018, **before** Dr. Menninger had ever requested a reader or surrogate or PPD had provided greater

---

[4] Whether an employee is "qualified" is evaluated as of the time of the dispute and can be informed by a physician's contemporaneous medical opinions.  *See, e.g.*, *Jones*, 679 F.3d at 18 (employer reasonably concluded based on physician's contemporaneous medical opinion that, despite plaintiff's after-the-fact arguments to the contrary at summary judgment, plaintiff was not "qualified" when her employment was terminated).

granularity regarding her client-facing tasks, Dr. Menninger was "spiral[ing]": she "worried all the time," had not left her home for "weeks," dreaded "see[ing] the people that [she] work[ed] with," and had "already resigned [herself] to defeat in the corporate culture." JA2002-JA2009.  For those reasons, Dr. Kessimian warned PPD that requiring Dr. Menninger to carry out public-facing duties without accommodations would threaten Dr. Menninger's health.  As she put it, "any changes to [Dr. Menninger's] role that increase the need for public speaking and/or social interaction . . . [would] make it substantially more difficult, *if not impossible, for [her] to perform her job*."  JA2942 (emphasis added).

PPD agreed to two accommodations that Dr. Kessimian proposed—it reduced Dr. Menninger's travel schedule and excused her from certain internal presentations. JA2819.  But Dr. Kessimian's third request—that PPD provide a "surrogate" employee to interact with and present to clients on Dr. Menninger's behalf, JA2820-JA2821—demonstrated that Dr. Menninger was not a "qualified" individual and was an unreasonable accommodation as a matter of law.

By insisting that a surrogate was necessary for her to continue in her role, Dr. Menninger all but conceded that she was herself incapable of performing her essential job functions—foreclosing any conclusion that she was a "qualified" individual under 42 U.S.C. § 12111(8).  Here, even if PPD had granted the surrogate or reader accommodation, it would be the stand-in employee, *not* Dr. Menninger,

-36-

performing Dr. Menninger's essential work functions. Dr. Menninger thus is not "qualified" under the ADA or Massachusetts law. *See Calef*, 322 F.3d at 86 n.8 (plaintiff who "cannot perform an essential function of the job" "with or without reasonable accommodation" is "not a qualified individual"); *accord Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir. 1997) ("We cannot say that [an employee] can perform the essential functions of the job with reasonable accommodation, if the only successful accommodation is for [the employee] not to perform those essential functions.").

This Court has made clear that Dr. Menninger's requested accommodation—a "surrogate" to perform her essential job tasks—is unreasonable as a matter of law. An accommodation for a disabled employee is not reasonable if it would require the employer "to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability." *Krennerich v. Inhabitants of Town of Bristol*, 943 F. Supp. 1345, 1351 (D. Me. 1996) (cleaned up); *see Laurin v. Providence Hosp.*, 150 F.3d 52, 60 (1st Cir. 1998) (citing *Krennerich* for this proposition and rejecting plaintiff's argument that employer was required to burden other existing employees with duties plaintiff could not perform due to disability); *Sarkisian v. Austin Prep. Sch.*, 85 F.4th 670, 677 (1st Cir. 2023) (plaintiff's "proposal that other faculty—who were already teaching full course loads and subjects other than English—should take

on her teaching responsibilities is unreasonable on its face"). And neither the ADA nor Massachusetts law requires an employer to accommodate a disabled employee by "reallocat[ing] essential functions to other employees." *Mulloy*, 460 F.3d at 153 (cleaned up); *see also Kvorjak*, 259 F.3d at 57. PPD therefore had no obligation to hire another employee to deliver Dr. Menninger's presentations, participate in meetings, and address clients' technical questions—regardless of whether the stand-in employee was called a "surrogate," a "reader," or something else. *See Mulloy*, 460 F.3d at 153-54 (where a requested accommodation is facially unreasonable, the employer is not required to adopt it).

And for good reason. In Dr. Menninger's case, her senior leadership role required an advanced level of education, experience, and familiarity with PPD's products and services to be able to develop business through client engagement. For a stand-in employee to be effective, PPD would have had to employ a second individual qualified for an Executive Director position—capable of engaging with sophisticated clients and presenting on complex medical issues concerning PPD's offerings—for the sole purpose of performing Dr. Menninger's essential job responsibilities. Dr. Menninger's request for a "reader" was thus akin to a law firm's top appellate advocate asking the firm to hire a stand-in oralist to accommodate an onset of crippling performance anxiety. Well-established law—to say nothing of common sense—dictates that such accommodation would be unreasonable. While

there might be a different role the lawyer could play, such as one limited to brief writing, the lawyer could not insist on retaining the same position and compensation if unable to perform a key task of advocacy.  Yet Dr. Menninger, through the correspondence of her treating physician, made clear that such accommodation was necessary for her to continue in her role and refused PPD's attempts to accommodate her by finding another, non-client-facing role at PPD.  Accordingly, because the evidence at trial showed that Dr. Menninger could not perform the essential functions of her job and that the only requested accommodation that PPD denied is one that this Court has held is *per se* unreasonable, she failed to establish that she is a "qualified" disabled person, and no reasonable jury could conclude otherwise. PPD is thus entitled to judgment as a matter of law on her discrimination claims.

### 2.    *Dr. Menninger Did Not Experience an Adverse Employment Action "Because of" Her Disability.*

Dr. Menninger's disparate-treatment theory of discrimination falls short for an independent reason:  Dr. Menninger failed to establish causation.  To succeed on her disparate-treatment claims, Dr. Menninger needed to prove that she suffered an adverse employment action, in whole or in part, "because of" her disability.  *See* 42 U.S.C. § 12112(b); Mass. Gen. Laws c. 151B, § 4(16) (2024).  As this Court has explained, "[a]n employee cannot be subject to an adverse employment action based on [their] disability unless the individual decisionmaker responsible for [that adverse action] has knowledge of that disability."  *O'Rourke v. Tiffany & Co.*, 988 F.3d 23,

25 (1st Cir. 2021) (citation omitted); *see Boadi v. Ctr. for Hum. Dev., Inc.*, 239 F. Supp. 3d 333, 351 (D. Mass. 2017).

The only potentially adverse employment action submitted to the jury was PPD's "expectations of increased public speaking and client interactions" as communicated to her in February 2018.  JA76-JA77, JA184-JA185.  But the trial evidence was uncontested that PPD had set, and initially communicated, these increased expectations *before* it knew about Dr. Menninger's disability.[5]  The evidence at trial showed that PPD notified Dr. Menninger of her increased client-facing duties in December 2017, when Mr. Mekerri told her about PPD's focus on client engagement.  JA313.  Dr. Menninger first disclosed her anxiety disorder to PPD weeks later, on January 11, 2018.  JA314-JA315, JA2923.  In fact, she testified that she disclosed her disability to PPD precisely *because of* the increased expectations PPD was setting for her.  JA314.

PPD did not take adverse employment action against Dr. Menninger when it later provided additional details about those increased expectations for client-facing engagements in February 2018.  PPD provided these additional details *at Dr. Menninger's request*.  JA959-JA960, JA1143, JA2628.  And PPD's February 2018

---

[5] Even if PPD had set these expectations after learning about Dr. Menninger's disability, Dr. Menninger would still be unable to establish any adverse employment action:  as discussed above, *see* Part I.B.1(a), public speaking and client interactions were always essential functions of Dr. Menninger's position, as detailed at the time of her hiring.

communications with Dr. Menninger was not an adverse employment action, as it merely clarified the expectations that it had established in December 2017, before it knew about Dr. Menninger's disability. JA1294. Thus, no reasonable jury could have found that PPD set "expectations of increased public speaking and client interactions" for Dr. Menninger "because of" a disability of which it had no knowledge. PPD is therefore entitled to judgment as a matter of law on Dr. Menninger's disparate-treatment claim on this basis as well.

### C. Dr. Menninger's Claims Fail Even on Plain Error Review.

Even if this Court finds that PPD did not preserve its challenges under Rule 50, it still reviews the sufficiency of the evidence on Dr. Menninger's discrimination claims for plain error. *See Chestnut v. City of Lowell*, 305 F.3d 18, 20-21 (1st Cir. 2002) (per curiam) (en banc) (this Court will "relieve a party of a prior forfeiture" when there is "error, plainness, prejudice, and miscarriage of justice or something akin to it"). And "where the failure of proof on an essential element . . . is total," as here, "customary appellate review and plain-error review of 'sufficiency' challenges differ only negligibly," because the issue is then one of law, rather than fact. *United States v. Pena-Lora*, 225 F.3d 17, 28 n.8 (1st Cir. 2000).

The deficiencies in Dr. Menninger's discrimination claims are not technical or nuanced; they are basic and obvious. There is no serious dispute that (1) client interaction was essential to Dr. Menninger's role at PPD, (2) Dr. Menninger's

disability prevented her from interacting with clients without a surrogate employee to speak to clients on her behalf, and (3) this Court's precedents hold that providing such a surrogate employee is not a reasonable accommodation—thus foreclosing any determination that she was a "qualified" employee capable of fulfilling the essential functions of her job.  Moreover, PPD learned of Dr. Menninger's disability *after* it took the relevant employment action that Dr. Menninger claims was adverse.  Such timing is fatal to her allegation that she suffered an adverse employment action "because of" her disability.  In short, Dr. Menninger's discrimination claims plainly fail as a matter of law.

Allowing the verdict to stand in the face of these fundamental deficiencies would be a miscarriage of justice.  Dr. Menninger secured a "remarkable" $24 million judgment, Add26, including $10 million in punitive damages, on claims that should have never gone to a jury.  Justice is not served if a party extracts such an award for claims that are plainly contradicted by this Court's binding precedents.  *See Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 37 (1st Cir. 2006).  Therefore, reversal of Dr. Menninger's discrimination claims is warranted even on plain error review.

Because judgment should be entered in PPD's favor on Dr. Menninger's discrimination claims, this Court should vacate the jury's verdict entirely.  "It is settled law that, when multiple claims are submitted to a jury . . . a new trial is

-42-

required if some of the claims should not have been submitted and the jury's consideration of those claims may have affected the verdict." *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 468 (1st Cir. 1996). That is true here because the jury awarded only a single set of damages for both Dr. Menninger's discrimination and retaliation claims. JA206-JA208, JA1861-JA1862. The Court thus has "no way of knowing what portion, if any, of the compensatory and punitive damages award was based on the jury's erroneous finding of [discrimination]," and the entire verdict must be vacated. *See Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 30 (1st Cir. 2002).

## II.    THE DISTRICT COURT'S "READER" INSTRUCTION WAS ERRONEOUS AND PREJUDICIAL AND THEREFORE ENTITLES PPD TO A NEW TRIAL.

This Court reviews the denial of a motion for a new trial on the basis of instructional error for an abuse of discretion. *Kennedy v. Town of Billerica*, 617 F.3d 520, 527, 530 (1st Cir. 2010). In so doing, it reviews the instructions themselves *de novo* and reviews errors in "form or wording" for an abuse of discretion. *Drumgold v. Callahan*, 707 F.3d 28, 53 (1st Cir. 2013) (citation omitted). When a district court denies a new trial motion despite a verdict that could have resulted from erroneous or misleading jury instructions, it abuses its discretion. *See id.*

Here, the district court abused its discretion in denying PPD's motion for a new trial, as the "reader" instruction was both erroneous and prejudicial. The evidence showed that the only accommodation that Dr. Menninger requested and

PPD declined to provide was an equally qualified and experienced substitute, which is unreasonable as a matter of law. Nonetheless, the court's instruction muddled this clarity by stating that a "reader" *could* be a reasonable accommodation. The statutory provision from which the word "reader" was taken uses that word in an entirely different way than Dr. Menninger and her psychiatrist did. By eliding that distinction, the instructions gave the jury the misimpression that PPD declined to provide a potentially reasonable accommodation. There is little doubt that, without this instruction, the jury may very well have determined that Dr. Menninger could not prevail on her discrimination and retaliation claims.

## A.    The District Court's "Reader" Instruction Misled the Jury.

To determine whether an instruction was erroneous, this Court asks whether the instruction "fairly and adequately" presented the relevant issues to the jury "in relation to the charge as a whole" and "in the context of the evidence." *Id.* Even an instruction that is superficially accurate as a matter of law may be erroneous if in the context of the evidence it "tended to confuse or mislead the jury on controlling issues." *Sanchez-Lopez v. Fuentes-Pujols*, 375 F.3d 121, 133 (1st Cir. 2004) (citation omitted).

Here, the district court's "reader" instruction inevitably misled the jury by effectively directing a judgment in Dr. Menninger's favor. Dr. Menninger and her psychiatrist consistently used "reader" as synonymous with "surrogate." In her

-44-

February 14 note, for example, Dr. Kessimian used "reader" and "surrogate" interchangeably, JA2586-JA2588, and Dr. Menninger used the term in the same way:  to mean a stand-in or substitute.  Indeed, the jury repeatedly heard Dr. Menninger describe her request for PPD to provide a stand-in employee to give presentations on her behalf as a request for a "reader."  JA523, JA2944-JA2945.  The term's meaning to the jury in the context of the evidence was unambiguous.

The term "reader" as it appears in 42 U.S.C. § 12111(9)(B), on which the district court relied for its instruction, means something very different.  That statutory provision (and MCAD Guidelines on Disability Discrimination in Employment § III.D) uses the term to refer to a person or program who can read words *to* an employee with impaired vision; it does not refer to a surrogate who can perform public-speaking duties *for* a disabled employee.  *See Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 799 (10th Cir. 2020) (interpreting "reader" in § 12111(9)(B) as someone who reads to a vision-impaired person); *Cox v. Corr. Med. Servs., Inc.*, No. 06-10350, 2007 WL 2873049, at *9 (E.D. Mich. Sept. 26, 2007) (same).  ADA regulations use "reader" in the same way.  *See, e.g.*, 28 C.F.R. § 35.104 ("Auxiliary aids and services includes . . . Qualified readers . . . or other effective methods of making visually delivered materials available to individuals who are blind or have low vision."); 29 C.F.R. App. § 1630.9(d) ("[A]n individual with a visual impairment . . . who is able to read unaided would not be required to

accept a reader as an accommodation."). The regulatory reference to a "reader" thus refers to a completely different "reader" accommodation than the one that Dr. Menninger requested.

The district court defended its "reader" instruction on the basis that "the language . . . was taken directly from 42 U.S.C. § 12111(9)(B)." Add28. But even a superficially accurate instruction can, in "the context of the evidence" be fundamentally misleading. *See Drumgold*, 707 F.3d at 53 (citation omitted). In *Costa-Urena v. Segarra*, 590 F.3d 18, 24-26 (1st Cir. 2009), for example, this Court held that a misleading jury instruction required it to vacate a verdict on claims that a public employer had improperly retaliated against its employees for protected speech. The trial court had instructed the jury that it "must find for the [employer]" if "the personnel actions had nothing to do with the [employees'] political preferences." *Id.* at 25 (cleaned up). That instruction was facially accurate, as far as it went: under the governing legal principles, an employer indeed cannot be liable for a personnel decision that "has nothing to do with" a protected activity. *See id.* at 25-26. In context, however, the instruction was misleading because, under relevant law, even if the jury found that the employer's decision had "something to do with" the protected activity, it could ***still*** rule in the employer's favor if the employer would have taken the same action regardless. *See id.*; *see also Drumgold*, 707 F.3d at 51-54 (vacating judgment and remanding for new trial despite jury instruction that

-46-

accurately explained concurrent causation because that issue was not implicated by the evidence); *Shane v. Shane*, 891 F.2d 976, 987 (1st Cir. 1989) (holding that a legally accurate instruction was properly excluded because it described issues not implicated by the evidence and thus "had great potential to confuse the central issues for the jury").

As in *Costa-Urena*, the trial's context rendered the district court's "reader" instruction legally accurate but misleading:  it accurately quoted a statute that did not apply based on this case's facts.  The "reader" instruction thus did not "fairly and adequately" present to the jury the issue of whether PPD refused to provide Dr. Menninger a reasonable accommodation when it denied her request for a surrogate. *See Drumgold*, 707 F.3d at 53 (citation omitted).  To the contrary, it gave the jury exactly the opposite understanding of the law on which Dr. Menninger's entire case depended and was therefore erroneous.

**B.     Without the "Reader" Instruction, the Jury May Well Have Returned a Verdict for PPD on Both Dr. Menninger's Discrimination and Retaliation Claims.**

An erroneous instruction is prejudicial if "on the record as a whole, a reviewing court cannot say with fair assurance that the judgment was likely unaffected" by the error.  *Putnam Res. v. Pateman*, 958 F.2d 448, 471 (1st Cir. 1992) (remanding for new trial where instructional "error had more than a merely theoretical impact").  Establishing prejudice sufficient to warrant a new trial is not

onerous: what matters is merely whether the error ***could have*** affected the result of the jury's deliberations. *See Costa-Urena*, 590 F.3d at 26 (remanding for a new trial because "the evidence was sufficiently mixed that it would allow (though not compel) a reasonable, properly instructed jury to find" for the appellants). In other words, a new trial is warranted unless this Court can conclude that a properly instructed jury almost certainly would have reached the same conclusion. *See Bastien v. Goddard*, 279 F.3d 10, 16 (1st Cir. 2002).

Here, the "reader" instruction was virtually outcome-determinative. And both parties recognized as much. While PPD presciently objected, Dr. Menninger's lawyer capitalized on the ambiguity of this dispositive issue. During his closing argument, Dr. Menninger's lawyer specifically drew the jury's attention to the instruction and contended that it would make clear that what Dr. Menninger requested of PPD was entirely reasonable under the law, stating: "the Judge is going to tell you that reasonable accommodations include . . . things like that provision of qualified readers. I expect, if you look at Dr. Kessimian's e-mail [characterizing the provision of a surrogate as interchangeable with providing a "reader"] that, yes, those are, at least on their face, reasonable." JA1759. After the jury heard this closing argument, the district court instructed the jury that reasonable accommodations can include precisely what Dr. Menninger had requested of PPD: the provision of a "reader." Add35.

Under these circumstances, there can be no doubt that, without the legally and factually inapplicable "reader" instruction, a reasonable jury easily **could** have found that Menninger failed to establish both her discrimination and retaliation claims. *See Costa-Urena*, 590 F.3d at 26. Indeed, even the district court acknowledged in its post-trial order "that the evidence adduced at this trial could have permitted a jury to make different findings and reach different conclusions than this jury did." Add34.

Had the jury determined that Dr. Menninger's discrimination claims failed because she was not "qualified," it may well have evaluated her retaliation claim quite differently, as these claims were inextricably linked in the trial evidence. One of the alleged "adverse actions" submitted to the jury was PPD's supposedly "sham" investigation conducted by Ms. Ballweg into Dr. Menninger's complaint against Mr. Mekerri. JA190. Had the jury concluded that Dr. Menninger was not a "qualified" individual entitled to bring a disability-discrimination claim, it likely would have reached the same conclusion as Ms. Ballweg—and therefore would have found that PPD's investigation was **not** an adverse action. Moreover, the jury entered a single damages award on both sets of claims without any basis to tell the theory under which they were awarded, further demonstrating that a new trial on retaliation is warranted. *See Marrero*, 304 F.3d at 30.

### III. THE JURY'S PUNITIVE DAMAGES AWARD IS UNSUPPORTED BY THE EVIDENCE AND ALMOST CERTAINLY THE DIRECT RESULT OF THE ERRONEOUS "READER" INSTRUCTION.

The district court compounded its instructional error by allowing the jury to consider punitive damages. To support a punitive damages award under federal or state law, Dr. Menninger needed to show that PPD's conduct was "so offensive that it justifies punishment and not merely compensation." *See Kiely v. Teradyne, Inc.*, 85 Mass. App. Ct. 431, 435-36, 13 N.E.3d 615, 620 (2014) (citation omitted); *see also* 42 U.S.C. § 1981a(b)(1) (to recover punitive damages, plaintiff must demonstrate that employer acted "with malice or with reckless indifference to the federal protected rights of an aggrieved individual"). Conduct rising to this level must be "outrageous, because of [its] evil motive or [its] reckless indifference to the rights of others." *Dartt v. Browning-Ferris Indus.*, 427 Mass. 1, 17, 691 N.E.2d 526, 537 (1998) (citation omitted). There must have been evidence that PPD engaged in "a conscious or purposeful effort to demean" Dr. Menninger because she was disabled, and that PPD knew its conduct would cause significant harm. *See Kiely*, 85 Mass. App. Ct. at 436, 13 N.E.3d at 620 (citation omitted).

PPD's conduct came nowhere close to meeting this standard. To the contrary, the evidence at trial showed that PPD engaged in a good-faith interactive process with Dr. Menninger, including by accepting several of her requested accommodations and offering her the chance to continue in another role, by not

requiring her to engage in any client-facing activities once she disclosed her disability, and by—even while she was on indefinite leave—"offer[ing] [her] any support that [she] needed." JA2686. The district court itself recognized PPD's good faith at summary judgment, finding it undisputed that PPD properly engaged in the "interactive process" of attempting to accommodate Dr. Menninger, as 42 U.S.C. § 1981a(a)(3) requires. JA74-JA75.

While Dr. Menninger characterized PPD's attempt to find an alternative position for her or negotiate a mutually agreeable separation as a malicious "exit strategy," JA1920, that is precisely what the law should *encourage* an employer in PPD's position to do. Even assuming PPD somehow misjudged whether Dr. Menninger's request for a stand-in to perform the Executive Director's client-facing tasks was legally appropriate, it was hardly "evil" or "reckless" for PPD to conclude that someone whose own psychiatrist said it would be dangerous for her health to conduct client meetings was unqualified to serve as the Labs' Executive Director— a position that required "business development" and "maintaining [client] relationships." JA2919.

This Court's decision in *Tobin v. Liberty Mutual Insurance Co.*, 553 F.3d 121 (1st Cir. 2009), and the Fifth Circuit's recent decision in *Harris v. FedEx Corporate Services, Inc.*, 92 F.4th 286 (5th Cir. 2024), aptly illustrate why punitive damages are unsupported here. In *Tobin*, this Court emphasized that a jury can award punitive

damages only if an employer behaves with "intentional or reckless indifference to federal rights." 553 F.3d at 149. "[G]eneral insensitivity," "troubling evidence," and "implausible testimony" do not necessarily "provide a basis for concluding that the particular conduct found actionable by the jury was committed in the face of a perceived risk that the action will violate federal law." *Id.* (cleaned up). To the contrary, evidence that "consideration was given"—correctly or not—"to the relevant factors," cuts against a punitive damages award. *Id.* at 148 (cleaned up). In *Harris*, the Fifth Circuit applied that standard to vacate and reverse a jury's punitive damages award in an employment-discrimination case. 92 F.4th at 293, 301-03. The court emphasized that, "for punitive damages, it is the employer's subjective intent that matters." *Id.* at 302. Based on the evidence, the court concluded that the plaintiff's supervisor subjectively believed that she was disciplining the plaintiff "for insubordination, not in retaliation for her complaints." *Id.* And even if the individual supervisor had acted with malice or reckless indifference, punitive damages would still be inappropriate as to the employer, the Fifth Circuit held, because the employer "made good-faith efforts to comply" with the relevant laws. *Id.*; *see also Heagney v. Wong*, 915 F.3d 805, 824-25 (1st Cir. 2019) (affirming jury's judgment for plaintiff on Chapter 151B claim, yet reversing the punitive damages award because there was simply "no basis for a reasonable jury" to "conclude[] that the defendants engaged in a conscious or purposeful effort to demean or diminish the class of which

the plaintiff is a part (or the plaintiff because he or she is a member of the class)")
(cleaned up); *Smith v. Bell Atl.*, 63 Mass. App. Ct. 702, 721, 829 N.E.2d 228, 244-
45 (2005) (affirming trial court's refusal to issue punitive damages instruction in a
reasonable-accommodation action where "there was no basis for finding that the
company intentionally or willfully violated the law or that its conduct was evil in
motive").

With respect to punitive damages, this case is like *Tobin* and *Harris*. Even if,
as the district court believed after trial, some of PPD's testimony was "imprecise and
implausible," Add14, that alone does not demonstrate malice or reckless disregard,
*see Tobin*, 553 F.3d at 149. To the contrary, because the evidence at trial showed
that PPD considered the relevant factors—including Dr. Menninger's essential
functions, the reasonableness of her proposed accommodations, and her complaints
about Mr. Mekerri—PPD's employees subjectively believed they were doing the
right thing, even if their efforts are deemed to have ultimately fallen short. *See
Tobin*, 553 F.3d at 149; *Harris*, 92 F.4th at 302. That is especially true here because,
regardless of what any individual PPD employee did, said, or wrote, the district court
already held that **PPD** made good-faith efforts to comply with the law. *Compare*
JA74-75 (holding that PPD satisfied the good-faith standard), *with Harris*, 92 F.4th
at 302 (reversing punitive damages award where employer made "good-faith efforts"
to act lawfully).

That the jury nonetheless awarded $10 million in punitive damages only underscores the likely prejudicial impact of the "reader" instruction. This instruction effectively told the jury that the surrogate that PPD refused to provide Dr. Menninger was, as a matter of law, a "reasonable accommodation" to which she was entitled— and that, upon finding as much, the jury should proceed to weigh damages. It is difficult to overstate how much this erroneous instruction distorted the jury's perception of PPD's conduct, leading it to interpret innocuous conduct as malicious.

Take, for instance, one of the key pieces of evidence that Dr. Menninger characterizes as inculpatory: a statement from a PPD manager that PPD would "delicately work [Dr. Menninger] out." JA2825. For a jury effectively instructed that PPD declined a wholly reasonable accommodation for a "reader," this statement could reflect a cold, calculated violation of Dr. Menninger's rights. If, on the other hand, the jury had not received this instruction and believed that the reasonableness of her request to hire a surrogate to fulfill her responsibilities was at least debatable, then the jury may well have credited the testimony of multiple PPD employees who described trying to help Dr. Menninger by sensitively addressing the psychological challenges that prevented Dr. Menninger from working. JA742-JA743, JA1151-JA1152. In fact, this benign interpretation is all the more reasonable in light of the uncontested evidence that PPD: (1) engaged in a good-faith "interactive process" to review Dr. Menninger's proposed accommodations and agreed to her other

requested accommodations, (2) alternatively worked to find her a non-client-facing role, (3) allowed her to take several months of paid leave, and (4) terminated her employment only when she said she would not return to work.

Yet the erroneous "reader" instruction effectively foreclosed this reasonable interpretation. Hamstrung by an incorrect understanding of what qualifies as a "reasonable accommodation," the jury misperceived PPD as a flagrant violator of Dr. Menninger's rights for which $10 million worth of punishment was in order. Had it been properly instructed, it would have been better able to understand PPD's actions and rightfully conclude that the evidence provided no basis for punishing PPD in this way.

Accordingly, this Court should at the very least strike the jury's grossly excessive $10 million punitive damage award.

## **CONCLUSION**

For the foregoing reasons, this Court should grant judgment as a matter of law to PPD on Dr. Menninger's disability-discrimination claims, then remand for a new trial on her retaliation claim. In the alternative, it should strike the award of punitive damages as contrary to law and unsupported by the evidence.

Dated: April 19, 2024                    Respectfully submitted,


                                         /s/ Douglas Hallward-Driemeier
                                         Douglas Hallward-Driemeier (BBO #627643)
                                         Douglas.Hallward-Driemeier@ropesgray.com
                                         ROPES & GRAY LLP
                                         2099 Pennsylvania Avenue NW
                                         Washington, DC 20006
                                         T: (202) 508-4776
                                         F: (202) 508-4650

                                         John Bueker (BBO #636435)
                                         John.Bueker@ropesgray.com
                                         ROPES & GRAY LLP
                                         800 Boylston Street
                                         Boston, MA 02199
                                         T: (617) 951-7951
                                         F: (617) 961-7050

                                         *Attorneys for Defendant-Appellant PPD
                                         Development, L.P.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that

this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R.

App. P. 32(f), the brief contains 12,935 words.

2.    The brief has been prepared in proportionally spaced typeface using

Microsoft Word for Office 365 in 14-point Times New Roman font. As permitted

by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature

of this word processing system in preparing this certificate.


Dated: April 19, 2024                    /s/ Douglas Hallward-Driemeier
                                         Attorney

                                         *Attorney for Defendant-
                                         Appellant PPD Development,
                                         L.P.*

# ADDENDUM

## TABLE OF CONTENTS

**Contents**                                                                        **Page(s)**

Ur gekcri'Xgtf kev'S wguvkqpu'hqt'vj g'Lwt{.'f cvgf "
O ctej "53."4245"]F m036; _‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖Cff3"

Hkpcri'Lwf i o gpv.'f cvgf "O c{ "34."4245"]F m0392_‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖Cff8"

Qtf gt"qp"Rnckpvkhhu'Crr nkecvkqp"hqt"Cy ctf "qh'Cwqtpg{u'Hggu"
cpf "Equvu."f cvgf "O c{ "34."4245"]F m038; _‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖Cff: "

Qtf gt"qp"F ghgpf cpvu'Rquv'Vtkcri'O qvkqpu."f cvgf "
P qxgo dgt"3."4245"]F m03; 5_‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖Cff33"

Ej cti g'vq'vj g'Lwt{ (Excerpts).'f cvgf 'O ctej "52."4245"]F m0367_‖‖‖‖‖‖‖‖‖‖‖‖Cff57"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LISA MENNINGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 19-11441-LTS |
| | ) | |
| PPD DEVELOPMENT, L.P., | ) | |
| | ) | |
| Defendant. | ) | |

## SPECIAL VERDICT QUESTIONS FOR THE JURY

### Question 1: Discrimination—Failure to Provide Reasonable Accommodation Claim

Question 1. Did Dr. Menninger prove by a preponderance of the evidence that PPD

unlawfully discriminated against her by failing to provide her with a reasonable

accommodation?

YES: ✓          NO: _____

*Please proceed to Question 2A.*

### Question 2: Discrimination—Disparate Treatment/Adverse Employment Action Claim

Question 2A. Did Dr. Menninger prove by a preponderance of the evidence that PPD

unlawfully discriminated against her by taking an adverse employment action against her

under <u>federal law</u> (applying the federal "but-for" causation standard)?

YES: ✓          NO: _____

*Please proceed to Question 2B.*

**Add1**

Question 2B. Did Dr. Menninger prove by a preponderance of the evidence that PPD unlawfully discriminated against her by taking an adverse employment action against her under Massachusetts law (applying the Massachusetts "determinative cause" causation standard)?

YES: ✓       NO: _____

*Please proceed to Question 3A.*

## Question 3: Retaliation Claim

Question 3A. Did Dr. Menninger prove by a preponderance of the evidence that PPD unlawfully retaliated against her under federal law (applying the federal "but-for" causation standard)?

YES: ✓       NO: _____

*Please proceed to Question 3B.*

Question 3B. Did Dr. Menninger prove by a preponderance of the evidence that PPD unlawfully retaliated against her under Massachusetts law (applying the Massachusetts "determinative cause" causation standard)?

YES: ✓       NO: _____

*Please proceed to Question 4.*

2

**Add2**

**Question 4: Damages**

*If your answer was "yes" to any of Questions 1-3B above, please proceed to Question 4A.*

*If your answer was "no" to all of Questions 1-3B above, please skip Questions 4A-4E and proceed to Certification.*

Question 4A. Enter below the amount of "back pay," if any, that Dr. Menninger proved by a preponderance of the evidence that she lost because of PPD's disability discrimination and/or retaliation.

$ _1,565,000.00_ (amount expressed in numbers);

_One Million five hundred sixty five thousand_(amount expressed in words)

*Please proceed to Question 4B.*

Question 4B. Enter below the amount of "front pay," if any, that Dr. Menninger proved by a preponderance of the evidence that she will lose because of PPD's disability discrimination and/or retaliation.

$ _5,465,000.00_ (amount expressed in numbers);

_Five million four hundred sixty five thousand_(amount expressed in words)

*Please proceed to Question 4C.*

3

**Add3**

Question 4C. Enter below the amount of damages for "emotional distress," if any, that Dr. Menninger proved by a preponderance of the evidence that she suffered up to today because of PPD's disability discrimination and/or retaliation.

$ _5,000,000.00_ (amount expressed in numbers);

_Five million_ (amount expressed in words)

*Please proceed to Question 4D.*


Question 4D. Enter below the amount of damages for "emotional distress," if any, that Dr. Menninger proved by a preponderance of the evidence that she is reasonably likely to suffer in the future because of PPD's disability discrimination and/or retaliation.

$ _2,00,000.00_ (amount expressed in numbers);

_Two million_ (amount expressed in words)

*Please proceed to Question 4E.*


Question 4E. Do you find that "punitive damages" are warranted against PPD?

YES: _✓_          NO: _____

*If you answered "yes" to Question 4E, please proceed to Question 4F.*

*If you answered "no" to Question 4E, please skip Question 4F and proceed to Certification.*

4

**Add4**

Question 4F. Enter below the amount of "punitive damages" that you award to Dr. Menninger.

$ *10,000,000* (amount expressed in numbers);

_____*Ten million*_____ (amount expressed in words)

*Proceed to Certification.*

**Certification**

I hereby certify the foregoing answers are the unanimous answers of the jury.

_____

Jury Foreperson

*3-31-2023*

Dated:

5

**Add5**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA MENNINGER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>PPD DEVELOPMENT, L.P., )<br>)<br>Defendant. )<br>) | Civil No. 19-11441-LTS |

FINAL JUDGMENT

May 12, 2023

SOROKIN, J.

Pursuant to the verdict of the jury, Doc. No. 149, dated March 31, 2023, judgment is

entered in favor of Lisa Menninger and against PPD Development, L.P. on Counts I (disability

discrimination and retaliation under federal law) and II (disability discrimination and retaliation

under Massachusetts law) of the Complaint, Doc. No. 1. Pursuant to the jury verdict, Judgment

enters (1) in favor of Lisa Menninger and against PPD Development, L.P. on Counts I and II,

and (2) in favor of Lisa Menninger and against PPD Development, L.P. in the amounts of:

$1,565,000 for back pay, $5,465,000 for front pay, $5,000,000 for past emotional distress,

$2,000,000 for future emotional distress, and $10,000,000 in punitive damages. Doc. No. 149.

Pursuant to Mass. Gen. Laws ch. 231, § 6B, the Court awards prejudgment interest at the

Massachusetts rate of 12 percent, starting from the date of the filing of the Complaint (June 28,

2019, Doc. No. 1) up to the date of this Judgment, on the $1,565,000 back pay and the

$5,000,000 past emotional distress damages awards by the jury.

**Add6**

Pursuant to the Court's Order, Doc. No. 169, the Court awards attorney's fees in the amount of $544,477 and costs in the amount of $103,329.45.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                              )
LISA MENNINGER,               )
                              )
        Plaintiff,            )
                              )
v.                            )          Civil No. 19-11441-LTS
                              )
PPD DEVELOPMENT, L.P.,        )
                              )
        Defendant.            )
_____)

ORDER ON PLAINTIFF'S APPLICATION FOR
AWARD OF ATTORNEY'S FEES AND COSTS (DOC. NO. 164)

May 12, 2023

SOROKIN, J.

Plaintiff Lisa Menninger's complaint in this action includes four claims: (1) disability

discrimination in violation of the Americans with Disabilities Act ("ADA"); (2) retaliation in

violation of the ADA; (3) disability discrimination in violation of Chapter 151B of the

Massachusetts General Laws; and (4) retaliation in violation of Chapter 151B. Doc. No. 1.

Although the Court dismissed some of Menninger's theories of liability asserted within some of

the claims in its Order on Defendant's Motion for Summary Judgment, Doc. No. 81, it did not

dismiss any of the claims in their entirety. Id. All four claims went to the jury following a two-

week trial.

At the close of Menninger's evidence, PPD moved for judgment as a matter of law.[1] Doc.

No. 159 at 50. The Court denied that motion. Id. PPD then presented its own evidence in the

_____

[1] Counsel for PPD used the older term for this motion, "directed verdict," Doc. No. 159 at 50, a
distinction without a difference.

**Add8**

form of an expert witness, Dr. Martin Kelly. Id. at 53–107. PPD then rested, however, PPD did

not move again for judgment as a matter of law at the close of all the evidence (i.e., after it rested

as there was no rebuttal evidence), before the case went to the jury. Id. at 107–08; Doc. No. 160.

On March 31, 2023, the jury returned a verdict in Menninger's favor on all claims. Doc. No. 149.

Specifically, the jury found that under both state and federal law,[2] Menninger proved by a

preponderance of the evidence that PPD unlawfully discriminated against her (under both her

failure to provide reasonable accommodation and disparate treatment/adverse employment action

theories of liability), and that PPD unlawfully retaliated against her. Id. at 1–2. They awarded

Menninger $1,565,000 for back pay, $5,465,000 for front pay, $5,000,000 for past emotional

distress, $2,000,000 for future emotional distress, and $10,000,000 in punitive damages, for a

combined damages total of $24,030,000. Id. at 3–5.

After the conclusion of the trial, on April 13, 2023, Menninger filed an application for an

award of $544,477 in attorney's fees and $103,329.45 in costs. Doc. No. 164. PPD filed an

opposition to this Motion that raises no objections to the reasonableness or accuracy of the

calculation approach, rates charged, or amounts of the fees and costs requested by Menninger.

Doc. No. 168. Instead, PPD's opposition asserts various reasons for which the jury verdict

should be overturned. Id. However, there is not currently any motion seeking to overturn the

verdict pending before the Court, no party has proposed a briefing schedule for any post-trial

motion(s), and the arguments presented in PPD's opposition are not relevant to whether the

amount of the fees and costs requested are reasonable or should be adjusted in any way. If PPD

---

[2] The parties agreed in advance of the jury charge that, with the exception of the separate federal
and state law causation standards for the disparate treatment discrimination and retaliation
claims, the Court could combine the corresponding state and federal claims in the jury
instructions and verdict form, and the jury's answers on the combined questions would resolve
both the state and federal claims.

prevails in setting aside the judgment, then, of course, the award of attorney's fees and costs will fall. But the issue before the Court at present is Menninger's application for fees and costs based on the jury verdict that currently stands.

The Court has considered the reasonableness of the fee award requested by Menninger under the "lodestar" method applied in the First Circuit. See, e.g., Pineda v. Skinner Servs., Inc., No. CV 16-12217-FDS, 2021 WL 5882596, at *2–5 (D. Mass. Dec. 13, 2021) (describing and applying the "lodestar method"); Hutchinson ex rel. Julien v. Patrick, 636 F.3d 1, 13–18 (1st Cir. 2011) (same); Gavin v. City of Bos., No. CV 18-10819-LTS, 2022 WL 847409, at *8–11 (D. Mass. Mar. 22, 2022) (same). Under that analysis, on the present record, the Court holds that the $544,477 in attorney's fees and $103,329.45 in costs calculated and requested by Menninger and her attorney, Doc. Nos. 164, 165, are reasonable and need not be adjusted upward or downward by the Court. The Court notes that counsel for the Plaintiff was (1) efficient during the pretrial and trial phases of the case; (2) exceptionally effective in all aspects of his presentation at trial, and (3) thoughtful in his approach, demonstrating a keen understanding of the law, the facts, and their interconnections. Judgment shall enter, including an award of $544,477 in attorney's fees and $103,329.45 in costs.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA MENNINGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil No. 19-11441-LTS |
| | ) |
| PPD DEVELOPMENT, L.P., | ) |
| | ) |
| Defendant. | ) |
| | ) |

ORDER ON DEFENDANT'S POST-TRIAL MOTIONS (DOC. NOS. 179, 180)

November 1, 2023

SOROKIN, J.

Before the Court are two post-verdict motions by the defendant, PPD Development, L.P.,

alternatively seeking judgment as a matter of law, a new trial, or remittitur.  Doc. Nos. 179, 180.

The plaintiff, Lisa Menninger, has opposed the motions, Doc. No. 186, and PPD has replied,

Doc. No. 189.  As explained below, PPD's motions are DENIED.

I.    INTRODUCTION

Twelve impartial and attentive jurors awarded Lisa Menninger approximately $24

million, a total that includes both compensatory and punitive damages, after finding PPD had

violated state and federal law by discriminating and retaliating against Menninger based on her

disability.  The verdict came at the end of a ten-day trial featuring testimony by thirteen

witnesses.  Menninger herself provided detailed and credible testimony in support of her claims,

including powerful descriptions of the harm she suffered at PPD's hands.  Now, having added a

new cadre of lawyers to its defense team, PPD seeks to undo the jury's verdict and escape

liability for every category of damages the jury awarded to Menninger.  In a pair of post-trial

motions, PPD advances a series of challenges, supporting them with flawed legal arguments that the Court previously rejected or that PPD has waived, and a selective recitation of the record which ignores evidence presented to the jury that plainly supports the verdict.

The Court will explain below why all of the challenges in both of PPD's motions fail. These rulings are rendered after careful consideration of the parties' papers related to the motions now pending; the many motions filed by the parties and resolved by the Court throughout all phases of this case, including summary judgment and in the course of this vigorously contested trial; and review of the trial record informed by the undersigned's firsthand observation of the trial. The Court will not, in this Order, set out an exhaustive summary of the evidence presented to the jury. A few points merit comment, though, to fill gaps in PPD's narration of the evidence and provide crucial context for the Court's evaluation and resolution of the pending motions.

First, this case arose from the way PPD responded after Menninger disclosed an anxiety disorder and requested accommodations to help manage her symptoms while performing her job. Menninger's symptoms were triggered by public speaking, among other things. Pursuit and proof of her claims at trial required Menninger to do something that is inherently difficult for a person with her condition: speak, at length, to a room full of strangers. During testimony that began after opening statements on the first day of trial and continued until the early part of the fourth day, Menninger told jurors about her work (as a clinical pathologist and laboratory director), her family (for whom she was the sole source of financial support), her history of mental health treatment (including how her symptoms and conditions evolved over time), and her experience of the events that led to the end of her employment at PPD (and, ultimately, this

lawsuit).[1]  In the Court's view, Menninger was an articulate, credible, and extremely effective witness.  The verdict strongly suggests the jury felt the same.  Her testimony, standing alone, supported many of the elements on which she had the burden of proof at trial.[2]

Second, Menninger's testimony, of course, did not stand alone.  It was supported by her own expert witnesses and corroborated by various documents admitted as exhibits at trial (and marshaled by Menninger in her opposition to the pending motions).  E.g., Doc. No. 186 at 6-15. Especially noteworthy, though, was the manner in which her evidence was bolstered—rather than undermined—by an expert witness offered by the defense.  That expert was Dr. Martin Kelly, a psychiatrist with more than five decades of experience in his field, and he was the last witness from whom the jurors heard.  See generally Trial Tr. vol. 9 at 54-107.[3]  The omission of any reference to Dr. Kelly's memorable testimony in PPD's post-trial papers is unsurprising. Two examples will suffice to illustrate the ways in which Dr. Kelly validated core elements of Menninger's claims.  He opined that Menninger's anxiety disorder posed no major disruption in

---

[1] She also was cross-examined about her ability to provide testimony and to travel alone to Boston from Oregon for the trial despite her anxiety.  These facts, which PPD suggested undermined Menninger's description of the effects of her anxiety, were before the jury to consider and weigh as it evaluated the evidence presented, as were Menninger's explanations offered in response to such questioning.

[2] For example, Menninger described her role at PPD and the daily responsibilities of her job in the time before she disclosed her disability, and she explained how she managed her anxiety when it posed challenges (which, before 2018, was rare).  She explained the ways her supervisor and others at PPD made it seem as though they were trying to force her out of her job after she disclosed her condition.  She described changes in her relationships and interactions with her supervisor and others in the wake of her disclosure.  She spoke about the impact of those events on her condition—at the time of the events and continuing in the years since then.  And, she told the jury she had hoped to continue working at PPD until her retirement.

[3] The ten volumes of the trial transcript appear on the electronic docket in this action at: Doc. No. 151 (vol. 1, Mar. 20, 2023); Doc. No. 152 (vol. 2, Mar. 21, 2023); Doc. No. 153 (vol. 3, Mar. 22, 2023); Doc. No. 154 (vol. 4, Mar. 23, 2023); Doc. No. 155 (vol. 5, Mar. 24, 2023); Doc. No. 156 (vol. 6, Mar. 27, 2023); Doc. No. 157 (vol. 7, Mar. 28, 2023); Doc. No. 158 (vol. 8, Mar. 29, 2023); Doc. No. 159 (vol. 9, Mar. 30, 2023); and Doc. No. 160 (vol. 10, Mar. 31, 2023).

her ability to function, including at work, before the events at issue arose in early 2018 (thereby supporting Menninger's claim that she was a qualified individual able to perform her essential work functions with or without accommodation at the relevant time). E.g., id. at 85-89, 106. And, he disagreed with the diagnosis of major depressive disorder endorsed by Menninger's doctors, opining instead that she suffers from "reactive depression" following a "powerful, negative life event[]"—here, PPD's response to her request for accommodations (thereby supporting Menninger's claim that PPD's conduct caused her substantial and identifiable harm). Id. at 68-70; see also id. at 87-88 (observing Menninger "did not describe panic attacks prior to the request for accommodation," but became "very anxious" about what would happen to her and her family after her request was denied); id. at 91 (referring to "PPD's response to Menninger's request for accommodation" as "the light switch that brought on her reactive depression"). It would be difficult to overstate the conspicuously unhelpful effect Dr. Kelly's testimony had on PPD's position as it was elicited live at trial.[4]

Third, several other witnesses who are or were key figures at PPD provided testimony that was as imprecise and implausible as Menninger's was clear and sincere. Deborah Ballweg, the human resources officer who investigated Menninger's complaint of unfair treatment after she disclosed her disability, testified immediately after Menninger. Almost from the start, Ballweg staked out a series of positions that she promptly had to revise or retreat from entirely when confronted with exhibits that called her statements into question. See, e.g., Trial Tr. vol. 4 at 80-83 (defending her role as the investigator of Menninger's complaint by stating she was "aware" of the underlying events but not "involved" in them, then agreeing she was the primary

---

[4] Menninger's counsel understood the power of this testimony, wielding it to great effect in his rebuttal argument at the conclusion of trial. Trial Tr. vol. 10 at 82.

recipient on various relevant emails and had approved PPD's response to Menninger's request

for accommodations); id. at 91-93 (denying she had seen Menninger's MCAD complaint, then

acknowledging she had personally signed PPD's answer to that complaint); cf. Doc. No. 186 at

9, 11-15 (detailing numerous credibility problems apparent from Ballweg's testimony).  Of the

two PPD witnesses who were present at an important February 2018 meeting, neither

remembered the event in any detail or offered an account that differed from Menninger's.[5]

Compare Trial Tr. vol. 7 at 24-26, 184, with Trial Tr. vol. 2 at 69-72 (describing being

"immediately" confronted with only "two options," neither of which involved Menninger

remaining in her position).[6]  And, the PPD executive to whom Menninger's own boss reported

provided fuel for Menninger's theory that PPD was less concerned with honoring its legal

obligations to her than it was with growing its business by pointing her toward the door.  See,

e.g., Trial Tr. vol. 7 at 210-11 (justifying email sent in April 2018 asking about the "timing" of

Menninger's "exit," even though she had not then expressed any intent to leave, by explaining

preparation was required because her position would be "expensive" to fill "if she opted to

leave"); see also id. at 22 (reflecting statement by human resources representative that PPD "had

to protect the business").  Put simply, the jury had plenty of reasons to view each of these

witnesses' renditions of the underlying events with considerable skepticism.

---

[5] The jury received the testimony of one of these witnesses—Menninger's direct supervisor and a
central figure in the underlying events—through deposition testimony that was read to them in
the courtroom.  Thus, they were not able to assess his testimony with the benefit of in-person
observations of him on the witness stand, or even an opportunity to evaluate his demeanor via a
videotaped examination.

[6] The Court notes that the significant gaps in the memories of both PPD witnesses—as evidenced
by the myriad times each responded to a question with some version of "I don't recall"—were
not limited to the specifics of this one meeting.

Finally, as the Court noted in its summary judgment ruling, this case presented several material factual disputes that a reasonable jury could have resolved in favor of either party. See Doc. No. 81 at 11, 14-15, 18-20. On the paper record presented by the parties at that time, the Court observed that some of those disputes appeared "close" or would require reconciling apparent "tension" between Menninger's position and other evidence. Id. at 11 n.11, 19. Those observations, however, were neither findings of fact pursuant to Rule 56(g) nor otherwise binding on the parties or the jurors at trial. With "the full record developed in court" at trial, Ortiz v. Jordan, 562 U.S. 180, 184 (2011), gaps in the summary judgment record were filled, conflicts and context explained, and observations of the various witnesses' demeanors provided a vital lens through which the jurors (and the Court) could view and understand the paper exhibits.[7] In that context, though the same fact-bound questions remained open for jurors to determine, the relative strength of the parties' positions appeared much different than it had on a written discovery record unilluminated by live witness testimony. Questions that had once appeared close no longer seemed so. Possible tension was mitigated or contextualized. Menninger's credible and detailed testimony was measured against accounts by PPD representatives that were often vague, suffered from troubling inconsistencies, or tended to corroborate Menninger's position rather than undermine it.

These overarching observations inform the Court's evaluation of PPD's motions. In the sections that follow, the Court explains why each of PPD's challenges is meritless.

---

[7] Because of this development in the record, a "summary judgment denial" becomes "ancient history" after a trial has occurred and a jury verdict rendered. Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc., 831 F.3d 815, 823-24 (7th Cir. 2016); accord Dupree v. Younger, 598 U.S. 729, 734 (2023). To the extent this Court granted summary judgment on any discrete legal theory or claim, its instructions to the jury carefully described the law in a manner entirely consistent with those rulings, and PPD has not suggested or demonstrated otherwise.

II.    RULE 50(B)

Invoking Federal Rule of Civil Procedure 50(b), PPD presents four challenges to the sufficiency of evidence supporting elements of Menninger's claims.  Doc. No. 180 at 1-2 (arguing no reasonable jury could find Menninger was "capable of performing the essential functions of her job with or without reasonable accommodation," had been "subjected to any 'adverse employment action' as a result of her disability," was denied "any 'reasonable accommodation' to which [she] was legally entitled," and had "experienced any 'adverse action' as a result of any protected activity").  Besides seeking entry of judgment in its favor as a matter of law for those reasons, PPD also asks the Court to strike the award of punitive damages, urging there was "insufficient evidence at trial to warrant an instruction" on such damages.  Id. at 2.

The first problem for PPD is that it altogether failed to articulate any of the four challenges it now raises to the elements of the discrimination and retaliation claims when it moved for a directed verdict at the close of Menninger's evidence.  As explained in the first subsection below, that failure results in waiver under the plain language of Rule 50 and decisions of the First Circuit interpreting it.  The only challenge PPD arguably did not waive—the request to strike the punitive damage award—is meritless for reasons the Court notes in the second subsection below.

A.    Renewal and Waiver

PPD's motion for judgment as a matter of law is governed—and largely foreclosed—by several well-established principles.  First, a defendant may move for judgment as a matter of law on any issue or claim as to which "a reasonable jury would not have a legally sufficient evidentiary basis to find for" the plaintiff at "any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a).  When making such a motion, the defendant must articulate its challenges

in a manner that is "sufficiently specific so as to apprise the district court of the grounds relied on in support of the motion." Zachar v. Lee, 363 F.3d 70, 73 (1st Cir. 2004); cf. Correa v. Hosp. San Francisco, 69 F.3d 1184, 1196 (1st Cir. 1995) (noting Rule 50(a) motion "at the close of all the evidence preserves for review only those grounds specified at the time" (emphasis added)). This requirement serves a dual purpose. It "informs the [plaintiff] of the challenge to the sufficiency of the evidence" at a time when there remains "a clear opportunity to provide additional evidence that may be available." Fed. R. Civ. P. 50 advisory committee's note to 2006 amendment. And, it "alerts the court to the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury." Id.

Second, "the scope of a Rule 50(b) motion is confined to those grounds raised in the Rule 50(a) motion." Santos-Arrieta v. Hosp. Del Maestro, 14 F.4th 1, 8 (1st Cir. 2021). Indeed, Rule 50(b) expressly allows only for "renewing" a motion for judgment as a matter of law after trial. It does not create a process through which parties may advance new requests for judgment as a matter of law for the first time in a post-verdict motion. See Fed. R. Civ. P. 50 advisory committee's notes to 1991 and 2006 amendments (emphasizing post-verdict motion is limited to "renewal" of earlier challenges and "can be granted only on grounds advanced" in Rule 50(a) motion). The First Circuit has repeatedly warned that a party "cannot use" a Rule 50(b) "motion as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." Correa, 69 F.3d at 1196 (emphasis added).

Besides including the word "renewed" in its opening post-verdict submissions, e.g., Doc. No. 180 at 1, PPD at first ignored these threshold requirements. See Doc. No. 181 at 14. As Menninger persuasively explains at the outset of her opposition memorandum, though, PPD's one-sentence "motion" at the close of Menninger's evidence in this case failed to preserve any of

the sufficiency-of-evidence challenges PPD now seeks to air with respect to Menninger's

discrimination and retaliation claims.  Doc. No. 186 at 2-5.  Confronted with this virtually

inescapable reality, PPD endeavors to avoid its waiver by engaging in revisionist history and

relying on inapposite precedent.  Doc. No. 189 at 9-11.  Its efforts miss the mark.

On the penultimate day of this trial, the Court spoke with counsel when the jurors were

excused for their morning break.  Trial Tr. vol. 9 at 48-51.  The break came at the conclusion of

the testimony of Menninger's final witness.  After confirming that the only thing her counsel

intended to do before resting was move in a group of exhibits by agreement of the parties, the

Court asked PPD's counsel to "assume [Menninger has] rested now," and "treat right now as if

[counsel had] rested, so whatever motions you want to make now, make them."  Id. at 49.  This

is an approach the Court routinely employs to permit defense counsel in civil trials to make Rule

50(a) motions outside the presence of the jury, and without delaying the proceedings when trial

is in session.  Cf. id. ("I just don't see the point of having a sidebar in front of the jury and make

them sit here.").  Having explained that, the following exchange occurred:

> THE COURT:  . . . [S]o he's effectively rested.  Are there any motions you want to
> make?  You don't have to, but I'm just giving you the chance.
>
> [PPD'S COUNSEL]:  Yeah.  A motion for directed verdict, Your Honor.
>
> THE COURT: All right.  Fine.  I will deny that.  So anything else?

Id. at 50.  The conversation then turned to Dr. Kelly (whose testimony would come next and

would end the presentation of all evidence in the case), the time the break would end, and the

Court's intent to meet with the lawyers for a charge conference after the jury was excused for the

day.  Id. at 50-51.

Once the lawyers were excused at the conclusion of that conversation, Court was in

recess for more than twenty minutes.  Id. at 51.  Before the jurors entered the courtroom after the

**Add19**

break, the Court conversed with Dr. Kelly about logistics like the administration of the oath.  Id. at 51-52.  The jurors returned, the remaining exhibits were admitted, and Menninger's counsel rested.  Dr. Kelly then testified.  At the conclusion of his testimony, PPD rested, and Menninger confirmed she wished to present no rebuttal case.  Id. at 107.  The jurors and the witness were then excused, and the Court met with the lawyers in the courtroom immediately thereafter to discuss the final jury charge.  Id. at 107-65.  When the conference was nearing its end, the Court recessed for lunch and an unrelated proceeding, later resuming its discussion with the lawyers about the remaining issues related to the final charge.  Id. at 165-69.  The Court then went over logistics related to closing arguments, reiterated that certain issues raised by the parties about the final charge (including punitive damages) were under advisement and would be resolved later that day, and then adjourned.  Id. at 169-77.

The morning of the next—and final—day of trial, the Court met with the lawyers before the jurors arrived to discuss additional issues Menninger's counsel had raised late the previous day and other logistical matters related to the final stage of the trial.  Trial Tr. vol. 10 at 4-10. Trial then resumed with jury instructions and closing arguments.  Before the jury was excused to deliberate, the Court spoke with the lawyers at sidebar.  Id. at 123-24.  Only after that conversation occurred were jurors excused to deliberate.  Only then was the case "submitted to the jury."  Fed. R. Civ. P. 50(a).

At no point did PPD's counsel seek to revisit its Rule 50(a) motion.  At no point did PPD ask the Court to reconsider its denial of the motion, seek an opportunity to articulate specific sufficiency challenges, or supplement its cursory oral request with a concise written version identifying one or more grounds (as parties often do, in the Court's experience).  There were many opportunities for it to do so.  PPD pursued none of those courses in open court during any

of the proceedings that occurred on March 30, 2023, after the motion was denied or on March

31, 2023, before the case was given to the jury. PPD pursued none of those courses in any

written communication or submission to the Court during any break or recess in the proceedings

on either of the final two days of trial. Indeed, PPD expressed no objection or complaint that it

had been prevented from articulating or fairly litigating a Rule 50(a) motion until its post-verdict

reply brief, after being confronted with the effects of its waiver.

      In these circumstances, the Court finds that PPD waived the sufficiency challenges

presented in its post-verdict motion, except for its challenge to the Court's decision to instruct

the jury on punitive damages. That argument—and only that argument—was advanced by PPD

before submission of the case to the jury, such that it is preserved for renewal via Rule 50(b).

      The Court further finds that there is simply no basis to excuse PPD's waiver in this case.

To the extent PPD seeks shelter in the First Circuit's decision in Blockel v. J.C. Penney Co., that

case is plainly and materially distinguishable from the circumstances outlined above.[8] The trial

transcript of the underlying exchange in Blockel unambiguously depicts an effort by counsel to

"proceed with" a motion "for directed verdict on certain issues," promptly followed by the trial

judge literally interrupting counsel mid-sentence, preventing them from identifying those issues.

337 F.3d 17, 25 n.2 (1st Cir. 2003). PPD's counsel certainly understands this context, as they

excerpted this very exchange in its entirety in their papers. Doc. No. 189 at 10. No such thing

happened in this case. The Court distinctly recalls the salient exchange—in part because PPD's

failure to specify any ground whatsoever for its motion was noteworthy in the moment. It was

the Court's perception that, had it not invited PPD to make "any motions" it wished to make,

---

[8] Indeed, PPD's characterization of Blockel as presenting "identical circumstances" that are "on all fours with the instant action" is just plain wrong. Doc. No. 189 at 9-10.

PPD would have made no Rule 50(a) motion at all.  When PPD's counsel did summarily request a "directed verdict" in response to the Court's invitation—an invitation accompanied by an explanation of why the Court raised the issue when it did—counsel offered no indication that they wished to say anything more in support of the request.  As the transcript confirms, the Court neither interrupted counsel nor in any other way acted to prevent further argument.  When no stated basis or further argument was forthcoming, the Court denied the motion.

Immediately after stating its ruling, the Court asked whether there was "anything else." Trial Tr. vol. 9 at 50.  Nothing about this exchange was rushed.  The jurors were not in the courtroom or waiting in the hallway; they were in a conference room having coffee and snacks. As noted already, PPD's counsel did not then, or at any other time before the jury began deliberating, seek to expand on, revive, or return to its motion for a directed verdict.  These events in no way resemble the exchange at issue in <u>Blockel</u>.[9]  PPD's misguided effort to fault the Court for its waiver are altogether unsupported by the transcript or the Court's recollection of the relevant exchange.

Beyond blaming the Court, PPD suggests counsel's incantation of the phrase "directed verdict" was adequate to preserve all conceivable sufficiency challenges that might be raised in this case, leaving "no basis for confusion" by Menninger or the Court.  Doc. No. 189 at 10-11.

---

[9] There are other distinctions between this case and <u>Blockel</u>.  For example, the trial judge in <u>Blockel</u> entertained in its entirety, and denied on its merits, a post-trial motion for judgment as a matter of law.  <u>See</u> Mem. & Order, <u>Blockel v. J.C. Penney Co.</u>, No. 01-cv-30027, ECF No. 52 (D. Mass. June 27, 2002).  Only on appeal did the plaintiff seek to prevent further review of the defendant's challenges by invoking the concept of waiver based on the lack of specificity in the pre-verdict motion.  337 F.3d at 24-25.  And, without conducting a legislative-history-style analysis of the evolution of Rule 50, the Court notes that amendments to that rule in 2006 included changes to Rule 50(b), with reasons described in notes from the advisory committee. Thus, the version of these rules applicable at the time of the <u>Blockel</u> trial, and the practices of lawyers in civil cases at that time, quite possibly differed in material respects from the rules and practices existing now.

This argument fares no better and merits little discussion.  An unadorned request "for directed verdict," as PPD made here, facially and entirely fails "to apprise the district court of the grounds relied on in support of the motion," as the Rule and various decisions of the First Circuit require. Parker, 547 F.3d at 12; see Fed. R. Civ. P. 50(a)(2) ("The motion must specify . . . the law and facts that entitle the movant to the judgment."); see also, e.g., Jones ex rel. United States v. Mass. Gen. Hosp., 780 F.3d 479, 487-88 (1st Cir. 2015); cf. Gonzalez-Bermudez v. Abbott Lab'ys P.R. Inc., 990 F.3d 37, 45 (1st Cir. 2021) (finding no waiver where moving party did not expressly refute a certain category of evidence in arguing pre-verdict motion but had "specifically asserted that there was no evidence to support" the particular claim as to which challenges were renewed post-verdict).  This case involved multiple claims with various disputed elements.  PPD failed to specify, at any point before the jury began deliberating, which claim(s) and/or which element(s) it believed were unsupported by the trial record.  This failure justified denial of the Rule 50(a) motion, such as it was, and prevents PPD from litigating such challenges for the first time now.

In sum, PPD has waived its claims that the discrimination and retaliation claims were not supported by sufficient evidence at trial.  Insofar as its Rule 50(b) motion raises such challenges, the motion is DENIED.[10]

---

[10] Were the Court's analysis of the sufficiency challenges to proceed beyond PPD's waiver and reach the merits of those claims, the result would be unchanged.  The Court's recollection and review of the record confirms the recitation of the trial evidence, and the Court endorses the application of the relevant legal principles to that evidence, that Menninger ably lays out in her memorandum.  Doc. No. 186 at 15-27.  In other words, the Court agrees and finds that there was ample evidence from which jurors reasonably could have found that Menninger was a "qualified individual," that she suffered at least one adverse employment action, that she was denied at least one reasonable accommodation, and that the elements of retaliation were satisfied (including, for example, by the "sham HR investigation" theory developed and powerfully argued by Menninger at trial and in her memorandum).

B.     Punitive Damages

The only challenge pressed in PPD's Rule 50(b) motion that it has not waived is a request that the Court strike the jury's award of punitive damages "because it is excessive, unsupported by evidence, and contrary to law."[11]  Doc. No. 181 at 31.  As the "party seeking to overturn a jury verdict," PPD "faces an uphill battle."  Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005).  In evaluating PPD's motion, the Court examines the trial record, including all reasonable inferences that may be drawn from the evidence presented at trial, through a lens "weighted toward preservation of the jury verdict."  Crowe v. Bolduc, 334 F.3d 124, 134 (1st Cir. 2003).  PPD is entitled to the relief it seeks only if "the evidence was so strongly and overwhelmingly inconsistent with the [award of punitive damages] that no reasonable jury could have returned it."  Id.  Here, the series of flawed positions PPD advances in support of its challenge to the punitive damage award do not come close to surmounting these demanding standards.[12]

PPD begins and ends its argument by relying on inaccurate characterizations of the Court's position as to a punitive damages instruction in this case.  To the extent there was tentativeness on the Court's part regarding such an instruction, it was grounded in the consideration and caution the Court routinely employs when assessing whether to instruct on

---

[11] Though PPD made no reference to punitive damages in its motion for a directed verdict, it did argue during the charging conference that no instruction on punitive damages should be given because, in PPD's view, the evidence would not support an award of such damages.  Trial Tr. vol. 9 at 163.  In responding to that argument, the Court noted PPD could raise it after the verdict, if appropriate, and the Court would entertain it at that time.  Id. at 172.  These facts, along with the absence of an objection by Menninger to the Court considering this issue now, distinguish it from the other sufficiency challenges the Court has deemed waived.
[12] It bears noting that PPD does not object now, and did not object at trial, to the specific content of the Court's punitive damages instruction.  The only objection it ever has raised on this topic is to the appropriateness of instructing on punitives at all.

punitive damages.  Such an instruction is a serious matter and is not appropriate in every case (as PPD correctly notes).  The Court neither expressed nor harbored "significant hesitancy to even provide a punitive damages instruction given the state of the record."  Doc. No. 181 at 31.  In this particular case, the Court's view of the evidence and of Menninger's claims—including her claim for punitive damages—shifted substantially as the Court heard the evidence at trial and thereafter evaluated it.  The comments by the Court that PPD has block-quoted in its papers do not reveal any "significant" or case-specific reservations.  Rather, they reflect the Court impartially expressing its view of the law, including the option for PPD to challenge any award after the trial.  That the Court voiced its willingness to "entertain, seriously" such a post-trial challenge was not an invitation or a signal that it would endorse such a challenge.  It was simply a statement that, were such a challenge presented, the Court would do its job: consider the parties' arguments and resolve the questions presented to it.  The Court has now undertaken that serious consideration of PPD's challenge and determines it falls short.

PPD's invocation of the Court's position surpasses mere exaggeration when, at the end of its argument, it asserts "the Court itself <u>suggested</u> during the charging conference" that "the award [of punitives] <u>should be vacated</u>."  <u>Id.</u> at 35 (emphasis added).  To be absolutely clear, the Court suggested no such thing.  The Court included a punitive damages instruction because it was persuaded that the evidence might support an award of such damages, depending on the jury's determinations of the facts.  It bears noting that the viability of Menninger's punitive damages request appeared, in the Court's view, to increase as the trial progressed.  This case was something of a perfect storm for PPD, gradually building momentum from the start of Menninger's opening statement to the conclusion of her rebuttal argument.  Practically each wave, it seemed, broke in Menninger's favor and washed away the foundation of PPD's defense,

bit by bit.[13]  The steady crescendo was orchestrated by Menninger's lead trial counsel, who was

adept at marshaling the evidence and eliciting testimony necessary to support his theory of the

case.

By the end of trial, and after hearing Menninger's closing argument weaving together the

evidence presented during the preceding two weeks, it came as no great surprise when the jury

returned a verdict that included an award of punitive damages.  Though the total damages

awarded in this case was obviously remarkable compared to run-of-the-mine civil cases courts

encounter each day, that alone is not a reason to strike or reduce the award.  As Menninger

details in her memorandum, the evidence in this case justified an instruction on punitive damages

and supported the jury's award of them.  See Doc. No. 186 at 6-15 (recounting in a manner

consistent with the record, as well as with the Court's recollection and perception of the

testimony, the evidence supporting the various considerations that govern whether to award

punitive damages and permitting a reasonable jury to conclude PPD acted with malice or

reckless indifference to Menninger's rights in the course of its responses to her request for an

accommodation and/or her HR complaint); cf. Gyulakian v. Lexus of Watertown, Inc., 56 N.E.3d

785, 797-99 (Mass. 2016) (vacating post-verdict order by trial court striking punitive damage

award and reinstating jury verdict, where amount awarded was more than ten times the

compensatory damages, based in part on evidence that reasonably supported a jury finding that

---

[13] Examples from the start and end of the trial make the point.  At the outset, the contrast in demeanor and credibility of Menninger (the first witness) and Ballweg (the second witness) was stark.  These two witnesses supplied a week's worth of testimony that substantially bolstered the plaintiff's narrative of the relevant events and undermined that of the defendant.  At the finish, the jury heard an expert called by the defense make statements that so strongly supported Menninger's theory of the case that her lawyer quoted some of them verbatim in his closing argument.

the employer's investigation of sexual harassment complaint was a sham).  PPD's arguments to the contrary are meritless.[14]

Accordingly, the only preserved challenge presented in PPD's Rule 50(b) motion fails.  PPD's post-verdict motion for judgment as a matter of law (Doc. No. 180) is DENIED.

III.    RULE 59(A) AND (E)

PPD separately seeks a new trial or remittitur, invoking Rule 59.  Doc. No. 179.  The Court may grant a new trial only if it concludes that doing so "is required in order to prevent injustice," including where "the verdict is against the weight of the evidence."  Jennings v. Jones, 587 F.3d 430, 436-38 (1st Cir. 2009) (cleaned up); accord Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de P.R., 554 F.3d 164, 174 (1st Cir. 2009).  Where a party uses Rule 59 as a vehicle for challenging a damages award, they face a "heavy burden" to show the "award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand."  Koster v. Trans World Airlines, Inc., 181 F.3d 24, 34 (1st Cir. 1999) (cleaned up); accord Monteagudo, 554 F.3d at 174.  The Court may not "disturb an award of damages because it is extremely generous or because" the Court believes "the damages are considerably less."  Koster, 181 F.3d at 34.

---

[14] To the extent PPD ties this challenge to its belief that the record did not support a finding that it violated the law at all, it has waived that argument (and the Court would reject it on its merits anyway, as noted previously, for the reasons expressed in Menninger's papers).  To the extent PPD urges that its own view of the facts would not support an award of punitives, that view ignores evidence unfavorable to PPD, was plainly rejected by the jury, and is inconsistent with the standard applicable to a Rule 50(b) motion.  To the extent PPD suggests the punitive award was excessive, it presents no developed argument in support of that position, relying entirely on the amount at issue without citing precedent that would permit the Court to reduce an award of punitives where that award is less than the total awarded compensatory damages.  See sections III(C) & IV, infra; cf. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) (noting absence of "rigid benchmarks that a punitive damages award may not surpass," but suggesting that if "compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages," might mark "the outermost limit of the due process guarantee").

In its Rule 59 motion, PPD advances five arguments it believes justify ordering a new trial. The first three are assertions that the amounts the jury awarded in front pay, back pay, and emotional distress damages are "excessive," "unsupported," and/or "legally deficient." Doc. No. 179 at 1-2. The next two are claims that the verdict was tainted by "misleading and prejudicial instructional errors" and by inclusion of "legally deficient discrimination claims." Id. at 2. Finally, and in the alternative, PPD urges the Court to reduce what it characterizes as a "grossly excessive" and irrational damage award. Id. Each of these challenges fail for reasons Menninger has identified and the Court will summarize in the subsections that follow.

     A.    <u>Jury Instructions</u>

Though PPD asserts the verdict in this case was tainted by "instructional errors" (plural), Doc. No. 181 at 39, it identifies only one supposed error: the Court's inclusion of "the provision of qualified readers or interpreters" in a list of ten accommodations that might be deemed reasonable "[d]epending on the circumstances." Trial Tr. vol. 10 at 93; <u>see</u> Doc. No. 181 at 40-41. PPD does not—and could not—contend that this portion of the closing charge was legally inaccurate. As PPD concedes, the language at issue was taken directly from 42 U.S.C. § 12111(9)(B), which lists examples of what "[t]he term 'reasonable accommodation' may include." The problem, from PPD's perspective, is that the instruction was "deeply problematic" (despite being accurate) in this case because Menninger had requested accommodations that in some instances included having readers or surrogates appear in her stead at events requiring substantial public speaking. Doc. No. 181 at 40.

PPD's position is without any legal or factual support. This case did not hinge, entirely or even significantly, on whether Menninger was entitled to have a "reader" make presentations

on her behalf.[15]  Other determinative issues that featured prominently included whether various

new responsibilities described by PPD were "essential functions" of Menninger's position; the

quantum of public speaking that was, in fact, "essential" to her job; whether PPD undertook a

course of conduct intended to force Menninger to quit instead of accommodating her disability;

and whether PPD conducted an adequate, good-faith investigation of Menninger's HR

complaint.  In any event, as the record of the charging conference confirms, the Court included

"or interpreters" at PPD's request, rather than just listing "readers" as an example, "to give it

some context."  Trial Tr. vol. 9 at 134.  Also in response to PPD's concerns regarding the

"reader" reference, the Court added a sentence following the list of examples to make clear that

the reasonableness of any accommodation was a matter for the jury to assess "based upon [its]

consideration of all the surrounding circumstances."  Trial Tr. vol. 10 at 93.  In this context, there

is simply no basis to conclude that anything about the challenged (but concededly accurate)

instruction was so confusing or prejudicial that it tainted the verdict and justifies a new trial.

 To the extent PPD attempts to revive in this context the sufficiency challenges the Court

deemed waived for purposes of the Rule 50(b) motion, those challenges do not provide an

avenue to relief from the jury's verdict.  PPD urges that the jury's ability to "evaluate the

evidence allegedly supporting Menninger's retaliation claim on its own merits" was impaired by

the fact that "the jury heard over and over" again—"including in the Court's instructions"—

about discrimination claims that were legally deficient.  Doc. No. 181 at 41-42.  This theory was

---

[15] A word search of the parties' closing arguments returns only one use of the word "readers" by Menninger's counsel, and it is a passing reference appearing seven pages into an argument that spanned twenty-eight pages.  Trial Tr. vol. 10 at 29.  PPD's counsel did not use the term at all, applying the term "surrogate" instead (a word which, in the Court's view, evokes something more than a mere "reader") in arguing the accommodations Menninger asked for were neither reasonable nor legally required.  E.g., id. at 55-57.

not raised by PPD at any point during the trial, including during the charging conference or at the sidebar after the Court had instructed the jury. If that is not enough reason to reject it now, the Court again endorses and incorporates Menninger's recitation of the facts and law which supported the jury's verdict on her discrimination claims. See supra note 10 and cited portion of Menninger's opposition memorandum.

      B.    <u>Compensatory Damages</u>

The bulk of PPD's Rule 59 motion focuses on the damages awards. The Court will address each component of the compensatory damages in turn. <u>First</u>, PPD makes cursory reference to the jury's award of $1,565,000 in back pay in its motion, claiming a new trial is required because the award "is excessive and unsupported by the evidence at trial." Doc. No. 179 at 1. In its memorandum and subsequent reply, however, PPD merely mentions the back-pay amount but offers no argument at all—developed or otherwise—with respect to that award. <u>See generally</u> Doc. No. 181 at 35-39; Doc. No. 189 at 22-20. Thus, any challenge to the back-pay award is waived.

<u>Second</u>, PPD asks the Court to set aside "the jury's wildly excessive front pay award," urging the expert testimony on which it was apparently based suffered from flawed assumptions that render it incapable of supporting the award. Doc. No. 181 at 36-38. The jury's front-pay award of $5,465,000 was just about $300,000 less than the amount of forward-looking economic loss Menninger's expert calculated. It is fair to assume, then, that jurors largely accepted and relied on the testimony of that expert in determining the appropriate front-pay award. As Menninger notes, PPD did not object before or during the trial to the admission of this expert's testimony or to the Court instructing the jury on front pay as an available category of compensatory damages. Doc. No. 186 at 33 n.9. Despite having filed no motion in limine

seeking to limit or exclude the expert's opinion, PPD now complains that he rendered an opinion based on "a series of assumptions that are not merely unsubstantiated, but directly contradicted by the factual record." Doc. No. 181 at 36. PPD goes on to briefly articulate only two assumptions it believes are flawed: the assumption Menninger would be unable to return to work for the thirteen years remaining in her "working life," and the assumption that Menninger would have continued working at PPD until her retirement.

For reasons outlined in Menninger's papers, the Court finds there was ample evidence that, if credited by the jury, supported both assumptions. Doc. No. 186 at 33-36. For example, Menninger herself testified she had hoped and planned to remain at PPD for the remainder of her career. Trial Tr. vol. 2 at 53. And there was evidence, including from doctors treating her for her anxiety, of the severe and lingering effects she suffered as a result of her mistreatment by PPD.[16] A jury could find, and an expert could assume, based on that evidence that Menninger had been a qualified individual capable of performing her job at PPD during the relevant period, but that the trauma she experienced because of PPD's discriminatory and retaliatory acts more likely than not rendered her incapable of returning to similar work in the future. Those two findings are not "logically inconsistent." Doc. No. 181 at 38. PPD's challenge to the front-pay award fails.

Third, PPD seeks to avoid the jury's award of $7 million to Menninger for emotional distress (with $5 million allocated for distress she suffered before the trial, and $2 million for the distress she would likely experience in the future). In advancing this challenge, PPD does not contest Menninger's proof that she has suffered, and will continue to suffer, profound emotional

---

[16] That there also was evidence from which jurors could have found Menninger likely would be able to return to work at some point in the future is of no great assistance to PPD. The jury did not reach—and was not required to reach—that conclusion.

distress.  Rather, it limits its argument to one centered on causation.[17]  According to PPD, evidence linking Menninger's emotional suffering to unlawful conduct by PPD "is wholly absent," and "PPD cannot be held responsible for Menninger's pre-existing disability, nor the debilitating symptoms that define it."  Doc. No. 181 at 38-39.  This position, of course, ignores substantial evidence in the record that supports a finding of such causation—including, as noted previously, the testimony of PPD's own expert witness.[18]  On this, again, Menninger's brief recites the evidence in a manner consistent with the record and the Court's recollection of the proceedings.  Doc. No. 186 at 28-33.  Menninger suffered profoundly, and the record supports a finding that the lion's share of her suffering was either caused or meaningfully exacerbated by PPD's discriminatory and retaliatory conduct.  The jury's award of emotional distress damages in this case, though certainly generous, is neither conscience-shocking nor "so high that it would be a denial of justice to permit it to stand."  Koster, 181 F.3d at 34.

In sum, the Court finds no basis to nullify the jury's compensatory damages awards and order a new trial in this case.  PPD's selective recitation of the evidence and invocation of hyperbolic language simply do not meet the burden PPD bears under Rule 59.

C.     Remittitur

As noted above, in "seeking remittitur," PPD "bears the heavy burden of showing that the award is 'grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.'"  Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 187 F. Supp. 3d 217, 225 (D. Mass. 2016) (quoting Koster, 181 F.3d at 34).

---

[17] The Court notes that PPD did not object at trial to the Court instructing the jury on emotional distress damages or to the particulars of that instruction.
[18] Notably, some of Dr. Kelly's testimony that supports a finding of causation was elicited on direct examination by PPD's own counsel.  E.g., Trial Tr. vol. 9 at 68.

A party cannot satisfy that burden by simply pointing to other cases in which the total damages awarded was less (without examining the similarity of those precedents to the case at issue), or even by pointing out that few juries have awarded total damages that meet or exceed the award at issue.  See Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 579 (1st Cir. 1989).  "If a jury's award has a foundation in the record, it will not be overturned except in the most egregious of circumstances."  Id. at 580; see also Koster, 181 F.3d at 34 (noting remittitur is appropriate only if the award "is so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law").

In an argument that is barely a page long, PPD invites the Court to "remit the jury's patently excessive verdict."  Doc. No. 181 at 42.  Its failure to develop this argument in any meaningful way risks waiving yet another of its post-verdict challenges.  Assuming it is not waived, the Court finds no basis for remittitur under the standards governing such a request.  This is so for the same reasons articulated above in rejecting each of PPD's challenges to the separate components of the jury's damages award, and for all of the reasons capably expressed by Menninger.  Doc. No. 186 at 36-41.  PPD's request for relief under Rule 59(e) is denied.

IV.    CONCLUSION

The Court listened closely to the evidence during trial and has reviewed and evaluated it carefully in considering PPD's motions.  The findings and conclusions the jury reached are unassailable when the governing legal standards are applied to the trial record.  Nor does the Court have any hesitancy in upholding the verdict, including all its components, when considered through the lens of the "interests of justice" or any other measure.  The jury in this case did not merely conclude that PPD intentionally discriminated and retaliated against Menninger.  It found that the foregoing was an organized, considered effort by a number of

**Add33**

executive-level employees who were well aware that their conduct violated the law <u>and</u> that the course of action they were undertaking was inflicting real and substantial harm.  The jury agreed that "PPD broke Lisa Menninger."  Doc. No. 186 at 2 (italics omitted).  It concluded that PPD's employees—during the course of the relevant events and again on the witness stand at trial— disingenuously claimed otherwise, demonstrating a flagrant disregard for the requirements of the law and the effects of their conduct.

To be sure, the sum total of the verdict is quite large.  The evidence presented and the jury's findings therefrom, however, reasonably and fairly support each component of the award. As is often true, the evidence adduced at this trial could have permitted a jury to make different findings and reach different conclusions than this jury did.  But the Court finds that this jury's determinations and conclusions are amply supported under the facts and law.  Nothing that occurred, in the Court's view, warrants a new trial.  Nor, again in the Court's considered view, is there a basis for suspecting a so-called "runaway jury," blinded by emotion.  This jury diligently attended to the evidence presented to it, then rendered a considered and thoughtful verdict grounded in that evidence.  Each category of damages is fairly and reasonably supported.  The award in total is large, but so is the harm PPD inflicted on Menninger.

For all of the foregoing reasons, the Court DENIES PPD's Motions for Judgment as a Matter of Law (Doc. No. 179) and for New Trial or Remittitur (Doc. No. 180).

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

direct and specific so as to put the employer on notice of the need for that accommodation. Any accommodations not sufficiently requested at the time of the underlying events cannot be considered as possible reasonable accommodations for purposes of this claim. In other words, when you move on to the fourth element below, you may only consider those accommodations that you believe were requested in a sufficiently direct and specific way so as to put the employer on notice of the need for that accommodation, and you may not consider any potentially reasonable accommodations that Dr. Menninger did not sufficiently request from PPD at the time of the underlying events.

<em><u>Element Four: Requested Accommodation Was "Reasonable"</u></em>

Fourth, Dr. Menninger must prove that the accommodation that she requested was "reasonable." In evaluating this, please refer back to my definition of a reasonable accommodation under element two and the factors described below. Dr. Menninger must also prove that PPD failed or refused to provide the requested accommodation.

Depending on the circumstances, a reasonable accommodation might include, among other things, (1) modifying or adjusting a job application process to enable a qualified applicant with a disability to be considered for the position, (2) making existing facilities used by employees readily accessible to and usable by persons with disabilities, (3) job restructuring, (4) a part-time or modified work schedule, (5) reassignment to a vacant position, (6) acquisition or modification of equipment or devices, (7) the adjustment or modification of examinations, training materials, or policies, (8) modifying when and how an essential job function is performed, (9) altering, reassigning, or eliminating non-essential job functions, or (10) the provision of qualified readers or interpreters. Whether something is a reasonable accommodation

**Add35**

is a determination you make based upon your consideration of all of the surrounding circumstances.

An accommodation is not "reasonable" if it requires eliminating or excusing an inability to perform any essential function of the job, if it requires shifting any of the essential functions of the job to other employees, if it requires creating a new position for the disabled employee, or if it creates an undue hardship for the employer.

Finally, as to any requested accommodations that you find to be "reasonable," you must determine whether PPD failed to provide that accommodation to Dr. Menninger.

### *Undue Hardship*

If you find that Dr. Menninger has proven by a preponderance of the evidence all four elements of this claim, you must consider whether the reasonable accommodation(s) that you found PPD failed to provide imposed an undue hardship on PPD. On this question, PPD bears the burden to prove that all of the accommodations that you found were both reasonable and not provided by PPD imposed an undue hardship.

An accommodation imposes an "undue hardship" if it would create significant difficulty or expense for PPD, considering the nature and cost of the accommodation, the overall financial resources of PPD, the effect of the accommodation on expenses and resources, and the impact of the accommodation on the operations of PPD. This last consideration—the impact of the accommodation on PPD's operations—includes the accommodation's impact on the ability of other employees to perform their duties, and the impact that the accommodation has on PPD's ability to conduct its business.

If you find that there was at least one reasonable accommodation that satisfied all of the elements above but that did not impose an undue hardship on PPD, then that reasonable

performed the "essential functions" of the Executive Director position at the time that PPD took the alleged adverse employment action against her with or without reasonable accommodation.

    <u>Third</u>, that PPD had knowledge of Dr. Menninger's alleged anxiety disorder at the time it took the alleged adverse employment action against her.

    And <u>fourth</u>, that PPD took an adverse employment action against Dr. Menninger, and that PPD did so in whole or in part because of her disability.

### *Element One: Disability*

    First, Dr. Menninger must prove that she had a "disability" within the meaning of anti-discrimination laws. Please refer to and apply here the definition of disability provided above under element one of claim one (the discrimination based on failure to provide reasonable accommodation claim).

### *Element Two: "Qualified Individual"*

    Please refer to the definition of "qualified individual" provided under claim one, element two above. The same definition applies here.

### *Element Three: Knowledge*

    Third, Dr. Menninger must prove by a preponderance of evidence that PPD had knowledge of Dr. Menninger's alleged anxiety disorder at the time it took the alleged adverse employment action against her.

### *Element Four: Adverse Employment Action & Causation*

    Fourth, Dr. Menninger must prove by a preponderance of the evidence that PPD took an adverse employment action against Dr. Menninger, and that PPD did so in whole or in part because of her disability. Dr. Menninger alleges that PPD's creation of new goals and

expectations for her role as Executive Director was an adverse employment action taken because of her disability.

To determine whether Dr. Menninger has proven this element, you must first decide whether PPD took an adverse employment action against her. A trivial harm is insufficient. The fact that an employee is unhappy with something that his or her employer did or failed to do is not enough to make that act or omission an adverse employment action. Likewise, subjective feelings of disappointment or disillusionment concerning an employment action do not constitute an adverse action. Rather, an employer takes materially adverse action against an employee typically when it (1) takes something of consequence away from the employee, for example, by discharging or demoting the employee, reducing his or her salary, or taking away significant responsibilities; or (2) fails to give the employee something that is a customary benefit of the employment relationship, for example, by failing to follow a customary practice of considering the employee for promotion after a particular period of service.

For an employment action to be adverse, it must have materially changed the conditions of Dr. Menninger's employment, which means that it must be more disruptive than a mere inconvenience or an alteration of job responsibilities. However, assignment of more difficult job responsibilities, disadvantageous assignments, unwarranted negative job evaluations, or toleration of harassment by other employees could qualify as adverse actions. Likewise, an employee may meet this standard by showing that her employer intentionally assigned new job duties to target her known disability, such as by selecting tasks that would be more difficult due to the disability.

Whether an action is materially adverse should be judged from the perspective of a reasonable person in Dr. Menninger's position, considering all of the circumstances and the

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 19, 2024, a copy of the foregoing was electronically filed with the United States Court of Appeals for the First Circuit by using the Court's CM/ECF system and will be sent electronically to the registered participants.


Dated: April 19, 2024              /s/ Douglas Hallward-Driemeier
                                   Attorney

                                   *Attorney for Defendant-Appellant PPD Development, L.P.*