No. 23-2030

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

LISA MENNINGER,

*Plaintiff-Appellee,*

v.

PPD Development, L.P.,

*Defendant-Appellant.*

BRIEF OF PLAINTIFF-APPELLEE

LISA MENNINGER

Patrick J. Hannon
Hartley Michon Robb Hannon LLP
101 Federal Street, Suite 1810
Boston, MA 02110
phannon@hmrhlaw.com
P: (617) 723-8000
Attorneys for Plaintiff-Appellee

# **Table of Contents**

TABLE OF AUTHORITIES ........................................................3

STATEMENT OF THE CASE ...................................................5

SUMMARY OF THE ARGUMENT ........................................28

ARGUMENT ...........................................................................29

- I.  PPD UNLAWFULLY DISCRIMINATED AGAINST DR. MENNINGER, AND THE JURY'S UNANIMOUS VERDICTS ON COUNT I (FAILURE TO ACCOMMODATE) AND COUNT II (DISPARATE TREATMENT) SHOULD BE AFFIRMED..........................29

   A.    PPD Failed to Comply With Rule 50(a), and Has Not Presented Any Legitimate Basis For Excusing That Failure. ................................................................30

   B.    There Was Sufficient Evidence to Support the Jury's Finding that Dr. Menninger Was Capable of Performing The Essential Functions Of Her Job With Or Without Accommodation. ..................................................31

   C.    There was Sufficient Evidence to Support the Jury's Finding That Dr. Menninger was Subjected to an Adverse Employment Action Because of her Disability......................42

- II.  THERE WAS NO INSTRUCTIONAL ERROR, AND PPD IS NOT ENTITLED TO A NEW TRIAL ........................................................... 44

    A.    PPD Failed to Preserve its Claim of Instructional Error ..... 45

    B.    There Was No Error, And PPD Suffered No Prejudice ........ 47

- III. THE JURY'S AWARD OF PUNITIVE DAMAGES SHOULD NOT BE DISTURBED ............................................................................. 50

CONCLUSION ...................................................................................... 67

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bell v. O'Reilly Auto Enterprises, LLC*, 626 F. Supp. 3d 141 (D. Me. 2022) .................................................................................... 31, 50

*Blockel v. J.C. Penney Co.*, .................................................................. 30

*Booker v. Massachusetts Dep't of Pub. Health*, 612 F.3d 34 (1st Cir. 2010) ................................................................................................ 44

*Burnett v. Ocean Properties, Ltd.*, 987 F.3d 57 (1st Cir. 2021) .............. 49

*Cargill v. Harvard University*, 60 Mass. App. Ct. 585 (2004) ............... 32

*Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31 (1st Cir. 2003) .. 51

*Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11 (1st Cir. 2002) 32, 38

*Gyulakian v. Lexus of Watertown, Inc.*, 475 Mass. 290 (2016) .............. 51

*Handrahan v. Red Roof Inns, Inc.*, 43 Mass. App. Ct. 13 (1997) ........... 51

*Keith v. Cnty. of Oakland*, 703 F.3d 918 (6th Cir. 2013) ........................ 47

*Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 441 Mass. 632 (2004) ................................................. 31

*Ward v. Massachusetts Health Rsch. Inst., Inc.*, 209 F.3d 29 (1st Cir. 2000) ................................................................................................ 32

**Other**

29 C.F.R. § 1630.2(n)(2),..........................................................................32

29 C.F.R. § 1630.2(n)(3)...........................................................................32

## STATEMENT OF THE CASE

The instant dispute stems from a meeting in late December 2017 between Dr. Menninger and her supervisor Hacene Mekerri. During that meeting, Mekerri told Dr. Menninger that he would "like to make some changes" to Dr. Menninger's role in the upcoming year. JA 278-79, 313-314. In particular, Mekerri mentioned the possibility of having Dr. Menninger provide formal PowerPoint presentations to some of its large pharmaceutical clients. *Id.*

This concerned Dr. Menninger because, since childhood, she suffered from Social Anxiety Disorder. JA278-79. Social Anxiety Disorder is a mental impairment in which a person experiences intense anxiety associated with *certain kinds* of social or performance circumstances. JA1017-19. Specifically, people with Social Anxiety Disorder have difficulty introducing themselves to other people, performing in front of other people, and giving speeches in front of other people. JA1018.

Importantly, Social Anxiety Disorder does not impact all forms of inter-personal communication. *Id.* For example, Dr. Menninger had no difficulty speaking with clients and potential clients over the phone to discuss technical matters, such as her laboratories' capabilities, or issues

5

arising with particular projects. JA3301. Whether, and, if so, to what extent, a specific activity would be difficult to perform because of Social Anxiety Disorder depends on a variety of factors, including context, setting, number of people, and the kinds of tasks at hand. JA1028-30. For Dr. Menninger in particular, activities focused around her technical or professional expertise, such as laboratory function and quality evaluation, were less likely to be impacted by her mental impairment. JA1029.

But even where Social Anxiety Disorder makes a particular task difficult, it does not make it impossible. JA1251-54. For example, a hallmark of Social Anxiety Disorder is difficulty engaging in public speaking. JA1030-31. Dr. Menninger had proven capable of engaging in public speaking activities throughout her professional career, including in medical school, her residency, and at PPD. JA280-82. These activities, however, put additional strain on Dr. Menninger, as she typically had to medicate with Valium, which came with significant side-effects. JA281, 521.

In their December 2017 meeting mentioned above, Dr. Menninger told Mekerri that the changes he was considering making to her role

would involve activities that made her "anxious." JA 313-14. Mekerri responded by noting that he had seen Dr. Menninger present slides before and she had done "an excellent job." *Id.* Mekerri further sought to reassure Dr. Menninger by telling her that "there's no reason to be anxious." *Id.*

It was this exchange with Mekerri that prompted Dr. Menninger to first disclose to PPD that she suffers from a mental impairment. JA314-15, 2923. Dr. Menninger was fearful of doing so, as she did not want to be seen by her employer as "defective" and did not want to risk losing her job or missing out on career advancement opportunities because of it. JA315. But Mekerri had indicated that he would be having a further discussion with Dr. Menninger after the holidays concerning the possible changes to her role, and Dr. Menninger thought it would be most productive to be open and honest as to why she was concerned about being asked to perform certain activities. JA 317, 2923.

It was a decision that Dr. Menninger would come to regret. The discussion that Mekerri was supposed to have with Dr. Menninger concerning possible changes to her role never took place. JA317. Instead, Mekerri directed Dr. Menninger to communicate with PPD's Human

Resources staff to complete paperwork concerning her disability and request for accommodation. JA318. Dr. Menninger dutifully complied, and asked her physician, Dr. Marianna Kessimian, to complete the required form. JA317, 321.

On January 31, 2018, Dr. Kessimian emailed the completed form to Chad St. John, PPD's human resource specialist assigned to Dr. Menninger's request. JA2582. This would be the first of two written communications between Dr. Kessimian and St. John concerning possible accommodations for Dr. Menninger—which we will refer to herein as the "First RFA," JA2582, and the "Second RFA," JA2586.

In the First RFA, Dr. Kessimian confirmed that Dr. Menninger suffered from a mental impairment that substantially limited multiple major life activities, including thinking, concentrating, communicating and working. JA2584. In explaining how the impairment impacted Dr. Menninger's work, Dr. Kessimian wrote

> Lisa's disability makes it extremely difficult for her to engage in public speaking and social interaction. While Lisa has been able to tolerate these types of activities to the extent that they have been necessary for her job, they often cause her to suffer from anxiety and other somatic symptoms. Any changes to her role that increase the need for public speaking and/or social interaction will increase her anxiety and worsen her somatic

symptoms, which would make it substantially more difficult,
if not impossible for Lisa to perform her job.

JA2585.

Further responding to questions on the form provided by PPD, Dr.
Kessimian recommended three potential accommodations: (1) that any
social interaction or public speaking incident to Dr. Menninger's role be
minimized as much as possible, (2) that her role not be changed to require
any increased social interaction or public speaking, or (3) if social
interactions and/or public speaking were deemed necessary for Dr.
Menninger's role, that Dr. Menninger be afforded the opportunity to
"plan" for these activities with her health care provider. *Id.*

Dr. Menninger's trial expert, Dr. Paul Summergrad, confirmed in
his testimony that each of these proposed accommodations would have
helped alleviate the stress and burden caused by Dr. Menninger's mental
impairment. JA 1036-38. In particular, Dr. Summergrad explained that
there are three "phases to the response to Social Anxiety Disorder"—the
anticipatory phase, the actual event, and the recovery—and that
"planning" would have helped Dr. Menninger because:

> [k]nowing what the tasks were, how frequent they were, who
> would be there, numbers of people that would be there, etc.,
> all of those would allow her both to anticipate correctly and

assess and also be able to manage those events, as she had been managing various forms of public speaking within her current role…

JA1037-39.

In response to the First RFA, St. John asked Dr. Menninger to identify "the specific expectations that [Mekerri] shared with you for 2018 that you believe you cannot or limitedly perform." JA2628-29. Dr. Menninger informed St. John that they "only had a general discussion concerning changes that he's considering" and were "supposed to have a follow-up conversation to discuss specifics," which never happened. *Id.*

Two days later, Dr. Menninger received an email from Mekerri, outlining five buckets of activities. JA327-28; JA2918. Some of the items were activities that Dr. Menninger performed "regularly without issue," others were tasks she had performed rarely, such as presenting slides during Town Halls, and others were activities she had never been asked to perform before, such as physically attending meetings at client sites (she had previously participated only by phone). JA328.

Mekerri's email left significant room for interpretation. It combined several different types of activities within each bucket and then provided a broad "frequency" that failed to identify the particular activities to

which it applied. JA329-330; JA2918. At trial, PPD offered no evidence to explain how this email was created or otherwise clarify its terms. JA1280-1291.

At St. John's request, Dr. Menninger provided Mekerri's "buckets" email to Dr. Kessimian so that she could provide more specific recommendations. JA337. This resulted in the Second RFA, which was the product of Dr. Menninger and Dr. Kessimian's collective "brainstorming," and was sent to St. John on February 14, 2018. JA924-25, 2586. As reflected in the document, the Second RFA focused on the tasks within each bucket that were made more difficult by Dr. Menninger's mental impairment. For any formal presentations, such as "Town Halls" or "sales presentations," Dr. Kessimian suggested that Dr. Menninger could prepare materials for someone else to present, or, alternatively, that Dr. Menninger could pre-record audio/video to be presented. JA2587. Similarly, for meetings at client sites, where socializing was more likely to occur, Dr. Kessimian suggested that a surrogate could attend in person, with Dr. Menninger available via remote means, such as video conferencing, and limited to a smaller group of attendees. *Id.*

At no time did Dr. Kessimian—or anyone else—say that Dr. Menninger **needed** any of these proposed accommodations in order to perform the tasks identified in Mekerri's buckets email. Consistent with the First RFA, Dr. Kessimian was providing suggestions as to how certain tasks within those "buckets" could be modified so as to minimize the amount of social interaction and public speaking that would be incident to Dr. Menninger's role. JA924-25. Moreover, nothing in the Second RFA suggested that these were the only accommodations that could achieve that goal. Indeed, the Second RFA specifically states that Dr. Menninger "is able to build business relationships in a more 'behind the scenes' fashion and would like [to] brainstorm other potential areas where she can add value[.]" JA2587.

Twelve days later, without any further discussion or communication with Dr. Menninger on the subject, St. John sent Dr. Menninger an email with PPDs response to the Second RFA. JA2819. Referring to the five buckets initially laid out by Mekerri, St. John indicated that PPD was providing an accommodation with respect to items 1 and 5, but that no accommodation was being provided with respect to items 2, 3 and 4. *Id.* The only justification offered for the

12

denials was that Dr. Menninger's "participation" in those activities was "critical" and "imperative." *Id.* Notably, no explanation was given as to why Dr. Menninger could not "participate" in a manner that would minimize, or at least allow her to better plan for, the social and public speaking aspects of those activities. *Id.*

Dr. Menninger received this email while en route to PPD's Highland Heights lab, where she was scheduled to attend a town hall and expected to have a further discussion about her accommodation request with Mekerri and St. John. JA338-340. But when Dr. Menninger met with Mekerri and St. John on February 28, 2018, they had a different agenda. JA340-343.

St. John started the meeting by presenting two options: Dr. Menninger could either take an "exit package" or she could take a ***temporary*** consulting role while they looked for someone with the necessary qualifications to take her position. JA340. In presenting these options, St. John insisted that Dr. Kessimian's proposed recommendations were "restrictions" that meant Dr. Menninger was unable to perform her job. JA341. Dr. Menninger "kept, over and over, correcting him, telling him they're not restrictions." *Id.* She explained

13

that she could perform all the responsibilities in the categories, just formal PowerPoint presentations would trigger panic attacks, and the Second RFA was the result of "brainstorming" in which she and Dr. Kessimian were "trying to come up with creative accommodations." JA341, 344. She also told St. John and Mekerri that "[t]here are a lot of things on this list that I do as part of my job routinely without issue…I just—for some tasks such as formal presentations I had to take Valium." JA341.

Dr. Menninger pleaded with the two men, "can we just talk about the tasks, the specific tasks that fell under the those buckets that they had said they could not accommodate?" JA342. She again explained "that there were things listed in those buckets that I did every day weekly without any issue," and desperately asked "could we just break out specific tasks in those that they believed I couldn't perform?" *Id.*

Mekerri and St. John refused, telling Dr. Menninger that they would not provide additional detail. JA342. They admitted that they "did not want her to be medicated" and "for something to happen." JA345. Mekerri callously added, "the business is bigger than all of us." *Id.*

14

At the time of trial, which was five years later, the events of that meeting continued to have a devastating impact on Dr. Menninger. As Dr. Summergrad explained to the jury, the "cardinal element" of Social Anxiety Disorder is the fear of being seen and exposed and humiliated." JA1046. This made Dr. Menninger's disclosure of her disability to PPD a risky proposition. *Id.* When PPD indicated in the February 28, 2018 meeting that it wanted to get rid of Dr. Menninger, and did not believe she was capable of performing her job anymore, it "activated the very concerns she had about being humiliated." *Id.*

"I replay this meeting over and over," she told the jury. JA340. Dr. Menninger was crying, scared, and pleading with them to just have a conversation. JA343. As the sole financial provider for her family, Dr. Menninger felt like she was begging for her life and for the survival of her family. JA342-343. She thought, "I can't do this to my child." *Id.*

At trial (and apparently still today), PPD claimed that it was not trying to push Dr. Menninger out, and her perception of the events on February 28, 2018 were all in her head. JA 1789-90. The evidence showed otherwise.

One such piece of evidence was email correspondence the very next day between Dr. Menninger, Mekerri and St. John. Dr. Menninger started the exchange by reiterating her request for additional information concerning the items in buckets 2, 3 and 4. JA2907. Just as she had done the day before, Dr. Menninger explained

> I think there are many tasks that could fall within those items that would not implicate my disability. If you can be more specific regarding the tasks that you believe fall within these items, I think we could have a more productive dialogue regarding which specific tasks implicate my disability and what reasonable accommodations may be available with respect to those specific tasks.

*Id.* Dr. Menninger also "reiterate[d]" that "I am capable of performing all functions of my job with or without accommodation" and offered to provide additional information if PPD "need[s] confirmation from my physician that this is the case."[1] *Id.* Lastly, Dr. Menninger noted that she was "disappointed that the proposed options about an exit package and consulting arrangement were suggested yesterday," and hoped to "return to exploring accommodation options for the specific tasks that trigger

---

[1] St. John also testified that he had worked in human resources for 27 years before joining PPD, and was aware that PPD had the right to request a certification from an employee's doctor if it had concerns about an employee's ability to do their job.  JA1169-70.

panic attacks." *Id.*

A few hours later, after apparently discussing this message with his boss, Deborah Ballweg, JA2792, St. John responded by abruptly cancelling a follow up meeting that had been scheduled with Dr. Menninger for later that day. JA1170-71; JA2911.

Another significant piece of evidence concerning the events at the February 28, 2018 meeting was an email from St. John to Ballweg just hours before the meeting took place. JA2825. In the exchange, St. John made explicit reference to "delicately working Lisa out." *Id.* Confronted with this email in front of the jury, St. John feigned ignorance as to what he had meant by the phrase. JA1150-52. Ballweg did not fare much better, telling the jury that she thought it was a reference to Dr. Menninger's remote working arrangement—which, given the context of the email, the jury could rightfully conclude was a bold-faced lie. JA745; JA2825.

But even more disastrous for PPD was a memo written by St. John a few days after the meeting, seeking advice from PPD's inhouse counsel, Lisa Noecker. JA2680-85. In the memo, which St. John provided to Ballweg for submission to Attorney Noecker, JA2667, St. John directly

states that he and Mekerri were seeking an "exit strategy" with Dr. Menninger because they believed "[Dr. Menninger] can no longer fully service the CL business as the Senior Lab leader to the degree that the business requires to grown [sic] and hit aggressive business targets." JA2685.

In addition to proving that PPD was, in fact, seeking an "exit strategy" to remove Dr. Menninger, the memo also confirmed other critical aspects of Dr. Menninger's account of the February 28, 2018 meeting. Specifically, St. John noted that Dr. Menninger "wanted more information listed out within the #2-#4 buckets," and that Mekerri refused to provide it. JA2684. The memo even included a draft email (the same draft reflected in JA2792) St. John had written to Dr. Menninger (which he wisely never sent) admitting that the reason for not providing the additional information she requested was because "[a]dding additional detail would only present the opportunity to select items in each bucket you believe you can or can't do." JA2684.

Confronted with this memo at trial, Ballweg and St. John were forced to admit the obvious. They both conceded that "exit" in this context was a reference to Dr. Menninger leaving PPD. JA648, 1175-76. Ballweg

likewise admitted that it was "inappropriate" for St. John to be seeking an exit strategy with respect to Dr. Menninger. JA652. Nonetheless, Ballweg claimed not to recall whether she did anything about it, JA651-52, and PPD declined to inform the jury how Attorney Noecker responded to the request. JA1177-78.

But the evidence spoke for itself. In the weeks that followed, PPD steadfastly refused to provide Dr. Menninger the additional information she was seeking about buckets 2, 3 and 4. Instead, St. John responded almost two weeks later, on March 12, 2018, with a message that deceptively tried to reframe Dr. Menninger's request for accommodation as an effort to "rewrite her job description." JA2809. The message intentionally ignored Dr. Menninger's repeated requests for additional information concerning buckets 2, 3 and 4, and suggested that any additional information that Dr. Menninger required could be obtained by reviewing her written job description. *Id.*

While the context of this email made it readily apparent that St. John was being duplicitous in his message, the reference to portions of Dr. Menninger's written job description were especially telling. Dr. Menninger was one of several individuals having the title "ED Labs."

19

JA2001. Previously, St. John had told Dr. Menninger that PPD intentionally wrote the job description broadly, so that it covered all of the individuals having that title. JA336-37, 445. This was confirmed at trial by another person who had the title of ED Labs, who explained that PPD assigned each "their own swim lane" based on "the experience that you either had to fulfill that role, or your credentials." JA1487-88.

For Dr. Menninger, her "swim lane" had been to serve as PPD's "medical director," which was based on her unique qualification as a pathologist. JA1311. This put her in charge of the "scientific stuff," which included a host of activities that could only be performed by her. JA 271-78.

Further, as St. John was well aware, the entire discussion concerning Dr. Menninger's request for accommodation was spawned by Mekerri's statement in December 2017 that he was considering making changes to her role. JA2628. Accordingly, when Dr. Menninger read Mr. St. John's March 12, 2018 email, it served as further confirmation that PPD was attempting to force her out.[2] JA 349-50.

---

[2] PPD incorrectly asserts in its brief that St. John subsequently agreed to Dr. Menninger's suggestion that they might "table this discussion

Mekerri's behavior after the February 28, 2018 meeting was also concerning to Dr. Menninger. While Mekerri had previously been warm and friendly to her, his demeanor became "tough and accusatory, very cold, disrespectful." JA357. It appeared to Dr. Menninger that "he did not trust me or appear to have trust in me," which was "completely opposite from our previous relationship." JA357.

Dr. Menninger was rightly concerned. After seeking advice from Attorney Noecker concerning an "exit strategy," St. John began coaching Mekerri to document criticisms of Dr. Menninger's work performance to his manager file. JA1182-84, 2589, 2785. This was done at Ballweg's direction. *Id.*

Shortly thereafter, Mekerri advised Dr. Menninger that he wanted her to revise her goals for the year. JA2561. He claimed this was in response to "recent lab issues" that were causing him "concern" and intimated that Dr. Menninger had not been doing enough to prevent such issues from occurring. *Id.* Mekerri told Dr. Menninger that, going

---

[about accommodations] until a particular task arises." Brief at 14. St. John never did so, and instead continued his campaign of ignoring Dr. Menninger's questions while intentionally mischaracterizing the accommodations she had requested. Ex. 115.

forward, he expected there to be no further errors in the labs for which she served as medical director. JA368-69.

Dr. Menninger correctly recognized that this was an effort to create a pretextual basis for her termination. As a manager herself, Dr. Menninger knew that PPD followed the SMART system for establishing goals, which is an acronym describing the necessary characteristics of a proper performance goal. JA1190. The "A" stands for achievable. *Id.* Eliminating lab errors is not an achievable goal. JA1328-29. Indeed, this was confirmed by Mekerri's boss, Dr. Christopher Fikry, who also testified that he did not believe any of the errors that occurred in Dr. Menninger's labs were her fault. JA1331-1338.[3]

In response to Mekerri's request, Dr. Menninger provided an email that explained the circumstances surrounding the "recent lab issues" referred to by Mekerri, and further explained all of the proactive efforts that were already being made to minimize lab errors in the future. JA2590-01. Ballweg then directed that Mekerri's response "be very specific about how [Dr. Menninger] didn't meet expectations." JA2738.

---

[3] For his part, Mekerri claimed no recollection concerning the alleged "lab issues" and was unable to explain why he had requested that Dr. Menninger change her goals. JA1303-1307.

After his original draft appeared too soft, Mekerri submitted a second draft that repeatedly accused Dr. Menninger of acting in an "unacceptable" manner. JA2779-80. That draft was apparently revised by Attorney Noecker, and forwarded to Mekerri by Ballweg for him to send to Dr. Menninger. JA2656.

While Noecker somewhat toned down the final version of Mekerri's message to Dr. Menninger, it was still plainly intended to make Dr. Menninger uncomfortable. *Id.* The message opened with the sentence "I am very surprised and somehow disappointed by your response." *Id.* The message went on to accuse Dr. Menninger of "chang[ing] the discussion to one of current performance," and asserted two additional false criticisms of Dr. Menninger's recent performance. JA376-380, 2894, 2903.

Mekerri's newfound campaign to falsely criticize Dr. Menninger's work performance—which, again, had not existed prior to the disclosure of her disability—had a negative impact on her health. She was not able to sleep, she was having multiple panic attacks a day, and she began to feel suicidal. JA384-385. As Dr. Menninger told the jury "I didn't want to live anymore. I felt like I let my family down and I just felt like a failure." JA385.

At some point in the Spring of 2018, Dr. Menninger developed Major Depressive Disorder. JA1043-44. As Dr. Summergrad explained to the jury, Dr. Menninger had already been at risk of developing Major Depressive Disorder based upon her own, as well as her family's, medical history. JA1044-45. PPD's conduct following disclosure of her disability, however, made it significantly more likely that she would develop Major Depressive Disorder, as it added substantially to her sense of hopelessness, which is a "cardinal symptom of major depression." JA 1049. Notably, PPD's expert was largely in agreement, opining that Dr. Menninger had suffered a "reactive depression," and describing PPD's response to her request for accommodation as the "light switch" that brought it about. JA1642-43.

While the foregoing evidence painted a very clear picture that PPD had broken the law and, in doing so, caused significant harm to Dr. Menninger, there were two additional pieces of evidence that especially underscored why a significant punitive damages award was appropriate.

First, was an email exchange on April 11, 2018, which began with a message from Dr. Fikry asking "Whats timing on Lisa Menninger's exit." JA2879. This was directed to Ballweg's boss, Jerry Williams, who

immediately forwarded the message to Ballweg asking "Where is [St. John] on this one…??" *Id.* Ballweg promptly responded as follows:

> Hacene gave her some tough feedback on a recent issue and f/u with email. ADAAA stalled—Menninger saying she can do all of her duties despite Dr. note. We are not close with term (3 rating for 2017 and just now starting to document) unless she self-selects.

*Id.*

In one fell swoop, this exchange ties together various elements of PPD's unlawful scheme, and demonstrates that it was maliciously perpetrated by senior managers at multiple levels of PPDs business. Indeed, the email makes clear that PPD was, in fact, pursuing an "exit" strategy with respect to Dr. Menninger, that the existence of that strategy was known by these individuals, and that St. John was responsible for its execution. The email further confirms that Mekerri's false criticisms of Dr. Menninger, along with the instructions to document the same, were intended to overcome the fact the Dr. Menninger had received a positive performance review, and PPD lacked a legitimate non-discriminatory reason for terminating her.

Most damning, however, is the clear implication that PPD still harbored hope for Dr. Menninger to "self-select"—meaning quit (JA

667)—and that Mekerri's "tough" feedback was an effort to compel her to do so.[4] While such a scheme would be abhorrent under any circumstances, it was particularly so here, as PPD knew that it was directing its pressure campaign at an employee already suffering from Social Anxiety Disorder.

Also confirming the outrageousness of PPD's conduct was the "sham" investigation conducted by Ballweg. As mentioned above, and documented extensively in emails presented at trial, Ballweg was intimately involved in PPD's response to Dr. Menninger's request for accommodation from the very outset. JA2625, JA2853, JA28115, JA2797, JA2883, JA2829. Nonetheless, Ballweg appointed herself to be the investigator of Dr. Menninger's complaints, which she raised in late April 2018. JA678-79.

Making this decision even more outrageous, one of the emails specifically cited by Dr. Menninger as evidence that she was being targeted by Mekerri, *was an email that Ballweg had directed him to send*.

---

[4] This was further supported by emails showing that, despite not being "close" with a term, PPD was hurriedly looking for Dr. Menninger's replacement, which it had already identified by June 1, 2018. Ex. 106, 109.

JA2656, 2709. Ballweg attempted to justify this clear conflict by claiming that she was just a "conduit" between Mekerri and Attorney Noecker. JA673-74. But Ballweg never investigated Attorney Noecker and, in fact, confided in St. John that her purported investigatory findings were actually "scripted by Lisa Noecker!" JA2662.

Of course, Ballweg did not need to conduct any investigation, as she was already aware that Dr. Menninger was being targeted because of her disability. Specifically, Ballweg knew about the efforts to work Dr. Menninger out "delicately." JA2825. She knew that when that failed, PPD sought an "exit strategy." JA2667, 2685. Ballweg also knew that, as part of that exit strategy, St. John was coaching Mekerri to document false performance criticisms and provide "tough" feedback. JA2879. And she knew that all of this was being coordinated by PPD's inhouse counsel, Lisa Noecker. JA673-74.

But again, Ballweg lied. She told Dr. Menninger that she "found no evidence of discrimination or retaliation." JA396. This left Dr. Menninger "hopeless," as she felt that Ballweg's investigation "was my last chance of trying to save my job [and] protect my family." JA396. This proved to be the last straw, as shortly thereafter, Dr. Kessimian concluded Dr.

Menninger had become a risk to herself, and recommended an immediate medical leave to pursue more intensive treatment. JA 926-27.

By the time of trial, Dr. Menninger had still not recovered from her Major Depressive Disorder, and remained unable to return to comparable employment. JA1050-51.

## SUMMARY OF THE ARGUMENT

1. PPD is not entitled to judgment as matter of law on Counts I and II of the Complaint. First, PPD waived its right to challenge the sufficiency of the evidence on these claims because it failed to make a proper motion at trial under Rule 50, and has identified no valid basis for excusing that failure. Second, even if PPD had not waived its rights, there is more than sufficient evidence for the jury to conclude that Dr. Menninger could perform her duties with or without accommodation, particularly given the fact that (i) PPD bears the burden of proof to establish that a task is "essential" and (ii) Dr. Menninger had a well-documented history of performing all of her duties at PPD without accommodation. Third, there is substantial evidence of PPD discriminatory intent, which easily supports a finding that the adverse employment actions to which Dr.

28

Menninger was subjected after disclosing her mental impairment were "because of" her disability.

2. PPD is not entitled to a new trial. First, PPD forfeited its rights with respect to the alleged instructional error because it failed to raise any objection after the district court modified the instruction to address PPD's stated concerns. But even if the issue were preserved, the record demonstrates that there was no instructional error and PPD is unable to demonstrate any risk of prejudice.

3. The record evidence demonstrates that the jury's award of punitive damages is well supported both factually` and legally, and should not be disturbed.

## **ARGUMENT**

I.   PPD UNLAWFULLY DISCRIMINATED AGAINST DR. MENNINGER, AND THE JURY'S UNANIMOUS VERDICTS ON COUNT I (FAILURE TO ACCOMMODATE) AND COUNT II (DISPARATE TREATMENT) SHOULD BE AFFIRMED.

In its first claim of error, PPD challenges the sufficiency of the evidence underlying the jury's unanimous verdicts on Counts I and II of the Complaint. Specifically, PPD argues that the evidence was insufficient to establish (1) that Dr. Menninger was capable performing the essential functions of her job with or without accommodation and (2)

that Dr. Menninger was subjected to an adverse employment action "because of" her disability. Before addressing these arguments, we begin with the trial court's finding of waiver based on PPD's failure to state the grounds for its motion for directed verdict.

### A.    PPD Failed to Comply With Rule 50(a), and has not Presented any Legitimate Basis for Excusing That Failure.

The requirements of Rule 50(a) are plain and simple. A motion for judgment as a matter of law must (i) be made before the case is submitted to the jury and (ii) "specify the judgment sought and the law and facts that entitle the movant to judgment." Fed. R. Civ. P. 50(a)(2).

Here, PPD concedes that, as the district court found below, its counsel did not provide the detail required by Rule 50(a). Brief at 30-32. PPD's only argument before this Court is that its failure to do so should be excused "because PPD had no reason to *suspect* that the court required, wanted, or would even permit further explanation." *Id.* (emphasis added).

PPD's argument is meritless. A parties' obligation to adequately state the grounds for its Rule 50(a) motion arises from the plain language

of the Rule itself, not from the party's ***suspicion*** as to what that particular court might wish to hear.

The lone case relied upon by PPD, *Blockel v. J.C. Penney Co.*, stands squarely for the proposition that a party's failure to state its grounds under Rule 50(a) may be excused if the district court "foreclosed" the party from doing so. 337 F.3d 17, 25 (1st Cir. 2003). PPD alleges no such "foreclosure" here and, as detailed in the district court's post-trial order, "no such thing happened in this case." Add13. "[T]he Court neither interrupted counsel nor in any other way acted to prevent further argument." Add14.

As PPD claims no error in this aspect of the district court's post-trial order, PPD fails to put forth any valid basis for excusing its noncompliance with Rule 50(a), and the district court's finding of waiver should be affirmed.

### B.    There Was Sufficient Evidence to Support the Jury's Finding that Dr. Menninger Was Capable of Performing The Essential Functions Of Her Job With Or Without Accommodation.

Even if PPD's sufficiency of the evidence arguments have not been waived, the record makes it abundantly clear that they lack merit.

31

1. An Employee's Request for Accommodation of an Activity is Not Evidence That the Employee is Incapable of <u>Performing That Activity.</u>

As an initial matter, PPD incorrectly asserts in its Brief that Dr. Menninger's requests for accommodations can be viewed as a "conce[ssion]" that she was "incapable of performing her essential job functions." Brief at 3. This is blatantly wrong.

Under both state and federal law, a disabled person is entitled to a reasonable accommodation even if it is not **needed** to successfully perform the functions of their job. *Bell v. O'Reilly Auto Enterprises, LLC*, 972 F.3d 21, 24 (1st Cir. 2020) ("An employee who can, with some difficulty, perform the essential functions of his job without accommodation remains eligible to request and receive a reasonable accommodation."); *Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 648 (2004) (same). Accordingly, there is nothing incongruent about Dr. Menninger's request for accommodation of activities—like public speaking—that she was capable of performing, as such an accommodation would alleviate the stress and strain caused by her mental impairment. *See id.*

32

2. PPD did not Presented any Evidence to Show, let Alone Compel a Finding, That the Essential Functions of Dr. Menninger's Role in 2018 Included Activities That She Was <u>Unable to Perform.</u>

From the outset of its argument, PPD fails to adequately address a critical step in the analysis: Identifying the essential functions of Dr. Menninger's job. This is particularly important because PPD bears the burden of demonstrating what the essential functions were. *Ward v. Massachusetts Health Rsch. Inst., Inc.*, 209 F.3d 29, 35 (1st Cir. 2000) (employer always bears the burden to prove a function was essential due to its superior access to information).

To determine if a function is essential, both federal and Massachusetts law apply a multi-factor analysis drawn from the three "reasons" why a function may be essential that are listed in the EEOC's regulations on the ADA, 29 C.F.R. § 1630.2(n)(2), and the seven evidentiary factors listed in 29 C.F.R. § 1630.2(n)(3). *Cargill v. Harvard University*, 60 Mass. App. Ct. 585, 595–96 (2004); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 24–25 (1st Cir. 2002). These factors include "evidence of the amount of time spent performing the particular function, the consequences of not requiring the applicant to perform the function, and the past and current work experience of incumbents in the

job (or in similar positions elsewhere)." *Gillen*, 283 F.3d at 25. "The employer's good-faith view of what a job entails, though important, is not dispositive." *Id.*

PPD's Brief fails to advance any serious argument within this analytical framework. PPD does not even articulate the specific responsibilities that it contends were essential. On page 33 it refers to "interacting with clients" as an essential task. On page 34, it refers generally to "public-facing responsibilities" as essential.

This lack of precision in PPD's argument presents a gaping hole in its appeal, as Dr. Menninger's mental impairment did not interfere with all inter-personal communications—just certain types. For example, Dr. Menninger had no difficulty speaking with clients and potential clients over the phone to discuss technical matters, such as her laboratories' capabilities, or issues arising with particular projects. JA3301. As a general matter, activities focused around her technical or professional expertise, such as laboratory function and quality evaluation, were less likely to be impacted by her mental impairment. JA1029.

Further, PPD makes no effort to argue that the activities contained within Mekerri's five "buckets" are all essential tasks. For example, PPD

completely fails to address the "social" components of those activities—such as attending client lunches and dinners 60%-80% of the time. JA2918. Nor does PPD present any argument to support the conclusion that it was "essential" for Dr. Menninger to perform any of the "bucket" activities with the frequency, or audience size, stated by Mekerri.

The evidence that PPD relies on for its argument also falls far short of the mark. PPD cites to just four sources—Dr. Menninger's job description (JA2919), Dr. Menninger's direct examination testimony concerning which of the "bucket" items she had performed in her role (JA328, 347), one page of Mekerri's testimony (JA1286), and testimony from Chris Clendening concerning his understanding of the activities being performed by PPD's current medical director (JA1515-1520). None of these sources provide any evidence that Dr. Menninger's "essential functions" in 2018 included activities that she was unable to perform.

Against this backdrop, PPD cannot credibly assert that the jury was compelled to find that Dr. Menninger's role changed in 2018, such that her essential functions included more activities that would be impacted by her mental impairment. Indeed, it is hardly surprising that PPD avoids that argument in its brief, as Dr. Menninger remained in her role

for the first five months of 2018, and was never once called upon to perform such activities. JA1785.

### 3. Dr. Menninger's History of Strong Job Performance <u>Provided an Adequate Factual Basis for the Jury's Finding.</u>

Whatever the essential functions might be, the evidence confirmed that Dr. Menninger had historically performed all of the functions of her role without accommodation. This was evidenced by Dr. Menninger's uniformly positive performance reviews, JA2606, 2615, as well as Mekerri's glowing testimony concerning how well Dr. Menninger performed when called upon to engage in public speaking activities. JA1251-54. Given this past performance, that jury had a significant factual basis for concluding that Dr. Menninger remained capable of performing the essential functions of her job without accommodation.

PPD does not appear to argue otherwise. Instead, it attempts to play arm-chair psychiatrist, deploying bits and pieces of Dr. Kessimian's treatment notes to try and suggest that Dr. Menninger's ability to perform her job had diminished sometime between December 2017 and February 2018. Brief at 36. But the evidence does not support that theory.

Indeed, none of the three psychiatrists who testified at trial—including PPD's own expert—opined that Dr. Menninger's ability to perform her job had diminished as of February 2018. To the contrary, Dr. Kessimian and Dr. Summergrad both opined that Dr. Menninger was capable of performing her job without accommodation. JA922, 1036. Likewise, PPD's expert opined that, prior to Dr. Menninger's February 28, 2018 meeting with Mekerri and St. John, she had not "suddenly develop[ed] a condition…that would interfere with her capacity to perform her job as a pathologist." JA1621.

While it is true that Dr. Menninger experienced some anxiety as a result of disclosing her mental impairment to PPD, the evidence made clear this was a symptom of her long-held Social Anxiety Disorder—not evidence that had she developed some new or additional impairment. Again, as Dr. Summergrad explained, a "cardinal element" of Social Anxiety Disorder is "fear of being seen and exposed and humiliated. JA1046. By disclosing her mental impairment to PPD, Dr. Menninger was exposing herself and putting herself in a vulnerable situation where her worst dreams could come true. *Id.* Thus, the anxiety that Dr. Menninger felt after disclosing her disability—such as her preference to

avoid being around the people in Highland Heights to whom she had "exposed" herself—was just further confirmation that she did, indeed, suffer from the mental impairment for which she was requesting accommodation. JA1048.

It also bears mention that, despite the initial anxiety Dr. Menninger experienced in connection with disclosing her mental impairment to PPD, the evidence shows she was experiencing improvement in the days leading up to her planned trip to Highland Heights in late February 2018. JA1118, 2010. And despite whatever lingering discomfort she felt, Dr. Menninger proved fully capable of traveling to that location to conduct her scheduled activities—all without any accommodation.

### 4. The Jury Could Properly Find That the Requested Accommodations Were Reasonable.

PPD's Brief spills an extensive amount of ink trying to portray Dr. Menninger's request for a "reader" or "surrogate" as an effort to reassign the essential functions of her role. But as PPD's argument makes clear, the value that Dr. Menninger brought to the table was not her beautiful oratory, but her brilliant mind. That is precisely what the reader/surrogate proposal sought to capture—a mechanism by which Dr.

Menninger could contribute her expertise while minimizing exposure to the specific activities that were difficult due to her mental impairment.

Given that it was PPD's burden to prove the essential functions of Dr. Menninger's job, it had the burden to show that it was essential for Dr. Menninger to provide these presentations personally. *Ward*, 209 F.3d at 35. Considering the factors discussed above, a reasonable factfinder could conclude that PPD did not meet that burden. In particular, the fact that Dr. Menninger was not called upon to do any such external presentations, including in 2018, along with the lack of any evidence showing that her replacement engages in such presentations, leaves PPD with nothing more than its own protestations that it was essential for Dr. Menninger to make the presentations herself, in person. While that view is important, it is not dispositive, and there remained genuine issues of material fact for the jury to decide. *Gillen*, 283 F.3d at 25.

The same is true with respect to all of the accommodations suggested in the Second RFA. Given the burden shifting framework, the paucity of evidence submitted by PPD in support of its claim that these functions were essential, and the overall fact intensive nature of the inquiry, the reasonableness of the requests presented a clear question of

39

fact for the jury to decide. The district court acted correctly in allowing the jury to decide it.

But even if the Second RFA contained only requests that were "unreasonable" as a matter of law, the verdict must still be affirmed based on the requests for accommodations contained in the First RFA. Indeed, it was those accommodations—not the request for any reader or surrogate—that Dr. Menninger's counsel made the focus of his closing argument. JA1760 ("I don't think this case is really about that [second] set of requests for accommodation. I would submit to you that what this case is really about is the first set if request for accommodations, the one that Dr. Kessimian made on January 31, 2018.")

PPD's brief makes no mention of the First RFA's—probably for good reason. The accommodations are simple, plainly reasonable, and PPD offered no evidence at trial as to why it refused to provide them.

Of particular significance was Dr. Kessimian's proposal that Dr. Menninger be afforded the opportunity to "plan" for activities that would involve public speaking or social interaction. It was an easy ask—no demand was made that Dr. Menninger be afforded a particular amount of time, nor were any other requirements imposed. Just let her plan, so

she can do her best to manage her symptoms and deal with distinct phases to the response to Social Anxiety Disorder. JA1035-39.

It was a great idea. All PPD had to do was communicate with Dr. Menninger concerning their expectations for her—be open and honest about what activities were upcoming, and what would be expected from Dr. Menninger when the time came.

But PPD refused to do it. Even after being put on notice that dr. Menninger would benefit from planning for her speaking and social activities, PPD refused to answer questions from Dr. Menninger about the expectations for her role. At trial, PPD offered no explanation for this failure.  But the evidence strong suggests that it was not done for any legitimate purpose, and that it was part and parcel of PPD's efforts to drive Dr. Menninger out of the company.

For all of these reasons, the jury's unanimous verdict on Count I should be affirmed.

### C.    There was Sufficient Evidence to Support the Jury's Finding That Dr. Menninger was Subjected to an Adverse Employment Action Because of her Disability.

In seeking to set aside the jury's verdict on Count II, PPD asserts that there was only one "potentially adverse employment action submitted to the jury." Brief at 40. PPD has that wrong.

During the charge conference, Dr. Menninger's counsel asked the district court to revise its draft language with respect to Count II to reflect the potential theories of liability that were supported by the evidence. Specifically, Dr. Menninger requested that the jury be instructed that

> Dr. Menninger alleges that PPD's creation of new goals and expectations for her role as executive director was an adverse employment action taken because of her disability.

JA1690. The district court agreed, explaining

> That seems fair, because the goal – that wasn't – that's not seeking to put into the case something I eliminated on summary judgment. I don't think I said at summary judgment that there are no other conceivable adverse actions…seems to me that there's evidence from which they could make their own decision about goals.

JA1691. PPD's counsel did not object to the revised instruction—either at the charge conference or after the jury charge itself.

42

During closing argument, Dr. Menninger's counsel highlighted this instruction for the jury and asked that they consider two potentially adverse employment actions in their deliberations. JA1765. The first was based on how PPD's approach to establishing the expectation for Dr. Menninger's role had suddenly changed. Specifically, counsel argued that—prior to disclosing her disability—PPD had openly engaged with Dr. Menninger about the expectations for her role. This was consistent with how PPD treated other persons holding her same title, whose broad job descriptions required additional detail to create a proper "swim lane." JA1487-88. After she disclosed her disability, however, PPD stopped communicating with Dr. Menninger in the same fashion. Specifically, PPD had become "very cold, very distant" and when Dr. Menninger asked questions about her responsibilities, PPD would not answer them. JA1765, 2684.

Turning to the second potentially adverse employment action, Dr. Menninger's counsel argued that PPD was—because of Dr. Menninger's disability—demanding that she meet unreasonable, unattainable goals. JA1767-68. Specifically, the evidence showed that before learning she was disabled, Dr. Menninger had been treated like other PPD employees,

43

who were assigned goals that were "achievable." JA1190. But after learning that she was disabled, PPD changed her goals, demanding that she prevent all further errors in the lab—a goal that PPD knew was impossible. JA1328-29.

Turning to the issue of "causation"—which is the only issue raised by PPD in this appeal—there was ample evidence from which the jury could infer that PPD was motivated by discriminatory intent. Most significantly, St. John and Mekerri's efforts to find an "exit strategy" were indicative of their discriminatory animus, and evidenced their desire to have Dr. Menninger "exit" PPD. JA2685. And the jury could reasonably infer that Mekerri and St. John were subjecting Dr. Menninger to these adverse employment actions with the hope that it would compel Dr. Menninger to quit. JA2879.

For these reasons, there was more than a sufficient evidentiary basis for the jury to conclude that Dr. Menninger was subjected to disparate treatment because of her disability.

## II.    THERE WAS NO INSTRUCTIONAL ERROR, AND PPD IS NOT ENTITLED TO A NEW TRIAL

PPD seeks a new trial based on a single claim of instructional error. As explained below, this claim was forfeited below when PPD failed to

lodge a proper objection to the challenged instruction under Rule 51. Accordingly, this claim of error is only reviewable for plain error. But regardless of the standard under the which the Court conducts review, there was no error in the instruction given by the district court, and PPD has suffered no prejudice.

### A.    PPD Failed to Preserve its Claim of Instructional Error.

Failure to properly and timely object to a jury instruction results in forfeiture. *Booker v. Massachusetts Dep't of Pub. Health*, 612 F.3d 34, 41 (1st Cir. 2010). "[S]trict enforcement of the object-or-forfeit rule serves to compel litigants to afford the trial court an opportunity to cure a defective instruction and to prevent the litigants from ensuring a new trial in the event of an adverse verdict by covertly relying on the error." *Id.* (cleaned up).

While "stating distinctly the matter objected to and the grounds for the objection" will often suffice to preserve rights, this Court has recognized that more is required when a proposed instruction is modified in response to an objection. *Id.* at 42. If a party remains dissatisfied by the modification, it must "inform the court that [they] believe[] the

45

instruction [i]s still problematic, specify the grounds for [their] objection, [and] give the court an opportunity to correct any error." *Id.*

PPD failed to fulfill that obligation here. During the charge conference, PPD's counsel advised the district court that it was "a little concerned" about include reference to "qualified readers" in the instructions. After some back and forth with the district court, PPD"s counsel "I'm just saying that if it's in the instruction, and the jury might read that as being, of, well. That must be what's required."

At that point, the district court suggested making a modification to the instruction to address PPD's counsel's concern, stating "I could add, potentially, a sentence at the end whether or not something is a reasonable accommodation depends upon, you know a determination considering all the relevant facts and circumstances." From there, the exchange continued as follow:

>**PPD Counsel:** That might be helpful, your honor.
>
>**Court:** Do you object to that?
>
>**Menninger's counsel:** I don't.
>
>**PPD's counsel:** Would it be okay to add "interpreter," just to give it some context?
>
>**Court:** Sure. I'll add it if you want.

**PPD's Counsel:** Thanks.

After this exchange, PPD did not express any further dissatisfaction with the instruction, or otherwise say or do anything to alert the district court that PPD still found the instruction problematic.

On this record, PPD's claim of error has plainly been forfeited. Indeed, the facts here are nearly identical to those in *Booker*. After the district court modified the instruction in an effort to address PPD's concerns, counsel had an affirmative obligation to advise the district court that it remained unsatisfied. PPD's failure to do so deprived the district court of an opportunity to correct any remaining error.

## B.    There Was No Error, And PPD Suffered No Prejudice

Regardless of how this Court resolves the forfeiture issue, PPD's claim of error simply has no merit. Pushing aside the heaps of hyperbole, PPD fails to offer any kind of cogent argument as to how the court's instruction could have possibly misled or confused the jury.

The instruction identified "qualified reader" as one of many examples[5] of workplace modifications that "[d]epending on the

---

[5] Other prominent examples to which PPD did not object were: "job restructuring," "modifying when and how an essential job function is

circumstances…might" be a reasonable accommodation. JA1823. And immediately following that list, the district court provided a crystal clear instruction that "[a]n accommodation is not reasonable if it requires eliminating or excusing an inability to perform any essential functions of the job, if it requires shifting any of the essential functions of the job to other employees, if it requires creating a new position for the disabled employee, or of it creates an undue hardship for the employer." JA1824. Nothing in those instructions is erroneous or misleading.

It also bears mention that accommodations are need specific, not disability specific. The law does not provide one set of accommodations for deaf people, another set for people with mobility issues, and so on. Disabilities come in all shapes and sizes, and they afflict people with all sorts of different needs, arising in a wide variety of contexts. That is precisely why the law imposes the duty to engage in an interactive dialogue, so that creative and thoughtful solutions can be identified that best suit a particular situation. *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013) ("The ADA requires employers to act, not based on

---

performed," and "altering, reassigning, or eliminating nonessential job functions." JA1823.

stereotypes and generalizations about a disability, but based on the actual disability and the effect that disability has on the particular individual's ability to perform the job.").

And here, as the district court noted, the jury could have reasonably found that providing Dr. Menninger a "reader" with respect to at least some of her formal presentation duties, was a reasonable accommodation to which she was entitled. Indeed, that was the exact accommodation that PPD provided Dr. Menninger with respect to her internal presentation duties (bucket #1).

But even if there were error—and there was not—PPD cannot demonstrate any risk of prejudice. As the district court noted in its post-trial order, "[t]his case did not hinge, entirely or even significantly, on whether Menninger was entitled to have a "reader" make presentations on her behalf." Indeed, as noted above, counsel for Menninger urged the jury in his closing to put aside that set of accommodation requests, and focus instead on the First FRA. JA1760.

\*    \*    \*

PPD, as is its style, wants to blame someone else for the damning jury verdict entered against it. But the fact is, that verdict was not the

result of any prejudice, or any confusion, or any error. It was the result of evidence presented to an attentive jury, that was properly instructed on the law, and reached a sound and just verdict. PPD has no one to blame but itself.

### III. THE JURY'S AWARD OF PUNITIVE DAMAGES SHOULD NOT BE DISTURBED

Under the highly deferential standards of Rule 50(b), the punitive damages award must be upheld if, when reading the evidence in the light most favorable to the verdict, and drawing the inferences in Dr. Menninger's favor, a reasonable jury could have concluded that PPD's actions met the legal standard for punitive damages. *Burnett v. Ocean Properties, Ltd.*, 987 F.3d 57, 69–70 (1st Cir. 2021). Here, PPD does not argue that there was any instructional error on the standard, and both parties agree that punitive damages could be awarded if PPD's actions were "outrageous, because of its evil motive or its reckless indifference to the rights of others," as determined by the factors listed by the Court in its charges to the jury. Those factors are:

> One, the egregious or outrageous character or nature of PPD's conduct; [two,] PPD's wealth in order to determine what amount of money is needed to punish PPD's conduct, and to

deter any future acts of discriminates or retaliation; three, the actual harm suffered by Dr. Menninger; four, the magnitude of any potential harm to other victims if similar future behavior is not deterred; five, whether there was a conscious or purposeful effort to demean or diminish the class of which Dr. Menninger is a part, or if there was a conscious or purposeful effort to demean or diminish Dr. Menninger because she was a member of that class; six, whether PPD was aware that the discriminatory or retaliatory conduct would likely cause serious harm or recklessly disregarded the likelihood that serious harm would arise; seven, PPD's conduct after learning that the initial conduct would likely cause harm; and eight, the duration of the wrongful conduct and any concealment of that conduct by PPD.

JA1847-49. (emphasis added).

Notably, PPD focuses its argument entirely on the sufficiency of the evidence supporting Dr. Menninger's failure to accommodate claim, but the punitive damage award must be upheld if the evidence supporting any of her successful claims supported an award of punitive damages. *Bell v. O'Reilly Auto Enterprises, LLC*, 626 F. Supp. 3d 141, 168 (D. Me. 2022). PPD's failure to address any argument to Dr. Menninger's retaliation claim is especially striking, as evidence of intentional

51

retaliation will typically suffice to create a jury question as to whether punitive damages should be awarded. *Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 41 (1st Cir. 2003).

Circumstances that have justified awarding punitive damages have included those where "upon learning of the plaintiff's [disability] condition, the defendant endeavored to bring about the plaintiff's termination." *Handrahan v. Red Roof Inns, Inc.*, 43 Mass. App. Ct. 13, 23, 680 (1997). Punitive damages were also upheld in *Gyulakian v. Lexus of Watertown, Inc.*, 475 Mass. 290, 305 (2016), in which the defendant undertook a "woefully insufficient" sham investigation after learning of unlawful harassment.

Here, the jury was presented with overwhelming evidence from which it could have properly found that PPD's actions were outrageous or at least recklessly indifferent to Dr. Menninger's rights. Focusing particularly on Dr. Menninger's retaliation and disparate-treatment claims, the evidence permitted the jury to find that PPD tried to coerce Dr. Menninger to quit; manufactured false grounds for Dr. Menninger's termination; and established new goals and expectations for Dr. Menninger's role that PPD knew were impossible—all evidence of a

purpose to demean a disabled employee (Factor 1). When Dr. Menninger complained of mistreatment and expressed that PPD's actions were already causing severe panic attacks, PPD doubled down on its misconduct by undertaking a sham "investigation." (Factor 7). The evidence showed that PPD took these actions with knowledge of Dr. Menninger's disorder and awareness or reckless disregard for how much its conduct would harm her (Factor 6); that PPD tried to cover up its misconduct in the Spring of 2018 and consistently continued to cover up its actions through trial, where its witnesses gave false and contradictory testimony  (Factor 8); and as discussed below that PPD's actions actually did cause profound harm to Dr. Menninger that has lasted for over 5 years and will continue to harm her significantly into the future (Factors 3 and 8).

Not only that, the evidence permitted the jury to find that PPD knew of its legal obligations not to discriminate and retaliate against a disabled employee who requested accommodations, yet did so anyway— thereby acting in the face of a perceived risk of unlawfulness. Indeed, PPD consciously perceived the risk that its actions would violate the law, because its HR officials asked its own lawyers to help foment an "exit

strategy" to get rid of Dr. Menninger, in which its in-house counsel actively participated. The jury could properly have found this conduct egregious and outrageous in character (Factor 1) justifying and necessitating deterrence (Factor 3). *See Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 82 (1st Cir. 2001) (evidence "that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful," supports a jury finding "that strong medicine is required to cure the defendants' disrespect for the law." (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 576–77 (1996)).

There is a strong evidentiary basis for these findings. But before delving into the evidence, a brief discussion is warranted concerning PPD's claim (which it repeats incessantly in its Brief) that the district court found "as a matter of law" that PPD had acted in good faith.

No it didn't. While the district court's summary judgment order found that PPD had fulfilled its obligation to engage in the interactive process, its analysis did not touch upon the *subjective intent* of PPD's officials. Instead, the district court took a more "objective" approach, noting that PPD had gone through the necessary steps required by law. JA74.

54

This is made evident by the fact that the district court identified trial worthy issues on matters directly pertaining to PPD's subjective intent. This included, for example, whether Mekerri had drafted the "buckets" email to include items that would make it "more difficult" for Dr. Menninger to do her job (JA76), whether PPD had attempted to coerce Dr. Menninger to quit (JA80), and whether Ballweg had conducted a "sham investigation." (JA82). Further, as the district court stated in its summary judgment order, "the record shows several internal communications among senior leadership and HR showing efforts to push Menninger out." JA82.

To be clear, given those disputed issues of fact, the district court should not have granted PPD summary judgment on the failure to accommodate claim, and if this were to be remanded, that decision should be reversed. But as the district court noted in its post-judgment order, what matters here in assessing the jury's verdict is the evidence presented at trial—which, as the district court makes clear, presented a compelling case in Dr, Menninger's favor.

So let's talk about the evidence. To begin, PPD knew it is illegal to discriminate and retaliate against a disabled employee who requested an

accommodation for a disability; and PPD knew that it had a legal obligation to extend a reasonable accommodation. JA696, 701. Cf. *Bell v. O'Reilly Auto Enterprises, LLC*, 626 F. Supp. 3d 141, 174–76 (D. Me. 2022) (evidence that company officials received ADA training supported punitive damages award under federal standard). PPD was aware of the risk of harm to Dr. Menninger because it was put on notice of Dr. Menninger's anxiety disorder on January 11, 2018 when Dr. Menninger disclosed her disability; again on January 31st when Dr. Menninger and Dr. Kessimian submitted the initial accommodation request, JA2582; and on February 14th when Dr. Menninger and Dr. Kessimian submitted the second accommodation request (responsive to Mr. Mekerri's five buckets) that included Dr. Kessimian's "psychoeducation" about social anxiety disorder. JA2815.

By February 27th Mr. St. John and Ms. Ballweg were discussing "delicately working Lisa out", directly showing that PPD was planning to try to get Dr. Menninger out of its company. JA2825. The next day, on February 28th, Mr. St. John and Mr. Mekerri tried to coerce Dr. Menninger to quit. Mr. St. John began the meeting with Dr. Menninger and Mr. Mekerri by immediately presenting her with just two options: an

exit package, or a consulting arrangement for a couple of months "until they could find somebody who could replace me who had my qualifications." JA340. Neither option would allow Dr. Menninger to keep her job. *Id.* Mr. Mekerri tried even harder to coerce Dr. Menninger to quit by telling her that PPD "did not want to hurt my reputation," JA346, a thinly veiled threat that she would be fired (and her reputation tarnished) if she did not quit.

The next day, March 1st, Dr. Menninger sent a follow-up email asking for more detail about buckets 2–4, reiterating her ability to do her job without accommodation, and offering to provide confirmation from her physician that she could do her job. JA2907. St. John cancelled the follow-up meeting that was scheduled for 3:30 PM that day and lied to Dr. Menninger that he was going to be "considering the items conveyed in your email." JA2911. What St. John actually did first was to email Mekerri and Ballweg a draft response to Dr. Menninger explicitly refusing to answer her question about buckets 2–4, which showed that Mr. St. John, Mr. Mekerri and Ms. Ballweg had no intention whatsoever of clarifying the changes to Dr. Menninger's role or responding appropriately to her request for accommodation. JA2792 ("Adding

additional detail would only present the opportunity to select items in each bucket you believe you can or can't do").

Ms. Ballweg (copying her boss Jerry Williams) then instructed Mr. St. John to prepare a packet for PPD's in-house counsel Lisa Noecker, JA645. Mr. St. John's packet, JA2667, explicitly asked Attorney Noecker for help with an "exit strategy" (emphasis added) to get rid of Dr. Menninger. JA2667; JA1176. As Mr. St. John testified, this packet was sent to legal, JA1177. Ms. Ballweg meanwhile lied under oath that St. John did not want to pursue an "exit strategy," JA643. But admitted that looking for an "exit strategy" was an "inappropriate" response to Dr. Menninger's accommodation request, JA652. The jury could have found she knew at the time that she was violating the law. Further, the jury could have found that Ms. Ballweg, Mr. Mekerri, and Mr. St. John lied— outrageously—when they attempted to claim that Mr. St. John and Mr. Mekerri were just trying to "help" Dr. Menninger during the February 28th meeting when they tried to coerce her to quit and subsequently when they were actually asking PPD's lawyers to help them get rid of her. JA635-54, 1152, 1247,1293.

Later in March PPD began trying to manufacture grounds for Dr. Menninger's termination. Ms. Ballweg worked as a go-between with Attorney Noecker, JA657-58, JA2642, as she coached Mr. St. John, JA751 ("I was . . . coaching Chad"), to in turn coach Mr. Mekerri to begin subjecting Dr. Menninger to increased scrutiny and documentation of alleged performance issues. JA662-63, 2638, 2785, 1182-83.

Shortly after this coaching began, Mr. Mekerri's boss (Chris Fikry) emailed Ms. Ballweg's boss (Mr. Williams) to ask "Whats timing on Lisa Menninger's exit?" JA2879. Mr. Williams then forwarded the message to Ms. Ballweg asking her "Where is Chad on this one. . .??" *Id.* Ms. Ballweg responded matter-of-factly that "Hacene gave her some tough feedback" but that "We are not close with term[ination]" because Dr. Menninger got a "3 rating for 2017 and just now starting to document) unless she self-selects." *Id.* Ms. Ballweg admitted it would have been inappropriate to terminate someone who just got a 3 rating, and that "self-selects" meant quit. JA667.

This evidence permitted the jury to find that Dr. Menninger's supervisor, along with his supervisor, three levels of the human resources department, and in-house counsel, were all colluding to achieve Dr.

Menninger's "exit" because she was disabled and had requested accommodation. Further demonstrating PPD's duplicitousness, Mr. Fikry admitted that at the time of PPD's summary judgment motion, he submitted a false affidavit to the district court claiming that he was "not involved" in the "discussions" about Dr. Menninger's request for workplace accommodations, and that he was "only aware" that those discussions occurred "as a result of this litigation." JA1328.

In furtherance of their unlawful scheme, Mr. Mekerri then adjusted Dr. Menninger's annual goals on April 11, 2018 to include "elimination of lab issues." JA2590. Multiple witnesses confirmed that PPD had an established practice requiring goals to be "achievable," which is the A in the acronym SMART, JA688-89, 1190, and that "elimination of lab issues" was an impossible goal. E.g., JA1329. Mr. Mekerri made this change with the help of Mr. St. John and approval of Ms. Ballweg. JA1184-85. The jury could have found PPD deliberately imposed this impossible term or condition of employment on Dr. Menninger in April with conscious desire to set her up for failure to "justify" a termination, and/or to pressure her to "self-select" by quitting.

After Dr. Menninger complained in writing on April 27, 2018 that Mr. Mekerri's treatment of her was getting "worse" and was causing her to experience increased panic attacks, JA2709—providing PPD with additional notice that its actions were causing, and would cause Dr. Menninger severe harm (Factor 6)—Mr. St. John told her that PPD would launch a "fair and impartial" investigation. JA393. The jury heard overwhelming evidence, including serially contradictory and dishonest testimony from Ms. Ballweg, that PPD conducted this "investigation" as a sham, with intent to cover up its wrongdoing and achieve Dr. Menninger's exit (Factor 7).

PPD knew how important the investigation was to Dr. Menninger and that she was very anxious about its outcome. JA721-27. (Factor 6). PPD also knew conducting a sham investigation was unlawful: Ms. Ballweg had received training on how to conduct investigations, including from PPD's in-house counsel and outside counsel who represented PPD at trial, and understood the need to be objective and impartial. JA621-22. There were other people within HR who could have conducted the investigation besides Ms. Ballweg. JA678-79. Ms. Ballweg admitted it would be inappropriate to investigate a matter in which she

was personally involved, JA622, but disingenuously testified that she was merely "aware" of the situation rather than "involved." JA623.

The evidence showed Ms. Ballweg had not only been deeply "involved" from the outset, but had personally directed and coordinated many of the very actions about which Dr. Menninger complained. Mr. St. John had kept Ms. Ballweg closely informed after Dr. Menninger disclosed her disability and through each step of Dr. Menninger's requests for accommodation, through PPD's February 26th rejection email, which Ms. Ballweg approved in advance. JA2625, JA2853, JA28115, JA2797, JA2883, JA2829. Ms. Ballweg knew back in February that Mr. St. John was trying to "delicately work[] Lisa out," and received his email saying so in writing, JA2825. She worked closely with Mr. St. John on the packet he drafted for Attorney Noecker seeking help with an "exit strategy." JA2667. She worked as a go-between with Attorney Noecker starting in late March to plan Mr. Mekerri's deliberate efforts to "document" pretextual issues with Dr. Menninger's performance. JA2638, 2642, 2785. And she coordinated and reported on the status of these "exit strategy" efforts with Mr. Williams (her boss) and Mr. Fikry (Mr.

Mekerri's boss) so that they would know the "timing" of when Dr. Menninger's "exit" was finally achieved. JA2879.

Dr. Menninger's April 27th email to Mr. St. John (JA2709) that triggered Ms. Ballweg's investigation combined two email threads that PPD had been trying to keep separate and "compartmentalized"— one about her request for accommodation and one about Mekerri's changes to her annual goals. The evidence showed that Ms. Ballweg was directly involved in reviewing and approving PPD's communications to Dr. Menninger in both of these threads. JA2725 (reasonable accommodations) and JA2720 (Goals). Not only that, Ms. Ballweg specifically had forwarded to Mr. Mekerri a draft for him to send (which became Mr. Mekerri's April 25th email in the Goals thread) that was written by Attorney Noecker. JA2656. But when Ms. Ballweg was confronted with JA2720 she falsely denied being aware in advance of Mr. Mekerri's April 25th email. JA670-71. She further denied that Mr. Mekerri's April 25th email was part of PPD's efforts to document alleged performance deficiencies with Dr. Menninger, which the jury could find was a lie. *Id.*

Ms. Ballweg continued to contradict herself, initially refusing to give a straight answer when asked to acknowledge that Mekerri's April 25th email was one of the emails Dr. Menninger had asked to be investigated, JA673-74; then claiming she was not "involved" in Mr. Mekerri's email because she had merely served as a "conduit" between Attorney Noecker and Mr. Mekerri, *id.;* but then admitted that she did know Dr. Menninger had attached Mekerri's email because it related to Dr. Menninger's complaint. JA678. Ms. Ballweg implausibly lied that she "would have had a conversation" with Attorney Noecker "If Lisa Noecker's name would have been attached to any of" the seven matters about which Dr. Menninger complained. *Id.* Ms. Ballweg did not investigate Attorney Noecker even though Ms. Ballweg knew Attorney Noecker was helping to craft this and other responses from PPD to Dr. Menninger. JA674-75.

There was also evidence that Ms. Ballweg's "investigatory" interviews were a mockery. Mr. St. John admitted that her only question was whether he "witnessed anything that was not fair and equitable in conversations between Dr. Menninger and Mr. Mekerri," and that was it. JA1206. The jury could have inferred that Ms. Ballweg actually used this

"investigatory interview" to ask Mr. St. John for help finding documentation that would show performance feedback from Mr. Mekerri pre-dating Dr. Menninger's disclosure of disability—in other words, she was not investigating Dr. Menninger's complaint but rather, trying to find evidence PPD could use to help cover up its efforts to achieve Dr. Menninger's "exit." JA2664, 2868, 1201-03.

There were many more contradictions in Ms. Ballweg's testimony about her investigation even on basic issues. Ms. Ballweg signed a sworn declaration to the MCAD that her "prompt and thorough" investigation had included an investigation of whether PPD had properly handled Dr. Menninger's accommodation requests. JA639-42. But she claimed at trial that she did not investigate PPD's handling of Dr. Menninger's request for accommodation. JA639. Then she testified that she did investigate PPD's handling of Dr. Menninger's accommodation requests, JA641, and that the February 28, 2018 meeting between Mr. St. John, Mr. Mekerri, and Dr. Menninger was within her investigation's scope. JA690. Then she contradicted herself again, denying that investigating the actions of Mr. St. John fell within her investigation's scope. JA692.

Ms. Ballweg admitted that it would have been material to her investigation's findings if she knew that Mr. St. John and Mr. Mekerri's conduct in their February 28, 2018 meeting with Dr. Menninger were part of an effort to gently work Dr. Menninger out of the company, or as part of an exit strategy, because PPD was at that point supposed to be working with Dr. Menninger to determine how it could have accommodated her in her job. JA690. But her investigation made no mention of the facts that Ms. Ballweg knew from her own personal involvement that showed she, Mr. Mekerri, Mr. St. John, Attorney Noecker, Mr. Williams, and Mr. Fikry all shared those exact motives. The jury could have found that Ms. Ballweg knew there was a "concerted plan to move Dr. Menninger out of her position," and indeed Ms. Ballweg did not even explicitly deny knowing there was such a plan when asked directly. JA792. The jury could have found that Ms. Ballweg uttered an egregious and outrageous lie, with conscious intent to demean Dr. Menninger, when she claimed that the discriminatory and retaliatory conduct Dr. Menninger complained about "just wasn't there." JA817.

The jury could also have found Ms. Ballweg lied when she testified that she "held out hope" that Dr. Menninger would return from medical

leave, JA861, because on June 4, 2018 (at the same time Dr. Menninger took medical leave) Ms. Ballweg's boss was already emailing her about logistics for "the new guy" who became Dr. Menninger's replacement—Dr. Basel Kashlan. JA903, 2859.

The reason Dr. Menninger had taken medical leave in early June was that PPD's conduct had caused her to no longer want to live. She suffered severe emotional distress with frequent periods of suicidality for five years and continues to suffer today.

*    *    *

The jury was overwhelmingly justified in concluding that "strong medicine" is needed to punish PPD for its brazen, duplicitous, and harmful conduct.

## CONCLUSION

For the foregoing reasons, Dr. Menninger respectfully requests that PPD's appeal be denied in all respects, that the judgement below be affirmed, and that Dr. Menninger be awarded her costs and reasonable attorney's fees.

Respectfully submitted,

/s/ Patrick J. Hannon
Patrick J. Hannon (BBO #664958)
Hartley Michon Robb Hannon LLP
101 Federal Street, Suite 1810
Boston, MA 02110
phannon@hmrhlaw.com

P: (617) 723-8000
Attorneys for Plaintiff-Appellee

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it was prepared with Century Schoolbook 14-point, a proportionally spaced font with serifs, and the motion complies with Federal Rule of Appellate Procedure 27(d)(2) because it contains 12,780 words, according to the word count of Microsoft Word.

/s/ Patrick J. Hannon
Patrick J. Hannon