No. 23-2030

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

LISA MENNINGER,

*Plaintiff-Appellee,*

*v.*

PPD DEVELOPMENT, L.P.,

*Defendant-Appellant.*

On Appeal from a Judgment of the
United States District Court for the District of Massachusetts
Docket No. 1:19-cv-11441-LTS

## REPLY BRIEF OF DEFENDANT-APPELLANT
## PPD DEVELOPMENT, L.P.

Douglas Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4600
Douglas.Hallward-Driemeier@ropesgray.com

John Bueker
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000
John.Bueker@ropesgray.com

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................. 1

ARGUMENT ......................................................................................... 2

I.   PPD'S SUFFICIENCY CHALLENGES ARE NOT WAIVED, AND
     DR. MENNINGER FAILS TO REBUT THEM ON THE MERITS. ............ 2

     A.   Dr. Menninger Cannot Distinguish *Blockel*, Where This Court
          Held That the Summary Denial of a Rule 50 Motion Preserves a
          Sufficiency Challenge. .......................................................... 2

     B.   Dr. Menninger Cannot Create a Dispute About Whether She
          Was "Qualified" By Contradicting Her Own Doctor's
          Contemporaneous Statement That She Needed a "Surrogate" to
          Perform Her Client-Facing Functions. .................................... 4

         1.   Direct Client Interaction Was Essential to Dr.
               Menninger's Role. ......................................................... 4

         2.   PPD Properly Relied on the Contemporaneous Opinion
               of Dr. Menninger's Treating Physician, Who Believed
               Dr. Menninger Could Not Interface More Frequently
               with Clients And Would Need a Surrogate. ...................... 8

         3.   Dr. Menninger Fails to Rebut PPD's Key Legal
               Argument That the Law Does Not Require an Employer
               to Hire a "Surrogate" Capable of Performing Essential
               Functions. ................................................................... 11

     C.   Even on Dr. Menninger's Own Account, Her Disparate-
          Treatment Claims Fail as a Legal Matter Because She Admits
          That PPD Told Her to Be More Public-Facing *Before* It Knew
          of Her Disability. ................................................................. 14

II.  DR. MENNINGER'S BRIEF CONFIRMS THAT THE COURT'S
     "READER" INSTRUCTION WAS ERRONEOUS IN CONTEXT
     AND ALMOST CERTAINLY PREJUDICIAL. ................................... 16

A.    Dr. Menninger's Waiver Argument Is Itself Waived and Is Wrong in Any Event. ...........................................................17

B.    The District Court Committed Instructional Error Because A "Reader" in the Sense Used Throughout Trial Is Not a Reasonable Accommodation, and Dr. Menninger Cites No Authority to Suggest Otherwise. ...........................................................19

C.    Dr. Menninger Does Not Meaningfully Dispute That the Instructional Error Was Prejudicial. ...................................................21

III.    DR. MENNINGER OVERLOOKS PPD'S GOOD-FAITH EFFORTS TO ACCOMMODATE HER DISABILITY AND FAILS TO ADDRESS THE INFLUENCE OF THE "READER" INSTRUCTION ON THE PUNITIVE-DAMAGES AWARD. ...................23

CONCLUSION ........................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander v. Northland Inn*,
  321 F.3d 723 (8th Cir. 2003) ...............................................................9

*Bain v. City of Springfield*,
  424 Mass. 758 (1997) ........................................................................26

*Bell v. O'Reilly Auto Enters.*,
  626 F. Supp. 3d 141 (D. Me. 2022) ...................................................28

*Blockel v. J.C. Penney Co.*,
  337 F.3d 17 (1st Cir. 2003) .............................................................2, 3

*Booker v. Mass. Dep't of Pub. Health*,
  612 F.3d 34 (1st Cir. 2010) ...........................................................18, 19

*Burnett v. Ocean Props., Ltd.*,
  987 F.3d 57 (1st Cir. 2021) ................................................................27

*Calef v. Gillette Co.*,
  322 F.3d 75 (1st Cir. 2003) ................................................................14

*Chestnut v. City of Lowell*,
  305 F.3d 18 (1st Cir. 2002) (per curiam) (en banc) ......................4, 19

*Costa-Urena v. Segarra*,
  590 F.3d 18 (1st Cir. 2009) ...........................................................22, 23

*Cox v. Corr. Med. Servs., Inc.*,
  2007 WL 2873049 (E.D. Mich. Sept. 26, 2007) ...............................20

*Cox v. New England Tel. & Tel. Co.*,
  414 Mass. 375 (1993) ..........................................................................7

*Dartt v. Browning-Ferris Indus.*,
  427 Mass. 1 (1998) ............................................................................24

*Drumgold v. Callahan*,
  707 F.3d 28 (1st Cir. 2013)................................................................20

*Exby-Stolley v. Bd. of Cnty. Comm'rs*,
  979 F.3d 784 (10th Cir. 2020) .........................................................20

*Gillen v. Fallon Ambulance Serv., Inc.*,
  283 F.3d 11 (1st Cir. 2002)................................................................5

*Gyulakian v. Lexus of Watertown, Inc.*,
  475 Mass. 290 (2016) .......................................................................28

*Handrahan v. Red Roof Inns, Inc.*,
  43 Mass. App. Ct. 13 (1997).............................................................27

*Hill v. Maloney*,
  927 F.3d 646 (1st Cir. 1990)............................................................21

*Jones v. Walgreen Co.*,
  679 F.3d 9 (1st Cir. 2012)..........................................................*passim*

*McAllister v. Innovation Ventures*,
  983 F.3d 963 (7th Cir. 2020) .......................................................9, 11

*McDonough v. City of Quincy*,
  452 F.3d 8 (1st Cir. 2006).................................................................26

*Michael v. City of Troy Police Dep't*,
  808 F.3d 304 (6th Cir. 2015) ...........................................................10

*Miranda-Rivera v. Toledo-Davila*,
  813 F.3d 64 (1st Cir. 2016)..............................................................16

*Mulloy v. Acushnet Co.*,
  460 F.3d 141 (1st Cir. 2006).........................................................6, 12

*O'Rourke v. Tiffany & Co.*,
  988 F.3d 23 (1st Cir. 2021)..............................................................15

*Richardson v. Friendly Ice Cream Corp.*,
  594 F.3d 69 (1st Cir. 2010)........................................................6, 7, 12

*Rivera-Carrasquillo v. Centro Ecuestre Madrigal, Inc.*,
812 F.3d 213 (1st Cir. 2016)...........................................................17, 18

*Russell v. Cooley Dickinson Hosp.*,
437 Mass. 443 (2002) ..............................................................................25

*Sarkisian v. Austin Prep. Sch.*,
85 F.4th 670 (1st Cir. 2023)................................................................20, 21

*Tobin v. Liberty Mut. Ins.*,
553 F.3d 121 (1st Cir. 2009).....................................................................24

*United States v. Tiru-Plaza*,
766 F.3d 111 (1st Cir. 2014)................................................................17, 18

*Zimmerman v. Direct Fed. Credit Union*,
262 F.3d 70 (1st Cir. 2001).......................................................................28

STATUTES

42 U.S.C. § 1981a .........................................................................................25

42 U.S.C. § 12111 ....................................................................................*passim*

42 U.S.C. § 12112 ......................................................................................4, 14

42 U.S.C. § 12113 ..........................................................................................11

Mass. Gen. Laws c. 151B, § 1 ...................................................................4, 14

Mass. Gen. Laws c. 151B, § 4 ...................................................................4, 14

OTHER AUTHORITIES

29 C.F.R. § 1630.2 ........................................................................................11

Fed. R. Civ. R. 50.....................................................................................2, 3, 4

MCAD Guidelines on Disability Discrimination in Employment § II.B .................7

## **INTRODUCTION**

Dr. Menninger's brief only underscores that her claims against PPD are legally deficient in fundamental ways and that the verdict was tainted by instructional error. Rather than address the glaring legal flaws in her claims, Dr. Menninger gives what amounts to another closing argument. But the issues on appeal are primarily legal, and Dr. Menninger fails to rebut the critical legal defects that require either judgment in PPD's favor or a new trial on all her claims.

Dr. Menninger overlooks basic legal principles of disability-discrimination law: (1) a disabled employee is not "qualified," and thus cannot bring a discrimination claim, if no reasonable accommodation would enable them to perform essential job functions; (2) an employer is entitled to rely on contemporaneous statements by the employee's treating physician in deciding whether the employee can perform essential job functions with or without an accommodation; (3) providing another employee to perform a disabled employee's essential job functions is not a reasonable accommodation; and (4) an employer cannot commit disability discrimination without knowing that an employee is disabled.

In failing to address these basic legal principles, Dr. Menninger highlights the broader danger of affirming the decision below. Adopting Dr. Menninger's view of the law would upset the careful balance struck in the Americans with Disabilities

-1-

Act and its Massachusetts analogue:  an employer must provide, if any, only a *reasonable* accommodation that does not impose an *undue hardship*, and the employee must perform the *essential job functions*.  *See* NAM Br. at 4-13.  This Court should restore that careful balance, which ultimately benefits both employers and employees.

PPD adequately preserved its challenges to the jury's verdict, the legal deficiencies in Dr. Menninger's case are irredeemable, and the verdict was almost certainly the product of an erroneous jury instruction.  Accordingly, this Court should vacate the judgment below, award judgment as a matter of law to PPD on Dr. Menninger's discrimination claims, and remand for a new trial on her retaliation claim; at a minimum, it should strike the $10 million in punitive damages.

## ARGUMENT

### I.    PPD'S SUFFICIENCY CHALLENGES ARE NOT WAIVED, AND DR. MENNINGER FAILS TO REBUT THEM ON THE MERITS.

Dr. Menninger attempts to sidestep PPD's arguments by asserting that PPD waived them.  She is incorrect.  But regardless, her disability-discrimination claims plainly fail as a matter of law.

### A.    Dr. Menninger Cannot Distinguish *Blockel*, Where This Court Held That the Summary Denial of a Rule 50 Motion Preserves a Sufficiency Challenge.

Dr. Menninger does not dispute that in *Blockel v. J.C. Penney Co.*, 337 F.3d 17, 25 (1st Cir. 2003), this Court articulated a bright-line rule:  when a district court

"foreclose[s]" a party from "stat[ing] its grounds [for judgment as a matter of law] under Rule 50(a)" by its immediate denial of a motion for directed verdict, the motion is preserved without any need for further argument. Menninger Br. at 31. Nor does she disagree that the district court did, in fact, summarily deny PPD's Rule 50(a) motion as soon as it was made. *See id.*; JA1601-1602. Her only argument is that the summary denial did not foreclose PPD from **later** further articulating the motion's grounds. *See* Menninger Br. at 31. Dr. Menninger misunderstands the law.

As PPD explained (at 30-31), the district court erred by focusing on the "many opportunities" PPD supposedly had to articulate the bases for its Rule 50(a) motion **after** it had already been denied. Add20-Add21. Preservation must be governed by a clear rule; it cannot depend on a court's post-hoc assessment of the arguments that a party might have made later. What matters under *Blockel* is whether the court "foreclosed" further argument at the time by immediately denying the motion. *See* 337 F.3d at 25. By summarily denying PPD's directed-verdict request as soon as it was made, the district court did just that. And by focusing exclusively on PPD's theoretical post-denial opportunities for further argument, Dr. Menninger repeats the court's error. Under *Blockel*, PPD's sufficiency challenges were preserved when it

-3-

made its Rule 50(a) motion, and PPD had no obligation to further articulate the bases

before raising them under Rule 50(b).[1]

> **B.    Dr. Menninger Cannot Create a Dispute About Whether She Was "Qualified" By Contradicting Her Own Doctor's Contemporaneous Statement That She Needed a "Surrogate" to Perform Her Client-Facing Functions.**

Only a "qualified" disabled employee can bring discrimination claims.  42

U.S.C. § 12111(8) & § 12112; Mass. Gen. Laws c. 151B, § 1(16) & § 4.  As PPD

explained (at 31-39), Dr. Menninger's disability-discrimination claims should never

have gone to the jury because the evidence at trial—including Dr. Menninger's

accommodation requests, PPD's communications with her treating psychiatrist, and

her job description, all of which her brief tellingly avoids discussing—demonstrates

unequivocally that she was not "qualified."

> **1.    *Direct Client Interaction Was Essential to Dr. Menninger's Role.***

PPD introduced indisputable evidence that client-facing duties such as

technical presentations, in-person interactions, and external site visits were essential

functions of Dr. Menninger's job, as was the need to ***increase*** the frequency of these

activities, as PPD communicated to Dr. Menninger in December 2017, before PPD

---

[1] Regardless, it is undisputed that PPD's sufficiency challenges are still entitled to plain-error review. *See Chestnut v. City of Lowell*, 305 F.3d 18, 20-21 (1st Cir. 2002) (per curiam) (en banc).  As PPD explained (at 41-43), because of fundamental legal errors, reversal of the verdict on Dr. Menninger's discrimination claims is warranted on plain-error review.

knew of her disability. As even Dr. Menninger's cited authority demonstrates, courts are not to "second-guess legitimate business judgments, but, rather, to ensure that an employer's asserted [essential function] requirements are solidly anchored in the realities of the workplace." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 25 (1st Cir. 2002).

Dr. Menninger concedes (at 35) that her job description listed "business development" and "[s]upport[ing] [the] [b]usiness [d]evelopment [team] in obtaining new customers and maintaining [client] relationships" as "Essential Functions," and provided that Dr. Menninger would be expected to "[i]nteract[] frequently with . . . outside representatives" and "present at meetings with internal and external representatives." JA2919. Dr. Menninger also concedes that her supervisor, Hacene Mekerri, informed her in December 2017 (before PPD knew of her disability) that these client-facing tasks would become even more essential and would increase going forward given PPD's business needs. JA313, JA1287. She further concedes (at 10, 34-35) that, in response to her request for greater specificity regarding their December conversation, Mr. Mekerri identified "five buckets of activities" that PPD expected her to perform, including participating in client bid defenses, delivering external sales presentations, and attending client meetings—all tasks that were already included in her job description. JA2918. It was "imperative" that Dr. Menninger perform these tasks herself so that she could build relationships

with PPD's clients, who "expect[]" to discuss scientific matters with "the people that hold [] scientific certificates." JA2819; JA1515. And Dr. Menninger does not dispute (at 35) that her replacement, Dr. Kashlan, regularly performs these same tasks. JA1515-1518.

The evidence thus unequivocally demonstrated that direct client interaction, including through site meetings and presentations, was essential to Dr. Menninger's role as defined by her employer, and became ***even more*** essential in December 2017 when PPD's business needs demanded its executives, including Dr. Menninger, ***increase*** their level of client interaction. The district court erred in not giving this evidence "substantial weight." *Mulloy v. Acushnet Co.*, 460 F.3d 141, 150 (1st Cir. 2006); *see also* PPD Br. at 33-34 (collecting cases).

In response, Dr. Menninger argues (at 34-35, 39) that (1) PPD did not articulate her job's essential functions with enough specificity; (2) before 2018, she rarely interfaced with clients, and (3) even in 2018, PPD never required her to participate in client-site meetings or lead client presentations. Each argument fails.

First, PPD provided Dr. Menninger, the district court, and the jury sufficiently specific examples of the client-facing functions it expected Dr. Menninger to perform. *See Richardson v. Friendly Ice Cream Corp.*, 594 F.3d 69, 75-77 (1st Cir. 2010) (job description describing essential function as "assist[ing] in kitchen, dining and take-out operations to facilitate production and customer service" was

sufficiently specific).  Second, it is black-letter law that the frequency of a task does not determine whether it is essential—even tasks that are "rarely or never performed" can be essential, and an employer is free to reallocate responsibilities in response to new circumstances.  MCAD Guidelines on Disability Discrimination in Employment § II.B; *see Cox v. New England Tel. & Tel. Co.*, 414 Mass. 375, 390 (1993); *see also Jones v. Walgreen Co.*, 679 F.3d 9, 16 (1st Cir. 2012) ("past [job] performance" does not determine tasks that may be "essential" in the future).  Third, the "voluntary accommodations" PPD made for Dr. Menninger in 2018—deciding not to force her to engage in the increased client interactions that her doctor indicated would jeopardize her health—do not "alter [the Court's] assessment of the essential functions" of her role.  *Richardson*, 594 F.3d at 78.

In short, the evidence was unambiguous that client-facing tasks, including site visits and presentations—as well as the needed ***increase*** in the frequency of these tasks after December 2017—were essential functions of Dr. Menninger's job. Affirming the judgment below would deprive employers of their right to define the essential functions of their employees' jobs—exactly contrary to the design of disability-discrimination law.

## 2. *PPD Properly Relied on the Contemporaneous Opinion of Dr. Menninger's Treating Physician, Who Believed Dr. Menninger Could Not Interface More Frequently with Clients And Would Need a Surrogate.*

Relying merely on her own assessment of her capabilities and past performance, Dr. Menninger now asserts (at 36-38) that, "[w]hatever the essential functions [of her job] might be," she could have performed them without any reasonable accommodation. But Dr. Menninger's self-serving characterizations, made more than six years after the events at issue, contrast sharply with the contemporaneous communications from Dr. Marianna Kessimian, Dr. Menninger's treating psychiatrist. Based on those communications, which Dr. Menninger conspicuously glosses over in her brief, PPD reasonably concluded that Dr. Menninger could not perform the increased client-facing duties asked of her in December 2017.

Dr. Kessimian told PPD that "***any changes** to [Dr. Menninger's] role that increase the need for public speaking and/or social interaction . . . [would] make it* ***substantially more difficult, if not impossible, for [Dr. Menninger] to perform her*** ***job***." JA2942 (emphases added). And Dr. Kessimian explained to PPD that ***Dr.*** ***Menninger's "brain and body are not able to tolerate public speaking*** ***engagements / socializing***." JA2587. For that reason, Dr. Kessimian informed PPD that, to accommodate Dr. Menninger, it would need to hire a "surrogate or reader," which Dr. Kessimian confirmed meant "***someone else who's not Dr. Menninger***

-8-

*[to] actually do[] the in-person interaction part.*"  JA973-JA976; JA2587-JA2588 (emphasis added).

Dr. Menninger accuses PPD (at 36) of "play[ing] arm-chair psychiatrist" in arguing that she could not perform the increased client-facing duties that PPD determined were essential without an accommodation.  In reality, PPD relied on her own treating physician's assessment—that "***any . . . increase***" in her level of client interaction would be intolerable—to reach that conclusion.  The only contemporaneous evidence that contradicted Dr. Kessimian's assessment was Dr. Menninger's conclusory assertions.  Forced to choose between Dr. Menninger self-serving assertion or the scientific assessment of her treating psychiatrist, PPD permissibly chose the psychiatrist.

PPD's choice was reasonable as a matter of law.  *See, e.g.*, *Jones*, 679 F.3d at 18.  Dr. Menninger's "belief or opinion that she [could] do [her job's essential] function is simply irrelevant" because ***disability laws "do[] not require an employer to permit an employee to perform a job function that the employee's physician has forbidden."***  *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003) (emphasis added).  To the contrary, "[o]nce an employee is evaluated by a doctor, an employer is entitled to rely on [the] physician's recommendation that the employee is not able to safely perform an essential function of [the] job." *McAllister v. Innovation Ventures*, 983 F.3d 963, 968-69 (7th Cir. 2020) (cleaned up).

-9-

In *Jones*, for example, this Court affirmed summary judgment in favor of an employer who terminated the plaintiff's employment because she could not perform her essential job functions—even though plaintiff insisted she could. *See* 679 F.3d at 18. The employer was "on firm ground" as a matter of law because the employer relied on the medical opinion of the plaintiff's treating physician. *Id.* So too here. Dr. Kessimian was unambiguous that Dr. Menninger could "not . . . tolerate public speaking engagements," JA2587, and that "any . . . increase" in public speaking would likely be "impossible," JA2942. Thus, like the employer in *Jones*, PPD was "on firm ground" when it relied on Dr. Kessimian's opinion to conclude that Dr. Menninger could not perform her essential job functions without accommodation.

Once again, Dr. Menninger's arguments would effect a sea-change in disability law. If employers could not rely on their employees' treating physicians' assessments, those employers would face an impossible dilemma: either ignore the recommendations of an employee's physician and put the employee's health at risk (exposing themselves to liability), or ignore the employee's self-serving assertions and face a discrimination lawsuit. The law has historically solved that dilemma by permitting employers to rely on the opinions of their employees' physicians without "run[ning] the very risk that the law seeks to prevent." *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 309 (6th Cir. 2015). Indeed, "[i]t would defy common sense to demand that [an employer] disregard [] well-documented medical opinions and

allow its employees . . . to prematurely return to work, thereby jeopardizing their safety."[2]  *McAllister*, 983 F.3d at 969.  By allowing Dr. Menninger's discrimination claims to reach the jury, the district court abandoned that "common sense" proposition and committed plain error.

### 3. *Dr. Menninger Fails to Rebut PPD's Key Legal Argument That the Law Does Not Require an Employer to Hire a "Surrogate" Capable of Performing Essential Functions.*

As PPD explained (at 32-39), two well-established legal principles should have foreclosed Dr. Menninger's disability-discrimination claims.  First, because PPD appropriately concluded that Dr. Menninger could not perform her essential client-facing job functions without an accommodation, Dr. Menninger was not "qualified" to bring disability-discrimination claims unless she identified a "reasonable" accommodation.  PPD Br. at 32 (collecting cases).  Second, an accommodation is ***unreasonable*** as a matter of law if it would require the employer to "delegate so many tasks that ***she*** would no longer be performing her essential [job] function[s]," *Richardson*, 594 F.3d at 81 (emphasis added), or to "reallocat[e] essential functions to make other workers' jobs more onerous," *Mulloy*, 460 F.3d at 153 (cleaned up); *see* PPD Br. at 35-38 (collecting cases).  Rather than dispute these

---

[2] The ADA expressly recognizes this principle in the "direct threat" context.  *See* 42 U.S.C. § 12113(a)-(b); 29 C.F.R. § 1630.2(r).  The EEOC gives the example of prohibiting a person with a narcolepsy diagnosis from operating dangerous power tools, regardless of the employee's wishes.  Neither the ADA nor any other law requires an employer to prioritize the employee's say-so over the medical evidence.

basic principles (because she cannot), Dr. Menninger argues (at 38-41) that (1) a surrogate or reader was just one of two possible accommodations that Dr. Kessimian suggested and PPD refused; and (2) when Dr. Kessimian proposed that PPD accommodate Dr. Menninger with a surrogate or reader, Dr. Kessimian was somehow not suggesting that PPD needed to hire a new employee or reallocate the essential functions of Dr. Menninger's role. Each of her arguments fails.

To start, Dr. Menninger makes much (at 8-11, 39-41) of a supposed distinction between her first request for accommodation in January 2018 and her request for a surrogate or reader in February 2018. According to Dr. Menninger (at 9, 40-41), in January 2018, she requested as an accommodation merely that PPD afford her the "opportunity to plan" for any public-speaking or client-facing duties in advance, but that PPD refused. That is inaccurate. Dr. Menninger's January 2018 accommodation request was for PPD to permit her to "develop[]" a "plan . . . for [client-facing] activities in consultation with [Dr. Kessimian] or another qualified health care provider." JA2583-2584. And PPD granted that accommodation: it readily permitted Dr. Menninger to consult with Dr. Kessimian to develop a plan for dealing with client-facing activities. Yet the plan that Dr. Menninger and Dr. Kessimian developed was for PPD to hire a surrogate or reader for client-facing tasks—an accommodation that, under this Court's precedent, was unreasonable as a matter of law.

Dr. Menninger tries to avoid this conclusion by suggesting that the surrogate or reader responsible for interfacing with clients would not be performing Dr. Menninger's job, but rather engaging in entirely different tasks. Dr. Menninger's attempt to compartmentalize her role proves too much. Contrary to Dr. Menninger's assertion (at 38), PPD did not hire her as its Executive Director for Laboratory Operations exclusively for her "beautiful mind." PPD hired her to be the laboratory director of a client-driven clinical research business, with all the varied functions and tasks that role entailed. Dr. Menninger's position required as an essential function that she support business development, maintain client relationships, and interact with customers. *See* JA2919. Only a surrogate capable of providing scientific solutions to clients in real time, answering clients' technical questions, and explaining PPD's products and services could take Dr. Menninger's place. Hiring such a surrogate—a second highly trained, highly educated, and highly compensated executive—would impose "an extraordinary financial burden" on employers—which the law does not require. NAM Br. at 12-14.

In sum, the evidence overwhelmingly showed that no reasonable accommodation would have enabled Dr. Menninger to perform her essential job functions. Dr. Kessimian made clear that the only way she could continue in her role was if someone else performed those essential functions. Because that proposal was *per se* unreasonable, PPD had no duty to accommodate, and no reasonable jury

-13-

could find that Dr. Menninger was "qualified" to bring a discrimination claim under the ADA or Massachusetts law. *See Calef v. Gillette Co.*, 322 F.3d 75, 86 n.8 (1st Cir. 2003); *see also* 42 U.S.C. § 12111(8) (defining "qualified individual") and § 12112 (antidiscrimination protections extend only to "qualified individual[s]"); Mass. Gen. Laws c. 151B, § 1(16) (defining "qualified handicapped person") & § 4 (disability discrimination protections extend only to "qualified handicapped person[s]").

### C.   Even on Dr. Menninger's Own Account, Her Disparate-Treatment Claims Fail as a Legal Matter Because She Admits That PPD Told Her to Be More Public-Facing *Before* It Knew of Her Disability.

Dr. Menninger's brief also only amplifies the separate legal deficiency underlying her disparate-treatment claim:  Dr. Menninger suffered no adverse employment action ***because of*** her disability. *See* PPD Br. at 39-41.  In the very first sentence of her brief (at 5), Dr. Menninger asserts that this entire "dispute stems from a meeting in late December 2017" during which Mr. Mekerri informed her that her role would require more public speaking and client interaction going forward. PPD agrees.  It was precisely this "expectation[] of increased public speaking and client interaction[]" that the district court sent to the jury as a potentially adverse employment action.  JA76-JA77.  And no reasonable jury could find that such action was taken "because of" Dr. Menninger's disability, because the undisputed evidence demonstrates that PPD communicated this expectation to Dr. Menninger ***before*** it

learned that she was disabled. JA313-JA315. *See O'Rourke v. Tiffany & Co.*, 988 F.3d 23, 25 (1st Cir. 2021) (employer cannot take an adverse employment action "because of" an employee's disability unless the employer "has knowledge of that disability").

Perhaps recognizing this reality, Dr. Menninger argues (at 44) that there were **multiple** potential adverse employment actions submitted to the jury, only one of which was PPD's imposition of increased public-facing duties in December 2017. Latching on to the district court's seemingly broad instruction that "PPD's creation of new goals and expectations for her role as executive director" could be an adverse action, Dr. Menninger now claims (at 43-44) that the jury could have determined that PPD took an adverse employment action against her when, after learning of her disability, PPD demanded that she "prevent all further errors in the lab," which PPD "knew was impossible." This argument is wrong.

The "new goals and expectations for [Dr. Menninger's] role" referenced in the court's adverse-action instruction referred specifically to the increased public-facing duties initially discussed at the December 2017 meeting and further elaborated, at Dr. Menninger's request, in Mr. Mekerri's February 2018 e-mail. The theory that PPD imposed these purportedly "new" "expectations" of increased public speaking and client interaction as a way of making Dr. Menninger's job harder was the **only** theory of adverse action that the court allowed to go to the jury—and in its

summary-judgment opinion, the court even noted that the jury might reject the claim on causation grounds.  JA76-77 & n.15.  If the court contradicted itself by later permitting Dr. Menninger to argue to the jury that anything other than her increased public-facing duties (such as stricter lab standards) constituted a "new goal[] or expectation[]," as Dr. Menninger now contends, that was error.  As this Court has said, "[a]llowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on the theories actually pled." *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016).  Therefore, because the only adverse employment action properly submitted to the jury on Dr. Menninger's disparate-treatment claim predated PPD's knowledge of her disability, this claim must fail as a matter of law.

## II.    DR. MENNINGER'S BRIEF CONFIRMS THAT THE COURT'S "READER" INSTRUCTION WAS ERRONEOUS IN CONTEXT AND ALMOST CERTAINLY PREJUDICIAL.

Dr. Menninger barely bothers to defend the critical instructional error committed by the district court:  telling the jury that a "reader"—the term the jury repeatedly heard Dr. Menninger use to refer to a surrogate employee—could be a reasonable accommodation.  JA1759.  This erroneous instruction certainly could have affected the result of the jury's deliberations—the low bar PPD must clear to demonstrate prejudice.

A.    **Dr. Menninger's Waiver Argument Is Itself Waived and Is Wrong in Any Event.**

Ironically, Dr. Menninger now contends (at 45-47) that PPD failed to preserve its claim that the district court gave an inaccurate "reader" instruction notwithstanding PPD's express challenge to including the "reader" language at the charge conference. But Dr. Menninger made no waiver argument in her post-trial briefs, nor did the district court find that PPD waived its instructional-error argument.

An argument "not directly raised before the district court"—even an argument that an opposing party has itself committed waiver—is waived on appeal. *See United States v. Tiru-Plaza*, 766 F.3d 111, 118 n.12 (1st Cir. 2014). Appellees "waive[] their waiver argument" when they fail to raise waiver below. *See Rivera-Carrasquillo v. Centro Ecuestre Madrigal, Inc.*, 812 F.3d 213, 233 n.32 (1st Cir. 2016). That well-established rule bars Dr. Menninger's waiver argument here.

Dr. Menninger had every opportunity to argue that PPD waived its objection when PPD challenged the reader instruction in its post-trial motions. Yet at no point in her forty-page opposition brief did she suggest that PPD needed to revisit its objection after the district court refused to remove the reference to "reader" and merely proposed additional terms. JA1949. Nor did the district court find PPD's argument waived. Add28-Add30. This Court should therefore decline to address

Dr. Menninger's waiver argument.  *See Rivera-Carrasquillo*, 812 F.3d at 233 n.32;

*Tiru-Plaza*, 766 F.3d at 118 n.12.

Regardless, PPD did not waive its claim of instructional error.  In *Booker v.*

*Massachusetts Department of Public Health*, 612 F.3d 34, 41 (1st Cir. 2010), the

sole case on which Dr. Menninger relies (at 45), the district court implicitly agreed

with the plaintiff's initial objection to a proposed jury instruction and modified the

instruction accordingly.  *Id.*  Because the plaintiff "did not voice any further

objection," the Court found any claim of error forfeited, because a party may not

"preserve a claim of error by objecting to a tentative instruction at the precharge

conference, but then failing to object after the instruction is modified to

***accommodate the initial objection***."  *Id.* at 41-42 (emphasis added).

Here, however, the district court ***disagreed*** with PPD's objection to the

proposed instruction:   PPD explained that the term "reader" in 42 U.S.C.

§ 12111(9)(B) does not "refer to the type of reader that Dr. Menninger was

requesting" but instead refers to someone who reads to a person whose vision is

impaired. JA1685.  The court, however, insisted that a "reader" "in [the] sense that

[Dr. Menninger] was asking for" might still "be a reasonable accommodation," and

refused to remove the word.  JA1686.  After rejecting PPD's statutory interpretation

argument, the court offered to "potentially" include the phrase "or interpreters" after

"readers" and an additional sentence suggesting that whether an accommodation is

"reasonable" is "based upon [the jury's] consideration of all the surrounding circumstances." *Id.* PPD's counsel did not concede that such additions would cure the legal error, only that they "might be helpful." *Id.* Based on that exchange, and unlike in *Booker*, PPD did not need to further preserve its objection. *Cf. Booker*, 612 F.3d at 42. But even if PPD waived its claim of instructional error, PPD is still entitled to a new trial because the "reader" instruction was plainly misleading and prejudicial. *See Chestnut*, 305 F.3d at 20-21 (unpreserved instructional errors are reviewed for plain error).

### B. The District Court Committed Instructional Error Because A "Reader" in the Sense Used Throughout Trial Is Not a Reasonable Accommodation, and Dr. Menninger Cites No Authority to Suggest Otherwise.

Although Dr. Menninger contends that the "reader" instruction was neither erroneous nor misleading, she spends barely any time explaining why, and she cites virtually no legal authority to support her argument. Indeed, she does not even dispute that (1) a superficially legally correct instruction can be misleading in the context of the evidence at trial; (2) "reader" was used throughout trial exclusively to mean a "surrogate" employee; (3) the jury was instructed that providing a "reader" can be a reasonable accommodation; (4) "reader" in the statute on which the instruction relied refers to something totally different from a "surrogate" employee; and (5) providing a surrogate employee is not a reasonable accommodation. Instead, Dr. Menninger resists the conclusion that logically follows from these premises by

arguing only (at 47-49) that additional language in the instruction made it not misleading and that, regardless, the jury could have legitimately concluded that a "reader" was reasonable.  Dr. Menninger's arguments are wholly unconvincing.

First, that the instruction stated that a "reader" could be reasonable "***depending on the circumstances***" misses the point.  *See* Menninger Br. at 47-48; JA1824.  The word "reader" in 42 U.S.C. § 12111(9)(B) refers to something or someone that reads words to an employee with impaired vision.  *See Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 799 (10th Cir. 2020); *Cox v. Corr. Med. Servs., Inc.*, 2007 WL 2873049, at *9 (E.D. Mich. Sept. 26, 2007).  Dr. Menninger is not vision impaired, and she did not ask PPD to provide a program or person to read words to her that she could not discern herself.  Rather, she asked for something else completely:  another employee to interact with clients in her stead, which is *per se* unreasonable.  *See Sarkisian v. Austin Prep. Sch.*, 85 F.4th 670, 677 (1st Cir. 2023); *Jones*, 679 F.3d at 20.  Thus, while a "reader" accommodation may indeed be reasonable in some circumstances, none existed here.  *See Drumgold v. Callahan*, 707 F.3d 28, 53 (1st Cir. 2013) (legally accurate instruction was misleading because it described an issue not properly implicated by the evidence).

Next, it is no cure that the instruction further stated, correctly, that an accommodation is not reasonable if it would require the employer to "eliminate" essential functions or "shift[]" them "to other employees."  *See* Menninger Br. at 48;

JA1824.  A jury that understood the earlier part of the instruction to mean that Dr. Menninger's requested "reader" was a reasonable accommodation could have erroneously understood this additional language to merely clarify that a "reader" does not entail assigning essential functions to another employee.  *See Hill v. Maloney*, 927 F.2d 646, 653 (1st Cir. 1990) (additional, correct instructional language did not cure other incorrect instructional language where the two were not logically inconsistent).  The additional language Dr. Menninger cites does not ameliorate the court's initial instructional error.  *See id.*

Finally, it is a non-sequitur to say that the jury could have found Dr. Menninger's requested "reader" to be reasonable because accommodations are "need specific, not disability specific."  Menninger Br. at 48-49.  Regardless of a disabled employee's "need," hiring someone else to do the disabled employee's job is not a reasonable accommodation.  *See Sarkisian*, 85 F.4th at 677; *Jones*, 679 F.3d at 20.  Dr. Menninger is simply incorrect that the jury could have reasonably concluded otherwise.

## C.    Dr. Menninger Does Not Meaningfully Dispute That the Instructional Error Was Prejudicial.

As PPD explained (at 47-48), it is not hard to show that the instructional error was prejudicial:  PPD must show only that the erroneous "reader" instruction ***could have*** changed the outcome.  *See Costa-Urena v. Segarra*, 590 F.3d 18, 26 (1st Cir. 2009).  Yet Dr. Menninger devotes just a handful of sentences (at 49) to addressing

prejudice. She relies (at 49) on a cherry-picked quote from the district court's post-trial opinion to argue that the case "did not hinge, entirely or even significantly, on whether Menninger was entitled to have a 'reader' make presentations on her behalf." Yet the court acknowledged that the basis for that statement was merely its own Ctrl+F "word search of the parties' closing arguments" for the word "readers." Add29. And Dr. Menninger conspicuously ignores that the court *also* concluded that "the evidence adduced at this trial could have permitted a jury to make different findings and reach different conclusions than this jury did," Add34—all but confirming that, had the jury been properly instructed, its verdict certainly could have been different.

In trying to downplay the significance of the "reader" instruction, Dr. Menninger conveniently ignores that her counsel, who collaborated with Dr. Kessimian to develop Dr. Menninger's accommodation proposal, which introduced the term "reader" to describe a surrogate employee, JA956, JA959, JA981, was also the one who requested that the court's instruction include "qualified readers" as an example of a "reasonable accommodation"; and he expressly encouraged the jury during his closing argument to compare Dr. Kessimian's "reader" request to the "reader" instruction, JA1759-1760. Her counsel's focus on the word belies any assertion now that it was irrelevant.

The "reader" instruction was central to Dr. Menninger's case, and without it, the jury *could have* returned a different verdict—which is all that is required for a new trial. *See Costa-Urena*, 590 F.3d at 26. Properly instructed, the jury easily could have found that Dr. Menninger was not "qualified," as the erroneous instruction effectively stated that PPD denied a "reasonable accommodation" that would have enabled her to perform her essential job functions.

Further, a properly instructed jury could have had a completely different view of Dr. Menninger's retaliation claim. As Dr. Menninger's brief (at 62) makes clear, her entire theory of retaliation was that PPD attempted to force her out rather than accommodate her disability. Yet PPD had no duty to accommodate her disability, because no reasonable accommodation would have enabled her to perform her essential job functions. Had the "reader" instruction not distorted this fact, the jury may very well have returned a retaliation verdict in PPD's favor also.

In short, Dr. Menninger does not meaningfully dispute that the verdict might have been different in all respects without the misleading "reader" instruction.

## III.   DR. MENNINGER OVERLOOKS PPD'S GOOD-FAITH EFFORTS TO ACCOMMODATE HER DISABILITY AND FAILS TO ADDRESS THE INFLUENCE OF THE "READER" INSTRUCTION ON THE PUNITIVE-DAMAGES AWARD.

Although Dr. Menninger spends several pages in her brief recounting PPD's supposed maltreatment of her and its witnesses' unconvincing trial testimony, she completely overlooks this Court's precedent: "[G]eneral insensitivity," "troubling

evidence," and "implausible testimony" do not necessarily "provide a basis for concluding that the particular conduct found actionable by the jury was committed in the face of a perceived risk that the action will violate federal law," which is necessary to support a punitive-damages award. *Tobin v. Liberty Mut. Ins.*, 553 F.3d 121, 149 (1st Cir. 2009) (cleaned up).  Punitive damages must be supported by evidence that the defendant's conduct was "outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Dartt v. Browning-Ferris Indus.*, 427 Mass. 1, 17 (1998).  That evidence is lacking here, and Dr. Menninger does not even contest the issues most relevant to the jury's punitive-damages award, which require that the award be set aside.

Dr. Menninger concedes that PPD (1) accommodated her disability by agreeing to reduce her travel obligations and eliminate her responsibility for delivering internal presentations; (2) engaged in an extended back and forth with her and her psychiatrist to determine her limitations; (3) offered her another position that did not require client interaction; (4) allowed her to take several months of paid medical leave, and (5) terminated her employment only when she said she would not return to work.  And perhaps most critically, Dr. Menninger admits (at 54) that the district court found that PPD "fulfilled its obligation to engage in the interactive process."  These undisputed facts demonstrate why punitive damages are legally unsupportable.  *See* 42 U.S.C. § 1981a(a)(3) ("[D]amages may not be awarded under

this section where the [employer] demonstrates good faith efforts . . . to identify and make a reasonable accommodation"); *Russell v. Cooley Dickinson Hosp.*, 437 Mass. 443, 452, n.6 (2002) ("We look to the Federal cases decided under the ADA as a guide to the interpretation of [Massachusetts disability-discrimination law].").

Moreover, Dr. Menninger fails to address the most likely reason why the jury awarded $10 million in punitive damages: the "reader" instruction. Telling the jury that a reasonable accommodation includes the provision of a "reader" (the precise word Dr. Kessimian used to describe her request) fundamentally altered how jurors perceived PPD's conduct. Dr. Menninger's entire defense (at 52-53) of the punitive-damages award relies on evidence that PPD "coerce[d] [her] to quit, manufactured false grounds for [her] termination, and established new goals and expectations for [her] role that PPD knew were impossible," and then performed a "sham" investigation into her complaints. Yet the only way that such actions could fairly be described as "outrageous" or "recklessly indifferent to Dr. Menninger's rights" is if PPD refused an accommodation that it was legally bound to grant. But PPD did no such thing, because a "reader" accommodation, in the sense that Dr. Menninger used it, is unreasonable as a matter of law.

Properly understood, the evidence was overwhelming that Dr. Menninger could not, even with a reasonable accommodation, perform the client-facing tasks that PPD required of her without jeopardizing her health, and that she was therefore

not "qualified."   Yet Dr. Menninger, aided by the court's instructional error, obscured this point by equating her unreasonable surrogate request with an ambiguous statutory term that refers to a reasonable accommodation for blind people.  Had the jury understood this, it very likely would have viewed differently the entire course of PPD's interactions with Dr. Menninger and credited PPD's belief that it was acting in compliance with the law.  *See McDonough v. City of Quincy*, 452 F.3d 8, 24 (1st Cir. 2006) ("malice and reckless indifference," for purposes of punitive damages under the ADA, "concern . . . the employer's knowledge that it is acting in violation of federal law"); *Bain v. City of Springfield*, 424 Mass. 758, 767 (1997) (punitive damages are appropriate "where a defendant's conduct warrants condemnation and deterrence").   Where an employee's disability is such that no reasonable accommodation would allow them to perform their job, an employer's efforts to find alternative employment for them—an "exit strategy"—are perfectly legal.  They may even be properly seen as compassionate.  But the misleading instruction—effectively declaring that Dr. Menninger ***could*** do her job with a reasonable accommodation, but that PPD refused to provide it—afforded the jury only one way of perceiving PPD's conduct:  as callous, malicious, and in reckless disregard of Dr. Menninger's rights.  Punitive damages were therefore a foregone conclusion.  And though Dr. Menninger need not have shown that her "reader" request was a reasonable accommodation to prevail on her retaliation claim, it was

almost certainly the mistaken belief that such request was reasonable which permitted the jury to perceive PPD's actions as deserving punishment.

Even assuming that the reader instruction was not reversible error, and that a jury ***could*** find that PPD violated Dr. Menninger's rights, that would be, at most, a very close call, not the kind of egregious conduct that warrants punitive damages. The law ***requires*** an employer to engage in an interactive process to seek a mutually agreeable way to accommodate an employee's disability. Even if this legally required process is too much stress for a particularly unstable employee to take, as Dr. Menninger's doctor testified was the case with her, JA989-JA990, the law does not permit punitive damages based on that legally required conduct.

None of the cases that Dr. Menninger cites in support of punitive damages are remotely factually analogous, as none involves an employer who reasonably, let alone ***correctly***, believed that a disabled employee was not "qualified." *See Burnett v. Ocean Props., Ltd.*, 987 F.3d 57, 70 (1st Cir. 2021) (employer "never responded to [employee's] request for an accommodation"); *Handrahan v. Red Roof Inns, Inc.*, 43 Mass. App. Ct. 13, 17-18 (1997) (undisputed that plaintiff was qualified and employer fired plaintiff for failing to adhere to company policy that was never enforced until after employer learned of plaintiff's disability); *Gyulakian v. Lexus of Watertown, Inc.*, 475 Mass. 290, 305 (2016) (employer completely failed to investigate substantiated claims of sexual harassment); *Zimmerman v. Direct Fed.*

*Credit Union*, 262 F.3d 70, 82 (1st Cir. 2001) (evidence showed that employer "abas[ed] [plaintiff], isolat[ed] her from her colleagues, and degrad[ed] her professionally" after she complained of discrimination); *Bell v. O'Reilly Auto Enters.*, 626 F. Supp. 3d 141, 174–76 (D. Me. 2022) (employer repeatedly rejected reasonable requests for an accommodation). Dr. Menninger cites no case, and PPD is aware of none, where an employer took actions like PPD's and yet was found to warrant condemnation and deterrence. Affirming the punitive-damages award would therefore create a new, more onerous standard of conduct for employers far beyond what the ADA and Massachusetts law requires. In sum, because the jury's punitive-damages award is unsupported by the evidence under the proper legal standard, and very likely the result of the district court's erroneous "reader" instruction, that award should be stricken.

## <u>CONCLUSION</u>

PPD is entitled to judgment as a matter of law on Dr. Menninger's discrimination claims. The Court should vacate the judgment below and remand for a new trial on Dr. Menninger's retaliation claim. Alternatively, it should strike the award of punitive damages as legally unsupported.

Dated: July 23, 2024                    Respectfully submitted,


                                        /s/ Douglas Hallward-Driemeier
                                        Douglas Hallward-Driemeier (BBO #627643)
                                        Douglas.Hallward-Driemeier@ropesgray.com
                                        ROPES & GRAY LLP
                                        2099 Pennsylvania Avenue NW
                                        Washington, DC 20006
                                        T: (202) 508-4776
                                        F: (202) 508-4650

                                        John Bueker (BBO #636435)
                                        John.Bueker@ropesgray.com
                                        ROPES & GRAY LLP
                                        800 Boylston Street
                                        Boston, MA 02199
                                        T: (617) 951-7951
                                        F: (617) 961-7050

                                        *Attorneys for Defendant-Appellant PPD
                                        Development, L.P.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 6,497 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


 Dated: July 23, 2024                  /s/ Douglas Hallward-Driemeier

                                       *Attorney for Defendant-Appellant*
                                       *PPD Development, L.P.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 23, 2024, a copy of the foregoing was electronically filed with the United States Court of Appeals for the First Circuit by using the Court's CM/ECF system and will be sent electronically to the registered participants.


Dated: July 23, 2024                  <u>/s/ Douglas Hallward-Driemeier</u>

*Attorney for Defendant-Appellant*
*PPD Development, L.P.*